SCOTT ALEXANDER WARREN  
DELVECCHIA vs FRONTIER AIRLINES  
December 13, 2019  
1–4

### Page 1

```
 1            UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF NEVADA
 3
     PETER DELVECCHIA, et al.,
 4
              Plaintiffs,
 5
         vs.         CASE NO. 2:19-CV-01322-KJD-NJK
 6
     FRONTIER AIRLINES, INC., et al.,
 7
              Defendants.
 8   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 9
10                   DEPOSITION OF
11                SCOTT ALEXANDER WARREN
12
13                 December 13, 2019
14                     10:09 a.m.
15
16              9950 West Cheyenne Avenue
                    Las Vegas, Nevada
17
18
19
20          Gary F. Decoster, CCR No. 790
21
22
23
24
25
```

### Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3   For the Plaintiffs:
 4              PARK AVENUE LAW LLC
                JOHN D. McKAY, ESQ.
 5              127 West Fairbanks Avenue
                Suite 519
 6              Winter Park, Florida  32789
                800.391.3654
 7              johndmckayatty@gmail.com
 8
 9   For the Defendants:
10              ADLER MURPHY & McQUILLEN LLP
                BRIAN T. MAYE, ESQ.
11              20 South Clark Street
                Suite 2500
12              Chicago, Illinois  60603
                312.345.0700
13              312.345.9860  Fax
                bmaye@amm-law.com
14
15   Also Present:  PETER DELVECCHIA
16                  MONICA HAYWORTH, VIDEOGRAPHER
```

### Page 3

```
 1                 INDEX OF EXAMINATION
 2
 3   WITNESS:  SCOTT ALEXANDER WARREN
 4
 5   EXAMINATION                                    PAGE
 6   By Mr. McKay                                     5
 7   By Mr. Maye                                     --
 8

15                   INDEX TO EXHIBITS
16                                                Initial
     Plaintiffs'       Description              Reference
17
18   Exhibit 1  Plaintiffs' Notice of Deposition     9
                of Scott Warren
19
     Exhibit 2  Employee performance record         90
20
     Exhibit 3  Employee training record            98
21
     Exhibit 4  LVMPD Voluntary Statement           99
22
     Exhibit 5  E-mail to Jason B. Grimes from     120
23              Scott Warren dated April 17, 2019
```

### Page 4

```
 1       Video Deposition of Scott Alexander Warren
 2                    December 13, 2019
 3             (Exhibits 1 through 5 marked.)
 4                       *  *  *
 5       THE VIDEOGRAPHER: This is Media No. 1 to the
 6   video recorded deposition of Scott Warren in the
 7   matter of Peter Delvecchia, et al., versus Frontier
 8   Airlines, Incorporated, et al., being heard before the
 9   United States District Court for the District of
10   Nevada, Case No. 2:19-CV-01322-KJD-NJK.
11       This deposition is being held at Titolo Law
12   Office, 9950 West Cheyenne Avenue, Las Vegas, Nevada,
13   starting at 10:09 a.m.
14       My name is Monica Hayworth, and I'm the
15   videographer. The court reporter is Gary Decoster
16   with Esquire Deposition Solutions.
17       Counsel, will you please introduce
18   yourselves, and affiliations, and the witness will
19   then be sworn.
20       MR. MCKAY: My name is John McKay. I am the
21   counsel for the plaintiffs, Peter Delvecchia and A.D.
22       MR. MAYE: Brian Maye for Frontier Airlines.
23       THE VIDEOGRAPHER: Thank you.
24       THE COURT REPORTER: Sir, would you raise
25   your right hand?
```



Page 49

1  confirm, you were assigned to be the B flight
2  attendant?
3     A.  Yes.
4     Q.  Okay. Tell me what the B is responsible for.
5     A.  Primarily the B makes the announcements
6  during boarding as far as welcome aboard, this is
7  flight whatever going to whatever city. The B reads
8  the safety demonstration as the others perform it.
9        On this particular flight the B prepares the
10 beverage carts, because they're all in the back on a
11 320, on this particular 320, and the B makes the
12 announcements as we begin our descent.
13    Q.  Okay. Is -- do you get a portion of the
14 aisles to provide -- I'm sorry, not aisles, rows to
15 provide service to as well?
16    A.  Yes, the B and the D will do the, what we
17 say, the back half, but it's not half; we'll do the
18 exit rows back.
19    Q.  Okay. And the D in this case was Amanda
20 Nichol; is that right?
21    A.  I don't recall who the D was.
22    Q.  All right. Had you ever worked with the D
23 before this flight?
24    A.  I don't remember ever working with her
25 before.

Page 50

1     Q.  Okay. How about the A and the C, had you
2  worked with them before?
3     A.  I had flown with Anna before. The other
4  lady, I don't recall working with her.
5     Q.  Okay. How many times had you flown with Anna
6  Bond?
7     A.  Once before.
8     Q.  Okay. Did you all communicate, you know,
9  socially at all?
10    A.  No.
11    Q.  Okay. At what point did you notice -- and
12 we're starting now from the time that you showed up to
13 work 50 minutes before the scheduled departure time --
14 at what point did you start to be aware of Peter
15 Delvecchia and his son?
16    A.  I noticed that -- shortly after boarding was
17 complete, I noticed they were being moved out of the
18 exit row.
19    Q.  All right. Are you sure that boarding was
20 complete at that point?
21    A.  Yes, because that's when the C goes to brief
22 the exit rows, once boarding is complete.
23    Q.  Okay. C doesn't do that prior?
24    A.  No.
25    Q.  Okay. So, okay, so boarding is complete, the

Page 51

1  C has gone to the exit rows, and then did you observe
2  her doing this?
3     A.  No, I wasn't looking at her, no.
4     Q.  Okay. And that was Anna Bond on this flight,
5  right?
6     A.  I believe she was the C, yeah.
7     Q.  Okay. So if you weren't watching her brief
8  the exit rows, how were you aware of Peter and his
9  son?
10    A.  I saw them stand up.
11    Q.  Okay. And did you know what was happening
12 when you saw them stand up?
13    A.  No, I did not know exactly, but usually when
14 the C briefs the exit row, then people stand up,
15 usually someone has to be moved for some reason.
16    Q.  Okay. And what are the reasons that somebody
17 gets moved?
18    A.  Some reasons would be under the age of 15,
19 not an English speaker, they may have a cast or a neck
20 brace on.
21    Q.  Okay, so that it would be dangerous for them
22 to assist?
23    A.  Yes.
24    Q.  Okay. And when you saw Peter and his son
25 stand up, what was going through your mind?

Page 52

1        MR. MAYE:  Object to form.
2        THE DEPONENT:  They must be age or language
3  barrier.
4  BY MR. MCKAY:
5     Q.  Okay. Did you think one or the other?
6     A.  No.
7     Q.  Okay. You did notice that Peter was white
8  and his son was black, right?
9        MR. MAYE:  Object to form.
10 BY MR. MCKAY:
11    Q.  Did you notice the races of Peter and his
12 son?
13    A.  Yes.
14    Q.  Okay. And what did you think about that?
15       MR. MAYE:  Object to form.
16       THE DEPONENT:  I didn't think anything of it.
17 BY MR. MCKAY:
18    Q.  Okay, but you thought that they were father
19 and son?
20    A.  I didn't think about that.
21    Q.  All right. You didn't think about what
22 combination of people they might be?
23    A.  No, like I said, I just saw them, it must be
24 either language or age.
25    Q.  Okay. What happened next?



### Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                    DISTRICT OF NEVADA
 3
 4   PETER DELVECCHIA, et al,        )
                                     )
 5        Plaintiff,                 )
                                     )
 6        vs.                        ) CASE NO. 2:19-CV-01322-KJD-NJK
                                     )
 7   FRONTIER AIRLINES, INC., et al, )
                                     )
 8        Defendants.                )
                                     )
 9   _____)
10
11
12
13
14
15
16
17
18
19            DEPOSITION OF ANNA BOND
20        Taken on Tuesday, December 10, 2019
21              At  1:37 p.m.
22              At Titolo Law Office
23             9950 West Cheyenne Avenue
24                Las Vegas, Nevada
25   REPORTED BY: SHIFRA MOSCOVITZ, CCR NO. 938
```

### Page 2

```
 1   APPEARANCES:
 2   For Plaintiffs:
 3                JOHN D. MCKAY, ESQ.
                  PARK AVENUE LAW
 4                127 W. Fairbanks Avenue
                  #519
 5                Winter Park, Florida
                  (800)391-3654
 6
 7
 8   For Plaintiffs:
 9                TIM TITOLO
                  TITOLO BRAIN AND INJURY LAW
10                9950 W. Cheyenne Avenue
                  Las Vegas, Nevada 89129
11                (702)869-5100
12
13
14   For Defendants:
15                BRIANE T. MAYE, ESQ.
                  ADLER MURPHY & MCQUILLEN LLP
16                20 South Clark Street
                  Suite 2500
17                Chicago, Illinois 60603
                  (312)345-0700
18
19
20
21   Also Present:  MONICA HAYWORTH, VIDEOGRAPHER
                    PETER DELVECCHIA
22
23
24
25
```

### Page 3

```
 1                      EXAMINATION
 2   WITNESS:                                      PAGE
     Anna Bond
 3
 4   Examination by
     Mr. McKay                                    4,105
 5
     Mr. Maye                                      103
 6
 7
 8
 9                        EXHIBITS
10   EXHIBIT                                       PAGE
11   Exhibit 1    Notice of Deposition              9
12   Exhibit 2    Copies of Text Messages          11
13   Exhibit 3    Record of all the Training       33
14   Exhibit 4    In-Flight Flyer                  34
15   Exhibit 5    In-Flight Must Reads             34
16   Exhibit 6    Flight Attendant Manual          34
17   Exhibit 7    Flight Attendant's Statement     91
18   Exhibit 8    Email From Jason B. Grimes       91
```

### Page 4

```
 1         LAS VEGAS, NEVADA; DECEMBER 10, 2019
 2                    1:37 P.M.
 3                     -oOo-
 4   (NRCP Rule 30(b)(4) waived by the parties prior to the
 5   commencement of the deposition.)
 6   (FRCP Rule 30(b)(5) waived by the parties prior to the
 7   commencement of the deposition.)
 8   Thereupon--
 9             ANNA BOND,
10   was called as a witness, and having been first duly sworn,
11   was examined and testified as follows:
12                    EXAMINATION
13   BY MR. MCKAY:
14        VIDEOGRAPHER: Okay, this is media number
15   one to the video recorded deposition of Anna
16   Bond in the matter of Peter Delvecchia, et al.
17   versus Frontier Airlines, Incorporated, et al.
18   Being heard before the United States District
19   Court, for the District of Nevada, case number
20   2:19-cv-01322-KJD-NJK. This deposition is
21   being held at Titolo Law Office, 9950 West
22   Cheyenne Avenue, Las Vegas, Nevada, starting
23   1:37 p.m. My name is Monica Hayworth and I am
24   the videographer. The court reporter is Shifra
25   Moscovitz with Esquire Deposition Solutions.
```



Page 41

1   MR. MAYE: Object to form.
2   A. Not when it's a full flight, the customer
3   service agents try to keep the back row empty, but
4   it is not always like that.
5   Q. Okay. So you got some people to switch
6   with them, the people came from row 17. And so
7   Peter and AD went back to row 17, right?
8   A. Yes.
9   Q. All right. Did anything unusual happen at
10  that point?
11  A. No.
12  Q. Okay. So everything looked fine from that
13  point on?
14  A. Yes.
15  Q. Okay. So the only thing that was of
16  concern to you was the fact that AD had looked at
17  Peter before giving his age?
18      MR. MAYE: Object to form.
19  A. At that time, it didn't occur to me it was
20  a weird behavior, it kind of seemed strange, but I
21  didn't take anything of it. So later on it kind of
22  clicked in my head that that was a really strange
23  behavior.
24  Q. In what context?
25  A. What do you mean, sorry?

Page 42

1   Q. Well, you said that at the time it
2   happened it didn't even register, right?
3   A. Well, at the time it was weird, I did see
4   something off, but it didn't really, it wasn't
5   enough for me to go tell the rest of the flight crew
6   what he just did.
7   Q. Okay. Now, as you look at, let me take
8   you through your briefing first, you went back to
9   the exit row, row 13 to brief the passenger seated
10  there, right?
11  A. Yes.
12  Q. Is that the only exit row on this
13  airplane?
14  A. 12 and 13.
15  Q. 12 and 13 both. So you were the person
16  that came back and kind of in a raised voice said,
17  hey, everybody in rows 12 and 13, I need your
18  attention, right?
19  A. Yes.
20  Q. Did you do that?
21  A. No.
22  Q. Oh.
23  A. I had moved them before briefing.
24  Q. I see. So before you even did the
25  briefing, you noticed that he appeared to be younger

Page 43

1   than 15?
2   A. Yes.
3   Q. Okay. And so right away you said
4   something like young man, how old are you?
5   A. Yes.
6   Q. Okay. He looked at his father for a
7   second and then said to you, I am 12?
8   A. Yes.
9   Q. So then you reseated them, and then you
10  did your briefing?
11  A. Yes.
12  Q. So you didn't have any interaction with
13  the other passengers in 12 and 13?
14  A. Not at that time.
15  Q. Okay. Where was Peter seated in 13?
16  A. He was sitting in 13 Echo.
17  Q. So that is the middle seat on aircraft
18  right?
19  A. Yes.
20  Q. And where was AD seated?
21  A. Thirteen Delta.
22  Q. Okay. The aisle seat?
23  A. Yes.
24  Q. Who was in 13 Foxtrum?
25  A. I don't recall.

Page 44

1   Q. Do you recall whether that was a white
2   person or black person?
3   A. I don't recall.
4   Q. Do you recall whether AD was a white
5   person or a black person?
6   A. I believe he is black.
7   Q. And what about Peter?
8   A. He is white.
9   Q. Okay. So you remember seeing a white man
10  and a black child?
11  A. I saw this, yes, physically, yes.
12  Q. Okay. And you thought it was odd when the
13  black child looked at the white male?
14      MR. MAYE: Object to form.
15  A. I didn't find it odd that any race, that
16  didn't really occur to me, it was just a boy and a
17  man. And the boy looked like he was asking
18  permission to talk.
19  Q. Okay. But that's not something that
20  really clicked you said until later?
21  A. Yes.
22  Q. How much later?
23      MR. MAYE: I am sorry, object to form.
24  She said that she did.
25      MR. MCKAY: Object to form was great.



AMANDA L. NICKEL
DELVECCHIA Vs. FRONTIER AIRLINES

December 11, 2019
1–4

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF NEVADA
 3
 4   PETER DELVECCHIA, et al.,
 5        Plaintiffs,
 6     vs.                      CASE NO.
                             2:19-CV-01322-KJD-NJK
 7   FRONTIER AIRLINES, INC.,
     et al.,
 8
          Defendants.
 9   _____
10
11
12
13            VIDEOTAPED DEPOSITION OF
14               AMANDA LEE NICKEL
15
16          Wednesday, December 11, 2019
17                  9:01 a.m.
18
19            9950 West Cheyenne Avenue
20                Las Vegas, Nevada
21
22       Judith Payne Kelly, RMR, CCR-539
23
24
25
```

**Page 2**

```
 1              APPEARANCES OF COUNSEL
 2
 3
     For the Plaintiffs:
 4
          JOHN D. McKAY, ESQ.
 5        Park Avenue Law, LLC
          127 West Fairbanks Avenue
 6        Box 519
          Winter Park, Florida   32789
 7        800.391.3654
          parkavelaw@gmail.com
 8
 9   For Defendant Frontier Airlines:
10        BRIAN T. MAYE, ESQ.
          Adler Murphy & McQuillen, LLP
11        20 South Clark Street
          Suite 2500
12        Chicago, Illinois   60603
          312.345.0700
13        bmaye@amm-law.com
14
     Also Present:
15
          MONICA HAYWORTH, VIDEOGRAPHER
16        PETER DELVECCHIA
17
18                 * * * * *
19
20
21
22
23
24
25
```

**Page 3**

```
 1              INDEX OF EXAMINATION
 2
 3   Witness                                    Page
 4   AMANDA LEE NICKEL
 5   EXAMINATION
 6   By Mr. McKay                                  5
 7   By Mr. Maye                                 130
 8   By Mr. McKay                                134
 9
10
11
12              INDEX TO EXHIBITS
13
14   Exhibit           Description             Page
15   Exhibit 1   Summary of training, 19AZF0229  34
                 DELVECCHIA FRONTIER 203
16
     Exhibit 2   Las Vegas Metropolitan Police   34
17               Department Voluntary Statement,
                 19AZF0229 DELVECCHIA FRONTIER 0120
18               and 0121
19
20
21
22
23
24
25
```

**Page 4**

1   Deposition of AMANDA LEE NICKEL
2       December 11, 2019
3
4       THE VIDEOGRAPHER: This is Media No. 1 to the
5   video-recorded deposition of Amanda Nickel in the
6   matter of Peter DelVecchia versus Frontier Airlines,
7   Incorporated, being heard before the United States
8   District Court for the District of Nevada, Case
9   No. 2:19-CV-01322-KJD-NJK.
10      This deposition is being held at Titolo Law
11  Office in Las Vegas, starting at 9:01 a.m. My name is
12  Monica Hayworth, and I'm the videographer. The court
13  reporter is Judy Kelly, with Esquire Deposition
14  Solutions.
15      Counsel, will you please introduce yourselves
16  and affiliations, and the witness will then be sworn.
17      MR. McKAY: John McKay of Park Avenue Law for
18  the plaintiffs.
19      MR. MAYE: Brian Maye for Frontier Airlines.
20      THE VIDEOGRAPHER: Thank you.
21  Thereupon,
22      AMANDA LEE NICKEL, having been first duly
23  sworn, was examined and testified as follows:
24  ///
25  ///



800.211.DEPO (3376)
EsquireSolutions.com

EXHIBIT 2

Page 129

1 believe he sat down in the row, but I can't recall.
2  Q.  Okay. Because there were times when you were
3 not observing?
4  A.  He never -- because the other passenger was
5 on the aisle, so I don't -- Scott never sat in the
6 middle of them or anything.
7  Q.  And you're sure of that?
8  A.  To the best of my recollection, yes.
9  Q.  Okay. But there are times when you didn't --
10 when you weren't watching row 31, right?
11  A.  Correct. But I was vigilant of -- or knew
12 where Scott was. I mean, you don't necessarily sit in
13 a row next to a passenger. That's not in our job.
14  Q.  All right. I'm not asking about your
15 specific job at this point. I'm just asking about your
16 observations.
17  A.  And my observations were I don't -- I don't
18 believe Scott was ever sitting in the middle seat.
19  Q.  Okay. But you would agree with me there were
20 times when you were doing your job, as you said, that
21 you were not looking at row 31?
22  A.  I was not looking at 30 -- row 31 every
23 second of the flight.
24      MR. McKAY:  Okay. Those are the only
25 questions that I have today, but I'm just going to

Page 130

1 adjourn because we do have some outstanding discovery
2 issues.
3      THE WITNESS:  What does that mean? I have to
4 come back?
5      MR. MAYE:  No, I don't know what he means --
6      THE WITNESS:  Okay.
7      MR. MAYE:  -- but I do have a few follow-up
8 questions.
9      THE WITNESS:  Okay.
10            EXAMINATION
11 BY MR. MAYE:
12  Q.  You testified earlier that before a decision
13 is made to separate a suspected victim of violence or
14 sexual misconduct, you don't interview those involved
15 or you don't conduct any, you know, investigation
16 involving asking questions of the suspected
17 perpetrator, suspected victim. Is that right?
18      MR. McKAY:  Objection to the form of the
19 question; and no, that was not her testimony.
20  A.  Correct. It is not in our training to
21 question the victim or the perpetrator. We leave that
22 to law enforcement so that we don't try and escalate a
23 situation.
24  Q.  (By Mr. Maye) And when you say "escalate the
25 situation," what do you mean? What could happen if you

Page 131

1 started interviewing the suspected perpetrator?
2      MR. McKAY:  Objection to the form of the
3 question.
4  A.  The perpetrator could get angry; there could
5 be physical violence to other passengers or to crew.
6  Q.  (By Mr. Maye) And why do you separate a
7 suspected victim from the suspected perpetrator on a
8 flight?
9      MR. McKAY:  Objection to the form of the
10 question.
11  A.  For the safety of the victim and other
12 passengers, the -- yeah, for the safety.
13  Q.  (By Mr. Maye) And is that based on your
14 training?
15  A.  Yes.
16  Q.  What about Frontier guidelines and policies?
17  A.  In Frontier's guidelines, you're supposed to
18 separate -- always separate the victim. They tell us
19 specifically you need to -- several rows need to be in
20 between the victim and the perpetrator; we're not
21 supposed to question the victim or the perpetrator,
22 just make the victim comfortable and wait for law
23 enforcement when they land.
24  Q.  And as a flight attendant, can you move the
25 suspected victim without notifying the captain?

Page 132

1      MR. McKAY:  Objection to the form of the
2 question.
3  A.  Actually, in the sexual misconduct training,
4 it says to separate them first and then notify the
5 pilot.
6  Q.  (By Mr. Maye) In this case you didn't do
7 that, right?
8      MR. McKAY:  Objection to the form of the
9 question.
10  A.  Correct.
11  Q.  (By Mr. Maye) You first contacted the
12 captain, correct?
13  A.  Yes.
14      MR. McKAY:  Objection to the form of the
15 question.
16  Q.  (By Mr. Maye) And why did you do that?
17  A.  Because we wanted to make sure we were making
18 the right decision in this case.
19  Q.  When Scott separated A.D. from his father,
20 did you observe the demeanor of Mr. DelVecchia?
21      MR. McKAY:  Objection to the form of the
22 question.
23  A.  I observed that there wasn't any yelling or
24 screaming or any arguing at that time. I noticed the
25 father stand up as the son exited the row. There was a



### Page 133

1 very brief discussion, only a few words spoken at that
2 time, until later when the father came back to the back
3 of the plane to speak to us.
4    Q. (By Mr. Maye) At any point did you observe
5 A.D. crying at all?
6    A. No.
7    Q. What are the potential risks of not
8 separating a potential victim from the suspected
9 perpetrator during a flight?
10       MR. McKAY: Objection to the form -- sorry.
11 Objection to the form of the question.
12    A. There could be continued harassment,
13 touching, continued threat to his safety if we hadn't
14 separated them.
15    Q. (By Mr. Maye) So by separating A.D. from his
16 father, you were removing a potential safety threat to
17 A.D.?
18       MR. McKAY: Objection to the form of the
19 question.
20    A. Yes.
21    Q. (By Mr. Maye) Do you recall if the race of
22 Mr. DelVecchia or the child were -- was relayed to the
23 captain?
24       MR. McKAY: Objection to the form of the
25 question.

### Page 134

1    A. Not that I recall. No race was mentioned of
2 either.
3       MR. MAYE: I have no further questions.
4 Thanks.
5       FURTHER EXAMINATION
6 BY MR. McKAY:
7    Q. You certainly conveyed your unease to the
8 captain, didn't you?
9    A. In what regards to -- in what time when we
10 spoke to the captain?
11    Q. At some point during the flight, you told the
12 captain you were uneasy about the situation of Peter
13 and A.D. traveling together on the plane?
14    A. I relayed to the captain my observations,
15 yes.
16    Q. Which included your unease?
17    A. It included what -- I told him exactly what I
18 had observed.
19    Q. Just as you told the police later in your
20 statement, right?
21    A. Yes.
22    Q. Okay. At no point during the flight did A.D.
23 indicate to you that he was being molested, did he?
24    A. We -- I did not ask him, and he did not say
25 anything in regards to that.

### Page 135

1    Q. So he never stated to you or to another
2 flight attendant, as far as you know, that he was being
3 molested?
4    A. Not that I recall.
5    Q. And no other passenger indicated to you that
6 they observed A.D. being molested by his father?
7    A. I did not question any passengers. It's not
8 our job.
9    Q. So that would be a no?
10    A. It would be that I did not ask any passengers
11 about the incident.
12    Q. Nor did any passengers tell you that they saw
13 that A.D. was being molested?
14    A. None said anything to me, no. It was not
15 discussed.
16    Q. And no flight attendant told you that they
17 had received any statement from a passenger that they
18 saw this alleged molestation occurring?
19    A. They did not say anything to me if they did.
20    Q. So all you have to base your conclusion that
21 this alleged molestation happened was the statement of
22 Scott that he had seen hands inserted between the legs,
23 right?
24       MR. MAYE: Object to form.
25    A. I didn't allege any molestation.

### Page 136

1    Q. (By Mr. McKay) No one said you did.
2    A. You just said "alleged molestation," and I
3 said I did not allege molestation.
4    Q. Okay.
5    A. This was not my decision. This was the
6 captain's decision after we gave him all of our
7 observations.
8    Q. My apologies. It's a difference in
9 terminology.
10       So the conclusion that there had been some
11 molestation, right or wrong, came from the statement by
12 Scott that he had seen something?
13    A. I didn't come to any conclusion.
14       MR. MAYE: Objection. Hold on. Hold on.
15 Object to form.
16       THE WITNESS: I didn't come to any
17 conclusions.
18    Q. (By Mr. McKay) Okay.
19    A. I reported what I saw and I went by the
20 captain's instructions.
21    Q. But you do believe that the sexual misconduct
22 must-read is somehow connected to what happened on
23 Flight 2067?
24    A. I believe -- yes.
25    Q. Okay. Fair enough. All right.

