CAPTAIN REX T. SHUPE  December 04, 2019
DELVECCHIA vs FRONTIER AIRLINES  1–4

Page 1

```
            UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF NEVADA
                        -oOo-

PETER DELVECCHIA, et al.,    )
                             )  Civil No.:
       Plaintiff,            )  2:19-CV-01322-KJD-NJK
                             )
v.                           )
                             )
FRONTIER AIRLINES, INC.,     )
et al.,                      )
                             )
       Defendants.           )
_____  )


        VIDEOTAPED DEPOSITION OF CAPTAIN REX SHUPE
                Taken on December 4, 2109
                      at 8:29 a.m.


                ADVANCED REPORTING SOLUTIONS
                     159 West Broadway
                  Broadway Lofts, Suite 100
                  Salt Lake City, Utah 84101




REPORTED BY:  Michelle Mallonee, RPR, CSR
```

Page 2

```
                      APPEARANCES

For Plaintiff:
     John D. McKay, Esq.
     PARK AVENUE LAW, LLC
     1255 East Logan Avenue
     Salt Lake City, Utah 84105
     (800) 391-3654
     johndmckayatty@gmail.com

For Defendant:
     Tara Shelke, Esq.
     ADLER MURPHY & MCQUILLEN LLP
     20 South Clark Street, Suite 2500
     Chicago, Illinois 60603
     (312) 345-0700
     tshelke@amm-law.com

ALSO PRESENT:
Alyse Largin, Videographer
                        * * *
```

Page 3

```
                       I N D E X
WITNESS                                          PAGE

              CAPTAIN REX SHUPE

Examination by Mr. McKay                            4

Examination by Mr. Shelke                          71








                     E X H I B I T S

                        (None)
```

Page 4

```
                     PROCEEDINGS
                        -oOo-
        THE VIDEOGRAPHER:  This is Media No. 1 in the
recorded video deposition of Rex Shupe, in the matter of
Peter Delvecchia versus Frontier Airlines, being heard
before the U.S. District Court for the District of
Nevada, Case 2:19-cv-01322.
        This deposition is being held at Advanced
Reporting in Salt Lake City, Utah.  Today's date is
December 4th, 2019.  The time is 8:29.
        Will counsel please state who they are and who
they represent.
        MR. MCKAY:  I'm John McKay of Park Avenue Law,
and I represent the plaintiffs, Peter and A.D.
        MS. SHELKE:  I'm Tara Shelke, last name spelled
S-H-E-L-K-E, and I represent Defendant Frontier Airlines.
        THE VIDEOGRAPHER:  Will the court reporter
please swear in the witness.

                       REX SHUPE,
             having been first duly sworn,
           was examined and testified as follows:
                      EXAMINATION
BY MR. MCKAY:
   Q.  Would you state your full name, please.
```



800.211.DEPO (3376)
EsquireSolutions.com

EXHIBIT 3

Page 13
1  flight, so we probably took a break and just took
2  advantage. Because to get set up for bathroom break is
3  a -- you know, it's a little more involved than it used
4  to be. So, yeah.
5      Q. Right. Right.
6      A. We probably -- I can't -- to be honest with you,
7  I can't remember if I went out for a bathroom break. But
8  it makes sense that we probably took advantage of it and
9  took a bathroom break as well.
10     Q. Okay. And I -- I believe you just said you were
11 a couple hours into the flight?
12     A. I believe so, yeah.
13     Q. Okay. Do you recall what time the flight
14 departed from Raleigh --
15     A. No.
16     Q. No. Okay.
17        Do you recall how long the flight is?
18     A. Raleigh to Vegas, depending on the winds, is
19 usually a four, four-and-a-half hour flight.
20     Q. Is this a -- a flight that you make frequently?
21     A. Yeah, we make that one pretty -- pretty often.
22     Q. Okay. Are you based in Las Vegas?
23     A. Based in Las Vegas.
24     Q. All right. Does that mean that a significant
25 number of your flights depart Las Vegas?

Page 14
1      A. Yes.
2      Q. Originate in Las Vegas, I should have said?
3      A. That's right, yeah.
4      Q. Okay. So you have to deadhead up there to start
5  your flights?
6      A. That's correct.
7      Q. Okay. All right. So Chelsie called you, said
8  that she needed to come in --
9      A. Yes.
10     Q. -- to speak with you?
11        Did she say anything else?
12     A. No.
13     Q. Okay. I presume the next thing that happened
14 was that she did enter the cockpit?
15     A. Umm-hmm.
16     Q. You have to say "yes" or "no."
17     A. Yes, sir. Yes.
18     Q. You don't have to say "sir," but you do have to
19 say yes or no.
20     A. Yes.
21     Q. All right. So when Chelsie came into the
22 cockpit, then, she was present, you were present, and
23 First Officer Mullin was present?
24     A. Correct.
25     Q. Okay. What did Chelsie say?

Page 15
1      A. That's when Chelsie mentioned about the --
2  the -- their concern in the back between A.D. and
3  Mr. Delvechh- ...?
4      Q. Delvecchia.
5      A. Delvecchia.
6      Q. Yeah. Now, let me just get into the specific
7  details.
8      A. Okay.
9      Q. You say she mentioned her concern.
10        But what specifically did she say to you?
11     A. Well, she talked about -- you know, and the
12 details are fuzzy. But she talked about she was
13 observing inappropriate touching between the adult and
14 the minor.
15     Q. Okay. And when you say "inappropriate
16 touching," certainly you must remember the details of
17 what she said was inappropriate touching?
18     A. Well, yeah, she mentioned that there was a
19 stroking on the face, and she -- you know, and her tone
20 of voice was such that, yeah, there was -- she was
21 concerned about -- you know, I don't -- she didn't give
22 too many details other than there was touching on the
23 face. She may have -- I don't remember exactly. She may
24 have remembered that -- what Scott had said about there
25 may have been the hand near the crotch area.

Page 16
1      Q. Okay. When she first came in?
2      A. Like I said, I don't remember the --
3  specifically the timeline on what she divulged.
4      Q. Okay.
5      A. But we were talking about -- yeah, the
6  inappropriate touching between the adult and the -- and
7  the minor.
8      Q. And one of the details that she provided to you
9  was this, just -- just from the looks of things, this was
10 an unusual father/son combination, right?
11     A. Well, we didn't -- I didn't even know then that
12 it was a father and son combination.
13     Q. Okay. That it was an unusual couple, let's say,
14 that one was white, one was black?
15     A. No, I didn't know one was white, one was black.
16     Q. You didn't know that at any time?
17     A. Well, when I exited the cockpit towards the end
18 of the flight.
19     Q. Okay.
20     A. Yeah.
21     Q. All right. We'll get to that. But -- all
22 right.
23        So she says that there is a -- a man traveling
24 with a child?
25     A. Yes.



Page 21

1  Q. Okay. And now Chelsie has --
2  A. And --
3  Q. Go ahead.
4  A. And -- and I'm sure we'll get into this, but I
5  also called back and chatted with the other two flight
6  attendants.
7  Q. Okay. Let's start with Chelsie and Scott.
8  A. Okay.
9  Q. And then we'll add the other two.
10      So Chelsie at this point has told you that she
11 was concerned about stroking of the face that she saw --
12 A. Yes.
13 Q. -- correct? Okay.
14     And then Scott comes in, and Scott says what?
15 A. Well, Scott described the -- the hand near the
16 crotch area and how inappropriate it seemed to Scott.
17 Q. What exactly did he say?
18 A. Well, I can't remember exactly what he says.
19 Q. All right.
20 A. But he says that the -- that the hand -- he
21 talked about the -- the inappropriate touching. What --
22 what that constituted for him, I don't -- but he did --
23 he was specific about the hand being near the groin area
24 of the minor.
25 Q. Okay. So it is a hand that is in the vicinity

Page 22

1 of the groin area is what you understood?
2  A. Yes.
3  Q. Okay. He didn't mention that the hand was --
4 was palpating or groping or anything along those lines?
5  A. Those words were not used.
6  Q. Okay. Anything similar to that, grabbing,
7 stroking, anything like that?
8  A. Not that I recall.
9  Q. Okay.
10 A. What I recall was the hand was inappropriately
11 in the -- in the groin/crotch area of the minor.
12 Q. Did he tell you that he observed both the adult
13 and the minor were asleep at the time?
14 A. Not that I recall.
15 Q. So are you saying that he might have and you
16 don't recall, or that he didn't?
17 A. No. It's not on my impression that they were --
18 that he relayed to us that they were asleep.
19 Q. Would that have made a difference to you?
20 A. I don't know.
21 Q. Well, would you -- would you consider that
22 somebody is inappropriate -- is being inappropriate if
23 they were sound asleep and their hand was in the vicinity
24 of somebody's groin?
25 A. Restate that question one more time.

Page 23

1  Q. Well, let me put it this way. If somebody is
2 sound asleep, their actions would be involuntary,
3 correct?
4  A. Correct. Yeah.
5  Q. Okay. So you wouldn't consider that somebody is
6 sexually molesting someone in their sleep?
7  A. Correct.
8  Q. Okay. So if Scott had told you that these two
9 people were asleep, presumably you would have said, well,
10 it's probably not an active action if the person is
11 asleep, right?
12 A. Right.
13 Q. Okay. And -- and if the other person is -- is
14 asleep as well, if two people are asleep, there's
15 probably not a -- a -- a sexual molestation situation
16 going on, right?
17 A. That sounds right.
18 Q. Okay. So it's important that Scott left out the
19 fact that the two people were asleep?
20 A. If that's what was happening, yes.
21 Q. Okay. So now, at this point, you've received
22 information from Chelsie that she didn't agree with the
23 stroking of the face, and you've received information
24 from Scott that there was a hand near the crotch. And
25 based on that information, you and First Officer Mullin,

Page 24

1 jointly with the flight attendants, made a decision to
2 separate the child from the adult?
3  A. Correct.
4  Q. Okay. Had you ever made a decision like that
5 before?
6  A. No. And let me add to that, that it wasn't just
7 those two.
8  Q. Okay.
9  A. For us to -- to take action with a passenger, we
10 don't take that lightly. And so I also called back the
11 third flight attendant and the fourth one and talked to
12 them individually on the phone.
13 Q. Okay.
14 A. "What did you see?"
15 Q. Okay. So let me just make sure we get the names
16 here.
17     So that's Amanda Nichol and Anna Bond, correct?
18 A. Correct.
19 Q. Okay. And what -- and -- and did you have them
20 both on the phone at the same time?
21 A. No.
22 Q. No. Okay.
23     So who did you speak with first?
24 A. The third, the C flight attendant.
25 Q. The C flight attendant is Bond?



Page 29

1  A. Contact?
2  Q. I mean, they hadn't rung their bell, they hadn't
3  said something to a flight attendant, anything along
4  those lines?
5  A. I don't know.
6  Q. Okay.
7  A. I wouldn't know who -- when the passengers ring
8  the bell. We don't --
9  Q. All right.
10 A. -- we don't know.
11 Q. But you, presumably, knew that the -- the child
12 had not complained to anyone about any inappropriate
13 touching?
14 A. I don't know if the child complained or not.
15 With all the information I'd received from the flight
16 attendants, I'd -- I -- it wasn't told me that the child
17 had complained.
18 Q. Okay. Now, after concluding the telephone or
19 intercom discussions with Bond and Nichol, what did you
20 do next?
21 A. Well, that's when we decided yes, let's separate
22 the two.
23 Q. And you say "we" decided. How -- how did
24 that -- I mean, you're the captain.
25 A. Well, sure.

Page 30

1  Q. So it's your decision.
2  A. The buck stops with me, right?
3  Q. Right.
4  A. Yeah.
5  Q. Right. But you -- you discussed it with all
6  four present?
7  A. Correct.
8  Q. Okay. And -- and I gather everybody agreed that
9  the right thing to do is -- is to separate the child from
10 the father?
11 A. Correct.
12 Q. All right. And again, you didn't know that it
13 was the father at this time?
14 A. I did not know.
15 Q. Okay. Now, I have had produced to me a page
16 from the flight attendant manual.
17    Do you -- do you receive the flight attendant
18 manual?
19 A. No.
20 Q. Okay. So what procedures, SOPs, or whatever
21 guides your decision making in a situation such as this,
22 especially one that you've never encountered before?
23 A. Well, I mean, we don't have a lot of guidance
24 when it comes to the -- the sexual -- this -- sexual in
25 nature or inappropriate touching in the back.

Page 31

1  We do have what we call "threat levels" in the
2  back between the passengers. There's Threat Level 1,
3  which is, you know -- and it escalates up to Threat Level
4  4.
5  Q. Okay. Well, let's go through those, since you
6  brought them up.
7     What is -- what defines Threat Level 1?
8  A. I believe Threat Level 1 is verbal
9  noncompliance.
10 Q. So a passenger who verbally, meaning with words,
11 is refusing to comply with --
12 A. Comply with --
13 Q. -- instructions from --
14 A. -- instructions from the flight attendants,
15 correct.
16 Q. Okay. We both have to talk --
17 A. Sorry. Yes.
18 Q. -- at different times?
19 A. Yes. I'm sorry.
20 Q. Okay. So let's go through that again just so
21 it's clear.
22    Threat Level 1, then, is a passenger who, using
23 words, refuses to comply with an instruction from a crew
24 member, correct?
25 A. Correct.

Page 32

1  Q. Okay. What is Threat Level 2?
2  A. Threat Level 2, I mean, I need to pull out my --
3  my FOM, my Flight Operations Manual, to get all the
4  details. But that's when the escalation involves
5  physical type -- pushing, hitting.
6  Q. Okay. All right. And is the FOM something that
7  you have with you in the cockpit to refer to if this
8  comes up?
9  A. Yes.
10 Q. Okay. Now, so Threat Level 2, then, is
11 physical.
12    What's Threat Level 3?
13 A. Threat Level 3 is -- like I said, I have to take
14 a look at it to see exactly, but that's where it's
15 escalating to threats, physical harm --
16 Q. Okay.
17 A. -- physical injury.
18 Q. Threats of physical harm or physical injury?
19 A. Yeah.
20 Q. Okay. And what is Threat Level 4?
21 A. That's attempted breach of the cockpit.
22 Hijacking.
23 Q. Sure.
24 A. And like I said, there's a -- there's a list in
25 there to -- to get all of the articulations that we would

