SHAWN E. MULLIN
PETER DELVECCHIA vs FRONTIER AIRLINES
December 10, 2019
1–4

### Page 1

```
 1             UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEVADA
 3
 4   PETER DELVECCHIA, et al,    )
                                 )
         Plaintiff,              )
                                 )
     vs.                         ) CASE NO.  2:19-CV-01322-KJD-NJK
                                 )
 7   FRONTIER AIRLINES, INC., et al, )
                                 )
         Defendants.             )
                                 )
    _____






    



19        DEPOSITION OF SHAWN EDWARD MULLIN
20        Taken on Tuesday, December 10, 2019
21                At  10:00 a.m.
22              At Titolo Law Office
23            9950 West Cheyenne Avenue
24                 Las Vegas, Nevada
25   REPORTED BY:  SHIFRA MOSCOVITZ, CCR NO. 938
```

### Page 2

```
 1  APPEARANCES:
 2  For Plaintiffs:
 3              JOHN D. MCKAY, ESQ.
                PARK AVENUE LAW
 4              127 W. Fairbanks Avenue
                #519
 5              Winter Park, Florida
                (800)391-3654
 6
 7
 8  For Plaintiffs:
 9              TIM TITOLO
                TITOLO BRAIN AND INJURY LAW
10              9950 W. Cheyenne Avenue
                Las Vegas, Nevada 89129
11              (702)869-5100
12
13
14  For Defendants:
15              BRIANE T. MAYE, ESQ.
                ADLER MURPHY & MCQUILLEN LLP
16              20 South Clark Street
                Suite 2500
17              Chicago, Illinois 60603
                (312)345-0700
18
19
20
21  Also Present:  MONICA HAYWORTH, VIDEOGRAPHER
                  PETER DELVECCHIA
22
23
24
25
```

### Page 3

```
 1                 EXAMINATION
 2  WITNESS:                                    PAGE
    Shawn Edward Mullin
 3
 4  Examination by
    Mr. McKay                              4,122,134
 5
    Mr. Maye                                 115,132
 6
 7
 8
 9                   EXHIBITS
10  EXHIBIT                                    PAGE
11  Exhibit 1    Notice of Deposition             9
12  Exhibit 2    Printouts of ACARS Messages     61
13  Exhibit 3    photographs from employee records 76
```

### Page 4

```
 1         LAS VEGAS, NEVADA; DECEMBER 10, 2019
 2         10:00 A.M.
 3             -oOo-
 4  (NRCP Rule 30(b)(4) waived by the parties prior to the
 5  commencement of the deposition.)
 6  (FRCP Rule 30(b)(5) waived by the parties prior to the
 7  commencement of the deposition.)
 8  Thereupon--
 9       SHAWN ADAM MULLIN,
10  was called as a witness, and having been first duly sworn,
11  was examined and testified as follows:
12             EXAMINATION
13  BY MR. MCKAY:
14       VIDEOGRAPHER:  This is media number one to
15  the video recorded deposition of Shawn Edward
16  Mullin in the matter of Peter Delvecchia et al.
17  versus Frontier Airlines Incorporated, et al,
18  being heard before the United States District
19  Court for the District of Nevada, case number
20  2:19-cv-01322-KJD-NJK.  This deposition is
21  being held at Titolo Law Office, 9950 West
22  Cheyenne Avenue, Las Vegas, Nevada, starting at
23  10:04 a.m.  My name is Monica Hayworth, and I
24  am the videographer.  The court reporter is
25  Shifra Moscovitz, with Esquire Deposition
```



800.211.DEPO (3376)
EsquireSolutions.com

EXHIBIT 4

**Page 81**

1  Q. And what was the basis for that decision?
2  A. Making sure the safety of the child was
3  paramount to us and we were avoiding any
4  inappropriate or potentially dangerous situations
5  that could arise.
6  Q. Now, had you at that point received any
7  information about who the adult and child were?
8  A. With respect to what?
9  Q. Flames?
10  A. No.
11  Q. Okay. Family relationship?
12  A. No, only that they were sitting together
13  and they were moved once. So I would assume that
14  they were family or traveling together.
15  Q. Could you have asked dispatch and/or SOC
16  for at least their names?
17  A. It's possible.
18  Q. It's possible that you could have done it?
19  A. Yes, but even if we would have asked, it's
20  not incredibly accurate, they would have had, you
21  know, passengers move into the incorrect seats
22  occasionally. So in the past we have done that, we
23  have gotten incorrect information and still had to
24  work with it through the passengers themselves.
25  Q. I see.

**Page 82**

1  A. So we could have asked, sure, but it
2  wouldn't have made a difference in our decisions.
3  Q. Somebody could have asked the passengers
4  themselves, couldn't they?
5  A. Sure, we knew that they were traveling
6  together, that they had sat together and moved
7  together, so it was safe to say they were together
8  in that situation.
9  Q. Was there any attempt made to ask them why
10  they were traveling together?
11  A. No, I mean people travel for many reasons,
12  and I don't think anyone asked.
13  Q. Was there any attempt made to ask them
14  their names?
15  A. I don't know that, I don't know if that's
16  a yes or no, I didn't ask them, so.
17  Q. You didn't ask anybody to find out what
18  their names are?
19  A. I did not ask that, no.
20  Q. Was there a discussion that they couldn't
21  be related to each other?
22  A. No.
23  Q. Was there at this point in time, with four
24  people in the cockpit, was there a discussion about
25  their different races?

**Page 83**

1  A. There was no discussion about it. I mean
2  I think it was used as a descriptor by somebody, but
3  I don't know, it was not a relevant fact in our
4  determinations of the captain and I making a
5  decision.
6  Q. So well one of the flight attendants you
7  are saying said the older man is white and the
8  younger child is black?
9  MR. MAYE: Object to form.
10  Q. Is that correct?
11  A. I don't know that they said the older man
12  was white. I know that it was a young African
13  American child. But I don't remember when they said
14  anything about the adult.
15  Q. But somehow you knew it was not an African
16  American adult traveling with an African American
17  child?
18  A. Yes, I don't know how that came up, it
19  would have been with one of the flight attendants.
20  Q. But you never saw, right?
21  A. No.
22  Q. So you would have had to have been told
23  that information by one of the flight attendants?
24  MR. MAYE: Object to form.
25  Q. Let me ask it a different way. Since you

**Page 84**

1  never saw them, you could only find out their race
2  by being told, right?
3  A. Yes.
4  Q. And the only people that would have
5  communicated that information to you were the flight
6  attendants?
7  A. Yes.
8  Q. Okay. Now, you, yourself, never saw the
9  adults touch the child?
10  A. Correct.
11  Q. Okay. Who made the decision to separate
12  the two passengers?
13  A. I think the four of us collectively had.
14  Like I said, earlier the captain and I had discussed
15  with the first flight attendant about what could
16  lead us to a situation where we would want to
17  separate them or what other outcomes we would have
18  to the extent of landing immediately, and as all
19  four flight attendants are in the cockpit, the
20  amount of information and the details that we had
21  received had led us down the track that we should
22  separate them and make sure to diffuse the situation
23  as best we can in the current in environment.
24  Q. So the decision was made based on new
25  information which was A, that the adult's hand was

