# EXHIBIT A

**Excerpts from Deposition of Anna Bond**

## Page 1

1        UNITED STATES DISTRICT COURT
2            DISTRICT OF NEVADA
3
4   PETER DELVECCHIA, et al,        )
                                    )
5        Plaintiff,                 )
                                    )
6        vs.                        ) CASE NO.  2:19-CV-01322-KJD-NJK
                                    )
7   FRONTIER AIRLINES, INC., et al, )
                                    )
8        Defendants.                )
    _____)
9
10
11
12
13
14
15
16
17
18
19            DEPOSITION OF ANNA BOND
20        Taken on Tuesday, December 10, 2019
21            At  1:37 p.m.
22          At Titolo Law Office
23        9950 West Cheyenne Avenue
24            Las Vegas, Nevada
25   REPORTED BY:  SHIFRA MOSCOVITZ, CCR NO. 938

## Page 2

1   APPEARANCES:
2   For Plaintiffs:
3            JOHN D. MCKAY, ESQ.
             PARK AVENUE LAW
4            127 W. Fairbanks Avenue
             #519
5            Winter Park, Florida
             (800)391-3654
6
7
8   For Plaintiffs:
9       TIM TITOLO
        TITOLO BRAIN AND INJURY LAW
10      9950 W. Cheyenne Avenue
        Las Vegas, Nevada 89129
11      (702)869-5100
12
13
14  For Defendants:
15           BRIANE T. MAYE, ESQ.
             ADLER MURPHY & MCQUILLEN LLP
16           20 South Clark Street
             Suite 2500
17           Chicago, Illinois 60603
             (312)345-0700
18
19
20
21  Also Present:  MONICA HAYWORTH, VIDEOGRAPHER
                   PETER DELVECCHIA
22
23
24
25

## Page 3

1                    EXAMINATION
2   WITNESS:                                  PAGE
    Anna Bond
3
4   Examination by
    Mr. McKay                                 4,105
5
    Mr. Maye                                  103
6
7
8
9                     EXHIBITS
10  EXHIBIT                                   PAGE
11  Exhibit 1      Notice of Deposition        9
12  Exhibit 2      Copies of Text Messages     11
13  Exhibit 3      Record of all the Training  33
14  Exhibit 4      In-Flight Flyer             34
15  Exhibit 5      In-Flight Must Reads        34
16  Exhibit 6      Flight Attendant Manual     34
17  Exhibit 7      Flight Attendant's Statement 91
18  Exhibit 8      Email From Jason B. Grimes  91
19
20
21
22
23
24
25

## Page 4

1        LAS VEGAS, NEVADA; DECEMBER 10, 2019
2            1:37 P.M.
3              -oOo-
4   (NRCP Rule 30(b)(4) waived by the parties prior to the
5   commencement of the deposition.)
6   (FRCP Rule 30(b)(5) waived by the parties prior to the
7   commencement of the deposition.)
8   Thereupon--
9            ANNA BOND,
10  was called as a witness, and having been first duly sworn,
11  was examined and testified as follows:
12            EXAMINATION
13  BY MR. MCKAY:
14      VIDEOGRAPHER:  Okay, this is media number
15  one to the video recorded deposition of Anna
16  Bond in the matter of Peter Delvecchia, et al.
17  versus Frontier Airlines, Incorporated, et al.
18  Being heard before the United States District
19  Court, for the District of Nevada, case number
20  2:19-cv-01322-KJD-NJK.  This deposition is
21  being held at Titolo Law Office, 9950 West
22  Cheyenne Avenue, Las Vegas, Nevada, starting
23  1:37 p.m.  My name is Monica Hayworth and I am
24  the videographer.  The court reporter is Shifra
25  Moscovitz with Esquire Deposition Solutions.


EXHIBIT
2
A

ANNA BOND                                                    December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                              33–36

Page 33

1  we didn't have parts in it, though, what is the it
2  you are referring to?
3     A.  The whole action of deciding what to do,
4  moving the two, moving the child, just everything,
5  in general, the whole flight.
6     Q.  And it's your belief that you and Chelsea
7  didn't have anything to do with any of that?
8     A.  Nothing major, yes.
9     Q.  Okay.  We are going to get into the
10  details in just a bit.  But I want to mark and
11  identify a couple of other documents first.
12           (Exhibit 3 was marked for
13            identification.)
14        All right.  The court reporter has
15  just given you what has been marked as your
16  deposition Exhibit Number 3.  Do you recognize what
17  this is?
18     A.  No.
19     Q.  All right.  Can you look under the
20  descriptions, does any of that make any sense to
21  you?
22     A.  Yes.
23     Q.  Okay.  Do you understand what those
24  descriptions are?
25     A.  Yes.

Page 34

1     Q.  And so would that be a record of all of
2  the training that you have received from Frontier to
3  date?
4     A.  Yes.
5     Q.  And is it accurate?
6     A.  Yes.
7     Q.  Okay.  That's all I had on that.  Thank
8  you.
9        MR. MCKAY:  Let's mark this as Exhibit 4,
10  please, through six.
11           (Exhibits 4-6 were marked for
12            identification.)
13     Q.  All right.  So I am going to ask you first
14  about what has been marked as Deposition Exhibit 4.
15  And have you ever seen that before?
16     A.  Yes.
17     Q.  Okay.  And it says in-flight flyer below
18  it in smaller print, in-flight Biweekly Briefing
19  Memo 19-06, January 25, 2019.  Have I read that
20  accurately?
21     A.  Yes.
22     Q.  Okay.  And what is the In-flight Flyer?
23     A.  It's a flyer they send out with new
24  information on safety regarding our job.
25     Q.  Okay.  And this one in particular copies a

Page 35

1  page titled human trafficking, right?
2     A.  Yes.
3     Q.  And it says January is national slavery
4  and human trafficking prevention month?
5     A.  Yes.
6     Q.  Did you read this when it came out?
7     A.  Yes.
8     Q.  And so you had read it prior to the flight
9  on March 28 of 2019?
10     A.  Yes.
11     Q.  And it says there, if you suspect a
12  passenger may be a victim of human trafficking,
13  first initiate nonthreatening conversation and ask
14  targeted questions.  Do you see that?
15     A.  Yes.
16     Q.  And the questions that they show you there
17  are first, ask where they are traveling, are they
18  going on vacation or visiting relatives.  And then
19  the second bullet point is, ask where they are
20  staying, who will be meeting them, what they will be
21  doing, et cetera.  Do you see that?
22     A.  Yes.
23     Q.  Now, on March 28 of 2019, did you ask any
24  of those questions of the young man identified as
25  AD?

Page 36

1     A.  No.
2     Q.  Okay.  Is there a reason you didn't ask
3  him those questions?
4     A.  I was in charge of the front and they were
5  seated in the back of the aircraft.
6     Q.  So they were not your responsibility?
7     A.  The whole plane is all of our
8  responsibility, but they were not in my section, no.
9     Q.  Okay.  So does it say somewhere on here
10  that you are only to do that if the person is seated
11  in your section?
12     A.  No.
13     Q.  Oh.  So back to my question about why you
14  didn't do it, why you didn't ask these questions
15  then, is your answer still because they were not in
16  your section?
17     A.  Yes.
18     Q.  Okay.  I guess that makes it easy, the
19  next question is, take note if traveling companion
20  or companions appears nervous or prevents the
21  child/person from answering questions or if their
22  answers seem evasive, do you see that?
23     A.  Yes.
24     Q.  All right.  Did you do that on March 28th?
25     A.  Yes.



ANNA BOND
PETER DELVECCHIA vs FRONTIER AIRLINES

December 10, 2019
37–40

Page 37

1    Q.  Okay.  And is it your testimony that you
2  made particular observations that are consistent
3  with this?
4    A.  Yes.
5    Q.  Okay.  And what are those observations?
6    A.  When I was briefing the exit row.
7    Q.  Yes.
8    A.  He was seated in my exit row, he looked
9  like a young child, so I did ask him what, how old
10  he was.  He ended up being under age where you have
11  to be 15 to sit in the exit row.  And when I asked
12  him how old he was, he looked at the gentleman
13  sitting next to me, and the man had nodded, and then
14  the boy had answered.
15    Q.  All right.  And you found something
16  untoward about that?
17    A.  Yes, the way he looked up at the gentleman
18  just made it seem like he was asking permission to
19  talk.
20    Q.  All right.  You had never seen anybody do
21  that before?
22    A.  No.
23    Q.  You never seen a child do that before?
24    A.  No.
25    Q.  You have had interaction in your other

Page 38

1  jobs with your children before, right?
2    A.  Yes.
3    Q.  And you have had interaction in Frontier
4  with children, correct?
5    A.  Yes.
6    Q.  And you are testifying that you have never
7  seen a child look to the parent before answering a
8  question from you?
9    A.  Not...
10      MR. MAYE:  Object to form.
11    A.  Not a question that simple.
12    Q.  I see.  Okay.  But he did answer you,
13  right?
14    A.  Yes.
15    Q.  And he said 12?
16    A.  Yes.
17    Q.  All right.  Was there anything unusual
18  about that?
19    A.  Not 12, no.
20    Q.  Okay.  And but it did require him to be
21  reseated?
22    A.  Yes.
23    Q.  And you told him and his father that they
24  needed to be reseated?
25    A.  Yes.

Page 39

1    Q.  What happened next?
2    A.  We had two volunteers move from the back
3  section and they agreed to move to the couple rows
4  behind the exit row together.
5    Q.  So since I know that the two that you
6  moved ended up in row 17, may I assume that the
7  volunteers came from row 17?
8    A.  Yes, correct.
9    Q.  Okay.  And the exit row is row 13, right?
10    A.  Yes.
11    Q.  Okay.  Now, just out of curiosity, why
12  didn't you move them to the empty row in the back?
13    A.  We keep the back row opened for a lot of
14  medical conditions or just to have room for us.
15    Q.  For us, meaning?
16    A.  The flight attendants, the flight crew.
17    Q.  Don't you have your own seats?
18    A.  Yes.
19    Q.  But you need extra seats?
20    A.  They are very uncomfortable.
21    Q.  The seats they give you?
22    A.  Yes.
23    Q.  So in order to have comfy seats you go to
24  the back row?
25    A.  Yes.

Page 40

1    Q.  So it wasn't an option under your training
2  to move Peter and AD to the back row?
3    A.  Can you repeat the question?
4    Q.  So it wasn't an option for you to move
5  these people from the exit row to the back row?
6    A.  That was an option, yes.
7    Q.  So who's decision was it not to use that
8  option, but to make two other people move?
9    A.  You know, but at that time it was my
10  decision to move them where, anywhere, but at that
11  time I didn't know the back row was empty.
12    Q.  Oh, why not?
13    A.  We didn't finish boarding, we haven't done
14  the cabin count yet.
15    Q.  Okay.
16    A.  So when we do the cabin count, that's when
17  we know where the empty seats are.  So we like to
18  finish everything before we start the cabin count,
19  so we don't have to redo the passenger count.  And
20  at that time I just ask for volunteers near the exit
21  row to move to the exit row.
22    Q.  Just going back to your previous
23  testimony, didn't you just tell me that the back row
24  was always kept open for medical and comfy seats for
25  the flight attendants?



ANNA BOND
PETER DELVECCHIA vs FRONTIER AIRLINES

December 10, 2019
41–44

Page 41

1       MR. MAYE: Object to form.
2       A.   Not when it's a full flight, the customer
3   service agents try to keep the back row empty, but
4   it is not always like that.
5       Q.   Okay. So you got some people to switch
6   with them, the people came from row 17. And so
7   Peter and AD went back to row 17, right?
8       A.   Yes.
9       Q.   All right. Did anything unusual happen at
10  that point?
11      A.   No.
12      Q.   Okay. So everything looked fine from that
13  point on?
14      A.   Yes.
15      Q.   Okay. So the only thing that was of
16  concern to you was the fact that AD had looked at
17  Peter before giving his age?
18      MR. MAYE: Object to form.
19      A.   At that time, it didn't occur to me it was
20  a weird behavior, it kind of seemed strange, but I
21  didn't take anything at it. So later on it kind of
22  clicked in my head that that was a really strange
23  behavior.
24      Q.   In what context?
25      A.   What do you mean, sorry?

Page 42

1       Q.   Well, you said that at the time it
2   happened it didn't even register, right?
3       A.   Well, at the time it was weird, I did see
4   something off, but it didn't really, it wasn't
5   enough for me to go tell the rest of the flight crew
6   what he just did.
7       Q.   Okay. Now, as you look at, let me take
8   you through your briefing first, you went back to
9   the exit row, row 13 to brief the passenger seated
10  there, right?
11      A.   Yes.
12      Q.   Is that the only exit row on this
13  airplane?
14      A.   12 and 13.
15      Q.   12 and 13 both. So you were the person
16  that came back and kind of in a raised voice said,
17  hey, everybody in rows 12 and 13, I need your
18  attention, right?
19      A.   Yes.
20      Q.   Did you do that?
21      A.   No.
22      Q.   Oh.
23      A.   I had moved them before briefing.
24      Q.   I see. So before you even did the
25  briefing, you noticed that he appeared to be younger

Page 43

1   than 15?
2       A.   Yes.
3       Q.   Okay. And so right away you said
4   something like young man, how old are you?
5       A.   Yes.
6       Q.   Okay. He looked at his father for a
7   second and then said to you, I am 12?
8       A.   Yes.
9       Q.   So then you reseated them, and then you
10  did your briefing?
11      A.   Yes.
12      Q.   So you didn't have any interaction with
13  the other passengers in 12 and 13?
14      A.   Not at that time.
15      Q.   Okay. Where was Peter seated in 13?
16      A.   He was sitting in 13 Echo.
17      Q.   So that is the middle seat on aircraft
18  right?
19      A.   Yes.
20      Q.   And where was AD seated?
21      A.   Thirteen Delta.
22      Q.   Okay. The aisle seat?
23      A.   Yes.
24      Q.   Who was in 13 Foxtrum?
25      A.   I don't recall.

Page 44

1       Q.   Do you recall whether that was a white
2   person or black person?
3       A.   I don't recall.
4       Q.   Do you recall whether AD was a white
5   person or a black person?
6       A.   I believe he is black.
7       Q.   And what about Peter?
8       A.   He is white.
9       Q.   Okay. So you remember seeing a white man
10  and a black child?
11      A.   I saw this, yes, physically, yes.
12      Q.   Okay. And you thought it was odd when the
13  black child looked at the white male?
14      MR. MAYE: Object to form.
15      A.   I didn't find it odd that any race, that
16  didn't really occur to me, it was just a boy and a
17  man. And the boy looked like he was asking
18  permission to talk.
19      Q.   Okay. But that's not something that
20  really clicked you said until later?
21      A.   Yes.
22      Q.   How much later?
23      MR. MAYE: I am sorry, object to form.
24  She said that she did.
25      MR. MCKAY: Object to form was great.



ANNA BOND
PETER DELVECCHIA vs FRONTIER AIRLINES

December 10, 2019
45–48

Page 45

1     MR. MAYE:  Well, you just mischaracterized
2  her testimony.  That's all.
3     MR. MCKAY:  Object to form works.
4     MR. MAYE:  Object to form.
5     Q.  Okay.  Go ahead?
6     A.  When I told the other crew members when
7  Chelsea had walked through the cabin and saw the man
8  caressing the little boy's face.
9     Q.  Okay.  That occurred after the plane had
10  taken off, right?
11     A.  Yes.
12     Q.  So between the time you reseated them and
13  after the plane took off and Chelsea made an
14  objection, nothing had clicked at that point?
15     A.  No.
16     Q.  Okay.  So the clicking, as you testified,
17  occurred after Chelsea said something to you?
18     A.  When Chelsea had told the crew, yes.
19     Q.  Okay.  When you say told the crew, do you
20  mean the cockpit crew?
21     A.  The flight attendants.
22     Q.  The other flight attendants?
23     A.  Yes.
24     Q.  Including you?
25     A.  Yes.

Page 46

1     Q.  So where did that event occur where all
2  four of you, I presume, were together?
3     A.  I believe it was in the forward galley.
4     Q.  Okay.  Why were the four flight attendants
5  in the forward galley at that time?
6     A.  When we want to talk about something
7  strange or what we saw, we do come to one galley,
8  so.
9     Q.  I am sorry, you say this is a sort of a
10  routine, is this something that's told to you in
11  training or just something that happens and it's
12  just the way things are done?
13     A.  It's just something that happens, and it's
14  just the way things are done.
15     Q.  Okay.  So who of the four of you said they
16  wanted to talk about something strange?
17     A.  Chelsea.
18     Q.  Okay.  And how did she do that, how did
19  she communicate that to the rest of you?
20     A.  I don't remember the whole conversation.
21     Q.  All right.  Well, I mean presumably you
22  all are working in different parts of the airplane
23  normally, right?
24     A.  Right.
25     Q.  So you were working in the same area as

Page 47

1  Chelsea?
2     A.  Yes.
3     Q.  Okay.  Chelsea was the A and you were the
4  C, correct?
5     A.  Yes.
6     Q.  Is that right, or B?
7     A.  I was the C, yes.
8     Q.  You were the C.  Okay, let me make sure my
9  notes are right on that.  Okay, you are right.  So
10  Chelsea was the A, Scott Warren was the B, Anna
11  Bond, you were the C, and Amanda Nichol was the D?
12     A.  Yes.
13     Q.  Okay.  So the first time that you all get
14  together to discuss Peter and AD is after Chelsea
15  makes an observation?
16     A.  Yes.
17     Q.  And at this point the flight is already up
18  in the air?
19     A.  Yes.
20     Q.  Has service occurred?
21     A.  I believe it was after service.
22     Q.  Okay.  Can you give an estimate of how
23  many minutes into the flight you were at that point?
24     A.  If I were to estimate, we usually start
25  service around 20 minutes after take off.  So if it

Page 48

1  was a busy flight, might have taken 15 to 20 minutes
2  after that, but I don't recall if it was busy or
3  not.  If it's quick it ends in five minutes,
4  obviously it could have been from 20 to 35 to 40
5  minutes.
6     Q.  Okay.  That's right, on Frontier
7  everything is for sale, right?
8     A.  Yes.
9     Q.  So on a quick flight it may be that nobody
10  wants to buy anything?
11     A.  Yes.
12     Q.  That's why it can finish, so quickly?
13     A.  Yes.
14     Q.  But you don't recall on this flight at
15  some point after service was over, somehow Chelsea
16  informed you that she wanted talk to everybody
17  together?
18     A.  Yes.
19     Q.  Okay.  And then what happened?
20     A.  I believe when we all got together, Amanda
21  had saw something strange or felt something strange
22  about those two.  I am not entirely sure the whole,
23  how the whole conversation went, but I remember all
24  of us at one point didn't feel good about those two.
25     Q.  Okay.  And you mentioned earlier it was



ANNA BOND
PETER DELVECCHIA vs FRONTIER AIRLINES

December 10, 2019
49—52

Page 49

1   Chelsea's observation of something with respect to
2   the face, is that correct?
3       A.   Yes.
4       Q.   What did Chelsea say she had seen that
5   made her uncomfortable?
6       A.   I am not sure what her exact words were,
7   but I think it was caressing of the face.
8       Q.   Okay.  So Chelsea said I saw the adult
9   caressing the child's face?
10      A.   Yes.
11      Q.   Anything more, anymore detail of any kind?
12      A.   I don't know.
13      Q.   Might have been?
14      A.   Might have been.
15      Q.   All right and then what happened or what
16  was said after that?
17      A.   I don't remember.
18      Q.   But you think you remember other people
19  chiming in with observations?
20      A.   Yes.
21      Q.   Who?
22      A.   It was Amanda, and then at one point Scott
23  had saw something else.
24      Q.   Okay.  At that, during that same meeting?
25      A.   It was, yes, during the same meeting, yes.

Page 50

1       Q.   Why do you say at one point Scott had
2   seen?
3       A.   Because the whole meeting took a few
4   minutes.  This is when we had the pilots involved
5   after we all talked about it, this is when we had
6   the pilot involved.
7       Q.   So now the pilots are involved as well?
8       A.   Yes.  So the whole meeting took place
9   pretty quickly, but it was like the flight
10  attendants talking, and then as we were talking we
11  got the pilots involved.
12      Q.   Okay.  So all of this is precipitated by
13  Chelsea's mentioning of the face, and convening
14  immediately, so far so good, correct?
15      A.   So Chelsea seeing the caressing of the
16  face, and then that's when I had told them about
17  what I had seen, when I was at the exit row, and
18  then Amanda had mentioned that she didn't, she saw
19  something off with those two, like during the, when
20  I had initially moved them.  After I had moved them
21  I walked to the back of the cabin to tell Scott and
22  Amanda why I had to move the two passengers out of
23  the exit row.
24      Q.   Okay.
25      A.   I had told them it was because the boy was

Page 51

1   12 and not able.
2       Q.   Yes.
3       A.   Amanda had mentioned that she thought I
4   was moving them because of language issues, not
5   because he was 12.
6       Q.   Had she spoken with them?
7       A.   No.
8       Q.   So she had just looked at them and
9   determined that they spoke a different language?
10      A.   Yes.
11      Q.   Okay.  Did she say why?
12      A.   The little boy did seem a lot older in the
13  face.
14      Q.   Excuse me, if that doesn't connect up with
15  what we were just talking about.  The little boy
16  seemed older in the face, therefore she thought he
17  spoke a different language?
18      A.   Yes, so we have requirements on why we
19  have to move them.  If they are old enough and they
20  are willing and able, it's usually a language
21  barrier where they are not able to speak English, so
22  we do have to move them, so a lot of the times it's
23  either age or language.
24      Q.   I see.  So she was communicating to you, I
25  thought it was a language issue because I thought he

Page 52

1   was over 15?
2       A.   Yes.
3       Q.   I see.  And that's what you understand her
4   to mean?
5       A.   Yes.
6       Q.   So really the sequence of events, you
7   determined that he is 12, you moved them, you go
8   back to talk to Amanda and Scott to say, hey, I
9   moved them and here is why.  So far right?
10      A.   Yes.
11      Q.   And Amanda said, oh, it was age, not
12  language?
13      A.   Yes.
14      Q.   Did Scott say anything at that point?
15      A.   No.
16      Q.   Is that the end of the conversation about
17  that?
18      A.   Yes.
19      Q.   So then you go back to your station at the
20  front of the plane?
21      A.   Yes.
22      Q.   Okay.  And then the plane takes off and
23  service occurs?
24      A.   Yes.
25      Q.   Am I missing anything important in that?

