# EXHIBIT C

**Excerpts from Deposition of Amanda Nickel**

AMANDA L. NICKEL
DELVECCHIA Vs. FRONTIER AIRLINES

December 11, 2019
1–4

**Page 1**

```
 1           UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF NEVADA
 3
 4   PETER DELVECCHIA, et al.,
 5        Plaintiffs,
 6   vs.                    CASE NO.
                            2:19-CV-01322-KJD-NJK
 7   FRONTIER AIRLINES, INC.,
     et al.,
 8
          Defendants.
 9   _____
10
11
12
13            VIDEOTAPED DEPOSITION OF
14               AMANDA LEE NICKEL
15
16         Wednesday, December 11, 2019
17                  9:01 a.m.
18
19          9950 West Cheyenne Avenue
20              Las Vegas, Nevada
21
22      Judith Payne Kelly, RMR, CCR-539
23
24
25
```

**Page 2**

```
 1           APPEARANCES OF COUNSEL
 2
 3
     For the Plaintiffs:
 4
         JOHN D. McKAY, ESQ.
 5       Park Avenue Law, LLC
         127 West Fairbanks Avenue
 6       Box 519
         Winter Park, Florida   32789
 7       800.391.3654
         parkavelaw@gmail.com
 8
 9   For Defendant Frontier Airlines:
10       BRIAN T. MAYE, ESQ.
         Adler Murphy & McQuillen, LLP
11       20 South Clark Street
         Suite 2500
12       Chicago, Illinois  60603
         312.345.0700
13       bmaye@amm-law.com
14
     Also Present:
15
         MONICA HAYWORTH, VIDEOGRAPHER
16       PETER DELVECCHIA
17
18                * * * * *
```

**Page 3**

```
 1              INDEX OF EXAMINATION
 2
 3   Witness                                    Page
 4   AMANDA LEE NICKEL
 5   EXAMINATION
 6   By Mr. McKay                                  5
 7   By Mr. Maye                                 130
 8   By Mr. McKay                                134
 9
10
11
12              INDEX TO EXHIBITS
13
14   Exhibit           Description             Page
15   Exhibit 1   Summary of training, 19AZF0229  34
                 DELVECCHIA FRONTIER 203
16
     Exhibit 2   Las Vegas Metropolitan Police   34
17               Department Voluntary Statement,
                 19AZF0229 DELVECCHIA FRONTIER 0120
18               and 0121
```

**Page 4**

```
 1        Deposition of AMANDA LEE NICKEL
 2             December 11, 2019
 3
 4       THE VIDEOGRAPHER:  This is Media No. 1 to the
 5   video-recorded deposition of Amanda Nickel in the
 6   matter of Peter DelVecchia versus Frontier Airlines,
 7   Incorporated, being heard before the United States
 8   District Court for the District of Nevada, Case
 9   No. 2:19-CV-01322-KJD-NJK.
10       This deposition is being held at Titolo Law
11   Office in Las Vegas, starting at 9:01 a.m.  My name is
12   Monica Hayworth, and I'm the videographer.  The court
13   reporter is Judy Kelly, with Esquire Deposition
14   Solutions.
15       Counsel, will you please introduce yourselves
16   and affiliations, and the witness will then be sworn.
17       MR. McKAY:  John McKay of Park Avenue Law for
18   the plaintiffs.
19       MR. MAYE:  Brian Maye for Frontier Airlines.
20       THE VIDEOGRAPHER:  Thank you.
21   Thereupon,
22       AMANDA LEE NICKEL, having been first duly
23   sworn, was examined and testified as follows:
24   ///
25   ///
```



ESQUIRE DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

**EXHIBIT C**

Page 65

1 others?
2     MR. MAYE: Object to form.
3     A. Later on in the flight, there was other
4 observations made by other people.
5     Q. (By Mr. McKay) Okay. Let's continue with
6 your statement here. So we've talked about your uneasy
7 feeling; and then the next sentence is "Shortly after
8 takeoff, during service, the" -- and there's a
9 redaction there -- "was sleeping."
10    What was in the box that was redacted?
11    A. I don't remember the exact word, but I was
12 referring to the father.
13    Q. Okay. So the father -- you observed the
14 father being asleep?
15    A. At the time of service, yes.
16    Q. Okay. And was it your job to service that
17 row that they were seated in?
18    A. Yes.
19    Q. Okay. Did you observe the son at that same
20 time?
21    A. Yes.
22    Q. Okay. Did you observe what he was wearing?
23    A. It was dark, so no.
24    Q. Okay. So other -- if it hadn't been dark,
25 you would have seen what he was wearing? Is that what

Page 66

1 you're saying?
2     MR. MAYE: Object to form.
3     A. I would assume so, yes.
4     Q. (By Mr. McKay) Okay. And so the father was
5 sleeping. "So I asked" blank "if he would like" -- "if
6 he wanted anything to eat or drink."
7     That would have been the son?
8     A. Yes.
9     Q. Okay. And do you know whether you said "the
10 son" in that box?
11    A. Like I said, I don't recall the exact word
12 that was put there.
13    Q. Okay. "And he very anxiously shook his head
14 no without speaking." That's what you wrote?
15    A. Correct. Yes.
16    Q. Okay. And how did you determine that it was
17 very anxiously?
18    MR. MAYE: Object to form.
19    A. His body movements, the fact that he wouldn't
20 speak to me. He shook his head very quickly after
21 glancing over to the father, who was sleeping, and
22 refused to answer the question verbally.
23    Q. (By Mr. McKay) Well, you don't say anything
24 about him glancing over to his father here in the
25 statement. Why not?

Page 67

1     MR. MAYE: Object to form.
2     A. Because I did not put all of the specific
3 details in this statement.
4     Q. (By Mr. McKay) So you specifically have a
5 memory of him glancing at his father after you asked
6 the question?
7     A. Yes.
8     Q. Could it perhaps have been to see whether his
9 father wanted something to eat or drink?
10    MR. MAYE: Object to form.
11    A. It may have been, but he was sleeping.
12    Q. (By Mr. McKay) Could it perhaps have been to
13 see whether his father was awake to be able to pay for
14 the food and drink that you were selling?
15    A. I can't speculate on that.
16    Q. Because people have to pay for it, right?
17    A. Except if they would like a glass of water.
18    Q. Okay. But you said anything to eat or drink.
19 So anything that he wanted to eat, he would have to
20 have paid for, right?
21    A. Yes.
22    Q. Okay. And that's just a fact of life on
23 Frontier Airlines, isn't it?
24    A. Yes.
25    Q. Okay. So in your experience, 12-year-old

Page 68

1 children don't usually carry a lot of money, do they?
2     MR. MAYE: Object to form.
3     A. I don't know.
4     Q. (By Mr. McKay) You don't know whether
5 12-year-old children typically carry a lot of money?
6     MR. MAYE: Object to form.
7     A. I'm not an expert on all 12-year-old
8 children.
9     Q. (By Mr. McKay) You have a 12-year-old child.
10    A. Correct.
11    Q. Does he carry around a lot of money?
12    A. He carries money, yes.
13    MR. MAYE: Object to form.
14    Q. (By Mr. McKay) Okay. But are you -- do all
15 of his friends also carry around a lot of money?
16    A. I don't know. I don't know his friends.
17    Q. All right. Would you agree with me that it
18 wouldn't have been unusual for a 12-year-old child to
19 look to their parent to pay for something if they
20 wanted to buy something to eat?
21    MR. MAYE: Object to form.
22    A. It -- like I said, it was the body movement
23 of very anxiously shaking his head no, like he didn't
24 want to speak to me anymore.
25    Q. (By Mr. McKay) Well, now you've already at



Page 81

1   A.   -- not that I noticed.
2   Q.   (By Mr. McKay) I understand what you said,
3   but I'm asking you specifically did you observe --
4   A.   And I said no three times.
5   Q.   -- them --
6        Well, it may be the way you think you say
7   something, but what you actually said was "Not that I
8   noticed."
9   A.   So not that I observed.
10  Q.   Okay. So you did not observe them arguing?
11  Right?
12  A.   Yes.
13  Q.   Okay. So they complied with the
14  instructions?
15  A.   Yes.
16  Q.   And they didn't swing any fists or arms at
17  Anna Bond?
18  A.   Not that I observed.
19  Q.   So they didn't?
20  A.   Not that I observed.
21  Q.   You did not observe them swinging any arms or
22  fists at Anna Bond?
23       MR. MAYE: That's right.
24  A.   That's what I said three times.
25       MR. MAYE: That's what she said three times.

Page 82

1   Q.   (By Mr. McKay) Yes, I understand what you
2   think you said.
3        Okay. So Peter and A.D. were given a safety
4   instruction and they complied with it. So is that a
5   basis on which to conclude that they may become a
6   safety issue?
7        MR. MAYE: Object to form.
8   A.   That had nothing to do --
9   Q.   (By Mr. McKay) I just want a yes or no.
10  A.   Ask it again.
11  Q.   You observed Peter and A.D. complying
12  willingly with a safety instruction, right?
13  A.   Yes.
14  Q.   And that was not a reason to tell the
15  captain, right?
16  A.   In and of itself, no.
17  Q.   Good. Okay. So did you observe Peter and
18  A.D. -- well, strike that.
19       When they moved to row 17, was there another
20  passenger in row 17?
21  A.   Yes.
22  Q.   Do you remember anything about that
23  passenger?
24  A.   No.
25  Q.   Male, female?

Page 83

1   A.   I believe it was male, but I can't a hundred
2   percent say.
3   Q.   Okay. Do you remember whether he was
4   Caucasian or black?
5   A.   No. No.
6   Q.   Okay. Now, did you observe Peter and A.D.
7   harassing that passenger?
8   A.   No.
9   Q.   Did anyone else tell you that they observed
10  Peter and A.D. harassing that passenger?
11  A.   No.
12  Q.   Okay. So there was no harassment going on
13  between Peter and A.D. and that passenger?
14  A.   Yes.
15  Q.   That's correct, a correct statement?
16  A.   Yes.
17  Q.   Okay.
18       MR. MAYE: John, do you want to take a break?
19  It's about an hour and forty minutes in.
20       MR. McKAY: Oh, we did take a break. We took
21  two breaks.
22       Let me just finish this line of questioning.
23       MR. MAYE: That's fine. I just want to make
24  sure that the court reporters are fine.
25       MR. McKAY: You know, I have concerns about

Page 84

1   all of them as well.
2        MR. MAYE: Okay.
3        MR. McKAY: But I know that we just recently
4   took two breaks.
5        THE WITNESS: Not when we -- not when we were
6   still on the record. I did not get a break.
7        MR. MAYE: Taking a break is not a bad thing.
8   I'm not trying to disrupt you or . . .
9   Q.   (By Mr. McKay) So you decided to talk to the
10  captain and the first officer about it. And then it
11  says "He advised us to do frequent walk-bys." Who is
12  "he"?
13  A.   The captain.
14  Q.   Rex Shupe?
15  A.   Yes.
16  Q.   Did you know him?
17  A.   No.
18  Q.   Have you ever flown with him again?
19  A.   Not that I believe so.
20  Q.   Had you ever flown with him previously?
21  A.   Not that I believe so.
22  Q.   And then as you see there, there's a
23  redaction. Do you know what was in that redaction?
24  A.   I believe it was Scott's observation.
25  Q.   Okay. So would you read the sentence,



800.211.DEPO (3376)
EsquireSolutions.com

4

Page 129

1 believe he sat down in the row, but I can't recall.
2   Q.  Okay. Because there were times when you were
3 not observing?
4   A.  He never -- because the other passenger was
5 on the aisle, so I don't -- Scott never sat in the
6 middle of them or anything.
7   Q.  And you're sure of that?
8   A.  To the best of my recollection, yes.
9   Q.  Okay. But there are times when you didn't --
10 when you weren't watching row 31, right?
11   A.  Correct. But I was vigilant of -- or knew
12 where Scott was. I mean, you don't necessarily sit in
13 a row next to a passenger. That's not in our job.
14   Q.  All right. I'm not asking about your
15 specific job at this point. I'm just asking about your
16 observations.
17   A.  And my observations were I don't -- I don't
18 believe Scott was ever sitting in the middle seat.
19   Q.  Okay. But you would agree with me there were
20 times when you were doing your job, as you said, that
21 you were not looking at row 31?
22   A.  I was not looking at 30 -- row 31 every
23 second of the flight.
24       MR. McKAY:  Okay. Those are the only
25 questions that I have today, but I'm just going to

Page 130

1 adjourn because we do have some outstanding discovery
2 issues.
3       THE WITNESS:  What does that mean? I have to
4 come back?
5       MR. MAYE:  No, I don't know what he means --
6       THE WITNESS:  Okay.
7       MR. MAYE:  -- but I do have a few follow-up
8 questions.
9       THE WITNESS:  Okay.
10             EXAMINATION
11 BY MR. MAYE:
12   Q.  You testified earlier that before a decision
13 is made to separate a suspected victim of violence or
14 sexual misconduct, you don't interview those involved
15 or you don't conduct any, you know, investigation
16 involving asking questions of the suspected
17 perpetrator, suspected victim. Is that right?
18       MR. McKAY:  Objection to the form of the
19 question; and no, that was not her testimony.
20   A.  Correct. It is not in our training to
21 question the victim or the perpetrator. We leave that
22 to law enforcement so that we don't try and escalate a
23 situation.
24   Q.  (By Mr. Maye) And when you say "escalate the
25 situation," what do you mean? What could happen if you

Page 131

1 started interviewing the suspected perpetrator?
2       MR. McKAY:  Objection to the form of the
3 question.
4   A.  The perpetrator could get angry; there could
5 be physical violence to other passengers or to crew.
6   Q.  (By Mr. Maye) And why do you separate a
7 suspected victim from the suspected perpetrator on a
8 flight?
9       MR. McKAY:  Objection to the form of the
10 question.
11   A.  For the safety of the victim and other
12 passengers, the -- yeah, for the safety.
13   Q.  (By Mr. Maye) And is that based on your
14 training?
15   A.  Yes.
16   Q.  What about Frontier guidelines and policies?
17   A.  In Frontier's guidelines, you're supposed to
18 separate -- always separate the victim. They tell us
19 specifically you need to -- several rows need to be in
20 between the victim and the perpetrator; we're not
21 supposed to question the victim or the perpetrator,
22 just make the victim comfortable and wait for law
23 enforcement when they land.
24   Q.  And as a flight attendant, can you move the
25 suspected victim without notifying the captain?

Page 132

1       MR. McKAY:  Objection to the form of the
2 question.
3   A.  Actually, in the sexual misconduct training,
4 it says to separate them first and then notify the
5 pilot.
6   Q.  (By Mr. Maye) In this case you didn't do
7 that, right?
8       MR. McKAY:  Objection to the form of the
9 question.
10   A.  Correct.
11   Q.  (By Mr. Maye) You first contacted the
12 captain, correct?
13   A.  Yes.
14       MR. McKAY:  Objection to the form of the
15 question.
16   Q.  (By Mr. Maye) And why did you do that?
17   A.  Because we wanted to make sure we were making
18 the right decision in this case.
19   Q.  When Scott separated A.D. from his father,
20 did you observe the demeanor of Mr. DelVecchia?
21       MR. McKAY:  Objection to the form of the
22 question.
23   A.  I observed that there wasn't any yelling or
24 screaming or any arguing at that time. I noticed the
25 father stand up as the son exited the row. There was a



### Page 133

1 very brief discussion, only a few words spoken at that
2 time, until later when the father came back to the back
3 of the plane to speak to us.
4　Q.　(By Mr. Maye) At any point did you observe
5 A.D. crying at all?
6　A.　No.
7　Q.　What are the potential risks of not
8 separating a potential victim from the suspected
9 perpetrator during a flight?
10　　　MR. McKAY: Objection to the form -- sorry.
11 Objection to the form of the question.
12　A.　There could be continued harassment,
13 touching, continued threat to his safety if we hadn't
14 separated them.
15　Q.　(By Mr. Maye) So by separating A.D. from his
16 father, you were removing a potential safety threat to
17 A.D.?
18　　　MR. McKAY: Objection to the form of the
19 question.
20　A.　Yes.
21　Q.　(By Mr. Maye) Do you recall if the race of
22 Mr. DelVecchia or the child were -- was relayed to the
23 captain?
24　　　MR. McKAY: Objection to the form of the
25 question.

### Page 134

1　A.　Not that I recall. No race was mentioned of
2 either.
3　　　MR. MAYE: I have no further questions.
4 Thanks.
5　　　FURTHER EXAMINATION
6 BY MR. McKAY:
7　Q.　You certainly conveyed your unease to the
8 captain, didn't you?
9　A.　In what regards to -- in what time when we
10 spoke to the captain?
11　Q.　At some point during the flight, you told the
12 captain you were uneasy about the situation of Peter
13 and A.D. traveling together on the plane?
14　A.　I relayed to the captain my observations,
15 yes.
16　Q.　Which included your unease?
17　A.　It included what -- I told him exactly what I
18 had observed.
19　Q.　Just as you told the police later in your
20 statement, right?
21　A.　Yes.
22　Q.　Okay. At no point during the flight did A.D.
23 indicate to you that he was being molested, did he?
24　A.　We -- I did not ask him, and he did not say
25 anything in regards to that.

### Page 135

1　Q.　So he never stated to you or to another
2 flight attendant, as far as you know, that he was being
3 molested?
4　A.　Not that I recall.
5　Q.　And no other passenger indicated to you that
6 they observed A.D. being molested by his father?
7　A.　I did not question any passengers. It's not
8 our job.
9　Q.　So that would be a no?
10　A.　It would be that I did not ask any passengers
11 about the incident.
12　Q.　Nor did any passengers tell you that they saw
13 that A.D. was being molested?
14　A.　None said anything to me, no. It was not
15 discussed.
16　Q.　And no flight attendant told you that they
17 had received any statement from a passenger that they
18 saw this alleged molestation occurring?
19　A.　They did not say anything to me if they did.
20　Q.　So all you have to base your conclusion that
21 this alleged molestation happened was the statement of
22 Scott that he had seen hands inserted between the legs,
23 right?
24　　　MR. MAYE: Object to form.
25　A.　I didn't allege any molestation.

### Page 136

1　Q.　(By Mr. McKay) No one said you did.
2　A.　You just said "alleged molestation," and I
3 said I did not allege molestation.
4　Q.　Okay.
5　A.　This was not my decision. This was the
6 captain's decision after we gave him all of our
7 observations.
8　Q.　My apologies. It's a difference in
9 terminology.
10　　　So the conclusion that there had been some
11 molestation, right or wrong, came from the statement by
12 Scott that he had seen something?
13　A.　I didn't come to any conclusion.
14　　　MR. MAYE: Objection. Hold on. Hold on.
15 Object to form.
16　　　THE WITNESS: I didn't come to any
17 conclusions.
18　Q.　(By Mr. McKay) Okay.
19　A.　I reported what I saw and I went by the
20 captain's instructions.
21　Q.　But you do believe that the sexual misconduct
22 must-read is somehow connected to what happened on
23 Flight 2067?
24　A.　I believe -- yes.
25　Q.　Okay. Fair enough. All right.

