# EXHIBIT D

**Excerpts from Deposition of Rex Shupe**

CAPTAIN REX T. SHUPE
DELVECCHIA vs FRONTIER AIRLINES

December 04, 2019
1–4

## Page 1

```
 1            UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF NEVADA
 3                         -oOo-
 4
 5   PETER DELVECCHIA, et al.,    )
                                  )  Civil No.:
 6        Plaintiff,              )  2:19-CV-01322-KJD-NJK
                                  )
 7   v.                           )
                                  )
 8   FRONTIER AIRLINES, INC.,     )
     et al.,                      )
 9                                )
          Defendants.             )
10   _____)
11
12
13
14      VIDEOTAPED DEPOSITION OF CAPTAIN REX SHUPE
15              Taken on December 4, 2109
16                   at 8:29 a.m.
17
18
19            ADVANCED REPORTING SOLUTIONS
                    159 West Broadway
20              Broadway Lofts, Suite 100
                Salt Lake City, Utah 84101
21
22
23
24   REPORTED BY:  Michelle Mallonee, RPR, CSR
25
```

## Page 2

```
 1                     APPEARANCES
 2
 3   For Plaintiff:
 4       John D. McKay, Esq.
         PARK AVENUE LAW, LLC
 5       1255 East Logan Avenue
         Salt Lake City, Utah 84105
 6       (800) 391-3654
         johndmckayatty@gmail.com
 7
 8   For Defendant:
 9       Tara Shelke, Esq.
         ADLER MURPHY & MCQUILLEN LLP
10       20 South Clark Street, Suite 2500
         Chicago, Illinois 60603
11       (312) 345-0700
         tshelke@amm-law.com
12
13
14   ALSO PRESENT:
15   Alyse Largin, Videographer
16                      * * *
```

## Page 3

```
                 I N D E X
WITNESS                                          PAGE

            CAPTAIN REX SHUPE

Examination by Mr. McKay                           4

Examination by Mr. Shelke                         71




                 E X H I B I T S

                      (None)
```

## Page 4

PROCEEDINGS
-oOo-

3  THE VIDEOGRAPHER: This is Media No. 1 in the
4  recorded video deposition of Rex Shupe, in the matter of
5  Peter Delvecchia versus Frontier Airlines, being heard
6  before the U.S. District Court for the District of
7  Nevada, Case 2:19-cv-01322.
8    This deposition is being held at Advanced
9  Reporting in Salt Lake City, Utah. Today's date is
10 December 4th, 2019. The time is 8:29.
11   Will counsel please state who they are and who
12 they represent.
13   MR. MCKAY: I'm John McKay of Park Avenue Law,
14 and I represent the plaintiffs, Peter and A.D.
15   MS. SHELKE: I'm Tara Shelke, last name spelled
16 S-H-E-L-K-E, and I represent Defendant Frontier Airlines.
17   THE VIDEOGRAPHER: Will the court reporter
18 please swear in the witness.
19
20       REX SHUPE,
21     having been first duly sworn,
22     was examined and testified as follows:
23          EXAMINATION
24 BY MR. MCKAY:
25 Q. Would you state your full name, please.

ESQUIRE DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

EXHIBIT D

Page 21

1  Q. Okay. And now Chelsie has --
2  A. And --
3  Q. Go ahead.
4  A. And -- and I'm sure we'll get into this, but I
5  also called back and chatted with the other two flight
6  attendants.
7  Q. Okay. Let's start with Chelsie and Scott.
8  A. Okay.
9  Q. And then we'll add the other two.
10     So Chelsie at this point has told you that she
11  was concerned about stroking of the face that she saw --
12  A. Yes.
13  Q. -- correct? Okay.
14     And then Scott comes in, and Scott says what?
15  A. Well, Scott described the -- the hand near the
16  crotch area and how inappropriate it seemed to Scott.
17  Q. What exactly did he say?
18  A. Well, I can't remember exactly what he says.
19  Q. All right.
20  A. But he says that the -- that the hand -- he
21  talked about the -- the inappropriate touching. What --
22  what that constituted for him, I don't -- but he did --
23  he was specific about the hand being near the groin area
24  of the minor.
25  Q. Okay. So it is a hand that is in the vicinity

Page 22

1  of the groin area is what you understood?
2  A. Yes.
3  Q. Okay. He didn't mention that the hand was --
4  was palpating or groping or anything along those lines?
5  A. Those words were not used.
6  Q. Okay. Anything similar to that, grabbing,
7  stroking, anything like that?
8  A. Not that I recall.
9  Q. Okay.
10  A. What I recall was the hand was inappropriately
11  in the -- in the groin/crotch area of the minor.
12  Q. Did he tell you that he observed both the adult
13  and the minor were asleep at the time?
14  A. Not that I recall.
15  Q. So are you saying that he might have and you
16  don't recall, or that he didn't?
17  A. No. It's not on my impression that they were --
18  that he relayed to us that they were asleep.
19  Q. Would that have made a difference to you?
20  A. I don't know.
21  Q. Well, would you -- would you consider that
22  somebody is inappropriate -- is being inappropriate if
23  they were sound asleep and their hand was in the vicinity
24  of somebody's groin?
25  A. Restate that question one more time.

Page 23

1  Q. Well, let me put it this way. If somebody is
2  sound asleep, their actions would be involuntary,
3  correct?
4  A. Correct. Yeah.
5  Q. Okay. So you wouldn't consider that somebody is
6  sexually molesting someone in their sleep?
7  A. Correct.
8  Q. Okay. So if Scott had told you that these two
9  people were asleep, presumably you would have said, well,
10  it's probably not an active action if the person is
11  asleep, right?
12  A. Right.
13  Q. Okay. And -- and if the other person is -- is
14  asleep as well, if two people are asleep, there's
15  probably not a -- a -- a sexual molestation situation
16  going on, right?
17  A. That sounds right.
18  Q. Okay. So it's important that Scott left out the
19  fact that the two people were asleep?
20  A. If that's what was happening, yes.
21  Q. Okay. So now, at this point, you've received
22  information from Chelsie that she didn't agree with the
23  stroking of the face, and you've received information
24  from Scott that there was a hand near the crotch. And
25  based on that information, you and First Officer Mullin,

Page 24

1  jointly with the flight attendants, made a decision to
2  separate the child from the adult?
3  A. Correct.
4  Q. Okay. Had you ever made a decision like that
5  before?
6  A. No. And let me add to that, that it wasn't just
7  those two.
8  Q. Okay.
9  A. For us to -- to take action with a passenger, we
10  don't take that lightly. And so I also called back the
11  third flight attendant and the fourth one and talked to
12  them individually on the phone.
13  Q. Okay.
14  A. "What did you see?"
15  Q. Okay. So let me just make sure we get the names
16  here.
17     So that's Amanda Nichol and Anna Bond, correct?
18  A. Correct.
19  Q. Okay. And what -- and -- and did you have them
20  both on the phone at the same time?
21  A. No.
22  Q. No. Okay.
23     So who did you speak with first?
24  A. The third, the C flight attendant.
25  Q. The C flight attendant is Bond?



Page 29

1  A.  Contact?
2  Q.  I mean, they hadn't rung their bell, they hadn't
3  said something to a flight attendant, anything along
4  those lines?
5  A.  I don't know.
6  Q.  Okay.
7  A.  I wouldn't know who -- when the passengers ring
8  the bell. We don't --
9  Q.  All right.
10  A.  -- we don't know.
11  Q.  But you, presumably, knew that the -- the child
12  had not complained to anyone about any inappropriate
13  touching?
14  A.  I don't know if the child complained or not.
15  With all the information I'd received from the flight
16  attendants, I'd -- I -- it wasn't told me that the child
17  had complained.
18  Q.  Okay. Now, after concluding the telephone or
19  intercom discussions with Bond and Nichol, what did you
20  do next?
21  A.  Well, that's when we decided yes, let's separate
22  the two.
23  Q.  And you say "we" decided. How -- how did
24  that -- I mean, you're the captain.
25  A.  Well, sure.

Page 30

1  Q.  So it's your decision.
2  A.  The buck stops with me, right?
3  Q.  Right.
4  A.  Yeah.
5  Q.  Right. But you -- you discussed it with all
6  four present?
7  A.  Correct.
8  Q.  Okay. And -- and I gather everybody agreed that
9  the right thing to do is -- is to separate the child from
10  the father?
11  A.  Correct.
12  Q.  All right. And again, you didn't know that it
13  was the father at this time?
14  A.  I did not know.
15  Q.  Okay. Now, I have had produced to me a page
16  from the flight attendant manual.
17      Do you -- do you receive the flight attendant
18  manual?
19  A.  No.
20  Q.  Okay. So what procedures, SOPs, or whatever
21  guides your decision making in a situation such as this,
22  especially one that you've never encountered before?
23  A.  Well, I mean, we don't have a lot of guidance
24  when it comes to the -- the sexual -- this -- sexual in
25  nature or inappropriate touching in the back.

Page 31

1      We do have what we call "threat levels" in the
2  back between the passengers.





CAPTAIN REX T. SHUPE  
DELVECCHIA vs FRONTIER AIRLINES

December 04, 2019  
45–48

Page 47
1 why don't I go back and give CPR to a passenger that's
2 having a heart attack?
3    Q.   Okay.
4    A.   What we are presented with is the information
5 that's the -- the issue that's going on in the back. We
6 make the decisions, what's -- in relationship to
7 aviating. So if we need to divert, or if we need to
8 consider a holding, or whatever it is that we do, we are
9 just presented with the information that's in the back,
10 and then we make the decisions on what the airplane does.
11   Q.   Your primary job is to fly the airplane?
12   A.   Correct.
13   Q.   So when a flight attendant comes to you and
14 says, Hey, I saw two passengers in the back who boarded
15 together engaged in -- in -- in some form of touching
16 each other, why don't you just say, Hey, my job's to fly
17 the airplane, that's your job?
18   A.   Well, because my responsibility is also to the
19 safety of the passengers --
20   Q.   Okay.
21   A.   -- right?
22   Q.   And where in -- in your written rules of
23 responsibility does it say for you to take a 12-year-old
24 child and -- and remove them from their parent during the
25 flight?

Page 48
1    A.   Well, we don't have an articulation in our FOM.
2    Q.   So that's just something you made up?
3    A.   We separated the adult from the child based on
4 the information that I had from the flight attendants.
5    Q.   And none of that involved flying the airplane,
6 did it?
7    A.   Correct.
8    Q.   Okay.
9    A.   But it involved the safety of the passengers.
10   Q.   And after the -- after you left the cockpit
11 after this discussion -- well, let me -- let me back up.
12 Strike that.
13        So you had the discussion with all the flight
14 attendants, and you made the decision in the cockpit to
15 separate the child from the adult. And then, I believe
16 you said the flight attendants left the cockpit; is that
17 correct?
18   A.   Correct.
19   Q.   And after the flight attendants left the
20 cockpit, you consulted the FOM?
21   A.   Yes.
22   Q.   Okay.
23   A.   Later, yeah.
24   Q.   Yes. Now, you've already at this point made --
25 given an order to separate the child from the adult,



800.211.DEPO (3376)  
EsquireSolutions.com

5

CAPTAIN REX T. SHUPE
DELVECCHIA vs FRONTIER AIRLINES

December 04, 2019
49–52

Page 49

1  but --
2    A.  Right.
3    Q.  -- now you're looking for backup for the order;
4  is that right?
5    A.  Just make sure -- yeah. I --
6    Q.  Okay.
7    A.  -- want to make sure that what we're doing is
8  the correct thing to do.
9    Q.  All right. Now, did you discuss this with First
10 Officer Mullin?
11   A.  No.
12   Q.  No. This is something you did on your own?
13   A.  Yeah.
14   Q.  Okay. And then after you looked at the FOM, you
15 left the cockpit?
16   A.  No, not that I remember, no.
17   Q.  So for the entire flight, you never left the
18 cockpit?
19   A.  I probably did. I don't remember when, and it
20 might have been when we first had the meeting.
21   Q.  Okay.
22   A.  I -- I can't remember when I left the cockpit to
23 use the restroom. And that's the only reason we leave
24 the cockpit.
25   Q.  Right.





Page 69

1   A.  Yeah.
2   Q.  Okay. And was that because somebody had sent
3 you an email or --
4   A.  No.
5   Q.  -- anything? No. You just felt the need --
6   A.  Just -- umm-hmm.
7   Q.  -- to tell him? All right.
8       Do you know whether your conversation with him
9 was recorded in any way?
10  A.  No.
11  Q.  You don't know, or --
12  A.  I don't -- no, I don't think so.
13  Q.  Okay. And what's the chief pilot's name?
14  A.  Devon Hussey. I'm not -- I'm not exact on the
15 spelling. H-U-S-S-E-Y, I believe.
16  Q.  Okay. In Denver?
17  A.  In Las Vegas.
18  Q.  In Las Vegas. Okay.
19      And he's the chief pilot for all of --
20  A.  No, just for the Las Vegas base.
21  Q.  Just for Las Vegas?
22  A.  Yeah.
23  Q.  Okay. I see. All right.
24      Is there anything else that you know about this
25 incident that I haven't asked you about?

Page 70

1   A.  Well, I think you've asked quite a bit about
2 this incident.
3   Q.  I've covered everything? All right. I just
4 want to make sure before you leave that I've covered
5 everything.
6       I've asked you everything that you know about
7 the incident?
8   A.  Correct.
9   Q.  Okay. All right.
10      So what will happen next is that the court
11 reporter will type this out in a transcript. And you
12 have the right to proofread the transcript, essentially,
13 make sure that everything is correct. You can change
14 typos. You can also change factual matter if, for
15 instance, you remember something different than how you
16 remembered it today.
17  A.  Okay.
18  Q.  You have to tell us now whether you want to do
19 that or whether you waive that procedure.
20      MS. SHELKE: We'll read and -- we'll read and
21 reserve. We'll reserve and read.
22      THE WITNESS: Reserve and read?
23      MS. SHELKE: Yes.
24      THE WITNESS: There you go.
25      MS. SHELKE: But I do have a few questions

Page 71

1 before we wrap up.
2       MR. MCKAY: Oh, I'm sorry. I just -- that's
3 terrible. Please. Please ask questions.
4           EXAMINATION
5 BY MS. SHELKE:
6   Q.  I just want to make sure we have a good timeline
7 on this.
8       Captain, you were asked a lot of questions about
9 this incident.
10  A.  Yes.
11  Q.  It is correct that you do not remember the
12 specific timeline, correct?
13  A.  That's correct.
14  Q.  Okay. But you do recall that Flight Attendant
15 Chelsie Bright called the cockpit and said she wanted to
16 come in, correct?
17  A.  Correct.
18  Q.  And that is unusual to you?
19  A.  That is unusual.
20  Q.  Okay. And then while the -- Chelsie Bright, the
21 flight attendant, was in the cockpit, a second flight
22 attendant asked to come in as well, correct?
23  A.  Correct.
24  Q.  And that was highly unusual to you?
25  A.  That's unusual times two.

Page 72

1   Q.  And then based on the representations made by
2 both flight attendants, you called and spoke with the
3 remaining two flight attendants, correct?
4   A.  Correct, for verification, yeah.
5   Q.  Okay. And based on your verification from the
6 two flight attendants who did not come into the cockpit,
7 you decided that -- or you supported the decision to
8 separate the two passengers involved in this incident,
9 correct?
10  A.  Yes. After the discussions with all --
11      MR. MCKAY: Objection. Sorry. Objection to the
12 form. Go ahead.
13      That's okay. You can go ahead and answer. I
14 just make these objections for the record.
15      THE WITNESS: Okay.
16      MR. MCKAY: Yeah.
17  Q.  (BY MS. SHELKE:) So -- so it is correct that
18 after you spoke with the two flight attendants in the
19 cockpit and the two flight attendants who did not come
20 into the cockpit, you supported the decision to separate
21 the two passengers, correct?
22  A.  Correct.
23  Q.  When the decision to -- to separate the two
24 passengers was made, you had no information with regards
25 to either passenger's race, correct?



Page 73

1  A. Correct.
2     MR. MCKAY: Objection to the form.
3  Q. (BY MS. SHELKE:) When the decision to separate
4  the two passengers was made, you had no information with
5  respect to the relationship between the passengers,
6  correct?
7  A. Correct.
8  Q. If you had any information with respect to the
9  relationship of the passengers, would that have changed
10 your decision to separate the two passengers?
11 A. With the information that I had, no.
12 Q. After the two passengers were separated, did you
13 call back to the flight attendants to see if the
14 situation had escalated in any way?
15    MR. MCKAY: Objection to the form.
16    THE WITNESS: Yes.
17 Q. (BY MS. SHELKE:) Do you recall if the situation
18 had escalated any further after the two passengers were
19 separated?
20 A. No -- do I recall?
21 Q. Correct.
22 A. Restate that.
23 Q. Sorry. After the two passengers were separated,
24 did the situation ever escalate further?
25 A. No. No.

Page 74

1  Q. And it was your decision that the matter should
2  be sorted out on the ground by law enforcement --
3  A. Yes.
4  Q. -- correct?
5  A. Yes.
6  Q. That's all the questions I have.
7  A. Okay.
8     MR. MCKAY: All right. Now we're done, and you
9  want to read and sign?
10    MS. SHELKE: Yes, please.
11    MR. MCKAY: And that is that.
12    Thank you very much for coming in.
13    THE WITNESS: Thank you, John.
14    THE VIDEOGRAPHER: This is the end of the
15 deposition. We're off the record. The time is 10:03.
16    THE COURT REPORTER: And the same transcript
17 orders as yesterday?
18    MR. MCKAY: Yes, exactly the same.
19    (The deposition concluded at 10:03 a.m.)

Page 75

1  Case: Peter Delvecchia v. Frontier Airlines, Inc.
   Civil No.: 2:19-cv-01322-KJD-NJK
2  Reported By: Michelle Mallonee, RPR, CSR
   Date Taken: December 4, 2019
3
4
5                  WITNESS CERTIFICATE
6
   I, REX SHUPE, HEREBY DECLARE:
7
        That I am the witness referred to in the foregoing
8  transcript; that I have read the transcript and know
   the contents thereof; that with these corrections I
9  have noted, this transcript truly and accurately
   reflects my testimony.
10
   PAGE-LINE         CHANGE-CORRECTION           REASON
11
12
13
14
                   No corrections were made.
15
16   I, REX SHUPE, deponent herein, do hereby certify
   and declare under penalty of perjury
17 the within and foregoing transcription to be true and
   correct.
18
19
                   REX SHUPE, Deponent
20
        SUBSCRIBED and SWORN to at _____
21  _____, this _____ day of
        _____, 2019.
22
23
                                     Notary Public
24
25

Page 76

1                  REPORTER'S CERTIFICATE
2  STATE OF UTAH   )
                    )
3  COUNTY OF DAVIS )
4
5     I, MICHELLE MALLONEE, a Certified Shorthand
6  Reporter and Registered Professional Reporter, hereby
7  certify:
8        That the foregoing proceedings were taken before
9  me at the time and place therein set forth, at which time
10 the witness was placed under oath to tell the truth, the
11 whole truth, and nothing but the truth;
12       That the proceedings were taken down by me in
13 stenotype and thereafter my notes were transcribed
14 through computer-aided transcription; and the foregoing
15 transcript constitutes a full, true, and accurate record
16 of such testimony adduced and oral proceedings had, and
17 of the whole thereof.
18       I further certify that I am not a relative or
19 employee of any attorney of the parties, nor do I have a
20 financial interest in the action.
21       I have subscribed my name on this 12th day of
22 December, 2019.
23
24                              *Michelle Mallonee*
25                        Michelle Mallonee, CSR, RPR

