# EXHIBIT E

## Excerpts from Deposition of Shawn Mullin

SHAWN E. MULLIN
PETER DELVECCHIA vs FRONTIER AIRLINES

December 10, 2019
1–4

### Page 1

```
 1            UNITED STATES DISTRICT COURT
 2                  DISTRICT OF NEVADA
 3
 4   PETER DELVECCHIA, et al,        )
                                     )
 5        Plaintiff,                 )
                                     )
 6        vs.                        ) CASE NO. 2:19-CV-01322-KJD-NJK
                                     )
 7   FRONTIER AIRLINES, INC., et al, )
                                     )
 8        Defendants.                )
                                     )
 9   _____)
10
11
12
13
14
15
16
17
18
19        DEPOSITION OF SHAWN EDWARD MULLIN
20        Taken on Tuesday, December 10, 2019
21                  At 10:00 a.m.
22               At Titolo Law Office
23            9950 West Cheyenne Avenue
24                  Las Vegas, Nevada
25   REPORTED BY: SHIFRA MOSCOVITZ, CCR NO. 938
```

### Page 2

```
 1   APPEARANCES:
 2   For Plaintiffs:
 3              JOHN D. MCKAY, ESQ.
                PARK AVENUE LAW
 4              127 W. Fairbanks Avenue
                #519
 5              Winter Park, Florida
                (800)391-3654
 6
 7
 8   For Plaintiffs:
 9              TIM TITOLO
                TITOLO BRAIN AND INJURY LAW
10              9950 W. Cheyenne Avenue
                Las Vegas, Nevada 89129
11              (702)869-5100
12
13
14   For Defendants:
15              BRIANE T. MAYE, ESQ.
                ADLER MURPHY & MCQUILLEN LLP
16              20 South Clark Street
                Suite 2500
17              Chicago, Illinois 60603
                (312)345-0700
18
19
20
21   Also Present: MONICA HAYWORTH, VIDEOGRAPHER
                  PETER DELVECCHIA
22
23
24
25
```

### Page 3

```
 1                    EXAMINATION
 2   WITNESS:                                    PAGE
     Shawn Edward Mullin
 3
 4   Examination by
     Mr. McKay                              4,122,134
 5
     Mr. Maye                                 115,132
 6
 7
 8
 9                      EXHIBITS
10   EXHIBIT                                     PAGE
11   Exhibit 1    Notice of Deposition              9
12   Exhibit 2    Printouts of ACARS Messages      61
13   Exhibit 3    photographs from employee records 76
```

### Page 4

```
 1      LAS VEGAS, NEVADA; DECEMBER 10, 2019
 2            10:00 A.M.
 3             -oOo-
 4   (NRCP Rule 30(b)(4) waived by the parties prior to the
 5   commencement of the deposition.)
 6   (FRCP Rule 30(b)(5) waived by the parties prior to the
 7   commencement of the deposition.)
 8   Thereupon--
 9       SHAWN ADAM MULLIN,
10   was called as a witness, and having been first duly sworn,
11   was examined and testified as follows:
12            EXAMINATION
13   BY MR. MCKAY:
14       VIDEOGRAPHER: This is media number one to
15   the video recorded deposition of Shawn Edward
16   Mullin in the matter of Peter Delvecchia et al.
17   versus Frontier Airlines Incorporated, et al,
18   being heard before the United States District
19   Court for the District of Nevada, case number
20   2:19-cv-01322-KJD-NJK. This deposition is
21   being held at Titolo Law Office, 9950 West
22   Cheyenne Avenue, Las Vegas, Nevada, starting at
23   10:04 a.m. My name is Monica Hayworth, and I
24   am the videographer. The court reporter is
25   Shifra Moscovitz, with Esquire Deposition
```



800.211.DEPO (3376)
EsquireSolutions.com

EXHIBIT
E
2

Page 38

1 and collect a couple of pieces of paper from us and
2 deliver a couple of pieces of paper to us right
3 before we leave.
4  Q. Now, with this flight 2067, do you
5 remember whether or not there was a Specials report
6 given to you?
7  A. I don't remember, it's delivered probably
8 75 percent of the time, 80 percent of the time.
9  Q. Just so I understand your testimony,
10 though, if their names, if a particular passenger is
11 involved in the flight attendant's call, were not
12 included on the specials report, you would not have
13 any referenced material that would have told you
14 their names, right?
15  A. Correct.
16  Q. Okay. And I believe you said you weren't
17 sure -- strike that. Do you know which flight
18 attendant initially called the cockpit?
19  A. I don't.
20  Q. Okay. After you and Captain Shoop
21 discussed the contents of that first call, what
22 happened next?
23  A. I mean, through the course of this entire
24 action obviously we are going to be flying the
25 aircraft.

Page 39

1  Q. Yes.
2  A. So my primary duty, and crews especially
3 was to work the radios and communicate with ATC and
4 Captain Shoop's primary duty was to fly the
5 aircraft. So I know that he and I discussed it,
6 just if there is anything we can talk about, I
7 remember the initial, after the initial call from
8 the flight attendants, he and I discussed it very
9 briefly. It was just, hey, you know, if this
10 becomes more of an issue we need to look into
11 additional steps, is there anything you can think of
12 that we should look at. And we both maybe did a
13 couple of searches in our manuals to see if there is
14 anything that addressed it, kind of, I think Captain
15 Shoop and I were discussing things in a way that he
16 would allow him to formulate kind of a checklist or
17 a plan, say, hey, if this we do that. And that's
18 kind of how we run our lives is, we take as much
19 information in and if it reaches a certain
20 threshold, then we act upon it accordingly, if not
21 we continue to the next option and stuff. So I
22 think he and I were just discussing things so that
23 he could formulate that work flow.
24  Q. And when you say you were looking at
25 things, that would have be the FLM Part 1?

Page 40

1  A. Correct.
2  Q. And did each of you have that on your
3 phones?
4  A. On our Ipads, when we are on the aircraft.
5  Q. I see, on a tablet?
6  A. Yes, it's our electronic flight bag is
7 managed through a controlled software that's on our
8 Ipads.
9  Q. So when you were looking for things then,
10 were you looking specifically at the threat levels?
11  A. I do know that we looked at the threat
12 levels, I looked at the threat levels, I am not sure
13 what he looked at. I looked at the threat levels to
14 see what they meant and kind of what the designators
15 are for each one. And there is many. And I also
16 did use a cursory search for anything related to
17 passenger safety or anything of that nature, just to
18 see if I could find anything, but I couldn't come up
19 with anything in the time. And, you know, as
20 typically is the case when we are flying the
21 aircraft, we have to divvy up those responsibilities
22 and their level of threat and level of importance.
23 So I did that for a while until I got busy flying
24 the aircraft again and then they hadn't called back.
25 So initially I just I assumed that there was not



Page 41

1  anything additional going on, so we kind of just
2  flew for a while.
3      Q.  I assume the aircraft was on auto pilot at
4  this point?
5      A.  Generally at that point, yes.
6      Q.  Okay. And Captain Shoop was the pilot
7  flying, you were the pilot monitoring?
8      A.  Correct.
9      Q.  So when you say you had to get back to
10 flying the airplane, that would be more of the
11 monitoring?
12     A.  Yes, monitoring, and as the pilot
13 monitoring it's typically my job to input any routes
14 and if we get any reroutes from ATC, and then the
15 Captain will, or the pilot flying will then verify
16 them. It requires two steps of verification for any
17 of those things, yes.
18     Q.  One of things I have asked for in this
19 case and have not received is a log of the actual
20 flight route flown. Do you remember on this
21 particular date whether there was any unusual or
22 different routing from the typical routing of this
23 flight?
24     A.  This was one of my first few times going
25 to Raleigh. I probably had only been there three or



Page 82

1  A. So we could have asked, sure, but it
2  wouldn't have made a difference in our decisions.
3  Q. Somebody could have asked the passengers
4  themselves, couldn't they?
5  A. Sure, we knew that they were traveling
6  together, that they had sat together and moved
7  together, so it was safe to say they were together
8  in that situation.
9  Q. Was there any attempt made to ask them why
10 they were traveling together?
11 A. No, I mean people travel for many reasons,
12 and I don't think anyone asked.
13 Q. Was there any attempt made to ask them
14 their names?
15 A. I don't know that, I don't know if that's
16 a yes or no, I didn't ask them, so.
17 Q. You didn't ask anybody to find out what
18 their names are?
19 A. I did not ask that, no.
20 Q. Was there a discussion that they couldn't
21 be related to each other?
22 A. No.
23 Q. Was there at this point in time, with four
24 people in the cockpit, was there a discussion about
25 their different races?

Page 83

1  A. There was no discussion about it. I mean
2  I think it was used as a descriptor by somebody, but
3  I don't know, it was not a relevant fact in our
4  determinations of the captain and I making a
5  decision.
6  Q. So well one of the flight attendants you
7  are saying said the older man is white and the
8  younger child is black?
9      MR. MAYE: Object to form.
10 Q. Is that correct?
11 A. I don't know that they said the older man
12 was white. I know that it was a young African
13 American child. But I don't remember when they said
14 anything about the adult.
15 Q. But somehow you knew it was not an African
16 American adult traveling with an African American
17 child?
18 A. Yes, I don't know how that came up, it
19 would have been with one of the flight attendants.
20 Q. But you never saw, right?
21 A. No.
22 Q. So you would have had to have been told
23 that information by one of the flight attendants?
24     MR. MAYE: Object to form.
25 Q. Let me ask it a different way. Since you

