Timothy R. Titolo, Esq.
Nevada Bar No. 003617
TITOLO LAW OFFICE
9950 West Cheyenne Ave.
Las Vegas, Nevada 89129
(702) 869-5100
tim@titololaw.com

John D. McKay, Esq.
*Admitted pro hac vice*
PARK AVENUE LAW LLC
127 W. Fairbanks Ave. No. 519
Winter Park, Florida 32789
(434) 531-9569
johndmckayatty@gmail.com

**Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| PETER DELVECCHIA, *et al.*, | Case No: **2:19-CV-01322-KJD-DJA** |
| Plaintiffs, | |
| vs. | **PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANT FRONTIER AIRLINES, INC.** |
| FRONTIER AIRLINES, INC., *et al.*, | |
| Defendants. | |

Plaintiffs, Peter DelVecchia individually and as next friend of A. D., a minor, by counsel,

hereby move for sanctions pursuant to Fed. R. Civ. P. 37(b)(2)(A) and/or the Court's inherent

sanction authority against Defendant Frontier Airlines, Inc. ("Frontier") for Frontier's failure to

comply with the Court's May 8, 2020 Order (ECF No. 83) compelling certain discovery responses

and the Court's March 29, 2021 Order (ECF No. 120) that affirmed the May 8, 2020 Order and

modified it to compel additional discovery responses. To date, Frontier has not fully complied with

those Orders because it has produced responsive documents with relevant information redacted. The Orders did not authorize redaction of any information, and the redacted information does not fit within any recognized privilege or other law authorizing redaction of information.

### Certification Pursuant to Rule 37(a)(1) and LR 26-6(c)

Plaintiffs' counsel have made good faith efforts to resolve all of the matters discussed in this Motion without Court intervention, but all such efforts have been unsuccessful. The meet-and-confer sessions include a conference call conducted with Attorneys John McKay (representing Plaintiffs), Brian Maye (representing Frontier) and Matthew Martin (representing Frontier) over a period of one hour and forty minutes on July 29, 2021, in which multiple discovery issues including the ones briefed herein were discussed, and a follow-up call between Messrs. McKay and Martin on August 4, 2021 that lasted one hour and fifteen minutes covering the same issues. Despite a sincere effort to resolve or narrow the dispute concerning the redactions during those two calls, the parties were unable to resolve or narrow the dispute without Court intervention.

### Procedural History

The May 8, 2020 Order by Magistrate Judge Albregts granted in part, and denied in part, Plaintiffs' Second Amended Motion to Compel (ECF No. 77). As relevant to this Motion, that Order directed the following with respect to Plaintiffs' First RFP No. 47: "Defendant shall provide a supplemental response of any race discrimination complaints filed by passengers, not employees, over the past 5 years only, and limited geographically to the continental United States." ECF No. 83 at 4. With respect to Plaintiffs' Second RFP Nos. 2-7, requesting Passenger Incident Reports describing situations in which a passenger was involved as a perpetrator, victim, or otherwise accused or suspected of being involved in human trafficking or sex trafficking or racial profiling on a Frontier flight, the Court held: "The Court finds it relevant and proportional to compel a supplemental

response of Passenger Incidents Reports only that are related to human or sex trafficking or racial profiling, that involved a parent-child relationship, for the past 5 years in the continental United States." *Id.* at 4-5.

Exercising their rights under Fed. R. Civ. P. 72(a) and LR IB 3-1, Plaintiffs filed Objections (ECF No. 88) to that Order, seeking, *inter alia*, to remove the temporal, geographical and parent-child restrictions contained in the above-quoted rulings. Notably, Frontier did not move for a stay of the May 8 Order or a stay of discovery while the Objections were being decided, nor does Rule 72 automatically impose one. *See, e.g., Weinstein v. Meritor, Inc.*, No. 2:16-cv-01076, 2017 WL 1552322, at *2 (D. Nev. Apr. 27, 2017)(discussing two-part test necessary for imposing a stay of discovery). The Objections, if sustained, would have only *expanded* the scope of what was to be produced under Magistrate Judge Albregts' Order, yet Frontier did not produce any of the documents that Judge Albregts had ordered to be produced during the entire 10-month period that Plaintiffs' Objections were pending before Judge Dawson. Judge Dawson ruled on the Objections on March 29, 2021 (ECF No. 120), with the result that only the parent-child restriction—that had been applicable only to Second RFP Nos. 2-7, *not* to First RFP No. 47—was removed from the order to produce. Frontier finally began to produce documents responsive to First RFP No. 47 and Second RFP Nos. 2-7 nearly four months after Judge Dawson's Order, on July 16 and 30, 2021. Ultimately, the documents produced revealed numerous instances where Frontier's employees, flight attendants and pilots alike, have singled out persons of color for disparate treatment—including kicking them off flights for what may have been pretextual reasons—and have falsely accused passengers of being involved in human trafficking and/or sex trafficking based primarily on the passengers' appearance, especially where people of different races were traveling together. However, Frontier redacted from the documents all information that would identify the persons affected by those decisions, effectively

preventing Plaintiffs and their counsel from contacting them to obtain further information and

potential witnesses for the prosecution of their own claims of discriminatory treatment by Frontier.

Because Frontier also labeled the redacted documents it produced as "Confidential" under the

Protective Order entered in this case on October 10, 2019 (ECF No. 37), they are being filed under

seal as **Exhibit A** to this Motion, along with a Motion for Leave to File Under Seal.

### ARGUMENT

### I.     <u>Frontier's 14-month delay in producing documents is inexcusable</u>

By the time Judge Albregts issued the first Order compelling production of the documents,

Frontier had been in possession of the requests for more than six months.[1] Certainly that was

sufficient time to have collected the requested documents from Frontier's files to have them ready to

produce in the event its baseless objections were overruled (which they were). Frontier did not

comply with Judge Albregts' Order after it was entered, however, apparently electing without legal

authority to wait until Plaintiffs' Objections were ruled on by Judge Dawson. But Frontier did not file

any cross-objections to Judge Albregts' Order, and the only possible result of Plaintiffs being

successful on their Objections was that Frontier would have to produce *more* documents than Judge

Albregts had ordered, not less. Ultimately, Judge Dawson's ruling on Plaintiffs' Objections meant

that Frontier had to produce some, but not all, of the additional documents that Plaintiffs had

requested beyond what Judge Albregts had ordered produced on May 8, 2020. By the time Judge

Dawson issued his decision on the Objections, Frontier had been in possession of the requests for *17*

*months* and had been under an Order to produce responsive documents limited to five years and the

continental United States (and with the additional limitation of a parent-child relationship as to

---

[1] Plaintiffs' First RFP, which included No. 47, was served on October 7, 2019, and the Second RFP, which included Nos. 2-7, was served on November 15, 2019.

Second RFP Nos. 2-7 only) for the preceding *10 months*. Yet, it had not produced a single responsive document by then, and would not do so for an additional four months.

The Covid-19 pandemic has disrupted the progress of this litigation, as reflected in the parties' multiple joint filings for extension of the pretrial deadlines. But those disruptions have mostly affected the ability of the parties' attorneys to travel for in-person depositions and conduct other discovery such as an IME, and the ability to obtain expert witness opinions that depend on certain discovery having been conducted. Frontier has operated its business throughout the pandemic, however, and in fact even completed a successful Initial Public Offering this past Spring. The responsive documents presumably were located in Frontier's corporate offices in Denver, or were in an electronic database, and are of a type that could easily have been transmitted electronically following entry of the Orders compelling their production.

A separate, but equally disruptive, delay was caused by the Transportation Security Administration (TSA) withholding the release of certain relevant Sensitive Security Information ("SSI") until the Court entered TSA's own SSI-specific Protective Order. However, the documents that are the subject of the Orders do not contain SSI and were therefore not affected by that delay.

There simply is no justification for Frontier delaying its compliance with the Court's Order for 14 months. Its willful disobedience of the Court's Orders to produce the documents should subject it to sanctions, under Rule 37(b)(2)(A) and/or the Court's inherent powers to sanction, *see America Unites for Kids v. Rousseau*, 985 F.3d 1075, 1085 and 1088 (9th Cir. 2021).

Rule 37(b)(2)(A) states, in relevant part:

If a party . . . fails to obey an order to provide or permit discovery, including an order under Rule . . . 37(a), the court where the action is pending may issue further just orders. They may include the following:

(i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;

(ii) prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence;

(iii) striking pleadings in whole or in part;

(iv) staying further proceedings until the order is obeyed;

(v) dismissing the action or proceeding in whole or in part;

(vi) rendering a default judgment against the disobedient party; or

(vii) treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination.

Frontier's refusal to comply with the Court's two Orders has consumed *more than a year* during which, even despite the restrictions imposed by the pandemic, Plaintiffs and their counsel could have been analyzing the effect of the prior instances of false accusations and discriminatory treatment on their own claims, making necessary pleading amendments based on those prior instances of discrimination, obtaining expert opinions in support of their claims based on the information, and contacting the witnesses to Frontier's pattern of conduct and arranging for their depositions. Frontier is no stranger to litigation, and obviously intended to gain strategic advantage over Plaintiffs by orchestrating the delay in defiance of the discovery rules and the Court's Orders. "'Courts need not tolerate flagrant abuses of the discovery process.'" *O'Neal v. Las Vegas Metro. Police Dep't*, Case No. 2:17-cv-02765-APG-EJY (D. Nev. Aug. 10, 2020)(quoting *Campbell Indus. v. M/V Gemini*, 619 F.2d 24, 27 (9th Cir. 1980)). Plaintiffs respectfully suggest that the most appropriate sanction for Frontier's conduct is that of Rule 37(b)(2)(A)'s subparts (i), (ii) and (vii), finding Frontier in contempt of Court and directing the following finding of fact:

> Defendant Frontier Airlines, Inc. has instructed its flight attendants to look for, and report to the Captains of flights, suspected human trafficking and sex trafficking by its passengers. However, despite the fact that it has received multiple notices of its flight attendants and pilots racially profiling passengers and falsely suspecting passengers of human trafficking or sex trafficking based at least in part on their being Black or part of a mixed race group, it has never provided its flight attendants or pilots with any training on the avoidance of discrimination toward passengers based on their race, national origin or ethnicity.

Moreover, pursuant to subpart (ii), Frontier should be prohibited from introducing any evidence that conflicts with that finding. Issuing sanctions under Rule 37 is a matter within the Court's broad discretion. *Payne v. Exxon Corp.,* 121 F.3d 503, 507 (9th Cir. 1997). "A district court's finding that one of its orders was violated 'is entitled to considerable weight because a district judge is best equipped to assess the circumstances of the non-compliance.'" *Id.* (quoting *Adriana Int'l Corp. v. Thoeren,* 913 F.2d 1406, 1411 (9th Cir. 1990), *cert. denied,* 498 U.S. 1109 (1991)).

"'An award of sanctions under Rule 37 should effectuate its three purposes: (1) ensuring the disobedient party does not benefit from non-compliance; (2) obtaining compliance with discovery orders; and (3) providing a general deterrent in the particular case and litigation in general.'" *Tourgeman v. Collins Fin. Servs. Inc.*, Case No. 08-cv-1392-JLS(NLS) (S.D. Cal., Jan. 5, 2012)(quoting *United Consumers Club, Inc. v. Prime Time Marketing Management Inc.*, 271 F.R.D. 487, 501 (N.D. Ind., 2010)). This is a case in which Plaintiffs have calculated that Frontier has objected to no less than 77% of their discovery requests, often with cut-and-paste boilerplate relevance objections that are demonstrably baseless. *See, e.g.,* ECF No. 77, at 7-18 and ECF No. 83, at 5. As noted above, Frontier's refusal to comply with the rules of discovery and the Court's Orders is clearly intentional, aimed at creating an advantage by delaying and denying Plaintiffs access to documents that support their claims. Although "[w]illfulness is not required to impose a Rule 37(b)(2)(A)(i) sanction unless the sanction amounts to dismissal or default judgment," *id.,* willfulness on Frontier's part is obviously present here. "Sanctions under Rule 37(b)(2) must first be "just" and second "related" to the claim at issue in the order to provide discovery." *Id.* (citing *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites*, 456 U.S. 694, 707 (1982)). The requested sanctions meet both prongs of that requirement, because they are tailored to the specific issue of fact that Plaintiffs were attempting to establish through the discovery requests they served on Frontier almost two years

ago, and the Court can see that the redacted documents do, in fact, establish a pattern of racial profiling and false trafficking accusations by flight attendants assisted by Frontier pilots. Frontier has never denied that it did not provide the flight attendants and pilots involved in the instant case—or any others—with anti-discrimination training concerning passengers, despite the Department of Transportation urging all U.S. airlines to do so more than two years prior to the subject flight because of the airlines' statutory obligations to prevent and prohibit racial, ethnic and other types of discrimination against customers under the plain language of 49 U.S.C. §40127(a) and the Department's interpretations of 49 U.S.C. §§ 41310(a), 41702, and 41712, *see* 2017 WL 127996 (D.O.T. 2017)(D.O.T. press release and guidance document).[2]

Hairs could, conceivably, be split over whether a 10-month or 4-month delay in responding to a Court Order constitutes a "fail[ure] to obey" that Order for purposes of Rule 37(b)(2),[3] although redacting information from produced documents where the Orders compelling production did not authorize redaction should clearly qualify. Even if Frontier's noncompliance were to fall outside of the language of Rule 37(b)(2), the Court also possesses inherent powers to manage its dockets to promote the "orderly and expeditious disposition of cases." *Rousseau*, 985 F.3d, at 1088. "That authority includes the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* (quoting *Goodyear Tire & Rubber Co. v. Haeger* , ⸺ U.S. ⸺, 137 S. Ct. 1178, 1186 (2017))(internal quotation marks deleted). Frontier's dilatory conduct, improper redaction of relevant

---

[2] Copies are attached hereto as **Exhibit B**. Given the direct overlap between the airline-specific statutes and the general prohibitions of 42 U.S.C. §1981, Plaintiffs believe that the airline statutes and the DOT's guidance issued pursuant to them put Frontier and its employees on specific notice of their identical obligations under §1981.

[3] *But see, Brockton Sav. Bank v. Peat, Marwick, Mitchell & Co.*, 771 F.2d 5, 12 n.7 (1ˢᵗ Cir. 1985)(Coffin, J.)(dicta)( "As an aside, we reiterate that even if the order to appear were invalid, First United's failure to obey earlier orders, its tactics of delaying discovery, and its failure to reveal the non-existence of the solicitation letters earlier, would by themselves justify default judgment.").

information and willful disobedience of the Court's two Orders is such an abuse, and supports the sanctions requested above even if they are not authorized under Rule 37(b)(2)(A).

## II.     The Court should also order Frontier to remove all the redactions

Frontier claims that it redacted all of the passenger names and their email addresses, physical addresses, telephone numbers and other means of reaching out to them, based on its alleged concern for maintaining those potential witnesses' privacy. However, even though it now asserts that argument, it never previously raised any privacy-based objection in connection with First RFP 47 or Second RFP Nos. 2-7, the discovery requests under which the documents were ordered to be produced. *See*, requests and objections incorporated in ECF No. 77 (Plaintiffs' Second Amended Motion to Compel).[4] Nor did Frontier make any such argument in its brief in opposition to the motion to compel, *see* ECF No. 79, at 3-6. "[F]ailure to object to discovery requests within the time required constitutes a waiver of any objection." *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1473 (9th Cir. 1992); *see also Haddad v. Interstate Management Co., LLC*, 2012 WL 398764, * 1 (D. Nev. 2012) (same); 7 James Wm. Moore et al., MOORE'S FEDERAL PRACTICE, § 33.174[2], at 33-106, §34.13[2][a], at 34-56 to 34-56.1 (3d ed. 2012). Failing to argue a particular objection in a brief also constitutes waiver, *see Medina v. City of San Diego*, 2014 U.S. Dist LEXIS 135672, 2014 WL 4793026, at *17 (S.D. Cal, Sept. 25, 2014)("Defendant waived this objection by . . . abandoning it in the opposition to Plaintiff's motion").

Furthermore, the names and telephone numbers/email addresses of former passengers of an airline do not fit within any known evidentiary privilege, a point illustrated by the fact that Frontier has not provided any privilege log concerning the redactions. They also do not fit within the language of Fed. R. Civ. P. 5.2(a) requiring redaction (and even if they did, that Rule applies only to a non-

---

[4] Due to a typographical error, First RFP No. 47 was misidentified as "No. 45" in that Motion. It is the second "No. 45" discussed in the Motion.

sealed "filing with the court," not to production in discovery). There is no statutory authority for redacting this type of information, either.

Frontier argues that a federal regulation, 14 C.F.R. § 243.9(c), renders the information "confidential" and justifies its redaction from the produced documents. In doing so, it willfully ignores the language of Part 243 of the Federal Aviation Regulations.

Frontier is not the first to misapply the limited confidentiality terms of § 243.9(c); in fact, Plaintiffs have found seven district court opinions and one state appellate court decision, dating back to 1999, that mention a presumed federal mandate under § 243.9(c) to keep airline passenger names and addresses confidential. The problem is that all of those decisions are bad law, based on an erroneous reading of the regulation and compounded by repetitive citations to that initial mistake. As discussed in further detail below, they represent eight data points in a game of "legal precedent telephone" gone astray.[5] Once the language of regulation is examined properly, it is clear that:

    1.    Part 243 applies in its entirety only to international flights; and

    2.    Where Part 243 does apply, its sole confidentiality provision applies only to *emergency contact* information provided by passengers (*i.e.,* the names and telephone numbers of persons to contact in the event an international flight crashes or goes missing).

The proper place to begin any analysis of a regulation or statute is with the language of the regulation or statute itself. *Inland Empire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754, 761 (9th Cir. 1996)("We start, as we must, with the plain language of the Regulation.") "If the language [of the regulation] is unambiguous, and its literal application does not conflict with the intentions of its drafters, the plain meaning should prevail." *Idaho First Nat'l Bank v. Commissioner*

---

[5] Technically, the district court decisions do not even qualify as precedent, *see U.S. v. Ensminger,* 567 F.3d 587, 591 (9th Cir. 2009)("a district court opinion does not have binding precedential effect, especially one from another federal circuit")(quoting *NASD Dispute Resolution, Inc. v. Jud. Council of Cal.,* 488 F.3d 1065, 1069 (9th Cir. 2007)); *see also* LR IA 7-3(f).

*of Internal Revenue*, 997 F.2d 1285, 1289 (9th Cir.1993). Part 243 was added to the Federal Aviation Regulations (*i.e.,* Title 14 of the Code of Federal Regulations) in 1998 pursuant to the authority of the Aviation Security Improvement Act of 1990, codified at 49 U.S.C. § 44909. *See* 63 F.R. 8258 (February 18, 1998). That legislation was enacted following the Lockerbie, Scotland air disaster in 1988, that killed 190 American citizens, including 35 Syracuse University students. The Department of Transportation explained the impetus for the legislation as follows:

> During the immediate aftermath of the tragic bombing of Pan American Flight 103 over Lockerbie, Scotland on December 21, 1988, the Department of State experienced difficulties in securing complete and accurate passenger manifest information and in notifying the families of the Pan American 103 victims. The Department of State did not receive the information for ''more than seven hours after the tragedy'' (Report of the President's Commission on Aviation Security and Terrorism, p. 100). When the Department of State did acquire the passenger manifest information from Pan American, in accordance with airline practice, it included only the passengers' surnames and first initials, which did not permit the Department of State to carry out their legal responsibility of notifying the family members in a timely fashion.

*Id.*

The first subsection of Section 44909 confirms its application only to *international* flights:

> a) Air Carrier Requirements.—(1) Not later than March 16, 1991, the Secretary of Transportation shall require each air carrier to provide a passenger manifest for a flight to an appropriate representative of the Secretary of State—
>
> > (A) not later than one hour after that carrier is notified **of an aviation disaster outside the United States involving that flight**; or
> >
> > (B) if it is not technologically feasible or reasonable to comply with clause (A) of this paragraph, then as expeditiously as possible, but not later than 3 hours after the carrier is so notified.

49 U.S.C. §44909(a)(1)(emphasis added). Subparagraph 2 of that subsection directs that the passenger manifest for an international flight "should include" the full name and passport number for each passenger, **and** "the name and telephone number **of a contact** for each passenger." 49 U.S.C. § 44909(a)(2)(emphasis added). Subparagraph 3 and subsection (b) provide instructions to the Secretary of Transportation regarding rulemaking to implement the statute's directives.

As described in the commentary contained in the notice of adoption of the final rule that appeared in the Federal Register for Part 243, the rulemaking dragged on for several years, and was impacted by a regulatory moratorium imposed by the (H. W.) Bush Administration and comments by foreign air carriers concerning conflicts with their foreign laws. *See,* 63 F.R. at 8258-60. While the rulemaking was ongoing, two more air disasters involving international flights occurred that resulted in losses of American lives: the crash of American Airlines Flight 965 into a mountaintop near Cali, Colombia on December 20, 1995, and the explosion of TWA Flight 800 shortly after takeoff from JFK Airport *en route* to Paris on July 17, 1996.[6] The Department of Transportation noted that problems arose in both crashes with the ability to promptly notify the families who had lost loved ones in those crashes. *Id.,* at 8259-60.

In the aftermath of the ValuJet Flight 592 crash into the Everglades on May 11, 1996, the Department of Transportation launched another Advance Notice of Proposed Rulemaking ("ANPRM") seeking comments on the establishment of similar flight manifest rules for domestic flights, *see,* 61 F.R. 11789 (March 13, 1997).[7] That ANPRM was issued under the authority of a different piece of legislation, the Aviation Disaster Family Assistance Act of 1996, that was signed into law by President Clinton. After receiving numerous comments, however, the Department withdrew that ANPRM in 2004 and never created any regulations concerning flight manifest information on domestic flights. *See,* 69 F.R. 43540 (July 21, 2004). Recognizing that the comment period for the domestic ANPRM was still open at the time it published its final rule on Part 243 in 1998, the Department made it clear that the final rule applied only to international flights: "The purpose of the rule is to allow the Department of State to carry forward its legal obligation of

---

[6] TWA 800 was an international flight that crashed in U.S. territorial waters, *see,* 63 F.R. at 8259.
[7] ValuJet 592 was a domestic flight scheduled to fly from Miami to Atlanta.

notifying, in a timely fashion, families of U.S. citizens who die outside the United States." 63 F.R., at 8271.

That intent is clearly stated in the language of Part 243 itself. Section 243.1, titled "Purpose," states: "The purpose of this part is to ensure that the U.S. government has prompt and adequate information in the case of an aviation disaster on covered flight segments." The term "covered flight segment" is specifically defined in the following section, § 243.3:

> *Covered flight segment* means a passenger-carrying flight segment operating to or from the United States (*i.e.*, the flight segment where the last point of departure or the first point of arrival is in the United States). **A covered flight segment does not include a flight segment in which both the point of departure and point of arrival are in the United States.**

(Emphasis added). As the highlighted sentence makes clear, a "covered flight segment" to which Part 243 applies cannot be a domestic flight. If that were not clear enough, § 243.5 reiterates the point: "This part applies to **covered flight segments** operated by covered airlines. (See § 243.3 of this part)." (Emphasis added).

Section 243.7 specifies the duties of "covered airlines" to collect and solicit information from passengers:[8]

**§ 243.7 Information collection requirements.**

**(a)** For covered flight segments, each covered airline shall:

**(1)** Collect, or cause to be collected, the full name for **each passenger** who is a U.S. citizen. U.S.-citizen passengers for whom this information is not obtained shall not be boarded;

**(2)** Solicit, or cause to be solicited, a name and telephone number of **a contact** from each passenger who is a U.S. citizen; and

**(3)** Maintain a record of the information collected pursuant to this section.

---

[8] A "covered airline" is defined as a certificated U.S. air carrier or a foreign air carrier operating aircraft with more than 60 seats. § 243.3.

**(b)** The covered airline operating the flight segment shall be responsible for ensuring compliance with paragraph (a) of this section.

(Emphasis added). It is important to note how the Regulation imposes different treatment for "passengers" and "contacts." Each is a defined term under § 243.3. "*Passenger* means every person aboard a covered flight segment regardless of whether he or she paid for the transportation, had a reservation, or occupied a seat, except the crew." (Emphasis in original). "*Contact* means a person not on the covered flight or an entity that should be contacted in case of an aviation disaster. The contact need not have any particular relationship to a passenger." (Emphasis in original). A "contact" as used in Part 243 is what is commonly considered an "emergency contact." In fact, the term "emergency contact" was used in the original draft of the regulation, but the Department of Transportation decided to delete the word "emergency" from the final regulation:

> We have changed the term ''emergency contact'' to ''contact'' at the request of a number of commenters. Some airlines believe that passengers will be anxious if they are asked for an emergency contact, and that the airline will need to engage in a dialogue regarding whether there is a problem involving the flight and the nature of the emergency. Comments and discussion of the Task Force indicate that use of the term ''contact name and phone number'' (as opposed to ''emergency contact name and phone number'') could make the collection of the information less burdensome but still provide the Department of State with information that will allow it to carry out its responsibilities. The air carrier must, however, make clear that the contact should be someone not traveling with the passenger who can be reached in the event of an emergency. If an airline prefers to use the term ''emergency contact'' it is free to do so.

63 F.R., at 8272. The final section of Part 243 does, however, retain the term "emergency contacts": "The U.S. Department of Transportation may at any time require a covered airline to produce a passenger manifest including emergency contacts and phone numbers for a specified covered flight segment to ascertain the effectiveness of the carrier's system." § 243.17 ("Enforcement").

Also, while collection of passenger names is mandatory under §243.7(a)(1) ("passengers for whom this information is not obtained shall not be boarded"), collection of contact names and phone

numbers is not. Subsection (a)(2) requires only that such information be "solicited" from each passenger. The Department explained:

> The rule also requires covered airlines to solicit a contact name and telephone number. It is up to the passenger whether or not to provide it. Airlines should not pressure the passenger; the government requirement is only to ask for the information. Airlines should not state or imply that it is a government requirement. Similarly, an airline cannot deny boarding under the authority of this rule if a passenger chooses not to provide a contact. As noted in the definition section, a contact can be whoever or whatever the passenger wants it to be. There is no requirement that it be a family member, next-of-kin, a friend or a business or social group.

*Id.,* at 8273. Thus, it is highly conceivable that a given flight would have fewer "contacts" than "passengers."

The Department expressed concern that the emergency contact information provided voluntarily by passengers could potentially be misused:

> After further consideration, we decided to add an additional, explicit provision banning covered airlines from using the contact information for any commercial or marketing purpose. Contact information is personal and is provided by passengers with the expectation that it will not be used for other purposes.

*Id.,* at 8274. The final language of the regulation concerning information collection is contained in § 243.9:

**§ 243.9 Procedures for collecting and maintaining the information.**

Covered airlines may use any method or procedure to collect, store and transmit the required information, subject to the following conditions:

**(a)** Information on individual passengers shall be collected before each passenger boards the aircraft on a covered flight segment.

**(b)** The information shall be kept until all passengers have disembarked from the covered flight segment.

**(c)** The contact information collected pursuant to section 243.7(a)(2) of this part shall be kept confidential and released only to the U.S. Department of State, the National Transportation Safety Board (upon NTSB's request), and the U.S. Department of Transportation pursuant to oversight of this part. This paragraph does not preempt other governments or governmental agencies that have an independent, legal right to obtain this information.

**(d)** The contact information collected pursuant to section 243.7(a)(2) of this part shall only be used by covered airlines for notification of family members or listed contacts following an aviation disaster. The information shall not be used for commercial or marketing purposes.

Subsection (c) of § 243.9 is the only mention of confidentiality in all of Part 243, and it is explicitly limited to "[t]he contact information collected pursuant to section 243.7(a)(2) of this part," which, as noted above, is only the emergency contact information. There is no intersection of §243.9(c) with passenger names and telephone numbers/emails, because a "contact" is "a person not on the covered flight." §243.3.

Given the clarity of the language of Part 243 and its obvious efficacy in carrying out the intentions of its drafters at the Department of Transportation, one would assume that anyone reading Part 243 would immediately understand that it applies only to international flights and that its sole confidentiality provision applies only to the emergency contact information solicited from passengers on those international flights. Unfortunately, however, the eight judicial opinions mentioned above are evidence that such an understanding has not always occurred, raising significant questions whether the authors of those opinions ever read the full regulation they cited.

The earliest of the opinions is *Wallman v. Tower Air Inc.,* 189 F.R.D. 566 (N.D. Cal. 1999), in which the Magistrate Judge gave a mostly accurate recitation of the history behind Part 243 (albeit identifying Pan Am Flight 103 as "TWA 103"), but then stated, "The **passenger list and contact information** may not be released, except to the family of a passenger, the State Department, or the NTSB." 189 F.R.D., at 568 (emphasis added). As noted above, § 243.9(c) has no application to the "passenger list." Of even greater importance is the fact that Part 243 in its entirety had no application to the flight at issue, because the opinion states that it was Tower Air Flight 23 on January 17, 1999 between JFK and SFO, a domestic flight. Ironically, in spite of the misapplication of Part 243, the opinion concludes with an accurate holding: "The Aviation Security Improvement Act of 1990 does

not require a special privilege beyond the protection afforded by the rules of civil procedure for a passenger list." *Id.,* at 569. The court ordered the list of passenger names, addresses and telephone numbers to be produced under a protective order. *Id.*

The second case is *Delta Airlines v. Cook,* 816 N.E.2d 448 (Ind. App. 2004), in which the state Court of Appeals reviewed the denial of partial summary judgment to defendant Atlantic Coast Airlines (ACA), the operator of the Delta flight in question. Again, the flight was a domestic flight— from Indianapolis to New York City—so Part 243 did not apply to it. Nevertheless, the Court stated, "ACA is correct that pursuant to 14 C.F.R. § 243.9, the passenger list may not be released, except to the family of a passenger, the State Department, or the NTSB." 816 F.R.D., at 461. It cited *Wallman* for that incorrect statement. *Id.* Also following *Wallman's* lead, however, it upheld the lower court's order compelling production of the passenger list, finding "adequate justification" under the rules of civil procedure since "the other passengers on [plaintiff's] flight are all potential witnesses in this case." *Id.*

Four years later, a Judge in the District of the Virgin Islands also followed *Wallman's* incorrect holding regarding confidentiality. In *Nathaniel v. American Airlines,* No. 07-cv-00033-RLF-GWC, 2008 WL 5046848 (D. V. I., Nov. 20, 2008), the flight at issue was from St. Croix to Miami. Given the U.S.V.I.'s status as a territory of the United States, the flight was not a "covered flight segment" entitled to application of Part 243 because "both the point of departure and point of arrival are in the United States." §243.3. Nevertheless, American Airlines redacted the entire passenger manifest from flight documents it produced with its Rule 26(a)(1) disclosures, arguing, as Frontier has in this case, that not doing so would violate §243.9(c). The Court accurately quoted the language of Part 243 in ruling on the issue, but seemingly missed the point that the flight was not a "covered flight segment" to which Part 243 would apply. Citing to both *Wallman* and *Cook*, it held

that there was "adequate justification" for producing the passenger list under a protective order "despite the confidentiality provisions of the statute [*sic*]" because "[t]hese passengers on Plaintiff's flight are potential witnesses in this case and are likely to have discoverable information." 2008 WL 5046848 at *6.

In another case involving American Airlines, a Magistrate Judge in the Southern District of Florida made a similar ruling, also relying on the "authority" of *Wallman* and *Cook*. *Jakobot v. American Airlines*, No. 10-CV-61576-LENARD/Turnoff, 2011 WL 13214326 (S.D. Fla., May 23, 2011). The flight at issue in *Jakobot* was also a domestic flight, from Fort Lauderdale, Florida to Texas. The plaintiff passenger sought an order compelling American to produce the names and addresses of the other passengers on the flight, arguing that they were potential witnesses. Despite the inapplicability of Part 243 by its plain language, the Court recited its terms, *see* 2011 WL 13214326 at *2, cited *Wallman* and *Cook*, and ruled that the names and addresses could be produced pursuant to a protective order under the authority of *Wallman*. It did so "while recognizing the protection provided by federal law to the release of information contained in Defendant's passenger manifest. . . ." *Id.*

From that foundation of four erroneous rulings built upon the *Wallman* court's initial mistaken application of § 243.9(c), subsequent decisions became even more interesting. A Magistrate Judge in the Eastern District of Pennsylvania, ruling on a motion to compel production of a passenger manifest, coined the term "*passenger contact information*" that would proceed to take on a life of its own, outside the language of § 243.9(c). *Raub v. US Airways, Inc.,* No. 16-1975, 2017 U.S. Dist. LEXIS 94018, 2017 WL 2633430 (E.D. Pa., 2017). At least, Part 243 *did* apply to the flight at issue in *Raub*, which was from Cancun, Mexico to Philadelphia. But the plaintiff was seeking a list of passengers aboard the flight, not the emergency contact names and telephone numbers to which §

243.9(c) applies. The Court, however, incorrectly merged the passenger list discussed in §

243.7(a)(1) with the emergency contact information discussed in § 243.7(a)(2), creating a new

concept of "passenger contact information":

> Federal law prohibits airlines from releasing **passenger contact information**. *See* 14 C.F.R. §§ 243.7(a), 243.9. Plaintiff has not made a sufficient showing of need for this information to justify this court overriding this **important privacy policy**.

2017 WL 2633430, *2 (emphasis added). Of course, as described above, there has never been a

privacy policy applicable to passenger names, important or otherwise.

Six months later, a Magistrate Judge in the Eastern District of California picked up on the

erroneous concept of "passenger contact information" as being protected by §243.9(c), in *Phan v.*

*JetBlue Airways Corp.,* No. 2:16-cv-2328 WBS DB, 2017 U.S. Dist. LEXIS 212832 (E.D. Cal., Dec.

27, 2017). The plaintiff in that case sought an order compelling production of the flight manifest, and

JetBlue asked for a "protocol" that would permit passengers named on the manifest "an opportunity

to object to the production of their identities." Slip at 2. Despite the inapplicability of Part 243 to the

flight,[9] the Court adopted JetBlue's argument that "14 C.F.R. §243.9(c) . . . provides that passenger

contact information . . . shall be kept confidential and may be released only to certain governmental

agencies." *Id.* Relying on the holdings of *Wallman, Nathaniel, Jakobot* and *Raub,* the Court ruled that

a portion of the passenger manifest could be produced to the plaintiff under a protective order.

A Judge in the Western District of Washington, ruling on a motion to compel in a case arising

from a domestic flight from New York to Seattle, parroted the holding of *Raub* down to the erroneous

declaration of an "important privacy policy":

> Federal law prohibits airline carriers from releasing **passenger contact information**. *See* 14 C.F.R. §§ 243.7(a), 243.9. For that reason, a party seeking to compel disclosure must sufficiently justify to the court its reasons to override this important privacy policy.

---

[9] The opinion does not contain details of the flight, but the Complaint filed in the case identifies it as a domestic flight from Boston to Sacramento. ECF No. 1, at ¶ 1.1.

*See Raub v. US Airways, Inc.*, No. CV 16-1975, 2017 WL 2633430, at *2 (E.D. Pa. June 19, 2017).

*Karrani v. JetBlue Airways Corp.,* No. C18-1510 RSM, 2019 U.S. Dist. LEXIS 89031 (W.D. Wash., May 28, 2019)(emphasis added). Again, the Department of Transportation expressed no such privacy policy concerning passenger names in drafting Part 243, nor is "passenger contact information" a term recognized by that regulation, nor is the regulation applicable to domestic flights.

Also relying on *Raub,* a Magistrate Judge in the Central District of California erroneously applied Part 243 to a domestic flight between Denver and Los Angeles in *Anders v. United Airlines, Inc.,* No. CV 19-5809-GW (KS), 2020 U.S. Dist. LEXIS 250250 (E.D. Cal., Dec. 18, 2020), and also erroneously held that § 243.9(c) applies to "passenger contact information," meaning names, addresses and telephone numbers/email addresses of passengers.

Frontier relies on at least some of those eight cases as support for its redactions. Continued citation of the cases serves only to distort the law, however, because there is no basis in Part 243 for their holdings. "[Where] jurisprudence is not supported by history or by sound legal reasoning[,] it is simply bad law." *Papasan v. Allain,* 478 U.S. 265, 293 (1986)(Brennan, J., concurring in part and dissenting in part). In such circumstances, "*stare decisis* must yield." *Id.* This Court should look no further than the language of Part 243, which clearly does not make passengers' names or their addresses, email addresses or phone numbers confidential with respect to *any* flight, and only has application to international flights, which are not at issue in this action. There is, in fact, no legal authority for making passenger names, addresses, email addresses or phone numbers confidential. For that reason, the Court should order Frontier to produce all of the documents in unredacted form.


DATED this 20th day of August, 2021.


      /s/ John D. McKay           
      John D. McKay (admitted *pro hac vice*)

PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANT FRONTIER

PARK AVENUE LAW LLC
127 W. Fairbanks Ave., No. 519
Winter Park, FL 32789
johndmckayatty@gmail.com
(434) 531-9569

Timothy R. Titolo (Nev. Bar. No. 3617)
TITOLO LAW OFFICE
9950 West Cheyenne Avenue
Las Vegas, Nevada 89129
(702) 869-5100
tim@titololaw.com

***Attorneys for Plaintiffs Peter DelVecchia
And A.D., a Minor***