<u>**EXHIBIT A**</u>

**Proposed Third Amended Complaint**

Timothy R. Titolo, Esq.
Nevada Bar No. 003617
TITOLO LAW OFFICE
9950 West Cheyenne Ave.
Las Vegas, Nevada 89129
(702) 869-5100
tim@titololaw.com

John D. McKay, Esq.
*Admitted pro hac vice*
PARK AVENUE LAW LLC
127 W. Fairbanks Ave. No. 519
Winter Park, Florida 32789
(434) 531-9569
johndmckayatty@gmail.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

|  |  |
|---|---|
| PETER DELVECCHIA, individually and as next friend of A.D., a Minor,<br><br>Plaintiffs,<br><br>vs.<br><br>FRONTIER AIRLINES, INC., SCOTT WARREN, and REX SHUPE,<br>Defendants. | Case No: 2:19-CV-01322-KJD-DJA<br><br>**THIRD AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

For their Third Amended Complaint against Defendants, FRONTIER AIRLINES, INC. ("Frontier"), SCOTT WARREN ("Warren"), and REX SHUPE ("Shupe"), Plaintiffs, PETER DELVECCHIA and A.D. (a minor suing by and through his next friend, Peter DelVecchia), allege the following:

Introduction

This is a civil action seeking compensatory and punitive damages, as well as attorneys' fees, for the intentional violation of Plaintiffs' civil rights while they were passengers aboard a flight operated by Defendant Frontier Airlines, Inc. ("Frontier") and staffed by Frontier's employees including Defendants Scott Warren and Rex Shupe, on March 28, 2019. Plaintiffs also seek compensatory and punitive damages under state law for Defendants' extreme and outrageous behavior that resulted in intentional infliction of emotional distress, false imprisonment, battery, assault and defamation. Plaintiff Peter DelVecchia ("Peter") is a White American citizen who purchased tickets from Frontier for himself and his son to fly from Raleigh-Durham International Airport ("RDU") in North Carolina, the state where they reside, to McCarran International Airport ("LAS") in Las Vegas to go on a father-and-son hiking and camping trip in Death Valley National Park. Peter's son, who is identified in this Complaint only by his initials ("A.D.") to protect his privacy, is a Black American citizen who was twelve years old at the time of the events described herein. He was adopted from an orphanage in Ethiopia at age three by Peter and Peter's late wife, Gay Tanwani DelVecchia. He possesses physical features consistent with his ethnic heritage, including a skin tone that is darker than that of many other African Americans. This suit involves discrimination based on the biracial characteristic of Plaintiffs' family unit and Peter's association with a Black child, as well as based on A.D.'s race, ancestry and ethnic characteristics. *See, St. Francis College v. Al-Khazraji,* 481 U.S. 604, 613 (1987).

From the moment Peter and A.D. were first seen by Frontier's flight attendants, including Warren, aboard the airliner, they were labeled "the situation" by the flight attendants, who remarked to one another that they saw "something off with those two,"

Third Amended Complaint and Demand for Jury Trial

based solely on observing their appearance from a distance. Their observations turned

quickly into an obsession, and they gossiped freely and frequently about their claimed

"observations" of Plaintiffs, who were by then seated in their assigned seats and chatting

with each other about the trip. Each claimed "observation," when discussed among them,

took on a sinister explanation, and eventually the flight attendants decided that "the

situation" needed to be reported to the flight's Captain during the flight, using a procedure

designed to report risks to the safety of the flight. Without ever speaking with Plaintiffs,

and aware that the genesis of the flight attendants' complaints was Plaintiffs' traveling

together as members of distinct races and ethnicities, Captain Shupe and his First Officer

endorsed and supported the flight attendants' discriminatory and outrageous conduct, and

employed procedures that were designed to thwart hijackings to achieve their shared goal

of having Plaintiffs separated out from the other passengers of the flight and delivered to

law enforcement authorities as though they were federal criminals at the conclusion of the

flight. Captain Shupe ordered, and the First Officer oversaw, the physical separation of

A.D. from Peter by Warren, whom Shupe had deputized to carry out that specific task.

They justified the physical separation of Plaintiffs and Warren's actions under a pretext of

responding to alleged sexual misconduct, an allegation that Warren knew to be false and

one that Shupe had recklessly neglected to investigate beyond assuming that Warren,

whom Shupe had never met before, was a man of his word when he made the false

accusation. Peter and A.D. were both sound asleep in their respective seats at the time of

Warren's claimed observation of misconduct, a fact that Warren intentionally withheld

from his report to Shupe. Acting on Shupe's instructions, Warren rushed at the sleeping

Peter and pummeled him on the back of his head and neck, and then forced A.D. to the rear

of the plane, where he was placed under the guard of an off-duty police officer and held

against his will for the 2.5 hours remaining in the flight. While A.D. was imprisoned in the back row, Warren sat down next to him and assaulted him by placing his hand just above his crotch. When the flight arrived in Las Vegas, Warren told Peter in a loud voice that "the FBI is waiting [outside the plane] for your ass." Peter and A.D. were taken into custody and Peter was questioned for 6 hours before they were both released. The local police and FBI determined that Peter and A.D. had done absolutely nothing wrong.

### Jurisdiction

This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. §1331 because it arises under a statute of the United States, specifically 42 U.S.C. §1981, which forbids racial discrimination against any person in the "making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." §1981(b).

Plaintiffs further invoke this Court's diversity jurisdiction pursuant to 28 U.S.C. §1332, and/or its supplemental jurisdiction pursuant to 28 U.S.C. §1367(a), over all state law claims also set forth herein, as the matter in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of different states, and the state law claims derive from the same nucleus of operative facts and are part of the same case or controversy that gives rise to the federally-based claims and causes of action.

This Court has both special and general personal jurisdiction over Frontier because Frontier operates an airline that makes daily scheduled flights into and out of LAS in this District, employs hundreds of employees within this District, routinely advertises its services to the citizens of Nevada through a variety of media, owns or leases property within Nevada, has sued and been sued in Nevada courts without contesting personal jurisdiction, and maintains offices and a Registered Agent within Nevada. Moreover, the claims set forth

herein all arise out of a scheduled flight operated by Frontier from RDU to LAS in Nevada, on which both Plaintiffs were passengers after contracting for carriage to Nevada with Frontier.

This Court has both special and general personal jurisdiction over the individual Defendants because Defendant Warren resides in Las Vegas, Nevada and is based by Frontier at LAS in Las Vegas, and Shupe is also based by Frontier at LAS, even though he is a resident of Utah, and because their actions complained of herein were undertaken at least partially within the borders of Nevada.

Venue

Venue is proper in this District pursuant to 28 U.S.C. §1391, subsections (b)(1), (b)(2), and (c)(2) because the individual Defendants reside in, or are based by Frontier in, Nevada, because Frontier is subject to this Court's personal jurisdiction and is deemed by Section 1391(c)(2) to reside in any judicial district in which it is subject to the Court's personal jurisdiction with respect to this civil action, and because a substantial part of the events or omissions giving rise to the claims occurred in this District, at LAS in Las Vegas, Nevada and *en route* thereto over land contained in this District.

The Parties

1.      Peter is an individual citizen of Hillsborough, North Carolina. He is a widower and a single parent. At the time of the events described herein, Peter was 55 years old. His race is Caucasian, or White.

2.      A.D. is also an individual citizen of Hillsborough, North Carolina. He is the adopted son of Peter and Peter's late wife, and has lived for most of his life with Peter. He also lived for two years Peter's late wife, who passed away when he was 5 years old. At the time of the events described herein, A.D. was 12 years old. His race is African-American,

or Black. His ancestry and ethnicity is Ethiopian, and he displays physical characteristics consistent with his ancestry and ethnicity, including, without limitation, dark skin tone and dark hair.

3.      Frontier is a Colorado corporation that has its principal place of business in Denver, Colorado. It is privately owned by Frontier Airlines Holdings, Inc., a holding company, that is itself privately owned by Frontier Group Holdings, Inc., another holding company. Up until April 1, 2021, Frontier Group Holdings, Inc. was wholly owned by a private equity firm named Indigo Partners, LLC. On April 1, 2021, Frontier Group Holdings, Inc. began offering a portion of its shares to the public, trading under Nasdaq symbol ULCC, which reportedly stands for "ultra-low cost carrier." Frontier operates a low-cost airline that, according to its website, conducts scheduled passenger flights between several cities in the United States, as well as to and from the countries of The Bahamas, Canada, Costa Rica, Dominican Republic, El Salvador, Guatemala, Jamaica, Mexico and Sint Maarten. *See,* https://flights.flyfrontier.com/en/sitemap/country-to-country-flights/page-1.[1]

4.      Defendant Warren is a male individual who was, at the time of the events described herein, employed as a flight attendant by Frontier. He worked as a Flight Attendant on the flight that is the subject of this Third Amended Complaint. He is a resident of Las Vegas, Nevada.  His race is African-American, or Black.

5.      Defendant Shupe is a male individual who was, at the time of the events described herein, employed as a pilot and Captain by Frontier. He worked as the Captain and

---

[1] In apparent defiance (or ignorance) of U.S. history and federal law, Frontier's website also advertises "Flights from the United States to" Puerto Rico and the U.S. Virgin Islands on its "Country to Country Flights" page. The Commonwealth of Puerto Rico and the United States Virgin Islands have been territories of the United States since 1899 and 1927, respectively.

Third Amended Complaint and Demand for Jury Trial

pilot-in-command of the flight that is the subject of this Third Amended Complaint. He is based by Frontier in Las Vegas, Nevada. He is a resident of Kaysville, Utah. His race is Caucasian, or White.

<u>"The Situation"</u>

6.      On the evening of March 28, 2019, Plaintiffs were passengers aboard Frontier's scheduled Flight 2067 from RDU to LAS ("Flight 2067"). Peter had purchased the tickets for both Plaintiffs from Frontier, at a cost of $702, for the purpose of taking A.D. on a hiking and camping trip in Death Valley National Park during A.D.'s spring break from school.

7.      When they boarded the plane at RDU, Peter and A.D. sat in the seats that Peter had selected online when he checked both of them in the previous evening. Peter sat in seat 13D, an aisle seat, and A.D. sat in seat 13E, a middle seat. Another passenger, a stranger to Plaintiffs, was seated in seat 13F, the window seat. Plaintiffs' seats were on the "aircraft right" side of the single-aisle Airbus A320 aircraft, in one of its designated exit rows.[2]

8.      Federal Aviation Regulations state that an airline may not seat a person in an exit row seat if the airline's employees determine that the person cannot perform one or more functions enumerated in the Regulations to assist with an emergency evacuation because, *inter alia,* the person is less that 15 years of age or cannot read and understand instructions printed in English and oral instructions that might be provided in English. Plaintiffs were

---

[2] "Aircraft right" denotes the right side of the aircraft as viewed from the perspective of someone who is looking from the rear of the aircraft toward the cockpit. On this particular A320, the seats on aircraft left are designated A, B and C, and the seats on aircraft right are designated D, E and F. Seats A and F are the two window seats and C and D are the two aisle seats.

unaware of the age restriction when Peter selected seats 13D and 13E, and when they first occupied those seats.

9.      One of Frontier's flight attendants, Anna Bond, approached Plaintiffs in those seats, and thought that A.D. looked too young to be seated in an exit row. Bond testified in her deposition that "he looked like a young child," so she asked A.D. his age and he replied, "twelve." Bond then informed both Plaintiffs of the age restriction and asked Peter whether they would prefer to be reseated individually or together. She testified that Peter responded, "together." She then arranged for Plaintiffs to trade seats with a couple who were also traveling together, and who were in seats 17E and 17F, the middle and window seats of Row 17, also on aircraft right. Peter and A.D. complied without objection to the reseating, and this time A.D. sat in the window seat and Peter sat in the middle seat. The aisle seat of their row was already occupied by a male passenger who was traveling alone.

10.     Two other flight attendants, Amanda Nickle and Defendant Warren, were stationed in the rear of the aircraft. They had both observed Bond speaking with Plaintiffs in Row 13 and then reseating them in Row 17, from a vantage point in the rear galley of the aircraft more than 13 rows away. Nickel, who is White, said she "saw something off with those two," based on their appearances. After reseating Plaintiffs, Bond walked back to the rear galley, where Nickel informed Bond that she "saw something off." Bond informed Nickel and Warren of the reason why she had reseated Plaintiffs, and later told the police in a written statement that Nickel and Warren had both been "shocked" that the reason was A.D.'s age rather than an inability to read, speak and understand English. Nickel had concluded that A.D. did not read or speak English, even though she had never spoken to him or heard him speak. She based her conclusion solely on his race and ethnic features. Upon learning that A.D. had informed Bond that he was 12, Nicole suggested to Bond and Warren

that A.D. had been untruthful, since in her opinion "he looked old in the face." Apparently influenced by Nickel's unfounded comments about something being "off" and her equally unfounded claim that A.D. had been untruthful about his age, Bond later claimed in her statement to the police that "the little boy did not look 12, and the relationship they [*i.e.*, A.D. and Peter] had looked very awkward." Nickel told the police in her own statement that "the two passengers together gave me [an] uneasy feeling, so I kept an eye on them."

11.     By that point, even before the flight had taken off, the flight attendants had labeled Peter and A.D. "the situation." That was true even though Peter and A.D. had willingly complied with Flight Attendant Bond's instructions, had changed their seats upon learning of the age restriction for the exit row, had occupied their assigned seats no differently than all of the other passengers, had not complained about anything or even raised their voices. Their being labeled as "the situation" was based solely on the fact that they were a family unit comprised of a White American man traveling with a Black youth who has Ethiopian ethnic characteristics. No non-mixed race passengers traveling together on the flight were similarly labeled, and none received similar treatment to what Plaintiffs received.

12.     At all times relevant hereto, Peter and A.D. were simply attempting to enjoy the benefits, rights and privileges of the contractual relationship that they had with Frontier, that came with the purchase of their tickets, in the same manner and to the same extent as any other persons who purchase airline tickets, including White persons. Frontier and its employees, including its employees who had final authority over the operation of the flight and managerial responsibilities, denied Peter and A.D. the enjoyment of those benefits, rights and privileges, on the basis of their appearance as a biracial family unit and/or a biracial group, and on the basis of A.D.'s race, ancestry and ethnic characteristics.

13.     But for the disparity in their races relative to each other, and the fact that A.D. has Ethiopian ancestry and Ethiopian ethnic characteristics, none of the discrimination detailed in this Third Amended Complaint would have occurred.

14.     After the aircraft took off to begin the nearly 4.5-hour flight, Peter fell asleep leaning forward in his seat, with his forehead resting on the back of seat 16E. He did so because the seat was uncomfortable and made sleeping in any other position difficult. A.D. also fell asleep in his own seat, 17F, sometime later. Neither had any idea that they had been labeled "the situation" and placed under surveillance by the flight attendants.

15.     Bond conveyed Nickel's and Warren's comments of "something off with those two" to the designated "A" flight attendant, Chelsie Bright Sakurada ("Sakurada"), with whom Bond was stationed at the front of the aircraft. [3] Bond and Sakurada are both White. According to Sakurada, Bond also told her two things that were patently false: that Peter had answered for A.D. when Bond asked A.D. his age, and that Peter had insisted that A.D. sit in the window seat so that he could not communicate with another passenger. (In fact, Bond had observed that A.D. had been seated next to another passenger in his previous seat, 13E). Bond and Sakurada concluded that those "observations," which were false, fit at least one of the points in an "Inflight Flyer" briefing document on human trafficking that Frontier's management had provided to them two months earlier. That Frontier briefing document instructed flight attendants to report suspicions of human trafficking. However, Bond and Sakurada chose not to follow the first point of instruction in the same briefing document, which stated: "If you suspect a passenger may be a victim of human trafficking[,] [i]nitiate non-threatening conversation and ask targeted questions: Ask where they are

---

[3] Pursuant to airline procedures, Bond was designated the "C" flight attendant. Warren was the "B" flight attendant and Nickel was the "D".

traveling; are they going on vacation or visiting relatives? Ask where they are staying, who will be meeting them, what they will be doing, etc." Bond and Sakurada never spoke to Peter and A.D. after Bond reseated them, despite making unfounded conclusions about their relationship and their actions. The only questions Bond ever asked Plaintiffs were about A.D.'s age and whether Peter wanted to be reseated with A.D.

16.    Bond's knowingly false statements to Sakurada, which imputed the ongoing commission of a serious federal crime onto Peter, and which would tend to damage his reputation in the community, were unprivileged and were made intentionally and maliciously, and amounted to defamation *per se* of Peter.

17.    Sakurada, having been brought into the group discussion of unfounded accusations about Peter and A.D., maliciously decided to add a salacious component to the gossip. Following the beverage service, she called all of the other flight attendants to the front galley of the aircraft and announced to them that she had seen Peter "stroking" A.D.'s face "up and down." (When she later demonstrated in her deposition the gesture she claimed to have seen, it was a common gesture that did not suggest any improper conduct or immorality). She subsequently claimed falsely that Nickel had also seen this "stroking," although Nickel denied ever seeing what Sakurada described. Warren and Bond also did not claim to have seen what Sakurada described.

18.    During their meeting in the front galley, all four flight attendants decided that they should report "the situation" to the Captain of the flight, Shupe, so that Peter and A.D. would be turned over to the police when the flight landed at LAS. Sakurada called the cockpit on the aircraft's intercom telephone to report "the situation."

19.    At the time of Sakurada's call to the cockpit, the aircraft had reached its cruising level for the flight and was being flown on autopilot. Shupe and his First Officer,

Shawn Mullin, told Sakurada that they would be taking their bathroom breaks in succession beginning at that time. In accordance with standard operating procedures created after the September 11 attacks, the flight attendants positioned beverage carts to block off the front galley from the passenger cabin, and each pilot took his turn using the lavatory and stretching his legs while the other pilot monitored the flight controls. In accordance with standard operating procedures adopted after the 2015 Germanwings Flight 9525 murder-suicide in the French Alps, the "A" flight attendant (Sakurada) entered the cockpit prior to the first pilot leaving for his break, and remained there until both pilots were back at the controls.

20.     The flight attendants had conversations with Shupe and Mullin that occurred in the front galley and/or in the cockpit. The conversations included the fact that Peter and A.D. were of different races, and that the flight attendants felt "uneasy" and "uncomfortable" by their appearance together. Upon information and belief, the conversations also included Nickel's and Warren's unfounded beliefs that A.D. did not speak English because of his ethnic characteristics and that he had been untruthful about his age because he looked "old in the face," as well as Bond's false claims about Peter answering her question for A.D. and insisting that A.D. sit in the window seat to prevent him from speaking with another passenger.

21.     Shupe, as the Captain and pilot-in-command of the flight, was "directly responsible for, and [was] the final authority as to, the operation of that aircraft." 14 C.F.R. §91.3.

22.     Upon being notified of "the situation" and the unfounded allegations of the flight attendants, Shupe approved of and condoned the flight attendants' observations and actions, as well as their decision not to conduct any investigation that involved communicating directly with Peter and A.D., despite the fact that Frontier's own briefing

document on human trafficking suspicions contained as its first bullet point an instruction to engage suspected passengers in a conversation that includes specific "targeted questions."

23.     When Shupe subsequently notified Frontier's management of the flight attendants' accusations about Plaintiffs through text-only messages sent to Frontier's Strategic Operations Center and Dispatch Center during the flight, management also condoned the flight attendants' and pilots' accusations and actions, as well as their failure to conduct any investigation that involved communicating directly with Peter and A.D. Frontier's management personnel themselves decided not to conduct any such investigation.

24.     Approximately three years before Flight 2067, in January, 2017, the United States Department of Transportation ("DOT"), the Cabinet Department that includes the Federal Aviation Administration, had published a document titled, "Guidance for Airline Personnel on Non-discrimination in Airline Travel" (the "Guidance Document"). The Guidance Document states, *inter alia*:

> This guidance is intended to assist airline employees and contractors ("airline personnel") *understand their legal obligation under 49 U.S.C. §40127(a), and other Federal anti-discrimination statutes, not to discriminate on the basis of race, color, national origin, religion, sex or ancestry in air travel.* The Department of Transportation ("Department") recognizes the very important and difficult job of the airlines to provide a safe and secure travel environment. At the same time, *it is important that this function be carried out in a non-discriminatory manner.*

(Emphasis added). A footnote to that text stated, "The Department has also interpreted 49 U.S.C. §§41310(a), 41712, and 41702 as prohibiting discrimination against air travelers." 49 U.S.C. §40127(a) states, "An air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry." Section 41310(a) applies to discrimination in foreign air transportation, which applies to Frontier's international flights; Section 41712 applies to unfair and deceptive practices and unfair methods of competition; and Section 41702 applies to interstate air

Third Amended Complaint and Demand for Jury Trial

transportation, which is applicable to Flight 2067 and numerous other flights conducted by Frontier on a daily basis. As "airline personnel" working within the federally-regulated field of passenger airline travel, Frontier's flight attendants and pilots on Flight 2067 knew, or should have known, about their anti-discriminatory obligations under federal law as outlined in the Guidance Document published by the Department of Transportation. As their employer and an airline engaged in the daily operation of flights providing domestic and international passenger airline travel, Frontier also knew, or should have known, about its anti-discriminatory obligations under federal law as outlined in DOT's Guidance Document. In addition, Frontier's management had been notified on numerous occasions by DOT of its statutory obligations to avoid discrimination toward passengers in the context of DOT's communications with Frontier's management about discrimination complaints filed with the DOT by Frontier's passengers. Moreover, "'[a]ll citizens are presumptively charged with knowledge of the law.'" *Joves v. Apfel,* 142 F.3d 443 (9th Cir. 1998)(quoting *Atkins v. Parker*, 472 U.S. 115, 130 (1985)). Nonetheless, Frontier and its employees intentionally and maliciously chose not to comply with federal law in their conduct concerning Peter and A.D., and Frontier condoned its employees' decisions to divert from their legal obligations as described below.

25.     The statutes mentioned in the DOT's Guidance Document, and the Guidance Document itself, underscore the importance of the rights protected by 42 U.S.C. §1981 in the specific field of passenger airline travel, and provided additional notice to Defendants of Plaintiffs' civil rights guaranteed by that statute.

26.     The DOT Guidance Document further states:

The guidance provides practical and useful decision-making techniques for airline employees and contractors to use when distinguishing between situations where a legitimate safety or security concern exists and situations in which concerns are based on assumptions and stereotypes related to a

Third Amended Complaint and Demand for Jury Trial

passenger's race, color, national origin, religion, sex, or ancestry. This guidance also demonstrates the application of these techniques and tools to promote appropriate nondiscriminatory responses to possible safety or security concerns through illustrative scenarios.

It is our understanding that <u>most</u> airlines already have training on non-discrimination against passengers in air travel. The Department encourages <u>all</u> airlines to implement comprehensive anti-bias training to help prevent and reduce incidents of unlawful discrimination. We also encourage airlines to incorporate this guidance into their training programs as an additional tool.

(Underlining in original).

27.    Despite its knowledge of the law and its obligations under the law, as well as the DOT's specific highlighting of the fact that airline personnel are prone to make unlawful discriminatory decisions based on concerns that arise from "assumptions and stereotypes related to a passenger's race, color, national origin, religion, sex, or ancestry" if they do not receive "comprehensive anti-bias training," Frontier intentionally chose not to provide *any* form of anti-bias training concerning passengers to any of its flight attendants or pilots aboard Flight 2067 (or any of its other flight attendants and pilots). Training several thousand flight attendants is expensive, and Frontier, as an "ultra-low cost carrier" owned by a private equity firm, made a decision that providing the training recommended by DOT to avoid discriminating against its passengers would cut too deeply into its profits. By failing to provide such training, it fostered and condoned an atmosphere aboard Flight 2067 and all of its other flights in which the types of unlawful discriminatory acts and decisions the Guidance Document seeks to prevent were, and are to this day, highly likely to occur. Moreover, Frontier recklessly exacerbated that situation by requiring those same flight attendants to read its "Inflight Flyer" briefing document two months prior to Flight 2067, which essentially deputized the flight attendants to police its passenger cabins for signs of human trafficking, and to report suspected human trafficking, without ever educating them about what appropriate signs of human trafficking are. As a direct result of Frontier's

Third Amended Complaint and Demand for Jury Trial

decisions not to provide such training, Flight Attendant Sakurada testified in her deposition that she defines human trafficking as "some child that is with an adult that they're not—that *they're not supposed to be with. They're not their parents*." (Italics added). Her testimony confirms that Frontier, by its decisions to forego recommended anti-bias training and to deputize its flight attendants to act on vaguely defined human trafficking standards, willingly and recklessly authorized those standards to be used as vehicles for discrimination by its employees in violation of 42 U.S.C. §1981.

28.    The DOT Guidance Document that Frontier and its employees disregarded stated that compliance with anti-discrimination laws required airline personnel to conduct a comprehensive investigation that specifically includes speaking with the passenger, and to affirmatively question themselves about whether the "passenger's appearance is the determinative factor causing concern." None of Frontier's employees aboard Flight 2067 or managing the flight from the ground did either of those things. In fact, none of the flight attendants or pilots aboard Flight 2067 ever engaged Peter or A.D. in a conversation about any of their concerns prior to acting on them. Frontier's management on the ground also failed to engage in, or recommend, a comprehensive investigation. When Shupe asked them if they had any information on Peter, they declined to provide any, while simultaneously making arrangements for the police and FBI to meet the plane at LAS and to take Peter and A.D. into custody. Documents produced by Frontier evidence numerous instances where Frontier's management has condoned false reports of trafficking by its flight attendants and pilots, involving reporting the passengers to law enforcement authorities, based on suspicions aroused by child passengers wearing "baggy clothing" and/or traveling with adults of a different race.

29.     Aware that the flight attendants' goal on Flight 2067 was to have Peter and A.D. taken into custody by law enforcement officers at LAS, Shupe and First Officer Mullin searched through their Flight Operations Manuals for protocols that would justify engaging law enforcement in "the situation." Both Shupe and Mullin knew at that time that Plaintiffs had never refused to comply with a flight attendant's instructions, had not engaged in any type of confrontation with the flight attendants, had not made any threats against the flight or anyone on it, had not been uncooperative or harassed anyone, were not under the influence of drugs or alcohol, and had not otherwise done anything wrong. They knew that they were taking action solely on the basis that Plaintiffs' appearances as a White man traveling together with a Black youth with Ethiopian ethnic features made the flight attendants "uneasy" and "uncomfortable." Their actions, therefore, which denied Peter and A.D. the normal benefits of the contract they had made with Frontier, were actions that were made on the basis of Plaintiffs' races and ethnicities.

### False Accusations

30.     Shupe and Mullin concentrated on certain protocols in their Flight Operations Manuals that were designed to apply to specific threats to the safety of flights such as hijackings. They knew that Peter and A.D. did not constitute any threat to the safety of the flight. They discussed between themselves the elements of the protocols and how what the flight attendants had reported did not fit the criteria for implementing any of the protocols or contacting law enforcement on the ground. But instead of using that joint conclusion as a reason for taking no action against Peter and A.D., Shupe declared to at least some of the flight attendants that he needed an additional piece of evidence in order to reach the desired goal of arranging for law enforcement to meet the plane at LAS pursuant to the protocols. He then instructed the flight attendants, directly and/or through First Officer Mullin, to

intensify their surveillance of Plaintiffs, and specifically to report to him any instance of "inappropriate touching." He made the flight attendants aware that a report of "inappropriate touching" was the key to getting Peter and A.D. reported to the police and FBI.

31.    Having thus been given specific authorization for increased surveillance from the Captain of the flight and identification of the specific additional information that the Captain needed to move forward with the desired goal of turning Peter and A.D. over to the authorities, the flight attendants met again in the front galley of the aircraft. Upon information and belief, First Officer Mullin was also in the front galley at that time, and he oversaw the flight attendants' meeting on behalf of Captain Shupe. Mullin could see into the passenger cabin where Peter and A.D. were asleep in their seats. Warren then declared that he had "an idea that would help the situation," and that he hoped to obtain the requested evidence while Mullin was still out of the cockpit in the galley area. He then pretended to conduct a "trash run" and walked toward the rear of the aircraft and back up to the front galley again, passing briefly by Row 17. Upon returning to the front galley, he falsely told the others that he had seen Peter touching A.D. in an inappropriate manner. Captain Shupe then invited Warren into the cockpit area to tell Shupe directly what he claimed to have seen. Warren entered the cockpit and embellished his false accusation with additional details, although he intentionally withheld from his report to Shupe the fact that he had observed both Peter and A.D. to be asleep in their respective seats.

32.    One of the female flight attendants accompanied Warren into the cockpit and falsely told Shupe and Mullin that each of the flight attendants had independently verified what Warren had reported seeing. Upon information and belief, the female flight attendant was Sakurada. In fact, no flight attendant other than Warren had claimed to have seen what Warren claimed he saw. Both Warren and the female flight attendant knew that the

information they provided to Shupe and Mullin was false, yet they intentionally provided it anyway, out of malice toward Peter and A.D. that was based on the flight attendants' reactions to the disparity in their races, their being a biracial family unit, A.D.'s dark skin tone, and his ethnic characteristics. Their false and malicious statements about Peter and A.D. imputed that the two passengers were engaged in serious sexual misconduct, which constituted defamation *per se* against both Peter and A.D.

33.     Shupe had never met any of the flight attendants prior to Flight 2067, and knew nothing about them. Nevertheless, he accepted what they told him at face value, and he declined to conduct any investigation that would verify their accusations and protect his passengers Peter and A.D. from discrimination and other forms of harm. In fact, he then decided to inflict harm on Peter and A.D. by his own actions.

34.     Shupe instructed Mullin to send certain messages to the Frontier management personnel monitoring the flight from the ground, over the aircraft's Aircraft Communication Addressing and Reporting System (ACARS). At approximately one hour and forty-five minutes into the flight, Mullin wrote, at Shupe's instruction: "THERE SEEMS TO BE SOME IINAPPROIATE [*sic*] TOUCHINGBETWEEN AN OLDER MALEND [*sic*] A YOUNGER MALE..12YOORIGINAL SEATS 13D 13EFLT ATTS R UNCOMFORTABL". Since Shupe and Mullin had not spoken with Peter or A.D., or conducted any other investigation into the facts, they sent that ACARS message with reckless disregard of the truth or falsity of the information contained in it. Moreover, since Mullin had observed Peter and A.D. from the vantage point of the front galley, he knew or should have known that the information contained in the ACARS message was false. By stating their original seat assignments that had been recorded in Plaintiffs' Passenger Name Record when Peter had checked in and selected seats 13D and 13E, Shupe and Mullin

specifically identified Peter and A.D. as the subjects of the message, to anyone who was able to access a passenger manifest, seating diagram or Plaintiffs' Passenger Name Record on Frontier's computer network, including any of the employees in Frontier's Customer Service Center, Dispatch Center and Strategic Operations Center, among others. In fact, Frontier employees and/or agents on the ground, acting within the scope of their duties for Frontier, copied the unfounded allegations into Plaintiffs' Passenger Name Record, this time using Plaintiffs' given names, within a few minutes of the transmission of that ACARS message. The false statements that they entered into Plaintiffs' Passenger Name Record were (and still are) observable by anyone with access to Frontier's database, which includes numerous employees and agents of Frontier. Upon information and belief, anyone who has been given log on credentials to Frontier's "Navitaire" booking and reservations system, which includes hundreds if not thousands of Frontier employees as well as outside agents, can access and read Plaintiffs' Passenger Name Record and can see the defamatory statements about Peter and A.D. there. Shupe's and Mullin's false and malicious statements about Peter and A.D., as well as those of the employees and/or agents who copied the statements into the Passenger Name Record without having any basis on which to know whether they were true or false, falsely imputed that Peter and A.D. were engaged in serious sexual misconduct, which constituted defamation *per se* against both Peter and A.D.

35.    Mullin sent an additional ACARS message several minutes later, in which he relayed the false claim that the "inappropriate touching" had been witnessed by multiple flight attendants: "THE FAS [flight attendants] WHITNESSED [*sic*] IT." Again, that message was sent with reckless disregard for its truth or falsity, since neither of the pilots had conducted any investigation of the facts. Moreover, Mullin knew or should have known that it was false, since he had observed Warren being the only flight attendant to pass by

Plaintiffs' row prior to the false accusation being made by Warren. Again, employees and/or agents of Frontier, acting within their duties for Frontier and having no basis on which to conclude whether the statements were true or false, recklessly and maliciously copied the false statements into Plaintiffs' Passenger Name Record, writing, "all crewmembers witnessed inappropriate touching of minor child." The false statements constituted defamation *per se* of Peter and A.D. because they falsely imputed that Peter and A.D. were engaged in serious sexual misconduct.

### Separation by Force

36.     At approximately the same time that Mullin sent the first ACARS message quoted above, Shupe instructed Warren to physically separate A.D. and Peter for the remainder of the flight, which had approximately 2.5 hours left to travel before landing. Although Shupe claimed that the separation was made pursuant to the protocol in the pilots' Flight Operations Manual, it was not authorized under the protocol. Shupe specifically authorized Warren to carry out the task of separating A.D. and Peter, but he left the details to Warren's own design.

37.     With the assistance of the other flight attendants, Warren set up a plan to attack Peter and take A.D. away from him for the remainder of the flight, with the aim of making both passengers uncomfortable for the remainder of the flight and delivering them separately to the FBI at the conclusion of the flight. As an integral part of the plan, Warren first approached a male passenger who is a police officer, informed him of the accusations against Peter and his plan, and asked him to be ready to act as a guard when he removed A.D. to the rear of the aircraft. The off-duty policeman agreed.

38.     Warren then rushed at Peter and A.D.'s row, aggressively and forcefully pushing the aisle seat passenger out of his way. Warren leaned into the row above the aisle

seat passenger's body, and began pummeling Peter, who was still asleep, on the back of his neck and head. The force of the blows gave Peter a concussion. Warren's blows woke Peter from sleep, albeit dazed and injured, and Warren ordered him to stand up in the aisle of the aircraft. Peter complied with that order, uncertain of what was happening. Warren then leaned into the row again and awakened A.D., told him to stand up, and marched him to the last row of the aircraft, which was unoccupied. The events happened so quickly that A.D. was unable to retrieve his shoes, which he had removed earlier in the flight. Warren directed A.D. to sit in the window seat of Row 30, which is seat 30F. A.D. objected, telling Warren that Peter is his father and that he wanted to sit with his father. Warren nevertheless forced A.D. to sit in seat 30F. Warren then instructed the policeman to sit in seat 30D, the aisle seat on the end of the same row where A.D. was seated. Warren instructed the policeman to keep A.D. in Row 30 for the remainder of the flight.

39.      Shoeless, upset and crying, A.D. pleaded on several occasions for Warren to let him return to Row 17 and his father. Warren refused all such requests. Warren confined A.D. against A.D.'s will in Seat 30F for the remaining 2.5 hours of the flight. A.D. knew of the limits of his confinement and that he was not permitted to leave the row. Warren's confinement of A.D. was authorized and condoned by Shupe, observed and condoned by Mullin and the other flight attendants, and known to, and condoned by, Frontier's management who received ACARS reports from the cockpit confirming that Peter and A.D. had been separated.

40.      Shupe received confirmation from Frontier's management through ACARS messages that law enforcement officers would meet the flight when it landed at LAS, because management had arranged for that to happen at Shupe's request. Shupe asked for any information that management had on Peter, and management declined to give him any.

41.     Still dazed and in pain from Warren's attack, Peter walked to the rear of the aircraft to inform Warren that A.D. is his son and to ask why he had been taken to the back of the plane. When he saw Peter approaching Row 30 where A.D. was being held, Warren rushed out of the rear galley and physically blocked Peter with his body from reaching the area where he was holding A.D. Warren laughed mockingly at Peter's inability to reach his son. Warren made statements loud enough for other passengers to hear that accused Peter of molesting A.D., and said that the FBI had been called to meet the aircraft when it landed at LAS, implying that Peter was a federal criminal. Warren was openly malicious toward both Peter and A.D. Upon information and belief, Warren believed that it was wrong and immoral for Peter to have adopted an African child, and he resented A.D.'s being adopted into a White family. Warren had trained with a state Child Protective Services Division prior to becoming employed by Frontier, and he knew well the effect a false accusation of child sexual molestation could have upon a person. Warren's knowingly false accusations that Peter had molested his son, coupled with statements that the FBI had been called in connection with the accusations, were unprivileged defamatory statements that tended to lower Peter's reputation in the community, excite derogatory opinions about him, and subject him to contempt. That was precisely Warren's aim in making those false statements. Those statements, that Warren made maliciously and with knowledge of their falsity, suggested that Peter was a federal criminal and someone engaged in serious sexual misconduct, which constitutes defamation *per se* against Peter.

42.     Conceding that he was acting improperly and outside of the law, Warren refused to identify himself to Peter. When Peter requested his name, Warren intentionally provided a false identity. Warren told Peter that his name is "Kevin," and refused to provide a surname to Peter. Warren's given name is Scott, and he has never been known as "Kevin."

43.     Warren ordered Peter to return to his seat in Row 17. After Peter returned to that seat, Warren sat down in seat 30E, the middle seat adjacent to where Warren was holding A.D., and told A.D. the specifics of what Warren falsely had claimed to see prior to the separation of A.D. and Peter. In doing so, Warren violated the airline's protocol for handling instances of alleged sexual molestation. A.D. objected to Warren's accusations, saying that Peter would never do anything of the nature described by Warren. Warren chose to physically demonstrate his accusations using A.D.'s body. Warren moved his hand to the area of A.D.'s crotch, terrifying A.D. and placing him in imminent fear that Warren was about to touch him without consent and fondle his genitalia. Although Warren's hand ultimately did not make contact with A.D.'s pants or his genitalia, it hovered so closely above A.D.'s crotch that the incident placed A.D. in fear of imminent battery, which was immensely upsetting to the 12-year-old.

44.     While his father was suffering the severe trauma of having been physically attacked and given a concussion, as well as having his son forcefully taken away, A.D. suffered his own severe trauma for the remainder of the flight, shoeless, cold, scared, crying and terrified by Warren's assault on him and the continued confinement by an off-duty policeman in Row 30. His confinement was not consented to by A.D. or Peter, but was instead against both of their wills, was unlawful, and was without any legitimate basis in aircraft safety or any other purpose recognized in the Federal Aviation Regulations. It amounted to false imprisonment of A.D. for several hours.

## Landing at LAS

45.     Flight 2067 landed at LAS at 9:27 p.m. local time, four hours and twenty-five minutes after taking off from RDU.

46.     Warren and the other flight attendants held A.D. in the rear of the aircraft until all of the other passengers had disembarked. Before Peter left the aircraft, Warren accosted Peter and said to him, maliciously and in a voice loud enough for others to hear, "Go on outside—the FBI is waiting for your ass." That statement again falsely implied that Peter was a federal criminal, which constituted defamation *per se*.

47.     After landing, one of the passengers asked a female flight attendant about what had happened. The female flight attendant, acting within the scope of her authority as an employee of Frontier, told the passenger "someone's hand was on someone's crotch." The passenger understood that she meant Peter's hand and A.D.'s crotch. The female flight attendant had no basis on which to believe that her statement was true, and had several reasons to know that it was false. She uttered the false statement maliciously, out of a desire to cast aspersions on Peter and A.D., because she objected to their being a family unit due to the disparity in their races and ethnicities. The female flight attendant's statement to the passenger constituted defamation *per se* of Peter and A.D. because it imputed that they were engaged in serious sexual misconduct.

48.     Because of the false information that had been maliciously reported by Frontier and its employees acting within the scope of their employment, including the patently false accusations of human trafficking and sexual misconduct, Peter and A.D. were taken into custody by officers of the Las Vegas Metropolitan Police Department ("LVMPD") and agents of the FBI. They were transported to a precinct office of LVMPD located at LAS, where they were kept separated and Peter was questioned for approximately six hours, into the early morning hours of March 29, 2021.

49.     Because he was dizzy and off balance as a result of the concussion that Warren's pummeling had given him, Peter fell at the precinct office and suffered further physical injury to his hand.

50.     At the conclusion of the questioning, the police and FBI concluded that Peter had done nothing wrong at all. They allowed him to reunite with A.D., and told Peter that he had been the victim of a "racist incident."

51.     Flight attendants and pilots of airline flights are cloaked with significant authority and power by virtue of their positions relative to the passengers and by virtue of federal regulations. The flight attendants and pilots of Flight 2067 all abused their authority relative to Peter and A.D., and subjected Peter and A.D. to treatment that was unlawful, discriminatory, outrageous and outside all tolerable limits for civilized society. The flight attendants' and pilots' abuse of their positions and authority included placing Peter and A.D. under improper surveillance, making false accusations about them, making unfounded and false reports about them to others, ordering them out of their seats for no valid reason, forcing A.D. to the rear of the plane and imprisoning him with an off-duty police officer in the last row of the airplane, sitting next to him and telling him falsified details of accusations against his father while committing assault on him, blocking Peter's access to his son in the rear of the plane, mocking Peter and accusing him of vile crimes and activities, making false reports about them to law enforcement authorities and arranging for such authorities to take them into custody when Flight 2067 landed, and delivering them into the custody of the law enforcement authorities on the basis of falsified accusations and refusal to conduct appropriate investigation of others' accusations. Those deliberate abuses of authority greatly harmed Peter and A.D.

52.     Peter and A.D. were victimized by the flight attendants, including Defendant Warren and the three others, by the pilots, including Defendant Captain Shupe and First Officer Mullin, by Frontier's management who knew of the accusations against them but failed to take appropriate steps to investigate the accusations and protect Plaintiffs from discrimination and harm, and by other employees and/or agents of Frontier who, with knowledge, consent and approval of Frontier's management, chose to harm Peter and A.D. by depriving them of their civil rights protected by 42 U.S.C. §1981 and by the aforementioned acts of defamation *per se*.

### Aftermath

53.     Peter continued to suffer from the effects of his concussion and extreme mental distress for weeks and months following Flight 2067. His symptoms included feeling disoriented, dizziness, nausea, headaches, vision problems, cognitive loss, memory problems, fatigue, and a recurring feeling that his head was being squeezed from both sides. He also suffered anxiety, embarrassment, humiliation and other emotional distress. He was diagnosed with a concussion and post-concussion syndrome resulting from the events on Flight 2067. His daily life was affected by those symptoms, and he continues to be adversely affected by a constant apprehension that he will encounter similar abusive conduct from others.

54.     A.D. was also traumatized by the events on Flight 2067 described above, and he has suffered for months and years following the flight. He has suffered from fear, anxiety and apprehension, concern that his only surviving parent will be taken away from him again, terrifying nightmares, nausea and vomiting. He has been diagnosed with Post-Traumatic Stress Disorder, and he continues to be treated for that condition. Like Peter, his daily life has been affected by his symptoms, as well as by a constant apprehension that he

will encounter similar abusive conduct from others. Like Peter, he also suffered anxiety, embarrassment, humiliation and other emotional distress as a result of Defendants' deliberate actions.

55.     Peter and A.D. have expended sums of money for medical treatment and counseling as a result of the physical injuries and mental distress that they suffered from the events on Flight 2067.

56.     To date, Frontier has not disciplined or reprimanded its employees in any manner whatsoever, and those employees have testified that they understand Frontier approved of, and continues to approve of, their conduct during the flight. Frontier has condoned its employees' and agents' conduct described above.

57.     Frontier is vicariously liable for the acts of its employees and authorized agents under the doctrine of *respondeat superior*.

58.     Frontier intentionally chose not to provide its employees and agents with any anti-bias training that would have informed them how to implement human trafficking, sexual misconduct and threat level protocols in a race-neutral manner to prevent discrimination, while knowing that the failure to provide such training would foster an environment in which flight attendants and pilots would use those protocols in ways that would cause discrimination to passengers on the basis of race, color, national origin, ethnic characteristics and/or ancestry. Frontier had notice of multiple instances of racial profiling and similar conduct by its flight attendants, and repeatedly condoned such activity by its employees against its passengers.

59.     Defendants' actions described herein amounted to willful and wanton and malicious conduct sufficient to impose punitive damages on all Defendants, jointly and severally, under the standards applicable to federal law. In addition, Defendants' actions

described herein were based on oppression, fraud and/or malice and reckless indifference to Plaintiffs' legal rights sufficient to impose punitive damages on all Defendants, jointly and severally, under the standards applicable to state law.

## COUNT I: COMPENSATORY AND PUNITIVE DAMAGES
## AND ATTORNEYS' FEES PURSUANT TO 42 U.S.C. §1981

60.     Plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 59 of this Third Amended Complaint as though such allegations were fully set forth herein.

61.     Plaintiffs have a federally-protected right under 42 U.S.C. §1981 to be free from discrimination based on their races, colors, ethnic characteristics and ancestry in the "making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," including their contractual relationship with Frontier as passengers aboard its Flight 2067 on March 28, 2019.

62.     Peter and A.D. together constitute members of a protected class under §1981 because they are members of a biracial family unit or group. A.D. also is a member of a protected class because of his African American or Black race, his Ethiopian ancestry, and his ethnic characteristics.

63.     The individual Defendants and Frontier, acting through its employees and authorized agents, acted out of racial animus in concluding that Plaintiffs should not be travelling together, in deciding that their appearance was unusual or "awkward" and made them "feel uncomfortable" and "uneasy," in concluding that their joint travel and biracial family unit must be evidence of human trafficking or sexual deviance, in physically attacking Peter, in detaining and committing assault on A.D., in making false accusations against them, and in otherwise denying Plaintiffs their federally-protected right to enjoy the benefits and

privileges of their contractual relationship with Frontier during the flight. Frontier also violated Plaintiffs' civil rights by failing to provide its employees training on how to implement Frontier's policies in a racially neutral manner and fostering an environment in which discrimination by its employees based on its customers' races, colors, ancestry and/or ethnic characteristics is permitted and condoned by Frontier's management. Their discriminatory and humiliating treatment of Plaintiffs was utterly unacceptable in civilized society and was an affront to the values that society expects in the equal treatment of all persons, especially those who travel aboard common carriers that are licensed by the United States government and that enjoy the privileges of operating commercial flights in federal airspace. But for the disparity in Peter and A.D.'s races, their respective skin colors, A.D.'s ethnicity, ancestry and ethnic characteristics, the acts of race and ethnic discrimination detailed in this Third Amended Complaint would not have happened.

64.    Defendants are liable to Plaintiffs, jointly and severally, for compensatory damages under 42 U.S.C. §1981 for their intentional acts and omissions that discriminated against Plaintiffs based on their races, colors, A.D.'s ethnicity, A.D.'s ancestry, and A.D.'s ethnic characteristics, and that caused Plaintiffs to sustain and endure severe emotional distress, serious physical injuries, shock, embarrassment and utter humiliation.

65.    Defendants are also liable to Plaintiffs, jointly and severally, for punitive damages under 42 U.S.C. §1981 because their discriminatory conduct was based on malice toward Plaintiffs, evil motives, recklessness and/or callous indifference to Plaintiffs' federally-protected legal rights.

66.    Defendants' conduct as described hereinabove has caused Plaintiffs to incur attorneys' fees and costs, and will continue to cause them to incur such fees and costs until this action has been resolved. Plaintiffs are entitled to recover those attorneys' fees and costs

in accordance with applicable federal laws, including 42 U.S.C. §1988, and rules of procedure, following a judgment on the merits.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages in an amount to be determined by the jury at trial, for punitive damages in an amount to be determined by the jury at trial, and for their attorneys' fees, costs, pre-judgment and post-judgment interest and such other and further relief as the Court shall deem just and proper.

### COUNT II: COMPENSATORY AND PUNITIVE DAMAGES PURSUANT TO STATE LAW FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

67.     Plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 59 of this Third Amended Complaint as though such allegations were fully set forth herein.

68.     The aforesaid acts of Defendants including, without limitation, placing Peter and A.D. under surveillance because they are of different races and ethnicities (which Peter and A.D. discovered after Peter was struck on the head and neck and A.D. was taken to the rear of the aircraft), falsely accusing Peter of human trafficking, falsely accusing both Plaintiffs of engaging in serious sexual misconduct, physically attacking Peter and striking him on the head and neck, removing A.D. from his seat and jailing him in the rear of the aircraft, assaulting A.D. with a hand placed in the area of his genitalia, refusing to allow A.D. to go back to his seat and Peter to speak with A.D., mocking and shouting at Peter and suggesting that he was a criminal, and arranging for police and FBI to take Peter and A.D. into custody when the plane landed, in full view of other passengers and persons in the airline terminal, were outrageous acts that are utterly intolerable in civilized society, were malicious, were conducted with reckless indifference to the likelihood that emotional

distress would result, and were intentional toward Plaintiffs and intended to cause them serious emotional distress. They therefore constitute the tort of intentional infliction of emotional distress.

69.     Defendants are liable to Plaintiffs, jointly and severally, for compensatory damages under applicable state laws for their intentional acts that caused Plaintiffs to suffer and endure severe emotional distress.

70.     Defendants are also liable to Plaintiffs, jointly and severally, for punitive damages under applicable state laws because their conduct was based on oppression, fraud and/or malice and reckless indifference to Plaintiffs' legal rights. Frontier is liable for punitive damages for its own conduct that was based on oppression, fraud and/or malice and reckless indifference to Plaintiffs' legal rights, and it is also liable for punitive damages for the actions of its employees and authorized agents because: (i) its officers and management knew its employees and authorized agents were not sufficiently trained on how to apply its trafficking, sexual misconduct and threat levels procedures in racially-neutral manners, and it further knew that the lack of such training was likely to result in harmful conduct to passengers; (ii) its officers and management authorized and ratified its employees' and authorized agents' conduct, by instructing them to make decisions based on its vague criteria for spotting trafficking, sexual misconduct and threat levels, by approving of the physical separation of Plaintiffs based on insufficient evidence and lack of reasonable investigation, by not disciplining its employees and authorized agents for their reckless application of those procedures; and (iii) it is personally guilty of oppression, fraud and malice, express or implied, against Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages in an amount to be determined by the jury at trial, for

punitive damages in an amount to be determined by the jury at trial, and for their costs, pre-judgment and post-judgment interest and such other and further relief as the Court shall deem just and proper.

### COUNT III: COMPENSATORY AND PUNITIVE DAMAGES
### PURSUANT TO STATE LAW FOR FALSE IMPRISONMENT

71.     Plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 59 of this Third Amended Complaint as though such allegations were fully set forth herein.

72.     The aforesaid acts of Defendants, specifically taking A.D. away from his father and forcing him to sit in the last row of the aircraft against A.D.'s and Peter's wills, keeping A.D. under constant guard by an off-duty policeman for the remaining duration of the flight and refusing his requests to be allowed to return to his father, constituted false imprisonment of A.D. which caused mental anguish and severe emotional distress to both A.D. and Peter.

73.     Defendants are liable to Plaintiffs, jointly and severally, for compensatory damages under applicable state laws for their intentional acts that falsely imprisoned A.D., causing Plaintiffs to sustain and endure mental anguish and severe emotional distress.

74.     Defendants are also liable to Plaintiffs, jointly and severally, for punitive damages under applicable state laws because their conduct was based on oppression, fraud and/or malice and reckless indifference to Plaintiffs' legal rights. Frontier is liable for punitive damages for its own conduct that was based on oppression, fraud and/or malice and reckless indifference to Plaintiffs' legal rights, and it is also liable for punitive damages for the actions of its employees and authorized agents because: (i) its officers and management knew its employees were not sufficiently trained on how to apply its trafficking, sexual misconduct and threat levels procedures in racially-neutral manners, and it further knew that

Third Amended Complaint and Demand for Jury Trial

the lack of such training was likely to result in harmful conduct to passengers; (ii) its officers and management authorized and ratified its employees' and authorized agents' conduct, by instructing them to make decisions based on its vague criteria for spotting trafficking, sexual misconduct and threat levels, by approving of the physical separation of Plaintiffs based on insufficient evidence and lack of reasonable investigation, by not disciplining its employees and authorized agents for their reckless application of those procedures; and (iii) it is personally guilty of oppression, fraud and malice, express or implied, against Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages in an amount to be determined by the jury at trial, for punitive damages in an amount to be determined by the jury at trial, and for their costs, pre-judgment and post-judgment interest and such other and further relief as the Court shall deem just and proper.

### COUNT IV: COMPENSATORY AND PUNITIVE DAMAGES PURSUANT TO STATE LAW FOR BATTERY AND ASSAULT

75.     Plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 59 of this Third Amended Complaint as though such allegations were fully set forth herein.

76.     The aforesaid acts of Warren toward Peter, including physically attacking Peter and striking him on the back of his neck and head, constituted the tort of battery upon Peter, were malicious and/or were conducted with reckless indifference to the likelihood that physical injury and emotional distress would result, and were intentional toward Peter and intended to, and did, cause him physical injury and severe emotional distress. They were done while Warren was under the control of Frontier and within the scope of Warren's employment with Frontier. Frontier hired Warren and trained him for his duties. Warren's tortious acts were conducted while Warren was carrying out the specific task that Captain

Third Amended Complaint and Demand for Jury Trial

Shupe, the pilot-in-command and final authority as to the conduct of Flight 2067, had instructed Warren to do, and they were reasonably foreseeable. Frontier is liable for the acts of Warren toward Peter under the doctrine of *respondeat superior*.

77.     The aforesaid acts of Warren toward A.D., including sitting next to A.D. in seat 30E and placing his hand nearly atop A.D.'s genitalia while describing to A.D. his false accusation against A.D.'s father, placed A.D. in imminent fear of battery and constituted the tort of assault upon A.D., were malicious and/or were conducted with reckless indifference to the likelihood that emotional distress would result, and were intentional toward A.D. and intended to, and did, cause him severe emotional distress. They were done while Warren was under the control of Frontier and within the scope of Warren's employment with Frontier. Frontier hired Warren and trained him for his duties. Warren's tortious acts were conducted while Warren was carrying out the specific task that Captain Shupe, the pilot-in-command and final authority as to the conduct of Flight 2067, had instructed Warren to do, and they were reasonably foreseeable. Frontier is liable for the acts of Warren toward A.D. under the doctrine of *respondeat superior*.

78.     Defendants Warren and Frontier are liable to Plaintiffs, jointly and severally, for compensatory damages under applicable state laws for their intentional acts that caused Plaintiffs to sustain and endure physical injuries and severe emotional distress.

79.     Defendants are also liable to Plaintiffs, jointly and severally, for punitive damages under applicable state laws because their conduct was based on oppression, fraud and/or malice and reckless indifference to Plaintiffs' legal rights. Frontier is liable for punitive damages for its own conduct that was based on oppression, fraud and/or malice and reckless indifference to Plaintiffs' legal rights, and it is also liable for punitive damages for the actions of its employees because: (i) its officers and management knew its employees

were not sufficiently trained on how to apply its trafficking, sexual misconduct and threat levels procedures in racially-neutral manners, and it further knew that the lack of such training was likely to result in harmful conduct to passengers; (ii) its officers and management authorized and ratified its employees' conduct, by instructing them to make decisions based on its published criteria for spotting trafficking, sexual misconduct and threat levels, by approving of the physical separation of Plaintiffs based on insufficient evidence and lack of reasonable investigation, and by not disciplining its employees for their reckless application of those procedures; and (iii) it is personally guilty of oppression, fraud and malice, express or implied, against Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment against Defendants Warren and Frontier, jointly and severally, for compensatory damages in an amount to be determined by the jury at trial, for punitive damages in an amount to be determined by the jury at trial, and for their costs, pre-judgment and post-judgment interest and such other and further relief as the Court shall deem just and proper.

### COUNT V: COMPENSATORY AND PUNITIVE DAMAGES PURSUANT TO STATE LAW FOR DEFAMATION *PER SE*

80.    Plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in Paragraphs 1 through 59 of this Third Amended Complaint as though such allegations were fully set forth herein.

81.    The aforesaid acts of Defendants included unauthorized and unprivileged publication to third parties (*i.e.,* other passengers of the flight, other flight attendants, the pilots, Frontier's personnel and agents on the ground who saw the ACARS messages, law enforcement officers, and everyone with access to Plaintiffs' Passenger Name Record, which includes numerous employees and agents of Frontier) of false and defamatory accusations that Peter had committed various crimes and serious sexual misconduct, and that A.D. was

a participant in, or victim of, serious sexual misconduct, human trafficking and/or sex trafficking, with the result that they caused presumed injury to Peter's and A.D's reputations and constitute defamation *per se*. In addition, they were malicious and/or were conducted with reckless indifference to the likelihood that emotional distress and damage to reputation would result, and were intentional toward Peter and A.D. and intended to, and did, cause them severe emotional distress and damage to reputation. They were done while the individual employees and agents, including, without limitation, Defendants Warren and Shupe, Flight Attendants Bond, Nickel and Sakurada, First Officer Mullin and the ground personnel/agents who added false statements of fact to Plaintiffs' Passenger Name Record, were under the control of Frontier and within the scope of their employment and/or agency relationship with Frontier. Frontier is therefore liable for their acts under the doctrine of *respondeat superior*.

82.     Defendants' and Defendants' employees' (and/or authorized agents') disclosures to the local LVMPD police officers and the FBI agents are not covered by immunity under the Aviation Transportation Security Act, 49 U.S.C. §44941, or any other federal or state immunity law, because they were made with actual knowledge that the disclosures were false, inaccurate or misleading, and/or were made with reckless disregard for the truth or falsity of the disclosures.

83.     Defendants are liable, jointly and severally, to Peter and A.D. for compensatory damages under applicable state laws for their intentional acts and omissions that caused Peter and A.D. to sustain and endure severe emotional distress and damage to their reputations, including, without limitation, presumed damages under state law for defamation *per se*.

84.     Defendants are also liable to Plaintiffs, jointly and severally, for punitive damages under applicable state laws because their conduct was based on oppression, fraud and/or malice and reckless indifference to Plaintiffs' legal rights. Frontier is liable for punitive damages for its own conduct that was based on oppression, fraud and/or malice and reckless indifference to Plaintiffs' legal rights, and it is also liable for punitive damages for the actions of its employees and authorized agents because: (i) its officers and management knew its employees and authorized agents were not sufficiently trained on how to apply its trafficking, sexual misconduct and threat levels procedures in racially-neutral manners, and it further knew that the lack of such training was likely to result in harmful conduct to passengers; (ii) its officers and management authorized and ratified its employees' and authorized agents' conduct, by instructing them to make decisions based on its published criteria for spotting trafficking, sexual misconduct and threat levels, by approving of the physical separation of Plaintiffs based on insufficient evidence and lack of reasonable investigation, and by not disciplining its employees and authorized agents for their reckless application of those procedures; and (iii) it is personally guilty of oppression, fraud and malice, express or implied, against Plaintiffs.

**WHEREFORE**, Plaintiffs demand judgment against Defendants, jointly and severally, for compensatory damages in an amount to be determined by the jury at trial, for punitive damages in an amount to be determined by the jury at trial, and for their costs, pre-judgment and post-judgment interest and such other and further relief as the Court shall deem just and proper.

**PLAINTIFFS DEMAND TRIAL BY JURY ON ALL COUNTS.**

DATED this ___ day of August, 2021.

Third Amended Complaint and Demand for Jury Trial

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PARK AVENUE LAW LLC

*s/ John D. McKay*_____
John D. McKay, Esq.
*Admitted pro hac vice*
127 W. Fairbanks Ave. No. 519
Winter Park, Florida 32789
(434) 531-9569
johndmckayatty@gmail.com

TITOLO LAW OFFICE
Timothy R. Titolo, Esq.
Nevada Bar No. 003617
9950 West Cheyenne Ave.
Las Vegas, Nevada 89129
(702) 869-5100
tim@titololaw.com

***Attorneys for Plaintiffs***