# EXHIBIT D

## GAO-19-654 Report



**U.S. GOVERNMENT ACCOUNTABILITY OFFICE**

**441 G St. N.W.**
**Washington, DC  20548**

August 22, 2019

The Honorable Roger Wicker
Chairman
The Honorable Maria Cantwell
Ranking Member
Committee on Commerce, Science, and Transportation
United States Senate

The Honorable Peter DeFazio
Chairman
The Honorable Sam Graves
Ranking Member
Committee on Transportation and Infrastructure
House of Representatives

**Airline Consumer Protections: Information on Selected Airlines' Non-Discrimination Training Programs**

Federal law prohibits airlines from discriminating against passengers on the basis of race, color, national origin, religion, sex, or ancestry.[1] Nevertheless, recent high-profile events reported in the media have led some non-discrimination advocacy organizations to question whether airlines treat all passengers equally and without bias. For example, in May 2016, airline personnel reportedly subjected an economics professor of Italian descent—perceived to be Middle Eastern—to additional security screening after a passenger raised security concerns upon seeing his math equations.[2] While airline staff determined the threat was not credible and allowed the professor to fly, the flight was delayed for hours.[3] More recently, in 2017, the National Association for the Advancement of Colored People (NAACP) issued a travel advisory (lifted in 2018) against one airline, citing "disrespectful, discriminatory or unsafe conditions" for African-American passengers.[4]

The Department of Transportation (DOT) is responsible for ensuring that airlines adhere to federal non-discrimination laws, among other consumer protections afforded to passengers.[5] The FAA Reauthorization Act of 2018 included provisions for us to examine airlines' training

---

[1]49 U.S.C. § 40127(a). The Department of Transportation (DOT) has also interpreted 49 U.S.C. §§ 41310(a), 41712, and 41702 as prohibiting discrimination against air travelers. Though in statute, airlines are generally referred to as "air carriers," we refer to them as "airlines" for the purpose of this report.

[2]Elaine Glusac, "Vigilance Gone Awry: When Math Gets Mistaken for Terrorism," *New York Times (*May 18, 2016).

[3]Catherine Rampell, "Ivy League economist ethnically profiled, interrogated for doing math on American Airlines flight," *Washington Post* (May 7, 2016).

[4]NAACP lifted the advisory after the airline agreed, among other things, to provide training to its employees on implicit bias (discussed later). NAACP, NAACP Issues National Travel Advisory for American Airlines, Oct. 24, 2017, and PBS News Hour, "NAACP lifts travel advisory against American Airlines," July 17, 2018.

[5]In this report, we use the term "consumer protections" to refer to laws and regulations that generally provide certain protections or benefits to airline passengers, though Congress's and DOT's purpose may have been broader.

programs on racial, ethnic, and religious non-discrimination for their employees and contractors, including how frequently airlines train new employees and contractors.[6] This report describes selected airlines' programs for training employees and contractors on racial, ethnic, and religious non-discrimination. In addition, in enclosure I, we identify key considerations for developing and presenting non-discrimination training programs.

To describe airlines' non-discrimination training programs, we requested interviews with a non-generalizable sample of six U.S. commercial airlines that we selected based on the type of airline (e.g., network or low-cost), number of 2017 passenger boardings, and number of passenger complaints submitted to DOT in 2016 and 2017 alleging discriminatory treatment by the airline.[7] Five of the six selected airlines agreed to be interviewed, and the other airline provided a written statement describing its non-discrimination training.[8] During interviews, we asked representatives from these selected airlines about the frequency of their non-discrimination training; type of training (e.g., in-person or web-based) provided; and variation, if any, by the type of employee (e.g., airline staff versus contractors).[9] We also asked selected airline representatives for documentation on their non-discrimination training programs, such as course materials. One airline provided us with access to a portion of its non-discrimination training materials.[10]

We also met with representatives from four non-discrimination advocacy organizations to gain their perspectives on airlines' non-discrimination training programs.[11] We selected this non-generalizable sample of organizations based on their expertise examining racial non-discrimination issues and recommendations from DOT, among other things. To understand DOT's oversight responsibilities related to ensuring that airlines adhere to federal non-discrimination laws, we conducted interviews with DOT officials and reviewed relevant information—including data on passenger complaints submitted directly to DOT from 2009 through 2018. We also reviewed applicable laws, regulations and guidance relating to federal non-discrimination requirements in aviation.

---

[6]Pub. L. No. 115-254, § 407, 132 Stat. 3186, 3330.

[7]We generally selected a mix of network and low-cost airlines that also had the highest numbers of passenger boardings and complaints. The six airlines were Alaska Airlines, American Airlines, Delta Air Lines, Southwest Airlines, Spirit Airlines, and United Airlines. Our report did not examine non-discrimination training programs for regional airlines. However, representatives from one association representing regional airlines said most of these airlines provide in-person and recurrent non-discrimination training to their employees.

[8]United Airlines provided a written statement we incorporated where possible. Since the statement did not cover all the questions we asked other airlines, in some places we have not provided United Airlines' perspectives. Airline representatives are not legally required to meet with us.

[9]Interviews used open- and closed-ended questions. Given the nature of open-ended questions, we cannot be sure that all representatives commented on the same things or provided information on all relevant training. The absence of a response should not suggest they do not do something, but rather that representatives did not raise it during the course of our interview.

[10]Representatives from all six airlines said that the training materials are business proprietary. While representatives from one airline allowed us to attend their training, they asked us not to include a summary of the information in our report because it is business proprietary. Airlines have no legal requirement to provide us with their non-discrimination training materials or to make such materials available to the public.

[11]These four organizations were the Arab American Institute, Legal Defense and Education Fund, Muslim Advocates, and the NAACP.

To describe key considerations for developing and presenting non-discrimination trainings, we conducted a literature search of peer-reviewed materials, government reports, and industry materials on developing and facilitating non-discrimination trainings that were published over the last 5 years. We selected 174 articles from the results; of those articles, we limited our review to eight studies that presented leading training practices and were relevant to racial, ethnic, or religious non-discrimination in customer service industries. We also conducted interviews with a non-generalizable sample of five stakeholders, whom we identified as leaders in the field, based on our literature search results and recommendations from non-discrimination advocacy organizations, among other things. Our list of leaders in the field is not exhaustive, and interviews with other leaders may have yielded some different key considerations. Nevertheless, our selected leaders in the field generally identified similar considerations. We also supplemented these key considerations with information from our past work examining leading training and diversity and inclusion practices. Commonly cited considerations are presented in enclosure I.

We conducted this performance audit from November 2018 to August 2019 in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

**Results in Brief**

Representatives we interviewed from all six selected airlines told us they provide non-discrimination training to employees; representatives from four said they provide the same training to contractor staff who work directly for the airline. Specifically, all selected airline representatives told us they provide initial non-discrimination training to newly hired employees who interact with passengers—including, for example, pilots, flight attendants, and customer service representatives. Airline representatives provided high-level examples describing the content of their trainings, but with one exception they declined to provide more specific information, citing the sensitive or business proprietary nature of such materials. Airlines have no legal requirement to provide us with their non-discrimination training materials or to make such materials available to the public.

Representatives generally stated that trainings emphasize treating all individuals fairly and without bias, regardless of race, ancestry, or religion, among other things. Representatives from four selected airlines also said that their non-discrimination trainings cover implicit bias—a term that refers to attitudes or stereotypes about groups of people that unconsciously affect a person's understanding, actions, and decisions. Non-discrimination trainings are typically embedded in larger training programs and delivered using a combination of in-person and web-based modules, according to airline representatives. Five selected airline representatives also told us they use available data (e.g., passenger complaint data) to evaluate the effectiveness of their non-discrimination trainings and make updates as needed.

DOT does not require airlines to provide non-discrimination training to employees and contractors; however, officials told us that most larger airlines generally provide such training. DOT officials also stated that they receive few discrimination complaints relative to the millions of passenger boardings each year. Further, DOT officials said that if they were to identify an issue when reviewing passenger complaints, among their various other monitoring activities, they could initiate an investigation of an airline's non-discrimination policies and take enforcement action if warranted. Nevertheless, representatives from non-discrimination

advocacy organizations we interviewed identified additional actions that DOT and airlines could take to help ensure the non-discriminatory treatment of passengers, including sharing airlines' non-discrimination trainings with such organizations for their input and feedback.

## Background

A number of federal statutes prohibit or have been interpreted by DOT to prohibit airline discrimination against airline passengers.[12] As previously mentioned, non-discrimination statutes are among the various consumer protections afforded to passengers by enacted legislation.[13] Federal law also allows airlines to refuse to transport any passenger if the airline determines that the passenger is, or might be, a threat to safety.[14] According to DOT guidance, this determination is made by the pilot in command of the aircraft or certain other specified airline personnel and cannot be arbitrary, but must be based on specific facts and circumstances known at the time.[15] In its guidance, DOT has unequivocally provided that a passenger's status in a protected class (e.g., their race, color, or national origin) cannot be the determinative factor in an airline's decision to deny boarding or remove a passenger from a flight.[16]

DOT is responsible for monitoring and enforcing airlines' compliance with established consumer protection requirements.[17] We have previously reported that DOT conducts five key activities to help ensure airlines' compliance with consumer protection requirements: (1) providing compliance assistance to airlines; (2) processing complaints from passengers; (3) conducting compliance inspections of airlines at headquarters and airports; (4) conducting airline investigations; and (5) enforcing airlines' compliance with consumer protection requirements.[18]

DOT reviews passenger complaints it receives that allege discrimination by airlines against passengers.[19] According to DOT, first, a DOT analyst is to review and forward the complaint to

---

[12]In addition to 49 U.S.C. § 40127(a), these statutes include 49 U.S.C. § 41310(a), which prohibits U.S. and foreign airlines from unreasonable discrimination against any person in foreign air transportation; 49 U.S.C § 41712, which prohibits airlines from engaging in unfair and deceptive practices and unfair methods of competition; and 49 U.S.C. § 41702, which requires airlines to provide safe and adequate interstate air transportation.

[13]While legislation can be enacted and DOT can regulate airlines and issue guidance to establish consumer protection requirements for airlines, the Airline Deregulation Act of 1978 (Pub. L. No. 95-504, 92 Stat. 1705) largely phased out the government's control over U.S. airlines' fares and services.

[14]See 49 U.S.C. § 44902(b). See also, 14 C.F.R. § 91.3(a) providing that the pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of the aircraft.

[15]DOT, *Passengers' Right to Fly Free from Discrimination*, (Washington, D.C.: January 2017).

[16]DOT, *Passengers' Right to Fly Free from Discrimination*, (Washington, D.C.: January 2017).

[17]The U.S. Equal Employment Opportunity Commission (EEOC) also enforces certain non-discrimination laws for government and private industry. See GAO, *Diversity in the Technology Sector: Federal Agencies Could Improve Oversight of Equal Employment Opportunity Requirements*, GAO-18-69 (Washington, D.C.: Nov. 16, 2017).

[18]GAO, *Airline Consumer Protections: Additional Actions Could Enhance DOT's Compliance and Education Efforts*, GAO-19-76 (Washington, D.C.: Nov. 20, 2018).

[19]DOT, *File a Consumer Complaint*, accessed June 6, 2019. We previously reported that complaints received by DOT for other issues—such as flight delays and cancellations—are received and coded by a DOT analyst and then forwarded to the airline, which must respond to the passenger. If the complaint does not appear to fall under any established consumer protections that DOT enforces, no additional action is generally taken. See GAO-19-76.

the appropriate airline, which is required to respond to DOT and the passenger.[20] Second, after a response is received, a DOT analyst and attorney are to review the case to determine if a violation occurred. We have previously reported that discrimination complaints are one of the key factors DOT uses when determining whether to initiate an investigation of an airline to identify potential non-compliance.[21]

From calendar year 2009 through 2018, DOT received, on average, about 80 complaints a year from passengers alleging discrimination against U.S. airlines, on a variety of bases, most commonly about racial discrimination. As shown in table 1, while the number of discrimination complaints generally decreased in most tracked categories over the 10-year time frame, race-based complaints increased. Nonetheless, discrimination complaints account for a small percentage of total passenger complaints DOT receives.[22] For example, in 2018, of the 8,874 complaints DOT received against U.S. airlines, 77 alleged discriminatory treatment. However, we have previously reported that DOT's complaint data provides an incomplete picture of all passenger complaints because it does not include complaints from passengers submitted directly to airlines.[23]

**Table 1: Discrimination Complaints Reported to the Department of Transportation (DOT) against U.S. Airlines by Passengers, Calendar Years 2009 through 2018**

| Year | Race | Ethnicity or Ancestry | National Origin | Religion | Other | Total |
|---|---|---|---|---|---|---|
| 2009 | 25 | 53 | 6 | 3 | 21 | 108 |
| 2010 | 24 | 54 | 10 | 5 | 25 | 118 |
| 2011 | 34 | 25 | 27 | 1 | 19 | 106 |
| 2012 | 40 | 8 | 15 | 7 | 13 | 83 |
| 2013 | 50 | 1 | 2 | 2 | 5 | 60 |
| 2014 | 42 | 4 | 8 | 1 | 5 | 60 |
| 2015 | 43 | 0 | 6 | 2 | 3 | 54 |
| 2016 | 57 | 0 | 10 | 6 | 8 | 81 |
| 2017 | 56 | 4 | 7 | 3 | 11 | 81 |
| 2018 | 53 | 1 | 8 | 1 | 14 | 77 |

Source: DOT. | GAO-19-654R

Note: "Other" includes complaints about discrimination on the basis of color, age, or sex, among other things.

DOT does not require airlines to provide non-discrimination training to employees and contractors, but it encourages airlines to implement comprehensive non-discrimination training to help prevent and reduce incidents of unlawful discrimination.[24] Additionally, in 2017 DOT developed guidance for airline employees and contractors to help them understand their legal obligations not to discriminate against passengers, in addition to a document for passengers to

[20]DOT, *File a Consumer Complaint*, accessed June 6, 2019.

[21]GAO-19-76.

[22]We previously reported that most complaints to DOT are about delayed or cancelled flights. See GAO-19-76.

[23]In 2018, we reported that DOT officials estimated that for every passenger complaint they receive, airlines receive about 50. See GAO-19-76.

[24]DOT has generally not established training requirements for airlines on consumer protections, except for disability issues. With respect to disability training, in general, DOT requires airlines to provide their employees and contractor staff who deal with the traveling public training on the proper and safe operation of equipment used to accommodate passengers with a disability, as well as on boarding and deplaning assistance. See 14 C.F.R. § 382.141.

help them understand their right to fly free from discrimination.[25] As discussed later, DOT officials stated that most larger airlines already have training programs, and DOT receives few passenger complaints about discrimination issues relative to passenger boardings.

**Representatives from All Selected Airlines Said They Include Non-Discrimination Topics in Their Training, but Available Information Is Limited**

<u>Airlines' Training Content and Delivery</u>

Representatives from all six selected airlines told us that they provide non-discrimination training to employees that address treating individuals fairly and without bias, with some variation in specific content. As described to us, while airlines do cover non-discrimination topics related to, for example, racial, ethnic or religious non-discrimination, most training content is generally not specific to one group, but rather about treating all individuals fairly and with respect. However, representatives from six selected airlines also provided some limited examples of instances where training topics address raising awareness about the fair and non-discriminatory treatment of individuals—such as on the basis of their race, color, national origin, or religion—or educating employees about cultural differences. Representatives from four selected airlines told us that some of their training covers implicit bias and cultural awareness.[26] According to representatives from one airline, they provide cultural diversity training to flight attendants who work on international flights to increase their understanding of specific cultural customs and improve their interactions with passengers. Representatives from two selected airlines also said they provide training related to non-discrimination on the basis of one's sexuality, age, or gender. For example, one airline provides a transgender sensitivity training. While representatives provided a limited number of high-level examples on the content of these trainings, they were hesitant to provide more specific information, citing the sensitive or business proprietary nature of such materials.[27]

Selected representatives also said that their airlines typically embed non-discrimination topics into broader in-person and web-based trainings, such as customer service or security training, periodically reintroducing material. Specifically, four selected airline representatives said they generally provide initial training to employees in person, and recurrent training using web-based modules. The remaining two airlines told us that they provide non-discrimination training using a combination of in-person and web-based training. Representatives also told us they use examples or scenarios based on real-world events to make training more impactful and accessible to its employees. For example, in 2016, one airline provided additional training to airline staff on implicit bias after flight attendants requested medical credentials from an African-American doctor who volunteered to help a distressed passenger.[28] Regardless of the delivery method, four selected airlines told us they typically embed non-discrimination topics into their

---

[25]See DOT, *Guidance for Airline Personnel on Non-Discrimination in Air Travel,* (Washington, D.C.: January 2017) and DOT, *Passengers' Right to Fly Free from Discrimination,* (Washington, D.C.: January 2017).

[26]Cultural awareness refers to knowledge and understanding of various cultural norms that informs and improves one's interactions with a diverse group of people. According to representatives, these trainings were not all mandatory. Rather, some were supplemental trainings that airline employees can take voluntarily.

[27]As discussed earlier, airlines have no legal requirement to share their non-discrimination training materials.

[28]According to the airline's press release, effective December 2016, it will no longer require employees to verify passengers' medical credentials. See Delta Air Lines, *Delta uses social feedback as opportunity to improve*, (December 19, 2016), accessed May 9, 2019.

training curriculum, and representatives from another airline said that they provide both embedded and stand-alone training. For example, representatives from one airline said they incorporate non-discrimination principles in trainings on customer service and professionalism.

Representatives from three selected airlines also said they incorporate non-discrimination principles into various customer service documents. According to these representatives, incorporating these principles in various documents—including policy and procedure manuals, corporate values, mission statements, codes of ethics, and organizational policies and procedures—further demonstrates their commitment to key non-discrimination principles. Our review of the six airlines' selected documents on their websites—including contracts of carriage and customer commitment documents, in addition to other selected policies or procedures—found that three of the airlines have non-discrimination statements.[29]

Who Receives Non-discrimination Training and How Often

Representatives from all six selected airlines told us they provide initial non-discrimination training to employees who work with passengers—including, for example, pilots, flight attendants, and customer service representatives—when they are hired. Representatives from all six airlines told us they provide recurrent training, and four of them said that they provide it on an annual basis, at a minimum. Representatives from four selected airlines also said they provide non-discrimination training to management. For example, representatives from one airline told us they recently provided training during a management meeting that covered non-discrimination topics. According to these representatives, providing trainings to management is easier because they are generally in the same location, compared to the rest of its workforce, which is geographically dispersed.

Representatives from four selected airlines also said they provide contractor staff who work for the airline directly with the same non-discrimination training they provide to employees. While representatives from one selected airline do not provide such training to contractors, they said they could provide informal training if an issue arises.

Training Evaluation and Updates

Representatives from five selected airlines told us they use available data to evaluate the effectiveness of their non-discrimination trainings. For example, representatives said they review trends in passenger complaints—both those that airlines receive directly and those submitted to DOT—alleging discrimination in order to inform their training.[30] Selected airline representatives also said they review employees' post-training assessments, such as course surveys, as well as passengers' in-flight surveys to assess the effectiveness of their non-discrimination training. According to representatives of one airline, their non-discrimination training has contributed to an increase in their customer satisfaction scores.[31]

---

[29]In this context, a contract of carriage is a contractual arrangement that defines the rights, liabilities, and duties of the airline and passenger.

[30]Selected airlines generally considered their complaint data to be proprietary and did not share this data with us. One airline provided us information on discrimination complaints it received from passengers relative to total passenger boardings, which showed a relatively constant rate between November 2017 and December 2018.

[31]DOT does not review airlines' non-discrimination training, nor does it assess the effectiveness of such trainings.

To help ensure that trainings are effective, representatives from five selected airlines told us they regularly update their trainings. In particular, selected airline representatives told us that they update trainings to promote employee engagement in materials and make sure information stays relevant. To that end, representatives from five selected airlines said they update trainings at least annually, if not more frequently. These representatives noted that their updates are driven by current events, or changes in internal policies or regulations. For example, in response to a widely publicized incident where a passenger alleged racial insensitivity onboard a flight, one airline now requires all airline employees to take training on implicit bias. In another case, representatives from one selected airline said they collaborated with an advocacy organization to provide airline employees with additional training on religious non-discrimination after an employee mistook a religious item as a security threat.

<u>DOT's and Selected Stakeholders' Perspectives</u>

While DOT does not require airlines to provide non-discrimination training to employees and contractors, officials told us they believe that most larger airlines provide such training to their employees and contractors. Officials also pointed to their monitoring and enforcement efforts, which, as discussed earlier, include reviewing passenger complaints and taking enforcement actions where officials identify a violation. DOT officials also said they receive few discrimination complaints relative to the millions of annual passenger boardings.[32] As previously discussed, DOT officials said that if they were to identify an issue when reviewing passenger complaints, among their various other monitoring activities, they could initiate an investigation of an airline's non-discrimination policies and take enforcement action if warranted. Our review identified two consent orders that DOT issued against airlines for discrimination issues between 2009 and 2018.[33] For example, in a 2012 consent order, DOT issued a civil penalty against one airline related to non-discrimination laws and as a condition of settlement set out in the consent order, required that the airline, among other things, provide civil rights training to its employees.[34]

DOT has taken a number of other steps designed to help ensure the fair, non-discriminatory treatment of all airline passengers. In December 2016, DOT convened a meeting between DOT and a selected group of airlines, advocacy organizations, and industry associations to discuss concerns related to eleven high-profile passenger incidents that occurred over a 6-month period.[35] Two advocacy organizations alleged that in each of these incidents, airlines racially or religiously profiled passengers, subjecting them to additional security screening or removing them from the aircraft due to safety concerns. DOT took two additional steps after the meeting in response to these concerns. First, in 2017 DOT developed and issued guidance for airline employees and contractors about federal non-discrimination laws. In addition to including decision-making techniques, the guidance also applied the techniques to scenarios related to

---

[32]Moreover, according to DOT officials, not all discrimination complaints that it receives necessitate a review of the airline's non-discrimination policy.

[33]In this context, a consent order is a type of settlement in which DOT orders an entity, such as an airline, to cease and desist from future violations and may require an airline to pay a civil penalty or complete specified corrective actions in order to avoid future litigation. For more information on DOT's enforcement mechanisms, see GAO-19-76.

[34]For more information, see DOT Consent Order 2012-5-2.

[35]See Muslim Advocates and NAACP Legal Defense and Educational Fund, *Muslim Advocates and the NAACP Legal Defense Fund Pen Letter to U.S. Department of Transportation Urging Immediate Action to Prevent Profiling of Airline Passengers*, May 11, 2016, accessed November 16, 2018.

passenger removals from an aircraft. Representatives from three selected airlines we interviewed told us they are familiar with the guidance and have used it to refine their trainings with some airline-specific modifications. Second, DOT began publishing more detailed data on passengers' complaints to DOT alleging discrimination in its *Air Travel Consumer Report*.[36] Specifically, DOT expanded its public reporting of non-discrimination complaints by disaggregating them into additional sub-categories, such as complaints about racial or religious discrimination.

While selected non-discrimination advocacy organizations we spoke with told us they were generally satisfied with DOT's response, they identified additional actions they would like to see from both DOT and airlines. Representatives from one advocacy organization told us they were disappointed that DOT would not persuade airlines to share their non-discrimination trainings with such organizations. Representatives from one organization said that they offered to provide input and feedback on airlines' trainings. As of July 2019, only one airline has discussed its training with the organization.[37] While advocacy organizations' representatives did not have access to airlines' training materials, and therefore did not know whether certain topics were already being covered, based on our interviews and written documents, they recommended that implicit bias, racial anxiety, and stereotype threat be included in airline training sessions.[38] These representatives also told us they would like to see DOT provide additional information about when a passenger can be removed from an aircraft, and the factors that warrant removal. A representative from one advocacy organization we interviewed stated that although airline employees generally aim to perform their job duties well, covering specific training topics and having additional procedures for passenger removals could provide greater assurance that employees perform their duties in a non-discriminatory manner. DOT officials acknowledged that advocacy organizations want additional specificity on non-discrimination training and procedures to ensure non-discriminatory passenger removals. However, DOT officials said they believe current laws coupled with agency guidance provide sufficient information.

In an effort to improve airlines' non-discrimination training programs, the FAA Reauthorization Act of 2018 included provisions for DOT to develop and disseminate leading non-discrimination training practices to airlines after we publish this report. The mandate also requires DOT to develop these practices in consultation with passengers of diverse backgrounds, national organizations that represent affected communities, and airlines. As of May 2019, DOT officials were unsure of their planned time frames for completion or plan to disseminate any results to airlines. Rather, DOT officials said they plan to make these decisions once we issue our report. DOT officials said they currently have no plans to review airlines' non-discrimination training programs relative to any practices they develop. Although DOT currently has no plans to review airlines' non-discrimination training programs, officials said they can review these programs as necessary.

---

[36]DOT issues a monthly *Air Travel Consumer Report*, which informs the public about the quality of airlines' services.

[37]According to representatives, one airline training director participated in a webinar with the organization to discuss how to incorporate leading non-discrimination training principles into their program.

[38]Racial anxiety refers to the heightened levels of stress and emotion that individuals may confront when interacting with people of other races. Stereotype threat refers to an individual's concern that his or her behavior will confirm a negative stereotype about the identity of the group to which the individual belongs. See enclosure I for additional information.

**Agency Comments**

We provided a draft of this report to DOT for review and comment. DOT provided technical comments, which we incorporated as appropriate.

_____

We are sending copies of this report to the Secretary of Transportation. In addition, the report is available at no charge on the GAO website at http://www.gao.gov.

If you or your staff have questions concerning this report, please contact me at (202) 512-2834 or vonaha@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are Jonathan Carver (Assistant Director); Melissa Swearingen (Analyst-in-Charge); Emily Flores; Clara Goldrich; Geoffrey Hamilton; Delwen Jones; Kelly Rubin; Pam Snedden; and Amy Suntoke.

Andrew Von Ah
Director, Physical Infrastructure

Enclosure – 1

**Enclosure I: Key Considerations for Non-Discrimination Training Programs**

After we submit this report to Congress, Section 407 of the FAA Reauthorization Act of 2018 directs the Department of Transportation (DOT) to develop and disseminate leading non-discrimination training practices to airlines to help them improve their training programs.[39] To help inform this effort, we identified the following key considerations for developing and presenting non-discrimination training programs based on a literature search and interviews with a non-generalizable sample of five stakeholders, whom we identified as leaders in the field.[40] This list of considerations highlights some strategies to develop and present effective and informed non-discrimination trainings, and is not an exhaustive list of considerations. In addition, many of the identified considerations are applicable across industries and therefore not specific to the airline industry. Furthermore, as previously noted, several of these considerations are consistent with leading practices we identified in our prior work on training and diversity and inclusion.[41]

Key considerations cited in the studies we reviewed and by the leaders in the field we interviewed are presented below.

- **Align non-discrimination training to organizational missions, goals, and culture.** To help ensure that employees understand that non-discrimination is fundamental to their job duties, leaders in the field said successful non-discrimination principles should align with the organization's mission statements, policies, or employees' responsibilities. Organizations can achieve employees' buy-in by, among other things, articulating the expectation that employees attend trainings and apply the principles in their work. In our previous work, we found that strategic alignment is a core characteristic of successful non-discrimination training programs.[42]

- **Demonstrate management's commitment to non-discrimination training**. Management should consistently demonstrate commitment to non-discrimination training programs. Organizations can demonstrate management's commitment by, among other things, having management take non-discrimination trainings. In our previous work, we found that management support is a core characteristic of successful training programs and for diversity management. [43]

- **Include key non-discrimination principles in training content**. Employees should have the same knowledge base from which to discuss non-discrimination, according to leaders in

---

[39]Pub. L. No. 115-254, § 407 132 Stat. 3186, 3330.

[40]We identified leaders in the field of non-discrimination training through our literature search and recommendations from non-discrimination advocacy organizations, among other things.

[41]GAO, *Diversity Management: Expert-Identified Leading Practices and Agency Examples*, GAO-05-90 (Washington, D.C.: Jan. 14, 2005) and GAO, *Human Capital: A Guide for Assessing Strategic Training and Development Efforts in the Federal Government*, GAO-04-546G (Washington, D.C.: Mar., 2004). As recently as 2017, we confirmed that these leading practices remain relevant. See GAO, *Financial Service Industry: Trends in Management Representation of Minorities and Women and Diversity Practices, 2007-2015*, GAO-18-64 (Washington, D.C.: Nov. 8, 2017).

[42]GAO-05-90 and GAO-04-546G.

[43]GAO-05-90 and GAO-04-546G.

the field we interviewed.[44] We identified the following topics based on our interviews with leaders in the field and the literature we reviewed:

- o *Implicit bias*, which refers to the attitudes or stereotypes that unconsciously affect a person's understanding, actions, and decisions. Such biases can lead to differing treatment of otherwise identical individuals depending upon a person's race, religion, or ethnicity.[45]

- o *Stereotype threat*, which refers to the concern that an individual's behavior may confirm a negative stereotype about the identity of the group to which an individual belongs.[46] For example, a Muslim passenger may fear that he or she will be perceived as dangerous by security or airline personnel; accordingly, he or she may act overly cautious and thus arouse suspicion**.**

- o *Racial anxiety*, which refers to the heightened levels of stress and emotion that individuals may confront when interacting with people of other races.[47] Studies have shown that interracial interaction can cause physical symptoms of anxiety and that our non-verbal behaviors—for example, making eye contact or using welcoming gestures or a pleasant tone of voice—can also be affected.[48]

- o *Cultural competence*, which provides individuals with an understanding of various cultural norms and can help improve interactions among diverse individuals, according to leaders in the field and literature we reviewed.[49]

- **Conduct non-discrimination trainings in person and with a qualified facilitator whenever possible.** Non-discrimination trainings are generally more effective when conducted in person and with a qualified facilitator, according to leaders in the field we interviewed and literature we reviewed. Since non-discrimination trainings cover sensitive topic areas, these leaders and literature said that it is important for a facilitator to lead conversations.[50] Some research also suggested that facilitators should be from a cultural

---

[44]On its website, the U.S. Equal Employment Opportunity Commission provides information on the types of actions that could constitute discrimination on the basis of race, religion, or national origin, among other things. Organizations could use this information to provide individuals with information on non-discrimination principles.

[45]Perception Institute, *Implicit Bias*, accessed June 23, 2019. In 2017 we reported that representatives from financial services firms thought implicit bias training was helpful for their managers and staff. See GAO-18-64.

[46]Perception Institute, *Stereotype Threat*, accessed June 24, 2019.

[47]Perception Institute, *Racial Anxiety*, accessed June 25, 2019.

[48]Perception Institute, *Racial Anxiety*, accessed June 25, 2019.

[49]See, for example, Zsofia Kenesei and Zsofia Stier, "Managing Communication and Cultural Barriers in Intercultural Service Encounters: Strategies from Both Sides of the Counter," *Journal of Vacation Marketing*, vol. 23, no. 4 (2017): p. 307 and Heather Getha-Taylor, Maja Husar Holmes, and Justin R. Moen, "Evidence-Based Interventions for Cultural Competency Development Within Public Institutions," *Administration & Society, vol. 00, no. 0 (2018):* p. 2.

[50]See, for example, Diether Gebert, Claudia Buengeler, and Kathrin Heinitz, "Tolerance: A Neglected Dimension in Diversity Training?" *Academy of Management Learning & Education,* vol. 16, no. 3, (2017): p. 426 and Heather McGhee and Sherrilyn Ifill, *Toward a Vision for Racial Equity & Inclusion at Starbucks: Review and Recommendations*, (New York City, New York: Demos, 2018): p. 4.

minority group, as their perspectives can provide a more lasting effect on employees.[51] While leaders in the field we interviewed stated that in-person training with a qualified facilitator is ideal, they acknowledged that due to budget and time constraints, in-person trainings are not always realistic. As a result, they noted that web-based training can be an alternative, though they similarly said that web-based trainings are also best when led by a facilitator who can engage participants in conversation.

- **Facilitate non-discrimination trainings in an interactive manner based on relevant scenarios**. According to leaders in the field we interviewed and literature we reviewed, non-discrimination trainings are most effective when employees are engaged and can relate to the material covered. In particular, leaders in the field we interviewed said employees must be able to see themselves in training scenarios. They said that trainings should also provide employees with sufficient time to discuss and reflect on materials, which according to research, increases the likelihood that employees may apply the training in future situations.[52]

- **Reinforce non-discrimination trainings periodically**. According to one study we reviewed and leaders in the field, non-discrimination trainings are most effective when employees receive training as new hires and periodically thereafter.[53] Several leaders in the field we interviewed explained that recurrent training is essential because individuals need to be exposed to content multiple times before they can internalize and absorb the material. Similarly, we have previously underscored the importance of continuous learning on training topics.[54]

- **Develop measures to evaluate the effectiveness of non-discrimination trainings**. Measuring the effectiveness of trainings can help employers determine whether material is achieving its intended goals, according to leaders in the field. Employers can evaluate training in a variety of ways. For example, organizations can conduct evaluations of employees' knowledge before and after trainings are conducted to understand their ability to apply the principles. We have previously reported that organizations should attempt to assess the effectiveness of their non-discrimination training efforts using a combination of quantitative and qualitative measures.[55] A quantitative measure could, for example, examine changes in rates of complaints. Alternatively, a qualitative measure could examine employees' and managers' views, collected through questionnaires, on the extent to which employees applied the content of the training program to their jobs.[56]

---

[51]See, for example, Lennie R.C. Geerlings, et al., "Cultural Competence in Clinical Psychology Training: A Qualitative Investigation of Student and Academic Experiences," *Australian Psychologist*, no. 53 (2018): p.166.

[52]See, for example, Lennie R.C. Geerlings, et al., "Cultural Competence in Clinical Psychology Training: A Qualitative Investigation of Student and Academic Experiences," *Australian Psychologist*, no. 53 (2018): p.165.

[53]Heather McGhee and Sherrilyn Ifill, Toward a Vision for Racial Equity & Inclusion at Starbucks: Review and Recommendations, (New York City, New York: Demos, 2017): p. 24.

[54]GAO-04-546G.

[55]GAO-05-90.

[56]GAO-04-546G.

- **Update non-discrimination trainings periodically**. Organizations should review non-discrimination trainings on a regular basis and revise materials to reflect the latest academic research, according to leaders in the field with whom we spoke. Specifically, leaders in the field generally recommended that organizations update training on an annual basis because academic research is evolving and current events make good training scenarios. Providing periodic updates helps ensure that individuals receive the most up-to-date and effective non-discrimination training to maximize investments. We have previously reported that organizations should have mechanisms for updating trainings and should include considerations such as changes in market conditions, agency capabilities, and technological advances.[57]

(103131)

---

[57]GAO-04-546G.

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

| GAO's Mission | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
|---|---|
| Obtaining Copies of GAO Reports and Testimony | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's website (https://www.gao.gov). Each weekday afternoon, GAO posts on its website newly released reports, testimony, and correspondence. To have GAO e-mail you a list of newly posted products, go to https://www.gao.gov and select "E-mail Updates." |
| Order by Phone | The price of each GAO publication reflects GAO's actual cost of production and distribution and depends on the number of pages in the publication and whether the publication is printed in color or black and white. Pricing and ordering information is posted on GAO's website, https://www.gao.gov/ordering.htm.<br><br>Place orders by calling (202) 512-6000, toll free (866) 801-7077, or TDD (202) 512-2537.<br><br>Orders may be paid for using American Express, Discover Card, MasterCard, Visa, check, or money order. Call for additional information. |
| Connect with GAO | Connect with GAO on Facebook, Flickr, Twitter, and YouTube. Subscribe to our RSS Feeds or E-mail Updates. Listen to our Podcasts. Visit GAO on the web at https://www.gao.gov. |
| To Report Fraud, Waste, and Abuse in Federal Programs | Contact:<br><br>Website: https://www.gao.gov/fraudnet/fraudnet.htm<br><br>Automated answering system: (800) 424-5454 or (202) 512-7470 |
| Congressional Relations | Orice Williams Brown, Managing Director, WilliamsO@gao.gov, (202) 512-4400, U.S. Government Accountability Office, 441 G Street NW, Room 7125, Washington, DC 20548 |
| Public Affairs | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |
| Strategic Planning and External Liaison | James-Christian Blockwood, Managing Director, spel@gao.gov, (202) 512-4707 U.S. Government Accountability Office, 441 G Street NW, Room 7814, Washington, DC 20548 |



Please Print on Recycled Paper.