John D. McKay, Esq.
*Admitted pro hac vice*
PARK AVENUE LAW LLC
201 Spear Street, Suite 1100
San Francisco, CA 94105
(434) 531-9569
johndmckayatty@gmail.com
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| PETER DELVECCHIA, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>FRONTIER AIRLINES, INC., *et al.*,<br>Defendants. | Case No: 2:19-CV-01322-KJD-DJA<br><br>**PLAINTIFFS' OPPOSITION TO FRONTIER'S MOTION FOR PROTECTIVE ORDER**<br>**(ECF No. 215)** |

Plaintiffs, Peter DelVecchia ("Peter") individually and as next friend of A. D., a minor ("A.D."), by counsel, respectfully file this Opposition to Defendant Frontier Airlines, Inc.'s Motion for Protective Order concerning its Fed. R. Civ. P. 30(b)(6) deposition (ECF No. 215).

### COUNTER STATEMENT REGARDING
### REQUIRED MEET AND CONFER

The Declaration of Attorney Brian Maye concerning a pre-filing meet and confer session states that such a session occurred over two dates, October 24 and November 3, and implicitly suggests that an exchange meeting the criteria discussed in *Cardoza v. Bloomin' Brands, Inc.,* 141 F.

PLAINTIFFS' OPPOSITION TO FRONTIER MOTION FOR PROTECTIVE ORDER
Page 1 of 16

Supp. 3d 1137, 1145-46 (D. Nev. 2015) took place between Attorneys Maye and McKay on those dates, with the result being that "Frontier agreed to withdraw objections to two numbered topics [and] Plaintiffs declined to withdraw any of the proposed topics." ECF No. 215 at 2. In truth, no such exchange occurred. Attorney McKay, who is lead counsel for Plaintiffs, has no recollection or record of any telephone conversation with Attorney Maye on October 24. In fact, he was tied up for most of the day with negotiations concerning the purchase of an aircraft in Switzerland, and had time that day only for two brief email exchanges with Mr. Maye and his office in this case concerning two unrelated matters. On November 3, the two attorneys held a 50-minute call concerning the Rule 30(b)(6) deposition notice that Plaintiffs had served on October 5. Another attorney from Mr. Maye's firm, Mr. Harris, was present on the call but did not contribute anything to the conversation beyond "Hello" in the first minute and "Have a nice day" in the 50th.

At the beginning of the call, Mr. Maye announced that Frontier had objections to 25 of the 39 subject matter topics in the notice of deposition. Mr. McKay then read through all 39 topics, starting at Topic 1, and Mr. Maye either asserted Frontier's objection or did not. By the time the 39th topic was read, Mr. Maye had asserted a total of 23 objections, not 25. He did not "agree[ ] to withdraw" any objections; he simply never asserted the full 25 objections that he initially said he was going to assert. One cannot agree to withdraw something that has never been asserted.

It is correct that Plaintiffs did not withdraw any of the listed topics, but that was because all of them are relevant and proportional to their claims pleaded in the Third Amended Complaint, and because Frontier never advanced any meaningful argument as to why any topic was not appropriate for discovery pursuant to Rules 26 and 30. Defense counsel cited no specific case law, treatise, Rule of Civil Procedure, or other authority supporting any argument concerning any of the listed topics, instead stating only phrases like "we don't think this is relevant." Mr. McKay stated multiple times

during the phone call that the Local Rules and the cases interpreting them require the attorneys to conduct a meet and confer with fully developed arguments no different than the arguments a party would advance during a court hearing. When pressed by Mr. McKay for authorities, Mr. Maye said "We've cited cases before and you didn't like them." He then mentioned "*Karrani* and the Magistrate's prior rulings." Mr. McKay reminded him that *Karrani* is a non-precedential opinion of a District Court Judge on a motion for summary judgment in a case with vastly different facts and allegations, not a discovery relevance opinion, and that the Judge who decided the summary judgment motion in that case was one of the ones who had incorrectly read 14 CFR §243.9(c) as applying to passengers. Mr. Maye had no response to that. Mr. McKay also reminded him that both Judges Albregts and Dawson had held that the prior passenger complaints of discrimination, which appear to be the principal reasons for most of Frontier's objections, are relevant to Plaintiffs' §1981 claims. Again, Mr. Maye did not respond. That was the entirety of anything that might pass for legal argument during the 50-minute call. It was a far cry from Frontier's counsel's duty to engage in a "two-way communication with the nonresponding party to meaningfully discuss each contested discovery dispute in a genuine effort to avoid judicial intervention." *Cardoza,* 141 F. Supp. 3d at 1145 (quoting *ShuffleMaster, Inc. v. Progressive Games, Inc*., 170 F.R.D. 166, 171 (D. Nev. 1996)). This Court has noted that a moving party's duty concerning a meet and confer session is met when it:

> …treat[s] the informal negotiation process as a substitute for, and not simply a formalistic prerequisite to, judicial resolution of discovery disputes. This is done when the parties present to each other the merits of their respective positions with the same candor, *specificity, and support* during the informal negotiations as during the briefing of discovery motions.

*Id.* (internal quotations omitted, brackets and italics added)(quoting *Nevada Power v. Monsanto,* 151 F.R.D. 118, 120 (D. Nev. 1993)).

As a threshold matter in deciding Frontier's Motion, this Court should determine whether Frontier has made a good faith effort to comply with its meet and confer obligations to try to resolve

PLAINTIFFS' OPPOSITION TO FRONTIER MOTION FOR PROTECTIVE ORDER
Page 3 of 16

the objections without judicial intervention. *Id.* It has not.[1] "Courts may look beyond the certification made to determine whether a sufficient meet-and-confer actually took place." *Id.*

## ARGUMENT

### I.  The scope of discovery is determined by the pleadings.

Although it is well settled that "pre-trial discovery is ordinarily 'accorded a broad and liberal treatment,'" *Shoen v. Shoen,* 5 F.3d 1289, 1292 (9th Cir. 1993)(quoting *Hickman v. Taylor,* 329 U.S. 495, 507 (1947)); *see also, Ecuador v. Mackay,* 742 F.3d 860, 866 (9th Cir 2014)(the scope of permissible discovery under Rule 26 is "broad"), and Rule 26(b)(1) defines the scope of such discovery as that which is "relevant to any party's claim or defense and proportional to the needs of the case," those standards appear to have been overlooked in Frontier's arguments and the Court's prior rulings on Plaintiffs' discovery motions. Plaintiffs' 39-page Third Amended Complaint alleges that the DelVecchias were illegally subjected to surveillance and lies by Frontier's employees based solely on the colors of their skin and Plaintiff A.D.'s ethnicity and ethnic features, were labeled "the situation" by those employees for the same reasons, were subjected to acts of battery and assault by one of the flight attendants that left one Plaintiff with a concussion, were subjected to intentional infliction of emotional distress, false imprisonment and defamation *per se* by several Frontier employees and the airline's agents, Frontier incorrectly argues that "the Court is well aware [that] this case involves a discrete episode of alleged discrimination," and a recent Order by the Magistrate Judge begins by summarizing the entirety of the 39-page complaint as, "This is a discrimination action arising out of Frontier's separation of Peter DelVecchia and his adopted son, A.D., during a flight for suspected human trafficking." ECF No. 192 at 1. Under no reading of federal civil

---

[1] After the meet and confer call had been completed, Mr. Maye emailed Mr. McKay a copy of the Magistrate Judge's Order on Plaintiffs' Fourth and Fifth Motions to Compel (ECF No. 192), which Plaintiffs' counsel already had, another copy of *Karrani*, and four other cases that he had never even mentioned during the meet and confer call. Emails do not meet the standards of LR IA 1-3(f), *see Ahmad v. Fulkerson,* Case No. 3:20-cv-0717-MMD-CLB (D. Nev. June 14, 2021).

procedure law would it be appropriate to ignore 90 percent of a party's pleading so that the scope of discovery under Rule 26(b)(1) is framed only to the claims expressed in the remaining 10 percent. The full allegations of Plaintiffs' Third Amended Complaint have survived Frontier's multiple motions to dismiss because they are claims upon which relief may be granted. Under Rule 26(b)(1), Plaintiffs should be entitled to conduct discovery concerning them. *See Shoen.*

With relevance to the objections raised by Frontier in the present Motion, Plaintiffs have specifically pleaded that the subject flight attendants claimed to have characterized their relationship to each other as "very awkward" based on their different races, ECF No. 153 at ¶ 10, discussed their different races among themselves and the pilots, saying that they felt "uneasy" and "uncomfortable" seeing them traveling together, and that they suspected them of human trafficking, yet they never inquired into their actual relationship, *id.* at ¶¶ 15-16, 18, 20, 23. All of that occurred despite Frontier's own protocols requiring them to gather information about passengers suspected of human trafficking, through questioning the passengers themselves, which Defendants deliberately chose not to do. *Id.* at ¶¶ 22-23. Those allegations clearly justify asking Frontier in its deposition why it decided not to provide the crew members of the subject flight with a printed manifest that would have disclosed that both Plaintiffs have the same surname.

Plaintiffs have also alleged that flight attendant Scott Warren struck Plaintiff Peter DelVecchia in the back of the head with sufficient force to give him a concussion, *id.* at ¶ 38, and that he subsequently lied to Plaintiff A.D. telling him that his father had placed his hand on his crotch, demonstrating the alleged illegal contact by placing his own hand above and almost on the 12-year-old boy's crotch, *id.* at ¶ 43. Those allegations are part of Plaintiffs' claims, and they justify asking Frontier in its deposition about what it trains its flight attendants about the propriety of physical contact with passengers and discussing with a minor passenger allegations of sexual misconduct.

Plaintiffs have alleged that Warren compounded his intentional misconduct by lying to Plaintiff Peter DelVecchia about his own name, *id.* at ¶ 42, which makes relevant to Plaintiffs' claims an inquiry into Frontier's policies about employees identifying themselves to the company's passengers, its policies against misrepresenting information to those passengers, and whether it ever enforces such policies.

Moreover, Plaintiffs have alleged that Frontier has intentionally decided not to provide its flight attendants and pilots with anti-discrimination training despite strong warnings from the United States Department of Transportation that failing to do so will almost certainly lead to violating passengers' protected civil rights and violating a number of federal statutory prohibitions against discrimination based on race or ethnicity (which statutes are simply airline-specific reiterations of the more general protections afforded by Section 1981), *see id.* at ¶¶ 26-27, 58, 63, 70, 74, 79, 84. They have alleged that Frontier instead chose to foster an environment throughout its airline in which it condoned acts of discrimination by its employees, as borne out by the fact that, during a five-year period preceding Plaintiffs' flight, it received multiple discrimination complaints from passengers *weekly* and *on its domestic flights alone* (the Court did not permit Plaintiffs to inquire into any of the international flights, which comprise a large percentage of its total flights). Plaintiffs have alleged that Frontier acts with reckless indifference to the protected civil rights of passengers of color, mixed races and non-American ethnicity, turning a blind eye to the numerous instances of discrimination and ensuring that complaints by passengers alleging discrimination will not be acted upon in any meaningful manner, which justifies an award of punitive damages under federal and state laws. *See id.* at ¶¶ 76-77, 79, 81, 84. Frontier refuses to acknowledge that the punitive damages claims are part of Plaintiffs' allegations, and attempts to mislead the Court into constraining discovery concerning them. Such constraint flies in the face of the broad scope of discovery permitted by Rule 26(b)(1) and

specifically recognized by the Ninth Circuit in *Shoen* and *Ecuador v. Mackay*. The fact that Frontier continues to this day to foster a discrimination-friendly environment was amply demonstrated during a deposition taken on November 17, 2022, in which a Black passenger who had been seated directly behind Plaintiff A.D. on the subject flight testified that she was subjected to race discrimination on a Frontier flight three weeks ago when a Caucasian flight attendant demanded that she move her bag out of a storage bin to make room for the bags of Caucasian passengers, then had the pilot kick her off the flight when she complained about the unfairness of the demand. She testified that she made a complaint to Frontier and received only an email offering her a $25 voucher against the cost of future travel on Frontier. When she demanded an investigation, she was "assured" by Frontier that the matter would be reviewed, even though five employees of the same department that responded to her have testified under oath that they have no way of knowing whether such reviews are ever conducted.

## II.    The specific topics Frontier objects to are well within the scope of discovery, and the Court should allow inquiry about them.

Frontier's specific arguments about the topics it objects to are conclusory and unsupported by case law, as were its positions taken during the meet and confer session. While answering questions on some of the topics included by Plaintiffs in their Notice of Deposition might prove uncomfortable for Frontier, the topics are directly related to Plaintiffs' claims in this case, as well as some of Frontier's defenses, and they are within the scope of discovery under Rule 26(b)(1).

The portions of Topic 1 that Frontier objects to are directly related to Plaintiffs' allegations that Defendant Warren improperly committed a battery on Plaintiff Peter DelVecchia, improperly assaulted Plaintiff A.D. with hand gestures close to his genitals, and improperly and outrageously told A.D. a falsehood about his father fondling him. As discussed above, the areas of inquiry are within the scope of discovery concerning those claims. Frontier argues that the inquiries are "argumentative

[and] harassing," but there is nothing argumentative or improper about seeking discovery into facts that would establish that Warren knew or should have known that his actions were improper. As noted above, there are punitive damages claims applicable to all of Warren's actions. Plaintiffs must be afforded a fair opportunity to conduct discovery as to those pleaded claims. The fact that Warren denied the actions in his deposition has absolutely no bearing on whether discovery should be permitted as to the impropriety of the actions and his knowledge of the impropriety, so that the jury can apply all of the relevant facts if it determines that he did, in fact, do the things that Plaintiffs have alleged.

As discussed above, Frontier's decision not to provide a manifest of names to the crew (Topic 2) is directly relevant to its corporate exacerbation of a situation in which its employees decided not to inquire of Plaintiffs' surnames, and chose instead to label them human traffickers based on the different colors of their skins. Its questionable conduct in not providing the manifest was initially raised in this case by one of the flight attendants, Chelsie Bright Sakurada, during her deposition. Frontier relies primarily on what is essentially a closing argument to support its position that discovery should not be permitted on this topic, which is not a valid argument for limiting discovery ("The implication is that learning Plaintiffs shared the same last name would have alleviated the crewmembers' concerns about inappropriate behavior, which is false.") That argument is not even factually correct, since Frontier wholly ignores the allegations that the crewmembers initially began suspecting Plaintiffs of human trafficking, and their "suspicions" snowballed from that foundational mischaracterization. *See* ECF No. 153 at ¶¶ 10-11, 15-18. Frontier's negligence argument, referencing "Judge Lawson's" prior ruling dismissing Plaintiffs' negligence count, *see* ECF No. 215 at 9, is misplaced. Frontier's decision not to provide a manifest was an intentional and reckless act

that compounded its crew members' reckless and illegal assumptions about Plaintiffs, a point that was initially raised by Ms. Sakurada herself.

Frontier's argument concerning the highlighted final clause of Topic 3 illustrates why its counsel should have taken the meet and confer criteria seriously. During the meet and confer session, defense counsel said only that Frontier objected to the highlighted portion "because it relates to the prior complaints." That generalization was essentially meaningless, but Plaintiffs' counsel's prompting for more details and legal support went unanswered. Upon reading Frontier's expanded argument in its written Motion, it is clear that Frontier has misunderstood what documents are referenced in the topic. The referenced Bates numbers are the ones assigned to the documents described in the preceding text of the Topic description, which are documents that Frontier has explicitly *not objected to* testifying about. It appears that Frontier thinks the Bates numbers refer to documents bearing the same number range that it produced, but which have significantly different text preceding the numbers.[2] The error would have been easily spotted had Frontier's counsel presented a fully developed argument at the meet and confer, as required by the Local Rule and numerous decisions of this Court.

Frontier's argument relating to the highlighted portions of Topic 4 relies on a prior ruling of the Court that undercuts Plaintiffs' ability to prove reckless indifference on Frontier's part, which in turn undercuts their ability to support their claims for punitive damages. The Court's previous statement that it "does not find more evidence regarding unrelated complaints and Frontier's handling of complaints in general to be relevant to Plaintiffs' case," *see* ECF No. 215 at 9 (quoting ECF No. 192 at 13), overlooks Plaintiffs' allegations that Frontier acts with reckless indifference to the constitutionally-protected rights of all of its passengers of mixed races, color and different ethnicities

---

[2] The Bates numbers of documents produced by Plaintiffs are preceded by "P". The Bates numbers of documents produced by Frontier are preceded by "FRONTIER" or "19AZF0229 DELVECCHIA FRONTIER".

by turning a blind eye to acts of discrimination by its employees and refusing to train or discipline its employees concerning acts of discrimination. Plaintiffs allege that Frontier's turning a blind eye to such acts created the environment in which the crew of their flight felt emboldened and authorized to take actions against them that violated their protected rights. *See* ECF No. 153 at ¶¶ 27, 58. It has come out in deposition testimony subsequent to the filing of the Third Amended Complaint that Frontier shunts all passenger complaints alleging discrimination to a special panel of employees located in its corporate headquarters who are instructed by it to respond to the complaints with boilerplate "templates" that always deny the occurrence of any discrimination and offer coupons for use against the cost of future travel on Frontier in small amounts like $25 or $50. Its process of issuing kneejerk denials that discrimination occurred virtually assures that none of its employees will ever be disciplined for committing acts of discrimination. (As noted above, similar discriminatory conduct continues to occur, as recently as three weeks ago). Yet, Frontier has consistently responded to Plaintiffs' inquiries about whether it has *ever* enforced its written policies against discrimination in connection to the more than 300 complaints of discrimination during the 5-year period preceding Plaintiffs' flight with vague references to the possibility that it has, but stating that one could only find out for certain by looking at the employee files for the employees who were the subjects of the complaints, but their names are not given in the complaints and it recently spoliated the only database that could match the complaints to specific employees. Its evasive actions have prevented Plaintiffs from obtaining discovery that would show that its anti-discrimination policies are unenforced words on paper, which is a fact directly relevant to Plaintiffs' claims of reckless indifference and punitive damages. The Court's prior rulings have told Plaintiffs that their attempts to get the information through document requests is the incorrect method, and that they should pursue it in depositions. But the depositions of the panel members led to consistent statements that they do not know what

information is in the specific employees' files or whether the company ever disciplined them. The only reasonable way to obtain the needed information is to ask it of the company itself, in its Rule 30(b)(6) deposition, for the details of any enforcement of its policies. The Court should not prevent Plaintiffs from doing so.

Regarding Topic 5, Frontier's argument mischaracterizes the purpose of the inquiry to suggest that Plaintiffs are surreptitiously trying to avoid the Court's ruling dismissing their negligence count. Plaintiffs are doing nothing of the sort. The highlighted parts of Topic 5, which delve into a number of ways that the flight attendants and pilots utterly failed to follow Frontier's written procedures for in-flight activities, instead are relevant to Frontier's defense that its employees were merely following the company's written protocols in singling out Plaintiffs for the treatment that they received. The employees were not, in fact, following the protocols, and they were violating several other protocols in their zeal to have Plaintiffs turned over to the police. Examples included all four flight attendants meeting in the front galley of the aircraft to discuss what to do about Plaintiffs, which they have all admitted in their deposition testimony, and the pilots allowing multiple flight attendants into the cockpit at once. (In fact, as Frontier's own manuals dictate, the cockpit should have been sealed and off limits to *all* of the flight attendants if, as Captain Shupe testified, a Threat Level 2 situation had been declared by him.) Showing that the employees were willfully violating the company policies in their actions is relevant to showing that the purported "non-discriminatory" reasons asserted by them to defend their actions were pretenses, a showing that Plaintiffs are specifically entitled to make under the Supreme Court's holding in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), and its progeny. As the Ninth Circuit held in *Sanghvi v. City of Claremont,* 328 F.3d 532, 537 (9th Cir. 2003), utilizing the *McDonnell Douglas* framework permits the jury to infer the ultimate element of a

claim of discrimination based on circumstantial evidence (since direct evidence of discriminatory intent is rarely available to any Section 1981 plaintiff).

Frontier's objections to Topics 6, 7, 13, 17 and 18 repeat the "argumentative and harassing" "overbroad and vague" and "irrelevant" arguments for topics they do not want to answer. Those topics are directly related to Frontier's corporate condonation of discriminatory behavior by its flight attendants and pilots, including inquiries into why it does not enforce its written policy forbidding lying and misrepresenting information to passengers, and why it has not conducted any factual investigation into Peter DelVecchia's allegation that Defendant Warren hit him and falsely told him that his name is "Kevin." Plaintiffs have cited specific policy sections that Warren violated and seek to ask why nothing was done about those violations by Frontier. That is not comparable to the request discussed in *Tyler v. City of San Diego,* No. 14-cv-1179-GPC (JLB) (S.D. Cal. February 2, 2015), which asked only, in relevant part, "whether the City knew if could not sexually harass." The Southern District of California's ruling on that distinguishable topic is inapposite. Moreover, it makes no difference that Warren denies identifying himself as "Kevin" if Plaintiff has testified that he did do so (documents produced by Frontier support Plaintiffs' allegation that he did). Topics 13, 17 and 18 are a relevant inquiry into the ways in which Frontier has condoned its pilots violating its written procedures in order to support discriminatory actions against Plaintiffs. Not conducting any investigation into clear violations of the policies, or disciplining Defendant Shupe or First Officer Mullin for violating clear written policies, is relevant evidence of Frontier's reckless indifference toward the protected civil rights of its passengers.

Topics 8, 32 and 33 similarly are relevant to Plaintiffs' allegations that Frontier's anti-discrimination policies are meaningless if it does not enforce them, and its lack of enforcement is evidence of its reckless indifference to passengers' protected civil rights. Frontier's internal manuals

claim that employees will be disciplined and even discharged for failing to comply with applicable laws and regulations, yet it appears to take no action against its employees who violate the several federal laws that specifically forbid discrimination against passengers based on their race or ethnicity. At least 338 passenger complaints claim that flight attendants and/or pilots discriminated against passengers of color—Plaintiffs are intending to ask whether Frontier has ever reacted to those complaints by enforcing its "Compliance with Laws and Regulations" policy. If it has done nothing to enforce that policy in the context of violations of the anti-discrimination laws, then that is relevant evidence of its reckless indifference to protected civil rights that would support Plaintiffs' claims for punitive damages. Plaintiffs have a right to inquire into that subject.[3]

Topic 10 follows the same theme, inquiring whether any Frontier employee was disciplined during the 5-year period predating the subject flight for using such blatantly offensive racial slurs as the N-word, "you people" or "your kind." While there is no question that those particular slurs were not used on the subject flight, a failure by Frontier to discipline an employee for using such obvious racial slurs would be highly probative of its reckless indifference toward the protected civil rights of passengers of color. Plaintiffs should be permitted to inquire into any such instances of discipline.[4]

Topic 28 simply puts Frontier on notice that Plaintiffs might ask it to explain or provide additional details about the documents it has produced to date in this litigation. There is nothing unreasonable about that topic; defendants are routinely asked questions in their depositions about the documents they have produced in discovery. Plaintiffs would certainly be willing to provide a list of

---

[3] As Plaintiffs have alleged in Paragraphs 26-28 of the Third Amended Complaint, Frontier has received specific warnings from the Department of Transportation, the Cabinet department that directly oversees airlines, that it needs to make sure that its employees are not violating the federal anti-discrimination laws. Frontier has done nothing in response to those communications, which is evidence of its reckless indifference.

[4] Frontier seems to be suggesting in its footnote 1 that it was improper for Plaintiffs to spell out the N-word in the Notice. However, the Notice is not a published document, and as uncomfortable as it is to spell the word out, Plaintiffs know from experience that Frontier will utilize any contrivance not to answer discovery that might help Plaintiffs' case. If Plaintiffs had said "N-word" or "nxxxxr," they have no doubt that Frontier would respond by saying that no employee has ever called a passenger of color "N-word" or "nxxxxr."

the questions ahead of the deposition, so that Frontier can designate a witness with knowledge about them. The point is not sandbag any witness; it is to obtain relevant facts and context about the documents that the documents themselves fail to provide.

Topics 30 and 31 pertain to the brief summaries of instances where Frontier's employees documented concerns about possible human trafficking. They are relevant to Frontier condoning accusations of human trafficking without conducting any follow-up to ensure that the allegations were made appropriately. Simply deputizing flight attendants to voice concerns about potential human trafficking without giving them any anti-discrimination training or reviewing their accusations to see whether they were made solely on the appearances of the targets of the accusations is highly relevant to Frontier's reckless indifference toward protected civil rights, and Plaintiffs should be able to inquire into them.

Topic 34 inquires into Frontier's communications with the DOT concerning its many complaints of discrimination. This is directly relevant to Frontier's reckless indifference toward its passengers' protected civil rights. A large number of the discrimination complaints produced by Frontier in this case were complaints that were forwarded by the DOT and logged by Frontier as having DOT oversight. Frontier did not produce any of its responses to DOT concerning the complaints, and those responses are probative of its reckless indifference toward the protected civil rights of persons of color.

Topics 35-37 relate to the details of the special panel that Frontier has established in its corporate office to receive and bury complaints of discrimination. As discussed above, that panel is responsible for ensuring that complaints of discrimination by its employees, however valid and regardless of whether they have been sent by the DOT, never result in any repercussions for the employees involved. This is highly relevant to Plaintiffs' claims that Frontier is recklessly indifferent

to its passengers' protected civil rights, and that, in turn, its directly relevant to its claims for punitive damages against Frontier.

Topic 38 seeks to inquire into the details of Frontier's spoliation of a critical database that would identify the flight attendants and pilots who were working on the flights on which the 338 discrimination complaints arose. According to the deposition testimony of the members of the panel that dispose of discrimination complaints, the only way to determine whether Frontier ever disciplined any of its flight attendants or pilots for acts of discrimination alleged in the passenger complaints is to know their names and to review their employee files. The panel members testified that they have no idea whether any flight attendants have ever been disciplined for discriminating against passengers of color or mixed-race families. Frontier relies entirely on *dicta* from an earlier ruling by the Magistrate Judge that was not concerned with a spoliation motion (Plaintiffs have not yet filed one) and overlooked Plaintiffs' allegations that Frontier's refusal to address allegations of discrimination by its employees fosters an environment in which discrimination runs rampant—as evidenced by the account of the deposition witness described above.

Topic 39 was added to the Notice of Deposition after Frontier refused to admit Requests for Admissions that would have established the documents it produced as business records. There is little question that the documents are business records under the definition of F.R.E. 803(6). Frontier's refusal to admit to what were essentially *pro forma* requests for admissions necessitated having someone from the company come to the corporate deposition to authenticate the company's own documents as reliable records. That will likely be a laborious process, but it is far better to address it in the deposition than with custodian witnesses at trial. Plaintiffs should not be prevented from establishing that documents produced by Frontier from its company files are its business records.

## **CONCLUSION**

For all the reasons set forth above, Plaintiffs respectfully submit that Frontier's Motion for Protective Order should be denied.

DATED this 17th day of November, 2022.

                                          /s/ John D. McKay
                                *Attorney for Plaintiffs Peter DelVecchia*
                                *And A.D., a Minor*