# EXHIBIT B -

*Deposition Transcript and Exhibits to Deposition of Mr. Obasi*

Page 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEVADA

3

4    PETER DELVECCHIA, et al.,      ) Case No.:
                                    ) 2:19-cv-01322-KJD-DJA
5                 Plaintiffs,       )
                                    )
6    vs.                            )
                                    )
7    FRONTIER AIRLINES, INC.,       )
     et al.,                        )
8                                   )
                  Defendants.       )
9    _____)

10

11

12

13

14

15      REMOTE VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION

16                           OF

17                     FRANCOIS OBASI

18   Taken on Thursday, September 15, 2022, at 9:12 a.m. PDT

19            Appearing via videoconference from
                  10651 Solar Hawk Avenue
20                  Las Vegas, Nevada

21

22      By a Certified Court Reporter and Legal Videographer

23

24   Reported by:  Dawn Bratcher Gustin, CCR 253, RPR, CRR
                                    California CSR 7124
25   Job No. 50620, Firm No. 061F


EXHIBIT B

Page 2

```
 1   APPEARANCES:
     (All participants appearing remotely)
 2
     For the Plaintiffs:
 3
             JOHN D. McKAY, ESQ.
 4           PARK AVENUE LAW LLC
             201 Spear Street
 5           Suite 1100
             San Francisco, California 94105
 6           johndmckayatty@gmail.com

 7

 8   For the Defendants:

 9           BRIAN T. MAYE, ESQ.
             ADLER MURPHY & McQUILLEN LLP
10           20 South Clark Street
             Suite 2500
11           Chicago, Illinois 60603
             bmaye@amm-law.com
12

13
     The Videographer:
14
             NICK NARDIELLO, Legal Video Specialist
15           OASIS REPORTING SERVICES

16

17   Also Present Intermittently:

18           PETER DELVECCHIA

19

20                      * * * * * * * *

21

22

23

24

25
```



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 3

```
 1                    I N D E X

 2   WITNESS                                          PAGE

 3   FRANCOIS OBASI

 4        Examination by Mr. McKay                       5

 5        Examination by Mr. Maye                       51

 6        Further Examination by Mr. McKay             98

 7        Further Examination by Mr. Maye             116

 8

 9

10                    E X H I B I T S
                                              IDENTIFIED/
11   EXHIBIT        DESCRIPTION                    MARKED

12   Exhibit 1      Voluntary statement (1 page)   33/124

13   Exhibit 2      Still photograph dated Dec 3,  33/124
                    2019 10:44:42 (1 page)
14
     Exhibit 3      Photograph of Mr. DelVecchia   35/124
15                  and A.D. (1 page)

16   Exhibit 4      3/28/19 LVMPD Communication    58/124
                    Center Call Log (3 pages)
17

18

19

20

21

22

23

24

25
```

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 4

1        DEPOSITION OF FRANCOIS OBASI

2      Thursday, September 15, 2022, 9:12 a.m., PDT

3                    --oOo--

4          P R O C E E D I N G S

5        THE VIDEOGRAPHER:  Today is September 15th,

6  2022, and the time is approximately 9:12 a.m. Pacific

7  Standard [sic] Time.

8        This is the remote deposition of Francois

9  Obasi, in the case Peter DelVecchia vs. Frontier

10  Airlines Inc., et al.

11        I am Nick Nardiello with Oasis Reporting

12  Services.  I will be monitoring the proceedings and

13  recording both video and audio today.

14        At this time I will ask counsel to identify

15  themselves, state whom they represent, and agree on the

16  record that there is no objection to the court reporter

17  administering a binding oath to the witness through

18  remote videoconferencing.  If no objection is stated,

19  we'll proceed forward with the agreement of all counsel.

20  We'll begin appearances with the noticing attorney.

21        MR. McKAY:  This is John McKay.  I represent

22  the DelVecchias, the plaintiffs, and I have no

23  objection.

24        MR. MAYE:  Brian Maye for Defendants.  I have

25  no objections.

www.oasisreporting.com                          702-476-4500

EXHIBIT B

Page 5

1          THE VIDEOGRAPHER:   Thank you.

2          The court reporter today is Dawn Gustin with

3    Oasis Reporting Services.   The reporter may now swear in

4    the witness.

5                    FRANCOIS OBASI,

6          having been first duly sworn, was

7          examined and testified as follows:

8                    EXAMINATION

9    BY MR. McKAY:

10      Q.   Would you state your full name, please.

11      A.   Francois Obasi.   And I'm no longer a sergeant,

12   but it's all right.

13      Q.   All right.   Do you prefer to be addressed as

14   Mr. Obasi?

15      A.   Or just Obasi or Francois will do.   I'm fine.

16      Q.   Okay, sir.   All right.   Thank you very much.

17          Well, again, I'm John McKay, and I am the

18   attorney for the DelVecchias.   We met off the record.

19   And I will be taking the deposition this morning.

20   Mr. Brian Maye is also here representing the defendants,

21   and he may have some questions for you after I finish

22   up.

23          We have a couple of things to go through, and I

24   probably should ask have you ever had your deposition

25   taken before?



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 6

1      A.   No.

2      Q.   Okay.

3      A.   Not by Zoom or anything like that, no.

4      Q.   Okay.  So I presume as a long-time police

5   officer, you had a chance to testify in court once or

6   twice?

7      A.   Yes.  Yes.

8      Q.   Okay.

9      A.   Couple of hundred, maybe.

10     Q.   Couple of hundred times.

11     A.   Yes.

12     Q.   Okay.  So this proceeding is very much like

13  testimony in court.  You're -- you've just been sworn in

14  just as you would have been in court.  And as I question

15  you, there is the possibility that an objection will be

16  raised by opposing counsel.  The only thing that's

17  different from the courtroom situation is that there's

18  no judge here to respond to the objection.  And so --

19     A.   Okay.

20     Q.   -- we simply wait a beat, and then you can go

21  ahead and give your answer.

22          If at some point down the road the judge reads

23  the transcript and sustains the objection, then your

24  answer might be taken out, but this way, we're able to

25  just go ahead and record objections for the record to be

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 7

1  dealt with later.

2         Is that understood?

3     A.   Yes, sir.

4     Q.   Okay.  The court reporter is taking down a

5  written transcript just like in court.  The important

6  thing, especially with these electronic depositions, is

7  to remember that if two people speak at the same time,

8  she hears neither of us.  And it's very much like

9  talking into a walkie-talkie.  So if we both push the

10 button at the same time, nothing comes through.

11        So we have to be very careful and a little bit

12 stilted in the sense that I request that you wait until

13 I'm entirely finished with my answer -- or my

14 question -- excuse me.  Even if you know the answer and,

15 in normal conversation, might want to jump in and -- and

16 add the answer, you need to wait until it's absolutely

17 clear that I've finished and then begin your answer, and

18 that way we'll be very careful not to step on each

19 other.  Okay?

20    A.   Yes, sir.

21    Q.   All right.  And if you do answer, we will

22 assume that you understood the question.  So if you

23 don't understand any question, be sure to say so, and I

24 will rephrase or repeat it or whatever's necessary under

25 the circumstances.



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 8

1          The last thing to remember is that we need to
2    use words rather than nonverbal responses like "um-hum"
3    because of the difficulty that the court reporter has in
4    accurately transcribing something like a nonverbal
5    answer.
6          One last thing, actually, I do need to mention
7    in this case is that we do have a minor involved as one
8    of the parties, and that's Mr. DelVecchia's son, and
9    because of federal rules that apply to providing
10   information about minors in the court record, we have to
11   refer to him by his initials, which are A.D.  So if I'm
12   asking you a question about A.D., that's asking you
13   about Mr. DelVecchia's son.
14         Is that okay?
15   A.   Yes, sir.
16   Q.   Okay.  Thank you, sir.
17         I guess, first of all, just for a background,
18   where do you currently reside?
19   A.   In Las Vegas.  Do you need my full address
20   or --
21   Q.   Yes, please, if you don't mind.
22   A.   Okay.  10651 Solar Hawk Avenue, Las Vegas,
23   Nevada 89129.
24   Q.   And who do you live there with?
25   A.   I live with my wife and -- wife, minor



Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 9

1  daughter, and my brother.

2      Q.   Okay.  Do you have any plans in the foreseeable

3  future to move from that address?

4      A.   No, I do not.

5      Q.   Okay.  And I understand that your wife is a

6  detective for the Las Vegas Police Department?

7      A.   Yes, she is.

8      Q.   Okay.  And you used to be a detective for that

9  same department; is that correct?

10     A.   Actually, no.  I was a supervisor -- a

11 sergeant, patrol sergeant.

12     Q.   Okay.  Thank you.  Patrol sergeant.

13          And how long were you with the Las Vegas

14 Metropolitan Police Department?

15     A.   21.5 years.

16     Q.   All right, Sir.  And what reason -- for what

17 reason did you retire?

18     A.   I actually retired to become a full-time dad.

19     Q.   A full-time dad?

20     A.   Yes, sir.

21     Q.   Okay.  To your daughter?

22     A.   Yes, sir.

23     Q.   Okay.  I want to ask you some questions about

24 the evening of March 28, 2019, which was the evening

25 that the flight arrived from Raleigh-Durham, North



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 10

1    Carolina, that's the subject of this action.

2         Do you remember that evening?

3    A.   Yes, sir.

4    Q.   What was the first knowledge that you had that

5    this flight was arriving and might require your

6    attention?

7    A.   We received a call from the airport control

8    center saying that the call was inbound.  I believe we

9    had about a, maybe, 30-to-40-minute heads-up of the

10   flight landing in the gate and -- etcetera, and that

11   they would need our assistance.

12   Q.   Was there any other information provided at

13   that time by the airport control center?

14   A.   Yes.  They were able to give me the names of

15   the parties involved, the father and son, and kind of a

16   brief of the incident, because usually the airport

17   control center gets very, very brief information from

18   the pilot.

19   Q.   Okay.  Now, just to be clear, you said "from

20   the pilot."  Is the -- is the pilot of the aircraft

21   directly connected to the aircraft -- airport control

22   center?

23   A.   I believe -- and I'm not an expert in this

24   part, but I believe the pilot calls it into air traffic

25   control, who relays it to the dispatcher in the airport

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 11

1   control center.

2       Q.    Okay.  But as far as the information of the

3   full names of Mr. DelVecchia and his son, where do you

4   think that information would have come from before

5   getting to you?

6           MR. MAYE:   Object to form.

7   BY MR. McKAY:

8       Q.    Go ahead.

9       A.    Okay.  That -- that information would have had

10  to come from, basically, the -- the pilot or the copilot

11  to --

12      Q.    Okay.

13      A.    -- ACC, airport control center.

14      Q.    If -- is there a possibility that if the pilot

15  and copilot didn't have the information, that it would

16  come from somebody at the airline?

17      A.    That's a possibility, but that would -- the

18  airport control center would have to initiate that call

19  to them.

20      Q.    So when you received -- and, I'm sorry, I keep

21  hearing some kind of a radio.  Is that your end?

22      A.    No.  I have no radio on.  I can -- let me --

23  let me disconnect my Bluetooth.  Maybe that will help.

24  One second.

25      Q.    Okay.



EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 12

1    A.    Okay.  Is that better?

2    Q.    Yes.  Much better.  Thank you.

3    A.    Okay.  I think it was my Bluetooth.

4    Q.    Okay.  We were getting an echo, then, I guess.

5          When you receive information that the flight

6  was coming in and giving the DelVecchias' names, what

7  were you told in addition to the names?

8    A.    We were told that it was a possible -- going to

9  say, like, kind of a child molestation/child

10  endangerment case.

11    Q.    Okay.  And where would that information have

12  come from?

13          MR. MAYE:  Object to form.

14          THE WITNESS:  Well, we -- I'm sorry.

15          Well, to me, it's coming from airport control,

16  but, for them, it would have to come from within the

17  aircraft itself.

18  BY MR. McKAY:

19    Q.    Okay.  All right.  And what did you do next

20  upon obtaining this information?

21    A.    I alerted my officers.  I believe I took two or

22  three officers to prep them to go out to the call

23  because it takes sometimes a good 10 to 15 minutes to

24  get to that destination from where we are.  And due to

25  the -- the names -- the names were somewhat unique to



EXHIBIT B

Francois Obasi                           Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 13

1  me.  So I actually did a quick Google of the names.

2      Q.   Okay.  And did you find anything on the

3  Internet?

4      A.   I did.  I found a picture of the minor.

5      Q.   Okay.  Of A.D.?

6      A.   Yes.

7      Q.   And what did that picture show?

8      A.    Initially, actually, to my own failure, I

9  thought I was looking at a young, like, African-American

10 male in a football jersey.  I later found out it was

11 actually a hockey jersey --

12     Q.   Okay.

13     A.    -- highlighting, I guess, the fact that he

14 could play hockey really well.

15     Q.   And did you see any text accompanying the

16 photograph that gave any background information?

17     A.   It just said -- it just said his name and the

18 fact that he was a very good hockey player in that

19 air- -- like, in the North Carolina area, North Carolina

20 area.

21     Q.   Did you find anything on his father?

22     A.   No, sir.  No.

23     Q.   Okay.  So at this point, you knew that the

24 names -- and you -- did you know that they were father

25 and son?



EXHIBIT B

Francois Obasi                           Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 14

1       A.   I -- I just -- actually, based on the

2   descriptions we were given, I just assumed it was

3   possibly, like, an adoptive situation.

4       Q.   Okay.  But you did know that they both shared

5   the same surname?

6       A.   Yes, sir.

7       Q.   Okay.  Now, in terms of -- you said it took

8   about 15 minutes from where you are.  So at that point

9   in time, is this a police station within the airport?

10       A.   Yes.  We had -- actually have two police

11   stations, one at Terminal 1 and one at Terminal 3, that

12   we are based out of, and then we either drive out to the

13   gate, or we can take the tram transport out to the gate.

14       Q.   And do you remember which of the two stations

15   you were in?

16       A.   I was at 3.  My office is at Terminal 3.

17       Q.   Okay.  And as far as the aircraft arriving, did

18   you know which terminal it was coming into?

19       A.   Yes, sir.  Well, that's what regulates which

20   supervisor or which units handle the call.  Frontier is

21   a Terminal 3 ticketing station; so it makes it my

22   responsibility.  And I honestly do not remember if my

23   partner, the other sergeant, was on that night or not

24   or to -- I don't believe he --

25       Q.   Okay.



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 15

1      A.   So I was probably in charge of the whole
2  airport anyway.
3      Q.   Okay.  So after you got the information, you
4  say that you met with three of your officers?
5      A.   I believe three.  I believe three.  Just --
6  yeah.
7      Q.   Okay.  And then what -- what happened next?
8      A.   We basically waited for the aircraft to arrive
9  at the gate and made contact with all the parties
10  involved.
11      Q.   Okay.  So when the aircraft arrived at the
12  gate, where were you and the officers relative to the
13  door of the airplane?
14      A.   We're right outside the door.  Well,
15  actually -- yeah, once it -- once it's secure to the --
16  I'm forgetting the name for it.
17      Q.   The jetway?
18      A.   Yes, the jetway.  Sorry.
19      Q.   Sure.
20      A.   So once that's secure, because no one can
21  really be on it except for the workers prior to the
22  plane being secure on it.  Once that's secured and they
23  open the door, then we usually go down the jetway to
24  wait for the -- the parties involved.
25      Q.   Okay.  So would you have then watched

www.oasisreporting.com                                           702-476-4500



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 16

1  passengers coming off of the plane and entering the

2  jetway?

3      A.    Yes, sir.

4      Q.    Okay.  And what did you observe from the point

5  that you got to the door of the aircraft?

6      A.    Quite a few passengers coming off.  Some were

7  kind of, like, mumbling about what was going on.  It was

8  kind of hard -- it was -- like I say, if you've been on

9  a plane, everybody is just trying to get off.  So people

10 were just -- you could hear kind of, like, mumblings of

11 something happening.

12     Q.    So are you saying that the mumbling that you

13 heard was relevant to the situation that had caused you

14 to come to the airplane?

15     A.    Yes, sir.

16     Q.    And do you remember any details at all of

17 what --

18     A.    I'm sorry.  I remember one lady making a

19 statement along the lines of, you know, like, "That was

20 wrong" kind of a deal, and then walking away.

21     Q.    Okay.

22     A.    Basic -- yeah.  But like I say -- but at this

23 point, like I say, because that's quite normal anytime

24 we go to an aircraft to have, you know, people with

25 their opinions leaving the aircraft.


EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 17

```
 1      Q.    Okay.

 2      A.    Yeah.

 3      Q.    And did you at any time interact with

 4   representatives of the airline at the plane?

 5      A.    Um, you mean that were not part of the crew?

 6      Q.    No.  Actually, I should have rephrased that

 7   differently.

 8      A.    Okay.

 9      Q.    Did you interact with any of the crew of the

10   flight?

11      A.    Yes, sir.

12      Q.    Okay.  And who were they?

13      A.    The -- I remember speaking briefly to the

14   pilot, and then there was a -- a black male attendant

15   and a white female attendant.

16      Q.    Okay.  Let's start with the pilot.  What --

17   what did you talk with the pilot about?

18      A.    The pilot basically stated to me that he called

19   it in because he had all of his attendants, as he put

20   it, coming to him saying something was wrong.  I'm not

21   sure what his criteria to call us is, but he was kind of

22   explaining to me that, you know, he had his crew telling

23   him something was wrong.  So that's why he called it in.

24      Q.    Okay.  And did he provide any other details

25   about what "it" was?
```



EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 18

1      A.   No, because he -- he was not a witness or part

2   of that.  He just was, you know, the -- I guess the

3   message conveyor.

4      Q.   Okay.  And how about the male and female flight

5   attendant, what did they --

6      A.   Ah -- I'm sorry.  The male didn't say much.

7   The female stated, "I'm not sure they're even

8   related" --

9      Q.   Okay.

10     A.   -- is what she said.

11     Q.   All right.  Did she say that to you?

12     A.   Yeah, well -- yes.  But it was -- well, my

13   officers are really doing the investigation.  I just

14   supervise.  I was, you know, more overseeing, but I'm

15   standing -- it's a very small space --

16     Q.   Okay.

17     A.   -- in that opening because all the other -- we

18   had let everybody else kind of come off the plane.

19     Q.   Right.

20          Did she elaborate at all on what she meant by

21   saying that she's not sure they're even related?

22     A.   She mentioned the fact -- the fact that --

23   because I had not visually seen them yet -- the fact

24   that he was a middle-aged white man and it was a younger

25   black male.  And also something about a class that she



EXHIBIT B

Francois Obasi                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 19

1   had taken.

2         Q.   A class.

3         A.   Yeah, some -- it -- I'm sorry.  Say -- repeat

4   again, sir.

5         Q.   No, I'm sorry.  I interrupted you.  Go ahead

6   and say what she said.

7         A.   Oh, she -- she was basically -- they were

8   talking about -- she was talking about a class, which

9   I -- which I took to be more of a, kind of like a human

10  trafficking/child endangerment class that they give the

11  airlines for -- to look for, like, warning signs of

12  these type things.

13        Q.   Okay.  And did she mention any signs other than

14  the fact that it was a middle-aged white man with a

15  younger black male?

16             MR. MAYE:  Object to form.

17             THE WITNESS:  She --

18  BY MR. McKAY:

19        Q.   You can go ahead.

20        A.   Okay.  Well, she -- she basically described

21  what she saw as, you know, the wrong action and what

22  caused her to react --

23        Q.   And what was that?

24        A.   -- and why she alerted her people.

25             She -- I'm sorry.  Somebody else is talking.



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 20

```
 1            Oh, I'm sorry.
 2            She basically stated that she saw the -- the --
 3   I guess, A.D. put his head into the lap of Mr. -- the --
 4   the adult, and then the adult was rubbing -- rubbing his
 5   face affectionately, as she put it, and that she thought
 6   it was maybe too affectionate for an adult male and a
 7   young boy.
 8        Q.   Okay.  Did she say anything else?
 9        A.   No, not really.  Just the fact that she -- it
10   was -- she thought it was, you know, wrong, and it made
11   her uncomfortable and that she alerted her coworkers.
12        Q.   Okay.  And that that was -- she told you that
13   was based on a class that she had taken.  Did she
14   indicate that was with the airline or given by the
15   airline?
16        A.   Well, she didn't say it was based on the class.
17   She was just kind of talking about this class that they
18   had taken.  You know, not -- she didn't say, hey, I took
19   a class, and I saw this and this.  She just kind of
20   mentioned a reference to class.  And I -- and, yes, she
21   said it was a class that she -- it was given to her by
22   the airlines.
23        Q.   Okay.  And we have in this case three female
24   flight attendants.  One was very dark brunette hair and
25   two are more or less blond.
```



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 21

```
 1      A.   Yes.

 2      Q.   Do you remember --

 3      A.   Yeah.

 4      Q.   -- the color of hair?

 5           MR. MAYE:  Object to form.

 6           THE WITNESS:  Yeah, she -- she was blond, and

 7   she was actually kind of tall.

 8   BY MR. McKAY:

 9      Q.   She was blond and kind of tall?

10      A.   Yes, sir.

11      Q.   Okay.  All right.  How about age?

12      A.   I would give her between -- I would say 25 to

13   30.

14      Q.   Okay.  Did she indicate that she had any

15   children of her own?

16      A.   I do not recall that.  No, I don't recall that.

17      Q.   Okay.  All right.  Did you at any point see the

18   other female flight attendants?

19      A.   They were kind of in the background but had,

20   really, nothing to say.

21      Q.   Okay.  Just trying to zero in on -- on which of

22   the ones you talked to.

23           So when you saw the other flight attendants,

24   was one a dark brunette and the other a blond?

25           MR. MAYE:  Object to form.
```

OASIS
REPORTING SERVICES

EXHIBIT B

Page 22

 1          THE WITNESS:  I do remember one with darker

 2     hair.  I don't really remember another blond, to be

 3     honest with you.

 4     BY MR. McKAY:

 5          Q.   Do you remember whether the other one that was

 6     in the background was younger or older than the one who

 7     said she didn't believe they were related?

 8          A.   The other one was a little bit older, looked at

 9     least to me.  I'm --

10          Q.   Okay.  Yeah.

11          A.   She looked a little bit older.

12          Q.   Okay.  Fair enough.  Thank you.

13               So what happened then after you received this

14     information from the flight attendants?

15          A.   Also -- so we already had -- because of the

16     type of case it is, it's not actually a local police

17     department's jurisdiction.  It's actually a case for the

18     FBI.  So I had already called the FBI agents about what

19     was going on.  So our job -- well, my job at the time

20     was to determine if there was actually, you know, enough

21     speculation to detain for the FBI.

22          Q.   Okay.  And what did you determine?

23          A.   Well, we determined basically, based on her

24     accusation, that there was at least enough to detain and

25     let the FBI come out.  And because of the child's age, I

EXHIBIT B

Francois Obasi                     Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 23

1  requested they bring out, like, a forensic specialist

2  that knew how to speak to children and not mislead them.

3      Q.   Okay.  And how did you make these requests?

4  Was that by walkie-talkie or something?

5      A.   No.  No, sir.  We have a -- it's kind of, like,

6  a in-the-bucket phone number, like, a central phone

7  number to the FBI on-call agents, and then you just --

8  you just call.  You know, they tell you, yeah, we'll be

9  there.

10         I want to say they got there, actually, pretty

11  quick.  Maybe 30 to 45 minutes, or so.  And they'll let

12  you know, yes, we're en route.  Take them to your

13  substation, and they'll come, or sometimes they'll say

14  can you just do a quick written report, you know,

15  release them, and we'll pick up the report and do a

16  follow-up.

17     Q.   Okay.  And do you recall what they said to you

18  on this occasion?

19     A.   Yes.  They asked us to detain for them, and

20  they would be en route with a -- a specialist that could

21  interview the minor.

22     Q.   Okay.  And as far as you knew, were these

23  agents who were based in the area?

24     A.   Yes, sir.  Yes, sir.  Because they were all

25  there within -- within an hour, they had a -- a team



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 24

1  there.

2      Q.   Okay.  So let's just concentrate, then, on what

3  you did after making that call.  Did you take any

4  statements from the flight attendants?

5      A.   My officers gave them voluntary statements

6  with, you know, just a -- what we have is just a Metro

7  basic voluntary form.

8      Q.   Okay.

9      A.   And then basically -- I believe one of the

10 officers waited for those forms, because it takes

11 sometimes a good 15, 20 minutes for them to complete it

12 and doing their regular job as well.  And then we

13 transported, basically, the adult and minor back to

14 Terminal 3 Substation.

15     Q.   Okay.  Before I ask you about that, let me just

16 share my screen with you and show you some of these

17 statements.

18          Hang on just a second.  I'm not getting the

19 exact document I want, and, for some reason, Zoom isn't

20 allowing me to get rid of this thing here.  Let's see.

21          Can you see the screen now?

22     A.   Yeah, kind of.  It's -- oof, okay.  Let me

23 see --

24     Q.   Trying to --

25     A.   One second while I turn my garage light on.  If



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 25

1   it's me or it's just --

2        Q.    Okay.

3        A.    -- rather small.

4        Q.    Sure.

5        A.    Yeah, I can see the form, but it's, like -- ah,

6   okay.  Let me try to --

7        Q.    Okay.

8        A.    Yeah, somewhat hard to read.  Is there a way to

9   blow it up more or no?

10       Q.    I'm going to try.  Let's see.

11       A.    Oh, there you go.  Okay.

12       Q.    Is that helpful?

13       A.    Yeah.  Yeah, that --

14       Q.    Okay.

15       A.    Okay.

16       Q.    First of all, is this -- is this the voluntary

17  statement form you were referring to?

18       A.    Yes, sir.

19       Q.    Okay.  And I see an event number there.  Whose

20  event number is that?

21       A.    That would be our -- that would be Metro's

22  because an event number is generated for any --

23  anything.  Any -- even just a -- stopping a person to

24  talk to.  If you call it out over the radio, an event

25  number is created.

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 26

1     Q.   Okay.  Now, if we were to contact the police
2  department and give them this event number, would there
3  be a -- any kind of file materials attached to it?
4     A.   Only these voluntary statements because it's
5  not -- because there's no report generated because it's
6  not our crime, I guess, is the way to say it; it's the
7  FBI's.  So even if we had -- oh, sorry.  Go ahead.
8     Q.   No, that's that echo.  I don't know where it's
9  coming from.
10    A.   Yeah, it's not my end because I have absolutely
11 nothing else on in my garage.  So --
12    Q.   Okay.
13    A.   Yeah, but we -- so we -- being that we did no
14 report, then the only thing -- and, actually, even --
15 even these voluntary statements, because they were given
16 to the FBI, may not be attached, to be honest with you.
17    Q.   Okay.
18    A.   Yeah.
19    Q.   Is there -- is there any kind of file folder
20 or -- or electronic folder that is opened up for an
21 event number like this?
22    A.   Normally, like I say, only if we're doing a
23 report.  And there's also -- how do I explain this?
24         So airport control center is not part of Metro
25 Police.  It's actually part of the airport or Clark


EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 27

```
 1   County Aviation.  So anything they do when I -- so when
 2   I speak to an airport controller, they then have to call
 3   Las Vegas Metro dispatcher, and it's kind of like a
 4   triple relay.
 5           So on a normal thing, everything I say over the
 6   radio, a police dispatcher would record.  With the
 7   airport controller, they're not trained that way.  So
 8   the same -- do you understand?  Do you understand what
 9   I'm saying?
10       Q.   Okay.  So -- so you were in contact with the
11   airport control center rather than your own police
12   dispatch.
13           Is that what you're saying?
14       A.   Yes.  Yes.  The airport is unique in that way,
15   where we're basically, you know, like, the enforcement
16   arm of Clark County Aviation.  So we don't have our own
17   dispatcher.  She dispatches police, cleaners, anybody
18   you can think of to be dispatched.
19       Q.   Okay.  Let me just let you look at the
20   statement here, and I will tell you there are white
21   blocks of redactions of information, and that is how
22   they came to us from the FBI; so the FBI applying its
23   procedures with redacted information.  But if you can
24   look through what's left, and I'll just ask you a few
25   questions about this when you've had a chance to look.
```



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 28

1  I've got it blown up so that I'll just try to move back

2  and forth, if that helps you.

3          And I'll also tell you that I'm not going to

4  ask you about any of the details of what's written.  I

5  just want to ask you if this is one of the statements

6  that you or -- or your officers took of one of the

7  flight attendants.

8      A.   Yes, it is.  Actually, if you can go down, it

9  will show the -- maybe they redacted it, but usually it

10 will show the officer that --

11     Q.   Yeah, they've re- --

12     A.   -- signed it to say --

13     Q.   They redacted every name, every signature.

14     A.   Okay.  Okay.  Yeah, because that's not mine --

15 yeah, one of our officers will fill in the addresses in

16 the bottom --

17     Q.   Okay.

18     A.   -- and the full -- yeah, so -- but that is --

19 that is definitely one of our -- our forms and appears

20 to be one of the forms that we collected.

21     Q.   Okay.  And I'm just going to show you very

22 quickly another one that's already been identified by

23 Flight Attendant Bond as Bond Exhibit 7.  And, just

24 generally, is that also one of the forms that was given

25 to one of the flight attendants to fill out?


EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 29

```
 1       A.   Yes, sir.
 2       Q.   Okay.  And I'm going to show you what's been
 3  previously marked in a deposition as Nickel Exhibit 2
 4  and identified by her, Ms. Amanda Nickel, as her
 5  statement.  And I'll ask you, is this also one of the
 6  voluntary statement forms that your officers gave to one
 7  of the flight attendants?
 8       A.   Yes, sir.
 9       Q.   Okay.  And I'll show you, finally, the fourth
10  one that's been identified as Warren Exhibit 4, and it
11  was identified by Flight Attendant Mr. Warren as his
12  statement.  Is this also a voluntary statement that was
13  given by your police officers to the flight attendants?
14       A.   Yes, sir.
15       Q.   Okay.  Now, bear with me just a second.  I'm
16  going to stop sharing, and I'm going to find a document
17  that shows pictures of all the flight attendants that's
18  been produced by Frontier, and I'll put that up on the
19  screen in just a second.
20       A.   Okay.
21       Q.   Okay.  Okay.  Do you see the four pictures
22  there?
23       A.   Yes, sir.
24       Q.   All right.  And let me ask you if you can
25  identify, first of all, the gentleman.  Is that the male
```



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 30

1   flight attendant that you saw?

2      A.   Yes, sir.

3      Q.   Okay.  Now, of the other three, can you

4   identify which one was with him that said she didn't

5   think that they were related?

6           MR. MAYE:  Object to form.  That

7   mischaracterizes previous testimony.

8   BY MR. McKAY:

9      Q.   All right.  Well, I'll ask it a different way,

10  then, sir.

11          Can you identify the flight attendant that you

12  saw standing with the male flight attendant when you

13  spoke first to the flight attendants at the airplane?

14     A.   Do you want me to say her name or just the

15  description?

16     Q.   Yeah, well, if you -- if you can identify her

17  by her name, that would be very helpful.

18     A.   It's Amanda Nickel.

19     Q.   Okay.  And you're sure that's the one that --

20  that you saw standing with the male flight attendant.

21     A.   Yes, sir.  Her hair appeared a little lighter

22  that day, but that's --

23     Q.   Okay.

24     A.   -- that's her.

25     Q.   Very good.


EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 31

1          And just to be sure, if I told you that

2    Ms. Bright down below here is depicted with darker hair

3    than she apparently had in 2019, would that make any

4    difference?

5          MR. MAYE:  Object to form.

6          THE WITNESS:  It --

7    BY MR. McKAY:

8      Q.   Go ahead.

9      A.   Oh.

10          Because I -- in my memory, I remember seeing

11   two flight attendants with lighter hair.

12     Q.   Right.

13          So what I'm -- what I'm just trying to make

14   sure, these are, apparently, photographs that were taken

15   perhaps the day these folks were hired.

16     A.   Okay.

17     Q.   And their -- we have taken Ms. Bright's

18   deposition, and in it she had lighter hair.

19          So what I'm saying is if Ms. Bright had

20   appeared with lighter hair on the evening that you were

21   at the airplane, would that change your mind as to who

22   you saw, or are you positive upon facial features that

23   it was Ms. Nickel?

24          MR. MAYE:  Object to form.

25          THE WITNESS:  Can I go ahead or --



EXHIBIT B

Francois Obasi                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 32

1   BY MR. McKAY:

2       Q.   Yes.  You can go ahead, yeah.

3       A.   Okay.  I think if Mrs. Bright had blond hair,

4   which is kind of hard to imagine her in, then it would

5   make their faces somewhat similar.  And, yeah, I -- like

6   I say, yeah, that would -- I would have to go back

7   and -- if I had access to my old camera.  But if she had

8   blonder, lighter hair, yeah, it would -- it would kind

9   of be a toss-up between the two of them, in honesty.

10      Q.   Okay.  So you brought up an interesting point.

11  Did you take photographs when you arrived at the

12  airplane?

13      A.   My body-worn camera was running.

14      Q.   Okay.  And would that have been given back to

15  the police department?

16      A.   Yes, sir.  That -- because it's -- at the end

17  of every shift, it's plugged in and uploaded

18  automatically into our system.

19      Q.   Okay.  So that recording should be available if

20  we were to ask the police department for it?

21      A.   Yes, sir.  Of every -- every officer involved

22  in the call has to have their body camera on unless it's

23  something private and personal.

24      Q.   Okay.  And do you -- do you know how long

25  that -- those tapes are kept?



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 33

1      A.   I believe there's -- it's quite long.  It has

2  to be, like, a four-, five-year for noninvolved type

3  things like something minor.

4      Q.   Okay.

5      A.   But it's quite a long time.  It's quite --

6      Q.   Okay.

7      A.   -- a long time.

8      Q.   I'm going to ask you to bear with me just

9  another second while I locate a photograph of Ms. Bright

10 at the time of her deposition, and then I'll ask you a

11 question about it.

12          All right, sir.  I'm showing you what I will

13 have marked as Obasi Exhibit 2.  We'll -- we'll mark the

14 first statement, voluntary statement, that I showed you

15 as Exhibit 1.  So will this will be -- this photograph

16 will be Exhibit 2.

17          (Exhibits 1 and 2 were identified for

18          the record.)

19 BY MR. McKAY:

20     Q.   And I represent to you that this was a -- this

21 is a still taken from the video of the deposition of

22 Chelsie Bright on December 3 of 2019.  And you can see

23 there that her hair is a bit lighter than it was -- and

24 longer than it was depicted in the photograph I showed

25 you a minute ago.



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 34

1        Is -- is this, then, the woman that you saw

2   outside the plane?

3        A.   I would have to say she looks a lot closer to

4   what I remember, but not the -- I don't remember her

5   hair being down, to be honest with you, I thought it was

6   up.

7        Q.   Okay.

8        A.   But this looks a lot closer to the person I

9   remember.

10       Q.   Okay.  So in terms of the woman who mentioned

11  something about having taken a class, you think that it

12  was this woman depicted in Exhibit 2?

13       MR. MAYE:  Object to form.

14  BY MR. McKAY:

15       Q.   You can go ahead.

16       A.   Yes, sir.

17       Q.   Okay.  All right.  Thank you.

18       Okay.  So you indicated that you thought the

19  other officers, or at least one of them, stayed behind

20  to wait for the statements to be done.  What did you,

21  yourself, do next?

22       A.   We transported the adult and minor, if I

23  remember correctly, separately back to the station.

24       Q.   How --

25       A.   I --



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 35

1     Q.    -- did you do that?

2     A.    By vehicle.

3     Q.    Okay.

4     A.    And because we -- we have the ability to park

5   pretty much under the aircraft and then used the

6   off-ramp of the jetway so we don't have to -- because

7   it's actually -- where the planes land at -- well,

8   sorry.  It's Reid Airport now -- it's actually an

9   island.

10          So to -- you have to drive out, like I said, or

11  take a tram.  So we had -- some of our officers will

12  take cars out and some of us will take the tram out, but

13  we basically transported them back to Terminal 3.

14    Q.    Okay.  And I'm going to show you another

15  picture here in just a second.

16          All right.  I'm showing you here what we're

17  going to mark as Obasi Exhibit 3.

18          (Exhibit 3 was identified for the

19          record.)

20  BY MR. McKAY:

21    Q.    And I'll ask you if the gentleman in this

22  picture is the gentleman that you say you transported

23  from the plane.

24    A.    Yes, sir.

25    Q.    Okay.  And so did you go with the father or the

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 36

1   son?

2       A.   The son.

3       Q.   All right.  And did you have any conversation

4   with him as you were traveling back to the station?

5       A.   Yes, sir.

6       Q.   All right.  And what was that conversation?

7   What do you remember about it?

8       A.   Well, one, one very articulate young man.  And

9   the first thing he basically said to me is that he knew

10  why this was happening.

11      Q.   Okay.  And what did he say about that?

12           MR. MAYE:  Object to form.

13  BY MR. McKAY:

14      Q.   You can go ahead.  Anytime an objection is

15  made, you don't have to wait for me to tell you it's

16  okay to go ahead.

17      A.   Oh, okay.  Yeah.

18      Q.   You can just go ahead.

19      A.   I was just giving the pause.

20           But -- so he basically said it happened -- it

21  had happened before where they were separated by law

22  enforcement, and it was because his father was black --

23  was white and he was black --

24      Q.   Okay.

25      A.   -- is what the young man told me.



EXHIBIT B

Francois Obasi                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

                                                                    Page  37

 1      Q.    Did he give you any specifics about that?

 2      A.    Not locationwise.  He just -- he just said --

 3  and he also spoke of a couple of kind of, like, racially

 4  based incidences in North Carolina that he felt, you

 5  know, made him uncomfortable because of his -- of his

 6  being different from his father.  And also -- and

 7  being -- playing hockey, he said.

 8      Q.    Okay.  And I'm sorry, just to clarify, things

 9  that happened while he was playing hockey or things that

10  happened to him because he played hockey?

11      A.    I would say just due to being involved in

12  hockey in the sport itself.

13      Q.    Okay.  All right.  Did he indicate to you

14  that -- that he felt that a young black man playing

15  hockey was -- was different, seen as different by

16  people?

17          MR. MAYE:  Object.

18  BY MR. McKAY:

19      Q.    Is that what you would say?

20          MR. MAYE:  Object to form.

21          THE WITNESS:  Yes, he did.  Yes, he did.

22  Especially -- he actually mentioned the fact of because

23  of the area they lived in, he felt that, you know, it

24  wasn't as accepted.

25  /////

          702-476-4500

EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 38

1   BY MR. McKAY:

2       Q.    Okay.  All right.  And did -- did he say

3   anything else to you, or did you say anything to him

4   as -- as you were traveling back to the station?

5       A.    No, sir.  I was -- I was actually very careful

6   not to have him speak about what occurred on the

7   aircraft because, you know, that wasn't -- I felt like

8   that's something I would leave for the -- the FBI when

9   they arrived.  So I just tried to, you know, speak about

10  any -- he talked about his -- I want to say adopted

11  sister becoming a doctor and maybe -- and losing his

12  mom.  I believe his mom had recently passed.  So just

13  other conversation to kind of keep him away from the

14  incident at hand because I didn't want to --

15      Q.    Okay.

16      A.    -- refer to that.

17      Q.    And so you were accompanying him, A.D.  Did you

18  have any knowledge as to how the father was going to get

19  to the police station?

20      A.    Yes.  The same way.  He was going to be

21  transported, but we -- I already had told my officers to

22  basically have a holding area, what we call a cell.

23  It's more of a room, a camera-monitored room.  And I

24  would take the minor to our conference room.  And I also

25  instructed them -- because we had initially handcuffed



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 39

1  him.  So I told him once we -- once we got into the area

2  where he was secured and an officer was watching him all

3  the time, to go ahead and take the handcuffs off.

4      Q.   So just so we're clear, who had handcuffs on?

5      A.   Mr. -- is it DelVecchio [sic]?  The dad, the

6  adult.

7      Q.   Okay.  Okay.  Did the son as well?

8      A.   No, sir.  Not at any point.

9      Q.   Okay.

10     A.   No, sir.

11     Q.   Okay.  All right.  So -- so the father was

12  transported in handcuffs, and the son was not; correct?

13     A.   Yes, sir.  Yes, sir.

14     Q.   Okay.  All right.  So when you got back with

15  the son, what -- what happened next?

16     A.   I -- I took him into the conference room of the

17  station, and I believe I got him some snacks, because we

18  have a pretty big snack area, and just -- we kind of

19  just had small chitchatter about stuff and his -- what

20  his father had planned for him for travel and whatnot,

21  just trying to make small talk to keep him comfortable

22  and build a rapport.

23     Q.   Do you remember what he had said about the

24  plans that they had?

25     A.   He said -- he said something about hiking and



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 40

1   RV -- if I remember correctly, something about an RV

2   ride, and he mentioned Zion, I remember.

3        Q.   Okay.

4        A.   And that was really kind of, you know, as far

5   as what he knew of the plans, I should say.

6        Q.   I see.  Okay.  Now, how did he seem to you at

7   that point in time?

8        A.   Surprisingly -- and what -- I have to use the

9   word impressed.  He was actually a very calm young man.

10  He kind of seemed to understand what was going on.  He

11  wasn't, like, afraid of us or for his dad, and I tried

12  to assure him that, you know, we meant him no harm.

13  This was just a -- some, basically, steps we had to go

14  through to clear, you know, what -- the incident.

15       Q.   All right.  How about his overall mood?

16  What -- what did he appear like?

17       A.   He seemed a little -- I mean, he was obviously

18  not -- you might say disappointed, maybe, might be the

19  best way to do it because it had interrupted his trip,

20  you know, and what you are going to do.  But I think --

21  I tried my best to just make him comfortable and assured

22  him it would be over soon.

23       Q.   Okay.  Now, you, by this point, had spent

24  around two decades with the police force; correct?

25       A.   Yes, sir.


EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 41

1      Q.   Okay.  Had you -- during that time, had you had

2   cases of children who were being trafficked?

3      A.   Not -- not trafficked, sir, no.

4      Q.   How about -- did you have any training about

5   human trafficking?

6      A.   Yes, sir.

7      Q.   Okay.  Did anything that you saw of A.D.

8   suggest to you, based on that training, that he looked

9   like somebody who was a subject or a participant in

10  human trafficking?

11          MR. MAYE:  Object to form.

12          THE WITNESS:  No, sir.  And if I could clarify,

13  when you say "trafficking," are you also including,

14  like, molestation and stuff like that?

15  BY MR. McKAY:

16     Q.   I didn't hear you.

17     A.   I'm sorry.  When you -- when you say

18  "trafficking," are you also including, like, child

19  molestation and those type of things or just -- or just

20  the fact of trafficking?

21     Q.   I was going to ask you those separately, if

22  that's --

23     A.   Oh, okay.

24     Q.   -- okay.

25     A.   Yeah.  Okay.  Okay.



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 42

1    Q.   All right.  So when I'm talking about

2  trafficking, I'm talking about taking somebody against

3  their will or -- or under some form of duress to

4  someplace that they otherwise wouldn't have chosen to

5  go.

6    A.   Yes.  And no -- no signs of that whatsoever.

7    Q.   Okay.  Now, how about have you -- have you had

8  situations where you've had to investigate claims of

9  child molestation?

10   A.   Unfortunately, yes.

11   Q.   Okay.  Did A.D., as you viewed him that night,

12  give any indications of being a victim of child

13  molestation?

14        MR. MAYE:  Object to form.

15        THE WITNESS:  No, sir.

16  BY MR. McKAY:

17   Q.   Okay.  Now, did you stay with him the entire

18  time that his father was being detained elsewhere?

19   A.   I think I briefly, maybe for a couple of

20  minutes, walked -- because it's just, like, about a --

21  say, maybe 30-yard difference between the conference

22  room and our holding area, and I think I walked down in

23  the very beginning for maybe two minutes, and that was

24  to get, like, snacks and -- I can't remember if it was a

25  soda or juice.  But then, yes, I was in the room with

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 43

```
1   him the whole time.
2       Q.   When you did go in the vicinity of the holding
3   area, were you able to look in and see Mr. DelVecchia?
4       A.   Yes, sir.
5       Q.   And how did he appear to you?
6       A.   He appeared frustrated, probably would be the
7   best way -- he just seemed very frustrated that this was
8   occurring.  And I remember briefly speaking to him, you
9   know, the fact of what was going to happen, you know,
10  the FBI coming out and that his son was okay, that I
11  would sit with him in the room myself.
12      Q.   Okay.  So this was before the FBI had arrived?
13      A.   Yes, sir.  Yeah, we had to wait -- I want to
14  say it may have been close to an hour, but they were
15  there pretty quickly as far as --
16      Q.   Okay.
17      A.   -- being called out from home.
18      Q.   And do you remember how long they spent with
19  him after they arrived?
20      A.   I want to say it was -- it was well over --
21  maybe like an hour, like, close to an hour and a half.
22      Q.   Okay.  Now, did you know any of these FBI
23  officers?
24      A.   There is -- not by name because the -- the
25  regular -- our regular FBI officer had just transferred.
```



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 44

1  So these were pretty much -- not -- well, I want to say

2  new to me, probably not new to the area.

3      Q.   Okay.

4      A.   But they were just office -- you know, we -- I

5  can't say I knew any of them personally, no.

6      Q.   Okay.  Well, did you at any time -- either

7  while they were questioning Mr. DelVecchia or after they

8  had finished, did you have any conversation with them?

9      A.   Briefly as they were leaving because they --

10 they -- because we usually wait for a decision, which is

11 a hundred percent of the time, the FBI has never

12 arrested anyone that we've detained.  Usually it's --

13 sorry.

14     Q.   That's the echo again.  Sorry.

15     A.   Yeah.

16          Yeah, normally it's a, okay, you know, thank

17 you; we've done our report.  They're going to be

18 released.  We get -- we usually get no follow-up

19 whatsoever --

20     Q.   Okay.

21     A.   -- from -- yeah, from the FBI.  So --

22     Q.   In this particular instance, did they make any

23 kind of comments to you at all?

24     A.   Not really.  They basically just said that they

25 were going to release the -- the father and son and



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 45

1   that -- I believe that they were going to get with the

2   airlines.

3       Q.   Okay.  Get with the airlines for what purpose?

4       A.   I believe to --

5            MR. MAYE:  Object to form.

6            THE COURT REPORTER:  I'm sorry.  I didn't hear

7   the answer.

8            THE WITNESS:  Oh, because I stopped.  Sorry.

9            I believe -- I believe they were going to talk

10  with the airlines to complete the other part of their

11  investigation.

12  BY MR. McKAY:

13      Q.   Okay.  Do you -- did you have any knowledge of

14  what that other part was?

15      A.   Not at all.  Just being honest.  The -- our --

16  our relationship with the FBI is pretty much a one-way

17  street.

18      Q.   I -- I sympathize -- I empathize.

19      A.   Yeah.

20      Q.   I think Mr. Maye will as well.

21      A.   Yeah.

22      Q.   Okay.  So after the FBI departed, then, did you

23  have any further conversations with either

24  Mr. DelVecchia or A.D.?

25      A.   Yes, sir.  We actually were outside of our



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 46

1  substation, and, you know, he was basically telling me

2  about -- I believe he talked -- was talking about his

3  daughter.

4          THE COURT REPORTER:  Was talking about his...

5          THE WITNESS:  Daughter.

6  BY MR. McKAY:

7      Q.   Okay.

8      A.   Yes.

9      Q.   And what did he say about his daughter?

10     A.   He was -- and if I remember correctly, he said

11 he -- his daughter had a -- was a doctor, something

12 those lines, and had graduated, was very proud of her.

13 And I believe he told me he was himself an educator,

14 something like that, and that he was doing a trip with

15 his son, you know, to kind of help, I guess, ease the

16 loss of his wife, and that -- that this -- this type of

17 thing had occurred before, and he was tired of it.  And

18 he also mentioned -- and then he said outside of the

19 station, he -- he kind of described the way he was

20 separated from his son to me.

21     Q.   What do you mean?  Can you elaborate?

22         MR. MAYE:  Object to form.

23         THE WITNESS:  Yes.

24         Well, he said that basically his son was -- had

25 a headache, if I remember correctly, and he was

www.oasisreporting.com                                      702-476-4500



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 47

1   comforting him, and suddenly he felt like a -- what he

2   thought was maybe a slap or punch to the back of his

3   head and that he was told he had to go to the back of

4   the aircraft and sit next to a person -- I can't

5   remember if he told me it was male or female -- and that

6   somebody else sat next to his son.

7          He never -- no one ever really told us about

8   that part prior.  Like I said, it was also an FBI case.

9   So we don't know if there were, like, U.S. Marshals or,

10  you know, like, flight marshals, as you call them, or

11  some random person on the plane.  I don't really know

12  that part of it.

13  BY MR. McKAY:

14     Q.   Okay.  And are you sure that this conversation

15  that you just relayed was that night, or could it have

16  been at a different time?

17          MR. MAYE:  Object to form.

18          THE WITNESS:  Can you -- we only spoke -- I

19  only spoke to him that night.  We've never spoken

20  afterwards.

21  BY MR. McKAY:

22     Q.   I see.  Okay.

23          You -- you believe -- as you remember things,

24  you don't -- you don't think that you spoke with

25  Mr. DelVecchia at any other time?



EXHIBIT B

Francois Obasi                                   Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 48

```
 1          MR. MAYE:  Object to form.
 2          THE WITNESS:  Oh.  Oh, well.  You know what?
 3  I'm sorry.  I'm sorry.
 4          Yes, Mr. DelVecchio did come back to our
 5  station.  I'm not -- I think he was -- oh, you know
 6  what?  Yes, you're right.  I'm sorry.  My bad.  He did
 7  come back to the station when he was leaving the state.
 8  You're right.
 9  BY MR. McKAY:
10      Q.   Okay.
11      A.   Yes.
12      Q.   And why did he do that, do you know?
13      A.   He -- I believe he --
14          MR. MAYE:  Object to form.
15          THE WITNESS:  I can't absolutely say why he did
16  it, but I believe he wanted to make contact with me.
17  BY MR. McKAY:
18      Q.   Okay.  So let me go back to my question, then.
19  In terms of the subject matter that was discussed that
20  you remember, are you -- do you know whether that --
21  that discussion with Mr. DelVecchia happened on the
22  night of the flight landing or when he came back to
23  leave the state?
24      A.   I -- I remember -- I remember the night of the
25  flight him mentioning the way he was separated from his
```

EXHIBIT B

Francois Obasi                           Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 49

1 son, and I think we kind of got back into that

2 conversation when he came back on his way out.

3      Q.   Okay.  Fair enough.

4           Do you remember talking with him about where he

5 was from when he grew up?

6      A.   Well, he said he was from -- well, no -- well,

7 actually, he -- he was initially from New York but lived

8 in North Carolina.

9      Q.   Okay.  And where are you originally from?

10     A.   Well, originally, I was born in the Caribbean,

11 in Barbados.

12     Q.   Okay.

13     A.   Grew up in the Bronx but went to school in

14 Brooklyn.

15     Q.   Okay.

16     A.   So we kind of -- yeah, and I believe -- if I

17 remember correctly, he was from Brooklyn.

18     Q.   Okay.  All right.  Did you at any time give him

19 a business card?

20     A.   Yes, I did.

21     Q.   Okay.  And why did you do that?

22     A.   Just -- just being clear, I felt that what

23 happened or the miss- -- if you want to call it

24 misunderstanding -- I felt was wrong and -- and it seems

25 like he was always starting off on ground zero anytime



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 50

1  it happened.  So I -- so I gave him my card and

2  basically told him if he was stopped by police, you

3  know, for this type of incident, that they could call me

4  and I would just, you know -- I could be, like, his --

5  kind of say reference to say, yes, this is father and

6  son, and this has happened before.

7      Q.   Okay.  From your observation, what did you

8  conclude was -- was the reason for the event on the

9  airplane and them being separated?

10          MR. MAYE:  Object to form.

11          THE WITNESS:  Well, for me personally, I say --

12  I think it was kind of -- you might call it reverse

13  racism and overzealousism.

14  BY MR. McKAY:

15      Q.   Okay.  And when you say "reverse racism," what

16  specifically do you mean?

17      A.   I think when you have a middle-aged Caucasian

18  male with a juvenile black male, it probably sent up red

19  flags to certain people.

20      Q.   Okay.  Had they both been the same race, do you

21  think it would have sent the same red flags?

22          MR. MAYE:  Object to form.

23          THE WITNESS:  Definitely not.

24  BY MR. McKAY:

25      Q.   Okay.  And as you observed Mr. DelVecchia on


EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 51

1  the night that the flight landed, did you see anything

2  about him that caused you to think that he looked like a

3  participant in human trafficking or a child molester?

4          MR. MAYE:  Object to form.

5          THE WITNESS:  Nothing at all.

6          MR. McKAY:  All right.  That's all I have, sir.

7  Thank you.  Mr. Maye might have some questions.

8                    EXAMINATION

9  BY MR. MAYE:

10     Q.   Mr. Obasi, you've been dispatched many times to

11  meet a flight; correct?

12     A.   Yes, sir.

13     Q.   And what were some of the reasons for being

14  called to meet the flight?

15     A.   You're talking about in general or --

16     Q.   Yes.  Yes.  From your experience, the different

17  times you were dispatched to a flight, what were the

18  various reasons why you were dispatched to the -- to the

19  flight?

20     A.   I would say our number one reasoning -- and I

21  kind of have to go back prior to COVID, because with

22  COVID, it was always about the mask.  Normally we have

23  disturbances from fights on planes, arguments.  We've

24  had people touching flight attendants inappropriately.

25  Just a lot of alcohol-related calls --



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 52

1     Q.    Um-hum.

2     A.    -- on flights.  We've had calls where a person

3   was having a heart attack, doctors trying to give CPR,

4   and some guy decides that he has the right to YouTube it

5   from the middle of it.

6           So, you know, just if you can imagine it, it's

7   probably called on a plane.  I was there for, like,

8   three years.  Just a lot of different things.

9     Q.    And when a -- a call is -- or a request is made

10  to the Metro Police to meet the aircraft for one of

11  these -- the, you know, potential inappropriate touching

12  or assaults, what does the response look like with

13  respect to your office?  What do you do?

14    A.    We basically get the arrival time of the

15  aircraft, the gate number so we know exactly where the

16  plane is going.  We usually try to coordinate at

17  least -- if it rises to a certain level as far as, say,

18  a supervisor being on-site, supervisors don't always

19  have to go out, but it's recommended, you know, for most

20  cases.

21          Usually we try to have at least two to four

22  officers meet the plane just for, you know, separation,

23  crowd control, because that can be an issue due to the

24  fact of our call is coming in as a possible father-son,

25  we don't know the relationship, but we also don't know



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 53

1   if there's, like, another group of family members with

2   them.  So you have to, you know, just prepare for the --

3   for the unexpected, basically.

4           But we just -- we just meet at the plane.  Most

5   of the time it's actually to keep the peace kind of a

6   thing for us, and also, I should add, we usually try to

7   have a representative of that airline be present.

8       Q.   When there's an allegation that a potential

9   crime was committed, do you and your officers conduct an

10  investigation when you get to the flight?

11      A.   Very brief.  It's just because there's very

12  few -- and the law has changed slightly, I believe,

13  right about when I was ready to retire as far as what we

14  can actually arrest for while in flight versus, you

15  know, over other air space.  It's a whole mess of a law

16  that they've -- they're trying to streamline, but

17  normally -- normally these cases fall under the FBI

18  jurisdiction.  So our job is really just to go out and

19  do a preliminary to see if we have enough to detain for

20  the FBI to come out.

21      Q.   And part of your preliminary investigation,

22  what does that consist of, interviews of --

23      A.   Interviews of --

24      Q.   I'm sorry.  Go ahead.

25      A.   Yeah, I'm sorry.


EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 54

1          So it's usually interviews of the, you might

2   say, accuser.  So you're basically talking to the flight

3   attendants, in reality, because normally the pilot isn't

4   your best source of information because it's being

5   relayed to the pilot from the flight attendant.  So we

6   usually try to talk to the flight attendants just to

7   see, okay, what occurred, get them writing a voluntary.

8          As far as the -- the accused person, there's

9   really not -- to be honest with you, there's not a lot

10  of talking to them unless it's something that we really

11  feel we can solve on the site, you know, where you kind

12  of let them have their say.  Because -- and that's

13  usually your misunderstanding type ones or even like the

14  mask where it's, like, oh, hey, I'm sorry, blah, blah,

15  blah.  So we kind of pull them aside, say, hey, you

16  know, what's going on?  Usually with a case that we know

17  it's going to rise to an FBI investigation, we try not

18  to actually interview the -- the accused that much

19  on-site.

20  Q.   And after you complete your interviews of

21  witnesses and sometimes the accused, you make a decision

22  whether or not to refer the case to the FBI?

23  A.   Well, no.  Well, yes.  I guess you could say

24  yes.  Because if it doesn't rise to the level of even

25  being a case, then, you know, there's no need to call



EXHIBIT B

Francois Obasi                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 55

1  them in.  We usually just inform, you know, the airlines
2  that the -- usually the pilot is -- honestly, the pilot
3  disappears first.  They're on some different schedule.
4         So normally we try to, you know, inform the
5  airlines, hey, this is not a criminal matter.  I would
6  say 90 percent of them fell under the civil side of
7  things.  So usually the airline will decide to trespass
8  or, you know, whatever they're going to do, which is now
9  out of our control.
10         So what we do is once we are done with our part
11  and we make the decision, no, this isn't a crime, then
12  we let the airline -- usually the airport manager will
13  make that decision that, hey, what -- what do you want
14  to do with this person?
15     Q.   So after -- after you conduct your
16  investigation, then you can make the decision that, hey,
17  this person can go on their way; we don't believe a
18  crime was committed.
19     A.   Yes, sir.
20     Q.   Okay.
21     A.   Sorry.  My camera's falling down.
22     Q.   And the -- the airline doesn't make the
23  decision to send the case to the FBI; correct?
24     A.   No, they do not.  No.
25     Q.   And the officers on the scene can make the



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 56

1   decision that, hey, there's no need to investigate this

2   incident any further; correct?

3       A.   Yes, sir.

4       Q.   And in this case, you and your officers

5   interviewed the flight attendants and Mr. DelVecchia and

6   A.D.; correct?

7       A.   No.  No.  No -- because we -- we're not allowed

8   to interview the minor without, like, an expert or

9   officer trained in that.  And even the -- sorry -- even

10  the interviewer of the adult father, that's -- you know,

11  they're not really asking him, like, incriminating

12  questions.  Like I said, we -- our part is just to

13  basically detain and wait.

14      Q.   So in this case, you did not interview --

15  interview A.D. about the allegations; is that fair?

16      A.   Yes.  Yes.

17      Q.   And you interviewed flight attendants and the

18  pilots?

19      A.   I believe my officers did briefly enough to,

20  you know, ascertain, you know, what was -- what they

21  perceived to be going on.

22      Q.   And did you or your officers speak with

23  Mr. DelVecchia about the allegations?

24      A.   I did not personally prior to the FBI coming.

25  I don't remember any of my officers doing it.  I know



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 57

1   Mr. DelVecchio was actually talking because I could kind

2   of hear down the hallway.  I think he was just kind of

3   expressing himself.  I wouldn't call it an interview per

4   se.

5       Q.   Talking about what?

6       A.   Talking about what occurred on the plane and

7   his frustration with it.

8       Q.   So you interviewed the various crew members,

9   and you had discussions with Mr. DelVecchia or someone

10  that was under your supervision, and a decision was made

11  to refer the case to the FBI; correct?

12          MR. McKAY:  Objection to the form.

13          THE WITNESS:  Yeah -- well, not so much -- yes,

14  you could say, yes, referred, because it's not in our

15  jurisdiction anyway.

16  BY MR. MAYE:

17      Q.   What I'm saying is you decided that there was

18  sufficient information to warrant the FBI investigating;

19  correct?

20          MR. McKAY:  Objection to the form.

21          THE WITNESS:  Yes, sir.

22  BY MR. MAYE:

23      Q.   Okay.  Okay.  And you could have after

24  interviewing everyone said, "You know what?  This is all

25  a big misunderstanding.  Mr. DelVecchia, you and your



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 58

1  son can keep on going.  Go on your way.  Have your --
2  you know, continue with your trip."
3          MR. McKAY:  Objection to the form.
4          THE WITNESS:  Yes, I could, with a lot of
5  backlash.
6  BY MR. MAYE:
7      Q.   Okay.  I'm going to show you what I guess is --
8  is this Exhibit 4, I believe?
9          MR. McKAY:  Yeah, I have up to 3.
10         THE WITNESS:  Way too small for me to read, but
11 it's fine.
12         MR. MAYE:  Okay.  I'll blow it up.
13         So I'm showing the witness -- I think it's
14 Exhibit 4.  I'm showing the witness what has been marked
15 as Exhibit 4, which I represent is the Las Vegas Metro
16 Police Department call log for what was then called
17 McCarran Airport.
18         THE WITNESS:  Um-hum.
19         (Exhibit 4 was identified for the
20         record.)
21         MR. McKAY:  Objection.  Brian, this has not
22 been produced in discovery.
23         MR. MAYE:  Yes, it has.
24         MR. McKAY:  I have not seen this.
25         MR. MAYE:  It's been produced.

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 59

1        MR. McKAY:  Well, I object to its use in this
2   deposition because I have not seen it.  And if it was
3   produced, it would have come to me.
4        MR. MAYE:  Okay.
5   BY MR. MAYE:
6      Q.   This is the call log for the Las Vegas Metro
7   Police Department at McCarran for March 28, 2019.
8        MR. McKAY:  Objection.  No foundation.
9   Objection.  Motion to strike.
10       MR. MAYE:  Okay.
11  BY MR. MAYE:
12     Q.   Mr. Obasi, does this document look familiar to
13  you?
14     A.   It looks like one of our printed call logs from
15  dispatch or from our CAD system, I should say.
16     Q.   Okay.  And there's this "LOC McCarran Airport."
17       What is that?
18     A.   I'm sorry?
19     Q.   What does this -- it says "LOC McCarran
20  Airport."
21       What does that indicate?
22     A.   Oh, "LOC" would just be location.
23     Q.   And McCarran Airport is?
24     A.   Where we were operating.
25     Q.   Okay.  And this -- this is a call log for your



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 60

1    substation at McCarran?

2        A.    Yes, sir.  Well, it would be a call log for all

3    the officers that had been assigned to the call.

4        Q.    Okay.  Right here where I've highlighted, it

5    says "NINT [sic] 21:13:55."

6              What does that indicate?

7        A.    I have no clue.  Is it N-I- -- is it, like,

8    initiate?  Initiated maybe?

9        Q.    Please don't speculate.

10       A.    Yeah, I don't -- I don't -- just so you know,

11   sir, these are dispatch center terms from McCarran

12   dispatch.

13       Q.    Okay.

14       A.    So these aren't -- these aren't abbreviations

15   that we would use in the field.

16       Q.    Okay.  Let me show you this.

17             I'm highlighting -- well, do you see where I'm

18   highlighted?  It says "21:13:55 DPTCH," and then the

19   next column, "LV/3Q70 Bravo," and then parentheses,

20   "(Officers: LV/Tripp Blane)."

21             MR. McKAY:  And I still have an objection based

22   on lack of foundation based on not produced in

23   discovery, based on improper questioning of this

24   document, and I move to strike.

25             MR. MAYE:  Okay.  Okay.  Can you and I have



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 61

1  this --

2         MR. McKAY:  Can I have a continuing objection

3  on that by agreement, Mr. Maye?

4         MR. MAYE:  Yes, please.  Thank you.

5         MR. McKAY:  Thank you.

6  BY MR. MAYE:

7     Q.   Mr. Obasi, this 21:13:55, do you know what that

8  indicates?

9     A.   I believe that's a time.  Usually that's a

10 time, but --

11    Q.   So would there be -- would that be 9:13 p.m.

12 and 55 seconds?

13    A.   Yes.  Yes, in civilian time, yes.

14    Q.   Okay.  And it says, "Dispatch" -- I'm sorry.

15 It says, "DPTCH."

16         Do you know what that means?

17    A.   That's dispatch.

18    Q.   Okay.  And then what does that mean, dispatch

19 of who, of what?  What does that mean?

20    A.   It means dispatch of whatever unit is on the

21 end of that line.  It means that the -- now, there is a

22 time -- there would be a slight time delay here because

23 our -- because we're being dispatched by airport control

24 who then calls it into Metro control.  Yeah, it's kind

25 of a -- yeah.  But -- yeah -- but the -- whoever --

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 62

1   whoever was being dispatched on this line, their call

2   sign would be at the end, and we're all -- they're all

3   queen units or Q.

4       Q.    Right.  So you're referring to the LV-3Q70B?

5       A.    Yes.

6       Q.    And does that name, Blane Tripp, sound familiar

7   to you?

8       A.    Yes, it does.

9       Q.    And who is Officer Blane Tripp?

10      A.    One of the officers assigned to my squad.

11      Q.    And did Officer Tripp -- was he one of the

12  officers that was present at the gate when the flight

13  arrived?

14      A.    Yes, sir.

15      Q.    And how long have you worked with Officer

16  Tripp?

17      A.    Well, I was his supervisor for about three

18  years at the airport, but I've actually known -- we've

19  worked together before I promoted.  I would say in total

20  about 18 years.

21      Q.    And is Officer Tripp a good officer?

22      A.    Yes, he is.  Excellent officer.

23      Q.    And according to this record, were there other

24  officers dispatched to the flight?

25      A.    I actually --



EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 63

1           MR. McKAY:  Objection.  Form.

2           THE WITNESS:  I actually cannot read this.

3    It's actually very small on my screen.

4    BY MR. MAYE:

5       Q.   Oh, sorry.

6       A.   If there's other -- if there's other units

7    assigned -- I can see, yeah, there's 3 Queen 91 -- looks

8    like a few people were out there.  79, 91, 55, yeah.  So

9    anyone -- anything that says -- anything in that bracket

10   means that they were assigned.

11      Q.   So Officer Martin Wright was dispatched to the

12   flight?

13      A.   Yes.  I'm not sure if Officer Wright made it to

14   the plane, because I did have some extra officers kind

15   of come to the station, you know, because, we thought

16   we'd be there a while.  So some -- not everyone that's

17   assigned to the -- to this call made it to the plane.

18      Q.   Do you recall if Officer Anthony White made it

19   to the plane?

20      A.   Yes, Officer White did.  He's actually now

21   retired, but --

22      Q.   And how about Officer Greg Leavitt?

23      A.   I honestly do not recall if Officer Leavitt,

24   who is also retired, made it out to the flight.

25      Q.   And does it show that these officers were all



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 64

1  dispatched at 2114?

2      A.   Yes.

3      Q.   And when it indicates they were dispatched,

4  does that mean that they were requested to go somewhere?

5      A.   It just means that they're requested to aid

6  with the call.  As far as where -- where they go, that's

7  something that we coordinate as far as, like, do I need

8  you at the plane, do I need you to bring a car onto the

9  tarmac to help us transport, you know, or do I need you

10  to be at the station when we arrive?  It's kind of a

11  coordinated effort.

12      Q.   Okay.  And do you recall if Officer Tripp made

13  it to the gate?

14      A.   Yes, I believe Officer Tripp and Officer White

15  were actually with me.

16      Q.   Okay.  And down farther below, it says --

17      A.   So I'm squinting trying to read it.

18      Q.   Can you see that where I've highlighted it in

19  blue, "23:14 Dispatch," and then "Officer Bradley" --

20      A.   Berghuis.

21      Q.   -- "Berghuis."

22      A.   Yeah.

23      Q.   Do you see that?

24      A.   Yes.

25      Q.   Do you recall if Officer Berghuis was at the



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 65

1  gate?

2     A.   He may have been.  I don't recall because

3  some -- well, some of the -- like, Officer Berghuis is

4  actually a Terminal 1 officer.  So some of them may have

5  met us out there and then kind of, you know, departed

6  because it's not going back to Terminal 1.

7          And, also, I believe he's -- because I believe

8  the call went into when our -- because we were what we

9  call swing shift.  So the call kind of went into when

10 our graveyard units came on.  So some of the people

11 you're seeing assigned are actually graveyard units and

12 would not have been there initially.

13    Q.   Was Officer Berghuis a graveyard --

14    A.   Yes --

15    Q.   -- unit?

16    A.   -- if I remember correctly -- and I think he's

17 retired as well.  Sorry.  But the airport is kind of a

18 retirement gig.  But I believe Officer Berghuis was a

19 graveyard officer.

20    Q.   Were you also a graveyard officer?

21    A.   No, sir.  I was the swing shift supervisor.

22    Q.   Why does Officer Berghuis, who was a graveyard

23 officer -- why was he dispatched at 11:14 and you were

24 also dispatched at 11:14?

25          Do you see that?



EXHIBIT B

Francois Obasi                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 66

```
 1      A.    I think that's just the way that -- I'm not
 2   sure what -- why -- why that would happen.  And
 3   sometimes, like I said, this is just them clicking a
 4   button.  I can't tell you what they are doing because I
 5   believe I was already on the call, you know.  So I don't
 6   know why that would -- I don't -- I have no clue.
 7      Q.    Are you certain that you were at the gate?
 8      A.    What?
 9      Q.    Are you certain that you were at the gate --
10      A.    Yes, sir.
11      Q.    -- with the other officers?
12      A.    Yes, sir.
13      Q.    Okay.  And who -- who inputs the information
14   about the timing of the dispatch to the various officers
15   or various personnel?
16      A.    Okay.  So like I was trying to explain earlier,
17   airport control center is not a police dispatch center
18   per se; so they don't have the same technology.  So what
19   happens is they will actually tell us about the call,
20   and then they call our regular police dispatch to
21   retrieve an event number.  So if they don't tell Metro
22   dispatch that we are on the call, Metro dispatch doesn't
23   know.
24            It's probably as clear as mud at this point.
25   So what happens is sometimes we can actually have an
```



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 67

1  officer be on a call and was dispatched by airport

2  control but Metro dispatch doesn't know; so it won't

3  show up in the log properly.

4          Does that make sense?

5      Q.   Okay.  So you said that from your recollection

6  it was you, Officer Tripp, and Officer White who met the

7  aircraft.

8      A.   Yeah.  Yes, sir.  Yes, sir.

9      Q.   Okay.  And who conducted the -- withdrawn.

10         Did you, Officer Tripp, or -- and/or Officer

11  White interview anyone at the gate?

12     A.   I remember -- you mean as far as the -- the

13  workers of Frontier?

14     Q.   Yeah, anyone.  Any wit- -- passengers, any crew

15  members.

16     A.   Honestly, I remember the officers speaking with

17  crew members, and I remember the -- because while I was

18  speaking with the pilot is when the attendants were kind

19  of also talking and getting into the conversation, but

20  it wasn't -- I would not call that an interview.  It was

21  more of a, like, what's going on, you might say, with

22  the pilot.

23     Q.   And you said that you were speaking to the

24  pilot about what was going on.

25     A.   Yes, sir.



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 68

1      Q.    And you said the pilot never gave you any
2  details about what was alleged to have happened; right?
3      A.    Not -- not in depth.  He just said that his --
4  he may have went over it briefly, but he was -- he was
5  definitely trying to -- or he made it clear to me that
6  the reason why he called is because his crew alerted
7  him.
8      Q.    About something.
9      A.    Yes, about the -- yeah.  About something --
10 about something that was enough for him to make that
11 call, you might say.
12     Q.    But he didn't explain what that was to you.
13     A.    No, he -- no, he didn't, no.
14     Q.    And did Officer Tripp interview any of the --
15 any of the flight attendants or passengers?
16     A.    I -- I believe Officer Tripp spoke with the
17 attendants.  Like I say, I can't honestly at this point
18 tell you exactly what Officer Tripp did or any of the
19 other officers, like, who they exactly spoke with.
20     Q.    Okay.  So -- so you don't know whether or not
21 Officer Tripp interviewed any of the flight attendants.
22     A.    I do not.  That would be an assumption on my
23 part.
24     Q.    And you don't know whether or not Officer White
25 interviewed any of the flight attendants?



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 69

 1     A.   No, I -- I cannot, like I said, give a definite
 2  yes on that.
 3     Q.   And you do not know whether any of the officers
 4  interviewed any of the passengers.
 5     A.   I don't believe we had any passenger witnesses
 6  that stuck around.
 7          MR. McKAY:  Mr. Maye, do we need this document
 8  displayed?
 9          MR. MAYE:  No.
10          THE WITNESS:  You make him squint.  I'm sorry.
11          MR. MAYE:  Yeah, let me --
12          MR. McKAY:  I'd just like to see the witness.
13          MR. MAYE:  That's fine.
14          MR. McKAY:  Thank you.
15          MR. MAYE:  Sure.
16  BY MR. MAYE:
17     Q.   You never interviewed any of the flight
18  attendants; correct?
19     A.   Not a formal interview.
20     Q.   Did you interview or speak with Mr. DelVecchia
21  or A.D. about what had occurred?
22     A.   You're talking about at the flight?
23     Q.   Yes.  At the gate.
24     A.   No, I did not.
25     Q.   Did you -- okay.  At any point, did you have a



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 70

1  conversation with Mr. DelVecchia or A.D. about what had

2  transpired on the aircraft?

3       A.   Yes, sir.

4       Q.   And what did Mr. DelVecchia tell you?

5       A.   Mr. DelVecchio basically stated that his son --

6  but he said he was having a headache, was uncomfortable,

7  and that he was comforting him.  And I think he

8  mentioned something about a -- like, a blanket, maybe

9  putting a blanket down first, something like that, and

10 that suddenly he was -- he felt he was struck, he was

11 told to go to -- to the back, and he was sitting with a

12 stranger for the remainder of the flight while someone

13 else sat with his son.

14      Q.   So he told you that he was rubbing his son's

15 head --

16      A.   Yes.

17      Q.   -- and that at that point -- that at that point

18 someone hit him in the head?

19      A.   Yeah.  Well, he -- I remember him saying he was

20 confronted by somebody.  Like I said, that part of it I

21 can't remember, but he said, yes, his son had put his

22 head into his lap where, like, the -- like, blanket was

23 and that he was, like, rubbing his face, like,

24 comforting him, you know, for basically having a

25 headache, being uncomfortable with the flight, and

www.oasisreporting.com                                    702-476-4500



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 71

1   that's when everything started.

2        Q.   Okay.  And then at that point he said that

3   someone hit him?

4        A.   Yes, he said -- he said somebody hit him and --

5   and told him to go to the back.

6        Q.   Told Mr. DelVecchia to go to the back?

7        A.   Yes, sir.

8        Q.   And where did -- and where in back did he go?

9        A.   He didn't give me a specific seat number.  He

10  just said that -- that he was guided towards the back,

11  and he sat next to a male stranger who he kind of

12  inferred he thought was somebody official.

13       Q.   And -- okay.  And how long did he tell you he

14  sat in that seat in the back of the airplane, if you

15  know?

16       A.   From the time it happened till basically the

17  time the aircraft landed.

18       Q.   And where was A.D. at this time?

19       A.   A.D. was still in his -- or -- well, original

20  seat or area.  He didn't move the -- the -- A.D.

21       Q.   And did he tell you anything else about what

22  happened on the plane?

23       A.   No, just the fact he -- it was embarrassing.  I

24  remember him saying it was embarrassing.

25       Q.   Did he tell you who hit him?



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 72

1      A.   No, he did not, actually.  I don't remember
2  ever getting a description of -- I'm not sure he knew
3  who did it, to be honest with you.
4      Q.   And if you had learned information about a
5  passenger being battered in the head, is that something
6  that you would investigate?
7      A.   Yes, but we did not -- but this is information
8  that I actually found out after the FBI, you know, had
9  done their thing.  It was not brought up to us -- like,
10 we didn't know about it initially.  Actually, the -- no
11 one -- I kind of assumed after everything came out that
12 maybe they were air marshals onboard by the action, but
13 we weren't told about the presence of any law
14 enforcement on the flight.
15     Q.   Is it possible that -- withdrawn.
16          It was unclear to me when Mr. DelVecchia told
17 you about the slap or punch.  Was it the day of that
18 flight or when it -- he returned for his return flight?
19     A.   That's -- to be honest with you, sir, that's
20 the part -- so the day when he left -- when he left
21 after the FBI had released him -- well, we released him
22 because he was in our station, I remember having a brief
23 conversation, and I'm -- I'm honestly trying to recall
24 if he -- he explained it to me that day or the day when
25 he came back.  I'm -- and honestly I can't -- I'm



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 73

1   trying -- having a hard time differentiating that --

2   that bit of information.

3       Q.   Okay.  And do you recall if he said that he was

4   slapped or punched?

5       A.   I remember him saying punched.

6       Q.   You testified earlier that -- that -- slap or

7   punch.

8       A.   Yeah, and that's -- that's probably just me

9   talking.  But in kind of replaying what he was saying,

10  he felt like it was a punch.  Like, me, I got super

11  large hands.  So, you know, it could have been either

12  one.  But he felt basically he was hit in the back of

13  the head.

14      Q.   When you were on the scene -- you and Officer

15  Tripp and Officer White on the scene at the gate, were

16  you made aware that Mr. DelVecchia and A.D. were father

17  and son?

18      A.   No.  Actually -- actually, the attendant made a

19  statement that said, "I'm not sure they're related."  I

20  remember that statement and I --

21      Q.   Did you --

22      A.   I'm sorry.  Go ahead.

23      Q.   Did you ever ask Mr. DelVecchia if they were

24  related?

25      A.   Yes.



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 74

1     Q.   And when did you ask him that?

2     A.   I remember when we got back to the station, I

3  remember asking, you know, just that simple question

4  because I didn't feel that was any -- in any form

5  incriminating, you might say, as far as their

6  relationship.  And I remember he said, and it was

7  corroborated by his son, that it was an adoptive

8  situation.

9     Q.   In terms of their relationship, father and son,

10  does that have any bearing on whether an allegation of

11  misconduct is credible or not?

12    A.   I would say yes, sir.  Yes.

13    Q.   And how -- what is the significance to you in

14  terms of whether or not an allegation is credible?

15    A.   Well, for me personally, if a complete stranger

16  is caressing the face of an 11-, 12-year-old boy, not

17  even on an aircraft, anywhere, regardless of, you know,

18  race, whatever, that's -- that's not normal.  Being a

19  father of two, if I'm caressing my daughter's face

20  because she's uncomfortable, then that's, you know,

21  absolutely normal.  That's not outside of the norm.  But

22  I could see if it was a complete stranger where that

23  would set off red flags.  That's what I'll say about the

24  relationship.

25    Q.   In your long experience in law enforcement,



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 75

1   have you seen cases in which crimes were committed by a

2   family member against another familiar member?

3       A.   Oh, yeah, well, actually --

4            MR. McKAY:  Objection to the form.

5            THE WITNESS:  Yeah.  Yeah, that's --

6   BY MR. MAYE:

7       Q.   Okay.

8       A.   Yeah.

9       Q.   Okay.  And the fact that they were father and

10  son, is that information that would make an

11  investigation unnecessary?

12      A.   No.  No.  But depends on the action.  If, you

13  know --

14      Q.   Yes.  So if an allegation was made that a

15  father had inappropriately touched his child, if you

16  learned they were father and son, would you then not

17  investigate?

18      A.   Oh, no, that would be an inves- -- definitely

19  an investigation for inappropriate touching.

20      Q.   Okay.

21      A.   Yes.

22      Q.   So merely learning that they were father and

23  son didn't warrant your letting them go.

24      A.   No.  No, sir.  No.

25      Q.   Okay.  So ultimately you made the decision to



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 76

1  turn the case over to the FBI for further investigation.

2  Do you believe that was the prop- --

3         MR. McKAY:  Objection to form.

4  BY MR. MAYE:

5     Q.   Do you believe that was the right decision?

6     A.   Yes, sir.  Actually, it was the only decision.

7     Q.   It was the only decision based on what you knew

8  about the allegations; correct?

9         MR. McKAY:  Objection to the form.

10        THE WITNESS:  Well, the fact that the

11 allegation was made and I was not present during the

12 action.  So the allegation was made.  The only option I

13 have, because it's not my jurisdiction, is to not be

14 negligent and turn this case over to the FBI.

15 BY MR. MAYE:

16    Q.   Well, you earlier said that there are times

17 when allegations are made, you conduct a preliminary

18 investigation, and you determine, hey, there's no basis

19 for this, we can let them go; correct?

20    A.   Yes, sir, but that's usually not a crime that

21 falls -- we're talking, like, maybe, like, face masks or

22 like a he-said/she-said shoving match where both parties

23 do not want to proceed type.  You know, something

24 that's -- that's usually a misdemeanor not occurring in

25 our presence type thing.  Nothing -- nothing felonious,


EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 77

1 nothing that could rise to that level.

2     Q.   So the fact that this was father and son, that

3 didn't warrant your not giving the case to the FBI;

4 correct?

5         MR. McKAY:  Objection to the form.

6         THE WITNESS:  No, sir.

7 BY MR. MAYE:

8     Q.   Okay.  And you mentioned earlier that

9 Mr. DelVecchia told you that A.D.'s head was on his lap

10 and he was rubbing his head, and then he was -- he was

11 struck.

12         Did they -- did Mr. DelVecchia tell you

13 anything else about what happened on the aircraft?

14         MR. McKAY:  Objection to the form.

15         THE WITNESS:  That was it, pretty much, that he

16 was just separated from his son for the rest of the

17 flight.

18 BY MR. MAYE:

19     Q.   You said that you learned from A.D. that this

20 had happened before.

21     A.   Yes, sir.

22     Q.   Did A.D. go into detail about what had happened

23 before?

24     A.   No, he did not.  No, he did not.  Actually, I

25 believe I kind of -- kind of steered him away from --

www.oasisreporting.com                    702-476-4500

EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 78

1  from that, from that part of the conversation not

2  wanting to, you know, interfere with the FBI's interview

3  when they got there.

4      Q.   Did he mention that it was suspected that there

5  was inappropriate touching on the flight?

6      A.   That kind of rings a bell that he said -- he

7  said -- I know he said it happened before on a flight.

8  Not so much about touching.  He didn't go into why.

9      Q.   If a child passenger revealed to you that his

10  father had been suspected of inappropriately touching

11  him on a previous occasion and on the current occasion

12  it was the same situation, would -- would that raise

13  concern in your mind that the current allegation is

14  something that should be investigated?

15          MR. McKAY:  Objection to the form and

16  argumentative.

17          THE WITNESS:  I think that -- I think that

18  leaves a lot to be -- you know, I mean -- because I

19  would have to know the true circumstances of the first

20  allegation.

21  BY MR. MAYE:

22      Q.   Um-hum.

23      A.   Not just -- not just a broad allegation.  But

24  definitely, you know, those are red flags.

25      Q.   When you worked for the Las Vegas Metro Police



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 79

1  Department, did they have a policy of if you see

2  something, say something?

3      A.   Yes, sir.  Mostly that's geared towards

4  terrorism, but recently it's kind of been broadened.

5      Q.   And what does that mean to you?

6      A.   "See Something, Say Something" basically means

7  that when you see something suspicious, you should speak

8  up and alert someone.

9      Q.   Alert law enforcement?

10     A.   Yes, alert law enforcement, or if they're, you

11  know, in a hospital, alert, you know, health care,

12  somebody in authority that can, you know, get some kind

13  of help.

14     Q.   And you believe that if an adult sees another

15  adult inappropriately touching a child, do you believe

16  that that adult should notify law enforcement?

17          THE WITNESS:  Yes --

18          MR. McKAY:  Objection.  Argumentative.  Calls

19  for speculation.  Objection to the form of the question.

20          THE WITNESS:  Yes, sir.

21  BY MR. MAYE:

22     Q.   Okay.  Essentially, you know, it's better to be

23  safe than sorry; right?

24          MR. McKAY:  Objection.  Argumentative.

25          THE WITNESS:  Yes, sir.



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 80

1  BY MR. MAYE:

2      Q.   Do you agree that it's better to be wrong and

3  inconvenience someone than to potentially turn a blind

4  eye toward something that could be bad?

5           MR. McKAY:  Objection.  Argumentative.

6  Objection to the form.

7           THE WITNESS:  Yes, sir.

8  BY MR. MAYE:

9      Q.   Two flight attendants testified that they

10  observed Mr. DelVecchia inappropriately touching A.D.

11  and they notified the captain?

12           MR. McKAY:  Objection.

13  BY MR. MAYE:

14      Q.   Based on your professional experience, do you

15  believe it was appropriate for the captain to contact

16  law enforcement?

17           MR. McKAY:  Improper question.  Objection to

18  the form.  Argumentative.

19           THE WITNESS:  I would say based on -- on what

20  was told to the captain, it was proper for him to inform

21  us.

22  BY MR. MAYE:

23      Q.   Okay.  You testified that you conducted an

24  Internet search of A.D.  When did you do that?

25      A.   Probably about five minutes to ten minutes



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 81

1    after I received the dispatch.  And I called -- I
2    believe I called the airport control center and --
3    because I was, like, well, what are their names?  And --
4    because the dispatcher had -- had actually said -- I
5    remember now -- said something about -- because I asked
6    her what's the relation?  And she says, "Well, I think
7    it's father and son," and she gave me the names.  But
8    the combination of the minor's first name with the last
9    name, I immediately said, oh, this is -- it's an African
10   first name.  So that's why it kind of -- it kind of set
11   off that investigative bell in my head.
12        Q.   You testified earlier that when you came to the
13   gate, you heard some people mumbling about what had
14   happened.
15        A.   Yeah, it was just passengers.  We get that a
16   lot.  People walking by and leaving will, you know --
17   they -- everybody has, you know, like, oh, that was
18   wrong.  Oh, my god, this just happened, you know, blah,
19   blah, blah.  So we kind of heard, like -- like,
20   grumblings because you have, you know, a plane of a
21   hundred-and-something people basically disembarking, and
22   everybody's kind of glad it's not them that we're
23   waiting for.
24             So I remember one lady -- and I can't really
25   describe her that well -- saying, "Oh, that was wrong,"



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 82

1   you know, kind of stuff like that.  Other people, like,

2   "Man, you know, what's going on?"  Some people seemed a

3   little confused.

4        Q.   Right.  I was going to ask you about that.  You

5   said that some woman said, "That was wrong."

6             Do you know what she was referring to?

7        A.   Well, I assume she was referring to the father

8   and son situation or the, you know, the accused

9   situation.

10       Q.   Meaning what he did was wrong?

11       A.   No, I -- no, she -- she pointed -- she kind of

12  referenced towards the crew.  So I took that to mean she

13  felt like what the airlines had done was wrong.

14       Q.   What did -- what did this woman look like?

15       A.   She -- I remember her being, like, a white,

16  kind of middle-aged female kind of -- I remember dark

17  brown hair.  Don't ask me to describe her face outside

18  of that.  I wasn't -- like I said, she was, you know,

19  somewhat nondescript, and we were kind of concentrating

20  on, you know, disembarking these folks and -- again,

21  because it -- it wasn't like a -- in some cases we kind

22  of have to hold everybody on the flight, but in a case

23  like this where it's just, like, the -- you know,

24  airline stewardesses, father and son or adult/minor, we

25  don't really need -- you know, there was no actual



EXHIBIT B

Francois Obasi                           Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 83

1  civilian witness to it, if you know what I'm saying.

2      Q.    Right.

3      A.    So we didn't need to hold anybody else.

4      Q.    Where were you standing when you heard her say

5  this?

6      A.    I was standing actually in the -- kind of like

7  the -- the jetway has, like, a little push-out part

8  that's for if you want to go down the staircase.  So we

9  kind of stand -- I was standing in that part so people

10 could still disembark without obstruction.

11     Q.    And was she walking with anyone?

12     A.    I can't -- I honestly couldn't tell you if

13 anybody around her was connected to her, sir.

14     Q.    Was she walking from the aircraft to the

15 terminal?

16     A.    Well, she was -- she was leaving the aircraft

17 into the jetway.

18     Q.    Okay.  So she was -- she was -- but she was --

19 she was exiting the aircraft and walking up towards --

20     A.    Yeah, it's --

21     Q.    -- the terminal?

22     A.    It's a one-way trip, yeah.  She --

23     Q.    Right.

24     A.    You have to basically get off the plane, get

25 through the jetway into the terminal.



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 84

1      Q.    And she wasn't looking back at all?

2      A.    As far as -- what do you mean when you say

3  "looking back"?

4      Q.    Well, where --

5      A.    You mean at someone else?

6      Q.    Where -- where was she facing?  Where was she

7  facing?

8      A.    Initially, when she came off the -- the -- that

9  gap between the door and the jetway --

10     Q.    Uh-huh.

11     A.    -- she was kind of, like, you know, saying what

12  she was saying, and she kind of glanced over at the --

13  because they were -- the flight attendants were

14  standing, you know, where they stand kind of in the

15  doorway as people are leaving, and she looked at them

16  when she made the statement, which is why, you know,

17  like, an inference like, you know, you did wrong kind of

18  a thing.

19     Q.    So she was on the aircraft when she made the

20  statement?

21     A.    I would say leaving.  It's that gap, you know,

22  the --

23     Q.    So --

24     A.    -- like about to step off the aircraft onto the

25  jetway, that kind of uncomfortable first step.



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 85

1    Q.   Okay.  So she was -- she was stepping off the
2  aircraft.

3    A.   Right.  Right.  Right.

4    Q.   Okay.  And she was facing you?

5    A.   I want to say -- well, I guess you could say
6  facing because I'm looking into the aircraft.

7    Q.   Right, and she's stepping off the aircraft.

8    A.   She's stepping off the aircraft, she kind of
9  glances over, and then she just keeps walking.  But it
10 was, like -- like a row of -- you know, people were just
11 floating off the aircraft.  Just ready, you know how it
12 is.  When the plane lands, everybody's up; everybody
13 wants to go.

14   Q.   So were there people in front of her when she
15 stepped off the aircraft?

16   A.   Yes.  There were people in front of her, people
17 behind her, yes.

18   Q.   And when she was stepping off the aircraft,
19 this is when she made this comment, "That was wrong"?

20   A.   Yes, sir.

21   Q.   And how do you know what she was talking about?

22   A.   Well, being that this was the only thing
23 happening on that aircraft, that was the inference, in
24 honesty.

25   Q.   So your reason --



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 86

```
 1      A.    Yeah.

 2      Q.    So you're spec- -- you're speculating what she

 3  was referring to.

 4            MR. McKAY:  Objection to the form.

 5            THE WITNESS:  You can -- yes, that's -- yeah.

 6  BY MR. MAYE:

 7      Q.    Okay.

 8            You earlier testified that you saw a flight

 9  attendant standing with a male flight attendant, a

10  female flight attendant standing with a male flight

11  attendant.

12            When was that?

13      A.    Well, that was when they opened -- when they

14  opened the door.  And it's quite normal.  They'll

15  usually -- you know, you'll kind of have, like -- like,

16  flight attendants standing together kind of telling

17  people good-bye or, you know, have a safe continuing

18  trip, whatever.  So just -- I remember there was a -- a

19  male and a female and then another female.  If I'm

20  looking at the flight, it's, like, male, female, then

21  another female.  I could see three attendants.

22      Q.    And they were on the aircraft.

23      A.    Yeah, they were still on the aircraft.

24      Q.    And you were on the jet bridge.

25      A.    And I'm on the -- yeah, on the jet bridge right
```

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 87

1   in the mouth of the airplane.

2       Q.   And there were passengers walking past them and

3   then exiting the aircraft?

4       A.   Well, we kind of -- well, both.  So initially

5   we let people, you know, kind of exit, exit, exit.  And

6   then once that's kind of finished, then we kind of move

7   in a little bit closer to have -- because you -- you

8   really can't start that conversation.  Unless -- unless

9   there's something physical going on like a fight where

10  we have to actually get --

11      Q.   Um-hum.

12      A.   -- on the plane, we kind of wait for the

13  disembarkment, you know.  And -- and let's say the --

14  the accused party isn't -- you know, is coming off among

15  that crew, we usually will ask the flight attendant to

16  say, "Hey, can you point out, you know, who we're here

17  for?" you know, kind of a thing, if that makes sense.

18      Q.   Were Officers Tripp and White standing with you

19  on the jet bridge while the passengers were deplaning?

20      A.   Yes, sir.

21      Q.   And after the passengers deplaned, did -- where

22  did you, Officer White, and Officer Tripp go?

23      A.   I -- I stayed pretty much on the jet bridge.  I

24  don't ever remember going onto the aircraft.  I believe

25  Officer Tripp -- it's been a while -- and White took



EXHIBIT B

Francois Obasi                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 88

1   custody of the adult, Mr. DelVecchio, and he was then

2   transferred to an awaiting transport car which was on

3   the tarmac, if I remember correctly.

4        Q.   When did Mr. DelVecchia exit the aircraft

5   relative to the other passengers?  Did he --

6        A.   After.

7        Q.   Did he --

8        A.   After.

9        Q.   Go ahead.

10       A.   After.  After they disembarked.

11       Q.   So all the -- all the passengers exited the

12  aircraft, and then Mr. DelVecchia exited, and then

13  Mr. -- Officer White and Tripp took him into custody?

14       A.   Yes, sir.

15       Q.   And where was A.D. at the time Mr. DelVecchia

16  was taken into custody?

17       A.   I believe he -- they had him maybe, like, a

18  couple of seconds behind that, they brought him up.

19       Q.   And who brought him up?

20       A.   A flight -- I'm assuming a flight attendant,

21  because I couldn't see inside of the craft.  So by the

22  time he came up, you know, there were multiple people

23  standing from -- from here in the aircraft.  So I

24  couldn't tell you which one in specific brought him up

25  to that area.



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 89

1      Q.   So when A.D. was toward the front of the

2  aircraft, you were still on the jet bridge; right?

3      A.   Yes.  Yes.  I never actually entered the

4  aircraft.

5      Q.   Okay.  And Officer White and Officer Tripp had

6  taken Mr. DelVecchia into custody?

7      A.   Yes, sir.

8      Q.   So they never had any contact with the flight

9  attendants?

10     A.   I remember them speaking with the flight

11 attendants and giving -- what do you call -- voluntary

12 statements for them, but I -- I don't -- I don't believe

13 I was there for that part of their interview.

14     Q.   Well, I thought you said that after the

15 passengers deplaned, then Mr. DelVecchia deplaned and

16 Officer White and Officer Tripp took Mr. DelVecchia into

17 custody; right?

18     A.   Right.  And took -- and took him to a transport

19 car --

20     Q.   Okay.

21     A.   -- which is waiting right down.  So once he's

22 given -- which would have been probably Officer White,

23 because he was our driver.  So once he's detained in

24 that car, then they can come back, you know, and

25 continue what they're doing.



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 90

1      Q.   Did they come back?

2      A.   Well, yes, they would have had to, yes.

3      Q.   Well, but do you recall whether or not they

4  came back?

5      A.   We got the voluntary statements.  So I'm going

6  to -- yeah, I would -- I would say yes.

7      Q.   Well, I'm asking if you recall if they came

8  back, not -- not any assumptions.  Do you recall either

9  of them coming back?

10     A.   I can't specifically tell you their -- their

11 motions that day.

12     Q.   Okay.  And so -- and you don't recall who gave

13 them the blank voluntary statement forms.

14          MR. McKAY:  Objection to the form.  Asked and

15 answered.

16 BY MR. MAYE:

17     Q.   Who gave the flight attendants -- who gave the

18 flight attendants the voluntary statement forms?

19     A.   No, I can't tell you which officer specifically

20 gave them to them.

21     Q.   Is it possible you gave them the forms?

22     A.   I would -- I would say that's impossible.

23     Q.   That's impossible or possible?

24     A.   Impossible.

25     Q.   Impossible.



Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 91

1          And why is that?

2      A.    Yeah, I don't -- as a supervisor, I don't carry

3  forms.

4      Q.    Okay.

5      A.    Yeah, so it is impossible.

6      Q.    So it would have been either Officer White or

7  Officer Tripp?

8      A.    Yes.  More than likely, the forms probably came

9  from Officer Wright who was driving the car and

10 probably -- you know, what we normally do is the person

11 in the car has all the forms, and then they pass them on

12 to the officer who is making contact, if that makes

13 sense.

14     Q.    Did you observe an officer hand the forms to

15 the flight attendants?

16     A.    I did.  I did observe an officer hand the form

17 and explain how to fill them out and asking them if they

18 had the time to do it because some of our -- you know,

19 sometimes there's connecting flights.  So we can't

20 really -- you know, we can't force them to stay.  We

21 have to kind of collect it later.

22          But I remember -- I remember -- I believe it

23 was Officer Tripp who said, "Hey, these are the forms.

24 Can you fill them out?  You know, we'll wait for them."

25 And then I took off with the -- with the juvenile.



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 92

1    Q.   And when he asked them if they had time, where
2  was the officer located?
3    A.   The officer would have been, like, in the --
4  kind of, like, the end of the jetway, beginning of the
5  aircraft.
6    Q.   And where the flight attendants?
7    A.   Still -- well, in the same general area.  It's
8  like a -- because that area is bigger than -- than, you
9  know, being on the aircraft.  So usually that's where we
10 kind of congregate.
11   Q.   So was it on the aircraft or off the aircraft?
12   A.   In honesty, sir, I believe it's a combination
13 because I remember the flight attendants standing in,
14 like, the doorway and the officers standing on the
15 jetway.
16   Q.   Were the pilots present?
17   A.   In the very beginning, I remember the one which
18 I identified as a pilot was there, but I would say a few
19 minutes later, I don't remember seeing them again.
20   Q.   And do you recall how many flight attendants
21 were on the aircraft?
22   A.   I saw three, but I know there's normally four.
23   Q.   Do you recall how many pilots were on the
24 aircraft?
25   A.   I saw two.  Well, pilot and copilot.  There was



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 93

1  another gentleman -- I believe it was a gentleman --
2  that I remember kind of popped up behind, but I don't
3  remember that person having anything to say.
4       Q.   And you never saw any of your officers
5  interviewing the flight attendants about the incident?
6            MR. McKAY:   Objection to the form.   Asked and
7  answered.
8            THE WITNESS:   Yeah, I -- I didn't -- I was not
9  witness to those interviews.
10 BY MR. MAYE:
11      Q.   You earlier testified that one of the flight
12 attendants made a comment about the relationship between
13 Mr. DelVecchia and A.D., that she thought maybe they
14 weren't father and son.   When did -- when did that
15 happen?
16      A.   That was in the very beginning of -- of our
17 contact with the flight attendants.
18      Q.   Is this before the passengers deplaned or
19 after?
20      A.   That's a good one.   It may have been before.
21 It may have been before.
22      Q.   You never went onto the aircraft; correct?
23      A.   No, sir.
24      Q.   So how did you overhear this?
25      A.   Well, she's standing in the doorway.   That's



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 94

1  where -- well, once the plane lands and they're ready to

2  deboard, the flight attendants stand right in the mouth

3  of the door.  So there were only, like, maybe three,

4  four feet away from each other.

5      Q.   So all the flight attendants were standing at

6  the door?

7      A.   Well, the ones that I could see were standing

8  by the door.

9      Q.   And how many could you see?

10     A.   I could see three people, three flight

11 attendants.

12     Q.   Three flight attendants standing at the door.

13 And what were they doing?

14          MR. McKAY:  Objection to the form.

15          THE WITNESS:  They were just basically telling

16 people to have a good day.

17 BY MR. MAYE:

18     Q.   When -- when you overheard the flight attendant

19 say that she didn't think they were family, what was she

20 doing?

21          MR. McKAY:  Objection to the form.

22          THE WITNESS:  She was just talking.  Just

23 standing talking.

24 BY MR. MAYE:

25     Q.   Talking to whom?



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 95

1      A.   She was kind of looking in our direction.  So I
2   assume she was relaying part of the story to us as
3   officers.
4      Q.   So she was standing in the door by herself?
5      A.   No, sir.  Like I said already, there were
6   multiple attendants in the doorway, and basically the
7   statement was made -- we're standing outside of the
8   aircraft; she's standing in the inside of the aircraft.
9      Q.   And was she speaking to the other flight
10  attendants or speaking to you?
11          MR. McKAY:  Objection to the form.
12          THE WITNESS:  I can't tell you exactly who she
13  was speaking to.  She was just speaking.
14  BY MR. MAYE:
15     Q.   And do you know which flight attendant was
16  speaking?
17     A.   As I said earlier describing her, basically
18  looked like a young white female with kind of light,
19  kind of, like, dirty-blond hair.
20     Q.   Do you know if you the saw a male flight
21  attendant with her at the time?
22     A.   Yes.  There was a black, male flight attendant.
23     Q.   So it was this -- this flight attendant who
24  made this comment, the male flight attendant, and a
25  third flight attendant?

www.oasisreporting.com                          702-476-4500



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 96

1          MR. McKAY:  Objection to the form.

2          THE WITNESS:  Yes.  That I could see.

3   BY MR. MAYE:

4      Q.   Okay.  And what did the third flight attendant

5   look like?

6      A.   They were actually two -- two of them appeared

7   blond, to me.  One -- I would say one -- one was a --

8   looked maybe five years older than the other one, maybe,

9   a little bit older.  One looked a little older than the

10  other one.

11     Q.   When you were speaking with A.D. in the car,

12  was he in decent spirits?

13         MR. McKAY:  Objection to the form.

14         THE WITNESS:  I -- like I say, he wasn't

15  crying.  I can't say -- I guess, yeah, you could say

16  because I was trying my best to make him comfortable.

17  BY MR. MAYE:

18     Q.   So you said he wasn't crying and you were

19  making him feel comfortable.  Do you think you were

20  doing a good job making him feel comfortable?

21     A.   Yes, sir, I think I was doing a good job of

22  trying to build rapport with him because I felt, you

23  know, as a -- he's a 12-year-old boy, 11-, 12-year-old

24  boy.  You know, it's an unusual situation.  So, you

25  know, I just -- I just didn't want to make it harder,



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 97

1  you know, or make him feel like we were the big, bad

2  police or something like that.

3      Q.    And when you were speaking with A.D. in the

4  conference room at the substation, he appeared to be

5  comfortable and in good spirits?

6          MR. McKAY:  Objection to the form.

7          THE WITNESS:  I -- I wouldn't say in good

8  spirits, but he was very mature about what was happening

9  is the best way to describe it.

10 BY MR. MAYE:

11     Q.    He wasn't crying?

12     A.    No, he was not.

13     Q.    And he didn't appear to be distressed?

14         MR. McKAY:  Objection to form.

15         THE WITNESS:  I would -- I would say he was

16 upset, but he was not what you might call, like, overly

17 distressed --

18 BY MR. MAYE:

19     Q.    Okay.

20     A.    -- about the situation.

21     Q.    You said that your office was initially

22 provided very limited information about what the

23 allegations were; correct?

24     A.    Yes, sir.

25     Q.    You were never told that there was an

www.oasisreporting.com                    702-476-4500

EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 98

1  allegation that someone was suspected of human

2  trafficking; correct?

3          MR. McKAY:  Objection to the form.

4          THE WITNESS:  No, not human trafficking.

5  BY MR. MAYE:

6      Q.   Okay.  You were told that there was an

7  allegation of potential inappropriate touching; correct?

8      A.   Yes, sir.

9      Q.   And that's the reason that your office was

10 called to the -- to meet the aircraft; correct?

11     A.   Yes, sir.

12         MR. MAYE:  I have no further questions.  Thank

13 you, Mr. Obasi.

14         THE WITNESS:  Thank you, sir.

15                  FURTHER EXAMINATION

16 BY MR. McKAY:

17     Q.   I know we've kept you here a long time.  I'll

18 try to be very brief in my redirect, sir.

19     A.   I have a four-hour trip to Yuma after this.

20     Q.   Okay.  So it got a little confusing there in

21 Mr. Maye's questions about where the flight attendants

22 were.  So I apologize, but I just want to clear this up.

23         First of all, is it correct to say that you saw

24 three of the four flight attendants?

25     A.   Yes, sir.



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 99

1      Q.   Okay.  And of those three, two were female and
2  one was male; correct?
3      A.   Yes, sir.
4      Q.   The male was African-American, and the females
5  were Caucasian; correct?
6      A.   Yes, sir.
7      Q.   Okay.  And of the two females, one seemed about
8  five years older than the other.
9      A.   Yes.  There was a slight -- there wasn't an
10 extreme age difference, but the -- the one speaking the
11 most or that made a statement was definitely younger.
12     Q.   Okay.  And that person was standing near the
13 male flight attendant; right?
14     A.   Yes.
15     Q.   Okay.  Now I want to get to the nitty-gritty.
16 Were they -- at the time that she was making that
17 statement, did they have their feet planted inside the
18 airplane or outside the airplane?
19     A.   They were inside the airplane.
20     Q.   Okay.  And as far as Mr. Maye's questions about
21 standing in the door, they weren't blocking the door,
22 were they?
23     A.   No.  No.  No, sir.
24     Q.   Passengers could exit the plane in front of
25 them?



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 100

```
 1     A.    Yeah, actually, it's -- I'll describe -- it's
 2  their normal -- usually where they stand as -- as
 3  passengers are leaving the plane.  They kind of have
 4  that spot there pre to the --
 5     Q.    Okay.
 6     A.    -- the cockpit.
 7     Q.    Yes.
 8     A.    Yeah.
 9     Q.    And so -- and so that's where you observed the
10  man and the younger woman flight attendants.
11     A.    Yes.  Yes, sir.
12     Q.    And relative to them, where was this third
13  woman flight attendant?
14     A.    She would have been if you are looking at the
15  plane off to the right side.
16     Q.    Okay.  All right.  So in the aisle of the
17  plane?
18     A.    Well, she came -- well -- so initially, when
19  all the people are getting off, we could see, like, at
20  least two of the flight attendants, and then, like, a
21  pilot kind of sticking his head behind them.  And then
22  after everybody's off, then you see a third person kind
23  of pop up.
24     Q.    Okay.
25     A.    I don't know what's -- what's prior to that,
```



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 101

1   but at the time when I could see three of them, there

2   was no passengers to obstruct, if you know what I'm

3   saying.

4        Q.    Okay.  So you first saw the third female flight

5   attendant after all the passengers had deplaned.

6        A.    Yes, sir.

7        Q.    Okay.  Now, when you have referred to the

8   pilot, do you mean the captain?

9        A.    Yeah, I guess captain, pilot.  And like I said,

10  in honesty, sir, he could have been the co, cocaptain or

11  copilot, but he was the one wearing the fancy uniform

12  that kind of poked his head up, and he's the one --

13       Q.    Okay.

14       A.    -- that made -- made the statement about "my

15  crew."

16       Q.    Of the two of them, did one seem older than the

17  other?

18       A.    Are you talking about the --

19       Q.    The pilot.

20       A.    -- the crew?

21       Q.    The pilots.

22       A.    I -- I honestly cannot answer that because I

23  don't -- I remember the pilot -- I would give him maybe

24  40 to 50ish, but I can't really recall the second person

25  that well.



EXHIBIT B

Francois Obasi                     Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 102

1    Q.   Okay.  Okay.  Now, you're not an expert on

2  pilot procedures and when they need to call and report

3  or request law enforcement, are you?

4    A.   Not at all, sir.  No.

5    Q.   Okay.  Let me ask you about A.D.  When you --

6  when you first saw him, that was when he was being

7  brought off the plane by a flight attendant?

8    A.   Yes, sir.

9    Q.   Okay.  And now, was this the third flight

10  attendant that you just testified about?

11    A.   I -- I would assume, but I didn't really see --

12  (audio distorted) -- him up to the doorway, if you know

13  what I'm saying.  So I don't really -- I can't

14  specifically say who brought him to the door.

15    Q.   Okay.  Now, you mentioned that you were born on

16  Barbados; is that right?

17    A.   Yes.  Yes, sir.

18    Q.   Okay.  Would you describe your ethnic heritage

19  as -- as African-Caribbean?

20    A.   I'm just Caribbean, yes.

21    Q.   Just Caribbean.  Okay.

22         THE COURT REPORTER:  I'm just what?  I'm sorry.

23         THE WITNESS:  I'm just Caribbean or West Indie.

24  BY MR. McKAY:

25    Q.   Okay.



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 103

1      A.   Yeah, we don't put the -- we don't put the

2  "African" in front, but it's okay.

3      Q.   Okay.  Fair enough.

4           With respect to A.D. when you saw him, did you

5  have an impression as to his ethnicity?

6      A.   Yes, sir.

7      Q.   And what was that?

8      A.   By his features, I assumed either kind of like

9  an Ethiopian region.  Right.

10     Q.   Okay.  And --

11     A.   Yeah, that's kind of what I assumed.

12     Q.   And, if you would, what -- what specifically

13  about his features led you in that direction?

14     A.   Usually you -- you -- for -- I mean, like I

15  said, being, you know, from another country, you might

16  say we -- we tend to recognize features pretty well.  So

17  when I saw, like, his -- like, the forehead, the shape

18  of his face, I immediately assumed more of an

19  Ethiopian/Eritrean type background.

20     Q.   Okay.  Now, would you say that for a

21  12-year-old he was tall?

22     A.   Well, probably by American standards.  Like,

23  say -- like, being from Barbados, we are mostly of

24  Nigerian descent.  So our average male is, like, 6-2,

25  6-3.



EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 104

1      Q.   Okay.

2      A.   So he would be -- so he would be average height

3   where I'm from, but in -- on American standards, he's a

4   pretty well-built, you know, 12-year-old.

5      Q.   Okay.

6      A.   Put it that way.

7      Q.   Have you had occasion in your lifetime to sit

8   in the middle seat of an airplane?

9      A.   Oh, yes, sir.

10     Q.   Okay.  Do you think that someone as tall as

11   A.D. could physically have maneuvered in a way that he

12   put his head onto the middle seat occupant's lap while

13   sitting in the window seat?

14          MR. MAYE:  Object to form.

15          THE WITNESS:  That -- having flown -- and I

16   have an older daughter, that's kind of hard to do

17   without some manipulation.

18   BY MR. McKAY:

19     Q.   Okay.

20     A.   Yeah.

21     Q.   Now, when Mr. Maye asked you questions about

22   making an internal assessment, and I think he said -- I

23   think you said there are occasions where something

24   doesn't rise to the level of a case so you don't call

25   the FBI.



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 105

1          Do you remember that?

2     A.   Yes, sir.

3     Q.   Okay.  Were you referring there to the "I don't

4  want to wear a mask" kind of situation?

5          MR. MAYE:  Object to form.

6          THE WITNESS:  Yes, sir.  But after a while, TSA

7  actually took those over so we didn't have to really

8  prosecute with those.  But a lot of those cases are

9  wearing a mask, maybe a verbal argument type thing that

10 there's no real crime.

11 BY MR. McKAY:

12    Q.   And you have some discretion in those cases?

13    A.   Yes, sir.

14    Q.   Okay.  Now, if a report is made that while the

15 plane is in the air in the federal air space a sexual

16 molestation has occurred, that's a fairly serious crime,

17 is it not?

18    A.   Yes, sir.

19    Q.   And that's a crime that, if it occurs in the

20 federal air space, is always the FBI's jurisdiction;

21 correct?

22         MR. MAYE:  Object to form.

23         THE WITNESS:  Always.  Yes, sir.

24 BY MR. McKAY:

25    Q.   Okay.  And so you don't have any discretion in

EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 106

1  those cases to just say we're not going to make a case

2  of this, do you?

3          MR. MAYE:  Object to form.

4          THE WITNESS:  We do not.  We do not.

5  BY MR. McKAY:

6      Q.   Okay.  And in this particular case, isn't it

7  correct that you had already called the FBI before you

8  had spoken with any of the flight attendants?

9      A.   Yes.  I alerted the FBI, and I also -- I just

10 remembered I also called our internal, like, sexual

11 assault experts, you know, just to make sure.

12     Q.   Okay.

13     A.   And they were -- and they were basically, like,

14 not ours, not touching it, not coming out kind of a

15 deal.

16     Q.   And why did they say that to you, your own

17 people?

18     A.   Well, because it was clearly -- it's a

19 jurisdictional issue.

20     Q.   So it was the FBI's jurisdiction?

21     A.   Yeah.  Federal -- federal airways.  There's

22 also the fact of, like, we always say once the door is

23 closed and the plane taxis, FBI.

24     Q.   Yeah.  Okay.  And knowing that it was the FBI's

25 jurisdiction, you didn't take any notes of what people



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 107

1  told you yourself, did you?

2          MR. MAYE:  Object to form.

3          THE WITNESS:  No.  No, I did not.

4  BY MR. McKAY:

5     Q.   Okay.  And you -- I believe you said earlier

6  that -- that your police department might not have even

7  opened a file on it; right?

8     A.   No, not outside of the -- of the

9  computer-generated things that you see.  There would

10 be --

11    Q.   Okay.

12    A.   -- no reason for a case file.

13    Q.   Okay.  And so when you are testifying about

14 your own observations, things that you heard, those are

15 based on -- on your own having -- sorry -- strike that.

16         When you testify about things that you heard or

17 saw yourself, those are based on your specific

18 recollections of what occurred and what you saw.

19         Is that a fair statement?

20    A.   Yes, sir.

21    Q.   Okay.  When you were testifying about what

22 Mr. DelVecchia told you later, those weren't things that

23 you yourself observed; right?

24         MR. MAYE:  Object to form.

25         THE WITNESS:  No, sir.

EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 108

1  BY MR. McKAY:

2      Q.   I mean, you -- you heard him talking about it,

3  but they were not events that you had witnessed; right?

4          MR. MAYE:  Object to form.

5          THE WITNESS:  No, sir, I did not witness it.

6  BY MR. McKAY:

7      Q.   Okay.  And you also -- did you take any notes

8  of, specifically, the details of what he told you?

9      A.   No, sir, I did not.

10     Q.   Okay.  So is it possible that you might have

11  misremembered some of those specific details?

12         MR. MAYE:  Object to form.

13         THE WITNESS:  I would say maybe a word or two

14  or the way it was said but not the general, you know,

15  gist of things.

16  BY MR. McKAY:

17     Q.   Okay.  We just talked about a minute ago, I

18  mean, the -- his telling you that A.D.'s head was in his

19  lap doesn't seem possible now when you think about it,

20  does it?

21         MR. MAYE:  Object to form.

22         THE WITNESS:  Like I said, I -- it doesn't seem

23  possible based on his height, but I think as far as him

24  comforting him, I remember him saying that.

25  /////



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 109

1  BY MR. McKAY:

2      Q.   So could it have been that you just remembered

3  him saying that he was comforting him when he was

4  touching his face?

5          MR. MAYE:  Object to form.

6          THE WITNESS:  That's -- that's possible, sir.

7  BY MR. McKAY:

8      Q.   Okay.  I made a note here that I thought I

9  heard you say an officer's name was White, and then I

10  thought I heard you say an officer's name was Wright.

11     A.   Yes, sir, two different officers.

12     Q.   Okay.  So when you say that Officer Wright was

13  the driver, that's a different person than Officer

14  White.

15     A.   Yes, sir.  It should be M, as in "Mary," Wright

16  and A, as in "Anthony," White.

17     Q.   Okay.

18     A.   And Officer White should have a B behind his

19  call sign.

20     Q.   Okay.  Is Officer Wright, with an R, is that a

21  female officer?

22     A.   No, that's a -- a male officer.  He's actually

23  retired also.

24     Q.   Okay.  But the M, as in "Mary," it was just --

25     A.   No, the M, as in "Mary" was -- (audio



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 110

1  distorted) -- his name is Mart -- Mart -- Martin.

2       Q.   Okay.  Thank you.

3            Who -- what officer would have accompanied --

4  if you know, which officer would have accompanied

5  Mr. DelVecchia into the holding room?

6       A.   That probably initially was Officer Wright and

7  then -- because he's the -- what we call our ramp car,

8  our driving car.  Then he would have left, and another

9  officer would have just kind of sat either in the room

10 or directly outside.

11      Q.   I see.

12           So Officer Wright, with an R, would have

13 delivered Mr. DelVecchia but then would have been

14 replaced by somebody else.

15      A.   Yeah, he's basically like our Uber driver.

16      Q.   Okay.  Do you know who would have come in to

17 replace Officer Wright?

18      A.   At that point it probably -- because we were

19 probably going late, it may have been, like, maybe

20 Berghuis or even Officer Tripp or White.  I believe they

21 were taking turns because directly across from that room

22 is also our main break room.  So it's easy for, you

23 know, officers to congregate there and take turns kind

24 of watching someone in custody.

25      Q.   Okay.  Would the officers that you had just



EXHIBIT B

Page 111

1  named, would they have kept their body cams on even when

2  they were back at the station?

3      A.   Yes.  As long as -- as long as they were

4  watching a suspect or purported suspect, their body

5  cameras would have been on.

6      Q.   And is there also -- like we see on TV, is

7  there also closed-circuit television watching people in

8  the holding room?

9      A.   It's available, but that was not activated.  We

10  usually use that for -- if we have someone in custody

11  that, you know -- you know, maybe one of the big-time

12  drug dealers or drug hauls that can be activated, but it

13  has to be activated by one of our detectives.

14      Q.   I see.  And you don't think it was that night?

15      A.   Oh, I can guarantee it was not.

16      Q.   Was not?  Okay.

17      A.   It was not.

18      Q.   Okay.  Now, you had mentioned that the airline

19  doesn't make a decision to call the FBI, but the airline

20  does make a decision to call law enforcement of some

21  kind, doesn't it?

22      A.   Yes, sir.

23      Q.   Okay.  All right.  And the information that

24  would have been put into any kind of a call log would be

25  the information as it's received from the ACC, the



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 112

1  aircraft control center?

2      A.   Yes, sir.

3      Q.   And I'm sorry.  I misspoke.  The airport

4  control center; is that right?

5      A.   Yes, sir.

6      Q.   Okay.  And the airport control center would

7  necessarily get the information coming from the airline?

8      A.   Yes.  They --

9           MR. MAYE:  Object to form.

10 BY MR. McKAY:

11     Q.   Okay.  I'm sorry.  What else were you going

12 to --

13     A.   They either get it from the airline or directly

14 from the cockpit.

15     Q.   Okay.  And speaking of the cockpit, when you

16 spoke to the pilot, he told you that the flight

17 attendants had told him enough to make the call; is that

18 correct?

19     A.   Well, the way he put it is that his crew -- his

20 crew basically alerted him to an incident, and when

21 his -- when his whole crew, you know, alerts him, he

22 pretty much has to call.

23     Q.   Okay.  Did he say it that way, or was that your

24 interpretation?

25     A.   No, he basically -- the way I took it and the



EXHIBIT B

Page 113

1  way he was saying it, it came across almost apologetic.

2      Q.   He -- you had testified in response to

3  Mr. Maye's questions that the pilot told you something

4  that was enough to make the call.  And my question is

5  how was that conveyed to you, that there was a threshold

6  of some sort?

7      A.   That's just what he said.  He never -- there

8  was never a comment -- a conversation of a threshold of

9  when he has to call or needs to call.  I think he was

10  just saying that, hey, you know, if my whole crew is

11  coming to me about a problem, I'm calling.

12      Q.   Okay.

13      A.   If that makes sense, yeah.

14      Q.   Okay.  But did he ever say to you that the

15  entire crew had seen the alleged fondling?

16      A.   He didn't say that they saw it.  He just said

17  that the crew, like, complained to -- to him.

18      Q.   Okay.

19      A.   He never said the word "saw."

20      Q.   Okay.  With respect to your conversation with

21  A.D., you testified in response to Mr. Maye's questions

22  that something rang a bell in Mr. Maye's discussion or

23  question about a prior flight.  Was it the flight that

24  rang a bell to you or the fact that it happened on a

25  flight?



EXHIBIT B

Francois Obasi                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 114

1      A.   No.  It was when he said about a prior
2  incident -- -
3      Q.   Yes.
4      A.   -- because -- because I remember -- I remember
5  A.D. basically said, you know -- and I think that's --
6  again, my perception talking to this child -- why he was
7  not overly upset because this had happened before.
8      Q.   Okay.
9      A.   It wasn't brand-new to him.  So, yeah, he -- he
10  said basically, like, yeah, we -- like, were on another
11  flight.  He didn't tell me, like --
12      Q.   Okay.
13      A.   -- you know, what flight, whatever.  Just that
14  it happened before on a flight that they had been
15  separated.
16      Q.   Did he at any time tell you that the prior
17  incident on a flight had involved an allegation of
18  inappropriate touching?
19      A.   No.  I don't remember that, no.
20      Q.   Okay.
21      A.   And if I could clarify.
22      Q.   Go ahead.
23      A.   The juvenile actually never mentioned
24  inappropriate touching.
25      Q.   Okay.  And when you say "the juvenile," you



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 115

1   mean A.D.?

2      A.    A.D.  A.D.  I'm sorry.  A.D. never -- he never

3   referred to anything like that.

4      Q.    Okay.

5      A.    He just called it being separated from his dad.

6   He never mentioned anything about inappropriate behavior

7   on his father's part.

8      Q.    Okay.  He never said a thing about

9   inappropriate touching on his father's part.

10     A.    No, sir.

11     Q.    In any context whatsoever?

12     A.    No, sir.  Not to me, no.

13     Q.    Okay.  You had agreed with Mr. Maye that

14  certain things Mr. Maye described would raise what you

15  called red flags.  And my question to you is did

16  anything that A.D. said to you raise any red flags?

17     A.    No, sir.

18     Q.    Okay.  Mr. Maye got you to agree that "See

19  Something, Say Something" is -- is a valid law

20  enforcement technique.

21         Do you remember that?

22     A.    Yes, sir.  Yes, sir.

23     Q.    Do you believe that "See Something, Say

24  Something" is a license to commit racial discrimination?

25         MR. MAYE:  Object to form.



EXHIBIT B

Francois Obasi                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 116

1          THE WITNESS:  Not at all, no.

2   BY MR. McKAY:

3      Q.   Okay.  Is it wrong to tell a lie that gets

4   somebody in trouble with the police?

5          MR. MAYE:  Object to form.

6          THE WITNESS:  Yes, sir.

7          MR. McKAY:  All right.  That's all I have.

8   Thank you very much, sir.

9          THE WITNESS:  You're welcome.

10                 FURTHER EXAMINATION

11  BY MR. MAYE:

12     Q.   I just have a few more questions.

13          A.D. never told you that a flight attendant

14  treated him inappropriately, did he?

15     A.   No, sir.

16     Q.   That a flight attendant touched him

17  inappropriately?

18     A.   No, sir.

19     Q.   That a flight attendant did anything that could

20  be perceived as sexual assault?

21     A.   No, sir.

22     Q.   You said -- you testified earlier that you

23  requested the FBI's assistance after you received the

24  message from the airport control center; correct?

25     A.   Yes.  I -- I honestly don't remember the time

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 117

1  frame, but, yes, I -- I'm the one that called.

2       Q.   Did you request the FBI's assistance before you

3  arrived at the gate?

4       A.   I actually believe so.  I called -- well, I

5  called their -- their "in bucket" number, as you call

6  it, or the on-call officer because we were told, you

7  know, of the type of case it was.  And a lot of that was

8  more just to alert them as to what was going on because

9  it's a -- like I said, it's an on-call -- they're not in

10 an office.  It's a from-home situation.  So it's more of

11 a heads-up of, hey, this may be going on.

12      Q.   So when the aircraft arrived and you spoke with

13 the crew, you could have decided, hey, this doesn't

14 warrant going to the FBI; correct?

15      A.   In this case, I would say no.

16      Q.   And why?

17      A.   Basically because -- well, one, I wasn't

18 present; and, two, the allegation was made.  So for --

19 for me to step outside of my jurisdiction even for a

20 case that's felonious and this -- you know, I don't know

21 what the word -- I mean, that would bring this much

22 backlash if it's true, you know, like I said, it's

23 better to be, I guess, safe than sorry.

24      Q.   Okay.

25      A.   But this is -- that wasn't my decision to make,

www.oasisreporting.com                    702-476-4500

EXHIBIT B

Francois Obasi                     Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 118

1  in honesty, sir.

2      Q.   So you -- so you got the FBI involved based on

3  the message from airport control center that the captain

4  said there was an allegation of inappropriate touching.

5      A.   Yes, sir.

6      Q.   Okay.  Now, if the message came in and the

7  message was there's an allegation that someone spilled

8  Diet Coke on another passenger, did you -- would you

9  have a discretion there to not request FBI's

10 involvement?

11     A.   Yes.

12         MR. McKAY:  Objection to form.

13         THE WITNESS:  Yeah, if it's something -- I'm

14 sorry.  Something that my --

15         MR. McKAY:  Sorry.

16         Objection to form.  Calls for speculation.

17 BY MR. MAYE:

18     Q.   You can answer.  I'm sorry, I couldn't hear

19 your answer.

20     A.   Oh, I'm sorry.  I said, yes, sir, for something

21 that minor that could be handled on scene, we -- we

22 would definitely wait before calling the FBI.

23     Q.   So you do have discretion, but it's based on

24 what the allegation is.

25     A.   Yes, sir.



EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 119

1    Q.    Okay.  And in this case when the allegation was

2    there's suspected inappropriate touching, you made the

3    decision, hey, I think this warrants getting the FBI

4    involved.

5    A.    Yes.

6          MR. McKAY:  Objection to the form of the

7    question.

8    BY MR. MAYE:

9    Q.    Okay.

10   A.    Yes, sir.

11   Q.    Okay.  And so your decision to get the FBI

12   involved was based exclusively on the information that

13   was communicated to you by the airport control center;

14   correct?

15   A.    I would say, yes, based on that information and

16   severity if it was true.

17   Q.    Better safe than sorry.

18   A.    Yes, sir.

19   Q.    Okay.  Did you speak with anyone to prepare for

20   this deposition?

21   A.    Excuse me?

22   Q.    Did you speak with anyone to prepare for your

23   deposition?

24   A.    No.  We -- we did a test run to make sure that

25   my connection worked.  That was it.



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 120

1     Q.   And who did that test run?

2     A.   Mr. McKay.

3     Q.   And did you ever -- have you ever spoken with
4  Mr. McKay about your knowledge about this incident?

5     A.   We -- we did speak -- yeah, we spoke, actually,
6  pretty early on by phone.

7     Q.   And what did you talk about?

8     A.   Just what happened and the fact that he was
9  representing the -- the plaintiff, I guess.  I don't
10 know what the right word is for it.

11    Q.   And you shared with him the information that
12 you're aware of?

13    A.   Yes, sir.  Not -- not as probably I should say
14 in-depth as today, but it was just basic -- basic
15 questions of, you know, what happened, time, stuff like
16 that.

17    Q.   Did he ever show you any documents?

18    A.   No, sir.  This is by telephone.

19    Q.   And that was the only time you spoke with him?

20    A.   Yes, sir.  Yeah, we've only ever spoken by
21 telephone.  We've never gotten any, like, documents
22 about this case or anything like that.

23    Q.   I'm sorry.  How many times did you speak with
24 him by telephone?

25    A.   I think we spoke twice, but the -- part of it



EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 121

1   was also because, again, the reason why I wasn't -- I

2   didn't connect it before, I downloaded a spam blocker

3   that kind of took over my phone, and I didn't realize

4   it.  So we had to kind of clear that up first.  So we

5   kind of spoke about that, and then he wanted to make

6   sure I would be able to connect with you guys properly.

7        Q.   Just to clarify, you don't know or you don't

8   recall who escorted A.D. from the back of the aircraft

9   to the front of the aircraft?

10       A.   No, sir.  I wouldn't be able to see that, guys,

11  from where I'm standing -- or I was standing.

12       Q.   Okay.  Um -- or strike that.

13            You said you initially contacted the FBI based

14  on the message from airport control center to give them

15  a heads-up.

16            Did you then follow up with them and say, hey,

17  this is still a go, or what happened then?

18       A.   Yes, sir.  Yes.  Then the follow-up would have

19  been a confirmation to, yes, we need you to come out.

20  And I -- because I also wanted to make sure that one of

21  their agents was qualified to speak to an adolescent.

22       Q.   And when did you make that follow-up call?

23       A.   I believe that was after we arrived back at the

24  substation because that's about a -- what is it? --

25  like, five-minute trip from the aircraft.



EXHIBIT B

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 122

1      Q.    And at that point you were aware that

2  Mr. DelVecchia and A.D. were father and son; correct?

3      A.    Yes, sir, yes.

4      Q.    And you could have at that point -- had you

5  believed it was warranted, you could have called the FBI

6  and said, hey, you know what?  I've spoken with the

7  child, I've spoken with the alleged perpetrator, and I

8  don't think it's warranted for the FBI to interview

9  either of them.

10          You could have done that right?

11          MR. McKAY:  Objection to form.  Calls for

12  speculation.

13          THE WITNESS:  Well, yes, sir, but I never did a

14  full interview of Mr. -- of the adult, of

15  Mr. DelVecchio.

16  BY MR. MAYE:

17     Q.    I understand that, sir.  But it's in your -- in

18  your authority to do a -- to have done that.

19          MR. McKAY:  Objection to the form.

20  Argumentative.

21          THE WITNESS:  Yes, sir.

22          MR. MAYE:  Okay.  I have no further questions.

23  Thank you, Mr. Obasi.  Appreciate it.

24          THE WITNESS:  Thank you, sir.

25          MR. McKAY:  Sir, what's going to happen next is



EXHIBIT B

Francois Obasi                           Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 123

1  that the court reporter is going to type up a formal

2  transcript of this, and you have the right to look it

3  over and proofread it and make any changes or

4  corrections.

5          I would recommend that you do so in this case

6  since it's being taken remotely and there has been some

7  echo that might have caused her to misunderstand

8  something that you said at the end of a sentence.

9          So when the transcript is ready, which usually

10 takes a week or two, the court reporter or I will get in

11 touch with you to let you know it's available for you to

12 review, and then you can go through it and -- and note

13 any changes, corrections, or even if you remember

14 something that you had forgotten today, you have the

15 right to put that in and just provide a little

16 explanation that, you know, it was something that you

17 remembered later.  Okay?

18          THE WITNESS:  Yes.  Yes, sir.

19          MR. McKAY:  All right.  Okay.  Thank you.

20 Thank you very much for your time today.  We appreciate

21 your coming and sitting in your garage.  I know that

22 hasn't been easy.  I appreciate it very much.

23          THE WITNESS:  Like I said, I have a five-hour

24 drive after this.  So it's okay.

25          MR. McKAY:  Oh, boy.  Well, I hope we haven't



EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 124

1  bored you too much.  Get some coffee.

2          MR. MAYE:  Yes, safe travels.

3          THE WITNESS:  Thank you very much.

4          THE VIDEOGRAPHER:  This concludes the

5  deposition of Francois Obasi on -- excuse me -- on

6  September 15th, 2022.  The time is 11:55 a.m., and we are

7  off the video record.

8          MS. REPORTER:  Could I get counsels' transcript

9  orders on the record, please, whether you like hard copy

10 or electronic.

11         MR. McKAY:  I do not like paper one little bit.

12 So I only want electronic, please, and I do request a

13 transcript and also a copy of the video.

14         THE VIDEOGRAPHER:  Okay.

15         MR. MAYE:  Same.  Same order for us.  Thank

16 you.

17         THE VIDEOGRAPHER:  Same order.  Okay.  Thank

18 you.

19         (Deposition concluded at 11:56 a.m.)

20         (Exhibits 1 through 4 were marked.)

21

22

23

24

25

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

```
                                                        Page 125
 1                      CERTIFICATE OF WITNESS

 2    PAGE     LINE    CHANGE                  REASON

 3    _____

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19                       *   *   *   *   *

20          I, FRANCOIS OBASI, witness herein, do hereby
      certify and declare under penalty of perjury the within
21    and foregoing transcription to be my deposition in said
      action; that I have read, corrected, and do hereby affix
22    my signature to said deposition.

23

          _____   _____
24        FRANCOIS OBASI
          Witness                                Date
25
```



EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Page 126

1                    REPORTER'S CERTIFICATE

2

   STATE OF NEVADA            )
3                             ) ss
   COUNTY OF WASHOE           )

4

5          I, Dawn Bratcher Gustin, a duly certified court
   reporter licensed in and for the State of Nevada, do
6  hereby certify:

7          That I reported the taking of the deposition of
   the witness, FRANCOIS OBASI, at the time and place
8  aforesaid;

9          That prior to being examined, the witness was by
   me duly sworn to testify to the truth, the whole truth,
10 and nothing but the truth;

11         That I thereafter transcribed my shorthand notes
   into typewriting and that the typewritten transcript of
12 said deposition is a complete, true, and accurate record
   of the proceedings to the best of my ability.

13

14         I further certify that (1) I am not a relative,
   employee, or independent contractor of counsel of any of
   the parties; nor a relative, employee, or independent
15 contractor of the parties involved in said action; nor a
   person financially interested in the action; nor do I
16 have any other relationship with any of the parties or
   with counsel of any of the parties involved in the
17 action that may reasonably cause my impartiality to be
   questioned; and (2) that transcript review pursuant to
18 FRCP 30(e) was requested.

19         IN WITNESS WHEREOF, I have hereunto set my hand
   in the County of Washoe, State of Nevada, this 29th day
20 of September 2022.

21

22         _____
           Dawn Bratcher Gustin, CCR 253, RPR, CRR
23

24

25

www.oasisreporting.com                                    702-476-4500

EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**1**

**1**
14:11 33:15,17 65:4,6
124:20

**10**
12:23

**10651**
8:22

**11-**
74:16 96:23

**11:14**
65:23,24

**11:55**
124:6

**11:56**
124:19

**12-year-old**
74:16 96:23 103:21
104:4

**15**
12:23 14:8 24:11

**15th**
124:6

**18**
62:20

**2**

**2**
29:3 33:13,16,17
34:12

**20**
24:11

**2019**
9:24 31:3 33:22 59:7

**2022**
124:6

**21.5**
9:15

**2114**

**64:1**

**21:13:55**
60:5,18 61:7

**23:14**
64:19

**25**
21:12

**28**
9:24 59:7

**3**

**3**
14:11,16,21 24:14
33:22 35:13,17,18
58:9 63:7

**30**
21:13 23:11

**30-to-40-minute**
10:9

**30-yard**
42:21

**4**

**4**
29:10 58:8,14,15,19
124:20

**40**
101:24

**45**
23:11

**5**

**50ish**
101:24

**55**
61:12 63:8

**6**

**6-2**

**103:24**

**6-3**
103:25

**7**

**7**
28:23

**79**
63:8

**8**

**89129**
8:23

**9**

**90**
55:6

**91**
63:7,8

**9:13**
61:11

**A**

**A.D.**
8:11,12 13:5 20:3
38:17 41:7 42:11
45:24 56:6,15 69:21
70:1 71:18,19,20
73:16 77:19,22 80:10,
24 88:15 89:1 93:13
96:11 97:3 102:5
103:4 104:11 113:21
114:5 115:1,2,16
116:13 121:8 122:2

**A.d.'s**
77:9 108:18

**a.m.**
124:6,19

**abbreviations**
60:14

**ability**
35:4

**absolutely**
7:16 26:10 48:15
74:21

**ACC**
11:13 111:25

**accepted**
37:24

**access**
32:7

**accompanied**
110:3,4

**accompanying**
13:15 38:17

**accurately**
8:4

**accusation**
22:24

**accused**
54:8,18,21 82:8 87:14

**accuser**
54:2

**action**
10:1 19:21 72:12
75:12 76:12

**activated**
111:9,12,13

**actual**
82:25

**add**
7:16 53:6

**addition**
12:7

**address**
8:19 9:3

**addressed**
5:13

**addresses**
28:15



EXHIBIT B

Francois Obasi

Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**adolescent**
121:21

**adopted**
38:10

**adoptive**
14:3 74:7

**adult**
20:4,6 24:13 34:22
39:6 56:10 79:14,15,
16 88:1 122:14

**adult/minor**
82:24

**affectionate**
20:6

**affectionately**
20:5

**afraid**
40:11

**African**
81:9 103:2

**African-american**
13:9 99:4

**African-caribbean**
102:19

**age**
21:11 22:25 99:10

**agents**
22:18 23:7,23 121:21

**agree**
80:2 115:18

**agreed**
115:13

**agreement**
61:3

**ahead**
6:21,25 11:8 19:5,19
26:7 31:8,25 32:2
34:15 36:14,16,18
39:3 53:24 73:22 88:9
114:22

**aid**
64:5

**air**
10:24 53:15 72:12
105:15,20

**air-**
13:19

**aircraft**
10:20,21 12:17 14:17
15:8,11 16:5,24,25
35:5 38:7 47:4 52:10,
15 67:7 70:2 71:17
74:17 77:13 83:14,16,
19 84:19,24 85:2,6,7,
8,11,15,18,23 86:22,
23 87:3,24 88:4,12,23
89:2,4 92:5,9,11,21,24
93:22 95:8 98:10
112:1 117:12 121:8,9,
25

**airline**
11:16 17:4 20:14,15
53:7 55:7,12,22 82:24
111:18,19 112:7,13

**airlines**
19:11 20:22 45:2,3,10
55:1,5 82:13

**airplane**
15:13 16:14 30:13
31:21 32:12 50:9
71:14 87:1 99:18,19
104:8

**airport**
10:7,13,16,21,25
11:13,18 12:15 14:9
15:2 26:24,25 27:2,7,
11,14 35:8 55:12
58:17 59:16,20,23
61:23 62:18 65:17
66:17 67:1 81:2 112:3,
6 116:24 118:3 119:13
121:14

**airways**
106:21

**aisle**
100:16

**alcohol-related**

51:25

**alert**
79:8,9,10,11 117:8

**alerted**
12:21 19:24 20:11
68:6 106:9 112:20

**alerts**
112:21

**allegation**
53:8 74:10,14 75:14
76:11,12 78:13,20,23
98:1,7 114:17 117:18
118:4,7,24 119:1

**allegations**
56:15,23 76:8,17
97:23

**alleged**
68:2 113:15 122:7

**allowed**
56:7

**allowing**
24:20

**Amanda**
29:4 30:18

**American**
103:22 104:3

**and/or**
67:10

**Anthony**
63:18 109:16

**anytime**
16:23 36:14 49:25

**apologetic**
113:1

**apologize**
98:22

**apparently**
31:3,14

**appeared**
30:21 31:20 43:6 96:6
97:4

**appears**
28:19

**apply**
8:9

**applying**
27:22

**area**
13:19,20 23:23 37:23
38:22 39:1,18 42:22
43:3 44:2 71:20 88:25
92:7,8

**argument**
105:9

**argumentative**
78:16 79:18,24 80:5,
18 122:20

**arguments**
51:23

**arm**
27:16

**arrest**
53:14

**arrested**
44:12

**arrival**
52:14

**arrive**
15:8 64:10

**arrived**
9:25 15:11 32:11 38:9
43:12,19 62:13 117:3,
12 121:23

**arriving**
10:5 14:17

**articulate**
36:8

**ascertain**
56:20

**assault**
106:11 116:20

**assaults**
52:12



EXHIBIT B

Case 2:19-cv-01322-KJD-DJA   Document 247-3   Filed 06/06/23   Page 130 of 156

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**assessment**
104:22

**assigned**
60:3 62:10 63:7,10,17
65:11

**assistance**
10:11 116:23 117:2

**assume**
7:22 82:7 95:2 102:11

**assumed**
14:2 72:11 103:8,11,
18

**assuming**
88:20

**assumption**
68:22

**assumptions**
90:8

**assure**
40:12

**assured**
40:21

**attached**
26:3,16

**attack**
52:3

**attendant**
17:14,15 18:5 28:23
29:11 30:1,11,12,20
54:5 73:18 86:9,10,11
87:15 88:20 94:18
95:15,21,22,23,24,25
96:4 99:13 100:13
101:5 102:7,10
116:13,16,19

**attendants**
17:19 20:24 21:18,23
22:14 24:4 28:7,25
29:7,13,17 30:13
31:11 51:24 54:3,6
56:5,17 67:18 68:15,
17,21,25 69:18 80:9
84:13 86:16,21 89:9,
11 90:17,18 91:15

92:6,13,20 93:5,12,17
94:2,5,11,12 95:6,10
98:21,24 100:10,20
106:8 112:17

**attention**
10:6

**attorney**
5:18

**audio**
102:12 109:25

**authority**
79:12 122:18

**automatically**
32:18

**Avenue**
8:22

**average**
103:24 104:2

**Aviation**
27:1,16

**awaiting**
88:2

**aware**
73:16 120:12 122:1

───────────────

**B**

**back**
24:13 28:1 32:6,14
34:23 35:13 36:4 38:4
39:14 47:2,3 48:4,7,
18,22 49:1,2 51:21
65:6 70:11 71:5,6,8,
10,14 72:25 73:12
74:2 84:1,3 89:24
90:1,4,8,9 111:2
121:8,23

**background**
8:17 13:16 21:19 22:6
103:19

**backlash**
58:5 117:22

**bad**

48:6 80:4 97:1

**Barbados**
49:11 102:16 103:23

**based**
14:1,12 20:13,16
22:23 23:23 37:4 41:8
60:21,22,23 76:7
80:14,19 107:15,17
108:23 118:2,23
119:12,15 121:13

**basic**
16:22 24:7 120:14

**basically**
11:10 15:8 17:18 19:7,
20 20:2 22:23 24:9,13
27:15 35:13 36:9,20
38:22 40:13 44:24
46:1,24 50:2 52:14
53:3 54:2 56:13 70:5,
24 71:16 73:12 79:6
81:21 83:24 94:15
95:6,17 106:13 110:15
112:20,25 114:5,10
117:17

**basis**
76:18

**battered**
72:5

**bear**
29:15 33:8

**bearing**
74:10

**beat**
6:20

**begin**
7:17

**beginning**
42:23 92:4,17 93:16

**behavior**
115:6

**believed**
122:5

**bell**

78:6 81:11 113:22,24

**Berghuis**
64:20,21,25 65:3,13,
18,22 110:20

**big**
39:18 57:25 97:1

**big-time**
111:11

**bigger**
92:8

**bit**
7:11 22:8,11 33:23
73:2 87:7 96:9 124:11

**black**
17:14 18:25 19:15
36:22,23 37:14 50:18
95:22

**blah**
54:14,15 81:18,19

**Blane**
60:20 62:6,9

**blank**
90:13

**blanket**
70:8,9,22

**blind**
80:3

**blocker**
121:2

**blocking**
99:21

**blocks**
27:21

**blond**
20:25 21:6,9,24 22:2
32:3 96:7

**blonder**
32:8

**blow**
25:9 58:12

**blown**



EXHIBIT B

Francois Obasi                                      Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

28:1

**blue**
64:19

**Bluetooth**
11:23 12:3

**body**
32:22 111:1,4

**body-worn**
32:13

**Bond**
28:23

**bored**
124:1

**born**
49:10 102:15

**bottom**
28:16

**boy**
20:7 74:16 96:23,24
123:25

**bracket**
63:9

**Bradley**
64:19

**brand-new**
114:9

**Bravo**
60:19

**break**
110:22

**Brian**
5:20 58:21

**bridge**
86:24,25 87:19,23
89:2

**briefly**
17:13 42:19 43:8 44:9
56:19 68:4

**Bright**
31:2,19 32:3 33:9,22

**Bright's**
31:17

**bring**
23:1 64:8 117:21

**broad**
78:23

**broadened**
79:4

**Bronx**
49:13

**Brooklyn**
49:14,17

**brother**
9:1

**brought**
32:10 72:9 88:18,19,
24 102:7,14

**brown**
82:17

**brunette**
20:24 21:24

**bucket**
117:5

**build**
39:22 96:22

**business**
49:19

**button**
7:10 66:4

---

**C**

**CAD**
59:15

**call**
10:7,8 11:18 12:22
14:20 17:21 23:8 24:3
25:24 27:2 32:22
38:22 47:10 49:23
50:3,12 52:9,24 54:25
57:3 58:16 59:6,14,25
60:2,3 62:1 63:17 64:6
65:8,9 66:5,19,20,22

**called**
67:1,20 68:11 89:11
97:16 102:2 104:24
109:19 110:7 111:19,
20,24 112:17,22
113:4,9 117:5 121:22

**called**
17:18,23 22:18 43:17
51:14 52:7 58:16 68:6
81:1,2 98:10 106:7,10
115:5,15 117:1,4,5
122:5

**calling**
113:11 118:22

**calls**
10:24 51:25 52:2
61:24 79:18 118:16
122:11

**calm**
40:9

**camera**
32:7,13,22

**camera's**
55:21

**camera-monitored**
38:23

**cameras**
111:5

**cams**
111:1

**captain**
80:11,15,20 101:8,9
118:3

**car**
64:8 88:2 89:19,24
91:9,11 96:11 110:7,8

**card**
49:19 50:1

**care**
79:11

**careful**
7:11,18 38:5

**caressing**
74:16,19

**Caribbean**
49:10 102:20,21,23

**Carolina**
10:1 13:19 37:4 49:8

**carry**
91:2

**cars**
35:12

**case**
8:7 12:10 20:23 22:16,
17 47:8 54:16,22,25
55:23 56:4,14 57:11
76:1,14 77:3 82:22
104:24 106:1,6 107:12
117:7,15,20 119:1
120:22 123:5

**cases**
41:2 52:20 53:17 75:1
82:21 105:8,12 106:1

**Caucasian**
50:17 99:5

**caused**
16:13 19:22 51:2
123:7

**cell**
38:22

**center**
10:8,13,17,22 11:1,13,
18 26:24 27:11 60:11
66:17 81:2 112:1,4,6
116:24 118:3 119:13
121:14

**central**
23:6

**chance**
6:5 27:25

**change**
31:21

**changed**
53:12

**charge**
15:1

OASIS
REPORTING SERVICES

EXHIBIT B

Case 2:19-cv-01322-KJD-DJA   Document 247-3   Filed 06/06/23   Page 132 of 156

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Chelsie
33:22

child
12:9 41:18 42:9,12
51:3 75:15 78:9 79:15
114:6 122:7

child's
22:25

children
21:15 23:2 41:2

chitchatter
39:19

chosen
42:4

circumstances
7:25 78:19

civil
55:6

civilian
61:13 83:1

claims
42:8

clarify
37:8 41:12 114:21
121:7

Clark
26:25 27:16

class
18:25 19:2,8,10 20:13,
16,17,19,20,21 34:11

cleaners
27:17

clear
7:17 10:19 39:4 40:14
49:22 66:24 68:5
98:22 121:4

clicking
66:3

close
43:14,21

closed
106:23

closed-circuit
111:7

closer
34:3,8 87:7

clue
60:7 66:6

cocaptain
101:10

cockpit
100:6 112:14,15

coffee
124:1

Coke
118:8

collect
91:21

collected
28:20

color
21:4

column
60:19

combination
81:8 92:12

comfortable
39:21 40:21 96:16,19,
20 97:5

comforting
47:1 70:7,24 108:24
109:3

comment
85:19 93:12 95:24
113:8

comments
44:23

commit
115:24

committed
53:9 55:18 75:1

communicated
119:13

complained
113:17

complete
24:11 45:10 54:20
74:15,22

computer-generated
107:9

concentrate
24:2

concentrating
82:19

concern
78:13

conclude
50:8

concluded
124:19

concludes
124:4

conduct
53:9 55:15 76:17

conducted
67:9 80:23

conference
38:24 39:16 42:21
97:4

confirmation
121:19

confronted
70:20

confused
82:3

confusing
98:20

congregate
92:10 110:23

connect
121:2,6

connected
10:21 83:13

connecting
91:19

connection
119:25

consist
53:22

contact
15:9 26:1 27:10 48:16
80:15 89:8 91:12
93:17

contacted
121:13

context
115:11

continue
58:2 89:25

continuing
61:2 86:17

control
10:7,13,17,21,25 11:1,
13,18 12:15 26:24
27:11 52:23 55:9
61:23,24 66:17 67:2
81:2 112:1,4,6 116:24
118:3 119:13 121:14

controller
27:2,7

conversation
7:15 36:3,6 38:13 44:8
47:14 49:2 67:19 70:1
72:23 78:1 87:8 113:8,
20

conversations
45:23

conveyed
113:5

conveyor
18:3

coordinate
52:16 64:7

coordinated
64:11



EXHIBIT B

Case 2:19-cv-01322-KJD-DJA   Document 247-3   Filed 06/06/23   Page 133 of 156

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**copilot**
11:10,15 92:25 101:11

**copy**
124:9,13

**correct**
9:9 39:12 40:24 51:11
55:23 56:2,6 57:11,19
69:18 76:8,19 77:4
93:22 97:23 98:2,7,10,
23 99:2,5 105:21
106:7 112:18 116:24
117:14 119:14 122:2

**corrections**
123:4,13

**correctly**
34:23 40:1 46:10,25
49:17 65:16 88:3

**corroborated**
74:7

**counsel**
6:16

**counsels'**
124:8

**country**
103:15

**County**
27:1,16

**couple**
5:23 6:9,10 37:3 42:19
88:18

**court**
6:5,13,14 7:4,5 8:3,10
45:6 46:4 102:22
123:1,10

**courtroom**
6:17

**COVID**
51:21,22

**coworkers**
20:11

**CPR**
52:3

**craft**
88:21

**created**
25:25

**credible**
74:11,14

**crew**
17:5,9,22 57:8 67:14,
17 68:6 82:12 87:15
101:15,20 112:19,20,
21 113:10,15,17
117:13

**crime**
26:6 53:9 55:11,18
76:20 105:10,16,19

**crimes**
75:1

**criminal**
55:5

**criteria**
17:21

**crowd**
52:23

**crying**
96:15,18 97:11

**current**
78:11,13

**custody**
88:1,13,16 89:6,17
110:24 111:10

---

**D**

---

**dad**
9:18,19 39:5 40:11
115:5

**dark**
20:24 21:24 82:16

**darker**
22:1 31:2

**daughter**
9:1,21 46:3,5,9,11
104:16

**daughter's**
74:19

**day**
30:22 31:15 72:17,20,
24 90:11 94:16

**deal**
16:20 106:15

**dealers**
111:12

**dealt**
7:1

**deboard**
94:2

**decades**
40:24

**December**
33:22

**decent**
96:12

**decide**
55:7

**decided**
57:17 117:13

**decides**
52:4

**decision**
44:10 54:21 55:11,13,
16,23 56:1 57:10
75:25 76:5,6,7 111:19,
20 117:25 119:3,11

**defendants**
5:20

**definite**
69:1

**delay**
61:22

**delivered**
110:13

**Delvecchia**
11:3 43:3 44:7 45:24
47:25 48:21 50:25
56:5,23 57:9,25 69:20

70:1,4 71:6 72:16
73:16,23 77:9,12
80:10 88:4,12,15 89:6,
15,16 93:13 107:22
110:5,13 122:2

**Delvecchia's**
8:8,13

**Delvecchias**
5:18

**Delvecchias'**
12:6

**Delvecchio**
39:5 48:4 57:1 70:5
88:1 122:15

**departed**
45:22 65:5

**department**
9:6,9,14 26:2 32:15,20
58:16 59:7 79:1 107:6

**department's**
22:17

**depends**
75:12

**depicted**
31:2 33:24 34:12

**deplaned**
87:21 89:15 93:18
101:5

**deplaning**
87:19

**deposition**
5:19,24 29:3 31:18
33:10,21 59:2 119:20,
23 124:5,19

**depositions**
7:6

**depth**
68:3

**descent**
103:24

**describe**
81:25 82:17 97:9


EXHIBIT B

Case 2:19-cv-01322-KJD-DJA   Document 247-3   Filed 06/06/23   Page 134 of 156

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

100:1 102:18

**describing**
95:17

**description**
30:15 72:2

**descriptions**
14:2

**destination**
12:24

**detail**
77:22

**details**
16:16 17:24 28:4 68:2
108:8,11

**detain**
22:21,24 23:19 53:19
56:13

**detained**
42:18 44:12 89:23

**detective**
9:6,8

**detectives**
111:13

**determine**
22:20,22 76:18

**determined**
22:23

**Diet**
118:8

**difference**
31:4 42:21 99:10

**differentiating**
73:1

**differently**
17:7

**difficulty**
8:3

**direction**
95:1 103:13

**directly**
10:21 110:10,21

112:13

**dirty-blond**
95:19

**disappears**
55:3

**disappointed**
40:18

**disconnect**
11:23

**discovery**
58:22 60:23

**discretion**
105:12,25 118:9,23

**discrimination**
115:24

**discussed**
48:19

**discussion**
48:21 113:22

**discussions**
57:9

**disembark**
83:10

**disembarked**
88:10

**disembarking**
81:21 82:20

**disembarkment**
87:13

**dispatch**
27:12 59:15 60:11,12
61:14,17,18,20 64:19
66:14,17,20,22 67:2
81:1

**dispatched**
27:18 51:10,17,18
61:23 62:1,24 63:11
64:1,3 65:23,24 67:1

**dispatcher**
10:25 27:3,6,17 81:4

**dispatches**

27:17

**displayed**
69:8

**distorted**
102:12 110:1

**distressed**
97:13,17

**disturbances**
51:23

**doctor**
38:11 46:11

**doctors**
52:3

**document**
24:19 29:16 59:12
60:24 69:7

**documents**
120:17,21

**door**
15:13,14,23 16:5 84:9
86:14 94:3,6,8,12 95:4
99:21 102:14 106:22

**doorway**
84:15 92:14 93:25
95:6 102:12

**downloaded**
121:2

**DPTCH**
60:18 61:15

**drive**
14:12 35:10 123:24

**driver**
89:23 109:13 110:15

**driving**
91:9 110:8

**drug**
111:12

**due**
12:24 37:11 52:23

**duly**
5:6

**duress**
42:3

**E**

**earlier**
66:16 73:6 76:16 77:8
81:12 86:8 93:11
95:17 107:5 116:22

**early**
120:6

**ease**
46:15

**easy**
110:22 123:22

**echo**
12:4 26:8 44:14 123:7

**educator**
46:13

**effort**
64:11

**elaborate**
18:20 46:21

**electronic**
7:6 26:20 124:10,12

**embarrassing**
71:23,24

**empathize**
45:18

**en**
23:12,20

**end**
11:21 26:10 32:16
61:21 62:2 92:4 123:8

**endangerment**
12:10 19:10

**enforcement**
27:15 36:22 72:14
74:25 79:9,10,16
80:16 102:3 111:20
115:20

**entered**



EXHIBIT B

Francois Obasi

Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

89:3

**entering**
16:1

**entire**
42:17 113:15

**escorted**
121:8

**Essentially**
79:22

**etcetera**
10:10

**Ethiopian**
103:9

**Ethiopian/eritrean**
103:19

**ethnic**
102:18

**ethnicity**
103:5

**evening**
9:24 10:2 31:20

**event**
25:19,20,22,24 26:2,
21 50:8 66:21

**events**
108:3

**everybody's**
81:22 85:12 100:22

**exact**
24:19

**EXAMINATION**
5:8 51:8 98:15 116:10

**examined**
5:7

**Excellent**
62:22

**exclusively**
119:12

**excuse**
7:14 119:21 124:5

**exhibit**
28:23 29:3,10 33:13,
15,16 34:12 35:17,18
58:8,14,15,19

**exhibits**
33:17 124:20

**exit**
87:5 88:4 99:24

**exited**
88:11,12

**exiting**
83:19 87:3

**experience**
51:16 74:25 80:14

**expert**
10:23 56:8 102:1

**experts**
106:11

**explain**
26:23 66:16 68:12
91:17

**explained**
72:24

**explaining**
17:22

**explanation**
123:16

**expressing**
57:3

**extra**
63:14

**extreme**
99:10

**eye**
80:4

---

**F**

**face**
20:5 70:23 74:16,19
76:21 82:17 103:18
109:4

**faces**
32:5

**facial**
31:22

**facing**
84:6,7 85:4,6

**fact**
13:13,18 18:22,23
19:14 20:9 37:22
41:20 43:9 52:24
71:23 75:9 76:10 77:2
106:22 113:24 120:8

**failure**
13:8

**fair**
22:12 49:3 56:15
103:3 107:19

**fairly**
105:16

**fall**
53:17

**falling**
55:21

**falls**
76:21

**familiar**
59:12 62:6 75:2

**family**
53:1 75:2 94:19

**fancy**
101:11

**farther**
64:16

**father**
10:15 13:21,24 35:25
36:22 37:6 38:18
39:11,20 42:18 44:25
50:5 56:10 73:16 74:9,
19 75:9,15,16,22 77:2
78:10 81:7 82:7,24
93:14 122:2

**father's**
115:7,9

**father-son**
52:24

**FBI**
22:18,21,25 23:7
26:16 27:22 38:8
43:10,12,22,25 44:11,
21 45:16,22 47:8
53:17,20 54:17,22
55:23 56:24 57:11,18
72:8,21 76:1,14 77:3
104:25 106:7,9,23
111:19 117:14 118:2,
22 119:3,11 121:13
122:5,8

**FBI's**
26:7 78:2 105:20
106:20,24 116:23
117:2 118:9

**features**
31:22 103:8,13,16

**federal**
8:9 105:15,20 106:21

**feel**
54:11 74:4 96:19,20
97:1

**feet**
94:4 99:17

**fell**
55:6

**felonious**
76:25 117:20

**felt**
37:4,14,23 38:7 47:1
49:22,24 70:10 73:10,
12 82:13 96:22

**female**
17:15 18:4,7 20:23
21:18 47:5 82:16
86:10,19,20,21 95:18
99:1 101:4 109:21

**females**
99:4,7

**field**
60:15

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**fight**
87:9

**fights**
51:23

**file**
26:3,19 107:7,12

**fill**
28:15,25 91:17,24

**finally**
29:9

**find**
13:2,21 29:16

**fine**
5:15 58:11 69:13

**finish**
5:21

**finished**
7:13,17 44:8 87:6

**five-hour**
123:23

**five-minute**
121:25

**five-year**
33:2

**flags**
50:19,21 74:23 78:24
115:15,16

**flight**
9:25 10:5,10 12:5
17:10 18:4 20:24
21:18,23 22:14 24:4
28:7,23,25 29:7,11,13,
17 30:1,11,12,13,20
31:11 47:10 48:22,25
51:1,11,14,17,19,24
53:10,14 54:2,5,6
56:5,17 62:12,24
63:12,24 68:15,21,25
69:17,22 70:12,25
72:14,18 77:17 78:5,7
80:9 82:22 84:13 86:8,
9,10,16,20 87:15
88:20 89:8,10 90:17,
18 91:15 92:6,13,20

93:5,11,17 94:2,5,10,
12,18 95:9,15,20,22,
23,24,25 96:4 98:21,
24 99:13 100:10,13,20
101:4 102:7,9 106:8
112:16 113:23,25
114:11,13,14,17
116:13,16,19

**flights**
52:2 91:19

**floating**
85:11

**flown**
104:15

**folder**
26:19,20

**folks**
31:15 82:20

**follow**
121:16

**follow-up**
23:16 44:18 121:18,22

**fondling**
113:15

**football**
13:10

**force**
40:24 91:20

**forehead**
103:17

**forensic**
23:1

**foreseeable**
9:2

**forgetting**
15:16

**forgotten**
123:14

**form**
11:6 12:13 19:16 21:5,
25 24:7 25:5,17 30:6
31:5,24 34:13 36:12

37:20 41:11 42:3,14
45:5 46:22 47:17 48:1,
14 50:10,22 51:4
57:12,20 58:3 63:1
74:4 75:4 76:3,9 77:5,
14 78:15 79:19 80:6,
18 86:4 90:14 91:16
93:6 94:14,21 95:11
96:1,13 97:6,14 98:3
104:14 105:5,22 106:3
107:2,24 108:4,12,21
109:5 112:9 115:25
116:5 118:12,16 119:6
122:11,19

**formal**
69:19 123:1

**forms**
24:10 28:19,20,24
29:6 90:13,18,21 91:3,
8,11,14,23

**found**
13:4,10 72:8

**foundation**
59:8 60:22

**four-**
33:2

**four-hour**
98:19

**fourth**
29:9

**frame**
117:1

**Francois**
5:5,11,15 124:5

**from-home**
117:10

**front**
85:14,16 89:1 99:24
103:2 121:9

**Frontier**
14:20 29:18 67:13

**frustrated**
43:6,7

**frustration**
57:7

**full**
5:10 8:19 11:3 28:18
122:14

**full-time**
9:18,19

**future**
9:3

_____

**G**

**gap**
84:9,21

**garage**
24:25 26:11 123:21

**gate**
10:10 14:13 15:9,12
52:15 62:12 64:13
65:1 66:7,9 67:11
69:23 73:15 81:13
117:3

**gave**
13:16 24:5 29:6 50:1
68:1 81:7 90:12,17,20,
21

**geared**
79:3

**general**
51:15 92:7 108:14

**generally**
28:24

**generated**
25:22 26:5

**gentleman**
29:25 35:21,22 93:1

**gig**
65:18

**gist**
108:15

**give**
6:21 10:14 19:10
21:12 26:2 37:1 42:12



EXHIBIT B

49:18 52:3 69:1 71:9
101:23 121:14

**giving**
12:6 36:19 77:3 89:11

**glad**
81:22

**glanced**
84:12

**glances**
85:9

**god**
81:18

**good**
12:23 13:18 24:11
30:25 62:21 93:20
94:16 96:20,21 97:5,7

**good-bye**
86:17

**Google**
13:1

**graduated**
46:12

**graveyard**
65:10,11,13,19,20,22

**Greg**
63:22

**grew**
49:5,13

**ground**
49:25

**group**
53:1

**grumblings**
81:20

**guarantee**
111:15

**guess**
8:17 12:4 13:13 18:2
20:3 26:6 46:15 54:23
58:7 85:5 96:15 101:9
117:23 120:9

**guided**
71:10

**guy**
52:4

**guys**
121:6,10

---

**H**

**hair**
20:24 21:4 22:2 30:21
31:2,11,18,20 32:3,8
33:23 34:5 82:17
95:19

**half**
43:21

**hallway**
57:2

**hand**
38:14 91:14,16

**handcuffed**
38:25

**handcuffs**
39:3,4,12

**handle**
14:20

**handled**
118:21

**hands**
73:11

**Hang**
24:18

**happen**
43:9 66:2 93:15
122:25

**happened**
15:7 22:13 36:20,21
37:9,10 39:15 48:21
49:23 50:1,6 68:2
71:16,22 77:13,20,22
78:7 81:14,18 113:24
114:7,14 120:8,15
121:17

**happening**
16:11 36:10 85:23
97:8

**hard**
16:8 25:8 32:4 73:1
104:16 124:9

**harder**
96:25

**harm**
40:12

**hauls**
111:12

**Hawk**
8:22

**he-said/she-said**
76:22

**head**
20:3 47:3 70:15,18,22
72:5 73:13 77:9,10
81:11 100:21 101:12
104:12 108:18

**headache**
46:25 70:6,25

**heads-up**
10:9 117:11 121:15

**health**
79:11

**hear**
16:10 41:16 45:6 57:2
118:18

**heard**
16:13 81:13,19 83:4
107:14,16 108:2
109:9,10

**hearing**
11:21

**hears**
7:8

**heart**
52:3

**height**
104:2 108:23

**helpful**
25:12 30:17

**helps**
28:2

**heritage**
102:18

**hey**
20:18 54:14,15 55:5,
13,16 56:1 76:18
87:16 91:23 113:10
117:11,13 119:3
121:16 122:6

**highlighted**
60:4,18 64:18

**highlighting**
13:13 60:17

**hiking**
39:25

**hired**
31:15

**hit**
70:18 71:3,4,25 73:12

**hockey**
13:11,14,18 37:7,9,10,
12,15

**hold**
82:22 83:3

**holding**
38:22 42:22 43:2
110:5 111:8

**home**
43:17

**honest**
22:3 26:16 34:5 45:15
54:9 72:3,19

**honestly**
14:22 55:2 63:23
67:16 68:17 72:23,25
83:12 101:22 116:25

**honesty**
32:9 85:24 92:12
101:10 118:1



EXHIBIT B

Case 2:19-cv-01322-KJD-DJA   Document 247-3   Filed 06/06/23   Page 138 of 156

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**hope**
123:25

**hospital**
79:11

**hour**
23:25 43:14,21

**human**
19:9 41:5,10 51:3
98:1,4

**hundred**
6:9,10 44:11

**hundred-and-something**
81:21

---

**I**

**identified**
28:22 29:4,10,11
33:17 35:18 58:19
92:18

**identify**
29:25 30:4,11,16

**imagine**
32:4 52:6

**immediately**
81:9 103:18

**important**
7:5

**impossible**
90:22,23,24,25 91:5

**impressed**
40:9

**impression**
103:5

**improper**
60:23 80:17

**in-depth**
120:14

**in-the-bucket**
23:6

**inappropriate**
52:11 75:19 78:5 98:7
114:18,24 115:6,9
118:4 119:2

**inappropriately**
51:24 75:15 78:10
79:15 80:10 116:14,17

**inbound**
10:8

**incidences**
37:4

**incident**
10:16 38:14 40:14
50:3 56:2 93:5 112:20
114:2,17 120:4

**including**
41:13,18

**inconvenience**
80:3

**incriminating**
56:11 74:5

**indications**
42:12

**Indie**
102:23

**inference**
84:17 85:23

**inferred**
71:12

**inform**
55:1,4 80:20

**information**
8:10 10:12,17 11:2,4,
9,15 12:5,11,20 13:16
15:3 22:14 27:21,23
54:4 57:18 66:13 72:4,
7 73:2 75:10 97:22
111:23,25 112:7
119:12,15 120:11

**initially**
13:8 38:25 49:7 65:12
72:10 84:8 87:4 97:21
100:18 110:6 121:13

**initials**
8:11

**initiate**
11:18 60:8

**Initiated**
60:8

**inputs**
66:13

**inside**
88:21 95:8 99:17,19

**instance**
44:22

**instructed**
38:25

**interact**
17:3,9

**interesting**
32:10

**interfere**
78:2

**internal**
104:22 106:10

**Internet**
13:3 80:24

**interpretation**
112:24

**interrupted**
19:5 40:19

**interview**
23:21 54:18 56:8,14,
15 57:3 67:11,20
68:14 69:19,20 78:2
89:13 122:8,14

**interviewed**
56:5,17 57:8 68:21,25
69:4,17

**interviewer**
56:10

**interviewing**
57:24 93:5

**interviews**

**53:22,23 54:1,20 93:9**

**inves-**
75:18

**investigate**
42:8 56:1 72:6 75:17

**investigated**
78:14

**investigating**
57:18

**investigation**
18:13 45:11 53:10,21
54:17 55:16 75:11,19
76:1,18

**investigative**
81:11

**involved**
8:7 10:15 15:10,24
32:21 37:11 114:17
118:2 119:4,12

**involvement**
118:10

**island**
35:9

**issue**
52:23 106:19

---

**J**

**jersey**
13:10,11

**jet**
86:24,25 87:19,23
89:2

**jetway**
15:17,18,23 16:2 35:6
83:7,17,25 84:9,25
92:4,15

**job**
22:19 24:12 53:18
96:20,21

**John**
5:17


EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**judge**
6:18,22

**juice**
42:25

**jump**
7:15

**jurisdiction**
22:17 53:18 57:15
76:13 105:20 106:20,
25 117:19

**jurisdictional**
106:19

**juvenile**
50:18 91:25 114:23,25

---

**K**

**kind**
10:15 11:21 12:9 16:7,
8,10,20 17:21 18:18
19:9 20:17,19 21:7,9,
19 23:5 24:22 26:3,19
27:3 32:4,8 37:3 38:13
39:18 40:4,10 44:23
46:15,19 49:1,16 50:5,
12 51:21 53:5 54:11,
15 57:1,2 61:24 63:14
64:10 65:5,9,17 67:18
71:11 72:11 73:9
77:25 78:6 79:4,12
81:10,19,22 82:1,11,
16,19,21 83:6,9 84:11,
12,14,17,25 85:8
86:15,16 87:4,5,6,12,
17 91:21 92:4,10 93:2
95:1,18,19 100:3,21,
22 101:12 103:8,11
104:16 105:4 106:14
110:9,23 111:21,24
121:3,4,5

**knew**
13:23 23:2,22 36:9
40:5 44:5 72:2 76:7

**knowing**
106:24

**knowledge**
10:4 38:18 45:13
120:4

---

**L**

**lack**
60:22

**lady**
16:18 81:24

**land**
35:7

**landed**
51:1 71:17

**landing**
10:10 48:22

**lands**
85:12 94:1

**lap**
20:3 70:22 77:9
104:12 108:19

**large**
73:11

**Las**
8:19,22 9:6,13 27:3
58:15 59:6 78:25

**late**
110:19

**law**
36:21 53:12,15 72:13
74:25 79:9,10,16
80:16 102:3 111:20
115:19

**learned**
72:4 75:16 77:19

**learning**
75:22

**leave**
38:8 48:23

**leaves**
78:18

**leaving**

16:25 44:9 48:7 81:16
83:16 84:15,21 100:3

**Leavitt**
63:22,23

**led**
103:13

**left**
27:24 72:20 110:8

**letting**
75:23

**level**
52:17 54:24 77:1
104:24

**license**
115:24

**lie**
116:3

**lifetime**
104:7

**light**
24:25 95:18

**lighter**
30:21 31:11,18,20
32:8 33:23

**limited**
97:22

**lines**
16:19 46:12

**live**
8:24,25

**lived**
37:23 49:7

**LOC**
59:16,19,22

**local**
22:16

**locate**
33:9

**located**
92:2

**location**
59:22

**locationwise**
37:2

**log**
58:16 59:6,25 60:2
67:3 111:24

**logs**
59:14

**long**
9:13 32:24 33:1,5,7
43:18 62:15 71:13
74:25 98:17 111:3

**long-time**
6:4

**longer**
5:11 33:24

**looked**
22:8,11 41:8 51:2
84:15 95:18 96:8,9

**losing**
38:11

**loss**
46:16

**lot**
34:3,8 51:25 52:8 54:9
58:4 78:18 81:16
105:8 117:7

**LV-3Q70B**
62:4

**LV/3Q70**
60:19

**LV/TRIPP**
60:20

---

**M**

**made**
15:9 20:10 36:15 37:5
52:9 57:10 63:13,17,
18,24 64:12 68:5
73:16,18 75:14,25
76:11,12,17 84:16,19


EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

85:19 93:12 95:7,24
99:11 101:14 105:14
109:8 117:18 119:2

**main**
110:22

**make**
23:3 31:3,13 32:5
39:21 40:21 44:22
48:16 54:21 55:11,13,
16,22,25 67:4 68:10
69:10 75:10 96:16,25
97:1 106:1,11 111:19,
20 112:17 113:4
117:25 119:24 121:5,
20,22 123:3

**makes**
14:21 87:17 91:12
113:13

**making**
16:18 24:3 91:12
96:19,20 99:16 104:22

**male**
13:10 17:14 18:4,6,25
19:15 20:6 29:25
30:12,20 47:5 50:18
71:11 86:9,10,19,20
95:20,22,24 99:2,4,13
103:24 109:22

**man**
18:24 19:14 36:8,25
37:14 40:9 82:2
100:10

**manager**
55:12

**maneuvered**
104:11

**manipulation**
104:17

**March**
9:24 59:7

**mark**
33:13 35:17

**marked**
29:3 33:13 58:14

124:20

**marshals**
47:9,10 72:12

**Mart**
110:1

**Martin**
63:11 110:1

**Mary**
109:15,24,25

**mask**
51:22 54:14 105:4,9

**masks**
76:21

**match**
76:22

**materials**
26:3

**matter**
48:19 55:5

**mature**
97:8

**Maye**
5:20 11:6 12:13 19:16
21:5,25 30:6 31:5,24
34:13 36:12 37:17,20
41:11 42:14 45:5,20
46:22 47:17 48:1,14
50:10,22 51:4,7,9
57:16,22 58:6,12,23,
25 59:4,5,10,11 60:25
61:3,4,6 63:4 69:7,9,
11,13,15,16 75:6 76:4,
15 77:7,18 78:21
79:21 80:1,8,13,22
86:6 90:16 93:10
94:17,24 95:14 96:3,
17 97:10,18 98:5,12
104:14,21 105:5,22
106:3 107:2,24 108:4,
12,21 109:5 112:9
115:13,14,18,25
116:5,11 118:17 119:8
122:16,22 124:2,15

**Maye's**

98:21 99:20 113:3,21,
22

**Mccarran**
58:17 59:7,16,19,23
60:1,11

**Mckay**
5:9,17 11:7 12:18
19:18 21:8 22:4 30:8
31:7 32:1 33:19 34:14
35:20 36:13 37:18
38:1 41:15 42:16
45:12 46:6 47:13,21
48:9,17 50:14,24 51:6
57:12,20 58:3,9,21,24
59:1,8 60:21 61:2,5
63:1 69:7,12,14 75:4
76:3,9 77:5,14 78:15
79:18,24 80:5,12,17
86:4 90:14 93:6 94:14,
21 95:11 96:1,13 97:6,
14 98:3,16 102:24
104:18 105:11,24
106:5 107:4 108:1,6,
16 109:1,7 112:10
116:2,7 118:12,15
119:6 120:2,4 122:11,
19,25 123:19,25
124:11

**Meaning**
82:10

**means**
61:16,20,21 63:10
64:5 79:6

**meant**
18:20 40:12

**meet**
51:11,14 52:10,22
53:4 98:10

**member**
75:2

**members**
53:1 57:8 67:15,17

**memory**
31:10

**mention**

8:6 19:13 78:4

**mentioned**
18:22 20:20 34:10
37:22 40:2 46:18 70:8
77:8 102:15 111:18
114:23 115:6

**mentioning**
48:25

**mess**
53:15

**message**
18:3 116:24 118:3,6,7
121:14

**met**
5:18 15:4 65:5 67:6

**Metro**
24:6 26:24 27:3 52:10
58:15 59:6 61:24
66:21,22 67:2 78:25

**Metro's**
25:21

**Metropolitan**
9:14

**middle**
52:5 104:8,12

**middle-aged**
18:24 19:14 50:17
82:16

**mind**
8:21 31:21 78:13

**mine**
28:14

**minor**
8:7,25 13:4 23:21
24:13 33:3 34:22
38:24 56:8 118:21

**minor's**
81:8

**minors**
8:10

**minute**
33:25 108:17



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**minutes**
12:23 14:8 23:11
24:11 42:20,23 80:25
92:19

**mischaracterizes**
30:7

**misconduct**
74:11

**misdemeanor**
76:24

**mislead**
23:2

**misremembered**
108:11

**miss-**
49:23

**misspoke**
112:3

**misunderstand**
123:7

**misunderstanding**
49:24 54:13 57:25

**molestation**
41:14,19 42:9,13
105:16

**molestation/child**
12:9

**molester**
51:3

**mom**
38:12

**mood**
40:15

**morning**
5:19

**Motion**
59:9

**motions**
90:11

**mouth**
87:1 94:2

**move**
9:3 28:1 60:24 71:20
87:6

**mud**
66:24

**multiple**
88:22 95:6

**mumbling**
16:7,12 81:13

**mumblings**
16:10

---

## N

**N-I-**
60:7

**named**
111:1

**names**
10:14 11:3 12:6,7,25
13:1,24 81:3,7

**necessarily**
112:7

**negligent**
76:14

**Nevada**
8:23

**Nickel**
29:3,4 30:18 31:23

**Nigerian**
103:24

**night**
14:23 42:11 47:15,19
48:22,24 51:1 111:14

**NINT**
60:5

**nitty-gritty**
99:15

**nondescript**
82:19

**noninvolved**
33:2

**nonverbal**
8:2,4

**norm**
74:21

**normal**
7:15 16:23 27:5 74:18,
21 86:14 100:2

**North**
9:25 13:19 37:4 49:8

**note**
109:8 123:12

**notes**
106:25 108:7

**notified**
80:11

**notify**
79:16

**number**
23:6,7 25:19,20,22,25
26:2,21 51:20 52:15
66:21 71:9 117:5

---

## O

**Obasi**
5:5,11,14,15 33:13
35:17 51:10 59:12
61:7 98:13 122:23
124:5

**object**
11:6 12:13 19:16 21:5,
25 30:6 31:5,24 34:13
36:12 37:17,20 41:11
42:14 45:5 46:22
47:17 48:1,14 50:10,
22 51:4 59:1 104:14
105:5,22 106:3 107:2,
24 108:4,12,21 109:5
112:9 115:25 116:5

**objection**
6:15,18,23 36:14
57:12,20 58:3,21 59:8,
9 60:21 61:2 63:1 75:4
76:3,9 77:5,14 78:15
79:18,19,24 80:5,6,12,

17 86:4 90:14 93:6
94:14,21 95:11 96:1,
13 97:6,14 98:3
118:12,16 119:6
122:11,19

**objections**
6:25

**observation**
50:7

**observations**
107:14

**observe**
16:4 91:14,16

**observed**
50:25 80:10 100:9
107:23

**obstruct**
101:2

**obstruction**
83:10

**obtaining**
12:20

**occasion**
23:18 78:11 104:7

**occasions**
104:23

**occupant's**
104:12

**occurred**
38:6 46:17 54:7 57:6
69:21 105:16 107:18

**occurring**
43:8 76:24

**occurs**
105:19

**off-ramp**
35:6

**office**
14:16 44:4 52:13
97:21 98:9 117:10

**officer**
6:5 28:10 32:21 39:2



EXHIBIT B

Case 2:19-cv-01322-KJD-DJA   Document 247-3   Filed 06/06/23   Page 142 of 156

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

43:25 56:9 62:9,11,15,
21,22 63:11,13,18,20,
22,23 64:12,14,19,25
65:3,4,13,18,19,20,22,
23 67:1,6,10 68:14,16,
18,21,24 73:14,15
87:22,25 88:13 89:5,
16,22 90:19 91:6,7,9,
12,14,16,23 92:2,3
109:12,13,18,20,21,22
110:3,4,6,9,12,17,20
117:6

**officer's**
109:9,10

**officers**
12:21,22 15:4,12
18:13 24:5,10 28:6,15
29:6,13 34:19 35:11
38:21 43:23 52:22
53:9 55:25 56:4,19,22,
25 60:3,20 62:10,12,
24 63:14,25 66:11,14
67:16 68:19 69:3
87:18 92:14 93:4 95:3
109:11 110:23,25

**official**
71:12

**older**
22:6,8,11 96:8,9 99:8
101:16 104:16

**on-call**
23:7 117:6,9

**on-site**
52:18 54:19

**onboard**
72:12

**one-way**
45:16 83:22

**oof**
24:22

**open**
15:23

**opened**
26:20 86:13,14 107:7

**opening**
18:17

**operating**
59:24

**opinions**
16:25

**opposing**
6:16

**option**
76:12

**order**
124:15,17

**orders**
124:9

**original**
71:19

**originally**
49:9,10

**overhear**
93:24

**overheard**
94:18

**overly**
97:16 114:7

**overseeing**
18:14

**overzealousism**
50:13

---

### P

**p.m.**
61:11

**paper**
124:11

**parentheses**
60:19

**park**
35:4

**part**
10:24 17:5 18:1 26:24,

25 45:10,14 47:8,12
53:21 55:10 56:12
68:23 70:20 72:20
78:1 83:7,9 89:13 95:2
115:7,9 120:25

**participant**
41:9 51:3

**parties**
8:8 10:15 15:9,24
76:22

**partner**
14:23

**party**
87:14

**pass**
91:11

**passed**
38:12

**passenger**
69:5 72:5 78:9 118:8

**passengers**
16:1,6 67:14 68:15
69:4 81:15 87:2,19,21
88:5,11 89:15 93:18
99:24 100:3 101:2,5

**past**
87:2

**patrol**
9:11,12

**pause**
36:19

**peace**
53:5

**people**
7:7 16:9,24 19:24
37:16 50:19 51:24
63:8 65:10 81:13,16,
21 82:1,2 83:9 84:15
85:10,14,16 86:17
87:5 88:22 94:10,16
100:19 106:17,25
111:7

**perceived**

56:21 116:20

**percent**
44:11 55:6

**perception**
114:6

**perpetrator**
122:7

**person**
25:23 34:8 47:4,11
52:2 54:8 55:14,17
91:10 93:3 99:12
100:22 101:24 109:13

**personal**
32:23

**personally**
44:5 50:11 56:24
74:15

**personnel**
66:15

**phone**
23:6 120:6 121:3

**photograph**
13:16 33:9,15,24

**photographs**
31:14 32:11

**physical**
87:9

**physically**
104:11

**pick**
23:15

**picture**
13:4,7 35:15,22

**pictures**
29:17,21

**pilot**
10:18,20,24 11:10,14
17:14,16,17,18 54:3,5
55:2 67:18,22,24 68:1
92:18,25 100:21
101:8,9,19,23 102:2
112:16 113:3



EXHIBIT B

Case 2:19-cv-01322-KJD-DJA   Document 247-3   Filed 06/06/23   Page 143 of 156

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**pilots**
56:18 92:16,23 101:21

**plaintiff**
120:9

**plane**
15:22 16:1,9 17:4
18:18 34:2 35:23
47:11 52:7,16,22 53:4
57:6 63:14,17,19 64:8
71:22 81:20 83:24
85:12 87:12 94:1
99:24 100:3,15,17
102:7 105:15 106:23

**planes**
35:7 51:23

**planned**
39:20

**plans**
9:2 39:24 40:5

**planted**
99:17

**play**
13:14

**played**
37:10

**player**
13:18

**playing**
37:7,9,14

**plugged**
32:17

**point**
6:22 13:23 14:8 16:4,
23 21:17 32:10 39:8
40:7,23 66:24 68:17
69:25 70:17 71:2
87:16 110:18 122:1,4

**pointed**
82:11

**poked**
101:12

**police**
6:4 9:6,14 14:9,10

22:16 26:1,25 27:6,11,
17 29:13 32:15,20
38:19 40:24 50:2
52:10 58:16 59:7
66:17,20 78:25 97:2
107:6 116:4

**policy**
79:1

**pop**
100:23

**popped**
93:2

**positive**
31:22

**possibility**
6:15 11:14,17

**possibly**
14:3

**potential**
52:11 53:8 98:7

**potentially**
80:3

**pre**
100:4

**prefer**
5:13

**preliminary**
53:19,21 76:17

**prep**
12:22

**prepare**
53:2 119:19,22

**presence**
72:13 76:25

**present**
53:7 62:12 76:11
92:16 117:18

**presume**
6:4

**pretty**
23:10 35:5 39:18
43:15 44:1 45:16

77:15 87:23 103:16
104:4 112:22 120:6

**previous**
30:7 78:11

**previously**
29:3

**printed**
59:14

**prior**
15:21 47:8 51:21
56:24 100:25 113:23
114:1,16

**private**
32:23

**problem**
113:11

**procedures**
27:23 102:2

**proceed**
76:23

**proceeding**
6:12

**produced**
29:18 58:22,25 59:3
60:22

**professional**
80:14

**promoted**
62:19

**proofread**
123:3

**prop-**
76:2

**proper**
80:20

**properly**
67:3 121:6

**prosecute**
105:8

**proud**
46:12

**provide**
17:24 123:15

**provided**
10:12 97:22

**providing**
8:9

**pull**
54:15

**punch**
47:2 72:17 73:7,10

**punched**
73:4,5

**purported**
111:4

**purpose**
45:3

**push**
7:9

**push-out**
83:7

**put**
17:19 20:3,5 29:18
70:21 103:1 104:6,12
111:24 112:19 123:15

**putting**
70:9

---

**Q**

---

**qualified**
121:21

**queen**
62:3 63:7

**question**
6:14 7:14,22,23 8:12
33:11 48:18 74:3
79:19 80:17 113:4,23
115:15 119:7

**questioning**
44:7 60:23

**questions**
5:21 9:23 27:25 51:7


EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

56:12 98:12,21 99:20
104:21 113:3,21
116:12 120:15 122:22

**quick**
13:1 23:11,14

**quickly**
28:22 43:15

---

**R**

**race**
50:20 74:18

**racial**
115:24

**racially**
37:3

**racism**
50:13,15

**radio**
11:21,22 25:24 27:6

**raise**
78:12 115:14,16

**raised**
6:16

**Raleigh-durham**
9:25

**ramp**
110:7

**random**
47:11

**rang**
113:22,24

**rapport**
39:22 96:22

**re-**
28:11

**react**
19:22

**read**
25:8 58:10 63:2 64:17

**reads**

6:22

**ready**
53:13 85:11 94:1
123:9

**real**
105:10

**reality**
54:3

**realize**
121:3

**reason**
9:16,17 24:19 50:8
68:6 85:25 98:9
107:12 121:1

**reasoning**
51:20

**reasons**
51:13,18

**recall**
21:16 23:17 63:18,23
64:12,25 65:2 72:23
73:3 90:3,7,8,12
92:20,23 101:24 121:8

**receive**
12:5

**received**
10:7 11:20 22:13 81:1
111:25 116:23

**recently**
38:12 79:4

**recognize**
103:16

**recollection**
67:5

**recollections**
107:18

**recommend**
123:5

**recommended**
52:19

**record**
5:18 6:25 8:10 27:6

33:18 35:19 58:20
62:23 124:7,9

**recording**
32:19

**red**
50:18,21 74:23 78:24
115:15,16

**redacted**
27:23 28:9,13

**redactions**
27:21

**redirect**
98:18

**refer**
8:11 38:16 54:22
57:11

**reference**
20:20 50:5

**referenced**
82:12

**referred**
57:14 101:7 115:3

**referring**
25:17 62:4 82:6,7 86:3
105:3

**region**
103:9

**regular**
24:12 43:25 66:20

**regulates**
14:19

**Reid**
35:8

**related**
18:8,21 22:7 30:5
73:19,24

**relation**
81:6

**relationship**
45:16 52:25 74:6,9,24
93:12

**relative**
15:12 88:5 100:12

**relay**
27:4

**relayed**
47:15 54:5

**relaying**
95:2

**relays**
10:25

**release**
23:15 44:25

**released**
44:18 72:21

**relevant**
16:13

**remainder**
70:12

**remember**
7:7 8:1 10:2 14:14,22
16:16,18 17:13 21:2
22:1,2,5 31:10 34:4,9,
23 36:7 39:23 40:1,2
42:24 43:8,18 46:10,
25 47:5,23 48:20,24
49:4,17 56:25 65:16
67:12,16,17 70:19,21
71:24 72:1,22 73:5,20
74:2,3,6 81:5,24
82:15,16 86:18 87:24
88:3 89:10 91:22
92:13,17,19 93:2,3
101:23 105:1 108:24
114:4,19 115:21
116:25 123:13

**remembered**
106:10 109:2 123:17

**remotely**
123:6

**repeat**
7:24 19:3

**rephrase**
7:24



EXHIBIT B

Francois Obasi

Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**rephrased**
17:6

**replace**
110:17

**replaced**
110:14

**replaying**
73:9

**report**
23:14,15 26:5,14,23
44:17 102:2 105:14

**reporter**
7:4 8:3 45:6 46:4
102:22 123:1,10 124:8

**represent**
33:20 58:15

**representative**
53:7

**representatives**
17:4

**representing**
5:20 120:9

**request**
7:12 52:9 102:3 117:2
118:9 124:12

**requested**
23:1 64:4,5 116:23

**requests**
23:3

**require**
10:5

**reside**
8:18

**respect**
52:13 103:4 113:20

**respond**
6:18

**response**
52:12 113:2,21

**responses**
8:2

**responsibility**
14:22

**rest**
77:16

**retire**
9:17 53:13

**retired**
9:18 63:21,24 65:17
109:23

**retirement**
65:18

**retrieve**
66:21

**return**
72:18

**returned**
72:18

**revealed**
78:9

**reverse**
50:12,15

**review**
123:12

**rid**
24:20

**ride**
40:2

**rings**
78:6

**rise**
54:17,24 77:1 104:24

**rises**
52:17

**road**
6:22

**room**
38:23,24 39:16 42:22,
25 43:11 97:4 110:5,9,
21,22 111:8

**route**
23:12,20

**row**
85:10

**rubbing**
20:4 70:14,23 77:10

**rules**
8:9

**run**
119:24 120:1

**running**
32:13

**RV**
40:1

───────────

**S**

───────────

**safe**
79:23 86:17 117:23
119:17 124:2

**sat**
47:6 70:13 71:11,14
110:9

**scene**
55:25 73:14,15 118:21

**schedule**
55:3

**school**
49:13

**screen**
24:16,21 29:19 63:3

**search**
80:24

**seat**
71:9,14,20 104:8,12,
13

**seconds**
61:12 88:18

**secure**
15:15,20,22

**secured**
15:22 39:2

**sees**
79:14

**send**
55:23

**sense**
7:12 67:4 87:17 91:13
113:13

**sentence**
123:8

**separated**
36:21 46:20 48:25
50:9 77:16 114:15
115:5

**separately**
34:23 41:21

**separation**
52:22

**September**
124:6

**sergeant**
5:11 9:11,12 14:23

**set**
74:23 81:10

**severity**
119:16

**sexual**
105:15 106:10 116:20

**shape**
103:17

**share**
24:16

**shared**
14:4 120:11

**sharing**
29:16

**shift**
32:17 65:9,21

**shoving**
76:22

**show**
13:7 24:16 28:9,10,21
29:2,9 35:14 58:7
60:16 63:25 67:3
120:17


EXHIBIT B

Francois Obasi

Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**showed**
33:14,24

**showing**
33:12 35:16 58:13,14

**shows**
29:17

**sic**
39:5 60:5

**side**
55:6 100:15

**sign**
62:2 109:19

**signature**
28:13

**signed**
28:12

**significance**
74:13

**signs**
19:11,13 42:6

**similar**
32:5

**simple**
74:3

**simply**
6:20

**sir**
5:16 7:3,20 8:15,16
9:16,20,22 10:3 13:22
14:6,19 16:3,15 17:11
19:4 21:10 23:5,24
25:18 29:1,8,14,23
30:2,10,21 32:16,21
33:12 34:16 35:24
36:5 38:5 39:8,10,13
40:25 41:3,6,12 42:15
43:4,13 45:25 51:6,12
55:19 56:3 57:21 60:2,
11 62:14 65:21 66:10,
12 67:8,25 70:3 71:7
72:19 74:12 75:24
76:6,20 77:6,21 79:3,
20,25 80:7 83:13
85:20 87:20 88:14

89:7 92:12 93:23 95:5
96:21 97:24 98:8,11,
14,18,25 99:3,6,23
100:11 101:6,10
102:4,8,17 103:6
104:9 105:2,6,13,18,
23 107:20,25 108:5,9
109:6,11,15 111:22
112:2,5 115:10,12,17,
22 116:6,8,15,18,21
118:1,5,20,25 119:10,
18 120:13,18,20
121:10,18 122:3,13,
17,21,24,25 123:18

**sister**
38:11

**sit**
43:11 47:4 104:7

**site**
54:11

**sitting**
70:11 104:13 123:21

**situation**
6:17 14:3 16:13 74:8
78:12 82:8,9 96:24
97:20 105:4 117:10

**situations**
42:8

**slap**
47:2 72:17 73:6

**slapped**
73:4

**slight**
61:22 99:9

**slightly**
53:12

**small**
18:15 25:3 39:19,21
58:10 63:3

**snack**
39:18

**snacks**
39:17 42:24

**soda**
42:25

**Solar**
8:22

**solve**
54:11

**someplace**
42:4

**son**
8:8,13 10:15 11:3
13:25 36:1,2 39:7,12,
15 43:10 44:25 46:15,
20,24 47:6 49:1 50:6
58:1 70:5,13,21 73:17
74:7,9 75:10,16,23
77:2,16 81:7 82:8,24
93:14 122:2

**son's**
70:14

**sort**
113:6

**sound**
62:6

**source**
54:4

**space**
18:15 53:15 105:15,20

**spam**
121:2

**speak**
7:7 23:2 27:2 38:6,9
56:22 69:20 79:7
119:19,22 120:5,23
121:21

**speaking**
17:13 43:8 67:16,18,
23 89:10 95:9,10,13,
16 96:11 97:3 99:10
112:15

**spec-**
86:2

**specialist**
23:1,20

**specific**
71:9 88:24 107:17
108:11

**specifically**
50:16 90:10,19 102:14
103:12 108:8

**specifics**
37:1

**speculate**
60:9

**speculating**
86:2

**speculation**
22:21 79:19 118:16
122:12

**spent**
40:23 43:18

**spilled**
118:7

**spirits**
96:12 97:5,8

**spoke**
30:13 37:3 47:18,19,
24 68:16,19 112:16
117:12 120:5,19,25
121:5

**spoken**
47:19 106:8 120:3,20
122:6,7

**sport**
37:12

**spot**
100:4

**squad**
62:10

**squint**
69:10

**squinting**
64:17

**staircase**
83:8

OASIS
REPORTING SERVICES

EXHIBIT B

Francois Obasi

Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**stand**
83:9 84:14 94:2 100:2

**standards**
103:22 104:3

**standing**
18:15 30:12,20 83:4,6,
9 84:14 86:9,10,16
87:18 88:23 92:13,14
93:25 94:5,7,12,23
95:4,7,8 99:12,21
121:11

**start**
17:16 87:8

**started**
71:1

**starting**
49:25

**state**
5:10 48:7,23

**stated**
17:18 18:7 20:2 70:5

**statement**
16:19 25:17 27:20
29:5,6,12 33:14 73:19,
20 84:16,20 90:13,18
95:7 99:11,17 101:14
107:19

**statements**
24:4,5,17 26:4,15 28:5
34:20 89:12 90:5

**station**
14:9,21 34:23 36:4
38:4,19 39:17 46:19
48:5,7 63:15 64:10
72:22 74:2 111:2

**stations**
14:11,14

**stay**
42:17 91:20

**stayed**
34:19 87:23

**steered**
77:25

**step**
7:18 84:24,25 117:19

**stepped**
85:15

**stepping**
85:1,7,8,18

**steps**
40:13

**stewardesses**
82:24

**sticking**
100:21

**stilted**
7:12

**stop**
29:16

**stopped**
45:8 50:2

**stopping**
25:23

**story**
95:2

**stranger**
70:12 71:11 74:15,22

**streamline**
53:16

**street**
45:17

**strike**
59:9 60:24 107:15
121:12

**struck**
70:10 77:11

**stuck**
69:6

**stuff**
39:19 41:14 82:1
120:15

**subject**
10:1 41:9 48:19

**substation**
23:13 24:14 46:1 60:1
97:4 121:24

**suddenly**
47:1 70:10

**sufficient**
57:18

**suggest**
41:8

**super**
73:10

**supervise**
18:14

**supervision**
57:10

**supervisor**
9:10 14:20 52:18
62:17 65:21 91:2

**supervisors**
52:18

**surname**
14:5

**Surprisingly**
40:8

**suspect**
111:4

**suspected**
78:4,10 98:1 119:2

**suspicious**
79:7

**sustains**
6:23

**swing**
65:9,21

**sworn**
5:6 6:13

**sympathize**
45:18

**system**
32:18 59:15

---

**T**

**takes**
12:23 24:10 123:10

**taking**
5:19 7:4 42:2 110:21

**talk**
17:17 25:24 39:21
45:9 54:6 120:7

**talked**
21:22 38:10 46:2
108:17

**talking**
7:9 19:8,25 20:17
42:1,2 46:2,4 49:4
51:15 54:2,10 57:1,5,6
67:19 69:22 73:9
76:21 85:21 94:22,23,
25 101:18 108:2 114:6

**tall**
21:7,9 103:21 104:10

**tapes**
32:25

**tarmac**
64:9 88:3

**taxis**
106:23

**team**
23:25

**technique**
115:20

**technology**
66:18

**telephone**
120:18,21,24

**television**
111:7

**telling**
17:22 46:1 86:16
94:15 108:18

**ten**
80:25



EXHIBIT B

Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

**tend**
103:16

**terminal**
14:11,16,18,21 24:14
35:13 65:4,6 83:15,21,
25

**terms**
14:7 34:10 48:19
60:11 74:9,14

**terrorism**
79:4

**test**
119:24 120:1

**testified**
5:7 73:6 80:9,23 81:12
86:8 93:11 102:10
113:2,21 116:22

**testify**
6:5 107:16

**testifying**
107:13,21

**testimony**
6:13 30:7

**text**
13:15

**thing**
6:16 7:6 8:1,6 24:20
26:14 27:5 36:9 46:17
53:6 72:9 76:25 84:18
85:22 87:17 105:9
115:8

**things**
5:23 19:12 33:3 37:8,9
41:19 47:23 52:8 55:7
107:9,14,16,22 108:15
115:14

**thought**
13:9 20:5,10 34:5,18
47:2 63:15 71:12
89:14 93:13 109:8,10

**threshold**
113:5,8

**ticketing**

14:21

**till**
71:16

**time**
7:7,10 10:13 14:9 17:3
22:19 33:5,7,10 39:3
40:7 41:1 42:18 43:1
44:6,11 47:16,25
49:18 52:14 53:5 61:9,
10,13,22 71:16,17,18
73:1 88:15,22 91:18
92:1 95:21 98:17
99:16 101:1 114:16
116:25 120:15,19
123:20 124:6

**times**
6:10 51:10,17 76:16
120:23

**timing**
66:14

**tired**
46:17

**today**
120:14 123:14,20

**told**
12:7,8 20:12 31:1
36:25 38:21 39:1
46:13 47:3,5,7 50:2
70:11,14 71:5,6 72:13,
16 77:9 80:20 97:25
98:6 107:1,22 108:8
112:16,17 113:3
116:13 117:6

**toss-up**
32:9

**total**
62:19

**touch**
123:11

**touched**
75:15 116:16

**touching**
51:24 52:11 75:19
78:5,8,10 79:15 80:10

98:7 106:14 109:4
114:18,24 115:9 118:4
119:2

**traffic**
10:24

**trafficked**
41:2,3

**trafficking**
41:5,10,13,18,20 42:2
51:3 98:2,4

**trafficking/child**
19:10

**trained**
27:7 56:9

**training**
41:4,8

**tram**
14:13 35:11,12

**transcribing**
8:4

**transcript**
6:23 7:5 123:2,9
124:8,13

**transferred**
43:25 88:2

**transpired**
70:2

**transport**
14:13 64:9 88:2 89:18

**transported**
24:13 34:22 35:13,22
38:21 39:12

**travel**
39:20

**traveling**
36:4 38:4

**travels**
124:2

**treated**
116:14

**trespass**

55:7

**trip**
40:19 46:14 58:2
83:22 86:18 98:19
121:25

**triple**
27:4

**Tripp**
62:6,9,11,16,21 64:12,
14 67:6,10 68:14,16,
18,21 73:15 87:18,22,
25 88:13 89:5,16 91:7,
23 110:20

**trouble**
116:4

**true**
78:19 117:22 119:16

**TSA**
105:6

**turn**
24:25 76:1,14 80:3

**turns**
110:21,23

**TV**
111:6

**type**
19:12 22:16 33:2
41:19 46:16 50:3
54:13 76:23,25 103:19
105:9 117:7 123:1

---

**U**

---

**U.S.**
47:9

**Uber**
110:15

**Uh-huh**
84:10

**ultimately**
75:25

**um-hum**
8:2 52:1 58:18 78:22



EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

87:11

**unclear**
72:16

**uncomfortable**
20:11 37:5 70:6,25
74:20 84:25

**understand**
7:23 9:5 27:8 40:10
122:17

**understood**
7:2,22

**unexpected**
53:3

**uniform**
101:11

**unique**
12:25 27:14

**unit**
61:20 65:15

**units**
14:20 62:3 63:6 65:10,
11

**unnecessary**
75:11

**unusual**
96:24

**uploaded**
32:17

**upset**
97:16 114:7

---

**V**

**valid**
115:19

**Vegas**
8:19,22 9:6,13 27:3
58:15 59:6 78:25

**vehicle**
35:2

**verbal**
105:9

**versus**
53:14

**vicinity**
43:2

**victim**
42:12

**video**
33:21 124:7,13

**viewed**
42:11

**visually**
18:23

**voluntary**
24:5,7 25:16 26:4,15
29:6,12 33:14 54:7
89:11 90:5,13,18

---

**W**

**wait**
6:20 7:12,16 15:24
34:20 36:15 43:13
44:10 56:13 87:12
91:24 118:22

**waited**
15:8 24:10

**waiting**
81:23 89:21

**walked**
42:20,22

**walkie-talkie**
7:9 23:4

**walking**
16:20 81:16 83:11,14,
19 85:9 87:2

**wanted**
48:16 121:5,20

**wanting**
78:2

**warning**
19:11

**warrant**

57:18 75:23 77:3
117:14

**warranted**
122:5,8

**warrants**
119:3

**Warren**
29:10,11

**watched**
15:25

**watching**
39:2 110:24 111:4,7

**wear**
105:4

**wearing**
101:11 105:9

**week**
123:10

**well-built**
104:4

**West**
102:23

**whatever's**
7:24

**whatnot**
39:20

**whatsoever**
42:6 44:19 115:11

**white**
17:15 18:24 19:14
27:20 36:23 63:18,20
64:14 67:6,11 68:24
73:15 82:15 87:18,22,
25 88:13 89:5,16,22
91:6 95:18 109:9,14,
16,18 110:20

**wife**
8:25 9:5 46:16

**window**
104:13

**wit-**
67:14

**withdrawn**
67:9 72:15

**witnessed**
108:3

**witnesses**
54:21 69:5

**woman**
34:1,10,12 82:5,14
100:10,13

**word**
40:9 108:13 113:19
117:21 120:10

**words**
8:2

**worked**
62:15,19 78:25 119:25

**workers**
15:21 67:13

**Wright**
63:11,13 91:9 109:10,
12,15,20 110:6,12,17

**writing**
54:7

**written**
7:5 23:14 28:4

**wrong**
16:20 17:20,23 19:21
20:10 49:24 80:2
81:18,25 82:5,10,13
84:17 85:19 116:3

---

**Y**

**years**
9:15 52:8 62:18,20
96:8 99:8

**York**
49:7

**young**
13:9 20:7 36:8,25
37:14 40:9 95:18

**younger**
18:24 19:15 22:6


EXHIBIT B

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

99:11 100:10

**Youtube**
  52:4
**Yuma**
  98:19

---

**Z**

---

**Zion**
  40:2
**Zoom**
  6:3 24:19

EXHIBIT B

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**VOLUNTARY STATEMENT**

Page _____ of _____

Event # 190300 137169

### THIS PORTION TO BE COMPLETED BY OFFICER

| Specific Crime | | Date Occurred 3/28/19 | Time Occurred 1900 |
|---|---|---|---|

Location of Occurrence: FRONTIER FLIGHT 2067
Sector/Beat: ☐ City ☐ County

Your Name (Last / First / Middle): 
Date of Birth: 
Social Security #: 

| Race | Sex | Height | Weight | Hair | Eyes | Work Schdl. (Hours) | (Days Off) | Business / School Frontier | b6 b7C |

Residence Address: (Number & Street) | Bldg./Apt.# | City | State | Zip Code
Res. Phone: 
Bus. Phone: 

Bus. (Local) Address: (Number & Street) Maccaren Airport | Bldg./Apt.# | City Las Vegas | State NV | Zip Code
Occupation: Flight Attendant
Depart Date (if visitor): 

Best *place* to contact you during the day: Cell phone
Best *time* to contact you during the day: Anytime I leave a message
Can You Identify the Suspect? ☑ Yes ☐ No

**DETAILS** Within about 20 minutes of flight, the flight attendants in the back informed me about the situation of the _____. They told me that they felt uncomfortable, and that we should keep our eyes open and watch out. When I made my trash run, to keep my eyes open. I saw _____ b6 b7C _____ I personally went up to the cockpit and told the captain because the situation made all of us feel uncomfortable. In the meantime, while I was up there, _____ noticed _____ and came up to the cockpit and told the captain. The captain asked _____ to seperate _____ After that, I stayed in the front of the cabin and did not see or talk to them.

I HAVE READ THIS STATEMENT AND I AFFIRM TO THE TRUTH AND ACCURACY OF THE FACTS CONTAINED HEREIN. THIS STATEMENT WAS COMPLETED AT (LOCATION) 5757 Wayne Newton Blvd LV, NV 89119 Gate D-18
ON THE 29 DAY OF MARCH AT 7:00 (AM / PM), 2019.

Witness/Officer: _____

Witness/Officer: _____
LVMPD 85 (REV. 6-08)

b6 b7C

Obasi
9/15/2022
**Exhibit 1**
Oasis Reporting Services

F. Obasi Deposition
3/16/2022
Exhibit 1

EXHIBIT B

19AZF0229 DELVECCHIA FRONTIER 0117









DECLARATION OF RESEARCH ASSISTANT, CUSTODIAN OF RECORDS CONCERNING LAS VEGAS METROPOLITAN POLICE DEPARTMENT RECORDINGS OF EMERGENCY "9-1-1" CALLS (TAPE AND COMPUTERIZED MATERIALS)

I, **Erika Johnson**, hereby declare under the penalty of perjury:

1.      That I am an employee of the Las Vegas Metropolitan Police Department, Las Vegas, Nevada and in such capacity, I act as the Custodian of Records for the records and recordings of 9-1-1 and 3-1-1 calls made to the Las Vegas Metropolitan Police Department.

2.      That all calls made to 9-1-1 are recorded by the Las Vegas Metropolitan Police Department onto DVDs and into computerized records.

3.      That I have examined the recordings made by the Las Vegas Metropolitan Police Department and that I have discovered that on March 28, 2019 a call was made in reference to an event at 5757 Wayne Newton Blvd at or near 2113 hours.

4.      That I have made an exact, true, accurate and complete reproduction of the above described call to 9-1-1 onto a CD and have printed an exact, true, accurate, and complete reproduction of the computerized information concerning this call.  That I have written the Event Number 190300137169 onto that CD.  I then sealed that CD into an envelope, attached this declaration and the computerized information concerning that call to that envelope and wrote my name and the same Event Number on the outside of that envelope.

5.      That the original recording of the call (DVD and computer entries) by the Las Vegas Metropolitan Police Department was made at the time the call was received by the Las Vegas Metropolitan Police Department and that the recording was made by a person with knowledge in the course of a regularly conducted business activity of the Declarant or of the office of the Declarant.

6.      That such recording of the 9-1-1 calls made to the Las Vegas Metropolitan Police Department are a regular practice of the Las Vegas Metropolitan Police Department and are part of the activities of the Las Vegas Metropolitan Police Department and the recording of the 9-1-1 calls are matters observed pursuant to a duty imposed by law.  That this is a full, true and correct copy of the original on file with the Las Vegas Metropolitan Police Department, except for information that is privileged and confidential by law.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:    November 14, 2019          Signature: _____

                                                    CUSTODIAN OF RECORDS



Obasi
9/15/2022
**Exhibit 4**
EXHIBIT B
Oasis Reporting Services



**LVMPD - COMMUNICATION CENTER**
**EVENT SEARCH**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| EVT | **LLV190300137169** | | TYPE | **428** | | PRI | **1** |
| LOC | **MCCARRAN AIRPORT** | | BLDG | | | APT | |
| ADDR | **5757 WAYNE NEWTON BLVD** | | XST | **T1 DEPARTURES** | | CITY / SD | **LAS VEGAS / CC** |
| CADD | | | CNAM | | | CPHONE | |
| MAP | **3125-23** | | S/B | **Q1** | | SRA | **K466** |
| P/U | **1Q80** | | OFF1 | **B4154B** | | OFF2 | |
| DATE | **2019-03-28** | | INIT | **21:13:55** | | AREA | **SC** |
| 911 | **N** | | CLSE | **01:48:40** | | DISP | **L** |

| Time | Code | Unit | Location / Detail | | Col1 | Col2 |
|---|---|---|---|---|---|---|
| 21:13:55 | ER | 3Q70B | 5757 WAYNE NEWTON BLVD | | C052 | 16857 |
| 21:13:55 | INC CREATE | | Initiated By C16857 | | C052 | C16857 |
| 21:13:55 | PRIM UNIT | | Primary:  From:  To: LV/3Q70B | | C052 | C16857 |
| 21:13:55 | DPTCH | | LV/3Q70B (Officers: LV/Tripp Blane) | | C052 | C16857 |
| 21:13:55 | INC STAT | | IncStatName  From: Pending  To: Active | | C052 | C16857 |
| 21:14:23 | AR | 3Q91 | 5757 WAYNE NEWTON BLVD | | C052 | 16857 |
| 21:14:23 | AR | 3Q80B | 5757 WAYNE NEWTON BLVD | | C052 | 16857 |
| 21:14:23 | AR | 3Q55 | 5757 WAYNE NEWTON BLVD | | C052 | 16857 |
| 21:14:23 | DPTCH | | LV/3Q91 (Officers: LV/Wright Martin) | | C052 | C16857 |
| 21:14:23 | DPTCH | | LV/3Q80B (Officers: LV/White Anthony) | | C052 | C16857 |
| 21:14:23 | DPTCH | | LV/3Q55 (Officers: LV/Leavitt Greg) | | C052 | C16857 |
| 21:15:28 | CM | | FLIGHT ATTENDANT WITN FTR FONDLING 12YO SON /  MED REF'D  /  FLIGHT LANDS AT 2120HRS | | C052 | 16857 |
| 21:15:55 | CM | | SUPS ADVD VIA AM | | C052 | 16857 |
| 21:16:11 | AR | 3Q70B | 5757 WAYNE NEWTON BLVD | | C052 | 16857 |
| 21:17:54 | ER | 3Q91 | 5757 WAYNE NEWTON BLVD | | M1217 | M6177W |
| 21:18:21 | ER | 3Q91 | 5757 WAYNE NEWTON BLVD | | M1217 | M6177W |
| 21:19:50 | AR | 3Q91 | 5757 WAYNE NEWTON BLVD | | M1217 | M6177W |
| 23:14:01 | CL | 3Q91 | | | M1217 | M6177W |
| 23:14:01 | INC UPDT | | Dispo:  From:  To: N | | M1217 | 06177 |
| 23:14:01 | INC UPDT | | DispoFields  From:  To: N | | M1217 | 06177 |
| 23:14:01 | INC UPDT | | UnitIDFields  From:  To: LV/3Q91 | | M1217 | 06177 |
| 23:14:02 | ER | 1Q80 | 5757 WAYNE NEWTON BLVD | | C110 | 17130 |
| 23:14:02 | DPTCH | | LV/1Q80 (Officers: LV/Berghuis Bradley) | | C110 | C17130 |
| 23:14:43 | ER | 610 | 5757 WAYNE NEWTON BLVD | | C110 | 17130 |
| 23:14:43 | DPTCH | | LV/610 (Officers: LV/Obasi Francois) | | C110 | C17130 |
| 23:15:01 | AR | 610 | 5757 WAYNE NEWTON BLVD | | C110 | 17130 |
| 23:15:01 | AR | 1Q80 | 5757 WAYNE NEWTON BLVD | | C110 | 17130 |
| 23:15:33 | PRIM UNIT | | Primary:  From: LV/3Q70B  To: LV/1Q80 | | C110 | C17130 |
| 23:15:33 | PRIM UNIT | | Primary:  From: LV/3Q70B  To: LV/1Q80 | | C110 | C17130 |
| 23:16:26 | CL | 3Q55 | | | C110 | 17130 |
| 23:16:26 | INC UPDT | | Dispo:  From:  To: N | | C110 | 17130 |
| 23:16:26 | INC UPDT | | DispoFields  From:  To: N | | C110 | 17130 |
| 23:16:26 | INC UPDT | | UnitIDFields  From:  To: LV/3Q55 | | C110 | 17130 |
| 23:16:26 | CL | 3Q80B | | | C110 | 17130 |
| 23:16:26 | INC UPDT | | Dispo:  From:  To: N | | C110 | 17130 |
| 23:16:26 | INC UPDT | | DispoFields  From:  To: N | | C110 | 17130 |
| 23:16:26 | INC UPDT | | UnitIDFields  From:  To: LV/3Q80B | | C110 | 17130 |
| 23:16:27 | CL | 3Q70B | | | C110 | 17130 |

I HEREBY CERTIFY that this is a full, true
and correct copy of the original on file with
the Las Vegas Metropolitan Police Department,
except for the information that is privileged
and confidential by law.

RESEARCH ASSISTANT Communications Bureau



**LVMPD - COMMUNICATION CENTER**
**EVENT SEARCH**

| 23:16:27 | INC UPDT | | Dispo:  From:   To: N | | C110 | C17130 |
|---|---|---|---|---|---|---|
| 23:16:27 | INC UPDT | | DispoFields  From:   To: N | | C110 | C17130 |
| 23:16:27 | INC UPDT | | UnitIDFields  From:   To: LV/3Q70B | | C110 | C17130 |
| 01:36:25 | CM | | 610 C4 PER AIRPORT DISP STILL ON CALL | | C012 | 15951 |
| 01:47:45 | INC UPDT | | IncidentCallSource  From: 0   To: 2 | | C049 | C08478 |
| 01:47:45 | CM | | FBI HANDLING | | C049 | 8478 |
| 01:48:10 | CL | 1Q80 | | | C049 | 8478 |
| 01:48:10 | INC UPDT | | Dispo:  From:   To: L | | C049 | C08478 |
| 01:48:10 | INC UPDT | | DispoFields  From:   To: L | | C049 | C08478 |
| 01:48:10 | INC UPDT | | UnitIDFields  From:   To: LV/1Q80 | | C049 | C08478 |
| 01:48:40 | CL | 610 | | | C049 | 8478 |
| 01:48:40 | INC UPDT | | Dispo:  From:   To: L | | C049 | C08478 |
| 01:48:40 | INC UPDT | | DispoFields  From:   To: L | | C049 | C08478 |
| 01:48:40 | INC UPDT | | UnitIDFields  From:   To: LV/610 | | C049 | C08478 |
| 01:48:40 | INC STAT | | IncStatName  From: Active   To: Closed | | C049 | C08478 |

I HEREBY CERTIFY that this is a full, true
and correct copy of the original on file with
the Las Vegas Metropolitan Police Department,
except for the information that is privileged
and confidential by law

RESEARCH ASSISTANT Communications Bureau