CHARLES A. MICHALEK, ESQ.
Nevada Bar No. 5721
ROGERS, MASTRANGELO, CARVALHO & MITCHELL
700 South Third Street
Las Vegas, Nevada 89101
Phone: (702) 383-3400
Email: cmichalek@rmcmlaw.com

Brian T. Maye (admitted *pro hac vice*)
Richard C. Harris (admitted *pro hac vice*)
HINSHAW & CULBERTSON
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
Phone: (312) 422-5713
Email: bmaye@hinshawlaw.com
      rharris@hinshawlaw.com

***Attorneys for Defendants Frontier Airlines, Inc.,
Scott Warren, and Rex Shupe***

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| PETER DELVECCHIA, individually and as next friend of A.D., a Minor,<br><br>      *Plaintiffs*,<br><br><br>v.<br><br>FRONTIER AIRLINES, INC., SCOTT WARREN, and REX SHUPE,<br><br>      *Defendants*. | Case No.: 2:19-cv-01322-KJD-DJA<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

    Defendants FRONTIER AIRLINES, INC. ("Frontier"), SCOTT WARREN, and REX SHUPE (collectively "Defendants") hereby file this Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure 56 (Fed. R. Civ. P. 56) and Local Rule of Practice 56-1 (LR 56-1), and in support thereof provide the following Statement of Undisputed Material Facts and Memorandum of Points and Authorities:

## I.   **INTRODUCTION**

This lawsuit involves the actions of flight crew members who were genuinely concerned for the safety of a minor passenger. The reports made to law enforcement officers contained no material falsities, and there is simply no evidence, let alone "specific and substantial" evidence, to support Plaintiffs' claims that the flight crew members engaged in intentional racial discrimination.

On March 28, 2019, Plaintiffs flew on a Frontier flight from Raleigh-Durham International Airport ("RDU") to McCarran International Airport[1] ("LAS") in Las Vegas, Nevada. During the flight, Flight Attendant ("FA") Chelsey Bright-Sakurada reported to Captain Rex Shupe that she observed Plaintiff Peter DelVecchia ("Peter") "stroking" the face of Plaintiff A.D., a minor, in an manner that made her uncomfortable. FA Scott Warren later reported to Captain Shupe that he observed Peter's hand located on A.D.'s crotch. Based on these reports, Captain Shupe reported to law enforcement authorities that Peter "seem[ed]" to be "inappropriately touching" a minor, and instructed the flight attendants to separate Plaintiffs for the remainder of the flight. Investigations conducted by the Las Vegas Metropolitan Police Department ("LV Police") and Federal Bureau of Investigation ("FBI") did not result in criminal charges. Plaintiffs brought the instant suit against Frontier, FA Warren, and Captain Shupe seeking compensatory and punitive damages for claims of racial discrimination under 42 U.S.C. § 1981, defamation, intentional infliction of emotional distress, false imprisonment, assault, and battery. ECF No. 153.

Defendants are immune from liability under § 44941 of the Aviation and Transportation Security Act ("ATSA") (49 U.S.C. § 44901 *et seq.*) because there is no evidence of actual malice in their reports of "inappropriate touching" of a minor. Moreover, Plaintiffs' § 1981 claims fail because there is no evidence that Defendants' legitimate, non-discriminatory reason for their actions (concern for A.D.'s safety) was pretext for intentional race discrimination. For these reasons and those argued below, the Court should grant Defendants' Motion for Summary Judgment and dismiss this case in its entirety.

---

[1] In December of 2021, the airport's name was changed from McCarran to Harry Reid International Airport.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.    <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Peter is A.D.'s adopted father. At the time of the incident, Peter was a 55 year-old man and A.D. was a 12 year-old boy. Peter identifies his race as Caucasian, and A.D. identifies his race as African American. The Defendants are Frontier, FA Scott Warren, and Captain Shupe. FA Warren identifies his race as African American and Captain Shupe identifies his race as Caucasian. ECF No. 153, ¶¶ 1, 2, 4, 5.[2]

Plaintiffs initially occupied two seats in an exit row. Ex. A, p. 21:21-24. After FA Anna Bond ("FA Bond") ascertained that A.D. was too young to sit in an exit row, Plaintiffs were relocated to Row 17, with Peter in the middle seat and A.D. in the window seat. The aisle seat was occupied by a man unknown to Plaintiffs. ECF No. 153, ¶ 9.

After Peter and A.D. were reseated in Row 17, FA Bright-Sakurada reported to Captain Shupe that she was concerned about the manner in which an older male was "stroking" the face of a child. Ex. D, p. 19:3-8. FA Bright-Sakurada's full deposition transcript is attached as **Exhibit E**. She testified that Peter was "leaning over very closely and just up and down, just stroking, just looking at him, just stroking his face up and down, up and down." Ex. E, p. 49:22-24. FA Bright-Sakurada had never seen a father touch his son's face the way Peter was touching A.D.'s face. *Id*., p. 50:20-22. A.D. testified that Peter was rubbing his face and back in a manner he described as a "loving" show of affection that was typical for Peter, both privately and in public. Ex. B, pp. 66:23-68:7. In their Third Amended Complaint, Plaintiffs describe Peter's conduct as "a common gesture that did not suggest any improper conduct or immorality." ECF No. 152, ¶ 17.

FA Warren subsequently walked past Row 17 and observed Peter's hand on A.D.'s crotch. FA Warren testified that Plaintiffs "appeared to be asleep" although he was unsure if they were actually asleep.

---

[2] Peter's full deposition transcript is attached as **Exhibit A**; due to A.D.'s status as a minor, only select pages of his deposition transcript are attached **Exhibit B**; FA Warren's full deposition transcript is attached as **Exhibit C**, and Captain Shupe's full deposition transcript is attached as **Exhibit D**.

FA Warren reported to Captain Shupe that he observed Peter's hand on A.D.'s crotch, but he did not remember telling Captain Shupe that Peter and A.D. "appeared to be asleep." *Id.*, pp. 107:4-108:10.

Plaintiffs allege they were both "sound asleep" when FA Warren saw Peter's hand on A.D.'s crotch. ECF No. 153, p. 3; ¶¶ 14, 31, 34. Peter recalled that he took half of a sleeping pill and A.D. took his melatonin. Peter then hugged and kissed A.D. and fell asleep with A.D.'s head on his shoulder. Ex. A, p. 25:7-15, p. 41:2-3.

Based on FA Bright-Sakurada's report that she was concerned about Peter "stroking" A.D.'s face and FA Warren's report that he saw Peter's hand on A.D.'s crotch, Captain Shupe determined Peter and A.D. should be separated for the rest of the flight. Ex. D, p. 23:21-24:3; p. 27:14-21. He did not know their respective races, and he did not recall learning that Peter and A.D. appeared to be asleep when Peter's hand was on A.D.'s crotch. *Id.*, pp. 16:11-18; 22:10-14. Captain Shupe testified: "My duty is not to – to interrogate or to – to go in the back and investigate the situation on a – on a personal level. My duty is to fly the airplane to the destination and do it safely and sort it out when we get on the ground with law enforcement." *Id.*, p. 41:20-25.

Captain Shupe and First Officer Sean Mullin exchanged text messages with ground personnel through the Aircraft Communication Addressing and Reporting System ("ACARS"). *Id.*, p. 53:1-4. As reflected in the attached **Exhibit F**, the pilots first reported that the flight attendants were uncomfortable about what "seem[ed]" to be "inappropriate touching" between an older male and a 12 year-old boy. They relayed Plaintiffs' original seat assignments and asked for additional information regarding the adult. No new information was provided. The pilots later sent responses to ground personnel indicating that the flight attendants had witnessed the "inappropriate touching," and that Plaintiffs had been separated. The pilots sought confirmation that law enforcement officers (or "LEOs") would be waiting at the gate when

they arrived in Las Vegas, and noted that Plaintiffs would deplane to meet the LEOs after the other passengers. The flight arrived in Las Vegas at 8:36 p.m. on March 28, 2019.[3] *Id.*

The deposition transcript of LV Police Sergeant Francois Obasi is attached as **Ex. G**. Sergeant Obasi's job was to meet the flight on its arrival and determine the need for FBI involvement. Ex. G, p. 22:15-21. Sergeant Obasi and other LV Police officers met with the flight attendants in the area of the "jetway" (or "jet bridge") just outside the aircraft, where the flight attendants completed written reports. *Id.* at p. 91:14-92:15. Sergeant Obasi also briefly spoke with Captain Shupe. *Id.* at p. 17:13-23. Based on what was told to Captain Shupe, Sergeant Obasi thought it was proper for him to notify authorities. *Id.* at p. 80:14-21. Based on the flight attendants' statements and the officers' discussions with Peter, Sergeant Obasi determined there was sufficient information to warrant the FBI investigating. *Id.* at p. 57:8-21. Plaintiffs were transported to Terminal 3 Substation to meet the FBI, and the written LV Police statements were given to the FBI. *Id.* at pp. 24:9-14; 26:13-16.

Copies of the flight attendants' written reports are attached as **Group Exhibit H**.[4] The reports generally reflect the flight attendants concerns after Peter was seen rubbing or "stroking" A.D.'s face, and Peter's hand was seen on A.D.'s crotch. The reports further reflect that Peter told FA Warren he was asleep, A.D. told FA Warren he felt safe and did not know Peter's hand was on his crotch, and A.D. said he and Peter "had been separated before on a flight." *Id.* at p. 0118-0119; Ex. C, p. 104:11-13; 105:14-20.

Peter alleges he was questioned for about six hours after the flight landed. ECF No. 153, p. 4. He struggled cognitively during this time. *Id.* at p. 112:15-23. He explained during his interview that he had "no idea" what happened and he had taken a sleep aid to fall asleep. *Id.*, p. 116:1-3.

---

[3] As reflected by Ex. F, the flight arrived in Las Vegas at 04:36 Zulu Time on March 29, which converts back to 8:36 p.m. Pacific Standard Time on March 28.

[4] Group Exhibit H contains several redactions. Frontier was unable to obtain unredacted copies. When deposed by Plaintiffs, the flight attendants testified to their impressions of what was redacted.

The FBI prepared a written report of its investigation, a copy of which is attached as **Exhibit I**.[5] The FBI report reflects that Peter said he was awakened during the flight when a male flight attendant "angrily poked him in the back." Peter also indicated that law enforcement officers had been called before on "several different occasions" due to concerned citizens reporting "possible inappropriate behavior" between Peter and A.D. *Id.* Near the end of Peter's FBI interview, an officer indicated that no charges would likely be filed, but nonetheless requested Peter's consent to search his camera, laptop, and cell phone. Ex. A, pp. 120:15-121:9; Ex. I. After a search of Peter's electronic devices revealed nothing inappropriate, Plaintiffs retrieved their luggage and no further action was taken. Ex. I.

Regarding A.D.'s statement to FA Warren that Plaintiffs were "separated before on a flight" (Group Ex. H, at p. 0118) and Peter's statements to the FBI that concerned citizens had previously reported "possible inappropriate behavior" (Ex. I), Peter testified as follows.

Regarding a prior incident travelling with a different airline, Peter explained:

> "I probably should say right now, A.D. is an incredibly affectionate person, and he was probably ten at the time, and he put his head on my shoulder, and he fell asleep, and I fell asleep as well. And I was informed, when I got off the plane, by the FBI, that a passenger reported it to an airline attendant, who then asked the police to question us once we landed." Ex. A, p. 81; 8-16.

Another prior incident occurred in a movie theatre when Plaintiffs were asked to step outside during the film "Black Panther" and police explained the concerns reported by other movie patrons:

> "[The police] said that I was holding [A.D.'s] hand, and that my hand was resting against his leg, and that somebody called them and said that they were concerned about abuse of a minor. And he didn't say sexual abuse, but he said abuse of a minor. And then they talked to A.D. apart from me." Ex. A, p. 91; 17-23.

Regarding the subject flight, Peter testified that after he was separated from A.D., but before the plane landed, he was "relieved" to hear the police had been called. Ex. A, p. 69:23-24. He explained:

> "I had prior experiences like this, which I know you know about, and the FBI and the police were always extremely fair about it. This is not new. And I kept trying to tell myself over and over again that, 'This will be quick,' and it's always gone very fair. And not 'always'

---

[5] Exhibit I also contains several redactions made by the FBI.

like it's been a hundred times. I think there's been three – or two. Two other times. This was the third time. So I kept trying to calm myself down, because I knew if they were truly waiting outside the plane, then in my mind: In five minutes we're done." *Id.,* p. 73:10-21.

### III.   MEMORANDUM OF POINTS AND AUTHORITIES

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Only disputed facts which might affect the outcome of the suit will preclude the entry of summary judgment, and irrelevant factual disputes will not be considered. *Pratt v. Cox*, No. 3:11-cv-00604-RCJ (WGC), 2012 U.S. Dist. LEXIS 186357, at *4 (D. Nev. Dec. 19, 2012).

This case is about the difficult decisions that airlines and their employees must make when dealing with genuine concerns of child endangerment. Accordingly, before addressing Plaintiffs' claims of racial discrimination (which have no factual support), Defendants must first invoke their federal immunity for making voluntary disclosures to law enforcement officers regarding a threat to passenger safety.

### A.   Plaintiffs' Lawsuit Should be Dismissed in its Entirety, as Defendants are Immune from Liability for their Reports to Law Enforcement and the Conduct that Resulted

Section 44941(a) of the ATSA provides in relevant part:

Any air carrier … or any employee of an air carrier … who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism … to any … Federal, State, or local law enforcement officer, or any airport or airline security officer or regulation of the United States, any constitution, law, or regulation of shall not be civilly liable to any person under any law any State or political subdivision of any State, for such disclosure.

Under § 44941(b), ATSA immunity is lost only if a disclosure to law enforcement is made with "actual knowledge that the disclosure was false, inaccurate, or misleading," or with "reckless disregard" as to the truth or falsity of the disclosure. As stated in *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237 (2014), Congress patterned the exception after the "actual malice" standard articulated in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). Applying this standard, "a statement otherwise eligible for

ATSA immunity may not be denied immunity unless the statement is materially false." *Air Wisconsin*, 571 U.S. at 246-47. Determining whether a false statement is "materially false" in the ATSA context requires determining whether a true statement would produce a different effect on a reasonable law enforcement officer. A falsity is not material under the ATSA "absent a substantial likelihood that a reasonable security officer would consider it important in determining a response to the supposed threat." *Id*. at 252. Accordingly, statements to law enforcement do not lose ATSA immunity because of minor imprecisions so long as "the gist" of the statements is accurate. *Id*. at 255.

Defendants are entitled to ATSA immunity in this case because "the gist" of their statements to law enforcement officers was accurate, as reflected in the pilots' ACARS messages, which relayed the flight attendants' concerns of "inappropriate touching" of a minor. These concerns were based on (1) FA Bright-Sakurada's report that she observed Peter "stroking" A.D.'s face in a manner that made her uncomfortable, and (2) FA Warren's report that he observed Peter's hand on A.D.'s crotch.

Regarding FA Bright-Sakurada's initial report to Captain Shupe, it is undisputed that Peter was rubbing A.D.'s face in a manner A.D. described as "loving." Ex. B, p. 67:1-13. Regarding FA Warren's subsequent report to Captain Shupe, although Plaintiffs allege FA Warren "falsely told the others that he had seen Peter touching A.D. in an inappropriate manner" (ECF No. 153, ¶ 31), they have no basis for such an accusation. Because Plaintiffs claim they were both "sound asleep" when FA Warren saw Peter's hand on A.D.'s crotch (ECF No. 153, p. 3), they lack the necessary foundation to dispute FA Warren's observation. *See Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (plaintiff could not perceive the events that transpired while she was asleep); *see also Branch Banking & Trust Co. v. Smoke Ranch Development, Ltd. liability Co.*, No. 2:12-cv-00453-APG-NJK, 2014 U.S. Dist. LEXIS 136626, at *40 (D. Nev. Sep. 26, 2014) (factual assertions in pleadings are binding and withdraw fact from issue).

In *Baez v. JetBlue Airways Corp.*, 793 F.3d 269 (2d Cir. 2015), the plaintiff timely checked her luggage but missed her flight's departure. After learning she could not board her flight, she commented:

"Isn't it a security risk to let a bag go on a plane without a passenger, what if there was a bomb in the bag?" When JetBlue's employee (Malabet) reported the incident to her supervisor, the FBI investigated the bag but found no bomb. The plaintiff later brought claims against JetBlue and Malabet for negligence, defamation, false arrest, and IIED, but the district court granted summary judgment to JetBlue and Malabet on grounds that the ATSA afforded them "immunity from suit." *Id.* at pp. 272-73.

On appeal, the plaintiff maintained she had raised a mere hypothetical question about the risk posed by an unaccompanied bag and pointed to Malabet's testimony that she herself did not believe there was a legitimate security threat. However, the Second Circuit concluded that a reasonable law enforcement officer would still want to investigate the bag regardless of whether Malabet's report was couched in terms of a hypothetical bomb threat. *Id.* at pp. 275. This was evident by the FBI's report, which included the hypothetical formulation of the plaintiff's comments and showed that the officers took the threat seriously, even if Malabet did not. *Id.* at pp. 276. Finally, the Second Circuit held that Malabet's report to her supervisor was protected under § 44941 as "the first step in a chain of events" leading to a voluntary disclosure of a possible threat to law enforcement. *Id.*

*Baez* is instructive here for its treatment of material and immaterial falsities regarding the intent of a suspected wrongdoer. In the context of aviation safety, bomb threats and child endangerment are among matters of the utmost importance, and reasonable police officers do not consider a reporter's perception of a suspected wrongdoer's intent to be an important factor in determining whether to investigate.

In *Baez*, from the perspective of a reasonable law enforcement officer, it was immaterial whether the plaintiff made a hypothetical or sincere bomb threat, and Malabet had no duty to investigate or even report her perception of the plaintiff's intent. Here, from the standpoint of a reasonable law enforcement officer, it was immaterial whether the ACARS messages indicated that Peter appeared to be asleep when his hand was on A.D.'s crotch. This much is evident by Sergeant Obasi's testimony that it was proper for Captain Shupe to notify authorities (Ex. F, p. 80:14-21), and by the FBI's lengthy investigation of Peter.

Despite learning that Peter was asleep when his hand was on A.D.'s crotch, and that A.D. felt safe and he did not know Peter's hand was on his crotch (Ex. C, p. 104:11-13; 105:14-20; Ex. G, p. 0118-0119), the FBI still investigated Peter for six hours and searched his camera, laptop, and cell phone. Ex. A, pp. 120:15-121:9; Ex. G.

In *Cupp v. Delta Air Lines, Inc.*, No. 4:22cv29, 2023 U.S. Dist. LEXIS 58732 (E.D. Va. Mar. 3, 2023), a flight attendant was concerned about the manner in which a disabled man was touching a 13 year-old girl. The captain reported the flight attendant's concerns to law enforcement officers who met the plane upon its arrival and took the disabled man into custody. It turned out that the man was the girl's father, and there was no evidence of wrongdoing. The father brought claims against the airline for negligence, IIED, false imprisonment, and tortious interference with parental rights. *Cupp*, 2023 U.S. Dist. LEXIS 58732, at *4-7. However, the Virginia Eastern District Court dismissed the father's complaint in its entirety with prejudice under Fed. R. Civ. P 12(b)(6), based on Virginia statutory law providing immunity from civil liability for individuals who report suspected child abuse.[6]

The *Cupp* court noted that the statutory immunity applied to voluntary reporters and is designed to encourage people to report suspicions of child endangerment without fear of civil liability. Like the immunities afforded under § 44941 of the ATSA, the Virginia statutory immunity applied in *Cupp* unless the defendant acted in bad faith or with malicious intent in reporting to law enforcement. *Id*. at *10. The case law applying the Virginia statute established that a reporting party "has no duty to investigate and inquire before reporting potential child abuse." *Id*. at *14. The plaintiff's allegations that the defendant airline should have known of the plaintiffs' familial relationship did "not rise to the level of bad faith or malicious intent," as "[a] familial relationship does not necessarily negate suspicions of child abuse, and a failure to properly train employees, without more, rises to the level of negligence at best." *Id*. at *15.

---

[6] The plaintiff in *Cupp* filed a notice of appeal. At the time of this writing the appeal remains pending.

The *Cupp* court concluded by quoting the Fourth Circuit in *Wolf v. Fauquier County Board of Supervisors*, 555 F.3d 311, 323-24 (4th Cir. 2009):

> Hard choices surround the issue of suspected child abuse. Virginia's reporting statute and its social services apparatus are both based on the assumption that false positives – mistaken reports of child abuse followed by DSS investigations – are less harmful than false negatives – serious harm to a child that could have been prevented but was not. Thus it is with every legal regime; whenever government seeks to prevent harm before it occurs, it must make difficult tradeoffs between tolerating mistake on the one hand and serious injury on the other. *Cupp*, 2023 U.S. Dist. LEXIS 58732, at *15-16.

Like *Cupp*, this case is about the hard choices airline employees must make in handling concerns of child endangerment. Similar to the Virginia reporting statute at issue in *Cupp*, ATSA immunity under § 44941 is premised on the assumption that in the aviation context, mistaken reports of suspicious behavior are less harmful than false negatives. Based on the undisputed facts in this case, the risk of a mistaken report of child abuse was outweighed by the risk of serious harm to A.D.[7]

A final case worthy of discussion on the topic of ATSA immunity is *Ilczyszyn v. Southwest Airlines Co.*, 80 Cal. App. 5th 577, 579-80 (2022), in which the California Court of Appeals considered whether immunity under § 44941 applies only to the "actual disclosure of a security threat, and not to conduct associated with such disclosures." Answering this question in the affirmative, the California court found that "Congress intended to confer upon air carriers the greatest possible degree of protection by enacting section 44941" (*id.* at 601), and held in relevant part:

> We conclude that the immunity under section 44941 may be extended to the conduct that arises from security threat disclosures. As the trial court here observed, limiting this important immunity to a disclosure only, and denying immunity to the conduct that flows from the disclosure, would defeat the purpose of the immunity and render it essentially meaningless. The limitation that plaintiffs seek to place on the immunity turns the TSA's

---

[7] Additionally, Nevada provides its own statutory immunity from civil or criminal liability to any person who in good faith reports the abuse or neglect of a child to a law enforcement agency. NRS § 432B.160(1); NRS § 432B.220(5). In any proceeding to impose liability against a person for making such a report, "there is a presumption that the person acted in good faith." NRS § 432B.160(3). For the same reasons discussed above, Plaintiffs cannot overcome this presumption. Thus, while Defendants are entitled first and foremost to ATSA immunity under § 44941, it cannot be overlooked that the Nevada statutes provide an additional layer of immunity for the reports made to Nevada law enforcement officers.

'when in doubt, report' policy on its head. By its very nature, a report of a suspicious incident to the TSA—like the report at issue in this case—is a tentative assessment of an evolving situation based on imperfect information. 'Baggage handlers, flight attendants, gate agents, and other airline employees who report suspicious behavior to the TSA should not face financial ruin if, in the heat of a potential threat, they fail to choose their words with exacting care.' *Id.* at 601-602 (*quoting Air Wisconsin,* 571 U.S. at pp. 253–254).

The cases discussed above demonstrate the difficulties air carriers and their employees face when presented with threats to passenger safety. In the era of "see something, say something," airlines and their employees must not be subjected to civil liability for mistakes made acting in the best interests of children – even when dealing with racially diverse passengers. *See Sajimi v. City of New York*, No. 07-CV-3252 (ENV)(MDG), 2011 U.S. Dist. LEXIS 3912, at * 4, 25 (E.D.N.Y. Jan. 13, 2011) (granting summary judgment in favor of the defendant airline after the plaintiff was arrested for suspected child abuse and/or mistreatment despite presenting Lufthansa travel documents verifying that two minor children were to be transported to Nigeria unaccompanied by an adult). In sum, the Court should follow *Baez*, *Cupp*, and *Ilczyszyn,* and hold that Defendants have the greatest possible degree of protection under § 44941, including immunity that extends beyond mere defamation and reputation-based torts and applies to Defendants' alleged conduct associated with their disclosures to law enforcement. For these reasons, the Court should grant summary judgment in favor of Defendants as to all of Plaintiffs' claims.

## B.    Plaintiffs Cannot Sustain their Claims for Racial Discrimination

The lack of material falsities or actual malice reflected in Defendants' reports to law enforcement officers is part and parcel of why Plaintiffs cannot prevail under 42 U.S.C. § 1981, which requires proving "purposeful" and intentional discrimination on the basis of race. *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391 (1982). To meet this exacting standard, Plaintiffs must prove Defendants would have responded differently but for the fact that Peter is Caucasian and A.D. is African American. *See Comcast Corp. v. National Ass'n of African American-Owned Media*, 140 S. Ct. 1009, 1015 (2020). Plaintiffs' claims fail because no evidence suggests that Defendants' reports to law enforcement officers

were the products of intentional racial discrimination, and Captain Shupe did not even know of Plaintiffs' races until well after he ordered their separation and sent the ACARS messages. Ex. D, p. 16:11-15.

Section 1981 guarantees all persons the same rights to make and enforce contracts, including with respect to the performance of contracts and the "enjoyment of all benefits, privileges, terms and conditions of the contractual relationship." 42 U.S.C. § 1981(b); *see also* ECF No. 67, p. 4. Section 1981 claims require proof of racial animus either through direct evidence, such as derogatory or offensive comments, or through circumstantial evidence. *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1152 (9th Cir. 2006). When a plaintiff's case is entirely circumstantial (such as here), the circumstantial evidence must be **"specific and substantial"** to defeat a motion for summary judgment. (Emphasis added) *Coghlan v. American Seafoods Co. LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005).

To evaluate circumstantial evidence for a plaintiff's discrete claim of racial discrimination, courts apply the burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Applying that framework here, if Plaintiffs can establish a *prima facie* case of racial discrimination, the burden shifts to Defendants to demonstrate a legitimate, non-discriminatory reason for their conduct. If Defendants meet their burden, Plaintiffs must prove that such a reason was merely a pretext for intentional discrimination. *Lindsey*, 447 F.3d at 1144 (9th Cir. 2006). Because (1) Plaintiffs cannot establish a *prima facie* case of racial discrimination, and (2) there is no "specific and substantial" evidence suggesting that Defendants' concern for the safety of A.D. was mere pretext for intentional racial discrimination, this Court should grant Defendant's Motion for Summary Judgment as to Plaintiffs' § 1981 claims.

### 1.   Plaintiffs cannot establish a *prima facie* case of racial discrimination

The *prima facie* case required by *McDonnell Douglas* is an evidentiary standard, not a pleading standard. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002). The plaintiff has the burden of "proving by the preponderance of the evidence a *prima facie* case of discrimination." *Swierkiewicz*, 534 U.S. at 510-11 (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981)).

To establish a *prima facie* case of racial discrimination in this case, Plaintiffs must prove by the preponderance of the evidence that: (1) they are members of a protected class; (2) they attempted to contract for certain services; (3) they were denied the right to contract for those services; and (4) such services were available to similarly-situated individuals who were not members of Plaintiff's protected class, or such services were provided in a "markedly hostile manner" which a reasonable person would find objectively discriminatory. *Lindsey*, 447 F.3d at 1145; *Karrani v. JetBlue Airways Corp.*, No. C18-1510 RSM, 2019 U.S. Dist. LEXIS 127944, at *11 (W.D. Wash. July 31, 2019); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001).

Regarding the first element noted above, there is no dispute that A.D. is a protected class member, but Plaintiffs incorrectly assert that "Peter and A.D. together constitute members of a protected class under § 1981 because they are members of a biracial family unit or group." ECF No. 153, ¶ 62. Plaintiffs like Peter who are not protected class members gain standing under § 1981 if they are the direct target of racial discrimination and sustain personal injuries stemming from their association with members of a protected class. *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1055 (9th Cir. 2002). The preponderance of the evidence in this case does not show that Peter was the direct target of racial discrimination based on his association with A.D., but rather that flight attendants expressed genuine concerns about Peter's physical contact with A.D. Regarding the second and third elements noted above, Peter and A.D. entered no contracts with FA Warren or Captain Shupe, so their § 1981 claims can apply only to Frontier. Finally, regarding the fourth element noted above, the preponderance of the evidence does not show that Frontier provided any services to Plaintiffs in a "markedly hostile manner" which a reasonable person would find objectively discriminatory. For all of these reasons, Defendants respectfully maintain that Plaintiffs cannot make the required *prima facie* evidentiary showing for their § 1981 claims.

### 2. Defendants had a legitimate, non-discriminatory reason for their actions

As argued at length above, Defendants' legitimate, non-discriminatory reason for their actions was a genuine concern for the safety of A.D., a minor. Defendants are supported in this regard because: (1) FA Bright-Sakurada reported observing Peter "stroking" A.D.'s face in a manner she found concerning, and A.D.'s testimony confirmed that Peter was rubbing A.D.'s face prior to the separation; and (2) FA Warren reported observing Peter's hand on A.D.'s crotch, and, because Plaintiffs were sleeping at the time, they cannot dispute that Peter's hand was on A.D.'s crotch.

### 3. Plaintiffs cannot show that Defendants' concern for A.D.'s well-being was merely a pretext for intentional discrimination

As noted, circumstantial evidence of intentional discrimination must be "specific and substantial" to create an arguable question of material fact to survive summary judgment on a § 1981 claim. *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1029 (9th Cir. 2006). To show pretext, the plaintiff must prove the defendant's reason was false and discriminatory intent was behind the true reason. *Maxfield v. Cintas Corp*. No. 2, 427 F.3d 544, 550-51 (8th Cir. 2005). Pretext means "a fabrication, designed to conceal an unlawful reason;" it is "something worse than a business error," where "deceit [is] used to cover one's tracks." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000). The plaintiff cannot prove pretext by showing that the defendant's acts were "foolish or trivial or even baseless." *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 733 (9th Cir. 2001).

Here, Plaintiffs rely on unfounded and unsubstantiated allegations to gin up claims of racial discrimination based on the "biracial characteristic of Plaintiffs' family unit and Peter's association with a Black child, as well as based on A.D.'s race, ancestry and ethnic characteristics." ECF No. 153, p. 2. In a prior Order, the Court aptly summarized Plaintiffs' theory of liability when it dismissed Plaintiffs' negligence counts in their Second Amended Complaint and ruled:

> Plaintiffs allege that Frontier's negligence resulted in flight attendants conducting their duties in ways that were not racially neutral. However, a cause of action for negligent racial discrimination does not exist. ECF No. 121, p. 6.

Despite the labels on Plaintiffs' claims in their Third Amended Complaint, they have continued to rest on a theory of negligent racial discrimination involving implicit bias, which is neither actionable nor at issue, and which Frontier vehemently denies. As the Court previously ruled, such allegations do not rise to the level needed to show intentional racial discrimination. *See Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1419 (9th Cir. 1988) ("conclusory allegations of discrimination are insufficient to satisfy the requirements of Rule 56" and "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.").

For example, Plaintiffs allege FA Amanda Nickel "saw something off" with them and said they gave her an "uneasy feeling." Plaintiffs claim the flight attendants labeled them as "the situation" after FA Bond arranged their move from the exit row to Row 17. According to Plaintiffs, they were labeled "the situation" based solely on the fact that "they were a family unit comprised of a White American man traveling with a Black youth who has Ethiopian ethnic characteristics." ECF No. 153, ¶¶ 10-11. These allegations are drawn from deposition testimony taken out of context, and they do nothing to discount FA Sakurada-Bright's undisputed observation of Peter "stroking" A.D.'s face in a manner that made her feel uncomfortable, and FA Warren's undisputed observation of Peter's hand on A.D.'s crotch. Considering the undisputed facts supporting the flight attendants' genuine concerns for A.D.'s well-being, Plaintiffs' conjecture about the flight attendants' mental impressions during their encounter on the plane constitutes neither specific nor substantial evidence of intentional discrimination.

Plaintiffs further claim that FA Warren fabricated his allegation that Peter's hand was on A.D.'s crotch while Peter and A.D. were sleeping. As established above, Plaintiffs' lack of knowledge while they were sleeping precludes them from denying that Peter's hand was on A.D.'s crotch. *See Lowry*, 858 F.3d at 1256. Nonetheless, Plaintiffs malign FA Warren with unsupported accusations that he believed it was "immoral for Peter to have adopted an African child," and he "resented A.D.'s being adopted into a White family." ECF No. 153, ¶ 41. Plaintiffs have not identified or produced a single witness or document to

support these wild allegations. That Plaintiffs must tie their theory together by baselessly speculating that FA Warren, himself an African American man, intentionally discriminated against Plaintiffs serves only to demonstrate the weakness of Plaintiffs' § 1981 claims.

Plaintiffs conclude their general allegations with the following paragraph which has already been the subject of multiple discovery motions:

> Frontier intentionally chose not to provide its employees and agents with any anti-bias training that would have informed them how to implement human trafficking, sexual misconduct and threat level protocols in a race-neutral manner to prevent discrimination, while knowing that the failure to provide such training would foster an environment in which flight attendants and pilots would use those protocols in ways that would cause discrimination to passengers on the basis of race, color, national origin, ethnic characteristics and/or ancestry. Frontier had notice of multiple instances of racial profiling and similar conduct by its flight attendants, and repeatedly condoned such activity by its employees against its passengers. Frontier's knowledge of, and condonation of, numerous incidents of race-based and ethnicity-based discrimination by its employees against persons of color and mixed-race groups over many years leading up to the events described herein intentionally and recklessly fostered an environment in which its employees, including, without limitation, those working on Flight 2067, believed that they were authorized by their employer to discriminate against passengers of color and mixed-race groups of passengers. *Id*. at 58.

This entire paragraph is pure fiction unsupported by any admissible evidence, and a transparent effort to repackage negligence allegations and pass them off in support of intentional tort claims. In denying Plaintiffs' Fourth Motion to Compel, which sought the discovery of redacted personal contact information pertinent to prior informal passenger complaints against Frontier, Judge Albregts ruled: "Plaintiffs assert that they are entitled to 'pattern and practice' evidence but have not made any 'pattern and practice' claims." ECF No. 192, p. 11-12. Judge Albregts noted that Plaintiffs "are pursuing their claims on their own behalf, not for a class of people." *Id*. at p. 12. Judge Albregts ruled that Plaintiffs have made no showing that "pattern or practice" evidence is connected to their claims beyond their "conclusory assertions" in their briefs that Frontier promotes "corporate hostility" toward persons of color. *Id*.

District Court Judge Dawson later upheld Magistrate Judge Albregts' ruling and concluded that "conducting a more expansive discovery effort to determine the details of what these previous complaints

consist of, is not relevant or proportional or to the needs of the case." ECF No. 232, p. 13. It is thus evident that Plaintiffs have erroneously based their private and discrete § 1981 claims on a theory of proving intentional discrimination through the improper use of "pattern-and-practice" evidence.

Finally, Plaintiffs repeatedly assert that Captain Shupe "recklessly neglected to investigate beyond assuming that Warren, whom Shupe had never met before, was a man of his word," and sent the ACARS messages without conducting his own independent investigation. ECF No. 153, p. 3, ¶ 34; *see also* ¶ 22, 23, 28, 33, 35, 51, 52, 70, 74, 79, 84. Even if true, a failure to investigate would only amount to negligence and would not constitute "specific and substantial evidence" of intentional discrimination. Nonetheless, the *Karrani v. JetBlue* case cited *supra* (at p. 14) illustrates why Plaintiffs' allegations are meritless.

The plaintiff in *Karrani* (Mr. Karrani) was a Somalian-born US citizen who brought a § 1981 claim alleging he was wrongfully removed from a flight due to racial discrimination. Mr. Karrani had a dispute with a flight attendant (Ms. Pancerman) over the use of a lavatory while the plane was descending for an unrelated stop. Ms. Pancerman claimed Mr. Karrani hit her, while Mr. Karrani claimed it was Ms. Pancerman who initiated the physical contact. *Karrani*, No. C18-1510 RSM, 2019 U.S. Dist. LEXIS 127944, at *2. The parties further disputed what details Ms. Pancerman provided to the captain which led him to request assistance from law enforcement officers on the ground. When the plane landed, although the investigating police officer declined to charge Mr. Karrani with assault, the captain nonetheless barred Mr. Karrani from re-boarding the flight. *Id*. at *3-4.

To demonstrate a legitimate, non-discriminatory reason for the captain's decisions, the airline asserted passenger safety concerns and relied on § 44902 of the Federal Aviation Act, which provides that an air carrier "may refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety." 49 U.S.C. § 44902. To show pretext, Mr. Karrani argued the captain was required to do more than defer to his flight attendants, and should have independently investigated the parties' different

versions of events. *Id.* at *17. The *Karrani* court disagreed and granted summary judgment in favor of the defendant airline, noting:

> The threshold for an airline determining that a passenger presents a possible safety issue is very low, given the countervailing interest of the airline to ensure the safety and security of its other passengers and flight crew. For that reason, courts grant airlines broad latitude to determine what constitutes a 'safety risk' – even if the matter seems innocuous. *Id.*, *14.

*Karrani* is instructive here for its recognition that "courts analyzing the lawfulness of a captain's removal decision routinely consider only that information acted upon by the captain – not the information "he reasonably *should have* known." *Id.* at *18 (emphasis in original) (quoting *Cerqueira v. American Airlines, Inc.*, 520 F.3d 1, 14 (1st Cir. 2008)). Even in instances where flight attendants provide exaggerated or false information to the captain, the inquiry under § 44902 still depends on the reasonable belief of the captain. *Karrani*, No. C18-1510 RSM, 2019 U.S. Dist. LEXIS 127944, at *18.

Frontier does not argue it is entitled to § 44902 immunity, as Plaintiffs were not technically removed from their flight. Frontier relies on *Karrani* only to highlight the flaw in Plaintiffs' claim that Captain Shupe owed them a duty to investigate the flight attendants' observations to protect them from racial discrimination. *See* ECF No. 153, ¶ 33. The same principles protecting a captain's decision to remove a passenger based on the information provided by flight attendants apply equally here, regardless of whether the statutory immunity also applies. Given the "very low" threshold for an airline determining that a passenger presents a possible safety issue, Captain Shupe's decisions in this case were amply justified based on the information provided by FA Bright-Sakurada and FA Warren. Plaintiffs' numerous allegations that Captain Shupe failed to conduct an independent justification are incorrect and do nothing by way of "specific or substantial" evidence to show pretext for intentional racial discrimination.

In sum, Captain Shupe's lack of knowledge regarding Plaintiffs' races presents Plaintiffs with an insurmountable evidentiary burden of persuasion under the *McDonnell Douglas* test. Because Plaintiffs can do nothing more than speculate as to the perceptions of the crew members in the course of reporting their genuine concerns for A.D.'s safety, Plaintiffs are unable to show that Defendants' concerns were

pretext for intentional racial discrimination, and this Court should grant Defendants' Motion for Summary Judgment as to Plaintiffs' § 1981 claims.

### C.     Plaintiffs Cannot Sustain Their Claims for Defamation

In Nevada, proving a defamation claim requires showing: (1) a false and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages. *Pope v. Motel 6*, 121 Nev. 307, 114 P.3d 277, 282 (Nev. 2005). A defamation claim fails if the disputed statements are "absolutely true, or substantially true." *Pegasus v. Reno Newspapers, Inc.*, 118 Nev. 706, 714-15, 57 P.3d 82, 87-88 (2002).

Here, Plaintiffs claim Captain Shupe and First Officer Mullin published defamatory statements through the ACARS system, and that FA Warren and other Frontier personnel published defamatory statements in Frontier's Passenger Name Record ("PNR") for Plaintiffs. As discussed above, the statements at issue in the ACARS messages reflect the flight attendants' genuine concerns regarding undisputed facts. Plaintiffs cannot establish their claims based on the flight attendants' observations of Peter rubbing A.D.'s face or Peter having his hand on A.D.'s crotch.

Plaintiffs claim their PNR is available to Frontier's employees "on Frontier's computer network" (ECF No. 153 ¶ 34), but there is no evidence that the statements contained therein were published to a third person. Further, Frontier's PNR for Plaintiffs contains only privileged internal communications and reports of statements collected during Frontier's internal investigation.

A defendant in Nevada is entitled to qualified or conditional privilege if an alleged defamatory statement was made in good faith regarding subject matter which the person communicating had an interest, or in reference to which the person had a right or a duty, if it is made to a person with a corresponding interest or duty. Whether a communication is conditionally privileged is a question of law. If a disputed statement is deemed privileged, then the burden then shifts to the plaintiff to prove the

defendant abused the privilege by publishing the communication with "malice in fact." *Circus Circus Hotels v. Witherspoon*, 99 Nev. 56, 62 (1983).

Here, the statements reflected in the ACARS messages and Plaintiffs' PNR are entitled to qualified privilege under Nevada law. The disputed communications were relayed by the pilots to ground personnel whose job was to respond and/or relay pertinent information to law enforcement officers, and by other Frontier employees in furtherance of their employment responsibilities to provide customer service and field and investigate passenger complaints. The disputed communications are, therefore, entitled to qualified or conditional privilege because they were all made by individuals regarding the incident at bar, which was a subject matter in which they had an interest, or in reference to which the communicating person had a right or duty and made statements to a person with a corresponding interest or duty.

To the extent Plaintiffs' defamation claims rely on oral statements made aboard the subject flight, there is no evidence that a third-party heard such alleged statements, and, therefore, the publication element cannot be met. For all of these reasons, the Court should grant summary judgment in favor of Defendants as to Plaintiffs' defamation claims.

**D.   Plaintiffs Cannot Sustain their Claims for False Imprisonment**

In Nevada, false imprisonment is the "unlawful violation of the personal liberty of another, and consists in confinement or detention without sufficient legal authority." Nev. Rev. Stat. § 200.460; *Rivera v. Bogden*, No. 2:17-CV-2776 JCM (NJK), 2018 U.S. Dist. LEXIS 151842, at *10 (D. Nev. Sep. 6, 2018). Proving a claim for false imprisonment requires a showing that: (1) the defendant intended to confine the plaintiff within boundaries fixed by the defendant; (2) the defendant's act directly or indirectly resulted in the confinement of the plaintiff; and (3) the plaintiff was conscious of the confinement or harmed by it. *Leslie v. Las Vegas Metro. Police Dep't,* No. 2:14-cv-01430-JAD-VCF, 2015 U.S. Dist. LEXIS 170154, at *18 (D. Nev. Dec. 18, 2015).

Here, Plaintiffs allege Defendants falsely imprisoned A.D. by separating him from Peter and confining him to the back row of the airplane. ECF No. 153, ¶ 72. Defendants acknowledge that A.D. was prevented from returning to sit by Peter in Row 17, but Defendants dispute that A.D. was otherwise confined to any fixed boundaries. A.D.'s movement was no more restricted than Peter's movement in that the two were merely prevented from contacting each other.

Regardless, to the extent that A.D. was confined within a fixed boundary, Plaintiffs cannot show that Defendants' conduct was "unlawful" under Nev. Rev. Stat. § 200.460. As per the Federal Aviation Regulations ("FARs"), 14 C.F.R. § 91.3(a) provides: "The pilot in command of an aircraft is directly responsible for, and is the final authority as to, the operation of that aircraft." 14 C.F.R. § 121.533(d) further provides: "Each pilot in command of an aircraft is, during flight time, in command of the aircraft and crew and is responsible for the safety of the passengers, crewmembers, cargo, and airplane." Because Captain Shupe was authorized under the FARs to take action necessary in furtherance of passenger safety, it cannot be said that Defendants acted "unlawfully" in preventing A.D. from returning to Row 17.

Plaintiffs' false imprisonment claim demonstrates the importance of extending § 44941 immunity to the conduct that arises from Defendants' disclosures of suspicious activity. *See Ilczyszyn*, 80 Cal. App. 5th at 601. It would be absurd to hold that an airline captain who in good faith instructs that a minor be separated from a potentially abusive adult could expose the airline and/or its employees to civil liability for false imprisonment. For all of these reasons, this Court should grant Defendants' Motion for Summary Judgment as to Plaintiffs' claims of false imprisonment.

### E.     Plaintiffs Cannot Sustain their Claims for IIED, Assault or Battery

Plaintiffs' claims for IIED, assault, and battery each rely on disputed facts occurring after the flight attendants reported their concerns of inappropriate touching to Captain Shupe, after Captain Shupe instructed the flight attendants to separate A.D. from Peter, and after Captain Shupe and First Officer Mullin sent their first ACARS message informing ground personnel of inappropriate touching involving

a minor. Consequently, the disputed facts discussed below have no bearing on flight attendants' pre-separation observations or reports regarding their concerns of inappropriate touching.

### 1.    Disputed Events that Occurred During Separation and Post-Separation

Peter claims he remained asleep up to and until the time that FA Warren separated them. He alleges FA Warren awakened him by "pummeling" him on the back of his neck and head. ECF No. 153, p. 3, and ¶ 38; *see also*; Ex. A, p. 44: 11-23, p. 67:13-20. A.D. further claims that when FA Warren came to the back row of the airplane to question him, FA Warren hovered his hand over A.D.'s crotch – without touching A.D. – to demonstrate where he had seen Peter's hand. ECF No. 153, ¶ 43.

FA Warren testified that he walked to Row 17 and told the male passenger sitting in the aisle seat that he needed to "clear the row out." *Id.*, at p. 81:12-16. FA Warren denied physically contacting Peter. *Id.*, at p. 82:14-16. He testified that when the other male passenger exited the aisle seat, Peter was already awake and complied with his instructions to exit Row 17. FA Warren then instructed A.D. to exit Row 17 and sit in the back row of the aircraft. *Id.*, at p. 82:23-83:16. FA Warren denied that he came close to touching A.D. in the manner A.D. alleges. Ex. C, pp. 104:14-21.

Christopher Higgins was a passenger on the subject flight. A copy of the transcript from his deposition is attached as **Exhibit J**. At the time of the flight, Mr. Higgins worked as a detective for the Wake Forest (North Carolina) Police Department. He had previously worked 25 years for the New York City Police Department. *Id.* at pp. 12:2-13:1. Mr. Higgins testified as follows: Approximately three hours into the flight, he was approached by a Black male flight attendant (FA Warren) who asked if he was willing to change seats. FA Warren calmly expressed that there was a concern involving two passengers. *Id.* at pp. 12:21; 24:17; 25:7-13. He said nothing about their races. *Id.* at pp. 12:26:1-4. Mr. Higgins was approximately 5-6 rows away from Row 17. After the passenger in the aisle seat stood from his seat, FA Warren appeared to lean over and "maybe tapped [Peter] on the shoulder, or said something to him." It appeared from Mr. Higgins' vantage point that Peter may have been asleep, but Mr. Higgens did not know

if Peter was sleeping at the time. Peter stood up quickly and exited Row 17. FA Warren then leaned over and appeared to wake up A.D., who stood up. *Id.* at pp. 29: 13-25; 30: 1-9; 129: 12-25. FA Warren walked with A.D. to the back row of the plane. A.D. sat in the window seat and Mr. Higgins occupied the aisle seat in the row to which A.D. was moved. The middle seat was left vacant and remained so for the rest of the flight. *Id.* at pp. 43:8-44:8. After Plaintiffs' were separated, Mr. Higgins never saw FA Warren get close enough to touch A.D., and he only spoke to A.D. from the aisle. *Id.* at pp. 44:15-21; 49:11-24; 51:15-24. Mr. Higgins did not perceive the interactions between FA Warren and Peter and A.D. to be confrontational. *Id.* at p. 104:4-9. Based on Mr. Higgins' experience, he did not consider FA Warren to be angry. *Id.* at p. 42:9-12.

### 2.    Plaintiffs Cannot Sustain their Claims for IIED

In Nevada, the elements of a cause of action for IIED are (1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation. *Hackler v. State Farm Mutual Automobile Insurance Co.*, 210 F. Supp. 3d 1250, 1257 (D. Nev. 2016). Conduct is considered extreme and outrageous in Nevada if it is considered to be "atrocious, beyond all possible bounds of decency, and utterly intolerable." *Id.*

A court typically determines whether the defendant's conduct may be regarded as sufficiently "extreme and outrageous" to result in liability. *Tarr v. Narconon Fresh Start*, 72 F. Supp. 3d 1138, 1143 (D. Nev. 2014). The plaintiff must demonstrate that the stress is so severe and of such intensity that no reasonable person could be expected to endure it." *Watson v. Las Vegas Valley Water Dist.,* 378 F. Supp. 2d 1269, 1279 (D. Nev. 2005). "General physical or emotional discomfort is insufficient to demonstrate severe emotional distress." *Switzer v. Rivera,* 174 F. Supp. 1097, 1108 (D. Nev. 2001). If a plaintiff's claimed emotional damages are not secondary to physical injuries, then either a physical impact must have

occurred or the plaintiff must present proof of "serious emotional distress" causing an injury or illness. *Kennedy v. UMC University Medical Center*, 203 F. Supp. 3d 1100, 1110 (D. Nev. 2016).

To support their IIED claims here, Plaintiffs allege that Defendants falsified their reports of inappropriate touching, and they accuse Defendants of:

> "… physically attacking Peter and striking him on the head and neck, removing A.D. from his seat and jailing him in the rear of the aircraft, assaulting A.D. with a hand placed in the area of his genitalia, refusing to allow A.D. to go back to his seat and Peter to speak with A.D., mocking and shouting at Peter and suggesting that he was a criminal, and arranging for police and FBI to take Peter and A.D. into custody when the plane landed, in full view of other passengers and persons in the airline terminal…"

For the same reasons previously detailed, Plaintiffs cannot establish that Defendants committed extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress. Plaintiffs are also unable to show that Defendants caused them to suffer any severe or extreme emotional distress, because, by their own admissions, this was at least the third time they were questioned by law enforcement officers in connection with their public displays of affection.

Unlike the incident at bar, Plaintiffs' prior encounters with law enforcement officers following a different flight and in a movie theater were, apparently, resolved quickly. Although Plaintiffs were ultimately questioned at length by law enforcement officers after their flight in this case, during the time they were separated on the plane, Peter was confident that law enforcement officers in Las Vegas would clear them of any wrongdoing within "five minutes." Ex. A, p. 73:19-21. Because Defendants were justified in separating Plaintiffs, and because Plaintiffs' past experiences led them to believe the in-flight separation would result only in a minimal delay upon exiting the aircraft, the Court should grant Frontier's Motion for Summary Judgment as to Plaintiffs' IIED claims.

### 3.    Plaintiffs Cannot Sustain their Claims of Assault and Battery

To state an assault claim, a plaintiff must demonstrate that the defendant (1) intended to cause harmful or offensive physical contact, and (2) the victim was put in apprehension of such contact. *Sandoval v. Las Vegas Metro Police Dep't*, 854 F. Supp. 2d 860, 882 (D. Nev. 2012). To establish

a battery claim in Nevada, a plaintiff must show that the actor (1) intended to cause harmful or offensive contact, and (2) such contact did occur. *Switzer v. Rivera,* 174 F. Supp. 2d 1097, 1109 (D. Nev. 2001).

Here, to establish their claims of assault and battery, Plaintiffs rely on their allegations that FA Warren placed his hand "nearly atop A.D.'s genitalia" when describing his observation of where Peter's hand was located, and that FA Warren struck Peter in the back of his neck and head when he carried out Captain Shupe's instruction to separate A.D. from Peter. ECF No. 153, ¶¶ 76-77.

As with Plaintiffs' false imprisonment claim, their assault and battery claims further illustrate the importance of extending § 44941 immunity to the conduct that arises from Defendants' disclosures of suspicious activity. *Ilczyszyn v. Southwest Airlines Co.*, 80 Cal. App. 5th 577, 601 (2022). Regarding FA Warren's alleged assault of A.D., it would be absurd to hold an airline and/or flight attendant civilly liable for attempting to describe to a child why he was separated from his adult travelling companion. Although FA Warren denied hovering his hand over A.D.'s crotch or coming close to touching A.D., he should undoubtedly be entitled to § 44941 immunity for his alleged conduct. Regardless, there is no evidence indicating that FA Warren intended to cause any harmful or offensive physical contact with A.D.

As to Plaintiffs' allegations of battery, it bears mentioning that Plaintiffs deposed multiple passengers who sat in the vicinity of Row 17 aboard the subject flight, and none of them witnessed FA Warren's alleged "pummeling" of Peter. *See* ECF No. 153, ¶ 38. This includes Mr. Higgins, who was well positioned to view the incident and recalled nothing of the sort. To hold that such a wild, unsupported allegation could help a plaintiff avoid summary judgment would undermine the principles of § 44941 immunity. *See also Gonzales v. Agnos*, No. 93-17368, 1994 U.S. App. LEXIS 31225, at *2 (9th Cir. Nov. 4, 1994) (noting that conclusory allegations unsupported by admissible evidence are insufficient to defeat a summary judgment motion). Because FA Warren is entitled to § 44941 immunity for the conduct that flowed from his authorized and protected disclosures, Defendants' Motion should be granted as to Plaintiffs' claims of IIED, Assault, and Battery.

**F.      The Court Must Dismiss Plaintiffs' Claims for Punitive Damages**

In Nevada, punitive damages are available upon a showing by clear and convincing evidence that the defendant is guilty of oppression, fraud or malice, whether express or implied. *Garcia v. Awerbach*, 463 P.3d 461, 464 (Nev. 2020). Hence, to justify punitive damages, the defendant's conduct must have *exceeded* mere recklessness or gross negligence. *Id.*

Nevada law further prescribes the circumstances under which an employee's conduct can be attributable to the corporation for purposes of awarding punitive-damages. *De Freitas v. Hertz Corp.*, No. 2:18-cv-01522, 2022 U.S. Dist. LEXIS 167486, 2022 WL 4290327, at *8 (D. Nev. Sept. 16, 2022) (citing NRS § 42.007). NRS § 42.007 provides that an employer is not liable for punitive damages unless:

(a) the employer had advance knowledge that the employee was unfit for the purposes of the employment and employed the employee with a conscious disregard of the rights or safety of others;

(b) the employer expressly authorized or ratified the wrongful act of the employee for which the damages are awarded; or

(c) the employer is personally guilty of oppression, fraud or malice, express or implied.

For all of the reasons discussed above, Plaintiffs are unable to justify their claims for punitive damages. Despite Plaintiffs' own characterization of Defendants' conduct and embellishments of the same, Plaintiffs have alleged nothing that would rise above mere negligence. This goes not only for FA Warren and Captain Shupe, but also for Frontier. There is no evidence to suggest that Frontier had any advanced notice that Captain Shupe and/or FA Warren were unfit for their employment, or that Frontier employed them with conscious disregard for the safety of others. Likewise, there is nothing to show that Frontier authorized or ratified any wrongful acts of its employees for which damages could be awarded in this case. Because the undisputed facts and points discussed above belie any notion that Frontier committed oppression, fraud, or malice, above all else, the Court should dismiss Plaintiffs' punitive damages claims with prejudice.

**IV.**     **CONCLUSION**

The Court should grant Defendants' Motion for Summary Judgment and dismiss Plaintiffs' claims in their entirety, including Plaintiffs' claims for punitive damages, and grant such further relief as the Court deems necessary and just.

DATED this 26th day of October, 2023                Respectfully submitted,

/s/ *Richard C. Harris*
Brian T. Maye (admitted *pro hac vice*)
Richard C. Harris (admitted *pro hac vice*)
HINSHAW & CULBERTSON
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
Phone: (312) 422-5713
Email: bmaye@hinshawlaw.com
            rharris@hinshawlaw.com

Charles A. Michalek (Nevada Bar No. 5721)
ROGERS, MASTRANGELO, CARVALHO & MITCHELL
700 South Third Street
Las Vegas, Nevada 89101
Phone: (702) 383-3400
Email: cmichalek@rmcmlaw.com

***Attorneys for Defendants Frontier Airlines, Inc., Scott Warren & Rex Shupe***

**CERTIFICATE OF SERVICE**

I hereby certify that on October 26, 2023, I caused the foregoing to be electronically filed with the United States District Court for the District of Nevada using the CM/ECF system.

By: */s/ Richard C. Harris*