Page 1

1            UNITED STATES DISTRICT COURT
                 DISTRICT OF NEVADA
2           CASE NO. 2:19-CV-01322-KJD-NJK
3

4   PETER DELVECCHIA, individually and
    as next friend of A.D., a minor,
5
             Plaintiffs,
6
    vs.
7
    FRONTIER AIRLINES INC. and JOHN DOES
8   1 through 5, inclusive,

9            Defendants.
    _____/
10

11

12

13              Videotaped Deposition of

14                PETER DELVECCHIA

15

16              (Taken by Plaintiffs)

17            Raleigh, North Carolina

18           Tuesday, November 19, 2019

19

20

21

22

23            Reported in Stenotype By:
                  Denise Y. Meek
24        Court Reporter and Notary Public

PETER DELVECCHIA                                    November 19, 2019

---

Page 2

```
 1                APPEARANCES
 2
 3  FOR THE PLAINTIFFS:
 4      JOHN D. McKAY, ESQ.
        Park Avenue Law
 5      127 West Fairbanks Avenue, Suite 519
        Winter Park, FL  32789
 6      800-391-3654
        parkavelaw@gmail.com
 7
 8  FOR THE DEFENDANTS:
 9      TARA SHELKE, ESQ.
        Adler Murphy & McQuillen, LLP
10      20 South Clark Street, Suite 2500
        Chicago, IL  60603
11      312-345-0700
        tshelke@amm-law.com
12
13  ALSO PRESENT:
14      CARL REHL, Videographer
15
16
17          Videotaped Deposition of PETER DELVECCHIA,
18  a witness called on behalf of the Defendants, before
19  Denise Y. Meek, Court Reporter and Notary Public, in
20  and for the State of North Carolina, at Smith
21  Anderson Blount Dorsett Mitchell & Jernigan, LLP,
22  150 Fayetteville Street, Suite 2300, Raleigh,
23  North Carolina, on Tuesday, November 19, 2019,
24  commencing at 10:00 a.m.
```

---

Page 3

```
 1             INDEX OF EXAMINATIONS
 2
 3  PETER DELVECCHIA                          PAGE
 4  By Ms. Shelke                          6, 249
 5  By Mr. McKay                              238
 6
 7
 8              INDEX OF EXHIBITS
 9  NUMBER          DESCRIPTION             PAGE
10  Exhibit 1  Plaintiff Peter DelVecchia's    30
              Answer and Objections to
11            Interrogatories from Defendant
              Frontier Airlines, Inc.
12
    Exhibit 2  Events related to Frontier Airlines  35
13            Flight 2067 - Bates: P56-P60
14  Exhibit 3  Text messages - Bates: P50-P55  168
15  Exhibit 4  Photographs - Bates: P42-P49    188
16
17
18
19
20
21
22
23
24
```

---

Page 4

```
 1               -  -  -
 2      THE VIDEOGRAPHER:  This is the
 3  videotaped deposition of Peter DelVecchia,
 4  taken in the matter of Peter DelVecchia,
 5  individually, and as next friend of A.D., a
 6  minor, plaintiffs, versus Frontier
 7  Airlines, Inc., and John Does 1 through 5,
 8  inclusive, defendants, in the United States
 9  District Court, District of Nevada,
10  case number 2:19-CV-01322-KJD-NJK.
11      This deposition is being held at Smith
12  Anderson on November 19, 2019.
13      My name is Carl Rehl, videographer,
14  from U.S. Legal Support; and the court
15  reporter is Denise Meek, also with
16  U.S. Legal Support.
17      We are going on the record at 10:00.
18      Will counsel now state their name and
19  appearances for the record.
20      MR. McKAY:  I'm John McKay, and I'm
21  here representing the plaintiffs.
22      MS. SHELKE:  Tara Shelke on behalf of
23  defendant Frontier Airlines.
24      THE VIDEOGRAPHER:  And would the court
```

---

Page 5

```
 1  reporter please swear in the witness.
 2      THE REPORTER:  Please raise your right
 3  hand.
 4      Do you solemnly swear the testimony you
 5  will give in this matter will be the truth,
 6  the whole truth, and nothing but the truth,
 7  so help you God?
 8      THE WITNESS:  Yes.
 9      THE REPORTER:  Thank you.
10               -  -  -
11          PETER DELVECCHIA,
12      having been first duly sworn,
13  was examined and testified as follows:
14               -  -  -
15      THE WITNESS:  I have one quick
16  question.  I'm sorry.  Do I refer to my son
17  as A.D.?
18      MR. McKAY:  Please.
19      THE WITNESS:  All right.  Because I --
20  and we're all going to do it, because I
21  don't know how safe all this is.  I want to
22  make sure that --
23      MR. McKAY:  Yeah, we're doing that so
24  we don't have to file everything under
```

---

PETER DELVECCHIA                                November 19, 2019

Page 6

1  seal.
2           THE WITNESS:  I'm going to try to
3  remember.
4           MR. MCKAY:  So just remember to use
5  A.D.  And If you don't remember, that's
6  okay.  We'll fix it.
7           THE WITNESS:  But this is not public in
8  any way that my son could be --
9           MR. MCKAY:  Identified?
10          THE WITNESS:  Yes.
11          MR. MCKAY:  Yeah, we'll take care of
12  it.
13                  EXAMINATION
14  BY MS. SHELKE:
15     Q.  Would you state your full name, please.
16     A.  Peter DelVecchia.
17     Q.  Let the record reflect that this is the
18  deposition of plaintiff Peter DelVecchia, taken
19  pursuant to notice and set for today's date by
20  agreement of the parties.
21          This deposition shall be conducted in
22  accordance with the Federal Rules of Civil
23  Procedure and all applicable local rules of the
24  United States District Court for the District

Page 7

1  of Nevada.
2           Peter, we met last week.  May name is
3  Tara Shelke.  I represent defendant
4  Frontier Airlines in this lawsuit.
5           I'm going to be asking you some
6  questions today about the events that took
7  place on board Frontier Flight 2076, from
8  Raleigh to Las Vegas, on March 28th of 2019.
9           You were a passenger on Frontier
10  Flight 2067, from Raleigh to Las Vegas, on
11  March 28, 2019, correct?
12     A.  Yes.
13     Q.  And you were traveling with your son,
14  correct?
15     A.  Uh-huh.
16          MR. MCKAY:  You have to say "yes" or
17  "no."
18     A.  Yes.
19     Q.  You have only one son, correct?
20     A.  Yes.
21     Q.  We're going to go off the record in a
22  moment, and if you will tell me the full name
23  of your son, please, once we go off the record.
24          MS. SHELKE:  Going off the record.

Page 8

1           THE VIDEOGRAPHER:  Off the record at
2  10:02.
3           (Off the record.)
4           THE VIDEOGRAPHER:  Back on the record
5  at 10:02.
6  BY MS. SHELKE:
7     Q.  Peter, while we were off the record,
8  you told me the full name of your son.  I will
9  refer to your son as A.D. during this
10  deposition, and I will ask that you do the same
11  as well, please.
12     A.  Uh-huh.  Yup.
13     Q.  In addition to your son, you have two
14  daughters, correct?
15     A.  Yes.
16     Q.  Gayle and Amanda?
17     A.  Yes.
18     Q.  Do you have any other children?
19     A.  No.
20     Q.  Yesterday we took the depositions of
21  your daughters, Gayle and Amanda.
22          Did you speak with Gayle after her
23  deposition yesterday?
24     A.  Yes.

Page 9

1     Q.  Did she tell you anything about her
2  deposition?
3     A.  Basically, that she was scared, and she
4  was uncomfortable where you went with the
5  questions.
6     Q.  Did you also speak with Amanda after
7  her deposition?
8     A.  Yes.
9     Q.  What did she tell you about her
10  deposition?
11     A.  That she wasn't comfortable where you
12  went with the questions.
13     Q.  Did she tell you anything else?
14     A.  Yes, that your questions had nothing to
15  do with the flight and were bearing on my
16  wife's death and my raising of my child.
17     Q.  A few things to keep in mind through
18  this deposition today.
19          The first is that we do have a court
20  reporter --
21     A.  Uh-huh.
22     Q.  -- taking down everything that we say.
23     A.  I'm aware of that.
24     Q.  She can only take down one person

1  speaking at a time.
2      A.  Okay.
3      Q.  So if you'll wait for me to finish my
4  question before you answer, I'll be sure to
5  wait for you to also finish your answer before
6  I ask a follow-up question.
7      A.  Okay.
8      Q.  The second is, as you're doing right
9  now, your answers do need to be verbal.  The
10 court reporter cannot take down nods or shrugs.
11         And third, if I ask you a question, and
12 you do not understand it, please let me know,
13 and I will ask it differently or rephrase it.
14 But if I ask you a question and you answer it,
15 I'm going to assume you understood the
16 question.
17     A.  Yup.
18     Q.  And fourth, if you do need to take a
19 break at any time, please let me know, and we
20 can certainly do that.  But if there is a
21 question pending, I will ask you to answer the
22 question before we take a break.
23     A.  Okay.
24     Q.  What is your date of birth?

1      A.  April 22, 1963.
2      Q.  And you are widowed, correct?
3      A.  Yes.
4      Q.  What was your wife's name?
5      A.  Gay.
6      Q.  When did you get married to Gay?
7      A.  February 20, 1987.
8      Q.  And when did Gay pass away?
9      A.  July of 2014.
10     Q.  Have you since remarried?
11     A.  No.
12     Q.  Were you married before your marriage
13 to Gay?
14     A.  No.
15     Q.  Are you currently dating anyone?
16     A.  Yes.
17     Q.  Who are you dating?
18     A.  Alexis Franzese.
19     Q.  Does Alexis live with you?
20     A.  No.
21     Q.  Were you dating Alexis at the time of
22 this incident on March 28, 2019?
23     A.  Yes.
24     Q.  What is your home address?

1  ████████████████████████████████
2  ██████████████████████
3      Q.  Who lives with you at that address?
4      A.  My son.
5      Q.  How long have you lived at that
6  address?
7      A.  Since August of 1996.
8      Q.  I understand that you moved to
9  North Carolina from New York.  Is that correct?
10     A.  Yes.
11     Q.  When did you move to North Carolina?
12     A.  July of 1996.
13     Q.  And what brought you to North Carolina?
14     A.  Let me just clarify.  I think it was
15 July.  I don't have -- I'm going to say it was
16 probably July 1996.
17     Q.  Okay.  What brought you to
18 North Carolina?
19     A.  My job moved.
20     Q.  Before this incident on March 28th of
21 2019, how would you have described A.D.?
22     A.  A happy kid.
23     Q.  Was he shy?
24     A.  No.

1      Q.  Would he talk to strangers?
2      A.  Yes.
3      Q.  Would he meet friends easily?
4      A.  Yes.
5      Q.  Did he have a lot of friends?
6      A.  Repeat that.
7      Q.  Did he have a lot of friends?
8      A.  Did he have a lot of friends?  Yes.
9      Q.  Are you a college graduate?
10     A.  Yes.
11     Q.  What college did you attend?
12     A.  Long Island University.
13     Q.  What year did you graduate?
14     A.  Wow.  I think it was 1985.
15     Q.  What was your degree or major?
16     A.  Accounting.
17     Q.  Did you attend graduate school after
18 college?
19     A.  No.
20     Q.  Do you have any further education apart
21 from your college degree?
22     A.  Formal education, no.
23     Q.  Any informal certificates or other
24 training?

PETER DELVECCHIA                                    November 19, 2019

Page 14

1    A.  I'm a CPA.  I am a CGMA.
2    Q.  I'm sorry.  A --
3    A.  It's an acronym, CGMA.
4        And I take a significant amount of
5    courses every year in a non-college capacity.
6    Q.  The courses that you take in a
7    non-college capacity every year, are those
8    accounting related?
9    A.  These years, yes.
10   Q.  In the past years that you have taken
11   college level classes, have any of them been
12   related to medical training?
13   A.  Define the period you're talking about,
14   please.
15   Q.  You said that "recently" the courses --
16   A.  Recently -- define "recently," please.
17   I just want to get an idea where you're going.
18   Q.  Sure.  Well, I guess I would ask you:
19   When you said recently the classes that you
20   have been taking have been related to
21   accounting, what years are you talking about?
22   A.  Since my wife's passing.
23   Q.  So since 2014, have you taken any
24   courses that relate to medical training?

Page 15

1    A.  Courses, no.  I've done substantial
2    reading.
3    Q.  And when you say "substantial reading,"
4    is that for your own entertainment or learning,
5    or towards a particular purpose?
6    A.  Both.
7    Q.  What purpose would that be?
8    A.  First off, it's -- I spent 23 years
9    reading about medical stuff because of my wife.
10   It's a hard habit to break when you read
11   something interesting.  Some of it has to do
12   with stock investing, and some of it has to do
13   with just researching something that might be
14   affecting me or my children.
15   Q.  And you are currently a CPA; is that
16   correct?
17   A.  Yes.
18   Q.  And that stands for "certified public
19   accountant"?
20   A.  Yes.
21   Q.  Are you currently employed?
22   A.  Self-employed.
23   Q.  Do you have a business name or d/b/a
24   that you operate under?

Page 16

1    A.  Yes.
2    Q.  What is the name of that company?
3    A.  Peter DelVecchia, CPA, PLLC.
4    Q.  How long have you run your company?
5    A.  It was incorporated in August of 2018.
6    Q.  Do you have any employees at your
7    company?
8    A.  No.
9    Q.  Before August of 2018, where did you
10   work?
11   A.  AICPA.
12   Q.  What is AICPA?
13   A.  It's now called the Association of
14   International Certified Public Accountants.  It
15   was at one time called, about the time I left,
16   the American Institute of Certified Public
17   Accountants.
18   Q.  And what does that institution do?
19   A.  It does a variety of things.  Are you
20   asking insofar as what my job was?  Are you
21   asking what they do or...
22   Q.  First, what exactly the institution
23   does.
24   A.  The institution is a member

Page 17

1    organization.  It's a nonprofit.  Its primary
2    purpose is designed for the education of
3    accountants and the lobbying to promote a CPA
4    cause.
5    Q.  And what was your role within that
6    company?
7    A.  I was in ethics.
8    Q.  When did you start at that company?
9    A.  1999.
10   Q.  Were you always in the ethics
11   department since you started your employment
12   there?
13   A.  No.
14   Q.  Can you talk me through your job
15   progression at AICPA since 1999?
16   A.  I can't give you specific dates.  I can
17   give you positions, and I can give you
18   departments.  I started in ethics in 1999.
19       I moved over to something called the
20   Quality Control Inquiry Committee, QCIC,
21   probably a couple years later.  I'm not
22   definite on the timing.
23       Then I moved to peer review for a short
24   period of time, back into QCIC, and then into

PETER DELVECCHIA                                    November 19, 2019

Page 18

1   ethics.  And the move into ethics was in late
2   2004.
3        Q.  When did you resign from AICPA?
4        A.  May of 2018.
5        Q.  Between May of 2018 and August of 2018,
6   did you hold any employment positions?
7        A.  No.
8        Q.  Between May of 2018 and August of 2018,
9   what if anything did you do for work?
10       A.  I did not.
11       Q.  During May of 2018 through August of
12  2018, what did you do day to day?
13       A.  Spent time with my son and my daughters
14  as much as I could.
15       Q.  On May 28th of 2019, you and A.D. were
16  traveling to Las Vegas to go to Death Valley
17  National Park; is that correct?
18       A.  That isn't the exact date.
19           MR. McKAY:  What date did you say?
20           MS. SHELKE:  March 28th.
21           THE WITNESS:  You said May.
22           MS. SHELKE:  If I misspoke, sorry.  My
23       apologies.
24  BY MS. SHELKE:

Page 19

1        Q.  Or March 28th of 2019, you and A.D.
2   were traveling to Las Vegas to go to
3   Death Valley National Park; is that correct?
4        A.  Yes.
5        Q.  How did that trip come about?
6        A.  He always wanted to go to Death Valley.
7   We go to parks all the time.
8        Q.  And what was the plan for that trip?
9        A.  Mostly hiking.
10       Q.  Do you recall the planned itinerary
11  that you had in place?
12       A.  I don't recall it, but I can give you
13  an overview, if that's what you'd like.
14       Q.  Go ahead.
15       A.  The overview is we were going to spend
16  the day hiking up mountains, every day.
17       Q.  So every day you would have a different
18  hike; is that correct?
19       A.  That's correct.
20       Q.  How would you -- what was the plan to
21  get from Las Vegas to Death Valley?
22       A.  We were staying overnight in a hotel
23  and picking up a camper van the next morning.
24  From that point, driving to Death Valley, and

Page 20

1   then hiking until the day we had to leave.
2        Q.  And on the day you had to leave, was
3   the plan to drive back during the day, return
4   the camper van, and go straight to the airport?
5        A.  I don't specifically recall.  That
6   sounds correct, but I don't specifically
7   recall.
8        Q.  When did you gather your supplies for
9   the trip, meaning food, et cetera?  Did you
10  purchase your supplies in Las Vegas, or did you
11  pack and take everything with you?
12       A.  Neither.
13       Q.  How did you go about your food for the
14  days that you were hiking?
15       A.  Bought them at the park or groceries on
16  the way.  That was the plan.
17       Q.  How did you come to fly Frontier?
18       A.  It was the only nonstop flight there
19  was to Las Vegas from RDU.
20       Q.  Had you flown Frontier before?
21       A.  Once before.
22       Q.  Do you recall when that was?
23       A.  I think it was the summer before.
24       Q.  Was that also with A.D.?

Page 21

1        A.  Yes.
2        Q.  Were any of your other children there
3   with you for that previous flight on Frontier?
4        A.  No.
5        Q.  Do you recall where you went on that
6   previous flight on Frontier?
7        A.  Utah, Colorado, and Arizona.
8        Q.  And your outbound flight from Raleigh
9   to Las Vegas was in the evening; is that
10  correct?
11       A.  Which flight are you talking about?
12       Q.  The outbound flight from Raleigh to
13  Las Vegas on March 28th of 2019.
14       A.  And repeat your question, please.
15       Q.  Your outbound flight from Raleigh to
16  Las Vegas on March 28th of 2019 was in the
17  evening, correct?
18       A.  Yes.
19       Q.  And when you first boarded the aircraft
20  and took your seats, where were you seated?
21       A.  On the plane.  No, we were seated in
22  the exit row.  I don't recall the specific.
23  You have it in here somewhere, but I don't
24  recall it.  I think it was 13.

PETER DELVECCHIA                                    November 19, 2019

Page 22

1    Q.  But to the best of your recollection,
2  when you first boarded the aircraft and took
3  your seats, you were in the exit row, correct?
4    A.  Yes.
5    Q.  And then you were reseated, correct?
6    A.  Yes.
7    Q.  How did that happen?
8    A.  Actually, I didn't realize we were in
9  the exit row until I got on the plane, but I
10  knew they were going to reseat us.  And an
11  attendant came over and, you know, they go into
12  their normal speech about how you have to help
13  people off, and she asked my son's age, and we
14  told her, and they moved us.
15    Q.  Were there any issues or complaints
16  with respect to the flight attendant reseating
17  you and A.D. from the exit row?
18    A.  Issues -- define "issues."
19    Q.  Did you have any trouble with being
20  reseated out of the exit row?
21    A.  Define "trouble."  Whose trouble?
22  Mine?  The attendant's?  My son's?  Who are you
23  talking about?
24    Q.  Your trouble.

Page 23

1    A.  My personal trouble?
2    Q.  Correct.
3    A.  No.
4    Q.  Did the flight attendant have any
5  trouble with you with respect to reseating?
6  Anything that you would --
7    A.  Again, please define "trouble."  You're
8  saying -- "trouble" can mean a variety of
9  things.
10    Q.  Was there anything that was unusual
11  about the reseating from the exit row to the
12  new seats that you were seated in?
13    A.  Again, "unusual" is a vague term.  So
14  why don't I just try to give you an overview,
15  if that would be fine.
16    Q.  Okay.
17    A.  You're asking me if there was anything
18  difficult about it.  They couldn't find
19  somebody to move.  It took several minutes.
20  And the flight attendant was clearly annoyed.
21    Q.  Do you know who the flight attendant
22  was annoyed with?
23    A.  Because we booked with a minor.  That's
24  my guess.  I don't know that for a fact.  I

Page 24

1  shouldn't have said that.
2    Q.  Okay.  So it was your perception that
3  the flight attendant was annoyed with you?
4    A.  Yeah.  She seemed like a perfectly fine
5  person, but she was clearly annoyed.
6    Q.  And then once you were reseated, you
7  sat in the middle seat; is that correct?
8    A.  Yes, my son wanted the window.
9    Q.  After you were reseated until the plane
10  took off, what did you do?
11    A.  I can only answer that in general ways
12  from what I normally do.
13    Q.  What do you normally do?
14    A.  But I'd like you to be more specific by
15  "What do you do?"  Are you asking me for an
16  entire itinerary of what I did?  Because I can
17  tell you what I remember.  But if you're asking
18  me for very specific or detailed information, I
19  don't have it.
20    Q.  I'm curious as to what you did once you
21  were seated on the aircraft until the doors
22  closed and the plane took off.
23    A.  I don't --
24    Q.  Did you fall asleep?  Did you eat

Page 25

1  something?  Did you talk on the telephone?
2    A.  I don't recall talking on the
3  telephone.  I don't recall what A.D.'s and my
4  conversation was about, but I believe it was
5  about hockey, which is all he ever talks about,
6  and music.
7      I took a quarter of a sleeping pill,
8  because I'm an insomniac.  I hadn't slept for
9  several days.  I needed to sleep, because I
10  wanted to be active.  So I took like a half of
11  a pill.  And I asked (redacted) if he took his
12  melatonin, which is a normal, usual action at
13  home.  I remember hugging him, and I remember
14  giving him a kiss, and I remember his head on
15  my shoulder, and then saying good night.  And
16  then I don't -- I can't tell you when the doors
17  closed.  So if you're looking for more
18  activities, I can't tell you when the doors
19  closed, because at that point I was starting to
20  nod off.
21      MS. SHELKE:  And for the record, the
22    minor's name was used.
23      THE WITNESS:  I'm sorry.
24      MS. SHELKE:  So at the conclusion of

PETER DELVECCHIA                                    November 19, 2019

Page 26

1   this deposition, we will move to exclude
2   those names.
3        THE WITNESS:  I'm sorry.
4        MR. McKAY:  Can we take a five-minute
5   break?
6        MS. SHELKE:  Sure.
7        MR. McKAY:  Okay.
8        THE VIDEOGRAPHER:  Off the record at
9   10:18.
10       (Recess from 10:19 to 10:20 a.m.)
11       THE VIDEOGRAPHER:  Back on the record
12   at 10:20.
13  BY MS. SHELKE:
14       Q.  Peter, you mentioned that you took a
15  quarter sleeping pill on the plane.
16       A.  Uh-huh.  Yes.
17       Q.  Do you --
18       A.  I'm sorry.
19       Q.  Do you recall what brand of sleeping
20  pill you took?
21       A.  No.
22       Q.  Is it your regular practice to take a
23  sleeping pill before you go to sleep at night?
24       A.  When I'm struggling, it is, yes.

Page 27

1        Q.  When you say "struggling," what do you
2   mean?
3        A.  I don't sleep well.  I haven't slept
4   well in many years.  And sometimes I just -- I
5   just get to the point where I need more sleep,
6   so I will take a quarter of a sleeping pill.
7        Q.  Do you always take the same brand of
8   sleeping pill?
9        A.  No.
10       Q.  Do you happen to know what brand of
11  sleeping pill you took on Flight 2067?
12       A.  No.
13       Q.  You mentioned that you asked A.D. if he
14  had taken his melatonin; is that correct?
15       A.  Yes.
16       Q.  Is A.D. prescribed to take melatonin?
17       A.  It was at his doctor's recommendation.
18  It's a vitamin, so...
19       Q.  Is that something A.D. takes on a daily
20  basis?
21       A.  Yes.
22       Q.  To the best of your recollection, did
23  you fall asleep before the plane took off?
24       A.  I -- I -- I don't remember.  I think I

Page 28

1   did.  I mean, it was quick.  I was exhausted.
2        MR. McKAY:  It's okay.  You don't have
3   to have a perfect memory.
4        A.  I really think I did, but I can't swear
5   to it.  So I'm trying to tell the whole truth,
6   and all that stuff, but I remember giving him a
7   hug and a kiss, and I put my head back, and I
8   was gone.
9        Q.  Okay.
10       A.  But I don't remember if the door
11  closed.  I don't remember if the plane took
12  off.  I can't tell you.
13       Q.  Okay.  You mentioned that you were
14  exhausted, that you were struggling, that you
15  had not slept well for some time.
16       Was there any particular incident that
17  had led to you not sleeping well in the days
18  before your flight to Las Vegas?
19       A.  When you say "days before," I'm
20  assuming you mean a couple of days before, or
21  are you talking about, you know, years?  What
22  are you -- what are you -- please define it.
23       Q.  Sure.  Well, you mentioned that you had
24  been struggling for some time, and you had not

Page 29

1   slept for -- let's say the 48 hours before
2   this --
3        A.  Beforehand.
4        Q.  -- before the particular flight.
5        Was there anything in particular that
6   had happened that led to you struggling and not
7   sleeping well in the 48 hours before this
8   flight?
9        A.  No.
10       Q.  What about in the week before this
11  flight?
12       A.  No.
13       Q.  So anything that was weighing on your
14  mind or otherwise causing you to struggle had
15  happened one week or more prior to this
16  particular flight?
17       A.  No.
18       Q.  Okay.
19       A.  Nothing had happened for years before.
20       Q.  Okay.
21       A.  All right.
22       Q.  Do you recall what -- as you settled in
23  to go to sleep on Flight 2067, do you recall
24  what A.D. was doing?

PETER DELVECCHIA                                      November 19, 2019

Page 30

1    A.  Are you talking about before I fell
2  asleep?
3    Q.  Correct.
4    A.  He was looking out the window.  He was
5  chatting, because A.D. is very chatty, and then
6  he said he was cold.  We checked the thing up
7  top.  It was off.  And then he put a sweater
8  over himself, and asked me if I had another
9  sweater, and I told him no.  And he took the
10 gray sweater -- and it was a gray, kind of
11 shirt sweater -- and he wrapped it around
12 himself, and then put it around his legs.
13 And he got something out of his bag.  I think
14 it might have been his headphones and his iPod,
15 and then I fell off.
16   Q.  To the best of your recollection, was
17 A.D. wearing shorts or trousers or pants for
18 this flight?
19   A.  I can tell you that I don't remember
20 with certainty, but I'm pretty positive it was
21 pants, because it was March.  And he's very
22 conscious about his legs getting cold, because
23 he runs, so he doesn't like the cramping.
24      (Exhibit 1 marked.)

Page 31

1  BY MS. SHELKE:
2    Q.  I'm showing you what we've marked as
3  Deposition Exhibit Number 1.
4      Do you recognize this document?
5    A.  Yes.
6    Q.  Did you electronically sign this
7  document on November 8, 2019?
8    A.  I don't remember the date, but I know I
9  signed it.
10   Q.  In this document, which is called
11 answers to interrogatories, you refer to a
12 flight attendant by the name of Scott Turner.
13   A.  It's my mistake.  I spoke to John about
14 that, yes.
15   Q.  Do you know the name of the flight
16 attendant who was involved in this incident?
17   A.  Scott.  Well, he introduced himself as
18 Kevin.  So let me be very clear about that.
19 Kevin, and he would not provide a last name.
20 Now I know his name, and it is Scott Warren.
21 And I don't know where I got Turner from, to be
22 honest with you.  It's very likely I was
23 working, and the name Turner was involved in
24 what I was doing, and I might have just carried

Page 32

1  that forward.  I don't know.
2    Q.  So just to clarify for the record,
3  then, Scott Turner, in your answers to
4  interrogatories, should be Scott Warren?
5    A.  Yes.
6    Q.  And this person, Scott Warren,
7  identified himself to you as Kevin, and would
8  not provide a last name?
9    A.  Yes, he told me three times his name
10 was Kevin.
11   Q.  Apart from -- is it okay if I refer to
12 him as Scott?
13   A.  Yes.
14   Q.  Apart from Scott, you also believe that
15 another flight attendant was involved in the
16 incident.  Do you know his or her name?
17   A.  Okay.  I'm not trying to be
18 contentious, but you have to be more specific
19 for me.  There were multiple people on there.
20 So if we can talk about when you're referring
21 to.  There were people who moved us, people who
22 served drinks, people who collected, you know,
23 trash.  So if you can please be specific, I'd
24 appreciate it.

Page 33

1    Q.  Sure.  If you'll turn to page 2,
2  interrogatory number 3.
3    A.  Can I have a minute to read it?
4    Q.  Yes, please go ahead and read both the
5  question and your answer.
6    A.  (Reviewing.)  Okay.  Yes.
7    Q.  There is a sentence in there that says:
8  "The only witnesses to the incident that I know
9  of are myself, A.D., and two flight attendants
10 that were most directly involved, one being
11 Scott Turner, who falsely identified himself as
12 'Kevin,' and another whose identity is known to
13 Frontier but not to me."
14   A.  Right.
15   Q.  Have you since learned the identity of
16 that second flight attendant?
17   A.  No.
18   Q.  Do you know if that second flight
19 attendant was male or female?
20   A.  Male.
21   Q.  Do you know the names -- sorry.  Strike
22 that.
23      From the time you boarded the aircraft
24 until you fell asleep, did you have any

PETER DELVECCHIA                                        November 19, 2019

Page 34

1  interaction with Scott Warren?
2      A.  Not that I remember.
3      Q.  From the time you boarded the aircraft
4  until you fell asleep, do you know if A.D. had
5  any interaction with Scott Warren?
6      A.  Not that I know of.
7      Q.  Tell me what happened after you fell
8  asleep.
9      A.  Okay.  I'm sorry.  I don't mean to be
10 difficult, but are you saying I fell asleep and
11 then what?
12     MR. McKAY:  Yes.
13     MS. SHELKE:  Yes.
14     A.  After I fell asleep, I was asleep.
15 All right?  But if you don't mind, can I look
16 at this?  Because this is serving as a reminder
17 to me.  And John provided that to you, I think,
18 but --
19     Q.  May I see what you have in front of
20 you?
21     MR. McKAY:  It's the typed notes --
22     MS. SHELKE:  Okay.
23     MR. McKAY:  -- that I produced.
24     MS. SHELKE:  And it's pages 56

Page 35

1  through 60?
2      MR. McKAY:  He doesn't have those
3  numbers, but yes.
4      MS. SHELKE:  Bates numbered 56 through
5  60?
6      MR. McKAY:  Yes.
7      MS. SHELKE:  I'd like to mark it as an
8  exhibit.
9      MR. McKAY:  Sure.
10     MS. SHELKE:  So we'll mark it as
11 Deposition Exhibit Number 2, please.
12     (Exhibit 2 marked.)
13     MS. SHELKE:  John, do you need a copy?
14     MR. McKAY:  Yeah, if you've got one.
15     MS. SHELKE:  (Handing.)
16     MR. McKAY:  Thank you.
17 BY MS. SHELKE:
18     Q.  And then, Peter, just to clarify, the
19 version that you have in front of you, apart
20 from that having a Bates number, is identical
21 to the version that the court reporter put in
22 front of you?
23     A.  Well, I put some underlines and some
24 notes so I could answer your questions faster.

Page 36

1      Q.  Okay.
2      A.  All right?  That's all I changed.
3      Q.  Okay.
4      A.  Because I read it quickly this morning,
5  and I just wanted to make sure I was moving
6  quick enough for you, and I did put some hand
7  notes here.
8      Q.  Okay.  As we're going through this, if
9  you have handwritten notes that add to the
10 content of the document, do let me know.
11     A.  I will.  Okay.
12     Q.  Could I ask you a few questions before
13 we get started?
14     A.  Of course.
15     Q.  When was this document prepared?
16     A.  This has been an ongoing thing.  I
17 started it out by hand notes, and then I
18 started putting it on the computer, and then I
19 would make hand notes and then put it back on
20 the computer again as I went.  So it's been
21 ongoing a while, but I can't give you a
22 specific date.
23     Q.  Do you recall when you first started
24 keeping those handwritten notes?

Page 37

1      A.  Yes, I started keeping them sometime
2  right after the flight, because A.D. was
3  struggling very hard, so I started taking
4  notes.
5      Q.  When you say "after the flight," you're
6  referring to Flight 2067 --
7      A.  Yes.  I'm sorry.
8      Q.  -- on March 28th?
9      A.  Yes.
10     Q.  So to the best of your recollection,
11 you started keeping handwritten notes which
12 were then transcribed into Deposition Exhibit
13 Number 2 while you were in Las Vegas?
14     A.  No, no, no, no, no.  I'm sorry.  When I
15 got back, and A.D. was struggling really hard,
16 and he started blaming himself quite a bit for
17 what went on -- and I hope I'm not saying
18 anything out of line.  If I am, please stop me.
19 But he began blaming himself.  He started
20 talking about how he wished he was not adopted
21 because, you know, his color is a problem now,
22 and he started struggling a lot.  So I started
23 taking notes, because I wanted him to
24 understand it wasn't his fault.

PETER DELVECCHIA                                    November 19, 2019

Page 38

1    Q.  Did anybody ask you to keep notes?
2    A.  No.
3    Q.  This practice of keeping notes, is this
4  something that you have done in the past?
5    A.  For work.
6    Q.  Have you ever done it in a personal
7  capacity?
8    A.  Post-its all over the place when I have
9  to do something.  I guess that's it.
10   Q.  Okay.
11   A.  Well, can I modify that?
12   Q.  Yeah.
13   A.  Since my wife's passing, I have not
14  done it.  When it was health related, there
15  were volumes.  So, yes, I'm a note-taker when
16  there's a tremendous amount of information or
17  when it's something like this.
18   Q.  Okay.  But since your wife's passing,
19  you have not taken similar notes with respect
20  to A.D.'s behaviors, feelings, thoughts,
21  anything like that?
22   A.  No.
23   Q.  Okay.  Then we'll go ahead with this
24  document, and we'll go through bullet point by

Page 39

1  bullet point.
2    A.  Whatever.  Yes.
3    Q.  Okay.  So why don't you tell me point
4  number 1.
5    A.  Okay.  But you had asked me a question
6  about what happened when I fell asleep on the
7  plane.  Do you want me to go back and answer
8  that, or do you just want to go through this,
9  and I'll read it?
10   MR. McKAY:  Let's just -- I think
11  there's a new set of questions now.
12   THE WITNESS:  Okay.
13   MR. McKAY:  Yeah.
14   A.  Do you want me to read every word or
15  just --
16   Q.  Yes, please, if you'll start with point
17  number 1.
18   A.  We're not going to finish in two hours.
19       All right.  This, basically, is titled
20  "Events Related to Flight 2067 Frontier."
21  Flight RDU to Las Vegas, scheduled time to
22  leave was 7:59.
23       We got to RDU at 6:30.  We checked the
24  bags.  We seated in exit row 13, which was the

Page 40

1  right side of the plane if we're facing
2  forward.  The attendant asked us to move to a
3  non-exit row.  It was because they asked my
4  son's age.  She was friendly but annoyed that
5  we had booked the exit row and was curt.  We
6  took our packs from under the seat.
7        Can I ask your permission -- where -- I
8  can see some of the things I wrote here may not
9  be clear.  So can I clarify as we go?  I mean
10  you already have the exhibit.
11   Q.  Yes.
12   A.  All right.  So me and my son took the
13  packs from under the seat in front of us, and
14  we moved to a row further back on the same side
15  of the plane.  I was now seated in the middle
16  seat, and my son by the window.
17       I was next to a passenger who had his
18  headphones out and was on a laptop.  He was
19  polite when we came.  I only saw him look over
20  once, and most of the time he kept his head
21  into his laptop, but I wasn't staring at him,
22  so I don't know.  I remember he was very
23  polite.  He didn't even have his arm on the
24  armrest, so I was very comfortable in the

Page 41

1  middle seat.
2        I asked my son to take melatonin.  I
3  took a quarter dose of a sleep aid.
4        My butt was hurting, because the seats
5  were terrible.  I could probably clarify that.
6  The seats are very hard on Frontier, and it was
7  very -- this is going to play into it later --
8  I was having a lot of trouble because it was
9  just pressing hard against my underside.
10   Q.  When you say it was going to "play into
11  it later," tell me, then -- you said your butt
12  was hurting.  Was that related only to the seat
13  being hard?
14   A.  Yes, but that is the reason why -- and
15  we'll get into this later as we go through -- I
16  had to lean my head against the front of the
17  seat, because the back of my thighs were
18  starting to get pins and needles, because the
19  seat was so hard.  So I was trying to get
20  weight off, and so I sat like this
21  (indicating), because I didn't know how I would
22  make it through the flight.
23   Q.  Okay.
24   A.  Yeah, the seats were just -- I mean,

PETER DELVECCHIA                                    November 19, 2019

Page 42

1  Frontier is renowned for it.  Their seats are
2  very hard and thin and unpadded, because
3  they're maximizing the room, so...
4      Q.  Was there anything that caused your
5  butt to hurt, apart from the condition of the
6  seat?
7      A.  No.  The plane was very cold.  I
8  mentioned that.
9          We were both concerned with getting
10  enough sleep.  It was an overnight flight.  As
11  I said, we were planning on being active.  We
12  talked about hiking and music a bit, and then
13  the plane began to taxi.  So my notes do say
14  that.  The plane did begin to taxi.
15          And I remember my son was cold.  He
16  pulled a gray jacket out of his bag, over his
17  body.  He tucked it in around his thighs to the
18  end of the seat.  I told him I was going to
19  sleep.  I kissed him.  I put my head back.
20          The seat was very hard, and I woke up.
21  I checked my son.  He was sleeping restlessly,
22  I felt.  Across the aisle there were people
23  having a good time.  They were laughing.  They
24  were enjoying themselves.

Page 43

1      Q.  If I could interrupt you there.
2          When you say these people across the
3  row from -- across the aisle from you, are you
4  referring to the left side of the aircraft?
5      A.  If I'm facing forward, the left side of
6  the aircraft, yes.
7      Q.  Okay.  And was it in your row?  The row
8  in front of you?  The row behind you?
9      A.  I couldn't see the row in front of me,
10  but it was definitely my row, and it was
11  definitely the row behind, and then it sounded
12  like they were further back.  So it was like
13  they knew each other, and they were having a
14  good time.
15      Q.  Okay.  Did anything lead you to believe
16  that they were laughing at your expense?
17      A.  Oh, no, no, they were just -- they were
18  going on vacation together and having a nice
19  time.
20      Q.  Okay.
21      A.  Nice people.
22          Go forward?
23      Q.  Yes, one more question.
24      A.  Yeah.

Page 44

1      Q.  When you woke up at this time and
2  looked across the aisle and saw the other
3  passengers having a good time, do you know if
4  beverage service had already been conducted?
5      A.  I don't.
6      Q.  Okay.  Do you know if any of the
7  passengers who you saw cross the aisle had
8  beverages with them?
9      A.  I don't remember.
10      Q.  Okay.  Go ahead.
11      A.  All right.  At this point, my bottom
12  side was hurting a lot, and I moved forward,
13  and I put my head against the back of the seat
14  in front of me, and I put my elbows on my
15  knees, because I was trying to relieve some of
16  the pressure by leaning forward.  And that's
17  pretty much what I remember.  And then I
18  started to really sleep, and it was a much
19  sounder sleep when I did that.
20          I have no idea how long we were in
21  flight.  I've tried to remember that.  I cannot
22  remember how long we were there, because I
23  was -- I was actually sleeping.
24      Q.  Do you recall at any point being

Page 45

1  offered a beverage on this flight?
2      A.  No, I don't, no.
3      Q.  Okay.
4      A.  Ready?
5      Q.  Yeah.
6      A.  All right.  So I as I mentioned, the
7  sleep was poor for several nights before.  And
8  as I was sleeping there -- and I want to
9  reiterate, my head was against the seat ahead
10  of me -- there were several hard hits to the
11  back and my head and neck.
12      Q.  Okay.  If I could stop you there.
13      A.  Yes.
14      Q.  Was your tray table up, or was it
15  folded down?
16      A.  It was up.
17      Q.  Okay.  And how many hits to the back of
18  your head and neck would you say you received?
19      A.  I cannot tell you that.  I know there
20  were two that I felt, but I can't say.  I don't
21  know.  There may have been more.  I'm just
22  saying that when I woke up, I felt my head
23  smashed down twice against the seat.  And I
24  remember that it hurt here (indicating),

PETER DELVECCHIA                                    November 19, 2019

Page 46

1  because they were smashing it, and it was
2  hitting the seat.  But it could have been more.
3  I don't know.  I mean, I was really asleep.
4      Q.  Do you know where the point of contact
5  was made on the back of your head and neck?
6      A.  I can guess that by where the pain was
7  and where definitely the last blow I felt.  And
8  it was -- do you want me to show you or just
9  answer it?
10     Q.  You can show me, and then we'll put
11  that into words as well for the court reporter.
12     A.  It was right here (indicating).
13     Q.  So it was at the base of your neck, the
14  bottom three or four inches of your hair?
15     A.  Yes, it was in this area (indicating).
16  But there were -- when I got back to the hotel,
17  there were significant red marks all around my
18  neck.
19        MR. McKAY:  Just to clarify your
20        description, I don't think it was the base
21        of his neck as much as the base of his
22        skull.
23        THE WITNESS:  Right.
24        MS. SHELKE:  Correct.

Page 47

1  BY MS. SHELKE:
2      Q.  So the last blow that you felt was
3  three or four inches of the back of your head
4  where your hair covers you?
5      A.  Well, my hair is different now than it
6  was then, so let me clarify that.  But I can
7  tell you that, very specifically, it's where
8  the curve is right here (indicating) before we
9  start moving into the neck.
10     Q.  Okay.  And then when you got to the
11  hotel later, you also observed red marks on the
12  base of your neck?
13     A.  When I got in the hotel later on, it
14  was actually, you know, hours and hours later.
15  And I tried to see what had happened, because I
16  didn't know if it was cut, and I didn't know
17  what to think.  And I could look in the mirror
18  and see to the side that it was all red right
19  here (indicating).  But that's about all I
20  could see in the mirror from that point.  It
21  was just very, very red.
22     Q.  Did you ever ask A.D. to look at --
23     A.  No.
24     Q.  -- your back -- I'm sorry.

Page 48

1      Q.  Did you ever ask A.D. to look at the
2  back of your head, neck, or shoulders, and
3  describe what he saw, the day after this
4  incident?
5      A.  No, I did not.
6      Q.  You also mentioned that the front of
7  your forehead or face hit the seat-back in
8  front of you.  Would that be correct?
9      A.  Yes.
10     Q.  What portion of the front of your face
11  hit the seat-back in front of you?
12     A.  (Indicating.)
13     Q.  Your forehead?
14     A.  Yes, right here (indicating).
15     Q.  Okay.  So the upper part of your
16  forehead?
17     A.  Right.
18     Q.  Did you sustain any cuts or bruises as
19  a result of hitting your head on the seat-back
20  in front of you?
21     A.  I did not check.
22     Q.  Were you bleeding, to your knowledge,
23  at any time after you hit the seat-back in
24  front of you?

Page 49

1      A.  Not to my knowledge.  I did not check.
2      Q.  Did you ever develop a bruise on the
3  front of your head that you believe was related
4  to hitting the seat-back in front of you?
5      A.  I did not check.
6      Q.  When you say you did not check, to the
7  best of your recollection, looking in the
8  mirror for the two to five days after this
9  incident, you did not see any bruises on your
10  forehead or upper part of your head, correct?
11     A.  I will clarify that.  We did not have a
12  mirror.  We were in a camper van.
13     Q.  Okay.
14     A.  There were no mirrors available
15  anywhere.
16        And at the hotel, I didn't check,
17  simply because I was -- I was really worried
18  about the back of my head.
19     Q.  You mentioned that your hair was
20  different at the time of this incident.  How
21  was it different then?
22     A.  It was probably a lot shorter.
23     Q.  Apart from being shorter in length, was
24  there anything different about your hair than

PETER DELVECCHIA                                    November 19, 2019

Page 50

1  today?
2      A.  I may have a few more gray hairs, but
3  that's about it.
4      Q.  I believe we're on point 17.  If you'll
5  continue.
6      A.  Okay.  I felt several hard hits to the
7  back of my neck and my head.  I know I yelled
8  something out.  And the first thing I did was
9  grab A.D.'s leg, because it was just reflexive.
10  I wanted to make sure he was all right.
11          I saw somebody hanging over me with a
12  white shirt.  And I can't say I saw his face,
13  but I definitely saw the white shirt out of the
14  corner of my eye.  It was the same person who
15  later identified himself as Kevin.
16          And I want to add something here that's
17  not there.  As I grabbed A.D.'s leg --
18          THE WITNESS:  And, John, I'm sorry, I
19      do remember this now, so I can put this in
20      here.
21      A.  He definitely was the person hitting me
22  in the head, because as I got up, his face
23  was -- he was the only black flight attendant,
24  and it was a black man standing over me and

Page 51

1  leaning into the row.  So I have no doubt who
2  hit me.  Okay?  So let's be really clear about
3  that.  The person later identified himself as
4  Kevin, and was yelling, "Get out, just get
5  out," to my son, and then yelled at me to move.
6      Q.  If you'll stop there.
7      A.  Uh-huh.
8      Q.  When you were sleeping with your head
9  resting on the seat-back in front of you, do
10  you know the position of the passenger on your
11  left?  Meaning was he seated leaning back
12  against his seat?
13      A.  Next to me meaning in the seat right
14  next to me?
15      Q.  On your left side in the aisle seat.
16      A.  In my row?
17      Q.  Correct.
18      A.  Okay.  I just want to be specific.  His
19  head was down into the computer, like this
20  (indicating), from what I remember.  And I
21  can't be specific, because, again, I didn't
22  look at him when I got hit.  But that was the
23  position he was in every single time I looked
24  over his way.  And when -- give me -- I'm just

Page 52

1  trying to -- I'm just trying to put the pieces
2  together for a minute.
3          Can you -- can you ask me the question
4  again, please?
5      Q.  Sure.  I was wondering about the
6  position of the passenger who was seated to
7  your left in the aisle seat in your row.
8          You mentioned that he was hunched over;
9  is that correct?
10      A.  Every time I saw him, he was hunched
11  over his computer, yes.
12      Q.  And did he have his tray table down?
13      A.  I believe he did, yes.
14      Q.  Okay.  And then when the flight
15  attendant was hanging over you, as you say in
16  17c of Deposition Exhibit Number 2, I'm
17  wondering, was he hanging down in front of you
18  towards your back, or in front of the other
19  passenger?
20      A.  I didn't check.
21      Q.  What is your recollection with respect
22  to how the flight attendant was hanging over
23  you, given the position of the passenger next
24  to you hunched over his computer?

Page 53

1      A.  He was recoiling off the row.
2      Q.  When you say he was "recoiling off the
3  row" --
4      A.  He was coming back up.
5      Q.  The passenger next to you was coming --
6      A.  No, Kevin -- or Scott -- was coming
7  back up.
8      Q.  Describe that for me.  When you say
9  "coming back up," what do you mean?
10      A.  His body was partially in the row and
11  he was moving back up like this (indicating),
12  and yelling at the same time.  I can't tell
13  you -- I know where you're going.  You're
14  looking for specifics about where he was.  I
15  can't tell you that.  All I can tell you is,
16  his body was leaning into the row a little bit,
17  and he was in the process of moving out of the
18  row.
19      Q.  Did he lean into the row behind the
20  passenger to your left and you?
21      A.  I can only tell you what happened with
22  me.  I can't tell you what happened with the
23  person next to me.
24      Q.  Okay.  And then 17d says:  "Yelled at

PETER DELVECCHIA                                    November 19, 2019

1  me to move," which is yelled at you to move.
2      A.  Yes.
3      Q.  If you'll continue from there.
4      A.  My son looked very confused.  He kept
5  saying "Okay."  I thought he did something
6  wrong.  The first thing I started thinking
7  about was that he did something wrong.  I
8  mean -- or he had to use the bathroom, and I
9  didn't wake up, and I thought Scott was trying
10 to help him get to the bathroom.  I had no idea
11 what was going on.
12         And then I remember searing pain.  The
13 pain was horrible in my eyes.  It was all down
14 my neck and back.  And I will add that I
15 remember being very foggy.  I just -- I
16 couldn't get focused.  It was like I was in
17 like a cloud.
18         I don't remember if I stepped out of
19 the row or if the person next to me did.  I
20 can't answer that.  I remember Kevin leading my
21 son to the rear of the plane.
22     Q.  Okay.  If you'll stop there.  Did you
23 hit your eyes, to the best of your
24 recollection?

1      A.  No, I definitely did not hit my eyes.
2          I'm sorry.
3          MR. McKAY:  It's okay.
4      Q.  That's all right.  That's all right.
5          Just to clarify for the record:  Did
6  you hit your eyes on the seat-back in front
7  of you?
8      A.  No.
9      Q.  Okay.  And you described being "foggy."
10 Is that a fogginess that you would relate in
11 any way to the sleeping pill that you took?
12     A.  No.
13     Q.  And how is it that you can distinguish
14 the fogginess as not being related to the
15 sleeping pill?
16     A.  Because it was a quarter dose.  I hate
17 medication, so I don't take anything that
18 affects me -- my clarity.  I never do.  And
19 I've taken them before, and it's never affected
20 it.  There is usually no residual effect.  I
21 only take enough of it to stop my brain from
22 going a hundred miles an hour.
23     Q.  So in the past, to clarify:  You have
24 taken the same dosage of the same or a similar

1  sleeping pill, been woken up in the middle of
2  the night, and not experience such fogginess?
3      A.  Yeah, I mean, I've taken it and not
4  gone to bed for two hours afterwards.
5      Q.  Okay.  If you'll continue with point
6  number 18 and 19.
7      A.  Okay.  As I said, I can't remember if I
8  stepped out of the row or the person next to me
9  did, and that relates to letting A.D. out.
10         I remember Scott leading my son to the
11 rear of the plane.  I sat back in the row, but
12 I don't remember if he moved.  I remember
13 sitting back down.  I was really dizzy, and
14 there was pain in my head, neck, and upper
15 back.  My head was foggy.  I can't tell you how
16 much time passed before 21 and 22.  It might
17 have been a while.
18         But I asked the person next to me what
19 happened, and he wouldn't pick his head up.  I
20 remember he was back in the computer, and I saw
21 he had headphones on, so I asked him quite loud
22 what happened, and he never picked his head up.
23     Q.  Do you know if he was actively ignoring
24 you or if he did not hear you?

1      A.  I felt like he didn't -- I'm saying I
2  felt like he didn't want to get involved.  I
3  don't know anything.
4      Q.  Do you have any understanding as to
5  whether you passed out or otherwise became
6  unconscious after A.D. left your row?
7      A.  I don't know.  It is possible.  I don't
8  know.
9      Q.  Okay.
10     A.  Do you want me to continue?
11     Q.  Yes, please.
12     A.  All right.  At this point I started to
13 panic, and I started asking people everywhere
14 around me, specifically the people across the
15 aisle in the same row, what had happened,
16 because I thought maybe they had seen.  And I
17 remember there was no more chatter.  People
18 were really quiet.  And they were looking at me
19 like I was a -- they were -- looked scared.  So
20 I said to them, "Do you have any idea what
21 happened?"  And all I remember is shrugs.  And
22 then there was a person in the middle seat of
23 the row across the aisle that said, "We have no
24 idea."

PETER DELVECCHIA                                    November 19, 2019

Page 58

1     Q.  Okay.  Just to stop you there.
2         So when you say the row across the
3  aisle, it is your row, just on the other side
4  of the aisle?
5     A.  Yes.  So you said I was in 17.
6     Q.  Yes.
7     A.  So it would be 17, I guess, A --
8     Q.  A, B, and C row?
9     A.  -- B, and C row, yes.
10    Q.  Okay.  Do you happen to recall if
11  the -- whether the passengers in the row --
12  strike that.
13        Do you happen to recall if they were
14  male or female passengers on the other side of
15  the aisle in your row?
16    A.  I remember a female.  I don't -- I just
17  remember the lady that shrugged.
18    Q.  And to the best of your recollection,
19  the lady that shrugged was in the middle seat,
20  which would be 17B?
21    A.  I can't swear to it, but I think so,
22  yes.
23    Q.  Okay.  And you asked her what had
24  happened --

Page 59

1     A.  I asked --
2     Q.  -- or something to that effect?
3     A.  Sorry.  I asked a collective what had
4  happened.
5     Q.  Okay.  And you asked the collective
6  group, which would be when you said the row
7  across the other side of the aisle of you, and
8  the female shrugged in response; is that
9  correct?
10    A.  Yes, and I think she also said,
11  "No idea," but somebody said, "No idea."
12    Q.  Okay.  Point number 23 says:  "No idea,
13  looked scared."  Who looked scared?
14    A.  Every face that I could see looked
15  scared and uncomfortable.  And as I mentioned,
16  the chatter was gone.
17    Q.  Continue.
18    A.  All right.  I don't know how long
19  between 23 and 24, but I was sitting there, and
20  I was trying to get up and walk without
21  falling.  I was waiting for the fog to clear up
22  a little bit.  And I stood up, and I was trying
23  to find my son, and I saw him in the rear row,
24  way, way in the back.

Page 60

1     Q.  So to clarify, point number 24, when it
2  says, "read" row, it's actually "rear"?
3     A.  "Rear" row.  I'm sorry.
4     Q.  I'm just -- I'm just being clear here.
5     A.  Yeah, I'm sorry about that.
6     Q.  And when you say "rear," you're
7  referring to the last row of the aircraft,
8  correct?
9     A.  It was the last row.
10    Q.  Okay.  Do you know if he was seated on
11  the right or left side of the last row of the
12  aircraft as you're looking forward?
13    A.  It looked -- I could not tell, because
14  my guess is he was pushing like this
15  (indicating).  He was probably moving the seat.
16  So at that time I could not see which seat he
17  was in.
18        MR. McKAY:  She was asking a different
19  question.
20        THE WITNESS:  Oh, I'm sorry.
21        MR. McKAY:  Was it -- was it aircraft
22  right or aircraft left?
23        THE WITNESS:  Oh, I'm so sorry.
24    A.  It was the same -- so if you're facing

Page 61

1  forward, it's the rear -- the right side, same
2  as me.
3     Q.  Okay.  In the win- --
4     A.  I misunderstood you.
5     Q.  That's okay.
6     A.  No, I can't say the window.  I don't
7  know.
8     Q.  Okay.  But it was the last row of the
9  aircraft facing -- on the right-hand side,
10  facing forward?
11    A.  Yes.
12    Q.  Thank you.
13    A.  And at that time I didn't know what to
14  think.
15    Q.  Okay.  We'll continue with Deposition
16  Exhibit 2.
17    A.  Okay.  So I started to walk back, and
18  Kevin came -- I'm sorry -- Scott came from the
19  galley, you know, that little galley in the
20  back, to confront me.  And there was a very
21  large white man with a white shirt sitting in
22  the aisle seat in (redacted) -- I'm sorry, I
23  did it again -- in my son's row.
24    Q.  When you say Kevin -- or Scott -- came

PETER DELVECCHIA                                    November 19, 2019

Page 62

1  from the back galley to confront you, what do
2  you mean by that?
3      A.  It was like he saw me coming up, and he
4  stepped out, and he stood in front of the row
5  where my son was, I would even say in a
6  threatening manner.
7      Q.  And in your perception, he did that in
8  a threatening manner to you and to block you
9  from entering the aisle?
10     A.  Yes.
11     Q.  The white man who was sitting in the
12  aisle seat in your son's row in the back of the
13  aircraft, do you have any understanding of who
14  he was?
15     A.  He had a white shirt on, and I'm not a
16  hundred percent sure, but it looked like there
17  was a Frontier symbol right around here
18  (indicating) on his -- on his shirt.
19     Q.  Okay.  So roughly where a patch pocket
20  would be, you think there was a Frontier --
21     A.  Not -- go ahead.  I'm sorry.
22     Q.  -- a Frontier logo?
23     A.  Not to the pocket.  Just like right
24  over here (indicating) to the side where a

Page 63

1  pocket would be.
2      Q.  Okay.
3      A.  I don't know if that's because his
4  shirt was twisted, but that's where it
5  appeared.
6      Q.  Okay.  Is there anything else you
7  remember about this person?
8      A.  He was a very -- yes, I do.
9      Q.  What do you remember?
10     A.  He was large.  His hair was a light
11  brown or a dark blond, if you will.  I remember
12  him looking at me, and looking at my son, as I
13  went back there, and I have a rough idea of his
14  face.  He had a very square face, and I don't
15  remember him wearing glasses, and that's the
16  best I got.
17     Q.  Did you ever come to learn this
18  person's name?
19     A.  No.
20     Q.  Had you ever seen this person prior to
21  the time you saw him sitting in the same row as
22  your son in the back of the aircraft?
23     A.  Yes.
24     Q.  When did you see him before the time

Page 64

1  you saw him sitting in the same row as your son
2  in the back of the aircraft?
3      A.  My recollection is that he accompanied
4  Scott on his assault, if you will.  He was --
5  and I can't give you specifics, but when -- I
6  remember looking at my son, coming out of the
7  aisle.  I recall this person being about six or
8  so feet behind Scott, in the aisle.
9      Q.  So to the best of your recollection --
10     A.  Can I --
11     Q.  Go ahead.
12     A.  -- just clarify one thing?  Would that
13  be all right?
14     Q.  Sure.
15     A.  I was trying to think.  I'm a little
16  cloudy on that.  I'm not going to say I
17  specifically remember it, because -- but I
18  think he was standing there, yes.
19     Q.  And just to clarify as to where you
20  think this person was standing, you said six or
21  seven feet behind Scott.  So that would be
22  further back in the aircraft?
23     A.  Toward the rear.
24     Q.  Toward the rear?

Page 65

1      A.  Yes.
2      Q.  Okay.  When Scott hit you, as you
3  allege, did this person do anything?
4      A.  He was staring at me.  And that's the
5  reason I remember.  He -- it sounds goofy, but
6  he was almost compassionate.
7      Q.  So your recollection is that, as you
8  were sleeping with your head resting on the
9  seat-back in front of you, Scott hit you on the
10  back of your head and neck, but you were able
11  to see this passenger six to seven feet towards
12  the back of the aircraft staring at you in a
13  compassionate manner?
14         MR. McKAY:  Objection to the form of
15  the question.
16     A.  Yeah, your question is leading me to a
17  conclusion, so I'm going to rephrase my answer.
18  It's not necessarily going to answer it the way
19  you asked it.
20         My -- this had nothing to do with the
21  time that my head was hit.  It had nothing to
22  do with, you know, the actual time of the
23  assault, but it had to do with at some point
24  that A.D. was exiting that row, he was there,

PETER DELVECCHIA                                    November 19, 2019

---

Page 66

1  where I was looking up and aware of people
2  there.
3      **Q.  Okay.  Then to clarify:  The first time**
4  **that you saw this passenger who we've been**
5  **talking about, the large white man in the white**
6  **shirt, who was sitting in the same row as your**
7  **son, in the back of the aircraft, was when A.D.**
8  **was taken from his seat next to you to go to**
9  **the back of the aircraft?**
10     A.  Yes.
11     **Q.  Okay.  Go ahead.  So you were at the**
12  **back of the aircraft at this point.**
13     A.  Where would you like me to pick up
14  from?
15     **Q.  I think we talked about point number**
16  **25, unless you have anything more to add there?**
17     A.  No, I'll continue to 26, then, if
18  that's okay.
19         So, again, this person was looking up
20  at me, and he had a very compassionate face.  I
21  remember that very clearly, because I was
22  hoping he would at least help me out.  And as I
23  said, I remember he was with -- I put Kevin at
24  the time.  Now I know his name is Scott.  He

Page 67

1  was with Scott when he took my son.
2         My son was at the window seat with a
3  seat between him and the person on the aisle
4  seat.  I asked Scott why he took my son and if
5  my son did something wrong.  I was very clear
6  about the word "son."  And the conversation was
7  something like this.
8         I'm not -- there's no quotes.  I can't
9  tell you specific words.  But, again, I asked
10  him why he took my son.  And he said, "You know
11  what you did."  And I said to him, "No, I
12  don't."
13         And he said, "You touched his
14  genitals."  And I said, "How could I do that?
15  I was asleep."
16         And he said, "Doesn't matter.  You
17  touched him."  I said, "Again, I was asleep.
18  Didn't my son tell you that?"  And he said,
19  "No, he didn't, but we all saw you touching
20  him."
21         And I said, "Who saw that?"  And he
22  said, "All of us."  And I should mention that
23  this is where he first identified himself as
24  Kevin.  And I -- and I -- before this little

Page 68

1  blurb on the table, I said, "Can I have your
2  last name?"  And he said, "Just Kevin.  That's
3  all you need."  All right?  So I very clearly
4  remember him identifying himself that way.
5         He said -- I asked him, "Who saw that?"
6  And he said, "All of us.  The police have been
7  called.  You will have to tell them.  They will
8  be waiting at the gate."
9         So I said, "Okay, I guess we will sort
10  it out then.  What is your last name, Kevin?"
11  And he said, "It doesn't matter.  Deal with the
12  police," and he smiled at me in a very
13  malicious, nasty way.
14         I asked A.D. if he was okay.  I told
15  him I loved him.  That man in the aisle watched
16  the whole thing looked upset and unkind.  And I
17  remember I also told A.D. to relax, that we'd
18  take care of it.
19         MR. McKAY:  I'm sorry.  It sounded like
20     you said he looked "upset and unkind," and
21     your notes are different.
22         THE WITNESS:  Are we talking about --
23         MR. McKAY:  The white man.
24         THE WITNESS:  "Not unkind."

Page 69

1         MR. McKAY:  "Not unkind."
2         THE WITNESS:  "Not unkind."
3         MR. McKAY:  Okay.  I just wasn't sure
4     if I heard that right.
5  BY MS. SHELKE:
6     **Q.  If I could interrupt you there:  Did**
7  **that passenger who was seated on the aisle seat**
8  **in A.D.'s row say anything during your exchange**
9  **with the flight attendant?**
10     A.  No, he did not, that I saw.  I can't
11  say he didn't, but he didn't when I was there.
12  And I was -- that's why I remember him so
13  clearly, because he was looking at me like in a
14  supportive way, and I kept hoping he would say
15  something.
16     **Q.  Did you speak with this gentleman?**
17     A.  No.
18     **Q.  When the flight attendant told you that**
19  **the police had been called, and they would sort**
20  **it out once the flight landed, did you accept**
21  **that it was a matter that the police should**
22  **sort out?**
23     A.  I was very relieved the police had been
24  called.

PETER DELVECCHIA                                    November 19, 2019

Page 70

1   Q.  Why were you relieved?
2   A.  Because I expected fairness.  I mean,
3   this man was an animal.  I didn't want him near
4   my son.  I wanted the police there.  I wanted
5   somebody to help me out.  I knew I was going to
6   get nowhere with this person, and I was
7   extremely relieved that the police had been
8   called.
9   Q.  If you'll continue on with -- is there
10  anything more about the conversation with the
11  flight attendant that you remember?
12  A.  Yes, he was hostile.
13  Q.  When you say "hostile," can you
14  describe that further?
15  A.  Every motion of his body, the way he
16  spoke, he was hostile, angry.  Just his body
17  language was angry and hostile.  There did not
18  appear to be any way at that point of making
19  him understand that he made a mistake.
20  Q.  Did this flight attendant swear at you?
21  A.  He did not swear at me, not at that
22  time.
23  Q.  You said "not at that time."  So you
24  recall another instance where he swore at you?

Page 71

1   A.  Yes, we'll get into that.
2   Q.  Okay.  But up until this point where
3   you had the exchange with the flight attendant
4   in the back of the aircraft, the flight
5   attendant had not sworn at you, correct?
6   A.  No.
7   Q.  Did he yell at you?
8   A.  He was loud.
9   Q.  You say loud but not yelling.  Would
10  that be fair?
11  A.  I think yelling is subjective.  I would
12  say it was above a normal conversational tone.
13  Q.  Okay.  Anything more about the
14  conversation that you remember?
15  A.  No.
16  Q.  Go ahead with point number 29.
17  A.  I went back to my seat, and I looked
18  around, and a lot of people were staring.  A
19  lot of people, especially across the row,
20  looked very scared and upset.  They didn't say
21  anything to me, though.  And that's when I
22  started getting very nauseous.  I started to
23  feel like I was going to throw up.  And I
24  remember being very dizzy at that point, and

Page 72

1   that my back and my neck were just, in the
2   back, right around in here (indicating), it was
3   horrible, and my head was hurting a lot.
4         And people kept glancing over at me
5   across the aisle, and it started to get really
6   uncomfortable, and I started to get really
7   upset.  I mean, my son was taken away, and I
8   started to think to myself that -- you know,
9   what kind of pain he was in.
10        A.D. is not one that deals with
11  separation well.  He's had a lot of hardship.
12  And he does not like being away from either
13  myself or Gayle, and then to some extent,
14  Amanda.  And it was really difficult, and all I
15  kept thinking about is what kind of pain he was
16  going through.
17        And I started trying to calm myself,
18  because I was thinking:  If I start yelling or
19  going to the back again, that the other
20  passengers were going to get upset.  And you
21  read about these stories of people who make a
22  fuss on the airlines, and then people start to
23  panic, and that's just not fair to them.
24        So I took a magazine out, and I was

Page 73

1   looking at some pictures.  It was some nature
2   magazine.  As I mentioned before, my son and I
3   spend a lot of time outdoors, and it brings us
4   both a great deal of happiness.  And I tried to
5   look at the pictures and calm myself down.  And
6   I tried to put the magazine up, because it was
7   really embarrassing.  And I tried to act as
8   nonchalant as I could, because I didn't want
9   the other passengers getting upset.
10        I had prior experiences like this,
11  which I know you know about, and the FBI and
12  the police were always extremely fair about it.
13  This is not new.  And I kept trying to tell
14  myself over and over again that, "This will be
15  quick," and it's always gone very fair.  And
16  not "always" like it's been a hundred times.  I
17  think there's been three -- or two.  Two other
18  times.  This was the third time.  So I kept
19  trying to calm myself down, because I knew if
20  they were truly waiting outside the plane, then
21  in my mind:  In five minutes we're done.
22        I kept trying to look at A.D.  I
23  couldn't get his attention.  He looked
24  terrified.  I had a lot of guilt over it, I can

PETER DELVECCHIA                                    November 19, 2019

Page 74

1  tell you that.
2      Q.  I'll stop you there.
3          MR. McKAY:  Is this a good time for a
4  break?  We've been going about an hour.
5          MS. SHELKE:  Sure.
6          MR. McKAY:  Okay.  And I think we're
7  halfway through the notes.
8          MS. SHELKE:  Okay.
9          MR. McKAY:  And I need coffee.
10         MS. SHELKE:  Sounds good.
11         THE VIDEOGRAPHER:  Off the record at
12  11:07.
13         (Recess from 11:07 to 11:29 a.m.)
14         THE VIDEOGRAPHER:  Back on the record
15  at 11:29.
16  BY MS. SHELKE:
17     Q.  Mr. DelVecchia, before we took a break,
18  we were talking about point number 29 on
19  Deposition Exhibit Number 2, and I have some
20  follow-up questions about that one.
21         You said that A.D. does not deal with
22  separation well.
23     A.  No.
24     Q.  No, you did not say that?

Page 75

1      A.  No, he does not.  I was answering the
2  question.
3      Q.  Oh, sorry, yes.  Okay.
4      A.  I'm sorry.
5      Q.  Can you tell me a little more about
6  that?
7      A.  He is -- he's just a very attached kid.
8  He's just -- he's got a lot of friends.  But I
9  think by virtue of being adopted and changing
10  countries and losing his family -- because he
11  was three when he was detached from his family
12  in Africa and brought here.  And then his mom
13  passed away a couple years later.  So I think
14  that, you know, it shook him up a little bit.
15         And, plus, you know, he is -- he's -- I
16  don't know if I can say this, but he's just --
17  please stop me if saying anything wrong, but
18  he's a very unusual kid.  He's very sensitive,
19  and he's very compassionate.  And as much as I
20  worry about him, he's also worried about me and
21  his sisters.  He's just -- he's just -- he's
22  not a 12-year-old kid that just ignores and
23  moves on with his life.  Things impact him.
24  And he has a very deep understanding of things.

Page 76

1          THE WITNESS:  Is it okay if I go on a
2  little bit?
3          MR. McKAY:  Yes, yes, absolutely.
4      A.  Just something so simple as, you
5  know -- I can give you an example.  My leg
6  surgery, he'll make sure, you know, to fill my
7  water glass and help me with dinner.  I mean,
8  he's just a very loving, thoughtful child.  And
9  pulling him away, it immediately creates an
10  insecurity for him.  And it's not like he
11  gets -- he acts out.  He just doesn't like it.
12         And he's extremely close with my
13  daughter, Gayle, and the two of them are pretty
14  inseparable.  He is with all of us.  He just --
15  he doesn't like to be messed around with, with
16  his family structure.  And I would say we're
17  all like that, pretty much, every one of us.
18  And maybe that's nature or nurture.  I don't
19  know.
20         Does that help?
21     Q.  Yes.
22     A.  Okay.
23     Q.  You talked about returning to your seat
24  after speaking with the flight attendant in the

Page 77

1  back of the aircraft, and you said that you had
2  some pain in the back of your neck -- in the
3  base -- you said you had some pain.  You
4  pointed or gestured to the base of your neck.
5          Is that a correct representation of
6  where you felt pain?
7      A.  No.
8      Q.  Where did you feel pain when you
9  returned back to your seat after speaking with
10  the flight attendant in the back of the
11  aircraft?
12     A.  Well, I want to define "after."  Okay?
13  Because I don't know that it was immediately
14  after.  So I want to be careful there.
15         But when I returned to my seat, there
16  was a pain that started like right here
17  (indicating), in the sides of my head, and it
18  felt like my head was being crushed.  And it
19  just -- I don't know how to put it to you, but
20  it was like just, literally, like somebody was
21  stepping on my head.  It was nothing I had ever
22  felt in my life.  It was really painful.  And
23  my neck felt tight, I guess the way it would
24  feel when you get hit, and I started to get

PETER DELVECCHIA                                          November 19, 2019

Page 78

1   nauseous and dizzy.
2         And I remember it very clearly,
3   because, you know, I was sitting behind a
4   magazine, just praying that I wouldn't throw up
5   all over the place, because it was -- it was
6   unbelievable.  And I didn't know what was
7   happening to me.  I thought it was stress.  I
8   mean, I know better now, but it was an
9   unbelievably different feeling than I've ever
10  felt.
11       **Q.  Did you actually ever throw up?**
12       A.  No, I did pull the bag out and I -- a
13  couple times I thought I was going to, but it
14  pulled back.  That flight, I did not throw up
15  on the flight.
16       **Q.  And you said you "thought it was**
17  **stress, but you know better now."**
18       A.  Yes.
19       **Q.  What do you believe to be different**
20  **now?**
21       A.  I think it was a concussion.
22       **Q.  Has any medical professional told you**
23  **that you suffered a concussion as a result of**
24  **this incident on Flight 2067?**

Page 79

1       A.  Because I did not see somebody right
2   away, they would not be definitive, but they
3   said it was highly likely it was a concussion.
4       **Q.  Do you recall the doctor's name that**
5   **told you it was highly likely you suffered a**
6   **concussion?**
7       A.  Yes, it's in your exhibit.  Do you mind
8   if I go to it?
9       **Q.  Which exhibit are you referring to, for**
10  **the record?**
11       MR. McKAY:  It's the interrogatories.
12       THE WITNESS:  Yeah.
13       A.  It's on page 5.  His name is
14  Kenneth Carnes, and his name is identified in
15  there.
16       **Q.  Okay.  Thank you.**
17       And you said that you felt people
18  **staring at you as you sat in your seat; is that**
19  **correct?**
20       A.  Yes.
21       **Q.  The people who you felt staring at you,**
22  **were these the passengers seated across the**
23  **aisle from you?**
24       A.  Yes.

Page 80

1       **Q.  Was anybody else staring at you, such**
2   **as the passengers in the row in front of you?**
3       A.  I couldn't tell that.
4       **Q.  Okay.  Did you ever start to cry as you**
5   **sat in your seat?**
6       A.  No.
7       **Q.  You mentioned that you pulled out a**
8   **magazine.  Was that a magazine that you had**
9   **brought with you?**
10       A.  Yes.  Well, yes, because it had nature
11  pictures in it, and I always read magazines
12  with hiking.  Sorry.  Yes.
13       **Q.  And you mentioned two other times where**
14  **the FBI was involved in an incident.**
15       A.  I didn't say that.  What I said is
16  where -- where we had police involved, is what
17  I meant.  If I wasn't clear, my apologies on
18  that.
19       **Q.  Okay.  So you've experienced two other**
20  **instances where the police were involved in a**
21  **situation pertaining to you and A.D., correct?**
22       A.  Yes.
23       **Q.  And this instance on Flight Number 2067**
24  **would be the third time?**

Page 81

1       A.  Yes.
2       **Q.  Okay.  And what was the first of those**
3   **two times that you're referring to?**
4       A.  The first time was on -- what A.D.
5   says, it was a Delta flight.  I don't remember.
6   A.D. has a much better memory than me.  And it
7   was a Delta flight.  And he was tired.  He...
8       I probably should say right now, A.D.
9   is an incredibly affectionate person, and he
10  was probably ten at the time, and he put his
11  head on my shoulder, and he fell asleep, and I
12  fell asleep as well.  And I was informed, when
13  I got off the plane, by the FBI, that a
14  passenger reported it to an airline attendant,
15  who then asked the police to question us once
16  we landed.
17       **Q.  Do you recall where this incident**
18  **occurred?  Where the flight landed?**
19       A.  I do not.  I can only tell you what
20  A.D. says.
21       **Q.  Okay.  And where was the second**
22  **incident?**
23       A.  The second incident was in a movie
24  theater in Wilmington.  We have a small, little

Page 82

1  condo down there, we've had for many years,
2  that we go to on the weekends.  And we went to
3  a movie, because it was raining.  And I don't
4  remember what started it off, but I remember he
5  was holding my hand, and we were watching
6  Black Panther.  And he was holding my hand
7  and -- oh, can I go back on something?
8      Q.  Yes.
9      A.  Okay.  So I'm sorry.  I wanted to
10 answer your question.  I goofed up.
11         After the plane, they identified
12 themselves as the FBI.
13         THE WITNESS:  And can I go on about
14    that a little bit?
15         MR. McKAY:  Sure.
16         MS. SHELKE:  Yes.
17 BY MS. SHELKE:
18     Q.  So just to clarify, you're speaking
19 about the incident that A.D. believes occurred
20 on a Delta flight?
21     A.  Yes.  Yes.
22     Q.  Okay.
23     A.  When I got off the plane, there was
24 people who waited for -- I'm sorry.  I should

Page 83

1  have gone into this.  I got distracted.  The
2  people were waiting at the gate, and they saw
3  us come off the plane, and they asked if they
4  could speak to us for a couple minutes.  And
5  the person identified themself as the FBI.
6         And just be patient with me.  I'm
7  trying to remember the specifics.  Okay?  And
8  they said -- they said that somebody had
9  reported that there was a possibility of
10 trafficking, and he wanted to know if he could
11 talk to A.D. inside.  And there were two of
12 them.  And one went to the side with A.D. and
13 asked him some questions, and then the other
14 one stayed with me, and he asked me who A.D.
15 was, when I adopted him.  He asked -- I know he
16 asked about our family structure, I'm pretty
17 sure of that.
18         And then we just waited.  And about
19 five minutes later, the other one came over and
20 apologized, and he said that, "People" -- his
21 words -- "People are not used to seeing a black
22 child with a white person," and he was very
23 apologetic, and we moved on, and maybe it took
24 five minutes.

Page 84

1      Q.  Did this interaction with the FBI that
2  you just described occur on the jet bridge, or
3  were you inside the terminal of the airport?
4      A.  We were inside the terminal, yeah.
5      Q.  Were you in a law enforcement, police,
6  or FBI office, or just at the gate area?
7      A.  The gate area, by a hall.  He asked us
8  to come over by a hall.  So there was like a
9  hall down the side or something.
10     Q.  And that was just for privacy.  Would
11 that be accurate?
12     A.  Uh-huh.
13     Q.  Yes?
14     A.  Yes.  Sorry.
15     Q.  And, again, you do not recall the city
16 you were in when this incident occurred?
17     A.  I don't.  A.D. said it was Salt Lake
18 City.  I don't remember.
19     Q.  Do you know what year it was?
20     A.  I'm sorry, Tara.  I think he was ten
21 years old, though.
22     Q.  Okay.
23     A.  I wish I could be more specific, but I
24 can't.

Page 85

1      Q.  That's fair.
2         After the incident that we just talked
3  about, where you spoke with the FBI for five
4  minutes or so, did you have any interaction
5  with the airline with respect to that incident?
6      A.  No.
7      Q.  After that incident that we just talked
8  about that occurred on a flight, did you have
9  any -- did you make any complaints to the NTSB,
10 the DOT, or the FAA?
11     A.  Are we talking about that same flight,
12 the Delta flight?
13     Q.  Yes.
14     A.  Okay.  No, I did not.  It wasn't
15 necessary.
16     Q.  After the incident on the Delta flight,
17 if it was indeed a Delta flight, did you file a
18 lawsuit?
19     A.  No, I did not.
20     Q.  Did you make any claims or complaints
21 against the airline?
22     A.  No, I did not.
23     Q.  Is there anything else that you recall
24 about this incident on the Delta flight?

PETER DELVECCHIA                                    November 19, 2019

Page 86

1    A.  I just remember we sat at the gate, and
2  I was explaining to him why these things
3  happened, for about 15 minutes.  And I remember
4  the police officer talking to him very briefly
5  about it as well.  He was very kind to him.
6    **Q.  You've talked about both police and**
7  **FBI.**
8    A.  I'm intermingling.  I'm sorry.
9    **Q.  Okay.**
10   A.  I'm just, you know, lumping them.
11   **Q.  So to the best of your recollection,**
12  **law enforcement, whether they were police or**
13  **FBI, you would not know?**
14   A.  He identified himself as FBI.
15   **Q.  FBI.**
16   A.  He definitely did.  And I'm using
17  interchangeably the words.  I'm sorry.
18   **Q.  And you said that you sat at the gate**
19  **for about 15 minutes and explained this**
20  **incident to your son?**
21   A.  Not at -- it may not have been at that
22  gate, but we sat down someplace afterwards and
23  talked, yeah.
24   **Q.  Did A.D. ask you any questions which**

Page 87

1  led to you explaining the incident to him?
2    A.  No.
3    **Q.  Is there anything else that you recall**
4  **about this incident on the Delta flight?**
5    A.  No, it was just a brief vacation, was
6  all.
7    **Q.  Is there anything else that A.D. has**
8  **told you that he recalls about this Delta**
9  **flight?**
10   A.  Only that he recalls it was Salt Lake
11  City and Delta, because we never even thought
12  about it again until the Frontier flight.  I
13  mean -- and I will add --
14       THE WITNESS:  And, John, if I'm saying
15   too much, please stop me.
16   A.  I was so impressed with the way it was
17  handled, that there is a certain amount of you
18  that then becomes:  "Okay, this is great.  I'm
19  glad they were involved.  I'm glad they were
20  very reasonable.  They were nice."  And I felt
21  like -- I felt supported.
22       Like when I -- on Frontier, for
23  instance, when I was on the flight, the only
24  thing that got me really, really concerned was

Page 88

1  Scott's hostility and hitting me, and then
2  confronting me, and his behavior.  You know, if
3  somebody had just said, "Look, you know, we got
4  this complaint.  I'm sorry, I'm going to move
5  him to the back of the plane for now, and the
6  FBI will take care of it," I could have walked
7  away from that saying, "Oh, thank God the FBI
8  is involved.  And this will be great, you
9  know."  It wasn't, though.  And I got
10  assaulted.  My son got taken.
11       He will tell you tomorrow, he was not
12  treated kindly.  He will tell you tomorrow that
13  they didn't even let him get his shoes.  They
14  didn't let him take his jacket.  He told them
15  he was cold.  He told them he needed his shoes.
16  There was no compassion given to him.  And,
17  obviously, this raised my concerns enormously,
18  to the point where I didn't even want to bring
19  his shoes back anymore.
20       So it was just a whole different set.
21  The FBI didn't scare me.  I mean, they were
22  very reasonable people, as were the police in
23  Wilmington.
24   **Q.  With respect to the incident that**

Page 89

1  occurred on the Delta flight, as you understand
2  **the charges, they related to human trafficking;**
3  **is that correct?**
4    A.  Yes.
5    **Q.  Were there any other charges that were**
6  **explained to you?**
7    A.  No, the only word he used was
8  "trafficking."
9    **Q.  And then moving on to the incident at**
10  **the movie theater in Wilmington.**
11   A.  Right.
12   **Q.  You were watching the movie**
13  **Black Panther --**
14   A.  Yes.
15   **Q.  -- to the best of your recollection?**
16   A.  It was.
17   **Q.  It was Black Panther, and it was only**
18  **you and A.D.?**
19   A.  Yes.
20   **Q.  None of your other children were with**
21  **you?**
22   A.  No.
23   **Q.  Do you recall the year?**
24   A.  I could tell you the year it came out.

PETER DELVECCHIA                                    November 19, 2019

Page 90

1  I don't know.
2      Q.  That's fair.
3      A.  I'm not sure.
4      Q.  And somebody called the police in that
5  instance?
6      A.  Yes.
7      Q.  And it would have been the Wilmington
8  local police?
9      A.  Yes.
10      Q.  Tell me when, in the course of the
11  movie, the police were called.  Meaning, were
12  they called during the previews, were you
13  pulled out of the movie, or did it occur at the
14  end of the movie?
15      A.  I can't tell you when the police were
16  called, obviously.  I can only tell you when
17  they asked me to step outside.  And I even
18  remember the scene, because it was the big
19  scene in the movie, and my son was very upset
20  about missing the scene, and it was some scene
21  where there was a struggle to become king or
22  something.
23          And they came to the aisle, and he was
24  very pleasant, and he said, "Do you mind if we

Page 91

1  just talk outside?"  And there was only two
2  other people.  We were in the lower half.  So
3  you know how the movie theater is divided, an
4  aisle, and there's an upper and a lower half,
5  and he wanted to sit in the lower half.  So,
6  you know, we were like this (indicating).  And
7  there was only one other -- two other people in
8  that whole lower half, and they were a black
9  couple about six or five chairs away.
10          And the officer asked us to step out,
11  and we went outside with him into the lobby.
12  In a hall, actually.
13      Q.  And it was one police officer?
14      A.  No, there were two.
15      Q.  And what did they explain to you was
16  the issue?
17      A.  They said that I was holding his hand,
18  and that my hand was resting against his leg,
19  and that somebody called them and said that
20  they were concerned about abuse of a minor.
21  And he didn't say sexual abuse, but he said
22  abuse of a minor.  And then they talked to A.D.
23  apart from me.
24      Q.  Did anything further come of that

Page 92

1  incident?  Meaning, did you have further
2  interactions with the police?
3      A.  No.
4      Q.  Did you make a complaint against the
5  movie theater in that instance?
6      A.  No.
7      Q.  Did you go back in to finish watching
8  the movie?
9      A.  We did.
10      Q.  Turning back to Deposition Exhibit
11  Number 2, point number 29h says that you looked
12  back at your son several times, he looked
13  scared, but you could not get his attention.
14          So you would stand up in your seat and
15  turn around to face the back of the aircraft;
16  is that correct?
17      A.  I actually was -- I specifically
18  remember trying to pull my knee up underneath
19  me.  I did not stand up, because I was afraid
20  of falling.  And I remember I had worked my
21  knee up so I could get up on one knee and look
22  at him, and I could only see his face.  I
23  couldn't see anything else.
24      Q.  So you could not see what he was doing;

Page 93

1  is that correct?
2      A.  That's right.
3      Q.  But you saw enough about his face that
4  it gave you the impression he looked scared?
5      A.  He looked like he was crying.
6      Q.  Did he later tell you that he was
7  crying?
8      A.  He will never admit he's crying.
9      Q.  If you'll continue on with Deposition
10  Exhibit Number 2.  I think we're at point 30,
11  at this point.
12      A.  Yeah.  So I sat there and I waited.
13  And I remember seeing -- Kevin, I put down, but
14  it's Scott.  He was collecting trash.  He never
15  looked my way.  He never even put the bag down
16  the aisle to collect trash.
17          As soon as the plane landed, and they
18  gave permission to use our phones, I asked
19  Amanda -- and I think John has kindly sent you
20  the texts to admit -- where I asked her to
21  please stay close by.  My recollection, at the
22  time I wrote this, it may not match her text,
23  but I asked her to, "Please stay near your
24  phone.  I think I need help."

PETER DELVECCHIA                                              November 19, 2019

Page 94

1    And I -- I don't -- I know I
2  communicated with Gayle first.  I don't know if
3  I tried to call her or text her.  And I
4  didn't -- I wasn't able to reach her, so I
5  ended up texting Amanda.  But, you know,
6  Amanda -- I just, you know, wanted to make sure
7  somebody was there in case this got carried
8  away, that they could help out.
9       So I sat in my seat.  I can't tell you
10 how long.  I sat there waiting for A.D. for a
11 while, because I didn't know what was going to
12 happen.  And trash collection started.  And he
13 was still sitting back there.  And I was hoping
14 to give him his shoes as he passed.  And his
15 jacket, but he stayed back there.  So I said I
16 better go --
17    Q.  So just to stop you over there.
18        You sat in your row as other passengers
19 exited the aircraft, correct?
20    A.  I got onto the back of the line, yes.
21    Q.  Okay.  So, typically, passengers in row
22 1 exit, and then passengers in row 2.
23    A.  Uh-huh.
24    Q.  When your row exited, did you go out

Page 95

1  into the aisle?
2    A.  No, I waited until the last of the
3  passengers were up and moving, and I stood up,
4  and I didn't see (redacted) moving.  I'm sorry.
5  I did it again.  I didn't see my son moving.
6  And I said, "You know what?  I just need to get
7  out there and get this moving," because the
8  feeling I got was that they were not going to
9  take him off until I was gone.
10       And I recall taking his shoes and -- I
11 definitely remember his shoes.  I can't swear
12 to the jacket.  But I remember putting his
13 shoes in the chair so he could take them as he
14 walked by, and I might have left his jacket
15 there too.  And then I grabbed the bags, and I
16 put the backpack on, and I started to walk off.
17    Q.  When the aircraft landed in Las Vegas,
18 before passengers started exiting the aircraft,
19 was any announcement made for people to remain
20 seated for a while, meaning so that other
21 passengers could be taken off or something like
22 that?
23    A.  I do not recall anything like that.
24    Q.  Apart from the flight attendant telling

Page 96

1  you that the police or FBI had been called,
2  were any announcements made when the aircraft
3  landed in Las Vegas with respect to FBI or
4  police to meet the aircraft?
5    A.  I can pretty definitively say no,
6  because I would have been humiliated.  That's
7  the only reason I know.
8    Q.  So to the best of your recollection,
9  apart from A.D. remaining on the aircraft, you
10 were the last passenger to exit the aircraft?
11    A.  I can't swear to that.  I mean, I don't
12 know if somebody was sitting down, but it was
13 definitely the back of the line.  I got right
14 in behind somebody.
15    Q.  And you left A.D.'s shoes, and possibly
16 the jacket, on the aisle seat in the row where
17 you had been sitting?
18    A.  I can't swear what seat, I don't know,
19 but I know I put them on the seat so he could
20 grab them.
21    Q.  Okay.  And then what happened?
22    A.  Well, I was walking down the aisle, and
23 Kevin -- or Scott -- saw me coming back, and he
24 turned around and he leaned on the seat facing

Page 97

1  me, like this (indicating), with his hands on
2  the seat, staring at me as I walked down the
3  aisle, and he just had this nasty, malicious
4  smile on his face.
5       And I said to him, "I'm going to ask
6  you again for your last name."  And I said,
7  "Because I'm not going to let this go."  And I
8  said, "So I really would like your last name."
9       And he said -- he just smiled at me,
10 and he started chuckling, and he said, "Go on
11 outside.  The FBI is waiting for your ass."
12 Okay?
13       And I can tell you, this time, it was a
14 yell, but it wasn't a loud voice, it was loud
15 enough so I saw several people ahead of me turn
16 around, and I told him very clearly, "You're
17 going to be hearing from me, because I can't
18 let this go."  And I never was mean to him, but
19 my intent was to file a complaint with the
20 airline, because I felt like he was a very
21 violent person and a very racist person, and he
22 shouldn't be around other human beings.  And my
23 intent was to talk to the airline when I got
24 back.

PETER DELVECCHIA                                    November 19, 2019

Page 98

1    So as I left the plane -- and I know,
2    Tara, you're going to ask me.  So I don't
3    remember how many officers, and I don't
4    remember the mix between FBI and police.  I
5    don't remember if there was any FBI there.  I
6    just know there were several police officers
7    right there outside the breezeway.
8    **Q.  The jet bridge?**
9    A.  The jet bridge, yes.
10       So they asked me my name; I told them.
11   One asked me if I knew what I did.  And I said
12   to him, "I didn't do anything."  And I said,
13   "I only know what I've been accused of."  And
14   he -- we started walking.  And it was me and an
15   officer on each side.  I don't remember if
16   there were any other officers, but I do
17   remember there were at least two.  And he said,
18   "You don't remember what you did?"  And I said,
19   "I was accused of touching my son."  And that's
20   where we left it.  And they were actually
21   really nice about it.  They were very pleasant.
22       I don't remember how long the walk was.
23   I can tell you that, you know, I was not doing
24   well.  I started to trip and fall several

Page 99

1    times.  They asked me if I wanted to get on a
2    golf cart, and I told them, "Let me try to
3    walk."  I kind of felt like if I walked, some
4    of the dizziness might ease up.  Then we
5    walked, and it felt like we walked for ten
6    miles.
7    **Q.  Do you know where A.D. was while you**
8    **were being escorted by the -- by law**
9    **enforcement?**
10   A.  Well, I know he was still on the plane.
11   I mean, he wasn't behind me.
12   **Q.  Okay.**
13   A.  But I'm going to assume -- now, you'll
14   have to deal with this with A.D., but he did
15   say that he saw me on -- the point where you
16   get off the jetway and go into the gate.  He
17   said he saw me.  And he only told me that the
18   other day.  I don't recall that.
19   **Q.  Okay.**
20   A.  I can't speak to that.
21       Okay.  But I got to the precinct, and I
22   had to use the bathroom, and I remember the
23   officer -- again, they were really nice, these
24   two were really nice -- and he let me use the

Page 100

1    bathroom.  He had to stay in the bathroom with
2    me, which was kind of weird.  But they told me
3    they were worried about suicide, and they're
4    not allowed to leave people alone.
5        And then I remember that they told me
6    they had to handcuff me.  So they put my left
7    hand in a handcuff and to some ring on a metal
8    bench.  I told them I was not doing well, and
9    they asked me why, and I told them, "Because
10   the flight attendant hit me several times in
11   the head."
12       And they asked me if I was going to --
13   I remember they asked me, "Are you going to
14   throw up?"  And I said, "I'm not sure I'm going
15   to throw up, but I'm really dizzy, and I have a
16   lot of pain."
17       So these two guys were really nice.
18   They talked to me a lot about hockey.  One of
19   them came from, I think, Long Island, and we
20   talked about the Islanders for a little while,
21   and hockey.  We talked about life in New York.
22   I mean, we were chatting for a long time.
23       And, you know, they were trying to be
24   very accommodating, because I was really

Page 101

1    hurting, and I was trying to lean on things.  I
2    remember them being very, very kind about it.
3    They moved all of my possessions onto a table
4    across the room.
5        And I remember I asked them -- and I'm
6    going to maybe exaggerate, but I must have
7    asked them 20 times where my son was, and if he
8    was okay.  And I remember this one guy kept
9    getting up and going down the hall and checking
10   him and reassuring me he was okay and telling
11   me what was going on.  They were telling me how
12   he's playing -- "He's watching hockey right now
13   on the TV, and I sat with him for a little
14   while, and we talked, and he's fine."
15       And then I remember asking somebody if
16   they could make sure that he's not hungry, or
17   if he needs something, and to tell him I'm all
18   right, and they went down and they did.  And I
19   remember we had a lot of interaction like this.
20   **Q.  At this point, you're talking about**
21   **being in the custody of law enforcement.**
22   A.  Yes.
23   **Q.  And you mentioned being in a precinct.**
24   **Is this a precinct on site at the**

Page 102

1  Las Vegas Airport?
2      A.  Yeah, it's actually right -- I can only
3  tell you it was a hall and rooms.  I don't
4  remember a lot else about it, but I remember
5  there were doors right next to the precinct,
6  and it's right inside the airport, several
7  hundred feet away from the nearest ticket line.
8      Q.  Okay.  And then you talked about being
9  handcuffed on your left hand to a metal bench.
10  Was this in a cell or a room?
11     A.  I would call it -- again, I'm going to
12  call it a room.  I don't know what else to call
13  it.  There was a chair for the officer, a table
14  where my possessions were, and a long bench
15  across the room, and there were loops there to
16  handcuff people.  And a door that slid and
17  locked, as I remember it latching it when they
18  closed the door.  I mean, maybe it's a cell;
19  maybe it's a room.  I don't know -- I don't
20  know the difference here.
21     Q.  And then apart from the two officers
22  who were speaking with you and speaking with
23  your son, were there any other persons present
24  in the room?

Page 103

1      A.  What period of time are we talking
2  about?
3      Q.  The period where we were talking
4  about -- right now, where you said that the
5  officers were checking on your son, watching
6  hockey with him, making sure he was okay, as
7  described through point 39 in Exhibit Number 2?
8      A.  For that period of time, it was just
9  those two officers, and that was it.  There
10  were other people that walked in later, as
11  we'll get into on here.  But at this point, in
12  39, there were just these two officers that
13  were coming in and out.
14     Q.  Okay.  Do you know the name --
15     A.  But somebody was with me at all times.
16     Q.  So you were never left alone, and you
17  were handcuffed on your left hand, correct,
18  during this time?
19     A.  To a loop on the bench.
20     Q.  Okay.  Go ahead.
21     A.  Are you ready?
22     Q.  Yes.
23     A.  Okay.  Let me just make sure I got
24  everything.  Okay?

Page 104

1      I should say that they fed him.  They
2  fed him something.  I don't know what it was.
3  A.D. said it was just snacks, and they gave him
4  some drinks.  I was really appreciative.  They
5  were so kind.
6      But then they changed the officers, and
7  this guy came in, who was yelling at me a lot
8  and calling me names and stuff.  He was just a
9  miserable guy.  And I asked him if he could
10  please let me know about A.D.  And he told me,
11  basically -- basically -- I don't remember the
12  exact words -- but, "What do you care?  You
13  sexually abused him," and then said there was
14  probable cause, and I was definitely going to
15  prison.  And I didn't answer him.  I was really
16  quiet.
17      And then he told me to get up, and I
18  fell into the wall.  I remember I couldn't
19  stand on my -- I kind of, you know -- he
20  unhandcuffed me and -- because he wanted to
21  cuff me around the back, so I had one arm --
22  and I remember hitting the wall.  And then he
23  gave me -- he was nice with that.  He gave me
24  time to stand up.

Page 105

1      And then he said, "Open your legs."
2  And I guess I didn't open them enough, so he
3  kicked my leg out further, and then I remember
4  my hand hitting something.  I don't know what
5  it was, but it was my left hand hitting
6  something.
7      And he asked me what was wrong, and
8  I -- and I told him.  I said, "I was asleep,
9  and a flight attendant pounded my back and
10  neck, and I don't feel good."  And he said to
11  me, "All right," and then he started to loosen
12  up a little bit.
13      And he searched me, and he told me he
14  had to put my hands behind my back, because if
15  I was seen with my left hand on the bench,
16  cuffed alone, and not my hands behind me, and I
17  went to prison that night, he could get in
18  trouble.  So he put my hands behind my back,
19  and I was like that for at least -- probably an
20  hour.  And I remember it very clearly, because
21  now the pain was just -- I think it was
22  probably getting worse and worse.
23      And he asked me what he could do to
24  make it easier.  And I told him, "I have a

PETER DELVECCHIA                                    November 19, 2019

Page 106

1  cushion in my bag.  Is there any way I can have
2  the cushion, just to lay down on for a little
3  while?"  You know, one of those neck cushions
4  for the plane.  And I brought one for A.D., but
5  he didn't use it.
6        So he got it, and he said, "You can't
7  lay down with the handcuffs."  And I said,
8  "All right.  Will you let me tuck it under my
9  butt?"  Which helped a little bit.  And then I
10 remember just leaning back on the wall for a
11 really long time.
12       And then he said something to me like,
13 "You don't really seem the type to have done
14 this, and you don't seem like the type to cause
15 trouble."  He came over, and he took the
16 handcuffs off, he recuffed my left hand to the
17 bench, and he actually apologized for being
18 difficult.
19       And he went out to check what was going
20 on with A.D., and he went out to see how much
21 longer I would be there.  And he asked me if I
22 needed medical help, and I told him, "I just
23 need to get out of here."  And that's not in
24 here.

Page 107

1        And I'm just -- I'm just telling you
2  what I remember.  All right?  So if you could
3  just give me a minute, Tara, just to catch back
4  up.  All right?  To make sure I didn't miss
5  anything?
6     **Q.  Go ahead.**
7     A.  Unless you have specific questions.
8     **Q.  No, I'll wait for you to finish.**
9     A.  (Reviewing.)  Yeah, the only other
10 thing I missed was my phone was buzzing like
11 crazy, and I knew it was my daughters, or at
12 least one of my daughters, was nervous.  The
13 only one I had gotten in touch with personally
14 was Amanda.  And I asked him if I could get my
15 phone and just let her know I was okay.  And he
16 said, "I can't, because if you delete
17 something, we could have been tampering with
18 evidence."  And I asked him if he could please
19 text her, and he said, "I'm not allowed to do
20 that either."  That's the only other thing I
21 remember on number 40.
22    **Q.  Where was your phone?**
23    A.  It was probably, I'm guessing, in my
24 backpack.

Page 108

1     **Q.  But you could hear it buzzing?**
2     A.  Yeah.  Well, it clicks when there's
3  messages.  So it was clicking and buzzing and
4  all that stuff.
5     **Q.  Okay.  And you've described being in a**
6  **significant amount of pain.  Where was this**
7  **pain?  Meaning, was it in your head?  Your**
8  **neck?  Your back?**
9     A.  It was that same crushing feeling in my
10 head, and it was now radiating down my back
11 really bad, and I started to get very fuzzy
12 again.  I remember they were asking me
13 questions, and he kept yelling the question at
14 me because I -- I -- I felt like I was -- I
15 felt like I was under water.  I guess that's
16 the best way to put it.  I just couldn't -- I
17 just couldn't focus on anything he was saying,
18 and it was getting increasingly worse.  And I
19 remember being very scared that I was not going
20 to -- when it got resolved -- I kept saying to
21 myself, "This is going to get resolved."  But
22 then I was worried about how I was going to
23 take care of A.D., if it got resolved, and
24 where I was going to sleep, or what I was going

Page 109

1  to do, because it was really like being under
2  water.
3     **Q.  And you said that the police officer**
4  **offered you medical assistance, but you said**
5  **no?**
6     A.  He said, "Do you need to see somebody?"
7  and I told him no.  I told him I would deal
8  with it later on.  All I wanted was my son.  I
9  didn't care.  I just wanted my son.
10    **Q.  Do you know the name of this police**
11 **officer?**
12    A.  I do not.
13    **Q.  Do you know the names of the police**
14 **officers in points 38 and 39 on Deposition**
15 **Exhibit Number 2?**
16    A.  I do not.
17    **Q.  Have you seen any written reports that**
18 **would identify the officers described in points**
19 **38, 39, and 40, in Deposition Exhibit Number 2?**
20    A.  I have not seen them identified
21 anywhere.
22    **Q.  Is there anything else about point**
23 **number 40?**
24    A.  I will tell you that I went back to the

PETER DELVECCHIA                                        November 19, 2019

Page 110

1  precinct to try to find them, and they wouldn't
2  let me in.
3      Q.  And that is described later --
4      A.  That's in here, yes.
5      Q.  -- in one of the points, correct?
6      A.  Yes.
7      Q.  Okay.  With respect to your left hand,
8  did you sustain -- and what happened with your
9  left hand?
10     A.  I don't know.  I remember that I lost
11 balance and fell or hit something.  And, Tara,
12 I cannot be specific.  I don't know.  All I
13 remember is it was throbbing, and when I got
14 out of there that night, this side (indicating)
15 of my hand was very swollen, and I thought it
16 was broken.
17         And I remember when I was in the hotel,
18 I was really nervous, because I didn't want to
19 ruin my son's vacation.  And I said, "All
20 right, I'm going to tape them up and" --
21 because I've messed up my hands many times.  I
22 said, "I'm going to tape them together and just
23 get through this vacation," because I didn't
24 want to ruin it.

Page 111

1          I mean, as I told you before, this was
2  his choice, and he was so clear about wanting
3  to go to Death Valley, because he loves the
4  desert.  And at this point, I wanted him to
5  just have a vacation and step past this, and
6  that's all I kept thinking about once we got
7  out of there.  We're getting ahead of
8  ourselves, I know, but that was my main
9  concern, to just get my son to Death Valley so
10 he could enjoy it.
11     Q.  And with respect to your left hand, you
12 gestured towards the front or the palm side of
13 your hand?
14     A.  No, it was --
15     Q.  Your fingers?
16     A.  My fingers.
17     Q.  Your fingers.  And would it be all four
18 fingers or --
19     A.  It was primarily my index finger, but
20 there was -- there was pain in these two
21 fingers (indicating).
22     Q.  So your index and your middle finger?
23     A.  Yeah.
24     Q.  And then when you taped them up, that

Page 112

1  was tape that you had in your personal
2  possessions?
3      A.  Yeah, I had first-aid kits in my bag.
4      Q.  Okay.  And apart from the first aid in
5  the form of the tape that you used in your two
6  fingers, did you do anything else to your
7  fingers while you were in Las Vegas or
8  Death Valley?
9      A.  My fingers?
10     Q.  Correct.
11     A.  No.
12     Q.  Anything else about point number 40?
13     A.  No.
14     Q.  Please continue.
15     A.  All right.  I have no idea of the
16 concept of the time.  It was a lot of hours, I
17 think.  I know I was there for over six hours,
18 but I don't know at what point the FBI called
19 me in.  And I think -- I think that was
20 probably the -- I'm going to tell you it was
21 probably -- I was probably in the worst shape
22 as far as cognitive ability at that point.  I
23 was really struggling.
24         And as time has gone on, I do remember

Page 113

1  them more, and I did call the FBI to get some
2  information on this.  So I will tell you that I
3  have called the FBI, and I went back to the
4  precinct to get information, because I -- I had
5  no recollection, once I left there, of most of
6  that discussion.
7      Q.  When you -- you mentioned that you
8  called the FBI --
9      A.  Yes.
10     Q.  -- to get more information.
11     A.  Yes.
12     Q.  Was this after you returned home to
13 Raleigh?
14     A.  Yes, and I'll get into this later.
15     Q.  Okay.  Go ahead.
16     A.  There were three people.  They
17 introduced themselves.  I don't remember
18 their -- I did not remember their names when I
19 walked out of there, but I can go into their
20 names in a minute.  There were two on my left
21 and one on my right.  I think they videotaped
22 it.  I'm not sure.  I was sitting at the far
23 end of the table.
24         I remember that I was hurting.  And

PETER DELVECCHIA                                    November 19, 2019

Page 114

1  there was a guy with a mustache who kept asking
2  me if I was okay.  And I told him, "Yes, I just
3  want to get this over with."  I told him
4  multiple times, "I just need to get this over
5  with."
6          So there was a lady who -- I believe
7  her name was Mary, now.  I don't know for sure.
8  She said she was in trafficking.  And she was
9  sitting right at my side, my left side, closest
10 to me.  And I asked them a lot of questions
11 about where my son was, and I was really
12 nervous.  And I don't know if they got up to
13 check, but they gave me a report that they had
14 spoken to him at length, that he was resting,
15 he had something to eat, he was watching TV,
16 and I shouldn't worry.
17         Then before we went to even the first
18 question, and this stands out very clear, they
19 told me that my son is very impressive.  That
20 he's a well-spoken, bright person, who loves me
21 a lot, and is very clear on the events that
22 happened, and he was very descriptive about the
23 events that happened.  And there was -- I
24 remember them saying there was no nonsense in

Page 115

1  his discussion, and that he was very clear
2  about it.
3          And then they asked me if I had any
4  contact with him since we were separated, and I
5  said no, I did not.  And then the lady went on
6  to confirm -- okay.  So when I was telling you
7  when the person was giving me this discussion
8  about A.D. -- it was the guy with the mustache
9  that was sitting next to Mary -- and he said --
10 my notes are a little off, so I'm going to put
11 them in better chronological order, if that's
12 okay.
13     Q.  Okay.
14     A.  Okay.  Mary confirmed her impressions
15 of A.D. as well, and also said that -- that he
16 is incredibly coherent, clear, and intelligent.
17         And this person to my right -- it felt
18 like I was playing bad cop/good cop.  He was
19 staring at me the whole time and sitting at the
20 edge of his seat.  So I really didn't
21 acknowledge him very much.
22         Mustache asked me -- and I'm going to
23 refer to him as Mustache, because I'm not sure
24 of his name -- he asked me what happened, and I

Page 116

1  told him, "I have no idea."  I said -- I told
2  him I took a quarter of a sleep aid to try to
3  fall asleep, and that was pretty much it.  And
4  they asked me why I did that, and I told them I
5  have insomnia.  And they asked me if I had
6  spoken to a doctor about it.  I said, "Very
7  loosely, we have."
8          And then the guy on the right started
9  speaking up and said, "Yeah, I have insomnia
10 too.  What do you do for it?"  And I said, you
11 know, "I mostly try to stick with things that
12 don't mess up my head, and I'm just -- the goal
13 is just to slow the brain down."  And then we
14 had a little discussion about that.
15     Q.  Okay.  I'm going to stop you there.
16         You said that you have spoken to a
17 doctor about insomnia.  Is that Dr. Ken Carnes
18 that you've spoken with?
19     A.  No, it was Sarah Ringel, my regular
20 doctor.
21     Q.  Okay.
22     A.  And I have spoken to her about it
23 before, yes.
24     Q.  Okay.

Page 117

1          MS. SHELKE:  The videographer has
2  indicated that we need to switch out the
3  tapes.
4          MR. McKAY:  Oh, okay.
5          MS. SHELKE:  So we'll go ahead and take
6  a break to do that.
7          MR. McKAY:  Sure.  Yeah.
8          THE VIDEOGRAPHER:  This concludes disk
9  number one.  The time is 12:12.
10         (Lunch recess from 12:12 to 1:26 p.m.)
11         THE VIDEOGRAPHER:  This begins disk
12 number two in the deposition of Peter
13 DelVecchia.  The time is 1:26.
14 BY MS. SHELKE:
15     Q.  Peter, before we took a break, we were
16 talking about your conversation with three FBI
17 agents, one of whom you believe was named Mary,
18 one whom you referred to as Mustache.
19     A.  Uh-huh.
20     Q.  And you were talking about insomnia and
21 what you had taken in order to fall asleep on
22 this flight.  I believe we were somewhere about
23 point 41h.  So we'll pick up right there, if
24 you want to continue with Deposition Exhibit

PETER DELVECCHIA                                    November 19, 2019

Page 118

1  **Number 2.**
2     A.  Yeah, I will tell you that -- to give
3  Mustache a name -- he is -- I believe he is
4  Agent Caldwell.  I don't -- I don't know for
5  sure, and I'll get into it in a little while,
6  but I hate to keep calling him Mustache.  So I
7  think his name is Caldwell.
8        MR. McKAY:  I think it's kind of a cool
9  name.
10       THE WITNESS:  It is kind of a cool
11       name, yeah.  He was Mustache until I went
12       back over it.
13    A.  Okay.  Are you ready?
14    **Q.  Yes.**
15    A.  Do you want to ask questions, or should
16  I just continue?
17    **Q.  If you'll continue with point number**
18  **41h or 41i, if that's where you think we are.**
19    A.  Okay.  And when I put these out, it
20  was -- I want to just make it clear, this is
21  not chronological, because if you looked at
22  this chronologically, it would probably not
23  make sense.  This is just recollections as time
24  went on, and only where I felt it was pretty

Page 119

1  clear.
2        So he asked me if I touched my son, and
3  I told him no.  And then he actually told me
4  that my son said the same thing, that he was
5  never touched.
6        And then he asked me questions about my
7  wife's passing, and other kids, and if we've
8  had other racially-based incidents.  You know,
9  my personal life.  There were some questions
10  about my personal life.  And we went -- we went
11  through all that.  I don't remember what the
12  answers were, nor do I remember the questions,
13  but I know we talked about it.
14       And I did -- as we talked about -- I
15  told him about the other flight.  I told him
16  about the movie theater.  And then they wanted
17  to know what other racially-charged incidents
18  we've had that were not connected to the police
19  being called, or something like that, and we
20  went through that.  And I got the feeling he
21  was just trying to tie up some of the stuff
22  that my son had told him.
23       Again, as I put here, there was a lot
24  of pain going on.  And then Mustache said --

Page 120

1  and these are his words, pretty much -- he said
2  that, "They're really not going to pursue this
3  any further."  He didn't call it a waste of his
4  time, but he basically said there was a lot of
5  wasted energy here; and as far as they were
6  concerned, they agreed with my son, that this
7  was a racially-charged incident; and made some
8  kind of comment that I should pursue this in
9  another means if I wanted to -- you know, I had
10  expressed some concerns about this person and
11  their mental balance, and he said that I should
12  pursue other means with the airlines or other
13  means, he said, to try to improve it for other
14  people.  And that's where we left this.
15       He told me that they would release me
16  and (redacted) -- I'm sorry, I did it again --
17  that they would release us, and they were going
18  to get him for me, my son for me.  And then
19  they brought me back to the cell, but then
20  they --
21       We're back up to 42, Tara.
22    **Q.  Yes.**
23    A.  They brought me back to the cell.  I
24  was sitting there for a little while.  I don't

Page 121

1  think I had handcuffs on anymore.  And the FBI
2  then returned, and the guy who was sitting
3  there stoically returned on his own and asked
4  me if he could look at my camera, my laptop,
5  and my phone, and I told him it was fine.  And
6  then they came back with some form for me to
7  sign.  And I guess it was a release, some form
8  of release, saying that they could look at the
9  stuff.
10       THE WITNESS:  And I believe it was
11       something you might have gotten in
12       connection with all this.
13       MR. McKAY:  Yeah.
14    A.  And they went through it, and they
15  spent, I don't know, a few minutes.  They asked
16  me where I was during a particular picture.  I
17  don't remember where the picture was taken, but
18  they did ask me about that.  And then they
19  asked me about who some child was in the
20  photos, and I don't remember who exactly, but I
21  sensed it was more just polite conversation
22  than it was checking on something.
23    **Q.  I'm sorry.  With respect to the**
24  **pictures, these are pictures that were on your**

PETER DELVECCHIA                                    November 19, 2019

Page 122

1  cell phone?
2      A.  I can't remember.
3      Q.  Okay.  So they were either pictures
4  that were on your cell phone, your camera, or
5  your laptop?
6      A.  Yes.
7      Q.  Okay.  And the question was with
8  respect to the location depicted in a
9  particular paragraph?
10     A.  The location in one photo, and I
11  believe they were asking me who a child was in
12  a different photo.
13     Q.  Who another child was, not one of your
14  children?
15     A.  Yes, it was a picture of me with a
16  child, and I don't remember, I think my son was
17  in the picture.  I can't remember.  It was
18  likely one of his friends.
19     Q.  Okay.
20     A.  You know, I'm guessing, because I know
21  he and I were both in the picture.
22     Q.  Okay.
23     A.  Okay.  Then Mary, the person I referred
24  to as Mary, brought my son back.  And they hung

Page 123

1  around for a couple minutes, and A.D. and I
2  were hugging for a little while, and they gave
3  us, I don't know, a couple minutes to just be
4  together.  And Mary apologized for everything.
5  And that I remember very clearly, because it
6  made me feel a lot better.
7          And then they walked us through the
8  airport to get the luggage.  And it was that
9  officer I told you was kind of nasty before,
10  but he was far nicer in this walk back.  And
11  they were kind enough to move my luggage close
12  by.  Remember I had told you there was a desk
13  somewhere really close, a ticketing desk really
14  close to the precinct.  They had moved all my
15  luggage there so I wouldn't have to walk too
16  far.  And they offered to try to get me a cab
17  or something, but we just kind of sat there for
18  a few moments and spoke, and then we went out
19  to get the cab.
20          When I got out to the cab, again, the
21  dizziness was coming in these waves.  The
22  headache was brutal.  I don't remember what cab
23  company we used.  I know we got into a cab.  I
24  think A.D. got it.  And if he didn't, somebody

Page 124

1  else did, but I did not get the cab.
2      Q.  Where were you taking the cab?
3      A.  A hotel.  I don't remember what hotel.
4      Q.  Was it a hotel that you had prebooked
5  before this --
6      A.  Yes.
7      Q.  -- before you made your arrangements --
8  sorry.  Strike that.
9          Was it a hotel that you had prebooked
10  when you were making your arrangements for this
11  trip?
12     A.  Yes.
13     Q.  Okay.  Go ahead.  So somebody hailed a
14  cab at the airport, and you both got in?
15     A.  We got into the cab.
16     Q.  Okay.
17     A.  And I'm just trying to refresh myself,
18  if you'll give me a moment.
19          So me and my son were talking quite a
20  bit in the car of what happened.  I recollect
21  he was sobbing in the car.  He was very upset.
22  And we talked a lot about what happened on the
23  flight and why it happened.  And the driver,
24  who was a rather large black male, he heard us,

Page 125

1  and he came out of the car, and I remember him
2  grabbing my arm and helping me out, and then
3  putting all my luggage -- he said he wasn't
4  allowed to bring it to the hotel, but he
5  brought the luggage to the curb.  And I
6  remember him -- he shook my hand, and he hugged
7  A.D., and he made some conversation about how
8  difficult it is to be black, basically.  So
9  there was some kind of conversation going on.
10  And I don't remember very much from there.  I
11  mean, I had another stretch where I just
12  couldn't remember anything.
13          When I got to the room, Amanda was
14  completely panicked, so I called her, and we
15  spoke for a little bit, and she was very upset.
16  I told her what was going on with my head.  I
17  told her what was going on with my hand.  I
18  remember telling her that I had a flight back,
19  and I was nervous, and to please not go away
20  from her phone.  And I remember calling Gayle
21  up, and Gayle didn't pick up the phone.  It was
22  like four in the morning, five in the morning,
23  I guess, something like that.
24     Q.  When you say "five in the morning,"

PETER DELVECCHIA                              November 19, 2019

Page 126

1  five in the morning Las Vegas time?
2      A.  Yes.
3      Q.  Okay.
4      A.  So I didn't expect Gayle or Amanda to
5  pick up the phone.
6          And then Amanda started carrying on
7  about how I should sue the airline, and, you
8  know, we went back and forth, and she was
9  aggravating me a lot because of it.  But she
10 was pushing, pushing, pushing, and I told her
11 all I wanted to do was get this person out of
12 circulation.  So I just wanted to file a
13 complaint with Frontier.  And then Amanda came
14 up with the idea about filing an assault charge
15 against him, which I don't know why I didn't
16 think of.  Well, I do know why I didn't think
17 about it.  So I -- I thought that sounded like
18 a really good idea.
19         And I tried to sleep that night.  I
20 woke up.  Then I started throwing up, that
21 night.
22     Q.  So you started throwing up after you
23 got to the hotel after you laid down to go to
24 sleep?

Page 127

1      A.  Yes.
2      Q.  How many times did you throw up?
3      A.  I don't know.  It was at least twice.
4      Q.  How long do you think you slept?
5      A.  I don't know.  It wasn't long.
6      Q.  When you say it wasn't long, was it
7  45 minutes?  Four hours?
8      A.  A couple hours, maybe.
9      Q.  Okay.
10     A.  I mean, it was, like I said, 4 or
11 5:00 a.m., and I remember he was hungry, and we
12 were trying to get breakfast by 8:00 the next
13 morning.
14         MR. McKAY:  Peter, I know you're
15 trying -- you're responding to her question
16 to tell her about this document.
17         THE WITNESS:  Okay.
18         MR. McKAY:  But I just want to remind
19 you that there's a camera.
20         THE WITNESS:  I'm sorry.
21         MR. McKAY:  And you're kind of just
22 looking at the paper.
23         THE WITNESS:  Yeah, it's just -- I'll
24 be honest with you, it's a little emotional

Page 128

1      for me right now.  So it's not that I'm
2      ignoring or reading, it's just it's -- it's
3      a little bit hard.
4  BY MS. SHELKE:
5      Q.  Do you recall if you got breakfast in
6  the hotel or if you went out somewhere?
7      A.  The hotel was a dump.  It was not a
8  pleasant place to stay.  And there was like a
9  strip mall across the street, and I remember he
10 wanted to go to Panera Bread, or something, and
11 that's where we went, and he had something to
12 eat.  And then the camper van place was two or
13 three miles away from there.
14         And we -- we basically just wanted to
15 sit down and start fresh.  That was what we
16 agreed to do.  And the fogginess was clearing.
17 I mean, I was able to get across the street,
18 which made me really happy.  It was a pretty
19 long street.  And I was confident -- I remember
20 being confident, because I said, "All right, my
21 head is clear enough to get across the street
22 now."  And then we went across the street.  And
23 there wasn't much traffic anyway.
24         And then we sat down, maybe an hour or

Page 129

1  so at Panera, and he ate quite a bit of food.
2  I did not eat.  I noted here, because I had
3  pain and nausea, which was -- I wasn't throwing
4  up, but there was nausea, so I held off on
5  food.
6      Q.  Did you do any coffee?
7      A.  I did have coffee.  And I was taking
8  Advils at that point, which was helping
9  stopping the squeezing of my head, but there
10 was still quite a bit of pain in the back of my
11 head.
12     Q.  So this is the first time you've
13 mentioned Advils.  By this point, how many
14 Advils do you think you've taken?
15     A.  I didn't take any until I got back to
16 the hotel and I could find them in my bag.
17     Q.  Okay.
18     A.  And at that point it was -- I probably
19 took -- I'm guessing, I don't know -- I
20 probably took a couple before I went to bed,
21 and then some more in the morning at some
22 point.
23     Q.  Okay.  When you say "some more that
24 morning" --

PETER DELVECCHIA                                    November 19, 2019

Page 130

1    A.  I never take more than two.
2    Q.  Okay.
3    A.  I'm not a pill lover.  So two is my
4  max.
5    Q.  Okay.  Apart from the Advil, would you
6  have taken any other medication?
7    A.  No.
8    Q.  Okay.
9    A.  No.  I take some vitamins, but I don't
10  think I took any that morning.
11    Q.  Okay.  How did you get -- after your
12  breakfast at Panera, did you go back to the
13  hotel to check out?
14    A.  I mean, I would have had to.
15    Q.  Okay.  And then how did you get from
16  the hotel to the camper van place?
17    A.  Then I remember calling an Uber.
18    Q.  Okay.  And then you would pick up the
19  RV that you had previously requested?
20    A.  RV is a generous term.  It's a van.
21    Q.  Okay.
22    A.  It's just basically -- you know like
23  the short yellow vans that you see at a school?
24  It's that size, converted with a bed and a

Page 131

1  stove, and that's really all it is.
2    Q.  Is it two bunk beds, or what is it?
3    A.  No, it's just -- it's a queen-size bed,
4  that's really all you have inside of it, and
5  there's a stove at the other side.
6    Q.  Okay.  Is there a bathroom on board?
7    A.  No, you pull into campgrounds.
8    Q.  Okay.
9    A.  It's basically camping in a van -- a
10  camper.
11    Q.  Okay.  How far is the drive from
12  Las Vegas to the national park?
13    A.  I don't know.  It wasn't very far.
14    Q.  Half a day?
15    A.  I don't remember.
16    Q.  Okay.
17    A.  But it wasn't -- I don't feel like it
18  was long.  We pulled over a lot -- a lot -- and
19  it probably -- if I guessed, it wouldn't be
20  accurate anyway.  I mean, we could do a
21  Google Maps thing.  But I know we stopped a
22  lot.  We got some groceries, and I stopped and
23  slept for about a half hour or 45 minutes, and
24  then I stopped again and I slept, and

Page 132

1  eventually we just got there.
2    Q.  Okay.  And you were able to drive from
3  Las Vegas to the national park, correct?
4    A.  Yes.
5    Q.  Okay.  Did you still have your head
6  pain, or had the Advils assisted with ceasing
7  the headache?
8    A.  It took away that feeling that my head
9  was being squeezed, but it's really hard for me
10  to describe it.  I mean, I described it before
11  like it's somebody stepping on your head, and
12  it took that away, but it felt like, you know,
13  a disastrous migraine.  That's kind of what it
14  felt like at that point.
15    Q.  Okay.
16    A.  And it actually -- I know this sounds
17  silly, but it felt really good to just sit
18  down.  It took some of the pressure off of my
19  neck, and it just felt good to be doing
20  something other than laying in bed nursing
21  myself.
22    Q.  Did you still have the nausea?
23    A.  The nausea was easing up too.  I did
24  have some in the next few days, but I felt

Page 133

1  pretty good, sitting there.
2    Q.  Apart from the two or more times that
3  you threw up while you tried to get some sleep
4  while you were at the hotel, did you throw up
5  while driving to Death Valley?
6    A.  No, I did not throw up while driving to
7  Death Valley.
8    Q.  Apart from the two or more times that
9  you threw up while you tried to get some sleep
10  while you were at the hotel, did you throw up
11  while driving to Death Valley?
12    A.  No, I did not throw up while driving to
13  Death Valley.
14    Q.  Okay.  Apart from the two or more times
15  that you threw up while at the hotel, did you
16  ever throw up again?
17    A.  I threw up one more time a couple days
18  later.  And then -- I mean, I was nauseous, but
19  it was just one time, and it wasn't horrific,
20  if that makes sense.
21    Q.  Okay.  Under point number 50, you say
22  you drove to Death Valley, and on the way, you
23  told A.D. you could only walk --
24    A.  Yeah.

PETER DELVECCHIA                                        November 19, 2019

Page 134

1    Q. -- flat trails "due to head and back
2  pain and vision getting bad in waves."
3    A. Yes.
4    Q. What does that mean, "vision getting
5  bad in waves"?
6    A. It was just -- the way it felt at that
7  point, and I remember very clearly, it was like
8  somebody was -- like a bad sinus infection
9  feeling. Like my eyes had tremendous pressure
10  in them. That was one of the reasons we had
11  stopped as often as we did, is because, you
12  know, when I sensed it, there were more than
13  enough opportunities just to pull over. And
14  most of the time it was just -- it was just
15  pressure for several days. But there were
16  times when it got kind of -- that my vision was
17  a bit occluded from it.
18    Q. And you talked about -- you mentioned
19  here that you were only able to walk flat
20  trails.
21       So had this incident not occurred, you
22  had other trails planned that you were not able
23  to do?
24    A. I had an itinerary of trails, yes.

Page 135

1    Q. Okay. Do you recall the itinerary of
2  trails?
3    A. I do not. I reached out to some
4  friends who also do a lot of hiking, and they
5  had written me back. And I have -- I have a
6  book at home. I probably have marked the ones
7  we had planned on doing, at some point. But
8  most of the time, we try to take the most
9  challenging hikes the park has to offer. I
10  mean, that's just generally what we do.
11       And we had intended to go up some
12  mountain, and I cannot remember the name of it,
13  and it was like 14-plus miles. And then there
14  was another mountain on the other side we
15  wanted to hike up. But, you know, I remember
16  at one of the stops we made, I talked to A.D.,
17  and I told him, "There's no way I'm going to
18  get up those mountains. It's just not going to
19  happen." So -- and he was -- he was okay with
20  that. And, frankly, the hikes we did take were
21  very easy, and we spent a lot of time driving
22  in the park, and just trying to go that route
23  instead of trying to be too strenuous.
24    Q. The driving in the park, was that not

Page 136

1  part of your initial plan?
2    A. No, we never drive in the park.
3    Q. Okay. So you usually -- strike that.
4       Your initial plan was to drive the van
5  to the park, park somewhere, and then mostly
6  traverse on foot?
7    A. We park at trailheads and then just go.
8    Q. Okay.
9    A. Yes.
10    Q. But because you were not feeling well,
11  instead of just parking at a trailhead and
12  hiking, you were driving through portions of
13  the park?
14    A. Yes.
15    Q. Okay. Do you recall how many days you
16  stayed at the park?
17    A. No.
18    Q. Do you recall any difficulty hiking the
19  flat trails that you did hike?
20    A. Yes, a lot.
21    Q. Do you recall on which days you had
22  difficulty?
23    A. Every day.
24    Q. And what was the difficulty?

Page 137

1    A. I couldn't stay awake. There were
2  bouts of nausea. There were points where the
3  head pain was just more than I could take. My
4  neck was killing me. The back of my head was
5  killing me. (Redacted) -- my son complained
6  several times that it wasn't fun, because I
7  kept falling asleep on the ground or on rocks.
8  We stopped a lot, and we never stop.
9    Q. And A.D. would complain to you that you
10  were moving slower than usual?
11    A. He was calling me an "old man" and
12  teasing me, yes.
13    Q. Did you take any Advil to try and ease
14  the headache or neck aches during these dates?
15    A. I took Advil nonstop, yes.
16    Q. So each time you would take two pills?
17    A. Yes.
18    Q. Would you take them every four hours?
19    A. Four to six.
20    Q. You talk in point number 53 about
21  "periodic vision issues." Can you tell me what
22  that means?
23    A. Exactly what I told you before. The
24  pressure was just -- it was -- it was bad.

PETER DELVECCHIA                                    November 19, 2019

Page 138

1     MR. McKAY:  Speak up, if you would,
2   please.
3     THE WITNESS:  I'm sorry.
4     A.  The pressure was just really bad.  It
5   was like in the back of my eyes.  And it
6   continued with this -- like a periodic clouding
7   over.  It was just -- it got fuzzy.  And it
8   would disappear, but it would get fuzzy, and
9   then I would have to just take a pause, and
10  sometimes wait just a little while, and it
11  would start to ease up.  The fuzziness would
12  ease up, but the pressure did not ease up at
13  all.
14    Q.  And when you say "fuzziness," this is a
15  fuzziness with your ability to see?
16    A.  Focus.
17    Q.  Okay.  You're wearing glasses today.
18    A.  Uh-huh.
19    Q.  Is that something that you wear every
20  day?
21    A.  Since I'm six years old.
22    Q.  And you would have worn your glasses
23  when you were hiking as well?
24    A.  Yes.

Page 139

1     Q.  And if you -- do you wear sunglasses?
2     A.  Generally, no.
3     Q.  And you would not have worn sunglasses
4   during this trip to Death Valley, correct?
5     A.  No, if the sun is bothering me, I have
6   a baseball cap I'll put on.
7     Q.  Okay.  Point number 53 says that you
8   had constant head and neck pain which did not
9   clear until you were back in North Carolina, a
10  little while.
11    Do you recall how long you were back in
12  North Carolina before the head and neck pain
13  cleared?
14    A.  It was -- I'm guessing it was probably
15  a week.
16    Q.  Until your neck pain and back pain
17  cleared, did you continue your Advil regimen
18  that we discussed -- two pills every four to
19  six hours?
20    A.  No, I just let it go.
21    Q.  Do you recall how many days you took
22  the Advil before letting it go?
23    A.  I do not know specifics.  I can give
24  you generalities, if that will help.

Page 140

1     Q.  Yes.
2     A.  I became concerned toward the time in
3   Vegas that -- again, I don't like pills very
4   much, I don't take them very much, but I got
5   concerned, because there is a risk of bleeding
6   when you're outside.  If you ever fell and got
7   hurt, there's the risk of bleeding or injury.
8   And I started to get a little bit concerned
9   that if I fell, I could have a bigger issue.
10  So I tried to back up as far as I could for the
11  last couple days.
12    Q.  Did you ever seek medical attention
13  when you were in Las Vegas or Death Valley?
14    A.  I did not, in Vegas, no, or
15  Death Valley.
16    Q.  Point number 54 says you decided not to
17  see a doctor as you assumed it was stress.
18    A.  Yes.
19    Q.  What was your assumption based on?
20    A.  Never having pain like that before.
21  And I also should add that I was very concerned
22  with wrecking my son's vacation.  I did not
23  want to take any time at all away from him.
24    Q.  Was this your son's spring break?

Page 141

1     A.  Yes.
2     Q.  Did you typically take him on a
3   spring-break vacation every year?
4     A.  Every year, no.
5     Q.  Was there --
6     A.  When I could.
7     Q.  Okay.  Was there anything special about
8   this particular spring break?
9     A.  He wanted it.  This was his choice to
10  go there.
11    Q.  Did you take him on a spring break last
12  year, 2018?
13    A.  Yes.
14    Q.  Where did you take him?
15    A.  Hockey Hall of Fame in Toronto.
16    Q.  Your return flight home was on April 3
17  of 2019; is that correct?
18    A.  I don't remember.  I should have looked
19  before I came.  I'm sorry.
20    Q.  That's okay.
21    On the day that you returned to the
22  Las Vegas Airport, to the best of your
23  recollection, you would have driven from the
24  national park straight to the camper return

PETER DELVECCHIA                                    November 19, 2019

Page 142

1  facility?
2      A.  I don't remember.
3      Q.  Okay.  What is the last thing you
4  remember about with respect to getting to the
5  airport?
6      A.  Can you be more definitive in that,
7  please?
8      Q.  Sure.  What do you remember with
9  respect to you and A.D. getting to the airport,
10  if anything?
11      A.  Getting there or being at the airport?
12      Q.  Getting to the airport.
13      A.  I remember struggling.  My head was
14  hurting really bad, and I started to have some
15  issues -- I mean, I had some issues remembering
16  things, and the pain was -- I assumed it was
17  because of the pain in my head, but I was
18  having some issues, logical issues.  You know,
19  I forgot to fill the car with gas, and we
20  almost ran out of gas.  Stupid things that I
21  don't normally do.  So I was having a lot of
22  difficulties, and I assumed it was because I
23  stopped taking the Advil.  And so I don't
24  remember if we stayed in a hotel.  I mean, I

Page 143

1  could check my bills.  I just don't remember --
2  I don't remember if we stayed somewhere first.
3      Q.  Okay.
4      A.  It's not very far, so I can't
5  specifically say, though.
6      Q.  Okay.  Point number 55 says you called
7  Frontier with respect to the flight crew on
8  your return flight.
9      A.  Yes.
10      Q.  What did they tell you?
11      A.  They wouldn't help me really much at
12  all.
13          Can I elaborate on that, or do you just
14  want a straight answer?
15      Q.  No, go ahead.
16      A.  One of the things I had told my son is
17  that when we got to the airport, I wasn't going
18  to get on the plane if there was this person on
19  the plane.  And my understanding is you have a
20  crew that goes back and forth, back and forth
21  to the same destinations over and over again.
22  Just people are in the same line.
23          And I was really worried about it, and
24  I tried not to think about it very much, but

Page 144

1  then when I got to the airport, I went up to
2  the Frontier counter, and the person was very
3  rude.  They just slid a card across the counter
4  at me and said, "Go file a complaint."  And I
5  said, "Okay."
6          So we found a spot, we had reception,
7  and I called Frontier, and the phone call took
8  probably -- I'm going to guess an hour.  It
9  might have been more.  I don't know.  But all I
10  kept asking them is if Kevin was going to be a
11  flight attendant on our flight, and they
12  wouldn't answer me.  I asked over and over
13  again.  And they finally told me, "There's not
14  going to be a Kevin there.  We have no record
15  of a Kevin on the flight."  And I tried to
16  describe -- I think I tried to describe the
17  person, you know, and they said that they
18  couldn't really help me.
19          So then I told them I wanted to file a
20  complaint.  They transferred me around a whole
21  bunch of times, and somebody eventually took
22  down the information.  But we kept -- I don't
23  know if they were hanging up on me or the
24  reception was poor, I'm not sure, but we got

Page 145

1  disconnected at least three or four times
2  during that phone call.  But I -- I -- as I
3  told my son, we weren't going to get on the
4  Frontier flight unless I had some assurance
5  that we were not going to repeat the situation
6  again.
7      Q.  Okay.  You mentioned that the ticket
8  agent slid a card at you.  Was it a business
9  card, or what kind of card was it?
10      A.  I can't tell you specifically.  It
11  was just a piece of paper, and it said,
12  "Have complaints?" and then a number under it
13  or something.
14      Q.  Okay.  So it was an information card,
15  not something for you to handwrite and fill out
16  and give back to her?
17      A.  No.
18      Q.  Okay.  What happened next, if you'll
19  walk me through the remainder of your --
20      A.  Do you want to go off this sheet?
21      Q.  Yes, please.
22      A.  At that point, I had left a lot of
23  hours.  I remember I was trying to leave time
24  to get to the airport, because I wanted to head

PETER DELVECCHIA                                    November 19, 2019

Page 146

1  back to the Las Vegas Metro and file a
2  complaint on Kevin -- or Scott, as we now know
3  him -- and the door was locked.  And I was
4  knocking, knocking, knocking on the door, and
5  some officer came out, and I asked if I could
6  come in to file a complaint, and he was not
7  very receptive.  I don't remember his name, but
8  I know he's from New York.  We ended up talking
9  about New York for a little while.  And he --
10 he just wasn't receptive to it.
11        He said, "Look, you know, you can come
12 in and file all the paperwork you want," he
13 said, "but we can't do anything, because you
14 were -- you were in the air, and that's FBI
15 territory."  And then I said to him, "Can you
16 give me the name of the FBI agents that I saw?
17 Because I don't know their names."  And he
18 was -- he was pushing back really hard.
19        And I remember asking him if there was
20 a place I could just sit down, because I wasn't
21 feeling well, and I remember him telling me,
22 "You can't -- you can't here.  You're just
23 going to have to get on your plane and deal
24 with it."

Page 147

1        And let me make sure I'm not forgetting
2  anything.
3        Then a very huge -- I mean, this guy
4  was -- he's a monster.  His name is Francois
5  Obasi.  He came over and -- he was the -- the
6  sergeant at the precinct, and he basically came
7  up to me, and he told me he remembered me, and
8  he remembered A.D.  And he said, "And I sat in
9  on part of his statement" -- my son's
10 statement -- and that he didn't get the chance
11 to meet me, but he very much wanted to meet me
12 before I left, and they escorted me out before
13 he had a chance.  And it was just a really --
14 kind of a weird thing.
15        And he asked me what I came back for,
16 and I told him, and he concurred that they
17 could not file charges against Scott, and that
18 I would have to talk to the FBI.  And I told
19 him, "Well, I've been talking to this officer
20 here who doesn't want to give me the name."
21 And he basically made a comment, "Well, I'm the
22 boss here, so I'm telling you to go ahead and
23 give him the name."  And the guy came out with
24 a piece of paper, and it said "Agent Caldwell"

Page 148

1  and a phone number.
2        And then we talked, I'm going to
3  guess -- I'm just going to remind myself, Tara,
4  if you can give me a moment -- I didn't write
5  it down, but I'm going to guess we talked over
6  an hour outside the precinct, and most of the
7  conversation was about race.  And he was clear
8  that he sat with my son's statement just long
9  enough, and he reached a conclusion that it was
10 a racist incident.
11        And I told him that the attendant was
12 black.  And I can't -- I didn't put this down,
13 because I can't quote him, but he said, "Black
14 people have a lot of problems with white
15 people, and it doesn't surprise me at all."
16 And then he spent the rest of that time we were
17 together talking to A.D. about race issues,
18 about growing up with pride, about sports.
19 About the way it was in -- he grew up in the
20 Bronx, and I was in Brooklyn, and so we -- we
21 compared lives together and talked about that
22 for a long time.
23        And he handed me his card, which I
24 photocopied and gave to John.  But he said, "If

Page 149

1  you ever have another problem on an airline, I
2  will happily vouch for your character and what
3  happened here, and I will get involved in it as
4  much as I can get involved."
5        And that gave -- it gave A.D. a lot of
6  comfort, and I was -- I was really very
7  thankful for that.  He was kind.  He told me he
8  could see that I was a good father and that I
9  cared a great deal about A.D.  And he bonded
10 really well with A.D., and I was so thankful,
11 because it made him feel a little bit better
12 about what happened.  And he told me to just
13 get on the flight, and if there were any
14 problems at all, that he would interface with
15 the FBI in North Carolina, and he would make
16 sure the FBI in Las Vegas got involved as well.
17 **Q.  You mentioned that this typewritten**
18 **note that we have here, Deposition**
19 **Exhibit Number 2, was based initially on some**
20 **handwritten notes that you had made.**
21        **Do you still have those handwritten**
22 **notes?**
23    A.  No.
24    **Q.  You also mentioned that you called the**

PETER DELVECCHIA                                    November 19, 2019

Page 150

1  FBI for more information.
2       Was that after you returned home to
3  North Carolina?
4       A.  Yes.
5       Q.  When you called the FBI for more
6  information, what were you told?
7       A.  I was able to get in touch with
8  Caldwell, who I think was Mustache.  And he --
9  I think he confirmed the name Mary for me.  And
10  he said he would call me back to see if I could
11  file an assault complaint against Scott Warren,
12  and that he wanted to talk to the people above
13  him.  And he confirmed to me that there would
14  be no further action -- that they couldn't
15  close it, but there would be no further action
16  on the FBI's part.
17       And he basically said, a couple times,
18  "Look, I know you didn't do anything wrong, and
19  I know you were assaulted, we saw that, but
20  there's nothing much we can do about that."
21  And he said -- he asked me if I
22  filed a complaint with Frontier, and I told him
23  I did, but I didn't believe Frontier was going
24  to do anything, because they wouldn't even tell

Page 151

1  me if Kevin was on the flight home, without a
2  struggle.
3       And he said -- and I told him I'm
4  having a lot of guilt, because I couldn't just
5  walk away, and I was assaulted, my son was --
6  in my mind, he was kidnapped -- and I'm not
7  going to mince words, he was kidnapped, in my
8  mind -- and we were both detained by the
9  police.  Our vacation was ruined.  I knew there
10  would be long-lasting effects to him that I
11  didn't think I could get through on my own.
12  And I told him that a person like this should
13  not be allowed to have contact with people.
14       And he said to me, in his words, he
15  said, "You're not going to get any satisfaction
16  for suing this through Frontier, and you need
17  to file a civil case."  He said, "Because there
18  is no other way that you can fix this unless
19  somebody admits to your son that what they did
20  was wrong."  And he called me back and
21  confirmed that I couldn't really successfully
22  file an assault.  He reiterated his comments
23  about a civil complaint.  He then told me he
24  was outraged by the thing as well, and that's

Page 152

1  pretty much it.
2       Q.  When did Agent Caldwell call you back,
3  to the best of your --
4       A.  The same day.
5       Q.  The same day.  And, I'm sorry, you may
6  have told me this:  When did you call the FBI
7  and speak with Agent Caldwell?
8       A.  I don't have a date.  I was very
9  deliberate in making sure my head cleared out
10  as best as I could get it, because I wanted to
11  make sure that I kept track of what they were
12  saying.  So I'm going to guess it was a week to
13  two weeks later, minimum.
14       Q.  Apart from those two telephone
15  conferences with Agent Caldwell, the one where
16  you called him, and then the one where he
17  called you back, have you spoken to
18  Agent Caldwell?
19       A.  Since or before?
20       Q.  Apart from those two calls, either --
21       A.  Never.
22       Q.  Okay.  Have you spoken with anybody
23  else at the FBI since this incident?
24       A.  No.

Page 153

1       Q.  Did Agent Caldwell provide you with any
2  documents?
3       A.  No.
4       Q.  Did anybody else at the FBI provide you
5  with any documents?
6       A.  No.
7       Q.  To the best of your knowledge or
8  recollection, your interview with the FBI, with
9  the three agents that we discussed earlier, was
10  videotaped?
11       A.  I can't swear to that.  It was either
12  recorded, videotaped, or something.  I really,
13  Tara, I don't remember.
14       Q.  But you have not seen the videotape, if
15  one exists, or heard an audio recording, if one
16  exists?
17       A.  No.
18       Q.  Did you ever try to obtain any further
19  information with respect to this incident from
20  the Las Vegas Police Department?
21       A.  No.  Are you talking about since I
22  returned back to North Carolina?
23       Q.  Correct.  I mean, you told me that you
24  went to the precinct, which I took to mean the

PETER DELVECCHIA                                          November 19, 2019

Page 154

1  Las Vegas Police Department precinct at the
2  Las Vegas Airport on the day of your return
3  flight, correct?
4      A.  Yes.
5      Q.  And you spoke with one police officer,
6  and then with Officer Obasi over there?
7      A.  Uh-huh.
8      Q.  Since that time, have you -- have you
9  sought to obtain any further records from the
10 Las Vegas Police Department?
11     A.  No, not that I remember, let me say
12 that, because I can't speak to that first week.
13 I don't remember ever calling them again.
14     Q.  And if you obtained any records, you
15 have not seen them since that first week where
16 you don't have much of a recollection?
17     A.  Can you repeat that?
18     Q.  Sure.  If you obtained -- you said that
19 you don't recall the first week after you
20 returned home to North Carolina, correct?
21     A.  I can't swear to the first week, I
22 said.
23     Q.  Okay.
24     A.  No, I don't remember ever calling

Page 155

1  anybody, but the first week back was rough.
2      Q.  Okay.  Is there anything else that is
3  not documented in Deposition Exhibit Number 2,
4  but would pertain to anything that we just
5  talked about?
6          MR. McKAY:  Objection to the form of
7      the question.
8      A.  Yeah, I don't really understand your
9  question, if you don't mind rephrasing it.
10     Q.  Sure.  Is there -- having gone through
11 the notes, your notes which are recorded on
12 Deposition Exhibit Number 2, is there anything
13 else that you now recall that you would like to
14 discuss with respect to the 60 bullet points
15 that are on this document?
16     A.  I don't know that I want to clarify
17 anything, because I think I was pretty clear --
18 or add anything, rather -- because I think I
19 was pretty comprehensive as best as my memory
20 serves me.
21         I just want to clarify that -- and I
22 know I talked about this -- that my son wrapped
23 a coat around him, and that was confirmed by a
24 text I had sent my daughter, Amanda, and it's

Page 156

1  been confirmed by my son.  And once he
2  mentioned it, and my daughter showed me the
3  text, I think it's a very important thing to
4  realize.  And it was sort of like an athletic
5  running shirt.  It's like this
6  stretchy-spandexy material, and I remember him
7  wrapping it around himself and tucking it up
8  under his butt and legs.  And if you ask my
9  daughters, this is A.D.'s common practice.  He
10 even sleeps with the blankets this way.  It's
11 like a joke.  We call him "the mummy."
12         And I do remember him wrapping himself.
13 So in my mind, I don't know how it escaped me
14 till now.  And there is absolutely no way that
15 I could have done anything that Kevin alleged,
16 in my mind, when there was a jacket stretched
17 over my son; and I didn't even recall it, he
18 does; and the text to Amanda.
19         So I want to emphasize that, because to
20 me, I've spent months now doubting myself and
21 wondering if my hand might have fallen on him
22 when I fell asleep, or wondering what people
23 saw.  The amount of self-doubt and the pain
24 that this has caused me has been ridiculous.

Page 157

1  And the other night, seeing the texts that
2  Amanda sent, it was like giving a person a
3  little bit of freedom from some of the pain
4  that this has caused.  So I do want to
5  emphasize that.
6      Q.  While you were on Flight 2067, did you
7  understand that the flight attendant's actions
8  were motivated by racism?
9      A.  I had no idea what was going on
10 initially.
11         Can you rephrase that?  Are you talking
12 about when he first was taken away?  After the
13 flight?  On the flight?  After he was taken
14 away?  Can you be more specific with that?
15     Q.  I'd like to know the first instance
16 that you recall where you thought the flight
17 attendant's actions, whatever they were at that
18 point, were motivated by racism?
19     A.  Probably at some point in the prison
20 cell.
21     Q.  So until then, you did not have a clear
22 thought that the flight attendant had acted
23 based on racism?
24         MR. McKAY:  Objection to the form of

PETER DELVECCHIA                                    November 19, 2019

Page 158

1    the question.
2        A.  As I said before, I don't know that I
3    had clear thought on anything.  I know I wasn't
4    speaking and thinking clearly.  I don't
5    remember thinking a racist-initiated thought
6    anytime on the flight.  And it probably wasn't
7    until -- it probably wasn't until I got
8    interviewed by the FBI that I started to think
9    about it, I'm guessing.  I generally don't
10   think like that.  I've had a lot of problems
11   with A.D., but those type of thoughts just are
12   not -- they're not a go-to for me.  So I
13   think -- well, we can get into philosophies,
14   but it's just not something I lean on.
15       **Q.  When you were on the aircraft, and A.D.**
16   **was sitting next to you in the window seat,**
17   **before the flight attendant took A.D. to reseat**
18   **him in the back of the aircraft, did the flight**
19   **attendant say anything to you with respect to**
20   **taking A.D.?**
21       A.  You had asked me a similar question
22   before, and I'm going to repeat.  Your question
23   before, you asked me if I had seen Kevin, or
24   had any contact with Kevin, and I'm going to

Page 159

1    reiterate no.
2        **Q.  My question this time is:  Did Kevin,**
3    **as you call him, say anything to you with**
4    **respect to taking A.D. from the seat next to**
5    **you?**
6        MR. McKAY:  To you as opposed to A.D.
7        A.  As I said before, I had no contact with
8    him.  I didn't even know he existed.
9        MR. McKAY:  No, she's asking you at the
10   time that he's removing A.D.
11       THE WITNESS:  Oh, right then removing
12   me?
13       MR. McKAY:  Yes.
14       MS. SHELKE:  Yes.
15       THE WITNESS:  Removing him?
16       MS. SHELKE:  Yes.
17   BY MS. SHELKE:
18       **Q.  In the moment where the flight**
19   **attendant is taking A.D., who is currently**
20   **sitting next to you on your right, as he is**
21   **taking A.D. away, does the flight attendant say**
22   **anything to you?**
23       A.  I cannot be sure without giving mental
24   state.  I don't remember him saying a word to

Page 160

1    me other than, "Move."
2        **Q.  Did A.D. say anything to you as the**
3    **flight attendant asked him to go with the**
4    **flight attendant?**
5        A.  He was saying something, and it wasn't
6    registering.  I could see him talking, but I
7    just couldn't register.
8        **Q.  And to the best of your recollection,**
9    **A.D. was speaking to you and not to the flight**
10   **attendant?**
11       MR. McKAY:  If you know.
12       THE WITNESS:  I don't.  I don't know.
13       A.  I remember him saying, "Okay."  That, I
14   do remember.  He kept saying, "Okay, okay,
15   okay, okay," because the attendant,
16   Scott Warren, was yelling at him to move, to
17   get out.  And I remember him -- it felt like
18   there was no way A.D. could move fast enough to
19   get out of the row to suit this person.  And I
20   remember him saying, "Okay, okay, okay, okay,
21   okay," and that's about all I remember him
22   saying.
23       **Q.  Did A.D. ever attempt to put on his**
24   **shoes before he left with the flight attendant?**

Page 161

1        A.  What I actually remember, that my son
2    does not, is that I saw his arm get grabbed.
3    And I can't swear to that, but I recall his arm
4    being grabbed.  I would imagine, knowing my
5    son, that he said, "I want my shoes," and I'm
6    going to guess it wasn't respected.
7        **Q.  When you say you saw A.D.'s arm get**
8    **grabbed, who grabbed A.D.'s arm?**
9        A.  Scott.
10       **Q.  Did Scott grab A.D.'s left or right**
11   **arm?**
12       A.  His right arm.  And, again, I'm going
13   to tell you, I'm not definitive on this.  And
14   the only reason I'm not is if, you know, my son
15   did not back that up.  But, you know, we have
16   had conversations since then in trying to work
17   through all this, and, you know, he told me
18   that Scott Warren put his hands above my son's
19   genitals, and he was very clear about that.
20   And I asked him if he was touched anywhere
21   else, and he said, "Not that I remember."  And
22   I asked him, "Did he grab your arm?  Did he
23   hurt you when he grabbed your arm?"  And my son
24   told me, "I don't remember him grabbing my

PETER DELVECCHIA                                    November 19, 2019

Page 162

1  arm."  But he did tell me that when he put his
2  hands above my son's genitals, that he shut
3  down completely, mentally.
4      Q.  Sticking for a moment strictly with the
5  flight attendant grabbing A.D.'s arm, did the
6  flight attendant reach in front of you to grab
7  A.D.'s right arm, which would have been closer
8  to the window?
9      A.  My recollection is that it is when my
10 son is working his way out of the aisle, and I
11 saw his arm get grabbed as he was working his
12 way out of the aisle.  And the recollection I
13 have to this whole thing is, this was treated
14 as such an emergent situation that it was
15 almost like he was getting thrown out of the
16 aisle.
17     Q.  Do you know if the flight attendant
18 continued to hold A.D. by the arm as he took
19 A.D. to the back of the aircraft?
20     A.  My recollection is he let go of it once
21 he crossed out of the row.
22     Q.  And then the incident involving A.D.'s
23 genitals or crotch area, did that happen near
24 the row where you were seated, or did that

Page 163

1  happen elsewhere in the aircraft?
2      A.  It happened when he took him privately
3  into the back of the airplane.
4      Q.  And you were not present to witness
5  this incident, correct?
6      A.  No, but my son has given me quite an
7  account of it.
8      Q.  Okay.  And with respect to your
9  understanding of it, did the flight attendant
10 touch A.D. on the crotch?
11     A.  He put his hand, according to my son,
12 an inch above it, and said, "This is what your
13 father did," to which my son said, "He never
14 touched me," he said, "You did."  And then
15 Scott started saying, "No, I saw him," and kept
16 his hands hovered above his crotch.
17     Q.  So your understanding is that Scott
18 kept his hands hovered above A.D.'s crotch more
19 than one time?
20     A.  No, it was the one time, but my son, at
21 the time, said it was a prolonged period.
22     Q.  Do you have an understanding as to
23 whether the flight attendant actually touched
24 A.D.'s genitals?

Page 164

1      A.  It was never said that he touched him.
2  But I feel like that's splitting hairs, to be
3  quite honest with you, and I want to go on
4  record with that.  If you take a 12-year-old,
5  and you put your hands anywhere near their
6  crotch, you're splitting hairs, at this point,
7  whether he touched him or not.  He violated his
8  safety, which is why I ultimately decided to
9  push forward with this.  This little
10 not-touching incident has caused A.D.
11 tremendous amounts of harm.  He's had to see a
12 therapist over this.  It was a complete
13 violation, whether he touched him or not.
14     Q.  When was the first time that A.D. told
15 you about this incident?
16     A.  It took a while.
17     Q.  When you say "a while" --
18     A.  A couple weeks after.
19     Q.  I'm sorry.  Let me finish.
20     A.  I'm sorry.  Go ahead.  I'm sorry.
21 You're right.  I'm sorry.  I'm getting upset.
22     Q.  That's okay.  Do you need to take a
23 break?
24     A.  No.

Page 165

1      Q.  So your testimony is that a couple of
2  weeks after this incident, once you were back
3  in North Carolina, A.D. told you that the
4  flight attendant had placed his hand about an
5  inch above his genitals, correct?
6      A.  Yes.
7      Q.  How did that conversation come up?
8      A.  We spent a lot of time talking, because
9  I was trying to assure him that things were
10 going to be okay.  And he said to me that he's
11 been keeping something private, he didn't want
12 to talk about it.
13         And I said, "What is it?"  And his
14 first comment was, "Kevin touched me."  And I
15 said, "Touched you where?"  And he said, "Well,
16 he didn't touch me, but he put his hand just
17 above my penis and my testicles," he said.  And
18 I said, "He put his hand above your crotch?"
19 And he said, "Yes."  And I said, "Did he make
20 any contact?"  He said, "No, but he was yelling
21 at me, 'This is what your father did.  Don't
22 you remember that this is what your father
23 did?'"  And my son told me, he said the times
24 that he told him, "His hands were nowhere near

PETER DELVECCHIA                                        November 19, 2019

Page 166

1  my crotch."  And he said, "But your hand is."
2  And he pulled it away.  And by his
3  recollection, the hand was there for a
4  prolonged period.
5       Q.  And where do you understand this
6  conversation took place on the aircraft?
7       A.  A.D. says that Kevin -- or Scott --
8  jumped into the seat next to him at some point
9  and was trying to dictate what he saw to my
10  son.  And I can't put it in his words, I don't
11  remember, but that's the feeling I got.
12       Q.  So your understanding is the flight
13  attendant sat in the middle seat --
14       A.  Yes.
15       Q.  Next to A.D.?
16       A.  Yes.
17       Q.  When A.D. left the window seat next to
18  you, did he take anything with him?
19       A.  I don't believe so, no.
20       Q.  Did he leave his iPad in the seat next
21  to you?
22            MR. McKAY:  iPod.
23  BY MS. SHELKE:
24       Q.  Sorry, iPod.

Page 167

1       A.  I recall that I put that in his bag.  I
2  can't say for sure.  I don't think he took
3  anything, to be more direct.
4       Q.  We've talked a lot about flight
5  attendant Scott Warren, and the other gentleman
6  who was wearing a white shirt with possibly a
7  Frontier logo on it?  Did you -- and also the
8  flight attendant who reseated you from the exit
9  row.
10           Do you have any other memory of
11  speaking with any other flight attendant on
12  this flight?
13       A.  Other than saying hello, no.
14       Q.  Did either of the pilots speak with
15  you?
16       A.  No.
17       Q.  Did you ask to speak with the captain?
18       A.  No.
19       Q.  You first texted -- between your two
20  daughters, you first texted Amanda about this
21  incident.  Is that your recollection?
22       A.  No, my first contact with was with
23  Gayle.  I can't remember by phone or by text,
24  but it was first with Gayle.

Page 168

1       Q.  And that first contact with Gayle would
2  have been once the aircraft landed, and they
3  said it was okay to use electronic devices?
4       A.  Yes.
5       Q.  During the time that this lawsuit has
6  been pending, have you ever asked Gayle if she
7  has any text messages from you from the date of
8  the incident?
9       A.  No.
10       Q.  Last night we were produced certain
11  text messages that I understand came from
12  Amanda's telephone.  I'm going to show them to
13  you now.
14            MS. SHELKE:  And we'll mark this as
15  Deposition Exhibit Number 3.
16            (Exhibit 3 marked.)
17            THE WITNESS:  Actually, can we take a
18  break for a couple minutes?
19            MR. McKAY:  Yes.
20            MS. SHELKE:  Yeah.
21            THE VIDEOGRAPHER:  Off the record at
22  2:20.
23            (Recess from 2:20 to 2:32 p.m.)
24            THE VIDEOGRAPHER:  Back on the record

Page 169

1  at 2:32.
2            THE WITNESS:  Tara, do you mind if I
3  just clarify something?
4            MS. SHELKE:  Yeah.
5            THE WITNESS:  If it's okay.
6            John had pointed out to me that I
7  misunderstood what you meant by "contact,"
8  and I just wanted to speak to that, if it's
9  all right.
10            When you said "contact," I was looking
11  at that as my contacting somebody.  But
12  John made a good point that that may be --
13  it may be required that the other person
14  actually be on the other end of the phone
15  when there's contact.
16            So although I reached out to Gayle
17  first, my first communication was with
18  Amanda, not Gayle.  And I believe it was
19  probably a phone call to Gayle, and she
20  probably was sleeping, so we didn't talk.
21  But Amanda tends to be a little bit of an
22  insomniac herself, so I knew I would
23  probably reach her.  Although, I tend to
24  think she was, you know, probably in

PETER DELVECCHIA                                    November 19, 2019

1    North Carolina at the time.  I don't
2    remember where she was.  But, nonetheless,
3    I just wanted to make that clear.
4        MS. SHELKE:  Thank you.
5        THE WITNESS:  All right.
6    BY MS. SHELKE:
7        Q.  So for the record, when the aircraft,
8    Flight 2067, landed in Las Vegas, and an
9    announcement was made that passengers could use
10   their cell phones, you would have called Gayle,
11   but not reached her, correct?
12       A.  That's what I believe, yes.
13       Q.  Okay.  But then you texted Amanda and
14   reached her, or was there also a phone call to
15   Amanda?
16       A.  Can I look at this?
17       Q.  Yeah, go ahead.
18       MR. McKAY:  So these are only from
19   Amanda's phone, as I understand it.
20       A.  I don't know.  It looks to me -- and
21   I'm looking at the time -- it looks like I
22   texted her at 12:29, and then it looks like she
23   didn't text me back until 3:45.  So I would say
24   that I probably didn't get this text from her

1    until I was in that cell or room at the LVMPD
2    precinct, whatever you call it.  All right?
3        Q.  Okay.  And then just for the record,
4    we'll clarify that Deposition Exhibit Number 3
5    is plaintiffs' production documents.  Page 50
6    through 55 -- and these appear to be text
7    messages from Amanda DelVecchia's phone, and
8    the text messages are between you -- Peter --
9    and Amanda.  Is that what they appear to be to
10   you?
11       A.  Yes, that's what they appear to be.
12       Q.  Okay.  And this is a black-and-white
13   copy of the text messages, but the lighter gray
14   on the left-hand side of the pages, would those
15   be your messages to Amanda?
16       A.  Yes.
17       Q.  And then on the right-hand side of the
18   pages, the darker gray would be Amanda's
19   responses to you, correct?
20       A.  Yeah, the darker color are Amanda, yes.
21       Q.  Okay.  Now, do you still have the same
22   phone that you had on March 28th of 2019?
23       A.  I'm going to guess no.  I had a phone
24   that malfunctioned and I think I might have

1    donated it.
2        Q.  Okay.  Do you have copies of the text
3    messages that you would have sent to Amanda
4    around the time of this incident in late
5    March 2019?
6        A.  No, I generally clear all texts one day
7    later -- generally.
8        Q.  Do you know who your cell phone
9    provider was in March and April of 2019?
10       A.  I've had Sprint.
11       Q.  And you've consistently had Sprint even
12   through today?
13       A.  Yeah, 20 years or something, 15 years
14   or something.
15       Q.  Okay.
16       MR. McKAY:  Wow.
17       THE WITNESS:  Yeah, I'm a loyal
18   customer.
19       MR. McKAY:  Yeah.
20       THE WITNESS:  But I'll never fly
21   Frontier again -- never.
22   BY MS. SHELKE:
23       Q.  And just looking at Deposition Exhibit
24   Number 3, it appears that your first message to

1    Amanda reads, "I have a problem on the plane
2    again.  Took A.D. to a different seat.  May
3    need some help."
4        A.  Uh-huh.
5        Q.  To the best of your recollection, that
6    was the first message you sent to Amanda,
7    correct?
8        A.  Yes.
9        Q.  There are some time stamps on these
10   photographs.  Sorry, on these text messages.
11   For instance, the first one is dated Friday,
12   March 29, 12:29 a.m.
13       Do you know what time zone these are?
14       A.  I'm going to imagine it's the time in
15   Las Vegas, because I know -- that sounds like
16   roughly the time we landed.  I would say, yeah,
17   it would probably be Las Vegas time.
18       Q.  On page 1 of Deposition Exhibit
19   Number 3, the last message in the bottom right
20   is:  "Are you even safe to drive?"
21       Do you know what that means?
22       A.  She was -- I don't know what time it
23   was sent.  And I'm noticing -- and I hate to
24   poke holes in this, but the percentage charge

PETER DELVECCHIA                                    November 19, 2019

---

Page 174

1  has changed.
2      Q.  It appears to me, at least, that the
3  cell phone was charging.
4      A.  Well, perhaps --
5      Q.  But if you disagree, we can investigate
6  further.
7      A.  I really --
8      MR. McKAY:  That usually means it's
9  charging, so...
10     THE WITNESS:  Yeah.  I mean, it was a
11 string.  It just seems odd.
12     MR. McKAY:  Oh, no, no, no.  Sorry.
13 The stuff at the top is Amanda's phone at
14 the time that -- the other night when she
15 took the screenshots.
16     THE WITNESS:  Oh.
17     MR. McKAY:  So ignore the top part,
18 yeah.
19     THE WITNESS:  I thought they were
20 screenshots.
21     MR. McKAY:  No, this is not a time.
22 This is --
23     THE WITNESS:  All right.
24     MR. McKAY:  This is when you sent it.

---

Page 175

1      THE WITNESS:  All right.  Okay.  Yeah,
2  I was a little bit confused by that,
3  because I saw the 7:02 up here, and I was
4  like, "This doesn't make any sense."
5      MR. McKAY:  To clarify, she was asking
6  you about these.
7      THE WITNESS:  Okay.
8      MR. McKAY:  So don't speculate if you
9  don't know.
10     THE WITNESS:  Would you mind asking me
11 again?
12     MS. SHELKE:  Sure.
13 BY MS. SHELKE:
14     Q.  And then I guess I would just start
15 with:  Peter, have you ever seen the five or
16 six pages that make up Deposition Exhibit
17 Number 3 before I put them in front of you
18 today?
19     A.  Yes, Amanda sent them to me Sunday
20 night.
21     Q.  Okay.  Were they in a different format
22 than what you have before you in Deposition
23 Exhibit Number 3?
24     A.  They were on my phone.  She sent them

---

Page 176

1  to me by text.
2      Q.  So she forwarded the text messages to
3  you --
4      A.  Yes.
5      Q.  -- or sent you screenshots?
6      A.  I think they're screenshots, yes.
7      Q.  Okay.  Returning to my question.
8      With respect to page 1, Deposition
9  Exhibit Number 3, the last message on the
10 bottom reads:  "Are you even safe to drive?"
11     Do you know what Amanda meant by that?
12     A.  I don't know.  I was trying to figure
13 that out just before you asked me, and I --
14     MR. McKAY:  Look at the next page
15 before you get too deep into that.
16     You're saying you took a cab.
17     A.  Yeah, it just seems like there's a
18 piece missing, because for her to make that
19 assumption, I don't -- I don't know how she
20 would have said that, but I'm thinking, you
21 know, maybe we had a phone call.  I don't know.
22 So I'm trying to put this in more of a logistic
23 manner, and it looks like something is missing
24 to me, why she was asking if I was even safe to

---

Page 177

1  drive.  And as John pointed out, I said, "I
2  took a cab," on the next page, "and we just got
3  to the hotel."
4      Q.  Okay.  And that was going to be my next
5  question.  It does appear to you that the time
6  line is a little off from the messages, and
7  either there are messages missing, or there was
8  a phone call in between.  Is that correct?
9      A.  There might have been.  I'm not sure.
10     MR. McKAY:  And I'll represent to you
11 that I received all of these and put them
12 in the order that I thought made sense, but
13 since I wasn't a party to the
14 communications, I could have gotten them
15 out of order.
16     MS. SHELKE:  Okay.  So to be clear,
17 you -- each page was sent to you as a page?
18     MR. McKAY:  Each one was a screenshot.
19     MS. SHELKE:  And you ordered them in
20 the order you got them?
21     MR. McKAY:  I did.  And I -- as we all
22 know by now, I can easily make mistakes
23 with things.  So, yes, it's very possible
24 that I got them out of order.

---

PETER DELVECCHIA                                      November 19, 2019

Page 178

1    MS. SHELKE:  Okay.
2  BY MS. SHELKE:
3    **Q.  Peter, if you will go to page 51, which**
4  **is page 2 of Deposition Exhibit Number 3 --**
5    A.  Page fifty what?
6    **Q.  The little page number.**
7    MR. McKAY:  The little, tiny Bates
8  stamp numbers.
9    THE WITNESS:  Oh, sorry.
10 BY MS. SHELKE:
11   **Q.  And this is a long text message that**
12 **appears to be from you to Amanda.**
13   A.  Uh-huh.
14   **Q.  The second sentence -- or third**
15 **sentence of it says:  "At the end of the day,**
16 **it was a black steward who was pissed off and**
17 **filed the claim."**
18   **Why do you think the flight attendant**
19 **was "pissed off"?**
20   A.  By this time A.D. and I had talked
21 about the racist piece of it, and I concurred
22 completely that this was a racist incident.
23   **Q.  How does being pissed off translate to**
24 **racism?  If you'll explain that to me.**

Page 179

1    A.  Oh, it's -- okay, yeah, I see where
2  you're going.  Well, it's -- I can't answer
3  that with certainty, I can only tell you what I
4  feel, if that's acceptable to you.
5    **Q.  Yes.**
6    A.  I think that -- okay.  So if you can
7  give me some leeway to just -- as a basis for
8  my opinion here.
9    I have been approached by many, many
10 black people who told me that I own a slave.
11 And I've been approached by black people who
12 have thrown garbage at me from cars that were
13 moving.  One actually threw a full bottle of
14 Pepsi at me and A.D. when we were riding our
15 bikes.  I have had people approach me in Costco
16 and tell me what a piece of -- pardon my
17 language -- what a piece of shit I am for
18 taking a black child out of his element.  And
19 it's just occurred to me over time that there's
20 probably some resentment.  A.D. would tell you
21 he has a whole different outlook on this, which
22 you should ask him, if you want, but I just
23 think that there's some resentment about taking
24 him out of a black home or possible black home.

Page 180

1    And I've tried to engage with people,
2  particularly when it happens at Costco or
3  Food Lion, which is a grocery store, if you
4  don't know, and I try to explain to them that
5  he was a starving kid in Africa, and this
6  likely saved his life.
7    But I will also tell you, there's just
8  as many people, if not more -- black people --
9  that come over and hug me in public and tell me
10 that I've done a wonderful thing.
11   So it's something of a balance.  And,
12 you know, the reaction it generates is -- it
13 seems to be one extreme or the other.  I'm
14 either getting hugged and kissed or I'm getting
15 garbage thrown at me.
16   **Q.  And in your mind, the flight attendant**
17 **was pissed off about the fact that you as a**
18 **white gentleman had adopted a black child?**
19   A.  Yes.  And, clearly, he knew he was my
20 son, because A.D. and I had both told him that
21 he was my son.
22   And you just reminded me of something.
23   THE WITNESS:  And, John, I don't know
24   if you want me to run it past you or I can

Page 181

1    just say what I want to say.
2    MR. McKAY:  Well, wait for a question.
3    THE WITNESS:  It's something that just
4    triggered a memory, that's all.
5  BY MS. SHELKE:
6    **Q.  Sticking with page 2 of Deposition**
7  **Exhibit Number 3.**
8    A.  Page 2.
9    **Q.  The page you're on right now.**
10   **There's a sentence that reads:  "And**
11 **the best you had a coach stretch over the whole**
12 **front of him."**
13   **Can you tell me what you intended to**
14 **mean there?**
15   A.  If you take your phone and say A.D.,
16 how it comes up is -- I mean, it's voice
17 texting.  And I'm terrible with the phone, so I
18 talk into it.  And then because I'm lazy, I
19 don't read it over.
20   So this was supposed to say:  "And A.D.
21 had a coat stretched over the whole front of
22 him, but a trumped up charge that I was playing
23 with his crotch."
24   **Q.  Similarly, if you'll turn to the next**

PETER DELVECCHIA                                          November 19, 2019

Page 182

1  page of Deposition Exhibit Number 3, that first
2  text message reads: "So I got handcuffed,
3  searched, put into a cell, and questioned for
4  seven hours, and white people of the racist."
5      A.  I don't know what I was referring to.
6      Q.  Okay.
7      A.  I'm looking at that.  I don't know.  I
8  was probably trying to tell her there was a
9  racist thing said of some variety.
10     Q.  If you'll turn to what is marked as
11  page 53 of Deposition Exhibit Number 3.
12         MR. McKAY:  It's the next page.
13         MS. SHELKE:  Yes.
14         MR. McKAY:  Yeah, you're right.
15  BY MS. SHELKE:
16     Q.  The last text message in the bottom
17  left-hand corner reads: "I'm okay.  I just
18  didn't appreciate what went on tonight.  They
19  have spent the whole time -- hours --
20  threatening and yelling at me."
21         Who is the "they" you're referring to
22  here?
23     A.  It's collective.  It's the -- it
24  started with Scott.  And when I wrote this, I

Page 183

1  very much remember speaking about the officer
2  who I referred to as nasty.  He was pretty
3  hostile.
4      Q.  And when you say he was threatening
5  you, what do you recall the threats to be?
6      A.  That I was going to prison.  And he
7  even made a point to talk about what they do to
8  child molesters in prison.
9      Q.  Do you have a recollection of when you
10  were texting Amanda at the time you wrote this
11  text message on page 53 of Deposition Exhibit
12  Number 3?
13     A.  What time this was?
14     Q.  Yes.
15     A.  I don't know.  To be honest with you, I
16  was falling in and out of sleep, and I was -- I
17  know I was sitting on the bed, and I was
18  sitting next to A.D., and I was hugging him,
19  and I was falling in and out myself.  And I
20  don't know -- I probably kept it up the whole
21  night.  I don't know.
22     Q.  If you'll turn to the next page.
23  There's a big text message halfway down the
24  page that reads: "I am sorry I was not very

Page 184

1  weak this morning honey."
2          Could you tell me what you meant to say
3  there?
4      A.  I was trying to say, "I was weak this
5  morning."  And it looks like it was many hours
6  later, and I was just trying to tell her I was
7  weak.
8      Q.  When you say "weak," what are you
9  meaning there?
10     A.  I didn't want to get into the whole
11  physical -- and I very specifically remember I
12  did not want to get into the whole specifics,
13  because my children are very protective, so I
14  was cautious telling her about the head injury,
15  and didn't want to get into it, and I just
16  wanted to tell her I was weak, so I was asleep.
17  Or more than likely, I just wasn't coherent
18  enough to text.
19     Q.  If you'll turn to the next page,
20  there's a big text message from you at the top
21  of the page.  The last sentence of that reads:
22  "A.D. thinks it's because he looks well taken
23  care of that it inspires resentment and
24  racism."

Page 185

1      A.  Those are A.D.'s thoughts.
2      Q.  When did A.D. tell you that?
3      A.  A.D. says it all the time.  He believes
4  that -- I mean, I would rather he said it, but
5  the reality is he talks about it.  A.D. is very
6  aware of sociopolitical dynamics, and his
7  experience has been that, with other children
8  in school, there's a resentment, because he
9  plays hockey, because he's well dressed,
10  because he's taken care of, because he's always
11  with his father, because his dad picks him up
12  every day.  And he's, basically, told me many
13  times that he doesn't endear himself to the
14  other black children in the school.
15     Q.  So the resentment that you described,
16  A.D. understands other black children to feel
17  that way?
18     A.  And people, in general -- I should have
19  been more specific -- yes.
20     Q.  Other black people?
21     A.  Just in general, yes.
22     Q.  If you'll look at the last text message
23  on this page 55 of Deposition Exhibit Number 3,
24  it cuts off, but it says:  "Not sure if you are

PETER DELVECCHIA                                    November 19, 2019

Page 186

1  getting any of my text last few days."
2      This seems to imply that there may have
3  been other text messages.  Is that your
4  impression?
5      A.  Yes.
6      Q.  Do you recall sending Amanda any text
7  messages to which you did not get a response
8  that are not included in this document?
9      A.  I recall sending both of my daughters
10  many text messages.
11      Q.  And you recall that some of those text
12  messages were not received by your daughters
13  due to spotty cell service?
14      A.  Yes.  And I can't swear to it, but I
15  remember being in contact with them.  And I
16  recall trying to call them a lot, so I could be
17  confusing calls with texting.  I generally
18  prefer to call.  So I may have been trying to
19  call them.
20      Q.  Do you and Gayle share a family cell
21  phone plan with Sprint?
22      A.  No, we didn't.
23      Q.  Do you and Amanda share a family cell
24  phone plan with Sprint?

Page 187

1      A.  No.
2      Q.  And A.D. did not have a cell phone in
3  March and April of 2019; is that correct?
4      A.  No, he did not.
5      Q.  He has since gotten a cell phone?
6      A.  Yes, he has.
7      Q.  Do you know if A.D. was provided a
8  social worker while he was questioned by either
9  the police or the FBI?
10      A.  He was not provided a social worker.
11  At least, that's what he told me.
12      Q.  Do you know if A.D. was given a snack
13  or something to drink when he was reseated in
14  the back of the aircraft?
15      A.  He was not.  That's what he told me.
16      Q.  Did A.D. tell you what he did for the
17  remainder of the flight after he was reseated
18  in the back of the aircraft?
19      A.  He told me he spent the time crying and
20  trying to ask to come back to me.  That's all
21  he told me.
22      Q.  Do you know if A.D. had any
23  conversation with the gentleman who sat in the
24  aisle seat in his row in the back of the

Page 188

1  aircraft?
2      A.  He said he did not.
3      Q.  I'm going to show you some photographs
4  that your attorney produced to us.
5      MS. SHELKE:  We'll mark this as
6  Deposition Exhibit Number 4.
7      (Exhibit 4 marked.)
8      THE WITNESS:  Are we done with these?
9      MS. SHELKE:  Yes.
10      THE WITNESS:  I'll just put them over
11  here.
12      MS. SHELKE:  We'll come back to
13  Number 1 in a little bit.
14  BY MS. SHELKE:
15      Q.  So I'm showing you what we've marked as
16  Deposition Exhibit Number 4.  These are some
17  photographs that your attorney produced to us.
18  Just take a quick look through them.
19      A.  (Reviewing.)
20      Q.  Do you recognize the photographs?
21      A.  Yeah, they're mine.
22      Q.  And these are photographs that you took
23  with your cell phone?
24      A.  No.

Page 189

1      Q.  Okay.  How did you take these
2  photographs?
3      A.  I actually shouldn't have said that.  I
4  don't know if -- I have a cell phone, and I've
5  got two cameras.  So I don't -- I don't recall
6  what I took it with, but they're just pictures.
7      Q.  And they're pictures that you took
8  during the trip to Death Valley National Park,
9  correct?
10      A.  Yes.
11      Q.  On the first page there are five
12  photographs, three of which depict your son,
13  correct?
14      A.  Yes.
15      Q.  Do you recall taking any photographs,
16  such as selfies, that depict both you and A.D.
17  while you were on this trip?
18      A.  I don't.
19      Q.  Do you know if you have any of those
20  photographs?
21      A.  I don't.
22      Q.  Do you know what is depicted in the
23  photograph on page 2?
24      A.  Hold on.  I want to make sure there's

PETER DELVECCHIA                                    November 19, 2019

Page 190

1  nothing in here other than this before I say
2  that.
3          I'm sorry.  What was the question?  On
4  that?
5      Q.  What is depicted in the photograph on
6  page 2 of Deposition Exhibit Number 4?
7      A.  It's just part of Death Valley.
8  It's -- it was just -- from what I recall, we
9  drove there and took some pictures.  It's just
10 a large expanse.  I think it actually is the
11 Valley, the Death Valley.
12     Q.  There's a photograph of A.D. on page
13 number 3 of Deposition Exhibit Number 4.  Do
14 you have an idea when that was taken?
15     A.  Probably when we -- I'm guessing when
16 we returned the van.
17     Q.  Is that the van that you rented?
18     A.  Yes.
19     Q.  The photograph of the plant on page
20 number 5, I believe, anything significant about
21 that plant?
22     A.  No, it was just pretty.
23     Q.  If you'll turn to the comments that are
24 regarding these photographs, which is pages 48

Page 191

1  and 49 of Deposition Exhibit Number 4.
2      A.  Uh-huh.
3      Q.  Who is Ritaanne Marie T?
4      A.  My sister.
5      Q.  Where does she live?
6      A.  Staten Island, New York.
7      Q.  Did you ever tell your sister, the one
8  who lives in Staten Island, New York, about
9  this incident?
10     A.  Only once it hit the newspaper.
11     Q.  Who is Alex Monnin?
12     A.  Somebody I met on a trail in
13 Grand Canyon and hiked with out there for a
14 while.
15     Q.  And in your response to Alex's comment,
16 you mentioned hiking Mosaic Canyon,
17 Dante's View, and Red Wall.
18     A.  Uh-huh.
19     Q.  Were all three of these locations on
20 your initial itinerary?
21     A.  No --
22     Q.  So these are --
23     A.  -- not that I remember.  I had no
24 intention of going there.

Page 192

1      Q.  Okay.  Why is it that you had no
2  intention of going to these three locations?
3      A.  They're flat.
4          THE REPORTER:  I'm sorry?
5      A.  They're flat.  It just wasn't my thing.
6      Q.  Who is David Spencer, who has a comment
7  at the bottom of page 48?
8      A.  That's one of A.D.'s hockey coaches.
9      Q.  If you'll turn to the next page of
10 Deposition Exhibit Number 4.
11         Who is Stephanie Bronstein Finn?
12     A.  A former co-worker.  A former
13 co-worker.
14     Q.  And she worked at AICPA with you?
15     A.  Not with me, just a different
16 department.
17     Q.  Is she based in North Carolina?
18     A.  Yes, she's retired.  I don't know where
19 she is now.
20     Q.  That's all the questions I have about
21 that exhibit.
22         Did A.D. sustain any physical injuries
23 as a result of the incident on board
24 Flight 2067?

Page 193

1      A.  No.
2      Q.  If you'll turn to Deposition Exhibit
3  Number 1, which is your answers to
4  interrogatories.
5      A.  (Complying.)
6      Q.  Page 2, question number 3, the last
7  sentence of your answer to interrogatory
8  number 3 says:  "My injuries and damages are
9  known to my family members and my treating
10 physicians."
11         When you say "family members" there,
12 who are you referring to?
13     A.  Mostly Gayle, A.D., and probably to a
14 little lesser extent.  Amanda.  My sister,
15 Maureen, knows a tiny bit, not much more than a
16 tiny bit.
17     Q.  And your sister, Rita, who we saw named
18 in Deposition Exhibit Number 4, also knows
19 something about this?
20     A.  No, not the injuries.
21     Q.  So Rita only knows that the incident
22 occurred, but no further details?
23     A.  Yes.
24     Q.  Does Maureen know about any medical

PETER DELVECCHIA                                    November 19, 2019

Page 194

1   treatment that you received?
2       A.  Related to this incident?
3       Q.  Yes.
4       A.  No.
5       Q.  And when it says "treating physicians"
6   in your answer to interrogatory number 3, who
7   are you referring to?
8       A.  A.D.'s therapist and the neurologist
9   who is named in here.
10      MR. McKAY:  I think this was referring
11  to you, your treating physicians.
12      THE WITNESS:  Oh, I'm sorry.
13      MR. McKAY:  So it's probably Carnes and
14  your regular doctor.
15      A.  My answer is the same.  A.D.'s
16  therapist knows about the injuries to me, to
17  some extent, and so does Dr. Carnes.
18      Q.  Since your return to -- sorry.  Strike
19  that.
20          Since your return to Raleigh, you
21  sought medical treatment for your head and
22  neck; is that correct?
23      A.  Yes.
24      Q.  And who did you seek that treatment

Page 195

1   with?
2       A.  Carnes.
3       Q.  Did you also seek treatment related to
4   your eyes or your vision?
5       A.  No.
6       Q.  Did you seek any treatment related to
7   your back?
8       A.  No.
9       Q.  With respect to your head and neck,
10  when you saw Dr. -- do you recall the first
11  time that you saw Dr. Carnes?
12      A.  A significant amount of time had
13  passed.
14      Q.  Do you recall whether it was in the
15  month of April 2009?
16      A.  In May.
17      MR. McKAY:  Did you mean 2019?  You
18  said 2009.
19      MS. SHELKE:  Sorry.  Yes, I did mean
20  2019.
21      A.  In May of 2019.
22      Q.  In May of 2019.  Sorry.  My apologies.
23          When you saw Dr. Carnes in May of
24  2019 --

Page 196

1       A.  Can I -- give me a second.  I'm trying
2   to put the time together.  I might have
3   misanswered that.
4       MR. McKAY:  Can we go off for a second?
5       MS. SHELKE:  Sure.
6       THE VIDEOGRAPHER:  Off the record at
7   3:00.
8       (Brief discussion off the record.)
9       THE VIDEOGRAPHER:  Back on the record
10  at 3:01.
11  BY MS. SHELKE:
12      Q.  Peter, your attorney produced to us
13  some medical records from Raleigh Neurology
14  Associates.  Is that Dr. Carnes' office?
15      A.  Uh-huh.
16      MR. McKAY:  You have to say "yes."
17      A.  Yes.  Yes.
18      Q.  Okay.  And as I can see, there are two
19  treatment dates.  One of them is May 5th of
20  2019, and one of them is June 11th of 2019.
21          Does that sound right to you?
22      A.  Is it possible for me to read that?
23      Q.  Yes, I will show you --
24      A.  It would help me a little bit.

Page 197

1       Q.  It's the only copy that I brought, but
2   you are welcome to take a look at it.
3       A.  It's okay.  I'll give it back.
4       Q.  (Handing.)
5       A.  There's some inaccuracies in here.
6           5/11, I was in the hospital.
7       MR. McKAY:  Where is that?  I'm sorry.
8       THE WITNESS:  Right there (indicating).
9       A.  And I was not referred by Sarah Ringel,
10  but it seems that everybody puts that.
11          And June 11th, I cannot swear to it,
12  that's probably the date that I saw Dr. Carnes.
13      Q.  That is the date of the office visit or
14  treatment note, correct?
15      A.  Yes.
16      Q.  So in the month of April 2019, you did
17  not seek any medical treatment for your head or
18  your neck, correct?
19      A.  I did not.
20      Q.  And then in May of 2019, specifically,
21  on May 11th of 2019, you saw Dr. Carnes,
22  correct?
23      A.  No, on May 11th, I was in the hospital.
24      Q.  Okay.  Why were you in the hospital on

PETER DELVECCHIA                                    November 19, 2019

Page 198

1   May 11th?
2       A.  I bumped my head.  And the bump didn't
3   seem severe, but the pain was very similar to
4   what I had experienced on the airplane, and I
5   began to get worried that there was something
6   really wrong with me.  I am not -- my son plays
7   hockey, and I'm supposed to know about
8   concussions; I don't.  But the pain was just so
9   similar to what happened on the airplane that I
10  drove myself to the emergency room, and A.D.
11  was with me, and I asked my daughter to meet me
12  there -- Gayle.  And they did a whole battery
13  of tests that night, some CAT scans and some
14  visual stuff.  But it was just so similar, I
15  started -- I actually thought I had a brain
16  tumor or something.
17      Q.  Which ER did you drive yourself to?
18      A.  University of North Carolina in
19  Hillsborough.
20      Q.  And what was the incident that led to
21  you receiving a bump to your head?
22      A.  My son and I were playing a game called
23  "knee hockey" in our bonus room.  And the
24  ping-pong table was tied up, and we were

Page 199

1   kidding around underneath the ping-pong table
2   where it was folded, and it just came down, and
3   it just -- it kind of brushed my head as it
4   fell down.
5       Q.  Did you spend the night overnight in
6   the hospital on May 11th of 2019?
7       A.  No.
8       Q.  After the hospital visit on May 11th of
9   2019, did you have any care between that date
10  and June 11, 2019, related to this head injury?
11      A.  No.  Well, hold on a second.  Yes, I
12  did.  I saw Dr. Ringel.
13      Q.  What is Dr. Ringel?
14      A.  She's just a family doctor, who is now
15  retired.
16      Q.  So Dr. Ringel is a family doctor, she
17  is your doctor, and she is also A.D.'s doctor?
18      A.  Was.
19      Q.  During the time that she was
20  practicing?
21      A.  Yes.
22      Q.  Do you know how many times you saw
23  Dr. Ringel between May 11, 2019, and June 11,
24  2019?

Page 200

1       A.  Once.
2       Q.  Did Dr. Ringel prescribe any treatment
3   for your head injury when she saw you?
4       A.  I'm just trying to think.  Again, this
5   is another period where I had some memory
6   difficulties because of what went on.  So if
7   you read -- you're holding a -- what kind of
8   report is that?
9       Q.  I am holding what your attorney
10  produced to us as plaintiffs' document
11  production pages 18 through 27.
12      A.  Can I just take a look at it?
13      Q.  They appear to be medical records from
14  Raleigh Neurology Associates.
15      MR. McKAY:  I have requested records
16  from Dr. Ringel's office and have not
17  received them.  They would probably be the
18  best source of an answer to your question,
19  and I'll get them to you as soon as I get
20  them.
21      MS. SHELKE:  Okay.  And our office is
22  putting together some subpoenas.
23      Will Peter be accompanying A.D.
24  tomorrow to the deposition?

Page 201

1       MR. McKAY:  Yes.
2       MS. SHELKE:  We'll have some
3   authorizations that we'll ask that you sign
4   off on, and we'll show them to you
5   beforehand, of course.
6       A.  There's a line in here, I'm just trying
7   to find, Tara, if you can just bear with me.
8       Q.  Take your time.
9       A.  Okay.  There's a line in here that
10  says:  "Asymmetrical lateral ventricles."
11      And then if you look at the next thing,
12  it said:  "He was assaulted in April while on a
13  flight.  He was dizzy with headaches
14  afterwards.  He's only sleeping a few hours a
15  night."
16      When I went to the emergency room, the
17  conclusion that was told to me was that, for
18  the hit, it was way too much problems, that it
19  didn't make sense.
20      MR. McKAY:  For which hit?
21      THE WITNESS:  For the hit with the
22  ping-pong table.
23      A.  It was -- it was so severe, they said,
24  that it didn't correlate to the ping-pong

PETER DELVECCHIA                                    November 19, 2019

Page 202

1  table.  And they came up with this after the
2  CAT scan, about this ventricle issue, and
3  basically said, "We don't understand why this
4  is so severe, but you have a ventricle issue
5  that could be life-threatening."  So that's
6  what triggered me to go to Dr. Ringel, so that
7  she could help explain things, because I didn't
8  really understand.
9          And I think -- I think she -- you have
10  the records there.  I didn't look at them
11  beforehand.  I think she sent me for an MRI,
12  and she did it on a stat basis.  And then she
13  basically said the ventricle issue probably
14  wasn't a concern, but the severity of the
15  concussion from the ping-pong table was not
16  proportionate, and she wanted me to see a
17  neurologist, and that's why I went to
18  Dr. Carnes.
19      Q.  Did Dr. Ringel review the results of
20  the MRI herself?
21      A.  Yes.
22      Q.  And then did Dr. Ringel refer you to
23  Dr. Ken Carnes?
24      A.  No, he was the only neurologist I could

Page 203

1  get an appointment with quickly, and I don't
2  remember how I found him.
3      Q.  After -- when you went to see
4  Dr. Ringel, after your visit to the ER on
5  May 11, 2019, did Dr. Ringel prescribe any
6  medication to you?
7      A.  Not that I recall.
8      Q.  Did Dr. Ringel prescribe any other form
9  of treatment to you?
10      A.  She just told me I needed to get more
11  sleep.
12      Q.  Did Dr. Ringel give you a prescription
13  for sleep medication?
14      A.  No, she knows I won't take it.
15          MR. McKAY:  You have to speak up.
16      A.  I'm sorry.  I won't take it.  We've had
17  discussions about it.
18      Q.  Apart from the visit to Dr. Ken Carnes
19  on May -- on June 11, 2019, did you have any
20  further visits with Dr. Carnes?
21      A.  I've had a subsequent visit.
22      Q.  Do you recall when that was?
23      A.  No, I don't.  He's so hard to get into.
24  He would have records of that.

Page 204

1      Q.  Do you recall what Dr. Carnes'
2  treatment of you was on the first visit when
3  you saw him, June 11, 2019?
4      A.  Yes, he wanted to go through the
5  ventricle issue, and he told me not to worry.
6  He wanted -- he obviously was concerned with
7  the severity of the concussion, and he said --
8  his words -- his best guess is that, based upon
9  his review of the MRI that came back, and
10  description of the symptoms, is that I suffered
11  a concussion at the time of the assault on the
12  plane, and he felt that the ping-pong table was
13  so soon after it that it created damage, severe
14  damage at that time.  I don't remember if that
15  was the exact words.  A severe whatever he
16  called it.  But he said that because it was one
17  after the other likely increased the severity
18  of it.
19      Q.  What was Dr. Carnes' prescribed course
20  of treatment for you on June 11, 2019?
21      A.  He told me to continue relaxing.  He
22  was obviously concerned about the amount of
23  sleep.  We talked quite a bit about it.  I told
24  him the sleep was worse than ever, because I

Page 205

1  was having so many problems over the whole
2  airline thing, and he gave me some sleep aid,
3  which I finally -- and I don't remember the
4  name of it -- which I finally broke down and
5  took.  And it didn't work, and it made me
6  extremely hyper, so I stopped.  It was actually
7  making it worse rather than better.  And then
8  we had some phone calls afterwards about the
9  head pain and stuff.
10      Q.  Apart from the sleep aid, did
11  Dr. Carnes prescribe anything else to you on
12  June 11, 2019?
13      A.  Not that I recall.
14      Q.  Do you recall when the subsequent visit
15  with Dr. Carnes was?
16      A.  I don't.
17      Q.  At the subsequent visit with
18  Dr. Carnes, did he change his course of
19  treatment for you?
20      A.  Yes.
21      Q.  What did he prescribe at the subsequent
22  visit?
23      A.  He prescribed another sleep aid.
24      Q.  Do you recall which sleep aid he

PETER DELVECCHIA                                    November 19, 2019

Page 206

1  prescribed?
2      A.  Gabapoentin (sic).  I've taken it once,
3  though, so...
4      Q.  So Dr. Carnes prescribed a single dose
5  of the --
6      A.  No, the whole thing, and I had a very
7  adverse effect from it.
8      Q.  What was the adverse effect that you
9  suffered?
10     A.  I couldn't sleep.  I was up all night.
11     Q.  So both sleep aids that Dr. Carnes
12  prescribed to you would have the opposite
13  effect if they made your sleep issues worse
14  rather than better?
15     A.  Yes.
16     Q.  Since then, have you seen Dr. Carnes?
17     A.  I'm supposed to make an appointment.
18  I'm supposed to be in again, and I have not.
19     Q.  So you do plan to seek further
20  treatment with him?
21     A.  Yes.
22     Q.  Do you continue to suffer -- sorry.  Go
23  ahead.
24     A.  No, please go.

Page 207

1      Q.  Do you continue to suffer today from
2  the head and neck pain that you believe you
3  sustained on Flight 2067?
4      A.  Well, I was just about to comment on
5  that.  I just didn't get a chance.  Yes, I do.
6  Part of the reason I went to see him is my
7  hands began tingling between the flight
8  incident and the ping-pong incident in my left
9  arm, and that was another concern.  And I
10  couldn't get rid of the headaches.  Even today,
11  I've got a headache.  It's almost a daily thing
12  now.  And his hope with those two medications
13  that he prescribed is that they could treat the
14  headaches, because he feels they're migraines.
15  Whether or not they were caused by the flight
16  or the ping-pong table, I don't know.  And it
17  did improve the headaches.  The first batch
18  improved the headaches, but it did not improve
19  the sleeping.
20     Q.  So the two medications that Dr. Carnes
21  prescribed were supposed to do two things:
22  One, diminish your headaches; and also to
23  assist with sleep.  Is that correct?
24     A.  Yes.

Page 208

1      I didn't fully answer you on the other
2  one too.  The gabapoentin (sic) is addictive,
3  so I didn't take it.  That was another reason I
4  didn't take it.
5      Q.  The medication that you just talked
6  about, could you spell that for us?
7      A.  No, I cannot.  I'm sorry.  G-A-B-A --
8      MR. McKAY:  Is it gabapentin?
9      THE WITNESS:  Pentin, that might be it.
10     MR. McKAY:  Gabapentin.
11     MS. SHELKE:  Gabapentin.  There we go.
12  BY MS. SHELKE:
13     Q.  And the gabapentin was the medication
14  that Dr. Carnes prescribed on your subsequent
15  visit with him, correct?
16     A.  Second visit.
17     Q.  Okay.  And you only -- although
18  Dr. Carnes prescribed a full course of
19  treatment involving gabapentin, you only took
20  it on one occasion?
21     A.  That's right.
22     Q.  Did you tell Dr. Carnes that you
23  stopped taking the medication after the first
24  dose?

Page 209

1      A.  We haven't met again.
2      Q.  Have you had any phone calls with
3  Dr. Carnes since you stopped taking the
4  gabapentin?
5      A.  No, only his -- your -- that question
6  was vague, so I will say that I called the
7  front desk to try to get an appointment, and
8  I'm not successful.
9      Q.  Apart from discussing scheduling with
10  the front desk of Dr. Carnes' office, have you
11  left any messages with respect to your medical
12  condition?
13     A.  Just to make appointments.
14     Q.  You mentioned that your hands began
15  tingling, specifically, in your left arm.  Do
16  you have a date as to when that began?
17     A.  Within a week after the flight.
18     Q.  And when you say your left -- is it
19  your left hand?  Your left arm?  Can you tell
20  me a little bit more?
21     A.  It was something that came up years
22  ago.  I fell, hiking, and I fell on my
23  shoulder, and it -- there was some numbness for
24  a couple weeks, and then I experienced no

PETER DELVECCHIA                                         November 19, 2019

Page 210

1  further issues with it.  And after the flight,
2  it was like my fingertips would go completely
3  numb, and it would start tingling and then go
4  numb, and it was limiting my use of my left
5  hand.
6       Q.  Are you left- or right-hand dominant?
7       A.  I'm right-handed.
8       Q.  Apart from the tingling in the fingers
9  on your left arm, did you experience tingling
10  anywhere else on your left arm?  For example,
11  shoulder?  Forearm?  Elbow?
12       A.  I don't think so.
13       Q.  You likened your headaches to a
14  migraine.  Do you understand your headaches to
15  be migraines, or just similar?
16       MR. McKAY:  Objection to the form of
17       the question.
18       Go ahead.
19       A.  I do not liken my headaches to a
20  migraine.  I said I've had migraines.  And if I
21  did, I apologize.  The headaches are not the
22  same headaches I've had with migraines, but he
23  wanted to treat them as though they were
24  migraines.  But they're not similar to

Page 211

1  migraines, no.
2       Q.  So to be clear, the headaches that you
3  have experienced following the incident on
4  March 28th of 2019, are not similar to migraine
5  symptoms?
6       A.  No.  I mean, I've had migraines since
7  then.  I know the difference.  The migraines I
8  generally get on the right side -- the right
9  side of my head above my eye.  The pains I've
10  had in my head since that flight have been up
11  the back of my neck and right up into the
12  middle of the top of my head.
13       Q.  How often do you suffer from migraine
14  headaches?
15       A.  Once every month to two months.
16       Q.  How long has this been going on?
17       A.  My teens.
18       Q.  In the last five years, have you sought
19  medical treatment for your migraines?
20       A.  Yes.
21       Q.  Who have you sought your medical
22  treatment for your migraines from?
23       A.  I don't remember.  It was a neurologist
24  in New York.

Page 212

1       Q.  So even though you've lived in
2  North Carolina for some time, you would still
3  travel to New York for treatment related to
4  your migraines?
5       A.  No, I've had them since I was in my
6  teens.  And there was a stretch of time there
7  where it was just unbearable, and I was up in
8  New York until I was 44, and I sought some help
9  from a headache clinic.
10       Q.  Remind me when you moved to
11  North Carolina.
12       A.  2006.
13       Q.  In the last five years, have you sought
14  any medical treatment related to your
15  migraines?
16       A.  No.  No.  Frankly, they were pretty
17  nonexistent.
18       Q.  When you do suffer from migraines once
19  or twice a month, do you take any medication
20  for them?
21       A.  I generally take either Advil or
22  Excedrin.
23       Q.  Is that a specific migraine-related
24  dose that you take?

Page 213

1       A.  No.
2       Q.  You mentioned that you and A.D. were
3  playing --
4       A.  Can you go back and ask that last
5  question one more time?  I think I
6  misunderstood you, if we wouldn't mind reading
7  it back.
8       Q.  I do know my question.
9           When you take Advil or Excedrin for
10  your headache, are you taking a
11  migraine-specific Advil or Excedrin?
12       A.  I thought you might -- when I initially
13  heard you, I thought you meant prescription.
14  It is called Excedrin Migraine.  Is that what
15  you asked me?
16       Q.  That is what I asked you.
17       A.  Okay.  I'm sorry.
18       Q.  You and A.D. were playing a game that
19  you called "knee hockey" when the ping-pong
20  table fell on you.  Is that K-N-E-E?
21       A.  Yeah.
22       Q.  And what is the game?
23       A.  He has these nets in the bonus room,
24  and it's just a miniaturized hockey stick, and

Page 214

1  I play goalie for him, and he slaps this stupid
2  foam ball at me over and over again, and I've
3  got to stop it from going into the net.  So, in
4  essence, I'm pretty much laying on the floor,
5  kidding around on my knees and defending off
6  his foam ball blasts.
7      Q.  Apart from the headaches that we've
8  just discussed, and the tingling in your left
9  hand, do you have any other physical symptoms
10 that you relate to the injuries you suffered on
11 Flight 2067?
12          MR. McKAY:  As of today?
13          MS. SHELKE:  Yes.
14     A.  No.
15     Q.  Have you sought any counseling or
16 psychological treatment with respect to the
17 incident that occurred on Flight 2067?
18     A.  As of today, no.
19     Q.  Do you plan to?
20     A.  Are you saying "sought"?
21          MR. McKAY:  The question was "sought,"
22 yes.
23     A.  Right then, yes, I have.
24          When you're saying "sought," you mean

Page 215

1  what?  Can you tell me what you mean by
2  "sought"?
3      Q.  Have you --
4      A.  Are you asking me did I make phone
5  calls to make appointments, or are you asking
6  me about actually been with the therapist?
7      Q.  Have you been with the therapist?
8      A.  No.
9      Q.  Have you met with the therapist with
10 respect to any psychological issues?
11     A.  No.
12     Q.  Have you made appointments to see a
13 psychologist or other therapist in the future
14 related to mental health injuries that you
15 suffered on board Flight 2067?
16     A.  I have made calls to get appointments.
17 I cannot get anybody to see me.
18     Q.  What is your understanding as to why
19 you cannot get anybody to see you?
20     A.  This lawsuit.
21     Q.  What do you mean by that?
22     A.  Because I don't want to put somebody in
23 a position where they can independently provide
24 expert statements or testimony, and I've been

Page 216

1  very up front with them, and I told them that
2  what I went through before -- I mean, today,
3  they finally called me back.  I'm trying to
4  tell them that, "Here's why I need to see you,"
5  and they say, "I'm not going to get involved in
6  this."
7      Q.  But A.D. has -- you have made
8  appointments for A.D. that were either with
9  respect to counseling or psychological
10 treatment, correct?
11     A.  Yes.
12     Q.  Okay.  And he has actually met with a
13 counselor and received treatment from a
14 counselor, correct?
15     A.  Define what you mean by "treatment"?
16 These questions are -- they seem to be begging
17 more details.  So if you could just break them
18 into more detail for me.
19     Q.  Well, A.D. is currently seeing a
20 counselor, correct?
21     A.  Yes.
22     Q.  And the counselor's name is?
23          MR. McKAY:  Snider.
24 BY MS. SHELKE:

Page 217

1      Q.  Snider?  Susan Snider?
2      A.  Yes.
3      Q.  How often does A.D. meet with
4  Susan Snider?
5      A.  Now, or are we talking about in the
6  last three years?
7      Q.  Since -- sorry.  I'll break it up.
8          Since March 28th of 2019, has A.D.
9  changed the frequency with which he visits
10 Ms. Snider?
11     A.  Yes, he refused to go initially.  And
12 after a certain amount of cajoling, he had
13 agreed to see her sometime in, probably, I'm
14 going to guess, August.  But he refused until
15 that point.  And then we've been going about --
16 every week and a half to two weeks.  And you're
17 mentioning Susan Snider, but he also sees a
18 psychiatrist, Dr. Wall.
19          MR. McKAY:  And just so you know, I
20 have requested updated records from
21 Ms. Snider and Dr. Wall.  I don't have them
22 yet.
23          MS. SHELKE:  Okay.
24          MR. McKAY:  But you'll get them as soon

PETER DELVECCHIA                                    November 19, 2019

Page 218

1   as I get them.
2           THE VIDEOGRAPHER:  Ten minutes.
3           MS. SHELKE:  Ten minutes.  Okay.
4   Why don't we just take the tape out
5   now, if that's okay.
6           MR. McKAY:  Sure.
7           THE VIDEOGRAPHER:  This concludes disk
8   number 2.  The time is 3:24.
9           (Recess from 3:24 to 3:28 p.m.)
10          THE VIDEOGRAPHER:  This begins disk
11  number 3 in the deposition of
12  Peter DelVecchia.  The time is 3:28.
13  BY MS. SHELKE:
14      Q.  Peter, we were talking about A.D.'s
15  treatment with Ms. Susan Snider.
16          When did A.D. first start meeting with
17  Susan Snider?
18      A.  Almost three years ago when he was in
19  fifth grade.
20      Q.  And what was it that led to A.D.
21  meeting with Susan Snider for the first time?
22      A.  ADHD.
23      Q.  There were some behaviors that you had
24  picked up on that you thought required

Page 219

1   treatment?
2       A.  I just -- we tried for years to get him
3   to focus, and I just couldn't get there.  And I
4   didn't want to -- I'm sounding like a screwball
5   about medications, but I didn't want to put him
6   on medicine.  So we were trying focusing
7   techniques at home that were failing.
8       Q.  Were you also getting complaints from
9   school with respect to A.D. not being able to
10  focus?
11      A.  That question is not on target.  I can
12  elaborate, but it's not a -- it's not a -- I
13  don't mean to be cruel, but it's not really a
14  sensitive question as to what the situation
15  was.  So I can elaborate, if that would help.
16      Q.  That would help.
17      A.  With ADHD people, they -- their
18  behavior is erratic.  And they didn't
19  understand it was ADHD, and his behavior was
20  getting increasingly frustrated and tense,
21  because he couldn't -- he couldn't succeed at
22  school.  And it's something I will take on
23  personally, because I thought I could help him.
24  So their complaint was, "Gee, he's

Page 220

1   misbehaving," but he was misbehaving because
2   they were picking on him about his grades or
3   his inability to sit still, and which is why I
4   ultimately went to see Susan Snider, because it
5   was not controllable anymore.
6       Q.  What grade is A.D. in now?
7       A.  He's in seventh grade.
8       Q.  Did A.D. treat with Ms. Susan Snider
9   through the entirety of his fifth grade?
10      A.  No, it wasn't very long.
11      Q.  How long was it?
12      A.  I'm going to guess maybe six
13  appointments, maybe five.
14      Q.  Did Ms. Snider put A.D. on any
15  medication for his ADHD?
16      A.  She's not allowed to.  She's just a --
17  I know I shouldn't say "just" -- but she is a
18  therapist, and she referred him to Dr. Wall to
19  get the medications.
20      Q.  Did Ms. Snider provide any therapies or
21  behavioral coping mechanisms to A.D. to assist
22  with the ADHD issue?
23      A.  Yes.
24      Q.  So then A.D. saw both Susan Snider and

Page 221

1   Dr. Wall, concurrently?
2       A.  Within the same couple of months, yes.
3       Q.  And apart from prescribing medication,
4   what, if anything, has Dr. Wall done for A.D.?
5       A.  He talks to him a lot.  He talks to him
6   about acceptable behaviors, they both do, and
7   some coping mechanisms, if you will, and
8   focusing, but mostly medication from Dr. Wall.
9       Q.  Do you know what medication Dr. Wall
10  prescribed to A.D.?
11      A.  Yes.
12      Q.  What medication?
13      A.  Is that relevant?  I feel like this is
14  kind of violating my son right now.  Is it
15  really important to know what medication he's
16  on?
17      Q.  I would say so, but I'll leave it to
18  your attorneys to whether you can answer or
19  not.  One of the issues --
20          MR. McKAY:  I think the fact that he's
21  on medication is probably enough, unless
22  you have -- you plan on having some expert
23  say that his condition is related to his
24  medication.

PETER DELVECCHIA                                    November 19, 2019

Page 222

1        MS. SHELKE:  I don't believe that to be
2    the case.
3        MR. McKAY:  Okay.
4   BY MS. SHELKE:
5        Q.  Let me ask you this question:  Has the
6   medication that Dr. Wall prescribed to A.D.
7   changed from when he first started treating him
8   to now?
9        A.  It goes up with his weight.
10       Q.  Apart from with respect to weight, has
11  the medication changed in any way?
12       A.  You mean like change in brands?
13       Q.  Brands, dosage, frequency, adding of
14  medication?
15       A.  No, no, they have -- as a part of ADHD,
16  they have to try different medications out.  So
17  the first month we tried something, and it made
18  him very -- it focused him and fixed the
19  problem, but he was like a zombie.  So we
20  switched to a different dose of that, and then
21  we went to this new medication that has worked
22  extremely well.  And as time has gone on, A.D.
23  has grown significantly, and he's had to up the
24  dosage.

Page 223

1        So, for instance, an example would be,
2   when you see him, and he'll ask, and he'll say,
3   "Well, how long is his focus time?"  And, you
4   know, you'll say, "It's now down to 3:00 in the
5   afternoon."  And he'll say, "All right.  I'm
6   going to up that to get you to five so he can
7   get his homework done."  So those type of
8   discussions about go on, you know, every time
9   we see him.
10       Does that help?
11       Q.  Yes.
12       A.  And, Tara, there's nothing personal.  I
13  just don't like -- I feel like I'm violating my
14  son's privacy.  And if he wants to choose to
15  tell you, then that's fine.  It's just not -- I
16  don't feel it's my place.
17       Q.  Do you attend all of A.D.'s sessions
18  with Ms. Snider?
19       A.  I did until recently, I believe, and
20  then I felt he would benefit from being alone.
21  So it's something she and I mutually agreed
22  upon.
23       Q.  Was there anything in particular that
24  led to you reaching this -- making the decision

Page 224

1   that A.D. would benefit from sessions alone
2   with Ms. Snider?
3        A.  Just the part of helping him to grow up
4   to be independent.
5        Q.  Do you attend all of A.D.'s
6   appointments with Dr. Wall?
7        A.  Yes.
8        Q.  You said that after this incident there
9   was a period of time, from April 2019 until
10  August of 2019, when A.D. refused to see
11  Dr. Snider?
12       A.  Yes.
13       Q.  What is your understanding as to why
14  A.D. refused to see Dr. Snider during that
15  period of time?
16       A.  He didn't want to talk about this.
17       Q.  During the period of time, April 2019
18  through August 2019, did A.D. continue to
19  follow Ms. Snider's recommendations with
20  respect to coping therapies or behavioral
21  therapies that he had previously received from
22  her?
23       A.  Yes.
24       Q.  In one of your answers to

Page 225

1   interrogatories, you indicate that A.D. is now
2   being evaluated for PTSD.
3        When was A.D. first evaluated for PTSD?
4        A.  Can you refer me back to where you are
5   in these answers.
6        Q.  It's Deposition Exhibit Number 1,
7   page 4, question number 9.
8        A.  Thank you.
9        Q.  And it's in the bottom paragraph.
10       A.  Can I read it?
11       Q.  Yeah, take your time.
12       A.  (Reading.)
13       Yes, he was.  He was at the time that I
14  wrote this, yes.
15       Q.  So A.D. -- at the time that you wrote
16  this answer, A.D. was being evaluated for PTSD;
17  is that correct?
18       A.  Yes.
19       Q.  Was he diagnosed with PTSD.
20       A.  They're not sure yet, they said.
21       Q.  When you say "they," who are you
22  referring to?
23       A.  Well, Dr. Wall believes he is suffering
24  with it.  And Susan Snider believes he is not.

PETER DELVECCHIA                                    November 19, 2019

Page 226
1  She believes he's traumatized in a certain way,
2  but she basically said he's strong, and he'll
3  fight through it, so...
4        And I will say that neither of them are
5  PTSD experts.  I have been trying to get him in
6  to see somebody, for a while, that specializes
7  in this, but it's the same problem that I'm
8  facing myself, in that nobody wants to see him
9  because of this lawsuit, and this has been
10 going on for a while.
11      MR. McKAY:  I'm not sure that's
12      entirely accurate.  There's also quite a
13      backlog, apparently.  Calls that I have
14      made, they say there's like a two-month,
15      three-month backlog before you can get in
16      to see anybody.
17      THE WITNESS:  Yeah, I wasn't talking
18      about your calls.  I was talking about the
19      people that Susan has tried to reach, or
20      give me numbers of, and they want to see
21      him.
22 BY MS. SHELKE:
23      Q.  Your answer to interrogatory number 9
24 on page 4 of Deposition Exhibit Number 1 refers

Page 227
1  to A.D. having nightmares.
2        When did A.D. develop nightmares
3  relative to the incident that occurred on
4  Flight 2067?
5        A.  He will not talk about it.  So he has
6  had nightmares since it happened.  He generally
7  does not want to talk about it.  He's a rather
8  stoic kid, and he just doesn't want to speak
9  about it.  But I guess I didn't understand the
10 severity of it until sometime in August when
11 they began to get more and more frequent and
12 louder, and that's when I got really alarmed.
13      Q.  So although A.D. will not talk about
14 his nightmares, you are aware of them, because
15 you hear something in the middle of the night?
16      A.  There's a lot of screaming going on.
17 And he -- in August, he finally told me that he
18 was having dreams that -- and I don't know what
19 he's going to tell you tomorrow, because he's
20 not -- he's not very forthcoming, but he told
21 me he was having dreams frequently that I was
22 being handcuffed and taken away forever.
23      Q.  To the best of your recollection, when
24 did you first understand that A.D. was

Page 228
1  suffering nightmares?
2        A.  I knew it from the time it happened.
3  He just didn't want to talk, and I'm not one of
4  these parents that's going to bully their
5  children into a therapy appointment.
6        Q.  In the therapy sessions that you have
7  sat in on between A.D. and Ms. Snider, has A.D.
8  discussed his nightmares?
9        A.  Well, I stepped out of the room.  He
10 told me he did, yes.
11      Q.  Do you know if A.D. has discussed his
12 nightmares with Dr. Wall?
13      A.  He did briefly, yes.
14      Q.  You also mention in your answer to
15 interrogatory number 9, in Deposition Exhibit
16 Number 1, that A.D. suffers from sleeplessness.
17      To the best of your recollection, when
18 did A.D.'s sleeplessness begin?
19      A.  It's been sporadic since the flight.
20      Q.  Has he --
21      A.  I'm sorry.  And, I mean, he's a
22 12-year-old boy, and he's knocking on my door
23 in the middle of the night, asking me if he can
24 sleep in my room, because he's scared, and it's

Page 229
1  been going on a lot, and that has been
2  discussed with Susan Snider and Dr. Wall.
3        Q.  Has A.D. been prescribed any medication
4  with respect to the restlessness?
5        A.  Dr. Wall wants to give him something
6  for nightmares, and I do not want him taking
7  it.
8        Q.  Has either Dr. Wall or Ms. Snider given
9  A.D. any coping mechanisms with respect to his
10 sleeplessness?
11      A.  Yes.  And let me -- and, Tara, if you
12 don't mind, the medicine that Dr. Wall wants to
13 give him has very serious side effects.  It's
14 not that I'm resisting it.  I'm asking them to
15 find something that's not going to affect his
16 life and drag him down.
17      Q.  If you'll turn to page 6 of 10 in
18 Deposition Exhibit Number 1, question
19 number 15.
20      A.  Uh-huh.
21      Q.  After the objection, there's a part
22 that begins:  "Plaintiff states:  In multiple
23 statements made by the flight attendants, they
24 identified us as unusual and decided to keep an

U.S. Legal Support, Inc.
(312) 236-8352

PETER DELVECCHIA                                    November 19, 2019

Page 230

1  eye on us, simply because I am white and my son
2  is black."
3         Do you see that sentence?
4     A.  Yes.
5     Q.  What statements are you referring to
6  there?
7     A.  I have been provided the statements
8  that were given by the flight attendants,
9  either to the police or to Frontier, and they
10 have been redacted, but the way it read is that
11 we appeared to be unusual.  Obviously, we're
12 unusual.  But they had identified us as unusual
13 and decided to keep an eye on us.  And perhaps
14 this is a bit of emotion, but I'm pretty sure
15 it's because I'm white, and my son is black; or
16 because I'm in my fifties, and he's 12.
17 Whatever the reason is, there was an
18 unspecified concern.
19        I mean, I think something John and I
20 talked about, one of them had said that I put
21 my hand on his face.  And if that's enough to
22 cause concern, that's absolutely shocking to
23 me, because I dare any parent not to touch
24 their child's face or head.

Page 231

1         THE WITNESS:  Is that okay?
2         MR. McKAY:  Yeah, yeah, that's fine.
3  BY MS. SHELKE:
4     Q.  What is your understanding of the
5  captain's role in this incident?
6     A.  Negligence.
7     Q.  Can you elaborate on that?
8     A.  He failed to exercise due care.  I am
9  going to make the assumption that Mr. Warner,
10 whatever his name was, was not a balanced human
11 being, and he allowed him to remove my son, put
12 him to the back of the plane, have me arrested
13 and assault me.  And if the captain is in
14 charge of the ship, he didn't do his job.
15    Q.  What is your understanding of the first
16 officer's role in this incident?
17    A.  Pretty much the same.
18        THE WITNESS:  Is that okay?
19        MR. McKAY:  (Nodding head.)
20    A.  Can I give an opinion on this?
21    Q.  Sure.
22    A.  It's really simple had somebody just
23 gone out and asked what was going on.  A
24 two-second question, if my son is okay, was

Page 232

1  never even afforded.  Nobody came over except
2  for -- and I'm basing this off the statements
3  that I've read, because it seems like
4  everything was left to Scott to do.  Nobody
5  bothered to exercise a moment of thought as to
6  the damage, the incredible damage that was done
7  to two people.  The simple question, "Is
8  everything okay?" would have afforded them.
9  And those type of courtesies don't seem
10 difficult to me to exercise.
11        But the way that the statements read,
12 is that somebody complained I had my hand on my
13 son's face, this guy claims my hand was in his
14 crotch, and, boom, we're damaging two people.
15 It doesn't take a lot to exercise care.
16        And the more I personally think about
17 my son having a coat stretched on him, and how
18 ludicrous this whole thing is, amazes me that
19 nothing else was done to ensure that it did not
20 hurt my son.  And I am left holding a bag now
21 of a kid that can't recover from this, and I am
22 not recovering from it.
23        And it's just incredible to me that a
24 captain, who is supposedly a seasoned pilot,

Page 233

1  and I've seen his record -- I mean, it was sent
2  to me the other day -- he's not a fool.  He's a
3  pilot.  You just randomly allow somebody to
4  exercise their judgment and put two people in
5  harm's way the way you did, no, I don't think
6  the pilot is free of guilt in this one.  Nor do
7  I think the copilot is, or whatever you call
8  him, the first officer.  Nor do I think any of
9  the other flight attendants are.
10        So I'm sorry, that's just the way I
11 feel.  And that's not directed at you.  I'm
12 sorry.  I'm just -- I'm just a little upset
13 about it.  I do apologize.  It's very
14 upsetting, because my son is hurt.
15    Q.  One of the allegations in this lawsuit
16 is the damage to your reputation as a result of
17 this incident.
18        Can you tell me how this incident has
19 damaged your reputation?
20    A.  Well, we can start with what happened
21 on the plane.  Scott Warren made sure that
22 everybody was in earshot and heard what was
23 going on and removed my child.  It's been put
24 into the newspaper.  How it got there, I don't

PETER DELVECCHIA                                    November 19, 2019

Page 234

1  know what the process is.  But I've had
2  multiple phone calls about this.  And whichever
3  way this goes now, there's a -- it's in the
4  press.  There is a child abuse claim in the
5  newspaper on me.  I make my living off of my
6  reputation.  It is what I have.  My work is
7  investigations to state boards.  I have spent
8  almost 20 years of my life investigating
9  people, where my integrity has been beyond
10 reproach, and these people have damaged it with
11 one stupid, negligent, unprofessional act.  So,
12 yes, I think I'm hurt.
13     Q.  On the plane, were you ever identified
14 by your name?
15     A.  Nope, not that I know of.
16     Q.  On the plane, was A.D. ever identified
17 by his name?
18     A.  Not that I know of.
19     Q.  You said that there were articles in
20 the newspaper.  Are you referring to any
21 articles in your local newspaper?
22     A.  Yes.
23     Q.  What newspaper is that?
24     A.  I don't remember the specific names.

Page 235

1  One is in Charlotte.  There are several in
2  Las Vegas.  There was one I saw in Texas.
3  There was -- I think one was this Washington.
4  I counted over 20 references to articles on
5  this.
6      Q.  Were all the articles that you just
7  referenced online, or were some of them in
8  print as well?
9      A.  I can't -- I don't know if they're in
10 print.  I just googled my name.
11     Q.  So to be clear, you googled your name
12 and saw various news articles that referenced
13 this incident?
14     A.  Yes.  And the reason I googled it is
15 somebody called me and asked me if I was okay.
16     Q.  Who called you?
17     A.  I don't remember.  It was one of my
18 coworkers.
19     Q.  You said that as a result of -- you
20 said that as a result of the media coverage of
21 this incident, you received phone calls.  Who
22 did you receive the phone calls from?
23     A.  I received phone calls from my family
24 members.  I tried to cut that off and talk to

Page 236

1  my sisters beforehand.  I received calls from
2  several coworkers.  I believe there was a
3  couple of A.D.'s hockey parents.  It was quite
4  a few.  It was a dizzying day of people
5  mentioning it.  The vice president, who was one
6  of my direct superiors, knows about it.  My
7  understanding is, the person who was one of the
8  top five people at the AICPA, knows about it.
9  And then it has circulated within the AICPA.
10 That's my understanding through secondhand.
11     Q.  Do you know if any of A.D.'s parents --
12 A.D.'s friends have discussed this incident
13 with him?
14     A.  With him, I do not know.
15     Q.  Very early on in the deposition you
16 made the statement that A.D. blames himself and
17 wishes he were not adopted.  Do you remember
18 that?
19     A.  Uh-huh.
20     Q.  In what context did that come about?
21     A.  In context to this incident with the
22 airline.
23     Q.  When did A.D. first tell you that he
24 was blaming himself for this incident?

Page 237

1      A.  In Death Valley.
2      Q.  Why do you believe A.D. was blaming
3  himself for this incident?
4      A.  Because he's black.
5      Q.  Any other reasons?
6      A.  Nope.  At least, that's when he told me
7  in the beginning and after it happened, that if
8  I had not adopted him, we would never have
9  ended up with any of these troubles.
10     Q.  Since this incident, have you spoken
11 with any passengers on board Flight 2067?
12     A.  I was there at the deposition of
13 Chris --
14     MR. McKAY:  Campbell.
15     A.  -- Campbell.
16     Q.  Apart from Mr. Campbell's deposition,
17 have you spoken with any other passengers?
18     A.  No.
19     MS. SHELKE:  That's all the questions
20 that I have, but Mr. McKay may have some
21 follow-up.
22     MR. McKAY:  Yeah, let's take a quick
23 break.  Let's find out what the situation
24 is.  Let's take a quick break.

PETER DELVECCHIA                                    November 19, 2019

Page 238

1        THE VIDEOGRAPHER:  Off the record at
2    3:52.
3        (Recess from 3:52 to 4:04 p.m.)
4        THE VIDEOGRAPHER:  Back on the record
5    at 4:04.
6             EXAMINATION
7    BY MR. McKAY:
8    Q.  Peter, I just have a couple of
9    questions for you.
10        Ms. Shelke asked you to go through,
11   extensively, Deposition Exhibit 2.
12        And these are notes that you have done
13   over a period of time?
14   A.  Yes.
15   Q.  And what was the basis for doing that?
16   A.  It started as a way of my helping A.D.
17   cope.  So when -- he had these frequent
18   questions about why all this happened, and as I
19   said, he was blaming himself, initially, quite
20   a bit.
21        So my memory was so horrible about
22   it -- and it depends on who you ask.  If you
23   would ask Gayle and Amanda, they would tell you
24   that since I got off that flight, I've had

Page 239

1    memory issues.  And I can only tell you that --
2    there's probably a certain element of truth to
3    that; although, I don't want to admit it.  It
4    could be age.  But the -- the -- I cannot
5    remember what happened.
6        So every time I would remember
7    something, I would, you know, run over to my
8    hand notes and jot it down, and then try to put
9    it onto this list, and then talk about it, and,
10   you know, say, "Hey, you know, A.D., I do
11   remember -- you know, don't forget that this
12   happened, and that was not your fault."  And
13   over time, as this progressed, I also started
14   saying, you know, "I can't remember anything,"
15   and then I started to add the notes in
16   preparation for this.
17   Q.  When you write something down,
18   though, that's because you do have a memory at
19   that point?
20   A.  Yes.
21   Q.  And is it a case of memories coming and
22   going?
23   A.  No, I'm pretty firm now.  Once -- I'm
24   very visual and -- like when Tara was asking me

Page 240

1    questions here, I was actually running through
2    what I remember seeing in my head.  And the
3    more I can focus on it, the better grasp I'm
4    getting on it.
5        So a lot of times, they were actually
6    triggered by A.D., where he'd say, "Hey, I
7    remember this."  And then I would say, you
8    know, "Give me a little while," and I could
9    start to piece things together again.  And then
10   I wrote it down, and then I would put it to my
11   computer notes.
12   Q.  Okay.  And as you have seen things in
13   your head and pieced them together and put them
14   into your notes, do you feel that those
15   memories, as reflected in your notes, are
16   accurate?
17   A.  One hundred percent accurate.
18   Q.  Okay.
19   A.  I have no doubt they're accurate.
20   Q.  You talked a little bit about sleeping
21   aids or pills.  I don't know whether we used
22   both terms, but I just wanted to clarify.
23        When you take something to help you
24   sleep, normally, is it a prescribed medication,

Page 241

1    or something that you buy at the drugstore?
2    A.  Until recently, I have never taken any
3    prescribed sleep aid.  So they are generally
4    picked up at the drugstore or the grocery.  I
5    will tell you I never go more than one quarter
6    of the dose on the package.  And I've taken
7    Benadryl to help me, Advil PM, you know, things
8    like that, the most gentle things I can find.
9    Q.  Okay.  And so if the -- if the box has
10   a recommended dosage, then you would take a
11   fourth of that?
12   A.  Yes.
13   Q.  Okay.  And that's what you did on the
14   night of the flight?
15   A.  Yes.
16   Q.  Okay.
17   A.  And I just want to add something.
18   Q.  Yes.
19   A.  I deliberately only packed a quarter of
20   a dose.  So I tucked a half of a pill into my
21   pocket, which the dosage was two pills, and I
22   remember sliding the pill in my pocket as we
23   were leaving, and I broke it in half and put it
24   in my pocket.

PETER DELVECCHIA                                    November 19, 2019

Page 242

1    Q.  Okay.  I want to direct your attention
2  to question 3 -- or answer 3, in Exhibit 1,
3  which are your answers to interrogatories.  And
4  that's where you mention Scott, and then you
5  also say another flight attendant.  Do you see
6  that?
7    A.  Yes.
8    Q.  Okay.  And then you testified about a
9  white gentleman in a white shirt.  Is that who
10  you were referring to in that answer?
11    A.  Yes, the same person who sat on the
12  aisle seat next to A.D., or near A.D., and the
13  same person who I believe accompanied Scott to
14  his assault.
15    Q.  Okay.  So you thought at some point
16  that that was a flight attendant?
17    A.  I would say with certainty it was, but
18  A.D. does not agree with me.
19    Q.  Okay.  You referred to Scott at one
20  time, in response to Ms. Shelke's questions, as
21  an "animal."
22    A.  Yeah.
23    Q.  Can you elaborate on what you meant by
24  that?

Page 243

1    A.  I just felt he did not possess any
2  human compassion.
3    Q.  Okay.
4    A.  I would equate -- can I elaborate?
5    Q.  Sure.  Sure.
6    A.  He was like a dog that you get angry
7  and finally gets free of the fence and he comes
8  after you.  There was this anger and this
9  hostility and this absolute malice that
10  accompanied every movement in his body and
11  everything he did.  Even when he came out of
12  the galley to confront me, the smile on his
13  face was distorted and sick.  It was just a
14  horrible, creepy feeling of this human being.
15    Q.  And in describing that, you also said
16  at one point that it got to you to the point
17  you didn't even want to bring A.D.'s shoes
18  back.  Do you remember saying that?
19    A.  Yes.
20    Q.  And is that because of the hostility
21  that Scott displayed towards you?
22    A.  Yes.
23    Q.  When you talked about bringing his
24  shoes back, that was because he had left them

Page 244

1  in row 17, when he had been taken out?
2    A.  Yes.
3    Q.  Okay.  You mentioned an incident at the
4  Wilmington movie theater in which some officers
5  came.  Do you remember that?
6    A.  Yes.
7    Q.  And I believe you said that the seating
8  in the theater was in two different sections?
9    A.  Yes.
10    Q.  And that's where -- was that one of
11  those -- was that one where you sort of have to
12  climb up to the upper section?
13    A.  Yes, there's like an aisle.  It was a
14  wide aisle, and down here are the neck-breaker
15  seats, as we talk about, because you've got to
16  look straight up at the movie screen.
17    Q.  Yeah.
18    A.  And up here, you've got to climb a
19  bunch of steps to get further up.
20    Q.  Could the people who were in the
21  up-here section see the people who were in the
22  neck-breaker section?
23    A.  I would imagine if you got up out of
24  your seat and stood up, you could probably look

Page 245

1  over the backs of the seats, but, otherwise, I
2  would think the back of the seat would be in
3  the way.
4    Q.  Okay.  So you --
5    A.  And it was dark.
6    Q.  Okay.  So you testified that the only
7  other people who were down in that neck-breaker
8  section with you were a black couple?
9    A.  Yes.
10    Q.  Did you think that they were the ones
11  that had complained to the police about you and
12  your son?
13    A.  They're the only people I can think of.
14    Q.  Okay.  And why?  Why are they the only
15  people you can think of?
16    A.  Because the person complained that I
17  was holding his hand, and my hand was resting
18  on his leg.  And I can't imagine that anybody
19  could have seen me holding his hand through the
20  back of the seat from an upper section.  I
21  mean, I'm not -- you know, I'm not a physics
22  major.  I don't know the rate of decline, or
23  the ability to see, but, you know, he's got my
24  hand on the armrest, and he's got my hand like

PETER DELVECCHIA                                    November 19, 2019

Page 246

1  this, like that, and it's hitting his thigh.  I
2  can't remember anybody else that would have
3  seen this other than the couple that was next
4  to us.
5      Q.  And that would be consistent with the
6  other incidents where people of color have
7  complained about you being with your son?
8      A.  Either complained to -- yes, yeah,
9  or --
10     Q.  Either to your face or to law
11 enforcement?
12     A.  Yes.
13     Q.  Okay.  You testified earlier that when
14 the plane landed, and you tried to get in touch
15 with your daughters, you wanted them to stand
16 by in case things got bad or worse.
17         What specifically were you thinking,
18 based on what had happened up to that point on
19 the flight, what did you think was a
20 possibility that would require their
21 involvement?
22     A.  I'm on a plane, and I think it's fairly
23 common knowledge that if you act up on a plane,
24 you have a problem.  And this -- I didn't know

Page 247

1  what type of lies Kevin -- or Scott Warren --
2  might have told.  I felt like there was an
3  assortment of lies.  I felt like he was so
4  malicious that it would have gone to ridiculous
5  lengths.  And as my head started to clear up, I
6  started to say to myself, "I have no idea what
7  I'm in the middle of right now."
8      Q.  Did you think you might end up in jail?
9      A.  Yes.
10     Q.  And that your son would have to be
11 picked up by your daughters because you were
12 incarcerated?
13     A.  Yes.
14     Q.  When you came back after the trip to
15 Death Valley, and you were going to be flying
16 home on Frontier, you testified that you went
17 to the counter and asked them to confirm that
18 the same flight attendant wouldn't be on the
19 flight.  Do you remember that?
20     A.  Yes.
21     Q.  And because he had only given his name
22 as Kevin, which was a false name, that's the
23 name you gave to them?
24     A.  Yes.

Page 248

1      Q.  And they confirmed to you that there
2  would be no Kevin on the flight?
3      A.  No, they handed me a number on a card.
4      Q.  Okay.  And somebody else --
5      A.  And then I called, and they had me on
6  hold forever and told me there was no Kevin.
7      Q.  Okay.  But if they were looking through
8  records to determine that there was no Kevin on
9  the flight, actually, there could have been a
10 Scott Warren on the flight, couldn't there?
11     A.  Yes.
12     Q.  And so under those circumstances, you
13 could have ended up back in the air again with
14 your son and Scott Warren trapped on an
15 airplane?
16     A.  And lost my son, yes.
17     Q.  Okay.  And I think, finally, I wanted
18 to ask you:  How many therapists have you
19 called trying to get an appointment to be seen
20 for the circumstances that you've had after the
21 flight?
22     A.  I believe it's seven.
23     Q.  Seven different therapists?
24     A.  (Nodding head.)

Page 249

1      Q.  And they've all been local therapists?
2      A.  Yes.
3      Q.  And they've been people that were --
4  you were referred to?
5      A.  Yes.
6      Q.  And they've all told you that they are
7  not able to see you for one reason or another?
8      A.  Yes.
9      Q.  Okay.
10         MR. McKAY:  That's all I have.
11             EXAMINATION
12 BY MS. SHELKE:
13     Q.  I have one quick follow-up question.
14         You said that you've called seven
15 different therapists, and that they were all
16 people to whom you were referred.
17         Who referred you to these seven
18 therapists?
19     A.  Susan Snider.  The person I'm seeing,
20 Alexis, referred me to two, and the rest of
21 them, I think came from Susan Snider or -- I
22 don't remember any of the other names.  They
23 were just on a list of names, and, you know,
24 they may have been referred as part of A.D.

PETER DELVECCHIA                                          November 19, 2019

Page 250

```
1      Q.  And so when you say "referred," they're
2   actually just recommendations, recommended
3   people that you would call?
4      A.  If that's a better word, maybe, yes.
5      Q.  Okay.
6      A.  That's possible, yes.
7         MS. SHELKE:  Okay.  Thank you.
8         MR. McKAY:  Okay.  If that's all, then
9   we will read and sign, please.
10        THE VIDEOGRAPHER:  This concludes the
11  deposition of Peter DelVecchia.  The time
12  is 4:18.
13        MS. SHELKE:  And I will take a PDF with
14  exhibits.
15        (Deposition concluded at 4:18 p.m.)
16        (Signature reserved.)
17
18
19
20
21
22
23
24
```

Page 251

```
1           REPORTER'S CERTIFICATE
2   NORTH CAROLINA  )
3   WAKE COUNTY     )
4         I, Denise Y. Meek, a Court Reporter and
5   Notary Public in and for the State of North Carolina,
6   do hereby certify that there came before me on
7   Tuesday, November 19, 2019, the person hereinbefore
8   named, who was by me duly sworn to testify to the
9   truth and nothing but the truth of his knowledge
10  concerning the matters in controversy in this cause;
11  that the witness was thereupon examined under oath,
12  the examination reduced to typewriting under my
13  direction, and the deposition is a true record of the
14  testimony given by the witness.
15        I further certify that I am neither attorney
16  or counsel for, nor related to or employed by, any
17  attorney or counsel employed by the parties hereto or
18  financially interested in the action.
19        IN WITNESS WHEREOF, I have hereto set my
20  hand, this 3rd day of December, 2019.
21        _____
                   DENISE Y. MEEK
22                 Court Reporter/Notary Public
                   State of North Carolina
23
    COMMISSION:  201519500202
24  EXPIRATION:  July 8, 2020
```

Page 252

```
1                      ERRATA SHEET
2   CAPTION:  Peter DelVecchia vs. Frontier Airlines
3   JOB NO.:  855246
4         I, the undersigned, PETER DELVECCHIA, do hereby
    certify that I have read the foregoing deposition,
5   and that, to the best of my knowledge, said
    deposition is true and accurate with the exception of
6   the following corrections:
7   PAGE LINE CORRECTION AND REASON THEREFOR
8   ____:____:_____
9   ____:____:_____
10  ____:____:_____
11  ____:____:_____
12  ____:____:_____
13  ____:____:_____
14  ____:____:_____
15  ____:____:_____
16  ____:____:_____
17  ____:____:_____
18  ____:____:_____
19  ____:____:_____
20  ____:____:_____
21  ____:____:_____
22
23
24  _____        _____
    Date                     Peter DelVecchia
```

U.S. Legal Support, Inc.
(312) 236-8352

PETER DELVECCHIA                                      November 19, 2019

PETER DELVECCHIA                                      November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                      November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                      November 19, 2019

PETER DELVECCHIA                                        November 19, 2019

PETER DELVECCHIA                                        November 19, 2019

PETER DELVECCHIA                                        November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                        November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                          November 19, 2019

PETER DELVECCHIA                                      November 19, 2019

PETER DELVECCHIA                                          November 19, 2019

PETER DELVECCHIA                                          November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                    November 19, 2019

PETER DELVECCHIA                                        November 19, 2019

PETER DELVECCHIA                                     November 19, 2019