## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF NEVADA
 3   PETER DELVECCHIA, et al.,
 4              Plaintiffs,
 5       vs.              CASE NO. 2:19-CV-01322-KJD-NJK
 6   FRONTIER AIRLINES, INC., et al.,
 7              Defendants.
 8   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 9
10                  DEPOSITION OF
11               SCOTT ALEXANDER WARREN
12
13               December 13, 2019
14                   10:09 a.m.
15
16             9950 West Cheyenne Avenue
                 Las Vegas, Nevada
17
18
19
20        Gary F. Decoster, CCR No. 790
21
22
23
24
25
```

## Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3   For the Plaintiffs:
 4              PARK AVENUE LAW LLC
                JOHN D. McKAY, ESQ.
 5              127 West Fairbanks Avenue
                Suite 519
 6              Winter Park, Florida  32789
                800.391.3654
 7              johndmckayatty@gmail.com
 8
 9   For the Defendants:
10              ADLER MURPHY & McQUILLEN LLP
                BRIAN T. MAYE, ESQ.
11              20 South Clark Street
                Suite 2500
12              Chicago, Illinois  60603
                312.345.0700
13              312.345.9860  Fax
                bmaye@amm-law.com
14
15   Also Present:  PETER DELVECCHIA
16                  MONICA HAYWORTH, VIDEOGRAPHER
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1              INDEX OF EXAMINATION
 2
 3   WITNESS:  SCOTT ALEXANDER WARREN
 4
 5   EXAMINATION                          PAGE
 6   By Mr. McKay                          5
 7   By Mr. Maye                          --
 8
 9
10
11
12
13
14
15              INDEX TO EXHIBITS
16                                      Initial
     Plaintiffs'      Description      Reference
17
18   Exhibit 1  Plaintiffs' Notice of Deposition    9
                of Scott Warren
19
     Exhibit 2  Employee performance record        90
20
     Exhibit 3  Employee training record           98
21
     Exhibit 4  LVMPD Voluntary Statement          99
22
     Exhibit 5  E-mail to Jason B. Grimes from     120
23              Scott Warren dated April 17, 2019
24
25
```

## Page 4

```
 1   Video Deposition of Scott Alexander Warren
 2              December 13, 2019
 3          (Exhibits 1 through 5 marked.)
 4                 *   *   *
 5       THE VIDEOGRAPHER:  This is Media No. 1 to the
 6   video recorded deposition of Scott Warren in the
 7   matter of Peter Delvecchia, et al., versus Frontier
 8   Airlines, Incorporated, et al., being heard before the
 9   United States District Court for the District of
10   Nevada, Case No. 2:19-CV-01322-KJD-NJK.
11       This deposition is being held at Titolo Law
12   Office, 9950 West Cheyenne Avenue, Las Vegas, Nevada,
13   starting at 10:09 a.m.
14       My name is Monica Hayworth, and I'm the
15   videographer.  The court reporter is Gary Decoster
16   with Esquire Deposition Solutions.
17       Counsel, will you please introduce
18   yourselves, and affiliations, and the witness will
19   then be sworn.
20       MR. MCKAY:  My name is John McKay.  I am the
21   counsel for the plaintiffs, Peter Delvecchia and A.D.
22       MR. MAYE:  Brian Maye for Frontier Airlines.
23       THE VIDEOGRAPHER:  Thank you.
24       THE COURT REPORTER:  Sir, would you raise
25   your right hand?
```



Page 5

1           *   *   *
2          SCOTT ALEXANDER WARREN, having been first
3   duly sworn, was examined and testified as follows:
4                  EXAMINATION
5   BY MR. MCKAY:
6       Q.   Good morning.  Would you state your full
7   name, please?
8       A.   Scott Alexander Warren.
9       Q.   Have you ever been known by any other name?
10      A.   No.
11      Q.   Have you ever had your deposition taken
12   before?
13      A.   No.
14      Q.   Okay.  I'm just going to tell you a little
15   bit about the proceeding so that you understand it.
16   Be -- feel free, I should say, to ask any questions.
17          This is a court proceeding even though it's
18   not held in a courthouse or a courtroom.  We're here
19   at a lawyer's office, but that's pretty common for
20   depositions.
21          Depositions are adjuncts to ongoing court
22   proceedings, and this one happens to be in the federal
23   court here in Las Vegas.
24          The court reporter is authorized by the court
25   to administer oaths just like an oath would be

Page 6

1   administered in the courtroom, and the questioning
2   that we have today will be basically the same as it
3   would occur if you were sitting in court in front of a
4   judge and possibly a jury.
5          It's important to understand that the oath
6   has just as much power here as it does in a courtroom,
7   so the penalties for perjury, both federal and state,
8   are applicable to this proceeding and so there can be
9   prosecution for perjury if there is any failure to
10   tell the truth; is that all understood?
11      A.   Yes.
12      Q.   Okay.  Now, we will try to take breaks on the
13   hour, but if for any reason whatsoever you want to
14   take a break prior to the hour, just say so.  The only
15   thing I ask is that there not be a pending question at
16   a time when we take a break.
17          Other than that, though, we're pretty
18   flexible as far as, you know, taking breaks.  We don't
19   want to, you know, keep you here for any longer than
20   we need to.
21          And I just want to make sure that you
22   understand that the -- not only is there a videotape
23   going on, but there's also stenographic court
24   reporting, and the gentleman at the end is doing his
25   best to take down every word that's spoken here in the

Page 7

1   room when we are on the record, as we are now, and
2   it's very important, to assist him in that process,
3   that we remember a couple of things.
4          One is that it's virtually impossible for him
5   to accurately transcribe when two people are talking
6   at the same time, so we have to be a little bit
7   artificial in our discussion in the sense that you
8   have to wait until I'm finished asking a question
9   before you answer it and I will wait for you to
10   complete your answer before I begin another question;
11   is that understood?
12      A.   Yes.
13      Q.   Okay.  And the last thing, which you've been
14   very good about so far, is that we have to make sure
15   that we always use words rather than things like a
16   shrug of the shoulders, a nod of the head or an um-hum
17   because those can be ambiguous as far as the written
18   transcript goes, okay?
19      A.   Yes.
20      Q.   Okay.  Now, one of the plaintiffs in this
21   case is the son of Mr. Delvecchia, and because he's a
22   minor and because of the law with respect to naming
23   minors in lawsuits, we will be referring to him by his
24   initials A.D., is that okay?
25      A.   Yes.

Page 8

1       Q.   All right.  So if I mention A.D., then I am
2   referring to Peter's son.
3          Now, what is your residence address, sir,
4   currently?
5       A.   ████████████████████
6       Q.   Is that Mills, M-I-L-L-S?
7       A.   Nellis, N-E-L-L-I-S.
8       Q.   I'm sorry, N-E-L-L-I-S Boulevard, and is that
9   in Las Vegas?
10      A.   Yes.
11      Q.   Okay.  And what's the ZIP there?
12      A.   89120.
13      Q.   Is there any unit number or anything like
14   that?
15      A.   236.
16      Q.   Thank you.
17          Who do you live there with?
18      A.   I live by myself.
19      Q.   Do you have any family of any type here in
20   Las Vegas?
21      A.   No.
22      Q.   And for a work address, is that the McCarran
23   Airport?
24      A.   Yes.
25      Q.   Who is your immediate supervisor there?



SCOTT ALEXANDER WARREN                                    December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 9

1    A.  Her name is Corazon, and honestly I can't
2  think of her last name right now.
3    Q.  Okay.  Is she in charge of flight attendants?
4    A.  Yes.
5    Q.  Okay.  And just for identification purposes,
6  what are the last four digits of your Social Security
7  number?
8    A.  8060.
9    Q.  Thank you.
10       I'm going to show you now what's been
11  premarked as Warren Deposition Exhibit 1, and that is
12  the notice of deposition.  That's the formal document
13  served in the case to set up this deposition, and part
14  of it that was accepted by your counsel was -- is the
15  page you're on now, the subpoena.
16       And if you turn to that page, you'll see
17  there's two check marks on the left side, and the
18  second one describes certain materials, such as notes,
19  memoranda, that sort of thing; have you seen that
20  before?
21    A.  Yes.
22    Q.  Okay.  And did you understand, reading that,
23  what types of materials were being requested?
24    A.  Yes.
25    Q.  Okay.  Did you conduct a search for any

Page 10

1  similar -- any such materials?
2    A.  Yes.
3    Q.  All right.  And did you find any?
4    A.  No.
5    Q.  Okay.  So is it your testimony that you have
6  no written notes referring to the events that are
7  outlined in the complaint?
8    A.  I do not have any, no.
9    Q.  Okay.  Now, did you, in preparation for your
10  deposition today, review anything?
11    A.  Yes, I went online and just went over -- we
12  had a recent -- well, earlier this year, we had their
13  must reads, just updates that we need to read, on
14  sexual misconduct.
15    Q.  Okay.  And I think I may have a copy of what
16  you're referring to, so let me just find it and we'll
17  ensure that you're talking about the document that I
18  think you're talking about, all right?
19       This has been previously marked as Bond
20  Deposition No. 5.  It's marked with Delvecchia
21  Frontier Bates No. 0123 and 0123 -- I'm sorry, and
22  0124.  Is this the deposition that you reviewed?
23    A.  Yes, this is it.
24    Q.  Okay.  All right.  Thank you.  And is that
25  the only thing that you reviewed online?

Page 11

1    A.  Yes.
2    Q.  Okay.  Did you meet with Mr. Maye prior to
3  today's deposition?
4    A.  Yes.
5    Q.  Okay.  Was that yesterday?
6    A.  Yes.
7    Q.  All right.  Was that at the -- was that at a
8  law office here in town?
9    A.  No.
10    Q.  Okay.  Where did you meet, at your house?
11    A.  At a Starbucks.
12    Q.  Okay.  And how long did you meet with him?
13       MR. MAYE:  Object to form, also
14  attorney-client privilege.
15       MR. MCKAY:  Well, the time that you met with
16  him isn't privileged.  I think you --
17       MR. MAYE:  I don't know why you'd ask how
18  long we met, but you can answer.
19       THE DEPONENT:  It was about two hours long.
20  BY MR. MCKAY:
21    Q.  All right, thank you.
22       Other than Mr. Maye or anybody that works at
23  his office, have you communicated with anyone else in
24  the past month about the subject matter of this
25  lawsuit?

Page 12

1    A.  Yes, I flew with the captain, and it was very
2  brief, but he asked did I get a phone call from a
3  lawyer, I said yes, and that was the end of the
4  discussion.
5    Q.  Okay.  This was Captain Shupe?
6    A.  I know his first name is Rex.  I don't know
7  his last name.
8    Q.  Yes, okay.  All right.  And when was that?
9    A.  I do not know the date.
10    Q.  Okay.  Can you -- was it like last week, two
11  weeks ago, a month ago?
12    A.  Within the past month.
13    Q.  Within the past month, okay.
14       Do you remember where you were going on that
15  flight?
16    A.  No.
17    Q.  And was there anything more to the
18  conversation than what you've related?
19    A.  No.
20    Q.  Okay.  I presume he recognized you?
21    A.  Yes.
22    Q.  Okay.  All right.  Did you say anything to
23  him other --
24    A.  No.
25    Q.  Okay.  When is the last time that you



SCOTT ALEXANDER  WARREN                                  December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

---

Page 13

1  communicated in any fashion with Chelsea Bright?
2      A.  We flew together, it was more than a month
3  ago, but it was basically the same conversation, did
4  you get a call from a lawyer, yes, I did.
5      Q.  And you didn't discuss anything more?
6      A.  No.
7      Q.  Okay.  When is the last time that you
8  communicated in any fashion with Anna Bond?
9      A.  I did not communicate with her.
10     Q.  Okay.  When is the last time you communicated
11  in any fashion with Amanda Nichol?
12     A.  I have not communicated with her.
13     Q.  And when is the last time you communicated in
14  any fashion with first officer Shawn Mullin?
15     A.  I did not communicate with him.
16     Q.  All right, let me just get some biographical
17  details.  What is your birth date?
18     A.  4-3-84.
19     Q.  So you are 35 now?
20     A.  Yes.
21     Q.  Okay.  And where were you born?
22     A.  Cleveland, Ohio.
23     Q.  And did you grow up in Cleveland?
24     A.  Yes.
25     Q.  Okay.  Is that right in Cleveland or one of

Page 14

1  the suburbs?
2      A.  One of the suburbs.
3      Q.  Which one?
4      A.  Warrensville Heights.
5      Q.  Warrensville Heights?
6      A.  Yes.
7      Q.  Do you still have family there?
8      A.  In Cleveland, yes.
9      Q.  Okay.  Are they in Warrensville Heights or a
10  different suburb?
11     A.  In Cleveland, the city of Cleveland.
12     Q.  Right in the city, okay.  Who lives there
13  now?
14     A.  My mother and my father.
15     Q.  What's their address, if you remember?
16     A.  I don't remember.
17     Q.  All right.  Do you both live together?
18     A.  No.
19     Q.  No, okay.  Are they divorced?
20     A.  Yes.
21     Q.  All right.  How long have they been divorced?
22     A.  Since '91.
23     Q.  Okay.  So they both live in the city of
24  Cleveland but at different addresses?
25     A.  Yes.

Page 15

1      Q.  Okay.  What's your mother's name?
2      A.  Vernetta, V-E-R-N-E-T-T-A, Warren.
3      Q.  How about your father?
4      A.  Julius Warren.
5      Q.  Do you have any siblings?
6      A.  Yes.
7      Q.  How many?
8      A.  Two.
9      Q.  All right.  What's the first one?
10     A.  My brother's name is Christopher Warren.
11     Q.  And where does Christopher live?
12     A.  He lives in the city of Elyria,
13  E-L-Y-R-I-A, Ohio.
14     Q.  All right.  How old is Christopher?
15     A.  38.
16     Q.  And you have another brother or a sister?
17     A.  A sister.
18     Q.  All right.  What's her name?
19     A.  Lisa Warren.
20     Q.  And where does Lisa live?
21     A.  In Cleveland, Ohio.
22     Q.  Let's see, so you were approximately seven
23  when your parents divorced?
24     A.  Yes.
25     Q.  All right.  Did you grow up with one or the

Page 16

1  other or joint custody?
2      A.  We lived with my mom, but we saw my dad
3  regularly.
4      Q.  Okay.  And did you stay in Warrensville
5  Heights through, you know, elementary school and high
6  school and all?
7      A.  Yes.
8      Q.  Okay.  What was the name of your elementary
9  school?
10     A.  John Dewey, D-E-W-E-Y.
11     Q.  And what was the name of the middle school?
12     A.  Randall Wood, R-A-N-D-A-L-L W-O-O-D.
13     Q.  And how about high school?
14     A.  Warrensville Heights High School.
15     Q.  Did you go on to college?
16     A.  Yes.
17     Q.  Where did you go to college?
18     A.  Wright State University.
19     Q.  I've forgotten where that is.
20     A.  Dayton, Ohio.
21     Q.  Dayton, thank you.  I guess that makes sense,
22  huh?
23         And what did you study at Wright State?
24     A.  Middle childhood education.
25     Q.  I'm sorry, middle --



SCOTT ALEXANDER WARREN
DELVECCHIA vs FRONTIER AIRLINES

December 13, 2019

Page 17

1    A.  Middle childhood education.
2    Q.  Okay.  Could you just describe for me what
3 middle childhood education is?
4    A.  It's four through nine, with concentrations
5 in science and math, fourth grade through ninth grade.
6    Q.  Okay, thank you.  And did you get a degree in
7 that?
8    A.  Yes.
9    Q.  All right.  Is that a BA or BS?
10    A.  BS.
11    Q.  And what year did you get your BS?
12    A.  2008.
13    Q.  And actually, let me back up.  What year did
14 you graduate from Warrensville Heights High School?
15    A.  2002.
16    Q.  Did you go straight into Wright State or --
17    A.  Yes.
18    Q.  Okay.  So your degree is six years later.
19 Did you take some time off or was it a six-year
20 program?
21    A.  Changed majors.
22    Q.  Okay.  So you were in school the whole six
23 years?
24    A.  Yes.
25    Q.  Okay.  What was the first major that you had?

Page 18

1    A.  Initially it was computer science.
2    Q.  All right.  What made you decide you wanted
3 to do middle childhood education?
4    A.  Because teaching seemed like it would be fun.
5    Q.  Okay.  So after graduating from Wright State,
6 what did you do?
7    A.  After Wright State, I actually went to truck
8 driving school and became a truck driver.
9    Q.  Oh, where did you do that?
10    A.  In Indianapolis.
11    Q.  How long a school was that?
12    A.  School was three weeks.
13    Q.  What made you decide to do that?
14    A.  Driving trucks seemed like it would be fun.
15    Q.  Okay.  And this I presume is the big
16 18-wheelers?
17    A.  Yes.
18    Q.  Okay.  And did you then go on to get a job
19 doing that?
20    A.  Yes.
21    Q.  And who did you work for?
22    A.  PAM.
23    Q.  P-A-M?
24    A.  Yes.
25    Q.  Okay.  And how long did you work for PAM?

Page 19

1    A.  Less than a year.
2    Q.  Did it turn out to be less fun than you
3 thought or --
4    A.  A lot less.
5    Q.  Okay.  And what was not so fun about it?
6    A.  Just being away from everybody.
7    Q.  Being away from home?
8    A.  Yeah.
9    Q.  Okay.  Okay, so after you left -- well, first
10 of all, was it your decision to leave PAM?
11    A.  Yes.
12    Q.  Okay.  And after you left PAM, what did you
13 do?
14    A.  I worked at Walmart in Cleveland Heights,
15 Ohio.
16    Q.  In what capacity?
17    A.  I was a manager.
18    Q.  How long did you do that?
19    A.  A year and a half.
20    Q.  If possible, can we put some dates with that?
21    A.  Walmart was from around, I don't know the
22 exact date, August of 20 -- excuse me -- yeah, around
23 August of '09.
24    Q.  Okay.
25    A.  Until January of 2011.

Page 20

1    Q.  All right.  And why did you leave Walmart?
2    A.  It wasn't -- it was a terrible job, too much
3 physical labor.
4    Q.  All right.  And again, was it your decision
5 to leave or theirs?
6    A.  Mine.
7    Q.  Okay.  And what did you do?
8    A.  I started off as the customer service
9 manager, the manager over the front end, the cashiers,
10 and in the end I was the manager over the unloaders.
11    Q.  At Walmart?
12    A.  At Walmart, yes.
13    Q.  Okay.  So after leaving Walmart, what did you
14 do?
15    A.  That's when I became a paraprofessional at
16 Pinnacle Academy in Euclid, Ohio.
17    Q.  And what is Pinnacle Academy?
18    A.  It's a charter school.
19    Q.  And I'm sorry, I missed it, you became a
20 what?
21    A.  Paraprofessional.
22    Q.  Paraprofessional?
23    A.  Yes.
24    Q.  Okay.  And what -- how can you describe that
25 for me?



SCOTT ALEXANDER  WARREN                    December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 21

1    A.  Essentially it's a teacher's aide.
2    Q.  Okay.  And was that in the fourth grade to
3  ninth grade area?
4    A.  Yes, I had sixth graders and eighth graders.
5    Q.  All right.  And who was your supervisor
6  there?
7    A.  Her name was Yolanda Ryzner, R-Y-Z-N-E-R.
8    Q.  Okay.  And actually, let me back up.  Who was
9  your supervisor at Walmart, if you remember?
10    A.  I know her first name was Sharon and I do not
11  recall her last name.
12    Q.  Okay.  All right.  How long were you at
13  Pinnacle Academy?
14    A.  Just over a year.
15    Q.  Did you stay in the same paraprofessional
16  position?
17    A.  Yes.
18    Q.  Okay.  Were you working with a particular
19  teacher there?
20    A.  No, it was more specific students.  We worked
21  with students that were just under the passing score
22  for the state standardized test and worked with them
23  to get them over that.
24    Q.  Okay.
25    A.  So I had a small group of students I worked

Page 22

1  with. I had about seven kids.
2    Q.  Okay.
3    A.  Yeah.
4    Q.  All right.  Demographically what were the
5  students; was it mostly Caucasian, mostly
6  African-American, any --
7    A.  Mostly African-American.
8    Q.  Okay.  And why did you leave Pinnacle?
9    A.  We were hourly and they went to an extended
10  schedule.  It was the same amount of instruction, it
11  was 180 days, but they started at the beginning of
12  August and went till the end of June, so they ended up
13  having a week off every month, and being hourly, that
14  didn't work out.
15    Q.  Okay.  And I'll just ask the same question:
16  Was it your decision to leave --
17    A.  Yes.
18    Q.  -- or their decision?
19    A.  It was my decision to leave.
20    Q.  Okay.  So what did you do, where did you go?
21    A.  After Pinnacle I went to the Cleveland
22  Clinic.
23    Q.  Okay.  And what did you do at Cleveland
24  Clinic?
25    A.  I was in the inbound call center scheduling

Page 23

1  appointments.
2    Q.  Was that at the Cleveland Clinic facility or
3  at an off facility?
4    A.  Off-site facility.
5    Q.  Off-site, okay.
6        And what -- how long did you stay there?
7    A.  I was at the clinic for about two and a half
8  years.
9    Q.  Okay, so let's see here, you left Walmart in
10  January of 2011.  Did you go straight to Pinnacle?
11    A.  I started Pinnacle in November of 2010.
12    Q.  Okay, so they overlapped a bit?
13    A.  Yes.
14    Q.  Okay.  All right.  And then you left after
15  just about a year, so that would have been in late
16  2011?
17    A.  Yes.
18    Q.  Okay.  So then did you go straight to
19  Cleveland Clinic?
20    A.  Yes.
21    Q.  So 2011 then till about 2013?
22    A.  Yes.
23    Q.  Okay.  And when you left Cleveland Clinic,
24  was that your decision or theirs?
25    A.  It was my decision.

Page 24

1    Q.  And where did you go from there?
2    A.  I went to a place called State Serve in
3  Phoenix, Arizona.
4    Q.  State Serve, what did they do?
5    A.  They delivered hospice equipment.
6    Q.  Did they deliver to the end user or to
7  commercial facilities?
8    A.  Both.
9    Q.  Okay.  Was that -- did that involve driving a
10  truck again?
11    A.  Yes.
12    Q.  Okay.  Did you know anybody in Phoenix at
13  that time when you moved?
14    A.  No, there were a few people from college, but
15  nobody I was really close with.
16    Q.  Okay.  Did you go there particularly for the
17  job?
18    A.  No.
19    Q.  What caused you to go to Phoenix?
20    A.  I just wanted to live somewhere else.
21    Q.  Okay.  Little warmer?
22    A.  Yeah.
23    Q.  Okay.  All right, so did you go straight out
24  there from Cleveland Clinic?
25    A.  No, I didn't start State Serve until



SCOTT ALEXANDER WARREN
DELVECCHIA vs FRONTIER AIRLINES
December 13, 2019

Page 25

1 Christmas actually, yes, December of 2013.
2    Q.   Okay.  And what did you do in the meantime?
3    A.   I didn't do anything.  I didn't work for two
4 months.
5    Q.   Okay.  Okay, and how long did you stay with
6 State Serve?
7    A.   State Serve was about two years.
8    Q.   To about 2015?
9    A.   Yeah.
10    Q.   Was it your decision to leave?
11    A.   Yes.
12    Q.   Okay.  And where did you go after that?
13    A.   After that I went to a place called Vanguard
14 in Scottsdale, Arizona.
15    Q.   All right.  And what was that?
16    A.   It was data entry.
17    Q.   Okay.  And how long did you work there?
18    A.   Less than a year.
19    Q.   Who was your supervisor there at Vanguard?
20    A.   I do not remember her name -- oh, Deb.
21    Q.   Deb?
22    A.   No last name, I don't remember her last name.
23    Q.   Okay.  How about at State Serve, who was your
24 supervisor?
25    A.   Her name was Sarah.

Page 26

1    Q.   All right.  Okay, so data entry.  What type
2 of data entry was that?
3    A.   We dealt with 401(k)s and other retirement
4 plans.
5    Q.   All right.  And so you stayed there for less
6 than a year, so sometime in 2016 you left?
7    A.   No, sorry, I've had so many jobs, it's hard
8 to keep track of dates.  Bank of America was for two
9 years -- yeah, I would have left Vanguard sometime in
10 2015.
11    Q.   Okay.
12    A.   I want to say the second half, about
13 September-ish.
14    Q.   Okay.  And what did you do after that?
15    A.   I went to Bank of America.
16    Q.   Did you go straight to Bank of America?
17    A.   Yes.
18    Q.   Okay.  And what did you do for Bank of
19 America?
20    A.   I worked in the fraud department.
21    Q.   All right.  Is that related to like credit
22 card use?
23    A.   Credit card and debit card fraud, yes.
24    Q.   Okay.  All right.  How long did you stay
25 there?

Page 27

1    A.   About two years.
2    Q.   And was it your decision to leave?
3    A.   Yes.
4    Q.   Okay.  Who was your supervisor there?
5    A.   Excuse me.  Her name was Jamie.
6    Q.   Don't remember the last name?
7    A.   No.
8    Q.   All right, so that would have been about 2017
9 that you left?
10    A.   Yes.
11    Q.   All right.  And what did you do then?
12    A.   Then I became a social worker for the State
13 of Arizona.
14    Q.   Where was that based?
15    A.   In Phoenix.
16    Q.   And what did that entail?
17    A.   As a social worker, well, I was only
18 shadowing because I only was there for five weeks, but
19 going from home to home and doing the checkups on the
20 kids, following up on cases and reports of, you know,
21 anything from violence to sexual misconduct and things
22 like that.
23    Q.   Okay.  So it was -- in this particular aspect
24 of social work, it was for Child Protective --
25    A.   Yes.

Page 28

1    Q.   -- Services?
2    A.   Yes.
3    Q.   Okay.  Did you have any training for that?
4    A.   I did five weeks of training, yes.
5    Q.   So your shadowing somebody was part of the
6 training?
7    A.   Yes.
8    Q.   Okay.  And do you remember who your
9 supervisor was there?
10    A.   Amanda Rexin, R-E-X-I-N.
11    Q.   And was Amanda the person that you shadowed?
12    A.   No, I shadowed the other social workers.
13    Q.   Okay.  Was there training beyond the
14 shadowing?
15    A.   Yes, there were a ton of the computer-based
16 CBTs, different modules on everything dealing with the
17 job.
18    Q.   And what sorts of things did you encounter
19 during that five weeks of shadowing?  When you talked
20 about violence toward kids and things, what did you
21 encounter?
22    A.   Kids that had been, you know, hit and beat up
23 by their parents or guardians, molested by the
24 guardians and parents.  Those are the two biggest
25 things, you know, and also kids who parents were on



SCOTT ALEXANDER  WARREN                          December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 29

1 drugs.
2    Q.  Okay.  With respect to what you observed, was
3 it follow-ups after incidents had been determined to
4 have occurred or was it investigation of allegations
5 or what?
6    A.  They were mostly follow-ups with established
7 -- not patients, but I can't think of the right word.
8       MR. MAYE:  Clients?
9       THE DEPONENT:  Clients, yeah.
10 BY MR. MCKAY:
11    Q.  Okay, so to see how they were doing after an
12 incident?
13    A.  Yes.
14    Q.  Okay.  Did you ever work on the investigative
15 side of things?
16    A.  No.
17    Q.  Okay.  So somebody else had done the
18 investigation?
19    A.  Yes.
20    Q.  Okay, and that was in all the cases that you
21 observed?
22    A.  Yes.
23    Q.  Okay.  Were you ever trained as an
24 investigator in your CBTs or anything?
25    A.  We were in the process of doing that, but I

Page 30

1 didn't make it through training.
2    Q.  Okay.  And why was that?
3    A.  Because the day I started was the day
4 Frontier called me back to start working.
5    Q.  The day you started shadowing?
6    A.  The day I started working for the State of
7 Arizona --
8    Q.  Okay.
9    A.  -- was the same day Frontier contacted me.
10    Q.  Okay.  And you decided you'd rather work for
11 Frontier?
12    A.  Yes.
13    Q.  Okay.  When had you applied for Frontier?
14    A.  I applied with Frontier earlier in the year,
15 sometime before March.  I do not remember when,
16 though.
17    Q.  Do you remember why you decided to apply with
18 Frontier?
19    A.  I didn't want to sit at a desk anymore.
20    Q.  Okay.  And had somebody told you that
21 Frontier would be a good place to work?
22    A.  I just applied to several airlines and that
23 was the first one that contacted me.
24    Q.  Okay.  Who else did you apply with?
25    A.  I applied to Skywest, Mesa Airlines, and I

Page 31

1 can't remember the rest.
2    Q.  All right.  So was it a situation that pretty
3 much from the beginning of starting work with Arizona,
4 the State, you decided that you wanted to go to
5 Frontier?
6    A.  Yes.
7    Q.  Okay.  So why the five-week delay?
8    A.  The day Frontier contacted me, I wouldn't
9 start for another five weeks.
10    Q.  That was Frontier's decision?
11    A.  Yes.
12    Q.  Okay.  All right.  So you just hung in with
13 the social services then for that five weeks?
14    A.  Yes.
15    Q.  Okay.  But you already pretty much knew you
16 were going to go to Frontier at the end of the five
17 weeks?
18    A.  Yes.
19    Q.  Did you tell Ms. Rexin that?
20    A.  Yes.
21    Q.  Okay.  And she was okay with that?
22    A.  No, excuse me, I did not tell her initially,
23 no.
24    Q.  No, okay, so she thought she was training you
25 for a position that you were going to stay in?

Page 32

1    A.  Yes.
2    Q.  Okay.  And when did you tell her that you
3 were leaving?
4    A.  After I started with Frontier, maybe the
5 third day after I was in training with Frontier.
6    Q.  Okay, so that was kind of a surprise to
7 Ms. Rexin, I assume?
8    A.  Yes.
9    Q.  Okay.  Did she tell you how she felt about
10 that?
11    A.  No.
12    Q.  You say after you started training with
13 Frontier.  How long was your training?
14    A.  Three and a half weeks.
15    Q.  Was that all in Denver?
16    A.  Yes.
17    Q.  Okay.  So I presume once you started at
18 Frontier, you weren't in a position to shadow anybody
19 in Phoenix, were you?
20    A.  No.
21    Q.  So were you skipping out on work at that
22 point to go start with Frontier?
23    A.  I called out the first two days and then told
24 her I quit the third day.
25    Q.  I see.  Okay.



SCOTT ALEXANDER WARREN
DELVECCHIA vs FRONTIER AIRLINES

December 13, 2019

Page 33

1       All right, let me just back up a few
2   biographical things.  As a juvenile, up to the point
3   where you're 18, did you have any arrests?
4       A.  No.
5       Q.  Okay.  As an adult, have you had any arrests?
6       A.  No.
7       Q.  Okay.  Did you attend any summer camps or
8   anything as a kid?
9       A.  In the fourth grade, yes.
10      Q.  Where did you go in the fourth grade?
11      A.  I don't remember.
12      Q.  Okay.  Did you belong to any groups there in
13  Warrensville Heights?
14      A.  No.
15      Q.  Play any sports?
16      A.  No.
17      Q.  Have you ever been married?
18      A.  No.
19      Q.  Have you had any long relationships without
20  getting married?
21      A.  Yes.
22      Q.  All right.  Are you in a relationship now?
23      A.  No.
24      Q.  Okay.  Were you -- how long have you
25  worked -- strike that.

Page 34

1       How long have you lived in Las Vegas?
2       A.  Since November of 2017.
3       Q.  So I think I have your start date here with
4   Frontier, but do you remember it?
5       A.  Training started on August 7th, 2017.
6       Q.  All right, so you were in Denver for, did you
7   say it was three weeks?
8       A.  Three and a half weeks.
9       Q.  Three and a half weeks.  So August, maybe a
10  little into September of 2017; is that right?
11      A.  My date of hire is August 30th, 2017.
12      Q.  Okay.  So they don't pay you when you're
13  training?
14      A.  They do.
15      Q.  They do, but you're not considered hired at
16  that point?
17      A.  Correct.
18      Q.  Okay.  All right, first day, August 30, 2017,
19  did that involve actually working on a flight?
20      A.  I don't recall when my first flight was.
21      Q.  Okay.  So it looks like there's about a
22  two-month period where you were not living in
23  Las Vegas.  Were you living in Denver?
24      A.  I still lived in Phoenix.
25      Q.  Oh, you did, okay.  So for those two months,

Page 35

1   did you work out of Phoenix?
2       A.  I still worked out of Vegas.
3       Q.  Okay.  Are you on any medications today?
4       A.  No.
5       Q.  Okay.  Do you normally take any?
6       A.  No.
7       Q.  Health pretty good?
8       A.  Yes.
9       Q.  Have you ever been treated or seen anybody
10  for any type of mental issues like depression,
11  anxiety, anger?
12      A.  No.
13      Q.  How about now, do you engage in any
14  recreational sports?
15      A.  No.
16      Q.  Are you a weight lifter?
17      A.  No.
18      Q.  Go to the gym?
19      A.  No.
20      Q.  Aside from the allegations in this case, have
21  you ever hit anyone after turning 18?
22      A.  Excuse me?
23      Q.  After becoming 18 years of age, from then
24  until now, other than what's alleged in this case,
25  have you ever hit anybody?

Page 36

1       MR. MAYE:  Object to form.
2       John, what's the relevance of this?
3       MR. MCKAY:  He's accused of hitting somebody
4   in this case.
5       MR. MAYE:  Yeah, so?
6       MR. MCKAY:  I know you have an objection.
7       MR. MAYE:  Okay.  Object to form.
8   BY MR. MCKAY:
9       Q.  You can answer.
10      A.  No, I haven't.
11      Q.  Okay.  Have you ever been accused of any
12  unwelcome physical contact?
13      A.  No.
14      Q.  Contact?  No?
15      A.  No.
16      MR. MAYE:  Object to form.
17  BY MR. MCKAY:
18      Q.  Other than your shadowing work for the State
19  of Arizona, have you ever been personally involved in
20  any situation that involved allegations of sexual
21  misconduct?
22      A.  No.
23      MR. MAYE:  Object to form.
24      MR. MCKAY:  I'm sorry, I didn't hear you.
25      MR. MAYE:  You can answer.

Page 37

1   BY MR. MCKAY:
2      Q.   He objected.
3      A.   No.
4      Q.   Yeah, I heard that part.
5      A.   No.
6      Q.   Okay.  Other than your work in Arizona, have
7   you ever been personally involved in any situation
8   involving improper parenting of any kind?
9      A.   No.
10          MR. MAYE:  Object to form.  This is not
11   appropriate line of questioning.
12          MR. MCKAY:  I know that's your opinion.
13          MR. MAYE:  It's a fact.  Of a fact witness,
14   impeachment is about truthfulness, but I'll give you a
15   little leeway.
16          MR. MCKAY:  I'm sorry, you're not a judge,
17   sir.  You can object.
18          MR. MAYE:  Well, we know what happens when we
19   call the judge.
20          MR. MCKAY:  You can object, okay, and that's
21   pretty much the extent of it.
22          MR. MAYE:  Yeah, you're getting into
23   harassment area.
24          MR. MCKAY:  Well, that's again your opinion.
25          MR. MAYE:  Yes, and the judge will agree with

Page 38

1   me, just like she did previously.
2          MR. MCKAY:  Well, we'll str ke that from the
3   record, thank you.
4          MR. MAYE:  You won't strike anything that I
5   say.
6   BY MR. MCKAY:
7      Q.   Have you ever been personally involved in any
8   situation that involved the parenting of a black child
9   by a nonblack parent?
10          MR. MAYE:  Object to form.
11          THE DEPONENT:  Can you repeat the question?
12   BY MR. MCKAY:
13      Q.   Have you ever been personally involved in any
14   situation involving the parenting of a black child by
15   a nonblack parent?
16      A.   No.
17      Q.   Have you ever been involved in any situation
18   where there was an allegation of human trafficking?
19      A.   No.
20      Q.   Okay.  What is your employee number?
21          MR. MAYE:  You can provide that.
22          THE DEPONENT:  427916.
23   BY MR. MCKAY:
24      Q.   Thank you.
25          Okay, the training that you had at Frontier,

Page 39

1   what did that entail during that three and a half
2   weeks?
3      A.   It covered the parts of the aircraft -- this
4   is not everything, I may forget some things, but it
5   covered the day-to-day routine, you know, what to do
6   from takeoff to touchdown.  It covered what to do in
7   emergencies, how to open doors.  It covered other
8   things such as human trafficking and sexual
9   misconduct.
10      Q.   What sort of -- I know we've talked about the
11   inflight must read that was marked as Bond Exhibit 5,
12   but that didn't come out until March of 2019.  What
13   training did you have in sexual misconduct prior to
14   that?
15      A.   I don't recall exactly what it was during
16   training.
17      Q.   But you do recall something being mentioned
18   during your three and a half weeks of training in
19   Denver?
20      A.   Yes.
21      Q.   Okay.  Was there anything in writing that was
22   distributed to you in that context?
23      A.   I don't recall.
24      Q.   Do you currently have anything in writing
25   other than the inflight must read of March 15, 2019?

Page 40

1      A.   Anything in writing about what?
2      Q.   Sexual misconduct.
3      A.   I'm not sure.  I don't know.
4      Q.   Okay.  Was the training in sexual misconduct
5   that you recall from the three and a half weeks in
6   Denver, was that in the context of sexual harassment
7   in the workplace?
8      A.   It covered that and it covered if it's coming
9   from passengers as well.
10      Q.   Okay, coming from passengers meaning -- I'm
11   sorry to be so specific, but coming from passengers
12   meaning that somebody was -- might be sexually -- I'm
13   sorry, engaging in sexual misconduct with an employee?
14      A.   No, between two passengers.
15      Q.   Between two passengers, all right, and what
16   did Frontier tell you about that that you recall?
17      A.   I don't recall exactly.
18      Q.   Okay.  Do you recall anything about it?
19      A.   No.
20      Q.   Okay.  You just recall that there was
21   something mentioned?
22      A.   Yes.
23      Q.   Okay.  And you also mentioned human
24   trafficking.  What do you recall about that from your
25   three and a half weeks of training?



SCOTT ALEXANDER WARREN
DELVECCHIA vs FRONTIER AIRLINES                                        December 13, 2019

Page 41

1    A.   I don't remember.
2    Q.   Okay.  And do you know if there was any kind
3  of written material provided to you about that?
4    A.   I don't recall.
5    Q.   Was there any form of self-defense training
6  involved in this training?
7    A.   Yes.
8    Q.   Okay.  And what did they teach you about
9  that?
10    A.   Self-defense training was they taught
11  different types of strikes.
12    Q.   Okay.  If, for instance, there was a
13  hijacking situation or something or somebody was
14  attacking you, how to defend yourself, basically?
15    A.   And restrain, yes.
16    Q.   Okay.  What sort of strikes did they teach
17  you?
18    A.   They taught the palm strike to somebody's
19  nose and like a hammer blow.
20    Q.   All right.  Hammer blow to what area?
21    A.   Anywhere.
22    Q.   Okay.  And could you describe that again?
23    A.   It's like swing the hammer, I guess.
24    Q.   Okay.  Had you ever learned those things
25  before?

Page 42

1    A.   No.
2    Q.   Did they, did they do it by just showing you
3  a demonstration or did they have you actually do it?
4    A.   They had dummies we could do it on.
5    Q.   Okay.  And how did that go?
6        MR. MAYE:  Object to form.
7  BY MR. MCKAY:
8    Q.   Sorry, he objects and it's just for the
9  record, nothing happens.
10    A.   Okay.
11    Q.   So you can just go ahead and answer.
12    A.   It went well.
13    Q.   It went well?  Do you remember, I mean, how
14  long they had you spend striking dummies?
15    A.   Probably about 30 seconds.
16    Q.   Okay.  Was there a specific self-defense
17  class that this occurred in?
18    A.   It was just during training, it was just part
19  of the day, about an hour-long section on
20  self-defense.
21    Q.   Okay.  And did they have a different person
22  come in to teach it than had been teaching the other
23  stuff?
24    A.   Yes.
25    Q.   Okay.  And was that person introduced to you

Page 43

1  as like a self-defense expert of some sort?
2    A.   I do not remember how he was introduced.
3    Q.   Okay.  But he gave you a training module, so
4  to speak, of about an hour of ways that you could
5  defend yourself?
6    A.   Yes.
7    Q.   And that included the hammer chop and the
8  heel of the hand to the nose?
9    A.   Yes.
10    Q.   Okay.  And then he had everybody in the class
11  come up and demonstrate it on a dummy?
12    A.   Yes.
13    Q.   Okay.  How many times do you think you did a
14  hammer blow on the dummy?
15    A.   Probably about five times.
16    Q.   Okay.  Did he tell you you were doing it
17  right?
18    A.   They weren't telling people they were doing
19  it right or wrong.
20    Q.   Okay.  How many people were in the class?
21    A.   On that particular day, I don't recall.  We
22  started with 96 and ended with about 51 people
23  graduating.
24    Q.   Oh, okay, so some people decided, after doing
25  the training or during the training, they didn't want

Page 44

1  to continue?
2    A.   Or either failed the tests.
3    Q.   Oh, there were tests along the way?
4    A.   Yes.
5    Q.   Okay.  What sort of tests did you have?
6    A.   There were tests on everything we covered for
7  that day, there would be a test on either that same
8  day or the next day.
9    Q.   Did you have a test on the self-defense?
10    A.   Part of it was covered, yes.
11    Q.   And were these written tests?
12    A.   Yes.
13    Q.   So if somebody failed a test, then they were
14  asked to leave?
15    A.   You could fail two tests.  On the second one,
16  you were asked to leave.
17    Q.   Okay.  And so it sounds like a significant
18  number of people were asked to leave?
19    A.   Yes.
20    Q.   Okay.  And then after you finished your
21  training, then you were officially hired as a flight
22  attendant, correct?
23    A.   Yes.
24    Q.   And that's an hourly pay arrangement?
25    A.   Yes.



800.211.DEPO (3376)
EsquireSolutions.com

SCOTT ALEXANDER WARREN                                       December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 45

1    Q.  Okay.  And just out of curiosity, when does
2   the -- when does the clock start and when does it end?
3    A.  The clock starts when the main door, main
4   cabin door closes and it ends when we get to the gate
5   and it opens back up.
6    Q.  Okay.  So stuff before the door closes and
7   after it opens up on arrival, you don't get paid for?
8    A.  We don't get paid our hourly rate.
9    Q.  What do you get paid?
10   A.  We get paid per diem.
11   Q.  I see.  Okay.  And I understand that if you
12  are a flight attendant on an Airbus A320, you'll be
13  working with three other people; is that right?
14   A.  Yes.
15   Q.  And the positions are labeled A, B, C and D?
16   A.  Yes.
17   Q.  Okay.  And the position that you have is
18  something that you bid for?
19   A.  Yes, if you choose to.
20   Q.  Okay.  Do you have a particular position that
21  you prefer?
22   A.  No.
23   Q.  Have you worked all positions, A, B, C and D?
24   A.  Yes.
25   Q.  Okay.  I'm going to ask you some questions

Page 46

1   about a flight that was on March 28 of 2019 between
2   Raleigh-Durham airport and Las Vegas airport.  Do you
3   recall that flight?
4    A.  Yes.
5    Q.  Had you worked any other flight prior to it
6   on the day of March 28?
7    A.  No, that would have been the only flight of
8   the day.
9    Q.  Okay.  Now, since that originated in
10  Raleigh-Durham, how had you gotten to Raleigh-Durham?
11   A.  We would have flown in the day -- the night
12  before, or maybe --
13   Q.  From Las Vegas?
14   A.  I don't recall what the trip was or when
15  we -- where we came from, but we had a layover there
16  in Raleigh.
17   Q.  Okay.  And when you say we, was that the same
18  collection of flight attendants as were working on
19  Flight 2067 on the 28th of March?
20   A.  At least the A, B and C would have been the
21  same.  I don't know about the D.
22   Q.  Okay.  And you were the B?
23   A.  I was the B.
24   Q.  Okay.  Do you recall what time you got to
25  Raleigh-Durham the previous day?

Page 47

1    A.  No.
2    Q.  Was that the regularly scheduled flight from
3   Las Vegas to Raleigh-Durham?
4    A.  I don't recall if we came from Vegas or not.
5    Q.  Oh, I see, I'm sorry, you did say that.
6       Do you recall what you did between the time
7   of landing on the 27th and the time of reporting to
8   work on the 28th?
9    A.  Other than go to the hotel and sleep, no, I
10  don't recall anything else.
11   Q.  Okay.  Do you recall what hotel you went to?
12   A.  No.
13   Q.  All right.  Have you made that particular --
14  strike that.
15      Has Raleigh-Durham been a destination for you
16  in your work on several flights?
17   A.  Yes, I've been there before.
18   Q.  Okay.
19   A.  Working.
20   Q.  Do you typically stay at the same hotel?
21   A.  We have two hotels in Raleigh.
22   Q.  Okay.  What are they?
23   A.  It's the A Loft or -- I can't think of the
24  second one.
25   Q.  Okay.  Is it right at the airport?

Page 48

1    A.  No.
2    Q.  Okay.  All right, well, this was an evening
3   flight back to Las Vegas from Raleigh-Durham, right?
4    A.  Yes.
5    Q.  Do you recall what you did during the day
6   prior to it?
7    A.  No.
8    Q.  Any ideas, any thoughts of what you might
9   have done?
10   A.  Laid in the bed.
11   Q.  Until you reported for work?
12   A.  Perhaps.  I don't really recall, but I don't
13  do a lot on layovers.
14   Q.  What is the show time for arriving at a
15  flight as a flight attendant?
16   A.  We have to be at the gate 50 minutes before
17  takeoff, before scheduled to take off.
18   Q.  What do you recall about getting to
19  Flight 2067 on the 28th of March?
20      MR. MAYE:  Object to form.
21      THE DEPONENT:  I don't remember anything,
22  must have just been a typical ride in the shuttle to
23  the airport.
24  BY MR. MCKAY:
25   Q.  And I believe I asked you this, but just to



SCOTT ALEXANDER  WARREN
December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 49

1  confirm, you were assigned to be the B flight
2  attendant?
3      A.  Yes.
4      Q.  Okay.  Tell me what the B is responsible for.
5      A.  Primarily the B makes the announcements
6  during boarding as far as welcome aboard, this is
7  flight whatever going to whatever city.  The B reads
8  the safety demonstration as the others perform it.
9          On this particular flight the B prepares the
10  beverage carts, because they're all in the back on a
11  320, on this particular 320, and the B makes the
12  announcements as we begin our descent.
13     Q.  Okay.  Is -- do you get a portion of the
14  aisles to provide -- I'm sorry, not aisles, rows to
15  provide service to as well?
16     A.  Yes, the B and the D will do the, what we
17  say, the back half, but it's not half; we'll do the
18  exit rows back.
19     Q.  Okay.  And the D in this case was Amanda
20  Nichol; is that right?
21     A.  I don't recall who the D was.
22     Q.  All right.  Had you ever worked with the D
23  before this flight?
24     A.  I don't remember ever working with her
25  before.

Page 50

1      Q.  Okay.  How about the A and the C, had you
2  worked with them before?
3      A.  I had flown with Anna before.  The other
4  lady, I don't recall working with her.
5      Q.  Okay.  How many times had you flown with Anna
6  Bond?
7      A.  Once before.
8      Q.  Okay.  Did you all communicate, you know,
9  socially at all?
10     A.  No.
11     Q.  Okay.  At what point did you notice -- and
12  we're starting now from the time that you showed up to
13  work 50 minutes before the scheduled departure time --
14  at what point did you start to be aware of Peter
15  Delvecchia and his son?
16     A.  I noticed that -- shortly after boarding was
17  complete, I noticed they were being moved out of the
18  exit row.
19     Q.  All right.  Are you sure that boarding was
20  complete at that point?
21     A.  Yes, because that's when the C goes to brief
22  the exit rows, once boarding is complete.
23     Q.  Okay.  C doesn't do that prior?
24     A.  No.
25     Q.  Okay.  So, okay, so boarding is complete, the

Page 51

1  C has gone to the exit rows, and then did you observe
2  her doing this?
3      A.  No, I wasn't looking at her, no.
4      Q.  Okay.  And that was Anna Bond on this flight,
5  right?
6      A.  I believe she was the C, yeah.
7      Q.  Okay.  So if you weren't watching her brief
8  the exit rows, how were you aware of Peter and his
9  son?
10     A.  I saw them stand up.
11     Q.  Okay.  And did you know what was happening
12  when you saw them stand up?
13     A.  No, I did not know exactly, but usually when
14  the C briefs the exit row, then people stand up,
15  usually someone has to be moved for some reason.
16     Q.  Okay.  And what are the reasons that somebody
17  gets moved?
18     A.  Some reasons would be under the age of 15,
19  not an English speaker, they may have a cast or a neck
20  brace on.
21     Q.  Okay, so that it would be dangerous for them
22  to assist?
23     A.  Yes.
24     Q.  Okay.  And when you saw Peter and his son
25  stand up, what was going through your mind?

Page 52

1          MR. MAYE:  Object to form.
2          THE DEPONENT:  They must be age or language
3  barrier.
4  BY MR. MCKAY:
5      Q.  Okay.  Did you think one or the other?
6      A.  No.
7      Q.  Okay.  You did notice that Peter was white
8  and his son was black, right?
9          MR. MAYE:  Object to form.
10 BY MR. MCKAY:
11     Q.  Did you notice the races of Peter and his
12 son?
13     A.  Yes.
14     Q.  Okay.  And what did you think about that?
15         MR. MAYE:  Object to form.
16         THE DEPONENT:  I didn't think anything of it.
17 BY MR. MCKAY:
18     Q.  Okay, but you thought that they were father
19 and son?
20     A.  I didn't think about that.
21     Q.  All right.  You didn't think about what
22 combination of people they might be?
23     A.  No, l ke I said, I just saw them, it must be
24 either language or age.
25     Q.  Okay.  What happened next?



SCOTT ALEXANDER WARREN                                    December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 53

1        MR. MAYE: Object to form.
2        MR. MCKAY: Is it a leading question?
3        MR. MAYE: Object to form.
4        MR. MCKAY: What happened next?
5        MR. MAYE: It's a vague question. What
6    happened next with whom, with him, with the flight?
7    It's just a very vague question, it's object to form.
8        MR. MCKAY: Did you think I was asking about
9    people on the street?
10   BY MR. MCKAY:
11       Q. All right. What happened next that you
12   observed, sir?
13       MR. MAYE: In regard to what?
14       MR. MCKAY: Good heavens.
15       MR. MAYE: You're asking me, you just said I
16   don't understand --
17       MR. MCKAY: No, "sir" was --
18       MR. MAYE: -- your objection.
19       MR. MCKAY: "Sir" was to your client, not to
20   you. I'm sorry, you're not the deponent here,
21   Mr. Maye.
22       MR. MAYE: Well, John, you were directing --
23   you were directing comments to me. I objected to form
24   and you were questioning my objection, inquiring about
25   the basis for my objection.

Page 54

1        MR. MCKAY: Sorry, I had moved on after
2    that --
3        MR. MAYE: Okay.
4        MR. MCKAY: -- statement.
5    BY MR. MCKAY:
6        Q. Okay. Mr. Warren, what do you recall
7    observing after you saw Peter and his son stand up?
8    And this would be with respect to March 28, 2019,
9    Raleigh-Durham International Airport, a particular
10   A320 that was flying Flight 2067.
11       A. I don't remember exactly what happened next.
12   It was either before or after takeoff when Anna came
13   back and said, I had to move the people out of exit
14   row because the kid was underaged.
15       Q. Okay, so you didn't see them then getting
16   seated somewhere else?
17       A. I saw her move them to a different row. I
18   didn't see exactly where she sat them at.
19       Q. Okay. And did that involve moving people out
20   of that other row?
21       A. I don't remember if she moved anybody out.
22       Q. Okay, so you don't remember whether the
23   flight was fully seated?
24       A. It was not full because we left the back row
25   open.

Page 55

1        Q. Okay.
2        A. I'm not sure if Row 17 was occupied at the
3    time.
4        Q. Okay. Then your testimony is that Anna came
5    back at some point after takeoff to talk with you?
6        A. I don't remember if it was before or after
7    takeoff.
8        Q. All right, but she did come back to the,
9    what, to the aft galley?
10       A. Yes.
11       Q. Okay. And who was there, just you and
12   Amanda?
13       A. It would have been me and the D, yes.
14       Q. Okay. And what did Anna say, if anything?
15       A. I had to move people out of the exit row
16   because the kid was underaged.
17       Q. All right. And what did you say back to her?
18       A. Okay.
19       Q. And what did Amanda say, if anything?
20       A. I don't recall her saying anything.
21       Q. Okay. Now, in the statement that she gave
22   and in some testimony, Anna has stated that there was
23   some degree of shock, I think, as she put it, that it
24   was age rather than language; does that ring a bell
25   with you at all?

Page 56

1        MR. MAYE: Object to form.
2        THE DEPONENT: No.
3    BY MR. MCKAY:
4        Q. You weren't shocked?
5        A. No.
6        Q. And you didn't observe Amanda being shocked?
7        A. I don't remember that.
8        Q. Okay. All right, so she said she moved some
9    people because of age, you said all right, and that
10   was that?
11       A. Yes.
12       Q. Okay. And then did she go back to the front
13   of the plane?
14       A. Yes.
15       Q. Okay. So there wasn't anything that was
16   flagged as being unusual or that needed to be
17   addressed?
18       A. No.
19       Q. She'd already taken care of it?
20       A. Yes.
21       Q. Okay. So what do you recall happening next?
22       A. Next they -- if -- well, I think she came --
23   well, they come to the back of the -- galley, the
24   back galley, to get their service carts because
25   they're all in the back on this 320.



SCOTT ALEXANDER  WARREN                          December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 57

1    Q.   Yes.
2    A.   So they would have came and got their carts
3  and took it back up front, the A and C, they came back
4  and got the cart, and then they do rows in front of
5  Row 12, do those ones, that was their half.
6    Q.   Yes.
7    A.   And then me and the D did our half of the
8  plane.
9    Q.   Okay.  And that happens at a particular
10  point, does it, after takeoff?
11    A.   Shortly after takeoff, after -- usually about
12  20 minutes, 25 minutes after takeoff.
13    Q.   Okay.  Is that typically after the flight
14  levels out at its cruise altitude?
15    A.   It's before that.  It's usually -- yes, it's
16  before we reach our cruising altitude.
17    Q.   Okay.  And if I understand correctly from the
18  other flight attendants, everything that's on the cart
19  other than water is for sale; is that right?
20    A.   Yes.
21    Q.   So they came and they got their carts
22  and you and the D got your carts, and so I presume
23  then service started?
24    A.   Yes.
25    Q.   And there's alcoholic beverages being sold,

Page 58

1  right?
2    A.   Yes.
3    Q.   Okay.  And a flight out to Las Vegas, is
4  there typically a good bit of purchasing of alcoholic
5  beverages?
6    A.   Not necessarily.
7    Q.   How about on this flight?
8    A.   The average amount.
9    Q.   Okay, and what's that?
10    A.   A few people were drinking, maybe about ten
11  people I saw with drinks, just an estimation.
12    Q.   Okay.  And did you happen to make any
13  observations then about Peter and his son during the
14  service?
15    A.   No.
16    Q.   Okay.  When was the next time that you heard
17  or saw anything concerning Peter and his son?
18    A.   After service and we took the carts to the
19  back and they took their cart all the way up front, I
20  remember going to the front of the -- the front
21  galley -- excuse me -- excuse me.
22    Q.   We've actually been going about an hour.  Do
23  you want to take a break?
24    A.   Nope.
25    Q.   No, okay.

Page 59

1    A.   And I don't recall exactly what happened
2  next, but I remember the ladies up front saying they
3  saw Mr. Delvecchia here rubbing his son's face, they
4  said, in a weird manner.  I didn't see that.  And by
5  then I believe the captain had already been alerted,
6  so I went into the flight deck to speak with him and
7  he asked, Scott, could you go take a look at it.
8    Q.   Okay.  So let me just back up a bit and slow
9  that down a little bit.  After the service, how did
10  the other flight attendants convey to you the -- what
11  they had said about touching the face?  Was that done
12  on the intercom or in person?
13    A.   In person.
14    Q.   Okay.  And was it done back in your area at
15  the aft galley or was it done up in the front of the
16  plane?
17    A.   In the forward galley.
18    Q.   Okay.  So why were you up there?
19    A.   I don't know the reason why I went up there,
20  I may have been going to do trash, but I'm not stuck
21  in the back.  I can move around the plane.
22    Q.   Okay.  All right, so while you were up front
23  for whatever reason, they said that something had
24  occurred -- again, I'm sorry, what had occurred with
25  respect to the face?

Page 60

1    A.   They said Mr. Delvecchia was rubbing the
2  child's face, his son's face, in a weird,
3  inappropriate manner.
4    Q.   Okay.  When you say they, which people were
5  that?
6    A.   It was either the A or the C.  I don't
7  recall.
8    Q.   So just one person said that?
9    A.   Two of them agreed on it.  It may have been
10  the D as well because she would have been the one that
11  serviced that row.  I don't remember exactly who said
12  it.
13    Q.   Okay.
14    A.   But two of them -- at least two of them
15  noticed it.
16    Q.   Okay.  And did they use any words different
17  than what you've used?
18    A.   Those were the words I remember hearing.
19    Q.   Okay, rubbing and inappropriate?
20    A.   Yeah.
21    Q.   Okay.  All right, and I think you said by the
22  time you heard it, it had already been conveyed to the
23  captain?
24    A.   I remember going into the flight deck, so
25  yes, the captain would have known by then.



SCOTT ALEXANDER  WARREN                                          December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 61

1    Q.   And who was on the flight deck when you went
2   there?
3    A.   That would have been Captain Rex and the
4   first officer.
5    Q.   And just the three of you in the cockpit
6   then?
7    A.   I'm not sure if one of the other ladies came
8   in or not.  I don't recall.
9    Q.   Okay.  So is it your recollection that
10  somebody summoned you to go speak with them on the
11  flight deck?
12   A.   Somebody did, yeah.  I'm not sure who.
13   Q.   Okay.  So you went there because a request
14  had been made that you go talk to them?
15   A.   Yes.
16   Q.   Okay.  And who was it that did the talking
17  once you got there?
18   A.   It was the captain.
19   Q.   Okay.  Do you recall which of the two were
20  actually designated to fly the plane, pilot flying?
21   A.   I don't know.
22   Q.   Okay.  So did the captain turn around in his
23  seat and speak with you or --
24   A.   He turned sideways, yes.
25   Q.   Okay.  And what did the captain say to you?

Page 62

1    A.   I don't remember word for word what he said,
2   but he wanted me to go have a look.
3    Q.   Okay.  Did he mention anything about the
4   flight operations manual that they had been looking
5   at?
6    A.   No.
7    Q.   Okay.  Are you sure he hadn't said anything
8   about that?
9    A.   I don't recall if he did.
10   Q.   Okay.  All right, and so he asked you to go
11  take a look, and what did you do then?
12   A.   That's when I went -- I was in the front of
13  the plane and I walked to the back of the plane
14  looking at Mr. Delvecchia and his son as I walked by
15  Row 17 and that's when I noted that his hand was on
16  the child's crotch and they appeared to be sleeping.
17   Q.   Okay, so just so I understand, both the
18  father and the son appeared to be sleeping?
19   A.   Yes.
20   Q.   And the son was in the window seat?
21   A.   Yes.
22   Q.   And the father was in the middle seat?
23   A.   Yes.
24   Q.   And what did you observe about the person in
25  the aisle seat?

Page 63

1    A.   I don't remember what the guy on the aisle
2   seat was doing at the time.
3    Q.   Okay, you said the guy?
4    A.   It was a man, yes.
5    Q.   Okay.
6    A.   A guy, yeah.
7    Q.   All right.  And was there -- was this --
8   everything was standard otherwise as far as this
9   particular point in the flight, I mean, the lighting
10  and all that sort of thing?
11   A.   Yes.
12   Q.   Okay.  And so were you carrying a trash bag?
13   A.   I don't remember.
14   Q.   Okay.  But you remember that you were walking
15  from the front to the back when you made this
16  observation?
17   A.   Yes.
18   Q.   Okay.  And you could tell that Peter was
19  asleep?
20   A.   He appeared to be asleep.
21   Q.   And you could tell that A.D. was asleep?
22   A.   Appeared to be asleep, yes.
23   Q.   Okay.  And describe for me what you saw with
24  respect to Peter's hand.
25   A.   His right hand was on the boy's crotch -- the

Page 64

1   child, sorry -- like down on the front, to show you,
2   he can't write it, but --
3    Q.   Yeah, you can observe -- I mean, you can
4   demonstrate for the TV, if you could.
5    A.   Yeah, I mean, his right hand was like here on
6   the child.
7    Q.   Actually grabbing like that?
8    A.   Yes, the fingers were down in there and
9   everything.
10   Q.   Yeah.
11   A.   Um-hum.
12   Q.   Okay.  And you say it was the right hand.
13  Now, which side of the plane were they on?
14   A.   If you're facing forward towards the cockpit,
15  they would have been on the right-hand side, D-E-F.
16   Q.   Okay, they were on the right-hand side, so
17  that means that Peter's hand, his right hand, would
18  have crossed in front of his own body to get there?
19   A.   No, he's in E, the child is in F, so his
20  right hand would have been here.
21   Q.   Okay.  All right.  And what was the child
22  wearing?
23   A.   He had on a T-shirt and jeans -- T-shirt and
24  jeans on, from what I recall.
25   Q.   Okay.  Jeans as in long pants?



SCOTT ALEXANDER WARREN                                      December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 65

1    A.  Yeah.
2    Q.  Okay.  Blue jeans?
3    A.  I don't remember the color of them.
4    Q.  Okay.  Why do you think they were jeans?
5    A.  They may not have been jeans.  He had pants
6  and a T-shirt on.
7    Q.  Pants and a T-shirt?
8    A.  Yes.
9    Q.  Nothing else?
10    A.  That's all I saw.
11    Q.  Okay.  So you could actually see the hand in
12  between the two legs?
13    A.  Yes.
14    Q.  And as you said, you saw the thumb across one
15  of the legs and the fingers down inside the space
16  between the two legs?
17    A.  Yes.
18    Q.  Okay.  And what was Peter wearing?
19    A.  I don't recall.
20    Q.  Nothing at all that you recall?
21    A.  No.
22    Q.  Okay.  All right.  You don't remember the
23  color of A.D.'s pants.  Do you remember the color of
24  the shirt he was wearing?
25    A.  I don't remember the color of his shirt.

Page 66

1    Q.  Okay.  Now, Peter's arm that you observed,
2  was Peter wearing a long-sleeve shirt or a
3  short-sleeve shirt?
4    A.  I don't remember.
5    Q.  Well, did you see the skin of his arm up to
6  his elbow?
7    A.  I don't remember.
8    Q.  Don't remember, okay.  All right.  And how
9  long did you observe the hand as you were walking by?
10    A.  It couldn't have been more than five seconds
11  as I walked by.
12    Q.  Okay.  You were -- did you stop walking at
13  any point or were you walking continuously?
14    A.  I was walking continuously.
15    Q.  Okay.  Was the, was the shade down on the
16  window adjacent to A.D.?
17    A.  I don't remember if the shade was up or down.
18    Q.  Okay.  And so you walked to the aft galley
19  and then what did you do?
20    A.  I stood there for a few seconds, then I
21  walked back up to the front again to make sure that I
22  saw what I saw, and when I walked by again, his hand
23  was in the same place.
24    Q.  Okay.  And as you walked back up then, you
25  would be facing the nose of the aircraft?

Page 67

1    A.  Yes.
2    Q.  And you would be looking to your left?
3    A.  No.
4    Q.  You're looking to your right?
5    A.  Yes.
6    Q.  Because they were, what seats again, 17 --
7    A.  E and F.
8    Q.  E and F?
9    A.  Yes.
10    Q.  Okay.  So you were looking to your right and
11  Peter was in the middle seat, correct?
12    A.  Yes, yes.
13    Q.  And A.D. was in the window seat?
14    A.  Yes.
15    Q.  F.  And Peter's right hand was still between
16  the child's legs?
17    A.  Yes.
18    Q.  Okay.  In the area of his crotch?
19    A.  Yes.
20    Q.  Okay.  And they still appeared to be asleep?
21    A.  Yes.
22    Q.  Okay.  All right.  And what did you do after
23  making that observation?
24    A.  I continued on to the front and went in the
25  cockpit and told the captain what I saw.

Page 68

1    Q.  Okay.  How did you -- I mean, was the door to
2  the cockpit open at that point or did you have to call
3  to ask to be allowed onto the cockpit?
4    A.  I knocked to get in.
5    Q.  You knocked?
6    A.  Yeah.
7    Q.  Okay.  At this point had the barrier been
8  removed from the aisle?
9    A.  The barrier?
10    Q.  Well, let me back up.
11      At the time that you went to the cockpit the
12  first time, was -- had the flight attendants set up
13  for the pilots to take a lavatory break?
14    A.  Yes, whenever we open the cockpit door, we
15  put the cart in front of the aisle.
16    Q.  Okay.  My question is, was it already
17  established there when you went down to the front to
18  go into the cockpit the first time or did they set it
19  up so that you could go into the cockpit?
20    A.  I do not remember.
21    Q.  Okay.  And now you've walked to the back and
22  then to the front again.  At this point is the cart
23  set up across the aisle or is it gone?
24    A.  I don't remember if they left it set up or
25  not.



SCOTT ALEXANDER WARREN                          December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 69

1    Q.   Okay.  So when you knocked on the door, did
2  they have to put the cart back out?
3    A.   Yes.
4    Q.   Okay.  And then did the door open?
5    A.   They open the door shortly after we knock,
6  yeah.
7    Q.   Okay.  And now on this second visit to the
8  cockpit, who is there?
9    A.   I remember it being the first officer and the
10  captain.  I don't recall if there was another flight
11  attendant there or not.
12    Q.   Okay, just have no memory of it?
13    A.   I don't remember, no.
14    Q.   All right.  What was said first when you got
15  there?
16    A.   I told the captain that, you know, his hand
17  was on his crotch.
18    Q.   Okay.  And how did you say it?
19    A.   His hand is on his penis.
20    Q.   You said those exact words?
21    A.   Yeah.
22    Q.   Okay.  And what did the captain say, if
23  anything?
24    A.   I don't remember exactly what he said, but he
25  said we need to separate them.

Page 70

1    Q.   Okay, but, I mean, the conclusion was that he
2  said you need to separate them, but you don't remember
3  what the words were?
4    A.   I don't remember exactly what he said before
5  he said it, like word for word, but --
6    Q.   All right.  Do you recall the first officer
7  saying anything in this conversation?
8    A.   No.
9    Q.   Is that that he didn't say anything or that
10  you don't recall whether he did or not?
11    A.   I don't recall if he said anything or not.
12    Q.   Okay.  How about -- well, you said you didn't
13  know if there was another flight attendant there, so
14  basically all you remember is your exchange with the
15  captain?
16    A.   Yes.
17    Q.   Okay.  And did the captain give you any
18  instructions as to how to do that --
19    A.   No.
20    Q.   -- separation?  No.  So he left that up to
21  you?
22    A.   Yes.
23    Q.   What did you do then?
24    A.   From then I spoke with one of the flight
25  attendants, I don't remember which one.

Page 71

1    Q.   Well, let me just be -- I apologize for being
2  so specific, but at that point are you outside the
3  cockpit?
4    A.   Once he says separate them -- oh, yeah, when
5  we decided on how to do it, we were outside the
6  cockpit in the front galley.
7    Q.   Okay.  And how did that go down?
8    A.   Essentially, I forgot who I spoke with, but
9  we would turn the lights on, clear the row out, move
10  the child to the back row, and sit everybody back down
11  and turn the lights back off and put an ABP, an
12  able-bodied person, on the aisle seat while the child
13  was in the window seat --
14    Q.   Okay.
15    A.   -- in the back row.
16    Q.   Had you by that point already identified
17  somebody to be the able-bodied person?
18    A.   Not prior to us discussing it, no.
19    Q.   Okay.
20    A.   I believe I went and found someone after
21  that.
22    Q.   Okay.  So again, just to be specific, you've
23  left the cockpit and you are talking with another
24  flight attendant and are you up in the aft -- I'm
25  sorry, the front galley?

Page 72

1    A.   Yes.
2    Q.   Okay.  And are there any other flight
3  attendants present?
4    A.   I'm not sure if one of them were up there or
5  both, but someone else was up in the galley, yeah.
6    Q.   So there were three up in the front galley?
7    A.   At least.
8    Q.   Okay.  And were they all interested in how
9  you were going to separate them?
10    A.   Yes.
11    Q.   Okay.
12    A.   Everyone was listening.
13    Q.   Did you work out an arrangement where you
14  would ring the call button and then the lights would
15  go up?
16    A.   Yes.
17    Q.   Okay.  And was that your idea?
18    A.   I don't remember who idea it was.
19    Q.   Okay.  And why did you feel it was necessary
20  to do that?
21    A.   To turn the lights on?
22    Q.   Well, to do it on the signal of ringing the
23  call button.
24    A.   It would be the best way to get her attention
25  without waving my hands around.



SCOTT ALEXANDER WARREN
DELVECCHIA vs FRONTIER AIRLINES

December 13, 2019

Page 73

1    Q.  To get whose attention?
2    A.  The flight attendant up front so they can
3  turn on the lights.
4    Q.  Okay.  Why didn't you just turn on the lights
5  right then and there?
6    A.  No, because we didn't want to draw any
7  attention earlier than it needed to be.
8    Q.  Draw whose attention?
9    A.  Well, we turn on lights, everyone's going to
10  look up, everybody on the plane wonder why the lights
11  are on, so we wanted to have the lights on for as
12  short amount of time as possible.
13    Q.  Okay.  But you would agree that once you rang
14  the call button and the other flight attendant turned
15  the lights up, that same event would occur that
16  everybody would look up, right?
17    A.  Yes.
18    Q.  Okay.  And are you saying that there was no
19  way to accomplish the separation with the lights
20  dimmed?
21    A.  It was getting darker at the point, so
22  hopefully we wanted the lights on.
23    Q.  It was getting -- what was getting darker?
24    A.  The plane itself, like it was, you know, it
25  was an evening flight, so it was beginning to get

Page 74

1  dark.
2    Q.  All right, but there's still some lights when
3  it's --
4    A.  It wasn't dark -- it was dark enough to where
5  we wanted to have the lights on.
6    Q.  Because of why?
7    A.  We don't want to move people in the dark.  We
8  want as little -- you know, eliminate any problems
9  that may happen, that somebody may trip over
10  something, that's something else we don't need, so we
11  want it to be lit.
12    Q.  I see.  But, I mean, people get up and use
13  the lavatory in the dark?
14    A.  They do, they do.
15    Q.  Okay.
16    A.  We wanted the lights on.
17    Q.  Okay, you wanted the lights on.
18       Okay, so did you walk straight back to Row 17
19  and lean in and turn on the light?
20    A.  Yes.
21    Q.  Okay.  So you didn't walk to the back first
22  and then come forward?
23    A.  You know, honestly I don't recall if I went
24  to the back first or not.
25    Q.  Okay.

Page 75

1    A.  Sorry.
2    Q.  Where in this process did you make contact
3  with an able-bodied passenger?
4    A.  That was before -- when we came up with the
5  idea to hit the call button and turn the lights on, it
6  was after we made the decision to do that, that's when
7  I went and found an ABP.
8    Q.  Okay.  So you did a trip down the aisle first
9  to find the ABP?
10    A.  Yes.
11    Q.  Okay.  And did you have anybody in mind when
12  you started down the aisle?
13    A.  No, I didn't have anybody in mind.
14    Q.  So you were just looking for the right kind
15  of people?
16    A.  Yes.
17    Q.  And what, in your mind, defines the right
18  kind of people?
19    A.  It was someone who wasn't drinking.
20    Q.  Somebody who wasn't drinking?
21    A.  Yes.
22    Q.  Okay.  How many people weren't drinking?
23    A.  There were quite a few.
24    Q.  Okay.  Any other criteria?
25    A.  No, he was the first one that caught my eye.

Page 76

1    Q.  Male versus female?
2    A.  No, that was the first guy.  Excuse me, it
3  didn't have to be male or female, but he was the first
4  person I saw that looked like a good ABP.
5    Q.  Okay.  And where was he?
6    A.  I don't remember what row he was -- sorry,
7  the sun, the sun is bouncing off the --
8       THE VIDEOGRAPHER:  Could you move that way?
9       THE DEPONENT:  This way?
10       THE VIDEOGRAPHER:  Is that better?
11       THE DEPONENT:  Yeah.
12       I'm sorry, what was the question?
13  BY MR. MCKAY:
14    Q.  That's all right.  So -- I don't remember
15  what my question was.
16    A.  Oh, where was he.
17    Q.  Yeah, where he was.
18    A.  I don't remember what row he was in, but he
19  was in Seat D.
20    Q.  Okay, so on the other side of the -- oh,
21  Seat D, I'm sorry.
22    A.  Yeah.
23    Q.  I thought you said C.  Okay, so Seat D, so on
24  the same side of the plane as Peter and A.D.?
25    A.  Yes, somewhere between 17 and 30.



SCOTT ALEXANDER  WARREN
DELVECCHIA vs FRONTIER AIRLINES
December 13, 2019

Page 77

1    Q.  Okay.

2    A.  Row 17 and 30.

3    Q.  So the able-bodied passenger was seated
4  behind Peter and A.D.?

5    A.  Yes.

6    Q.  Okay.  And were you able to tell whether he
7  was traveling alone?

8    A.  I asked him was he traveling alone.  He said
9  yes.

10    Q.  Okay.  And can you describe him?

11    A.  He was a bigger guy, seemed to be more
12  heavyset, maybe somewhere in his 40s, and that's about
13  it.

14    Q.  Okay.  White, black?

15    A.  I don't recall if he was white or Hispanic.

16    Q.  Okay.  And you spoke to him in English?

17    A.  Yes.

18    Q.  Do you speak any other language?

19    A.  No.

20    Q.  Okay.  And so you asked him if he was
21  traveling alone?

22    A.  Yes.

23    Q.  And what else did you say to him?

24    A.  After that he said he was traveling alone, so
25  I asked him would you be willing -- I said I need to

Page 78

1  separate two people, would you be willing to sit in
2  the back row in the aisle for me, and he said yes.

3    Q.  Okay.  Did you tell him that he would have,
4  you know, some responsibilities with respect to
5  sitting in the -- on the aisle seat?

6    A.  No, I didn't say anything else to him.

7    Q.  All right.  Did he stand up at that point?

8    A.  No.

9    Q.  Okay.  So then did you go to Row 17 or did
10  you go back up to the front galley?

11    A.  Well, we made the plan, I went and found an
12  ABP, and then I don't remember exactly where I went
13  next.

14    Q.  Okay.  So the two choices could have been
15  either back up to the group in the front or -- to say,
16  hey, I found somebody, or it could have been go
17  straight from the plan to hit the call button at Row 17?

18    A.  I don't believe -- we didn't go straight into
19  the plan, but I don't know if I went to the back of
20  the plane or the front of the plane after finding my
21  ABP.

22    Q.  Okay.  So when you went to push the call
23  button, do you remember whether you came from the back
24  up to Row 17 or whether you came from the front and
25  went back to Row 17?

Page 79

1    A.  I don't recall.

2    Q.  Okay.  So what do you recall happening next?

3    A.  When I hit the call button, she turned on the
4  lights.  At that point I'm trying to clear out Row 17,
5  D-E-F, so I stand toward the back of the plane a
6  little bit, like more towards Row 18, because I first
7  had to get the other passenger in D up.

8        And because I was standing toward the back,
9  he automatically, you know, went toward the front, and
10  then Mr. Delvecchia got up and he again went towards
11  the front of the plane, and then I stepped forward,
12  more toward in front of 17, so that when the son came
13  out, he would go toward the back of the plane, so when
14  the son got up, I said go sit -- sorry -- go sit in
15  the back row.

16    Q.  Okay.  Let me break that down a little bit.
17  How did the -- well, first of all, when you mentioned
18  the person in the aisle seat, you made kind of a
19  typing gesture with your hands.  Was he looking at a
20  laptop?

21    A.  Oh, no, I'm just -- I don't know, I'm just
22  talking with my hands.

23    Q.  Okay.  Do you recall whether he was watching
24  a movie or something at the time?

25    A.  I don't remember if he was watching anything.

Page 80

1    Q.  Okay.  Now, the Frontier seats don't have TVs
2  in them, do they?

3    A.  No.

4    Q.  Okay.  So if anybody is watching any kind of
5  entertainment, it's whatever they brought themselves?

6    A.  Correct.

7    Q.  Okay.  And people do bring laptops and watch
8  movies and things?

9    A.  Yes.

10    Q.  Okay.  But you don't remember in this case
11  whether the person on the aisle was watching anything?

12    A.  I don't recall.

13    Q.  Okay.  Now, are you able to touch the call
14  button without leaning over anyone?  Can you do that
15  from the aisle standing up?

16    A.  You can do it from the aisle, yeah.

17    Q.  Okay, so when you got to the row, is the
18  first thing you did to turn on the call button?

19    A.  Yes, when it was time, yes.

20    Q.  Okay.  And I am sorry, how did you determine
21  it was time?

22    A.  Once I found my ABP and I had spoke with the
23  ladies up front.

24    Q.  Okay.  So you go to Row 17 and you turn on
25  the call button.  I presume that might have gotten



SCOTT ALEXANDER  WARREN                              December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 81

1  somebody's attention, did it, on Row 17?
2      A.  I don't know if that got their attention or
3  not.  When I rang the call button, lights turn on, I
4  got everybody up.  I wasn't like looking at their
5  faces when I pressed the call button.
6      Q.  Okay.  How -- obviously the person on the
7  aisle had to get up first, right?
8      A.  Yes.
9      Q.  Okay.  How did you communicate to that person
10  the reason why he needed to get up?
11      A.  I didn't give a reason.
12      Q.  What did you say?
13      A.  I need to clear the row out.
14      Q.  Okay.  Is that your exact words?
15      A.  Those may have been my exact words, but I
16  said I need to clear the row out, yeah.
17      Q.  Okay.  So then that person stood up and --
18  unbuckled, obviously, stood up and went more toward
19  the front of the plane?
20      A.  Yes.
21      Q.  Toward Row 16?
22      A.  Correct.
23      Q.  Okay.  And then you -- what did you say to
24  Peter?
25      A.  I don't remember exactly what I said.  I

Page 82

1  think I may have repeated myself and said I need to
2  clear the row out, I need to clear the row out.
3      Q.  Did he appear to you that he had just woken
4  up?
5      A.  I don't remember the look on his face, no.
6      Q.  All right.  Did you touch him?
7      A.  No.
8      Q.  You didn't hit him?
9      A.  No.
10      Q.  You deny hitting him?
11      A.  I did not hit him.
12      Q.  Okay.  You know you're under oath here.
13      A.  Yes.
14      Q.  Okay.  So you never laid a hand on Peter; is
15  that your testimony?
16      A.  I never laid a land on him.
17      Q.  Okay.  Now, what did you say to get him out
18  of his seat?
19      A.  I don't remember exactly what I said.  I may
20  have repeated myself and said I need to clear the row
21  out, I need to clear the row out, but I don't recall
22  exactly what I said to him.
23      Q.  Okay.  But you recall that he did stand up?
24      A.  Yes.
25      Q.  All right.  And where did he go again?

Page 83

1      A.  He went towards 16 as well, behind the other
2  gentleman.
3      Q.  Okay.  He went behind the first gentleman?
4      A.  Yes.
5      Q.  All right.  And then that left A.D. in the
6  window seat, right?
7      A.  Yes.
8      Q.  Now, again, did you make any observation with
9  respect to the shade on the window?
10      A.  I don't recall what position the shade was
11  in.
12      Q.  Okay.  Did you observe what A.D. was wearing?
13      A.  No, I don't remember what he was wearing.
14      Q.  Okay.  But you do -- it was the same thing he
15  was wearing when you saw Peter's hand, right?
16      A.  I don't remember.
17         MR. MAYE:  Object to form.
18  BY MR. MCKAY:
19      Q.  You don't remember?
20      A.  No.
21      Q.  Okay.  So how did you communicate anything to
22  A.D.?
23      A.  I told him to go sit in the back row.
24      Q.  Was he awake at this point?
25      A.  He was standing up and moving toward the

Page 84

1  aisle, yes, he was awake.
2      Q.  So you didn't have to touch him to shake him
3  awake or anything?
4      A.  No.
5      Q.  Okay.  And you said get up?
6      A.  I said you need to go sit in the back row.
7      Q.  Okay.  And did you tell him why?
8      A.  No.
9      Q.  So what happened next?
10      A.  He went to sit in the back row and then I
11  told Peter and the other gentleman you two can sit
12  back down, I waved for the lady to turn the light off,
13  and then I went to -- on my way to the back because
14  the son was already headed toward the back row.  On my
15  way back, I grabbed my ABP and I told him to sit in
16  the back row now.
17      Q.  Okay.  So the lights were bright and you were
18  standing at Row 17 watching A.D. go back to the last
19  row?
20      A.  I wasn't watching him.  I sent him back that
21  way.
22      Q.  Okay.  What is the last row, what's the
23  number, 31?
24      A.  30.
25      Q.  30, okay.  So you told him to go sit in



SCOTT ALEXANDER WARREN                                    December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 85

1  Row 30?
2      A.  Go sit in the back row.
3      Q.  Okay.  And the lights were still bright and
4  you watched Peter sit back down and the aisle seat
5  gentleman sit back down?
6      A.  Yes.
7      Q.  And was that the signal then for the lights
8  to go out?
9      A.  Once they sat down, I waved up front and she
10  turned the lights off.
11      Q.  Where in this process did you turn off the
12  call button?
13      A.  I don't remember when I turned the call
14  button off.  I probably just pressed it twice real
15  quick because it dings and then you turn it off.
16      Q.  I see.  And you don't remember when you did
17  that?
18      A.  No.
19      Q.  Okay.  And so now the lights have been dimmed
20  because you waved to somebody up front?
21      A.  Yes.
22      Q.  And now you walk to the row where the ABP was
23  sitting?
24      A.  Yes.
25      Q.  Was he on the aisle seat?

Page 86

1      A.  Yes, he was in D.
2      Q.  Okay.  And what then did you say to him?
3      A.  You can go sit in the back row now.
4      Q.  Okay.
5      A.  Excuse me.
6      Q.  Did you watch him go sit in the back row?
7      A.  Yes.
8      Q.  Okay.  And, again, do you want to take a
9  break?
10      A.  No, I don't.
11      Q.  Okay.  So do you need to be somewhere today?
12      A.  Nope.
13      Q.  Okay.
14          THE VIDEOGRAPHER:  Counsel, I eventually need
15  to just --
16          MR. MCKAY:  You need to change tape?
17          THE VIDEOGRAPHER:  Yes.
18          MR. MCKAY:  Yeah, let's take a break, we'll
19  go off, off the record.
20          THE VIDEOGRAPHER:  The time is approximately
21  11:40 a.m.  We're going back on the record.
22          MR. MCKAY:  No, we're going off the record.
23          THE VIDEOGRAPHER:  I'm sorry.
24          (Recess taken.)
25          THE VIDEOGRAPHER:  The time is approximately

Page 87

1  11:53 a.m.  We are now going back on the record.
2  BY MR. MCKAY:
3      Q.  Mr. Warren, before we broke, you were talking
4  about the observation that you made prior to
5  re-seating A.D., and it was, as you interpreted it, an
6  improper touching of the child by Peter?
7      A.  Excuse me?
8      Q.  As you interpreted what you say you observed,
9  it was an inappropriate touching of the child by
10  Peter?
11      A.  Yes.
12          MR. MAYE:  Object to form.
13  BY MR. MCKAY:
14      Q.  Had you, prior to this, ever witnessed an
15  inappropriate touching of a child by an adult?
16      A.  No.
17      Q.  Never in your life?
18      A.  No.
19      Q.  Okay.  Under any circumstances whatsoever?
20      A.  No.
21      Q.  Okay.  So this was a first for you?
22      A.  Yes.
23      Q.  Okay.  Now, the arrangement where you would
24  touch the call button and Amanda -- or somebody, I'm
25  sorry, you didn't give a name -- somebody would make

Page 88

1  the lights brighter, was that your idea?
2      A.  I don't remember whose idea it was.
3      Q.  Could have been yours?
4      A.  I don't remember.
5      Q.  Okay.  They would have been at Dim 2
6  previously, right?
7      A.  They were off.
8      Q.  I'm sorry, they were off?
9      A.  The lights were off.
10      Q.  There were no lights on whatsoever?
11      A.  No.
12      Q.  When did that happen?
13      A.  I don't recall the lights ever being on.
14      Q.  Okay, on the whole flight?
15      A.  Correct.  I mean, they were on in the galleys
16  on Dim 2, unless someone wants it brighter, but we
17  don't turn the lights on in the --
18      Q.  Cabin?
19      A.  -- the cabin until we're at time to land, do
20  final.
21      Q.  Okay.  So it's your belief that at the time
22  that you rang the call button, the lights were all the
23  way off?
24      A.  Yes.
25      Q.  Okay.  And they would have been that way also



SCOTT ALEXANDER  WARREN                           December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

1  in the, in the several minutes previous to that point?
2      A.  Yes.  We may have turned them on during
3  service.  I don't remember.  Some people like to turn
4  them on during service if it's harder to see, but I
5  don't remember if they were on during service or not,
6  but they were off prior to me ringing the call button.
7      Q.  Okay.  And when you observed Peter apparently
8  asleep, how was he seated in his chair?
9      A.  He was seated straight up with, you know, the
10  head kind of leaning back.
11      Q.  Okay.  Didn't have his head forward at all?
12      A.  No.
13      Q.  Okay.  All right.  And how was A.D.
14  apparently sleeping when you observed him?
15      A.  He was in a similar position, back up against
16  the chair, head back.
17      Q.  Okay.  Not leaning against the side of the
18  wall?
19      A.  He may have been leaning towards the wall,
20  but he was sitting more straight up.  He was not
21  hunched forward.
22      Q.  Okay.  I'm going to ask you -- I may have
23  accidentally handed you the exhibit marked 2.  Do you
24  have another single page under that?  No.
25          Okay, let me see.  Oh, no, 2 is right in

1  front of me.  What was the other one, 3?  Okay, good
2  enough.
3          Let me have you look now at Exhibit No. 2, if
4  you would.  Have you ever seen that document before?
5      A.  No, I haven't.
6      Q.  Okay.  I see what the problem is.  I had them
7  marked incorrectly on my own copies.
8          Okay, so how about the text that has dates
9  beside it under job performance, attendance and
10  recognition commendation; are those things that you
11  were previously aware of before today?
12      A.  Yes.
13      Q.  Okay.  Do you know who Robert Beswick is,
14  B-E-S-W-I-C-K?
15      A.  No, I don't.
16      Q.  Okay.  But on April 18 of 2018 it says been
17  advised not to hold on to credit cards.  Does that
18  mean that you were advised not to hold on to credit
19  cards?
20      A.  That is -- we do the inflight promotions with
21  the credit cards and they want you to mail them in as
22  soon as possible for the people that filled them out
23  and give them back to you.  One had fell to the
24  bottom -- I lost it, essentially.  It was still in my
25  possession somewhere, but it fell somewhere in one of

1  my bags I stopped using.  So when I found it, I turned
2  it in, but it was like a few months after the date
3  that was on there, so I received the e-mail saying
4  don't hold on -- it's credit card applications, not
5  actual credit cards.
6      Q.  That's what I was going to say, it doesn't
7  say applications.
8      A.  Yes, that's --
9      Q.  It says don't hold on to credit cards.
10      A.  That's credit card applications, yeah.
11      Q.  That's what you're saying, is this was
12  related to an application?
13      A.  Yes.
14      Q.  All right.  And then approximately a month
15  later, there's something about undershirts and --
16  shirts and undershirts, right?
17      A.  Yeah, the undershirt is supposed to be white
18  with the uniform.
19      Q.  Okay.  What is C-B-A-R-C-O-M?
20      A.  Is that someone's name?
21      Q.  I don't know.  I was asking you.  Do you
22  recognize it?
23      A.  I'm not familiar with that person, no.
24      Q.  Okay.  You think that's somebody's name?
25      A.  That -- oh, that -- Cody was -- he's the one

1  that ta ked to me about that.  Cody was our supervisor
2  at the time.
3      Q.  Okay.  So you think that's Cody Barcom?
4      A.  Yeah.
5      Q.  Okay.  And then on November 5, it says coach
6  and counsel regarding failure to complete must reads
7  18-35 and 18-36 by their scheduled due dates, and then
8  it says Mary, M-A-R-Y, Inflight, and then Mary dot
9  Slater; do you see that?
10      A.  Yes.
11      Q.  Do you know who Mary Slater is?
12      A.  I don't know who she is, no.
13      Q.  Do you know what is meant by Mary Inflight?
14      A.  She works inflight.  That's the department,
15  inflight.
16      Q.  Is inflight the department that handles
17  flight attendants?
18      A.  Yes.
19      Q.  Okay.  And what does coach and counsel mean?
20      A.  She sent an e-mail basically telling me that
21  I need to -- because I was under the impression -- I
22  was off, I didn't work for a while, just had some days
23  off, and I was under the impression initially that the
24  must reads had to be done before you flew again, but I
25  learned that they were due on that exact date, so



SCOTT ALEXANDER  WARREN                                    December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 93

1   that's what that one is.
2      Q.  I see.  When you say due, it means you have
3   to put a little code in at the bottom to indicate that
4   you read it?
5      A.  Yes.
6      Q.  Okay.  And why were you off for a while?
7      A.  I had sick time.
8      Q.  Okay.  I mean, were you sick or were you just
9   taking time off?
10     A.  No, I used my sick time.
11     Q.  All right.  Do you remember what you used it
12  for?
13     A.  No.
14     Q.  Okay.  August 12 of 2019, received complaint
15  from FA regarding Scott's attire while DHD.
16         Is that received a complaint from a flight
17  attendant regarding Scott's attire while deadheading?
18     A.  Yes.
19     Q.  Okay.  Do you remember the circumstances
20  there?
21     A.  Yeah, some flight attendant took a picture of
22  me.  I had on a black polo shirt and some khakis and
23  apparently that wasn't business casual enough for
24  them, so --
25     Q.  Why is that not business casual?

Page 94

1      A.  I don't know.  So she called me and said you
2   need to be in business casual when you deadhead.
3      Q.  Okay.  And it says here, I left him a
4   voicemail explaining what is acceptable and to
5   consider this a C slant C that will be placed in his
6   file.
7         Is that a coach and counsel?
8      A.  I don't know what that is.  That sounds
9   right, but I'm not sure.
10     Q.  Okay.  And then it says SSD and then a hyphen
11  and then KThompson; is that somebody you know?
12     A.  Kerry Thompson, yes.
13     Q.  Okay.  And who is Kerry Thompson?
14     A.  She's one of the inflight supervisors over
15  everybody.
16     Q.  Okay.  What does SSD mean?
17     A.  I'm not familiar with that.
18     Q.  All right.  So if there is something
19  significant about a coach and counsel, then it looks
20  like you have two of them in your file so far; is that
21  right?
22     A.  According to this, yes, there's two of them.
23     Q.  Okay.  And then the next thing is September 7
24  of 2019.  It reads, our reports indicate that the
25  required CBT, and then it's either 11 or a Roman

Page 95

1   Numeral II, online course was not completed which was
2   due on August 31, 2019.  As a result, a documented
3   verbal warning was issued via e-mail.  Then it says
4   Corazon dot Gerber.  Is that the Corazon you mentioned
5   before?
6      A.  Yes.
7      Q.  Okay, so her last name is Gerber?
8      A.  Yes.
9      Q.  All right.  And CBT would be computer-based
10  training?
11     A.  Correct.
12     Q.  All right.  Do you know what course that was?
13     A.  Yes, that was a follow-up to our yearly, our
14  annual training.
15     Q.  Okay.  And so what does your annual training
16  involve?
17     A.  It consists of first we have to arm and --
18  no, we have to do an evacuation on the mock-up of the
19  plane, we have to do CPR, and then the rest of the day
20  is them going through different models -- modules,
21  excuse me, changes in the system, just things that --
22  excuse me -- things to refresh you on.
23     Q.  Okay.  And then you get tested on them?
24     A.  No, there's a test prior to going into
25  training.

Page 96

1      Q.  Okay.  And so this is referring not to a test
2   but to an actual online course?
3      A.  It's a follow-up.  It's a follow-up to the
4   training that you did.
5      Q.  Okay.
6      A.  The test has to be done prior to going into
7   the yearly training.
8      Q.  Okay.  And it had to be completed when due,
9   and apparently it wasn't completed when due; is that
10  right?
11     A.  No, I didn't have it due by the due date.
12     Q.  You didn't have it in by the due date, okay.
13  And this says as a result a documented verbal warning
14  was issued.
15         So a verbal warning, I presume, is something
16  more than a coach and counsel?
17     A.  Correct.
18     Q.  Okay.  So you have a -- you have two coach
19  and counsels and one verbal warning up to September 7
20  of 2019; is that right?
21     A.  That's correct.
22     Q.  Okay.  Now, is there, is there a limit to how
23  many you can get?
24     A.  You can have eight points.
25     Q.  Eight points?



SCOTT ALEXANDER  WARREN                                    December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

1    A.  Yeah, not everything gives point.

2    Q.  I see.  What gives points?

3    A.  Lates, if you're late to a flight or checking
4   in, that's points, no-call/no-shows, late sick calls,
5   sick calls in general; but nothing on here, I think,
6   added any points.

7    Q.  All right.  Well --

8    A.  And I would actually only have -- I don't
9   have any -- they fall off after a year, so the 11-5
10  isn't on my record anymore, it would just be the C and
11  C from 8-12.

12   Q.  Okay.  Now, I see you have an attendance, is
13  that a no-show, NSO?

14   A.  That's a no-show, yes.

15   Q.  Okay.  On Christmas Eve of 2017, and it says
16  that places Scott at 4.0 points, right?

17   A.  Correct.

18   Q.  And DVW issued, is that a documented verbal
19  warning?

20   A.  Yes.

21   Q.  And then e-mail sent, and then Jennifer
22  Nielson; who is that?

23   A.  I don't know who that is.

24   Q.  Okay.  So actually January 2 of 2018 was
25  prior to September 7 of 2019, right?  So you had two

1   verbal -- documented verbal warnings as of September 7
2   of 2019, rather than one?

3    A.  In all, but they fall off after one calendar
4   year, so that's no longer . . .

5    Q.  Okay.  All right.  So you do have some things
6   on your record.  That's what's shown here on
7   Exhibit 2, right?

8    A.  Yes.

9    Q.  Okay.  And you say you can have eight.  What
10  happens if you get eight?

11   A.  You get terminated.

12   Q.  All right.  How many do you have as you sit
13  here now?

14   A.  Four.

15   Q.  Okay, so you're halfway there.

16       I'm going to have you look at what's been
17  marked as Exhibit 3.  Where did I put it?  Aha.  All
18  right.  And I'll represent to you that that's been
19  produced to us in this litigation.  It appears to be a
20  summary of your training; would you have any reason to
21  disagree with that?

22   A.  No, these appear to be things we've done
23  during training.

24   Q.  Okay.  Does that appear to be a complete
25  record of the training courses that you've completed?

1    A.  I'm not -- if this is everything -- if they
2   said it's everything, I guess it is, but I would
3   imagine it would have been more than this.

4    Q.  Oh, okay.

5    A.  This is like --

6    Q.  Do you recall any recent ones?

7    A.  No, nothing more recent than recurrent issue
8   that -- excuse me.

9    Q.  Okay.  And so is that recurrent emergency
10  training, is that your annual one that you were
11  mentioning?

12   A.  Yes, um-hum.

13   Q.  Okay.  And so some of that is done in person
14  and some of it is done online?

15   A.  The test is done online, everything else is
16  done in person.

17   Q.  Okay.  All right, that's all I have on that.

18       I'd like to show you now what's been marked
19  as Warren Exh bit 4, and it's labeled Las Vegas
20  Metropolitan Police Department Voluntary Statement at
21  the top; do you see that?

22   A.  Yes.

23   Q.  And there's a section that's got black bars
24  on the top and the bottom and it says this portion to
25  be completed by officer.  Is the information that's

1   inside that something that somebody else wrote?

2    A.  Yes, I did not write that.

3    Q.  Okay.  And then down at the bottom there's a
4   couple of redactions represented by empty boxes, but
5   above them is a printed statement, I have read this
6   statement and affirm to the truth and accuracy of the
7   facts contained herein.  This statement was completed
8   at McCarran Airport, 5757 Wayne Warren Boulevard,
9   Las Vegas, Nevada 89115, on the 28th day of March at
10  10:10 p.m., 2019; did you sign that statement?

11   A.  Yes, I remember signing it.

12   Q.  Okay.

13   A.  I didn't write everything, though.  I did not
14  write -- the address is not -- I didn't write that,
15  but I wrote McCarran Airport.  Someone else wrote
16  5757 Wayne Newton Boulevard.

17   Q.  Okay, thank you.  And I'm sorry, it's Wayne
18  Newton Boulevard, right?

19   A.  Wayne Newton, yeah.

20   Q.  Okay.  I remember Wayne Newton.  I'm that
21  old.

22       So the parts in between the this portion to
23  be completed by officer and that that you just
24  mentioned, all of it, that in the middle, is written
25  by you?



SCOTT ALEXANDER  WARREN                           December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 101

1    A.  Yes.
2    Q.  Okay.  And let's go through that, if we
3  could, please.
4         It says during our beverage and trash service
5  about 30 minutes into the flight the A and D flight
6  attendants noticed, and then it's a redaction, and
7  then followed by, not in the normal way.
8         Do you know what was written there?
9    A.  I don't remember it word for word, but that
10  would be something to the effect of noticed that
11  Mr. Delvecchia was touching his son's face not in a
12  normal way.
13    Q.  Okay.  And the not in a normal way was what
14  they said to you?
15    A.  I remember them saying in a weird, in a weird
16  manner.
17    Q.  Okay.  And then it says I walked by the two
18  people and noticed the, and then there's another
19  blank.
20    A.  It would have said that the man's hand was on
21  the child's crotch.
22    Q.  Okay.  I told the captain and he suggested we
23  separate them.  After moving --
24    A.  The child.
25    Q.  -- the child to 30F and placing an ABP in

Page 102

1  30D, I ta ked to --
2    A.  The father.
3    Q.  -- the father.
4    A.  No, excuse me, excuse me.
5    Q.  Okay.
6    A.  Okay, no, no, no, that was not the father
7  yet.  I talked to the child.
8    Q.  Talked to the child.  He said he was blank
9  and blank.
10    A.  One would have been adopted.  I'm not -- I
11  don't recall the second blank.
12    Q.  Okay.  And he said --
13    A.  Oh, maybe he said he was 12 years old and he
14  was adopted when he was three, I remember him saying
15  that.
16    Q.  Okay, you remember that?
17    A.  Yes.
18    Q.  All right.  And how did that come about, that
19  conversation?
20    A.  After -- excuse me -- after I moved the child
21  to the back row and had the ABP in the aisle seat, I
22  took a few minutes and sat down in Seat 30E and I just
23  asked the child a few questions, you know, asked him
24  is he okay, who is that guy, do you know where his
25  hand was on you, asked him was he safe, reassured him

Page 103

1  he was safe, you know, he can tell me if he isn't, and
2  we offered him something to drink.
3    Q.  Okay.  So you were seated in the middle seat
4  between the able-bodied passenger and the child?
5    A.  Well, he stood up for a moment so I could sit
6  down.
7    Q.  The able-bodied passenger did?
8    A.  Yes.
9    Q.  Okay.  So then you sat down and you asked who
10  the man next -- the man who you took him away from
11  was?
12    A.  I don't remember my exact words, but yeah, I
13  asked him something to the effect who is that man, do
14  you know him.
15    Q.  Okay.
16    A.  Something along those lines.
17    Q.  Okay.  So now previously we've been ta king,
18  we've been referring to him as the father.  Did you
19  not know he was his father?
20    A.  Did I know at the time?  I don't remember if
21  I knew at the time.  I don't remember if I knew --
22  when did I learn he was his father.
23    Q.  So you may have just found that out just
24  then?
25    A.  Through talking to the child, yeah.

Page 104

1    Q.  Okay.
2    A.  I'm not sure when I initially found out
3  that -- when he was his father.
4    Q.  All right, I believe you said you asked him
5  if he knew that the man's hand had been on his crotch?
6    A.  Yes, I said do you know where his hand was --
7  yeah, I don't remember my exact words.
8    Q.  And what did he say?
9    A.  He said no, he didn't know that his hand was
10  on him.
11    Q.  Okay.  Did he deny that the hand was on him?
12    A.  He said he did not know that the hand was on
13  him.
14    Q.  I see.  And then you said you showed him
15  where it was?
16    A.  No.
17    Q.  No?
18    A.  I show him like -- I did not touch the child,
19  no.
20    Q.  Are you sure of that?
21    A.  Positive.
22    Q.  Did you come close to touching him?
23    A.  No.
24    Q.  Did you place your hand in the area of where
25  you had seen the father's hand?



SCOTT ALEXANDER  WARREN                                    December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 105

1    A.  No.
2    Q.  Nowhere even close?
3    A.  No.
4    Q.  You're sure of that?
5    A.  Positive.
6    Q.  All right.  And then it says, says he was
7  blank, also said that they had been separated before
8  on a flight.
9        Do you see that?
10   A.  Yeah.
11   Q.  What was the blank?
12   A.  I don't recall what that one is.  Says he was
13  safe, says he was -- I don't recall what that one was.
14   Q.  All right.  Also said that they had been
15  separated before on a flight.
16       Did he tell you that?
17   A.  Yes.
18   Q.  What did he say?
19   A.  He said this has happened before, we've been
20  separated before.
21   Q.  And you're sure he said the word separated?
22  Yes?
23   A.  If I -- like we wrote this right after
24  landing.  I could be wrong, but I thought he said
25  that.

Page 106

1    Q.  Okay.  He said he had no idea that blank.
2    A.  His hand was on his crotch.
3    Q.  All right.  He also asked if he could go sit
4  next to --
5    A.  His father.
6    Q.  -- in 17E and 17F.  I said no.
7        Is that your saying that you said to him no?
8    A.  Yeah.  Yes.
9    Q.  So this child told you that as far as he
10  knew, he did not know that there had been any
11  inappropriate touching, that he was seated with his
12  father, who had adopted him when he was three, and he
13  wanted to go back and sit with his father, and you
14  said no?
15   A.  Yes.
16   Q.  And why did you say no?
17   A.  At that point we had captain's orders to
18  separate because his hand was on his crotch.
19   Q.  Okay.  So the captain's orders had come based
20  on your statement that you had seen the hand on the
21  crotch?
22   A.  Yes.
23   Q.  And even though the boy said that he didn't
24  have any problem with that and wanted to go sit with
25  his father, you said no?

Page 107

1        MR. MAYE:  Object to form.
2        THE DEPONENT:  I said no.
3  BY MR. MCKAY:
4    Q.  Okay.  And when you told the captain that you
5  had seen the father's hand or the man's hand on the
6  crotch of the child, did you inform the captain that
7  they were both asleep?
8    A.  I don't recall if I told the captain if they
9  were -- appeared to be asleep or not.
10   Q.  That would have been important information,
11  wouldn't it?
12       MR. MAYE:  Object to form.
13       THE DEPONENT:  I don't think so.
14  BY MR. MCKAY:
15   Q.  You don't think it would be important to tell
16  him that you saw two people sleeping and thought that
17  one person's hand was on another?
18   A.  No.
19   Q.  Do you think that people molest other people
20  in their sleep?
21       MR. MAYE:  Object to form.
22       THE DEPONENT:  No.
23  BY MR. MCKAY:
24   Q.  Okay.  So if Peter had been asleep, then he
25  couldn't have been molesting his child, right?

Page 108

1        MR. MAYE:  Object to form.
2        THE DEPONENT:  He appeared to be sleeping.
3  He could have not been asleep.
4  BY MR. MCKAY:
5    Q.   I see, so there was speculation on your part
6  that he might not have been asleep?
7        MR. MAYE:  Object to form.
8        THE DEPONENT:  He might not have been
9  sleeping.  His eyes were closed, but that doesn't mean
10  someone is asleep.
11  BY MR. MCKAY:
12   Q.  Did you ever make any attempt to figure out
13  whether he was sleeping or not?
14   A.  No.
15   Q.  Okay.  Did you ever make any attempt to
16  figure out whether the child had been sleeping or not?
17   A.  No.
18   Q.  Did you ever ask the child whether he
19  consented to having his father sleeping next to him
20  and touching him, if he was touching him?
21   A.  No.
22   Q.  Okay.  All right.  Then it says in your
23  statement about ten minutes later blank came to the
24  back row and asked why blank who he says blank had
25  been moved.



SCOTT ALEXANDER  WARREN                           December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 109

1    A.   About ten minutes later the father came to
2    the back row and asked why -- I don't remember the
3    rest of that, but about ten minutes later, he came
4    back to the plane to ask why his son had been moved.
5    Q.   Okay.  Maybe who he says was his son?
6    A.   I don't recall what's in the blanks.
7    Q.   All right.  And then on the next page it says
8    I told him because we saw you blank.
9    A.   I don't recall exactly what is behind that
10   blank, but if I put we, it would have been we because
11   -- I'm the only one that saw the hand on the crotch,
12   but the other ladies said they saw him rubbing his
13   face in a weird, inappropriate manner.
14   Q.   So --
15   A.   So I'm not sure exactly what's behind that
16   because we saw you blank.
17   Q.   But it indicates that you responded -- when
18   he asked you why his son was taken from him, you
19   responded by telling him the details of what
20   supposedly had been seen?
21   A.   Yes.
22   Q.   Okay.  And then it says he says he was sleep
23   and did not know blank.
24   A.   His hand was on the child's crotch.
25   Q.   Okay.  And that's a pretty important

Page 110

1    statement, isn't it?
2         MR. MAYE:  Object to form.
3         THE DEPONENT:  No.
4    BY MR. MCKAY:
5    Q.   No, even though you don't believe people can
6    molest other people in their sleep?
7         MR. MAYE:  Object to form.
8         THE DEPONENT:  The way his hand was down in
9    between the legs -- like if it would have been sitting
10   on top, that would have been, okay, maybe he fell
11   asleep, his hand was on his leg, but the way the
12   fingers were in there, that -- you know, that's what
13   drew the attention.
14   BY MR. MCKAY:
15   Q.   Now, you previously said, and I apologize for
16   the graphicness, but you said the hand -- you told the
17   captain his hand was on his penis.
18   A.   Yes.
19   Q.   Right?  Okay.  You're presumably familiar
20   with male anatomy, right?
21   A.   Yeah.
22   Q.   So if the hand is between the thighs, that's
23   not where the penis is, is it?
24   A.   The way his hand was here -- can I stand up
25   and show you again?

Page 111

1    Q.   Yeah.
2    A.   Here, there's a penis right under there.
3    Q.   Yeah.
4    A.   Yeah, that's the penis.
5    Q.   Okay.
6    A.   So that's where -- that's how his hand was on
7    the child.
8    Q.   Yeah.
9    A.   So, yes, his hand was on his penis.
10   Q.   Okay, so the heel of his hand then was in the
11   area --
12   A.   Yeah, like grabbing.
13   Q.   -- of the child's -- I see.
14   A.   The balls down here and everything.
15   Q.   All right.  Now, it's certainly possible,
16   isn't it, that the child didn't mind that and didn't
17   consider it sexual?
18        MR. MAYE:  Object to form.
19        THE DEPONENT:  There is a possibility the
20   child could not have found it that way, but --
21   BY MR. MCKAY:
22   Q.   Yeah.
23   A.   -- either way, we report what we see.
24   Q.   And this was important to you, wasn't it?
25   A.   Excuse me?

Page 112

1    Q.   This was important to you?
2    A.   Yes.
3    Q.   Okay.  And it was important to you to make
4    sure that what you believed to be something
5    inappropriate was acted on?
6    A.   Yes.
7    Q.   Okay.  And what is it that you said next?  It
8    says I told him we will --
9    A.   We will sort it out on the ground.
10   Q.   -- sort it out on the ground and he returned
11   to his seat, he being the father?
12   A.   Yes.
13   Q.   And then you made a point of saying he never
14   checked on blank for the rest of the flight.
15   A.   The child.
16   Q.   And it says he also asked if blank told us
17   that blank blank.
18   A.   Yeah, when I said we saw your hand on the
19   crotch, he asked, well, did he tell you that or did
20   you see it?
21   Q.   I see.
22   A.   And I told him, no, we saw you.
23   Q.   I told him no, we saw you?
24   A.   Yes.
25   Q.   And is it your testimony here under oath that



SCOTT ALEXANDER WARREN                    December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 113

1   this is exactly what you said to him?
2       A.   Yes.
3       Q.   Okay.  Now, if you look back at the inflight
4   must read that was Bond Exhibit 5 -- do you still have
5   that near you or does your counsel?
6       A.   I don't have that one.
7           MR. MCKAY:  I think it's in front of you down
8   there.  Can he look at that?
9           THE DEPONENT:  The must read.
10          MR. MAYE:  Oh, he can look at this one, yeah,
11  that's fine.
12          THE DEPONENT:  Thanks.
13          MR. MCKAY:  Okay.
14  BY MR. MCKAY:
15      Q.   Now, the second paragraph there, could you
16  read that?
17      A.   Out loud?
18      Q.   Yes, please.
19      A.   Immediately remove the affected individual --
20      Q.   I'm sorry, the one starting with the word
21  sexual.
22      A.   Sexual misconduct allegations need to be
23  treated with sensitivity and confidentiality while
24  remaining neutral.
25      Q.   So the sensitivity and confidentiality is an

Page 114

1   instruction to you as to how to handle the situation,
2   right?
3       A.   Yes.
4       Q.   And while remaining neutral, that means for
5   you to remain neutral, right?
6       A.   Yes.
7       Q.   And it says once an incident involving sexual
8   misconduct is reported to a flight attendant -- now,
9   first of all, this wasn't reported to you, was it, it
10  was something that you claim that you saw?
11      A.   The hand on the crotch, yes.  The other
12  ladies informed me of the rubbing of the face.
13      Q.   All right.  Is rubbing of the face something
14  that is sexual misconduct?
15      A.   I didn't see how it was done, so I can't say.
16      Q.   Okay, so it's a nothing as far as your
17  analysis, right?
18          MR. MAYE:  Object to form.
19  BY MR. MCKAY:
20      Q.   You didn't see it?
21      A.   I didn't see it.
22      Q.   You don't know how it was done?
23      A.   I don't know how it was done, I didn't see
24  it.
25      Q.   So if somebody said, hey, I saw so-and-so

Page 115

1   rubbing so-and-so's face, you're not going to say,
2   aha, sexual misconduct, right?
3       A.   No.
4       Q.   Okay.  So it really is the hand on the crotch
5   that you claim you saw and that is the incident of
6   sexual misconduct that you were acting on, right?
7       A.   Yes.
8       Q.   Okay.  And No. 1, it says advise the affected
9   individual, quote, for your safety, we are removing
10  you from the situation.  The pilot will be notified
11  and law enforcement will meet aircraft upon arrival at
12  the gate, end quotes; do you see that?
13      A.   Yes.
14      Q.   Okay.  And that was what was sent to you as a
15  must read on March 15 of 2019?
16      A.   Yes.
17      Q.   And you read it?
18      A.   Yes.
19      Q.   And you put in the little code at the end to
20  confirm that you read it?
21      A.   Yes.
22      Q.   Okay.  And did you say to A.D. those words?
23      A.   No.
24      Q.   No.  In fact, you sat down next to him and
25  asked him all about whether he knew that his own

Page 116

1   father's hand was groping his penis, right?
2       A.   Not in those exact words.
3       Q.   But pretty much essentially that?
4       A.   Yes.
5       Q.   Okay.  So that's not in conformity with these
6   instructions, is it?
7           MR. MAYE:  Object to form.
8           THE DEPONENT:  Not word for word, no.
9   BY MR. MCKAY:
10      Q.   No.  No. 2 says immediately remove the
11  affected individual who has reported the misconduct;
12  but that would be one of -- that would be you, right?
13  I mean, nobody reported the misconduct to you, did
14  they?
15          MR. MAYE:  Object to form.
16          THE DEPONENT:  This is in a case where
17  someone like a passenger tells us about, because
18  you're still going off of that --
19  BY MR. MCKAY:
20      Q.   No. 2.
21      A.   -- when it's reported to a flight -- so this
22  is going off of if like another passenger says, hey,
23  someone was touching me.
24      Q.   Okay.  The next clause --
25      A.   I can't remove myself from the plane.



SCOTT ALEXANDER WARREN                                    December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 117

1    Q.  I understand.
2    A.  The situation.
3    Q.  That's not recommended.
4        The next clause says do not question the
5    individual about the allegation.
6        Which individual is that?
7    A.  I would imagine that would be the person who
8    did the sexual misconduct, so in this case,
9    Mr. Delvecchia.
10   Q.  Okay.  So do not question him about the
11   allegation, it says, yet you said we saw what you did.
12   A.  That's not a question.
13   Q.  Ah.
14       MR. MAYE:  Object to form.
15   BY MR. MCKAY:
16   Q.  Okay, so you're saying that you're okay
17   because nothing that you said to him was technically a
18   question; is that right?
19       MR. MAYE:  Object to form.
20   BY MR. MCKAY:
21   Q.  Sir, is that right?
22   A.  It was not a -- I didn't question him, no.
23   Q.  I see.  Okay.
24       Well, let's drop down to No. 4.  Would you
25   read what No. 4 says, please, out loud?

Page 118

1    A.  Please don't advise the accused of the
2    situation or ask for witness reports as this sensitive
3    process will all be handled by the LEO.
4    Q.  Okay, and the LEO is law enforcement officer?
5    A.  Yes.
6    Q.  Okay, so it says -- in fact, it doesn't even
7    say please.  It says do not advise the accused of the
8    situation or ask for witness reports as this sensitive
9    process will all be handled by the LEO, law
10   enforcement officer, right?
11   A.  Yes.
12   Q.  Okay, so what you did with respect to
13   Mr. Delvecchia did not follow that instruction, did
14   it?
15       MR. MAYE:  Object to form.
16       THE DEPONENT:  No.
17   BY MR. MCKAY:
18   Q.  Okay.  No. 5 says upon landing, ask
19   passengers to remain seated and do not open the main
20   cabin door until a law enforcement officer is present.
21       Did you do that?
22   A.  No.
23   Q.  Okay.  No. 6 says flight attendants must
24   submit an incident report within 24 hours of the
25   flight.

Page 119

1        Did you do that?
2    A.  Yes.
3    Q.  So if I were to ask Frontier, I would find an
4    incident report filed by you?
5    A.  I was under the belief that this here was --
6    what I gave to the police was my incident report.
7    Q.  Well, that didn't go to Frontier, that went
8    to the police.
9    A.  I was under the impression that Frontier
10   would get a copy of it.
11   Q.  Well, now it says flight attendants must
12   submit an incident report, and incident report is
13   capitalized, within 24 hours of the flight.
14       Are you familiar with a form called an
15   incident report?
16   A.  I am, but again, I thought this was a
17   incident report as well.  I thought this would
18   substitute for it.
19   Q.  Okay.  And that kind of falls under the
20   category of you thought you didn't have to sign off on
21   a must read until you flew again, right?
22       MR. MAYE:  Object to form.
23   BY MR. MCKAY:
24   Q.  So are you just kind of making up your own
25   rules there?

Page 120

1        MR. MAYE:  Object to form.
2    BY MR. MCKAY:
3    Q.  Are you, sir?
4        MR. MAYE:  Harassment, object to form.
5    BY MR. MCKAY:
6    Q.  Is that what you're doing?
7    A.  I'm not making up my own rules, I just --
8    Q.  Okay, tell me, you just --
9        MR. MAYE:  Object to form.
10   BY MR. MCKAY:
11   Q.  How did you determine that the statement you
12   gave to the police department was going to be
13   sufficient to satisfy the must read?
14   A.  I just assumed the police would pass it on.
15   Again, I thought this was the incident report.
16   Q.  That was your assumption?
17   A.  Yes.
18   Q.  Okay.  Let's take a look now at Warren
19   Exhibit 5.  Is that something that you recognize?
20   A.  Yes.
21   Q.  Okay.  Is this an e-mail that you sent?
22   A.  Yes.
23   Q.  And you sent it to Jason B. Grimes, correct?
24   A.  Yes.
25   Q.  Who is Jason B. Grimes?



SCOTT ALEXANDER WARREN                                      December 13, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 121

1    A.  I do not know who he is.

2    Q.  Okay.  Do you know why you sent him an

3  e-mail?

4    A.  He requested for information on the flight.

5    Q.  Okay.  And without knowing who he was, you

6  just went ahead and sent it to him?

7    A.  Yes.

8    Q.  Okay.  Now, it says that you sent it on

9  Wednesday, April 17 of 2019, at 2:41 p.m.; is that

10  correct?

11    A.  Yes.

12    Q.  Okay.  So that's several weeks after the

13  flight, right?

14    A.  Yeah, it would have been a couple weeks after

15  that.

16    Q.  Okay.  And it says when the C briefed the

17  exit row, she noticed a child in the row.

18       That C was Anna Bond, right?

19    A.  Yes.

20    Q.  Okay.  He said he was 12 years old, period,

21  right?

22    A.  Yes.

23    Q.  Okay.  So that indicates that the child

24  responded to Anna Bond and told her that he was

25  12 years old, right?

Page 122

1       MR. MAYE:  Object to form.

2       THE DEPONENT:  Yes.

3  BY MR. MCKAY:

4    Q.  Okay.  He was black, period, right?

5    A.  Yes.

6    Q.  When she began to find him a new seat, an

7  older white man, early 50s, says, quote, this is my

8  son, period, close quotes, correct?

9    A.  What are you asking?

10    Q.  Is that what you wrote?

11    A.  I wrote everything on here.

12    Q.  Okay.  She moved them to Row 17E and F.

13  While doing service and trash about 25 minutes into

14  the flight, the A, C and D flight attendants noticed

15  the older man rubbing the boy's face in a way that

16  made them uncomfortable.

17       You wrote that, right?

18    A.  I wrote everything on this.

19    Q.  They asked me to check it out.  Right?

20    A.  Yes.

21    Q.  As I wa ked from the front to the rear, I

22  noticed the man's hand on the boy's crotch.  I walked

23  back up to the front again and his hand was still

24  there.  Both appeared to be sleeping.  We informed the

25  captain and he told us to separate the two, right?

Page 123

1    A.  Yes.

2    Q.  Now, why did you tell your company something

3  different than what you just told me under oath here

4  in the deposition?

5       MR. MAYE:  Object to form.

6       THE DEPONENT:  Well, I apologize, it was long

7  ago and I haven't seen this e-mail in a while, but

8  everything is accurate.

9  BY MR. MCKAY:

10    Q.  Well, which is accurate, your testimony here

11  today under oath or your e-mail to someone named Jason

12  B. Grimes, who you don't even know who he is?

13    A.  What did I say to contradict it?

14    Q.  You said that the flight attendants asked you

15  to go check out the rubbing of the face that made them

16  uncomfortable.

17       MR. MAYE:  Object to form.

18       THE DEPONENT:  Okay, so yeah, I said I don't

19  recall the exact order of events, so yeah, the flight

20  attendants asked me and not the captain, I apologize.

21  BY MR. MCKAY:

22    Q.  So you didn't go to the cockpit twice?

23    A.  I remember going to the cockpit twice.

24  Exactly what was said word for word, I don't recall.

25    Q.  Okay.  Your statement goes on to say, we

Page 124

1  informed the captain -- of your e-mail -- we informed

2  the captain and he told us to separate the two.  I put

3  the boy in Row 31F and placed an ABP in 31D and left

4  the older man in 17.  I spoke with the boy and he said

5  that was his dad.  He was adopted when he was three.

6  And that they have been separate before on another

7  flight.  He asked could he go back and sit by his dad.

8  I asked him if he knew that his dad's hand was on his

9  crotch.  He said no.  It took about 10 to 12 minutes

10  after I separated them for the dad to come back and

11  see what was going on.  I told him I saw where his

12  hand was and that's why you were separated.  The man

13  asked me, quotes, did he tell you where my hand was,

14  end quote.  I told him, quote, no, I saw it myself,

15  close quotes.  He spoke to the boy briefly asking if

16  he was all right and went back to his seat.  He did

17  not come check on the boy for the remaining three plus

18  hours of the flight.  He also deplaned without waiting

19  for the boy to come up from the last row.

20       All of that accurate?

21    A.  Yes.

22    Q.  So now --

23    A.  Well, it's 30.  It was 30F, not 31.

24    Q.  Okay, so that part is not accurate?

25    A.  Yeah.



SCOTT ALEXANDER  WARREN
DELVECCHIA vs FRONTIER AIRLINES

December 13, 2019

Page 125

1  Q.  All right.  Now, isn't it a fact that the boy
2  was escorted off the plane after the flight landed?
3  A.  I don't recall exactly who walked him off the
4  plane, but someone from the back, I would imagine,
5  would have walked him off, but I don't recall.
6  Excuse me.
7  Q.  Okay.  So you didn't participate in that?
8  A.  No, I don't remember walking him off the
9  plane.
10  Q.  Did you see Peter leave the plane?
11  A.  Yes.
12  Q.  Did you speak to him as he left the plane?
13  A.  Yes.
14  Q.  What did you say?
15  A.  Well, as he was deplaning, I was cleaning up
16  the -- cleaning up in between the aisles and he said
17  to me first, I didn't speak to him, he said, what's
18  your name and badge number, if anything happens to
19  him, I'm going to -- and then I cut him off and said,
20  go talk to the police.
21  Q.  Is that what you said, sir?
22  A.  Yes.
23  Q.  Specifically, go talk to the police?
24  A.  Go talk to the police, those exact words, I
25  remember that.

Page 126

1  Q.  Yeah, okay.  You remember that clearly?
2  A.  Yes.
3  Q.  Okay.  So this is your testimony under oath?
4  A.  It is.
5  Q.  And you remember that clearly?
6  A.  Yes.
7  Q.  All right.  Now, and your first name again
8  is?
9  A.  Scott.
10  Q.  Middle name?
11  A.  Alexander.
12  Q.  Okay.  Have you ever been known as Kevin?
13  A.  No.
14  Q.  Why did you tell Mr. Delvecchia that your
15  name was Kevin?
16      MR. MAYE:  Object to form.
17      THE DEPONENT:  I did not.
18  BY MR. MCKAY:
19  Q.  You did not?
20  A.  No.
21  Q.  You deny that?
22  A.  Yes.
23  Q.  Okay.  Have you ever told anyone before that
24  your name was Kevin?
25  A.  No.

Page 127

1  Q.  All right.  Now, in another deposition here,
2  some -- Anna and Chelsea have some texts, and they
3  said in them, Anna -- I'm sorry, Chelsea said to Anna,
4  me and you were like the messengers between Scott,
5  which was dealing with the situation, and the pilots.
6      Do you have any idea what they meant by that?
7  A.  Me and you were the messengers -- I'm sorry,
8  can you read that again?
9  Q.  So they were exchanging texts about their
10  upcoming depositions and they said me and you were
11  like messengers between Scott, which was dealing with
12  the situation, and the pilots.
13      Do you have any idea what they meant by you
14  were dealing with the situation and they were your
15  messengers?
16  A.  No, I mean, I was the one primarily handling,
17  you know, the separation and everything, but I don't
18  know exactly what they mean by that.
19  Q.  And then Chelsea says, I don't even want to
20  imagine what Scott is going through.
21      Why do you think she said that?
22      MR. MAYE:  Object to form.
23      THE DEPONENT:  I don't know why she said
24  that.  Probably because I was the one dealing with
25  everything and because I guess I was the one accused

Page 128

1  of hitting him.
2  BY MR. MCKAY:
3  Q.  You know you were accused of hitting him?
4  A.  Yeah.
5  Q.  When did you find that out?
6  A.  When I spoke with Tara.
7  Q.  Okay.  Now, I'm going to show you something.
8  I'm not going to mark it, but it's a -- it's part of
9  another -- it's part of Chelsea's information that she
10  provided us and it's something -- it's a candidate
11  information profile.  Did you fill out something like
12  that?
13  A.  Candidate information profile.  Maybe during
14  the hiring process.  I don't recall.
15  Q.  Yeah, everybody has one, but I don't have one
16  from you.  Do you know why that is?
17  A.  I do not know.
18  Q.  And it has a question, have you ever been
19  convicted or found guilty of or entered a plea of nolo
20  contendere or guilty to, regardless of adjudication, a
21  crime in any jurisdiction or are you currently under
22  criminal investigation?
23      Do you remember answering a question like
24  that?
25  A.  I don't remember that form, but that was over



Page 129

1  two years ago.
2      Q.  Do you remember answering a question like
3  that?
4      A.  If I filled out that sheet, I did, but I
5  don't remember that question because I check no to
6  those.  I've never been in court for any reason
7  before.  I've never been convicted, none of that, I
8  don't -- I stay on the right side of the law.
9      Q.  All right.  Never been under criminal
10  investigation?
11     A.  No.
12     Q.  Okay.  So your testimony is that if I press
13  Frontier to disclose that document from your file, it
14  will have an answer no?
15     A.  Correct.
16     Q.  Okay.  What happened after -- did you stay on
17  the plane after both Peter and A.D. got off the plane?
18     A.  Yes, I stayed on the plane.
19     Q.  And, I'm sorry, did -- when you sat by A.D.
20  in Row 30, did he have any shoes on?
21     A.  I don't recall if he had shoes on or not.
22     Q.  You never made that observation?
23     A.  No.
24     Q.  Okay.  When he left the plane, did you see
25  whether he had shoes on or not?

Page 130

1      A.  I do not recall if he had shoes on.
2      Q.  Do you recall anybody coming back on the
3  plane to get his shoes?
4      A.  No, I don't recall that.
5      Q.  Did you ever inform the captain that the
6  child had told you that he was adopted and that he
7  wanted to go back and sit with his father?
8      A.  I don't recall if I went back and relayed
9  that to the captain.  I don't remember.
10     Q.  Did you, did you go back and relay to the
11  captain that both parties had told you that they were
12  asleep?
13         MR. MAYE:  Object to form.
14         THE DEPONENT:  I don't remember telling the
15  captain that.
16  BY MR. MCKAY:
17     Q.  So you didn't tell the captain?
18     A.  I don't remember telling the captain that.
19     Q.  To the extent that there's an allegation that
20  you said to Peter to go on out of the airplane because
21  the FBI is waiting for your ass, do you deny saying
22  that?
23     A.  I did not say that.
24     Q.  To the extent that there's an allegation that
25  you punched Peter repeatedly in the back of the head

Page 131

1  and neck, do you deny that?
2      A.  I did not hit him at all.
3          MR. MCKAY:  All right, sir, we have some
4  outstanding discovery issues, you don't need to be
5  concerned about that, but just for the moment, I'm
6  just adjourning, and Mr. Maye may have some questions
7  for you.
8          MR. MAYE:  I have no questions.
9          MR. MCKAY:  Okay.  That's it.
10         THE VIDEOGRAPHER:  Just a moment.
11         This concludes the video deposition of Scott
12  Warren.  The time is approximately 12:42 p.m.  We're
13  going off the record.
14         (Thereupon, the deposition concluded
15         at 12:42 p.m.)
16
17
18
19
20
21
22
23
24
25

Page 132

1                  CERTIFICATE OF REPORTER
2   STATE OF NEVADA   )
                       )    ss:
3   COUNTY OF CLARK   )
4        I, Gary F. Decoster, CCR No. 790, licensed
5   by the State of Nevada, do hereby certify:  That I
6   reported the deposition of SCOTT ALEXANDER WARREN, on
7   Friday, December 13, 2019, commencing at 10:09 a.m.
8   That prior to being deposed, the witness was duly
9   sworn by me to testify to the truth.  That I
10  thereafter transcribed my said stenographic notes via
11  computer-aided transcription into written form, and
12  that the typewritten transcript is a complete, true
13  and accurate transcription of my said stenographic
14  notes.  That review of the transcript was not
15  requested.
16       I further certify that I am not a relative,
17  employee or independent contractor of counsel or of
18  any of the parties involved in the proceeding, nor a
19  person financially interested in the proceeding, nor
20  do I have any other relationship that may reasonably
21  cause my impartiality to be questioned.
22       IN WITNESS WHEREOF, I have set my hand in my
23  office in the County of Clark, State of Nevada, this
24  28th day of December, 2019.
25
                  GARY F. DECOSTER, CCR NO. 790

