## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2               FOR THE DISTRICT OF NEVADA
 3                         -o0o-
 4
 5   PETER DELVECCHIA, et al.,   )
                                 )  Civil No.:
 6        Plaintiff,             )  2:19-CV-01322-KJD-NJK
                                 )
 7   v.                          )
                                 )
 8   FRONTIER AIRLINES, INC.,    )
     et al.,                     )
 9                               )
          Defendants.            )
10   _____)
11
12
13
14      VIDEOTAPED DEPOSITION OF CAPTAIN REX SHUPE
15                Taken on December 4, 2109
16                      at 8:29 a.m.
17
18
19             ADVANCED REPORTING SOLUTIONS
                     159 West Broadway
20                Broadway Lofts, Suite 100
                   Salt Lake City, Utah 84101
21
22
23
24   REPORTED BY:  Michelle Mallonee, RPR, CSR
25
```

## Page 2

```
 1                     APPEARANCES
 2
 3   For Plaintiff:
 4       John D. McKay, Esq.
         PARK AVENUE LAW, LLC
 5       1255 East Logan Avenue
         Salt Lake City, Utah 84105
 6       (800) 391-3654
         johndmckayatty@gmail.com
 7
 8   For Defendant:
 9       Tara Shelke, Esq.
         ADLER MURPHY & MCQUILLEN LLP
10       20 South Clark Street, Suite 2500
         Chicago, Illinois 60603
11       (312) 345-0700
         tshelke@amm-law.com
12
13
14   ALSO PRESENT:
15   Alyse Largin, Videographer
16                        * * *
```

## Page 3

```
 1                       I N D E X
     WITNESS                                          PAGE
 2
                    CAPTAIN REX SHUPE
 3
     Examination by Mr. McKay                           4
 4
     Examination by Mr. Shelke                         71
 5
```

                    E X H I B I T S

                         (None)

## Page 4

                        P R O C E E D I N G S
                              -o0o-

THE VIDEOGRAPHER:  This is Media No. 1 in the recorded video deposition of Rex Shupe, in the matter of Peter Delvecchia versus Frontier Airlines, being heard before the U.S. District Court for the District of Nevada, Case 2:19-cv-01322.

This deposition is being held at Advanced Reporting in Salt Lake City, Utah.  Today's date is December 4th, 2019.  The time is 8:29.

Will counsel please state who they are and who they represent.

MR. MCKAY:  I'm John McKay of Park Avenue Law, and I represent the plaintiffs, Peter and A.D.

MS. SHELKE:  I'm Tara Shelke, last name spelled S-H-E-L-K-E, and I represent Defendant Frontier Airlines.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

                    REX SHUPE,
              having been first duly sworn,
          was examined and testified as follows:
                    EXAMINATION
BY MR. MCKAY:
    Q.  Would you state your full name, please.



Page 5

1  A.  My name is Rex Tyler Shupe.
2  Q.  Captain Shupe, we met off the record.  My name
3  is John McKay.  I represent the plaintiff, Peter
4  Delvecchia, and the minor plaintiff, A.D.  We will refer
5  today to him only by his initials because he's a minor,
6  and we're not allowed to state the name of a minor on the
7  public record.
8  A.  Okay.
9  Q.  I understand you've never had your deposition
10  taken before, so I'm going to go through some of the
11  logistical issues --
12  A.  Thank you.
13  Q.  -- about a deposition.
14     A deposition is a court proceeding, even though
15  it's not conducted in a courtroom.  So obviously, there's
16  no judge here.  But there is a judge of the case who can
17  and will look over deposition testimony, rule on
18  objections that may be made, and take other steps that
19  would typically be taken in the courtroom.
20     So even though there's no judge here, your
21  presence here today on the witness stand, sworn to tell
22  the truth, is precisely the same as it would be in a
23  courtroom; do you understand that?
24  A.  I understand.
25  Q.  So all of the penalties of perjury apply and

Page 6

1  anything else that would affect a witness sitting in a
2  courtroom.
3  A.  Yes, sir.
4  Q.  The most important things to remember, as I
5  mentioned off the record, are that the court reporter
6  here is taking a -- an accurate transcript, hopefully, of
7  everything that is said here today.  And in order to help
8  her keep everything accurate, we have to be a little bit
9  stilted in our conversation in the sense that we can't
10  jump in and speak when somebody else is speaking because
11  she can't take down two people talking at the same time.
12     The other thing to remember is -- and we will
13  remind you if it comes up -- but don't answer by a -- a
14  nod of the head, a shrug of the shoulders, or an
15  "umm-hmm" because it's very ambiguous and difficult to
16  transcribe.  So there may be times when you say
17  "umm-hmm," and then I say to you, "You have to say yes or
18  no."  I'm just reminding you to use a word, please.
19     We will take a break if we go an hour.  We may
20  not even go that long this morning, but if we do, we'll
21  take a break after an hour.  But if you want to take a
22  break before then, just simply say the word.  And we're
23  casual enough that we can take a -- take a -- a break
24  from the deposition.  The only thing I ask is that there
25  not be a pending question because nobody wants to

Page 7

1  think that --
2  A.  Sure.
3  Q.  -- you're out in the hall calling a friend to
4  find the answer.  Okay.
5     So I am going to be asking you about the Flight
6  2067, a Frontier Airlines Flight, on March 28, 2019.
7     Do you remember that flight?
8  A.  Yes.
9  Q.  Okay.  And you were the designated captain of
10  the flight?
11  A.  Yes, sir.
12  Q.  Who was your first officer?
13  A.  Andy Miller -- or ....
14  Q.  Sean Mullin, perhaps?
15  A.  Sean -- Sean Mullin, there you go.
16  Q.  Okay.
17  A.  Why did I say Andy?  It's Sean Mullin, yeah.
18  Q.  That's okay.
19     Had you flown with him before?
20  A.  That was the first time that --
21  Q.  Okay.
22  A.  -- I had flown with him, yes.
23  Q.  Where did you start the day that day?
24  A.  In Raleigh, I think.  I -- you know, I haven't
25  even looked at this flight.  But I believe we -- the

Page 8

1  flight was from Raleigh to Las Vegas.  I believe --
2  Q.  Okay.
3  A.  -- that's where we originated.
4  Q.  So would you have flown from Las Vegas to
5  Raleigh the night before?
6  A.  Probably not.
7  Q.  Okay.  Do you have any idea of where you flew
8  the day before?
9  A.  No.
10  Q.  Okay.  Do you know whether you flew the day
11  before with the same crew?
12  A.  No, probably not.  The flight attendants and the
13  pilots have completely different schedules.  It's -- it's
14  possible but not likely that we fly with the same flight
15  attendants on a daily basis.  In fact, there are a couple
16  times that you may swap crews through the day.
17     I usually fly with the same first officer
18  through the trip.  But even that, you know, due to needs
19  or schedules that -- you can even come off a flight and
20  change airplanes and -- and be with a new first officer.
21     But most likely with the flight attendants, that
22  was our first leg together --
23  Q.  Okay.
24  A.  -- on the trip.
25  Q.  The flight attendants, I'll represent to you,



Page 9
1 were Chelsie Bright, Anna Bond, Amanda Nichol, and Scott
2 Warren.
3     Do -- does that sound correct to you?
4  A.  That -- that sounds correct, yes.
5  Q.  Okay.  Did you know any of those before --
6  A.  No.
7  Q.  -- Flight 2067?
8  A.  No.
9  Q.  None at all?
10  A.  No.
11  Q.  Okay.  The Flight 2067, when did you report to
12 the aircraft on March 28?
13  A.  Our standard report time is 45 -- on an out
14 station is 45 minutes before the flight, you know.  We're
15 usually there maybe a few minutes early if we want to
16 grab coffee, grab something to eat.
17  Q.  All right.  Did you speak to anyone at the
18 station about any of the passengers before --
19  A.  No.
20  Q.  Okay.  Have you reviewed anything for your
21 deposition today?
22  A.  Well, you know, I had to go back and remember
23 the names of the flight attendants and -- but other than
24 that, not much, no.
25  Q.  So what exactly did you review in order to

Page 10
1 determine that information?
2  A.  Well, I've got -- Tara here helped me out with
3 the names.  And then I have -- well, yeah.  That's about
4 it.  I'm trying to think if I could go back and look on
5 the schedule, but the schedule kind of disappears off,
6 and then -- and it's been a while, so.
7  Q.  Okay.
8  A.  Tara is the one that refreshed me on the names
9 of the flight attendants.
10  Q.  All right.  And -- and you met with her when,
11 yesterday?
12  A.  Yesterday.
13  Q.  Okay.  And I assume that was after the Chelsie
14 Bright deposition?
15  A.  Yes, I believe so.
16  Q.  Okay.
17  A.  Yeah.
18  Q.  Did she inform you of what Chelsie Bright had
19 testified to?
20  A.  No.
21  Q.  Okay.  So as you sit here today, you don't
22 know what --
23  A.  No.
24  Q.  -- she testified to?
25  A.  No.

Page 11
1  Q.  Okay.  And are there any documents that you
2 looked at before your deposition?
3  A.  No.  The only thing I got was a -- was I looked
4 at the ACARS --
5  Q.  Okay.
6  A.  -- report that we had sent.
7  Q.  Okay.  That's -- that's the sort of a
8 spreadsheet of -- of ACARS statements, ACARS --
9  A.  Yeah.  Yeah.
10  Q.  -- messages back and forth?
11  A.  Umm-hmm.
12  Q.  And the ACARS messages are with your operations
13 team?
14  A.  That -- yeah, directly to dispatch.
15  Q.  Okay.  All right.  When was the first time that
16 you were informed of any information regarding my
17 clients, Peter Delvecchia and his son, A.D.?
18  A.  We got a call from Chelsie from the back.
19  Q.  Did you know that it was Chelsie who was calling
20 you?
21  A.  Yeah.
22  Q.  Okay.  She identified herself?
23  A.  Yeah.
24  Q.  Did she identify herself by name or by her
25 position?

Page 12
1  A.  Oh, I just recognized her voice and ....
2  Q.  But you said you didn't know her.
3  A.  Well, you know, we have a briefing before the
4 flight.
5  Q.  Okay.  And -- and based on that, you were able
6 to --
7  A.  Yeah.
8  Q.  -- recognize her voice?
9  A.  Yeah.
10  Q.  Okay.  And what did Chelsie say to you?
11  A.  She said she wanted to come up to the cockpit.
12  Q.  All right.  Did you discuss taking a break at
13 that time?
14  A.  No, we hadn't discussed that we needed a break.
15  Q.  I'm sorry, you had not discussed that you needed
16 a break?
17  A.  No, yeah.
18  Q.  And you did not --
19  A.  Usually -- usually we call and say, Hey, you
20 know, will you set up for us to come out and take a
21 break?
22  Q.  All right.  So you and Chelsie did not discuss
23 the pilots taking a break on that call?
24  A.  Not that it -- well, I don't remember if we
25 discussed the break.  We were a couple hours into the



Page 13

1 flight, so we probably took a break and just took
2 advantage. Because to get set up for bathroom break is
3 a -- you know, it's a little more involved than it used
4 to be. So, yeah.
5    Q. Right. Right.
6    A. We probably -- I can't -- to be honest with you,
7 I can't remember if I went out for a bathroom break. But
8 it makes sense that we probably took advantage of it and
9 took a bathroom break as well.
10   Q. Okay. And I -- I believe you just said you were
11 a couple hours into the flight?
12   A. I believe so, yeah.
13   Q. Okay. Do you recall what time the flight
14 departed from Raleigh --
15   A. No.
16   Q. No. Okay.
17      Do you recall how long the flight is?
18   A. Raleigh to Vegas, depending on the winds, is
19 usually a four, four-and-a-half hour flight.
20   Q. Is this a -- a flight that you make frequently?
21   A. Yeah, we make that one pretty -- pretty often.
22   Q. Okay. Are you based in Las Vegas?
23   A. Based in Las Vegas.
24   Q. All right. Does that mean that a significant
25 number of your flights depart Las Vegas?

Page 14

1    A. Yes.
2    Q. Originate in Las Vegas, I should have said?
3    A. That's right, yeah.
4    Q. Okay. So you have to deadhead up there to start
5 your flights?
6    A. That's correct.
7    Q. Okay. All right. So Chelsie called you, said
8 that she needed to come in --
9    A. Yes.
10   Q. -- to speak with you?
11      Did she say anything else?
12   A. No.
13   Q. Okay. I presume the next thing that happened
14 was that she did enter the cockpit?
15   A. Umm-hmm.
16   Q. You have to say "yes" or "no."
17   A. Yes, sir. Yes.
18   Q. You don't have to say "sir," but you do have to
19 say yes or no.
20   A. Yes.
21   Q. All right. So when Chelsie came into the
22 cockpit, then, she was present, you were present, and
23 First Officer Mullin was present?
24   A. Correct.
25   Q. Okay. What did Chelsie say?

Page 15

1    A. That's when Chelsie mentioned about the --
2 the -- their concern in the back between A.D. and
3 Mr. Delvechh- ...?
4    Q. Delvecchia.
5    A. Delvecchia.
6    Q. Yeah. Now, let me just get into the specific
7 details.
8    A. Okay.
9    Q. You say she mentioned her concern.
10      But what specifically did she say to you?
11   A. Well, she talked about -- you know, and the
12 details are fuzzy. But she talked about she was
13 observing inappropriate touching between the adult and
14 the minor.
15   Q. Okay. And when you say "inappropriate
16 touching," certainly you must remember the details of
17 what she said was inappropriate touching?
18   A. Well, yeah, she mentioned that there was a
19 stroking on the face, and she -- you know, and her tone
20 of voice was such that, yeah, there was -- she was
21 concerned about -- you know, I don't -- she didn't give
22 too many details other than there was touching on the
23 face. She may have -- I don't remember exactly. She may
24 have remembered that -- what Scott had said about there
25 may have been the hand near the crotch area.

Page 16

1    Q. Okay. When she first came in?
2    A. Like I said, I don't remember the --
3 specifically the timeline on what she divulged.
4    Q. Okay.
5    A. But we were talking about -- yeah, the
6 inappropriate touching between the adult and the -- and
7 the minor.
8    Q. And one of the details that she provided to you
9 was this, just -- just from the looks of things, this was
10 an unusual father/son combination, right?
11   A. Well, we didn't -- I didn't even know then that
12 it was a father and son combination.
13   Q. Okay. That it was an unusual couple, let's say,
14 that one was white, one was black?
15   A. No, I didn't know one was white, one was black.
16   Q. You didn't know that at any time?
17   A. Well, when I exited the cockpit towards the end
18 of the flight.
19   Q. Okay.
20   A. Yeah.
21   Q. All right. We'll get to that. But -- all
22 right.
23      So she says that there is a -- a man traveling
24 with a child?
25   A. Yes.



Page 17

1  Q.  The child was male.  She told you that, yes or
2  no?
3  A.  I believe so.
4  Q.  Okay.  And she said there was stroking of the
5  face, correct?
6  A.  Yes.
7  Q.  All right.
8  A.  I -- I can't remember how she articulated it
9  exactly.
10 Q.  All right.  Now, under other circumstances, if a
11 flight attendant told you that someone in Row 17 was
12 stroking the face of the person next to them that they
13 boarded with, would that have been an issue for you?
14 A.  Repeat that question.
15 Q.  Under other circumstances, if a flight attendant
16 had come to you and said that a person sitting in Row 17
17 was stroking the face of the person they boarded with,
18 would that have been an issue to you?
19 A.  Well, it becomes -- not necessarily.  I mean, it
20 becomes an issue -- I mean, the -- the fact that she
21 brought it up is -- then suddenly it's -- comes to your
22 attention --
23 Q.  Okay.
24 A.  -- I would say.
25 Q.  But -- but, I mean, people stroke other people's

Page 18

1  faces under normal circumstances, don't they?
2  A.  Yes.
3  Q.  And it's a sign of affection?
4  A.  Sure.
5  Q.  Okay.  So someone -- a flight attendant comes to
6  you and says, I observed someone in -- in Row 17 being
7  affectionate to the person next to them, is that -- is
8  that a problem that typically involves the captain?
9  A.  No.
10 Q.  Okay.
11 A.  No, I mean -- yeah, no.
12 Q.  All right.  So -- so it was raised to a degree
13 of concern because of the fact that she was concerned?
14 A.  Yeah.  Yes.
15 Q.  Okay.
16 A.  I mean, it's very unusual for us to get a call.
17 Usually we get a call saying, Hey, this is going on, or,
18 We've got passengers that -- you know, whatever it is,
19 you know, we just get it over the intercom.  She had
20 called and said she wanted to come to the cockpit, sit
21 down and have this discussion, which is unusual.
22 Q.  Okay.  So it was unusual that it wasn't just
23 conveyed to you by telephone, but, in fact, she said,
24 Hey, I want to talk to you in private, essentially?
25 A.  Yes, face to face.

Page 19

1  Q.  Okay.
2  A.  Yeah.
3  Q.  And so she came in, and she said that there is
4  this older male stroking the face of the child that he
5  boarded with, and she's concerned about that.
6      Have I accurately reported what she said
7  essentially?
8  A.  Yes.
9  Q.  Okay.  So what did you do?
10 A.  Well, I believe that Scott came to the cockpit a
11 little bit later.
12 Q.  Scott Warren?
13 A.  Scott Warren --
14 Q.  Okay.
15 A.  -- yeah.
16 Q.  And you didn't know Scott Warren?
17 A.  I didn't know Scott.
18 Q.  Okay.  But he asked -- obviously, you can't just
19 come in the cockpit, right?  You have to request --
20 A.  Right.  Yes.
21 Q.  -- entry?
22 A.  We have to set up the whole cockpit procedure --
23 Q.  Right.
24 A.  -- for coming and going, yeah.  And he came up.
25 Q.  So -- so then Scott comes in, so now there's

Page 20

1  four of you in the cockpit?
2  A.  Correct.
3  Q.  Was First Officer Mullin involved in these
4  conversations at all?
5  A.  Yes.
6  Q.  He was?
7  A.  Yeah.
8  Q.  Okay.  And what did he add to the conversation?
9  A.  Well, I can't remember if he added or not.  But
10 it was through the course of the discussion that we came
11 to our decision to separate the two, the adult and the
12 minor.
13 Q.  Okay.  So before you left the cockpit, the four
14 of you had decided to separate the adult from the minor?
15 A.  Before I left the cockpit?  That, I can't
16 remember.
17 Q.  Okay.
18 A.  Because to be honest with you, I can't remember
19 if I left the cockpit or not to use the bathroom.
20 Q.  Okay.  All right.  But at some point, you recall
21 that the group of you made a decision, jointly, that
22 there should be separation of the two passengers?
23 A.  Correct.
24 Q.  Okay.  And that was based on what information?
25 A.  On the information from the Chelsie and Scott.



Page 21

1  Q. Okay. And now Chelsie has --
2  A. And --
3  Q. Go ahead.
4  A. And -- and I'm sure we'll get into this, but I
5  also called back and chatted with the other two flight
6  attendants.
7  Q. Okay. Let's start with Chelsie and Scott.
8  A. Okay.
9  Q. And then we'll add the other two.
10     So Chelsie at this point has told you that she
11  was concerned about stroking of the face that she saw --
12  A. Yes.
13  Q. -- correct? Okay.
14     And then Scott comes in, and Scott says what?
15  A. Well, Scott described the -- the hand near the
16  crotch area and how inappropriate it seemed to Scott.
17  Q. What exactly did he say?
18  A. Well, I can't remember exactly what he says.
19  Q. All right.
20  A. But he says that the -- that the hand -- he
21  talked about the -- the inappropriate touching. What --
22  what that constituted for him, I don't -- but he did --
23  he was specific about the hand being near the groin area
24  of the minor.
25  Q. Okay. So it is a hand that is in the vicinity

Page 22

1  of the groin area is what you understood?
2  A. Yes.
3  Q. Okay. He didn't mention that the hand was --
4  was palpating or groping or anything along those lines?
5  A. Those words were not used.
6  Q. Okay. Anything similar to that, grabbing,
7  stroking, anything like that?
8  A. Not that I recall.
9  Q. Okay.
10  A. What I recall was the hand was inappropriately
11  in the -- in the groin/crotch area of the minor.
12  Q. Did he tell you that he observed both the adult
13  and the minor were asleep at the time?
14  A. Not that I recall.
15  Q. So are you saying that he might have and you
16  don't recall, or that he didn't?
17  A. No. It's not on my impression that they were --
18  that he relayed to us that they were asleep.
19  Q. Would that have made a difference to you?
20  A. I don't know.
21  Q. Well, would you -- would you consider that
22  somebody is inappropriate -- is being inappropriate if
23  they were sound asleep and their hand was in the vicinity
24  of somebody's groin?
25  A. Restate that question one more time.

Page 23

1  Q. Well, let me put it this way. If somebody is
2  sound asleep, their actions would be involuntary,
3  correct?
4  A. Correct. Yeah.
5  Q. Okay. So you wouldn't consider that somebody is
6  sexually molesting someone in their sleep?
7  A. Correct.
8  Q. Okay. So if Scott had told you that these two
9  people were asleep, presumably you would have said, well,
10  it's probably not an active action if the person is
11  asleep, right?
12  A. Right.
13  Q. Okay. And -- and if the other person is -- is
14  asleep as well, if two people are asleep, there's
15  probably not a -- a -- a sexual molestation situation
16  going on, right?
17  A. That sounds right.
18  Q. Okay. So it's important that Scott left out the
19  fact that the two people were asleep?
20  A. If that's what was happening, yes.
21  Q. Okay. So now, at this point, you've received
22  information from Chelsie that she didn't agree with the
23  stroking of the face, and you've received information
24  from Scott that there was a hand near the crotch. And
25  based on that information, you and First Officer Mullin,

Page 24

1  jointly with the flight attendants, made a decision to
2  separate the child from the adult?
3  A. Correct.
4  Q. Okay. Had you ever made a decision like that
5  before?
6  A. No. And let me add to that, that it wasn't just
7  those two.
8  Q. Okay.
9  A. For us to -- to take action with a passenger, we
10  don't take that lightly. And so I also called back the
11  third flight attendant and the fourth one and talked to
12  them individually on the phone.
13  Q. Okay.
14  A. "What did you see?"
15  Q. Okay. So let me just make sure we get the names
16  here.
17     So that's Amanda Nichol and Anna Bond, correct?
18  A. Correct.
19  Q. Okay. And what -- and -- and did you have them
20  both on the phone at the same time?
21  A. No.
22  Q. No. Okay.
23     So who did you speak with first?
24  A. The third, the C flight attendant.
25  Q. The C flight attendant is Bond?



Page 25

1  A.  Correct.
2  Q.  Okay.  Anna Bond.
3  A.  Yeah.
4  Q.  All right.  And what did she say to you?
5  A.  She -- she agreed that there was -- that it
6 seemed inappropriate, the touching between the -- she did
7 not go into detail what she saw, if she saw what Scott
8 and Chelsie had related.  But she did say that there was
9 something unusual about the two.  She was uncomfortable
10 with the situation.
11  Q.  Did she mention to you that there was a
12 difference in their races?
13  A.  No.
14  Q.  She didn't.
15  A.  No.
16  Q.  So at this point, you still --
17  A.  I still don't know they're different races.
18  Q.  All right.  But she -- did she mention to you
19 anything about when she briefed them in the exit row --
20  A.  No.
21  Q.  -- that they had originally -- let -- let me
22 back up.
23      Did she tell you that they had originally been
24 seated in the exit row?
25  A.  No.

Page 26

1  Q.  Okay.  So she didn't tell you anything about her
2 interaction with them when she briefed them originally in
3 the exit row?
4  A.  No.
5  Q.  Okay.  So when she told you that she agreed that
6 there was inappropriate touching, that was simply based
7 on what?  What had she seen?
8  A.  She didn't go into detail about what she had
9 seen --
10  Q.  Oh.
11  A.  -- with me, no.
12  Q.  So it was just a conclusion that she -- she
13 believed there was inappropriate touching?
14  A.  I think so.
15  Q.  Okay.  What did -- and that's all that she told
16 you?
17  A.  Yes.
18  Q.  Okay.  What did Amanda Nichol tell you?
19  A.  Amanda said that she had not witnessed anything
20 but that she hasn't -- wasn't looking at it, or she
21 hadn't observed it.
22  Q.  So basically she didn't add anything --
23  A.  She didn't add anything, so.
24  Q.  -- factual.
25      Did she agree that there was a situation, or?

Page 27

1  A.  Yeah, I mean, she knew what was going on, yes.
2  Q.  So she described a situation to you?
3  A.  She described a situation.
4  Q.  And what did she say about the situation?
5  A.  Well, she says that, I haven't observed
6 anything.  I didn't see it, I didn't -- you know, I'm not
7 privy to -- to what -- to the -- the situation.
8  Q.  But it sounds from your other statement that she
9 concurred with the decision to separate the two?
10  A.  Yes.
11  Q.  Okay.  But without any factual basis?
12  A.  Well, you know, when -- when we talked to them,
13 I didn't ask them if they should be separated or not.
14  Q.  Right.  You're the captain.
15  A.  Right.
16  Q.  You make the decision.
17  A.  Right.
18  Q.  Right.  So -- but you were obtaining facts from
19 them to help you with your decision?
20  A.  Well, the situation was -- you know, was serious
21 enough to where I wanted, you know, input from all four.
22  Q.  Okay.  Now, at this point, you have received a
23 notification of something that might be inappropriate,
24 but it didn't come from the affected individual, correct?
25  A.  You mean Delvecchia?

Page 28

1  Q.  Yeah.
2  A.  No.
3  Q.  Well, and it didn't come from the child, right?
4  A.  To me, no.
5  Q.  No.
6  A.  Directly, no.
7  Q.  And -- and let me ask you:  Do you, as -- as the
8 captain, do you know the names of the passengers in the
9 seats?
10  A.  No.
11  Q.  Okay.  And I understand from Ms. Bright's
12 testimony that in 2017, the -- Frontier stopped providing
13 a -- a manifest with names?
14  A.  I can't remember when they stopped or if they
15 stopped why they stopped, but we usually don't get names
16 in the cockpit.  Every once in a while they'll slip us
17 one if they -- and I don't know why.  Maybe they have an
18 extra copy or what it is.  But it's not -- it's not usual
19 that we have the name of the passengers in the cockpit.
20  Q.  Okay.  So you didn't know that the adult and the
21 child had the same surname?
22  A.  No.
23  Q.  Okay.  Now, again, there -- there hadn't been
24 any contact from the passenger, the young passenger or
25 even the adult passenger at this point, correct?



Page 29

1  A. Contact?
2  Q. I mean, they hadn't rung their bell, they hadn't
3 said something to a flight attendant, anything along
4 those lines?
5  A. I don't know.
6  Q. Okay.
7  A. I wouldn't know who -- when the passengers ring
8 the bell. We don't --
9  Q. All right.
10  A. -- we don't know.
11  Q. But you, presumably, knew that the -- the child
12 had not complained to anyone about any inappropriate
13 touching?
14  A. I don't know if the child complained or not.
15 With all the information I'd received from the flight
16 attendants, I'd -- I -- it wasn't told me that the child
17 had complained.
18  Q. Okay. Now, after concluding the telephone or
19 intercom discussions with Bond and Nichol, what did you
20 do next?
21  A. Well, that's when we decided yes, let's separate
22 the two.
23  Q. And you say "we" decided. How -- how did
24 that -- I mean, you're the captain.
25  A. Well, sure.

Page 30

1  Q. So it's your decision.
2  A. The buck stops with me, right?
3  Q. Right.
4  A. Yeah.
5  Q. Right. But you -- you discussed it with all
6 four present?
7  A. Correct.
8  Q. Okay. And -- and I gather everybody agreed that
9 the right thing to do is -- is to separate the child from
10 the father?
11  A. Correct.
12  Q. All right. And again, you didn't know that it
13 was the father at this time?
14  A. I did not know.
15  Q. Okay. Now, I have had produced to me a page
16 from the flight attendant manual.
17    Do you -- do you receive the flight attendant
18 manual?
19  A. No.
20  Q. Okay. So what procedures, SOPs, or whatever
21 guides your decision making in a situation such as this,
22 especially one that you've never encountered before?
23  A. Well, I mean, we don't have a lot of guidance
24 when it comes to the -- the sexual -- this -- sexual in
25 nature or inappropriate touching in the back.

Page 31

1    We do have what we call "threat levels" in the
2 back between the passengers. There's Threat Level 1,
3 which is, you know -- and it escalates up to Threat Level
4 4.
5  Q. Okay. Well, let's go through those, since you
6 brought them up.
7    What is -- what defines Threat Level 1?
8  A. I believe Threat Level 1 is verbal
9 noncompliance.
10  Q. So a passenger who verbally, meaning with words,
11 is refusing to comply with --
12  A. Comply with --
13  Q. -- instructions from --
14  A. -- instructions from the flight attendants,
15 correct.
16  Q. Okay. We both have to talk --
17  A. Sorry. Yes.
18  Q. -- at different times?
19  A. Yes. I'm sorry.
20  Q. Okay. So let's go through that again just so
21 it's clear.
22    Threat Level 1, then, is a passenger who, using
23 words, refuses to comply with an instruction from a crew
24 member, correct?
25  A. Correct.

Page 32

1  Q. Okay. What is Threat Level 2?
2  A. Threat Level 2, I mean, I need to pull out my --
3 my FOM, my Flight Operations Manual, to get all the
4 details. But that's when the escalation involves
5 physical type -- pushing, hitting.
6  Q. Okay. All right. And is the FOM something that
7 you have with you in the cockpit to refer to if this
8 comes up?
9  A. Yes.
10  Q. Okay. Now, so Threat Level 2, then, is
11 physical.
12    What's Threat Level 3?
13  A. Threat Level 3 is -- like I said, I have to take
14 a look at it to see exactly, but that's where it's
15 escalating to threats, physical harm --
16  Q. Okay.
17  A. -- physical injury.
18  Q. Threats of physical harm or physical injury?
19  A. Yeah.
20  Q. Okay. And what is Threat Level 4?
21  A. That's attempted breach of the cockpit.
22 Hijacking.
23  Q. Sure.
24  A. And like I said, there's a -- there's a list in
25 there to -- to get all of the articulations that we would



Page 33

1  refer to.
2     Q.  Okay.  And when this information about Peter and
3  A.D. was brought to your attention, did you consult the
4  FOM?
5     A.  I took a look at it, yeah.
6     Q.  Okay.  Did you go through the Threat Level 1, 2,
7  3, and 4 designations?
8     A.  When you say go --
9     Q.  Did you look at them?
10    A.  Well, after the -- after the flight attendants
11 departed the airplane -- I mean not the airplane, the
12 cockpit, I took a look at the -- at the threat levels,
13 yeah.
14    Q.  Okay.  Now, at that point you'd already made the
15 decision to separate them?
16    A.  Yes.
17    Q.  Okay.  But you then felt --
18    A.  Wanted to back that up just to make sure that --
19    Q.  Okay.
20    A.  -- you know --
21    Q.  Okay.
22    A.  -- we were where we should be.
23    Q.  Now, you -- you started us down this road when
24 you said we don't have a lot of guidance, and then you
25 mentioned the threat levels.

Page 34

1        Is there any other guidance that you consulted
2  in the FOM concerning this situation?
3     A.  No.
4     Q.  Okay.  So let's just go through the threat
5  levels.
6        You did not have any information that Peter or
7  A.D. had verbally refused to comply with an instruction
8  of a crew member?
9     A.  Correct.
10    Q.  You did not have any information that Peter or
11 A.D. had caused any sort of physical altercation with a
12 crew member?
13    A.  Correct.
14    Q.  You did not have any information that Peter or
15 A.D. had threatened physical injury to a crew member?
16    A.  Correct.
17    Q.  And you did not have any information that Peter
18 or A.D. had attempted a breach of the cockpit?
19    A.  Correct.
20    Q.  Okay.  So nothing that was brought to your
21 attention fit any of the threat levels?
22    A.  Well, on Threat Level 2 is -- there is a
23 section -- there is an articulation of inappropriate
24 touching.
25    Q.  Okay.  So Threat Level 2, which I don't have

Page 35

1  available to me, and apparently you don't either at the
2  moment, Threat Level 2, you say, has something in it
3  about inappropriate touching?
4     A.  Correct.
5     Q.  All right.  Now, can you tell me whether that is
6  inappropriate touching of another passenger or
7  inappropriate touching of a crew member?
8     A.  No, it doesn't -- I'd have to go read that to
9  see the articulation again.
10    Q.  All right.  Well, for our purposes today, did
11 you determine that the information provided to you met
12 Threat Level 2?
13    A.  Yes -- restate that question one more time.
14    Q.  Did you determine when you looked at the FOM and
15 the threat levels that the information that the flight
16 attendants had provided to you met the criteria of a
17 Threat Level 2?
18    A.  Yes.
19    Q.  Okay.  And what is the required action of the
20 captain upon determining that a Threat Level 2 exists?
21    A.  There is an articulation in there that has us to
22 restrain or subdue a passenger, contact dispatch, law
23 enforcement requested.
24    Q.  Okay.  So if -- if I understand you correctly,
25 the required action of a captain upon determining that a

Page 36

1  passenger meets Threat Level 2 is, first, to restrain the
2  passenger; second, to contact dispatch and request law
3  enforcement officers meet the plane?
4     A.  Correct.
5     Q.  Okay.  And you had determined that a Threat
6  Level 2 existed with respect to Peter Delvecchia?
7     A.  Correct.
8     Q.  And you had determined this based on a statement
9  by Scott Warren that he had seen Peter Delvecchia's hand
10 near the groin of the child next to him?
11    A.  Correct.
12    Q.  Okay.  Now, you did not restrain Peter
13 Delvecchia, did you?
14    A.  No.  Not -- not physically restrain as far as
15 with -- with the ties.  What do we have, the -- anything
16 like that.  The restraint came -- to restrain was the
17 separation.
18    Q.  Well, under Threat Level 2 in the FOM, it says
19 to restrain, correct?
20    A.  Correct.
21    Q.  And you have equipment on board the aircraft to
22 restrain someone, correct?
23    A.  Correct.
24    Q.  But you did not restrain Peter Delvecchia with
25 that equipment?



Page 37
1  A.  Not with the -- the equipment.
2  Q.  I see.
3  A.  No.
4  Q.  Okay.  And, in fact, you left him seated next to
5  another passenger?
6  A.  Able-bodied passenger, I assume.  That's --
7  Q.  How did you assume that?
8     MS. SHELKE:  I will object that I'm not sure
9  that Captain Shupe knows the names of the two plaintiffs.
10  If you'll refer to them as "the adult" and "the child."
11     MR. MCKAY:  I'm sorry.  Okay.  That's -- that's
12  well-taken.  All right.
13  Q.  (BY MR. MCKAY:)  So you -- you left the adult
14  seated next to another person, another passenger?
15  A.  Well, the flight attendants set it up to where
16  I'm -- I'm not quite sure if there was a -- where the
17  able-bodied passenger was.
18  Q.  Well, if -- if I represent to you that the
19  person seated next to the adult was the same person that
20  had been seated to [sic] him for the past two hours, that
21  would not be the same as finding an able-bodied passenger
22  to sit next to a restrained passenger, would it?
23  A.  Restate that again.
24  Q.  Did the flight attendants tell you anything at
25  all about the passenger seated next to Peter

Page 38
1  Delvecchia -- I mean the passenger that he did not board
2  with?
3  A.  No.
4  Q.  No.  Nothing.  You knew nothing.  You didn't
5  know whether it was a -- a -- an 80-year-old woman or a
6  12-year-old girl, or a 350-pound man.  You didn't know
7  anything, right?
8  A.  Correct.
9  Q.  Okay.  So at this point, you have made a
10  determination of Threat Level 2.  You have looked at the
11  FOM.  It requires you to restrain the adult, correct?
12  A.  Correct.
13  Q.  And you did not.
14  A.  Well, the restraint was the separation.
15  Q.  Okay.  If I get a copy of the FOM, is it going
16  to tell me that a separation is equivalent to restraining
17  a passenger?
18  A.  In those words, no.
19  Q.  No.  So this is -- this is just something that
20  you've concluded that is not in the FOM?
21  A.  Correct.
22  Q.  All right.  Sort of an equivalency determination
23  that you've made?
24  A.  Correct.
25  Q.  Okay.  Now, if there's an emergency situation on

Page 39
1  the plane, you have checklists for that, correct?
2  A.  Correct.
3  Q.  Okay.  And you would agree with me that standard
4  operating procedures require you to follow the checklist?
5  A.  Correct.
6  Q.  You don't get an opportunity to make equivalency
7  determinations on the checklist, do you?
8  A.  Correct.
9  Q.  Okay.  But in this case, you -- you decided to,
10  even though this was something you'd never done before?
11  A.  Correct.
12  Q.  Okay.  I'm assuming you determined that there
13  was no need to restrain the adult.  Would that be a fair
14  statement?
15  A.  Correct.
16  Q.  Okay.  But you did order that the child be
17  restrained in a sense?
18  A.  Separated.
19  Q.  Separated, which you just said was equivalent in
20  your mind to restraining?
21  A.  Correct.
22  Q.  Okay.  So a 12-year-old boy is restrained on
23  your order because a flight attendant thought he saw
24  somebody touch the boy inappropriately?
25  A.  Correct.

Page 40
1  Q.  Okay.  And he's restrained barefoot and crying
2  in the last row of the airplane for the next two to
3  two-and-a-half hours, correct?
4  A.  I don't know if he was crying or barefoot.
5  Q.  You never checked on him?
6  A.  Checked on the child?
7  Q.  Yes.
8  A.  No.
9  Q.  Twelve-year-old child in your care, you never
10  checked on him?
11  A.  Other than the news from the flight attendants.
12  Q.  Never determined that he got anything to eat?
13  A.  Well, that was up to the flight attendants as
14  far as --
15  Q.  Never determined that he got a blanket?
16  A.  I don't know.
17  Q.  Never determined that he got shoes for his bare
18  feet?
19  A.  Did I call, asking those questions?  No.
20  Q.  Okay.  Were you aware that his feet were bare?
21  A.  No.
22  Q.  And that that was because he had been taken
23  abruptly from his seat where he had removed his shoes?
24  A.  I don't know the details of what happened.
25  Q.  Did you know that he had a jacket wrapped around



Page 41
1  his lower half because he was cold?
2     A.  No.
3     Q.  Would that have affected your decision making
4  with respect to whether or not he was being groped?
5     A.  No.
6     Q.  So you were determined to make this decision to
7  restrain A.D., the child, even though you never spoke
8  with either him or the adult or even the passenger seated
9  adjacent to him?
10    A.  The decision was to separate the -- the adult
11  from --
12    Q.  I understand that.
13    A.  -- the child.
14    Q.  My question is:  Why didn't you conduct an
15  investigation into the facts that would have involved
16  asking the two people who were most directly involved in
17  the situation what happened?
18    A.  Well, the information that was provided to me
19  was the information that we based our decision to
20  separate the adult from the child.  My duty is not to --
21  to interrogate or to -- to go in the back and investigate
22  the situation on a -- on a personal level.  My duty is to
23  fly the airplane to the destination and do it safely and
24  sort it out when we get on the ground with law
25  enforcement.

Page 42
1     Q.  Okay.  So why didn't you simply call dispatch,
2  ask them to have law enforcement meet the plane and leave
3  it at that?
4     A.  Well, that's what we did, got ahold of dispatch.
5     Q.  You also restrained a 12-year-old boy, barefoot
6  and crying, in the back row, didn't you?
7     A.  Well, no.  We did not restrain a child in the
8  back.
9     Q.  Do you know that a -- an able-bodied passenger,
10  as used in the -- as used in your testimony, was actually
11  placed next to the boy so that he couldn't leave the --
12  the aisle?
13    A.  I did not know that, no.  I -- I -- I was not
14  aware of where the able-bodied passenger sat, whether it
15  was next to the child or next to the -- to the adult.
16    Q.  But you knew there was an able-bodied passenger
17  involved, correct?
18    A.  Later in the flight, yes, when I called back to
19  check --
20    Q.  Yes.
21    A.  -- to see if -- how everything was going.
22    Q.  Who did you speak to?
23    A.  I believe I spoke to Scott.
24    Q.  All right.  And what did Scott tell you?
25    A.  He just said that they were separated.

Page 43
1     Q.  So we got into this when you said you knew there
2  was an able-bodied passenger.  So --
3     A.  Well --
4     Q.  -- "he was separated" doesn't --
5     A.  Yeah.
6     Q.  -- mention an able-bodied passenger.
7         Where did the able-bodied passenger come into
8  the discussion?
9     A.  I don't know.
10    Q.  All right.  But somehow you know there was an
11  able-bodied passenger involved?
12    A.  Right.
13    Q.  But you don't know why?
14        Didn't you order this?
15    A.  No.
16    Q.  No?
17    A.  I didn't order it.  But --
18    Q.  You didn't say --
19    A.  -- I assumed that the flight attendants, as they
20  were handling the situation, that they would -- you know,
21  how they went about it, I don't know.
22    Q.  Well, you didn't know any of these flight
23  attendants before this flight --
24    A.  No.
25    Q.  -- correct?  Okay.

Page 44
1         So you didn't have any basis on which to assume
2  that they would do one thing or another, did you?
3     A.  No.  Correct.
4     Q.  Are -- are you familiar with the SOPs or
5  instructions that are given to flight attendants about
6  how they perform their duties?
7     A.  No.
8     Q.  Do you have any knowledge of the human
9  trafficking SOPs -- and when I -- you know what I mean by
10  "SOPs," right?
11    A.  Yeah.
12    Q.  Standard operating procedures?
13    A.  Uh-huh.
14    Q.  Okay.  And -- and Frontier has SOPs, correct?
15    A.  Correct.
16    Q.  Okay.  But you don't know what the SOP for human
17  trafficking is?
18    A.  Correct.
19    Q.  You don't know what the SOP for sexual
20  misconduct is?
21    A.  Correct.
22    Q.  And you don't have similar SOPs as a captain to
23  follow?
24    A.  Correct.
25    Q.  All you have are these Threat Levels 1, 2, 3,



Page 45

1 and 4?
2    A.  Correct.
3    Q.  Okay.  And so you made a determination of Threat
4 Level 2 but then didn't follow the requirements for
5 Threat Level 2?
6    A.  Threat -- how did I not follow the criteria?
7    Q.  You didn't restrain the adult.
8    A.  We -- the restraining came through -- and -- and
9 the restraining would come through the separation.  To
10 restrain or subdue is, I think, also articulated in the
11 FOM.  To subdue.  And it didn't seem -- because of the
12 cooperation -- I mean, this is me assuming that the
13 cooperation that took place, the calm, the -- the
14 following of instructions, that there didn't need to be a
15 physical restraining in the form of zip ties, or however
16 they do it in the back.  The restraint came from the
17 separation from the adult and the child.
18    Q.   If the adult is capable of getting out of his
19 seat and walking to the back, is that restraint?
20    A.  Well, if the adult is kept from the child, that
21 would be restraint, I would assume.  You know, I don't --
22 you know, you would have probably a -- more of a legal
23 definition of "restrain or subdue."  But -- and for us,
24 it was the separation of the adult and the child that
25 constituted -- I mean, we're -- we're drilling in on --

Page 46

1 on words.  We are.  And for us, it was a separation of
2 the adult and the child until we could get on the ground
3 and have law enforcement work it out.
4    Q.  Did you discuss with Scott Warren at any time
5 his physical contact with the adult?
6    A.  Scott's physical contact --
7    Q.  Yes.
8    A.  -- with the adult?
9       No.
10    Q.  Are you aware that a claim has been made by the
11 adult that he was violently struck by Scott?
12    A.  I became later aware of that.  Much later.
13    Q.  All right.  Is that an appropriate thing for
14 Scott to have done if, in fact, that is true?
15    A.  No, it's not appropriate if it's true.
16    Q.  Okay.  And again, why didn't you ask the child
17 what the relationship was between him and the adult and
18 whether or not he had been touched in a nonconsensual way
19 by the adult?
20    A.  Well, when would I do that?  Where -- I mean,
21 we -- to come back and -- and enmesh myself in the
22 situation in the back of the airplane, that is just not
23 what we do.  We are the -- the flight attendants have the
24 responsibility and the ability to -- to manage the issue
25 that's going on in the back.  I mean, it's like asking me

Page 47

1 why don't I go back and give CPR to a passenger that's
2 having a heart attack?
3    Q.  Okay.
4    A.  What we are presented with is the information
5 that's the -- the issue that's going on in the back.  We
6 make the decisions, what's -- in relationship to
7 aviating.  So if we need to divert, or if we need to
8 consider a holding, or whatever it is that we do, we are
9 just presented with the information that's in the back,
10 and then we make the decisions on what the airplane does.
11    Q.  Your primary job is to fly the airplane?
12    A.  Correct.
13    Q.  So when a flight attendant comes to you and
14 says, Hey, I saw two passengers in the back who boarded
15 together engaged in -- in -- in some form of touching
16 each other, why don't you just say, Hey, my job's to fly
17 the airplane, that's your job?
18    A.  Well, because my responsibility is also to the
19 safety of the passengers --
20    Q.  Okay.
21    A.  -- right?
22    Q.  And where in -- in your written rules of
23 responsibility does it say for you to take a 12-year-old
24 child and -- and remove them from their parent during the
25 flight?

Page 48

1    A.  Well, we don't have an articulation in our FOM.
2    Q.  So that's just something you made up?
3    A.  We separated the adult from the child based on
4 the information that I had from the flight attendants.
5    Q.  And none of that involved flying the airplane,
6 did it?
7    A.  Correct.
8    Q.  Okay.
9    A.  But it involved the safety of the passengers.
10    Q.  And after the -- after you left the cockpit
11 after this discussion -- well, let me -- let me back up.
12 Strike that.
13       So you had the discussion with all the flight
14 attendants, and you made the decision in the cockpit to
15 separate the child from the adult.  And then, I believe
16 you said the flight attendants left the cockpit; is that
17 correct?
18    A.  Correct.
19    Q.  And after the flight attendants left the
20 cockpit, you consulted the FOM?
21    A.  Yes.
22    Q.  Okay.
23    A.  Later, yeah.
24    Q.  Yes.  Now, you've already at this point made --
25 given an order to separate the child from the adult,



Page 49
1  but --
2     A.  Right.
3     Q.  -- now you're looking for backup for the order;
4  is that right?
5     A.  Just make sure -- yeah.  I --
6     Q.  Okay.
7     A.  -- want to make sure that what we're doing is
8  the correct thing to do.
9     Q.  All right.  Now, did you discuss this with First
10 Officer Mullin?
11    A.  No.
12    Q.  No.  This is something you did on your own?
13    A.  Yeah.
14    Q.  Okay.  And then after you looked at the FOM, you
15 left the cockpit?
16    A.  No, not that I remember, no.
17    Q.  So for the entire flight, you never left the
18 cockpit?
19    A.  I probably did.  I don't remember when, and it
20 might have been when we first had the meeting.
21    Q.  Okay.
22    A.  I -- I can't remember when I left the cockpit to
23 use the restroom.  And that's the only reason we leave
24 the cockpit.
25    Q.  Right.

Page 50
1     A.  Right.
2     Q.  But while you're out of the cockpit, it's
3  certainly permissible for you to go to the back of the
4  aircraft, isn't it?
5     A.  It is highly unrecommended to leave the -- to
6  leave the -- the restroom in the front galley area.
7     Q.  Where in the written rules that apply to your
8  job would I find the statement that backs that up?
9     A.  I don't think it's written.
10    Q.  So this is just an unwritten "highly
11 unrecommended"?
12    A.  In a post 9/11 world, yes.
13    Q.  Is this something that the chief pilot has told
14 you?
15    A.  Told me what?
16    Q.  That it's highly unrecommended that you --
17    A.  It's --
18    Q.  -- go to the back of the aircraft?
19    A.  It's just kind of our ethos as pilots.  In fact,
20 we have a -- we have a -- a procedure in the MEL.  Well,
21 it's not even a procedure.  But in an MEL, if that
22 front -- if the front lavatory is out of service --
23    Q.  Yes.
24    A.  -- it's actually something that a captain can
25 refuse an airplane for, just for that security reason to

Page 51
1  not have to walk clear to the back of the airplane.  It's
2  for security.
3     Q.  All right.  But that's the only thing you can
4  point to is -- is an inoperative lav?
5     A.  Right.  It's just not -- it's just not what we
6  do post 9/11, to traverse the cabin, to manage situations
7  that are going on in the cabin.
8     Q.  Now, you would agree with me that at any time in
9  this process you could have asked one of the flight
10 attendants to go back and speak with the adult and/or the
11 child in Row 17 and then relay that information to you,
12 right?
13    A.  Restate that question?
14    Q.  You would agree with me that at any time in this
15 process you could have asked one of the flight
16 attendants, or, in fact, ordered one of the flight
17 attendants to go back and interview the adult and/or the
18 child and to bring the results of that interview to you.
19    A.  Yes.
20    Q.  Okay.  But you chose not to do that?
21    A.  What I did was call back to ask how things are
22 going.
23    Q.  Well, that was after you'd already separated the
24 child --
25    A.  Correct.

Page 52
1     Q.  -- from the parent?
2     A.  Yeah.
3     Q.  I'm saying before you separated the child from
4  the parent, you could have made an inquiry about, for
5  instance, whether or not they were related, whether or
6  not the child objected to the hand being on his lap --
7  if, in fact, it was on his lap.
8         Any of those things you could have asked the
9  flight attendants to check with the passengers about,
10 couldn't you?
11    A.  I could have.
12    Q.  Okay.  And if the passengers had responded that
13 they were father and child and that nothing was
14 objectionable about their contact with each other, that
15 would have been a nonissue, wouldn't it?
16    A.  Yes.
17    Q.  Certainly wouldn't have been a Threat Level 2,
18 would it?
19    A.  Yes.
20    Q.  Would not have been?
21    A.  Would not have been.
22    Q.  Okay.  All right.  You did, in fact, contact law
23 enforcement, right?
24    A.  We did.
25    Q.  Okay.  And what did you tell law enforcement?



Page 53
1  A.  Well, we -- we ACARSed ahead that there was
2  inappropriate touching, that it -- we were informed that
3  there was inappropriate touching between an adult and a
4  minor.
5    Q.  And nobody from Frontier's operations -- is --
6  is that the right term, "operations"?
7    A.  Yeah, dispatch.
8    Q.  Dispatch.
9    A.  Yeah.
10   Q.  Nobody from dispatch ACARSed you back and said,
11  Well, did you ask the involved parties about this?
12   A.  No.
13   Q.  So everybody just took the word of the flight
14  attendants that there was inappropriate touching?
15   A.  Correct.
16   Q.  And wouldn't you agree with me that
17  "inappropriate" means "nonconsensual"?
18   A.  Correct.
19   Q.  So in order to determine that something is
20  nonconsensual, don't you have to interview the people to
21  see whether it was consented to?
22   A.  Well, yes.
23   Q.  Okay.
24   A.  I would agree to that in principle.
25       But in this situation, like I said, for us, it

Page 54
1  was presented to us as a flight crew from the flight
2  attendants.  And our job is not -- in that moment, our
3  job is not to interrogate, to interview, to -- especially
4  as pilots in the back of the airplane.  Like I said, it
5  would be akin to going back and -- and getting involved
6  in a medical issue or getting involved in a fight.  And
7  it's just -- we don't.
8       For the security of the aircraft, the pilots,
9  you know, come out of the cockpit, use the restroom,
10 and -- and return to the cockpit.  We don't go through
11 the cabin for security reasons.
12   Q.  But you do believe it is part of your job to
13 take a 12-year-old child away from the adult that he
14 boarded with?
15   A.  The information presented to me, it's my duty
16 to -- the well-being of the passengers, if that was -- if
17 the information presented to me precipitated our decision
18 to separate the two for the -- the few hours remaining
19 for the flight until law enforcement could work it out.
20 And it would be up to law enforcement to do the
21 interrogating.  It would be up to law enforcement to --
22 to find out exactly the situation behind the events
23 related to us as a flight crew.
24   Q.  And you believe that your actions in this regard
25 were dictated by the flight operations manual?

Page 55
1    A.  The actions were from the information we got
2  from the flight attendants.
3    Q.  No.  No.  No.  I'm talking about not this
4  particular situation, but all situations.  Presumably,
5  you must have some standard procedures for reacting to
6  information of whatever sort that's given to you by the
7  flight attendants, correct?
8    A.  Correct.
9    Q.  That either comes from your training or from
10 written documents that have been provided to you,
11 correct?
12   A.  Correct.
13   Q.  Have you had training in this particular subject
14 of a flight attendant coming to you and saying that they
15 are concerned about inappropriate touching?
16   A.  No.
17   Q.  Okay.
18   A.  No.
19   Q.  So Frontier has not given you any training
20 whatsoever on what to do in that situation?
21   A.  Correct.
22   Q.  Okay.  So let's, then, look at documents.
23      Has Frontier given you any documents that --
24 that give you procedures to take or actions to take in
25 those situations?

Page 56
1    A.  Well, we've discussed the threat levels.
2    Q.  That's it?  That's the only document that you
3  have?
4    A.  Right.  We do not have -- we don't have
5  documents that pertain specifically to groping,
6  molesting, human trafficking, no.
7    Q.  Okay.  Now, what if we looked at the section of
8  the FOM dealing with Threat Level 2 and found that it was
9  talking about inappropriate touching of a crew member as
10 opposed to inappropriate touching of the person seated
11 beside you?  Would that change the appropriateness of the
12 action that you took?
13   A.  If the -- if the inappropriate touching was
14 directed to a flight attendant?
15   Q.  Yeah.  If it said that a Threat Level 2 is based
16 upon inappropriate physical contact with a flight crew
17 member and didn't say anything about inappropriate
18 touching, so to speak, of -- of another passenger, would
19 that change the authorization of your actions in this
20 situation?
21   A.  I don't know.
22   Q.  Okay.
23   A.  I mean, it's -- we take it on a case-by-case
24 basis, obviously.  If you have a passenger that's
25 reacting in a physical way towards a flight attendant,



Page 57

1  then you take that as -- as it comes as a flight -- as a
2  case-by-case.
3     Q.  All right.  Let's go off the record for just a
4  second.
5         THE VIDEOGRAPHER:  Off the record.  9:27.
6     (A break was taken from 9:27 a.m. to 9:47 a.m.)
7         THE VIDEOGRAPHER:  Back on the record.  9:47.
8     Q.  (BY MR. MCKAY:)  Captain, before we broke, we
9  were talking about the ACARS messages.  And during the
10 break, we printed them out, and you have them there in
11 front of you.
12        First of all just in general, are those what you
13 recall as the ACARS messages --
14    A.  Yes.
15    Q.  -- for this flight?  Okay.
16        Now -- and I see on, starting at No. 10 and
17 working backwards that --
18        First of all, there's a time, and that's given
19 in Zulu time; is that correct?
20    A.  That's correct.
21    Q.  So if -- if we looked at the departure time of
22 the flight in Zulu, then this would tell us how far along
23 in the flight you were when this was sent?
24    A.  That's correct.
25    Q.  Okay.  And the No. 10 says "Aircrew Message."

Page 58

1         Does that mean that it was sent from the
2  cockpit?
3     A.  That's correct.
4     Q.  And the line that says "Freetext," all one word,
5  says, "There seems to be some inappropriate touching
6  between an older male and a younger male..12" Y-O?
7     A.  Year old.
8     Q.  Year old.
9         "... original seats 13 Delta 13 Echo flight
10 attendants are uncomfortable."
11        Was that, as far as you know, the entire
12 message?
13    A.  Yeah.
14    Q.  Okay.  Did you write that, or did First
15 Officer --
16    A.  You know, I can't remember.
17    Q.  Okay.  All right.
18    A.  With that "R UNCOMFORTABL," that seems like a
19 younger kid.
20    Q.  Yes.  Okay.  All right.  So just for the record,
21 the "R" is -- is represented just --
22    A.  A-R-E.
23    Q.  -- as the letter R.  Yeah.
24        Okay.  So it does appear that at the time that
25 this was sent, at least the age of the child was known

Page 59

1  and also the fact that they had been originally seated in
2  the exit row, correct?
3     A.  That's correct.
4     Q.  Okay.  And the next -- and that was sent at 1:47
5  Zulu.
6         And then there's a second message designated on
7  this page as Number 9 that looks like it was sent
8  immediately afterwards?
9     A.  Yep.
10    Q.  Okay.  And it says, "We need some input from
11 you..and" S-O --
12    A.  SOC.
13    Q.  SOC?
14    A.  Right.
15    Q.  What does that mean?
16    A.  SOC is the -- they're separate from -- it's an
17 operation center where they're watching the -- the big
18 picture of flights and --
19    Q.  Okay.
20    A.  -- and they're the ones that determine whether a
21 flight cancels or not.
22    Q.  I see.
23    A.  Yeah.
24    Q.  Do you know what it stands for?
25    A.  I don't, exactly.

Page 60

1     Q.  All right.
2     A.  Operation center, strategic operation center --
3     Q.  Okay.
4     A.  -- maybe?
5     Q.  All right.
6     A.  SOC.  That's what I know it as.
7     Q.  Okay.  So this is saying from the cockpit, "We
8  need some input from you," meaning dispatch?
9     A.  Yeah.
10    Q.  "And SOC"?
11    A.  Right.
12    Q.  Okay.
13    A.  Yeah.
14    Q.  And then the Number 8 is the next message, and
15 that is coming at 1:53 Zulu.
16        And where is that coming from?
17    A.  That's coming from dispatch.
18    Q.  Okay.  And it says, "Did the flight
19 attendants" -- oh, I just lost it on my page here.  Hang
20 on.
21        "Did the flight attendants witness the
22 inappropriate touching or was it reported by another
23 passenger or the younger male ...."
24        Is that what it says there?
25    A.  That's what it says here.



Page 61
1   Q.  Okay.  So that is dispatch asking whether, A,
2  the flight attendants witnessed it; B, it was reported by
3  another passenger; or C, it was reported by the younger
4  male who was supposedly touched, right?
5   A.  Correct.
6   Q.  Okay.
7   A.  Yes.
8   Q.  And the response was what?
9   A.  "The FAs witnessed it.  They are separated now."
10  Q.  Okay.  So at this point, the separation had
11 already occurred?
12  A.  Correct.
13  Q.  And dispatch --
14  A.  Or the instructions to --
15  Q.  The instructions --
16  A.  Correct.
17  Q.  -- had been made?  Okay.  All right.
18      And then the next ACARS is at 3:11 Zulu, and it
19 is from the cockpit saying, "Confirm that we are set for
20 our arrival with LEO" -- that's law enforcement officers?
21  A.  Correct.
22  Q.  "Also is there further info on this adult.. they
23 are still separated."
24      And what -- what did you mean by "further info"
25 from this -- "on this adult"?

Page 62
1   A.  Just information, like whatever information they
2  may or may not have on the adult.
3   Q.  Okay.  Would that include a name?
4   A.  Name or just -- yeah.
5   Q.  Okay.  So -- so nobody from dispatch ever sent
6  you an ACARS saying they are father and son?
7   A.  No.
8   Q.  Okay.  And then you didn't know they were father
9  and son?
10  A.  No.
11  Q.  Okay.  All you got back was at 3:14 Zulu, "LEOs
12 will meet the flight.  No new info on adult," correct?
13  A.  Correct.
14  Q.  Okay.  Now, dispatch has the names of the
15 passengers, does it not?
16  A.  I assume so, yeah.
17  Q.  Okay.  So they -- they had the names, they could
18 have said they both have the same surname, but they never
19 did?
20  A.  No.
21  Q.  Okay.  And then on Number 4 there, at 3:37 Zulu,
22 "Description:  Special Request," and it says, "6393, just
23 confirm we will, have LEOs standing by, at the gate., we
24 will deplane the.adult and child last."
25      First of all, is -- is that what it says?

Page 63
1   A.  Yes, that's what it says.
2   Q.  What is 6393?
3   A.  That, I don't know.
4   Q.  Okay.
5   A.  That might be a code because this is not going
6  to dispatch, this is going, actually, to Las Vegas
7  station.
8   Q.  Ah, okay.
9   A.  So when it says, "Special request."  So when
10 we're about an hour, hour and a half out, we'll send
11 specials, what we call "specials," specials being how
12 many wheelchairs we need, if we have any unaccompanied
13 minors, if we need bags of ice.  And then you can text --
14 on the second page you can text.
15  Q.  Okay.
16  A.  And this is where we just -- to make sure
17 there's communication between dispatch and -- and the
18 station, which we -- you know, usually happens.  But we
19 always -- we'll follow it up --
20  Q.  All right.
21  A.  -- just to say, Hey, just want to confirm.
22      This "6393," I don't know what that is.
23  Q.  Do you think that there is a list of codes that
24 might tell us what 6393 is?
25  A.  I don't know.

Page 64
1   Q.  Okay.  If there was, or if there were, would it
2  be with the Las Vegas station?
3   A.  I don't know.
4   Q.  Okay.  All right.
5   A.  This is the first time I've seen ACARS in a
6  printed ....
7   Q.  Oh, okay.
8   A.  In a printed -- you know, that 6393, yeah, I
9  would -- no, I'm not going to assume.
10  Q.  Okay.
11  A.  I don't know what it is.
12  Q.  But this is a message that's coming from the
13 cockpit?
14  A.  That's correct.
15  Q.  Okay.  So if -- if First Officer Mullin had
16 inputted 6393, presumably he knew what it meant?
17  A.  No.  Well, I mean, I can't presume what he knows
18 or doesn't know.  But 6393, that, I don't think -- that's
19 not coming from us, I don't think.
20  Q.  Oh, okay.
21  A.  I don't think.
22  Q.  But the message coming from you was just
23 confirming that law enforcement would be standing by and
24 indicating that you would hold the adult and the child
25 for deplaning last?



Page 65

1  A. Correct, which is usually what we do.
2  Q. Okay. And then we have a 3:43 Zulu. This is
3 Number 3. It says "CMD." And then it says, "Uplink -
4 from Las Vegas ops"; is that right?
5  A. Correct.
6  Q. Okay. And there is your -- your estimated time
7 of arrival, number of wheelchairs, et cetera, the gate,
8 and all of that typical information, right?
9  A. Correct.
10  Q. Okay. And then at the end, it says, "-copy they
11 will meet the flight if there is anymore witnesses please
12 deplane them last as well so they can give
13 statements ...."
14     Is that what it says?
15  A. That's what it says.
16  Q. All right. And did you detain any witnesses to
17 give statements?
18  A. Not that I recall. I don't know.
19  Q. Okay. I presume that this is information that
20 you would have had to relay to the flight attendants; for
21 instance, deplane the adult and the child last, detain
22 any witnesses, that sort of thing.
23     Did you make a call to the flight attendants?
24  A. No. And -- and when we're under 10,000 feet,
25 which is a lot of the time when we get these statements,

Page 66

1 when we're under 10,000 feet, then, no. We're in the
2 sterile, and so the communique between us and the cabin
3 will be limited and -- unless it's an outright emergency.
4 But, no. And -- and I -- I don't know if this was below
5 10,000 feet, but -- or not, but.
6  Q. Okay. So we'd have to look at the -- the flight
7 plan details to see --
8  A. Correct.
9  Q. -- where you were at 3:43 Zulu?
10  A. Correct.
11  Q. Okay. Do you recall what you did, if anything,
12 relative to this incident after you landed?
13  A. Well, after we land, we go through our
14 post-flight checks. And by the time we're done there,
15 then the passengers are usually, you know, most of the
16 way getting deplaned. First officer will do a walk
17 around. We -- I can't remember if this airplane --
18 probably was going back out. And so I didn't -- I can't
19 remember if I did a full shutdown. It doesn't matter.
20 But by the time we're finished up, then yeah. And -- and
21 I just kind of hung out, you know, waiting, because I
22 knew we'd be, you know, dealing with law enforcement.
23 And -- and I stood by in case there was any questions,
24 and --
25  Q. Okay. So did you observe the passengers

Page 67

1 deplaning?
2  A. Yes.
3  Q. Okay.
4  A. When you say "passengers" ....
5  Q. Well, did you observe the adult deplane?
6  A. I can't remember the adult deplaning. He may
7 have been deplaned by the time I came out of the cockpit.
8  Q. Okay. So your testimony is that you did not see
9 the -- the adult deplane?
10  A. Not that I recall.
11  Q. Okay. Did you see the child deplane?
12  A. I did.
13  Q. Okay. And -- and how was that accomplished, or
14 what did you see?
15  A. Just coming up the aisle.
16  Q. By himself?
17  A. I can't remember if he had somebody behind him.
18 I think the flight attendants were behind him, coming up
19 behind.
20  Q. Did he have shoes on?
21  A. Not that I -- I mean, I don't know. I didn't
22 take notice.
23  Q. All right. Did you take notice of his
24 appearance with respect to emotion?
25  A. Nothing came to mind that he was emotional.

Page 68

1  Q. All right.
2  A. Just deplane, yeah.
3  Q. Do you recall which flight attendants were near
4 him?
5  A. No.
6  Q. Okay. Did you give a statement to the police?
7  A. Not written, no.
8  Q. All right.
9  A. No.
10  Q. Did you just tell them what you've told me this
11 morning?
12  A. Well, they were mostly -- I didn't have much to
13 offer as far as the -- the details in the back, no. But
14 I stood -- I stood by, and if they had a question -- I
15 can't remember any questions that were directed to me.
16  Q. Okay. Did you have any other involvement? Did
17 you give, for instance, a statement to Frontier?
18  A. I talked with the chief pilot some -- a few days
19 later, yeah.
20  Q. A few days later?
21  A. Yeah.
22  Q. Okay. Is that because the chief pilot called
23 you?
24  A. No, I called him.
25  Q. You called him?



Page 69
1  A.  Yeah.
2  Q.  Okay.  And was that because somebody had sent
3  you an email or --
4  A.  No.
5  Q.  -- anything?  No.  You just felt the need --
6  A.  Just -- umm-hmm.
7  Q.  -- to tell him?  All right.
8      Do you know whether your conversation with him
9  was recorded in any way?
10  A.  No.
11  Q.  You don't know, or --
12  A.  I don't -- no, I don't think so.
13  Q.  Okay.  And what's the chief pilot's name?
14  A.  Devon Hussey.  I'm not -- I'm not exact on the
15  spelling.  H-U-S-S-E-Y, I believe.
16  Q.  Okay.  In Denver?
17  A.  In Las Vegas.
18  Q.  In Las Vegas.  Okay.
19      And he's the chief pilot for all of --
20  A.  No, just for the Las Vegas base.
21  Q.  Just for Las Vegas?
22  A.  Yeah.
23  Q.  Okay.  I see.  All right.
24      Is there anything else that you know about this
25  incident that I haven't asked you about?

Page 70
1  A.  Well, I think you've asked quite a bit about
2  this incident.
3  Q.  I've covered everything?  All right.  I just
4  want to make sure before you leave that I've covered
5  everything.
6      I've asked you everything that you know about
7  the incident?
8  A.  Correct.
9  Q.  Okay.  All right.
10     So what will happen next is that the court
11  reporter will type this out in a transcript.  And you
12  have the right to proofread the transcript, essentially,
13  make sure that everything is correct.  You can change
14  typos.  You can also change factual matter if, for
15  instance, you remember something different than how you
16  remembered it today.
17  A.  Okay.
18  Q.  You have to tell us now whether you want to do
19  that or whether you waive that procedure.
20     MS. SHELKE:  We'll read and -- we'll read and
21  reserve.  We'll reserve and read.
22     THE WITNESS:  Reserve and read?
23     MS. SHELKE:  Yes.
24     THE WITNESS:  There you go.
25     MS. SHELKE:  But I do have a few questions

Page 71
1  before we wrap up.
2     MR. MCKAY:  Oh, I'm sorry.  I just -- that's
3  terrible.  Please.  Please ask questions.
4               EXAMINATION
5  BY MS. SHELKE:
6  Q.  I just want to make sure we have a good timeline
7  on this.
8     Captain, you were asked a lot of questions about
9  this incident.
10  A.  Yes.
11  Q.  It is correct that you do not remember the
12  specific timeline, correct?
13  A.  That's correct.
14  Q.  Okay.  But you do recall that Flight Attendant
15  Chelsie Bright called the cockpit and said she wanted to
16  come in, correct?
17  A.  Correct.
18  Q.  And that is unusual to you?
19  A.  That is unusual.
20  Q.  Okay.  And then while the -- Chelsie Bright, the
21  flight attendant, was in the cockpit, a second flight
22  attendant asked to come in as well, correct?
23  A.  Correct.
24  Q.  And that was highly unusual to you?
25  A.  That's unusual times two.

Page 72
1  Q.  And then based on the representations made by
2  both flight attendants, you called and spoke with the
3  remaining two flight attendants, correct?
4  A.  Correct, for verification, yeah.
5  Q.  Okay.  And based on your verification from the
6  two flight attendants who did not come into the cockpit,
7  you decided that -- or you supported the decision to
8  separate the two passengers involved in this incident,
9  correct?
10  A.  Yes.  After the discussions with all --
11     MR. MCKAY:  Objection.  Sorry.  Objection to the
12  form.  Go ahead.
13     That's okay.  You can go ahead and answer.  I
14  just make these objections for the record.
15     THE WITNESS:  Okay.
16     MR. MCKAY:  Yeah.
17  Q.  (BY MS. SHELKE:)  So -- so it is correct that
18  after you spoke with the two flight attendants in the
19  cockpit and the two flight attendants who did not come
20  into the cockpit, you supported the decision to separate
21  the two passengers, correct?
22  A.  Correct.
23  Q.  When the decision to -- to separate the two
24  passengers was made, you had no information with regards
25  to either passenger's race, correct?



Page 73

1  A.  Correct.
2      MR. MCKAY:  Objection to the form.
3  Q.  (BY MS. SHELKE:)  When the decision to separate
4  the two passengers was made, you had no information with
5  respect to the relationship between the passengers,
6  correct?
7  A.  Correct.
8  Q.  If you had any information with respect to the
9  relationship of the passengers, would that have changed
10 your decision to separate the two passengers?
11 A.  With the information that I had, no.
12 Q.  After the two passengers were separated, did you
13 call back to the flight attendants to see if the
14 situation had escalated in any way?
15     MR. MCKAY:  Objection to the form.
16     THE WITNESS:  Yes.
17 Q.  (BY MS. SHELKE:)  Do you recall if the situation
18 had escalated any further after the two passengers were
19 separated?
20 A.  No -- do I recall?
21 Q.  Correct.
22 A.  Restate that.
23 Q.  Sorry.  After the two passengers were separated,
24 did the situation ever escalate further?
25 A.  No.  No.

Page 74

1  Q.  And it was your decision that the matter should
2  be sorted out on the ground by law enforcement --
3  A.  Yes.
4  Q.  -- correct?
5  A.  Yes.
6  Q.  That's all the questions I have.
7  A.  Okay.
8      MR. MCKAY:  All right.  Now we're done, and you
9  want to read and sign?
10     MS. SHELKE:  Yes, please.
11     MR. MCKAY:  And that is that.
12     Thank you very much for coming in.
13     THE WITNESS:  Thank you, John.
14     THE VIDEOGRAPHER:  This is the end of the
15 deposition.  We're off the record.  The time is 10:03.
16     THE COURT REPORTER:  And the same transcript
17 orders as yesterday?
18     MR. MCKAY:  Yes, exactly the same.
19     (The deposition concluded at 10:03 a.m.)
20
21
22
23
24
25

Page 75

1  Case: Peter Delvecchia v. Frontier Airlines, Inc.
   Civil No.: 2:19-cv-01322-KJD-NJK
2  Reported By:  Michelle Mallonee, RPR, CSR
   Date Taken: December 4, 2019
3
4
5            WITNESS CERTIFICATE
6
     I, REX SHUPE, HEREBY DECLARE:
7
     That I am the witness referred to in the foregoing
8  transcript; that I have read the transcript and know
   the contents thereof; that with these corrections I
9  have noted, this transcript truly and accurately
   reflects my testimony.
10
   PAGE-LINE         CHANGE-CORRECTION            REASON
11 ___ ___  _____   _____
         ___ ___  _____   _____
12 ___ ___  _____   _____
         ___ ___  _____   _____
13 ___ ___  _____   _____
         ___ ___  _____   _____
14 ___ ___  _____   _____
   _____   No corrections were made.
15
16     I, REX SHUPE, deponent herein, do hereby certify
   and declare under penalty of perjury
17 the within and foregoing transcription to be true and
   correct.
18
19     _____
            REX SHUPE, Deponent
20
       SUBSCRIBED and SWORN to at _____
21 _____, this _____ day of
   _____, 2019.
22
23                          _____
                                  Notary Public
24
25

Page 76

1              REPORTER'S CERTIFICATE
2  STATE OF UTAH    )
                    )
3  COUNTY OF DAVIS  )
4
5      I, MICHELLE MALLONEE, a Certified Shorthand
6  Reporter and Registered Professional Reporter, hereby
7  certify:
8      That the foregoing proceedings were taken before
9  me at the time and place therein set forth, at which time
10 the witness was placed under oath to tell the truth, the
11 whole truth, and nothing but the truth;
12     That the proceedings were taken down by me in
13 stenotype and thereafter my notes were transcribed
14 through computer-aided transcription; and the foregoing
15 transcript constitutes a full, true, and accurate record
16 of such testimony adduced and oral proceedings had, and
17 of the whole thereof.
18     I further certify that I am not a relative or
19 employee of any attorney of the parties, nor do I have a
20 financial interest in the action.
21     I have subscribed my name on this 12th day of
22 December, 2019.
23
24                         *Michelle Mallonee*
25                          Michelle Mallonee, CSR, RPR