**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF NEVADA
 3                      -oOo-
 4
 5  PETER DELVECCHIA, et al.,    )
                                 )  Civil No.:
 6       Plaintiff,              )  2:19-CV-01322-KJD-NJK
                                 )
 7  v.                           )
                                 )
 8  FRONTIER AIRLINES, INC.,     )
    et al.,                      )
 9                               )
         Defendants.             )
10  _____ )
11
12
13
14      VIDEOTAPED DEPOSITION OF CHELSIE SAKURADA
15            Taken on December 3, 2109
16                 at 9:54 a.m.
17
18
19         ADVANCED REPORTING SOLUTIONS
20              159 West Broadway
                Broadway Lofts, Suite 100
                Salt Lake City, Utah 84101
21
22
23
24  REPORTED BY:  Michelle Mallonee, RPR, CSR
25
```

**Page 2**

```
 1                  APPEARANCES
 2
 3  For Plaintiff:
 4      John D. McKay, Esq.
        PARK AVENUE LAW, LLC
 5      1255 East Logan Avenue
        Salt Lake City, Utah 84105
 6      (800) 391-3654
        johndmckayatty@gmail.com
 7
 8  For Defendant:
 9      Tara Shelke, Esq.
        ADLER MURPHY & MCQUILLEN LLP
10      20 South Clark Street, Suite 2500
        Chicago, Illinois 60603
11      (312) 345-0700
        tshelke@amm-law.com
12
13
14  ALSO PRESENT:
15  Alyse Largin, Videographer
16                    * * *
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1                I N D E X
    WITNESS                            PAGE
 2
                CHELSIE SAKURADA
 3
    Examination by Mr. McKay            5
 4
 5
 6
 7
 8
 9
10              E X H I B I T S
11
12  EXHIBIT NO.     DESCRIPTION        PAGE
13  Exhibit 1 - Las Vegas Metropolitan Police    87
               Department Voluntary Statements; Bates
14             labeled 19AZF0229 DELVECCHIA FRONTIER
               0115 through 0121
15
    Exhibit 2 - Email dated April 17, 2019; Bates   87
16             labeled 19AZF0229 DELVECCHIA FRONTIER
               0104
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1           P R O C E E D I N G S
 2                    -oOo-
 3       THE VIDEOGRAPHER:  This is Media 1 to the
 4  videotaped deposition of Chelsie Bright "Sakurad" -- is
 5  that correct?
 6       THE WITNESS:  Sakurada.
 7       THE VIDEOGRAPHER:  Sakurada.
 8       -- in the matter of Peter Delvecchia versus
 9  Frontier Airlines, being heard before the U.S. District
10  Court for the District of Nevada, Case 2:19-CV-01322.
11       This deposition is taking place at Advanced
12  Reporting Solutions in Salt Lake City, Utah.  Today's
13  date is December 3rd, 2019.  The time is 9:54.
14       Will counsel please state who they are and who
15  they represent.
16       MR. MCKAY:  I'm John McKay of Park Avenue Law,
17  and I represent the plaintiffs, Peter Delvecchia and A.D.
18       MS. SHELKE:  I'm Tara She ke, last name's
19  spelled S-H-E-L-K-E, on behalf of Defendant Frontier
20  Airlines.
21       THE VIDEOGRAPHER:  Will the court reporter
22  please swear in the witness.
23  //
24  //
25  //
```



Page 5

1        CHELSIE SAKURADA,
2      having been first duly sworn,
3    was examined and testified as follows:
4            EXAMINATION
5  BY MR. MCKAY:
6    Q.  Would you state your full name, please.
7    A.  Chelsie Adriann Sakurada.
8    Q.  And how do you spell the middle name?
9    A.  A-D-R-I-A-N-N.
10    Q.  All right.  And actually, I should get you to do
11  the first name as well.
12    A.  Chelsie, C-H-E-L-S-I-E.
13    Q.  I-E.  Okay.
14        We met off the record, but my name is John
15  McKay, and I represent the plaintiffs in this case.
16        Have you ever had a deposition taken before?
17    A.  No.
18    Q.  All right.  I will just explain the process to
19  you and, by all means, ask a question if you have any
20  questions.  But this is a court proceeding, even though
21  it's taken outside of the courtroom.  There's obviously
22  no judge here.  There's no jury.  There's no people
23  watching.  But it's being videotaped for possible use
24  later at court.
25        And one thing to keep in mind is that because it

Page 6

1  is a court proceeding, all of the rules apply that would
2  apply if you were actually seated in a courtroom in front
3  of a judge.  Is that understood?
4    A.  Yes.
5    Q.  Okay.  So especially the fact that you've just
6  been sworn to tell the truth means that the penalties of
7  perjury would apply in the event of any, you know,
8  refusal to tell the truth or -- or departure from the
9  truth.  Is that understood?
10    A.  Yes.
11    Q.  Okay.  A few little housekeeping details.
12        We have to bear in mind the entire time that
13  there is a court reporter here who is going to be taking
14  down every single word that's spoken in this room.  And
15  her job becomes extremely difficult if you and I talk at
16  the same time.  So I need to have you wait until I'm
17  completely finished with my question before you begin
18  your answer.  And I will do my best to do the same with
19  respect to you.  I will wait for your complete answer
20  before I ask my next question.  Is that okay?
21    A.  Yes.
22    Q.  Okay.  And the other important thing with
23  respect to the court reporter is that every once in a
24  while, you may be inclined to nod your head for an answer
25  or to say something nonverbal, like "umm-hmm," and that

Page 7

1  is murder for the court reporter to write down.  So we
2  will remind you.  Don't worry about it.  But to the
3  extent that you can think ahead of time to answer with an
4  actual word, please do so.
5    A.  Okay.
6    Q.  I want to ask you a few just basic questions
7  about your identity.  So I apologize in advance.
8        But could you tell me your date of birth?
9    A.  April 7th, 1992.
10    Q.  And what are the last four digits of your social
11  security number?
12    A.  6236.
13    Q.  And do you have any relatives who live in
14  Las Vegas where the case will be tried?
15    A.  No.
16    Q.  Okay.  Where did you attend school?
17    A.  Weber State University.
18    Q.  And how is that spelled?
19    A.  W-E-B-E-R.
20    Q.  And that is located where?
21    A.  In Ogden, Utah.
22    Q.  And did you graduate from Weber State?
23    A.  I got an associate's.
24    Q.  All right.  And what is your associate's degree
25  in?

Page 8

1    A.  General.
2    Q.  Okay.  And do you remember what year that was?
3    A.  No.
4    Q.  Okay.  That's fine.  Once we get the context
5  laid, it -- it might come back to you.
6    A.  Maybe.
7    Q.  How about high school?  Where did you go to high
8  school?
9    A.  Roy, Roy High School, R-O-Y.
10    Q.  And how big a school is Roy High School?
11    A.  It's a 5A school, so it's fairly big.  I don't
12  know if that means anything --
13    Q.  I'm sorry.
14    A.  -- to you.
15    Q.  What I meant was, for instance, your graduating
16  class, do you remember approximately how many people were
17  in it?
18    A.  No.
19    Q.  Was it --
20    A.  It was big.
21    Q.  It was big, so like a thousand people?
22    A.  Probably.
23    Q.  Okay.
24    A.  Yes.
25    Q.  All right.  And did you grow up in Roy?



Page 9

1   A.  My last ten years I grew up in Roy.
2   Q.  All right.
3   A.  I was born in Wyoming.
4   Q.  You were born in Wyoming?
5   A.  Umm-hmm.
6   Q.  Okay.  Where in Wyoming?
7   A.  Evanston.
8   Q.  And how old were you when you moved to Utah?
9   A.  Ten.
10  Q.  Okay.  All right.  So you were born in 1992.
11      So it would have been 2002, approximately, when
12  you moved to Utah?
13  A.  Yes.
14  Q.  Okay.  And you were ten years old.  So then
15  eight years later.
16      You probably graduated from high school around
17  2010?
18  A.  Yep.
19  Q.  Okay.  And did you go straight into Weber State?
20  A.  Yes.
21  Q.  Okay.  So 2012 --
22  A.  Yes.
23  Q.  -- maybe, for the graduation?  Okay.
24      What did you do after graduating from Weber
25  State?

Page 10

1   A.  I worked, and later, then, attended cosmetology
2   school in Ogden.
3   Q.  Okay.  Let me start with the -- the work that
4   you did.  Where was that?
5   A.  I worked at Lagoon for eight years and a
6   clothing store called "DownEast Outfitters."
7   Q.  And can you just clarify what Lagoon is?
8   A.  Yeah, it's an amusement park.
9   Q.  Okay.  What did you do at the amusement park?
10  A.  I was a guest services manager.
11  Q.  And what did that entail?
12  A.  Helping customers that are upset, that have
13  complaints, comments, sort of thing.
14  Q.  Okay.  And did you say you did that for eight
15  years?
16  A.  Yes.
17  Q.  All right.  So --
18  A.  Yes.
19  Q.  -- from 2012 to 20- -- we're getting beyond --
20  A.  I started in --
21  Q.  -- where we are in this.
22  A.  -- 2009 working there.
23  Q.  Okay.
24  A.  But I was still working there after I had
25  attended college as well, so.

Page 11

1   Q.  Okay.  So you started before you graduated from
2   high school?
3   A.  Correct.
4   Q.  Okay.  And worked there for -- if you worked
5   for -- for nine years, that would be until last year?
6   A.  Umm-hmm, yep.
7   Q.  Okay.  All right.  And then did you also work at
8   the same time at DownEast clothing?
9   A.  Yes.
10  Q.  Okay.  So that sort of overlapped?
11  A.  Yeah.
12  Q.  All right.  And where was DownEast?
13  A.  DownEast is in Ogden.
14  Q.  Okay.  And what did you do for them?
15  A.  I was just a salesperson on the floor, just a
16  outfit -- I worked in the outfit department.
17  Q.  Okay.  All right.  So you helped people buy --
18  choose and buy clothes?
19  A.  Yes.
20  Q.  Okay.  And during that time, did you live in
21  Ogden?
22  A.  Roy.
23  Q.  In Roy.  You lived in Roy.
24  A.  Umm-hmm.
25  Q.  Okay.  What was your address in Roy?

Page 12

1   A.  ███████████.
2   Q.  And is that also the house where from ten years
3   on you -- you lived with your parents?
4   A.  No.  I purchased a house in -- let's see, I was
5   21 -- so seven years ago in Ogden and lived there for two
6   years and then sold it --
7   Q.  Okay.
8   A.  -- in 2016.  Oh, no, that doesn't make sense.
9   Q.  Okay.  We'll figure it all out.
10      Let's start with where you lived during high
11  school.
12  A.  At that address in Roy.
13  Q.  All right.  That was the ███████████?
14  A.  Yes.
15  Q.  Okay.  And then after high school, you say you
16  purchased a house?
17  A.  Yes.  It had to have been in 2013.
18  Q.  So after college?
19  A.  Yes.
20  Q.  And the house was actually in Ogden rather than
21  Roy?
22  A.  Yes.
23  Q.  Okay.  And what was the address of that house?
24  A.  ███████████, and I don't know the zip
25  code.



Page 13

1   Q.   That's okay.  And you had that house for seven
2  years?
3   A.   No, just two.
4   Q.   Two years.  All right.  I keep getting to 2020,
5  and it's not 2020 yet, is it?
6       MS. SHELKE:  No, not yet.  One more month.
7       MR. MCKAY:  All right.  So -- okay.
8   Q.  (BY MR. MCKAY:)  And why did you sell the house?
9   A.   I decided I wanted to be a flight attendant and
10  went to Denver for training.  And then you have to sort
11  of live in your base for -- oh, my gosh -- for the time
12  that you don't have a job.  You are just on call.  You
13  have to live in base for when you're on call.
14   Q.   Okay.  I think just --
15   A.   Reserve.
16   Q.   -- so it's clear for me and for the record, I'm
17  going to back up to where you first decided that you
18  wanted to go work for Frontier.
19   A.   Okay.
20   Q.   All right.  So you were -- at that point, at the
21  time you made your decision, were you still at the
22  Lagoon?
23   A.   Yes.  It's seasonal.  So you only work about 12
24  days in the spring, and then they give you access to the
25  park.

Page 14

1   Q.   Okay.  So how did you go about applying to
2  Frontier?
3   A.   I found out there was a meet and greet in
4  Denver, and my friend flew me out on a buddy pass.
5   Q.   So you had a friend who already worked at
6  Frontier?
7   A.   Yes.
8   Q.   Okay.  And who is that?
9   A.   Sarah Carr.
10   Q.   S-A-R-A-H?
11   A.   Umm-hmm.  And then C-A-R-R.
12   Q.   All right.  Does Sarah still work at Frontier?
13   A.   From what I'm aware, yeah.
14   Q.   Okay.  And how did you know Sarah?
15   A.   High school.
16   Q.   And so you flew out to the meet and greet.
17       And what did that entail?
18   A.   Just a one-on-one interview with someone from
19  the company.  And then at that point, they told me if
20  they wanted to set up a real interview with me at the
21  actual interviewing date.
22   Q.   So you met someone who gave you somewhat
23  of an interview, and then they said they would interview
24  you more formally at a later date?
25   A.   Yeah.  That's when they gave me the application,

Page 15

1  and I filled that out and then brought it to the actual
2  interview with me.
3   Q.   Okay.  So you filled out a hard copy
4  application?
5   A.   Yes.
6   Q.   Okay.  And let me just jump ahead for a second.
7       Have you ever seen your employee file at
8  Frontier?
9   A.   No.
10   Q.   Okay.  Is there someone who you understand would
11  be the custodian of employee files, like an HR person?
12   A.   Not that I'm aware of.
13   Q.   No?
14   A.   Each base has a supervisor, and I -- maybe --
15  maybe that person.
16   Q.   Okay.  So -- so you haven't had to, say, file
17  any papers for a -- for an HR person --
18   A.   No.
19   Q.   -- for any kind of benefits or anything like
20  that?
21   A.   Benefits is all online.  So I would say there is
22  a lot of interaction on email, but I've never met anyone
23  in particular.
24   Q.   Okay.  What sort of benefits do you get from
25  Frontier?

Page 16

1   A.   Just medical, dental, vision.
2   Q.   Okay.  And that's all?
3   A.   Yes.
4   Q.   Okay.  All right.  So you filled out an
5  application.  And then you brought it with you, I -- I
6  imagine, to Denver for another interview?
7   A.   I stayed in Denver.  I have a cousin that lives
8  out there, so I just stayed with her until -- my
9  interview was that next Thursday.
10   Q.   Okay.  So there was only a week between the meet
11  and greet and the interview?
12   A.   Yes.
13   Q.   All right.  And were you hired at the interview?
14   A.   Yes.
15   Q.   Okay.  And that was in the position of a flight
16  attendant?
17   A.   Yes.
18   Q.   Okay.  Do you remember the date that you were
19  you hired?
20   A.   October 16th is what my badge says.
21   Q.   All right.  October 16.
22       And of what year?
23   A.   2016.
24   Q.   2016.  All right.
25       So you have now been working there for three



1  years?
2  A.  Yes.
3  Q.  Have you always been working in the same
4  position?
5  A.  Yes.
6  Q.  And the position is known as "flight attendant"?
7  A.  Yes.
8  Q.  Now, I'm aware that when you're on a particular
9  flight, there's an A position, a B position, a C
10  position, and a D position; is that right?
11  A.  Correct.
12  Q.  Okay.  Is that something that could change with
13  each flight that you work on?
14  A.  Yes.  It changes with trips.  So you're on the
15  same position for the trip.  And then when you get off
16  that trip back to your base and then you go on a
17  different trip, you can go into a different position.
18  Q.  And when you say a trip, could that be multiple
19  flights?
20  A.  Yes.
21  Q.  Okay.  So what is a typical trip for you?
22  A.  I like to work turns.  So my typical trips are
23  just one day.  I would go to Raleigh and back or Denver
24  and back.  But it's very typical to have that be up to
25  one day -- up to five days in a row where you'd go to

1  multiple locations and have layovers for five nights and
2  then come back to your base after the fifth day.
3  Q.  Okay.  If you do a turn where you, for instance,
4  go to one city and come back, would you do that multiple
5  times in a day?
6  A.  No.
7  Q.  Just once?
8  A.  Just once.
9  Q.  So one trip out, one trip back.
10  A.  Yes.
11  Q.  I'm sorry, one flight out, one flight back.  And
12  the combination of those would be one trip.
13  A.  One trip, yes.
14  Q.  Okay.  And how are those assigned to you?
15  A.  You have the opportunity to bid before the
16  schedule comes out for what you would like.  But it's all
17  based on seniority, so you get what you get based off of
18  how long you've worked for the company.
19  Q.  And is that all done online?
20  A.  Yes.
21  Q.  Do you typically end up with the same trips?
22  A.  I do.
23  Q.  Okay.
24  A.  Yeah.
25  Q.  And -- and what typically are they?  What

1  cities?
2  A.  Turns to Tampa, to Detroit, and Minneapolis is
3  what I usually get.
4  Q.  Okay.  Thank you.  Before we get too far into
5  this, I want to back up and make sure that I have your
6  current address.
7  And what is that?
8  A.  The ▮▮▮▮▮▮▮▮▮▮▮▮▮
9  Q.  Okay.
10  A.  In Roy.
11  Q.  And that's where you lived in high school --
12  A.  Umm-hmm.
13  Q.  -- as well.  Okay.  You have to say "yes" or
14  "no."
15  A.  Yes.  Sorry.
16  Q.  This is where I'll remind you.  Okay.
17  A.  Thank you.
18  Q.  Okay.  So are -- are you back with your parents
19  now?
20  A.  Yes.
21  Q.  Okay.  And who else lives at the house with you?
22  A.  My mom.  It's my mom's house.  And my husband
23  and my newborn baby.
24  Q.  And just for the record, what's your husband's
25  name?

1  A.  Matthew Sakurada.
2  Q.  And that's S-A-K-U-R-A-D-A?
3  A.  Correct.
4  Q.  And I believe off the record I heard you say
5  that he works at a warehouse?
6  A.  Yes.
7  Q.  And -- and what is the warehouse?
8  A.  Associated Foods.
9  Q.  How long have you known Matthew?
10  A.  Seventeen years.
11  Q.  Okay.  So you went to high school with him as
12  well?
13  A.  Yes.
14  Q.  Okay.  All right.  Back to working at Frontier.
15  Was there -- after you got hired, was there some
16  type of training that you attended?
17  A.  Yes.
18  Q.  All right.  Was that all in Denver?
19  A.  Yes.
20  Q.  Okay.  And does Frontier have a particular
21  facility where that training occurs?
22  A.  Yes.  It just changed, though.  But they used to
23  have it in the -- there was a Frontier building --
24  Q.  Okay.
25  A.  -- in Denver.



Page 21

1    Q.   And so you stayed in one building for all of
2  your training?
3    A.   Correct.
4    Q.   Okay.  Tell me about what topics were covered in
5  the training.
6    A.   Mostly safety.  Everything from service on a
7  cart to evacuation.
8    Q.   Okay.  So safety with respect to the carts would
9  be operating them in a way they don't run into people?
10   A.   Correct.
11   Q.   Okay.  Securing them so they don't fly around
12 the cabin at times you don't want them to be --
13   A.   Yes.
14   Q.   -- on their own?
15        And then evacuation, of course, use of the
16 emergency exits and those sorts of things?
17   A.   Correct.
18   Q.   Okay.  I presume things like life rafts and life
19 jackets and all that as well?
20   A.   Yes.
21   Q.   Okay.  Do you remember any other topics that
22 were covered during training?
23   A.   We went over defense, self-defense, hijacking.
24   Q.   Tell me about what you were trained as far as
25 self-defense goes.

Page 22

1    A.   Mostly on how to protect ourselves, so --
2  obviously.  So if they come at you, just how to block
3  and -- or how to use other resources on the plane to
4  protect yourself, the coffee pot, the cart, if you needed
5  to.
6    Q.   All right.
7    A.   And mainly that was it.
8    Q.   Were you ever given any kind of instructions
9  about when to strike a passenger?
10   A.   We have never been given instructions to strike
11 a passenger.  If needed, we can get other people
12 involved -- other passengers involved to help us sit him
13 down, tie them up, however we need, but not to physically
14 harm them.
15   Q.   Okay.  And all of these would -- all of these
16 situations would be in the context of self-defense?
17   A.   Correct.
18   Q.   Okay.  Now you mentioned h jacking, protocols
19 in -- in case the aircraft is hijacked; is that right?
20   A.   Correct.
21        MR. MCKAY:  I won't get into those because I
22 assume that they're top secret?
23        MS. SHELKE:  Yes.
24        MR. MCKAY:  Okay.
25   Q.   (BY MR. MCKAY:)  Any other topics that you

Page 23

1  remember?
2    A.   Nope.
3    Q.   Okay.
4    A.   We -- there -- they do a portion of, like, a --
5  crew respons bility, so what to do if you're in each
6  position.  Each position has very different
7  respons bilities on the plane.  So we have, like, a crew
8  resource topic for a couple of days that explain what you
9  do in each position and, you know, how to treat your
10 customers and ....
11   Q.   Okay.  Would you be able to summarize that if I
12 asked you to tell me what happens in the A position, the
13 B position, et cetera?
14   A.   Yeah.
15   Q.   Okay.  Well, let's go ahead with that, then.
16        What are the responsibilities of the A position?
17   A.   So the A is mostly the purser of the flight.
18 They are the ones that have all communication between the
19 flight attendants, and then they're the person that
20 communicates with the pilots.
21   Q.   So if a message has to be delivered to the
22 pilots, then it would only be through the A position?
23   A.   Most l kely, yes.
24   Q.   Well, when you say "most l kely," what occasions
25 would there be when that's not the case?

Page 24

1    A.   Anyone can call the pilots at any time.  But if
2  there's something that they need to communicate between
3  the flight attendants and they all have to be on the same
4  page, so any sort of -- any sort of situation -- medical,
5  just for example -- that would be communicated through
6  all the flight attendants and then just received the
7  message through the A.  But if it's, "How long do we have
8  left in this flight," anyone can call.
9    Q.   And when you say "call," that would be on the --
10 the phone that -- that you can pick up from the passenger
11 cabin, correct?
12   A.   Yes, correct.  Yeah.
13   Q.   Are there any situations which would entail the
14 A actually going into the cockpit to talk with the
15 pilots?
16   A.   Yes.  The A does the pilot breaks, so they go up
17 there for that.  And then the A -- in this situation that
18 we're dealing with today, the A -- I was the one that
19 went up to the front and told the pilots about the
20 situation that was happening so it could be more secure
21 and not in front of passengers.
22   Q.   Okay.  So we'll do that in a second.
23   A.   Okay.
24   Q.   But that was an instance in which you actually
25 went into the cockpit?



CHELSIE B. SAKURADA                                April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 25

1    A.  Correct.

2    Q.  Okay.  Now, I -- I'm not asking you to divulge
3 anything that is sensitive information.  But just in
4 general, to get from the passenger cabin to the cockpit,
5 do you first have to call?

6    A.  Correct.

7    Q.  Okay.  There's no way that you can independently
8 open the door to get to the cockpit?

9    A.  No, unless there's an emergency.

10   Q.  Okay.  All right.  But in -- under normal
11 circumstances --

12   A.  Yeah.

13   Q.  -- the procedure is to pick up the phone, call
14 the cockpit, tell them that you want to come in and speak
15 to them?

16   A.  Correct.

17   Q.  Okay.  When you mentioned pilot breaks, that's
18 a -- a lavatory break; is that right?

19   A.  Correct.

20   Q.  Okay.  And that's where you -- you pull the --
21 the cart across to block the aisle?

22   A.  Yes.

23   Q.  Okay.  And so that, you say, is done by the A
24 position?

25   A.  Yes.  The C position will be the one that blocks

Page 26

1 it with the cart, stands in front, but the A is the one
2 who goes in.

3    Q.  Okay.  Because somebody has to be in the cockpit
4 while the -- one of the pilots is in the lavatory?

5    A.  There always has to be two people in the cockpit
6 at all times.

7    Q.  Okay.  Very good.  Anything else that the A
8 does?

9    A.  No.

10   Q.  Let's see.  Does -- this is going to be a really
11 stupid question.

12       Frontier doesn't have a first class, does it?

13   A.  No.

14   Q.  Okay.  So --

15   A.  It's okay.

16   Q.  Is there any portion of the cabin that the A is
17 responsible for serving?

18   A.  Usually the first six rows.  It's blocked up
19 into four different -- if there's four flight attendants,
20 four different sections.  And the A usually gets the
21 first six rows.

22   Q.  Okay.

23   A.  There's no rule.  I think it's just what we do.

24   Q.  All right.  Okay.  And that's all for the A,
25 then?

Page 27

1    A.  Yeah.  They meet and greet the customers and
2 also tell them goodbye when they get off the plane.

3    Q.  So the A would be present when all customers are
4 leaving the airplane?

5    A.  Yes.

6    Q.  Okay.

7    A.  Standing in front of the cockpit door.

8    Q.  Okay.  With Frontier, is it part of the standard
9 operating procedure for the -- one of the pilots also to
10 be there to say goodbye?

11   A.  No.

12   Q.  No.  Okay.  So is -- during the -- let's call it
13 the goodbye process, is the door typically shut to the
14 cockpit?

15   A.  It's typically open because the pilots are gone.

16   Q.  Oh, okay.  Very good.  They get out of there
17 quick, huh?

18   A.  Before the customers -- or passengers sometimes.

19   Q.  All right.  How about the B position?

20   A.  The B position is in charge of the back galley,
21 so the aft galley.  They set up all of the carts, they
22 get the food ready, and they also make most of the
23 announcements.

24       I forgot about that with A.  A does make a few
25 announcements as well.

Page 28

1    Q.  Okay.  Is -- are there any particular
2 announcements that are for the A as opposed to the B?

3    A.  Yeah.

4    Q.  Okay.  What are those?

5    A.  So the A does in the air.  It's hard to explain.
6 So the -- the B does anything before.  So they're -- they
7 make the announcements before they take off and before
8 we're going to land.  And the A does the announcements in
9 the current.  So they do, Okay, now we're in the air, so
10 now we're going to start our service.

11   Q.  Okay.  All right.  Turbulence announcements as
12 well for the A?

13   A.  Anyone can do that.

14   Q.  Anyone can do that?

15   A.  Umm-hmm.

16   Q.  Okay.  And what else does the B handle?

17   A.  Mostly just the galley.  And then they do the --
18 the speaking of the demo.

19   Q.  Okay.  So would it be normal for the B, then,
20 during the majority of the flight to be in the aft
21 galley?

22   A.  Correct.

23   Q.  Okay.

24   A.  Besides service and trash.

25   Q.  All right.  As far as service goes, what service



CHELSIE B. SAKURADA
DELVECCHIA vs FRONTIER AIRLINES

April 17, 2019

Page 29

1 is offered on a typical flight on Frontier?

2     A.   Everything is for purchase.  We have just -- so

3 we have soda, pop cans.  And then we have snacks,

4 Pringles, Chex Mix.

5     Q.   All right.  And is that one pass of the cart per

6 flight?

7     A.   Depends how long the flight is.  If it's over

8 2 -- hour 45, you have to go through another time.

9     Q.   Okay.  And each time, it's the same thing, just

10 pushing the cart through and selling to whoever indicates

11 that they want to buy something?

12     A.   Correct, yeah.

13     Q.   Okay.  All right.  Have we covered everything

14 that the B does?

15     A.   Yes.

16     Q.   Okay.  What does the C do?

17     A.   The C is in charge of the front portion of the

18 passengers.  They make sure that everyone is seated, all

19 the bags are pushed forward.  All the passengers have

20 their seats up.  That everyone is seated correctly.  And

21 then they brief the exit rows by informing them that

22 they're in the exit row and that, in case of emergency,

23 are they willing to help?  And they do that.

24          And then they also help out with the cart, if

25 needed, in the front.  Because the A and C will kind of

Page 30

1 tag team the cart in the front.  Some of our planes have

2 carts in the front, most of our planes have carts in the

3 back -- if that makes sense.

4     Q.   Okay.  So on most flights, there's actually two

5 carts serving the cabin?

6     A.   Yes.

7     Q.   Okay.  And at what point is the division between

8 front and back?  Is it the exit rows?

9     A.   Yeah.

10     Q.   Okay.  Do you just have one exit row or two?

11     A.   Two.

12     Q.   Two.  Okay.

13          So the C, then, would cover both of the exit

14 rows and everything forward of the exit rows?

15     A.   Correct.

16     Q.   Okay.

17     A.   For the most part.  We all work as a team

18 throughout all of it.  So if there's any sort of --

19 anyone raises their hand, anyone can go and -- and talk

20 to that person.

21     Q.   Sure.

22     A.   But for the most part, the C takes care of the

23 forward half of the cabin.

24     Q.   Okay.  And I'll bet I can guess what the D does,

25 but go ahead and tell me.

Page 31

1     A.   The back part.

2     Q.   All right.

3     A.   Exactly what the C does but in the back.

4     Q.   All right.

5     A.   And they -- that's basically all they do.  They

6 just help out if the B needs any help.  It's -- really,

7 we can do with three flight attendants, but it depends on

8 what plane you are on -- which we were on a 320 at the

9 time.  They have to have a D position because they have

10 to have four flight attendants due to how many passengers

11 are on board or how big the plane is.  So the D doesn't

12 really do a whole lot.  They are just there if they need

13 help.

14     Q.   Okay.  But they do cover the service in the

15 back --

16     A.   Correct.

17     Q.   -- of the cabin?

18     A.   Yes.

19     Q.   Okay.  And that's from behind the exit rows all

20 the way to the tail?

21     A.   We usually split it.  So A usually does the

22 first six, C will usually do 7 through 13.  The D will

23 usually do 14 through halfway back, 22.  And then the B

24 usually does 23 to throughout 27.

25     Q.   Okay.  Okay.  And so we've covered everything

Page 32

1 that the B does -- I'm sorry, the D does now?

2     A.   Yes.  They help out with the demo as well.

3     Q.   Is there a -- a way that people are chosen to

4 do, for instance, the D as opposed to the A?  Is it

5 seniority based or anything along those lines?

6     A.   It is.  You can bid for your position when you

7 put in your bid for the schedule for the next month.  And

8 you can choose what position you would like to be, but it

9 is given to you based off of seniority.

10     Q.   Okay.  What is the favorite?

11     A.   Mine is A.

12     Q.   A.  Okay.  So it's different for different

13 people?

14     A.   Correct.

15     Q.   Okay.  What would other people consider the

16 favorite?

17     A.   B.

18     Q.   Because --

19     A.   You don't have to talk to people.

20     Q.   -- less to do?

21     A.   Yep.  A lot to do, but not in the public eye

22 because they're in the back.

23     Q.   Okay.  So -- so the C and D positions are the

24 less-favored positions?

25     A.   Yes.



CHELSIE B. SAKURADA                                    April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 33

1    Q.  Because they -- they have more work and more
2  customer interaction?
3    A.  Correct.
4    Q.  Okay.  All right.  Let's talk about now the
5  flight that occurred on March 28 of this year, 2019.  And
6  the flight that is the subject of this litigation is --
7         MR. MCKAY:  I always forget the number.  Is it
8  2067?
9         MS. SHELKE:  Right.
10    Q.  (BY MR. MCKAY:)  2067 from Raleigh-Durham
11  International Airport to Las Vegas McCarran Airport.
12         Do you remember that flight?
13    A.  Yes.
14    Q.  Were you on a trip that involved a flight or
15  flights prior to that flight?
16    A.  I don't remember.
17    Q.  You don't remember.
18    A.  Hmm-mm.
19    Q.  Okay.  Is there any possibility -- well, first
20  of all, where are you based?
21    A.  Vegas -- Las Vegas.
22    Q.  Okay.  So is there any possibility that you
23  would have deadheaded out to the East Coast and then
24  started a trip from Raleigh-Durham?
25    A.  Most likely not me, no.  There is a possibility

Page 34

1  that the other flight attendants could.  I don't deadhead
2  very often.
3    Q.  Okay.  So it's probable, then, that you started
4  in Las Vegas?
5    A.  Yes.
6    Q.  Okay.  And if that's the case, would you have
7  flown from Las Vegas direct to Raleigh-Durham?
8    A.  Maybe.
9    Q.  Maybe.  Okay.  You just don't remember?
10    A.  Hmm-mm.  I don't remember if it was just a turn
11  or if it was, like, a three-day trip.  I don't remember
12  that.
13    Q.  I see.  Okay.  And if it was a three-day trip,
14  you would have had to spend the night somewhere?
15    A.  Correct.
16    Q.  And you just don't remember?
17    A.  No.
18    Q.  Okay.  All right.  So I guess we'll pick up,
19  then, with the flight that's the subject of this
20  litigation, 2067.
21         Do -- what's the earliest thing that you
22  remember about that flight?
23    A.  I remember boarding the flight in particular.
24    Q.  Because you were the A?
25    A.  Yes.

Page 35

1    Q.  All right.  And so you would have been the
2  person standing at the doorway, greeting passengers as
3  they arrived on the plane?
4    A.  Correct.
5    Q.  All right.  Do you remember seeing my clients --
6    A.  No.
7    Q.  -- board the plane?
8    A.  Not walk in.
9    Q.  No, you didn't see them at that point?
10    A.  Not that I remember.  I see a lot of faces.
11    Q.  Sure.  What is -- well, let me -- let me ask you
12  this.  Strike that.
13         Had you heard anything about them prior to the
14  boarding process?
15    A.  No.
16    Q.  Okay.  What is the first thing that you remember
17  after boarding?
18    A.  The C walked up to the exit row to do her
19  briefing, and I noticed she was doing her briefing.  And
20  then she came back and said that she had a weird feeling
21  about the two.  They were sitting in the exit row.  And
22  she told me she had asked them how old the little boy
23  was, and the dad quickly answered with the age.  And she
24  had to then switch them seats.  So I do remember her
25  switching seats before she came back and let me know that

Page 36

1  that's what she was doing.
2    Q.  And what is her name?
3    A.  Anna.
4    Q.  And this is Anna Bond?
5    A.  Yes.
6    Q.  Do you know Anna beyond working with her on that
7  flight?
8    A.  Yes.
9    Q.  Okay.  Is she also based in Las Vegas?
10    A.  Yes.
11    Q.  Do you work with her frequently?
12    A.  Yes.  We're the same seniority almost.
13    Q.  Okay.  So you've known her for three years?
14    A.  Yep.
15    Q.  All right.  And when you go out on a trip, is it
16  typically with Anna also working the flight?
17    A.  It can be.  It varies, but I worked with her
18  probably ten times before, which isn't a lot, but it is a
19  lot because there's a lot of flight attendants.  I've
20  worked with her more -- more than I have other flight
21  attendants, yes.
22    Q.  Okay.  All right.  And have you worked with her
23  several times since?
24    A.  No.  I went on maternity leave in July, so I
25  didn't work a lot after that.



CHELSIE B. SAKURADA                                          April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 37

1    Q.   Okay.  All right.  So I believe you said that
2  after Anna Bond, the C position, brief to the exit row,
3  she wa ked back.
4        Do you mean back to the front of the plane or
5  back to the back of the plane?
6    A.   Sorry.  To the front.
7    Q.   To the front.  Okay.  So she briefed the
8  passengers and then walked to where you were, which was
9  in the front of the aircraft?
10   A.   Correct.
11   Q.   All right.  Had you watched her brief the
12 passengers?  Exit row passengers, I mean.
13   A.   Yes, because then she started switching people.
14 And that caught my attention.  We don't switch people
15 very often, so.
16   Q.   Okay.
17   A.   Yeah.  She briefed them.  And then -- I couldn't
18 hear her, but I could just see.  And then she started
19 switching people.  And I was l ke, Hmm, someone must be
20 underage.
21   Q.   Okay.  All right.  And you concluded that was
22 the case, the reason for the switch?
23   A.   Most likely, yes.
24   Q.   Okay.  And what age do you have to be to be in
25 the exit row?

Page 38

1    A.   Fifteen.
2    Q.   And at this point, this was the first time that
3  you noticed the Delvecchias?
4    A.   Yes.
5    Q.   Okay.  And they were switched with some people
6  in Row 17; is that your recollection?
7    A.   Correct, yes.
8    Q.   Okay.  So when Anna Bond walked up to the front
9  of the aircraft after making the switch, what
10 specifically did she say to you?
11   A.   She said, "There's a boy that was in Row" -- I
12 don't remember if they were in 13 or 12, in the exit row,
13 "that I questioned.  And so I asked him, 'Hey, what --
14 how old are you?'  And the dad quickly answered for him."
15 And at this time, the boy was in the aisle, and the dad
16 was in the middle.  And when they had switched rows to
17 Row 17, she thought it was very weird that the dad made
18 the son get in first so, like, he wasn't allowed to be
19 around a different passenger.
20       And she also noted that it was very strange that
21 the son couldn't speak for himself.  We ask kids all the
22 time how old they are, and they always speak for
23 themselves.  But the dad stepped in very quickly and
24 said, "He's 11," or, "He's 12."
25   Q.   And this is all as related to you by Anna Bond?

Page 39

1    A.   Correct.
2    Q.   Because you didn't see or hear any of this?
3    A.   Correct.
4    Q.   Okay.  And she even said the words about, like,
5  he wasn't allowed to be by another passenger?
6    A.   Correct.
7    Q.   Okay.  So this was all essentially suppositions
8  that Anna Bond made and passed on to you?
9    A.   Yeah, completely assumptions from her as well,
10 yeah.
11   Q.   Okay.  All right.  Did she indicate that she
12 inquired as to the relationship of the -- of the two?
13   A.   We never assumed anything, hmm-mm.  She didn't
14 say.
15   Q.   Okay.  So she didn't say, for instance, I asked
16 if the two were related?
17   A.   No.
18   Q.   All right.  Now, you have aboard the aircraft
19 the passenger manifest, correct?
20   A.   We have a manifest.  All it has on there is how
21 many people are connecting and then the flight number and
22 where we're going.  It has no names.
23   Q.   Oh, I see.  So they don't give you a printout
24 of, for instance, Mr. Smith is in 1A and Mrs. Smith is in
25 1B?

Page 40

1    A.   Correct.  They don't.  They used to.  They got
2  rid of that in 2017.
3    Q.   Did they tell you why?
4    A.   Wasting paper.
5    Q.   Do you remember that specifically that they said
6  that?
7    A.   I don't think there was anything official, but
8  that's what I heard.
9    Q.   Okay.  You heard that from other flight
10 attendants?
11   A.   Yes.
12   Q.   Okay.  So what year did you say they got rid of
13 the ...?
14   A.   I think 2017.
15   Q.   2017?
16   A.   Umm-hmm.
17   Q.   Okay.  So for two years, then, you never knew
18 the names of any of your passengers?
19   A.   Correct.  It's very hard if there was an
20 emergency.
21   Q.   Did you ever mention this to management that it
22 would be hard in an emergency?
23   A.   Yeah.  We've all complained about -- well,
24 multiple people have sent emails and complained about it,
25 but nothing has been changed.  I did not personally send



CHELSIE B. SAKURADA                                      April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 41

1 an email, but ....
2    Q.  Okay.  And how are such complaints made?  To
3 whom would an email be sent?
4    A.  There's just a crew hotline, so -- I don't know
5 who answers it.
6    Q.  And when you say "crew hotline," is that an
7 email address?
8    A.  Yes.  You can also call as well.
9    Q.  And is that part of inflight services?
10   A.  Yeah.  It can be anything from, like,
11 complaints, inflight -- anything happened inflight,
12 anything happened on layovers.
13   Q.  Okay.  And when you make a complaint, do you
14 have to give your name?
15   A.  No.
16   Q.  No.  So it's sort of a -- like an informant
17 line --
18   A.  Yeah.
19   Q.  -- sort of thing?  Okay.
20   A.  If there's ever a serious issue, we would
21 probably go to our base supervisor.
22   Q.  All right.  Who is your base supervisor?
23   A.  I don't know who it is anymore.  It used to be
24 Maria.
25   Q.  Okay.  So at the time of this flight, it would

Page 42

1 have been Maria?
2    A.  Yes.
3    Q.  All right.  And do you know Maria's last name?
4    A.  No.
5    Q.  So this is your immediate supervisor, but you
6 don't know her last name.
7    A.  I just don't remember right now.  I'm sorry.
8    Q.  Okay.  All right.  All right.  So at some point,
9 you knew her name?
10   A.  Yeah.
11   Q.  Okay.  All right.  And does she -- does Maria
12 stay in Las Vegas?
13   A.  Yes.
14   Q.  All right.  She doesn't go out on trips?
15   A.  I think they can, but I don't know.  I think --
16   Q.  Okay.
17   A.  I only ever see her in the office.
18   Q.  All right.
19   A.  I do know that they can fly.  They can be put on
20 the line.  But when they are serving their time as a
21 supervisor, I'm pretty positive they stay in the office
22 as a supervisor during that time.
23   Q.  Okay.  And when you say go out on the line,
24 that's going out on trips?
25   A.  Correct.

Page 43

1    Q.  All right.  Okay.  So we're at the point where
2 you and Anna Bond had this conversation after she briefed
3 and moved the Delvecchias --
4    A.  Yes.
5    Q.  -- right?  Okay.
6       Did she say anything more to you?
7    A.  Just that we should keep an eye out.  That was
8 it.
9    Q.  All right.  Did she say why you should keep an
10 eye out?
11   A.  Because she thought it was -- the interaction
12 was really weird, how she asked the boy, and then the dad
13 stepped in.
14   Q.  All right.  What were you thinking at the time
15 when you received this information?
16   A.  Probably nothing.
17   Q.  All right.  And she didn't -- just to make it
18 clear:  She didn't identify them as the boy and his dad,
19 or did she?
20   A.  She might have said the dad answered.  I mean,
21 we can only make assumptions.  So I think that she -- she
22 could have said the dad.  I'm pretty sure that's probably
23 how she said it.  The dad answered, and --
24   Q.  Okay.  So you think at that point that both you
25 and she were aware that Peter Delvecchia was the dad of

Page 44

1 A.D.?
2    A.  Yeah.
3    Q.  Okay.
4    A.  Either foster or just traveling with an
5 unaccompanied minor, we knew that -- yeah.
6    Q.  Well, now that's a -- you raise a good point.
7       If there is an unaccompanied minor on a flight,
8 are you informed of that prior to the flight?
9    A.  Yeah.  I shouldn't have said that.  Yes.
10      They are flown in a different way, yes.
11   Q.  Okay.  Tell me about that.
12      MS. SHELKE:  I will just interject to say that
13 Frontier currently does not have an unaccompanied minor
14 program, and I don't believe they had an unaccompanied
15 minor program in effect at the time of this incident,
16 either.
17      THE WITNESS:  Correct.
18   Q.  (BY MR. MCKAY:)  So does that mean that an
19 unaccompanied minor could not fly?
20   A.  Correct.
21      MS. SHELKE:  Correct.
22      MR. MCKAY:  Okay.
23      MS. SHELKE:  That you will not take custody of
24 an unaccompanied minor under a formal program.
25   Q.  (BY MR. MCKAY:)  Okay.  And is -- is what



Page 45

1  Ms. Shelke said correct?
2     A.  Correct.
3     Q.  All right.  So at the time of this flight, it
4  would be -- it would have been impossible for there to
5  have been an unaccompanied minor?
6     A.  Correct.
7     Q.  All right.  That would have been screened out
8  well before anybody got on the flight?
9     A.  Yes.
10    Q.  Okay.  All right.  So, in this case, then,
11  because of what Anna Bond said to you, you knew that this
12  was a father and his son who were traveling together?
13    A.  Yes.
14    Q.  But you knew that Anna Bond had raised concerns
15  or suspicions of something?
16    A.  Yes.
17    Q.  What did you think the something was?
18    A.  I didn't see anything myself.  So I -- I took
19  her words and understood what she was saying and just
20  went on with my job.
21    Q.  Now, you were aware at the time because you had
22  seen them move that the father was white and the son was
23  black?
24    A.  Yes.
25    Q.  What, if anything, did Anna Bond say to you

Page 46

1  about that fact?
2     A.  She -- not that I recall anything about the
3  race.  She might have said, I don't know the relation
4  because of this, but I don't ever remember her saying
5  anything about the race at all.
6     Q.  Okay.  She said, I don't know their relation
7  because of their race?
8     A.  If she would have said anything, she probably
9  would have said that.  But I don't remember her saying
10  anything about the race at all.
11    Q.  Okay.  And you, I think, just said that he --
12  "he," the father -- was either a foster dad or, and then
13  you trailed off.
14       What did you mean by that?
15    A.  I meant by -- because I did say "unaccompanied
16  minor."  I guess I meant it could have been like an uncle
17  or someone traveling with the kid that was a trusted
18  person that they bought their tickets together.
19    Q.  All right.  All right.  So what was the next
20  thing that you recall on the flight?
21    A.  About the situation?  Because we went on just
22  with our flight duties.  We took off.  We got into the
23  air.  We started to set up our carts.  That's the first
24  thing that we always do, to get ready for service.  And
25  the D flight attendant, which I believe her name was

Page 47

1  Amanda, I think, she -- it was my first time flying with
2  her.  She walked up to the front and said -- because we
3  were all aware of the situation, I guess.  I don't know
4  if Anna had went back to the back and just said, Hey,
5  keep your eyes out on 17, or if she had called.  I don't
6  remember.  But I do know that we were all aware.
7       And so Amanda wa ked up to the front, had
8  glanced over at 17 on her way up doing trash run, and
9  came up to me and -- me and Anna and said, "He's kind
10  of -- the older gentleman is stroking the face of this
11  younger boy.  Come and look," kind of a thing, is what
12  she said.
13    Q.  All right.  And that is what you remember that
14  she said?  I mean --
15    A.  Correct.
16    Q.  -- in other words, that's an accurate depiction
17  of what Amanda, if that was her name, the D, said to you?
18    A.  Correct.
19    Q.  Okay.  That, "The older gentleman is stroking
20  the face" --
21    A.  -- "the little boy's face," yeah.
22    Q.  "The little boy's face."  All right.
23       Now, did you see him stroking the little boy's
24  face?
25    A.  Yeah.  So I did a -- a trash run.  We don't want

Page 48

1  to make anything obvious.  So we do trash runs if there's
2  something that we feel like we need to go through the
3  cabin and -- and look at.
4       So I did a trash run, and, you know, trash,
5  trash, trashed everybody.  And as -- as I was -- I was
6  going past 17, I did see the older gentleman lean over
7  and just -- just went like this, up and down, up and
8  down, up and down.  And it was just a very awkward thing
9  to see.
10    Q.  Because he was white and the boy was black?
11    A.  No.  Because I would -- even my mom wouldn't do
12  that to me, just sit there and stroke my face up and
13  down.  If there was something on my face, she would get
14  it off, but that's it.  She wouldn't sit there and
15  continue doing it.
16       It had to have been at least 30 seconds from
17  Amanda had passed by and seen them doing this that I went
18  back to 17 and -- and saw him still doing it.
19    Q.  Were they talking to each other --
20    A.  No.
21    Q.  -- at that time?
22    A.  Hmm-mm.
23    Q.  You're positive that they weren't ta king to
24  each other?
25    A.  Positive, yes.



CHELSIE B. SAKURADA                                         April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 49

1    Q.  And how long did you keep your eyes on them at
2  that point?
3    A.  A few seconds.
4    Q.  All right.  So in that couple of seconds, they
5  weren't saying any words to each other?
6    A.  Correct.
7    Q.  They were both awake?
8    A.  Umm-hmm.
9    Q.  You have to say "yes" or "no."
10   A.  Yes, sorry.
11   Q.  All right.  So now, certainly you've seen people
12 who are related to each other make gestures of affection?
13   A.  All the time.
14   Q.  Okay.  You say this is not something that your
15 mother would do to you?
16   A.  No.
17   Q.  But would you agree that it's something that
18 another mother or father might do to a child?
19   A.  No.
20   Q.  Tell -- show me again what it is exactly that
21 you feel that no parent would do to their child.
22   A.  He just was leaning over very closely and just
23 up and down, just stroking, just looking at him, just
24 stroking his face up and down, up and down.
25   Q.  All right.

Page 50

1    A.  It just wasn't normal.  I've never seen that.
2    Q.  Well, it's something that you've never seen
3  and -- and you believe that no parent would do that with
4  a child?
5    A.  Not for that long.
6    Q.  Well, you said a couple seconds.
7    A.  Well, I guess I'm just going off of what Amanda
8  had seen.  She's like, "This is what's happening.  Go and
9  look," and he was still doing it.
10   Q.  Did Amanda say to you how many seconds she
11 observed this going on?
12   A.  I'm sure she just walked by.
13   Q.  So it's possible that it could have happened
14 just for a brief moment when Amanda saw it and then not
15 happened until you saw it again for a brief moment?
16   A.  Yeah, that's very possible.
17   Q.  So it could have been just a couple of seconds
18 total of a father touching his son's face?
19   A.  Yes.
20   Q.  And you've never seen a father touch his son's
21 face?
22   A.  Not like that, no.
23   Q.  Well, you keep saying "like that" with -- with
24 some measure of disgust.  But what you're representing
25 with your hands doesn't seem that abnormal, does it?

Page 51

1    A.  To me it was, yes.
2    Q.  It was to you?
3    A.  Yeah.  Because it wasn't -- it wasn't him
4  getting anything off of the guy.  It wasn't him just l ke
5  this.  Like, it was -- it was just an up and down.  And
6  then as I -- because I went through the cabin, and then I
7  came back through, and he was still doing it, so.
8    Q.  All right.  Well, let's -- let's break this down
9  here.
10      If it had been a little girl, would that have
11 seemed abnormal to you?
12   A.  Yeah, it would have.
13   Q.  If the parent had been a mother, it would have
14 seemed abnormal to you?
15   A.  Absolutely.
16   Q.  So basically, no parent of any sex in your mind
17 should stroke the child's face of any sex?
18   A.  No.  No, they shouldn't.
19   Q.  Is -- is this something that you've learned in
20 your upbringing?
21   A.  Yeah.
22   Q.  Okay.  And -- and how in your upbringing was
23 this conveyed to you?
24   A.  I don't know.  It just seemed inappropriate.
25      I have worked -- I worked at the Foster Center

Page 52

1  of Utah Youth Village here, and they have foster kids.
2  And I've -- I've seen a lot of just parental and kid
3  interaction with that.  I mean, at Lagoon -- I've worked
4  in a lot of situations, and I just kind of know what to
5  look for.  And that, it wasn't a normal stroking.  It
6  wasn't normal.
7    Q.  When you say "what to look for," in what context
8  are you speaking?
9    A.  As a flight attendant.
10   Q.  Well, now, you were talking about working at the
11 Lagoon.  You weren't working there as a flight attendant.
12   A.  Oh, well, correct, yeah.
13   Q.  All right.  So you also mentioned working at
14 some foster care place?  Where was that?
15   A.  Utah Youth Village.  It's in Salt Lake.
16   Q.  You have to speak a little slower.
17   A.  Sorry.
18   Q.  Utah ...?
19   A.  Youth Village.
20   Q.  Youth Village.
21   A.  Umm-hmm.
22   Q.  And who runs that?
23   A.  I don't remember his name.
24   Q.  It's just run by a single individual?
25   A.  Correct.



CHELSIE B. SAKURADA
DELVECCHIA vs FRONTIER AIRLINES
April 17, 2019

Page 53

1    Q.   All right.  Is it affiliated with any larger
2  organization?
3    A.   No, it's nonprofit -- nonprofit organization.
4    Q.   All right.  When did you work there, or do you
5  work there now?
6    A.   No, I worked there in 2016.  I was laid off
7  before I became a flight attendant.
8    Q.   All right.  So when you testified earlier that
9  you were working at Lagoon before you became a flight
10  attendant, that wasn't correct.  You were actually
11  working at Utah Youth Village?
12    A.   I worked at multiple places.  Because Lagoon is
13  just part time.  It's just a seasonal -- it's not open
14  year-round.  And then I only do the -- I come in for 12
15  days in the year, and I work those 12 days to get the --
16  the benefits that they provide.
17    Q.   Okay.  But then earlier I asked you where you
18  worked, and you gave two places.  One was Lagoon, and one
19  was the clothing --
20    A.   Umm-hmm.
21    Q.   -- store.
22        So you're saying now that you worked in lots of
23  places.  What other places did you work?
24    A.   I've worked at Utah Youth Village.  I worked at
25  Great Harvest Bread Company.

Page 54

1    Q.   And what did you do at Great Harvest Bread
2  Company?
3    A.   I just was a cashier in the front, sold bread.
4    Q.   How long did you work there?
5    A.   Maybe about a year.
6    Q.   Do you remember when in time that was?
7    A.   Not off the top of my head, no.
8    Q.   All right.  What did you do at Utah Youth
9  Village?
10    A.   I worked in the private school that they had as
11  a -- just a -- kind of a teacher's aide.  I would watch
12  the kids while they went to school.
13    Q.   Did you receive any training in what you did?
14    A.   Just on-the-job training.
15    Q.   All right.  And did that include anything having
16  to do with abnormal parenting or anything along those
17  lines?
18    A.   Yeah.  We always look for the interaction
19  between the person who comes to pick them up, between the
20  child and the person that comes to get them.
21    Q.   Well, what specifically were you taught to look
22  for?
23    A.   Anything abnormal.
24    Q.   Who defines "abnormal"?
25    A.   Society.  I don't know.  I -- I guess if the --

Page 55

1  the child seems nervous or they're looking away, they're
2  not responding to the parents, the parent is harsh.  Just
3  things that normal -- that -- that parents wouldn't do.
4    Q.   Normal parents?
5    A.   Yeah.
6    Q.   Here in Utah?
7    A.   Yeah.
8    Q.   White parents?
9    A.   No.
10    Q.   Well, most people in Utah are white, are they
11  not?
12    A.   Most are, yes.
13    Q.   How about your high school class?  How many
14  nonwhite people were in your high school class?
15    A.   Maybe three, four.
16    Q.   Three or four out of a thousand?
17    A.   That are African American type, yes.  We have
18  Asians.  We have other kinds as well.
19    Q.   Okay.  Other kinds of ...?
20    A.   Races.
21    Q.   Races?
22    A.   Yeah.
23    Q.   Okay.  You had what you described as three or
24  four African American types.
25    A.   Race, yes.

Page 56

1    Q.   Race.  That's -- and you consider that a type?
2    A.   Of ethnicity, yes.
3    Q.   Okay.  So in your growing up, then, you came
4  into contact with about three or four African Americans?
5    A.   My mom also fostered three African Americans
6  from Africa as refugees.
7    Q.   All right.
8    A.   So I had more personal contact with them.
9    Q.   And did they live in the house with you?
10    A.   Correct.
11    Q.   All right.  How long did they live there?
12    A.   One lived there for about six years.  The other
13  one -- goodness, probably five.  The same amount of time.
14  And then one just was a very brief -- she wasn't 21 yet,
15  she was turning 21.  So she lived there for about a year.
16    Q.   All right.  Did you consider them to be family
17  members?
18    A.   I still do.
19    Q.   All right.  Where in Africa did they come from?
20    A.   They all came from the Congo area.
21    Q.   Did you ever notice that as a result of their
22  culture they did things differently than you and your mom
23  did?
24    A.   They definitely do things differently.  But the
25  interaction between the older parent and the younger



CHELSIE B. SAKURADA                                April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 57

1  parent are basically the same.
2     Q.   Well, I'm sorry.  You didn't know these
3  children's parents, did you?
4     A.   No.
5     Q.   You only knew your mom, acting as a foster
6  parent?
7     A.   Yeah, that's right.  Yeah.
8     Q.   Okay.  So presumably, the way your mom
9  interacted with them would be the same way that your mom
10  interacted with you?
11     A.   Correct, yeah.
12     Q.   Okay.  So as far as -- as how -- for instance,
13  a -- a parent in the Congo might interact with their
14  child, you wouldn't know?
15     A.   No.
16     Q.   Okay.  And with respect to how a child from
17  Africa might want a parent to interact with them, you did
18  or didn't know?
19     A.   What the child would expect?  I guess I don't.
20     Q.   Okay.  All right.  So you would agree with me
21  that your knowledge of social norms involving African
22  children is rather limited?
23     A.   Yes.
24     Q.   Okay.  So at this point, there is a situation,
25  as you've described it, aboard the aircraft.  And the

Page 58

1  situation is based on two things.  One, Anna Bond saying
2  that she thought the interaction of the dad and the son
3  was odd to her.
4     A.   Right.
5     Q.   Okay.  But she wasn't very specific, except
6  saying that the father answered for the child, and the
7  father directed where the child would sit on the
8  airplane?
9     A.   Correct.
10     Q.   Okay.  Prior to this during your many flights,
11  had you ever witnessed a parent answering a question for
12  a child?
13     A.   Yeah.  But the -- the child still normally
14  speaks up.  I mean, the -- the child would start to
15  answer, and then they'd be like, "Yeah, you're -- you
16  know you're five," or whatever.  And it's -- I guess it's
17  more of the -- the parent is more pushing along the child
18  but not just answer for them completely.  No, I've never
19  seen that.
20     Q.   Okay.  Let's take a ten-minute break.
21     MS. SHELKE:  Okay.
22     MR. MCKAY:  We've been going about an hour.
23     THE VIDEOGRAPHER:  Off the record.  10:56.
24     (A break was taken from 10:56 a.m. to 11:08 a.m.)
25     THE VIDEOGRAPHER:  This is the beginning of

Page 59

1  Media 2.  We're back on the record.  The time is 11:08.
2     Q.   (BY MR. MCKAY:)  All right.  So before we broke,
3  we were talking about instances in which you had seen a
4  parent answer for a minor child, right?
5     A.   Yes.
6     Q.   And you had not noticed anything unusual about
7  that happening?
8     A.   No.
9     Q.   Okay.  But in this case because Anna Bond told
10  you that she thought it was unusual, then you thought it
11  was unusual, too?
12     A.   Yes.
13     Q.   Okay.  And you had, I presume, seen parents or
14  other people decide who is going to sit in the window and
15  who is going to sit in the center seat, right?
16     A.   Yes.
17     Q.   And, in fact, if the choice of a couple -- if
18  the choices of a couple were window seat and middle seat,
19  it's kind of a nice gesture to take the middle, isn't it?
20     A.   Yes.
21     Q.   Okay.  And it's easier to sleep if you're in the
22  window seat?
23     A.   Yes.
24     Q.   And this was an evening flight?
25     A.   Yes.

Page 60

1     Q.   And people were sleeping?
2     A.   Yes.
3     Q.   Okay.
4     A.   Going to Vegas.  Some people were sleeping.
5     Q.   Okay.  All right.  So because Anna Bond felt
6  uncomfortable with what she had seen and described it as
7  a situation, then you felt uncomfortable as well?
8     A.   I don't feel I felt uncomfortable, I just was
9  more aware.
10     Q.   Now, nothing that Anna Bond had said to you or
11  that you had observed indicated that these people were a
12  risk to the safety of the flight?
13     A.   Absolutely not.
14     Q.   Okay.  So, again, I ask what was it that you
15  were concerned about?
16     A.   Before the face rubbing, nothing.  I -- I mean,
17  we -- we -- we're just there for the safety of the
18  people.  We look around.  If we see anything that we have
19  never seen before, we just kind of tell each other.  And
20  then we are all just aware of that person.  We all just
21  keep an eye out a little better on the person that the
22  one person -- the one flight attendant mentioned.
23     Q.   Well, what if one of your fellow flight
24  attendants says, Hey, look at that lady with the pink hat
25  and the big feather in it?  That would be something maybe



CHELSIE B. SAKURADA
DELVECCHIA vs FRONTIER AIRLINES

April 17, 2019

Page 61

1  you hadn't seen before, right?
2      A.   Yeah.
3      Q.   And then for the rest of the flight, you're
4  going to do surveillance on that lady?
5      A.   No, because her pink hat didn't -- didn't -- she
6  didn't -- it had nothing to do with anybody else.  I -- I
7  guess the -- the concept that we were looking -- we are
8  always trying to look for trafficking, I guess.  And
9  that's something that we always look for.
10     Q.   Well, now we've gone from there wasn't a risk to
11  safety, it wasn't all that concerning, to trafficking.
12  So let's talk about that.
13         Why -- first of all, does the company instruct
14  you to look for trafficking?
15     A.   We have topics about it.  I mean, there's --
16  sometimes there's newsletters that are sent out, or just
17  topics that are sent out in email about the subject.  And
18  we're all aware of it as flight attendants.
19     Q.   All right.  When you say "are sent out," you
20  mean sent out by Frontier to its employees?
21     A.   Yes.
22     Q.   And how often have you received these things?
23     A.   Only a handful of times, maybe two, three.
24     Q.   Two times you received emails and/or newsletters
25  about trafficking?

Page 62

1      A.   Yes.
2      Q.   And when you say "trafficking," what
3  specifically do you mean?
4      A.   It's mostly newsletters about other instances
5  that have happened, like, on different flights and what
6  to look out for.  And one of the things to look out for
7  is a kid that doesn't answer for himself.
8      Q.   And does that specifically include a child
9  traveling with his parent --
10     A.   Umm-hmm, yes.
11     Q.   -- who doesn't answer for himself?
12     A.   Correct.
13     Q.   And this is because of what Frontier has told
14  you?
15     A.   Yes.
16     Q.   Okay.  So you felt that by labeling Peter and
17  A.D. as a situation to keep an eye on that you were
18  following Frontier's policies?
19     A.   Absolutely.
20     Q.   Okay.  Now, again, these couple of items that
21  you've received from your employer about trafficking,
22  what did you understand "trafficking" to mean?
23     A.   To me, it is some child that is with an adult
24  that they're not -- that they're not supposed to be with.
25  They're not their parents.  They're not their person

Page 63

1  that's over them, the guardian.  That they are kept
2  silent from this person that is taking them from one
3  place to another, and -- and they're not supposed to be.
4      Q.   And you believe, based on what Anna Bond told
5  you, that Peter was keeping A.D. silent?
6      A.   Yes.
7      Q.   And you believe that Peter took the middle seat
8  specifically so that A.D. couldn't interact with someone
9  seated beside him?
10     A.   Yes.  It was something to continue looking out
11  for, yes.
12     Q.   Now, when they were in the exit row, where were
13  Peter and A.D. seated?
14     A.   Peter was in the middle, A.D. was seated in
15  the -- the D seat, which is in the aisle.  So there was
16  someone across the aisle from him, yes.
17     Q.   There was someone next to him?
18     A.   The father was next to him, and then there was an
19  aisle, and then there was another person on the other
20  side.
21     Q.   All right.  All right.  So presumably, A.D.
22  could have spoken with that person across the aisle,
23  right?
24     A.   Correct.
25     Q.   It's not that far?

Page 64

1      A.   No, it's not.
2      Q.   Okay.  So, but -- but in this case, you, I
3  believe, said you should be on the look out for someone
4  who shouldn't -- a child who shouldn't be with the
5  guardian.
6      A.   Yeah.
7      Q.   Okay.  And in this case, you had a child that
8  was a different race from the guardian, right?
9      A.   Umm-hmm.
10     Q.   And that was unusual to you?
11     A.   No.
12     Q.   It was not unusual to you?
13     A.   Not to me, no.
14     Q.   Did not raise or heighten your concerns about
15  whether or not this child should be with this adult?
16     A.   No.
17     Q.   So the only thing that heightened your concerns
18  were that Anna Bond said that the father answered for the
19  child?
20     A.   Anna -- Anna Bond was uncomfortable, and it made
21  us all just, yeah, keep an eye out, absolutely.
22     Q.   Uncomfortable is kind of a general concept,
23  isn't it?
24     A.   Yeah, it's very general.  That's why we kept an
25  eye out.



CHELSIE B. SAKURADA
DELVECCHIA vs FRONTIER AIRLINES
April 17, 2019

Page 65

1  Q.  Didn't you feel an obligation to question Anna
2  Bond more about why she was uncomfortable?
3  A.  No, because there are situations that arise all
4  the time that could make us feel uncomfortable for just a
5  moment, and then, you know, nothing happens.  But we
6  still keep an eye out, especially when it's a kid's
7  safety.
8  Q.  And you felt that A.D. was in an unsafe
9  position?
10  A.  I would say that he wasn't -- I -- I didn't feel
11  that he was unsafe at that time, no.
12  Q.  Okay.  Now, let's get back to the concept of
13  trafficking because it appears your employer is intent on
14  educating all of you flight attendants on this concept of
15  trafficking.  So I want to be clear about what you
16  understand trafficking to be.
17      Trafficking connotes taking somebody from one
18  place on another; does it not?
19  A.  Yes.
20  Q.  And for what reason?
21  A.  I don't know.  I mean, I've heard of people
22  selling off children or -- just illegal activity, but not
23  anything specifically.
24  Q.  Did you feel in this instance, based on what
25  Anna Bond had told you and what you had seen Peter doing

Page 66

1  with A.D.'s face, that Peter was going to sell A.D. in
2  Las Vegas?
3  A.  I have no idea.
4  Q.  You have no idea?
5  A.  No.
6  Q.  Okay.
7  A.  My -- my -- my job is to -- to just protect
8  everyone on the plane.  I don't know what happens on the
9  ground.
10  Q.  Okay.  Your job is to make sure that they are
11  safe from risks that are inherent in the operation of
12  airplanes?
13  A.  Correct, yeah.
14  Q.  And suspicions of trafficking really doesn't
15  involve anything about the operation of airplanes, does
16  it?
17  A.  Well, that -- that's up to the captain.  The
18  captain flies the plane.  I am solely for those
19  passengers 100 percent.  Even in an emergency, I'm the
20  one who gets those passengers off.
21  Q.  Right.  You're the one that makes sure that they
22  get to the exits and they get safely out the exits, that
23  they are wearing their life vests, and that they don't
24  inflate them inside because they'll stick to the ceiling.
25  And it's something they never tell you, by the way.

Page 67

1  A.  They don't until it's an emergency.  They really
2  don't.  I don't think they --
3  Q.  It's not very funny because there's several
4  people that died because of that.
5      And you are responsible for making sure that
6  carts don't run into people's feet and legs and elbows --
7  A.  Yes.
8  Q.  -- right?
9      But I'm curious where in your duties all of a
10  sudden you became in charge of making sure that people
11  aren't quote, unquote, trafficked?
12  A.  I mean, if -- the safety of the child.  The
13  safety of the passenger.  I mean, we also make sure that
14  this drunk person isn't going to sit on this other drunk
15  person, or -- we are -- yeah.  We're there for them in
16  all ways.  I mean, verbally, physically, in every way.  I
17  mean, if two people were starting to yell at each other,
18  I would get involved in that, too, and separate them,
19  too.
20  Q.  If you thought a child was being trafficked and
21  the child was 12 years old, wouldn't you find a way to
22  ask the child if he was safe?
23  A.  By separation, yes.
24  Q.  All right.
25  A.  You have to get them separated by passing them a

Page 68

1  note and having them come to the bathroom, or signaling
2  for them to go to the restroom and then ask them there,
3  yes.
4  Q.  Did you do either of those things with respect
5  to A.D.?
6  A.  No, because until -- no -- no, I didn't.
7  Q.  All right.  What was the next thing that you
8  recall occurring?  And I -- I'll remind you that we're up
9  to the point where you have seen Peter touching A.D.'s
10  face.
11  A.  I went up to the front, and then all of us
12  congregated to the front to talk about this situation.
13  And we all equally felt that it was just something we
14  needed to bring up to the captain's attention.
15  Q.  So, and when you say "we all," you mean A, B, C,
16  and D?
17  A.  Correct.
18  Q.  Okay.
19  A.  We -- yes.  We don't usually go up to the
20  captain unless we are all on the same page.
21  Q.  All right.  So that is yourself and Anna Bond?
22  A.  (No audible response.)
23  Q.  You have to say "yes."
24  A.  Oh, yes.
25  Q.  Yes?  Okay.



CHELSIE B. SAKURADA                                                 April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 69

1    A.  Yes.
2    Q.  And Amanda Nichol?
3    A.  Yes.
4    Q.  And Scott Warren?
5    A.  Correct.
6    Q.  And you're all meeting where, in the -- in the
7  aft gal --
8    A.  No, forward.
9    Q.  -- or, I'm sorry, the -- the fore gal?
10   A.  Forward gal, yes.
11   Q.  Okay.  And what specifically was said in that
12  meeting?
13   A.  I came back up to the front and said I, as well,
14  saw the -- the man touching the little boy's face.  I
15  don't think we ever -- you can't assume a relationship
16  like that.  I don't -- I don't know if I ever assumed
17  that it was the father.  I -- I don't remember.  But I --
18  I probably said that the man was touching the young
19  man's face -- the boy's face.  And -- and I said, "I
20  don't know.  I just don't have a good feeling about it."
21  And everyone else was, like, "Me, either."  And so --
22   Q.  Well, when you say "everybody," everybody at
23  this point, all four flight attendants, are up at the
24  front, right?
25   A.  Umm-hmm.  Umm-hmm.

Page 70

1    Q.  You have to say "yes" or "no."  I'm sorry.
2    A.  Yes, sorry.
3    Q.  So how did they get there?  When did they get
4  there?  You had just said that Amanda had come to the
5  front and said that she had seen something.
6    A.  Yes.  So I don't know if someone called Scott,
7  but Scott eventually made his way up to the front after I
8  came back.
9    Q.  Do you know Scott?
10   A.  I had flown with him once before, but not
11  personally, no.
12   Q.  Okay.  So now everybody's there, and you come
13  back and say, Yeah, I saw it too?
14   A.  Yes.
15   Q.  And it made you uncomfortable?
16   A.  Yes.
17   Q.  And everybody else agreed?
18   A.  Yes.
19   Q.  And then the determination was made to tell the
20  captain?
21   A.  Correct.
22   Q.  All right.  How did you go about telling the
23  captain?
24   A.  So I just called him normally and asked him if
25  he needed anything.  And he said, "Yeah, it's actually

Page 71

1  time for a break."  We had been up in the air now for a
2  good while that, you know, they might want to stand up
3  and get out.  So he said, "Yes, it's time for a break."
4  And I said, "Perfect."
5    And as I went up there -- because there's --
6  we just did the normal change to get up into the cockpit.
7  What happens is the flight attendant then appears in
8  the -- goes into the cockpit, and all three of you guys
9  are up there.  And then one of them will exit after that.
10   Q.  Right.  Who exited?
11   A.  Well, nobody at first because I decided to tell
12  them --
13   Q.  Okay.
14   A.  -- first.
15   Q.  So at this point, all you've discussed with the
16  captain on the phone is that there's going to be a break?
17   A.  Correct.
18   Q.  And they let you in --
19   A.  Umm-hmm.
20   Q.  -- to the cockpit?
21       And you're there in the cockpit with the captain
22  and the first officer?
23   A.  Correct.
24   Q.  And they're both still in their seats?
25   A.  Yes.

Page 72

1    Q.  And you, then, say, "Hey" -- what?
2    A.  I just -- so I told them from the very
3  beginning, like, Hey, when, you know, they sat down, Anna
4  went to brief them.  He wasn't old enough.  The dad
5  answered.  Then when they went to -- and this boy didn't
6  say anything throughout the whole entire conversation,
7  and usually kids talk.  And so when they went to this Row
8  17, same thing.  They sat down, and she just felt weird
9  about it.  It just not -- it just made her feel
10  uncomfortable.
11       And then -- and then Amanda had seen the dad
12  rubbing the boy's face.  And then I had done a trash run
13  30 seconds later, had seen it, came back, still saw it.
14  And I just -- yeah, that's exactly what I told him.
15   Q.  Nothing more?
16   A.  That we all just felt that it was very
17  uncomfortable.
18   Q.  Okay.  And what happened next?
19   A.  Then someone called up to the cockpit.  I can't
20  recall who it was.  I --
21   Q.  So it would have been one of the other three?
22   A.  The other three.
23   Q.  Okay.
24   A.  And in the meantime, Scott, because he belongs
25  in the back of the area of the plane, went back to the



CHELSIE B. SAKURADA                                                April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 73

1  plane, glanced over at them, and he had seen the -- the
2  hand of the older gentleman on the younger boy's crotch.
3     Q.   According to Scott.
4     A.   According to Scott, correct.
5        I was still up in the cockpit, telling them how
6  we felt uncomfortable.
7     Q.   What was the call about?
8     A.   The call was: "Scott needs to come up and talk
9  to you" because you have to have that direct
10 communication over the phone before you just knock on the
11 door.  So Scott had -- in -- when I was going up there,
12 ta king to them about how uncomfortable I felt and all
13 the other flight attendants felt about the -- their
14 relationship, Scott had made his way back to the back of
15 the plane, looked over, saw the hand, immediately turned
16 back around, came up to the front and said, "I need to go
17 in there to talk to the captain."  Someone, I don't
18 remember, called up and said, "Scott needs to come up and
19 ta k to you guys."
20    Q.   Had the barricading with the carts occurred
21 already by this point?
22    A.   Yes, but we let through flight attendants.
23    Q.   Okay.  So -- so wa k me through that procedure
24 from your calling on the air phone to the cockpit.
25    A.   Umm-hmm.

Page 74

1     Q.   You say ...?
2     A.   "I'm coming in."
3     Q.   "I'm coming in."  And -- okay.
4        So at that point while you're still back in the
5  cabin, did -- did you bring out the cart to barricade the
6  aisle?
7     A.   Umm-hmm.  So yeah, as soon as --
8     Q.   I'm sorry.  You have to stop doing --
9     A.   Yes.
10    Q.   -- "umm-hmms."
11    A.   Yes.  I'm sorry.
12    Q.   It's just torture for her.
13    A.   I'm so sorry.
14    Q.   Okay.  That's all right.
15    A.   Okay.  So as soon as the captain or first
16 officer, one of them, need to come out into the galley
17 area with the passengers, we all -- we -- after that they
18 say yes, we put the cart in front, barricade it --
19    Q.   Okay.  So as soon as he said, "It's time for a
20 break" --
21    A.   Yes.
22    Q.   -- that's when you put the cart across?
23    A.   Yes.
24    Q.   Okay.  So now I want to ask:  Who is on the nose
25 side of the cart, and who is on the tail side of the

Page 75

1  cart?
2     A.   Scott had left the conversation before I had
3  gone up there, and he started walking to the back.  So he
4  was the only one that was on the aft side of the cart.
5     Q.   Okay.  And so then you went in, leaving Amanda
6  and Anna in the forward galley?
7     A.   Correct.
8     Q.   Okay.  And while you were in the cockpit,
9  somebody calls and says Scott needs to come in?
10    A.   Correct.
11    Q.   And it probably wasn't Scott because Scott would
12 have said, I need to come in, right?
13    A.   Right.
14    Q.   Okay.  So it was either Amanda or Anna.
15    A.   Yes.
16    Q.   All right.  And that was, as you understand it,
17 because Scott had wa ked to the back, seen something, and
18 then walked back to the front?
19    A.   Correct.
20    Q.   Okay.  And told them, Hey, I need to get up in
21 the cockpit, too?
22    A.   Yes.
23    Q.   Did Scott come into the cockpit?
24    A.   Correct.
25    Q.   Okay.  And what did Scott say?

Page 76

1     A.   He said, "I just went back to the back of the
2  cabin, and the older gentleman has his hand on the
3  crotch."
4     Q.   Did Scott mention that they were both asleep?
5     A.   No, he didn't say anything that --
6     Q.   Did he say they were awake?
7     A.   No, he didn't say that.
8     Q.   All he said, as you recall it, "I just saw the
9  older gentleman's hand" --
10    A.   And it was resting.  He said, "It's resting on
11 the boy's crotch."
12    Q.   Did he mention that the boy had a jacket wrapped
13 around his waist and legs?
14    A.   No.
15    Q.   Did you -- well, let's -- I'm getting ahead
16 here.
17       So what happened next after Scott said that?
18 Now at this point, there's four of you in the cockpit,
19 right?
20    A.   Yes.
21    Q.   Okay.  So what happened next?
22    A.   We, as in me, the captain, and Scott, came up
23 with the idea -- I don't know who initially came up with
24 the idea, maybe the captain -- came up with the idea that
25 we needed to separate them because we have no idea what's



CHELSIE B. SAKURADA
DELVECCHIA vs FRONTIER AIRLINES
April 17, 2019

Page 77

1 going on. And either separate the boy from the dad or
2 the dad from the boy. Either way, they needed to be
3 separated. So we decided as a -- as a little group of
4 the three of us -- because the co-captain just didn't say
5 much -- decided that we were going to -- that Scott was
6 going to go up to the two and ask the boy to come with
7 him to the back of the plane because the back row is
8 empty.
9    Q.  Was there any suggestion or discussion about
10 Scott striking the man at that point?
11   A.  No.
12   Q.  Okay.  You didn't hear anything mentioned?
13   A.  No.
14   Q.  Okay.  Now, when you said the co-captain, you
15 mean the first officer?
16   A.  Yes.
17   Q.  And that would be the gentleman in the right
18 seat?
19   A.  Correct.
20   Q.  Did you know his name?
21   A.  No.
22   Q.  Okay.  Now, the initial reason, at least in the
23 captain's mind, for why you were in the cockpit was that
24 it was time for a break?
25   A.  Correct.

Page 78

1    Q.  Did the captain take the break?
2    A.  I believe they did, but I don't remember.
3    Q.  When you say "they" -- they -- correct me if I'm
4 wrong, but both pilots can't leave the cockpit, can they?
5    A.  At the same time, no.
6    Q.  Okay.  So did one take a break and then the
7 other?
8    A.  Yes.
9    Q.  Okay.  Who took a break first?
10   A.  I don't remember.
11   Q.  All right.  With respect to the break they took,
12 did they just go to the lav behind the barricade and then
13 go back to the cockpit?
14   A.  Yes.
15   Q.  Okay.  And while they were in the lav, I presume
16 the cockpit door was secured?
17   A.  Absolutely.
18   Q.  Okay.  Now, there's nothing that would have
19 prevented either the captain or the first officer from
20 going back to Row 17 and asking Peter and A.D. about
21 their relationship, was there?
22   A.  No.
23   Q.  Nothing would have prevented that.  You agree
24 with that?
25   A.  Would have prevented that.

Page 79

1    He wouldn't have.  I guess I don't understand
2 the question.
3    Q.  Okay.
4    A.  He would never go back there.
5    Q.  All right.  Tell me why a pilot would never go
6 back there.
7    A.  Because that's where the passengers are.  And
8 they are in charge of the safety of everybody in landing
9 the plane, and something can happen if they pass the
10 barricade and go on the same side as the passengers.
11 Anyone can strike them down.  Anything could happen.
12   Q.  You have never seen a pilot walk down the aisle
13 toward the back of the aircraft when there were
14 passengers aboard?
15   A.  I have one time, and that was only because the
16 forward bathroom stopped working, and we were about to
17 land; otherwise, they would probably divert the plane
18 because it is a safety issue, yes.
19   Q.  So a pilot is allowed to walk through the
20 passenger cabin if it is for the purpose of using an
21 operating bathroom?
22   A.  Correct.
23   Q.  But in your understanding, the captain or any
24 pilot is not allowed to walk back under any other
25 circumstances?

Page 80

1    A.  I don't think "allowed" is the word.  I just
2 don't think they would.  I think they're allowed to if
3 they wanted to.
4    Q.  Well, that was my question.
5    A.  Oh, I'm so sorry.
6    Q.  Okay.  That's all right.  But there's nothing --
7 there's no protocol or standard operating procedure or
8 federal aviation regulation that prevents the captain of
9 the aircraft, for example, from walking back into the
10 cab- -- into the passenger cabin, is there?
11   A.  I understand.
12      To my knowledge, no.
13   Q.  Okay.  So again, I'll ask you:  If there was a
14 situation that made people uncomfortable, wouldn't it
15 have been appropriate for the captain to wa k back and
16 ask Peter and A.D. about their relationship to each
17 other?
18   A.  No.  I have never seen a captain want to get
19 involved l ke that.  He could have, but I have never seen
20 that.  They are not comfortable with the passengers,
21 they're comfortable flying the plane.
22   Q.  So -- okay.  So -- so the -- as a rule from your
23 understanding, the pilots at Frontier are not comfortable
24 dealing with passengers?
25   A.  Correct.



CHELSIE B. SAKURADA
DELVECCHIA vs FRONTIER AIRLINES

April 17, 2019

Page 81

1    Q.   And you didn't know either the captain or the
2  first officer?
3    A.   I had flown with the captain once upon a time,
4  but that's all I remember.
5    Q.   All right.  So at this point, then, we've got
6  four people in the cockpit.  A decision is made to
7  separate Peter and A.D., and that is going to be done by
8  Scott, correct?
9    A.   Correct.
10    Q.   Okay.  And how much experience did Scott have,
11  do you know?
12    A.   I think he's newer than me.  He's more junior to
13  me, but I don't know by how much.
14    Q.   Do you know anything about Scott?
15    A.   No.
16    Q.   Okay.  So did Scott, then, leave the cockpit?
17    A.   Yes.  I stayed in.
18    Q.   Okay.  So was it your understanding that Scott
19  was going to go directly back to Row 17 when he left?
20    A.   Yes.
21    Q.   Okay.  You stayed in the cockpit, and then
22  sequentially each of the pilots took their lavatory
23  break?
24    A.   Yes.
25    Q.   And how long do you think that took?

Page 82

1    A.   Altogether, maybe like eight minutes.
2    Q.   All right.  And during that eight minutes, you
3  presumed that Scott was interacting with Peter and A.D.?
4    A.   Yes.
5    Q.   Now, is there any reason why the pilot and first
6  officer wouldn't have been able to observe Scott doing
7  this?
8    A.   I'm sorry, I -- we have to wait until the flight
9  attendant is out of the cockpit because the pilots are
10  taking their breaks.  So I'm very sorry.
11       I guess in my -- when I was up in the cockpit, I
12  could assume that Scott was doing it at that point, but
13  he did not.  He waited until I got out of the cockpit.
14    Q.   Okay.  So what was his required position when
15  the pilots were on break?  Is that what you're telling
16  me, that he has to be somewhere when they're on break?
17    A.   He -- we are supposed to -- when there's a
18  break, we are supposed to just secure our galleys,
19  mainly, so someone doesn't try to come and open up the
20  door or act out of the normal when a pilot is using the
21  bathroom.  So he was headed back to the back to be near
22  his doors because we were doing a -- a pilot break.
23    Q.   Okay.  Now, sometimes when I fly and I see the
24  pilots taking a break, they use the lavatory and then
25  come out and chat a bit with the flight attendant.

Page 83

1  Do they do that at Frontier as well?
2    A.   Sometimes.
3    Q.   Okay.  So you're saying that had they been
4  standing there chatting, they wouldn't have seen Scott
5  interact with Row 17 because Scott would have waited
6  until they were both back in the cockpit?
7    A.   Correct.
8    Q.   Okay.  And is it your belief that that's the way
9  things transpired?
10    A.   Yes.  I saw him talking to Row 17 to move them.
11    Q.   Oh, you did?
12    A.   Yeah.  So I had to have been out of the cockpit.
13    Q.   Right.  Okay.  So after the second pilot
14  finishes his break and comes back in the cockpit, then
15  you left the cockpit?
16    A.   Correct.
17    Q.   Okay.  And I presume you moved the cart away
18  from the aisle?
19    A.   Yes.
20    Q.   Okay.  And then what happened next?
21    A.   I -- mainly because we were curious, we just
22  kind of sat in the -- or in the front galley and watched
23  him move the boy because we didn't know if the father was
24  going to be upset or -- you know, you can never know
25  what's going to happen.  So we sat there and watched him.

Page 84

1  And he just leaned over very calmly and said -- so he
2  came from the front -- no, he came from the back.  He had
3  to come from the back because he -- sorry, he was in the
4  back already.  So he came from the back, and then he
5  leans very calmly over and --
6    Q.   What do you mean by leaned very calmly?
7    A.   He just was very, I ke, just very subtle about
8  the way he -- he did it.  And in fact, me and Anna, we
9  were like, "Wow, that was very subtle the way he
10  interacted with those" -- and we both said that while he
11  was doing it.
12    Q.   So the three of you are now in the forward
13  galley?
14    A.   I don't believe Amanda was, but I don't
15  remember.
16    Q.   Where was Amanda?
17    A.   Probably back in the back.
18    Q.   Okay.  So at some point, then, after the pilot's
19  break and the cart is moved, then Amanda and Scott resume
20  positions in the back of the airplane?
21    A.   Correct.
22    Q.   And then Scott comes forward to Row 17 while you
23  and Amanda watched -- I'm sorry, while you and Anna
24  watched?
25    A.   Yes.  Yes.



CHELSIE B. SAKURADA
DELVECCHIA vs FRONTIER AIRLINES

April 17, 2019

Page 85

1    Q.   Okay.  And you said that he leaned in?
2    A.   Umm-hmm.
3    Q.   Was it -- that in front of or behind the aisle
4  seat passenger?
5    A.   In front of.
6    Q.   In front of?
7    A.   Yes.
8    Q.   You're positive about that?
9    A.   Yes.
10   Q.   Who have you discussed this with?
11   A.   Besides my close family, nobody.  Anna.  Me and
12  Anna talk about it, so --
13   Q.   You and Anna talk about it, okay.
14       So how many times have you and Anna talked about
15  this?
16   A.   Just twice.
17   Q.   And what was the most recent time that you
18  talked with Anna about this?
19   A.   Just the other day when I got a call from my
20  lawyer.
21   Q.   All right.  And you called Anna to discuss what
22  you both remembered?
23   A.   No.  We didn't really talk about the situation a
24  whole lot.  We just -- how it was crazy that this -- that
25  this was happening.

Page 86

1    Q.   Go ahead.
2    A.   That we were coming to court, that this was
3  going to happen.  We just thought it was a very odd
4  situation.  But we didn't talk about the situation in
5  general.  We just did it over Facebook Messenger.
6    Q.   Oh, so this was not an oral discussion?
7    A.   Hmm-mm.
8    Q.   This was by Facebook Messenger?
9    A.   Umm-hmm.
10   Q.   Do you still have those -- those IMs or
11  messages?
12   A.   Yeah.
13       MR. MCKAY:  All right.  I'm going to ask that
14  those be produced.
15       THE WITNESS:  Okay.
16   Q.   (BY MR. MCKAY:)  Do you have them here?
17       THE WITNESS:  Oh, oh.  Sorry.
18       MS. SHELKE:  We'll do it later.
19       MR. MCKAY:  Well, I mean --
20       THE WITNESS:  Yeah, it's just on my phone.
21       MR. MCKAY:  We'll save an additional deposition
22  if you have them here and you want to show them.
23       THE WITNESS:  Okay.
24       MS. SHELKE:  I have not seen them.
25       MR. MCKAY:  You can look at them now.  We can

Page 87

1  take a break.
2       MS. SHELKE:  Okay.  Let's take a break.
3       MR. MCKAY:  All right.
4       THE VIDEOGRAPHER:  Off the record.  11:39.
5    (A break was taken from 11:39 a.m. to 11:48 a.m.)
6    (Exhibits 1 and 2 were marked for identification.)
7       THE VIDEOGRAPHER:  Back on the record.  11:48.
8    Q.   (BY MR. MCKAY:)  All right.  We took a break
9  while you provided Ms. Shelke with some text messages
10  that you had between yourself and Anna Bond; is that
11  correct?
12   A.   Correct.
13   Q.   Now, I have been given four screen shots.  And
14  let me just ask you first:  Are these all of the messages
15  or texts that you have between yourself and Anna Bond
16  that refer to the subject of this lawsuit?
17   A.   Yes.
18   Q.   Okay.  Have you done any messages with anyone
19  else about the subject of this lawsuit?
20   A.   No.  I'm not friends with either Scott or
21  Amanda.
22   Q.   Okay.  So -- and tell me again the date when
23  these were exchanged between you and Anna?
24   A.   It just happened yesterday, so -- oh, it must
25  have been Saturday and Sunday.  So the -- Saturday is the

Page 88

1  1st?
2    Q.   Okay.
3    A.   No, Sunday is the 1st.  So the 30th and the 1st.
4    Q.   Okay.  So I'm -- I'm showing that you,
5  apparently, sent Anna a text at about 6:16 p.m., saying,
6  "Have you done your deposition yet?"  Is that correct?
7    A.   Correct.
8    Q.   Okay.  And then Anna wrote back, "No, you?"
9       And then you said, "I do mine on Monday and
10  Tuesday.  They are flying to SLC since I'm on maternity
11  leave.  This is crazy."
12       Is that what you said?
13   A.   Yes.
14   Q.   Okay.  And then Anna said back to you, "I do
15  mine on the 9th and the 10th.  They're coming to Vegas.
16  Congrats on your baby.  Let me know how it goes, please.
17  I've never done anything like this.  Do not know what to
18  expect"; is that right?
19   A.   Correct.
20   Q.   Okay.  And then you wrote back -- I think I have
21  to go to the next screen shot for that.  Okay.
22       You wrote back, This is -- "That is crazy.  Oh,
23  I will let you know all about it even if they tell me not
24  to."
25   A.   I did say that.



1    Q.   You did say that?  So basically your intent was
2  to share the contents of the deposition with Anna even if
3  you were told not to?
4    A.   That is what I told her, yes.
5    Q.   Okay.  And is that a true statement?
6    A.   I wouldn't have told her the security part of
7  it.  But yes, the interaction between me and her and if
8  she was okay.  If I l ked her or not.  That's what I
9  would have told her.
10   Q.   Okay.  And then you say, "Haha.  You will just
11 have to keep it on the down low.  I haven't done anything
12 like this before either.  Part of me is freaking out, but
13 then I think again, and we did NOTHING" -- and "nothing"
14 is all caps -- "wrong, so we will be fine.  Thank you.
15 Heart symbol.  I will let you know on Tuesday after it's
16 all over with."
17        That's what you said?
18   A.   Correct.
19   Q.   Okay.  And then Anna said to you, "I will not
20 tell a soul LOL.  I know we barely had part in it too.
21 You literally did nothing, and I just moved them out of
22 the exit row.  We shouldn't even have to go.  We had zero
23 part.  I'm really glad we didn't have parts in it,
24 though.  Imagine what Scott is going to have to do."
25        What did you understand that to mean?

1    A.   That we did not interact with the people at all.
2  Anna did have the interaction of the exit row, but I did
3  not interact with either, so, once.
4    Q.   All right.  You know that Scott struck Peter,
5  don't you?
6    A.   Scott did not str ke Peter.
7    Q.   Okay.  You know that Peter accused Scott of
8  striking him, don't you?
9    A.   That is what -- I have been aware.  Yes, I've
10 heard that.
11   Q.   And -- and from whom did you find that out?
12   A.   Her.
13   Q.   Okay.  Now, Anna says, "Anyways, yes, LMK" for
14 "let me know"?
15   A.   Yes.
16   Q.   "Good luck."
17        And then you say, "I was thinking the same
18 thing."  Is that right?
19   A.   Yes.
20   Q.   Okay.  "I was thinking the same thing.  Me and
21 you were like the messengers between Scott, which was
22 dealing with the situation, and the pilots."
23        What did you mean by that?
24   A.   I did not see the touching of the groin, so I
25 was just the -- the messenger of what he saw.  But Scott

1  did come in and say it himself to the captain.  But I
2  was -- after that, the captain called back and was, like,
3  "Anything else?"  I was, like, "No."  I was just, like,
4  the messenger of what happened.  And I wasn't in the
5  situation at all.
6    Q.   But that statement that you make to Anna isn't
7  consistent with your testimony under oath here this
8  morning, is it?
9    A.   I was the person that was doing -- I was the
10 person that was going to go up into the cockpit and let
11 them know that we felt uncomfortable anyways, so I was
12 the messenger.  Of the actual physical incident of the
13 touching of the groin, yes, Scott did come up and give
14 his -- what he saw.
15   Q.   So you were not the messenger for Scott for that
16 piece of information?
17   A.   Not for that piece of information, correct.
18   Q.   And you were not the messenger for Scott when
19 you talked to Amanda and later informed the captain that
20 there was something you wanted to tell him?
21   A.   I was the messenger between Amanda and the
22 captain, yes.
23   Q.   Amanda, not Scott?
24   A.   Correct.
25   Q.   Okay.  And you testified that the group of you

1  decided to tell the captain?
2    A.   Yes.
3    Q.   And that was all four of you, right?
4    A.   Yes.
5    Q.   Not Scott alone?
6    A.   No.
7    Q.   Okay.  All right.
8        Then you say, "Besides that, I told the cops who
9  he was, and that was it."
10        What did you mean there?
11   A.   Oh, when we landed -- so the captain called the
12 cops while we were in the air.  Well, he -- he relayed a
13 message down to operations.  Operations sent the cops to
14 us at the plane.  And as soon as we landed, when we
15 opened up -- when the door was opened, I -- they just
16 wanted me to point out who he was.  That's all.
17   Q.   Who -- who who was?
18   A.   Who the father was and the son was.
19   Q.   All right.  So you were the one that identified
20 Peter and A.D. to the police?
21   A.   Correct, because I was in the front because I'm
22 the A.
23   Q.   All right.  And so you're saying there, "Besides
24 that, I told the cops who he was, and that was it."
25        So you're saying that other than what you've



CHELSIE B. SAKURADA                                          April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 93

1  described to Anna as being a messenger between Scott and
2  the pilots, the only other thing you did was to tell the
3  cops who Peter was?
4      A.  Yes.
5      Q.  Okay.  Then you say, "Oh, well, this guy is just
6  pissed he got caught and now is trying to fight it."
7          What do you mean by that?
8      A.  Scott saw him touch him, so he's coming after us
9  because of what Scott saw.
10     Q.  So it's your testimony under oath here this
11  morning that you believe that Peter Delvecchia is a child
12  molester?
13     A.  Yeah.  Yeah.
14     Q.  Okay.  All based on what a fellow flight
15  attendant, who you barely know, represented to you?
16     A.  Correct.
17     Q.  And you take that as gospel because Scott told
18  it to you?
19     A.  Yes.
20     Q.  And you believe, then, that Peter Delvecchia is
21  upset that he got caught molesting his son?
22     A.  Correct.
23     Q.  And is trying to fight it.
24          What do you mean "fight it"?
25     A.  I mean, this is a lawsuit.  He's coming after

Page 94

1  us, right?  So he -- I guess he's coming -- fighting back
2  at us.
3      Q.  That's what you believe?
4      A.  That's what I believe, yeah.
5      Q.  Okay.  Then you say, "I don't even want to
6  imagine what Scott is going through!"
7          What do you mean by that?
8      A.  Because he physically saw it.  That's all I
9  meant by that, is he's the one that actually had a
10  conversation with them.  He's the one that actually moved
11  the person and got the able-bodied passenger involved.
12  And he -- he did all of the interaction.
13     Q.  All right.  Now, remembering that you've been
14  placed under oath and that this is a court proceeding,
15  are you saying that you think that Scott is somehow
16  traumatized because he had more interaction with the
17  passengers than you did?
18     A.  No, I just -- he'll probably just be in the
19  deposition longer and have more questions to answer
20  because he's the one that actually dealt with them.
21     Q.  And on the basis of that thought that you're
22  relaying to us under oath, you wrote to your friend Anna,
23  "I don't even want to imagine what Scott is going
24  through!"
25     A.  Umm-hmm.  Oh, well, I meant what he's going to

Page 95

1  be going through.  He's not going through anything right
2  now -- but -- well, not that I'm aware of, but --
3      Q.  Well, you don't talk to him, do you?
4      A.  No, I don't know him.
5          But the deposition alone, what he's -- what he
6  is -- what's going to happen in the deposition is what --
7  all I was ta king about.
8      Q.  Well, it seems like you were quite concerned.
9  "I don't even want to imagine what Scott is going
10  through!"
11     A.  I can just be very dramatic.
12     Q.  But why of the four of you do you single out
13  Scott?
14     A.  Because he's the one that had communication with
15  them.  Amanda had no communication with them at all that
16  I'm aware of.  And I never talked to either one of them
17  as well.  And all Anna did was just traded them seats.
18     Q.  And as you sit here today under oath, do you
19  believe that Scott did nothing inappropriate?
20     A.  Absolutely.
21     Q.  Tell me what you remember next in the timeline.
22  You're still up in the flight, and you're watching Scott
23  lean over.  And it's your testimony under oath here this
24  morning that you and Anna remarked to each other at the
25  time he was leaning over that he did so gently?

Page 96

1      A.  Yes, I mean --
2      Q.  What exactly did you say to Anna on that
3  subject?
4      A.  I don't remember exactly what I said, but
5  something along the lines of, "Wow, that went really
6  smooth."  The interaction was really smooth.
7      Q.  What went really smooth?
8      A.  The -- him leaning down and saying, "Hey, I need
9  you to come with me."  There was no words.  I mean, I
10  couldn't -- I could not hear.
11     Q.  You couldn't hear the words.
12     A.  I could not hear.
13     Q.  Right.
14     A.  But there was no actions of anyone upset.  Like,
15  he didn't raise his hands or even look too upset.  He
16  just --
17     Q.  You seem like you're either defending something
18  or -- or suggesting that you believed something was going
19  to occur.  Is that a fair statement?
20     A.  When he leaned over to ask them to separate,
21  yes.  I mean, you -- I did not know what was going to
22  happen.  And at that moment, the father could have been
23  upset and struck the flight attendant.  And so, yeah.
24     Q.  Oh, really.  And did you -- as you stood there
25  with Anna Bond, did you think there was a possibility



CHELSIE B. SAKURADA                                           April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 97

1 that if Scott interacted with Peter that Peter was going
2 to strike him?
3     A.  Yeah.  I always expect the worst.
4     Q.  Were you able to see Peter and A.D. at that
5 point?
6     A.  I could not see A.D.  He's too small.  He was --
7     Q.  Could you see Peter?
8     A.  The -- like this far, the eyes and up.
9     Q.  You saw from the eyes and up?
10    A.  Yes.
11    Q.  Was this before or after Scott leaned over?
12    A.  Both.  I could see him before and after.
13    Q.  All right.  So let's talk about before.
14        Are you telling me under oath that you were
15 looking in the eyes of Peter Delvecchia before Scott
16 leaned over?
17    A.  I don't think I looked in his eyes, but I looked
18 at his head.
19    Q.  Were his eyes open?
20    A.  I do not remember.
21    Q.  So he could have been sleeping?
22    A.  He could have been, yeah.
23    Q.  Okay.  And after Scott leaned over, what did you
24 observe with respect to Peter?
25    A.  There was no emotion at all.  The boy just got

Page 98

1 up and went to the back.
2     Q.  There was no emotion at all from whom?
3     A.  The dad -- the -- the father, Peter.
4     Q.  Okay.  So you were looking at Peter?
5     A.  Umm-hmm.
6     Q.  You said you could see him from the eyes up?
7     A.  Right.
8     Q.  And you observed no emotion?
9     A.  He looked up.  I don't know if he said anything.
10 I couldn't hear.  And then the little boy just got up and
11 moved.
12    Q.  And it's your testimony under oath that you did
13 not see Scott str ke Peter in any fashion?
14    A.  No.
15    Q.  Okay.  Is it possible that he could have struck
16 him and you did not see it?
17    A.  No.  I was looking in that direction.  I -- I
18 would have seen it.  And so would have the guy on the
19 aisle and people that --
20    Q.  I'm sorry.  Do you know what the guy on the
21 aisle saw?
22    A.  Well, no.  He saw his movie.  But I -- there
23 would have been more, I would assume, of a reaction from
24 the father.  And there was absolutely no reaction at all.
25    Q.  Did you read Mr. Campbell's deposition?

Page 99

1     A.  I have no idea who that is.
2     Q.  The guy on the aisle.
3     A.  No.  No, I have not.  No.
4     Q.  Did your attorney tell you what Mr. Campbell
5 testified to?
6     A.  No.
7     Q.  Have you heard from anybody else what
8 Mr. Campbell knew or saw?
9     A.  Hmm-mm.  I just saw him watch a movie.  That's
10 all I'm going off of, what I saw.
11    Q.  All right.  As you sit here today, if
12 Mr. Campbell said that Scott pushed himself in behind
13 Mr. Campbell in an aggressive manner, would you disagree
14 with that?
15    A.  Absolutely.
16    Q.  So then so far, Mr. Campbell, who doesn't know
17 the Delvecchias at all, and Mr. Delvecchia, in your
18 estimation, are both lying?
19        MS. SHELKE:  I'll object only because she does
20 not know what Mr. Campbell testified to.
21        THE WITNESS:  Yeah.
22    Q.  (BY MR. MCKAY:)  If I told you that
23 Mr. Campbell testified under oath that Scott
24 aggressively pushed himself behind Mr. Campbell to get
25 to Mr. Delvecchia, if I told you that, would you say

Page 100

1 that that is false?
2     A.  Correct.
3     Q.  If I told you that Mr. Delvecchia says that he
4 was struck on the back of the head and neck by
5 Mr. Warren, by Scott, you would also say that that's
6 false?
7     A.  Correct.
8     Q.  And this is under oath, and you understand the
9 penalties of perjury, correct?
10    A.  Absolutely.
11    Q.  So this is your recollection of watching the
12 event, that neither of those two things happened?
13    A.  Correct.
14    Q.  Okay.  What do you remember happening next?
15    A.  The boy got up and --
16    Q.  By "the boy," you mean A.D.?
17    A.  A.D.  Sorry, yes, got up --
18    Q.  The black young man?
19    A.  Yes.  And wa ked to the back with Scott.  And I
20 didn't -- didn't look after that.
21    Q.  You didn't look at all?
22    A.  No, because all -- all I was concerned about is
23 what the -- the older man, Peter, was going to do at the
24 moment.  Was he going to be defensive?  Was he going to
25 start yelling?  You know, that was my only concern.



CHELSIE B. SAKURADA

April 17, 2019

DELVECCHIA vs FRONTIER AIRLINES

Page 101

1    Q.  You thought that if a male flight attendant went
2  back to a passenger's row and physically separated the
3  child from the parent that the parent might be upset?
4    A.  I would not let that happen with my kid,
5  absolutely not.
6    Q.  So you thought that the parent would be upset?
7    A.  Yes.
8    Q.  And that's a pretty normal expectation, isn't
9  it?
10    A.  Yes.
11    Q.  So you and the other five Frontier employees all
12  decided to do something --
13    A.  That's correct.
14    Q.  -- to Peter and A.D. that you believe would make
15  you very upset?
16    A.  Yes.
17    Q.  And all of you conspired to do this because you
18  were uncomfortable?
19        MS. SHELKE:  Objection to the use of the word
20  "conspire."
21    Q.  (BY MR. MCKAY:)  All of you agreed to do this
22  action because some of you felt uncomfortable --
23    A.  Correct.
24    Q.  -- with Peter and A.D.?
25    A.  With Peter touching A.D., yes.

Page 102

1    Q.  Okay.  And you are testifying that you did not
2  see where Scott took A.D.?
3    A.  I know he put him in the last row, I just
4  couldn't tell you any -- I don't know if they chatted
5  first.  I don't know.
6    Q.  How do you know he put him in the last row?
7    A.  Because I saw him in the last row.
8    Q.  So you did watch him take A.D. to the back row?
9    A.  I watched them go to the back.  I looked away.
10  Maybe I was on my cart, I don't know.  And then when we
11  started service, I did notice that the -- the boy was in
12  the back row in the window in the F seat.
13    Q.  Okay.  And previously, had that row been empty?
14    A.  Yes.
15    Q.  And why was the row empty?
16    A.  They -- the gate agents try to leave the back
17  row empty just for any sort of emergencies.  Or if -- the
18  flight attendants, we don't have a lot of room in the
19  galleys, and so sometimes, you know, one of us can sit
20  there and eat our food that we have.  It's -- it's mostly
21  just for if we need it, which this was a position where
22  we did need it.
23    Q.  All six seats?
24    A.  No, just one side.  They only try to keep one
25  side open.

Page 103

1    Q.  So the -- the gate agents try to keep three
2  seats in the last row empty?
3    A.  Umm-hmm.
4    Q.  You have to say "yes" or "no."
5    A.  Yes.
6    Q.  In case they are needed?
7    A.  Yes.
8    Q.  All right.  So when Anna briefed the exit row
9  and determined that Peter and A.D. needed to be moved
10  together, why didn't Anna put them in the last row, which
11  was empty?
12    A.  Because we try to keep that open for any sort of
13  emergencies or anything.  I mean, at that point, nothing
14  was an emergency.  Nothing was alarming to us at all.
15    Q.  So you wanting a place to sit down and eat
16  something is an emergency --
17    A.  No.
18    Q.  -- in your estimation?
19    A.  No.  Sometimes we need passengers to lay down if
20  they're having -- they are having a hard time breathing.
21  Well, if they have to lay down, we don't want them to lay
22  on the galley floor.  So we can just put up the middle
23  seat things, and they can lay down on the seats.  I would
24  never say that it's an emergency for -- for flight
25  attendants at all.  It just --

Page 104

1    Q.  Flight attendants have their own seats, don't
2  they?
3    A.  Yes.
4    Q.  Yes.  They have to be belted into a seat in
5  order to take off and land, don't they?
6    A.  Correct.
7    Q.  And that's a federal regulation?
8    A.  Yes.
9    Q.  And you can certainly sit in those seats and eat
10  something, can't you?
11    A.  Yes.
12    Q.  Okay.  So keeping the back row open, while it
13  may be used for an emergency, as you've testified here,
14  is also used for flight attendants' convenience?
15    A.  Yes.
16    Q.  Okay.  Yet your friend Anna decided to
17  inconvenience two people in another row and move them to
18  the exit row so that Peter and A.D. could have their
19  seats?
20    A.  I don't -- yes.  I mean, moving to the exit row
21  is never inconvenient for anybody.  And I think that's
22  what she was just -- I ke, Hey, we've got to move two
23  people.  Hey, does two people want to move to the exit
24  row?  She just found two.
25    Q.  So you knew that those two people would be



CHELSIE B. SAKURADA                                      April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 105

1 perfectly comfortable moving to the exit row?
2    A.   Absolutely.
3    Q.   Were they white?
4    A.   I have no idea what they were.  I'm sorry.
5    Q.   And -- but you were able to know that they felt
6 perfectly comfortable with making that move?
7    A.   Umm-hmm.
8    Q.   "Yes"?
9    A.   Yes.
10   Q.   Yet, when you observed Peter being affectionate
11 to his son, you know in your mind that that's abnormal?
12   A.   Yes.
13   Q.   You're -- I can see you're very confident about
14 that.
15   A.   Yeah.
16   Q.   You have some very clear beliefs about what
17 physical interaction is normal and what's abnormal.
18   A.   Yes.
19   Q.   Okay.  Are those beliefs that -- that you have
20 formulated during your upbringing?
21   A.   Yes.
22   Q.   Let me ask you this:  Are you a member of the
23 LDS church?
24   A.   Yes.
25   Q.   Are you adherent to the LDS belief -- LDS

Page 106

1 beliefs?
2    A.   Inherent?
3    Q.   Adherent.  Do you adhere to the beliefs of the
4 LDS church?
5    A.   Not all of them.
6    Q.   Which -- with which do you disagree?
7    A.   Do you know the LDS beliefs?
8    Q.   I do.
9    A.   Okay.  Coffee, I drink coffee.  I swear.  That's
10 about it.
11   Q.   You're aware that until 1978, people who were
12 black had a very limited amount of benefits that they
13 could get from the church; are you not?
14   A.   I didn't know that from the church, no.
15   Q.   You didn't know?
16   A.   Absolutely not.
17   Q.   Okay.  In fact, there's still limitations on the
18 church's extension of benefits to black people, are there
19 not?
20   A.   I don't see it.  But there are members of the
21 church that are black that are presiding in the member of
22 the 12 and the -- the 72.
23   Q.   You're aware that the church has some very
24 specific beliefs about homosexuality, correct?
25   A.   Yes.

Page 107

1    Q.   And do you hold those beliefs as well?
2    A.   I do not.
3    Q.   You do not?
4    A.   (No audible response.)
5    Q.   Do you have friends who are gay?
6    A.   Yes.
7    Q.   All right.  And you -- you accept their
8 lifestyle?
9    A.   Yes.
10   Q.   Okay.  But something about Peter touching his
11 son's face set you off?
12   A.   Yes.
13   Q.   Made you uncomfortable?
14   A.   Yes.
15   Q.   Made you want to tell the captain?
16   A.   Yes.
17   Q.   Okay.  And it led you to conclude that it was a
18 situation that required the intervention of the police?
19   A.   It wouldn't have until the groin touching, yes.
20   Q.   But you didn't see the groin touching, you only
21 heard about it from Scott?
22   A.   Umm-hmm.  Yes.  We all -- we all believe each
23 other.  That's -- I mean, that's -- that's what we do.
24   Q.   That's a great point.  I'm glad you brought that
25 up.

Page 108

1        As flight attendants, you all stick together on
2 beliefs and -- and decisions, right?
3    A.   Correct.
4    Q.   Okay.  To the extent that you protect each other
5 in your employment, right?
6    A.   Yes, correct.
7    Q.   Okay.  So -- so if somebody needs something to
8 be told in a particular way in order to protect his or
9 her employment, that's something that you would go along
10 with?
11   A.   Yes -- oh, no.  To protect their employment?
12 Okay.  So sorry, can you explain that?
13   Q.   Sure.  If somebody during a flight made a
14 mistake and was concerned that that mistake might get
15 them in hot water with the employer, you would back that
16 person up, wouldn't you?
17   A.   No.  If they did a -- if they made a mistake and
18 they were wrong, I wouldn't back them up, no.
19   Q.   Under no circumstances whatsoever?
20   A.   Under -- no.  Not at all.
21   Q.   You would report them to the -- to Frontier?
22   A.   Absolutely.
23   Q.   Have you done so before?
24   A.   I have for cell phone usage.  That's it.  I have
25 never seen a flight attendant do anything that's --

CHELSIE B. SAKURADA
DELVECCHIA vs FRONTIER AIRLINES

April 17, 2019

Page 109

1 that's -- that's wrong, like --
2   Q.   Who did you report for cell phone usage?
3   A.   I have no idea.  It was in my first year.
4   Q.   And to whom did you make the report?
5   A.   I just called the hotline.
6   Q.   So it was an anonymous --
7   A.   Yeah.
8   Q.   -- tip?
9      But you gave the name of the person using the
10 cell phone?
11   A.   I probably didn't.  I probably just said the
12 position at the time.
13   Q.   And what happened to that person?
14   A.   I have no idea.
15   Q.   You didn't follow up on it?
16   A.   No, we -- no.
17   Q.   Did you ever work with that person again?
18   A.   No, not that I'm aware of.
19   Q.   And what was the violation specifically?
20   A.   You're -- just can't be on your phone in the
21 jump seat.  Well, you're not supposed to have your phone
22 at all, but especially in the jump seat.
23   Q.   And that's up in the cockpit?
24   A.   That is -- the jump seats are in our -- in our
25 galley.  They're in the front -- the two, the A and the C

Page 110

1 sit in the forward jump seats facing the passengers, and
2 then the two sit in -- behind -- in the galley behind the
3 wall.
4   Q.   Okay.  And you saw someone sitting in the jump
5 seat, using their phone?
6   A.   Yes.
7   Q.   Where was the airplane in relation to the
8 airport at that point?
9   A.   Taking off.
10   Q.   It was already taking off?
11   A.   Yes.
12   Q.   So it was on the takeoff run on the runway?
13   A.   It was on -- yeah, it was while we were taking
14 off.
15   Q.   All right.  Okay.  And what did you say, if
16 anything, to that person?
17   A.   Nothing.
18   Q.   So you just secretly reported them for a
19 violation without even interacting with them?
20   A.   Yes.
21   Q.   Is that something that you've done before?
22   A.   That was the only time.
23   Q.   Are there any other instances in your life where
24 you've reported somebody for doing something wrong
25 without talking to them about it?

Page 111

1   A.   No, not that I'm aware right now.
2   Q.   Not that you're aware of right now?
3   A.   Yeah, I don't --
4   Q.   Okay.
5   A.   No.
6   Q.   Let's take a look at what's been marked as
7 Deposition Exhibit 1.
8      And just for the record, Exhibit 1 is a group of
9 documents beginning with Delvecchia Frontier 0115 to
10 0121.
11      MR. MCKAY:  I don't need to say the "19AZ"
12 stuff, do I?
13      MS. SHELKE:  No.
14      MR. MCKAY:  What does that mean?
15      MS. SHELKE:  It's our file number.
16      MR. MCKAY:  Oh, okay.  All right.
17      MS. SHELKE:  Thank you.
18      MR. MCKAY:  I'll give you those.
19      MS. SHELKE:  Is it just one copy?
20      MR. MCKAY:  There is just one copy because you
21 and I have electronic copies of this, and we are
22 21st-century lawyers.
23   Q.   (BY MR. MCKAY:)  So what I'm going to ask you to
24 do there -- I recognize that that's not -- those are
25 statements by several people, not all of which are you.

Page 112

1 I'm going to ask you because they're redacted which one
2 is yours.
3   A.   The second -- the second one on the page.
4   Q.   Okay.  So what I'm going to ask you to do.  Do
5 you see some little print down at the bottom right-hand
6 corner?
7   A.   Yes.
8   Q.   Okay.  And it starts -- well, starts with
9 "19AZ," but then it says "Delvecchia Frontier," and then
10 it has a four-digit number?
11   A.   Yes.
12   Q.   Okay.  So using the four-digit numbers only,
13 what page or pages are your statement?
14   A.   It says "0117."
15   Q.   Okay.  Let me get to that.
16      Do you, first of all, recognize any of the other
17 handwriting of the other things that are not your
18 statement?
19   A.   I'm assuming that's Scott's.
20      Nope.  I -- Scott's, but not the -- not the
21 girls'.
22   Q.   Okay.  As far as the girls go, you're not able
23 to identify whose is whose?
24   A.   Unless I read it.
25   Q.   Well, go ahead and read it and see if you can



CHELSIE B. SAKURADA
DELVECCHIA vs FRONTIER AIRLINES
April 17, 2019

Page 113

1 help me determine whose is whose.
2  A. This is Anna's, so 115 is Anna.
3  Q. Okay. And that's because it says, "Briefing pax
4 noticed a younger person"?
5  A. Yes.
6  Q. All right. Now, let's take a look at that
7 before we get too far. Why don't you go ahead and read
8 that sentence. And I understand that there's a redaction
9 at the end. So you can just say "box."
10  A. Oh, okay. Just the whole thing?
11  Q. Just that first sentence.
12  A. Okay. "Briefing passenger noticed a younger
13 person sitting in the exit row asked him how old he was
14 and he said."
15  Q. "Box."
16  A. "Box."
17  Q. Yeah. So actually, Peter didn't answer for the
18 child, did he, according to her?
19  A. According to this, no.
20  Q. But you say that she came and told you that he
21 did?
22  A. I swear she did.
23  Q. Okay. So she gave you a piece of inaccurate
24 information, didn't she?
25  A. Either that, or I'm not remembering correctly.

Page 114

1 But I'm -- I'm positive she said that. Positive.
2  Q. Okay. So let's take her statement to the police
3 at face value. And if she said that A.D. gave his age,
4 then there's nothing unusual about that, is there?
5  A. No, not at all.
6  Q. Okay. And so then the only unusual thing would
7 be that Peter took the middle seat and his son took the
8 window?
9  A. Yeah, from what she said.
10  Q. All right. Now, your child's only a month old,
11 so you haven't had the opportunity to travel with him or
12 her, have you?
13  A. Correct, no.
14  Q. Okay. Have you observed other parents taking
15 the middle seat so their child can have the window?
16  A. All the time.
17  Q. All the time?
18  A. Yes.
19  Q. Okay. So there's really nothing unusual about
20 that either.
21  A. Hmm-mm.
22  Q. So basically, Peter, the white middle-aged man,
23 and A.D., his 12-year-old African American son, did two
24 things, neither of which was unusual in your experience,
25 and that started this whole situation, right?

Page 115

1  A. Yes.
2  Q. Okay. So let's go to your statement now, and
3 you said that starts on page 117?
4  A. Yes.
5  Q. Okay. All right. Now, let's just start at the
6 top there.
7  Who -- who wrote the stuff that is to the left
8 and right of the words "Voluntary Statement"? Is that
9 something that you wrote or something that the policeman
10 wrote?
11  A. No, that's something that they wrote.
12  Q. Okay. And how about the part where it says,
13 "Location of Occurrence, Frontier Flight 2067," did you
14 write that or somebody else?
15  A. Someone else.
16  Q. And the date and the time was somebody else?
17  A. Yes.
18  Q. Okay. Where were you when this was being
19 written down?
20  A. In the -- I was -- I was standing in the front
21 galley. Some people had taken their seats in the front
22 first, like, three rows, but I was standing.
23  Q. Okay. So should I understand that after all the
24 passengers deplaned, the police came on board the plane?
25  A. Yes.

Page 116

1  Q. And took statements there?
2  A. Yes.
3  Q. Okay. So you never went to the police station?
4  A. No.
5  Q. Okay. Have you ever been to the police station
6 there?
7  A. No.
8  Q. Okay. So were you in the presence of the other
9 flight attendants when you wrote out your statement?
10  A. We were, yes.
11  Q. And did you discuss among yourselves what you
12 remember happening?
13  A. Nope. It was 100 percent everyone was filling
14 out their own paper.
15  Q. Okay. So there was no discussion between you
16 about the events while you were filling out your
17 statements?
18  A. No.
19  Q. Was a policeman watching you while you filled
20 out the statement?
21  A. Yes.
22  Q. Do you remember a description of that person?
23  A. No.
24  Q. Okay. So does -- would it be fair to say that
25 your handwriting starts below the bold line that has



CHELSIE B. SAKURADA                                         April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 117

1  "Frontier Flight 2067" on it?
2     A.  Yes.
3     Q.  And everything below that is -- is your own
4  handwriting?
5     A.  Up until the "I have read the statement," the
6  "5757," that's not me.
7     Q.  Okay.  So between that statement and the
8  "Frontier Flight 2067" on the lines given on the
9  statement form, that's all you?
10    A.  Yep.
11    Q.  Okay.  And you're -- you say in your statement,
12  "Within about 20 minutes of the flight, the flight
13  attendants in the back informed me about the situation of
14  the" -- and there's a box.
15        Do you see that?
16    A.  Yes.
17    Q.  Do you know what you wrote that's covered up by
18  the box?
19    A.  No.
20    Q.  You don't remember?  Okay.  That's fine.  I
21  mean, if you don't remember, that's fine.
22    A.  Yeah.
23    Q.  Okay.  So rather than just Amanda -- I'm sorry,
24  Anna saying something to you, this is saying "the flight
25  attendants," plural, right?

Page 118

1     A.  Yes.
2     Q.  So "within 20 minutes of the flight," then, are
3  you saying that all three of the other flight attendants
4  spoke to you?
5     A.  No, it was just Amanda.
6     Q.  So then the statement you gave to the police is
7  not correct?
8     A.  Yes.
9     Q.  Okay.
10    A.  There -- because there was only one flight
11  attendant, just Amanda that came up and told me.
12    Q.  Okay.  So when you filled out that statement, as
13  you just pointed out a few minutes ago, there was a
14  statement at the bottom that says, "I have read this
15  statement and I affirm to the truth and accuracy of the
16  facts contained herein."  And then there's an address and
17  a date.
18        And then you signed it, didn't you?
19    A.  Yeah, I must have.
20    Q.  In fact, it was witnessed by a police officer,
21  right?
22    A.  Umm-hmm.
23    Q.  Yes?
24    A.  Yes.
25    Q.  Okay.  And now you're testifying under oath that

Page 119

1  it's not correct?
2     A.  The "s" is not correct, yes.
3     Q.  Okay.  So "attendants" plural is -- is an
4  incorrect statement --
5     A.  Correct.
6     Q.  -- that you affirmed with your signature?
7     A.  Yes.
8     Q.  Now, the next line after the redaction says,
9  "They" -- again -- "told me that they felt uncomfortable,
10  and that we should keep our eyes open and watch out."
11        And again, that's not correct because it was
12  only Anna, wasn't it?
13    A.  Amanda.
14    Q.  Amanda.  Sorry.
15    A.  Yes.
16    Q.  Okay.  "When I made my trash run, to keep my
17  eyes open, I saw" blank.
18        Do you know what was redacted there?
19    A.  I only saw the man touching the -- the boy's
20  face up and down.
21    Q.  Okay.  "I personally went up to the cockpit and
22  told the captain because the situation made all of us
23  feel uncomfortable."
24        Now, that's different from what you've testified
25  to here this morning, isn't it?

Page 120

1     A.  How?
2     Q.  Doesn't that leave out the meeting of the four
3  flight attendants up in the forward galley and the
4  decision to go tell the captain?
5     A.  Yeah.  I mean, the officer just asked us to make
6  it -- I didn't really think that was important, let's be
7  honest.  I didn't think that that needed to be said.  So
8  I only wrote that I went up and talked to the captain.
9     Q.  So saying that "I personally went up" is -- is a
10  little inaccurate, isn't it?
11    A.  I was the only one who originally went up, but.
12    Q.  In the context, it's inaccurate, isn't it,
13  because you had a meeting with the other flight
14  attendants, and it was a joint decision?
15    A.  Yes.  But I personally went up to the cockpit
16  myself.
17    Q.  Then you say, "In the meantime while I was up
18  there," blank "noticed."
19        Would that be Scott noticed?
20    A.  Yes.
21    Q.  Okay.  And that would be the hand on the groin
22  that he reported, right?
23    A.  Yes.
24    Q.  "... and came up to the cockpit and told the
25  captain."



CHELSIE B. SAKURADA                                              April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

| | |
|---|---|
| Page 121 | Page 123 |

Page 121

1    So that's similar to what you've testified here
2 this morning?
3    A.  Yes.
4    Q.  Okay.  "The captain asked" -- would that be
5 Scott?
6    A.  Yes.
7    Q.  -- "to separate" -- and that would be, then,
8 the -- the two passengers, right?
9    A.  Correct.
10    Q.  After that, "I stayed in the front of the cabin
11 and I did not see or talk to them," right?  That's part
12 of your statement?
13    A.  Yes.
14    Q.  That you affirmed to be true?
15    A.  Yes.
16    Q.  But, in fact, you did see them, according to
17 your testimony here this morning.
18        Which is true?
19    A.  Yes.
20    Q.  Which is true?
21    A.  Oh.  I did see them.
22    Q.  Right.  So your testimony here this morning is
23 different from what you gave to the police and affirmed
24 is true?
25    A.  Yes.

Page 123

1    A.  Yes.  It -- it's more when I land, but
2 throughout the whole flight, there's times where it gets
3 turbulent, and it -- and I feel sick.  I don't remember
4 feeling sick during the flight, but when it was landing,
5 that's when I -- when I got sick, overwhelmingly sick.
6    Q.  Was there turbulence during the flight?
7    A.  Not that I recall.
8    Q.  Okay.
9    A.  There's always turbulence, but not any big
10 turbulence that I recall.  We must have gotten up right
11 away, because within 20 minutes of the flight, we had
12 already had conversations.  So yeah, it must have not
13 been turbulent taking off.
14    Q.  Okay.  Fair enough.
15        I'm going to show you a statement that's been
16 produced, and it's been marked as Exhibit 2.  This is
17 Delvecchia Frontier 0104.  I'll show it to your counsel
18 first.
19        First of all, have you ever seen that document
20 before?
21    A.  No.
22    Q.  Okay.  And this is apparently a statement made
23 by your friend Anna Bond?
24    A.  Yes.
25    Q.  Okay.

| | |
|---|---|
| Page 122 | Page 124 |

Page 122

1    Q.  Okay.  And that's the end of your statement?
2    A.  That's it.
3    Q.  Okay.  Now, did you give a statement to
4 Frontier?
5    A.  No.
6    Q.  Were you asked to?
7    A.  I am supposed to, yes.
8    Q.  You were supposed to but you didn't?
9    A.  Correct.
10    Q.  Why?
11    A.  I was so sick.  I was -- I was just really sick.
12 I was three months pregnant, and I was really sick.  And
13 all I wanted to do was go home.  And I vaguely remember
14 that, and I didn't get online and make the report after.
15    Q.  Well, you didn't just get three months pregnant
16 and sick at the end of the flight, did you?
17    A.  No.  But by the time we had landed, I was
18 sick -- sick to my stomach.  I needed to throw up.
19    Q.  So during the flight, you were also nauseous,
20 right?
21    A.  Yes.
22    Q.  All right.  So during the time that you were
23 making all of these observations about Peter and A.D.,
24 you were having your own issues with respect to being
25 uncomfortable and nauseous?

Page 124

1    A.  Looks like it.
2    Q.  So she gave a statement to Frontier?
3    A.  Yes.
4    Q.  But you didn't?
5    A.  Correct.
6    Q.  Did you and she talk about what she would say in
7 her statement?
8    A.  No.
9    Q.  Okay.  Go ahead and read the first sentence out
10 loud there, please.
11    A.  "As the C, I went to brief the exit row before
12 the [sic] MCD," which is the main cabin door, "closed."
13    Q.  Okay.  And then what's the next?
14    A.  "As I briefed I noticed a boy sitting in the
15 exit row.  I ... asked him how old he was to make sure he
16 is 15 or older.  He ... answered '12.'"
17    Q.  Okay.  So once again, her statement not only to
18 the police but also to her employer was that A.D.
19 answered her when she asked him how old he was?
20    A.  Correct.  Yeah.
21    Q.  And still, your recollection under oath is that
22 she came to you and said, I'm uncomfortable because the
23 father answered for the child?
24    A.  Yeah.
25    Q.  Okay.  All right.



CHELSIE B. SAKURADA                                                April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 125

1       Have you at this point told me everything that
2 you recall about Flight 2067?
3    A.  Yes.
4    Q.  Okay.  There's nothing else that I could ask you
5 about that you have any information about?
6    A.  Nope.  The flight kept going.  I didn't have any
7 interaction with either one.  The father, during the
8 flight, eventually went up to go and talk to Scott, but I
9 had nothing -- I didn't -- I didn't even watch them.  I
10 just saw him get up and go to the back.  That's all I
11 saw.
12   Q.  Okay.  So he would have gone to the back --
13   A.  Yes.
14   Q.  -- to talk to Scott?
15   A.  Yes.  I think it was mostly just to check on his
16 son, but I don't know.
17   Q.  Oh.  What about when the passengers were
18 deplaning?  Did you -- do you remember seeing anything,
19 any interaction between Scott and the father?
20   A.  No.  Nope.  The father was in, still in Row 17.
21 And as it was his time to get off, he exited with the
22 rest of the passengers.
23   Q.  Was there any announcement made that people
24 should wait or any of those special announcements?
25   A.  No.

Page 126

1    Q.  Okay.  So the father deplaned in a line with
2 other passengers around him?
3    A.  Yes.
4    Q.  Did you see him deplane?
5    A.  Yes.
6    Q.  You watched him all the way up the aisle and all
7 the way off the airplane?
8    A.  I did -- probably not -- did not watch him all
9 the way up the aisle.  But I saw that he was about to
10 come off, and so that's when I let the -- the cop know
11 that that was him.
12   Q.  I see.  So there was a cop standing near you --
13   A.  Just right next to me, yeah.
14   Q.  -- up in the front?  Okay.
15       Was the cockpit door open at this point?
16   A.  Was the --
17   Q.  -- cockpit door open at that point?
18   A.  I don't remember.
19   Q.  Okay.  Where was Scott at this time?
20   A.  In the back.
21   Q.  All the way in the back?
22   A.  Yes.
23   Q.  In the aft galley?
24   A.  Yes.
25   Q.  Okay.  And you don't remember him saying

Page 127

1 anything to the father?
2    A.  No.
3    Q.  Okay.  I have to ask this:  Have you ever been
4 convicted of a crime?
5    A.  Nope.
6    Q.  All right.  That is all I have for now,
7 although, Tara, you were going to produce some documents
8 before this young lady's deposition?
9       MS. SHELKE:  We sent you on Friday the personnel
10 file and the training materials.
11      MR. MCKAY:  Okay.  There was nothing else that
12 was --
13      MS. SHELKE:  No.
14      MR. MCKAY:  Okay.
15      MS. SHELKE:  Sorry, not Friday.  The last
16 working day last week.  You and I had an email exchange.
17      MR. MCKAY:  Yes.  Yes.
18      MS. SHELKE:  Sorry, that day.
19      MR. MCKAY:  So there's nothing outstanding that
20 we agreed to for production?
21      MS. SHELKE:  Correct.
22      MR. MCKAY:  Okay.  All right.
23      You have the ability to read and sign the
24 transcript.  What's going to happen after this is that
25 the court reporter is going to type up a transcript of

Page 128

1 your testimony this morning.  And the rules allow you to
2 read through that under -- you have a specific amount of
3 time, it's usually 30 days, to read through and make any
4 corrections that are necessary.  And those can be, you
5 know, typographical errors, or it can be that, you know,
6 you suddenly remember something differently than what you
7 testified about.
8       THE WITNESS:  Okay.
9       MR. MCKAY:  Because we want to make sure this is
10 an accurate transcript both for your protection and for
11 our understanding of what the facts are --
12      THE WITNESS:  Correct.
13      MR. MCKAY:  -- okay?
14      So you can either say that you want to do that,
15 or you can waive that.  It's entirely up to you.
16      THE WITNESS:  I'll do it.
17      MR. MCKAY:  Okay.  So she will read and sign.
18 All right.
19      And we are done, unless Tara has any questions.
20      MS. SHELKE:  I have no questions.
21      MR. MCKAY:  Okay.
22      THE VIDEOGRAPHER:  This is the end of the
23 deposition.  We're off the record.  The time is 12:33.
24      THE COURT REPORTER:  How would you like your
25 transcripts delivered?



CHELSIE B. SAKURADA                                                    April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

---

**Page 129**

1    MR. MCKAY:  I would like one.  Does it all come

2 together, or?

3    THE COURT REPORTER:  Sure.  You want a copy of

4 the video?

5    MR. MCKAY:  Yeah.

6    MS. SHELKE:  I'd like an etran with exhibits or

7 PDF with exhibits, however you prefer to send it.

8    THE COURT REPORTER:  Would you like me to send

9 the read and sign to you?

10    MS. SHELKE:  Yes, please, and we'll get it to

11 her.

12    MR. MCKAY:  Just a PDF.

13    (The deposition concluded at 12:33 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 131**

1                REPORTER'S CERTIFICATE

2 STATE OF UTAH    )
                   )
3 COUNTY OF DAVIS  )

4

5    I, MICHELLE MALLONEE, a Certified Shorthand

6 Reporter and Registered Professional Reporter, hereby

7 certify:

8    That the foregoing proceedings were taken before

9 me at the time and place therein set forth, at which time

10 the witness was placed under oath to tell the truth, the

11 whole truth, and nothing but the truth;

12    That the proceedings were taken down by me in

13 stenotype and thereafter my notes were transcribed

14 through computer-aided transcription; and the foregoing

15 transcript constitutes a full, true, and accurate record

16 of such testimony adduced and oral proceedings had, and

17 of the whole thereof.

18    I further certify that I am not a relative or

19 employee of any attorney of the parties, nor do I have a

20 financial interest in the action.

21    I have subscribed my name on this 11th day of

22 December, 2019.

23

24                        _Michelle Mallonee_

25                   Michelle Mallonee, CSR, RPR

---

**Page 130**

1 Case: Peter Delvecchia v. Frontier Airlines, Inc.
  Civil No.: 2:19-CV-01322-KJD-NJK
2 Reported By:  Michelle Mallonee, RPR, CSR
  Date Taken: December 3, 2019
3

4

5            WITNESS CERTIFICATE

6

    I, Chelsie Sakurada, HEREBY DECLARE:
7

    That I am the witness referred to in the foregoing
8 transcript; that I have read the transcript and know
  the contents thereof; that with these corrections I
9 have noted, this transcript truly and accurately
  reflects my testimony.
10
  PAGE-LINE        CHANGE-CORRECTION        REASON
11 ____ ____ _____ _____

12 ____ ____ _____ _____

13 ____ ____ _____ _____

14 ____ ____ _____ _____
      _____ No corrections were made.
15
16    I, Chelsie Sakurada, deponent herein, do hereby
  certify and declare under penalty of perjury
17 the within and foregoing transcription to be true and
  correct.
18

19    _____

20          Chelsie Sakurada, Deponent

    SUBSCRIBED and SWORN to at _____
21 _____, this _____ day of
  _____, 2019.
22

23                        _____
                              Notary Public
24

25

---

**Page 132**

1  Reference No.: 4732976

2

3  Case:  DELVECCHIA vs FRONTIER AIRLINES

4

      DECLARATION UNDER PENALTY OF PERJURY

5

      I declare under penalty of perjury that

6  I have read the entire transcript of my Depo-
   sition taken in the captioned matter or the

7  same has been read to me, and the same is
   true and accurate, save and except for

8  changes and/or corrections, if any, as indi-
   cated by me on the DEPOSITION ERRATA SHEET

9  hereof, with the understanding that I offer
   these changes as if still under oath.

10

11      _____

12          Chelsie B. Sakurada

13

14       NOTARIZATION OF CHANGES

15           (If Required)

16

17  Subscribed and sworn to on the _____ day of

18

19  _____, 20____ before me,

20

21  (Notary Sign)_____

22

23  (Print Name)                    Notary Public,

24

25  in and for the State of _____

---



800.211.DEPO (3376)
EsquireSolutions.com

CHELSIE B. SAKURADA                                    April 17, 2019
DELVECCHIA vs FRONTIER AIRLINES

Page 133

```
1    Reference No.: 4732976
     Case:  DELVECCHIA vs FRONTIER AIRLINES
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   Chelsie B. Sakurada
```

Page 134

```
1    Reference No.: 4732976
     Case:  DELVECCHIA vs FRONTIER AIRLINES
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24
     SIGNATURE:_____DATE:_____
25   Chelsie B. Sakurada
```

