

(702) 476-4500 | www.oasisreporting.com | info@oasisreporting.com
400 South Seventh Street, Suite 400, Las Vegas, NV 89101

**COURT REPORTING | NATIONAL SCHEDULING | VIDEOCONFERENCING | VIDEOGRAPHY**

Page 1

1                    UNITED STATES DISTRICT COURT

2                     FOR THE DISTRICT OF NEVADA

3

4  PETER DELVECCHIA, et al.,      ) Case No.:
                                  ) 2:19-cv-01322-KJD-DJA
5                  Plaintiffs,    )
                                  )
6  vs.                            )
                                  )
7  FRONTIER AIRLINES, INC.,       )
   et al.,                        )
8                                 )
                   Defendants.    )
9  _____)

10

11

12

13

14

15      REMOTE VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION

16                              OF

17                       FRANCOIS OBASI

18  Taken on Thursday, September 15, 2022, at 9:12 a.m. PDT

19              Appearing via videoconference from
                   10651 Solar Hawk Avenue
20                    Las Vegas, Nevada

21

22

      By a Certified Court Reporter and Legal Videographer
23

24  Reported by:  Dawn Bratcher Gustin, CCR 253, RPR, CRR
                                     California CSR 7124
25  Job No. 50620, Firm No. 061F



Francois Obasi                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

2

```
1   APPEARANCES:
    (All participants appearing remotely)
2
    For the Plaintiffs:
3
        JOHN D. McKAY, ESQ.
4       PARK AVENUE LAW LLC
        201 Spear Street
5       Suite 1100
        San Francisco, California 94105
6       johndmckayatty@gmail.com
7
8   For the Defendants:
9       BRIAN T. MAYE, ESQ.
        ADLER MURPHY & McQUILLEN LLP
10      20 South Clark Street
        Suite 2500
11      Chicago, Illinois 60603
        bmaye@amm-law.com
12
13
    The Videographer:
14
        NICK NARDIELLO, Legal Video Specialist
15      OASIS REPORTING SERVICES
16
17  Also Present Intermittently:
18      PETER DELVECCHIA
19
20               * * * * * * * *
21
22
23
24
25
```

3

```
1              I N D E X
2   WITNESS                              PAGE
3   FRANCOIS OBASI
4     Examination by Mr. McKay              5
5     Examination by Mr. Maye              51
6     Further Examination by Mr. McKay     98
7     Further Examination by Mr. Maye     116
8
9
10             E X H I B I T S
                                   IDENTIFIED/
11  EXHIBIT     DESCRIPTION           MARKED
12  Exhibit 1   Voluntary statement (1 page)  33/124
13  Exhibit 2   Still photograph dated Dec 3, 33/124
                2019 10:44:42 (1 page)
14
    Exhibit 3   Photograph of Mr. DelVecchia  35/124
15              and A.D. (1 page)
16  Exhibit 4   3/28/19 LVMPD Communication   58/124
                Center Call Log (3 pages)
17
18
19
20
21
22
23
24
25
```

4

```
1            DEPOSITION OF FRANCOIS OBASI
2       Thursday, September 15, 2022, 9:12 a.m., PDT
3                    --oOo--
4           P R O C E E D I N G S
5       THE VIDEOGRAPHER:  Today is September 15th,
6   2022, and the time is approximately 9:12 a.m. Pacific
7   Standard [sic] Time.
8       This is the remote deposition of Francois
9   Obasi, in the case Peter DelVecchia vs. Frontier
10  Airlines Inc., et al.
11      I am Nick Nardiello with Oasis Reporting
12  Services.  I will be monitoring the proceedings and
13  recording both video and audio today.
14      At this time I will ask counsel to identify
15  themselves, state whom they represent, and agree on the
16  record that there is no objection to the court reporter
17  administering a binding oath to the witness through
18  remote videoconferencing.  If no objection is stated,
19  we'll proceed forward with the agreement of all counsel.
20  We'll begin appearances with the noticing attorney.
21      MR. McKAY:  This is John McKay.  I represent
22  the DelVecchias, the plaintiffs, and I have no
23  objection.
24      MR. MAYE:  Brian Maye for Defendants.  I have
25  no objections.
```

5

```
1       THE VIDEOGRAPHER:  Thank you.
2       The court reporter today is Dawn Gustin with
3   Oasis Reporting Services.  The reporter may now swear in
4   the witness.
5            FRANCOIS OBASI,
6       having been first duly sworn, was
7       examined and testified as follows:
8            EXAMINATION
9  BY MR. McKAY:
10      Q.  Would you state your full name, please.
11      A.  Francois Obasi.  And I'm no longer a sergeant,
12  but it's all right.
13      Q.  All right.  Do you prefer to be addressed as
14  Mr. Obasi?
15      A.  Or just Obasi or Francois will do.  I'm fine.
16      Q.  Okay, sir.  All right.  Thank you very much.
17      Well, again, I'm John McKay, and I am the
18  attorney for the DelVecchias.  We met off the record.
19  And I will be taking the deposition this morning.
20  Mr. Brian Maye is also here representing the defendants,
21  and he may have some questions for you after I finish
22  up.
23      We have a couple of things to go through, and I
24  probably should ask have you ever had your deposition
25  taken before?
```



6

1   A.   No.
2   Q.   Okay.
3   A.   Not by Zoom or anything like that, no.
4   Q.   Okay.  So I presume as a long-time police
5   officer, you had a chance to testify in court once or
6   twice?
7   A.   Yes.  Yes.
8   Q.   Okay.
9   A.   Couple of hundred, maybe.
10   Q.   Couple of hundred times.
11   A.   Yes.
12   Q.   Okay.  So this proceeding is very much like
13   testimony in court.  You're -- you've just been sworn in
14   just as you would have been in court.  And as I question
15   you, there is the possibility that an objection will be
16   raised by opposing counsel.  The only thing that's
17   different from the courtroom situation is that there's
18   no judge here to respond to the objection.  And so --
19   A.   Okay.
20   Q.   -- we simply wait a beat, and then you can go
21   ahead and give your answer.
22       If at some point down the road the judge reads
23   the transcript and sustains the objection, then your
24   answer might be taken out, but this way, we're able to
25   just go ahead and record objections for the record to be

7

1   dealt with later.
2       Is that understood?
3   A.   Yes, sir.
4   Q.   Okay.  The court reporter is taking down a
5   written transcript just like in court.  The important
6   thing, especially with these electronic depositions, is
7   to remember that if two people speak at the same time,
8   she hears neither of us.  And it's very much like
9   talking into a walkie-talkie.  So if we both push the
10   button at the same time, nothing comes through.
11       So we have to be very careful and a little bit
12   stilted in the sense that I request that you wait until
13   I'm entirely finished with my answer -- or my
14   question -- excuse me.  Even if you know the answer and,
15   in normal conversation, might want to jump in and -- and
16   add the answer, you need to wait until it's absolutely
17   clear that I've finished and then begin your answer, and
18   that way we'll be very careful not to step on each
19   other.  Okay?
20   A.   Yes, sir.
21   Q.   All right.  And if you do answer, we will
22   assume that you understood the question.  So if you
23   don't understand any question, be sure to say so, and I
24   will rephrase or repeat it or whatever's necessary under
25   the circumstances.

8

1       The last thing to remember is that we need to
2   use words rather than nonverbal responses like "um-hum"
3   because of the difficulty that the court reporter has in
4   accurately transcribing something like a nonverbal
5   answer.
6       One last thing, actually, I do need to mention
7   in this case is that we do have a minor involved as one
8   of the parties, and that's Mr. DelVecchia's son, and
9   because of federal rules that apply to providing
10   information about minors in the court record, we have to
11   refer to him by his initials, which are A.D.  So if I'm
12   asking you a question about A.D., that's asking you
13   about Mr. DelVecchia's son.
14       Is that okay?
15   A.   Yes, sir.
16   Q.   Okay.  Thank you, sir.
17       I guess, first of all, just for a background,
18   where do you currently reside?
19   A.   In Las Vegas.  Do you need my full address
20   or --
21   Q.   Yes, please, if you don't mind.
22   A.   Okay.  ████████████████████████
   ████████████████████
24   Q.   And who do you live there with?
25   A.   I live with my wife and -- wife, minor

9

1   daughter, and my brother.
2   Q.   Okay.  Do you have any plans in the foreseeable
3   future to move from that address?
4   A.   No, I do not.
5   Q.   Okay.  And I understand that your wife is a
6   detective for the Las Vegas Police Department?
7   A.   Yes, she is.
8   Q.   Okay.  And you used to be a detective for that
9   same department; is that correct?
10   A.   Actually, no.  I was a supervisor -- a
11   sergeant, patrol sergeant.
12   Q.   Okay.  Thank you.  Patrol sergeant.
13       And how long were you with the Las Vegas
14   Metropolitan Police Department?
15   A.   21.5 years.
16   Q.   All right, Sir.  And what reason -- for what
17   reason did you retire?
18   A.   I actually retired to become a full-time dad.
19   Q.   A full-time dad?
20   A.   Yes, sir.
21   Q.   Okay.  To your daughter?
22   A.   Yes, sir.
23   Q.   Okay.  I want to ask you some questions about
24   the evening of March 28, 2019, which was the evening
25   that the flight arrived from Raleigh-Durham, North



10

1  Carolina, that's the subject of this action.
2       Do you remember that evening?
3    A.  Yes, sir.
4    Q.  What was the first knowledge that you had that
5  this flight was arriving and might require your
6  attention?
7    A.  We received a call from the airport control
8  center saying that the call was inbound.  I believe we
9  had about a, maybe, 30-to-40-minute heads-up of the
10  flight landing in the gate and -- etcetera, and that
11  they would need our assistance.
12    Q.  Was there any other information provided at
13  that time by the airport control center?
14    A.  Yes.  They were able to give me the names of
15  the parties involved, the father and son, and kind of a
16  brief of the incident, because usually the airport
17  control center gets very, very brief information from
18  the pilot.
19    Q.  Okay.  Now, just to be clear, you said "from
20  the pilot."  Is the -- is the pilot of the aircraft
21  directly connected to the aircraft -- airport control
22  center?
23    A.  I believe -- and I'm not an expert in this
24  part, but I believe the pilot calls it into air traffic
25  control, who relays it to the dispatcher in the airport

11

1  control center.
2    Q.  Okay.  But as far as the information of the
3  full names of Mr. DelVecchia and his son, where do you
4  think that information would have come from before
5  getting to you?
6       MR. MAYE:  Object to form.
7  BY MR. McKAY:
8    Q.  Go ahead.
9    A.  Okay.  That -- that information would have had
10  to come from, basically, the -- the pilot or the copilot
11  to --
12    Q.  Okay.
13    A.  -- ACC, airport control center.
14    Q.  If -- is there a possibility that if the pilot
15  and copilot didn't have the information, that it would
16  come from somebody at the airline?
17    A.  That's a possibility, but that would -- the
18  airport control center would have to initiate that call
19  to them.
20    Q.  So when you received -- and, I'm sorry, I keep
21  hearing some kind of a radio.  Is that your end?
22    A.  No.  I have no radio on.  I can -- let me --
23  let me disconnect my Bluetooth.  Maybe that will help.
24  One second.
25    Q.  Okay.

12

1    A.  Okay.  Is that better?
2    Q.  Yes.  Much better.  Thank you.
3    A.  Okay.  I think it was my Bluetooth.
4    Q.  Okay.  We were getting an echo, then, I guess.
5       When you receive information that the flight
6  was coming in and giving the DelVecchias' names, what
7  were you told in addition to the names?
8    A.  We were told that it was a possible -- going to
9  say, like, kind of a child molestation/child
10  endangerment case.
11    Q.  Okay.  And where would that information have
12  come from?
13       MR. MAYE:  Object to form.
14       THE WITNESS:  Well, we -- I'm sorry.
15       Well, to me, it's coming from airport control,
16  but, for them, it would have to come from within the
17  aircraft itself.
18  BY MR. McKAY:
19    Q.  Okay.  All right.  And what did you do next
20  upon obtaining this information?
21    A.  I alerted my officers.  I believe I took two or
22  three officers to prep them to go out to the call
23  because it takes sometimes a good 10 to 15 minutes to
24  get to that destination from where we are.  And due to
25  the -- the names -- the names were somewhat unique to

13

1  me.  So I actually did a quick Google of the names.
2    Q.  Okay.  And did you find anything on the
3  Internet?
4    A.  I did.  I found a picture of the minor.
5    Q.  Okay.  Of A.D.?
6    A.  Yes.
7    Q.  And what did that picture show?
8    A.  Initially, actually, to my own failure, I
9  thought I was looking at a young, like, African-American
10  male in a football jersey.  I later found out it was
11  actually a hockey jersey --
12    Q.  Okay.
13    A.  -- highlighting, I guess, the fact that he
14  could play hockey really well.
15    Q.  And did you see any text accompanying the
16  photograph that gave any background information?
17    A.  It just said -- it just said his name and the
18  fact that he was a very good hockey player in that
19  air -- like, in the North Carolina area, North Carolina
20  area.
21    Q.  Did you find anything on his father?
22    A.  No, sir.  No.
23    Q.  Okay.  So at this point, you knew that the
24  names -- and you -- did you know that they were father
25  and son?



Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

14

1    A.   I -- I just -- actually, based on the
2  descriptions we were given, I just assumed it was
3  possibly, like, an adoptive situation.
4    Q.   Okay.  But you did know that they both shared
5  the same surname?
6    A.   Yes, sir.
7    Q.   Okay.  Now, in terms of -- you said it took
8  about 15 minutes from where you are.  So at that point
9  in time, is this a police station within the airport?
10   A.   Yes.  We had -- actually have two police
11  stations, one at Terminal 1 and one at Terminal 3, that
12  we are based out of, and then we either drive out to the
13  gate, or we can take the tram transport out to the gate.
14   Q.   And do you remember which of the two stations
15  you were in?
16   A.   I was at 3.  My office is at Terminal 3.
17   Q.   Okay.  And as far as the aircraft arriving, did
18  you know which terminal it was coming into?
19   A.   Yes, sir.  Well, that's what regulates which
20  supervisor or which units handle the call.  Frontier is
21  a Terminal 3 ticketing station; so it makes it my
22  responsibility.  And I honestly do not remember if my
23  partner, the other sergeant, was on that night or not
24  or to -- I don't believe he --
25   Q.   Okay.

15

1    A.   So I was probably in charge of the whole
2  airport anyway.
3    Q.   Okay.  So after you got the information, you
4  say that you met with three of your officers?
5    A.   I believe three.  I believe three.  Just --
6  yeah.
7    Q.   Okay.  And then what -- what happened next?
8    A.   We basically waited for the aircraft to arrive
9  at the gate and made contact with all the parties
10  involved.
11   Q.   Okay.  So when the aircraft arrived at the
12  gate, where were you and the officers relative to the
13  door of the airplane?
14   A.   We're right outside the door.  Well,
15  actually -- yeah, once it -- once it's secure to the --
16  I'm forgetting the name for it.
17   Q.   The jetway?
18   A.   Yes, the jetway.  Sorry.
19   Q.   Sure.
20   A.   So once that's secure, because no one can
21  really be on it except for the workers prior to the
22  plane being secure on it.  Once that's secured and they
23  open the door, then we usually go down the jetway to
24  wait for the -- the parties involved.
25   Q.   Okay.  So would you have then watched

16

1  passengers coming off of the plane and entering the
2  jetway?
3    A.   Yes, sir.
4    Q.   Okay.  And what did you observe from the point
5  that you got to the door of the aircraft?
6    A.   Quite a few passengers coming off.  Some were
7  kind of, like, mumbling about what was going on.  It was
8  kind of hard -- it was -- like I say, if you've been on
9  a plane, everybody is just trying to get off.  So people
10  were just -- you could hear kind of, like, mumblings of
11  something happening.
12   Q.   So are you saying that the mumbling that you
13  heard was relevant to the situation that had caused you
14  to come to the airplane?
15   A.   Yes, sir.
16   Q.   And do you remember any details at all of
17  what --
18   A.   I'm sorry.  I remember one lady making a
19  statement along the lines of, you know, like, "That was
20  wrong" kind of a deal, and then walking away.
21   Q.   Okay.
22   A.   Basic -- yeah.  But like I say -- but at this
23  point, like I say, because that's quite normal anytime
24  we go to an aircraft to have, you know, people with
25  their opinions leaving the aircraft.

17

1    Q.   Okay.
2    A.   Yeah.
3    Q.   And did you at any time interact with
4  representatives of the airline at the plane?
5    A.   Um, you mean that were not part of the crew?
6    Q.   No.  Actually, I should have rephrased that
7  differently.
8    A.   Okay.
9    Q.   Did you interact with any of the crew of the
10  flight?
11   A.   Yes, sir.
12   Q.   Okay.  And who were they?
13   A.   The -- I remember speaking briefly to the
14  pilot, and then there was a -- black male attendant
15  and a white female attendant.
16   Q.   Okay.  Let's start with the pilot.  What --
17  what did you talk with the pilot about?
18   A.   The pilot basically stated to me that he called
19  it in because he had all of his attendants, as he put
20  it, coming to him saying something was wrong.  I'm not
21  sure what his criteria to call us is, but he was kind of
22  explaining to me that, you know, he had his crew telling
23  him something was wrong.  So that's why he called it in.
24   Q.   Okay.  And did he provide any other details
25  about what "it" was?

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

18

1   A.  No, because he -- he was not a witness or part
2   of that.  He just was, you know, the -- I guess the
3   message conveyor.
4   Q.  Okay.  And how about the male and female flight
5   attendant, what did they --
6   A.  Ah -- I'm sorry.  The male didn't say much.
7   The female stated, "I'm not sure they're even
8   related" --
9   Q.  Okay.
10  A.  -- is what she said.
11  Q.  All right.  Did she say that to you?
12  A.  Yeah, well -- yes.  But it was -- well, my
13  officers are really doing the investigation.  I just
14  supervise.  I was, you know, more overseeing, but I'm
15  standing -- it's a very small space --
16  Q.  Okay.
17  A.  -- in that opening because all the other -- we
18  had let everybody else kind of come off the plane.
19  Q.  Right.
20     Did she elaborate at all on what she meant by
21  saying that she's not sure they're even related?
22  A.  She mentioned the fact -- the fact that --
23  because I had not visually seen them yet -- the fact
24  that he was a middle-aged white man and it was a younger
25  black male.  And also something about a class that she

19

1   had taken.
2   Q.  A class.
3   A.  Yeah, some -- it -- I'm sorry.  Say -- repeat
4   again, sir.
5   Q.  No, I'm sorry.  I interrupted you.  Go ahead
6   and say what she said.
7   A.  Oh, she -- she was basically -- they were
8   talking about -- she was talking about a class, which
9   I -- which I took to be more of a, kind of like a human
10  trafficking/child endangerment class that they give the
11  airlines for -- to look for, like, warning signs of
12  these type things.
13  Q.  Okay.  And did she mention any signs other than
14  the fact that it was a middle-aged white man with a
15  younger black male?
16     MR. MAYE:  Object to form.
17     THE WITNESS:  She --
18  BY MR. McKAY:
19  Q.  You can go ahead.
20  A.  Okay.  Well, she -- she basically described
21  what she saw as, you know, the wrong action and what
22  caused her to react --
23  Q.  And what was that?
24  A.  -- and why she alerted her people.
25     She -- I'm sorry.  Somebody else is talking.

20

1      Oh, I'm sorry.
2      She basically stated that she saw the -- the --
3   I guess, A.D. put his head into the lap of Mr. -- the --
4   the adult, and then the adult was rubbing -- rubbing his
5   face affectionately, as she put it, and that she thought
6   it was maybe too affectionate for an adult male and a
7   young boy.
8   Q.  Okay.  Did she say anything else?
9   A.  No, not really.  Just the fact that she -- it
10  was -- she thought it was, you know, wrong, and it made
11  her uncomfortable and that she alerted her coworkers.
12  Q.  Okay.  And that that was -- she told you that
13  was based on a class that she had taken.  Did she
14  indicate that was with the airline or given by the
15  airline?
16  A.  Well, she didn't say it was based on the class.
17  She was just kind of talking about this class that they
18  had taken.  You know, not -- she didn't say, hey, I took
19  a class, and I saw this and this.  She just kind of
20  mentioned a reference to class.  And I -- and, yes, she
21  said it was a class that she -- it was given to her by
22  the airlines.
23  Q.  Okay.  And we have in this case three female
24  flight attendants.  One was very dark brunette hair and
25  two are more or less blond.

21

1   A.  Yes.
2   Q.  Do you remember --
3   A.  Yeah.
4   Q.  -- the color of hair?
5      MR. MAYE:  Object to form.
6      THE WITNESS:  Yeah, she -- she was blond, and
7   she was actually kind of tall.
8   BY MR. McKAY:
9   Q.  She was blond and kind of tall?
10  A.  Yes, sir.
11  Q.  Okay.  All right.  How about age?
12  A.  I would give her between -- I would say 25 to
13  30.
14  Q.  Okay.  Did she indicate that she had any
15  children of her own?
16  A.  I do not recall that.  No, I don't recall that.
17  Q.  Okay.  All right.  Did you at any point see the
18  other female flight attendants?
19  A.  They were kind of in the background but had,
20  really, nothing to say.
21  Q.  Okay.  Just trying to zero in on -- on which of
22  the ones you talked to.
23     So when you saw the other flight attendants,
24  was one a dark brunette and the other a blond?
25     MR. MAYE:  Object to form.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

22

1       THE WITNESS:  I do remember one with darker
2   hair.  I don't really remember another blond, to be
3   honest with you.
4   BY MR. McKAY:
5       Q.   Do you remember whether the other one that was
6   in the background was younger or older than the one who
7   said she didn't believe they were related?
8       A.   The other one was a little bit older, looked at
9   least to me.  I'm --
10      Q.   Okay.  Yeah.
11      A.   She looked a little bit older.
12      Q.   Okay.  Fair enough.  Thank you.
13          So what happened then after you received this
14  information from the flight attendants?
15      A.   Also -- so we already had -- because of the
16  type of case it is, it's not actually a local police
17  department's jurisdiction.  It's actually a case for the
18  FBI.  So I had already called the FBI agents about what
19  was going on.  So our job -- well, my job at the time
20  was to determine if there was actually, you know, enough
21  speculation to detain for the FBI.
22      Q.   Okay.  And what did you determine?
23      A.   Well, we determined basically, based on her
24  accusation, that there was at least enough to detain and
25  let the FBI come out.  And because of the child's age, I

23

1   requested they bring out, like, a forensic specialist
2   that knew how to speak to children and not mislead them.
3       Q.   Okay.  And how did you make these requests?
4   Was that by walkie-talkie or something?
5       A.   No.  No, sir.  We have a -- it's kind of, like,
6   a in-the-bucket phone number, like, a central phone
7   number to the FBI on-call agents, and then you just --
8   you just call.  You know, they tell you, yeah, we'll be
9   there.
10          I want to say they got there, actually, pretty
11  quick.  Maybe 30 to 45 minutes, or so.  And they'll let
12  you know, yes, we're en route.  Take them to your
13  substation, and they'll come, or sometimes they'll say
14  can you just do a quick written report, you know,
15  release them, and we'll pick up the report and do a
16  follow-up.
17      Q.   Okay.  And do you recall what they said to you
18  on this occasion?
19      A.   Yes.  They asked us to detain for them, and
20  they would be en route with a -- a specialist that could
21  interview the minor.
22      Q.   Okay.  And as far as you knew, were these
23  agents who were based in the area?
24      A.   Yes, sir.  Yes, sir.  Because they were all
25  there within -- within an hour, they had a -- a team

24

1   there.
2       Q.   Okay.  So let's just concentrate, then, on what
3   you did after making that call.  Did you take any
4   statements from the flight attendants?
5       A.   My officers gave them voluntary statements
6   with, you know, just a -- what we have is just a Metro
7   basic voluntary form.
8       Q.   Okay.
9       A.   And then basically -- I believe one of the
10  officers waited for those forms, because it takes
11  sometimes a good 15, 20 minutes for them to complete it
12  and doing their regular job as well.  And then we
13  transported, basically, the adult and minor back to
14  Terminal 3 Substation.
15      Q.   Okay.  Before I ask you about that, let me just
16  share my screen with you and show you some of these
17  statements.
18          Hang on just a second.  I'm not getting the
19  exact document I want, and, for some reason, Zoom isn't
20  allowing me to get rid of this thing here.  Let's see.
21          Can you see the screen now?
22      A.   Yeah, kind of.  It's -- oof, okay.  Let me
23  see --
24      Q.   Trying to --
25      A.   One second while I turn my garage light on.  If

25

1   it's me or it's just --
2       Q.   Okay.
3       A.   -- rather small.
4       Q.   Sure.
5       A.   Yeah, I can see the form, but it's, like -- ah,
6   okay.  Let me try to --
7       Q.   Okay.
8       A.   Yeah, somewhat hard to read.  Is there a way to
9   blow it up more or no?
10      Q.   I'm going to try.  Let's see.
11      A.   Oh, there you go.  Okay.
12      Q.   Is that helpful?
13      A.   Yeah.  Yeah, that --
14      Q.   Okay.
15      A.   Okay.
16      Q.   First of all, is this -- is this the voluntary
17  statement form you were referring to?
18      A.   Yes, sir.
19      Q.   Okay.  And I see an event number there.  Whose
20  event number is that?
21      A.   That would be our -- that would be Metro's
22  because an event number is generated for any --
23  anything.  Any -- even just a -- stopping a person to
24  talk to.  If you call it out over the radio, an event
25  number is created.



Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

26

1   Q.   Okay.  Now, if we were to contact the police
2 department and give them this event number, would there
3 be a -- any kind of file materials attached to it?
4   A.   Only these voluntary statements because it's
5 not -- because there's no report generated because it's
6 not our crime, I guess, is the way to say it; it's the
7 FBI's.  So even if we had -- oh, sorry.  Go ahead.
8   Q.   No, that's the echo.  I don't know where it's
9 coming from.
10   A.   Yeah, it's not my end because I have absolutely
11 nothing else on in my garage.  So --
12   Q.   Okay.
13   A.   Yeah, but we -- so we -- being that we did no
14 report, then the only thing -- and, actually, even --
15 even these voluntary statements, because they were given
16 to the FBI, may not be attached, to be honest with you.
17   Q.   Okay.
18   A.   Yeah.
19   Q.   Is there -- is there any kind of file folder
20 or -- or electronic folder that is opened up for an
21 event number like this?
22   A.   Normally, like I say, only if we're doing a
23 report.  And there's also -- how do I explain this?
24        So airport control center is not part of Metro
25 Police.  It's actually part of the airport or Clark

27

1 County Aviation.  So anything they do when I -- so when
2 I speak to an airport controller, they then have to call
3 Las Vegas Metro dispatcher, and it's kind of like a
4 triple relay.
5        So on a normal thing, everything I say over the
6 radio, a police dispatcher would record.  With the
7 airport controller, they're not trained that way.  So
8 the same -- do you understand?  Do you understand what
9 I'm saying?
10   Q.   Okay.  So -- so you were in contact with the
11 airport control center rather than your own police
12 dispatch.
13        Is that what you're saying?
14   A.   Yes.  Yes.  The airport is unique in that way,
15 where we're basically, you know, like, the enforcement
16 arm of Clark County Aviation.  So we don't have our own
17 dispatcher.  She dispatches police, cleaners, anybody
18 you can think of to be dispatched.
19   Q.   Let me just let you look at the
20 statement here, and I will tell you there are white
21 blocks of redactions of information, and that is how
22 they came to us from the FBI; so the FBI applying its
23 procedures with redacted information.  But if you can
24 look through what's left, and I'll just ask you a few
25 questions about this when you've had a chance to look.

28

1 I've got it blown up so that I'll just try to move back
2 and forth, if that helps you.
3        And I'll also tell you that I'm not going to
4 ask you about any of the details of what's written.  I
5 just want to ask you if this is one of the statements
6 that you or -- or your officers took of one of the
7 flight attendants.
8   A.   Yes, it is.  Actually, if you can go down, it
9 will show the -- maybe they redacted it, but usually it
10 will show the officer that --
11   Q.   Yeah, they've re- --
12   A.   -- signed it to say --
13   Q.   They redacted every name, every signature.
14   A.   Okay.  Okay.  Yeah, because that's not mine --
15 yeah, one of our officers will fill in the addresses in
16 the bottom --
17   Q.   Okay.
18   A.   -- and the full -- yeah, so -- but that is --
19 that is definitely one of our -- our forms and appears
20 to be one of the forms that we collected.
21   Q.   Okay.  And I'm just going to show you very
22 quickly another one that's already been identified by
23 Flight Attendant Bond as Bond Exhibit 7.  And, just
24 generally, is that also one of the forms that was given
25 to one of the flight attendants to fill out?

29

1   A.   Yes, sir.
2   Q.   Okay.  And I'm going to show you what's been
3 previously marked in a deposition as Nickel Exhibit 2
4 and identified by her, Ms. Amanda Nickel, as her
5 statement.  And I'll ask you, is this also one of the
6 voluntary statement forms that your officers gave to one
7 of the flight attendants?
8   A.   Yes, sir.
9   Q.   Okay.  And I'll show you, finally, the fourth
10 one that's been identified as Warren Exhibit 4, and it
11 was identified by Flight Attendant Mr. Warren as his
12 statement.  Is this also a voluntary statement that was
13 given by your police officers to the flight attendants?
14   A.   Yes, sir.
15   Q.   Okay.  Now, bear with me just a second.  I'm
16 going to stop sharing, and I'm going to find a document
17 that shows pictures of all the flight attendants that's
18 been produced by Frontier, and I'll put that up on the
19 screen in just a second.
20   A.   Okay.
21   Q.   Okay.  Okay.  Do you see the four pictures
22 there?
23   A.   Yes, sir.
24   Q.   All right.  And let me ask you if you can
25 identify, first of all, the gentleman.  Is that the male



Francois Obasi                                   Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

---

30

1  flight attendant that you saw?
2      A.  Yes, sir.
3      Q.  Okay.  Now, of the other three, can you
4  identify which one was with him that said she didn't
5  think that they were related?
6          MR. MAYE:  Object to form.  That
7  mischaracterizes previous testimony.
8  BY MR. McKAY:
9      Q.  All right.  Well, I'll ask it a different way,
10 then, sir.
11         Can you identify the flight attendant that you
12 saw standing with the male flight attendant when you
13 spoke first to the flight attendants at the airplane?
14     A.  Do you want me to say her name or just the
15 description?
16     Q.  Yeah, well, if you -- if you can identify her
17 by her name, that would be very helpful.
18     A.  It's Amanda Nickel.
19     Q.  Okay.  And you're sure that's the one that --
20 that you saw standing with the male flight attendant.
21     A.  Yes, sir.  Her hair appeared a little lighter
22 that day, but that's --
23     Q.  Okay.
24     A.  -- that's her.
25     Q.  Very good.

---

31

1          And just to be sure, if I told you that
2  Ms. Bright down below here is depicted with darker hair
3  than she apparently had in 2019, would that make any
4  difference?
5          MR. MAYE:  Object to form.
6          THE WITNESS:  It --
7  BY MR. McKAY:
8      Q.  Go ahead.
9      A.  Oh.
10         Because I -- in my memory, I remember seeing
11 two flight attendants with lighter hair.
12     Q.  Right.
13         So what I'm -- what I'm just trying to make
14 sure, these are, apparently, photographs that were taken
15 perhaps the day these folks were hired.
16     A.  Okay.
17     Q.  And their -- we have taken Ms. Bright's
18 deposition, and in it she had lighter hair.
19         So what I'm saying is if Ms. Bright had
20 appeared with lighter hair on the evening that you were
21 at the airplane, would that change your mind as to who
22 you saw, or are you positive upon facial features that
23 it was Ms. Nickel?
24         MR. MAYE:  Object to form.
25         THE WITNESS:  Can I go ahead or --

---

32

1  BY MR. McKAY:
2      Q.  Yes.  You can go ahead, yeah.
3      A.  Okay.  I think if Mrs. Bright had blond hair,
4  which is kind of hard to imagine her in, then it would
5  make their faces somewhat similar.  And, yeah, I -- like
6  I say, yeah, that would -- I would have to go back
7  and -- if I had access to my old camera.  But if she had
8  blonder, lighter hair, yeah, it would -- it would kind
9  of be a toss-up between the two of them, in honesty.
10     Q.  Okay.  So you brought up an interesting point.
11 Did you take photographs when you arrived at the
12 airplane?
13     A.  My body-worn camera was running.
14     Q.  Okay.  And would that have been given back to
15 the police department?
16     A.  Yes, sir.  That -- because it's -- at the end
17 of every shift, it's plugged in and uploaded
18 automatically into our system.
19     Q.  Okay.  So that recording should be available if
20 we were to ask the police department for it?
21     A.  Yes, sir.  Of every -- every officer involved
22 in the call has to have their body camera on unless it's
23 something private and personal.
24     Q.  Okay.  And do you -- do you know how long
25 that -- those tapes are kept?

---

33

1      A.  I believe there's -- it's quite long.  It has
2  to be, like, a four-, five-year for noninvolved type
3  things like something minor.
4      Q.  Okay.
5      A.  But it's quite a long time.  It's quite --
6      Q.  Okay.
7      A.  -- a long time.
8      Q.  I'm going to ask you to bear with me just
9  another second while I locate a photograph of Ms. Bright
10 at the time of her deposition, and then I'll ask you a
11 question about it.
12         All right, sir.  I'm showing you what I will
13 have marked as Obasi Exhibit 2.  We'll -- we'll mark the
14 first statement, voluntary statement, that I showed you
15 as Exhibit 1.  So will this will be -- this photograph
16 will be Exhibit 2.
17         (Exhibits 1 and 2 were identified for
18          the record.)
19 BY MR. McKAY:
20     Q.  And I represent to you that this was a -- this
21 is a still taken from the video of the deposition of
22 Chelsie Bright on December 3 of 2019.  And you can see
23 there that her hair is a bit lighter than it was -- and
24 longer than it was depicted in the photograph I showed
25 you a minute ago.

---

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

---

34

1      Is -- is this, then, the woman that you saw
2  outside the plane?
3      A.  I would have to say she looks a lot closer to
4  what I remember, but not the -- I don't remember her
5  hair being down, to be honest with you, I thought it was
6  up.
7      Q.  Okay.
8      A.  But this looks a lot closer to the person I
9  remember.
10     Q.  Okay.  So in terms of the woman who mentioned
11  something about having taken a class, you think that it
12  was this woman depicted in Exhibit 2?
13         MR. MAYE:  Object to form.
14  BY MR. McKAY:
15     Q.  You can go ahead.
16     A.  Yes, sir.
17     Q.  Okay.  All right.  Thank you.
18         Okay.  So you indicated that you thought the
19  other officers, or at least one of them, stayed behind
20  to wait for the statements to be done.  What did you,
21  yourself, do next?
22     A.  We transported the adult and minor, if I
23  remember correctly, separately back to the station.
24     Q.  How --
25     A.  I --

---

35

1      Q.  -- did you do that?
2      A.  By vehicle.
3      Q.  Okay.
4      A.  And because we -- we have the ability to park
5  pretty much under the aircraft and then used the
6  off-ramp of the jetway so we don't have to -- because
7  it's actually -- where the planes land at -- well,
8  sorry.  It's Reid Airport now -- it's actually an
9  island.
10         So to -- you have to drive out, like I said, or
11  take a tram.  So we had -- some of our officers will
12  take cars out and some of us will take the tram out, but
13  we basically transported them back to Terminal 3.
14     Q.  Okay.  And I'm going to show you another
15  picture here in just a second.
16         All right.  I'm showing you here what we're
17  going to mark as Obasi Exhibit 3.
18         (Exhibit 3 was identified for the
19         record.)
20  BY MR. McKAY:
21     Q.  And I'll ask you if the gentleman in this
22  picture is the gentleman that you say you transported
23  from the plane.
24     A.  Yes, sir.
25     Q.  Okay.  And so did you go with the father or the

---

36

1  son?
2      A.  The son.
3      Q.  All right.  And did you have any conversation
4  with him as you were traveling back to the station?
5      A.  Yes, sir.
6      Q.  All right.  And what was that conversation?
7  What do you remember about it?
8      A.  Well, one, one very articulate young man.  And
9  the first thing he basically said to me is that he knew
10  why this was happening.
11     Q.  Okay.  And what did he say about that?
12         MR. MAYE:  Object to form.
13  BY MR. McKAY:
14     Q.  You can go ahead.  Anytime an objection is
15  made, you don't have to wait for me to tell you it's
16  okay to go ahead.
17     A.  Oh, okay.  Yeah.
18     Q.  You can just go ahead.
19     A.  I was just giving the pause.
20         But -- so he basically said it happened -- it
21  had happened before where they were separated by law
22  enforcement, and it was because his father was black --
23  was white and he was black --
24     Q.  Okay.
25     A.  -- is what the young man told me.

---

37

1      Q.  Did he give you any specifics about that?
2      A.  Not locationwise.  He just -- he just said --
3  and he also spoke of a couple of kind of, like, racially
4  based incidences in North Carolina that he felt, you
5  know, made him uncomfortable because of his -- of his
6  being different from his father.  And also -- and
7  being -- playing hockey, he said.
8      Q.  Okay.  And I'm sorry, just to clarify, things
9  that happened while he was playing hockey or things that
10  happened to him because he played hockey?
11     A.  I would say just due to being involved in
12  hockey in the sport itself.
13     Q.  Okay.  All right.  Did he indicate to you
14  that -- that he felt that a young black man playing
15  hockey was -- was different, seen as different by
16  people?
17         MR. MAYE:  Object.
18  BY MR. McKAY:
19     Q.  Is that what you would say?
20         MR. MAYE:  Object to form.
21         THE WITNESS:  Yes, he did.  Yes, he did.
22  Especially -- he actually mentioned the fact of because
23  of the area they lived in, he felt that, you know, it
24  wasn't as accepted.
25  /////

---



Francois Obasi                                      Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

38

BY MR. McKAY:
2    Q.   Okay.  All right.  And did -- did he say
3  anything else to you, or did you say anything to him
4  as -- as you were traveling back to the station?
5    A.   No, sir.  I was -- I was actually very careful
6  not to have him speak about what occurred on the
7  aircraft because, you know, that wasn't -- I felt like
8  that's something I would leave for the -- the FBI when
9  they arrived.  So I just tried to, you know, speak about
10  any -- he talked about his -- I want to say adopted
11  sister becoming a doctor and maybe -- and losing his
12  mom.  I believe his mom had recently passed.  So just
13  other conversation to kind of keep him away from the
14  incident at hand because I didn't want to --
15    Q.   Okay.
16    A.   -- refer to that.
17    Q.   And so you were accompanying him, A.D.  Did you
18  have any knowledge as to how the father was going to get
19  to the police station?
20    A.   Yes.  The same way.  He was going to be
21  transported, but we -- I already had told my officers to
22  basically have a holding area, what we call a cell.
23  It's more of a room, a camera-monitored room.  And I
24  would take the minor to our conference room.  And I also
25  instructed them -- because we had initially handcuffed

39

him.  So I told him once we -- once we got into the area
2  where he was secured and an officer was watching him all
3  the time, to go ahead and take the handcuffs off.
4    Q.   So just so we're clear, who had handcuffs on?
5    A.   Mr. -- is it DelVecchio [sic]?  The dad, the
6  adult.
7    Q.   Okay.  Okay.  Did the son as well?
8    A.   No, sir.  Not at any point.
9    Q.   Okay.
10    A.   No, sir.
11    Q.   Okay.  All right.  So -- so the father was
12  transported in handcuffs, and the son was not; correct?
13    A.   Yes, sir.  Yes, sir.
14    Q.   Okay.  All right.  So when you got back with
15  the son, what -- what happened next?
16    A.   I -- I took him into the conference room of the
17  station, and I believe I got him some snacks, because we
18  have a pretty big snack area, and just -- we kind of
19  just had small chitchatter about stuff and his -- what
20  his father had planned for him for travel and whatnot,
21  just trying to make small talk to keep him comfortable
22  and build a rapport.
23    Q.   Do you remember what he had said about the
24  plans that they had?
25    A.   He said -- he said something about hiking and

40

RV -- if I remember correctly, something about an RV
2  ride, and he mentioned Zion, I remember.
3    Q.   Okay.
4    A.   And that was really kind of, you know, as far
5  as what he knew of the plans, I should say.
6    Q.   I see.  Okay.  Now, how did he seem to you at
7  that point in time?
8    A.   Surprisingly -- and what -- I have to use the
9  word impressed.  He was actually a very calm young man.
10  He kind of seemed to understand what was going on.  He
11  wasn't, like, afraid of us or for his dad, and I tried
12  to assure him that, you know, we meant him no harm.
13  This was just a -- some, basically, steps we had to go
14  through to clear, you know, what -- the incident.
15    Q.   All right.  How about his overall mood?
16  What -- what did he appear like?
17    A.   He seemed a little -- I mean, he was obviously
18  not -- you might say disappointed, maybe, might be the
19  best way to do it because it had interrupted his trip,
20  you know, and what you are going to do.  But I think --
21  I tried my best to just make him comfortable and assured
22  him it would be over soon.
23    Q.   Okay.  Now, you, by this point, had spent
24  around two decades with the police force; correct?
25    A.   Yes, sir.

41

Q.   Okay.  Had you -- during that time, had you had
2  cases of children who were being trafficked?
3    A.   Not -- not trafficked, sir, no.
4    Q.   How about -- did you have any training about
5  human trafficking?
6    A.   Yes, sir.
7    Q.   Okay.  Did anything that you saw of A.D.
8  suggest to you, based on that training, that he looked
9  like somebody who was a subject or a participant in
10  human trafficking?
11        MR. MAYE:  Object to form.
12        THE WITNESS:  No, sir.  And if I could clarify,
13  when you say "trafficking," are you also including,
14  like, molestation and stuff like that?
15  BY MR. McKAY:
16    Q.   I didn't hear you.
17    A.   I'm sorry.  When you -- when you say
18  "trafficking," are you also including, like, child
19  molestation and those type of things or just -- or just
20  the fact of trafficking?
21    Q.   I was going to ask you those separately, if
22  that's --
23    A.   Oh, okay.
24    Q.   -- okay.
25    A.   Yeah.  Okay.  Okay.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

42

1    Q.  All right.  So when I'm talking about
2  trafficking, I'm talking about taking somebody against
3  their will or -- or under some form of duress to
4  someplace that they otherwise wouldn't have chosen to
5  go.
6    A.  Yes.  And no -- no signs of that whatsoever.
7    Q.  Okay.  Now, how about have you -- have you had
8  situations where you've had to investigate claims of
9  child molestation?
10   A.  Unfortunately, yes.
11   Q.  Okay.  Did A.D., as you viewed him that night,
12 give any indications of being a victim of child
13 molestation?
14      MR. MAYE:  Object to form.
15      THE WITNESS:  No, sir.
16 BY MR. McKAY:
17   Q.  Okay.  Now, did you stay with him the entire
18 time that his father was being detained elsewhere?
19   A.  I think I briefly, maybe for a couple of
20 minutes, walked -- because it's just, like, about a --
21 say, maybe 30-yard difference between the conference
22 room and our holding area, and I think I walked down in
23 the very beginning for maybe two minutes, and that was
24 to get, like, snacks and -- I can't remember if it was a
25 soda or juice.  But then, yes, I was in the room with

43

1  him the whole time.
2    Q.  When you did go in the vicinity of the holding
3  area, were you able to look in and see Mr. DelVecchia?
4    A.  Yes, sir.
5    Q.  And how did he appear to you?
6    A.  He appeared frustrated, probably would be the
7  best way -- he just seemed very frustrated that this was
8  occurring.  And I remember briefly speaking to him, you
9  know, the fact of what was going to happen, you know,
10 the FBI coming out and that his son was okay, that I
11 would sit with him in the room myself.
12   Q.  Okay.  So this was before the FBI had arrived?
13   A.  Yes, sir.  Yeah, we had to wait -- I want to
14 say it may have been close to an hour, but they were
15 there pretty quickly as far as --
16   Q.  Okay.
17   A.  -- being called out from home.
18   Q.  And do you remember how long they spent with
19 him after they arrived?
20   A.  I want to say it was -- it was well over --
21 maybe like an hour, like, close to an hour and a half.
22   Q.  Okay.  Now, did you know any of these FBI
23 officers?
24   A.  There is -- not by name because the -- the
25 regular -- our regular FBI officer had just transferred.

44

1  So these were pretty much -- not -- well, I want to say
2  new to me, probably not new to the area.
3    Q.  Okay.
4    A.  But they were just office -- you know, we -- I
5  can't say I knew any of them personally, no.
6    Q.  Okay.  Well, did you at any time -- either
7  while they were questioning Mr. DelVecchia or after they
8  had finished, did you have any conversation with them?
9    A.  Briefly as they were leaving because they --
10 they -- because we usually wait for a decision, which is
11 a hundred percent of the time, the FBI has never
12 arrested anyone that we've detained.  Usually it's --
13 sorry.
14   Q.  That's the echo again.  Sorry.
15   A.  Yeah.
16      Yeah, normally it's a, okay, you know, thank
17 you; we've done our report.  They're going to be
18 released.  We get -- we usually get no follow-up
19 whatsoever --
20   Q.  Okay.
21   A.  -- from -- yeah, from the FBI.  So --
22   Q.  In this particular instance, did they make any
23 kind of comments to you at all?
24   A.  Not really.  They basically just said that they
25 were going to release the -- the father and son and

45

1  that -- I believe that they were going to get with the
2  airlines.
3    Q.  Okay.  Get with the airlines for what purpose?
4    A.  I believe to --
5       MR. MAYE:  Object to form.
6       THE COURT REPORTER:  I'm sorry.  I didn't hear
7  the answer.
8       THE WITNESS:  Oh, because I stopped.  Sorry.
9    I believe -- I believe they were going to talk
10 with the airlines to complete the other part of their
11 investigation.
12 BY MR. McKAY:
13   Q.  Okay.  Do you -- did you have any knowledge of
14 what that other part was?
15   A.  Not at all.  Just being honest.  The -- our --
16 our relationship with the FBI is pretty much a one-way
17 street.
18   Q.  I -- I sympathize -- I empathize.
19   A.  Yeah.
20   Q.  I think Mr. Maye will as well.
21   A.  Yeah.
22   Q.  Okay.  So after the FBI departed, then, did you
23 have any further conversations with either
24 Mr. DelVecchia or A.D.?
25   A.  Yes, sir.  We actually were outside of our



Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

46

1 substation, and, you know, he was basically telling me
2 about -- I believe he talked -- was talking about his
3 daughter.
4        THE COURT REPORTER:  Was talking about his...
5        THE WITNESS:  Daughter.
6 BY MR. McKAY:
7    Q.  Okay.
8    A.  Yes.
9    Q.  And what did he say about his daughter?
10   A.  He was -- and if I remember correctly, he said
11 he -- his daughter had a -- was a doctor, something
12 those lines, and had graduated, was very proud of her.
13 And I believe he told me he was himself an educator,
14 something like that, and that he was doing a trip with
15 his son, you know, to kind of help, I guess, ease the
16 loss of his wife, and that -- that this -- this type of
17 thing had occurred before, and he was tired of it.  And
18 he also mentioned -- and then he said outside of the
19 station, he -- he kind of described the way he was
20 separated from his son to me.
21   Q.  What do you mean?  Can you elaborate?
22       MR. MAYE:  Object to form.
23       THE WITNESS:  Yes.
24       Well, he said that basically his son was -- had
25 a headache, if I remember correctly, and he was

47

1 comforting him, and suddenly he felt like a -- what he
2 thought was maybe a slap or punch to the back of his
3 head and that he was told he had to go to the back of
4 the aircraft and sit next to a person -- I can't
5 remember if he told me it was male or female -- and that
6 somebody else sat next to his son.
7        He never -- no one ever really told us about
8 that part prior.  Like I said, it was also an FBI case.
9 So we don't know if there were, like, U.S. Marshals or,
10 you know, like, flight marshals, as you call them, or
11 some random person on the plane.  I don't really know
12 that part of it.
13 BY MR. McKAY:
14   Q.  Okay.  And are you sure that this conversation
15 that you just relayed was that night, or could it have
16 been at a different time?
17       MR. MAYE:  Object to form.
18       THE WITNESS:  Can you -- we only spoke -- I
19 only spoke to him that night.  We've never spoken
20 afterwards.
21 BY MR. McKAY:
22   Q.  I see.  Okay.
23       You -- you believe -- as you remember things,
24 you don't -- you don't think that you spoke with
25 Mr. DelVecchia at any other time?

48

1        MR. MAYE:  Object to form.
2        THE WITNESS:  Oh.  Oh, well.  You know what?
3 I'm sorry.  I'm sorry.
4        Yes, Mr. DelVecchio did come back to our
5 station.  I'm not -- I think he was -- oh, you know
6 what?  Yes, you're right.  I'm sorry.  My bad.  He did
7 come back to the station when he was leaving the state.
8 You're right.
9 BY MR. McKAY:
10   Q.  Okay.
11   A.  Yes.
12   Q.  And why did he do that, do you know?
13   A.  He -- I believe he --
14       MR. MAYE:  Object to form.
15       THE WITNESS:  I can't absolutely say why he did
16 it, but I believe he wanted to make contact with me.
17 BY MR. McKAY:
18   Q.  Okay.  So let me go back to my question, then.
19 In terms of the subject matter that was discussed that
20 you remember, are you -- do you know whether that --
21 that discussion with Mr. DelVecchia happened on the
22 night of the flight landing or when he came back to
23 leave the state?
24   A.  I -- I remember -- I remember the night of the
25 flight him mentioning the way he was separated from his

49

1 son, and I think we kind of got back into that
2 conversation when he came back on his way out.
3   Q.  Okay.  Fair enough.
4        Do you remember talking with him about where he
5 was from when he grew up?
6   A.  Well, he said he was from -- well, no -- well,
7 actually, he -- he was initially from New York but lived
8 in North Carolina.
9   Q.  Okay.  And where are you originally from?
10   A.  Well, originally, I was born in the Caribbean,
11 in Barbados.
12   Q.  Okay.
13   A.  Grew up in the Bronx but went to school in
14 Brooklyn.
15   Q.  Okay.
16   A.  So we kind of -- yeah, and I believe -- if I
17 remember correctly, he was from Brooklyn.
18   Q.  Okay.  All right.  Did you at any time give him
19 a business card?
20   A.  Yes, I did.
21   Q.  Okay.  And why did you do that?
22   A.  Just -- just being clear, I felt that what
23 happened or the miss--- -- if you want to call it
24 misunderstanding -- I felt was wrong and -- and it seems
25 like he was always starting off on ground zero anytime

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

50

1  it happened.  So I -- so I gave him my card and
2  basically told him if he was stopped by police, you
3  know, for this type of incident, that they could call me
4  and I would just, you know -- I could be, like, his --
5  kind of say reference to say, yes, this is father and
6  son, and this has happened before.
7      Q.  Okay.  From your observation, what did you
8  conclude was -- was the reason for the event on the
9  airplane and them being separated?
10     MR. MAYE:  Object to form.
11     THE WITNESS:  Well, for me personally, I say --
12 I think it was kind of -- you might call it reverse
13 racism and overzealousism.
14 BY MR. McKAY:
15     Q.  Okay.  And when you say "reverse racism," what
16 specifically do you mean?
17     A.  I think when you have a middle-aged Caucasian
18 male with a juvenile black male, it probably sent up red
19 flags to certain people.
20     Q.  Okay.  Had they both been the same race, do you
21 think it would have sent the same red flags?
22     MR. MAYE:  Object to form.
23     THE WITNESS:  Definitely not.
24 BY MR. McKAY:
25     Q.  Okay.  And as you observed Mr. DelVecchia on

51

1  the night that the flight landed, did you see anything
2  about him that caused you to think that he looked like a
3  participant in human trafficking or a child molester?
4      MR. MAYE:  Object to form.
5      THE WITNESS:  Nothing at all.
6      MR. McKAY:  All right.  That's all I have, sir.
7  Thank you.  Mr. Maye might have some questions.
8             EXAMINATION
9  BY MR. MAYE:
10     Q.  Mr. Obasi, you've been dispatched many times to
11 meet a flight; correct?
12     A.  Yes, sir.
13     Q.  And what were some of the reasons for being
14 called to meet the flight?
15     A.  You're talking about in general or --
16     Q.  Yes.  Yes.  From your experience, the different
17 times you were dispatched to a flight, what were the
18 various reasons why you were dispatched to the -- to the
19 flight?
20     A.  I would say our number one reasoning -- and I
21 kind of have to go back prior to COVID, because with
22 COVID, it was always about the mask.  Normally we have
23 disturbances from fights on planes, arguments.  We've
24 had people touching flight attendants inappropriately.
25 Just a lot of alcohol-related calls --

52

1      Q.  Um-hum.
2      A.  -- on flights.  We've had calls where a person
3  was having a heart attack, doctors trying to give CPR,
4  and some guy decides that he has the right to YouTube it
5  from the middle of it.
6         So, you know, just if you can imagine it, it's
7  probably called on a plane.  I was there for, like,
8  three years.  Just a lot of different things.
9      Q.  And when a -- a call is -- or a request is made
10 to the Metro Police to meet the aircraft for one of
11 these -- the, you know, potential inappropriate touching
12 or assaults, what does the response look like with
13 respect to your office?  What do you do?
14     A.  We basically get the arrival time of the
15 aircraft, the gate number so we know exactly where the
16 plane is going.  We usually try to coordinate at
17 least -- if it rises to a certain level as far as, say,
18 a supervisor being on-site, supervisors don't always
19 have to go out, but it's recommended, you know, for most
20 cases.
21        Usually we try to have at least two to four
22 officers meet the plane just for, you know, separation,
23 crowd control, because that can be an issue due to the
24 fact of our call is coming in as a possible father-son,
25 we don't know the relationship, but we also don't know

53

1  if there's, like, another group of family members with
2  them.  So you have to, you know, just prepare for the --
3  for the unexpected, basically.
4         But we just -- we just meet at the plane.  Most
5  of the time it's actually to keep the peace kind of a
6  thing for us, and also, I should add, we usually try to
7  have a representative of that airline be present.
8      Q.  When there's an allegation that a potential
9  crime was committed, do you and your officers conduct an
10 investigation when you get to the flight?
11     A.  Very brief.  It's just because there's very
12 few -- and the law has changed slightly, I believe,
13 right about when I was ready to retire as far as what we
14 can actually arrest for while in flight versus, you
15 know, over other air space.  It's a whole mess of a law
16 that they've -- they're trying to streamline, but
17 normally -- normally these cases fall under the FBI
18 jurisdiction.  So our job is really just to go out and
19 do a preliminary to see if we have enough to detain for
20 the FBI to come out.
21     Q.  And part of your preliminary investigation,
22 what does that consist of, interviews of --
23     A.  Interviews of --
24     Q.  I'm sorry.  Go ahead.
25     A.  Yeah, I'm sorry.



Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

54

1     So it's usually interviews of the, you might
2  say, accuser.  So you're basically talking to the flight
3  attendants, in reality, because normally the pilot isn't
4  your best source of information because it's being
5  relayed to the pilot from the flight attendant.  So we
6  usually try to talk to the flight attendants just to
7  see, okay, what occurred, get them writing a voluntary.
8     As far as the -- the accused person, there's
9  really not -- to be honest with you, there's not a lot
10 of ta king to them unless it's something that we really
11 feel we can solve on the site, you know, where you kind
12 of let them have their say.  Because -- and that's
13 usually your misunderstanding type ones or even like the
14 mask where it's, like, oh, hey, I'm sorry, blah, blah,
15 blah.  So we kind of pull them aside, say, hey, you
16 know, what's going on?  Usually with a case that we know
17 it's going to rise to an FBI investigation, we try not
18 to actually interview the -- the accused that much
19 on-site.
20    Q.   And after you complete your interviews of
21 witnesses and sometimes the accused, you make a decision
22 whether or not to refer the case to the FBI?
23    A.   Well, no.  Well, yes.  I guess you could say
24 yes.  Because if it doesn't rise to the level of even
25 being a case, then, you know, there's no need to call

55

1  them in.  We usually just inform, you know, the airlines
2  that the -- usually the pilot is -- honestly, the pilot
3  disappears first.  They're on some different schedule.
4     So normally we try to, you know, inform the
5  airlines, hey, this is not a criminal matter.  I would
6  say 90 percent of them fell under the civil side of
7  things.  So usually the airline will decide to trespass
8  or, you know, whatever they're going to do, which is now
9  out of our control.
10    So what we do is once we are done with our part
11 and we make the decision, no, this isn't a crime, then
12 we let the airline -- usually the airport manager will
13 make that decision that, hey, what -- what do you want
14 to do with this person.
15    Q.   So after -- after you conduct your
16 investigation, then you can make the decision that, hey,
17 this person can go on their way; we don't believe a
18 crime was committed.
19    A.   Yes, sir.
20    Q.   Okay.
21    A.   Sorry.  My camera's falling down.
22    Q.   And the -- the airline doesn't make the
23 decision to send the case to the FBI; correct?
24    A.   No, they do not.  No.
25    Q.   And the officers on the scene can make the

56

1  decision that, hey, there's no need to investigate this
2  incident any further; correct?
3     A.   Yes, sir.
4     Q.   And in this case, you and your officers
5  interviewed the flight attendants and Mr. DelVecchia and
6  A.D.; correct?
7     A.   No.  No.  No -- because we -- we're not allowed
8  to interview the minor without, like, an expert or
9  officer trained in that.  And even the -- sorry -- even
10 the interviewer of the adult father, that's -- you know,
11 they're not really asking him, like, incriminating
12 questions.  Like I said, we -- our part is just to
13 basically detain and wait.
14    Q.   So in this case, you did not interview --
15 interview A.D. about the allegations; is that fair?
16    A.   Yes.  Yes.
17    Q.   And you interviewed flight attendants and the
18 pilots?
19    A.   I believe my officers did briefly enough to,
20 you know, ascertain, you know, what was -- what they
21 perceived to be going on.
22    Q.   And did you or your officers speak with
23 Mr. DelVecchia about the allegations?
24    A.   I did not personally prior to the FBI coming.
25 I don't remember any of my officers doing it.  I know

57

1  Mr. DelVecchio was actually talking because I could kind
2  of hear down the hallway.  I think he was just kind of
3  expressing himself.  I wouldn't call it an interview per
4  se.
5     Q.   Talking about what?
6     A.   Talking about what occurred on the plane and
7  his frustration with it.
8     Q.   So you interviewed the various crew members,
9  and you had discussions with Mr. DelVecchia or someone
10 that was under your supervision, and a decision was made
11 to refer the case to the FBI; correct?
12        MR. McKAY:  Objection to the form.
13        THE WITNESS:  Yeah -- well, not so much -- yes,
14 you could say, yes, referred, because it's not in our
15 jurisdiction anyway.
16 BY MR. MAYE:
17    Q.   What I'm saying is you decided that there was
18 sufficient information to warrant the FBI investigating;
19 correct?
20        MR. McKAY:  Objection to the form.
21        THE WITNESS:  Yes, sir.
22 BY MR. MAYE:
23    Q.   Okay.  Okay.  And you could have after
24 interviewing everyone said, "You know what?  This is all
25 a big misunderstanding.  Mr. DelVecchia, you and your



58

1 son can keep on going. Go on your way. Have your --
2 you know, continue with your trip."
3        MR. McKAY: Objection to the form.
4        THE WITNESS: Yes, I could, with a lot of
5 backlash.
6 BY MR. MAYE:
7    Q.   Okay. I'm going to show you what I guess is --
8 is this Exhibit 4, I believe?
9        MR. McKAY: Yeah, I have up to 3.
10       THE WITNESS: Way too small for me to read, but
11 it's fine.
12       MR. MAYE: Okay. I'll blow it up.
13       So I'm showing the witness -- I think it's
14 Exhibit 4. I'm showing the witness what has been marked
15 as Exhibit 4, which I represent is the Las Vegas Metro
16 Police Department call log for what was then called
17 McCarran Airport.
18       THE WITNESS: Um-hum.
19       (Exhibit 4 was identified for the
20       record.)
21       MR. McKAY: Objection. Brian, this has not
22 been produced in discovery.
23       MR. MAYE: Yes, it has.
24       MR. McKAY: I have not seen this.
25       MR. MAYE: It's been produced.

59

1        MR. McKAY: Well, I object to its use in this
2 deposition because I have not seen it. And if it was
3 produced, it would have come to me.
4        MR. MAYE: Okay.
5 BY MR. MAYE:
6    Q.   This is the call log for the Las Vegas Metro
7 Police Department at McCarran for March 28, 2019.
8        MR. McKAY: Objection. No foundation.
9 Objection. Motion to strike.
10       MR. MAYE: Okay.
11 BY MR. MAYE:
12   Q.   Mr. Obasi, does this document look familiar to
13 you?
14   A.   It looks like one of our printed call logs from
15 dispatch or from our CAD system, I should say.
16   Q.   Okay. And there's this "LOC McCarran Airport."
17       What is that?
18   A.   I'm sorry?
19   Q.   What does this -- it says "LOC McCarran
20 Airport."
21       What does that indicate?
22   A.   Oh, "LOC" would just be location.
23   Q.   And McCarran Airport is?
24   A.   Where we were operating.
25   Q.   Okay. And this -- this is a call log for your

60

1 substation at McCarran?
2    A.   Yes, sir. Well, it would be a call log for all
3 the officers that had been assigned to the call.
4    Q.   Okay. Right here where I've highlighted, it
5 says "NINT [sic] 21:13:55."
6        What does that indicate?
7    A.   I have no clue. Is it N-I- -- is it, like,
8 initiate? Initiated maybe?
9    Q.   Please don't speculate.
10   A.   Yeah, I don't -- I don't -- just so you know,
11 sir, these are dispatch center terms from McCarran
12 dispatch.
13   Q.   Okay.
14   A.   So these aren't -- these aren't abbreviations
15 that we would use in the field.
16   Q.   Okay. Let me show you this.
17       I'm highlighting -- well, do you see where I'm
18 highlighted? It says "21:13:55 DPTCH," and then the
19 next column, "LV/3Q70 Bravo," and then parentheses,
20 "(Officers: LV/Tripp Blane)."
21       MR. McKAY: And I still have an objection based
22 on lack of foundation based on not produced in
23 discovery, based on improper questioning of this
24 document, and I move to strike.
25       MR. MAYE: Okay. Okay. Can you and I have

61

1 this --
2        MR. McKAY: Can I have a continuing objection
3 on that by agreement, Mr. Maye?
4        MR. MAYE: Yes, please. Thank you.
5        MR. McKAY: Thank you.
6 BY MR. MAYE:
7    Q.   Mr. Obasi, this 21:13:55, do you know what that
8 indicates?
9    A.   I believe that's a time. Usually that's a
10 time, but --
11   Q.   So would there be -- would that be 9:13 p.m.
12 and 55 seconds?
13   A.   Yes. Yes, in civilian time, yes.
14   Q.   Okay. And it says, "Dispatch" -- I'm sorry.
15 It says, "DPTCH."
16       Do you know what that means?
17   A.   That's dispatch.
18   Q.   Okay. And then what does that mean, dispatch
19 of who, of what? What does that mean?
20   A.   It means dispatch of whatever unit is on the
21 end of that line. It means that the -- now, there is a
22 time -- there would be a slight time delay here because
23 our -- because we're being dispatched by airport control
24 who then calls it into Metro control. Yeah, it's kind
25 of a -- yeah. But -- yeah -- but the -- whoever --

Francois Obasi                                     Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

---

62

1  whoever was being dispatched on this line, their call
2  sign would be at the end, and we're all -- they're all
3  queen units or Q.
4      Q.   Right.  So you're referring to the LV-3Q70B?
5      A.   Yes.
6      Q.   And does that name, Blane Tripp, sound familiar
7  to you?
8      A.   Yes, it does.
9      Q.   And who is Officer Blane Tripp?
10     A.   One of the officers assigned to my squad.
11     Q.   And did Officer Tripp -- was he one of the
12 officers that was present at the gate when the flight
13 arrived?
14     A.   Yes, sir.
15     Q.   And how long have you worked with Officer
16 Tripp?
17     A.   Well, I was his supervisor for about three
18 years at the airport, but I've actually known -- we've
19 worked together before I promoted.  I would say in total
20 about 18 years.
21     Q.   And is Officer Tripp a good officer?
22     A.   Yes, he is.  Excellent officer.
23     Q.   And according to this record, were there other
24 officers dispatched to the flight?
25     A.   I actually --

---

63

1          MR. McKAY:  Objection.  Form.
2          THE WITNESS:  I actually cannot read this.
3  It's actually very small on my screen.
4  BY MR. MAYE:
5      Q.   Oh, sorry.
6      A.   If there's other -- if there's other units
7  assigned -- I can see, yeah, there's 3 Queen 91 -- looks
8  like a few people were out there.  79, 91, 55, yeah.  So
9  anyone -- anything that says -- anything in that bracket
10 means that they were assigned.
11     Q.   So Officer Martin Wright was dispatched to the
12 flight?
13     A.   Yes.  I'm not sure if Officer Wright made it to
14 the plane, because I did have some extra officers kind
15 of come to the station, you know, because, we thought
16 we'd be there a while.  So some -- not everyone that's
17 assigned to the -- to this call made it to the plane.
18     Q.   Do you recall if Officer Anthony White made it
19 to the plane?
20     A.   Yes, Officer White did.  He's actually now
21 retired, but --
22     Q.   And how about Officer Greg Leavitt?
23     A.   I honestly do not recall if Officer Leavitt,
24 who is also retired, made it out to the flight.
25     Q.   And does it show that these officers were all

---

64

1  dispatched at 2114?
2      A.   Yes.
3      Q.   And when it indicates they were dispatched,
4  does that mean that they were requested to go somewhere?
5      A.   It just means that they're requested to aid
6  with the call.  As far as where -- where they go, that's
7  something that we coordinate as far as, like, do I need
8  you at the plane, do I need you to bring a car onto the
9  tarmac to help us transport, you know, or do I need you
10 to be at the station when we arrive?  It's kind of a
11 coordinated effort.
12     Q.   Okay.  And do you recall if Officer Tripp made
13 it to the gate?
14     A.   Yes, I believe Officer Tripp and Officer White
15 were actually with me.
16     Q.   Okay.  And down farther below, it says --
17     A.   So I'm squinting trying to read it.
18     Q.   Can you see that where I've highlighted it in
19 blue, "23:14 Dispatch," and then "Officer Bradley" --
20     A.   Berghuis.
21     Q.   -- "Berghuis."
22     A.   Yeah.
23     Q.   Do you see that?
24     A.   Yes.
25     Q.   Do you recall if Officer Berghuis was at the

---

65

1  gate?
2      A.   He may have been.  I don't recall because
3  some -- well, some of the -- like, Officer Berghuis is
4  actually a Terminal 1 officer.  So some of them may have
5  met us out there and then kind of, you know, departed
6  because it's not going back to Terminal 1.
7          And, also, I believe he's -- because I believe
8  the call went into when our -- because we were what we
9  call swing shift.  So the call kind of went into when
10 our graveyard units came on.  So some of the people
11 you're seeing assigned are actually graveyard units and
12 would not have been there initially.
13     Q.   Was Officer Berghuis a graveyard --
14     A.   Yes --
15     Q.   -- unit?
16     A.   -- if I remember correctly -- and I think he's
17 retired as well.  Sorry.  But the airport is kind of a
18 retirement gig.  But I believe Officer Berghuis was a
19 graveyard officer.
20     Q.   Were you also a graveyard officer?
21     A.   No, sir.  I was the swing shift supervisor.
22     Q.   Why does Officer Berghuis, who was a graveyard
23 officer -- why was he dispatched at 11:14 and you were
24 also dispatched at 11:14?
25          Do you see that?

---



Francois Obasi

Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

66

1    A.  I think that's just the way that -- I'm not
2 sure what -- why -- why that would happen.  And
3 sometimes, like I said, this is just them clicking a
4 button.  I can't tell you what they are doing because I
5 believe I was already on the call, you know.  So I don't
6 know why that would -- I don't -- I have no clue.
7    Q.  Are you certain that you were at the gate?
8    A.  What?
9    Q.  Are you certain that you were at the gate --
10    A.  Yes, sir.
11    Q.  -- with the other officers?
12    A.  Yes, sir.
13    Q.  Okay.  And who -- who inputs the information
14 about the timing of the dispatch to the various officers
15 or various personnel?
16    A.  Okay.  So like I was trying to explain earlier,
17 airport control center is not a police dispatch center
18 per se; so they don't have the same technology.  So what
19 happens is they will actually tell us about the call,
20 and then they call our regular police dispatch to
21 retrieve an event number.  So if they don't tell Metro
22 dispatch that we are on the call, Metro dispatch doesn't
23 know.
24        It's probably as clear as mud at this point.
25 So what happens is sometimes we can actually have an

67

1 officer be on a call and was dispatched by airport
2 control but Metro dispatch doesn't know; so it won't
3 show up in the log properly.
4        Does that make sense?
5    Q.  Okay.  So you said that from your recollection
6 it was you, Officer Tripp, and Officer White who met the
7 aircraft.
8    A.  Yeah.  Yes, sir.  Yes, sir.
9    Q.  Okay.  And who conducted the -- withdrawn.
10        Did you, Officer Tripp, or -- and/or Officer
11 White interview anyone at the gate?
12    A.  I remember -- you mean as far as the -- the
13 workers of Frontier?
14    Q.  Yeah, anyone.  Any wit- -- passengers, any crew
15 members.
16    A.  Honestly, I remember the officers speaking with
17 crew members, and I remember the -- because while I was
18 speaking with the pilot is when the attendants were kind
19 of also talking and getting into the conversation, but
20 it wasn't -- I would not call that an interview.  It was
21 more of a, like, what's going on, you might say, with
22 the pilot.
23    Q.  And you said that you were speaking to the
24 pilot about what was going on.
25    A.  Yes, sir.

68

1    Q.  And you said the pilot never gave you any
2 details about what was alleged to have happened; right?
3    A.  Not -- not in depth.  He just said that his --
4 he may have went over it briefly, but he was -- he was
5 definitely trying to -- or he made it clear to me that
6 the reason why he called is because his crew alerted
7 him.
8    Q.  About something.
9    A.  Yes, about the -- yeah.  About something --
10 about something that was enough for him to make that
11 call, you might say.
12    Q.  But he didn't explain what that was to you.
13    A.  No, he -- no, he didn't, no.
14    Q.  And did Officer Tripp interview any of the --
15 any of the flight attendants or passengers?
16    A.  I -- I believe Officer Tripp spoke with the
17 attendants.  Like I say, I can't honestly at this point
18 tell you exactly what Officer Tripp did or any of the
19 other officers, like, who they exactly spoke with.
20    Q.  Okay.  So -- so you don't know whether or not
21 Officer Tripp interviewed any of the flight attendants.
22    A.  I do not.  That would be an assumption on my
23 part.
24    Q.  And you don't know whether or not Officer White
25 interviewed any of the flight attendants?

69

1    A.  No, I -- I cannot, like I said, give a definite
2 yes on that.
3    Q.  And you do not know whether any of the officers
4 interviewed any of the passengers.
5    A.  I don't believe we had any passenger witnesses
6 that stuck around.
7        MR. McKAY:  Mr. Maye, do we need this document
8 displayed?
9        MR. MAYE:  No.
10        THE WITNESS:  You make him squint.  I'm sorry.
11        MR. MAYE:  Yeah, let me --
12        MR. McKAY:  I'd just like to see the witness.
13        MR. MAYE:  That's fine.
14        MR. McKAY:  Thank you.
15        MR. MAYE:  Sure.
16 BY MR. MAYE:
17    Q.  You never interviewed any of the flight
18 attendants; correct?
19    A.  Not a formal interview.
20    Q.  Did you interview or speak with Mr. DelVecchia
21 or A.D. about what had occurred?
22    A.  You're talking about at the flight?
23    Q.  Yes.  At the gate.
24    A.  No, I did not.
25    Q.  Did you -- okay.  At any point, did you have a



Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

---

70

1 conversation with Mr. DelVecchia or A.D. about what had
2 transpired on the aircraft?
3    A.   Yes, sir.
4    Q.   And what did Mr. DelVecchia tell you?
5    A.   Mr. DelVecchio basically stated that his son --
6 but he said he was having a headache, was uncomfortable,
7 and that he was comforting him.  And I think he
8 mentioned something about a -- like, a blanket, maybe
9 putting a blanket down first, something like that, and
10 that suddenly he was -- he felt he was struck, he was
11 told to go to -- to the back, and he was sitting with a
12 stranger for the remainder of the flight while someone
13 else sat with his son.
14    Q.   So he told you that he was rubbing his son's
15 head --
16    A.   Yes.
17    Q.   -- and that at that point -- that at that point
18 someone hit him in the head?
19    A.   Yeah.  Well, he -- I remember him saying he was
20 confronted by somebody.  Like I said, that part of it I
21 can't remember, but he said, yes, his son had put his
22 head into his lap where, like, the -- like, blanket was
23 and that he was, like, rubbing his face, like,
24 comforting him, you know, for basically having a
25 headache, being uncomfortable with the flight, and

---

71

1 that's when everything started.
2    Q.   Okay.  And then at that point he said that
3 someone hit him?
4    A.   Yes, he said -- he said somebody hit him and --
5 and told him to go to the back.
6    Q.   Told Mr. DelVecchia to go to the back?
7    A.   Yes, sir.
8    Q.   And where did -- and where in back did he go?
9    A.   He didn't give me a specific seat number.  He
10 just said that -- that he was guided towards the back,
11 and he sat next to a male stranger who kind of
12 inferred he thought was somebody official.
13    Q.   And -- okay.  And how long did he tell you he
14 sat in that seat in the back of the airplane, if you
15 know?
16    A.   From the time it happened till basically the
17 time the aircraft landed.
18    Q.   And where was A.D. at this time?
19    A.   A.D. was still in his -- or -- well, original
20 seat or area.  He didn't move the -- the -- A.D.
21    Q.   And did he tell you anything else about what
22 happened on the plane?
23    A.   No, just the fact he -- it was embarrassing.  I
24 remember him saying it was embarrassing.
25    Q.   Did he tell you who hit him?

---

72

1    A.   No, he did not, actually.  I don't remember
2 ever getting a description of -- I'm not sure he knew
3 who did it, to be honest with you.
4    Q.   And if you had learned information about a
5 passenger being battered in the head, is that something
6 that you would investigate?
7    A.   Yes, but we did not -- but this is information
8 that I actually found out after the FBI, you know, had
9 done their thing.  It was not brought up to us -- like,
10 we didn't know about it initially.  Actually, the -- no
11 one -- I kind of assumed after everything came out that
12 maybe they were air marshals onboard by the action, but
13 we weren't told about the presence of any law
14 enforcement on the flight.
15    Q.   Is it possible that -- withdrawn.
16       It was unclear to me when Mr. DelVecchia told
17 you about the slap or punch.  Was it the day of that
18 flight or when it -- he returned for his return flight?
19    A.   That's -- to be honest with you, sir, that's
20 the part -- so the day when he left -- when he left
21 after the FBI had released him -- well, we released him
22 because he was in our station, I remember having a brief
23 conversation, and I'm -- I'm honestly trying to recall
24 if he -- he explained it to me that day or the day when
25 he came back.  I'm -- and honestly I can't -- I'm

---

73

1 trying -- having a hard time differentiating that --
2 that bit of information.
3    Q.   Okay.  And do you recall if he said that he was
4 slapped or punched?
5    A.   I remember him saying punched.
6    Q.   You testified earlier that -- that -- slap or
7 punch.
8    A.   Yeah, and that's -- that's probably just me
9 talking.  But in kind of replaying what he was saying,
10 he felt like it was a punch.  Like, me, I got super
11 large hands.  So, you know, it could have been either
12 one.  But he felt basically he was hit in the back of
13 the head.
14    Q.   When you were on the scene -- you and Officer
15 Tripp and Officer White on the scene at the gate, were
16 you made aware that Mr. DelVecchia and A.D. were father
17 and son?
18    A.   No.  Actually -- actually, the attendant made a
19 statement that said, "I'm not sure they're related."  I
20 remember that statement and I --
21    Q.   Did you --
22    A.   I'm sorry.  Go ahead.
23    Q.   Did you ever ask Mr. DelVecchia if they were
24 related?
25    A.   Yes.

---

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

74

1    Q.  And when did you ask him that?
2    A.  I remember when we got back to the station, I
3  remember asking, you know, just that simple question
4  because I didn't feel that was any -- in any form
5  incriminating, you might say, as far as their
6  relationship.  And I remember he said, and it was
7  corroborated by his son, that it was an adoptive
8  situation.
9    Q.  In terms of their relationship, father and son,
10  does that have any bearing on whether an allegation of
11  misconduct is credible or not?
12    A.  I would say yes, sir.  Yes.
13    Q.  And how -- what is the significance to you in
14  terms of whether or not an allegation is credible?
15    A.  Well, for me personally, if a complete stranger
16  is caressing the face of an 11-, 12-year-old boy, not
17  even on an aircraft, anywhere, regardless of, you know,
18  race, whatever, that's -- that's not normal.  Being a
19  father of two, if I'm caressing my daughter's face
20  because she's uncomfortable, then that's, you know,
21  absolutely normal.  That's not outside of the norm.  But
22  I could see if it was a complete stranger where that
23  would set off red flags.  That's what I'll say about the
24  relationship.
25    Q.  In your long experience in law enforcement,

75

1  have you seen cases in which crimes were committed by a
2  family member against another familiar member?
3    A.  Oh, yeah, well, actually --
4        MR. McKAY:  Objection to the form.
5        THE WITNESS:  Yeah.  Yeah, that's --
6  BY MR. MAYE:
7    Q.  Okay.
8    A.  Yeah.
9    Q.  Okay.  And the fact that they were father and
10  son, is that information that would make an
11  investigation unnecessary?
12    A.  No.  No.  But depends on the action.  If you
13  know --
14    Q.  Yes.  So if an allegation was made that a
15  father had inappropriately touched his child, if you
16  learned they were father and son, would you then not
17  investigate?
18    A.  Oh, no, that would be an inves-- -- definitely
19  an investigation for inappropriate touching.
20    Q.  Okay.
21    A.  Yes.
22    Q.  So merely learning that they were father and
23  son didn't warrant your letting them go.
24    A.  No.  No, sir.  No.
25    Q.  Okay.  So ultimately you made the decision to

76

1  turn the case over to the FBI for further investigation.
2  Do you believe that was the prop- --
3        MR. McKAY:  Objection to form.
4  BY MR. MAYE:
5    Q.  Do you believe that was the right decision?
6    A.  Yes, sir.  Actually, it was the only decision.
7    Q.  It was the only decision based on what you knew
8  about the allegations; correct?
9        MR. McKAY:  Objection to the form.
10        THE WITNESS:  Well, the fact that the
11  allegation was made and I was not present during the
12  action.  So the allegation was made.  The only option I
13  have, because it's not my jurisdiction, is to not be
14  negligent and turn this case over to the FBI.
15  BY MR. MAYE:
16    Q.  Well, you earlier said that there are times
17  when allegations are made, you conduct a preliminary
18  investigation, and you determine, hey, there's no basis
19  for this, we can let them go; correct?
20    A.  Yes, sir, but that's usually not a crime that
21  falls -- we're talking, like, maybe, like, face masks or
22  like a he-said/she-said shoving match where both parties
23  do not want to proceed type.  You know, something
24  that's -- that's usually a misdemeanor not occurring in
25  our presence type thing.  Nothing -- nothing felonious,

77

1  nothing that could rise to that level.
2    Q.  So the fact that this was father and son, that
3  didn't warrant your not giving the case to the FBI;
4  correct?
5        MR. McKAY:  Objection to the form.
6        THE WITNESS:  No, sir.
7  BY MR. MAYE:
8    Q.  Okay.  And you mentioned earlier that
9  Mr. DelVecchia told you that A.D.'s head was on his lap
10  and he was rubbing his head, and then he was -- he was
11  struck.
12        Did they -- did Mr. DelVecchia tell you
13  anything else about what happened on the aircraft?
14        MR. McKAY:  Objection to the form.
15        THE WITNESS:  That was it, pretty much, that he
16  was just separated from his son for the rest of the
17  flight.
18  BY MR. MAYE:
19    Q.  You said that you learned from A.D. that this
20  had happened before.
21    A.  Yes, sir.
22    Q.  Did A.D. go into detail about what had happened
23  before?
24    A.  No, he did not.  No, he did not.  Actually, I
25  believe I kind of -- kind of steered him away from --



Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

78

1 from that, from that part of the conversation not
2 wanting to, you know, interfere with the FBI's interview
3 when they got there.
4    Q.   Did he mention that it was suspected that there
5 was inappropriate touching on the flight?
6    A.   That kind of rings a bell that he said -- he
7 said -- I know he said it happened before on a flight.
8 Not so much about touching.  He didn't go into why.
9    Q.   If a child passenger revealed to you that his
10 father had been suspected of inappropriately touching
11 him on a previous occasion and on the current occasion
12 it was the same situation, would -- would that raise
13 concern in your mind that the current allegation is
14 something that should be investigated?
15       MR. McKAY:  Objection to the form and
16 argumentative.
17       THE WITNESS:  I think that -- I think that
18 leaves a lot to be -- you know, I mean -- because I
19 would have to know the true circumstances of the first
20 allegation.
21 BY MR. MAYE:
22    Q.   Um-hum.
23    A.   Not just -- not just a broad allegation.  But
24 definitely, you know, those are red flags.
25    Q.   When you worked for the Las Vegas Metro Police

79

1 Department, did they have a policy of if you see
2 something, say something?
3    A.   Yes, sir.  Mostly that's geared towards
4 terrorism, but recently it's kind of been broadened.
5    Q.   And what does that mean to you?
6    A.   "See Something, Say Something" basically means
7 that when you see something suspicious, you should speak
8 up and alert someone.
9    Q.   Alert law enforcement?
10    A.   Yes, alert law enforcement, or if they're, you
11 know, in a hospital, alert, you know, health care,
12 somebody in authority that can, you know, get some kind
13 of help.
14    Q.   And you believe that if an adult sees another
15 adult inappropriately touching a child, do you believe
16 that that adult should notify law enforcement?
17       THE WITNESS:  Yes --
18       MR. McKAY:  Objection.  Argumentative.  Calls
19 for speculation.  Objection to the form of the question.
20       THE WITNESS:  Yes, sir.
21 BY MR. MAYE:
22    Q.   Okay.  Essentially, you know, it's better to be
23 safe than sorry; right?
24       MR. McKAY:  Objection.  Argumentative.
25       THE WITNESS:  Yes, sir.

80

1 BY MR. MAYE:
2    Q.   Do you agree that it's better to be wrong and
3 inconvenience someone than to potentially turn a blind
4 eye toward something that could be bad?
5       MR. McKAY:  Objection.  Argumentative.
6 Objection to the form.
7       THE WITNESS:  Yes, sir.
8 BY MR. MAYE:
9    Q.   Two flight attendants testified that they
10 observed Mr. DelVecchia inappropriately touching A.D.
11 and they notified the captain?
12       MR. McKAY:  Objection.
13 BY MR. MAYE:
14    Q.   Based on your professional experience, do you
15 believe it was appropriate for the captain to contact
16 law enforcement?
17       MR. McKAY:  Improper question.  Objection to
18 the form.  Argumentative.
19       THE WITNESS:  I would say based on -- on what
20 was told to the captain, it was proper for him to inform
21 us.
22 BY MR. MAYE:
23    Q.   Okay.  You testified that you conducted an
24 Internet search of A.D.  When did you do that?
25    A.   Probably about five minutes to ten minutes

81

1 after I received the dispatch.  And I called -- I
2 believe I called the airport control center and --
3 because I was, like, well, what are their names?  And --
4 because the dispatcher had -- had actually said -- I
5 remember now -- said something about -- because I asked
6 her what's the relation?  And she says, "Well, I think
7 it's father and son," and she gave me the names.  But
8 the combination of the minor's first name with the last
9 name, I immediately said, oh, this is -- it's an African
10 first name.  So that's why it kind of -- it kind of set
11 off that investigative bell in my head.
12    Q.   You testified earlier that when you came to the
13 gate, you heard some people mumbling about what had
14 happened.
15    A.   Yeah, it was just passengers.  We get that a
16 lot.  People walking by and leaving will, you know --
17 they -- everybody has, you know, like, oh, that was
18 wrong.  Oh, my god, this just happened, you know, blah,
19 blah, blah.  So we kind of heard, like -- like,
20 grumblings because you have, you know, a plane of a
21 hundred-and-something people basically disembarking, and
22 everybody's kind of glad it's not them that we're
23 waiting for.
24       So I remember one lady -- and I can't really
25 describe her that well -- saying, "Oh, that was wrong,"

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

82

1 you know, kind of stuff like that.  Other people, like,
2 "Man, you know, what's going on?"  Some people seemed a
3 little confused.
4     Q.   Right.  I was going to ask you about that.  You
5 said that some woman said, "That was wrong."
6         Do you know what she was referring to?
7     A.   Well, I assume she was referring to the father
8 and son situation or the, you know, the accused
9 situation.
10     Q.   Meaning what he did was wrong?
11     A.   No, I -- no, she -- she pointed -- she kind of
12 referenced towards the crew.  So I took that to mean she
13 felt like what the airlines had done was wrong.
14     Q.   What did -- what did this woman look like?
15     A.   She -- I remember her being, like, a white,
16 kind of middle-aged female kind of -- I remember dark
17 brown hair.  Don't ask me to describe her face outside
18 of that.  I wasn't -- like I said, she was, you know,
19 somewhat nondescript, and we were kind of concentrating
20 on, you know, disembarking these folks and -- again,
21 because it -- it wasn't like a -- in some cases we kind
22 of have to hold everybody on the flight, but in a case
23 like this where it's just, like, the -- you know,
24 airline stewardesses, father and son or adult/minor, we
25 don't really need -- you know, there was no actual

83

1 civilian witness to it, if you know what I'm saying.
2     Q.   Right.
3     A.   So we didn't need to hold anybody else.
4     Q.   Where were you standing when you heard her say
5 this?
6     A.   I was standing actually in the -- kind of like
7 the -- the jetway has, like, a little push-out part
8 that's for if you want to go down the staircase.  So we
9 kind of stand -- I was standing in that part so people
10 could still disembark without obstruction.
11     Q.   And was she walking with anyone?
12     A.   I can't -- I honestly couldn't tell you if
13 anybody around her was connected to her, sir.
14     Q.   Was she walking from the aircraft to the
15 terminal?
16     A.   Well, she was -- she was leaving the aircraft
17 into the jetway.
18     Q.   Okay.  So she was -- she was -- but she was --
19 she was exiting the aircraft and walking up towards --
20     A.   Yeah, it's --
21     Q.   -- the terminal?
22     A.   It's a one-way trip, yeah.  She --
23     Q.   Right.
24     A.   You have to basically get off the plane, get
25 through the jetway into the terminal.

84

1     Q.   And she wasn't looking back at all?
2     A.   As far as -- what do you mean when you say
3 "looking back"?
4     Q.   Well, where --
5     A.   You mean at someone else?
6     Q.   Where -- where was she facing?  Where was she
7 facing?
8     A.   Initially, when she came off the -- the -- that
9 gap between the door and the jetway --
10     Q.   Uh-huh.
11     A.   -- she was kind of, like, you know, saying what
12 she was saying, and she kind of glanced over at the --
13 because they were -- the flight attendants were
14 standing, you know, where they stand kind of in the
15 doorway as people are leaving, and she looked at them
16 when she made the statement, which is why, you know,
17 like, an inference like, you know, you did wrong kind of
18 a thing.
19     Q.   So she was on the aircraft when she made the
20 statement?
21     A.   I would say leaving.  It's that gap, you know,
22 the --
23     Q.   So --
24     A.   -- like about to step off the aircraft onto the
25 jetway, that kind of uncomfortable first step.

85

1     Q.   Okay.  So she was -- she was stepping off the
2 aircraft.
3     A.   Right.  Right.  Right.
4     Q.   Okay.  And she was facing you?
5     A.   I want to say -- well, I guess you could say
6 facing because I'm looking into the aircraft.
7     Q.   Right, and she's stepping off the aircraft.
8     A.   She's stepping off the aircraft, she kind of
9 glances over, and then she just keeps walking.  But it
10 was, like -- like a row of -- you know, people were just
11 floating off the aircraft.  Just ready, you know how it
12 is.  When the plane lands, everybody's up; everybody
13 wants to go.
14     Q.   So were there people in front of her when she
15 stepped off the aircraft?
16     A.   Yes.  There were people in front of her, people
17 behind her, yes.
18     Q.   And when she was stepping off the aircraft,
19 this is when she made this comment, "That was wrong"?
20     A.   Yes, sir.
21     Q.   And how do you know what she was talking about?
22     A.   Well, being that this was the only thing
23 happening on that aircraft, that was the inference, in
24 honesty.
25     Q.   So your reason --



Francois Obasi                                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

---

86

1   A.   Yeah.
2   Q.   So you're spec- -- you're speculating what she
3   was referring to.
4         MR. McKAY:  Objection to the form.
5         THE WITNESS:  You can -- yes, that's -- yeah.
6   BY MR. MAYE:
7   Q.   Okay.
8         You earlier testified that you saw a flight
9   attendant standing with a male flight attendant, a
10  female flight attendant standing with a male flight
11  attendant.
12        When was that?
13   A.   Well, that was when they opened -- when they
14  opened the door.  And it's quite normal.  They'll
15  usually -- you know, you'll kind of have, like -- like,
16  flight attendants standing together kind of telling
17  people good-bye or, you know, have a safe continuing
18  trip, whatever.  So just -- I remember there was a -- a
19  male and a female and then another female.  If I'm
20  looking at the flight, it's, like, male, female, then
21  another female.  I could see three attendants.
22   Q.   And they were on the aircraft.
23   A.   Yeah, they were still on the aircraft.
24   Q.   And you were on the jet bridge.
25   A.   And I'm on the -- yeah, on the jet bridge right

---

87

1   in the mouth of the airplane.
2   Q.   And there were passengers walking past them and
3   then exiting the aircraft?
4   A.   Well, we kind of -- well, both.  So initially
5   we let people, you know, kind of exit, exit, exit.  And
6   then once that's kind of finished, then we kind of move
7   in a little bit closer to have -- because you -- you
8   really can't start that conversation.  Unless -- unless
9   there's something physical going on like a fight where
10  we have to actually get --
11   Q.   Um-hum.
12   A.   -- on the plane, we kind of wait for the
13  disembarkment, you know.  And -- and let's say the --
14  the accused party isn't -- you know, is coming off among
15  that crew, we usually will ask the flight attendant to
16  say, "Hey, can you point out, you know, who we're here
17  for?" you know, kind of a thing, if that makes sense.
18   Q.   Were Officers Tripp and White standing with you
19  on the jet bridge while the passengers were deplaning?
20   A.   Yes, sir.
21   Q.   And after the passengers deplaned, did -- where
22  did you, Officer White, and Officer Tripp go?
23   A.   I -- I stayed pretty much on the jet bridge.  I
24  don't ever remember going onto the aircraft.  I believe
25  Officer Tripp -- it's been a while -- and White took

---

88

1   custody of the adult, Mr. DelVecchio, and he was then
2   transferred to an awaiting transport car which was on
3   the tarmac, if I remember correctly.
4   Q.   When did Mr. DelVecchia exit the aircraft
5   relative to the other passengers?  Did he --
6   A.   After.
7   Q.   Did he --
8   A.   After.
9   Q.   Go ahead.
10   A.   After.  After they disembarked.
11   Q.   So all the -- all the passengers exited the
12  aircraft, and then Mr. DelVecchia exited, and then
13  Mr. -- Officer White and Tripp took him into custody?
14   A.   Yes, sir.
15   Q.   And where was A.D. at the time Mr. DelVecchia
16  was taken into custody?
17   A.   I believe he -- they had him maybe, like, a
18  couple of seconds behind that, they brought him up.
19   Q.   And who brought him up?
20   A.   A flight -- I'm assuming a flight attendant,
21  because I couldn't see inside of the craft.  So by the
22  time he came up, you know, there were multiple people
23  standing from -- from here in the aircraft.  So I
24  couldn't tell you which one in specific brought him up
25  to that area.

---

89

1   Q.   So when A.D. was toward the front of the
2   aircraft, you were still on the jet bridge; right?
3   A.   Yes.  Yes.  I never actually entered the
4   aircraft.
5   Q.   Okay.  And Officer White and Officer Tripp had
6   taken Mr. DelVecchia into custody?
7   A.   Yes, sir.
8   Q.   So they never had any contact with the flight
9   attendants?
10   A.   I remember them speaking with the flight
11  attendants and giving -- what do you call -- voluntary
12  statements for them, but I -- I don't -- I don't believe
13  I was there for that part of their interview.
14   Q.   Well, I thought you said that after the
15  passengers deplaned, then Mr. DelVecchia deplaned and
16  Officer White and Officer Tripp took Mr. DelVecchia into
17  custody; right?
18   A.   Right.  And took -- and took him to a transport
19  car --
20   Q.   Okay.
21   A.   -- which is waiting right down.  So once he's
22  given -- which would have been probably Officer White,
23  because he was our driver.  So once he's detained in
24  that car, then they can come back, you know, and
25  continue what they're doing.

---

Francois Obasi                                Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

90

1    Q.   Did they come back?
2    A.   Well, yes, they would have had to, yes.
3    Q.   Well, but do you recall whether or not they
4    came back?
5    A.   We got the voluntary statements.  So I'm going
6    to -- yeah, I would -- I would say yes.
7    Q.   Well, I'm asking if you recall if they came
8    back, not -- not any assumptions.  Do you recall either
9    of them coming back?
10   A.   I can't specifically tell you their -- their
11   motions that day.
12   Q.   Okay.  And so -- and you don't recall who gave
13   them the blank voluntary statement forms.
14       MR. McKAY:  Objection to the form.  Asked and
15   answered.
16   BY MR. MAYE:
17   Q.   Who gave the flight attendants -- who gave the
18   flight attendants the voluntary statement forms?
19   A.   No, I can't tell you which officer specifically
20   gave them to them.
21   Q.   Is it possible you gave them the forms?
22   A.   I would -- I would say that's impossible.
23   Q.   That's impossible or possible?
24   A.   Impossible.
25   A.   Impossible.

91

1        And why is that?
2    A.   Yeah, I don't -- as a supervisor, I don't carry
3    forms.
4    Q.   Okay.
5    A.   Yeah, so it is impossible.
6    Q.   So it would have been either Officer White or
7    Officer Tripp?
8    A.   Yes.  More than likely, the forms probably came
9    from Officer Wright who was driving the car and
10   probably -- you know, what we normally do is the person
11   in the car has all the forms, and then they pass them on
12   to the officer who is making contact, if that makes
13   sense.
14   Q.   Did you observe an officer hand the forms to
15   the flight attendants?
16   A.   I did.  I did observe an officer hand the form
17   and explain how to fill them out and asking them if they
18   had the time to do it because some of our -- you know,
19   sometimes there's connecting flights.  So we can't
20   really -- you know, we can't force them to stay.  We
21   have to kind of collect it later.
22       But I remember -- I remember -- I believe it
23   was Officer Tripp who said, "Hey, these are the forms.
24   Can you fill them out?  You know, we'll wait for them."
25   And then I took off with the -- with the juvenile.

92

1    Q.   And when he asked them if they had time, where
2    was the officer located?
3    A.   The officer would have been, like, in the --
4    kind of, like, the end of the jetway, beginning of the
5    aircraft.
6    Q.   And where the flight attendants?
7    A.   Still -- well, in the same general area.  It's
8    like a -- because that area is bigger than -- than, you
9    know, being on the aircraft.  So usually that's where we
10   kind of congregate.
11   Q.   So was it on the aircraft or off the aircraft?
12   A.   In honesty, sir, I believe it's a combination
13   because I remember the flight attendants standing in,
14   like, the doorway and the officers standing on the
15   jetway.
16   Q.   Were the pilots present?
17   A.   In the very beginning, I remember the one which
18   I identified as a pilot was there, but I would say a few
19   minutes later, I don't remember seeing them again.
20   Q.   And do you recall how many flight attendants
21   were on the aircraft?
22   A.   I saw three, but I know there's normally four.
23   Q.   Do you recall how many pilots were on the
24   aircraft?
25   A.   I saw two.  Well, pilot and copilot.  There was

93

1    another gentleman -- I believe it was a gentleman --
2    that I remember kind of popped up behind, but I don't
3    remember that person having anything to say.
4    Q.   And you never saw any of your officers
5    interviewing the flight attendants about the incident?
6        MR. McKAY:  Objection to the form.  Asked and
7    answered.
8        THE WITNESS:  Yeah, I -- I didn't -- I was not
9    witness to those interviews.
10   BY MR. MAYE:
11   Q.   You earlier testified that one of the flight
12   attendants made a comment about the relationship between
13   Mr. DelVecchia and A.D., that she thought maybe they
14   weren't father and son.  When did -- when did that
15   happen?
16   A.   That was in the very beginning of -- of our
17   contact with the flight attendants.
18   Q.   Is this before the passengers deplaned or
19   after?
20   A.   That's a good one.  It may have been before.
21   It may have been before.
22   Q.   You never went onto the aircraft; correct?
23   A.   No, sir.
24   Q.   So how did you overhear this?
25   A.   Well, she's standing in the doorway.  That's



Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

94

1 where -- well, once the plane lands and they're ready to
2 deboard, the flight attendants stand right in the mouth
3 of the door.  So there were only, like, maybe three,
4 four feet away from each other.
5    Q.   So all the flight attendants were standing at
6 the door?
7    A.   Well, the ones that I could see were standing
8 by the door.
9    Q.   And how many could you see?
10   A.   I could see three people, three flight
11 attendants.
12   Q.   Three flight attendants standing at the door.
13 And what were they doing?
14       MR. McKAY:  Objection to the form.
15       THE WITNESS:  They were just basically telling
16 people to have a good day.
17 BY MR. MAYE:
18   Q.   When -- when you overheard the flight attendant
19 say that she didn't think they were family, what was she
20 doing?
21       MR. McKAY:  Objection to the form.
22       THE WITNESS:  She was just talking.  Just
23 standing talking.
24 BY MR. MAYE:
25   Q.   Talking to whom?

95

1    A.   She was kind of looking in our direction.  So I
2 assume she was relaying part of the story to us as
3 officers.
4    Q.   So she was standing in the door by herself?
5    A.   No, sir.  Like I said already, there were
6 multiple attendants in the doorway, and basically the
7 statement was made -- we're standing outside of the
8 aircraft; she's standing in the inside of the aircraft.
9    Q.   And was she speaking to the other flight
10 attendants or speaking to you?
11       MR. McKAY:  Objection to the form.
12       THE WITNESS:  I can't tell you exactly who she
13 was speaking to.  She was just speaking.
14 BY MR. MAYE:
15   Q.   And do you know which flight attendant was
16 speaking?
17   A.   As I said earlier describing her, basically
18 looked like a young white female with kind of light,
19 kind of like, dirty-blond hair.
20   Q.   Do you know if you the saw a male flight
21 attendant with her at the time?
22   A.   Yes.  There was a black, male flight attendant.
23   Q.   So it was this -- this flight attendant who
24 made this comment, the male flight attendant, and a
25 third flight attendant?

96

1       MR. McKAY:  Objection to the form.
2       THE WITNESS:  Yes.  That I could see.
3 BY MR. MAYE:
4    Q.   Okay.  And what did the third flight attendant
5 look like?
6    A.   They were actually two -- two of them appeared
7 blond, to me.  One -- I would say one -- one was a --
8 looked maybe five years older than the other one, maybe,
9 a little bit older.  One looked a little older than the
10 other one.
11   Q.   When you were speaking with A.D. in the car,
12 was he in decent spirits?
13       MR. McKAY:  Objection to the form.
14       THE WITNESS:  I -- like I say, he wasn't
15 crying.  I can't say -- I guess, yeah, you could say
16 because I was trying my best to make him comfortable.
17 BY MR. MAYE:
18   Q.   So you said he wasn't crying and you were
19 making him feel comfortable.  Do you think you were
20 doing a good job making him feel comfortable?
21   A.   Yes, sir, I think I was doing a good job of
22 trying to build rapport with him because I felt, you
23 know, as a -- he's a 12-year-old boy, 11-, 12-year-old
24 boy.  You know, it's an unusual situation.  So, you
25 know, I just -- I just didn't want to make it harder,

97

1 you know, or make him feel like we were the big, bad
2 police or something like that.
3    Q.   And when you were speaking with A.D. in the
4 conference room at the substation, he appeared to be
5 comfortable and in good spirits?
6       MR. McKAY:  Objection to the form.
7       THE WITNESS:  I -- I wouldn't say in good
8 spirits, but he was very mature about what was happening
9 is the best way to describe it.
10 BY MR. MAYE:
11   Q.   He wasn't crying?
12   A.   No, he was not.
13   Q.   And he didn't appear to be distressed?
14       MR. McKAY:  Objection to form.
15       THE WITNESS:  I would -- I would say he was
16 upset, but he was not what you might call, like, overly
17 distressed --
18 BY MR. MAYE:
19   Q.   Okay.
20   A.   -- about the situation.
21   Q.   You said that your office was initially
22 provided very limited information about what the
23 allegations were; correct?
24   A.   Yes, sir.
25   Q.   You were never told that there was an



Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

98

1 allegation that someone was suspected of human
2 trafficking; correct?
3       MR. McKAY:  Objection to the form.
4       THE WITNESS:  No, not human trafficking.
5 BY MR. MAYE:
6    Q.  Okay.  You were told that there was an
7 allegation of potential inappropriate touching; correct?
8    A.  Yes, sir.
9    Q.  And that's the reason that your office was
10 called to the -- to meet the aircraft; correct?
11    A.  Yes, sir.
12       MR. MAYE:  I have no further questions.  Thank
13 you, Mr. Obasi.
14       THE WITNESS:  Thank you, sir.
15             FURTHER EXAMINATION
16 BY MR. McKAY:
17    Q.  I know we've kept you here a long time.  I'll
18 try to be very brief in my redirect, sir.
19    A.  I have a four-hour trip to Yuma after this.
20    Q.  Okay.  So it got a little confusing there in
21 Mr. Maye's questions about where the flight attendants
22 were.  So I apologize, but I just want to clear this up.
23       First of all, is it correct to say that you saw
24 three of the four flight attendants?
25    A.  Yes, sir.

99

1    Q.  Okay.  And of those three, two were female and
2 one was male; correct?
3    A.  Yes, sir.
4    Q.  The male was African-American, and the females
5 were Caucasian; correct?
6    A.  Yes, sir.
7    Q.  Okay.  And of the two females, one seemed about
8 five years older than the other.
9    A.  Yes.  There was a slight -- there wasn't an
10 extreme age difference, but the -- the one speaking the
11 most or that made a statement was definitely younger.
12    Q.  Okay.  And that person was standing near the
13 male flight attendant; right?
14    A.  Yes.
15    Q.  Okay.  Now I want to get to the nitty-gritty.
16 Were they -- at the time that she was making that
17 statement, did they have their feet planted inside the
18 airplane or outside the airplane?
19    A.  They were inside the airplane.
20    Q.  Okay.  And as far as Mr. Maye's questions about
21 standing in the door, they weren't blocking the door,
22 were they?
23    A.  No.  No.  No, sir.
24    Q.  Passengers could exit the plane in front of
25 them?

100

1    A.  Yeah, actually, it's -- I'll describe -- it's
2 their normal -- usually where they stand as -- as
3 passengers are leaving the plane.  They kind of have
4 that spot there pre to the --
5    Q.  Okay.
6    A.  -- the cockpit.
7    Q.  Yes.
8    A.  Yeah.
9    Q.  And so -- and so that's where you observed the
10 man and the younger woman flight attendants.
11    A.  Yes.  Yes, sir.
12    Q.  And relative to them, where was this third
13 woman flight attendant?
14    A.  She would have been if you are looking at the
15 plane off to the right side.
16    Q.  Okay.  All right.  So in the aisle of the
17 plane?
18    A.  Well, she came -- well -- so initially, when
19 all the people are getting off, we could see, like, at
20 least two of the flight attendants, and then, like, a
21 pilot kind of sticking his head behind them.  And then
22 after everybody's off, then you see a third person kind
23 of pop up.
24    Q.  Okay.
25    A.  I don't know what's -- what's prior to that,

101

1 but at the time when I could see three of them, there
2 was no passengers to obstruct, if you know what I'm
3 saying.
4    Q.  Okay.  So you first saw the third female flight
5 attendant after all the passengers had deplaned.
6    A.  Yes, sir.
7    Q.  Okay.  Now, when you have referred to the
8 pilot, do you mean the captain?
9    A.  Yeah, I guess captain, pilot.  And like I said,
10 in honesty, sir, he could have been the co, cocaptain or
11 copilot, but he was the one wearing the fancy uniform
12 that kind of poked his head up, and he's the one --
13    Q.  Okay.
14    A.  -- that made -- made the statement about "my
15 crew."
16    Q.  Of the two of them, did one seem older than the
17 other?
18    A.  Are you talking about the --
19    Q.  The pilot.
20    A.  -- the crew?
21    Q.  The pilots.
22    A.  I -- I honestly cannot answer that because I
23 don't -- I remember the pilot -- I would give him maybe
24 40 to 50ish, but I can't really recall the second person
25 that well.

Francois Obasi                                   Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

102

1    Q.   Okay.  Okay.  Now, you're not an expert on
2  pilot procedures and when they need to call and report
3  or request law enforcement, are you?
4    A.   Not at all, sir.  No.
5    Q.   Okay.  Let me ask you about A.D.  When you --
6  when you first saw him, that was when he was being
7  brought off the plane by a flight attendant?
8    A.   Yes, sir.
9    Q.   Okay.  And now, was this the third flight
10  attendant that you just testified about?
11    A.   I -- I would assume, but I didn't really see --
12  (audio distorted) -- him up to the doorway, if you know
13  what I'm saying.  So I don't really -- I can't
14  specifically say who brought him to the door.
15    Q.   Okay.  Now, you mentioned that you were born on
16  Barbados; is that right?
17    A.   Yes.  Yes, sir.
18    Q.   Okay.  Would you describe your ethnic heritage
19  as -- as African-Caribbean?
20    A.   I'm just Caribbean, yes.
21    Q.   Just Caribbean.  Okay.
22    THE COURT REPORTER:  I'm just what?  I'm sorry.
23    THE WITNESS:  I'm just Caribbean or West Indie.
24  BY MR. McKAY:
25    Q.   Okay.

103

1    A.   Yeah, we don't put the -- we don't put the
2  "African" in front, but it's okay.
3    Q.   Okay.  Fair enough.
4         With respect to A.D. when you saw him, did you
5  have an impression as to his ethnicity?
6    A.   Yes, sir.
7    Q.   And what was that?
8    A.   By his features, I assumed either kind of like
9  an Ethiopian region.  Right.
10    Q.   Okay.  And --
11    A.   Yeah, that's kind of what I assumed.
12    Q.   And, if you would, what -- what specifically
13  about his features led you in that direction?
14    A.   Usually you -- you -- for -- I mean, like I
15  said, being, you know, from another country, you might
16  say we -- we tend to recognize features pretty well.  So
17  when I saw, like, his -- like, the forehead, the shape
18  of his face, I immediately assumed more of an
19  Ethiopian/Eritrean type background.
20    Q.   Okay.  Now, would you say that for a
21  12-year-old he was tall?
22    A.   Well, probably by American standards.  Like,
23  say -- like, being from Barbados, we are mostly of
24  Nigerian descent.  So our average male is, like, 6-2,
25  6-3.

104

1    Q.   Okay.
2    A.   So he would be -- so he would be average height
3  where I'm from, but in -- on American standards, he's a
4  pretty well-built, you know, 12-year-old.
5    Q.   Okay.
6    A.   Put it that way.
7    Q.   Have you had occasion in your lifetime to sit
8  in the middle seat of an airplane?
9    A.   Oh, yes, sir.
10    Q.   Okay.  Do you think that someone as tall as
11  A.D. could physically have maneuvered in a way that he
12  put his head onto the middle seat occupant's lap while
13  sitting in the window seat?
14    MR. MAYE:  Object to form.
15    THE WITNESS:  That -- having flown -- and I
16  have an older daughter, that's kind of hard to do
17  without some manipulation.
18  BY MR. McKAY:
19    Q.   Okay.
20    A.   Yeah.
21    Q.   Now, when Mr. Maye asked you questions about
22  making an internal assessment, and I think he said -- I
23  think you said there are occasions where something
24  doesn't rise to the level of a case so you don't call
25  the FBI.

105

1         Do you remember that?
2    A.   Yes, sir.
3    Q.   Okay.  Were you referring there to the "I don't
4  want to wear a mask" kind of situation?
5    MR. MAYE:  Object to form.
6    THE WITNESS:  Yes, sir.  But after a while, TSA
7  actually took those over so we didn't have to really
8  prosecute with those.  But a lot of those cases are
9  wearing a mask, maybe a verbal argument type thing that
10  there's no real crime.
11  BY MR. McKAY:
12    Q.   And you have some discretion in those cases?
13    A.   Yes, sir.
14    Q.   Okay.  Now, if a report is made that while the
15  plane is in the air in the federal air space a sexual
16  molestation has occurred, that's a fairly serious crime,
17  is it not?
18    A.   Yes, sir.
19    Q.   And that's a crime that, if it occurs in the
20  federal air space, is always the FBI's jurisdiction;
21  correct?
22    MR. MAYE:  Object to form.
23    THE WITNESS:  Always.  Yes, sir.
24  BY MR. McKAY:
25    Q.   Okay.  And so you don't have any discretion in



Francois Obasi                                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

106

1 those cases to just say we're not going to make a case
2 of this, do you?
3        MR. MAYE:  Object to form.
4        THE WITNESS:  We do not.  We do not.
5 BY MR. McKAY:
6    Q.  Okay.  And in this particular case, isn't it
7 correct that you had already called the FBI before you
8 had spoken with any of the flight attendants?
9    A.  Yes.  I alerted the FBI, and I also -- I just
10 remembered I also called our internal, like, sexual
11 assault experts, you know, just to make sure.
12   Q.  Okay.
13   A.  And they were -- and they were basically, like,
14 not ours, not touching it, not coming out kind of a
15 deal.
16   Q.  And why did they say that to you, your own
17 people?
18   A.  Well, because it was clearly -- it's a
19 jurisdictional issue.
20   Q.  So it was the FBI's jurisdiction?
21   A.  Yeah.  Federal -- federal airways.  There's
22 also the fact of, like, we always say once the door is
23 closed and the plane taxis, FBI.
24   Q.  Yeah.  Okay.  And knowing that it was the FBI's
25 jurisdiction, you didn't take any notes of what people

107

1 told you yourself, did you?
2        MR. MAYE:  Object to form.
3        THE WITNESS:  No.  No, I did not.
4 BY MR. McKAY:
5    Q.  Okay.  And you -- I believe you said earlier
6 that -- that your police department might not have even
7 opened a file on it; right?
8    A.  No, not outside of the -- of the
9 computer-generated things that you see.  There would
10 be --
11   Q.  Okay.
12   A.  -- no reason for a case file.
13   Q.  Okay.  And so when you are testifying about
14 your own observations, things that you heard, those are
15 based on -- on your own having -- sorry -- strike that.
16        When you testify about things that you heard or
17 saw yourself, those are based on your specific
18 recollections of what occurred and what you saw.
19        Is that a fair statement?
20   A.  Yes, sir.
21   Q.  Okay.  When you were testifying about what
22 Mr. DelVecchia told you later, those weren't things that
23 you yourself observed; right?
24        MR. MAYE:  Object to form.
25        THE WITNESS:  No, sir.

108

1 BY MR. McKAY:
2    Q.  I mean, you -- you heard him talking about it,
3 but they were not events that you had witnessed; right?
4        MR. MAYE:  Object to form.
5        THE WITNESS:  No, sir, I did not witness it.
6 BY MR. McKAY:
7    Q.  Okay.  And you also -- did you take any notes
8 of, specifically, the details of what he told you?
9    A.  No, sir, I did not.
10   Q.  Okay.  So is it possible that you might have
11 misremembered some of those specific details?
12        MR. MAYE:  Object to form.
13        THE WITNESS:  I would say maybe a word or two
14 or the way it was said but not the general, you know,
15 gist of things.
16 BY MR. McKAY:
17   Q.  Okay.  We just talked about a minute ago, I
18 mean, the -- his telling you that A.D.'s head was in his
19 lap doesn't seem possible now when you think about it,
20 does it?
21        MR. MAYE:  Object to form.
22        THE WITNESS:  Like I said, I -- it doesn't seem
23 possible based on his height, but I think as far as him
24 comforting him, I remember him saying that.
25 /////

109

1 BY MR. McKAY:
2    Q.  So could it have been that you just remembered
3 him saying that he was comforting him when he was
4 touching his face?
5        MR. MAYE:  Object to form.
6        THE WITNESS:  That's -- that's possible, sir.
7 BY MR. McKAY:
8    Q.  Okay.  I made a note here that I thought I
9 heard you say an officer's name was White, and then I
10 thought I heard you say an officer's name was Wright.
11   A.  Yes, sir, two different officers.
12   Q.  Okay.  So when you say that Officer Wright was
13 the driver, that's a different person than Officer
14 White.
15   A.  Yes, sir.  It should be M, as in "Mary," Wright
16 and A, as in "Anthony," White.
17   Q.  Okay.
18   A.  And Officer White should have a B behind his
19 call sign.
20   Q.  Okay.  Is Officer Wright, with an R, is that a
21 female officer?
22   A.  No, that's a -- a male officer.  He's actually
23 retired also.
24   Q.  Okay.  But the M, as in "Mary," it was just --
25   A.  No, the M, as in "Mary" was -- (audio

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

110

1  distorted) -- his name is Mart -- Mart -- Martin.
2     Q.  Okay.  Thank you.
3        Who -- what officer would have accompanied --
4  if you know, which officer would have accompanied
5  Mr. DelVecchia into the holding room?
6     A.  That probably initially was Officer Wright and
7  then -- because he's the -- what we call our ramp car,
8  our driving car.  Then he would have left, and another
9  officer would have just kind of sat either in the room
10  or directly outside.
11     Q.  I see.
12        So Officer Wright, with an R, would have
13  delivered Mr. DelVecchia but then would have been
14  replaced by somebody else.
15     A.  Yeah, he's basically like our Uber driver.
16     Q.  Okay.  Do you know who would have come in to
17  replace Officer Wright?
18     A.  At that point it probably -- because we were
19  probably going late, it may have been, like, maybe
20  Berghuis or even Officer Tripp or White.  I believe they
21  were taking turns because directly across from that room
22  is also our main break room.  So it's easy for you,
23  know, officers to congregate there and take turns kind
24  of watching someone in custody.
25     Q.  Okay.  Would the officers that you had just

111

1  named, would they have kept their body cams on even when
2  they were back at the station?
3     A.  Yes.  As long as -- as long as they were
4  watching a suspect or purported suspect, their body
5  cameras would have been on.
6     Q.  And is there also -- like we see on TV, is
7  there also closed-circuit television watching people in
8  the holding room?
9     A.  It's available, but that was not activated.  We
10  usually use that for -- if we have someone in custody
11  that, you know -- you know, maybe one of the big-time
12  drug dealers or drug hauls that can be activated, but it
13  has to be activated by one of our detectives.
14     Q.  I see.  And you don't think it was that night?
15     A.  Oh, I can guarantee it was not.
16     Q.  Was not?  Okay.
17     A.  It was not.
18     Q.  Okay.  Now, you had mentioned that the airline
19  doesn't make a decision to call the FBI, but the airline
20  does make a decision to call law enforcement of some
21  kind, doesn't it?
22     A.  Yes, sir.
23     Q.  Okay.  All right.  And the information that
24  would have been put into any kind of a call log would be
25  the information as it's received from the ACC, the

112

1  aircraft control center?
2     A.  Yes, sir.
3     Q.  And I'm sorry.  I misspoke.  The airport
4  control center; is that right?
5     A.  Yes, sir.
6     Q.  Okay.  And the airport control center would
7  necessarily get the information coming from the airline?
8     A.  Yes.  They --
9        MR. MAYE:  Object to form.
10  BY MR. McKAY:
11     Q.  Okay.  I'm sorry.  What else were you going
12  to --
13     A.  They either get it from the airline or directly
14  from the cockpit.
15     Q.  Okay.  And speaking of the cockpit, when you
16  spoke to the pilot, he told you that the flight
17  attendants had told him enough to make the call; is that
18  correct?
19     A.  Well, the way he put it is that his crew -- his
20  crew basically alerted him to an incident, and when
21  his -- when his whole crew, you know, alerts him, he
22  pretty much has to call.
23     Q.  Okay.  Did he say it that way, or was that your
24  interpretation?
25     A.  No, he basically -- the way I took it and the

113

1  way he was saying it, it came across almost apologetic.
2     Q.  He -- you had testified in response to
3  Mr. Maye's questions that the pilot told you something
4  that was enough to make the call.  And my question is
5  how was that conveyed to you, that there was a threshold
6  of some sort?
7     A.  That's just what he said.  He never -- there
8  was never a comment -- a conversation of a threshold of
9  when he has to call or needs to call.  I think he was
10  just saying that, hey, you know, if my whole crew is
11  coming to me about a problem, I'm calling.
12     Q.  Okay.
13     A.  If that makes sense, yeah.
14     Q.  Okay.  But did he ever say to you that the
15  entire crew had seen the alleged fondling?
16     A.  He didn't say that they saw it.  He just said
17  that the crew, like, complained to -- to him.
18     Q.  Okay.
19     A.  He never said the word "saw."
20     Q.  Okay.  With respect to your conversation with
21  A.D., you testified in response to Mr. Maye's questions
22  that something rang a bell in Mr. Maye's discussion or
23  question about a prior flight.  Was it the flight that
24  rang a bell to you or the fact that it happened on a
25  flight?

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

114

1    A.  No.  It was when he said about a prior
2  incident -- --
3    Q.  Yes.
4    A.  -- because -- because I remember -- I remember
5  A.D. basically said, you know -- and I think that's --
6  again, my perception talking to this child -- why he was
7  not overly upset because this had happened before.
8    Q.  Okay.
9    A.  It wasn't brand-new to him.  So, yeah, he -- he
10  said basically, like, yeah, we -- like, were on another
11  flight.  He didn't tell me, like --
12    Q.  Okay.
13    A.  -- you know, what flight, whatever.  Just that
14  it happened before on a flight that they had been
15  separated.
16    Q.  Did he at any time tell you that the prior
17  incident on a flight had involved an allegation of
18  inappropriate touching?
19    A.  No.  I don't remember that, no.
20    Q.  Okay.
21    A.  And if I could clarify.
22    Q.  Go ahead.
23    A.  The juvenile actually never mentioned
24  inappropriate touching.
25    Q.  Okay.  And when you say "the juvenile," you

115

1  mean A.D.?
2    A.  A.D.  A.D.  I'm sorry.  A.D. never -- he never
3  referred to anything like that.
4    Q.  Okay.
5    A.  He just called it being separated from his dad.
6  He never mentioned anything about inappropriate behavior
7  on his father's part.
8    Q.  Okay.  He never said a thing about
9  inappropriate touching on his father's part.
10    A.  No, sir.
11    Q.  In any context whatsoever?
12    A.  No, sir.  Not to me, no.
13    Q.  Okay.  You had agreed with Mr. Maye that
14  certain things Mr. Maye described would raise what you
15  called red flags.  And my question to you is did
16  anything that A.D. said to you raise any red flags?
17    A.  No, sir.
18    Q.  Okay.  Mr. Maye got you to agree that "See
19  Something, Say Something" is -- is a valid law
20  enforcement technique.
21      Do you remember that?
22    A.  Yes, sir.  Yes, sir.
23    Q.  Do you believe that "See Something, Say
24  Something" is a license to commit racial discrimination?
25      MR. MAYE:  Object to form.

116

1      THE WITNESS:  Not at all, no.
2  BY MR. McKAY:
3    Q.  Okay.  Is it wrong to tell a lie that gets
4  somebody in trouble with the police?
5      MR. MAYE:  Object to form.
6      THE WITNESS:  Yes, sir.
7      MR. McKAY:  All right.  That's all I have.
8  Thank you very much, sir.
9      THE WITNESS:  You're welcome.
10      FURTHER EXAMINATION
11  BY MR. MAYE:
12    Q.  I just have a few more questions.
13      A.D. never told you that a flight attendant
14  treated him inappropriately, did he?
15    A.  No, sir.
16    Q.  That a flight attendant touched him
17  inappropriately?
18    A.  No, sir.
19    Q.  That a flight attendant did anything that could
20  be perceived as sexual assault?
21    A.  No, sir.
22    Q.  You said -- you testified earlier that you
23  requested the FBI's assistance after you received the
24  message from the airport control center; correct?
25    A.  Yes.  I -- I honestly don't remember the time

117

1  frame, but, yes, I -- I'm the one that called.
2    Q.  Did you request the FBI's assistance before you
3  arrived at the gate?
4    A.  I actually believe so.  I called -- well, I
5  called their -- their "in bucket" number, as you call
6  it, or the on-call officer because we were told, you
7  know, of the type of case it was.  And a lot of that was
8  more just to alert them as to what was going on because
9  it's a -- like I said, it's an on-call -- they're not in
10  an office.  It's a from-home situation.  So it's more of
11  a heads-up of, hey, this may be going on.
12    Q.  So when the aircraft arrived and you spoke with
13  the crew, you could have decided, hey, this doesn't
14  warrant going to the FBI; correct?
15    A.  In this case, I would say no.
16    Q.  And why?
17    A.  Basically because -- well, one, I wasn't
18  present; and, two, the allegation was made.  So for --
19  for me to step outside of my jurisdiction even for a
20  case that's felonious and this -- you know, I don't know
21  what the word -- I mean, that would bring this much
22  backlash if it's true, you know, like I said, it's
23  better to be, I guess, safe than sorry.
24    Q.  Okay.
25    A.  But this is -- that wasn't my decision to make,

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

118

1  in honesty, sir.
2     Q.  So you -- so you got the FBI involved based on
3  the message from airport control center that the captain
4  said there was an allegation of inappropriate touching.
5     A.  Yes, sir.
6     Q.  Okay.  Now, if the message came in and the
7  message was there's an allegation that someone spilled
8  Diet Coke on another passenger, did you -- would you
9  have a discretion there to not request FBI's
10 involvement?
11    A.  Yes.
12        MR. McKAY:  Objection to form.
13        THE WITNESS:  Yeah, if it's something -- I'm
14 sorry.  Something that my --
15        MR. McKAY:  Sorry.
16        Objection to form.  Calls for speculation.
17 BY MR. MAYE:
18    Q.  You can answer.  I'm sorry, I couldn't hear
19 your answer.
20    A.  Oh, I'm sorry.  I said, yes, sir, for something
21 that minor that could be handled on scene, we -- we
22 would definitely wait before calling the FBI.
23    Q.  So you do have discretion, but it's based on
24 what the allegation is.
25    A.  Yes, sir.

119

1     Q.  Okay.  And in this case when the allegation was
2  there's suspected inappropriate touching, you made the
3  decision, hey, I think this warrants getting the FBI
4  involved.
5     A.  Yes.
6         MR. McKAY:  Objection to the form of the
7  question.
8  BY MR. MAYE:
9     Q.  Okay.
10    A.  Yes, sir.
11    Q.  Okay.  And so your decision to get the FBI
12 involved was based exclusively on the information that
13 was communicated to you by the airport control center;
14 correct?
15    A.  I would say, yes, based on that information and
16 severity if it was true.
17    Q.  Better safe than sorry.
18    A.  Yes, sir.
19    Q.  Okay.  Did you speak with anyone to prepare for
20 this deposition?
21    A.  Excuse me?
22    Q.  Did you speak with anyone to prepare for your
23 deposition?
24    A.  No.  We -- we did a test run to make sure that
25 my connection worked.  That was it.

120

1     Q.  And who did that test run?
2     A.  Mr. McKay.
3     Q.  And did you ever -- have you ever spoken with
4  Mr. McKay about your knowledge about this incident?
5     A.  We -- we did speak -- yeah, we spoke, actually,
6  pretty early on by phone.
7     Q.  And what did you talk about?
8     A.  Just what happened and the fact that he was
9  representing the -- the plaintiff, I guess.  I don't
10 know what the right word is for it.
11    Q.  And you shared with him the information that
12 you're aware of?
13    A.  Yes, sir.  Not -- not as probably I should say
14 in-depth as today, but it was just basic -- basic
15 questions of, you know, what happened, time, stuff like
16 that.
17    Q.  Did he ever show you any documents?
18    A.  No, sir.  This is by telephone.
19    Q.  And that was the only time you spoke with him?
20    A.  Yes, sir.  Yeah, we've only ever spoken by
21 telephone.  We've never gotten any, like, documents
22 about this case or anything like that.
23    Q.  I'm sorry.  How many times did you speak with
24 him by telephone?
25    A.  I think we spoke twice, but the -- part of it

121

1  was also because, again, the reason why I wasn't -- I
2  didn't connect it before, I downloaded a spam blocker
3  that kind of took over my phone, and I didn't realize
4  it.  So we had to kind of clear that up first.  So we
5  kind of spoke about that, and then he wanted to make
6  sure I would be able to connect with you guys properly.
7     Q.  Just to clarify, you don't know or you don't
8  recall who escorted A.D. from the back of the aircraft
9  to the front of the aircraft?
10    A.  No, sir.  I wouldn't be able to see that, guys,
11 from where I'm standing -- or I was standing.
12    Q.  Okay.  Um -- or strike that.
13        You said you initially contacted the FBI based
14 on the message from airport control center to give them
15 a heads-up.
16        Did you then follow up with them and say, hey,
17 this is still a go, or what happened then?
18    A.  Yes, sir.  Yes.  Then the follow-up would have
19 been a confirmation to, yes, we need you to come out.
20 And I -- because I also wanted to make sure that one of
21 their agents was qualified to speak to an adolescent.
22    Q.  And when did you make that follow-up call?
23    A.  I believe that was after we arrived back at the
24 substation because that's about a -- what is it? --
25 like, five-minute trip from the aircraft.



Francois Obasi

Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

---

122

1   Q.   And at that point you were aware that
2   Mr. DelVecchia and A.D. were father and son; correct?
3      A.   Yes, sir, yes.
4      Q.   And you could have at that point -- had you
5   believed it was warranted, you could have called the FBI
6   and said, hey, you know what?  I've spoken with the
7   child, I've spoken with the alleged perpetrator, and I
8   don't think it's warranted for the FBI to interview
9   either of them.
10      You could have done that right?
11      MR. McKAY:  Objection to form.  Calls for
12   speculation.
13      THE WITNESS:  Well, yes, sir, but I never did a
14   full interview of Mr. -- of the adult, of
15   Mr. DelVecchio.
16   BY MR. MAYE:
17      Q.   I understand that, sir.  But it's in your -- in
18   your authority to do a -- to have done that.
19      MR. McKAY:  Objection to the form.
20   Argumentative.
21      THE WITNESS:  Yes, sir.
22      MR. MAYE:  Okay.  I have no further questions.
23   Thank you, Mr. Obasi.  Appreciate it.
24      THE WITNESS:  Thank you, sir.
25      MR. McKAY:  Sir, what's going to happen next is

---

123

1   that the court reporter is going to type up a formal
2   transcript of this, and you have the right to look it
3   over and proofread it and make any changes or
4   corrections.
5      I would recommend that you do so in this case
6   since it's being taken remotely and there has been some
7   echo that might have caused her to misunderstand
8   something that you said at the end of a sentence.
9      So when the transcript is ready, which usually
10   takes a week or two, the court reporter or I will get in
11   touch with you to let you know it's available for you to
12   review, and then you can go through it and -- and note
13   any changes, corrections, or even if you remember
14   something that you had forgotten today, you have the
15   right to put that in and just provide a little
16   explanation that, you know, it was something that you
17   remembered later.  Okay?
18      THE WITNESS:  Yes.  Yes, sir.
19      MR. McKAY:  All right.  Okay.  Thank you.
20   Thank you very much for your time today.  We appreciate
21   your coming and sitting in your garage.  I know that
22   hasn't been easy.  I appreciate it very much.
23      THE WITNESS:  Like I said, I have a five-hour
24   drive after this.  So it's okay.
25      MR. McKAY:  Oh, boy.  Well, I hope we haven't

---

124

1   bored you too much.  Get some coffee.
2      MR. MAYE:  Yes, safe travels.
3      THE WITNESS:  Thank you very much.
4      THE VIDEOGRAPHER:  This concludes the
5   deposition of Francois Obasi on -- excuse me -- on
6   September 15th, 2022.  The time is 11:55 a.m., and we are
7   off the video record.
8      MS. REPORTER:  Could I get counsels' transcript
9   orders on the record, please, whether you like hard copy
10   or electronic.
11      MR. McKAY:  I do not like paper one little bit.
12   So I only want electronic, please, and I do request a
13   transcript and also a copy of the video.
14      THE VIDEOGRAPHER:  Okay.
15      MR. MAYE:  Same.  Same order for us.  Thank
16   you.
17      THE VIDEOGRAPHER:  Same order.  Okay.  Thank
18   you.
19      (Deposition concluded at 11:56 a.m.)
20      (Exhibits 1 through 4 were marked.)
21
22
23
24
25

---

125

1                    CERTIFICATE OF WITNESS
2   PAGE   LINE   CHANGE                    REASON
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19                    *  *  *  *  *
20      I, FRANCOIS OBASI, witness herein, do hereby
    certify and declare under penalty of perjury the within
21   and foregoing transcription to be my deposition in said
    action; that I have read, corrected, and do hereby affix
22   my signature to said deposition.
23
    _____   _____
24   FRANCOIS OBASI
    Witness                                Date
25

---

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

126

```
 1                    REPORTER'S CERTIFICATE
 2
    STATE OF NEVADA        )
 3                         ) ss
    COUNTY OF WASHOE       )
 4
 5          I, Dawn Bratcher Gustin, a duly certified court
    reporter licensed in and for the State of Nevada, do
 6  hereby certify:
 7          That I reported the taking of the deposition of
    the witness, FRANCOIS OBASI, at the time and place
 8  aforesaid;
 9          That prior to being examined, the witness was by
    me duly sworn to testify to the truth, the whole truth,
10  and nothing but the truth;
11          That I thereafter transcribed my shorthand notes
    into typewriting and that the typewritten transcript of
12  said deposition is a complete, true, and accurate record
    of the proceedings to the best of my ability.
13
            I further certify that (1) I am not a relative,
14  employee, or independent contractor of counsel of any of
    the parties; nor a relative, employee, or independent
15  contractor of the parties involved in said action; nor a
    person financially interested in the action; nor do I
16  have any other relationship with any of the parties or
    with counsel of any of the parties involved in the
17  action that may reasonably cause my impartiality to be
    questioned; and (2) that transcript review pursuant to
18  FRCP 30(e) was requested.
19          IN WITNESS WHEREOF, I have hereunto set my hand
    in the County of Washoe, State of Nevada, this 29th day
20  of September 2022.
21
22  _____
            Dawn Bratcher Gustin, CCR 253, RPR, CRR
23
24
25
```



Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                     Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                              Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                          Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                   Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                        Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                   Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.

Francois Obasi                                    Peter DelVecchia, et al. v. Frontier Airlines, Inc., et al.