MARGARET A. MCLETCHIE, Nevada Bar No. 10931
**MCLETCHIE LAW GROUP, PLLC**
602 South 10th Street
Las Vegas, NV 89101
Telephone: (702) 728-5300 / Fax: (702) 425-8220
Email: efile@nvlitigation.com

JOHN D. MCKAY, California Bar No. 220202 (*admitted pro hac vice*)
**PARK AVENUE LAW LLC**
201 Spear Street, Suite 1100
San Francisco, CA 94105
Telephone: (434) 531-9569 / Fax: (407) 264-6551
Email: johndmckayatty@gmail.com
*Counsel for Plaintiffs Peter DelVecchia and A.D., a Minor*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| PETER DELVECCHIA, *et al.*,<br>    Plaintiffs,<br><br>vs.<br><br><br>FRONTIER AIRLINES, INC., *et al.*,<br>    Defendants. | **Case No: 2:19-CV-01322-KJD-DJA**<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 266)**<br><br>**ORAL ARGUMENT REQUESTED** |

Plaintiffs, Peter DelVecchia individually ("Peter") and as next friend of A.D., a minor ("A.D."), respectfully file this Response in Opposition to the Motion for Summary Judgment (ECF No. 266) filed by Defendants Frontier Airlines, Inc. ("Frontier"), Rex Shupe ("Shupe"), and Scott Warren ("Warren"), and request oral argument on the motion.

1

2

# TABLE OF CONTENTS

3   TABLE OF CONTENTS ..................................................................................................... ii

4   TABLE OF AUTHORITIES .............................................................................................. iii

5   I.     STATEMENT OF MATERIAL FACTS PURSUANT TO LR 56-1 ......................... 1

6   II.    OBJECTIONS TO DEFENDANTS' STATEMENT OF FACTS ............................. 25

7   III.   ARGUMENT ........................................................................................................... 26

8      A.   49 U.S.C. § 44941(a) Does Not Immunize Defendants' Actions. ....................... 26

9         1.   The Statute Is Not Intended to Apply Here. ................................................ 26

10         2.   The Statute Does Not Afford Immunity for Actions and Statements Attributable Solely to

11      the Airline or Its Employees and Agents. ................................................................ 27

12         3.   The Statute Does Not Invalidate § 1981. .................................................... 29

13         4.   § 44941(b) Invalidates Any Immunity Through § 44941(a). ...................... 30

14      B.   NRS 432B.160 Has No Application to the Instant Case. .................................... 32

15      C.   Plaintiffs' § 1981 Claims Survive Summary Judgment. ..................................... 33

16         1.   Defendants Misstate the Applicable Law. ................................................... 33

17         2.   Plaintiffs Have Both Direct and Circumstantial Evidence of Discriminatory Intent. ........... 35

18         3.   Plaintiffs Do Not Argue Negligent Discrimination. ................................... 42

19         4.   *Karrani v. JetBlue Airways Corp.* is Distinguishable ............................... 42

20         5.   Plaintiffs' Claims Meet the "But-For" Test. .............................................. 43

21      D.   The IIED Claim Survives ................................................................................... 45

22      E.   The False Imprisonment Claim Survives Summary Judgment. ........................... 47

23      F.   The Battery and Assault Claim Survives. ........................................................... 47

24      G.   Plaintiffs' Defamation Claim Survives. ............................................................. 48

25      H.   Plaintiffs' Punitive Damages Claims Survive. ................................................... 50

26   IV.   CONCLUSION ....................................................................................................... 51

27

28

**TABLE OF AUTHORITIES**

**Cases**

*Abdallah v. Mesa Air Group, Inc.,* 2023 U.S. App. LEXIS 27271 (5th Cir. October 13, 2023).. 27, 28, 29

*Air Wisconsin Airlines Corp. v. Hoeper,* 571 U.S. 237 (2014).................................................... 26, 27

*Aragon v. Republic Silver State Disposal Inc.,* 292 F.3d 654 (9th Cir. 2002) ........................ 33, 34, 36

*Baez v. JetBlue Airways Corp.,* 793 F.3d 269 (2d Cir. 2015)................................................. 27, 28

*Bains LLC v. ARCO Products Co.,* 405 F.3d 764 (9th Cir. 2005) ......................................... 44

*Banerjee v. Continental, Inc.,* Case No. 2:16-cv-669-JCM-VCF, 2016 U.S. Dist. LEXIS 141891 (D. Nev. Oct. 11, 2016)..................................................................................... 45

*Barnes v. AT&T Pension Ben. Plan,* 718 F.Supp.2d 1167 (N.D. Cal. 2010) ........................ 33

*Bayaa v. United Airlines, Inc.,* 249 F.Supp.2d 1198 (C.D. Cal. 2002)................................. 27

*Belmont v. JetBlue Airways Corp.,* 401 F.Supp.3d 348 (E.D.N.Y. 2019) ............................ 27

*Burgess v. Goldstein,* 997 F.3d 541 (4th Cir. 2021) ............................................................. 26

*Burns v. Mayer*, 175 F.Supp.2d 1259 (D. Nev. 2001) .......................................................... 47

*Cardenas v. Massey,* 269 F.3d 251 (3d Cir. 2001) .............................................................. 34

*Castro v. Poulton*, No. 2:15-CV-1908 JCM (GWF), 2017 U.S. Dist. LEXIS 132105 (D. Nev. Aug. 18, 2017).............................................................................................................. 26

*Cerqueria v. American Airlines, Inc.,* 520 F.3d 1 (1st Cir. 2008), *cert. denied,* 555 U.S. 821........... 30

*Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862 (6th Cir. 2001)....................................... 37

*Chuang v. University of California Davis*, 225 F.3d 1115 (9th Cir. 2000) ........................... 39

*City of Richmond v. J.A. Croson Co*., 488 U.S. 469 (1994) ................................................ 35

*Columbare v. Southwest Airlines Co.,* Case No. 3:21-CV-297-B-BK, 2023 U.S. Dist. LEXIS 13383 (N.D. Tex. January 10, 2023) ................................................................................... 27

*Colvin v. United States,* 479 F.2d 998 (9th Cir. 1973)......................................................... 26

*Comcast Corp. v. National Ass'n of African American-Owned Media,* 140 S. Ct. 1009 (2020)......... 43

*Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018 (9th Cir. 2006) ............................. 35

*Countrywide Home Loans, Inc. v. Thitchener,* 192 P.3d 243 (Nev. 2008) ..................... 50, 51

*Dasrath v. Continental Airlines, Inc.,* Case No. 02-2683 (DRD), 2006 U.S. Dist. LEXIS 9707 (D.N.J. 2006) .................................................................................................................................. 27

*Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581 (5th Cir. 1998)................................ 33

*Desert Palace Inc. v. Costa,* 539 U.S. 90 (2003) ............................................................................ 35

*Earl v. Nielsen Media Research, Inc.,* 658 F.3d 1108 (9th Cir. 2011)............................................... 39

*Eid v. Alaska Airlines, Inc.,* 621 F.3d 858 (9th Cir. 2010) ............................................ 29, 30, 41, 42

*Fakoya v. County of Clark,* Case No. 2:12-cv-02149-JAD-CWH, 2014 U.S. Dist. LEXIS 143240 (D. Nev. Oct. 8, 2014)....................................................................................................................... 33

*Favreau v. Chemcentral Corp.*, 107 F.3d 877, 1997 U.S. App. LEXIS 3804 (9th Cir. 1997) ........... 33

*Flores v. City of Winchester,* 873 F.3d 739 (9th Cir. 2017)........................................................ 34, 44

*France v. Johnson,* 795 F.3d 1170 (9th Cir. 2015) ..................................................................... 35, 40

*Frias v. Valle*, 101 Nev. 219, 698 P.2d 875 (1985) ......................................................................... 26

*Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30*, 694 F.2d 531 (9th Cir. 1982)............. 41

*General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375 (1982) ..................................... 34

*Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441 (9th Cir. 1994) ................................................................ 35

*Hampton v. Dillard Department Stores, Inc.,* 247 F.3d 1091 (10th Cir. 2001) .................................. 38

*Hemmings v. Tidyman's Inc.,* 285 F.3d 1174 (9th Cir. 2002) .......................................................... 45

*Hernandez v. City of Reno,* 634 P.2d 668 (Nev. 1981) .................................................................... 47

*Hossack v. Floor Covering Associates of Joliet,* 492 F.3d 853 (7th Cir. 2007) ............................... 34

*Ilczyszyn v. Southwest Airlines Co.,* 80 Cal.App.5th 577 (Cal. App. 2022) ............................... 26, 27

*Jones v. Reno Hilton Resort Corp.,* 889 F.Supp. 408 (D. Nev. 1995) .......................................... 50, 51

*Jones v. Royal Admin. Servs. Inc.,* 866 F.3d 1100 (9th Cir. 2017) .................................................. 44

*Jun Yu v. Idaho State Univ.,* 11 F.4th 1065 (9th Cir. 2021).............................................. 34, 35, 42

*Jurado v. Eleven-Fifty Corp.,* 813 F.2d 1406 (9th Cir. 1987) .......................................................... 34

*Karrani v. JetBlue Airways Corp.,* 2019 U.S. Dist. LEXIS 127944 (W.D. Wash. 2019) ............. 42, 43

*K-Mart Corp. v. Washington*, 866 P.2d 274 (Nev. 1993) ............................................................ 48, 49

*Kolstad v. Am. Dental Ass'n,* 527 U.S. 526 (1999).......................................................................... 45

*Kreith v. American Airlines, Inc.*, Case No. 20 C 1593, 2021 U.S. Dist. LEXIS 37098 (E.D. Ill. March 1, 2021).................................................................................................................. 27

*Lansdale v. Hi-Health Supermart Corp.,* 314 F.3d 355 (9th Cir. 2002)................................ 35

*Lindsey v. SLT Los Angeles, LLC,* 447 F.3d 1138 (9th Cir. 2006) ................................. 36, 37

*Lowthorp v. Mesa Air Grp. Incorporated*, 2021 U.S. Dist. LEXIS 136967 (D. Ariz. Jul 22, 2021)..... 7

*Lubin v. Kunin,* 17 P.3d 422 (Nev. 2001) ............................................................................ 50

*Lyons v. England,* 307 F.3d 1092 (9th Cir. 2002)........................................................ 33, 34, 41

*Madison v. Courtney,* 365 F.Supp.3d 768 (N.D. Tex. 2019) .............................................. 38

*Mahzoomi v. Southwest Airlines Co.,* 419 F.Supp.3d 1136 (N.D. Cal. 2019) ............... 27, 36, 37, 38

*Mazzeo v. Gibbons*, 649 F. Supp. 2d 1182 (D. Nev. 2009)................................................. 46

*McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273 (1976)......................................... 33

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ................................................. 34

*McKinney v. Office of the Sheriff of Whitley County,* 866 F.3d 803 (7th Cir. 2017) .......................... 35

*Nat'l Mut. Ins. Co. of D.C. v. Tidewater Trans. Co., Inc.*, 337 U.S. 582 (1949)...................... 38

*Payne v. Norwest Corp.,* 113 F.3d 1079 (9th Cir. 1997) .................................................... 39

*Pope v. Motel 6*, 114 P.3d 277 (Nev. 2005)....................................................................... 48

*Posadas* v. *City of Reno*, 851 P.2d 438 (Nev. 1993)............................................................ 45

*Roadhouse v. Patenaude & Felix, A.P.C.,* Case No.: 2:13-cv-00560-GMN-CWH, 2014 U.S. Dist. LEXIS 85713 (D. Nev. June 23, 2014)............................................................................... 33

*Sandoval v. LVMPD,* 854 F.Supp.2d 860 (D. Nev. 2012) ................................................. 47

*Sengupta v. Morrison-Knudsen Co., Inc.*, 804 F.2d 1072 (9th Cir. 1986)........................... 36

*Shqeirat v. USAirways, Inc.,* 515 F.Supp.2d 984 (D. Minn. 2007)...................................... 27

*Simmons v. Navajo County,* 609 F.3d 1011 (9th Cir. 2010) ............................................... 33

*St. Francis College v. Al-Khazraji,* 481 U.S. 604 (1987) ................................................... 33

*Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002)............................................................ 34

*Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248 (1981)......................................... 35

*Tsao v. Desert Palace, Inc.,* 698 F.3d 1128 (9th Cir. 2012) .............................................. 49

*TWA v. Thurston,* 469 U.S. 111 (1985)............................................................................... 35

*United Airlines, Inc. v. Evans,* 431 U.S. 553 (1977) ............................................................ 41

*Veliz v. Cintas Corp.*, 2009 U.S. Dist. LEXIS 36328 (N.D. Cal. Apr. 23, 2009) ................................ 7

*Washington v. Garrett*, 10 F.3d 1421 (9th Cir. 1994) .......................................................... 39

*Woods v. Graphic Communications*, 925 F.2d 1195 (9th Cir. 1991) ........................................... 50

*Wyshak v. City Nat'l Bank,* 607 F.2d 824 (9th Cir. 1979) ...................................................... 33

*Young v. United Parcel Serv., Inc.,* 574 U.S. 972, ___, 135 S. Ct. 1338 (2015) ......................... 34, 35

**Statutes**

42 U.S.C. § 1981 ................................................................................................. passim

42 U.S.C. § 1988 ..................................................................................................... 50

49 U.S.C. § 40127 ..................................................................................................... 6

49 U.S.C. § 41310(a) ................................................................................................. 6

49 U.S.C. § 41702 ..................................................................................................... 6

49 U.S.C. § 41712 ..................................................................................................... 6

49 U.S.C. § 44902(b) ............................................................................................. 28, 29

49 U.S.C. § 44941(a) .......................................................................................... 26, 27, 28, 29

49 U.S.C. § 44941(b) ........................................................................................ 29, 30, 32

49 U.S.C. § 46504 ................................................................................................... 45

49 U.S.C. §44734(a)(4) ............................................................................................... 5

NRS 42.001 .......................................................................................................... 46

NRS 42.005(2)(e) ................................................................................................... 50

NRS 42.007 .......................................................................................................... 51

NRS 432B.160 .................................................................................................... 32, 33

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................................. 34

Fed. R. Evid. 403 ................................................................................................... 26

**Treatises**

Restatement (Second) of Torts § 35 (1965) ......................................................................... 47

Restatement (Second) of Torts § 46 ................................................................................. 45

Restatement (Second) of Torts, § 13 ......................................................................... 47

Restatement (Second) of Torts, § 18 ......................................................................... 47

**Regulations**

14 CFR § 121.585 ...................................................................................................... 36

14 CFR § 121.585(b)(3) and (6) .................................................................................. 3

## I.   STATEMENT OF MATERIAL FACTS PURSUANT TO LR 56-1

1.   Peter DelVecchia and his late wife, Gay Tanwani DelVecchia, adopted A.D. from an orphanage in Ethiopia in 2010. A.D. was born in Ethiopia to Ethiopian parents in 2007. Ex. A at 11:6-9. The orphanage told Peter and Gay that A.D.'s birth mother died and his father could not afford to raise A.D. with his siblings. When they adopted A.D., Peter and Gay had two daughters: Amanda, born to them in 1990, and Gayle, born in India in 1994 and adopted as an infant. *Id.* at 8:13-25.

2.   Peter was born in 1963 and is White. A.D. is Black with recognizable Ethiopian facial features. Sgt. Francois Obasi, a Black LVMPD supervisor[1] who identifies as a Caribbean, testified that he assumed A.D. is from "an Ethiopian region" when he first saw A.D. as, "being, you know, from another country … we tend to recognize features pretty well. So, when I saw [his features], I immediately assumed more of an Ethiopian/Eritrean type background" Ex. G at 103:8-19.

3.   Gay died in 2014, after complications from liver transplant surgery Ex. A at 11:8-9. Peter has raised A.D. as a single parent since A.D. was seven. They enjoy a close bond; Peter is the sole parent (out of four) that A.D. has not lost to unfortunate circumstances during his 16-year life.

4.   Peter and A.D. share an enthusiasm for sports, frequently hike and cycle together, and have a goal of hiking in all the national parks together. Ex. A at 19:5-16. Peter introduced A.D. to hockey at a young age, and he is a standout youth hockey player. *Id.* at 25:2-6; 185:5-12; Ex. G at 13:8-20.

5.   On February 28, 2019, Peter purchased two tickets for A.D. and him to fly from Raleigh Durham International Airport (RDU) to Las Vegas (LAS) aboard Frontier Flight 2067 on March 28, 2019 (the "Subject Flight"). He paid Frontier a total of $702.08 for the two tickets Ex. 1 at 0901, 0911. The purpose of the trip was to go hiking in Death Valley National Park during A.D.'s spring break from school. LAS is the closest major airport to the park. Ex. A at 19:1-24.

6.   When he checked in for the Subject Flight online, Peter selected seats 13D and 13E, which are aisle and middle seats in the aircraft's emergency exit row. Peter was unaware at that time that the seats were in the exit row.[2] ECF No. 153 at ¶ 7; ECF No. 155 at ¶ 7.

7.   Peter and A.D. arrived at RDU in the early evening of March 28, 2019 for the evening flight.

---

[1] Sgt. Obasi retired before his deposition date, after 21.5 years on the force. Ex. G at 9:12-15.
[2] The Complaint alleges that Peter was unaware of the age restriction. That was an error by counsel; Peter testified in his deposition that he did not realize the seats were in the exit row. Ex. A at 22:1-14.

They checked their suitcases at Frontier's counter and proceeded to the gate with only their day packs. They boarded the aircraft when permitted by the gate agents. Ex. A at 39:20-24.

8.   As noted by Plaintiffs' expert Captain Vickie Norton, had Frontier's gate agents done their jobs and inquired about A.D.'s age prior to the boarding, the reseating event discussed below never would have occurred. Ex. 2 at 1-2, § 3.0.

9.   Peter and A.D. sat in the middle and aisle seats, 13E and 13D, respectively.[3] Peter testified that once they took their seats and he realized they were in the exit row, he knew they would have to be moved to different seats due to A.D.'s age. Ex. A at 22:8-14. Another passenger sat in 13F, the window seat. Flight Attendant ("FA") Anna Bond approached Peter and A.D. prior to conducting her required exit row passenger briefing. Bond was 24 years old and had worked for Frontier for 2.5 years. She testified that she thought A.D. looked too young to be sitting in the exit row, so she asked him his age. She testified that he responded, "Twelve," which was true at the time. Ex. 3 at 60:1-5. Based on the federal minimum age of 15, she then informed Peter that A.D. would need to be reseated in a non-emergency exit row. She asked Peter if he wanted to remain in the exit row, or if he desired that they be reseated together. She related that Peter responded, "Together." Ex. 3's Ex. 8 at 0104.

10. FA Bond then found two passengers who were traveling together and were willing to move to the exit row. Ex. 3 at 39:2-10. She instructed Peter and A.D. to take those passengers' seats in Row 17, which were 17E and 17F. Peter and A.D. complied with her instruction without argument or complaint. Peter sat in 17E, the middle seat, and A.D. sat in 17F, the window seat because he wanted to be by the window. Ex. A at 24:6-8. A man named Christopher Campbell, whom they did not know, occupied the aisle seat, 17D. Ex. 4 at 9:1-21.

11. After reseating the four passengers, FA Bond walked to the rear of the aircraft to inform Defendant FA Scott Warren and FA Amanda Nickel why she had reseated Plaintiffs. Defendant Warren and FA Nickel observed the reseating from the aft galley, approximately 17 rows from the exit row Peter and A.D. had departed, and 13 rows from their new seats. Ex. 3 at 97:10-23.

12. In a statement given to law enforcement officers after the flight landed, Bond stated that she

---

[3] Bond's statements place A.D. in the middle seat and Peter in the aisle seat. *See e.g.,* Ex. 1 at 0905, but she testified that A.D. was in the aisle seat and Peter was in the middle, *see* Ex. 3 at 43:15-19.

1  informed Warren and Nickel that she had reseated Peter and A.D. due to A.D.'s age. She stated that
2  Warren and Nickel were both "shocked as I said age instead of language."[4] Bond added in her
3  statement, "[t]he little boy did not look 12, and the relationship they [*i.e.,* Peter and A.D.] had looked
4  very awkward." Bond testified in her deposition that Nickel also told her that she thought A.D. looked
5  "old in the face" Ex 3 at 51:3-13.
6      13. The following photograph of Peter and A.D. was taken in November of 2017 and is Ex. 4's
7  Ex. 1.



14  14. In her own police statement, FA Nickel[5] stated, "I assumed by the look of the younger
15  passenger [A.D.] that he had been moved due to a language barrier." When asked what she meant by
16  "the look of the younger passenger," Nickel said "he did not look 12 ... [f]rom my view." Nickel said
17  that he was taller than her own 12-year-old son, who is white. Ex. 5 at 53:2-15; 54:1-4; 55:19 - 56:24.
18  She testified that she did not believe that he was only 12 and assumed that he had not been truthful
19  with FA Bond *Id.* at 57:3 – 58:11; Ex. 3 at 37:8-14.
20      15. Nickel stated to police that seeing "the two passengers [Peter and A.D.] together gave me [an]
21  uneasy feeling, so I kept an eye on them. Ex. 5 and its Ex. 2." She claimed in her deposition, taken
22  after litigation commenced and after a meeting with another FA and Frontier's defense counsel, the
23  "uneasy feeling" she had from seeing Peter and A.D. together was based solely on her belief that A.D.
24  had falsely stated that he was 12 when he must have been older, and also on a statement by FA Bond
25  to her "that she thought it was a little strange the way the child did not answer until he had looked at
26  his father and then answered the question about his age" Ex. 5 at 53:20 – 54:4, 55:3-24. But Bond

[4] The ability to read, understand and relay instructions in English is another exit row requirement. *See* 14 CFR § 121.585(b)(3) and (6).
[5] Nickel's surname is misspelled in some transcripts as "Nichol."

1   testified Nickel had told her that "she saw something off with those two, like during the, when I had

2   *initially* moved them" (emphasis added). Ex. 3 and its Ex 7, 8. Peter and A.D. were facing away from

3   Nickel when Bond asked A.D. his age, but their faces were visible to her and Warren when they stood

4   up and turned to the rear of the aircraft to move from Row 13 to Row 17. *Id.* at 48:20-24, 97:13-23.

5       16. In contrast to Nickel, FA Bond testified that she had asked A.D. his age because "he looked

6   like a young child." Ex. 3 at 37:5-14. Another FA, Chelsie Bright-Sakurada,[6] who observed the

7   reseating from the front of the aircraft said, "…Hmm, someone must be underage." Ex. E at 37:11-23.

8       17. Approximately two months before the Subject Flight, Frontier circulated a document titled

9   "Inflight Flyer" "Bi-Weekly Briefing" to its FAs informing them that "January is National Slavery

10  and Human Trafficking Prevention Month" and instructing, "[i]f you suspect a passenger may be a

11  victim of human trafficking... [t]ake note if traveling companion(s) [*sic*] appears nervous or prevents

12  the child/person [*sic*] from answering questions or if their answers seem evasive." Frontier's document

13  did not contain any other specific indicia of human trafficking. Ex. 3 at 27:15 – 29:8, 102:18-25 and

14  its Ex. 3, 4. FA Bright-Sakurada, the senior "A" FA on the flight, testified that Frontier had sent two

15  "emails and/or newsletters" to all FAs about trafficking, and that "we're all aware of it as flight

16  attendants" Ex. E at 61:13 - 62:10. She said trafficking "is something that we always look for." She

17  testified that she understands human trafficking to mean "some child that is with an adult that they're

18  not … supposed to be with. They're not their parents. They're not their … guardian. That they are kept

19  silent from this person that is taking them from one place to another and … they're not supposed to

20  be." Bright-Sakurada testified that she felt "absolutely" that labeling Peter and A.D. as "The Situation"

21  and surveilling them during the flight amounted to following Frontier's policies. *Id.* at 61:3-18; 62:1

22  – 63:11. Bond also testified to multiple training sessions involving human trafficking but she could

23  not recall any involving anti-discrimination, nor did any training records indicate Frontier gave the

24  FAs or pilots any anti-discrimination training. Ex. 3 at 27:15 - 29:8.

25      18. Sgt. Obasi testified that upon arrival at the aircraft's door at LAS, he heard a white female FA,

26  believed to be Bright-Sakurada, say about Peter and A.D. "I'm not sure they're even related." Ex. G

27  _____

28  [6] Frontier documents refer to her as "Chelsie Bright," although she testified at her deposition that her
    surname is actually Sakurada. Counsel use "Bright-Sakurada" to avoid confusion.

at 18:22-25. That FA described the passengers to him as "a middle-aged white man and ... a younger black male," and she mentioned something about a class she had taken that Sgt. Obasi understood to be "kind of like a human trafficking/child endangerment class" given by the airline "to look for, like, warning signs of these type things." *Id.* at 18:25 - 20:22. Bright-Sakurada confirmed that she was at the front of the aircraft and identified Peter and A.D. to LVMPD officers. Ex. E at 92:7 – 93:4.

19. Since 2016, 49 U.S.C. §44734(a)(4) has required every airline to provide its FAs "initial and annual training regarding . . . recognizing and responding to potential human trafficking victims." The Department of Transportation and the Department of Homeland Security jointly created a comprehensive multi-factor educational program called the Blue Lightning Initiative ("BLI") that "serves to raise awareness about human trafficking as it pertains to the airline industry and provides information on how to identify and report it." As of the Subject Flight, Frontier was not listed as an airline participant in the BLI program. Ex. 6's Ex. 1 at 30. Frontier's training materials on human trafficking, which the Subject Flight's FAs were shown during initial training, display photographs of supposed victims of human trafficking, the majority of whom are persons of color. *Id.* at 28, 29.

20. When the flight departed, the sole interaction between Peter and A.D. and any FAs was the brief interaction with FA Bond about A.D.'s age and the reseating into Row 17. Peter and A.D. complied with Bond's instructions without any argument or threat to flight safety. Ex. 5 at 82:11-13. In their new seats, they discussed hockey and their vacation. Ex. A at 24:1-12, 25:7-20. Mr. Campbell, seated next to them, testified that he overheard Peter have a normal phone conversation while the aircraft was still on the ground. Ex. 4 at 12:2-18. Mr. Campbell was awake the entire flight and never witnessed Peter touching A.D. *Id.* at 14:4-14. He expressed surprise over Frontier's claims of alleged criminal activity by Peter; he never saw any criminal behavior by Peter or A.D. *Id.* at 24:1-13.

21. A.D., who was chilly, took a jacket from his pack and tucked it tightly around his legs. Ex. A at 42:15-18. Peter and A.D. went to sleep almost as soon as the flight departed; they slept until FA Warren woke them up to separate them. *Id.* at 44:22 - 45:11, 46:8-24; 67:13-20; Ex. 7 at 74:7-22.

22. After 1 hour and 53 minutes of flying and with 2 hours and 32 minutes left, an ACARS message from the pilots stated, "THEY ARE SEPERATED [*sic*] NOW," referring to Peter and A.D. The exact

time Warren separated Peter and A.D. was not recorded. Ex. F at §§ 2, 7.[7]

23. When the Subject Flight departed—unbeknownst to Peter and A.D.—the FAs had already labeled them "The Situation," began surveilling them, and orally compared notes on their alleged observations. First Officer ("FO") Shawn Mullin, who discussed Peter and A.D. with Defendant Captain Shupe, compared the exchange of information about Peter and A.D. to "playing telephone." Ex. 8 at 58:9-15.

24. The FAs' decision to surveil Peter and A.D., their labelling them "The Situation," Nickel's declarations that she had an "uneasy feeling" about seeing them together and that she saw "something off with those two" from over 17 rows away during their reseating, and Bond's claim that Peter and A.D.'s "relationship ... looked very awkward" all occurred prior to any of the FAs claiming to have witnessed any "inappropriate touching" occurring between Peter and A.D. Ex. 5, at 91:8-23; Ex. E at 46:2-22; 47:1-12; 48:4-9.

25. On January 13, 2017, more than two years before the Subject Flight, the Department of Transportation issued a set of documents reminding all airline personnel of the several airline-specific statutes prohibiting passenger discrimination,[8] and suggesting that airlines adopt and incorporate into their training materials a method "[t]o ensure compliance with the law" when evaluating suspicious passenger activity. The DOT summarized the method with the acronym "BE FAIR," and "encourage[d] all airlines to implement comprehensive anti-bias training to help prevent and reduce incidents of unlawful discrimination" (underlining in original) Ex. 10 at 212:2-22-213:22. Frontier's Rule 30(b)(6) designee testified that the company's management received the DOT documents and decided not to make "significant changes [to employee training] as a result[.]" Id. at 227:14 - 228:5. The FAs and pilots on the Subject Flight testified that they did not recall receiving any specific anti-discrimination training from Frontier. Ex. E at 21:4-23, 22:8-20; Ex. C at 38:25 – 41:4; Ex. 3 at 26:7-11; Ex. 5 at 37:13-24 and its Ex. 1. Nor did any of the management employees from Frontier's "Denver Team" of its Customer Relations Department who are charged with the responsibility of responding

---

[7] Although the ACARS (or "Skyspeed") messages were produced numbered top to bottom, the messages occurred in reverse order, from bottom to top. Times are in UTC ("Zulu" time).

[8] Primarily 49 U.S.C. § 40127, but "[t]he Department has also interpreted 49 U.S.C. §§ 41310(a), 41712, and 41702 as prohibiting discrimination against air travelers." See Ex. 9 at P000748, n. 1.

to passenger complaints of discrimination. Ex. 6's Ex. 1 at 6-10.

26. The DOT's "BE FAIR" guidelines instruct: "[a] comprehensive evaluation should include whether a passenger's appearance is the determinative factor causing concern. In other words, airline personnel should ask themselves – but for the passenger's perceived race, color, national origin, religion, sex, or ancestry, would I be concerned that his or her behavior rises to the level of a potential threat to security or safety?" Ex. 9 at P000749. The guidelines also recommend direct communication with the passenger "to clarify and confirm the facts and details involved in the situation." *Id.*[9]

27. Aside from FA Bond's brief interaction concerning the move from the exit row that was part of her routine duties, the FAs and pilots chose not to speak to Plaintiffs before acting on their assumptions.

28. Bond told FA Bright-Sakurada about her interaction with Plaintiffs at the exit row after takeoff, and changed the facts based on her earlier discussion with FAs Warren and Nickel. Bright-Sakurada testified that Bond told her that when she had asked A.D. his age, "the dad stepped in very quickly and said, 'He's 11,' or 'He's 12.'" Ex. E at 38:11-24. According to Bright-Sakurada, Bond told her she (Bond) thought "it was very strange that the son couldn't speak for himself." *Id.* at 38:20-21. Bright-Sakurada testified that Bond also told her that when Peter and A.D. moved back to Row 17, "[Bond] thought it was very weird that the dad made the son get in first [to sit in the window seat] so, like, he wasn't allowed to be around a different passenger." *Id.* at 38:16-19. Those false statements also occurred prior to any alleged FA observations of "inappropriate touching" by Peter. Bright-Sakurada conceded that A.D. had been seated just across the aisle from a stranger in Row 13. *Id.* at 63:12 – 64:1. When Bond testified subsequently in her own deposition, she admitted that Peter had not done any of the things that Bright-Sakurada had testified that Bond told her during the flight. Ex. 3 at 98:12-25. Yet Bright-Sakurada testified that Bond told her he had. In Bright-Sakurada's words, "I swear she did." Ex. E at 113:17-25.

---

[9] Plaintiffs request the Court take judicial notice of these U.S. government publications. *See Veliz v. Cintas Corp.*, 2009 U.S. Dist. LEXIS 36328, *11-12, n.2 (N.D. Cal. Apr. 23, 2009) (taking judicial notice of various Department of Transportation publications and notices); *Lowthorp v. Mesa Air Grp. Incorporated*, 2021 U.S. Dist. LEXIS 136967, *16-17 (D. Ariz. Jul 22, 2021) (same).

29. Bright-Sakurada testified that she noticed Peter "touching" or "stroking" A.D.'s face *only after FA Nickel had alerted her to it*: "And so Amanda [Nickel] walked up to the front, had glanced over at [Row] 17 on her way up doing trash run, and came up to me … and Anna [Bond] -- and said, 'He's kind of – the older gentleman is stroking the face of this younger boy. Come and look,' kind of thing, is what she said." Bright-Sakurada continued, "So I did a trash run … [as] I was going past 17, I did see the older gentleman lean over and just – just went like this, up and down, up and down, up and down. And it was just a very awkward thing to see" Ex. E at 46:19 – 48:15. Yet, Nickel testified she had not seen Peter touch A.D.'s face during the flight, and therefore she never could have alerted Bright-Sakurada to it; in fact, Bright-Sakurada is the only person who claimed to have seen Peter touch A.D.'s face. Ex. 5 at 86:6 – 87:21. Mr. Campbell, who was seated beside Plaintiffs and who testified that he was awake for the entire flight, testified that he never saw Peter touch A.D.'s face (or leg or thigh). Ex. 4 at 14:4-14. None of the three passengers seated across the aisle from Peter and A.D. saw Peter touch A.D.'s face. Ex. 11 at 36:9-12; Ex. 12 at 19:11-25; Ex. 13 at 11:19 – 12:6.

30. The following still from Bright-Sakurada's videotaped deposition shows her reenactment of what she claimed Peter did:



She then testified: "Q: So basically, no parent of any sex in your mind should stroke the child's face of any sex? A: No. No they shouldn't." Exhibit 14 is the DVD of the deposition. As indicated on the still, the demonstration occurs at approximately 10:44:42.

31. Frontier's written protocols require that a FA first ask another crew member to verify suspicious passenger activity by their own observation before reporting said activity to a Captain. Bright-Sakurada did not follow this protocol before reporting the alleged face touching to Captain Shupe, nor did Warren before reporting the alleged hand in/on the crotch to Captain Shupe. Warren was the only person who claimed to have seen the alleged crotch-touching. Ex. 10 at 62:13 – 63:14.

32. All four FAs met in the forward galley to discuss their "unease" about Peter and A.D. The meeting violated Frontier's written protocols. Ex. 10 at 234:4 – 235:16; and its Ex. 9 at 0727; Ex. E at 120:2-16; Ex. C at 59:1-17; Ex. 3 at 46:1-14; Ex. 5 at 74:17-25.

33. According to Bright-Sakurada, all four FAs agreed that she should report their unease to Captain Shupe, so she called him on the intercom and asked for permission to enter the cockpit. Captain Shupe testified that a FA's report of one passenger touching another passenger's face normally would not have been a cause for concern, but Bright-Sakurada's request to enter the cockpit made the situation "unusual." Captain Shupe allowed her to enter the cockpit; she testified that she told Captain Shupe and FO Mullin about "how uncomfortable I felt and all the other flight attendants felt about … [Peter and A.D.'s] relationship," what Bond had told her about Peter answering for A.D. about his age, Bond feeling uncomfortable when Peter insisted that A.D. take the window seat, how "this boy [A.D.] didn't say anything throughout the whole entire conversation [at the exit row]," how "Amanda [Nickel] had seen the dad rubbing the boy's face," and how Bright-Sakurada also claimed to have seen Peter touching A.D.'s face. Ex. D at 18:5-25, 25:2-20, 27:2-21. As noted, the other FAs admitted the "occurrences" that Bright-Sakurada had relayed to the Captain and FO had never taken place. Shupe testified that when he called Bond for her version, "she did not go into detail [about] what she saw," and did not tell him that she had seen what Bright-Sakurada and Warren had reported to him, "But she did say that there was something unusual about the two [and that] ...[s]he was uncomfortable with the situation." He testified Nickel provided no facts to him, but only said she agreed there was "a situation." Ex. E at 70:12-25, 72:2-17; 73:1-17.

34. Captain Norton, Plaintiffs' pilot expert, testified that Captain Shupe did not utilize any of the leadership skills available to him or conduct any logical fact-finding or data gathering to ensure that Bright-Sakurada's information was accurate. Ex. 15 at 266:1 - 267:18, 278:1-12, 279:4-19.

35. Bright-Sakurada testified that, while she was in the cockpit, another FA telephoned on the intercom and said that FA Warren insisted on entering the cockpit to tell Captain Shupe something. Bright-Sakurada testified that Captain Shupe admitted Warren to the cockpit with Bright-Sakurada. That violated Frontier's written protocols. Ex. E at 75:16 - 76:20; Ex. 10 at 234:4 – 235:16.

36. Warren, however, testified that he was summoned into the cockpit by someone in the cockpit, that the pilots had received the report of the face touching prior to his entry, that FA Nickel may have entered the cockpit after him, and they were in the cockpit together. Ex. C at 68:7-25, 71:8-18.

37. Nickel testified that she went into the cockpit with Warren, closed the door and heard him tell Captain Shupe that he had seen Peter's hand inserted between A.D.'s legs near his genital area. She testified that the only people in the cockpit at that time were Warren, her, and the pilots. Ex. 5 at 97:6-17. She testified that after Warren told this to Captain Shupe, Captain Shupe ordered A.D. be separated from Peter "immediately." A discussion ensued among Nickel, Warren and the two pilots about the details of how the separation would be accomplished. *Id.* at 98:1-21.

38. Bright-Sakurada testified that Warren entered the cockpit while she was already there and told Captain Shupe that he had seen Peter's hand "resting on the boy's crotch." Ex. E at 76:1-14. She testified that Warren said nothing to Captain Shupe about his observation that both Peter and A.D. appeared to be asleep at the time of his alleged observation. *Id.* at 76:4-5. Warren confirmed in his testimony that he did not tell Captain Shupe that Peter and A.D. appeared to be asleep. Ex. C at 130:10-18. Bright-Sakurada testified that there were only four persons in the cockpit at that time—herself, Warren, Shupe and Mullin, and that after Warren delivered the information to Captain Shupe, "We, as in me, the captain and Scott, came up with the idea that we needed to separate them because we have no idea what's going on. And either separate the boy from the dad or the dad from the boy. Either way, they needed to be separated. So we decided as a—as a little group of the three of us—because the co-captain just didn't say much— … that Scott was going to go up to the two and ask the boy to come with him to the back of the plane because the back row is empty." Ex. E at 76:22 – 77:8.

39. Thus, Bright-Sakurada and Nickel each testified to being the sole additional FA who witnessed Warren's delivery of his claimed observation to Captain Shupe and FO Mullin, and to being part of the discussion in the closed cockpit about how the separation would be carried out, *in the other's absence*. In Bright-Sakurada's telling, Warren said that he saw Peter's hand "resting on the boy's crotch." Ex. E at 76:10-11. In Nickel's telling, Warren reported seeing "the hand ... inserted between

the legs." Ex. 5 at 94:23 – 95:4. Each testified that the only other FA present when Warren discussed this was Warren. Warren testified that he only delivered that information in the cockpit once.[10]

40. Captain Shupe confirmed that Warren did not inform him that Peter and A.D. were asleep. When asked if that fact would have made a difference to him, he testified, "I don't know." Ex. D at 22:1 – 23:20. He subsequently conceded that he would not consider someone to be sexually molesting another if both persons were asleep. Yet, he never inquired about Peter and A.D.'s sleeping status and never sent anyone to speak to them. *Id.* at 27:1-21, 28:20 - 29:5.

41. Both Peter and A.D. have testified that Peter did not have his hand in or on A.D.'s crotch. They also testified that the way that A.D. had wrapped his jacket tightly around his legs would have made it impossible for things to have been as Warren claimed, with Peter's hand "down in between the legs" and "on [A.D.'s] penis." Ex. A at 155:16 – 157:8; Ex. 7 at 79:3 - 80:6. Moreover, A.D.'s therapist has testified that he has never shown any indicia of sexual abuse by his father.[11] Ex. 16 at 107:7-11.

42. FA Nickel testified: (a) the cabin lights were set to the "Dim Two" setting when Warren did his "walk through" and claimed to have seen Peter's hand "inserted between" A.D.'s legs near his genital area; and (b) when she conducted her beverage service in the cabin the cabin lights were also set on "Dim Two", and it was too dark for her to see what A.D. was wearing. Ex. 5 at 95:5-21. She also testified that while she and Warren were in the cockpit discussing the details of how the separation would be carried out with Captain Shupe, they decided Warren would make a signal to Nickel when he was at Row 17 and ready to proceed, and she'd then turn the lights up to full bright; when asked why they decided to turn the lights up, she responded, "So that we could—so everyone could see where they were and so that the child would be able to see as he exited the row where to walk." *Id.* at 100:2-14.

43. Captain Shupe agreed that he could have sent any of the FAs to speak with Peter and A.D. prior to taking action against them, and if they had reported that they are father and son and that

---

[10] Warren's testimony was unclear about whether he entered the cockpit once or twice, but if he did enter it twice, the first time would simply have been to receive Captain Shupe's instruction to walk past Row 17 and report what he saw. Ex. C at 59:8-17, 122:19 – 124:21.

[11] Defendants' motion claims that Warren's observation is an "undisputed fact," *see* ECF 266 at 3. Plaintiffs unequivocally dispute the veracity of Warren's alleged observation.

1    nothing was objectionable about their contact with each other, it would have been a "nonissue" and

2    "certainly" not a Threat Level 2. But he chose not to do that. Ex. D at 51:14 - 52:24.

3        44. Nickel testified that Captain Shupe addressed the FAs standing in the forward galley when he

4    took a lavatory break after Bright-Sakurada's call (presumably not including Bright-Sakurada, who

5    would have been inside the cockpit with FO Mullin due to airline protocols), and that he had

6    specifically instructed them to conduct frequent "walk-bys" observing Peter and A.D. and to report to

7    him "more touching." Ex. 5 at 84:9-15, 93:23 – 94:11. Similarly, FA Bond testified that she recalled

8    one of the pilots exiting the cockpit and speaking to the three remaining FAs (*i.e.,* herself, Nickel and

9    Warren) about Peter and A.D., and that "Scott [Warren] had an idea saying, let me go up and do a

10   walk through in the cabin, and see if there is anything suspicious while the [pilot][12] is out here." Ex. 3

11   at 75:7-14. She testified that she thought Warren's "idea" would "help the situation." *Id.* at 77:2-9.

12   She recalled Warren entering the cockpit after performing his "walk through" past Row 17 and back

13   up to the forward galley. *Id.* at 79:11-17; Ex. C at 60:21-25.

14       45. The testimony of the four FAs and the two pilots was inconsistent regarding the order of events

15   relating to the FAs' calls to the cockpit, the FAs entering the cockpit, which FAs were in the cockpit,

16   and what was said in the cockpit. However, the majority testified both pilots were on lavatory breaks

17   when they received information about Peter and A.D. from them. *See* Ex. 2 at Appx. C.

18       46. The forward lavatory the pilots used is adjacent to the cockpit door and the forward galley of

19   the aircraft. Several of the FAs testified that the pilots spoke to them about Peter and A.D. while

20   standing in the forward galley either before or after using the lavatory. Ex. 5 at 93:3 - 94:11; Ex. 3 at

21   71:7 – 72:5; Ex. E at 81:18 – 82:21; Ex. C at 68:1-15.

22       47. The forward galley is slightly more than 17 rows from Row 17, where Peter and A.D. were

23   seated during the first part of the flight. That is essentially the same distance from which Warren and

24   Nickel, standing in the aft galley, had observed Peter and A.D. standing up at Row 13, the exit row,

25   prior to takeoff; the aircraft has a total of 30 rows. Ex. C at 84:9-25.

26

27   ────────────

     [12] She initially used the word "Captain," but subsequently testified that she could not recall whether it

28   was Captain Shupe or FO Mullin who had been standing in the forward galley at that time. Passenger
     Higgins testified that FO Mullin stood in the galley and watched Warren when he stopped at Peter and
     A.D.'s row to initiate A.D.'s separation from Peter.

48. The aircraft did not have a First-Class cabin or any divider between cabins, so the view from both galleys is unobstructed.[13]

49. FO Mullin testified that after the pilots took their lavatory breaks, they knew that Peter is Caucasian and A.D. is Black.[14] Ex. 8 at 59:15 - 60:8.

50. Captain Shupe testified that he ordered Peter and A.D. to be separated based on Threat Level 2. However, he testified that he did not consult the wording of Threat Level 2 until after he had given the separation order and the two FAs had left the cockpit. Ex. D at 33:2-16. He acknowledged he did not follow Threat Level 2 procedures in the Frontier Flight Operations Manual (FOM) by ordering A.D. to be taken to the rear of the aircraft, but instead claimed that he had made an "equivalency determination" in what he ordered done. *Id.* at 38:15-24. He conceded that he is not permitted to make "equivalency determinations" regarding standard operating procedures in the FOM. *Id.* at 39:6-11. He also conceded that he never checked on 12-year-old A.D.'s condition after ordering that he be separated from his father. *Id.* at 40:5-19.

51. Captain Norton testified that Captain Shupe and FO Mullin had no legitimate basis on which to declare that Peter and A.D. constituted a Threat Level 2, and that they both failed to follow the required Department of Homeland Security's and Frontier's required procedures for a Threat Level 2. Ex. 2 at 4-7, 12-14; Ex. 15 at 202:22 – 203:20; 205:5-16; 255:14 - 256:20.

52. As noted in Captain Norton's Report, Captain Shupe was the Pilot-in-Command of the Subject Flight and he had authority over all of the assigned crewmembers of the Subject Flight during their duty time. Ex. 2 at 14. Captain Shupe himself testified, "the buck stops with me." Ex. D at 30:2-11. Frontier's FOM states that the Captain is the senior representative of Frontier on the flight and is responsible for compliance with all regulations, company policies and procedures. Ex. 10 at 239:12-20; *see also* Ex. 16 to Ex. 10 at 1078-79.

---

[13] Higgins testified that he recalled seeing a first-class cabin with wider seats and a curtain dividing it from the rest of the cabin, but it is undisputed by the parties that the aircraft used on the Subject Flight had no first-class cabin or curtain.

[14] Defendants incorrectly claim as an "undisputed fact" that Capt. Shupe did not know Plaintiffs' respective races, *see* ECF No. 266 at 4. Plaintiffs dispute that.

53. FO Mullin testified he recalled the first report concerning Peter and A.D. was made only by an intercom call from a FA to Captain Shupe, and that the initial report was of a "potential situation" involving an older gentleman traveling with a younger child and "inappropriateness" of an unspecified "sexual" nature. Ex. 8 at 30:9-21; 34:4-24; 35:16 - 36:2. He didn't think the pilots knew of the different skin colors at that point but admitted they did obtain that information "at some point in the flight", "relatively soon" after the initial report. Ex. 8 at 36:1-12. He testified that, after the initial call, he and Captain Shupe consulted the FOM for guidance and focused on the Threat Levels and he and Captain Shupe wanted to develop a "game plan" in the event of escalation Ex. 8 at 39:9-23, 54:19 - 55:2. Captain Shupe testified the pilots had not been given any information by Frontier on its human trafficking or sexual misconduct protocols. Ex. 8 at 68:20 -69:4.

54. FAs Warren and Nickel testified that after they received Captain Shupe's instruction to separate A.D. from Peter, Warren told Nickel that he would find an "Able Bodied Passenger" to assist them, and then he would signal Nickel to turn the cabin lights up to full bright when he was at Row 17. Ex. C at 75:2-19; 77:3-17; Ex. 5 at 98:10-25; 99:9-14; 100:4-14; 104:6-15. Warren then went to Row 20, where Higgins was seated, and had a discussion with Higgins. Higgins testified that the discussion lasted thirty seconds. Ex. J at 26:5-18. Passenger Taleik Johnson, who was seated next to Higgins, testified that the discussion lasted "more than seconds but less than five minutes." Ex. 17 at 19:2-15. Higgins agreed to assist Warren. Ex J at 22:18 – 23:15, 25:4-10.

55. Warren then approached Row 17, where Peter and A.D. were seated and asleep. Ex. C at 130:10-18.

56. Campbell, seated in the aisle seat next to Peter, testified that the male flight attendant (Warren) appeared to be "on a specific mission to come to our seats to remove A.D.," and that he "bump[ed] into me rather aggressively" and pushed him forward in his seat to reach over his back toward Peter. Ex. 4 at 14:16 – 15:14, 16:15 – 17:1. Campbell could not see what the flight attendant did with his hands after that. *Id.* at 17:4-6.

57. In a signed declaration, Higgins testified he was seated behind Row 17 (he was in seat 20D, an aisle seat on the same side of the cabin as Peter and A.D.), and that: "I could see the top of [Peter's] head, and it appeared to me that he was asleep. Ex. 18, ¶ 7. The male flight attendant used his right

arm to wake [Peter], but from my vantage point, I could not see his hand make contact with [Peter's] body. I then saw [Peter] stand and move out of the row into the aisle." *Id.* In his deposition, he testified that because of the height of the seats in the Frontier aircraft, "[y]ou can basically see the back of the head, almost." Ex. J at 30:25 – 31:12.

58. Peter testified that he was sleeping with his head leaning on the back of the seat in front of him, "because the back of my thighs were starting to get pins and needles, because the seat was so hard. So I was trying to get weight off ...." Ex. A at 41:14-22. He testified that he had been deeply asleep and he was awakened by "several hard hits to the back and my head and neck ... when I woke up, I felt my head [being] smashed down twice against the seat. And I remember that it hurt ... because they were smashing it, and it was hitting the seat." *Id.* at 45:6-24. He testified that the last blow he felt was to the base of his skull, and that his forehead had impacted the seat back in front of him. *Id.* at 46:4-24; 48:6-17; 50:6-15.

59. Warren instructed Peter to stand and vacate the row; Peter complied. Warren then woke A.D., took him back and made him sit in the Row 30 window seat. Ex. A at 56:5-17; Ex. C at 84:5 - 85:10.

60. Warren instructed Higgins, the "Able Bodied Passenger" and off-duty policeman, to sit in seat 30D, the aisle seat. Ex. J at 43:15-25. Higgins understood that his role was to keep Peter physically separated from A.D. and A.D. from Peter. Ex. J at 59:10-14, 82:7-14, 100:7 – 101:24, 105:1 – 106:24. Higgins willingly accepted his role and testified that A.D. could not exit the row without crawling over him or getting him to move. *Id*. at 105:21 – 106:24.

61. When Peter attempted to join A.D. in the last row, and informed him that A.D. was his son, Warren physically blocked his path. Ex. J at 48:3 – 49:2; Ex. A at 61:25 – 62:10.

62. When A.D. informed Warren that Peter is his father, had not molested him, never would molest him, and requested to return to his seat beside his father, Warren refused to allow him to leave Row 30 to do so for the remainder of the flight, which was 2.5 hours. Ex. 7 at 78:3-16; 79:8 - 80:6. A.D. testified: "I kept asking can I—can I go back to my seat?... [H]e was ignoring me." *Id.* at 78:3-6.

63. Peter testified that when Warren woke A.D. and took him out of his seat, A.D. "looked very confused. He kept saying 'Okay.' I thought he did something wrong. The first thing I started thinking about was that he did something wrong. I mean—or he had to use the bathroom and I didn't wake up,

and I thought [Warren] was trying to help him get to the bathroom. I had no idea what was going on. And then I remember searing pain. The pain was horrible in my eyes. It was all down my neck and back. And I will add that I remember being very foggy. I just—I couldn't get focused. It was like I was in like a cloud. I don't remember if I stepped out of the row or if the person next to me did. I can't answer that. I remember Kevin leading my son to the rear of the plane."[15] Ex. A at 54:4-21.

64. Peter testified that he took only a quarter dose of an over-the-counter sleeping aid at the beginning of the flight (a normal dose is two tablets, and he took half of one tablet). He testified that he had taken the same dose before and never experienced fogginess from it. Sometimes it does not even put him to sleep for another two hours after taking it. Ex. A at 55:9 – 56:4.

65. Sgt. Obasi testified that he recalled Peter telling him after he took Peter into custody that he had been "punched" – "he felt basically he was hit in the back of the head." Ex. G at 71:2-5; 73:3-13.

66. Peter testified that during the hiking trip that followed the Subject Flight, he experienced "tremendous pressure" in his eyes and had difficulties he had never had before hiking even flat trails: "I couldn't stay awake. There were bouts of nausea. There were points where the head pain was more than I could take. My neck was killing me. The back of my head was killing me... [M]y son complained several times that it wasn't fun, because I kept falling asleep on the ground or on rocks. We stopped a lot, and we never stop." Ex. A at 134:9-1; 135:15-23; 136:10-24; 137:1-15; 138:4-13; 140:2-11. He testified that he took Advil "nonstop." *Id.* at 137:13-15.

67. A.D. testified that his father complained of "blistering pain" in his head and nausea after they left the police station, difficulties with memory, constant headaches during hikes, and took a lot of Advil. Ex. 7 at 19:6-15, 59:4-25. A.D. testified that Peter still had memory issues 10 months later. *Id.* at 35:13-18; 59:4 - 60:4.

68. Peter testified that he had continuing pain and memory issues a week later, when they embarked on their return flight: "I remember struggling. My head was hurting really bad, and I started

---

[15] Peter testified that when he asked Warren for his name, he told him it is "Kevin." Ex. A at 67:21 - 68:13. Warren testified that he has never been known as Kevin, but he denied telling Peter that was his name. Ex. C at 126:12-22. Frontier's written protocols require employees to furnish identification when requested and give passengers accurate information, but Frontier has never investigated Peter's allegation that Warren gave a false name. Ex. 10 at its Ex. 15 page bates numbered 1448; Ex. 10 at its Ex. 24; Ex. 10 at 254:8-24, 172:6 – 173:17.

to have … some issues remembering things, and the pain was—I assumed it was because of the pain in my head, but I was having some issues, logical issues. You know, I forgot to fill the car up with gas, and we almost ran out of gas. Stupid things like that I don't normally do." Ex. A at 142:8-23.

69. Peter texted his older daughter, Amanda, after the Subject Flight landed. Amanda testified, "I could see from … my father's texts that he was disoriented. The fear that came through in those texts is something I've never seen before." Ex. 19 at 39:8-15. When they spoke by phone, she observed, "He was shaky, he was sick, he was disoriented. He expressed injury from the incident... He was extremely scared. He stated that they had only gone hiking because he couldn't get his mind clear and couldn't think straight, that nothing so terrifying had happened to him before." *Id.* at 43:20 - 44:10. She testified that Peter suffered "high anxiety" and nightmares of A.D. being taken since the Subject Flight. *Id.* at 55:17 - 56:7.

70. Peter's other daughter, Gayle, testified nearly nine months after the Subject Flight that Peter told her he had been hit multiple times in the head, and observed his cognitive difficulties from the incident: "[I]t takes him a few minutes to put things together now... and remember things fully." Ex. 20 at 53:3-12; 56:1-4; 66:18 - 67:20.

71. Peter's romantic partner, Alexis Franzese, PhD, a practicing psychologist and tenured associate professor of social psychology and medical sociology at Elon University, testified nearly one year after the Subject Flight that Peter continued to suffer cognitive difficulties through that date, including struggling to find words and forgetting things that they had talked about. She described that as a significant change from before the Subject Flight, when he was "sharp as a tack." Ex. 21 at 34:14 – 35:15. She noticed psychological changes since the Subject Flight, including Peter being "exceptionally hypervigilant" with an atypical awareness and orientation toward threat, and a defensiveness and fear for his son that he did not exhibit before. *Id.* at 35:16-24. She described a new irritability, loss of patience and shortness that did not exist pre-incident. She described him as being "profoundly patient pre-incident." Ex. 21 at 55:11-16.

72. Two board-certified neurologists, Kenneth Carnes, MD and Bruce Lasker, MD, have examined Peter following the Subject Flight. Dr. Carnes testified that the symptoms Peter described having after being hit on the head during the flight are consistent with a concussion. Ex. 22 at 80:13-21, 81:11 –

85:2. Dr. Lasker reviewed Peter's MRI and his records and interviewed Peter, and he diagnosed that Peter suffered a concussion from being struck on the head during the flight. Frontier has hired a clinical neuropsychologist who did not examine Peter but disputes that he suffered a concussion. Ex. 23 at 17:1-23, 55:1-25; 56:1-8.

73. Peter testified that after Warren took A.D. to the rear of the aircraft and seated Higgins at the end of his row, Peter walked to the rear of the aircraft to find out why Warren had taken him. Ex A at 61:15-23, 62:1-10. Higgins testified that Warren came out of the aft galley and blocked Peter in front of Row 30. Ex. J at 48:4-23. Higgins was close enough to Peter to hear him say to Warren that A.D. is his son and that he wants to speak with him because he is scared. *Id.* at 49:17-25. Higgins also heard what Peter said to A.D. from the aisle and repeated it verbatim in his declaration. *Id.* at 48:9-11. Peter's testimony confirmed what Higgins wrote in his declaration. Ex. 18 at ¶¶ 4-11.

74. Peter testified that when Warren blocked his path in the aisle just in front of Row 30, Warren appeared "hostile, angry," and his blocking Peter appeared "threatening." Ex. A at 62:3-18. Peter asked him why he took A.D. and told him that A.D. is his son. Warren responded that he had seen Peter touch his A.D.'s groin, accused him of knowing what he did, said that all the flight attendants had witnessed it, and said that the police had been called and would meet the flight at LAS. Peter asked Warren his name and he said "Kevin" and refused to provide a surname. *Id.* at 66:19- 68:11. Peter testified that Higgins was staring at him during this time, and that he appeared compassionate toward him. Warren then told Peter to return to his seat, and Peter complied. *Id.* at 66:15-25.

75. Peter testified that he was "very relieved" to learn that the police had been called. Ex. A at 69:18-25. When asked why by Frontier's counsel, he replied, "Because I expected fairness. I mean, this man [Warren] was an animal. I didn't want him near my son. I wanted the police there. I wanted somebody to help me out. I knew I was going to get nowhere with this person, and I was extremely relieved that the police had been called." Ex. A at 70:1-19.

76. Higgins testified that after the flight landed, a female FA told him that "someone's hand was in someone's crotch." Ex. 18: ¶ 10. He testified in his deposition that he understood that reference to be to Peter and A.D., although he declined to conclude which one was accused of doing the groping— "It could've been either one." Ex. J at 139:19 – 140:15.

77. Peter and A.D. had never been separated on a flight before, nor did A.D. tell Warren that they had. On a previous Delta flight that landed in Salt Lake City, they had been met by law enforcement officers *in the boarding gate area* after they had exited the flight, where they were questioned separately for a few minutes before leaving. Ex. A at 73:10-21. Frontier's statements claiming that A.D. said they had been separated before on a flight are mischaracterizations. *Id.* at 82:18 - 84:18.

78. Other passengers who had seen Warren take A.D. away from Peter assumed from what they had observed that Peter was engaged in criminal behavior. Mrs. Turkessa Vanrensalier-Wideman, who was seated 17A, testified to her thoughts upon seeing A.D. being taken away by the FA: "In my mind, I thought that maybe it was possible they thought that he could be human trafficking the child just because it was a Caucasian man with a black child, a older Caucasian man with a black child. Honestly, that's what I thought. I was hoping that—that's not what it was. But I mean, the fact that they did not give him any explanation as to why that they took his child from him I—I can't understand why you would take a child in the middle of a flight. I've taken a lot of flights in—in my time, and I travel sometimes for work, and I've never seen that happen. And it was a little alarming because it's a lot going on high up in the sky and no one wants—I mean it just gave me a flashback of a 9/11 situation where it's just like something going on in the air. And we're all stuck in this plane together. It was a little traumatic, honestly." She thought that a human trafficker had been caught. Ex. 11 at 26:5 - 27:21.

79. Ms. Brianna Hayes, seated next to Mrs. Vanrensalier-Wideman, testified that "I thought something was going on because they removed the little boy from the man." Ex. 12 at 69:15-25. Questioned further, she agreed with the conclusion that if the airline was removing the boy from the man, he must have done something wrong or somebody must have done something wrong. She thought she saw Peter take a pill after A.D. had been taken from him and thought "maybe he was committing suicide ... because he got caught doing something." *Id.* at 60:14-19.

80. Mr. Taleik Johnson, who had been seated next to Higgins and witnessed Warren asking him to assist, and then witnessed Warren taking A.D. to the rear of the aircraft and FAs blocking Peter from getting to A.D., testified that he was "trying to put the puzzle together, or pieces of the puzzle together to try to figure out what's going on," Ex. 17 at 13:1-19. Shortly after, he saw three uniformed police officers when he exited the aircraft and "I assumed that Mr. Peter was in trouble and that … A.D. was

taken away from Mr. Peter for a particular reason. I definitely didn't think that it was because he, you know, shouldn't have been there. But I just thought that it was something that occurred while I was asleep that could have resulted to, you know, them being displaced from each other." *Id.* at 15:15-21.

81. At one point, Warren sat next to A.D. in the middle seat of Row 30. Higgins testified that Warren never sat in the row, but Warren admitted in his deposition that he did. Ex. C at 115:24 - 116:4. Warren testified that he informed A.D. of the details of what he claimed to have seen Peter do. Warren conceded that he did not follow Frontier's protocol for sexual misconduct in doing so, which states: "Do not engage in discussion about the incident. It is ok to console the affected individual and let them know their safety is our top priority." Ex. 2 at 8. The protocol also says: "Advise the affected individual 'For your safety, we are removing you from the situation.' The pilot will be notified and law enforcement will meet the aircraft upon arrival at the gate." *Id.* Warren admittedly deviated substantially from those instructions:

> Q:   Okay, did you say to A.D. those words?
> A:   No.
> Q:   No. In fact, you sat down next to him and asked him all about whether he knew that his own father's hand was groping his penis, right?
> A:   Not in those exact words.
> Q:   But pretty much essentially that?
> A:   Yes.

Ex. C at 115:24 - 116:23.

82. A.D. testified "Warren told me that that man was putting his hand over your crotch. And he was showing me by putting his hand over my crotch. And that's when I was really freaked out. And I was really freaked out, so I wasn't really listening on what he was saying. But all I remember was he was just saying that that man was trying to hurt me or something else."[16] Ex. 7 at 78:15-25.

83. A.D.'s sister Amanda recalled that A.D. told her after the Subject Flight that he was forced to stay in the seat separated from Peter and that A.D. had insisted that Peter is his father and wanted to

---

[16] A.D. testified that Warren refused to acknowledge Peter as A.D.'s father when he spoke to A.D., calling him "that man." Ex. 7 at 78:3 – 79:11. This was despite being informed by both A.D. and Peter that they are father and son. *Id.* and Ex. A at 67:2-20. As noted above, Bright-Sakurada also stated to the police that she did not believe they are related. Ex. G at 18:4-10. Yet, much of the FAs' testimony referred to "the father" and "the son." *See e.g.,* Ex. E at 63:18-20, 83:21-25, 92:18; Ex. 3 at 88:8, 106:1; Ex. 5 at 65:11 – 66:12, 86:12-20.

1   be near him for the flight. A.D. told her that the flight attendant "hovered his hand above A.D.'s crotch

2   area" and that A.D. told her it made him feel "really uncomfortable and scared." Ex. 19 at 48:9 - 49:7.

3       84. After the flight, A.D. suffered ongoing nightmares in which Warren was again taking him away

4   from his father. Ex. A at 227:2 - 228:10. Peter testified that A.D. would often wake up screaming and

5   Peter would rush to his bedroom to comfort him. Two psychologists and an outpatient psychotherapist

6   diagnosed A.D. with Post-Traumatic Stress Disorder (PTSD) caused by the events on the Subject

7   Flight; the psychotherapist, a trauma specialist, conducted several treatment sessions with A.D. for

8   PTSD. Ex. 24 at 63:7 – 69:9; Ex. 25 at 109:17-18; Ex. 16 at 107:14-20. Defendants deny that A.D.

9   suffered PTSD.[17] Ex. 7 at 102:21 – 103:5.

10      85. Although A.D. had been under the care of mental health professionals prior to the Subject

11  Flight for attention-deficit hyperactivity disorder that was being treated with medication, he had never

12  exhibited symptoms of, or been diagnosed with, PTSD prior to the Subject Flight. Ex. 24 at 69:1-16.

13      86. One of A.D.'s teachers and a school principal testified that his school performance declined

14  significantly after the Subject Flight. Ex. 26 at 50:6-9, 56:6-15; Ex. 27 at 23:1 -24:22; 48:9 – 49:13;

15  51:29 -52:11.

16      87. Peter and A.D. both testified that their lives have been altered by the events on the Subject

17  Flight. They are now cautious in public settings not to exhibit affection toward each other, for fear of

18  being violently separated from each other again. Ex. 7 at 105:2-17; 106:1-11. They had encountered

19  hostility from others who misunderstood or disliked their adoptive relationship before the Subject

20  Flight, but never to the degree or with the severity of consequences encountered on the Subject Flight.

21  Ex. A at 227:2-16; 233:15-24. Much of the hostility has come from African-Americans, some of whom

22  have accused Peter to his face of having acquired "a slave." Ex. A at 178:14 – 180:21, 233:15 – 237:9.

23      88. Sgt. Obasi testified that he believes the events on the Subject Flight amounted to "reverse

24  racism," that "I think when you have a middle-aged Caucasian male with a juvenile black male, it

25  probably sent up red flags to certain people," and when asked whether he thought the same red flags

26

27

28

---

[17] The doctors are: Gustavo Halley, Psy.D., Lindsey Ohler, Psy.D., and Leah Sampson, MSW, LCSW.

would have been "sent up" if they had both been of the same race, he testified "Definitely not."[18] Ex. G at 50:17-23.

89. Lawrence Caravalho was a supervisory employee of Worldwide Flight Services (WFS) on the date of the Subject Flight and worked at LAS. Ex. 28 at 14:11-13. WFS was under contract with Frontier to provide ground handling services for Frontier at LAS. *Id*. at 25:16 – 26:11. WFS employees are trained in Frontier's procedures by Frontier employees, wear uniforms with Frontier's logo, work during schedules dictated by Frontier's flight operations, work in parts of the airport leased by Frontier, and use Frontier's computers and Frontier-licensed software. *Id.* at 15:17 – 17:13. One of the software programs used by WFS employees to conduct services for Frontier is called "Navitaire," and it incorporates reservation information, flight information and comments relating to passengers in "Passenger Name Records" ("PNRs"). *Id.* at 27:21 – 28:11. Regarding the comments entered into Plaintiffs' PNR at 8:06 p.m. on the evening of the Subject Flight, he testified that they were entered under his logon code. *Id.* at 42:11 – 43:10. However, he claimed that he does not recognize the syntax used and that the comments could have been entered by another WFS employee using a shared Frontier computer after Caravalho had logged onto it and walked away from it. *Id.* at 45:13 – 48:21. He also testified that any WFS employee who had been issued a logon code could access and read Plaintiffs' PNR containing the comments if "they want to be nosy." Ex. 28 at 85:24 – 86:22.

90. The entry written in Peter and A.D.'s PNR under Mr. Caravalho's logon code at 8:06 p.m. on the date of the Subject Flight used Peter's and A.D.'s full names and stated: "Called Leo Police per SOC, SCSM, seperated [*sic*] [A.D. by name] from Peter found inappropriate touching from Peter to [A.D. by name]. Leo has been called to meet the flight."[19] Ex. 28 at 45:13-17; 46:1-7; 51:8-12.

*91.* Angelica Paulo was another WFS supervisory employee working at LAS on the date of the Subject Flight. She testified that she worked under a Station Manager who was a direct Frontier employee, and that he had the power to fire WFS employees; she testified that he subsequently caused her to be terminated by WFS. Ex. 29 at 86:9-24. She testified that Frontier passengers likely believe that WFS employees at LAS are Frontier employees, and WFS employees do not inform them to the

---

[18] Defense counsel objected to the form of the question.

[19] "Leo" is shorthand for law enforcement officer(s), and "SOC" and "SCSM" are ground-based operations centers operated by Frontier.

contrary. *Id.* at 26:6-21. She described Navitaire as something available to all the WFS employees at LAS, and that is used as "one way to communicate with each other so that we know what the story is before the customer even gets to us." *Id.* at 28:18-20. She testified that any WFS employee can find out the background on a passenger by accessing Navitaire and reading the passenger's PNR. *Id.* at 28:7-14. She testified that includes employees of other companies at other airports that have contracts with Frontier to provide ground services to Frontier. *Id.* at 28:25 – 29:4. She testified that Navitaire comments are supposed to "just state the facts" about a passenger. *Id.* at 32:1-5. She testified that Frontier approved of everything that she had inputted to Navitaire, including comments concerning Peter and A.D. *Id.* at 34:25 – 35:2. She admitted creating the comments that were added to Peter and A.D.'s PNR at 2:05 a.m. after the flight had landed. *Id.* at 41:25 – 42:7. She had been one of the WFS employees present when the aircraft door was first opened after landing. *Id.* at 43:3-16.

92. Ms. Paulo testified that the "A" FA (Bright-Sakurada) had opened the aircraft door "and advised us of the situation." Ex. 29 at 43:3-6. She recalled specifically that Bright-Sakurada had told her and the others present on the jet bridge that *all of the FAs aboard the flight had witnessed inappropriate touching of the minor child. Id.* at 42:23 – 43:2. She testified that she did not know Bright-Sakurada personally and did not know whether she was telling the truth. *Id.* at 49:17 – 50:7 She agreed it would have been naïve to assume that she was telling the truth based solely on the fact that she is a Frontier employee. Ex. 29 at 55:9-16. At 2:05 a.m. on March 29, 2019, Ms. Paulo wrote in Peter and A.D.'s PNR: "Metro met inbound flt 2067. Per FA, all crew members witnessed inappropriate touching of minor child. FB witnessed touching of thighs. Father was escorted away by metro separate from child to police station. Per child, this was not the first incident that they have been separated in this manner. Checked luggage pulled and held in BSO."[20] Ex. 1 at 2-3. She testified that she did not know whether her statements in the second, third and fifth sentences of her comment were true or not. *Id.* at 51:4-12. She never spoke with A.D. or heard him make the statement she attributed to him and agreed that she was relaying unverified hearsay in her comments. Ex. 29 at 48:1-14.

---

[20] In her shorthand, "Metro" meant LVMPD, "FA" meant the "A" flight attendant, "FB" meant the "B" flight attendant (Warren), and "BSO" meant Baggage Services Office.

93. Ms. Paulo testified that the Subject Flight was memorable to her in her 9 years of working as a ground handler because "it never happened before. It was unusual." Ex. 29 at 97:3-9. She had witnessed police being called to meet flights before, but never for allegations such as these, that included allegations of "sexual harassment," "[t]rafficking," and "the flight attendants [*sic*] wasn't sure if they were related." *Id.* at 97:10-22. Concerning the latter, she testified: "she did mention that he was Caucasian and the young boy was not; and, you know, that he being touched in inappropriate ways." *Id.* at 97:23 – 99:20.

94. Frontier has no way to know how many people have accessed Peter and A.D.'s PNR since those comments were added, but admits at least one customer service agent has. Ex. 30 at 7. It has issued login credentials to thousands of individuals. Ex. 30 at 1-2.

95. Ms. Paulo testified that she recalled discrimination complaints by passengers during the four years that she worked for AirTran, another low-cost air carrier, but they were "a lot less than [at] Frontier." Ex. 29 at 83:20 – 84:6.

96. Frontier's Rule 30(b)(6) designee testified that Frontier has never disciplined an employee or agent for violating its discrimination policy, despite receiving approximately 300 complaints of discrimination during the 5-year period predating the Subject Flight on domestic flights alone, and its employees responded to those complaints frequently by telling complainants that "Frontier has a zero tolerance policy for discrimination." Ex 10 at 222:1-11, 231:15-24. Many complaints contained evidence of racial and ethnic discrimination such as telling African-American passengers, "I do not want any problem from you people," challenging a person of color on his right to sit in the exit row after his Caucasian traveling partner went to the lavatory, stopping an African-American mother from following her white-appearing minor son down the aircraft's aisle, referring to a passenger with the words, "He is Black," saying "to the back of the bus for you guys" to a group of four Black male passengers entering an aircraft, telling passengers of color that the airport "is not a bus station," calling an African-American female passenger a "N***r," not handing a document to an American passenger named Mohammed saying that "it is only for U.S. residents," responding to a passenger of Indian ethnicity who said she was going to file a complaint to Frontier, "Go ahead, they don't give a s**t about you," telling a group of passengers of Hispanic ethnicity "This is America, speak in an American

voice," saying "F**k you n*****r," to a Black passenger, saying in Spanish about a Black passenger, "That n***a got problems," saying "You can't get me fired you n****r," to a Black passenger, telling a Black war veteran passenger, "You people are always trying to get one over," telling Black passengers seated in premium seats, "You people don't look like you belong here," referring to a Black toddler with the comment that Black children are "cute at that age until they end up in jail later on," referring to Hispanic passengers as "Stupid Mexicans," and telling a group of them, "F***ing Mexicans ... This is my plane, I can make things go bad for you." Ex. 6's Ex. 1 at 13; 16; 20; 24. According to Frontier, none of those incidents led to an employee or agent being disciplined or being required to have anti-bias training. Ex. 6's Ex. 1 at 11-25; Ex. 10 at 230:15 – 231:14.

97. Frontier's "Denver Team" designated to respond to all discrimination complaints typically only investigated them by asking the FAs what had happened. Ex. 10 at 258:14 – 259:15, 267:2-3. Bright-Sakurada volunteered in her deposition that FAs "all believe each other. That's—I mean, that's—that's what we do." "Q: As flight attendants, you all stick together on beliefs—and decisions, right? A: Correct. Q: Okay. To the extent that you protect each other in your employment, right? A: Yes, correct."[21] Ex. E at 108:1-6.

98. At any point during the Subject Flight, Frontier's management could have informed Captain Shupe that Peter and A.D. have the same last name and are father and son, making Shupe's request for law enforcement unnecessary, or at least could have suggested that Shupe needed to obtain more information specifically from Peter and A.D., but management chose not to protect Peter and A.D. *See* Ex. G at 10:14 – 11:19, 80:25 – 81:11 (Airline gave names to dispatch, who gave them to Sgt. Obasi).

## II.    OBJECTIONS TO DEFENDANTS' STATEMENT OF FACTS

Defendants' Exhibit I contains documents obtained from the Federal Bureau of Investigation concerning the FBI's investigation which appear to include a narrative describing the FBI's interview with Peter at LAS. Numerous portions have been redacted, including the narrative's author's name and title. That author has never been identified in the record, nor have the documents been authenticated. Defendants nonetheless rely on the narrative as "undisputed facts" and attribute them to Peter, including a statement that the FA "angrily poked him in the back to wake him," and that law

---

[21] She subsequently walked back her statement, apparently after realizing its significance.

enforcement have been called previously to investigate "possible inappropriate behavior."[22] Since the author of those statements has never been identified and has never testified, it is unknown whether the specific words were Peter's, were accurately recorded, or were simply descriptors of the author's own choosing. They cannot be attributed to Peter, and do not constitute "undisputed facts" in the record. Even if this were not the case, the statements would be inadmissible because they are hearsay pursuant to Fed. R. Evid. 801, and not fall within any exception. *Burgess v. Goldstein,* 997 F.3d 541, 558-62 (4th Cir. 2021) (FBI notes held to be inadmissible hearsay, although admission was found to be harmless error under the circumstances of the case); *see also Colvin v. United States,* 479 F.2d 998, 1003 (9th Cir. 1973) ("statements attributed to other persons [in police reports] are clearly hearsay, and inadmissible under the common law exception to the hearsay rule….") (citations omitted); *Castro v. Poulton*, No. 2:15-CV-1908 JCM (GWF), 2017 U.S. Dist. LEXIS 132105, at *17 (D. Nev. Aug. 18, 2017) (citing *Colvin* and *cf. Frias v. Valle*, 101 Nev. 219, 221, 698 P.2d 875, 876 (1985).) The reference to "possible inappropriate behavior" allegedly reported in the past should additionally be excluded under Fed. R. Evid. 403 because it is more prejudicial than probative. Peter has never been found to have acted inappropriately toward A.D. (Statement of Facts ("SOF") ¶¶ 41, 62.)

## III.  ARGUMENT

### A.  49 U.S.C. § 44941(a) DOES NOT IMMUNIZE DEFENDANTS' ACTIONS.

#### 1.  The Statute Is Not Intended to Apply Here.

To support their effort to rely on § 44941(a) to immunize them, Defendants claim "[i]n the context of aviation safety, bomb threats and child endangerment are among matters of the utmost importance." (ECF No. 266 at 9.) However, § 44941's aim is preventing terrorism, not child endangerment.[23] There is no dispute that the sole report made by the pilots in the subject case seeking the involvement of law enforcement was an ACARS report that stated, "THERE SEEMS TO BE

---

[22] Defendants claim a "poke" could not have caused a concussion, but "poke" can also be slang for a punch with the fist, or the act of doing so. *See,* THE AMERICAN HERITAGE DICTIONARY OF THE AMERICAN LANGUAGE, 5th ed. (2022), online at www.ahdictionary.com (last visited Nov. 14, 2023).
[23] *See Air Wisconsin Airlines Corp. v. Hoeper,* 571 U.S. 237, 241 (2014); *Ilczyszyn v. Southwest Airlines Co.,* 80 Cal.App.5th 577, 595 (Cal. App. 2022). Part of the Act that created the TSA, § 44941 was enacted in response to the 9/11 terrorist attacks, "to assess and manage threats against air travel." *Hoeper,* 571 U.S. at 241. § 44941's immunity  was included "to ensure that air carriers and their employees would not hesitate to provide the TSA with the information it needed." *Id.,* at 248-49.

1    SOME IINAPPROIATE [*sic*] TOUCHINGBETWEEN [*sic*] AN OLDER MALEND [*sic*] A

2    YOUNGER   MALE.   .12YOORIGINAL   [*sic*]   SEATS   13D   13EFLT   [*sic*]   ATTS   R

3    UNCOMFORTABL. [*sic*]" (Ex. F, p. 3.) An allegation of "inappropriate touching" is not normally

4    considered a "threat[ ] against air travel" that would involve the TSA. Indeed, § 44941(a)'s plain

5    language reflects it applies to "a voluntary disclosure of any suspicious transaction relevant to a

6    possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or

7    terrorism, as defined by section 3077 of title 18, United States Code." 49 U.S.C. § 44941(a). No

8    reported decision has ever stretched the concept of "passenger safety" to include allegations of

9    "inappropriate touching" by another passenger; rather, they pertain to reports of alleged security or

10   terrorism threats consistent with its statutory history.[24] This Court should not extend the statute beyond

11   Congress's intent of preventing terrorism and should reject Defendants' novel application of it here.

12        *Cupp v. Delta Air Lines, Inc.,* 2023 U.S. Dist. LEXIS 58732 (E.D. Va. 2023), relied on by

13   Defendants, it is inapplicable because it concerned a Virginia statute, not § 44941(a). *Cupp*, however,

14   illustrates how innocuous expressions of parental love are falsely interpreted as sexual perversion and

15   human trafficking when the accuser does not accept the adult is the child's parent. *Id.* at **1-5.

### 2.   The Statute Does Not Afford Immunity for Actions and Statements Attributable Solely to the Airline or Its Employees and Agents.

17        The Fifth Circuit's opinion in *Abdallah* held that § 44941(a) immunity does not apply to

18   "things that occurred solely because of the airline's actions." 2023 U.S. App. LEXIS 27271, *10. Like

19   here, in *Abdallah* a flight attendant unilaterally attributed "unusual" and "odd" motives to objectively

20   normal behavior by two passengers of Middle Eastern ethnicity, alerted the captain prior to takeoff

---

[24] The cases are: *Hoeper* (firearm-related security threat); *Abdallah v. Mesa Air Group, Inc.,* 2023 U.S. App. LEXIS 27271 (5th Cir. October 13, 2023) (security threat); *Baez v. JetBlue Airways Corp.,* 793 F.3d 269 (2d Cir. 2015) (bomb threat); *Columbare v. Southwest Airlines Co.,* Case No. 3:21-CV-297-B-BK, 2023 U.S. Dist. LEXIS 13383 (N.D. Tex. January 10, 2023) (security threat); *Ilczyszyn,* 80 Cal.App.5th 577 (security threat); *Kreith v. American Airlines, Inc.*, Case No. 20 C 1593, 2021 U.S. Dist. LEXIS 37098 (E.D. Ill. March 1, 2021) (security threat); *Mahkzoomi v. Southwest Airlines Co.,* 419 F.Supp.3d 1136 (N.D. Cal. 2019) (terrorism threat); *Belmont v. JetBlue Airways Corp.,* 401 F.Supp.3d 348 (E.D.N.Y. 2019) (security threat); *Shqeirat v. USAirways, Inc.,* 515 F.Supp.2d 984 (D. Minn. 2007) (terrorism threat); *Dasrath v. Continental Airlines, Inc.,* Case No. 02-2683 (DRD), 2006 U.S. Dist. LEXIS 9707 (D.N.J. 2006) (security threat); and *Bayaa v. United Airlines, Inc.,* 249 F.Supp.2d 1198 (C.D. Cal. 2002) (terrorism threat).

because she felt "scared," and informed the captain "that her gut had 'never been wrong.'" *Id.* at *4.[25] Unlike here—where no Frontier crew member spoke to Peter and A.D. or investigated their father-son relationship before separating them (SOF ¶¶ 27, 98)—the airline's security expert interviewed the passengers and determined that they posed no security threat; nevertheless, the pilot was so convinced by the FA's "gut feeling" that she refused to take off, causing the flight to be canceled and requiring all passengers to be rebooked. *Id.* at *5-7. Facing suit under § 1981, the airline moved for summary judgment claiming immunity under § 44941(a) and a companion statute, 49 U.S.C. § 44902(b). The Fifth Circuit reversed the district court's grant of summary judgment, holding:

> Although § 44941(a) grants immunity for any communications made between [the airline] and external security agents—and to any impact that "flowed from the decisions made by such law enforcement officers," *Baez v. JetBlue Airways Corp.,* 793 F.3d 269, 276 (2d Cir. 2015), *it does not grant immunity for things that occurred solely because of the airline's actions. …§ 44941(a) does not grant immunity for [the] decision to cancel the flight or for other actions and statements attributable only to the airline*.

*Abdallah,* 2023 U.S. App. LEXIS 27271, *10 (footnote omitted, emphasis added). Here, even if § 44941(a) immunity applies to the pilots' request for law enforcement to meet the flight (which Plaintiffs dispute), the FAs' discriminatory decision to label Peter and A.D. "The Situation" and to begin surveilling them based on their disparate races and A.D.'s Ethiopian features (SOF ¶¶ 12, 15, 17, 23-24, 32-33) was not attributable to any decisions made by law enforcement officers. Nor were the FAs' false allegations of "inappropriate touching," (SOF ¶¶ 28-29, 36-39, 41), Captain Shupe's decision to separate A.D. from Peter without further investigation to corroborate the FAs' reports (SOF ¶¶ 37-38, 50, 97-98), Warren's vicious battery of Peter (SOF ¶¶ 58, 63, 65-72), the false imprisonment of A.D. in the back row for 2.5 hours (SOF ¶ 62), Warren's assault on A.D. (SOF ¶¶ 82-83), Warren's defamatory statements made about Peter to A.D., Warren's defamatory statements made about Peter within earshot of Higgins (SOF ¶ 73), the nonverbal defamatory statements the FAs and pilots made by separating A.D. from Peter in front of other passengers and prohibiting Peter from reaching A.D., the written (and easily-accessible) defamatory statements entered into Peter and A.D.'s PNR by Frontier's authorized WFS agents (SOF ¶¶ 28, 92-94), and the intentional infliction of emotional

---

[25] Undermining Defendants' argument that Warren could (or would) not discriminate against someone of his own race, the captain in *Abdallah*, like the plaintiffs, was of Middle Eastern ethnicity. *Id.* at n.2.

1    distress resulting from the totality of those outrageous actions. For the same reasons as in *Abdallah*,

2    this Court should not apply § 44941(a) immunity to any of those actions, most of which occurred prior

3    to the request to call law enforcement, and none of which bore any connection to that request.

4              **3.   The Statute Does Not Invalidate § 1981.**

5          The *Abdallah* Court's reasoning on the application of § 44902(b), an immunity statute not

6    applicable to the facts of the instant case, is nevertheless applicable by analogy to § 44941.[26] Relying

7    in part on the Ninth Circuit's decision in *Eid v. Alaska Airlines, Inc.,* 621 F.3d 858, 867-68 (9th Cir.

8    2010), which held that a decision not to transport a passenger must be reasonable, the Fifth Circuit

9    held that an airline's conduct that meets the "but for" standard for § 1981 liability (*i.e.,* that the

10   passenger's treatment would not have been the same had the passenger not been a member of a

11   protected class) necessarily cannot qualify for immunity under § 44902(b). *Abdallah,* 2023 U.S. App.

12   LEXIS 27271, *21, n. 10. As discussed below, § 44941(a) does not apply if the disclosure to the

13   authorities was made with actual knowledge that the disclosure was false, inaccurate or misleading, or

14   with reckless disregard of the disclosure's truth or falsity, § 44941(b). Here, Defendants' conduct

15   meets the "but for" standard under § 1981, as Peter and A.D. would not have been subjected to the

16   same treatment if they were both of the same race and A.D. did not have Ethiopian features. Thus, §

17   44941(b) applies because the disclosure was false, inaccurate or misleading, or was made with reckless

18   disregard of its truth or falsity, or alternatively because the disclosure was made on the basis of

19   "unreasonably or irrationally formed beliefs." *Eid*, 621 F.3d at 868. As the Fifth Circuit reasoned

> …"When confronted with two Acts of Congress allegedly touching on the same topic,
> [courts are] not at 'liberty to pick and choose among congressional enactments' and
> must instead strive 'to give effect to both.'" That's because we presume that "'Congress
> will specifically address' preexisting law when it wishes to suspend its normal
> operations in a later statute."

23   *Abdallah*, 2023 U.S. App. LEXIS 27271, *22 (citations omitted). Thus,  § 1981 and § 44941 must be

24   read in harmony to permit airline employees from reporting threats to flight safety while preventing

25   airline employees from subjecting completely innocent passengers to racial discrimination.[27]

---

[26] Although Defendants concede that § 44902(b) cannot apply, they pleaded it as an affirmative defense.
[27] The DOT's January 13, 2017, anti-discrimination guidance to airline personnel conveyed essentially the same message: "The Department of Transportation ... recognizes the very important and difficult

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**4.  § 44941(b) Invalidates Any Immunity Through § 44941(a).**

Immunity "shall not apply to" any disclosure made "with actual knowledge that the disclosure was false, inaccurate, or misleading; or ... [was] made with reckless disregard as to the truth or falsity of that disclosure." § 44941(b). Captain Shupe and FO Mullin jointly made the ACARS report requesting the involvement of law enforcement officers after they became aware that the FAs were focused on the fact Peter is White and A.D. is Black.[28] (SOF ¶¶ 22, 49.) They should have been aware the information from them could be "tainted by a flight attendant's racial animus." *See Eid,* 621 F.3d at 872 (quoting *Cerqueria v. American Airlines, Inc.,* 520 F.3d 1, 24 (1st Cir. 2008), *cert. denied,* 555 U.S. 821 (Lipez, J. dissenting from denial of rehearing *en banc*)). The Ninth Circuit has made clear "[a] flight commander is required to know a good deal more before turning passengers over to the police." 621 F.3d at 872. In rejecting that airline's argument—similar to Frontier's—that the captain "must have very broad discretion in acting to preserve the safety of the airplane and its passengers and must be able to rely on uncorroborated information he received from members of his crew in making command decisions," the *Eid* court explained:

> We certainly agree that the captain must be able to act decisively in an emergency and, in doing so, rely on communications from his crew. [However,] [a] jury may reasonably conclude that there was no emergency here. None of the passengers had made any threats, brandished a weapon or touched a flight attendant. Nor had any of the flight crew informed the captain that any of the passengers had done anything to endanger the plane… [A] jury could conclude that the captain acted unreasonably ....

*Id.* The same is true here: Peter and A.D. had made no threats against the safety of the flight or anyone aboard it. (SOF ¶ 20) They had complied without objection with a FA's instructions to change seats prior to takeoff. (*Id.*) They were *sound asleep* at the time of Warren's claimed observation, and Campbell, seated right beside Peter, had not seen any of the actions that Bright-Sakurada and Warren claimed to have witnessed, nor anything approaching criminal behavior. (SOF ¶¶ 38, 55-57.) The

_____

job of the airlines to provide a safe and secure travel environment. At the same time, it is important that this function be carried out in a non-discriminatory manner." Ex. 9 at P000748.
[28] A reasonable jury could find that both pilots had opportunities to view Peter and A.D. in person from the forward galley during their lavatory breaks (SOF ¶¶ 45-48), and Mullin admitted in his deposition that they knew of the different races after those breaks had occurred, and "relatively soon" after the initial report (SOF ¶¶ 49, 53).

aircraft was in cruise, on autopilot,[29] and the pilots were taking lavatory breaks. (SOF ¶¶ 44-46, 49.) They had hours of cruise flight left in which to conduct a proper investigation, but the pilots chose to issue a report at the FAs' urging without even waking Peter and A.D. up to hear their side of the story. (SOF ¶¶ 62, 98.) Captain Vickie Norton, an expert witness with 26 years of experience with United Airlines and over 16,000 hours of flight time, testified in her deposition that Captain Shupe had an obligation to confirm the information that he received from the FAs, but he chose not to conduct even a cursory investigation of the facts.[30] (SOF ¶ 34, 51-53.) This was so despite vague reports from Bright-Sakurada of "face touching" that a reasonable jury could find included mention of Peter and A.D.'s races, since their racial disparity and allegations of trafficking were a constant theme in her comments right up to when t she and her colleagues delivered Plaintiffs. into police custody at LAS. (SOF ¶¶ 17,18, 28, 33). Even Shupe had concluded that the face touching report did not justify reporting the passengers to the police, but instead of letting the racially charged matter drop, he recklessly instructed the FAs to bring him reports of "more touching" to justify a report to the police.[31] (SOF ¶ 44.)

Bright-Sakurada knew that only she had claimed to witness the "face touching," yet she falsely claimed otherwise. (SOF ¶ 29.) Bond falsified a story with details that made Peter and A.D. appear to be engaged in human trafficking, (SOF ¶¶ 12, 24, 28) which Bright-Sakurada relayed to the pilots and Shupe never investigated by asking the passengers themselves.[32] (SOF ¶¶ 33, 43). Warren, the other FAs and both pilots knew that the report of sexual molestation that allegedly provided Shupe the justification he had requested for engaging law enforcement, had been based on an alleged report of

---

[29] Admitted in Frontier's Answer, ECF No. 155 at ¶ 19.

[30] Captain Norton's expert report and deposition transcript have been filed under seal because they discuss details of matters the TSA has identified as Sensitive Security Information ("SSI") covered by the Court's special protective order, ECF No. 126. For the same reasons, Plaintiffs will not discuss those details in this Response but incorporate Captain Norton's discussion of them by reference.

[31] Defendants take liberties with A.D.'s testimony, claiming "it is undisputed that Peter was rubbing A.D.'s face in a manner that A.D. described as 'loving.'" ECF No. 266 at 8. The actual testimony was: "Q. Okay. And do you recall why he was rubbing your face? A: Just being a loving father." *Why* is a different concept from *how*. Ex. 7 at 67.

[32] While Shupe claimed that post 9/11 procedures prevent him from approaching passengers in the cabin during a flight, Captain Norton points out that nothing prevented him from sending a FA back to obtain Plaintiffs' account of the facts. *See, e.g.,* Ex. 15 at 59-60, 62.

an observation that only Warren claimed to have made, in violation of written standards requiring FAs to obtain verification from another person before reporting passenger conduct to a captain. (SOF ¶¶ 31, 38) FA Nickel knew that the cabin lights had been set at "Dim Two" when Warren made his alleged observation, the same setting at which she was unable to determine what A.D. was wearing from the same vantage point, yet she entered the cockpit with Warren and did not object to his claim that he could see Peter's hand between A.D.'s legs and on his penis. (SOF ¶¶ 37, 42) Warren, of course, knew that the allegation was false and that he had also withheld from Captain Shupe the fact that both Peter and A.D. appeared to him to be asleep.[33] (SOF ¶¶ 38, 55, 58) Passenger Higgins testified to watching Warren wake up both Peter and A.D. to separate them. (SOF ¶ 57) Shupe, who had likely seen Peter and A.D. asleep himself from the galley, never inquired about their sleep status during a time when the cabin lights were turned down and most of the passengers were sleeping.[34] (SOF ¶¶ 46-48, 43) Nor did Mullin, who had likely witnessed them asleep as well. (SOF ¶¶ 46-49) Shupe conceded that Warren's report would have been a nullity if both Peter and A.D. were asleep and he knew they were father and son. (SOF ¶¶ 40, 43, 98) Yet he and Mullin made the report anyway. That clearly qualifies as a "disclosure [that] was [made with actual knowledge it was] false, inaccurate, or misleading; or ... [was] made with reckless disregard as to the truth or falsity of that disclosure." Section 44941(b) therefore invalidates any claim of immunity. At the very least, fairness dictates that the issues of reasonableness and application of subsection (b) should be determined by the jury.

**B.  <u>NRS 432B.160 HAS NO APPLICATION TO THE INSTANT CASE.</u>**

Defendants surprisingly cite NRS 432B.160, refer to its language about a "presumption that the person acted in good faith," and claim that "Plaintiffs cannot overcome this presumption." (ECF No. 266 at 11, n.7.) Defendants have never pleaded NRS 432B.160's affirmative defense. (ECF Nos. 155 (Frontier), 156 (Warren), and 157 (Shupe)). Defendants' vague second affirmative defense, which claims "[p]ursuant to applicable federal and state law, [Defendant] is entitled to immunity, qualified

---

[33] Defendants incorrectly claim the groping is an "undisputed fact"; it is not. (SOF ¶ 41.)

[34] Defendants argue that Plaintiffs being asleep means that they "lack the necessary foundation to dispute FA Warren's observation," citing *Lowry v. City of San Diego,* 858 F.3d 1248, 1256 (9th Cir. 2017). While the sleeping plaintiff in *Lowry* had no basis to dispute that the police had made an oral warning of a police dog's impending entry into the building where she was sleeping, Peter and A.D. certainly are in a position to know that Peter would never molest A.D.

1   or otherwise" does not suffice. "The key to determining the sufficiency of pleading an affirmative

2   defense is whether it gives plaintiff fair notice of the defense." *Simmons v. Navajo County,* 609 F.3d

3   1011, 1023 (9th Cir. 2010) (quoting *Wyshak v. City Nat'l Bank,* 607 F.2d 824, 827 (9th Cir. 1979)).

4   Defendants' vague language gave no notice whatsoever that they intended to rely on NRS 432B.160,

5   and they are raising it for the first time only after four years of discovery have ended. The applicable

6   pleading standards apply with equal force to affirmative defenses. *Roadhouse v. Patenaude & Felix,*

7   *A.P.C.,* Case No.: 2:13-cv-00560-GMN-CWH, 2014 U.S. Dist. LEXIS 85713, *3-4 (D. Nev. June 23,

8   2014); *see also Barnes v. AT&T Pension Ben. Plan,* 718 F.Supp.2d 1167, 1172 (N.D. Cal. 2010).

9   Defendants' pleading failed to give notice that they intended to rely on NRS 432B.160. Discovery has

10  closed. They cannot rely on it—and even if they could, it would not allow for summary judgment.

11  "[I]n Nevada, good faith is a question of fact" for the jury. *Fakoya v. County of Clark,* Case No. 2:12-

12  cv-02149-JAD-CWH, 2014 U.S. Dist. LEXIS 143240, *7 (D. Nev. Oct. 8, 2014). The facts described

13  above provide ample bases for a reasonable jury to conclude that good faith was not present.

14  **C.  PLAINTIFFS' § 1981 CLAIMS SURVIVE SUMMARY JUDGMENT.**

15      **1.  Defendants Misstate the Applicable Law.**

16      Defendants misstate the legal standards for a § 1981 claim in several respects. They argue that

17  Peter is not a protected class member when Peter and A.D. belong to multiple protected classes for

18  purposes of § 1981. Peter belongs to two protected classes: (1) as a white person, *see McDonald v.*

19  *Santa Fe Trail Transp. Co.*, 427 U.S. 273, 285-296 (1976); *see also Aragon v. Republic Silver State*

20  *Disposal Inc.,* 292 F.3d 654, 659 (9th Cir. 2002); and (2) as a member of a bi-racial family unit, *see*

21  *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.,* 156 F.3d 581, 589 (5th Cir. 1998) (collecting cases);

22  *see also Favreau v. Chemcentral Corp.*, 107 F.3d 877, 1997 U.S. App. LEXIS 3804, *21-22 (9th Cir.

23  1997). A.D. belongs to three protected classes: (1) as a Black person, *see Lyons v. England,* 307 F.3d

24  1092, 1103 (9th Cir. 2002); (2) as a member of a bi-racial family unit; and (3) as a person of Ethiopian

25  heritage, *see St. Francis College v. Al-Khazraji,* 481 U.S. 604, 613 (1987).[35]

26      Defendants also claim Peter and A.D. cannot assert § 1981 claims against Defendants Shupe

27

28  ────────────────

[35] The case Defendants cite, *RK Ventures, Inc. v. City of Seattle,* 307 F.3d 1045, 1055 (9th Cir. 2002),
is not even a § 1981 or Title VII decision; it addresses § 1983 First Amendment and Equal Protection
standing.

and Warren because they had no contracts with them, but individual defendants can be held liable without separate contracts "when [the individual defendants] intentionally cause an infringement of rights protected by § 1981, regardless of whether the [employer] may also be held liable." *Cardenas v. Massey,* 269 F.3d 251, 268 (3d Cir. 2001); *accord Flores v. City of Winchester,* 873 F.3d 739, 753 & n.6 (9th Cir. 2017).

Defendants also inaccurately argue that Peter and A.D. must meet an "exacting standard" of proving "purposeful and intentional discrimination." ECF No. 266 at 12. There has never been a standard, exacting or otherwise, of "purposeful *and* intentional discrimination." The standard is just intentional discrimination, typically proven through circumstantial evidence because direct evidence of discriminatory intent is rare, *see Hossack v. Floor Covering Associates of Joliet,* 492 F.3d 853, 861 (7th Cir. 2007). In *General Building Contractors Ass'n v. Pennsylvania,* 458 U.S. 375 (1982), cited by Defendants, the Supreme Court did not use the combined term "purposeful and intentional" at any point; it merely used those two words separately, in different contexts, to describe the same thing: intentional discrimination. The Court used "purposeful" to clarify that § 1981 does not permit disparate impact claims, which are based on practices that are "neutral on their face, and even neutral in terms of intent, but [have] the incidental effect of disadvantaging blacks to a greater degree than whites." 458 U.S. at 388; *see also Jurado v. Eleven-Fifty Corp.,* 813 F.2d 1406, 1412 (9th Cir. 1987).

Defendants also argue incorrectly that Peter and A.D. must "prov[e] by a preponderance of the evidence a *prima facie* case of discrimination" for purposes of applying the *McDonnell Douglas* procedure.[36] ECF No. 266 at 14. Plaintiffs in the Ninth Circuit are not required to prove a *prima facie* case of discrimination by a preponderance of the evidence for purposes of *McDonnell Douglas.* "At the summary judgment stage, the requisite degree of proof necessary to establish a *prima facie* case is minimal and does not even need to rise to the level of a preponderance of the evidence." *Lyons*, 307 F.3d at 1112; *accord Aragon*, 292 F.3d at 659; *Young v. United Parcel Serv., Inc.,* 574 U.S. 972, ___, 135 S. Ct. 1338, 1353-54 (2015). And once the summary judgment motion has been decided, "the issue is no longer whether the plaintiff has established a *prima facie* case, but whether there was

---

[36] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

1  discrimination." *Jun Yu v. Idaho State Univ.,* 11 F.4th 1065, 1073 & n.5 (9th Cir. 2021).[37]

2          Defendants also attempt to apply an outdated concept of "specific and substantial"

3  circumstantial evidence that never had any verifiable metrics (nor do Defendants propose any) and

4  that flies in the face of the Supreme Court's mandate, in the context of the discrimination laws, that

5  circumstantial and direct evidence must be treated alike. *Desert Palace Inc. v. Costa,* 539 U.S. 90, 100

6  (2003). There has never been a requirement that *direct* evidence of discriminatory intent be "specific

7  and substantial," so requiring *circumstantial* evidence to meet that undefined standard would not be

8  treating the two types of evidence alike.[38]

9          **2.   Plaintiffs Have Both Direct and Circumstantial Evidence of Discriminatory Intent.**

10         "'[D]iscrimination on the basis of race is illegal, immoral, unconstitutional, inherently wrong,

11  and destructive to democratic society.'" *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1450 (9th Cir. 1994)

12  (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 521 (1994) (Scalia, J., concurring)). "Of

13  all the vile types of discrimination, courts and Congress have treated race discrimination as the most

14  vile of all." *Lansdale v. Hi-Health Supermart Corp.,* 314 F.3d 355, 359 (9th Cir. 2002). Thus, it makes

15  sense that courts allow plaintiffs more than one method of proving it. "A plaintiff may prove race

16  discrimination either directly or indirectly, and with a combination of direct and circumstantial

17  evidence." *McKinney v. Office of the Sheriff of Whitley County,* 866 F.3d 803, 807 (7th Cir. 2017);

18  *accord, Jun Yu,* 11 F.4th at 1073. "These methods plaintiffs can use to prove their discrimination claim

19  in no way require overt expressions of bias or overt racial animus." *Jun Yu,* 11 F.4th at 1073. The

20  Supreme Court developed the *McDonnell Douglas* burden-shifting framework specifically because

21  defendants are usually too savvy to declare their racial prejudices openly; it was "designed to 'sharpen

22  the inquiry into the elusive factual question of intentional discrimination.'" *McKinney,* 866 F.3d at

23  807 (quoting *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. 248, 255 & n.8 (1981)). Since it is a

24

25  [37] Defendants cite *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 510 (2002), for their argument on the
      burden of proof for a *prima facie* case, but it is a Fed. R. Civ. P. 12(b)(6) decision, not a summary
26    judgment decision. Subsequent Supreme Court opinions do not repeat its "preponderance of the
      evidence" dicta, *see e.g., Young,* 135 S. Ct. at 1353-54.
27  [38] Moreover, the Ninth Circuit has repeatedly questioned the continued viability of the "specific and
28  substantial" language following *Costa. See France v. Johnson,* 795 F.3d 1170, 1175 (9th Cir. 2015);
      *see also Cornwell v. Electra Cent. Credit Union,* 439 F.3d 1018, 1029-31 (9th Cir. 2006).

1    method of analyzing circumstantial evidence, the *McDonnell Douglas* analysis is "inapplicable where

2    the plaintiff provides direct evidence of discrimination." *TWA v. Thurston,* 469 U.S. 111, 121 (1985).

3    Moreover, it is "not intended to be an inflexible rule." *Young,* 135 S. Ct. at 1353.

4                                    *a)  Direct Evidence.*

5            Despite the rarity of direct evidence of discriminatory intent, Peter and A.D. have it. According

6    to FA Bond, FAs Nickel and Warren were "shocked" to learn that A.D. had not been removed from

7    the exit row because of an inability to speak English. (SOF ¶ 12)  That "shock" came from observing

8    him from 17 rows away, and although Nickel attempted to confine the discussion to A.D.'s height and

9    age, it had to have been based on his Ethiopian facial features as well—it is not a given that tall children

10   do not speak English.[39] She testified that she saw something "off" with Peter and A.D., and Bond told

11   the police that the "relationship they had looked very awkward." Bright-Sakurada entered the cockpit

12   to tell Captain Shupe "*how uncomfortable I felt and all the other flight attendants felt about the – their*

13   *[Peter and A.D.'s] relationship.*" (SOF, ¶ 33) Warren refused to accept that Peter is A.D.'s father,

14   based on their different skin colors (he specifically mentioned that A.D. is Black in a company email

15   defending his actions) (SOF ¶ 24), and Bright-Sakurada likewise declared to the arriving police team,

16   "I'm not sure they're even related," followed by a statement that Peter is Caucasian and A.D. is Black.

17   (SOF ¶¶ 18, 93) That reflects an intent to treat Peter and A.D. differently from other passengers by

18   virtue of their races and A.D.'s ethnic characteristics. *See Aragon,* 92 F.3d at 662 (collecting examples

19   of direct evidence of discriminatory intent).

20                             *b)  Circumstantial Evidence and* **McDonnell Douglas.**

21           In a § 1981 commercial services case, the *McDonnell Douglas* elements of a *prima facie* case

22   are different from those of a Title VII employment discrimination case; "[t]he *McDonnell Douglas*

23   standards are adaptable to different factual situations." *Sengupta v. Morrison-Knudsen Co., Inc.*, 804

24   F.2d 1072, 1075 (9th Cir. 1986). Magistrate Judge Donna Ryu of the Northern District of California

25   discussed this in her well-reasoned opinion in *Mahkzoomi,* which also involved a § 1981 claim by a

26   passenger against an airline. Judge Ryu first noted the elements of a *prima facie* case in the commercial

27

28

---

[39] There are also many other reasons why a person might be moved from an exit row, such as: problems with hearing or sight, lack of grip strength or arm strength, balance difficulties, or even hidden problems that might cause the person harm while assisting with an evacuation, *see* 14 CFR § 121.585.

services context under *Lindsey v. SLT Los Angeles, LLC,* 447 F.3d 1138, 1145 (9th Cir. 2006) are that "a plaintiff must show that he or she (1) is a member of a protected class, (2) attempted to contract for certain services, and (3) was the denied the right to contract for those services." (internal quotations omitted). While the *Lindsey* Court also applied a fourth element—that "such services remained available to similarly-situated individuals who were not members of the plaintiff's protected class," *id.*— she also pointed out that *Lindsey* "did not explicitly adopt this element for all section 1981 commercial services cases and discussed with approval the Sixth Circuit's alternative formulation of the fourth element [as well as the third] ... [in] ... *Christian v. Wal-Mart Stores, Inc.,* 252 F.3d 862, 872 (6th Cir. 2001)." In *Christian,* the Court recognized that requiring proof concerning similar-situated individuals imposes an unreasonable obstacle on commercial services discrimination plaintiffs and instead reformulated a portion of the test. As explained in *Mahkzoomi*:

> The Sixth Circuit modified the prima facie case to require that a plaintiff in a section 1981 commercial services case show that "(3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside of the protected class were not and/or (b) plaintiff received in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory."

> While the Ninth Circuit has not adopted the Sixth Circuit's version of the test, the court in *Lindsey* described the reasoning in *Christian* as "compelling" and left open the possibility that it would adopt its alternative formulation in commercial non-employment section 1981 cases. *Lindsey,* 447 F.3d at 1145. This court concludes that the test from *Christian* is a better fit for the circumstances of this case ...

*Mahkzoomi,* 419 F.Supp.3d at 1149. The test as adopted in *Mahkzoomi* for a § 1981 claim against Southwest Airlines is a better fit for the instant case as well. Like the plaintiff in *Mahkzoomi*, Peter and A.D. may not have been wholly denied the right to contract for air travel from RDU to LAS, but they received the benefits of that contract in a manner significantly different from the other passengers on the aircraft, none of whom were Ethiopian or members of a bi-racial family unit traveling together (as far as the parties have been able to determine), and in ways that were markedly hostile. Among other incivilities, the FAs kept Peter and A.D. under surveillance and lied about them (SOF ¶¶ 61-62, 73-74), Peter was struck on the head multiple times by Warren causing a concussion (SOF ¶¶ 56, 58, 63, 65-72), A.D. was forced to sit in the rear of the aircraft for 2.5 hours under the guard of an off-duty police officer (SOF ¶ 60-62), Warren sexually assaulted A.D. (SOF ¶¶ 82-84), Warren yelled at

Peter and accused him of heinous criminal acts (SOF ¶ 74), Warren falsely told A.D. that his father is a sexual molester (SOF ¶ 82), the FAs prevented A.D. from returning to sit with Peter (SOF ¶¶ 61-62, 73-74), and the crew held them and delivered them to the police and FBI. (SOF ¶¶ 74-75) The evidence of discrimination here is considerably greater than in other commercial services cases where a *prima facie* case of discrimination was found. *See, e.g., Hampton v. Dillard Department Stores, Inc.,* 247 F.3d 1091 (10th Cir. 2001) (shopper placed under surveillance, accused of shoplifting, and forced to empty her pocketbook in front of others based on race); *Madison v. Courtney,* 365 F.Supp.3d 768 (N.D. Tex. 2019) (African-American airline passenger upgraded to first-class cabin refused amenities such as placing a cocktail order or hanging his coat, and claimed that a FA spat into his drink).

Plaintiffs have supplied ample evidence that they are members of protected classes, as discussed above, that they attempted to contract for the normal services of an airline flight from RDU to LAS, and that they were denied the right to enjoy the benefits of the contractual relationship by all of the Defendants in that (a) they were deprived of services while similarly situated persons outside of their protected classes were not and/or (b) they received the services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory. As further evidence of the latter, Sgt. Obasi, a reasonable person who viewed the totality of the circumstances in the objective manner of a police officer responding to the flight, testified that he found that Peter and A.D. were treated by Frontier's employees in a discriminatory manner. (SOF ¶ 88) Plaintiffs' direct and circumstantial evidence, both alone and in combination, establishes a *prima facie* case.[40]

Having established a *prima facie* case, the burden shifts to Defendants to "articulate a legitimate, non-discriminatory reason for the adverse action." 419 F.Supp.3d at 1150. Defendants claim that the sole "legitimate, non-discriminatory reason for their actions was a genuine concern for the safety of A.D., a minor." ECF No. 266 at 15.[41] That bold argument contends that a 12-year-old child who was contentedly sleeping in his airliner seat next to his father, *en route* to a father-son hiking adventure, would be better off having his father struck in the head and given a concussion, being forced

---

[40] The direct evidence on its own does not even need to go through the *McDonnell Douglas* analysis.
[41] They repeat this claim numerous times in their motion. "If the mere repetition of an inaccuracy begets truth then that statement is true, not otherwise." *Nat'l Mut. Ins. Co. of D.C. v. Tidewater Trans. Co., Inc.*, 337 U.S. 582, 654 (1949) (Frankfurter, J., dissenting).

1   to the rear of the airplane without his shoes to sit alone and crying for 2.5 hours while being guarded

2   by a perfect stranger, falsely told that his father is a sexual pervert who groped him, subjected to an

3   assault by a FA that consisted of a near-groping of his genitals, delivered into the custody of police

4   and FBI as a suspected participant in human sex trafficking while watching his father placed in

5   handcuffs and humiliated in front of him, and given a potentially life-long case of PTSD (SOF ¶ 84-

6   85), all while the airline had the ability to determine their familial relationship simply by looking at

7   their boarding passes or speaking with them, but chose not to do so, instead assuming they were not

8   father and son because one is white and the other Black. (SOF ¶ 98)

9       Defendants' contention is inherently incapable of belief. However, the *McDonnell Douglas*

10  analysis permits a plaintiff to produce additional evidence to show pretext, which can be proven "in

11  two ways: (1) indirectly, by showing that the employer's proffered explanation is "unworthy of

12  credence" because it is internally inconsistent or otherwise not believable, or (2) directly, by showing

13  that unlawful discrimination more likely motivated the employer." *Chuang v. University of California*

14  *Davis*, 225 F.3d 1115, 1127 (9th Cir. 2000) (internal citation omitted). "These two approaches are not

15  exclusive; a combination of the two kinds of evidence may in some cases serve to establish pretext so

16  as to make summary judgment improper" *Id.* A plaintiff's showing that the defendant's proffered

17  explanation is unworthy of credence is relevant evidence of discriminatory intent in and of itself:

18      The factfinder's disbelief of the reasons put forward by the defendant (particularly if
19      disbelief is accompanied by a suspicion of mendacity) may, together with the elements
20      of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the
        employer's proffered reasons will permit the trier of fact to infer the ultimate fact of
21      intentional discrimination, and ... upon such rejection, no additional proof of
        discrimination is required.

22  *Washington v. Garrett*, 10 F.3d 1421, 1433 (9th Cir. 1994). "[T]he plaintiff who has established a

23  prima facie case need produce very little evidence of discriminatory motive to raise a genuine issue of

24  fact as to pretext." *Payne v. Norwest Corp.,* 113 F.3d 1079, 1080 (9th Cir. 1997) (internal quotation

25  marks and brackets omitted). The burden is "hardly an onerous one," *id.*[42] Since the factfinder "is

26  entitled to infer discrimination from plaintiff's *prima facie* case and showing of pretext without more,

27

28  ---
    [42] This lenient standard "tempers" the archaic "specific and substantial" language. *Earl v. Nielsen*
    *Media Research, Inc.,* 658 F.3d 1108, 1113 (9th Cir. 2011).

there will always be a question for the factfinder once a plaintiff establishes a *prima facie* case…" making summary judgment improper. *Washington,* 10 F.3d at 1433. The Ninth Circuit has "repeatedly held that it should not take much for a plaintiff in a discrimination case to overcome a summary judgment motion . . . because the ultimate question is one that can only be resolved through a searching inquiry—one that is most appropriately conducted by a factfinder, upon a full record." *France,* 795 F.3d at 1175 (internal citations and quotation marks omitted).

Further undermining the believability of Defendants' claims, they do not mention human trafficking at all in their arguments, nor have they included it as a reason for their supposed "genuine concern" for A.D.'s safety. Defendants would have the Court believe that nothing of any significance to this case occurred until FA Bright-Sakurada happened to see Peter "stroking" A.D.'s face after takeoff (having allegedly been first alerted to it by FA Nickel, who testified that she never saw it (SOF ¶ 29)). The reason for this subterfuge is obvious: allegations of sexual molestation by itself do not normally involve observations of the passengers' different races, but at least at Frontier, allegations of human trafficking clearly do. Defendants do not want to answer the question, "Why did you think these two particular passengers were involved in human trafficking?" because the answer inevitably leads to the fact that Peter is white, and A.D. is Black. That was, in fact, the answer Bright-Sakurada gave to her colleague Angelica Paulo when the aircraft door was first opened; Paulo testified that Bright-Sakurada informed her of the FAs suspicions of "abduction" and "trafficking" at the same time that she mentioned Plaintiffs' different races. (SOF ¶¶ 91-93) It was also what Sgt. Obasi heard her say when she declared that she did not believe Peter and A.D. are related and then commented on Frontier's human trafficking training. (SOF ¶ 18) Warren made a point of noting that A.D. is Black and Peter is a "white man" in his email to Frontier management after the flight. (SOF ¶ 24) Bond's false account to Bright-Sakurada was clearly designed to fit into the human trafficking indicia stated in the Frontier "Inflight Flyer" when she claimed that Peter had not permitted A.D. to answer the question about his age and had insisted that he sit in the window seat so he could not communicate with another passenger. (SOF ¶ 17) Bright-Sakurada's testimony that human trafficking means "some child that is with an adult that they're not – that they're not supposed to be with... [t]hey're not their parents" cannot be explained without reference to Peter and A.D.'s different skin colors. Perhaps

because the inference of racial discrimination[43] is so obvious, Defendants ignore the subject of human trafficking altogether and have changed the narrative from one that initially involved suspicions of human trafficking to one that centered solely around "inappropriate touching." The evidence belies their false narrative. Just as in *Cupp,* the deposition testimony shows the exaggerated and false claims of sexual molestation grew out of surveilling Peter and A.D. because they did not look right together in the FAs' minds, who then assumed the worst about physical contact between them.

Defendants' story is also not believable because if the FAs had truly suspected sexual molestation, they would have followed Frontier's sexual misconduct protocol, which forbade discussing the situation with the alleged victim, and the general protocol requiring a FA to obtain corroboration of an observation before reporting it to the captain as "suspicious," which both Bright-Sakurada and Warren chose not to follow. (SOF ¶¶ 31, 81) Moreover, there would have been no reason for Shupe's bizarre declaration of a "Threat Level Two" to justify calling law enforcement, since the sexual misconduct protocol already included authorization to call law enforcement to meet the flight. Ex. 10 at ex. 6. The Threat Level Two invocation was not only unnecessary, it was unauthorized and unreasonable (SOF ¶¶ 50-51, 53), since there was no evidence of a threat to the aircraft. *c.f. Eid*, 621 F.3d at 868. Shupe and Mullin implicitly acknowledged that when they failed to implement the rest of its required procedures, *see* Ex. 2 at 6, 12.

Frontier's long history of sweeping discrimination complaints against its employees and agents under the rug—specifically by diverting them to a special "Denver Team" that found 100 percent of them did not involve discrimination and declined to recommend discipline or retraining for any of the subject employees and agents (SOF ¶¶ 96-97)—is admissible evidence of pretext to show that Frontier and its employees were more likely motivated by discrimination in the instant case. *See Lyons,* 307 F.3d at 1110 ("untimely evidence of the employer's discriminatory acts 'may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue,'" quoting *United Airlines, Inc. v. Evans,* 431 U.S. 553, 558 (1977)); *see also Gay v. Waiters' and Dairy Lunchmen's Union, Local No. 30,* 694 F.2d 531, 553 (9th Cir. 1982) ("a plaintiff may establish a prima

---

[43] As noted by Plaintiffs' Expert, Frontier has often used human trafficking as a pretext for racial discrimination. *See* Ex. 6's Ex. 1, pp. 11-12.

facie case of disparate treatment ... with a combination of direct, circumstantial and statistical evidence of discrimination.") Matthew Hughey, PhD, a world-renowned sociologist and professor of sociology with a specialty in race relations, reviewed all of the documents relating to the 325 prior complaints of discrimination and human trafficking produced by Frontier, and concluded the actions of the Frontier employees and agents, and the manner in which Frontier "resolved" the complaints without imposing any discipline on its employees and agents, could not be explained by anything other than corporate hostility toward Frontier's customers of color. (*See* Ex. 6's Ex. 1, pp. 6-25.) Dr. Hughey also concluded that "the likely effect of the non-responsiveness of Frontier [in] not disciplining Frontier employees for complaints of discrimination involving them is that they are keenly aware that there are little to no consequences for racial profiling or discrimination." (*Id.*, p. 6.) He also reviewed the specific actions and testimony of the crew members involved in the instant case and determined that they were all motivated by racial stereotypes and racial animus. (*Id.*, pp. 25-45)

   **3.  Plaintiffs Do Not Argue Negligent Discrimination.**

   Defendants claim "[d]espite the labels on Plaintiffs' claims in their Third Amended Complaint, they have continued to rest on a theory of negligent racial discrimination involving implicit bias, which is neither actionable nor at issue, and which Frontier vehemently denies." ECF No. 266 at 16. That is untrue; Plaintiffs base their § 1981 claims on Frontiers' employees' and agents' intentional decisions and actions, and on the legally-permitted inferences discussed above. Frontier's "vehement[ ]" denial that its employees and agents possessed any implicit biases whatsoever further underscores the unbelievability of its position. Stereotypes and implicit bias are, sadly, common in modern American society. Acting on them can be the basis of a discrimination claim, as in the instant case. In the analogous context of discrimination under Title VI, the Ninth Circuit has held, "evidence of unconscious bias may be probative of the factual question of intentional discrimination in a Title VI disparate treatment case, although it will not necessarily be controlling in a totality of circumstances evaluation whether intentional discrimination occurred." *Jun Yu*, 11 F.4th at 1074.

   **4.  _Karrani v. JetBlue Airways Corp._ is Distinguishable**

   Defendants have frequently cited *Karrani v. JetBlue Airways Corp.,* 2019 U.S. Dist. LEXIS 127944 (W.D. Wash. 2019), in this case and do so again in the instant motion, claiming it is

"instructive." *See* ECF No. 266 at 19. Although they claim now to rely on the case solely in support of a minor point (which contradicts of the Ninth Circuit's holding in *Eid* that a Captain cannot rely passively on a flight attendant's gut feelings, especially absent evidence of a safety threat), they devote most of two pages of their motion to a description of its facts. They omit, however, that the "unrelated stop" they only casually mention was an emergency landing at an airport that was not in the flight plan necessitated by a serious medical emergency in the first row of the single-aisle aircraft.[44] Thus, the medical emergency was happening between Mr. Karrani and the forward lavatory when he insisted on using the forward lavatory—all while the aircraft was in a descent to the emergency landing site. JetBlue's FA's instructions that Karrani use an aft lavatory when the path to the fore lavatory was blocked by a passenger experiencing a medical emergency—even if delivered rudely or accompanied by a physical touch—could not satisfy the "but-for" standard, as the FA likely would have told passengers of any race or ethnicity to stay away from a passenger experiencing a medical emergency serious enough to require an emergency landing. Thus, *Karrani* is neither instructive nor precedential.

### 5. Plaintiffs' Claims Meet the "But-For" Test.

§ 1981 plaintiffs must prove that race was a but-for cause of their injuries. *Comcast Corp. v. National Ass'n of African American-Owned Media,* 140 S. Ct. 1009, 1013 (2020). "[A] but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause." *Bostock v. Clayton County,* 140 S. Ct. 1731, 1739 (2020). Writing in the context of a Title VII employment discrimination case based on sex, the Supreme Court said:

> This can be a sweeping standard. Often, events have multiple but-for causes. So, for example, if a car accident occurred both because the defendant ran a red light and because the plaintiff failed to signal his turn at the intersection, we might call each a but-for cause of the collision. When it comes to Title VII, the adoption of the traditional but-for causation standard means a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision. So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.

*Id.* The question here is simple: If Peter had been Black, or A.D. had been a white child with no foreign ethnic features (*i.e.*, if both had been the same race), would the FAs have labeled them "The Situation"

---

[44] JetBlue only operates single-aisle aircraft, *see* https://www.jetblue.com/flying-with-us/our-planes (last visited Nov. 14, 2023); the aircraft in question was likely an Airbus A320, the same model used by Frontier for the Subject Flight.

and surveilled them, leading to the false accusations and eventual forced separation? The A320 aircraft used on the Subject Flight has 30 rows of 6 seats, for a total of 180 passenger seats. (SOF ¶ 47) Numerous witnesses have testified that it was almost full, although Frontier had left seats 30D through 30F (where Warren forced A.D. to sit) empty. The other passengers consisted of several Black passengers traveling together, such as Taleik Johnson and his wife, and several white passengers traveling together, such as the couple who traded seats with Peter and A.D. The FAs and pilots did not surveil, accuse, harass, separate, strike, assault or defame any of the other passengers. Only Peter and A.D. were singled out for that treatment, initially because the FAs looked at them from 17 rows away and thought they looked "awkward" and "off," and seeing them together made the FAs "uncomfortable." (SOF ¶¶ 12, 24, 29, 33, Ex. F., p. 3) The question was answered best by Sgt. Obasi:

> Q: ... Had they both been the same race, do you think it would have sent [up] the same red flags?
> MR. MAYE:            Object to form.
> THE WITNESS:            Definitely not.

(Ex. G, p. 50) Plaintiffs have sufficient evidence to get to the jury on their § 1981 claims.

Frontier is liable for its own actions in violation of Peter and A.D.'s civil rights, as well as those of its employees and agents. *Jones v. Royal Admin. Servs. Inc.,* 866 F.3d 1100, 1105 (9th Cir. 2017) (discussing federal common-law principles of agency and vicarious liability); *Bains LLC v. ARCO Products Co.,* 405 F.3d 764, 774 (9th Cir. 2005) (vicarious liability under § 1981 for compensatory and punitive damages). Captain Shupe, especially, in his role as "the senior representative of Frontier on the flight [who] is responsible for compliance with all regulations, company policies and procedures," Ex. 10 at 240-41 & its ex. 6, page 1079, renders Frontier liable for failing to protect Peter and A.D., and Frontier renders itself liable for its total failure to enforce its discrimination policy:

> If a company official with sufficient authority to subject the company to vicarious liability backs-up a racist employee's racially-motivated conduct instead of protecting the victim from the employee, then the company is liable, even if the supervisor's motivation is non-racial, such as loyalty to his subordinate or a desire to avoid conflict within the company. A written antidiscrimination policy does not insulate a company from liability if it does not enforce the antidiscrimination policy and, by its actions, supports discrimination.

1  *Id.* Shupe and Warren are also individually liable for their own intentional violations of Peter and

2  A.D.'s civil rights. *Flores,* 873 F.3d at 753 & n.6.

3  Punitive damages are available under § 1981 where the defendant acted with reckless disregard

4  of the plaintiff's protected civil rights, especially where the defendant was aware of applicable anti-

5  discrimination principles yet acted anyway in a discriminatory manner. *Hemmings v. Tidyman's Inc.,*

6  285 F.3d 1174, 1196-1199 (9th Cir. 2002).[45] "Congress intended for punitive damages to apply in

7  intentional discrimination cases where the plaintiff can show that the [defendant] knowingly or

8  recklessly acted in violation of federal law." *Id.* at 1197 (citing *Kolstad v. Am. Dental Ass'n,* 527 U.S.

9  526, 535 (1999)). The evidence is abundant that Frontier and its employees knew of the protected civil

10 rights of passengers including Peter and A.D. but chose to ignore those rights. The DOT took great

11 pains to remind all airlines and airline personnel of their responsibility to protect passengers from

12 discrimination, yet Frontier and its employees chose to ignore the message. Frontier chose not to

13 upgrade its training, and it actively diverted all passenger complaints of discrimination, which arrived

14 at a rate of more than one per week on just its domestic flights, to a special "Denver Team" whose

15 role was to placate the complainants with false promises of investigations and offers of coupons for

16 future travel while declaring that no discrimination had occurred and taking no remedial action against

17 employees and agents who violated passengers' civil rights. (SOF ¶ 97) Frontier admits it never

18 enforced its antidiscrimination policy over the 5 years preceding the Subject Flight. (SOF ¶ 96)

19 **D.  THE IIED CLAIM SURVIVES**

20 To establish IIED, Peter and A.D. must prove: (1) defendants engaged in extreme and

21 outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress;

22 (2) plaintiffs suffered severe or extreme emotional distress; and (3) actual or proximate causation.

23 *Posadas* v. *City of Reno*, 851 P.2d 438, 444 (Nev. 1993). "Nevada courts refer to the Restatement

24 (Second) of Torts § 46 for guidance in interpreting IIED claims." *Banerjee v. Continental, Inc.,* Case

25 No. 2:16-cv-669-JCM-VCF, 2016 U.S. Dist. LEXIS 141891, *15 (D. Nev. Oct. 11, 2016). Extreme

26 and outrageous conduct "'may arise from an abuse by the actor of a position, or a relation with the

27 other, which gives him actual or apparent authority over the other, or power to affect his interests.'"

28

---

[45] Defendants' motion omits any discussion of the federal standard, *see* ECF No. 266 at 27.

*Id.* at \*16 (quoting Restatement (Second) of Torts § 46 cmt. e). It is beyond cavil that FAs and pilots occupy a position of power over an airliner's passengers traveling at 30,000 feet—resisting their instructions is a crime punishable by up to 20 years in prison. *See* 49 U.S.C. § 46504. The evidence reflects that Frontier's FAs and pilots intentionally abused their position of authority to cause emotional distress, or recklessly disregarded the probability that it would cause such distress. Falsely accusing Peter of molesting A.D. within earshot of other passengers and Frontier employees (SOF ¶¶ 76, 78-82, 92), attacking Peter with multiple blows to the head causing a concussion (SOF ¶¶ 58, 63, 65-72), sequestering A.D. in a dark rear seat guarded by an off-duty policeman (SOF ¶¶ 54, 59-60, 62, 73), telling A.D that his father molested him (SOF ¶¶ 81-82), refusing to accept that A.D. and Peter were related (SOF ¶¶ 18, 61-62, 82, n.17), assaulting A.D. by reaching for his genitals while he was trapped against the wall of the aircraft cabin (SOF ¶¶ 82-83), physically and verbally preventing blocking Peter from comforting A.D. (SOF ¶¶ 61-62, 73-74), and ultimately delivering them to police, who handcuffed Peter and delivered him to the FBI for hours of questioning for no valid reason (SOF ¶ 75), all while having the power to send both the father and the son to prison should they object, would be considered by any reasonable person to be extreme and outrageous conduct.

As shown by the testimony of Drs. Ohler and Halley, the expert psychologists, and Ms. Sampson, the treating psychotherapist, the actions of Frontier and its employees caused A.D. to suffer PTSD, a severe emotional illness. (SOF ¶¶ 84-87) And the testimony of Peter, A.D., Amanda, Gayle and Dr. Franzese, as well as that of Drs. Carnes and Lasker, establishes that Peter also suffered severe emotional distress as a result of their actions. (SOF ¶ 87) There is no shortage of evidence of severe injury in this case, but it should also be noted that Nevada courts evaluate IIED claims "on a continuum: the less extreme the outrage, the greater the need for evidence of physical injury or illness from the emotional distress." *Mazzeo v. Gibbons*, 649 F. Supp. 2d 1182, 1201 (D. Nev. 2009). It stands to reason, therefore, that where Defendants' conduct included whacking Peter on the head and imprisoning A.D. in a row all by himself for two and a half hours, the outrage was particularly extreme and the evidentiary requirements of distress should be lowered. Peter and A.D. are entitled to compensatory damages under Nevada law for IIED, as well as punitive damages since Defendants acted with "oppression," defined in NRS 42.001 as "despicable conduct that subjects a person to cruel

1   and unjust hardship with conscious disregard of the rights of the person." The FAs, pilots and
2   Frontier's management knew Peter and A.D. had rights. The evidence shows they did not care and
3   treated Peter and A.D. with disdain and as something less than human beings (for example, they did
4   not even make inquiries before taking action based on their unfounded assumptions).

5   ### E.  THE FALSE IMPRISONMENT CLAIM SURVIVES SUMMARY JUDGMENT.

6           Under Nevada law, a defendant is liable for false imprisonment when "(a) he acts intending to
7   confine the other or a third person within boundaries fixed by the actor, (b) his act directly or indirectly
8   results in such a confinement of the other, and (c) the other is conscious of the confinement or is
9   harmed by it.'" *Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981) (quoting Restatement
10  (Second) of Torts § 35 (1965)). There is no dispute that Warren took A.D. to the back of the aircraft
11  against his will, ordered him to sit in the window seat (30F), and instructed Higgins, the "Able Bodied
12  Passenger" and off-duty policeman, to sit in the aisle seat (30D) (SOF ¶¶ 59-63). Higgins understood
13  his role, as directed by Warren (who was himself acting under the direction of Captain Shupe,
14  Frontier's senior management official on the flight) to keep A.D. from getting to Peter and *vice versa*.
15  (SOF ¶ 60, 62) A.D. knew he could not leave the row because he asked Warren multiple times if he
16  could return to sit with Peter and Warren would not allow him to. (SOF ¶¶ 61-62, 73-74) When Peter
17  attempted to comfort A.D., Warren physically and in a threatening manner blocked him in view of
18  A.D. and Higgins. (SOF ¶¶ 61-62, 73-74) Warren kept A.D. in the back row with Shupe's (and
19  Frontier's) approval for 2.5 hours during which A.D. was upset, scared and crying. (SOF ¶ 62; *see
20  also* Ex. A at 187). That evidence amply satisfies the elements of the cause of action pleaded in Count
21  III. Moreover, Warren's conduct, as supported by Shupe and Nickel, was "despicable conduct that
22  subject[ed] [A.D.] to cruel and unjust hardship with conscious disregard of the rights of the person."
23  Defendants are therefore liable for punitive damages as well as compensatory damages.

24  ### F.  THE BATTERY AND ASSAULT CLAIM SURVIVES.

25          Warren's battery of Peter and assault of A.D. were knowing and despicable conduct supporting
26  punitive damages under Nevada law. "To establish a battery claim, a plaintiff must show that the actor
27  (1) intended to cause harmful or offensive contact, and (2) such contact did occur." *Burns v. Mayer*,
28  175 F.Supp.2d 1259, 1269 (D. Nev. 2001) (citing Restatement (Second) of Torts, §§ 13, 18 (1965)).

The elements of assault are that the defendant (1) intended to cause harmful or offensive physical contact or an imminent apprehension of such a contact, and (2) the victim was put in apprehension of such contact. *Sandoval v. LVMPD,* 854 F.Supp.2d 860, 882 (D. Nev. 2012). Peter's testimony establishes that Warren punched him repeatedly in the back of the head, an intentional act. (SOF ¶ 68 ) Campbell's testimony, although he could not see the punch after Warren bent him forward to lean over his back, supports the aggressive nature of Warren's attack on Peter. (SOF ¶ 56) Sgt. Obasi confirmed that Peter told him right after the flight landed that Warren had punched him. (SOF ¶ 65) Amanda also confirmed that. (SOF ¶ 69) The testimony of A.D., Amanda, Gayle, Dr. Franzese, Dr. Carnes and Dr. Lasker also confirm that Peter suffered a concussion on the flight and exhibited post-concussion symptoms. (SOF ¶¶ 58, 63, 65-72) The only way he could have suffered a concussion would have been being hit in the head as he testified.

A.D. testified that Warren intentionally reached toward his crotch and hovered his hand above his genitals while discussing his alleged observation. (SOF ¶¶ 82-83) A.D. testified that he was "really freaked out" by Warren's action, to the point that he could not concentrate on what Warren was saying. (SOF ¶ 82) Warren's hand movement was intentional, and A.D. was put in apprehension that Warren was going to grope him. (*Id.*) A.D. later reported what had happened to both Peter and Amanda. (SOF ¶ 83-84) Warren confirmed in his testimony that he sat next to A.D. and told him about what he claimed to have seen Peter do. (SOF ¶ 81) Higgins, who was seated next to them, attempted to protect Warren throughout his deposition by claiming under oath that Warren had never sat in the row, even though Warren admitted sitting there. (*Id.*) A reasonable jury could infer from Higgins's prevarication that something worth lying about had occurred there.

### G.  PLAINTIFFS' DEFAMATION CLAIM SURVIVES.

Defendants attempt to limit the breadth of the defamatory statements, but Count V alleges defamation *per se* injuring both Peter and A.D.'s reputations. and incorporated all allegations by reference. (ECF No. 153 at ¶¶ 80-84.) Under Nevada law, "[w]ords or conduct or the combination of words and conduct can communicate defamation." *K-Mart Corp. v. Washington*, 866 P.2d 274, 283 (Nev. 1993)*, overruled in part on other grounds by Pope v. Motel 6*, 114 P.3d 277 (Nev. 2005). There, a store employee chased, tackled, handcuffed, and led the plaintiff back into the store in front of a

crowd, where the employee said, "[e]xcuse me, sir, I'm from K-Mart security. I need you to come back in the store about using this product.'" *Id.* Even though the words alone were "arguably susceptible of innocent construction," the Supreme Court found substantial evidence of defamation to support the jury's verdict in favor of the plaintiff, because "the combination of words and actions together constitutes slander *per se* as it would impute, to a reasonable person, that Washington was a thief." *Id.* In *Tsao v. Desert Palace, Inc.,* 698 F.3d 1128, 1148 (9th Cir. 2012), the Ninth Circuit held that conduct alone—*i.e.*, a security guard "escorting [plaintiff] off the casino floor in handcuffs in view of other patrons" — could support a claim of defamation *per se*. *Id.* The *Tsao* Court held that "the qualified privilege does not apply in such circumstances." *Id.* Here, as in *Tsao*, Warren and Nickel, after discussing the plan with Shupe and reaching a consensus of how the separation would be conducted, made a point of raising the cabin lights and making a spectacle of the separation. (SOF ¶ 42) Other passengers testified that they thought from what they observed the FAs doing that Peter was engaged in the commission of a crime. (SOF ¶¶ 78-80) One went so far as to claim that Peter might be committing suicide because he got "caught." (SOF ¶ 79)

Defendants ignore that one of the FAs told Higgins, a third party, when the flight landed that "someone's hand was in someone's crotch," a statement Higgins knew referred to Peter and A.D. (SOF ¶ 76) Higgins was also seated just a few feet away from Warren when Peter testified that Warren angrily accused him of sexually molesting A.D., an exchange from which Higgins was able to repeat nearly verbatim what Peter said to Warren, but claims he heard nothing of what Warren said to Peter. (SOF ¶ 73) His testimony on that point is unbelievable; a reasonable jury could conclude from the fact that he heard Peter's statements and accurately recounted in his declaration what Peter testified he said, that he also heard what Peter testified that Warren said to him. Higgins, a former NYPD detective, was a savvy and evasive witness in his deposition. *See* Ex. J at 80-92. His claim that his 30-second-to-5-minute discussion with Warren prior to the separation consisted only of "Sir, would you be willing to change your seat?" is not worthy of belief, either. A reasonable jury could conclude that Warren published to Higgins the same statements that Peter testified Warren said to him.

Bright-Sakurada clearly knew that she was telling a falsehood when she announced in the jet bridge that "all" of the FAs had witnessed Peter molesting A.D. (SOF ¶¶ 28, 92-93) Paulo, an

authorized agent of Frontier, admitted that she had absolutely no way of knowing whether or not that statement was true when she repeated it in Peter and A.D.'s PNR (*Id.*), which can still be read to this day by anyone who can log onto Frontier's Navitaire program. (SOF ¶ 94) Frontier admitted in its interrogatory answers that one of its customer services employees has already accessed the PNR, for unexplained purposes. (*Id.*)  Similarly, Warren knew that his statement about Peter fondling A.D. was untrue when he reported it to the other FAs and the pilots, and Shupe and Mullin had no way of knowing whether it was true or not when they sent the non-safety-related message to Frontier's management through ACARS. (SOF ¶¶ 22, 27) No privilege attached to Warren falsely telling A.D. that his father had molested him, as no common interest existed between them. *See Lubin v. Kunin,* 17 P.3d 422, 428 (Nev. 2001). Moreover, Bond knew that she was lying when she told Bright-Sakurada that certain things had happened in the exit row that suggested human trafficking; she admitted those things never happened. (SOF ¶ 28)

Again, the ACARS statements do not qualify for immunity. Defendants' arguments that its employees' and agents' statements are entitled to immunity fail because they have not pleaded or produced *any* facts to show specifically to whom the statements were published within the company and why the publications should be covered by the qualified common interest privilege. *See Lubin,* 17 P.3d at 428 ("the Parents have not alleged the privilege by answer, let alone established facts to show that the privilege applies.") Defendants bore the burden of alleging and proving that the privilege applies, *Pope,* 114 P.3d at 284-85, and they have failed to sustain that burden. The defamatory statements were published with knowledge that they were untrue, or at least with reckless disregard of whether they were true, which not only satisfies the "actual malice" standard to override any privilege (to the extent it is necessary), but also satisfies the standard for an award of punitive damages.[46]

### H.  PLAINTIFFS' PUNITIVE DAMAGES CLAIMS SURVIVE.

Defendants move for summary judgment on all of Plaintiffs' punitive damages claims. They have only cited Nevada law, however, so they have not provided any support for summary judgment as to Plaintiffs' claims for punitive damages under § 1981, where a federal standard applies. Damages

---

[46] Defamation is an exception to the statutory limitations on punitive damages, *see* NRS 42.005(2)(e); it is governed instead by the "conscious disregard" standard, *see Countrywide Home Loans, Inc. v. Thitchener,* 192 P.3d 243, 252-55 (Nev. 2008).

under § 1981 are awarded pursuant to § 1988. *Woods v. Graphic Communications*, 925 F.2d 1195, 1204 (9th Cir. 1991). Section 1988 looks primarily to federal law, and only incorporates aspects of state law where the federal law is deficient. § 1988(a); *Jones v. Reno Hilton Resort Corp.,* 889 F.Supp. 408, 410 & n.1 (D. Nev. 1995).

> Punitive damages …can be awarded against an employer based on a respondeat superior theory. ..Also, we think that § 1981, unlike Title VII and Nevada statutory law, places no limit on punitive damage recovery.

> ...punitive damages can be awarded where the defendant acts with "evil motive or intent" or with "callous or reckless disregard for the federally protected rights of others."

*Id.* (citations omitted). The evidence cited above establishes that Defendants at the very least acted with "callous or reckless disregard for the federally protected rights of others," and Frontier's employees and agents did so while acting in the course of their employment and agency. For state law claims, the standard is "oppression, fraud or malice" as to all but the defamation claims, see *id.* at n.1, and the "conscious disregard" standard as to the latter, *see Countrywide*, 192 P.3d at 252-55. The evidence also satisfies those standards, especially concerning Defendants' abuse of their positions of authority over Plaintiffs and their knowing falsehoods about them. With respect to the NRS 42.007 elements cited by Defendants, all Defendants personally acted with the required standards of conduct, and the FAs' actions were not only ratified, but also directed, by Captain Shupe, who was their superior and Frontier's spokesperson. Their actions were additionally ratified by Frontier; none of them have been disciplined for any of the conduct at issue. *See* Ex. 10 at 228-29, 230, 238, 259-61.

## IV.   CONCLUSION

Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied.

DATED this 30th day of November, 2023.

 */s/ John D. McKay*
JOHN D. MCKAY, California Bar No. 220202 (*admitted pro hac vice*)
**PARK AVENUE LAW LLC**
Email: johndmckayatty@gmail.com
MARGARET A. MCLETCHIE, Nevada Bar No. 10931
LEO S. WOLPERT, Nevada Bar No. 12658
**MCLETCHIE LAW GROUP, PLLC**
Email: efile@nvlitigation.com
*Counsel for Plaintiffs Peter DelVecchia and A.D., a Minor*