## **EXHIBIT 3**

**Deposition of Flight Attendant Anna Bond
("C" Flight Attendant)**

1                UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3

4   PETER DELVECCHIA, et al,        )
                                    )
5        Plaintiff,                 )
                                    )
6            vs.                    ) CASE NO.  2:19-CV-01322-KJD-NJK
                                    )
7   FRONTIER AIRLINES, INC., et al, )
                                    )
8        Defendants.                )
    _____ )

9

10

11

12

13

14

15

16

17

18

19              DEPOSITION OF ANNA BOND

20         Taken on Tuesday, December 10, 2019

21                 At  1:37 p.m.

22             At Titolo Law Office

23          9950 West Cheyenne Avenue

24              Las Vegas, Nevada

25   REPORTED BY:  SHIFRA MOSCOVITZ, CCR NO. 938



800.211.DEPO (3376)
EsquireSolutions.com

```
 1    APPEARANCES:

 2    For Plaintiffs:

 3                        JOHN D. MCKAY, ESQ.
                          PARK AVENUE LAW
 4                        127 W. Fairbanks Avenue
                          #519
 5                        Winter Park, Florida
                          (800)391-3654

 6

 7

 8    For Plaintiffs:

 9                        TIM TITOLO
                          TITOLO BRAIN AND INJURY LAW
10                        9950 W. Cheyenne Avenue
                          Las Vegas, Nevada 89129
11                        (702)869-5100

12

13

14    For Defendants:

15                        BRIANE T. MAYE, ESQ.
                          ADLER MURPHY & MCQUILLEN LLP
16                        20 South Clark Street
                          Suite 2500
17                        Chicago, Illinois 60603
                          (312)345-0700

18

19

20

21    Also Present:  MONICA HAYWORTH, VIDEOGRAPHER
                      PETER DELVECCHIA
22

23

24

25
```



ANNA BOND                                          December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                            3

```
 1                        EXAMINATION

 2   WITNESS:                                         PAGE
     Anna Bond
 3

 4   Examination by
     Mr. McKay                                        4,105
 5
     Mr. Maye                                         103
 6

 7

 8

 9                         EXHIBITS

10   EXHIBIT                                         PAGE

11   Exhibit 1          Notice of Deposition          9

12   Exhibit 2          Copies of Text Messages       11

13   Exhibit 3          Record of all the Training    33

14   Exhibit 4          In-Flight Flyer               34

15   Exhibit 5          In-Flight Must Reads          34

16   Exhibit 6          Flight Attendant Manual       34

17   Exhibit 7          Flight Attendant's Statement  91

18   Exhibit 8          Email From Jason B. Grimes    91

19

20

21

22

23

24

25
```



```
 1              LAS VEGAS, NEVADA; DECEMBER 10, 2019

 2                        1:37 P.M.

 3                         -oOo-

 4  (NRCP Rule 30(b)(4) waived by the parties prior to the

 5  commencement of the deposition.)

 6  (FRCP Rule 30(b)(5) waived by the parties prior to the

 7  commencement of the deposition.)

 8  Thereupon--

 9                     ANNA BOND,

10  was called as a witness, and having been first duly sworn,

11  was examined and testified as follows:

12                     EXAMINATION

13  BY MR. MCKAY:

14          VIDEOGRAPHER:  Okay, this is media number

15      one to the video recorded deposition of Anna

16      Bond in the matter of Peter Delvecchia, et al.

17      versus Frontier Airlines, Incorporated, et al.

18      Being heard before the United States District

19      Court, for the District of Nevada, case number

20      2:19-cv-01322-KJD-NJK.  This deposition is

21      being held at Titolo Law Office, 9950 West

22      Cheyenne Avenue, Las Vegas, Nevada, starting

23      1:37 p.m.  My name is Monica Hayworth and I am

24      the videographer.  The court reporter is Shifra

25      Moscovitz with Esquire Deposition Solutions.
```



 1      Counsel, will you please introduce yourselves

 2      and affiliations and the witness will then be

 3      sworn.

 4           MR. MCKAY:  I am John McKay of Park Avenue

 5      Law, here on behalf of Plaintiffs, Peter

 6      Delvecchia and AD.

 7           MR. TITOLO:  Tim Titolo, on behalf of

 8      Plaintiff.

 9           MR. MAYE:  Brian Maye for Frontier

10      Airlines.

11                     (Witness sworn in.)

12      Q.   Would you please state your full name?

13      A.   Anna Bond.

14      Q.   Is that your full name or do you have a

15   middle name?

16      A.   I do not have a middle name.

17      Q.   Okay.  And what is your residence address,

18   please?

19      A.   2001 Ramrod Avenue, Henderson, Nevada

20   89014.

21      Q.   89014?

22      A.   Yes.

23      Q.   Have you ever had your deposition taken

24   before?

25      A.   No.



1          Q.   I know you met with your attorney and he

2    may have told you some of these things, I may be

3    repeating them, but it's important that we have an

4    understanding, that you understand the procedure, is

5    that okay?

6          A.   Yes.

7          Q.   All right.  So this is obviously being

8    taken in a conference room of a law office.  It's

9    not a court room, but this is a proceeding which is

10   in adjunct to a court case.  And your testimony

11   today is in front of a person who has been

12   authorized by the court to put you under oath, just

13   as you would be in a courtroom.  And your testimony

14   here today will be treated for all purposes just as

15   testimony in a courtroom.  And that means that once

16   you are placed under oath, you are bound to tell the

17   truth, and if you don't tell the truth there are

18   penalties that attach to that, just as they would in

19   a courtroom.  Do you understand that?

20         A.   I do.

21         Q.   Now, we can take a break at any time, we

22   will probably take one after an hour, but if you

23   need to take a break sooner than that, by all means,

24   just say so.  Don't be afraid to speak up if you

25   need to take a break, to use the facility, walk



1   around, whatever.  The only thing that I do ask is
2   that there not be a question pending because we
3   don't want to think that anybody is discussing how
4   to answer the question during the break, okay?
5        A.   Okay.
6        Q.   Most important of all is that the court
7   reporter seated here to your right is under an
8   obligation to make sure that her transcript that she
9   is typing out as we speak is an accurate transcript
10  of everything that is said here today.  And in order
11  to help her with that job, we have to keep a couple
12  of things in mind.  One is that we can't talk at the
13  same time because it's impossible for her to
14  separate out who said what at what point.  And I
15  assure you that I have seen many attempts at that
16  and they all look terrible.  So the best thing to do
17  is for you to remember to wait until I am completely
18  finished with my question before you answer it, and
19  I will do the same, to remember to wait until you
20  are finished answering the question before I ask
21  another question or any kind of comment or follow up
22  on that.  The other important rule is that your
23  answer to a question has to be with words.  It can't
24  be a nod of the head, shrug of shoulders or uh-huh,
25  because it's virtually impossible for her to



1  accurately reflect that on the transcript.  And this

2  is now your first test of your understanding of

3  that, is that understood?

4      A.   Yes.

5      Q.   Great, you have done well.  All right.  So

6  who lives at 2001 Ramrod Avenue with you?

7      A.   My roommate, Loudes Acedevo.

8      Q.   I am going to ask you to spell that?

9      A.   L-O-U-D-E-S, A-C-E-D-E-V-O.

10     Q.   Perfect.  Thank you.  Anyone else?

11     A.   No.

12     Q.   Do you have any relatives living in Las

13 Vegas?

14     A.   No.

15     Q.   What is your work address, would it be the

16 McCarran Airport?

17     A.   Yes.

18     Q.   And who is your immediate supervisor?

19     A.   We have two.  One is Cora, I am not sure

20 what her last name is.  And another gentleman named

21 Elmer.  I am not sure what his last name is either,

22 sorry.

23     Q.   No, that's just I am smiling because it's

24 interesting because it's consistent with everybody

25 else's testimony.  It seems like nobody knows



 1  anybody's last names in this business.  Okay.  What

 2  are the last four digits, just the last four of your

 3  Social Security number?

 4       A.   1980.

 5       Q.   There may be times during this deposition

 6  that I refer to Mr. Delvecchia's son as AD.  That's

 7  because of the court rule that we are not suppose to

 8  name people who are under the age of 18.  So to the

 9  extent that I say AD, I am referring to his son, who

10  was a passenger on the plane, is that understood?

11       A.   Yes.

12                      (Exhibit 1 was marked for

13                       identification.)

14       Q.   Okay.  Now, we have marked, and you have

15  in front of you Deposition Exhibit 1.  And I will

16  ask you to turn to the fourth page of that, please.

17  That, first of all, I will represent to you that is

18  a court document that sets up this deposition.  It's

19  called a notice of deposition.  And on the fourth

20  page there are some, there is a subpoena that was

21  accepted by your attorney on your behalf.  And if

22  you would just turn to that, there is a description

23  of materials on it.  The second check mark, where

24  there is a description of items, if you could just

25  read that to yourself.  And I will have a question

1  for you on that.  Okay.  So what that says is that

2  you have been asked to bring to this deposition any

3  and all notes, memorandum, e-mails or other

4  documents pertaining to the passengers seated in

5  seat 17 Echo and 17 Foxtrump on Frontier Airlines

6  Flight 2067 between RDU and LAS on March 28, 2018,

7  including without limitation discussions with other

8  crew members, the decision to separate them, the

9  request for law enforcement officers to meet the

10 flight at LAS, and any post landing actions.  Did

11 you bring any such documents with you today?

12      A.   No.

13      Q.   Did you look for any such documents?

14      A.   Yes.

15      Q.   Okay.  Where did you look?

16      A.   On my phone.

17      Q.   All right.  Did you find anything on your

18 phone?

19      A.   I do have a communication with another

20 flight crew.

21      Q.   Is that Chelsea Bright?

22      A.   Yes.

23      Q.   And is that entire communication the

24 one -- well, let me go ahead and mark this as

25 Exhibit 2.



```
 1                    (Exhibit 2 was marked for
 2                    identification.)
 3              First of all, were those the only
 4    things that you found?
 5         A.   Yes, I do have more, um messages.
 6         Q.   Texts?
 7         A.   Yes, between us since then.
 8         Q.   Okay.  Do you have those on your phone
 9    with you today?
10         A.   Yes.
11         Q.   Okay.  You say more.  So you know what
12    these are, you have seen a copy of Exhibit 2?
13         A.   I have not.
14         Q.   But you know what Chelsea gave to me at
15    her deposition?
16         A.   I messaged her yesterday regarding today.
17         Q.   Yes.
18         A.   I believe her deposition was before
19    yesterday.  So...
20         Q.   Yes.
21         A.   So I am guessing it is more than what you
22    have here.
23         Q.   All right.  Would you be able to show that
24    to me?
25         A.   Yes.
```



1        Q.   Okay.  All right.  Thank you.  So your

2    most recent texts with Chelsea were concerning what

3    to wear at the deposition?

4        A.   Yes.

5        Q.   And also what to wear at what you

6    described the practice?

7        A.   Yes.

8        Q.   Okay.  So as you understood it, you were

9    going to have a practice session before the

10   deposition?

11       A.   Yes.

12       Q.   Okay.  And you did have that with

13   Mr. Maye, who is seated here beside you?

14       A.   Yes.

15       Q.   And how long did that last?

16       A.   A couple of hours.

17       Q.   Okay.  So you met a couple of hours and

18   were the other flight attendants present?

19       A.   Yes.

20       Q.   And that was Chelsea, Scott, no, not

21   Chelsea, but Scott, Amanda and yourself, right?

22       A.   No.

23       Q.   Who was there?

24       A.   Amanda and the first officer.

25       Q.   Oh.  Okay.  Just the three of you?



1    A.   Yes.

2    Q.   Okay.  So Scott was not present?

3    A.   No.

4    Q.   Do you know why?

5    A.   No.

6    Q.   Okay.  Have you ever worked with Scott

7  other than the flight that's in question here?

8    A.   Yes.

9    Q.   Okay.  How many times?

10    A.   I believe once.

11    Q.   Was that before or after Flight 2067 on

12  March 28th?

13    A.   After.

14    Q.   Okay.  Did you talk about this flight when

15  you worked with Scott?

16    A.   Not that I remember.

17    Q.   Okay.  Have you talked with Scott at any

18  other time?

19    A.   No.

20    Q.   So the only times that you have ever

21  talked with Scott were on Flight 2067 and that other

22  flight that you worked with him on later?

23    A.   Yes.

24    Q.   All right.  Did you review anything for

25  your deposition today?



1       A.    The e-mail that I received from Terra.

2       Q.    And attorney communications?

3       A.    Yes.

4       Q.    All right.  Anything else?

5       A.    No.

6       Q.    Okay.  When did you first start working

7    for Frontier?

8       A.    October 10, 2016.

9       Q.    And where had you worked prior to that?

10      A.    At Los Angeles International Airport.

11      Q.    What did you do at LAX?

12      A.    I was a customer service agent for

13   Emirates Airlines.

14      Q.    Okay.  What did that entail?

15      A.    Dealing with passengers, checking them in,

16   helping them find their gate.

17      Q.    All right.  Was this the person that if I

18   were flying Emirates I would check in with when I

19   arrived at the airport?

20      A.    Yes.

21      Q.    Okay.  And how long did you do that?

22      A.    I believe four or five months, very brief

23   period.

24      Q.    All right.  It was always in the same

25   position?



 1          A.   Yes.

 2          Q.   Okay.  And why did you leave Emirates?

 3          A.   I was hired by Frontier Airlines.

 4          Q.   Let's go back in time.  Where did you work

 5     before Emirates?

 6          A.   I was at Benny Hannah Restaurant.

 7          Q.   Okay.  What did do you for them?

 8          A.   I was a server.

 9          Q.   Okay.  So typical description of a server?

10          A.   Yes.

11          Q.   I saw on one of the documents that part of

12     your work requirements were singing happy birthday,

13     however?

14          A.   Yes.

15          Q.   Okay.  Where did you work before Benny

16     Hannah?

17          A.   I worked at Redac Gateway Hotel.

18          Q.   Can you spell that?

19          A.   R-E-D-A-C.

20          Q.   And where is that?

21          A.   It's in Torrance, California.

22          Q.   What did you do there?

23          A.   I had multiple positions.  One of them

24     were serving at the restaurant, and the second one

25     was front desk.



1        Q.   Okay.  And I forgot to ask, Benny Hannah,
2    where was that?
3        A.   It's also in Torrance, California.
4        Q.   Is that where you grew up?
5        A.   That's where I was in college.
6        Q.   Okay.  Did you have work before Redac
7    Gateway Hotel?
8        A.   Yes, my very first job was at Mitsuwa
9    Marketplace.
10       Q.   M-I-T?
11       A.   S-U-W-A.
12       Q.   Marketplace?
13       A.   Yes.
14       Q.   And was that in Torrance?
15       A.   Yes.
16       Q.   Okay.  All right.  What did you do there?
17       A.   I was cashier.
18       Q.   Did you have any training at Emirates for
19   your position?
20       A.   Yes.
21       Q.   What did that entail?
22       A.   We had to know the military time, the 24
23   hour clock, the specific oceans, and just the
24   airport codes.
25       Q.   All right.  Is that it?



1      A.   Yes.

2      Q.   Okay.  Where were you born?

3      A.    In San Francisco, California.

4      Q.   And did you grow up there in San

5  Francisco?

6      A.   No, I grew up in Japan.

7      Q.   Okay.  And what city in Japan?

8      A.   Yokohama.

9      Q.   What years were you there in Japan?

10      A.   1995, I believe, until 2005.

11      Q.   All right.  And was that based on your

12  parents work?

13      A.   Yes, my dad's in the military.

14      Q.   Okay.  What does your dad do in the

15  military?

16      A.   I am not quite sure.

17      Q.   Okay.  Can you tell me branch of service?

18      A.   He is in the navy.

19      Q.   He is in the navy, okay.  So you grew up

20  and went to primary schools and all in Japan?

21      A.   Yes.

22      Q.   You speak Japanese?

23      A.   Yes.

24      Q.   When you decided to go from Emirates to

25  Frontier, did you file an application with them?



1         A.    With Frontier Airlines.

2         Q.    Yes.

3         A.    Yes.

4         Q.    Where, did you graduate high school in

5    Japan?

6         A.    No.

7         Q.    Where you did you graduate high school?

8         A.    Temecula Valley High School.

9         Q.    That's in California?

10        A.    Yes.

11        Q.    And did you go directly from high school

12   to college?

13        A.    Yes.

14        Q.    And what college did you attend?

15        A.    Dominguez, Cal State Dominguez Hills.

16        Q.    Can you spell that?

17        A.    D-O-M-I-N-G-U-E-Z, oh no, sorry, I am

18   going to have to type that really quick.

19        Q.    Okay.  Take your time.

20        A.    D-O-M-I-N-G-U-E-Z.

21        Q.    Okay.  Actually I think that's what you

22   said because that's what I wrote down?

23        A.    Okay.

24        Q.    Did you graduate from Cal State Dominguez?

25        A.    No.



1   Q.   How long did you attend?

2   A.   One year-and-a-half.

3   Q.   What did you study there?

4   A.   I was majoring in criminal justice, and

5   later on switched it to anthropology.

6   Q.   Is that four year are both of these four

7   years degrees?

8   A.   Yes.

9   Q.   And what caused you to leave after only a

10  year and a half?

11  A.   I started working and I liked making money

12  more than education.

13  Q.   Okay.  Fair statement.  So was it then

14  that you went to the Mitsuwa Market?

15  A.   Yes.

16  Q.   So these employment prior employments that

17  you have mentioned, those were all full-time

18  employment?

19  A.   Mitsuwa was part-time, Benny Hannah was

20  part-time.  I started at LAX as part-time, but went

21  into full-time.  Redac Gateway was full-time.

22  Q.   Okay.  I would like to ask you now about

23  flight attendant Chelsea Bright, you know her,

24  right?

25  A.   Yes.



1    Q.   Now, how long have you known Chelsea?

2    A.   Almost three years.

3    Q.   And where did you meet?

4    A.   At work in Denver, I believe.

5    Q.   At work for Frontier?

6    A.   Yes.

7    Q.   And you became friends?

8    A.   Yes.

9    Q.   Do you all socialize together, go out

10   together or anything like that?

11   A.   No.

12   Q.   No.  So you only are friends at work and

13   text between you, is that fair?

14   A.   Yes.

15   Q.   Okay.  Do you work with her frequently?

16   A.   A few times a year.

17   Q.   All right.  Do you all communicate like to

18   try to bid on the same flights to work together?

19   A.   No.

20   Q.   So if you work together a couple of times

21   a year, that's entirely by coincidence?

22   A.   Yes, she is in the class below me.

23   Q.   What does that mean?

24   A.   I graduated in October of 2016, I believe

25   she graduated in November of 2016.  So seniority,



1  our classes are about couple of weeks apart, so we

2  came into work basically around the same time.

3      Q.   But because of your graduation dates you

4  have more seniority than she does?

5      A.   Yes.

6      Q.   Okay.  So that means in practical effect

7  you are more likely to get a trip that you have been

8  on than she is?

9      A.   Yes.

10     Q.   Now, you said graduated, so what type of

11  training did you graduate from?

12     A.   Safety.

13     Q.   Safety training?

14     A.   Yes.

15     Q.   And what does that entail?

16     A.   Arming and disarming doors, making sure

17  safety equipment are stowed good, safety requiring

18  how to change spots with the pilot if they need to

19  use the restroom or just come and do some stretches.

20  We also had to learn how to survive when if we do

21  have like a crash or just prepare for emergency

22  landing, stuff like that.

23     Q.   How long does that safety training take?

24     A.   It was three weeks.

25     Q.   Okay.  And it was before you are sent out



1   to work on flights?

2          A.    Yes.

3          Q.    And was that in conjunction with any other

4   type of training during that period?

5          A.    No.

6          Q.    So basically you get hired, you go to

7   safety training and you start working, is that

8   right?

9          A.    You do have to pass an in-flight training

10  test.

11         Q.    What is that?

12         A.    Where you basically be one of the flight

13  attendants, but you have a supervisor watching you

14  do everything to make sure you are ready to become a

15  flight attendant.

16         Q.    Okay.  So is that sort of like shadowing

17  somebody who is already in the position?

18         A.    Yes.

19         Q.    So you do that on board a flight?

20         A.    Yes.

21         Q.    All right.  So if somebody, if I rang my

22  call button and the regular flight attendant came to

23  find out what I needed, you might have been with

24  her, is that the way it worked?

25         A.    Depending on what your instructor is like,



1  they might send you off on your own and then make

2  sure you know how to handle it by yourself or they

3  will take charge depending on how they think you are

4  with passengers.

5       Q.   Is your instructor a different person than

6  the flight attendant that's assigned on the flight

7  or is it a flight attendant?

8       A.   There is a specific group of people who

9  are hired to be a check flight attendant is what

10  they are called.  Usually the company assigns you on

11  a trip that they have already given throughout the

12  months, so they don't switch flight attendants just

13  so you can be with them.  If a check flight

14  attendant is already assigned to a trip, you would

15  just join them.

16       Q.   All right.  So just so I understand, if

17  it's an A320 and it's got four positions, A, B, C

18  and D.  And one of those positions is a check flight

19  attendant, and you as a trainee are assigned, are

20  there going to be five flight attendants or four?

21       A.   Five.

22       Q.   So you would be an additional flight

23  attendant on the flight?

24       A.   Yes.

25       Q.   And how many times did you do that?



1        A.    Once.

2        Q.    Just once.  And then you took a test or is

3   that the test?

4        A.    That's the test.

5        Q.    Okay.  So there is no written test, it's

6   just flying on a flight?

7        A.    There is written tests throughout the

8   training, but once you are all done with that you

9   just do the onboard training.

10       Q.    All right.  So is it fair to say that

11  there is no class that you attend, for instance, on

12  sexual harassment?

13       A.    They do prepare you, they do go over the

14  FAM, which is their flight attendant menu, which has

15  a lot of safety regulations and how to handle a lot

16  of situations.  So we do go through that during

17  training.

18       Q.    During the safety training?

19       A.    Yes, during the three week training.

20       Q.    Yes.

21       A.    We do cover the FAM, which is the flight

22  attendant manual.

23       Q.    All right.  Is that electronically given

24  to you or on paper?

25       A.    It's paper.



ANNA BOND                                          December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                          25

1          Q.    And how big is it, would you say?

2          A.    It's about good two inches, three inches.

3          Q.    Okay.  And so there is some portion of

4    that that's devoted to sexual harassment in the

5    workplace?

6          A.    I believe so, I am not sure if, I know

7    everything in there is regarding safety, and I do

8    know that couple of days ago we did get, not couple

9    of days ago, a while ago we did get a must read

10   which is an electronic version of the FAM.

11   Basically, it's like if they were revising the FAM,

12   they would send out a memo to all of the flight

13   attendants regarding how to handle sexual

14   harassment.  There was a section on that

15   electronically.  And now in the last I believe in

16   the last week they did give it to us physically.  So

17   I do have it in the FAM right now.

18         Q.    I just picked that out as an example, it's

19   one that's pretty common in manuals.  So you are

20   made aware then that there is a policy against

21   Sexual harassment in the workplace?

22         A.    Yes.

23         Q.    And are you tested on your knowledge about

24   that?

25         A.    In the training, I believe we weren't, we



ANNA BOND                                          December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                              26

```
 1   didn't do every scenario, but we did do some
 2   scenarios.  I don't really remember if it was sexual
 3   harassment, it was three years ago.  My training, so
 4   I don't remember if we really got tested on sexual
 5   harassment, but we did get tested on a lot of safety
 6   issues.
 7        Q.   Did you get any kind of training on racial
 8   discrimination, as applied to passengers?
 9        A.   I don't believe so, I don't know.
10        Q.   Okay.  You don't remember any?
11        A.   I don't.
12        Q.   Okay, now the FAM is the flight attendant
13   manual, correct?
14        A.   Yes.
15        Q.   And that's something that you carry with
16   you on a tablet?
17        A.   We carry it physically in our bag.
18        Q.   I see.  So you actually have a hard copy
19   present with you when you are working?
20        A.   Yes.
21        Q.   So if something comes up, you could look
22   up guidance from the FAM?
23        A.   Yes.
24        Q.   Is that done frequently?
25        A.   Yes.
```



1      Q.   What type of situations have you had that
2   you had to consult the FAM about?
3      A.   The most common is animals, pets in cabin,
4   service animals, roller skates or skate boards,
5   stuff that are, we get frequently, but every
6   situation is different.
7      Q.   And you have to find out what the rules
8   are, right?
9      A.   Yes.
10     Q.   And those rules are contained in the FAM?
11     A.   Yes.
12     Q.   Is there a section in the FAM about human
13  trafficking?
14     A.   I am not sure, I don't know.
15     Q.   Can you recall ever having any training on
16  human trafficking?
17     A.   I remember a brief training on it, but I
18  am not quite sure.
19     Q.   Well, when you say you remember a brief
20  training, what type of training are you speaking of?
21     A.   I remember them talking about it.
22     Q.   Who is them?
23     A.   The trainers.
24     Q.   That's all right.  So this is way back at
25  the beginning of your career, three years ago,



1   during your training?

2          A.   Yes, and every year we have a recurrent

3   training where we talk about different scenarios.   I

4   believe human trafficking, sexual harassment, a lot

5   of the common, not common, but a lot of the major

6   issues are talked about.

7          Q.   So you have been now to two recurring

8   training events?

9          A.   I have been to three.

10         Q.   Three.  Are those all conducted in Denver?

11         A.   Yes, for me, yes.

12         Q.   Okay.  And how long did each of those

13  last?

14         A.   They are from 8:00 a.m. to 5:00 p.m.

15         Q.   Just one day?

16         A.   Yes.

17         Q.   And during that time, describe for me what

18  sorts of things you do?

19         A.   So we get tested on arming, disarming

20  doors, our safety equipment, we do have a written

21  test where we do have to fill in the blanks using

22  our FAM.

23         Q.   So an open book test, basically?

24         A.   Yes, and we do discuss, after that we do

25  go over everything that happened throughout the year



1   or anything new regulations that they have came up

2   with, and we do talk about other safety stuff.

3        Q.   All right.  But as you sit here today, you

4   can't remember either at your initial training or in

5   these recurrent training on racial discrimination,

6   as it applies to passengers?

7        A.   No.

8        Q.   Okay, now before we get too far, let me

9   ask you about deposition Exhibit 2 there in front of

10  you.  And those are your texts that you mentioned

11  before with Chelsea?

12       A.   Yes.

13       Q.   Okay.  And are these an accurate copy of

14  those texts, as far as you can tell, and you can

15  check them against your phone, if you would like?

16       A.   Okay, yes.

17       Q.   Okay.  Now, just so I understand, the ones

18  that have a circular picture of you beside them are

19  your texts to Christy, and the darker ones are

20  Christy's texts back to you, is that accurate.

21       A.   Chelsea.

22       Q.   Sorry, Chelsea.  Yes?

23       A.   Yes.

24       Q.   So I notice here that you are asking about

25  her deposition and Chelsea tells you that she will



1  let you know on Tuesday after it's all over with, do
2  you see that?
3       A.   Yes.
4       Q.   Okay.  Did she contact you on Tuesday
5  after it was all over with?
6       A.   No.
7       Q.   Was the next contact the text that you
8  showed me directly from your phone?
9       A.   Yes.
10      Q.   Between you and Chelsea?
11      A.   Yes.
12      Q.   Okay.  Now, on the third page in Chelsea
13 says to you, oh, well, this guy is just pissed he
14 got caught and now is trying to fight it.  Is that a
15 statement by Chelsea that you agree with?
16      A.   Yes.
17      Q.   You do agree with that?
18      A.   Yes.
19      Q.   Okay.  And she then says, I don't even
20 want to imagine what Scott is going through,
21 exclamation point.  You see that?
22      A.   Yes.
23      Q.   What was your understanding of what that
24 meant?
25           MR. MAYE:  Object to form.  You can



1        answer.

2        Q.   Sorry, he makes objections and if he asks

3    you questions later, I might make objections and

4    basically your position with respect to those is

5    really easy, you just ignore them, they are for the

6    judge later on.

7        A.   Okay.

8        Q.   Yes.

9        A.   My thinking when she said that was Scott

10   did go through most of the actions when we were

11   dealing with this.  So we, I thought that he was

12   going to have a lot to do with this.

13       Q.   Well, this lawsuit, you mean?

14       A.   Yes.

15       Q.   Okay.  And, in fact, you know that he

16   punched Mr. Delvecchia, right?

17            MR. MAYE:  Object to form.

18       A.   No.

19       Q.   You don't know that?

20       A.   No.

21       Q.   Have you ever heard anyone say that?

22       A.   I did hear from Terra that he was being

23   accused.

24       Q.   When you say Terra, you mean your attorney

25   other than Mr. Maye?



1       A.   Yes.

2       Q.   All right.  So then that was when you

3   heard that from Terra, that was after these texts,

4   right?

5       A.   Yes.

6       Q.   Okay.  So again, you are saying, wow, or

7   something to that effect, I can't even imagine what

8   Scott is going through.  Actually, you said above,

9   it was your text that said, we had zero part, I am

10  really glad we didn't have parts in it, though,

11  imagine what Scott is going to have to do.  Do you

12  see that, it's on the top of the last page, I

13  believe?

14      A.   Sorry, I think I mixed all these pages up.

15      Q.   That's quite all right.  It's on a page

16  that only has one text from you to Chelsea.

17      A.   Oh, yes.

18      Q.   Okay.  And you are saying to Chelsea, we

19  shouldn't even have to go, we had zero part, I am

20  really glad we didn't have parts in it, though.

21  Imagine what Scott is going to have to do.

22      A.   Yes.

23      Q.   That's your statement?

24      A.   Yes.

25      Q.   Okay.  And when you say I am really glad



 1  we didn't have parts in it, though, what is the it

 2  you are referring to?

 3       A.   The whole action of deciding what to do,

 4  moving the two, moving the child, just everything,

 5  in general, the whole flight.

 6       Q.   And it's your belief that you and Chelsea

 7  didn't have anything to do with any of that?

 8       A.   Nothing major, yes.

 9       Q.   Okay.  We are going to get into the

10  details in just a bit.  But I want to mark and

11  identify a couple of other documents first.

12                    (Exhibit 3 was marked for

13                     identification.)

14                    All right.  The court reporter has

15  just given you what has been marked as your

16  deposition Exhibit Number 3.  Do you recognize what

17  this is?

18       A.   No.

19       Q.   All right.  Can you look under the

20  descriptions, does any of that make any sense to

21  you?

22       A.   Yes.

23       Q.   Okay.  Do you understand what those

24  descriptions are?

25       A.   Yes.



1       Q.   And so would that be a record of all of

2   the training that you have received from Frontier to

3   date?

4       A.   Yes.

5       Q.   And is it accurate?

6       A.   Yes.

7       Q.   Okay.  That's all I had on that.  Thank

8   you.

9            MR. MCKAY:  Let's mark this as Exhibit 4,

10          please, through six.

11                  (Exhibits 4-6 were marked for

12                  identification.)

13      Q.   All right.  So I am going to ask you first

14  about what has been marked as Deposition Exhibit 4.

15  And have you ever seen that before?

16      A.   Yes.

17      Q.   Okay.  And it says in-flight flyer below

18  it in smaller print, In-flight Biweekly Briefing

19  Memo 19-06, January 25, 2019.  Have I read that

20  accurately?

21      A.   Yes.

22      Q.   Okay.  And what is the In-flight Flyer?

23      A.   It's a flyer they send out with new

24  information on safety regarding our job.

25      Q.   Okay.  And this one in particular copies a



1  page titled human trafficking, right?

2       A.   Yes.

3       Q.   And it says January is national slavery

4  and human trafficking prevention month?

5       A.   Yes.

6       Q.   Did you read this when it came out?

7       A.   Yes.

8       Q.   And so you had read it prior to the flight

9  on March 28 of 2019?

10      A.   Yes.

11      Q.   And it says there, if you suspect a

12 passenger may be a victim of human trafficking,

13 first initiate nonthreatening conversation and ask

14 targeted questions.  Do you see that?

15      A.   Yes.

16      Q.   And the questions that they show you there

17 are first, ask where they are traveling, are they

18 going on vacation or visiting relatives.  And then

19 the second bullet point is, ask where they are

20 staying, who will be meeting them, what they will be

21 doing, et cetera.  Do you see that?

22      A.   Yes.

23      Q.   Now, on March 28 of 2019, did you ask any

24 of those questions of the young man identified as

25 AD?



ANNA BOND                                         December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                           36

1       A.    No.

2       Q.    Okay.  Is there a reason you didn't ask

3   him those questions?

4       A.    I was in charge of the front and they were

5   seated in the back of the aircraft.

6       Q.    So they were not your responsibility?

7       A.    The whole plane is all of our

8   responsibility, but they were not in my section, no.

9       Q.    Okay.  So does it say somewhere on here

10  that you are only to do that if the person is seated

11  in your section?

12      A.    No.

13      Q.    Oh.  So back to my question about why you

14  didn't do it, why you didn't ask these questions

15  then, is your answer still because they were not in

16  your section?

17      A.    Yes.

18      Q.    Okay.  I guess that makes it easy, the

19  next question is, take note if traveling companion

20  or companions appears nervous or prevents the

21  child/person from answering questions or if their

22  answers seem evasive, do you see that?

23      A.    Yes.

24      Q.    All right.  Did you do that on March 28th?

25      A.    Yes.



1      Q.   Okay.  And is it your testimony that you

2  made particular observations that are consistent

3  with this?

4      A.   Yes.

5      Q.   Okay.  And what are those observations?

6      A.   When I was briefing the exit row.

7      Q.   Yes.

8      A.   He was seated in my exit row, he looked

9  like a young child, so I did ask him what, how old

10 he was.  He ended up being under age where you have

11 to be 15 to sit in the exit row.  And when I asked

12 him how old he was, he looked at the gentleman

13 sitting next to me, and the man had nodded, and then

14 the boy had answered.

15     Q.   All right.  And you found something

16 untoward about that?

17     A.   Yes, the way he looked up at the gentleman

18 just made it seem like he was asking permission to

19 talk.

20     Q.   All right.  You had never seen anybody do

21 that before?

22     A.   No.

23     Q.   You never seen a child do that before?

24     A.   No.

25     Q.   You have had interaction in your other



 1  jobs with your children before, right?

 2       A.   Yes.

 3       Q.   And you have had interaction in Frontier

 4  with children, correct?

 5       A.   Yes.

 6       Q.   And you are testifying that you have never

 7  seen a child look to the parent before answering a

 8  question from you?

 9       A.   Not...

10            MR. MAYE:  Object to form.

11       A.   Not a question that simple.

12       Q.   I see.  Okay.  But he did answer you,

13  right?

14       A.   Yes.

15       Q.   And he said 12?

16       A.   Yes.

17       Q.   All right.  Was there anything unusual

18  about that?

19       A.   Not 12, no.

20       Q.   Okay.  And but it did require him to be

21  reseated?

22       A.   Yes.

23       Q.   And you told him and his father that they

24  needed to be reseated?

25       A.   Yes.



1        Q.    What happened next?

2        A.    We had two volunteers move from the back

3    section and they agreed to move to the couple rows

4    behind the exit row together.

5        Q.    So since I know that the two that you

6    moved ended up in row 17, may I assume that the

7    volunteers came from row 17?

8        A.    Yes, correct.

9        Q.    Okay.  And the exit row is row 13, right?

10       A.    Yes.

11       Q.    Okay.  Now, just out of curiosity, why

12   didn't you move them to the empty row in the back?

13       A.    We keep the back row opened for a lot of

14   medical conditions or just to have room for us.

15       Q.    For us, meaning?

16       A.    The flight attendants, the flight crew.

17       Q.    Don't you have your own seats?

18       A.    Yes.

19       Q.    But you need extra seats?

20       A.    They are very uncomfortable.

21       Q.    The seats they give you?

22       A.    Yes.

23       Q.    So in order to have comfy seats you go to

24   the back row?

25       A.    Yes.



1      Q.    So it wasn't an option under your training

2   to move Peter and AD to the back row?

3      A.    Can you repeat the question?

4      Q.    So it wasn't an option for you to move

5   these people from the exit row to the back row?

6      A.    That was an option, yes.

7      Q.    So who's decision was it not to use that

8   option, but to make two other people move?

9      A.    You know, but at that time it was my

10  decision to move them where, anywhere, but at that

11  time I didn't know the back row was empty.

12     Q.    Oh, why not?

13     A.    We didn't finish boarding, we haven't done

14  the cabin count yet.

15     Q.    Okay.

16     A.    So when we do the cabin count, that's when

17  we know where the empty seats are.  So we like to

18  finish everything before we start the cabin count,

19  so we don't have to redo the passenger count.  And

20  at that time I just ask for volunteers near the exit

21  row to move to the exit row.

22     Q.    Just going back to your previous

23  testimony, didn't you just tell me that the back row

24  was always kept open for medical and comfy seats for

25  the flight attendants?



1             MR. MAYE:  Object to form.

2        A.    Not when it's a full flight, the customer

3   service agents try to keep the back row empty, but

4   it is not always like that.

5        Q.    Okay.  So you got some people to switch

6   with them, the people came from row 17.  And so

7   Peter and AD went back to row 17, right?

8        A.    Yes.

9        Q.    All right.  Did anything unusual happen at

10  that point?

11       A.    No.

12       Q.    Okay.  So everything looked fine from that

13  point on?

14       A.    Yes.

15       Q.    Okay.  So the only thing that was of

16  concern to you was the fact that AD had looked at

17  Peter before giving his age?

18            MR. MAYE:  Object to form.

19       A.    At that time, it didn't occur to me it was

20  a weird behavior, it kind of seemed strange, but I

21  didn't take anything of it.  So later on it kind of

22  clicked in my head that that was a really strange

23  behavior.

24       Q.    In what context?

25       A.    What do you mean, sorry?



1       Q.   Well, you said that at the time it
2   happened it didn't even register, right?
3       A.   Well, at the time it was weird, I did see
4   something off, but it didn't really, it wasn't
5   enough for me to go tell the rest of the flight crew
6   what he just did.
7       Q.   Okay.  Now, as you look at, let me take
8   you through your briefing first, you went back to
9   the exit row, row 13 to brief the passenger seated
10  there, right?
11      A.   Yes.
12      Q.   Is that the only exit row on this
13  airplane?
14      A.   12 and 13.
15      Q.   12 and 13 both.  So you were the person
16  that came back and kind of in a raised voice said,
17  hey, everybody in rows 12 and 13, I need your
18  attention, right?
19      A.   Yes.
20      Q.   Did you do that?
21      A.   No.
22      Q.   Oh.
23      A.   I had moved them before briefing.
24      Q.   I see.  So before you even did the
25  briefing, you noticed that he appeared to be younger



1   than 15?

2        A.   Yes.

3        Q.   Okay.  And so right away you said

4   something like young man, how old are you?

5        A.   Yes.

6        Q.   Okay.  He looked at his father for a

7   second and then said to you, I am 12?

8        A.   Yes.

9        Q.   So then you reseated them, and then you

10  did your briefing?

11       A.   Yes.

12       Q.   So you didn't have any interaction with

13  the other passengers in 12 and 13?

14       A.   Not at that time.

15       Q.   Okay.  Where was Peter seated in 13?

16       A.   He was sitting in 13 Echo.

17       Q.   So that is the middle seat on aircraft

18  right?

19       A.   Yes.

20       Q.   And where was AD seated?

21       A.   Thirteen Delta.

22       Q.   Okay.  The aisle seat?

23       A.   Yes.

24       Q.   Who was in 13 Foxtrum?

25       A.   I don't recall.



1      Q.   Do you recall whether that was a white
2   person or black person?
3      A.   I don't recall.
4      Q.   Do you recall whether AD was a white
5   person or a black person?
6      A.   I believe he is black.
7      Q.   And what about Peter?
8      A.   He is white.
9      Q.   Okay.  So you remember seeing a white man
10   and a black child?
11      A.   I saw this, yes, physically, yes.
12      Q.   Okay.  And you thought it was odd when the
13   black child looked at the white male?
14           MR. MAYE:  Object to form.
15      A.   I didn't find it odd that any race, that
16   didn't really occur to me, it was just a boy and a
17   man.  And the boy looked like he was asking
18   permission to talk.
19      Q.   Okay.  But that's not something that
20   really clicked you said until later?
21      A.   Yes.
22      Q.   How much later?
23           MR. MAYE:  I am sorry, object to form.
24      She said that she did.
25           MR. MCKAY:  Object to form was great.



1          MR. MAYE:  Well, you just mischaracterized
2      her testimony.  That's all.
3          MR. MCKAY:  Object to form works.
4          MR. MAYE:  Object to form.
5      Q.   Okay.  Go ahead?
6      A.   When I told the other crew members when
7   Chelsea had walked through the cabin and saw the man
8   caressing the little boy's face.
9      Q.   Okay.  That occurred after the plane had
10  taken off, right?
11     A.   Yes.
12     Q.   So between the time you reseated them and
13  after the plane took off and Chelsea made an
14  objection, nothing had clicked at that point?
15     A.   No.
16     Q.   Okay.  So the clicking, as you testified,
17  occurred after Chelsea said something to you?
18     A.   When Chelsea had told the crew, yes.
19     Q.   Okay.  When you say told the crew, do you
20  mean the cockpit crew?
21     A.   The flight attendants.
22     Q.   The other flight attendants?
23     A.   Yes.
24     Q.   Including you?
25     A.   Yes.



1        Q.   So where did that event occur where all

2    four of you, I presume, were together?

3        A.   I believe it was in the forward galley.

4        Q.   Okay.  Why were the four flight attendants

5    in the forward galley at that time?

6        A.   When we want to talk about something

7    strange or what we saw, we do come to one galley,

8    so.

9        Q.   I am sorry, you say this is a sort of a

10   routine, is this something that's told to you in

11   training or just something that happens and it's

12   just the way things are done?

13       A.   It's just something that happens, and it's

14   just the way things are done.

15       Q.   Okay.  So who of the four of you said they

16   wanted to talk about something strange?

17       A.   Chelsea.

18       Q.   Okay.  And how did she do that, how did

19   she communicate that to the rest of you?

20       A.   I don't remember the whole conversation.

21       Q.   All right.  Well, I mean presumably you

22   all are working in different parts of the airplane

23   normally, right?

24       A.   Right.

25       Q.   So you were working in the same area as



1    Chelsea?

2         A.    Yes.

3         Q.    Okay.  Chelsea was the A and you were the

4    C, correct?

5         A.    Yes.

6         Q.    Is that right, or B?

7         A.    I was the C, yes.

8         Q.    You were the C.  Okay, let me make sure my

9    notes are right on that.  Okay, you are right.  So

10   Chelsea was the A, Scott Warren was the B, Anna

11   Bond, you were the C, and Amanda Nichol was the D?

12        A.    Yes.

13        Q.    Okay.  So the first time that you all get

14   together to discuss Peter and AD is after Chelsea

15   makes an observation?

16        A.    Yes.

17        Q.    And at this point the flight is already up

18   in the air?

19        A.    Yes.

20        Q.    Has service occurred?

21        A.    I believe it was after service.

22        Q.    Okay.  Can you give an estimate of how

23   many minutes into the flight you were at that point?

24        A.    If I were to estimate, we usually start

25   service around 20 minutes after take off.  So if it



ANNA BOND                                December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES              48

```
 1   was a busy flight, might have taken 15 to 20 minutes
 2   after that, but I don't recall if it was busy or
 3   not.  If it's quick it ends in five minutes,
 4   obviously it could have been from 20 to 35 to 40
 5   minutes.
 6       Q.   Okay.  That's right, on Frontier
 7   everything is for sale, right?
 8       A.   Yes.
 9       Q.   So on a quick flight it may be that nobody
10   wants to buy anything?
11       A.   Yes.
12       Q.   That's why it can finish, so quickly?
13       A.   Yes.
14       Q.   But you don't recall on this flight at
15   some point after service was over, somehow Chelsea
16   informed you that she wanted talk to everybody
17   together?
18       A.   Yes.
19       Q.   Okay.  And then what happened?
20       A.   I believe when we all got together, Amanda
21   had saw something strange or felt something strange
22   about those two.  I am not entirely sure the whole,
23   how the whole conversation went, but I remember all
24   of us at one point didn't feel good about those two.
25       Q.   Okay.  And you mentioned earlier it was
```



1  Chelsea's observation of something with respect to

2  the face, is that correct?

3       A.   Yes.

4       Q.   What did Chelsea say she had seen that

5  made her uncomfortable?

6       A.   I am not sure what her exact words were,

7  but I think it was caressing of the face.

8       Q.   Okay.  So Chelsea said I saw the adult

9  caressing the child's face?

10      A.   Yes.

11      Q.   Anything more, anymore detail of any kind?

12      A.   I don't know.

13      Q.   Might have been?

14      A.   Might have been.

15      Q.   All right and then what happened or what

16  was said after that?

17      A.   I don't remember.

18      Q.   But you think you remember other people

19  chiming in with observations?

20      A.   Yes.

21      Q.   Who?

22      A.   It was Amanda, and then at one point Scott

23  had saw something else.

24      Q.   Okay.  At that, during that same meeting?

25      A.   It was, yes, during the same meeting, yes.

1    Q.   Why do you say at one point Scott had

2  seen?

3    A.   Because the whole meeting took a few

4  minutes.  This is when we had the pilots involved

5  after we all talked about it, this is when we had

6  the pilot involved.

7    Q.   So now the pilots are involved as well?

8    A.   Yes.  So the whole meeting took place

9  pretty quickly, but it was like the flight

10  attendants talking, and then as we were talking we

11  got the pilots involved.

12    Q.   Okay.  So all of this is precipitated by

13  Chelsea's mentioning of the face, and convening

14  immediately, so far so good, correct?

15    A.   So Chelsea seeing the caressing of the

16  face, and then that's when I had told them about

17  what I had seen, when I was at the exit row, and

18  then Amanda had mentioned that she didn't, she saw

19  something off with those two, like during the, when

20  I had initially moved them.  After I had moved them

21  I walked to the back of the cabin to tell Scott and

22  Amanda why I had to move the two passengers out of

23  the exit row.

24    Q.   Okay.

25    A.   I had told them it was because the boy was



1   12 and not able.

2        Q.   Yes.

3        A.   Amanda had mentioned that she thought I

4   was moving them because of language issues, not

5   because he was 12.

6        Q.   Had she spoken with them?

7        A.   No.

8        Q.   So she had just looked at them and

9   determined that they spoke a different language?

10       A.   Yes.

11       Q.   Okay.  Did she say why?

12       A.   The little boy did seem a lot older in the

13  face.

14       Q.   Excuse me, if that doesn't connect up with

15  what we were just talking about.  The little boy

16  seemed older in the face, therefore she thought he

17  spoke a different language?

18       A.   Yes, so we have requirements on why we

19  have to move them.  If they are old enough and they

20  are willing and able, it's usually a language

21  barrier where they are not able to speak English, so

22  we do have to move them, so a lot of the times it's

23  either age or language.

24       Q.   I see.  So she was communicating to you, I

25  thought it was a language issue because I thought he



1   was over 15?

2        A.   Yes.

3        Q.   I see.  And that's what you understand her

4   to mean?

5        A.   Yes.

6        Q.   So really the sequence of events, you

7   determined that he is 12, you moved them, you go

8   back to talk to Amanda and Scott to say, hey, I

9   moved them and here is why.  So far right?

10       A.   Yes.

11       Q.   And Amanda said, oh, it was age, not

12  language?

13       A.   Yes.

14       Q.   Did Scott say anything at that point?

15       A.   No.

16       Q.   Is that the end of the conversation about

17  that?

18       A.   Yes.

19       Q.   So then you go back to your station at the

20  front of the plane?

21       A.   Yes.

22       Q.   Okay.  And then the plane takes off and

23  service occurs?

24       A.   Yes.

25       Q.   Am I missing anything important in that?



ANNA BOND                                    December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                      53

1        A.   No.

2        Q.   Period.  Okay, so then Chelsea brings to

3    your attention that she has seen the adult

4    caressing, was that her word caressing?

5        A.   I don't remember.

6        Q.   Okay.  Touching the face.  And she has a

7    concern about that.  So she convenes this meeting up

8    front?

9        A.   Yes.

10       Q.   So initially the meeting is you, Chelsea,

11   Amanda and Scott?

12       A.   Yes.

13       Q.   Do you have a discussion before the pilots

14   are brought into the discussion?

15       A.   I don't remember.

16       Q.   Okay.  But you do remember contributing

17   the observation about the boy looking to the man?

18       A.   Yes.

19       Q.   Okay.  And how you felt that now this

20   clicked, is this the point where it clicked?

21       A.   Yes.

22       Q.   And you say, uh-huh, if you have concerns,

23   let me add this because now I think that's a

24   concern?

25       A.   Yes.



1    Q.   Okay.  Did Scott at this point, now, right

2    now we convene the four, did Scott add anything at

3    that point?

4    A.   No.

5    Q.   Did Amanda add anything at that point?

6    A.   Yes.

7    Q.   What did she add?

8    A.   The whole how she felt it was a language

9    barrier and not the age, just the off.

10    Q.   Well, the way you just described to me

11    sounded perfectly normal.  She said, oh, it was age,

12    or I thought it was language, right?

13    A.   Right.

14    Q.   So now that has become part of the puzzle,

15    up in the meeting upfront, how so?

16    A.   I believe it was just a gut feeling.  Like

17    when we were trained to look at passengers and to

18    see their behavior throughout the flight.  We do

19    have a lot of feelings when we look at someone, the

20    way they are acting, the way they do certain things.

21    I believe it was just because, like I said, like

22    language, she did think it was like a language

23    barrier.  In her eyes the little boy looked older.

24    Q.   I got that part, but when you explained

25    that before it sounded very innocuous, that she



1  thought that she had observed the moving, I presume?

2      A.   Yes.

3      Q.   And she thought in her mind, oh, they are

4  being moved because he speaks a different language

5  than English?

6      A.   Yes.

7      Q.   And so then she was surprised to find that

8  no, they are being moved because he is 12 years old?

9      A.   Right.

10     Q.   Correct.  So now up front, this becomes a

11 piece of puzzle, so to speak, because she says

12 uh-huh, I had a gut feeling about that.  From what,

13 what was the gut feeling?

14     A.   Not really.

15          MR. MAYE:  Object to form.

16     A.   Not really a piece of a puzzle, but she

17 was just stating a fact of what she thought.

18     Q.   Okay.  But is that in your mind a relevant

19 fact at that point?

20          MR. MAYE:  Object to form.

21     A.   No.

22     Q.   It wasn't a relevant point, it was just so

23 what, right?

24     A.   Yes.

25     Q.   Okay.  So how does this then move to



1   involve the people flying the airplane?

2        A.   We do have to inform them of the caressing

3   of the face?

4        Q.   Why?

5        A.   Just because we all thought that it was

6   kind of off, that a man touching a child in a

7   certain way.

8        Q.   His face?

9        A.   Yes.

10       Q.   Okay.  And this is, as you just testified

11   five minutes ago, this is on the basis of the

12   training that you have received?

13       A.   Yes.

14       Q.   Okay.  And you have talked about your

15   training, we have looked at a printout that

16   memorialized your training.  At what point did you

17   get training on observation of passengers?

18            MR. MAYE:  Object to form.

19       A.   The observation of passengers, we don't

20   get trained on that.  It's based, it's like, it's

21   every single day, when we work, we are told to watch

22   out for drunk passengers, we are told to watch out

23   for aggravated passengers, we are told to watch out

24   for behavior, some weird behaviors.  You are not

25   specifically trained on that, they are just telling



1  you to watch out for those behaviors.

2       Q.   I see.  All right.  I presume you have a

3  lot of aggravated passengers, right?

4       A.   Yes.

5       Q.   So who tells you this?

6       A.   Our company.

7       Q.   And how is it told to you?

8       A.   During our initial training, during our

9  current training and throughout the year with our

10  must reads.

11       Q.   Okay.  So you have mentioned several times

12  that those are all safety based, right?

13       A.   Yes.

14       Q.   So a drunk passenger can be a safety

15  issue, right?

16       A.   Yes.

17       Q.   Okay.  And aggravated passenger could

18  potentially be a safety issue?

19       A.   Yes.

20       Q.   So you are told in your training to keep

21  an eye out for, should we say, suspicious behavior?

22       A.   Yes.

23       Q.   That might lead to a safety concern?

24       A.   Yes.

25       Q.   Okay.  Now, how does one passenger



1  touching another passengers' face fit into that?
2       A.   So Chelsea had told us that it was not a
3  way a parent would touch a child's face.
4       Q.   And is she an expert on that?
5            MR. MAYE:  Object to form.
6       A.   I don't know.
7       Q.   Okay.  You do know Chelsea, right?
8       A.   Yes.
9       Q.   Okay.  Has she had any special training on
10 how parents touch their children?
11           MR. MAYE:  Object to form.
12      A.   I don't know her past.
13      Q.   Okay.  So you don't know is the answer?
14      A.   Yes, I don't know.
15      Q.   Okay.  So you took her word for it that
16 this was not the way a parent touches a child?
17      A.   Yes.
18      Q.   Okay.  So it seems to me that upon
19 receiving this information, mentally you need to put
20 that into some kind of category, don't you?
21           MR. MAYE:  Object to form.
22      A.   Yes.
23      Q.   And what category did you put it into?
24      A.   I don't know.
25      Q.   Was it going to cause the plane to crash?



1      A.    No.

2      Q.    Was it going to lead to a high jacking?

3      A.    No.

4      Q.    Was it going to result in these two

5  running back to the exit row and trying to open the

6  exit window?

7      A.    No.

8      Q.    Okay.  So where do we classify touching

9  the face in a way that Chelsea Bright doesn't think

10  is the right way to touch a child?

11      A.    I believe there is multiple categories,

12  it's not, I am not sure at that time where I put it,

13  but no, it will be if you are talking categories it

14  would be sexual harassment, human trafficking, some

15  sort of that category.

16      Q.    Well, let's look at what is marked in

17  front of you then, we started talking about the

18  in-flight flyer, and we got to the point where you

19  were instructed, you haven't asked any questions of

20  the child other than his age, but you were to take

21  notes if traveling companion appeared nervous or if

22  the traveling companion prevents the child from

23  answering questions, but that didn't happen, did it?

24      A.    No.

25      Q.    And the answer to the only question you



1  asked wasn't evasive, was it?

2       A.   No.

3       Q.   He is 12 years old, he said he was 12

4  years old, right?

5       A.   Yes.

6       Q.   So the next bullet point in this document

7  that you received says contact the captain and

8  inform him/her of your suspicions, provide specific

9  details of the situation and explain why you believe

10  the behavior exhibits signs of human trafficking?

11       A.   Yes.

12       Q.   So the four of you up front, did you

13  determine then that based on what you saw Chelsea

14  saw and Amanda thought that you were, you were

15  observing a human trafficking situation?

16            MR. MAYE:  Object to form.

17       A.   I don't know.

18       Q.   Okay.  Who contacted the flight deck?

19       A.   I don't know.

20       Q.   Okay.  It wasn't you?

21       A.   It was not me.  I believe it could have

22  been Chelsea, she was the A, and at that time we had

23  talked about giving the pilots a break also.  That's

24  when the pilot came out, Chelsea went into the

25  flight deck and had discussed a little bit further.



1      Q.   So before we get to that discussion,

2   though, are you saying to me that Chelsea might have

3   simply called to offer the pilots a break?

4      A.   Yes.

5      Q.   Okay.  So you are not saying that Chelsea

6   called because you all had determined that this was

7   human trafficking?

8      A.   I don't know.

9      Q.   And the next bullet point says the captain

10   will evaluate the information, and if appropriate

11   involve law enforcement to resolve the concerns,

12   correct?

13      A.   Yes.

14      Q.   Okay.  And that's your understanding what

15   the procedure should be?

16      A.   Yes.

17      Q.   And then it says at the gate the captain

18   will notify a GSC, what does that stand for?

19      A.   Ground security crew.

20      Q.   Ground security crew.  And then the next

21   one would be ground security crew, captain and

22   Frontier SOC.  What is that?

23      A.   I am not sure what it stands for, but I

24   believe it's the people that the pilots talk to.

25      Q.   Okay.  Could it be operations control?



1        A.    Yes.

2        Q.    Okay.  Will evaluate the facts and a joint

3   decision will be made regarding the passenger's

4   continued travel, right?

5        A.    Yes.

6        Q.    And that's at the gate?

7        A.    Yes.

8        Q.    And that's something that the captain will

9   do in conjunction with the ground security crew and

10  Frontier's SOC?

11       A.    Yes.

12       Q.    Okay.  And then there is an indication

13  that there is an incident report to be completed

14  within 24 hours, right?

15       A.    Yes.

16       Q.    Okay.  So none of that involves flight

17  attendants taking any action other than informing

18  the captain, right?

19       A.    Right.

20       Q.    Okay.  So let's at that, look then at what

21  has been marked as Exhibit 5.  Do you see that in

22  front of you there?

23       A.    Yes.

24       Q.    Okay.  Now first of all, it's titled

25  underneath the picture at the top In-flight Must



1   Reads, correct?

2        A.   Yes.

3        Q.   Okay.  And you testified earlier that you

4   received things that are labeled must reads, right?

5        A.   Yes.

6        Q.   That basically means what it says, you

7   must read it because it's important?

8        A.   Yes.

9        Q.   Okay.  And it says references FAM, so that

10  would be the flight attendants manual?

11       A.   Yes.

12       Q.   Purpose, sexual misconduct and date, March

13  15th, 2019, right?

14       A.   Yes.

15       Q.   And it says it's must read number 19-13,

16  right?

17       A.   Yes.

18       Q.   Did you receive this on or about March 15

19  of 2019?

20       A.   Yes.

21       Q.   And did you read it?

22       A.   Yes.

23       Q.   Because you must?

24       A.   Right.

25       Q.   Okay.  And it says Frontier has definitely



1  had the below procedures when an incident involving

2  sexual misconduct by a passengers is reported on

3  board.  Sexual misconduct is a broad term

4  encompassing any unwelcome behavior of a sexual

5  nature that is committed without consent or by

6  forced intimidation, coercion or manipulation.

7  Sexual misconduct can be committed by a person of

8  any gender, and it can occur between people of the

9  same or different gender.  Have I read that

10  correctly?

11       A.   Yes.

12       Q.   Okay.  Now, the next instruction is sexual

13  misconduct allegations need to be treated with

14  sensitivity and confidentiality while remaining

15  neutral.  Would you agree with that?

16       A.   Yes.

17       Q.   And it says once an incident involving

18  sexual misconduct is reported to a flight attendant,

19  one, advise the effected individual, "for your

20  safety we are removing you from the situation.  The

21  pilot will be notified and law enforcement will meet

22  the aircraft upon arrival at the gate end quote.  Do

23  you see that?

24       A.   Yes.

25       Q.   Was that statement made to either Peter or



1  AD?

2        A.    I don't know.

3        Q.    Okay.  Number two says immediately remove

4  the effected individual who has reported the

5  misconduct.  Did AD report any misconduct?

6        A.    No.

7        Q.    Okay.  Do not question the individual

8  about the allegation.  Separate the parties involved

9  at least ten rows away from each other.  Ideal

10 separation would be to the front or rear of the

11 aircraft opposites of the accused individual.  Do

12 you see that?

13       A.    Yes.

14       Q.    Okay.  Now, then it says A, if no open

15 seats are available, move other passengers as

16 needed, B, reseat an airline employee and in

17 parenthesis, DHD crew, what does that mean?

18       A.    Dead heading.

19       Q.    F9, what does that mean?

20       A.    Frontier.

21       Q.    Or OA?

22       A.    Other airline.

23       Q.    Crew member or frontier employee and

24 that's the end of the parenthesis, if available, If

25 not seek an ABP, and I understand that's able body



1  passenger?

2        A.   Yes.

3        Q.   Next to the accused, advise the employee

4  or ABP there has been a conflict between two

5  passengers and you need their assistance in swapping

6  seats, right?

7        A.   Yes.

8        Q.   Three is notify the flight deck crew of

9  the incident, right?

10       A.   Yes.

11       Q.   And that's after one and two, would you

12  understand that?

13       A.   Yes.

14       Q.   Okay.  A, once an incident alleging sexual

15  misconduct has been reported to a crew member, law

16  enforcement must be notified, even if the effected

17  individual does not want to pursue legal action?

18       A.   Yes.

19       Q.   Again, AD never reported anything to you,

20  right?

21       A.   No.

22       Q.   And no passengers reported anything?

23       A.   No.

24       Q.   So it was just based on the collective

25  decision of the flight attendants up front and their



1    observations?

2         A.   Yes.

3         Q.   Okay.  B, if the effected individual has

4    questions about what will happen to the accused,

5    advise the effected individual that law enforcement

6    will meet the aircraft and interview all the parties

7    involved, as well as attain witness reports.  Do not

8    engage in discussions about the incident.  It is

9    okay to console the effected individual and let them

10   know their safety is our top priority, right?

11        A.   Yes.

12        Q.   Number four, do not advise the accused of

13   the situation or ask for witness reports, as this

14   sensitive process will be handled by the law

15   enforcement officer, right?

16        A.   Yes.

17        Q.   Number five, upon landing ask passengers

18   to remain seated and do not open the main cabin door

19   until a law enforcement officer is present, right?

20        A.   Yes.

21        Q.   Was that done?

22        A.   Yes.

23        Q.   Passengers were asked to remain seated?

24        A.   I don't know.

25        Q.   Okay.  So you don't know?



1        A.    Sorry, I don't know.

2        Q.    A, provide law enforcement officer with

3    the name of the effected individual and the seat

4    number of the accused, right?

5        A.    Yes.

6        Q.    Now, how do you get the name of the

7    effected individual?

8        A.    We can ask, we did not.

9        Q.    You didn't?

10        A.    We did not.

11        Q.    But you were about to say that you could

12   ask, right?

13        A.    Yes.

14        Q.    Yes.  Nobody asked AD his name, did they?

15        A.    I don't know.

16        Q.    You certainly didn't?

17        A.    I did not.

18        Q.    You didn't ask Peter his name either?

19        A.    I did not.

20        Q.    Okay.  All right.  Six, flight attendants

21   must submit an incident report within 24 hours of

22   the flight.  Did you do that?

23        A.    No, I did not.

24        Q.    Why not?

25        A.    I got an e-mail from Frontier Airlines



1  saying fill out an incident report or send an e-mail

2  back to us.

3      Q.   But you already had this prior to the

4  flight that says flight attendants must submit an

5  incident report within 24 hours of the flight?

6      A.   Yes.

7      Q.   But you didn't do that?

8      A.   No.

9      Q.   Even though you had read this?

10     A.   Yes.

11     Q.   Okay.  Statistics shows these incidents

12 occur more often during red eye flights.  It is

13 important for all flight attendants to take the

14 responsibility to pass through the cabin every 15

15 minutes.  Once service is completed, as required per

16 the flight attendant manual, 55.45, Page 1 on red

17 eye, and night flights, cabin lighting should be set

18 to dim two for service and the galley lights shouold

19 remain set to dim two except for takeoff and

20 landing.  Our goal in responding to these types of

21 incidents is to quickly and discretely remove the

22 effected individual from the situation.  We want to

23 communicate the next steps to the effected

24 individual so they are aware of the process and we

25 know we are reporting the incident, right?

ANNA BOND                                          December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                          70

1          A.   Yes.

2          Q.   And you read this?

3          A.   Yes.

4          Q.   And it says at the bottom by entering this

5     confirmation code I acknowledge I read and

6     understand this memo, is that something you did?

7          A.   Yes.

8          Q.   Okay.  So somewhere there is a record that

9     Anna Bond read this and understands it?

10         A.   Yes.

11         Q.   And there would presumably be a date with

12    that?

13         A.   Yes.

14         Q.   Now, I am going to ask you to look at

15    number six, and this appears to be a page from the

16    flight attendant manual, is it not?

17         A.   Yes.

18         Q.   Okay.  And it's a Revision 63 that's dated

19    after the accident, right?

20         A.   Yes.

21         Q.   Not the accident, the event?

22         A.   Yes.

23         Q.   Okay.  So you would not have had that at

24    the time of the flight, would you?

25         A.   No.



1    Q.   Okay.  All right.  So this wouldn't have
2    effected your actions on the flight?
3    A.   No.
4    Q.   All right.  Do you know if there was a
5    prior version that had any similar language?
6    A.   I don't know.
7    Q.   Okay.  So at this point, and what I mean
8    by this point is that the four of you are at the
9    front of the aircraft, and you have engaged the
10   pilot's, I think you were at the point where Captain
11   Shoop had left the cockpit to use the laboratory?
12   A.   I don't know what order they came out in.
13   Q.   All right.  But regardless of who came out
14   first or second, what happened next?
15   A.   I believe that when Chelsea had gone up
16   and the pilots came out, we were discussing about it
17   a little bit outside and Scott had said let me go
18   check it out.  And he had done a walk through, I
19   don't remember if he was holding a trash bag or not,
20   but he did walk through the cabin.
21   Q.   Okay.
22   A.   And when he had came back up he had
23   reported to us, and I don't remember if it was the
24   pilot or the first officer, but he had told all of
25   us that he had seen something suspicious.



```
 1        Q.   And this occurred amongst people who were
 2   inside the cockpit or outside the cockpit?
 3        A.   It was outside the flight deck.
 4        Q.   All right.  So in the galley area?
 5        A.   Yes.
 6        Q.   Okay.  And you had presumably the carts
 7   barricading the aisle?
 8        A.   Yes.
 9        Q.   And were all four flight attendants behind
10   the cart?
11        A.   No.
12        Q.   Who was behind the cart?
13        A.   It was me, for sure, and I believe it was
14   Amanda, Chelsea was in the flight deck.
15        Q.   Okay.  So let's back up then.  So Chelsea
16   had gone on to the flight deck to permit one of the
17   pilots to come out?
18        A.   Right.
19        Q.   Okay.  And then the door was closed and
20   secured?
21        A.   Right.
22        Q.   Okay.  So at this point Chelsea is on the
23   flight deck with the remaining pilot?
24        A.   Yes.
25        Q.   Who presumably has an oxygen mask on his
```



1  face?

2       A.   Yes.

3       Q.   And probably isn't engaging in any

4  conversation, correct?

5       A.   I don't --

6            MR. MAYE:  Object to form.

7       A.   I don't know.

8       Q.   Have you ever been up there when they have

9  a mask on?

10      A.   Yes.

11      Q.   Are you able to talk to them?

12      A.   Yes.

13      Q.   Oh you can. all right.  Anyway, Chelsea is

14  up there with whoever remained, and the other pilot

15  has used the laboratory is now hanging out with you?

16      A.   Yes, in the galley.

17      Q.   Okay.

18      A.   We do ask if they want a snack or a

19  beverage.

20      Q.   Sure.  And you mentioned before

21  stretching, how does that go about?

22      A.   They like to stretch in the galley.

23      Q.   In the galley?

24      A.   Yes.

25      Q.   They don't go down the aisle or anything?



1      A.   No.

2      Q.   Okay.  So what was discussed at this

3  point?

4      A.   I don't remember.

5      Q.   Okay.  Was it involving the passenger

6  Peter and AD?

7      A.   Yes, I believe so.

8      Q.   Okay.  But at this point before Scott went

9  back and forth, prior to that, all you had was the

10  information you already testified about, that there

11  was the touching of the face that Chelsea didn't

12  like, there was the look from you to Peter and back

13  to you when you asked the age?

14      A.   It was the child to the man.

15      Q.   The child to the man, back to you and

16  whatever it was that Amanda was adding to the

17  conversation?

18      A.   Yes.

19      Q.   Okay, so -- and you hadn't determined that

20  to be evidence of sexual misconduct or sexual

21  traffic?

22          MR. MAYE:   Object to form.

23      A.   No.

24      Q.   You had not, is that right?

25      A.   No.



1     Q.   What exactly then was this discussion with

2   the captain concerning, or I am sorry, I didn't mean

3   to say the captain, I meant to say the pilot because

4   we don't know whether it was the captain or the

5   first officer?

6     A.   Right.

7     Q.   So what exactly was this discussion

8   concerning?

9     A.   We were just discussing what we should do,

10   to keep an eye out, so our action after what we

11   should the rest of the flight.  That's when Scott

12   had an idea saying, let me go up and do a walk

13   through in the cabin, and see if there is anything

14   suspicious going on while the captain was out there.

15     Q.   Was it the captain or was it the first

16   officer?

17     A.   I am sorry, the pilot.

18     Q.   The pilot.  Again, I just want to know

19   what is accurate, is it the captain or we don't

20   know?

21     A.   We don't know, sorry.

22     Q.   Did that person say, hey, our flight

23   operations manual requires us to get involved when

24   certain things are observed?

25     A.   Nothing that was mentioned, no.



1       Q.    You don't recall or it wasn't mentioned?

2       A.    Wasn't mentioned outside the flight deck

3    to me.

4       Q.    Was there a time when you were on the

5    flight deck later?

6       A.    No.

7       Q.    So you were never on the flight deck?

8       A.    No.

9       Q.    Was anyone other than Chelsea ever on the

10   flight deck?

11      A.    Yes.

12      Q.    Okay.  And who was that?

13      A.    Scott had gone into the flight deck after

14   he had done his walk through.

15      Q.    Okay.  So Scott does one walk through,

16   right?

17      A.    Yes.

18      Q.    Okay.  And this is generated from the

19   discussion with the pilot at the front?

20      A.    Yes.

21      Q.    Okay.  And then Scott has an idea, he

22   says?

23      A.    Yes.

24      Q.    He declared, I have an idea?

25      A.    I believe it was Scott's idea, it could



 1  have been.

 2      Q.   Well, I mean did he say hey, I have an

 3  idea, and then do it?

 4      A.   I don't think he said those exact words,

 5  but I think it was his plan, saying let me go check

 6  it out, let me do a walk through.

 7      Q.   And you understand that to be Scott having

 8  an idea that would help the situation?

 9      A.   Yes.

10      Q.   Okay.  And so Scott then goes down the

11  aisle and then comes back up?

12      A.   Yes.

13      Q.   Okay.  And he says what?

14      A.   He says he sees the man with his hand in

15  his genital area.

16      Q.   Who's genital area?

17      A.   The little boy's.

18      Q.   Okay.  And this was new information to you

19  at this point?

20      A.   Yes.

21      Q.   And did Scott say whether or not either

22  the man or the boy was asleep?

23      A.   I don't recall.

24      Q.   Okay.  You don't remember him saying

25  anything, oh, but by the way they are asleep?



ANNA BOND                                    December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                      78

1    A.   I do remember someone saying he was

2    asleep.  I am not sure if that was during that event

3    or if it was later on.  But I am not sure if it was

4    during when Scott had seen the gentleman's hand on

5    the little boys genital area.

6    Q.   But somehow you became aware at some point

7    later that he might have been asleep when that

8    happened?

9    A.   Yes.

10   Q.   And that would mean the man?

11   A.   Yes.

12   Q.   Okay.  And as you sit here today, do you

13   think that people grope other people while they are

14   asleep?

15       MR. MAYE:  Object to form.

16   A.   Not when they are sleeping intentionally?

17   Q.   Yes, it would not be an intentional act if

18   the person was asleep, right?

19   A.   Yes.

20   Q.   So wouldn't it be important to know

21   whether they were asleep or not?

22   A.   Yes.

23   Q.   Before taking action?

24   A.   Yes.

25   Q.   Okay.  And it might also be important to



1  know, for instance, with respect to face touching,

2  whether or not it was consensual, right?

3       A.   Yes.

4       Q.   But nobody ever undertook to find those

5  things out?

6            MR. MAYE:  Object to form.

7       A.   No.

8       Q.   Nobody went to find out if there was

9  consent between the two or if they were asleep?

10       A.   Yes.

11       Q.   Okay.  So then Scott comes back with this

12  information.  Is the same pilot still there when

13  Scott reports this?

14       A.   Yes, I believe so.

15       Q.   What happens next?

16       A.   That's when Scott went into the flight

17  deck where there was two pilots.

18       Q.   Did somebody say, look, you need to say

19  this to the other pilot or something along those

20  lines?

21       A.   I don't recall how the conversation went,

22  but in that kind of conversation we like to talk in

23  the flight deck so not a lot of passengers can hear

24  us.

25       Q.   I see, okay.  But you didn't go?



1      A.   I did not go.

2      Q.   But Scott did and Chelsea was already

3  there?

4      A.   Yes.

5      Q.   Okay.  So then when the pilot and Scott

6  went up into the cockpit, I presume you don't know

7  what they discussed?

8      A.   No.

9      Q.   What happened from your standpoint and

10 observation?

11     A.   Once they had came out they had informed

12 me and I believe Amanda was out there with me, into

13 the galley, they had informed us that they were

14 going to separate the child from the man.

15     Q.   And who was going to do that?

16     A.   Scott.

17     Q.   Okay.  Who was saying, this is what is

18 going to happen?

19     A.   I don't know.  I don't recall if it was

20 Chelsea or Scott telling us.

21     Q.   Okay.  The pilots by this point are just

22 back in their seats, right?

23     A.   Yes.

24     Q.   So the people who come out of the cockpit

25 are only Scott and Chelsea?



 1        A.   Yes.

 2        Q.   So one of them said here is what we are

 3   going to do?

 4        A.   Yes.

 5        Q.   And Scott is going to go separate them?

 6        A.   Yes.

 7        Q.   Okay.  Did you watch that happen?

 8        A.   No.

 9        Q.   So you did not observe them being

10   separated?

11        A.   No.

12        Q.   And why was that?

13        A.   We were tending to the other passengers.

14        Q.   Okay.  What was going on with the other

15   passengers at that point?

16        A.   Service, when, sometimes they wake up in

17   the middle of the flight and want something to drink

18   or something to snack on.

19        Q.   All right.  Is this a case of them coming

20   up to the galley and saying hey, I am hungry or is

21   it like, oh, we better take the cart back through

22   again?

23        A.   No, it's people raising their hand or

24   pushing the call button or some way to get their

25   attention, but no one came up to the galley.





1      Q.   So after you were informed that the boy

2   was going to be separated from the man, at that

3   point your testimony is that other passengers

4   engaged your attention because they wanted things to

5   eat or drink?

6      A.   Yes.

7      Q.   Okay.  And is that also the case with

8   Amanda, was she also attending to those other

9   passengers?

10      A.   I believe Amanda was following Scott

11   towards the back.

12      Q.   I see.

13      A.   Just to make sure nothing else happened.

14      Q.   Okay.  But that's a belief rather than an

15   observation?

16      A.   Yes.

17      Q.   Okay.  What did you observe afterwards,

18   after that point in time, what next?

19      A.   I had walked to the back of the cabin and

20   the little boy was already sitting in the very last

21   row looking out the window and there was an ABP

22   sitting in an aisle seat.

23      Q.   And the little boy was at the window seat?

24      A.   Yes.

25      Q.   Looking out the window?



1       A.   Yes.

2       Q.   Okay.  Presumably the flight was at 30

3   some thousand feet at this point?

4       A.   Yes, I think so.

5       Q.   And the ABP, how did you know he was an

6   ABP?

7       A.   There was no-one sitting there before and

8   then the flight attendants had moved them.

9       Q.   What did you observe, if anything, about

10   the ABP?

11       A.   He was a very well dressed man.

12       Q.   How do you know, he had a tuxedo on?

13       A.   No, he was just button up, some slacks.

14       Q.   He had dress pants on?

15       A.   Yes, just nice shoes, he looked very like

16   stern.

17       Q.   Stern, okay.  How so?

18       A.   Just very looked proper like you know, we

19   don't, he was not slouching or anything.

20       Q.   Had you seen him before on the flight, had

21   you noticed him?

22       A.   No, no, oh, no.

23       Q.   And did he have any kind of insignia on

24   his shirt, that you remember?

25       A.   No.



1      Q.   You didn't recognize him as being an

2   employee of the airline?

3      A.   No, I did not.

4      Q.   Okay.  All right.  And describe his shirt

5   for me, I am sorry?

6      A.   I believe he was wearing a button up or

7   something with a collar.  I did see a collar.  I saw

8   him from the back angle.  So I did see a collar, I

9   just assumed it was a button up and it could have

10   been a polo.

11      Q.   It could have been a polo shirt?

12      A.   Yes.

13      Q.   All right.  And you say you saw him from

14   the back.  So were you in the back galley at this

15   point?

16      A.   Yes, when I walked to the back, yes,

17   that's when I saw the little boy.

18      Q.   Okay, did, I am sorry, who was in the back

19   in the galley at that time?

20      A.   At that time Scott and Amanda were both in

21   the back galley.

22      Q.   All right.  Did they say anything to you

23   about the separation or the people that were

24   separated?

25      A.   No.



1        Q.    So you were talking about other things?

2        A.    Yes, I just kind of went to the back and

3    like see how things went.

4        Q.    Okay.

5        A.    And since there was no commotion, I just

6    assumed everything went well.

7        Q.    No commotion meaning nobody was standing

8    up, nobody was yelling?

9        A.    Besides the rest of the passengers who was

10   drunk, flying to Vegas.

11       Q.    Were there drunk passengers?

12       A.    Yes.

13       Q.    How do you know they were drunk?

14       A.    They had a lot of, you know, liquor

15   bottles on their table.  They were yelling, you

16   know, they were having fun, just normal Vegas scene.

17       Q.    How many would you estimate were in that

18   condition?

19       A.    I know there was a couple of rows.  So I

20   know there was like six gentleman for sure, but on

21   the aircraft left side.

22       Q.    Okay.  So I take this would not have been

23   a five-minute service flight?

24       A.    No, maybe not.  Not for the back.

25       Q.    Right, people were buying alcoholic



ANNA BOND                                    December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                      86

1   beverages?

2        A.   Correct.

3        Q.   But those people were rather subdued, I

4   mean they weren't up dancing or yelling or swinging

5   fists?

6        A.   No.

7        Q.   Okay.  So basically everything looked okay

8   to you?

9        A.   Yes.

10       Q.   All right.  But for how long did you

11  observe, for instance, the boy looking out the

12  window?

13       A.   I was in the back galley for about two or

14  three minutes.

15       Q.   You weren't staring at him the whole time?

16       A.   No.

17       Q.   Would it be fair to say you just glanced

18  at him and saw him looking out the window?

19       A.   Yes.

20       Q.   Did they say anything to you about his

21  condition?

22       A.   No.

23       Q.   Did they say anything to you about the

24  father's reaction to being separated?

25       A.   Yes, they had informed me that he was



1   calm.

2        Q.   Was calm?

3        A.   Uh-huh.

4        Q.   Okay.  Did Scott say anything to you about

5   striking the gentleman?

6        A.   No.

7        Q.   Okay.  Did you come to understand later

8   that he had done so?

9             MR. MAYE:  Object to form.

10       A.   I heard about it, yes.

11       Q.   Okay.  All right.  And when did you hear

12   about it, I am sorry?

13       A.   It was into, not too long ago, maybe a

14   month ago.

15       Q.   Okay.  Was that at about the same time

16   that you were texting Chelsea about the upcoming

17   deposition?

18       A.   It was actually after that, after that.

19       Q.   It was after that?

20       A.   Yes, at that point I didn't know.

21       Q.   Okay.  What, if anything, do you remember

22   happening next in the sequence of events concerning

23   Peter and AD?

24       A.   So what I remember after that was the

25   deplaning.



1        Q.    Okay.

2        A.    Which was hours after everything had

3    happened.  Scott had suggested I would be in the

4    back for landing, and Scott would go in the front.

5        Q.    Why?

6        A.    I am sorry?

7        Q.    I am sorry, why?

8        A.    Oh, because just in case the father had

9    become agitated or aggravated or became aggressive,

10   he wanted a male flight attendant in the front to

11   make sure everything was going to be okay.

12       Q.    That's what he told you?

13       A.    Yes.

14       Q.    He switched seats with you then, as far

15   your flight attendant seats?

16       A.    Yes.

17       Q.    Okay.  And so you were in the back when

18   passengers deplaned?

19       A.    Yes.

20       Q.    Okay.  Did you watch all of the deplaning?

21       A.    Yes.

22       Q.    Did you see Scott interacting with the

23   gentleman from Row 17?

24       A.    No.

25       Q.    Is that because you had your attention on



1   other things?

2       A.   There is people in the aisle, so I

3   couldn't really see.

4       Q.   Drunk people, including?

5       A.   Yes.

6       Q.   Did you manage to make sure they got off

7   safely?

8       A.   Yes.

9       Q.   Okay.  The drunk people, I mean?

10      A.   Yes.

11      Q.   You, did you then get asked to make a

12   statement to the police?

13      A.   Yes.

14      Q.   Where did that occur, where did you give

15   the statement?

16      A.   I was sitting in row one.

17      Q.   In the aircraft?

18      A.   Yes.

19      Q.   Were there any passengers on the aircraft

20   at that time?

21      A.   No.

22      Q.   So this is after everybody had gotten off

23   the airplane?

24      A.   Yes.

25      Q.   And then the police had come aboard?



ANNA BOND                                December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                 90

1       A.   Yes.

2       Q.   Okay.  Did you watch AD get off the

3   airplane?

4       A.   Yes.

5       Q.   And tell me how that went?

6       A.   Since I was in the back, me and Amanda had

7   walked AD to the front of the aircraft, and handed

8   him over to the police officers.

9       Q.   This was after all other passengers were

10  off the plane?

11      A.   Yes.

12      Q.   And was there any exchange between you and

13  AD along the way?

14      A.   No.

15      Q.   Did he say anything along the way?

16      A.   No.

17      Q.   Was there any exchange between you and the

18  police officers?

19      A.   No.

20      Q.   Okay.  So that all occurred silently?

21      A.   Yes, I just followed Amanda, and I was

22  with them, but I didn't officially talk to anyone.

23      Q.   Did Amanda talk with AD?

24      A.   I don't recall, I believe she said let's

25  get off the aircraft or something along the sorts of



1  him getting off the aircraft.

2       Q.   Do you recall her saying anything to the

3  police?

4       A.   I don't recall.

5       Q.   Okay.  I am going to -- why don't we take

6  a break we have been going about an hour, I think.

7            VIDEOGRAPHER:  The time is approximately

8       3:10 p.m. we are going off the record.

9            (Whereupon, an off the record discussion

10      was held.)

11                      (Exhibits 7-8 were marked for

12                      identification.)

13            The time is approximately 3:22 p.m.

14  we are going on the record.

15      Q.   I just want ask you a few follow-up

16  questions now that we are back.  You testified that

17  when asked about why the facial touching made her

18  uncomfortable, Chelsea said it wasn't the way a

19  parent would touch their child, is that correct?

20      A.   Yes.

21      Q.   How did you all know that they were father

22  and son?

23      A.   They were traveling together.

24      Q.   Is that the only way?

25      A.   Yes.



1      Q.   Okay.  But it could have been, you know,

2    uncle and nephew or soccer coach and soccer star,

3    right?

4      A.   Yes.

5      Q.   So how did you all reach the conclusion of

6    parent and son?

7      A.   We just took a guess.

8      Q.   Okay.  All right.  A guess which turned

9    out to be accurate, right?

10     A.   Yes.

11     Q.   But you didn't have any reference

12   materials that would let you know that they had the

13   same last name, for example?

14     A.   No.

15     Q.   And you never asked?

16     A.   No.

17     Q.   Okay.  Did the son, when you observed him,

18   did you see a jacket wrapped around his legs?

19     A.   No.

20     Q.   Okay.  Is it something that you don't

21   remember seeing or that you definitely did not see?

22     A.   It's something I did not see.

23     Q.   You did not see.  So you could see, as you

24   walk back and forth, you are testifying that you

25   could see his legs just normally?



ANNA BOND                                    December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                      93

1    A.   Yes.

2    Q.   Okay.  And in what was he wearing for

3  pants?

4    A.   It was like khaki shorts kind of like

5  short shorts, like you know it goes up to down to

6  his shin.

7    Q.   Okay.  That doesn't sound like short

8  shorts?

9    A.   Not short shorts, but shorts.

10    Q.   So shorts.  So man's shorts or boys

11  shorts, where the bottom of the legs were near the

12  knee?

13    A.   A little bit below the knee, yes.

14    Q.   A little below the knee?

15    A.   Yes.

16    Q.   You remember that they were khaki?

17    A.   Was sort of like that texture, yes.

18    Q.   Okay now I just want to be very clear, is

19  this based on your observation when you first

20  encountered them in row 17 or is it based on later

21  seeing them, I am sorry, Row 13, or is it based on

22  later seeing them in row 17?

23    A.   From when I saw them in 13.

24    Q.   So with respect to later on, did you

25  yourself make any observations of them in row 17?



1      A.    No.

2      Q.    So is it fair to say that's just something

3  you never saw?

4      A.    Yes.

5      Q.    Okay.  You testified that about a month

6  ago you heard something, from whom did you hear

7  that, about a month ago, about Scott hitting?

8      A.    I believe it was from Terra.

9      Q.    Oh, it was from Terra, okay.

10     A.    Yes.

11     Q.    Not from anybody else on the flight?

12     A.    No.

13     Q.    Okay.  How about when Amanda went, after

14  the flight's landed and it's at the gate, and Amanda

15  approaches AD and says it's time to get off the

16  plane, did you notice whether AD was wearing shoes

17  or not?

18     A.    He was not wearing shoes.

19     Q.    He had no shoes?

20     A.    No.

21     Q.    Had he had shoes on when you observed him

22  in row 13?

23     A.    I don't recall.

24     Q.    Would not having shoes on be an issue with

25  respect to the exit row?



1     A.   I don't think it's one of the

2   requirements, no.

3     Q.   Okay.  So you just didn't recall whether

4   he had them on or not?

5     A.   No.

6     Q.   But definitely on the way out he had no

7   shoes?

8     A.   No shoes.

9     Q.   Did he get shoes at some point?

10     A.   I don't think so.

11     Q.   Okay.  So basically he was barefoot?

12     A.   He walked off the plane, and from what I

13   saw, when he was walking off the plane, he had socks

14   on.

15     Q.   Socks?

16     A.   Yes.

17     Q.   Okay.  Now, did you make any observations

18   beyond him leaving the plane?

19     A.   No.

20     Q.   Okay.  And you have already testified you

21   didn't see Peter get off the plane?

22     A.   No.

23     Q.   Okay.  You gave a statement to the police

24   when you were seated in row one?

25     A.   Yes.



1     Q.   Okay.  And I am going to show you what has

2     been marked in front of you as Exhibit 7, is that a

3     copy of your statement?

4          A.   Yes.

5          Q.   Now, I see there is a black bordered box

6     at the top that says this portion to be completed by

7     officer.  Do you see that?

8          A.   Yes.

9          Q.   Okay.  And down at the bottom, there is a

10    statement that says, I have read that statement, do

11    you see that?

12         A.   Yes.

13         Q.   Is everything in between those two points,

14    was that all written by you?

15         A.   Yes.

16         Q.   Okay.  And the details, as written out say

17    briefing pass, that's passengers, right?

18         A.   Yes.

19         Q.   Noticed a younger person sitting in the

20    exit row, asked him how old he was, and he said, and

21    it's been redacted, but it was 12, right?

22         A.   Yes.

23         Q.   I asked him if he was traveling with

24    someone else and he pointed at, and that would be

25    Peter, right?



ANNA BOND                                       December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                        97

1       A.   Yes.

2       Q.   Okay.  Do you remember what you wrote

3   there, like the man, or?

4       A.   I put the gentleman next to him, I

5   believe.

6       Q.   Okay.  And then it says I moved them to a

7   different seat a few rows back and walked to the

8   back to tell the crew what was going on, right?

9       A.   Yes.

10       Q.   And that's when you talked with Amanda and

11   Scott?

12       A.   Yes.

13       Q.   They were sitting at 13 D, E, originally

14   and moved to 17 E, F.  The crew in the back, and

15   then is this where you would have said Amanda and

16   Scott?

17       A.   Yes.

18       Q.   Okay.  Asked me if I had moved the two

19   people out of the exit row because of language.  And

20   I told them it was because of age.  Then they

21   thought something was off, so we kept an eye out

22   during the flight.  You see that?

23       A.   Yes.

24       Q.   Now that's a little different than what

25   you testified here about, isn't it, because that's



1 | them bringing up something a little off in the back
2 | of the plane?
3 |     A.   Right, so Amanda.
4 |     Q.   Amanda.  And that was the gut feeling that
5 | you testified about?
6 |     A.   Yes.
7 |     Q.   Now, also, and again, I know we are
8 | dealing with a redaction here from the FBI, but were
9 | you saying that they both asked or did you say just
10 | Amanda asked?
11 |     A.   I believe I said Amanda.
12 |     Q.   Okay.  All right.  And then it says, they,
13 | after take off, during service, blank had asked
14 | blank if he wanted anything.  And blank shook his
15 | head no.  Do you know what went in those boxes?
16 |     A.   I believe I said Amanda had asked the
17 | little boy.
18 |     Q.   Okay.  If he wanted anything?
19 |     A.   And the little boy.
20 |     Q.   Had shook his head no.  Okay.  So that's a
21 | perfectly normal thing?
22 |     A.   Right.
23 |     Q.   And while blank was sleeping, so that
24 | would have been the father?
25 |     A.   Right.



1      Q.   Okay.  Later on blank had walked through

2   the cabin collecting trash and had noticed that

3   blank, was this Scott?

4      A.   I don't remember if it was Scott or

5   Chelsea.

6      Q.   Okay.  Well, because it could have been

7   the face touching?

8      A.   Right.

9      Q.   Okay.  All right.  And then on the next

10  page, one we had noted, what are you saying there?

11     A.   I read this yesterday and I don't know.

12     Q.   Okay.  So any way we had noticed that the

13  blank, we kept a closer eye on them.  Do you know

14  what you had said there?

15     A.   I don't know.

16     Q.   Okay.  Next blank had something through

17  the cabin collecting trash and noticed it blank,

18  okay.  That, so if the first one was Chelsea and

19  face, this might be Scott and hand?

20     A.   It could be, I don't know.

21     Q.   It could be, but we don't know.  Okay.  We

22  had been talking to the captain throughout the

23  incident and the captain had suggested to separate

24  the two, is that accurate?

25     A.   Yes.



1    Q.   Okay.  We put blank in the very last row,

2    that would be AD.  And had an able body passenger

3    sit next to blank, AD on the aisle seat to make sure

4    nothing was going to happen.  What did you think was

5    going to happen?

6    A.   Anything.

7    Q.   Okay.  And then it says blank had most of

8    the interaction with blank.  Who goes in those

9    blanks?

10   A.   Scott.

11   Q.   Scott had most of the interaction with?

12   A.   The little boy.

13   Q.   The little boy.

14   A.   Yes, and both the man.

15   Q.   Okay.  And then back to the first page,

16   you signed that, did you not, after the statement

17   that says that I affirm the truth and accuracy of

18   the facts contained herein?

19   A.   I did sign it somewhere.

20   Q.   Okay?

21   A.   I can't find that, but.

22   Q.   All right.  That's fine.  But you signed

23   it somewhere?

24   A.   Yes.

25   Q.   Confirming the truth of it?



1       A.   Yes.

2       Q.   That's all I have on that one.  And then I

3  am going to ask you to look at number eight.  And

4  this appears to be an e-mail from you to Jason B.

5  Grimes, right?

6       A.   Yes.

7       Q.   And who is Jason B. Grimes?

8       A.   I don't know.

9       Q.   Okay.  Someone at Frontier, do you think?

10      A.   Yes.

11      Q.   And do you think that person had reached

12  out to you for a statement?

13      A.   Yes.

14      Q.   Okay.  And is this an accurate depiction

15  of what you responded to him with?

16      A.   Yes.

17      Q.   Okay.  There is a redaction after your

18  name, would that be your employee number?

19      A.   Yes.

20      Q.   What is your employee number?

21      A.   427070.

22      Q.   427070?

23      A.   Yes.

24      Q.   Okay, thanks.  I am going to direct your

25  attention to the next to last paragraph, where it



1  says the B and D flight attendants?

2       A.   Yes.

3       Q.   And it says, was shocked, as I said age

4  instead of language.  Now, this was written just

5  less than a month after the event occurred, okay.

6  And you recall that they were shocked?

7       A.   Right.

8       Q.   And it was both of them were shocked,

9  right?

10      A.   Yes.

11      Q.   So that's B and D is both Scott and

12  Amanda?

13      A.   Yes.

14      Q.   Okay.  And then you said the little boy

15  did not look 12.  Are you saying your observation or

16  their observation?

17      A.   Their observation.

18      Q.   Okay.  So they thought he didn't look 12.

19  And then it says and the relationship they had

20  looked very awkward, is that again repeating what

21  they said to you?

22      A.   No, that was me saying because of the

23  whole looking up situation.

24      Q.   Okay.  And that you believe was very

25  awkward?



ANNA BOND                                    December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                    103

1      A.    Yes.

2      Q.    Okay.  Did anybody other than Mr. Grimes

3  follow up with you at Frontier?

4      A.    No.

5      Q.    Has anybody that you know, yourself

6  included received any kind of warning or reprimands

7  about this incident?

8      A.    No.

9      Q.    As far as you know everything that was

10  done is, you know, okay with Frontier?

11      A.    Yes.

12      Q.    Okay.  Have you ever been convicted of any

13  crime?

14      A.    No.

15      Q.    We have to ask that.  Okay.  We have some

16  outstanding items, so I am going to complete, I will

17  adjourn, but you may have some questions.

18                    EXAMINATION

19  BY MR. MAYE:

20      Q.    When the flight attendants convened in the

21  front galley to discuss the facial touching, what

22  was the concern of the flight attendants about the

23  facial touching?

24            MR. MCKAY:  Objection to the form.

25      A.    It was just the concern of safety for the



1    passenger, the little boy and people around them.

2         Q.   What do you mean by the concern for the

3    safety of AD?

4         A.   Well, if he was touching the little boy it

5    would be sexual harassment.

6         Q.   So there was a concern the touching was of

7    a sexual nature?

8         A.   Yes.

9              MR. MCKAY:   Objection to form.

10        Q.   You testified that you walked past AD when

11   he was sitting in the back row, what was his

12   demeanor like?

13        A.   He was calm, he was not making any noise,

14   he was not talking to anyone.

15        Q.   Was he crying?

16        A.   No.

17        Q.   Did he ever try to get your attention and

18   ask to be moved back with his father?

19             MR. MCKAY:   Objection to the form.

20        A.   No.

21        Q.   What was his demeanor, like when he was

22   being escorted off the aircraft, by you and Amanda?

23        A.   The same, he was not talking to anyone,

24   just quiet.

25        Q.   He wasn't crying?



ANNA BOND                                    December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                     105

1        A.    No.

2        Q.    Okay.  I have no further questions.

3                        EXAMINATION

4    BY MR. MCKAY:

5        Q.    You said that the concern was for his

6    safety and people around him, didn't you?

7        A.    Yes.

8        Q.    Okay.  How would this have effected people

9    around them?

10       A.    Well, if there was a big commotion,

11   something could have happened where they would start

12   a fight or anything could have happened, honestly.

13   It was, it's, when we are up in the air, anything is

14   very unpredictable, so we have to be aware of the

15   safety of the victim, and also everybody around them

16   on the plane.

17       Q.    So a 12 year old boy you were afraid was

18   going to start a fight with his father?

19       A.    We just never know.

20       Q.    I see.  Okay.  So if you don't know a

21   situation isn't it better to not take invasive

22   action?

23       A.    Well, that was so when we took action it

24   was for the safety of him, of the little boy.  But

25   just because there is one event going on, doesn't



1   mean, so say if the father had acted out, and

2   accidentally hit the passenger next to him or

3   anything could have happened, there is millions of

4   situations that could have happened.  So we have to

5   make sure that like he is safe, also everyone around

6   them and the rest of the passengers on the plane are

7   safe.

8       Q.   Okay.  Now, if you were concerned about

9   sexual harassment, as you mentioned, wouldn't that

10  fall under the sexual misconduct in-flight must

11  read?

12      A.   Yes.

13      Q.   But there is a number of things that you

14  didn't do with respect to that, are there, for

15  instance, you never advised the effected individual

16  for your safety, we are removing you from a

17  situation, the pilot will be notified and law

18  enforcement will meet the aircraft upon arrival at

19  the gate, you testified you didn't say that?

20      A.   I did not say that.

21      Q.   And you don't know that Scott said it

22  either?

23      A.   I do not, no.

24      Q.   All right.  And you said that AD appeared

25  calm, but your previous testimony was that you only



1   saw him for a second or two?

2        A.   Yes.

3        Q.   All right.  So you are not really in a

4   position to make any extensive diagnosis of his

5   feelings at the time, are you?

6             MR. MAYE:  Object to form.

7        A.   Yes, I am not.

8        Q.   You are not?

9        A.   No, yes, I am not.

10       Q.   Okay.  All right.  And if he had asked

11  somebody to be returned to his father that likely

12  wouldn't have been you, would it?

13       A.   No.

14       Q.   Because you are at front of the airplane?

15       A.   I do walk through the cabin with trash

16  every few minutes.

17       Q.   But it wasn't you that, if he had asked

18  somebody to return to his father, it wasn't likely

19  to be you?

20       A.   No.

21       Q.   Okay.  That's all I have.  Thank you, no

22  further questions.  This concludes the video

23  deposition of Anna Bonds, on December 10, 2019.  The

24  time is approximately 3:39 p.m. we are going off the

25  record.



```
 1   (The deposition concluded at

 2   3:39 p.m.)

 3    *  *  *  *  *
```



1              CERTIFICATE OF DEPONENT

2      PAGE     LINE      CHANGE

3      _____

4      _____

5      _____

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

                       *  *  *  *  *

15
           I, ANNA BOND, deponent herein, do hereby certify
16     and declare under penalty of perjury the within and
       foregoing transcription to be my deposition in said action;
17     that I have read, corrected and do hereby affix my signature
       to said deposition.
18
                       _____
19                     ANNA BOND, Deponent

20

21

22

23

24

25



```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Shifra Moscovitz, Certified Court Reporter,

 4    State of Nevada, do hereby certify:

 5          That I reported the deposition of ANNA BOND,

 6    commencing on Tuesday, December 10th, 2019, at 1:37 P.M.

 7          That prior to being deposed, the witness was duly

 8    sworn by me to testify to the truth.  That I thereafter

 9    transcribed my said shorthand notes into typewriting and

10    that the typewritten transcript is a complete, true and

11    accurate transcription of my said shorthand notes.  That

12    prior to the conclusion of the proceedings, the reading and

13    signing was requested by the witness or a party.

14          I further certify that I am not a relative or

15    employee of counsel of any of the parties, nor a relative or

16    employee of the parties involved in said action, nor a

17    person financially interested in the action.

18          In witness whereof, I hereunto subscribe my name

19    at Las Vegas, Nevada, this 26th day of December, 2019.

20                         _____

21                         SHIFRA MOSCOVITZ, CCR No. 938

22

23

24

25
```



1 | Timothy R. Titolo, Esq.
Nevada Bar No. 003617
2 | TITOLO LAW OFFICE
9950 West Cheyenne Ave.
3 | Las Vegas, Nevada 89129
(702) 869-5100
4 | tim@titololaw.com

5

6 | John D. McKay, Esq.
*Admitted pro hac vice*
PARK AVENUE LAW LLC
7 | 127 W. Fairbanks Ave. No. 519
Winter Park, Florida 32789
8 | (800) 391-3654
9 | johndmckayatty@gmail.com

10 | **Attorneys for Plaintiffs PETER DELVECCHIA and**
**A.D., a Minor**

11

12 |

13 | **UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

14

15 | PETER DELVECCHIA, et al.,                )     **Case No: 2:19-CV-01322-KJD-NJK**
                                          )
16 |                   Plaintiffs,           )
                                          )
17 |                                        )
                                          )     **PLAINTIFFS' NOTICE OF**
18 | vs.                                    )     **DEPOSITION OF ANNA BOND**
                                          )
19 |                                        )
                                          )
20 | FRONTIER AIRLINES, INC., et al.,        )
                    Defendants.            )
21 | _____)

22

23 |         PLEASE TAKE NOTICE that the undersigned attorney for Plaintiffs, Peter DelVecchia

24 | individually and as next friend of A.D., a minor, will take the deposition of the person named herein,

25 | at the time and place specified below, upon oral examination before a Notary Public or other person

26 | authorized to administer oaths, to be recorded by stenographic and audiovisual means, for discovery

27

28



PLAINTIFFS' NOTICE OF DEPOSITION OF ANNA BOND
Page 1 of 3

1  and use as evidence, and for all other purposes permitted by the Federal Rules of Civil Procedure.

2  The deposition will continue from day to day until completed. The particular details are:

3       **Deponent:**    **Anna Bond, c/o Adler Murphy & McQuillan**

4       **Date:**        **December 10, 2019**

5

6       **Time:**        **1:00 p.m. PST**

7       **Place:**       **Titolo Law Office**
                          **9950 West Cheyenne Avenue**
8                         **Las Vegas, NV 89129**

9

10      DATED this 2nd day of December, 2019.

11

12                                            _____
                                              John D. McKay (admitted *pro hac vice*)
13                                            PARK AVENUE LAW LLC
                                              127 W. Fairbanks Ave., No. 519
14                                            Winter Park, FL 32789
                                              johndmckayatty@gmail.com
15                                            (800) 391-3654

16                                            Timothy R. Titolo (Nev. Bar. No. 3617)
                                              TITOLO LAW OFFICE
17                                            9950 West Cheyenne Avenue
                                              Las Vegas, Nevada 89129
18                                            (702) 869-5100
                                              tim@titololaw.com
19
                                              ***Attorneys for Plaintiffs Peter DelVecchia***
20                                            ***And A.D., a Minor***

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF DEPOSITION OF ANNA BOND
Page 2 of 3

1

## CERTIFICATE OF SERVICE

2      I HEREBY CERTIFY that on December 2, 2019, pursuant to prior agreement of counsel

3   permitting electronic service by email, I served the foregoing First Supplemental Initial Disclosures

4
    on counsel for Defendants by email addressed to the following persons:
5

6              Brian T. Maye, Esq.
               Tara Shelke, Esq.
7              ADLER MURPHY & McQUILLEN LLP
               20 South Clark Street, Suite 2500
8              Chicago, Illinois 60603
               Email: bmaye@amm-law.com
9                     tshelke@amm-law.com

10
               Charles A. Michalek, Esq.
11             ROGERS, MASTRANGELO, CARVALHO & MITCHELL
               700 South Third Street
12             Las Vegas, Nevada 89101
               Email: cmichalek@rmcmlaw.com
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Nevada

| | |
|---|---|
| PETER DELVECCHIA, et al. | ) |
| *Plaintiff* | ) |
| v. | )   Civil Action No.   2:19-cv-01322-KJD-NJK |
| | ) |
| FRONTIER AIRLINES, et al. | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:            Anna Bond, c/o ADLER MURPHY & McQUILLAN LLP

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Titolo Law Office | Date and Time: |
|---|---|
| 9950 West Cheyenne Avenue | |
| Las Vegas, Nevada 89129 | 12/10/2019 1:00 pm |

The deposition will be recorded by this method:    Stenographic and audiovisual

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Any and all notes, memoranda, emails, or other documents pertaining to the passengers seated in seats 17E and 17F on Frontier Airlines Flight 2067 between RDU and LAS on March 28, 2019, including, without limitation, discussions with other crew members, the decision to separate them, the request for law enforcement officers to meet the flight at LAS, and any post-landing actions.

---

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:      12/02/2019

|  CLERK OF COURT | | |
|---|---|---|
| | OR | |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Peter DelVecchia
_____ , who issues or requests this subpoena, are:
John D. McKay, Esq., Park Avenue Law LLC, 127 W. Fairbanks Ave. #519, Winter Park, FL 32789; (800) 391-3654; johndmckayatty@gmail.com

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 2:19-cv-01322-KJD-NJK

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____   on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Print        Save As...        Add Attachment                    Reset

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

11:41

 **Anna**

SAT AT 18:16

> Have you done your deposition yet?

SUN AT 00:59

 No. You?

> I do mine on monday and Tuesday.. they are flying to slc, since I'm on maternity leave.. this is crazy

I do mine on the 9th and the 10th. They're coming to Vegas.

Congrats on your baby!!

Let me know how it goes please!

I've never done anything like this

 Do not know what to expect

> That is crazy! Oh, I will let you know all about it! Even if they tell me not to haha you will just have to keep it on the down low!

Replying to **Anna**
I do mine on the 9th and the 10th.  They're coming to ...


Defendant's Exhibit
2 Bond
12/10/19
ESQUIRE

11:42



← **Anna**

with!

I will not tell a soul lol

I know! We barley had part in it too.  You literally did nothing and I just moved them out of the exit row.   We shouldn't even have to go. We had zero part. I'm really glad we didnt have parts in it though.  Imagine what Scott is going to have to do.

 Anyways yes! Lmk! Goodluck'

I was thinking the same thing! Me and you were like the messengers between scott, which was dealing with the situation, and the pilots. Besides that I told the cops who he was. And that was it!!

Oh well, this guy is just pissed he got caught, and now is trying to fight it.. I don't even want to imagine what Scott is going through!

Yes. I will. Talk to you on Tuesday!

Aa

19AZF0229 DELVECCHIA FRONTIER 208

11:42

 **Anna**

wrong. So we will be fine.

Thank you! 🤍 I will let you know on Tuesday after it's all over with!

I will not tell a soul lol

I know! We barley had part in it too.  You literally did nothing and I just moved them out of the exit row.   We shouldn't even have to go. We had zero part. I'm really glad we didnt have parts in it though.  Imagine what Scott is going to have to do.

 Anyways yes! Lmk! Goodluck'

I was thinking the same thing! Me and you were like the messengers between scott, which was dealing with the situation, and the pilots. Besides that I told the cops who he was. And that was it!!

Oh well, this guy is just pissed he got caught, and now is trying to fight it.. I don't even want to imagine what Scott is going

Aa

19AZF0229 DELVECCHIA FRONTIER 207

11:42

 **Anna**

 Do not know what to expect

That is crazy! Oh, I will let you know all about it! Even if they tell me not to. Haha you will just have to keep it on the down low!

I haven't done anything like this before either. Part of me is freaking out, but then I think again, and we did NOTHING wrong. So we will be fine.

Thank you! 🖤 I will let you know on Tuesday after it's all over with!

I will not tell a soul lol

I know! We barley had part in it too.  You literally did nothing and I just moved them out of the exit row.   We shouldn't even have to go. We had zero part. I'm really glad we didnt have parts in it though.  Imagine what Scott is going to have to do.

 Anyways yes! Lmk! Goodluck'

Replying to **Anna**

I do mine on the 9th and the 10th.  They're coming to …

19AZF0229 DELVECCHIA FRONTIER 206

FFT

PRINTED:
Summary -          Report - by Date/Eqpt/Pos

ID #:
Qual1:  319    BOND ANNA
Qual2:         -FA
Qual3:         -
Qual4:         -
Certificate#: 3937309

| A/C | POS | CODE | DESCRIPTION | S/U | TrgDate | BaseMonth | Instructor# | Hrs/min. | Lndgs | Cls | FAA |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 22OCT19 | OCT | 428082 | 6: 0 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 22OCT19 | OCT | 427042 | 2: 0 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 22OCT19 | OCT | 427554 | 3: 0 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 22OCT19 | OCT | 405593 | 1: 0 | 00 | 00 | |
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 19OCT18 | OCT | 414537 | 5: 0 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 19OCT18 | OCT | 422845 | 2: 0 | 00 | 00 | |
| | | RHAZ | Recurrent Has-Mat record per 121.1007(c) | | 19OCT18 | OCT | 422845 | 1: 0 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 19OCT18 | OCT | 401361 | 3: 0 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 19OCT18 | OCT | 410358 | 1: 0 | 00 | 00 | |
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 18OCT17 | OCT | 427796 | 6:00 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 18OCT17 | OCT | 414537 | 2:00 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 18OCT17 | OCT | 427796 | 3:00 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 18OCT17 | OCT | 405593 | 1:00 | 00 | 00 | |
| | | IOE | Initial Operating Experience | | 08NOV16 | NOV | 405384 | 7:12 | 00 | 00 | |
| 319 | | IEMV | Initial Emergency Training (hands on) | | 27OCT16 | OCT | 401361 | : | 00 | 00 | |
| 319 | | ICC | Initial Competency Check | | 27OCT16 | OCT | 401361 | : | 00 | 00 | |
| | | IGS | Initial Ground Training | | 27OCT16 | OCT | 401361 | : | 00 | 00 | |
| | | IBI | Initial Basic Indoc | | 27OCT16 | OCT | 401361 | : | 00 | 00 | |
| | | ISEC | Initial Security Training F/A | | 26OCT16 | OCT | 422972 | 14:00 | 00 | 00 | |
| | | ICRM | Initial Crew Resource Management | | 26OCT16 | OCT | 422972 | : | 00 | 00 | |
| | | IH2O | Initial Over Water Training | | 24OCT16 | OCT | 401361 | 5: | 00 | 00 | |
| 319 | | IHAZ | Initial Has-Mat record per 121.1007(c) | | 19OCT16 | OCT | 421020 | 2: | 00 | 00 | |
| | | IDIFF3 | Initial Differences Training 319/318 | | 14OCT16 | | 421020 | : | 00 | 00 | |
| | | IDIFF4 | Initial Differences Training 320/319/318 | | 14OCT16 | | 421020 | : | 00 | 00 | |
| | | IDIFF321 | Initial Differences for the 321 | | 14OCT16 | | 421020 | : | 00 | 00 | |

END OF REPORT

Defendant's Exhibit

3  Bond
12/10/19
ESQUIRE

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19AZF0229 DELVECCHIA FRONTIER 204



**Inflight Bi-Weekly Briefing**

**FRONTIER**

**Memo 19-06**
**January 25, 2019**

## Human Trafficking

January is National Slavery and Human Trafficking Prevention month.

If you suspect a passenger may be a victim of human trafficking:

**JANUARY**
**National Slavery & Human Trafficking Awareness Month**

- Initiate non-threatening conversation and ask targeted questions:
  - Ask where they are traveling; are they going on vacation or visiting relatives?
  - Ask where they are staying, who will be meeting them, what they will be doing, etc.
- Take note if traveling companion(s) appears nervous or prevents the child/person from answering questions or if their answers seem evasive.
- Contact the Captain and inform him/her of your suspicions. Provide specific details of the situation and explain why you believe the behavior exhibits signs of human trafficking.
- The Captain will evaluate the information and if appropriate, involve law enforcement to resolve the concerns.
- At the gate, the captain will notify a GSC.
- The GSC, Captain, and Frontier SOC will evaluate the facts and a joint decision will be made regarding the passengers' continued travel.
- Complete an Incident Report within 24 hours.

If suspected behavior is observed while on the ground, you may contact the Department of Homeland Security Tip Line at **866-347-2423**.

Human Trafficking tips are investigated through Immigration and Customs Enforcement Agency, so the number contains two acronyms to make it memorable, **866-DHS-2-ICE**.

You may also report an incident of suspected human trafficking online at www.ice.gov/tips.

### In This Issue

- Human Trafficking
- Sharing a FlyTab?
- FAM Revision 63
- Complimentary Beverages & Snacks
- Deadheading Crew
- Kids Fly Free
- Safety Information Cards
- Inflight Training
- Catering Corner
- Announcements

**Defendant's Exhibit**
4   Bond
12/10/19
● ESQUIRE

### Manual Information
FAM Rev. #62 - 01/29/2018
ISS Rev. #19 - 12/27/2016

**Comply365 App**
Version 3.4.0.955

**AspexGO App**
Version 2019.1   12/27/2018

Frontier Airlines, Inc. - Proprietary and Confidential - For Internal Use Only
*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER* 19AZF0229 DELVECCHIA FRONTIER 0122

**FRONTIER**
LOW FARES DONE RIGHT

## Inflight Must Reads

| | |
|---|---|
| **References:** | **Date:** |
| FAM | March 15, 2019 |
| | |
| **Purpose:** | **Must Read:** |
| Sexual Misconduct | 19-13 |

*FRONTIER*

Frontier has developed the below procedures when an incident involving sexual misconduct by a passenger is reported onboard. Sexual misconduct is a broad term encompassing any unwelcome behavior of a sexual nature that is committed without consent or by force, intimidation, coercion, or manipulation. Sexual misconduct can be committed by a person of any gender, and it can occur between people of the same or different gender.

Sexual misconduct allegations need to be treated with sensitivity and confidentiality while remaining neutral.

Once an incident involving sexual misconduct is reported to a Flight Attendant:

1. Advise the affected individual: *"For your safety, we are removing you from the situation. The pilot will be notified, and Law Enforcement will meet the aircraft upon arrival at the gate."*

2. Immediately remove the affected individual who has reported the misconduct; do not question the individual about the allegation. Separate the parties involved at least 10 rows away from each other. Ideal separation would be to the front or rear of the aircraft opposite of the accused individual.

   a. If no opens seats are available, move other passengers as needed.

   b. Reseat an airline employee (DHD crew, F9 or OA crewmember, F9 employee) if available. If not, sit an ABP next to the accused. Advise the employee or ABP there has been a conflict between two passengers and you need their assistance in swapping seats.

3. Notify the Flight Deck Crew of the incident.

   a. Once an incident alleging sexual misconduct has been reported to a crewmember, Law Enforcement must be notified even if the affected individual doesn't want to pursue legal action.

   b. If the affected individual has questions about what will happen to the accused, advise the affected individual that Law Enforcement will meet the aircraft and interview all parties involved as well as obtain witness reports. Do not engage in discussion about the incident. It is ok to console the affected individual and let them know their safety is our top priority.

4. Do not advise the accused of the situation or ask for witness reports as this sensitive process will all be handled by the LEO.

Defendant's Exhibit
5   David
12/10/19
ESQUIRE

5. Upon landing, ask passengers to remain seated and do not open the MCD until a LEO is present.

   a. Provide LEO with the name of the affected individual, and the seat number of the accused.

6. Flight Attendants must submit an Incident Report within 24 hours of the flight.

Statistics show these incidents occur more often during red-eye flights. It is important for all Flight Attendants to take the responsibility to pass through the cabin every 15 minutes once service is completed as required per the FAM, 55.45 Page 1. On Red Eye and night flights, cabin lighting should be set to DIM 2 for service and the Galley lights should remain set to DIM 2 except for take-off and landing.

Our goal in responding to these types of incidents is to quickly and discreetly remove the affected individual from the situation.  We want to communicate the next steps to the affected individual, so they are aware of the process and know we are reporting the incident.

By entering this confirmation code, I acknowledge I have read and understand this memo: ▮▮▮▮

Frontier Airlines, Inc. - Proprietary and Confidential - For Internal Use Only



**FRONTIER**

| Flight Attendant Manual | Rev 63 04/01/19 |

## 20.50 HUMAN TRAFFICKING

Flight Attendants are in a unique position to detect and discern human trafficking situations. Some suspicious indicators to watch for include:

- Afraid of uniformed security
- Unsure of destination
- Frightened, ashamed, or nervous
- Scripted stories (responses seemed rehearsed)
- Wearing inappropriate clothing and/or overall appearance does not fit route of travel, weather
- Claims of being an adult but appearance indicates adolescent features

If you suspect a passenger may be a victim of human trafficking:

1. Initiate nonthreatening conversation and ask targeted questions;
   - Ask where they are travelling; are they going on vacation or visiting relatives?
   - Ask where they are staying, who will be meeting them, what they will be doing, etc.

2. Take note if traveling companion(s) appears nervous or prevents the child/person from answering questions or if their answers seem evasive.

3. Contact the Captain and inform him/her of your suspicions. Provide specific details of the situation and explain why you believe the behavior exhibits signs of human trafficking;

4. The Captain will evaluate the information and if appropriate, involve law enforcement to resolve the concerns;

5. At the gate, the captain will notify a GSC.

6. The GSC, Captain, and Frontier SOC will evaluate the facts and a joint decision will be made regarding the customer's continued travel;

7. Complete an incident Report within 24 hours;

If suspected behavior is observed while on the ground, you may contact the Department of Homeland Security Tip Line at 866-347-2423.

Human Trafficking tips are investigated through the Immigration and Customs Enforcement Agency, so the number contains two acronyms to make it memorable. 866-DHS-2-ICE.

You can also report online at www.ice.gov/tips.



Page __1__ of __2__

**LAS VEGAS METROPOLITAN POLICE DEPARTMENT**
**VOLUNTARY STATEMENT**

Event # 190300 137169

**THIS PORTION TO BE COMPLETED BY OFFICER**

| Specific Crime | | Date Occurred 3/28/19 | Time Occurred 1900 |
|---|---|---|---|
| Location of Occurrence FRONTIER FLIGHT 2067 | | Sector/Beat | ☐ City ☐ County |

Your Name (Last / First / Middle) | Date of Birth | Social Security #

b6
b7C

| Race | Sex | Height | Weight | Hair | Eyes | Work Schdl. (Hours) Varies | (Days Off) | Business / School Frontier Airlines |

Residence Address: (Number & Street) McCarran Airport NV. | Bldg./Apt.# | City | State | Zip Code | Res. Phone:

Bus. (Local) Address: (Number & Street) | Bldg./Apt.# | City | State | Zip Code | Bus. Phone: | Occupation FA | Depart Date (if visitor)

Best *place* to contact you during the day: Cell phone | Best *time* to contact you during the day: Anytime | Can You Identify the Suspect? ☑ Yes ☐ No

**DETAILS** Briefing pax Noticed a younger person sitting in the exit row asked him how old he was and he said [ ] I asked him if he was traveling with someone else and he pointed at [ ] [ ] I moved them to a different seat a few rows back and walked to the back to tell the crew what was going on. ~~that~~ they were sitting at 13DE originally and moved to 17EF the crew in the back, [ ] asked me if I had moved the two people out of the exit row because of language and I had told them it was because of age. they then thought something was off so we kept an eye out during the flight. & after take off - during service, [ ] had asked [ ] if he ~~would~~ wanted anything and [ ] had shook his head No. while [ ] was sleeping. later on, [ ] had walked through the cabin, collecting trash and had Noticed that [ ]

b6
b7C

I HAVE READ THIS STATEMENT AND I AFFIRM TO THE TRUTH AND ACCURACY OF THE FACTS CONTAINED HEREIN. THIS STATEMENT WAS COMPLETED AT (LOCATION) McCarran Airport NV. 6757 WAYNE NEWTON RLVD.
ON THE 29 DAY OF MARCH AT 2200 (AM / PM) 2019

Witness/Officer: _____
Witness/Officer: _____
LVMPD 85 (REV. 6-08)

b6
b7C

Defendant's Exhibit
1 Bond
12/10/19
ESQUIRE

19AZF0229 DELVECCHIA FRONTIER 0115

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
## CONTINUATION

Event #: 19030137169

For One, we had Noticed that the [ ]
we kept a closer eye on them #A Next
had able through the cabin collecting trash and Noticed that

We had been talking to the captain throughout the    b6
incident and the captain had Suggested to seperate the two.   b7C
We put [ ] in the very last row and had an Able
body passanger sit next to [ ] on the aisle seat
to make sure Nothing was going to happen [ ]
had most of the interaction with [ ]

Page 2

19AZF0229 DELVECCHIA FRONTIER 0116

| | |
|---|---|
| **From:** | Anna Bond |
| **To:** | Grimes, Jason B. |
| **Subject:** | Re: Inquiry for Flight 2067 RDU-LAS 03/28/2019 Incident |
| **Date:** | Wednesday, April 17, 2019 2:21:24 PM |

Hello,

  My story:

As the C, I went to brief the exit row before MCD closed.

As I briefed I noticed a boy sitting in the exit row.  I had asked him how old he was to make sure he is 15 or older.  He had answered "12"

I asked him if he was traveling on his own and he pointed at a man sitting next to him. (The boy was in 13E the man was in 13D). I had asked the gentleman sitting in 13D if he wanted me to separate them move them together since the boy is not allowed to sit in the exit row because of the age requirement.

The man had answered "together"

Because it was a full flight, I had asked for two volunteers sitting next to each other to move to the exit row.  A man and a women had volunteered (17EF, if I am remembering correctly).

After the switch was made, I briefed the new passengers sitting the the exit row and headed to the back of the aircraft to notify the B and the D flight attendant that I had moved people out of the aircraft because of age requirement.

The B and the D flight attendant was shocked as I said age instead of language.  The little boy did not look 12, and the relationship they had looked very awkward.

I did not interact with either the man or the boy after that.  The B and the D flight attendant had dealt with most of it since the boy and the man was sitting in their section.


— Anna Bond ███

Sent from my iPhone

Defendant's Exhibit

8 Bond
12/10/19

ESQUIRE