## EXHIBIT 5

**Deposition of Flight Attendant Amanda Nickel
("D" Flight Attendant)**

1          UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEVADA

3

4  PETER DELVECCHIA, et al.,

5        Plaintiffs,

6     vs.                        CASE NO.
                                 2:19-CV-01322-KJD-NJK
7  FRONTIER AIRLINES, INC.,
   et al.,
8
        Defendants.
9  _____

10

11

12

13         VIDEOTAPED DEPOSITION OF

14            AMANDA LEE NICKEL

15

16      Wednesday, December 11, 2019

17             9:01 a.m.

18

19        9950 West Cheyenne Avenue

20           Las Vegas, Nevada

21

22    Judith Payne Kelly, RMR, CCR-539

23

24

25



```
 1                   APPEARANCES OF COUNSEL

 2


 3
      For the Plaintiffs:
 4
            JOHN D. McKAY, ESQ.
 5          Park Avenue Law, LLC
            127 West Fairbanks Avenue
 6          Box 519
            Winter Park, Florida  32789
 7          800.391.3654
            parkavelaw@gmail.com
 8

 9    For Defendant Frontier Airlines:

10          BRIAN T. MAYE, ESQ.
            Adler Murphy & McQuillen, LLP
11          20 South Clark Street
            Suite 2500
12          Chicago, Illinois  60603
            312.345.0700
13          bmaye@amm-law.com

14
      Also Present:
15
            MONICA HAYWORTH, VIDEOGRAPHER
16          PETER DELVECCHIA

17

18                         *  *  *  *  *

19

20

21

22

23

24

25
```



```
 1                    INDEX OF EXAMINATION

 2

 3   Witness                                         Page

 4   AMANDA LEE NICKEL

 5   EXAMINATION

 6   By Mr. McKay                                       5

 7   By Mr. Maye                                      130

 8   By Mr. McKay                                     134

 9

10

11

12                  INDEX TO EXHIBITS

13

14   Exhibit              Description             Page

15   Exhibit 1    Summary of training, 19AZF0229    34
                  DELVECCHIA FRONTIER 203
16
     Exhibit 2    Las Vegas Metropolitan Police     34
17                Department Voluntary Statement,
                  19AZF0229 DELVECCHIA FRONTIER 0120
18                and 0121

19

20

21

22

23

24

25
```



1          Deposition of AMANDA LEE NICKEL

2                December 11, 2019

3

4          THE VIDEOGRAPHER:  This is Media No. 1 to the

5   video-recorded deposition of Amanda Nickel in the

6   matter of Peter DelVecchia versus Frontier Airlines,

7   Incorporated, being heard before the United States

8   District Court for the District of Nevada, Case

9   No. 2:19-CV-01322-KJD-NJK.

10          This deposition is being held at Titolo Law

11   Office in Las Vegas, starting at 9:01 a.m.  My name is

12   Monica Hayworth, and I'm the videographer.  The court

13   reporter is Judy Kelly, with Esquire Deposition

14   Solutions.

15          Counsel, will you please introduce yourselves

16   and affiliations, and the witness will then be sworn.

17          MR. McKAY:  John McKay of Park Avenue Law for

18   the plaintiffs.

19          MR. MAYE:  Brian Maye for Frontier Airlines.

20          THE VIDEOGRAPHER:  Thank you.

21   Thereupon,

22          AMANDA LEE NICKEL, having been first duly

23   sworn, was examined and testified as follows:

24   ///

25   ///



```
 1                    EXAMINATION
 2   BY MR. McKAY:
 3        Q.   Would you state your full name, please.
 4        A.   Amanda Nickel.
 5        Q.   Is there a middle name?
 6        A.   Lee, L-e-e.
 7        Q.   Ms. Nickel, have you ever had your deposition
 8   taken before?
 9        A.   No.
10        Q.   Okay.  Let me just give you a little bit of
11   the basics of what's going on today.  Some of this may
12   be what you've already heard from your attorney, but I
13   just want to make sure that we cover everything so that
14   there's no misunderstanding.
15             The process today is obviously in a lawyer's
16   office, in a conference room, but there's a court
17   reporter here and she's authorized by the government to
18   give you an oath, which you've just taken, to tell the
19   truth; and that oath is precisely the same as if you
20   were in a courtroom with a judge and you took an oath
21   to tell the truth, and the penalties are the same.
22             So in the event that there's any failure to
23   tell the truth, it would be exactly as if you went into
24   a courtroom and failed to tell the truth.
25             Do you understand that?
```



1      A.    Yes.

2      Q.    Okay.  Now, we will probably take a break if

3  we should go as long as an hour.  I tend to take breaks

4  on the hour.  But if you feel the need to take a break

5  before that, all you'd have to do is say the word.

6  There's no rules against that.  It's not like we can't

7  just stop and, you know --

8      A.    Okay.

9      Q.    -- use the facilities or whatever.

10          The only thing I ask is that we not take a

11  break if there's a question pending, because nobody

12  wants to think that people are outside discussing how

13  to answer a question.  That's all.  Okay?

14      A.    Yes.

15      Q.    All right.  Now, there are a couple of things

16  that we have to do just to give respect to the court

17  reporter here, because her job is to type every word

18  that's said for an official transcript, which could be

19  used in court proceedings or reviewed by the judge.

20  And in order for her to do that, we have to observe a

21  few rules.

22          One of those is we cannot talk at the same

23  time, because there's no way for her to accurately

24  transcribe if two people are talking over each other.

25  So what I will ask of you is that you ensure that I'm



 1  finished with my question before you begin to answer

 2  it, and I will do the same to ensure that you are

 3  finished with your answer before I begin another

 4  question.  Is that acceptable?

 5      A.   Yes.

 6      Q.   Okay.  And, now, you've been extremely good

 7  about this so far, but let me just underscore that we

 8  also have to answer every question with a word or

 9  words, because if you shrug your shoulders, nod your

10  head or say "uh-huh," that's very ambiguous as far as

11  the written transcript goes, and we don't want there to

12  be any ambiguity.  Okay?

13      A.   Yes.

14      Q.   Okay.  Now, we may refer in this -- and by

15  the way, Peter DelVecchia, seated here, is one of the

16  plaintiffs.  The other plaintiff is his son.  And

17  because of rules that forbid naming people under 18 in

18  what might be the public record, we are using just the

19  initials A.D.  So if at any time during this deposition

20  I use the initials A.D., that's referring to Peter's

21  son.  Is that okay?

22      A.   Yes.

23      Q.   All right.  Now, what is your residence

24  address?

25      A.   1148 Whispering Birch Avenue in Las Vegas,



AMANDA L. NICKEL                                    December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                                    8

```
 1  Nevada 89123.
 2        Q.   And how long have you lived there?
 3        A.   About a year.
 4        Q.   Okay.  And where did you live before that?
 5        A.   Do you need the address?
 6        Q.   Yeah, if you don't mind.
 7        A.   11795 Bergamo Court, B-e-r-g-a-m-o, in
 8  Las Vegas.
 9        Q.   Okay.  That's fine.  I don't need the zip.
10             And who do you live at Whispering Birch
11  Avenue with?
12        A.   My two sons.
13        Q.   And how old are they?
14        A.   Thirteen and seven.
15        Q.   All right.  And are you divorced?
16        A.   Yes.
17        Q.   Okay.  What's your ex-husband's name?
18        A.   I don't feel comfortable giving that
19  information.
20        Q.   It's just his name.
21        A.   I understand, but he's not involved in this.
22        Q.   No, I understand that, but --
23        A.   So I'd prefer not to.
24        Q.   I understand that, too, and I sympathize with
25  that, but I do need to have some background
```



 1 | information, and there's no --

 2 |         MR. MAYE:  It's fine.

 3 |     Q.   (By Mr. McKay)  -- prohibition on it.

 4 |     A.   Justin Nickel.

 5 |     Q.   All right.  And how long were you married to

 6 | him?

 7 |     A.   About eight years.

 8 |     Q.   And when did you get divorced from him?

 9 |     A.   Officially, it was finalized in December of

10 | 2016.

11 |     Q.   All right.  Does he reside here in Las Vegas?

12 |     A.   Yes.

13 |     Q.   All right.  Do you have any relatives that

14 | live in the area?

15 |     A.   My brother does.

16 |     Q.   Okay.  What's your brother's name?

17 |     A.   Sean Payne, P-a-y-n-e.

18 |     Q.   And there's a couple of spellings of Sean.

19 | Which one is he?

20 |     A.   S-e-a-n.

21 |     Q.   S-e-a-n.  Okay.  What does -- what does he

22 | do?

23 |     A.   He's a lawyer.

24 |     Q.   Do you know what type of law he does?

25 |     A.   Personal injury.



1      Q.   On the plaintiff's side?

2      A.   I don't know.

3      Q.   Okay.  All right.  Are you based at the

4  McCarran Airport?

5      A.   Yes.

6      Q.   And who is your immediate supervisor there?

7      A.   We just got two new ones, so I'm not sure on

8  their names.

9      Q.   Okay.  But they would be the same for all of

10  the flight attendants?

11      A.   For Vegas, correct.

12      Q.   Okay.  So if Ms. Bond gave me some names

13  yesterday, they would be the same people?

14      A.   Correct.

15      Q.   Okay.  What's the last four digits of your

16  Social Security number?

17      A.   1801.

18      Q.   Okay.  Are you aware that there was a

19  subpoena for you to come and testify today?

20      A.   Yes.

21      Q.   And did you look at that subpoena?

22      A.   Yes.

23      Q.   Did you see that there was a description of

24  documents or other materials that were required to be

25  brought?



```
 1        A.   Yes.
 2        Q.   Okay.  And did you search for any such
 3   documents?
 4        A.   I did.
 5        Q.   And did you find any?
 6        A.   I did not.
 7        Q.   Okay.  One of those was, for instance, notes
 8   of the events on Flight 2067 on March 28th.  Did you
 9   keep any notes?
10        A.   I did not.
11        Q.   Okay.  Did you review anything, any types of
12   documents or electronic documents, before your
13   deposition here today?
14        A.   I did.
15        Q.   Okay.  What did you review?
16        A.   Our sexual misconduct information provided by
17   the company and also our flight attendant manual,
18   specifically on threats level 1 and 2.
19        Q.   Okay.  Let me start with the sexual
20   misconduct information.  Is that a must-read that was
21   sent out to flight attendants in early 2019?
22        A.   It was.
23        Q.   Okay.  Did you -- and with respect to the
24   threat levels, the prior testimony that I've heard in
25   this case has had to do with the pilots looking at
```



1  their flight operations manual for threat levels.  Are

2  you saying that the flight attendants' manual also has

3  threat levels defined in it?

4       A.   It does.

5       Q.   Okay.  Did you look at any particular threat

6  levels?  One, two, three or four?

7       A.   One and two.

8       Q.   One and two.  Okay.  Is that something that

9  you had read before?

10      A.   Yes.

11      Q.   Okay.  Under what circumstances?

12      A.   In our initial training for flight

13 attendants.

14      Q.   Okay.  And then you looked at it again, what,

15 yesterday or day before?  When?

16      A.   I reviewed it during the flight, and I went

17 over it again before this deposition.

18      Q.   Okay.  "During the flight" means on

19 March 28th?

20      A.   Correct.

21      Q.   Okay.  And then when you reviewed it for this

22 deposition, when did that occur?

23      A.   Two days ago.

24      Q.   All right.  Was that with Mr. Maye?

25      A.   No.



1      Q.   It was on your own?

2      A.   Correct.

3      Q.   Okay.  Did you do that just because you

4   thought of it or because somebody suggested that you

5   should?

6      A.   I went over it because I wanted to be clear

7   on what our training states for this incident.

8      Q.   That means it was your own idea to look over

9   it?

10      A.   Correct.

11      Q.   Okay.  And you -- but you did have a practice

12   session with Mr. Maye?

13      A.   We just had a prep session just to let us

14   know what would be happening.

15      Q.   Okay.  And Ms. Bond was there with you?

16      A.   Correct.

17      Q.   And who else?

18      A.   Shawn, the first officer.

19      Q.   Okay.  Was Scott Warren present?

20      A.   No.

21      Q.   Do you know if he was supposed to be present?

22      A.   I don't know.

23      Q.   Okay.  Do you know Scott Warren?

24      A.   Just from working that one flight.

25      Q.   That's the only time you've ever worked with



1  him?

2      A.   Correct.

3      Q.   Okay.  Have you ever spoken with him other

4  than that flight?

5      A.   No.

6      Q.   When did you begin work with Frontier

7  Airlines?

8      A.   It was November 5th, 2017.

9      Q.   So you were already divorced at that point?

10     A.   Correct.

11     Q.   Okay.  Did you have a job prior to that?

12     A.   I'm also a substitute teacher.

13     Q.   Okay.  Where do you do that?

14     A.   I'm licensed -- or I'm employed by the

15  charter schools in Las Vegas.

16     Q.   All right.  And do you teach a particular

17  grade or grades?

18     A.   I'm licensed for kindergarten through twelfth

19  grade.

20     Q.   Beyond your license in practicality, what --

21  what grades do you teach when they call you to

22  substitute?

23     A.   I can choose which jobs I pick up.

24     Q.   Okay.

25     A.   So -- I particularly pick up ones that are



1  near my house and at my child's school.

2      Q.   Okay.  So, again, is it -- do you actually

3  choose kindergarten, do you choose twelfth grade?

4      A.   I prefer a little bit of all the grades.

5      Q.   Okay.  And do you teach all subjects to them?

6      A.   I do.

7      Q.   Okay.  The charter schools in Las Vegas, what

8  are they?

9      A.   There's several of them.  There's a few

10  Pinecrest schools, Somerset schools, Mater schools.

11  I'm not -- don't have all of them on hand that I know

12  all the names.

13      Q.   That's okay.  I was asking in more general

14  terms.  Are they -- are they private schools?

15      A.   No.  They're charter schools.  They're still

16  governed by a group, but they do get public assistance

17  from the government for schools.

18      Q.   I see.  Okay.  I'm just --

19      A.   There's no tuition.

20      Q.   Okay.  I'm just not familiar with charter

21  schools.  I apologize.

22           So can you just describe for me as if you

23  were just trying to tell somebody what a charter school

24  is?

25      A.   It's a school that gets government funding,



1  but they are not under the school district on how they

2  run the schools.  It's run by a board of trustees.

3       Q.   Okay.  Is there a -- is there a religious

4  element to it?

5       A.   No.  Anyone can attend.  There's no tuition,

6  and you initially get into the school by a lottery when

7  you apply.

8       Q.   Okay.  Why do people apply to go to a charter

9  school?

10      A.   If they are particularly interested in a

11 certain area.  Some charter schools are arts or sports

12 or science.  So if they have an interest in having

13 their child attend that, or -- I'm not familiar with

14 the public schools here.  My kids have not attended.

15 So it's just, I think, learning -- they get a lot more

16 out of the school, from what I can take.

17      Q.   Okay.  So the charter school advertises a

18 concentration in certain areas?

19      A.   Some of them do.

20      Q.   Okay.  All right.  And your children, I

21 presume, have always attended charter schools?

22      A.   Since we've lived in Nevada, correct.

23      Q.   Okay.  Where did you live before Nevada?

24      A.   California.

25      Q.   Where in California?



1      A.    Anaheim specifically.

2      Q.    And did you have a job there?

3      A.    Correct.  I worked in the ER as a unit

4  secretary for ten years.

5      Q.    All right.  And when you say "the ER," what

6  hospital is that?

7      A.    Los Alamitos.

8      Q.    Okay.  What does a unit secretary do?

9      A.    You put in orders that the doctor orders for

10  the patients, you make phone calls that the doctor

11  requests, answer phones.  You directly work for the

12  doctor and the nurses for anything that they need done

13  clerical.

14      Q.    Okay.  And specifically in the emergency room

15  or emergency department?

16      A.    Correct.

17      Q.    All right.  Why did you leave that job?

18      A.    To move to Las Vegas.

19      Q.    Okay.  And why did you move to Las Vegas?

20      A.    Divorce.

21      Q.    Okay.  So -- okay.  Interesting.  But your

22  husband now -- ex-husband, excuse me, now lives here?

23      A.    Correct.

24      Q.    So he moved here after you moved here?

25      A.    Two years later.



1        Q.    Okay.  And I don't know if I asked you.  What

2    does Mr. Nickel do?

3        A.    He works in the water damage business.

4        Q.    Okay.  Like a recovery kind of repair if

5    somebody's had a big flood in their house?

6        A.    Correct.

7        Q.    Okay.  And do you have sole custody of the

8    children?

9        A.    Yes.  I have full physical and legal custody.

10       Q.    Okay.  And is that why Mr. Nickel moved here,

11   because the children were here?

12       A.    I would assume so.

13       Q.    Okay.  I don't want to get too personal, but

14   I gather that it's not an amicable --

15             MR. MAYE:  Objection, John.

16       Q.    (By Mr. McKay)  -- situation?

17             MR. MAYE:  Why is this relevant?

18             MR. McKAY:  Well, I need to know some

19   information about Mr. Nickel.

20             MR. MAYE:  You're going a little too far.

21       Q.    (By Mr. McKay)  Do you have any -- are there

22   protective orders or anything out?

23       A.    No.

24       Q.    No.  So you don't -- you don't have any kind

25   of legal restraints on Mr. Nickel?



AMANDA L. NICKEL                                    December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                                 19

1        A.    No.

2        Q.    Okay.

3              MR. McKAY:   That's what I was going to ask

4   about.

5        Q.    (By Mr. McKay)  All right.  So you began work

6   at Frontier November 5th of 2017.  I presume you made

7   an application with them for work?

8        A.    I went to a job fair.

9        Q.    Okay.  Was the job fair the first place that

10  you had developed an interest in Frontier Airlines?

11       A.    Correct.

12       Q.    Did you have any particular interest prior to

13  that in being a flight attendant for anyone?

14       A.    No.

15       Q.    Okay.  So what was it about Frontier that --

16  that interested you?

17       A.    I needed a change in jobs, and I saw an ad

18  and I applied.

19       Q.    Okay.  Were you at the time working in

20  Las Vegas?

21       A.    Correct.

22       Q.    Where -- where were you working?  Was it the

23  teaching?

24       A.    I was working as a process server.

25       Q.    Oh, okay.  Was that in connection with your



1  brother at all?

2      A.   No.  With my father.

3      Q.   All right.  Does your father live here?

4      A.   He's deceased.

5      Q.   I'm sorry.  Okay.  Did he live here

6  previously?

7      A.   Yes.

8      Q.   Okay.

9           THE WITNESS:  Can I take a break for a

10  minute?

11          MR. McKAY:  Sure.

12          THE VIDEOGRAPHER:  The time is approximately

13  9:19 a.m.  We're going off the record.

14              (A recess was taken.)

15          THE VIDEOGRAPHER:  The time is approximately

16  9:21 a.m.  We're going back on the record.

17      Q.   (By Mr. McKay)  So what was -- was there a

18  company that you did process serving for?

19      A.   Correct.

20      Q.   And what was the name of that company?

21      A.   Reno/Carson Messenger Service.

22      Q.   Reno, like the city Reno?

23      A.   Correct.

24      Q.   And Carson like the city?

25      A.   Yes.



1     Q.   Messenger Service.  And is process serving

2  all you did for that?

3     A.   Correct.

4     Q.   Okay.  And this was a company that was owned

5  by your father?

6     A.   No.  He ran the Las Vegas office.

7     Q.   Okay.  And does that office still exist?

8     A.   No.

9     Q.   Okay.  When your father passed away, was that

10  the end of the business?

11     A.   I don't know what is going on with their

12  business.

13     Q.   Okay.  Why did you want to leave that

14  business?

15     A.   Because it was too much driving and it was a

16  demanding job.

17     Q.   Okay.  In what way?

18     A.   The fact that it was all driving.

19     Q.   Well, you indicated those were two different

20  things, that it was too much driving and it was a

21  demanding job.  Are you now saying those are the same

22  things?

23     A.   The hours just were not flexible with my

24  kids, and it was too much driving.

25     Q.   Did they dictate the hours that you had to do



```
 1  service?
 2       A.   It was dictated by the type of serves they
 3  were, whether they were business or residential.
 4       Q.   Okay.  Was your -- was your father then your
 5  immediate supervisor?
 6            MR. MAYE:  Object to form, John.  You're
 7  harassing the witness, and I can direct the witness to
 8  not answer if the purpose here is to harass the
 9  witness.
10       Q.   (By Mr. McKay)  You can answer the question.
11       A.   I don't want to answer.
12       Q.   Well, you have to.
13            MR. MAYE:  No, she doesn't have to answer.
14       A.   I don't think any questions regarding my
15  father are relevant to what we're talking about today.
16       Q.   (By Mr. McKay)  I understand that may be your
17  opinion, but I have a right to ask questions.
18            MR. MAYE:  You don't have a right to harass
19  her.
20       A.   I'm not going to answer any more questions
21  regarding my father.
22       Q.   (By Mr. McKay)  Well, I'm asking who your
23  immediate supervisor was.  Was that your father?
24       A.   You can find that information out by speaking
25  to the company I worked for.
```



```
 1              MR. McKAY:  All right.  I think we're going
 2    to have to call the judge.
 3              MR. MAYE:  Excellent.
 4              THE WITNESS:  Fine.
 5              MR. McKAY:  We'll go off the record here for
 6    a second here.
 7              THE VIDEOGRAPHER:  The time is approximately
 8    9:24 a.m.  We're going off the record.
 9                  (Discussion off the record.)
10              THE VIDEOGRAPHER:  The time is approximately
11    9:27 a.m.  We're back on the record.
12                  (Whereupon, the following telephonic
13                   conference call was had:)
14              MR. HOGAN:  Can you give me the gist of what
15    the issue is?
16              MR. MAYE:  Sure, sure.  Plaintiffs' counsel
17    is --
18              MR. HOGAN:  And just to make sure, everyone's
19    on the line?
20              MR. MAYE:  Yes.  Everyone is on the line.
21              MR. McKAY:  Yes.  This is John McKay.  I'm
22    plaintiffs' counsel, sir.
23              MR. HOGAN:  Okay.
24              MR. MAYE:  Plaintiffs' counsel is inquiring
25    into the background of the fact witness, and he's going
```



1  into things such as the divorce of the fact witness,

2  the nature of the divorce, the current relationship

3  between the witness and her ex-husband.  Now he's

4  getting into the plaintiff -- the fact witness's

5  deceased father, who died a year ago.

6          It's very upsetting to the witness.  I

7  allowed some of it, but clearly the witness -- we had

8  to take a break because the witness was crying; and I

9  asked for a courtesy from opposing counsel to move on,

10  because it is harassment, from my perspective.  But

11  plaintiffs' counsel insists on continuing to ask

12  questions about the witness's deceased father, and so

13  here we are calling the court for assistance.

14          MR. McKAY:  I have a little different take on

15  that, sir, if I may.

16          MR. HOGAN:  Sure.

17          MR. McKAY:  I have not noticed the witness

18  crying at all.  That wasn't the observation during the

19  break.  She has stated on two occasions in this

20  deposition -- the deposition has only been going about

21  half an hour, and she's already at least twice

22  responded to questions that she feels they are

23  irrelevant to the current proceeding and would prefer

24  not to answer.

25          I tried to tell her that that's really not



1  her judgment to make, but then Mr. Maye has jumped in

2  and declared that I'm harassing her.

3          This is a case involving intentional tort,

4  some of which were inflicted on a 12-year-old boy.

5  This witness happens to have children of similar age,

6  she's also a schoolteacher on a part-time basis, and I

7  was getting into her employment and her family

8  background, which I think is highly relevant, because

9  we need to figure out why certain decisions were made

10  that ended up impacting my clients.  And suddenly

11  Mr. Maye has just arbitrarily declared that I'm

12  harassing her.

13          MR. HOGAN:  Okay.  If I can speak again to

14  Mr. Maye.

15          MR. MAYE:  Yes.  This is --

16          MR. HOGAN:  Why -- what's the gist of the

17  reasoning why this needs to be resolved on an emergency

18  basis instead of during a deposition (unintelligible)

19  and it not being resolved another way?

20          MR. MAYE:  Plaintiffs' counsel insisted on

21  calling the court.

22          MR. McKAY:  Well, that was after he said that

23  she's not going to answer any more questions.

24          MR. MAYE:  Yes, that's right.  I said that

25  inquiring about the relationship between the witness



 1  and her divorced husband, to inquire about her deceased

 2  father, and which is clearly causing the witness to be

 3  upset, is harassment.  And I allowed it to go on for

 4  several minutes, even though it was clear it was making

 5  the witness very uncomfortable.

 6           The witness had to at some point abruptly

 7  stop the deposition, exit the room because she was

 8  crying.  So I believe it's harassment and it's really

 9  inexplicable, so -- but it's plaintiffs' counsel who

10  asked to call the court.

11           MR. HOGAN:  Okay.  I'm going to have to put

12  you on another brief hold.

13           MR. MAYE:  Okay.

14           MR. McKAY:  Thank you.

15               (Pause in proceedings.)

16           MR. HOGAN:  Sorry.  Just to confirm,

17  plaintiffs' counsel, you're Mr. McKay?

18           MR. McKAY:  Yes, John McKay.

19           And could I have your name, please.

20           MR. HOGAN:  Yeah.  My name is Jesse Hogan.

21           MR. McKAY:  Jesse Hogan?

22           MR. HOGAN:  Yeah.

23           MR. McKAY:  Thank you, sir.

24           MR. HOGAN:  Hold on one more second.

25               (Pause in proceedings.)



 1          THE COURT:  Good morning, Counsel.  This is
 2   Judge Koppe.
 3          MR. McKAY:  Good morning, Your Honor.
 4          MR. MAYE:  Hi, Judge.
 5          THE COURT:  All right.  All right.  What is
 6   the situation?
 7          MR. MAYE:  So, Your Honor, this is Brian
 8   Maye, counsel for Frontier Airlines.  Amanda Nickel is
 9   a fact witness, a flight attendant for Frontier
10   Airlines, and we are presenting her today for a
11   deposition, for a fact deposition; and plaintiffs'
12   counsel is inquiring into Ms. Nickel's background and
13   he's been getting into things such as the divorce
14   between her and her ex-husband, the nature of the
15   divorce, was there a protective order, who has sole --
16   who has custody of the kids, is it sole custody.
17          Then he moved on to ask questions about the
18   witness's father.  The witness's father passed away
19   about a year ago.  And at one point the witness became
20   upset, started crying, she had to exit the deposition.
21          And plaintiffs' counsel insists on continuing
22   to ask questions about the witness's deceased father,
23   and to me it's over the line and it's clearly causing
24   great distress for the witness and it's harassment,
25   from my perspective; and so I asked counsel to not



 1  persist with these questions, this line of questioning,

 2  but he insists to continue to ask questions about the

 3  witness's deceased father.

 4          MR. McKAY:  May I be heard, Your Honor?

 5          THE COURT:  Yes.

 6          MR. McKAY:  So I am plaintiffs' counsel, Your

 7  Honor.  I'm here in Las Vegas taking the depositions

 8  this week of the flight attendants of the flight

 9  involved in the case as well --

10          THE COURT:  Okay.  And I want to get your

11  name for the record.

12          MR. McKAY:  I'm very sorry.  John McKay,

13  M-c-K-a-y.

14          THE COURT:  Okay, Mr. McKay.

15          MR. McKAY:  So I arranged for counsel with

16  Frontier to have these depositions of the flight crew.

17  The -- we had the copilot yester- -- yesterday and a

18  flight attendant yesterday, and this is another of the

19  flight attendants.

20          Now, as Your Honor may know, this is a case

21  of intentional torts as well as a Section 1981

22  discrimination claim.  A lot of the events impacted a

23  12-year-old boy, who is one of my clients; and as I was

24  doing just basic background questions of this witness,

25  some interesting things occurred.



1          One was that she has on two occasions told me

2    that she's not going to answer a question because she

3    believes it's irrelevant to the subject matter of the

4    suit, and I politely told her that that's not her

5    decision to make and I've asked her to answer the

6    questions.

7          There -- the other thing that's happened is

8    that she has gotten extremely defensive about things

9    involving her -- her home life; and those things are

10   potentially relevant to this case because we have

11   questions about why certain decisions were made to take

12   Mr. DelVecchia's child away from him on the airplane.

13         And this lady has -- she's subpoenaed to be

14   here today; and she has two children of similar age,

15   she is divorced, and it sounds like it is a very

16   acrimonious situation.

17         MR. MAYE:  Oh.

18         MR. McKAY:  She -- she -- I did not observe

19   her crying when she talked about her father, but she

20   said that she was employed by her father prior to this

21   job, and there's -- there seems to be some issue there.

22   She's also a part-time schoolteacher.

23         I just want to inquire into the factual

24   background here, because there -- she is a participant

25   in a decision that was made to strip my -- my client's



1  child from him and to sequester him in the back of the

2  airplane; and I think that her home situation and her

3  background is extremely relevant to these facts.

4           I was --

5           THE COURT:  How is her deceased father

6  relevant?

7           MR. McKAY:  Well, I'm exploring that, Your

8  Honor.  She said that she worked for her father as a

9  process server, and -- and then, really, I didn't ask

10 many more questions than that; but she -- I asked if

11 her father was her immediate supervisor, and she told

12 me that she wouldn't answer the question, and then she

13 asked for a break and left the room.

14          Then Mr. Maye started telling me that I was

15 harassing her.  That's basically all I've asked, is

16 whether her father was her immediate supervisor and why

17 she left the job.

18          MR. MAYE:  Your Honor, if I may.  She did

19 answer that question; and the questions to which she

20 said she didn't want to answer were the fifth, sixth,

21 seventh questions about the divorce, the nature of the

22 divorce, going down that -- that line of questioning,

23 which makes no sense, clearly making her upset.  And

24 counsel still wants to ask questions about her deceased

25 father.  It's harassment, Your Honor.



```
 1              MR. McKAY:  Your Honor, I don't see her being
 2   so much upset as angry and unwilling to participate in
 3   the deposition.  And then Mr. Maye chimed in telling
 4   me, just prior to this call to Your Honor, that she was
 5   not going to answer any more questions on anything
 6   having to do with her personal life.
 7              MR. MAYE:  No, about her deceased father.
 8              THE COURT:  All right.  Mr. McKay, this
 9   witness is here for -- as a fact witness, as an
10   observer of the situation and potentially, I assume,
11   as -- I believe you said as someone who made decisions
12   on that day.
13              MR. McKAY:  If I may, Your Honor, she --
14   she --
15              THE COURT:  Well, let me just finish.
16              MR. McKAY:  Okay.
17              THE COURT:  You've already delved into her
18   divorce, which the court doesn't know how much that is
19   relevant.  Yes, she may have kids essentially the same
20   age, but I'm not sure how relevant her divorce is to
21   any of this.  And if it is as you describe it, an
22   acrimonious relationship, it may be harassing to ask
23   questions about that, once you ask several, which it
24   sounds like you have.
25              MR. McKAY:  No, Your Honor.  If I may
```



1  respond.  A couple of procedural things.  First of all,

2  there is a motion to amend pending right now that would

3  add her as a party.  She was originally named as a Doe.

4  The amended complaint would name her by name as a

5  party.

6           She testified at the beginning here that one

7  of the things she made a point of reviewing, not only

8  on the flight but also prior to the deposition, was a

9  sexual harassment policy, because it appears she

10  believes that my client was sexually molesting his

11  child.

12           Now, if she has a history -- if this

13  acrimonious divorce has something to do with

14  allegations of child molesting, I think that's highly

15  relevant.  I hadn't gotten there yet because I was

16  shut down on any questions having to do with the

17  divorce.

18           But if this particular person who's about to

19  be a defendant in the case, I hope, is someone who has

20  a particular chip on her shoulder about sexual issues

21  with parents, then I think that is highly relevant to

22  the issues in the case.

23           MR. MAYE:  Your Honor, if you need me to

24  respond, I can.

25           THE COURT:  All right.  Go ahead, Mr. Maye.



1          MR. MAYE:  A couple of things.  This witness
2   did not observe any sexual touching during the flight.
3   This witness did not make any decisions about
4   separating the child from the parent, who was observed
5   by two other flight attendants inappropriately touching
6   the child.

7          MR. McKAY:  That's a subject --

8          MR. MAYE:  And I have no idea why getting
9   into the witness's divorce and deceased father have
10  anything to do with anything, other than to make this
11  witness uncomfortable and upset.

12         MR. McKAY:  Your Honor, if I may, there's
13  some significant questions about these allegations of
14  sexual molestation.  One of them was that one or two
15  flight attendants saw Mr. DelVecchia touching the face
16  of his 12-year-old son before the two of them went to
17  sleep.  And how that becomes sexual molestation is -- I
18  have no idea.  And then another --

19         THE COURT:  But not this witness.

20         MR. McKAY:  Well, that is what I'm trying to
21  find out eventually in this deposition, because while
22  she claims to have had no involvement in the decisions,
23  her statement to the police suggests otherwise, and
24  some testimony yesterday suggests otherwise.

25         THE COURT:  Well, you can clearly ask her



1  questions, Mr. McKay, about what she observed that day

2  and what decisions she made in her professional

3  capacity; but the court finds the questions about her

4  personal life are harassing, so the court sustains the

5  objection.

6          MR. MAYE:  Thank you for your time, Your

7  Honor.

8          MR. McKAY:  Thank you, Your Honor.

9          THE COURT:  Thank you.

10          (Conclusion of telephonic conference.)

11          MR. McKAY:  Are we still on the record?

12          THE VIDEOGRAPHER:  Yes.

13          (Exhibits 1 and 2 marked.)

14      Q.   (By Mr. McKay)  Ms. Nickel, I'm showing you

15  what's been marked as Deposition Exhibit 1, and I'll

16  represent to you that this was produced by your counsel

17  to me.

18          MR. MAYE:  John, do you have a copy?

19          MR. McKAY:  I do indeed.

20          MR. MAYE:  Thank you.

21      Q.   (By Mr. McKay)  And it is a summary of your

22  training at Frontier Airlines.

23          Would you review that, please, and let me

24  know if you dispute that description.

25          MR. MAYE:  I'm sorry.  Was this marked as



 1  Exhibit 1?

 2          MR. McKAY:  It was marked as Exhibit 1.

 3      A.   We weren't given a schedule like this, so I

 4  wouldn't be able to say accurately or not if this was

 5  how they went through the training or not.  I don't

 6  remember.

 7      Q.   (By Mr. McKay)  Okay.  Well, let me just ask

 8  you this:  Do you see the column that's marked

 9  Description?

10      A.   Correct.

11      Q.   Okay.  And can you read all of -- I mean, I'm

12  not asking you to read them, but have you read all of

13  the items under that column?

14      A.   Yes.

15      Q.   And are those topics of training that you

16  received from Frontier during your employment at

17  Frontier?

18      A.   Correct.

19      Q.   Is that a complete list of the training that

20  you've received from Frontier?

21      A.   Like I said, we trained off our flight

22  attendant manual, and it's broken up differently than

23  this.

24      Q.   All right.  Well, is there anything that

25  you've received training on that is not mentioned on



 1 | Exhibit 1?

 2 |      A.   Yes.  We received must-reads all the time,

 3 | which are part of our training.

 4 |      Q.   Okay.  And what are those must-reads about?

 5 |      A.   Various topics:  security, flight management.

 6 | We get several a week, so I can't list all the topics

 7 | of them.

 8 |      Q.   Okay.  So you would say that must-reads

 9 | should be included on this list?

10 |           MR. MAYE:  Object to form.

11 |      Q.   (By Mr. McKay)  Let me ask it a different

12 | way.  You're saying that if this is a list of training

13 | that you've received, the -- the total amount of

14 | training you've received should also include the

15 | must-reads that you receive?

16 |      A.   Correct.

17 |      Q.   And when you receive a must-read, from my

18 | understanding there is a thing at the bottom that you

19 | have to somehow indicate that you've read it.  Is that

20 | right?

21 |      A.   Correct.

22 |      Q.   And what did you do -- is it a box where you

23 | put your initials or a check mark or what?

24 |      A.   It's a numeric code that we have to then

25 | enter into the system that certifies that we have read



1  and understood what they have sent us.

2       Q.   Okay.  And how do you know what the code is?

3       A.   It is at the bottom of the must-read.

4       Q.   I see.  So if you hadn't read to the bottom,

5  you wouldn't know what the code was?

6       A.   Correct.

7       Q.   Okay.  And so it's different for every

8  must-read?

9       A.   Correct.

10      Q.   Okay.  By the way, what is your employee

11 number?

12      A.   428248.

13      Q.   Thank you.  So if we were to request all the

14 must-reads that you had acknowledged reading, which we

15 will do, then will those plus this list, Exhibit 1,

16 indicate all of the training that you've received from

17 Frontier?

18      A.   Correct.

19      Q.   Okay.  And as you sit here now, do you

20 believe that there is a must-read that is on the

21 subject of prevention of discrimination with respect to

22 customers or passengers?

23      A.   To be honest, I don't know if there's a

24 specific one.

25      Q.   Okay.  But you did mention there was one on



 1 | sexual misconduct?

 2 |      A.   Correct.

 3 |      Q.   Okay.  And I think I have a copy of that.

 4 | Let's -- it was marked as Exhibit 5 yesterday to the

 5 | Bond deposition.  So instead of marking it again, I'll

 6 | just show you.

 7 |           MR. McKAY:  Yeah, they didn't provide you

 8 | with the -- yesterday's exhibits.  Okay.

 9 |           MR. MAYE:  I can give her --

10 |           MR. McKAY:  Do you have a copy?  Okay.  Thank

11 | you.

12 |      Q.   (By Mr. McKay)  Would you take a look at Bond

13 | Exhibit 5, please, and see if that is the must-read

14 | that you were referring to in your testimony about

15 | sexual misconduct.

16 |      A.   It is.

17 |      Q.   Okay.  And did you receive that on or about

18 | March 15 of this year?

19 |      A.   Correct.

20 |      Q.   And did you at the end put in a code to

21 | indicate that you had read and understood it?

22 |      A.   Yes.

23 |      Q.   Okay.  Is it your testimony that you believe

24 | that this must-read is applicable to the situation that

25 | you encountered on Flight 2067 on March 28 of this



 1  year?

 2          MR. MAYE:  Object to form.

 3          You can answer.

 4      A.   Yes.

 5      Q.   (By Mr. McKay)  Yes, you do believe?

 6      A.   Yes.

 7      Q.   Okay.  And in what way?

 8      A.   Because of the observations that were made by

 9  all of the crew and the captain's decision to separate

10  them.

11      Q.   Okay.  Did -- did anybody, to your knowledge,

12  including you, advise A.D. with the language indicated

13  in paragraph numbered one?

14      A.   I did not, but Scott did.

15      Q.   So it's your testimony under oath here today

16  that Mr. Warren said to A.D., quote, For your safety,

17  we are removing you from the situation.  The pilot will

18  be notified and law enforcement will meet the aircraft

19  upon arrival at the gate, end quote?

20      A.   I don't know if he used those exact words.

21      Q.   Did -- were you listening when he addressed

22  A.D.?

23      A.   No.

24      Q.   So you wouldn't know whether he said that or

25  not, would you?



1       A.   He told me afterwards he told the kid why he
2   was being moved.
3       Q.   All right.  What did he say to you?
4       A.   I don't remember the exact words.
5       Q.   Well, what do you remember him saying to you?
6       A.   That we're removing you from the situation
7   because we believe it was a safety issue.
8       Q.   A safety issue?
9       A.   Correct.  The safety of him.
10      Q.   The safety of him?
11      A.   Correct.
12      Q.   The child?
13      A.   Yes.
14      Q.   Okay.  And did you agree with that statement
15  by Mr. Warren?
16           MR. MAYE:  Object to form.
17      A.   I mean, I agreed with what was happening; and
18  like I said, I don't know the exact words that were
19  said.
20      Q.   (By Mr. McKay)  Okay.  So he might have told
21  A.D. what he believed Peter had done?
22           MR. MAYE:  Object to form.
23      A.   I don't know the words that were used.
24      Q.   (By Mr. McKay)  Okay.  Do you know -- did you
25  observe him using any gestures with A.D.?



```
 1        A.    No.

 2        Q.    Did you observe him placing his hand near

 3   A.D.'s crotch?

 4        A.    Scott or the -- or the plaintiff?

 5        Q.    Scott.

 6        A.    No, he did not.  He was not near the -- or

 7   the victim.

 8        Q.    The victim.  You mean A.D.?

 9        A.    Correct.

10        Q.    Okay.  Why did you call him a victim?

11        A.    Because we -- that's what I believe he was.

12        Q.    Okay.  When did you form that belief?

13        A.    After we had all of our observations on

14   what -- on the situation at hand.

15        Q.    Okay.  So it was based on other people's

16   observations?

17        A.    And my own.

18        Q.    Okay.  What was your own observation?

19        A.    From the beginning of the flight, when he was

20   being moved, Anna came back and spoke to us and let us

21   know why he was being moved.  We believed -- I believed

22   it was a language issue, because he did not look under

23   15.

24        Q.    Let me stop you for a second, because you

25   said "when he was being moved"; and, of course we know
```



1  he was moved when he was separated from his father.

2  Are you referring to earlier, when he was moved out of

3  the exit row?

4      A.   Correct.

5      Q.   Okay.  I just want to be clear on that.  I'm

6  not criticizing you.  I'm just making sure that the

7  record is clear.

8           So when the aircraft was still on the ground,

9  he was -- he and his father were both asked to change

10 their seats from the exit row to another row, correct?

11     A.   Correct.

12     Q.   Okay.  And that was done by Anna Bond?

13     A.   Correct.

14     Q.   Okay.  Do you know Anna Bond?

15     A.   Just from the one flight I worked with her.

16     Q.   Is that the only flight you've ever worked

17 with her?

18     A.   I believe so.

19     Q.   Okay.  Have you ever spoken with her other

20 than on that flight?

21     A.   No.

22     Q.   Okay.  Did you speak with her two days ago at

23 the prep session?

24     A.   Not directly, no.

25     Q.   Okay.  Now -- so you thought there was a



1  language issue?

2         And first of all, let -- let me just ask it.

3  A language issue would be a reason to move somebody

4  from the exit row?

5     A.   Correct.

6     Q.   Okay.  Had you seen A.D. sitting in the exit

7  row prior to the point where Anna moved he and his

8  father?

9     A.   I observed them boarding the plane and taking

10  their seats while I was in the back of the plane.

11     Q.   Okay.  So what observations did you make at

12  that time?

13     A.   I did not focus on them at all, to be honest.

14  We have 186 passengers boarding the plane.

15     Q.   Okay.  But you saw a middle-aged white man

16  with a black child sitting in row 13?

17     A.   I observed a father and a son taking their

18  seats.

19     Q.   Well, now, did you observe what color their

20  skins were?

21     A.   I may have, but people come on, I quickly

22  observe them and then move on to the next passenger.

23     Q.   Okay.  But you -- did you at that time say to

24  yourself he shouldn't be sitting in the exit row

25  because he's -- he looks under 15?



1      A.    No.

2      Q.    Okay.  Did you make any -- did you have any

3  thoughts with respect to his age at that point?

4      A.    No.

5      Q.    Okay.  So when was the next time that you saw

6  A.D. and his father?

7      A.    When they were standing up to move to their

8  reassigned seats.

9      Q.    Okay.  Now, did you know that they were

10  father and son?

11      A.    I assumed they were.

12      Q.    Okay.  Why did you assume that?

13      A.    A child traveling with an adult is almost --

14  they're always traveling with mostly a parent.

15      Q.    Okay.  So you looked at these two and said

16  this is a father and son traveling together?

17      A.    Yes.

18      Q.    Okay.  Now, when they were being moved, what

19  did you observe?

20      A.    When they were walking back to their seats, I

21  made an observation to Scott that it must be a language

22  issue.

23      Q.    Okay.  Did you say --

24      A.    Yes.

25      Q.    -- that?  Okay.  And most of your passengers,



1   I would assume, speak English.  Right?

2        A.   I wouldn't assume that.  I don't speak to all

3   of them.

4        Q.   All right.  Is -- would you say that English

5   is the prevailing language of your passengers?

6             MR. MAYE:  Object to form.

7        A.   Not necessarily.

8        Q.   (By Mr. McKay)  Okay.  Did you think that

9   A.D. spoke Spanish?

10       A.   I didn't assume what language he spoke.

11       Q.   Okay.  But you thought he was a foreigner?

12            MR. MAYE:  Object to form.

13       A.   I thought it was a language issue.

14       Q.   (By Mr. McKay)  Okay.  And typically

15  non-English speakers would be people from other

16  countries?

17            MR. MAYE:  Object to form.

18       A.   Not necessarily.

19       Q.   (By Mr. McKay)  I see.  Okay.  Did you have

20  an opinion as to what language A.D. spoke?

21            MR. MAYE:  Object to form.

22       A.   No.

23       Q.   (By Mr. McKay)  Did you believe that A.D. was

24  African?

25            MR. MAYE:  Object to form.



AMANDA L. NICKEL                                  December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                              46

```
 1        A.    I don't know.  I did not assume.

 2        Q.    (By Mr. McKay)  Did you believe that was a

 3   possibility?

 4              MR. MAYE:  Object to form.

 5        A.    It didn't cross my mind where he was from or

 6   what back -- background -- ethnic background he had.

 7        Q.    (By Mr. McKay)  Okay.  But you believed that

 8   it was a different ethnic background from an English

 9   speaker?

10              MR. MAYE:  Object to form.

11        A.    Not necessarily.

12        Q.    (By Mr. McKay)  But you looked at him as he

13   was being moved and you said to Scott, "It must be a

14   language issue"?

15        A.    There are three reasons we move passengers

16   from the exit row:  if there's a physical ability, age,

17   or if they're non-English speaking.

18        Q.    Okay.

19        A.    I did not notice a physical ability; and to

20   my observation, he looked old enough, from where I was

21   standing.

22        Q.    So you're saying that by the process of

23   elimination, you concluded that it was a language

24   issue?

25        A.    Correct.
```



1      Q.    I see.   What was he wearing?

2      A.    I don't remember.

3      Q.    Okay.   Let me show you what's been marked as

4  Deposition Exhibit 2.

5            You can move those others if they're in your

6  way.

7            Actually, before we get to that, have you

8  seen other instances where one or more passengers had

9  to be moved from the exit row?

10     A.    Correct.

11     Q.    Correct means yes?

12     A.    Yes.

13     Q.    Okay.   First of all, is this the same model

14 aircraft that you typically are on when you're working?

15     A.    There's -- we have three aircrafts --

16     Q.    Okay.

17     A.    -- that we use.

18     Q.    What are they?

19           MR. McKAY:   Is that okay, Mr. Maye, if I ask

20 that?

21     A.    Airbus 321, an Airbus 320, and an Airbus 319.

22     Q.    (By Mr. McKay)   Okay.   And what was this one?

23     A.    It would have been an Airbus 320 because

24 there was four flight attendants.

25     Q.    Okay.   And on an Airbus A320, what are the



1   exit rows?

2        A.   12 and 13.

3        Q.   Okay.  And which row were Peter and A.D.

4   seated in?

5        A.   Row 13.

6        Q.   Okay.  Now, in other instances where you have

7   seen people move from the exit row, what have been the

8   reasons for that?

9        A.   Any number of reasons.  Like I said, if it's

10  a physical ability, age or language.

11       Q.   Is it a pretty common occurrence?

12       A.   Correct.

13       Q.   That means yes?

14       A.   Yes.

15       Q.   Okay.  So do you typically make an

16  observation like you did with Peter and A.D., that, you

17  know, it must be disability, it must be language, it

18  must be age, that sort of thing?

19       A.   If I notice passengers being moved.

20       Q.   You do that?

21       A.   Correct.

22       Q.   Okay.  And what sort of observations have you

23  made in the past?

24            MR. MAYE:  Object to form.

25       A.   I personally move passengers if I notice that



1  they have a physical impairment, if they cannot speak

2  English back to me or understand what I'm saying, or if

3  it's an age reason.

4      Q.   (By Mr. McKay)  Okay.  I understand that, but

5  this was specifically asking about you making an

6  observation to another flight attendant upon seeing

7  somebody being moved.  Have you done that before this

8  Flight 2067?

9          MR. MAYE:  Object to form.

10     A.   I may have.  It doesn't necessarily mean I

11 speak it to someone else.

12     Q.   (By Mr. McKay)  I'm asking about times that

13 you have.

14     A.   I can't recall any.

15     Q.   Okay.  So looking at Deposition Exhibit 2, do

16 you recognize that?

17     A.   Yes.

18     Q.   And what is that?

19     A.   My statement to the police and FBI.

20     Q.   All right.  Did you know it was also being

21 made to the FBI at the time you made it?

22     A.   Yes.

23     Q.   Okay.  How did you know that?

24     A.   Because they identified themselves as FBI.

25     Q.   "They" being who?



1        A.    The officer.

2        Q.    One person or two?

3        A.    I don't remember how many were on the plane,

4    but one of them identified himself as FBI, and his

5    shirt said FBI -- or jacket, whatever he had on.  I

6    can't recall.

7        Q.    Okay.  Can you describe the person?

8        A.    I know it was a Caucasian male, probably in

9    his forties.

10       Q.    Okay.  Was there anybody else present?

11       A.    There was a police -- at least one other

12   police officer, all of the crew, the captain, the first

13   officer.  We were all in the front of the plane.

14       Q.    Were there any passengers present?

15       A.    No.

16       Q.    When you say another police officer, do you

17   mean a Las Vegas police officer?

18       A.    Correct.

19       Q.    Okay.  Male or female?

20       A.    Male.  I believe he was African-American,

21   from what I recall.

22       Q.    Okay.  All right.  Because he was black?

23             MR. MAYE:  Object to form.

24       A.    He was African-American.

25       Q.    (By Mr. McKay)  Right.  So is Dave Matthews.



AMANDA L. NICKEL                                    December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                              51

1              Is -- are you saying because he was black?

2        A.    Yes.

3        Q.    Okay.  So there is at the top of your

4   statement a section that has two very thick black lines

5   and says "This portion to be completed by officer."  Do

6   you see that?

7        A.    Correct.

8        Q.    Okay.  Is it fair to assume that the writing

9   inside that block was made by somebody other than you?

10       A.    Yes.

11       Q.    Okay.  Now, down at the bottom, there is a

12  statement above the empty boxes that says "I have read

13  this statement and I affirm to the truth and accuracy

14  of the facts contained herein.  This statement was

15  completed at 5757 Wayne Newton Boulevard on the 28th

16  day of March at 10:10 p.m.," and it says 2012, which is

17  a mistake.  But do you see that language?

18       A.    Correct.

19       Q.    Okay.  Did you write the address and date on

20  those lines?

21       A.    Yes.

22       Q.    Okay.  And there's a couple of blank boxes.

23  If those boxes were removed, would one of them show

24  your signature?  In other words, did you sign this

25  document?



 1        A.    I -- yes.

 2        Q.    Okay.  All right.  So let's look at the

 3   information that you wrote on this statement form.  And

 4   first of all, it says "I was working flight number 2067

 5   RDU-LAS 3-28-19."

 6              And I'll just stop there.  That was the

 7   Frontier flight 2067 from Raleigh-Durham to Las Vegas

 8   on the 28th of March, 19 -- 2019; is that right?

 9        A.    Correct.

10        Q.    Okay.  And it says "when I noticed two

11   passengers being moved from the exit row to another row

12   due to one passenger being a minor."  Right?

13        A.    Yes.

14        Q.    Okay.  "They were originally seated in 13D

15   and 13E and moved to 17E and F."  And is that correct?

16        A.    Yes.

17        Q.    "I assumed by the look of the younger

18   passenger that he had been moved due to a language

19   barrier, but" -- and then it says "FA."  Does that mean

20   flight attendant?

21        A.    Yes.

22        Q.    And then there's a box where there's been a

23   redaction.  Would that have been somebody's name?

24        A.    Yes.

25        Q.    And whose name would that have been?



```
 1        A.    Flight attendant Anna.

 2        Q.    Okay.  "Said it was due to age.  Passenger

 3   stated he was only" -- and then I assume the redaction

 4   would read "12"?

 5        A.    Yes.

 6        Q.    Okay.  So you say "by the look of the younger

 7   passenger."  And just explain what you meant by that,

 8   please.

 9        A.    I meant that he did not look 12.

10        Q.    Okay.

11        A.    From my view.

12        Q.    Okay.  And then your next sentence says "The

13   passenger did not look" -- and I assume that was "12"

14   in the box -- "and the two passengers together gave me

15   uneasy feeling so I kept an eye on them."

16              Do you see that?

17        A.    Yes.

18        Q.    And you wrote that, right?

19        A.    Yes.

20        Q.    Okay.  So at ten minutes after 10 p.m. on the

21   night of the flight, you have written that you had an

22   uneasy feeling because of the two passengers together.

23   What did you mean there?

24        A.    One, I meant that he did not look the age

25   that he stated; and two, when Anna came back to let us
```



AMANDA L. NICKEL                                December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                            54

1  know why they were moved, she also told me that she

2  thought it was a little strange the way the child did

3  not answer until he had looked at his father and then

4  answered the question about his age.

5       Q.   And when's the last time you talked with Anna

6  Bond?

7            MR. MAYE:  Object to form.

8       A.   She was at the prep meeting, but I didn't

9  speak to her directly.

10      Q.   (By Mr. McKay)  Okay.  Did you hear her say

11  something to that effect at the prep meeting?

12           MR. MAYE:  Object to form.  Also

13  attorney-client privilege.  We're not getting into the

14  substance of that meeting.

15           Don't answer it.

16           THE WITNESS:  Okay.

17      Q.   (By Mr. McKay)  Are you testifying that on

18  the flight, when Anna Bond came back to you and Scott

19  Warren, she said those exact words that you just

20  testified?

21      A.   Yes.

22      Q.   Okay.  And what observation or conclusion did

23  you reach, if any, at that point upon hearing that from

24  Anna Bond?

25      A.   I didn't reach a conclusion.



AMANDA L. NICKEL                                    December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                              55

1        Q.   Okay.

2        A.   Those are the observations I made.

3        Q.   All right.  But you told the police and the

4   FBI that you had an uneasy feeling?

5        A.   It just seemed strange with those two

6   observations together, what Anna made and the one I

7   made about him not looking 12.

8        Q.   Okay.  And tell me why he didn't look 12.

9        A.   He looked older than 12.  I have

10  experience -- like I said, I see many children when I'm

11  teaching.  I at the time had a 12-year-old myself, and

12  he looked older than 12.

13       Q.   Okay.  How old was your child at the time?

14       A.   12.

15       Q.   Okay.  So is your child taller, shorter

16  than -- than A.D.?

17            MR. MAYE:  Object to form.

18       A.   I don't recall how tall he was.

19       Q.   (By Mr. McKay)  Okay.  So I'm trying to find

20  out what was it about A.D. that made you think this

21  child does not look 12.

22       A.   From where I was standing in the back of the

23  plane, it was a glance that he did not -- observation

24  made that he did not look 12.  He looked older.

25       Q.   Okay.  And I am asking you specifically what



1  was it about him that made him look older than 12.

2          MR. MAYE:  Object to form.

3      A.   I don't remember the specific features of him

4  at the time.

5      Q.   (By Mr. McKay)  All right.  But how did you

6  reach the conclusion that he looked older than 12?

7          MR. MAYE:  Object to form.

8      A.   Like I said, I don't recall his specific

9  features.

10      Q.   (By Mr. McKay)  Again, if you don't recall

11  what he looked like, how did you reach the conclusion

12  that he didn't look 12?

13          MR. MAYE:  Object to form.

14      A.   He looked tall, from where I saw.

15      Q.   (By Mr. McKay)  Okay.  Taller than a

16  12-year-old?

17      A.   Correct.

18      Q.   That you know?

19      A.   Yes.

20      Q.   Taller than 12-year-old kids you teach?

21      A.   Correct.

22      Q.   Taller than your own 12-year-old child?

23      A.   Like I said, I believe so at the time.  I

24  have not seen this child in nine months.

25      Q.   I'm asking about at the time.



1    A.   And like I said, I don't remember everything
2  about him exactly.
3    Q.   All right.  But it seems like you're having
4  difficulty comparing him to the height of your own
5  child; and I'm just asking, is it possible that he was
6  the same height as your own 12-year-old child?
7    A.   Probably a little taller, if I --
8    Q.   Just a little taller?
9    A.   I don't know specifically how many inches
10  taller he was than other 12-year-old children I know.
11    Q.   Okay.  So in your recollection, you looked at
12  him and said, he looks a little bit taller than
13  12-year-olds that I typically see?
14    A.   Yes.
15    Q.   Okay.  And based on that, did you conclude
16  that he had been lying to Ms. Bond when he said he was
17  12?
18       MR. MAYE:  Object to form.
19    A.   At the time I made the observation, I hadn't
20  spoken to Anna.
21    Q.   (By Mr. McKay)  Okay.  When Anna then came
22  and said that he was 12, or he said he was 12, did you
23  feel that he had been untruthful?
24       MR. MAYE:  Object to form.
25    A.   I felt that he might -- that might not be his



1   age.

2       Q.   (By Mr. McKay)  Okay.  Did you take it upon

3   yourself to go ask him yourself?

4       A.   No.  That's not my job.

5       Q.   Did you take it upon yourself to ask his

6   father?

7       A.   That's not my job.

8       Q.   But you knew it was his father, right?

9       A.   I assumed it was, yes.

10      Q.   So wouldn't a father know his son's age?

11           MR. MAYE:  Object to form.

12      A.   It wasn't my job to question his age.  He was

13  already moved from the exit row.

14      Q.   (By Mr. McKay)  Well, are you testifying that

15  it was your job to flag somebody as a potential safety

16  risk?

17      A.   It is, yes.

18      Q.   Okay.  So then my question again, if it's

19  your job to flag somebody as a potential safety risk,

20  wouldn't it be your job to ask some questions about the

21  person?

22           MR. MAYE:  Object to form.

23      A.   Anna had already spoken to them and removed

24  them from the exit row due to age.

25      Q.   (By Mr. McKay)  Okay.



 1      A.   There was no reason for me at that point to

 2 go over and question them.

 3      Q.   Fair enough.  So Anna, who is a flight

 4 attendant just like you --

 5      A.   Uh-huh.

 6      Q.   You have to say yes or no.

 7      A.   Yes.

 8      Q.   -- had made a determination that flight

 9 attendants are allowed to make.  Right?

10      A.   I'm sorry.  Can you repeat the question or

11 statement?

12      Q.   Anna, who is a flight attendant like you, had

13 made a determination that flight attendants like you

14 are allowed to make.  Right?

15           MR. MAYE:  Object to form.

16      A.   Make what?

17      Q.   (By Mr. McKay)  Well, she had determined that

18 the child was 12 years old and had therefore, according

19 to procedures and regulations -- had moved the child

20 from row 13 to row 17, correct?

21      A.   Yes, after questioning the parent and the

22 child.

23      Q.   Good.  Okay.  So she had questioned the

24 parent and the child to her satisfaction and had

25 determined that the child was not of sufficient age to



1  sit in the exit row?

2       A.    Yes.

3       Q.    My question to you is, upon obtaining that

4  information, what makes you uneasy?

5       A.    Between Anna stating that the child would not

6  answer the question about his age until getting

7  permission from his father and the observation that I

8  made that he looked older than 12.

9       Q.    Did she say to you that the father gave him

10 permission to answer the question?

11      A.    She said that the child looked up to his

12 father before he would answer the question.  That's the

13 observation she made.

14      Q.    Right before he did answer the question,

15 right?

16      A.    Correct.  Yes.

17      Q.    Okay.  You teach children.

18      A.    Yes.

19      Q.    You have children.

20      A.    Yes.

21      Q.    Have you ever seen a child who is asked a

22 question by a stranger, adult, look to their parent

23 before answering the question?

24      A.    Not at that age, no.

25      Q.    Not in your life?  You've never seen such a



```
 1  thing?
 2          MR. MAYE:  Object to form.
 3      A.   I don't recall, but --
 4      Q.   (By Mr. McKay)  It could have happened?
 5          MR. MAYE:  Object to form.
 6      A.   I don't interact many with children and
 7  parents as a substitute teacher, but my own child would
 8  answer the question without looking to me.
 9      Q.   (By Mr. McKay)  So once again, this
10  particular African-American child is not acting like
11  your Caucasian child?  Right?
12          MR. MAYE:  Object to form.
13      A.   I don't see why the color of their skin has
14  to do with answering a question.
15      Q.   (By Mr. McKay)  Well, in this instance, an
16  African-American child looked to his Caucasian father
17  before answering Anna's question, according to Anna.
18      A.   Yes.
19      Q.   Right?  Okay.  And that's not something that
20  your Caucasian child would have done, right?
21          MR. MAYE:  Object to form.
22      A.   My 12-year-old child.
23      Q.   (By Mr. McKay)  Yes.
24      A.   Yes.
25      Q.   And I presume he's Caucasian?
```



1              MR. MAYE:  Object to form.

2       A.   Yes.

3       Q.   (By Mr. McKay)  Okay.  So you're uneasy

4  because the African-American child looked to his father

5  before answering Anna's question and because he was

6  somewhat taller than your 12-year-old?

7              MR. MAYE:  Object to form.

8       A.   Because he looked older than 12.

9       Q.   (By Mr. McKay)  Okay.  And so you told the

10  police that you were uneasy about Peter and A.D.  It

11  was both of them, right?

12      A.   A father and son, yes.

13      Q.   Okay.  Now, if you had to put your uneasiness

14  into some subject category, what would it have been?

15             MR. MAYE:  Object to form.

16      A.   I'm not sure I understand the question.

17      Q.   (By Mr. McKay)  Well, you were acting in a

18  professional capacity at the time that you felt uneasy,

19  right?

20      A.   Yes.

21      Q.   Okay.  Was your uneasiness tied to your

22  professional duties on the flight?

23      A.   Yes.

24      Q.   Okay.  So what of your professional duties

25  was this set of circumstances making you uneasy about?



1    A.   In my circumstances, we're supposed to make

2 observations; and if we feel off about something, or

3 uneasy, to continue observing them.

4    Q.   In your training, then, you've been told

5 this?

6    A.   Yes.

7    Q.   Okay.  So in your training, did anyone

8 indicate to you what might be a reason for keeping an

9 eye on somebody?

10    A.   No.  We're just supposed to be vigilant and

11 look out for anything that we feel is off or makes us

12 uneasy.

13    Q.   Well, in your own mind, why do you keep an

14 eye on passengers that make you uneasy?

15    A.   Because it's our job to ensure the safety of

16 the aircraft and the other passengers.

17    Q.   Okay.  And so did you feel that these

18 observations that you made of A.D. were potentially

19 leading to a safety-of-the-aircraft issue?

20    A.   I did not know at the time if those two alone

21 had to do with safety; but it was something that I kept

22 an eye out, like we're taught.

23    Q.   Did you think maybe that they could be

24 highjackers?

25         MR. MAYE:  Object to form.



1      A.    I'm not going to assume any specific threat.

2      Q.    (By Mr. McKay)  I'm not asking you about

3 anything you might do in the future.  I'm asking you

4 about what you did on the Flight 2067 on March 28th.

5      A.    I have no experience with highjackers, so I

6 don't know the behavior of a highjacker.

7      Q.    Okay.  So they potentially could have been

8 highjackers?

9           MR. MAYE:  Object to form.

10      A.    They could have been anything.

11      Q.    (By Mr. McKay)  They could have been

12 anything?  They could have been bombers?

13      A.    I don't have experience with bombers.

14      Q.    Terrorists?

15      A.    I don't have experience with terrorists

16 personally on an airplane.

17      Q.    So, again, your uneasiness, then, is just not

18 connected to any particular belief that these people

19 might be engaged in some criminal activity?

20      A.    Not from those observations, no.

21      Q.    Okay.  Did you at any time later feel that

22 they were?

23           MR. MAYE:  Object to form.

24      A.    Those two alone, no.

25      Q.    (By Mr. McKay)  Those two in conjunction with



 1  others?

 2          MR. MAYE:  Object to form.

 3      A.   Later on in the flight, there was other

 4  observations made by other people.

 5      Q.   (By Mr. McKay)  Okay.  Let's continue with

 6  your statement here.  So we've talked about your uneasy

 7  feeling; and then the next sentence is "Shortly after

 8  takeoff, during service, the" -- and there's a

 9  redaction there -- "was sleeping."

10          What was in the box that was redacted?

11      A.   I don't remember the exact word, but I was

12  referring to the father.

13      Q.   Okay.  So the father -- you observed the

14  father being asleep?

15      A.   At the time of service, yes.

16      Q.   Okay.  And was it your job to service that

17  row that they were seated in?

18      A.   Yes.

19      Q.   Okay.  Did you observe the son at that same

20  time?

21      A.   Yes.

22      Q.   Okay.  Did you observe what he was wearing?

23      A.   It was dark, so no.

24      Q.   Okay.  So other -- if it hadn't been dark,

25  you would have seen what he was wearing?  Is that what



 1  you're saying?

 2          MR. MAYE:  Object to form.

 3     A.    I would assume so, yes.

 4     Q.    (By Mr. McKay)  Okay.  And so the father was

 5  sleeping.  "So I asked" blank "if he would like" -- "if

 6  he wanted anything to eat or drink."

 7          That would have been the son?

 8     A.    Yes.

 9     Q.    Okay.  And do you know whether you said "the

10  son" in that box?

11     A.    Like I said, I don't recall the exact word

12  that was put there.

13     Q.    Okay.  "And he very anxiously shook his head

14  no without speaking."  That's what you wrote?

15     A.    Correct.  Yes.

16     Q.    Okay.  And how did you determine that it was

17  very anxiously?

18          MR. MAYE:  Object to form.

19     A.    His body movements, the fact that he wouldn't

20  speak to me.  He shook his head very quickly after

21  glancing over to the father, who was sleeping, and

22  refused to answer the question verbally.

23     Q.    (By Mr. McKay)  Well, you don't say anything

24  about him glancing over to his father here in the

25  statement.  Why not?



1          MR. MAYE:  Object to form.

2     A.   Because I did not put all of the specific

3  details in this statement.

4     Q.   (By Mr. McKay)  So you specifically have a

5  memory of him glancing at his father after you asked

6  the question?

7     A.   Yes.

8     Q.   Could it perhaps have been to see whether his

9  father wanted something to eat or drink?

10         MR. MAYE:  Object to form.

11    A.   It may have been, but he was sleeping.

12    Q.   (By Mr. McKay)  Could it perhaps have been to

13 see whether his father was awake to be able to pay for

14 the food and drink that you were selling?

15    A.   I can't speculate on that.

16    Q.   Because people have to pay for it, right?

17    A.   Except if they would like a glass of water.

18    Q.   Okay.  But you said anything to eat or drink.

19 So anything that he wanted to eat, he would have to

20 have paid for, right?

21    A.   Yes.

22    Q.   Okay.  And that's just a fact of life on

23 Frontier Airlines, isn't it?

24    A.   Yes.

25    Q.   Okay.  So in your experience, 12-year-old



1  children don't usually carry a lot of money, do they?

2          MR. MAYE:  Object to form.

3      A.   I don't know.

4      Q.   (By Mr. McKay)  You don't know whether

5  12-year-old children typically carry a lot of money?

6          MR. MAYE:  Object to form.

7      A.   I'm not an expert on all 12-year-old

8  children.

9      Q.   (By Mr. McKay)  You have a 12-year-old child.

10     A.   Correct.

11     Q.   Does he carry around a lot of money?

12     A.   He carries money, yes.

13         MR. MAYE:  Object to form.

14     Q.   (By Mr. McKay)  Okay.  But are you -- do all

15  of his friends also carry around a lot of money?

16     A.   I don't know.  I don't know his friends.

17     Q.   All right.  Would you agree with me that it

18  wouldn't have been unusual for a 12-year-old child to

19  look to their parent to pay for something if they

20  wanted to buy something to eat?

21         MR. MAYE:  Object to form.

22     A.   It -- like I said, it was the body movement

23  of very anxiously shaking his head no, like he didn't

24  want to speak to me anymore.

25     Q.   (By Mr. McKay)  Well, now you've already at



1  this point decided that there was something that made

2  you uneasy about him, right?

3       A.   Yes.

4       Q.   I mean, that's in your statement.

5       A.   Yes.  Correct.

6       Q.   So -- so then you go to him and you interpret

7  his actions as being further evidence to support your

8  uneasy feeling.  Would that be a fair statement?

9            MR. MAYE:  Object to form.

10      A.   I noticed his body movements, yes.

11      Q.   (By Mr. McKay)  Yeah.

12      A.   Yes.

13      Q.   And you put that in your statement --

14      A.   Yes.

15      Q.   -- as another thing that you felt was

16 relevant?

17      A.   Yes.

18      Q.   Okay.  And you felt it was relevant that he

19 didn't use a word to say that he didn't want to buy

20 anything?

21      A.   Correct.

22      Q.   Now, is this the first pass -- how long have

23 you been a flight attendant?  I'm sorry.

24      A.   A little over two years.

25      Q.   Okay.  How many flights do you think you've



1  worked on?

2      A.   In the hundreds, maybe thousand.  I'm not

3  sure on the number.

4      Q.   Okay.  And each flight has about how many

5  people?

6      A.   Roughly from 150 to 230, depending on the

7  plane.

8      Q.   Okay.  So you have encountered thousands of

9  passengers in your work?  Is that a fair statement?

10     A.   Yes.

11     Q.   And part of those encounters have been asking

12 them if they want anything -- if they want to buy

13 anything to eat or drink, right?

14     A.   Yes.

15     Q.   Okay.  And is your testimony here today that

16 every passenger of those thousands of passengers has

17 responded to you with a word?

18          MR. MAYE:  Object to form.

19     A.   I don't know the number.

20     Q.   (By Mr. McKay)  Well, I wasn't asking for a

21 specific number.  I'm sorry.  Are you testifying that

22 every single passenger that you have offered food or

23 drink to on a Frontier Airlines flight has responded to

24 you verbally?

25          MR. MAYE:  Object to form.



1      A.   I wouldn't remember every passenger.

2      Q.   (By Mr. McKay)  You know, I don't think

3  you're answering my question.  Are you saying that

4  every passenger that you have ever, in your function as

5  a flight attendant for Frontier Airlines, offered food

6  or drink too, that every passenger has responded to you

7  verbally as opposed to, for instance, shaking their

8  head no?

9           MR. MAYE:  Object to form.

10     A.   Awake or asleep?

11     Q.   (By Mr. McKay)  I'm going to assume that the

12 sleeping ones don't respond to you.

13     A.   I just want to be sure.

14     Q.   Thank you.  So let's talk about the awake

15 ones.

16     A.   I don't know if every passenger.  I don't

17 keep track.

18     Q.   Well, I think I'm going to have to ask this a

19 different way.  Okay?  Is that all right with you?

20     A.   Yes.

21     Q.   Okay.  Have you ever previously offered food

22 or drink to a passenger on a Frontier Airlines flight

23 and had that person respond to you with a shake of the

24 head or a wave of the hand, indicating that they don't

25 want to buy anything to eat or drink?  Has that ever



1  occurred to you?

2      A.   It may have.  I don't recall --

3      Q.   Is that a yes?

4      A.   -- exact -- I don't recall exact scenarios.

5      Q.   So it might have happened to you?

6      A.   Yes.

7      Q.   You're not going to say here under oath that

8  it would -- it's highly unusual for someone to say they

9  don't want something by shaking their head, indicating

10  no?

11         MR. MAYE:  Object to form.  She just said it

12  may have happened.

13      Q.   (By Mr. McKay)  That's a different question,

14  and you can certainly answer it.

15      A.   Can you repeat the question?

16         MR. McKAY:  Would you read it back.

17             (Page 72, Lines 7 through 10

18              read by the reporter.)

19         THE WITNESS:  Most passengers respond with a

20  verbal answer when I ask.

21      Q.   (By Mr. McKay)  Well, you know, I asked you

22  that a little while ago and you said you didn't

23  remember.

24      A.   You said "every passenger."

25      Q.   Okay.  So most passengers use a word?  Is



1  that what you mean by verbal?

2       A.   Yes.

3       Q.   Okay.  So they either say yes or they say no?

4       A.   Yes.

5       Q.   Okay.  Now, most is not all, is it?

6       A.   No.

7       Q.   Okay.  So if most use a word, then the rest

8  don't.  Correct?

9            MR. MAYE:  Object to form.

10      A.   Yes.

11      Q.   (By Mr. McKay)  Okay.  So it's not unusual,

12  then, for somebody to indicate they don't want

13  something without using a word?

14      A.   No.

15      Q.   And when somebody does that, you don't report

16  them to the captain, do you?

17           MR. MAYE:  Object to form.

18      A.   That wasn't the only observation made about

19  it.

20      Q.   (By Mr. McKay)  Different question.  When --

21      A.   I did not report that to the captain directly

22  after that incident.

23      Q.   What I'm asking you about -- you're jumping

24  ahead here.  What I'm asking you about is, when a

25  passenger indicates to you during service that they



1  would not like to buy something, and they don't use a

2  word, in those instances, which you've already admitted

3  occur -- in all of those instances, or even in some of

4  those instances, have you reported the person to the

5  captain?

6      A.   No.

7      Q.   Okay.  All right.  So the next sentence of

8  your statement is "I voiced my concerns to the other

9  FAs" --

10         That's flight attendants, right?

11     A.   Yes.

12     Q.   -- "at which point we decided to speak to the

13  captain and first officer about it."

14         So I just want to get some clarification on

15  that.  First of all, what concerns did you voice to the

16  other flight attendants?

17     A.   The observations about what Anna spoke to us

18  about the interaction at the beginning, the observation

19  about where I thought he looked older than 12, and the

20  observations I made during service.

21     Q.   And where in the aircraft did this occur?

22     A.   In the forward galley.

23     Q.   And were the other three flight attendants

24  present?

25     A.   I don't recall if Scott was present the



 1 │ entire time, but Chelsie and Anna were.

 2 │     Q.   And Scott was present for some of the time?

 3 │     A.   Yes.

 4 │     Q.   Now, was this during a setup for a break by

 5 │ the pilots?  Do you know what I mean by that?

 6 │     A.   Yes.

 7 │     Q.   Okay.

 8 │     A.   It was before the captain's called for a

 9 │ break.

10 │     Q.   Okay.  So at this point -- thank you.  At

11 │ this point that you're speaking with the other flight

12 │ attendants about your concerns, nobody has spoken with

13 │ the cockpit about them taking a break?

14 │     A.   No.

15 │     Q.   Is that a correct statement?

16 │     A.   Yes, we hadn't spoken to the captain.

17 │     Q.   Got it.  Thank you.  And it's -- you say, "at

18 │ which point we decided to speak to the captain and

19 │ first officer about it."  And what do you mean by "it"?

20 │     A.   About the observations I made and about the

21 │ observation that Chelsie then made before we spoke to

22 │ the captain.

23 │     Q.   Okay.  Had you previously to this engaged in

24 │ a similar discussion about a passenger?

25 │     A.   I don't understand the question.



 1      Q.   Prior to this meeting in the forward
 2 galley --
 3      A.   Uh-huh, yes.
 4      Q.   -- had you had a similar meeting on another
 5 flight about another passenger?
 6      A.   No.
 7      Q.   Never?  So this was a first?
 8      A.   I'm confused.  I'm not understanding your
 9 question.
10      Q.   Okay.  Think in your mind about the time that
11 you're in the forward galley and you're speaking with
12 the other flight attendants, like you stated in your
13 report to the police.
14      A.   Yes.
15      Q.   Okay.  And it's before you called or somebody
16 has called the cockpit.  So it's just four flight
17 attendants standing in the forward galley talking about
18 observations about a passenger and making a decision to
19 call the captain.
20      A.   Yes, I have.
21      Q.   Okay.  You have done this before?
22      A.   Yes.
23      Q.   All right.  Tell me the circumstances.
24      A.   There's numerous ones.
25      Q.   That's okay.  I've got all morning.



1        A.   I don't recall all of them, but in the

2   general nature, if we view a passenger may be

3   intoxicated, if there's a medical issue.

4        Q.   Rather than summarize, tell me the ones you

5   remember.

6        A.   I've had several intoxicated passengers that

7   I've spoken to other flight attendants about.

8        Q.   Okay.  Which ones can you remember?

9        A.   They're usually all pretty much the same.  If

10  we notice it and the other flight attendants agree,

11  there's a decision made not to serve them anymore and

12  for us to alert the captain about a possible issue.

13       Q.   Okay.  And by "intoxicated," you mean drunk?

14       A.   Correct, or it could be using other drugs.

15       Q.   Okay.

16       A.   I'm not -- I don't have the experience to

17  gauge whether it's alcohol or other things.

18       Q.   All right.  But if you see, like, miniature

19  bottles that you've sold to them in front of them, you

20  would assume it's alcohol?

21       A.   Yes.

22       Q.   Okay.  And on this flight to Las Vegas, quite

23  a few people that drink alcohol, aren't there?

24            MR. MAYE:  Object to form.

25       A.   I wouldn't know all -- what everyone ordered.



AMANDA L. NICKEL                                    December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                                 78

1   I'm only in charge of a certain part of the plane.

2       Q.    (By Mr. McKay)  Okay.  What part of the plane

3   were you in charge of for Flight 2067?

4       A.    The aft.  The aft of the plane.

5       Q.    All right.  And where does the aft begin?

6       A.    There's -- it could be 13 or 14.  It just

7   depends on the crew that you're with --

8       Q.    All right.

9       A.    -- how we divide it up.

10      Q.    But roughly the dividing point is around the

11  wings?

12      A.    Correct.

13      Q.    Okay.  And the wings are also where the

14  emergency exits are, right?

15      A.    Correct.

16      Q.    Okay.  So from the dividing point back to the

17  rear galley on Flight 2067 on March 28, there were

18  several people who were intoxicated, weren't there?

19          MR. MAYE:  Object to form.

20      A.    I wouldn't remember who was drinking and who

21  wasn't.

22      Q.    (By Mr. McKay)  Why wouldn't you remember?

23      A.    I don't remember every passenger on every

24  flight, if they order alcohol or not.

25      Q.    You remember Peter and A.D. because they just



1  sat down in their seats and were moved to other seats,

2  didn't you?

3          MR. MAYE:  Object to form.

4      A.   I remember this flight because of that -- all

5  of this.

6      Q.   (By Mr. McKay)  Yeah.  But you don't remember

7  any intoxicated passengers?

8          MR. MAYE:  Object to form.  Asked and

9  answered.

10     A.   None that come to mind that we had to speak

11 to the captain about.

12     Q.   (By Mr. McKay)  And when does it become the

13 issue that you have to speak to the captain about it?

14     A.   If it becomes -- looks like it's going to

15 become a safety issue.

16     Q.   And that's something that you-all talk about?

17     A.   Yes.

18     Q.   "You" being the flight attendants?

19     A.   Yes.

20     Q.   All right.  And how do you know when

21 somebody's about to become a safety issue?

22     A.   It can be something physical that we observe

23 or verbal or the way that they're acting.  If it looks

24 like it's going to become a possible safety issue, we

25 notify the captain.



1      Q.   And what in your understanding is a safety

2  issue?  I mean, when does it become a safety issue?

3  What happens when it becomes a safety issue?

4      A.   If they're not following instructions that

5  are given based on safety, if they're harassing other

6  passengers and, you know -- on their safety.

7      Q.   Okay.  Now, you observed Peter and A.D.

8  taking seats in row 13, right?

9      A.   Yes.

10     Q.   And when it was determined that A.D. was 12

11  years old, that was a safety issue, correct?

12     A.   Yes.

13     Q.   And so Peter and A.D. were given an

14  instruction by Anna Bond to move to another row, right?

15     A.   Yes.

16     Q.   And they complied with that instruction,

17  right?

18     A.   Yes.

19     Q.   And you didn't see them arguing with Anna,

20  did you?

21     A.   Not that I noticed.

22     Q.   You didn't notice them arguing with Anna, did

23  you?

24     A.   I said --

25          MR. MAYE:  Object to form.



1      A.   -- not that I noticed.

2      Q.   (By Mr. McKay)  I understand what you said,

3  but I'm asking you specifically did you observe --

4      A.   And I said no three times.

5      Q.   -- them --

6           Well, it may be the way you think you say

7  something, but what you actually said was "Not that I

8  noticed."

9      A.   So not that I observed.

10     Q.   Okay.  So you did not observe them arguing?

11  Right?

12     A.   Yes.

13     Q.   Okay.  So they complied with the

14  instructions?

15     A.   Yes.

16     Q.   And they didn't swing any fists or arms at

17  Anna Bond?

18     A.   Not that I observed.

19     Q.   So they didn't?

20     A.   Not that I observed.

21     Q.   You did not observe them swinging any arms or

22  fists at Anna Bond?

23          MR. MAYE:  That's right.

24     A.   That's what I said three times.

25          MR. MAYE:  That's what she said three times.



1      Q.   (By Mr. McKay)  Yes, I understand what you

2  think you said.

3           Okay.  So Peter and A.D. were given a safety

4  instruction and they complied with it.  So is that a

5  basis on which to conclude that they may become a

6  safety issue?

7           MR. MAYE:  Object to form.

8      A.   That had nothing to do --

9      Q.   (By Mr. McKay)  I just want a yes or no.

10     A.   Ask it again.

11     Q.   You observed Peter and A.D. complying

12 willingly with a safety instruction, right?

13     A.   Yes.

14     Q.   And that was not a reason to tell the

15 captain, right?

16     A.   In and of itself, no.

17     Q.   Good.  Okay.  So did you observe Peter and

18 A.D. -- well, strike that.

19          When they moved to row 17, was there another

20 passenger in row 17?

21     A.   Yes.

22     Q.   Do you remember anything about that

23 passenger?

24     A.   No.

25     Q.   Male, female?



1      A.   I believe it was male, but I can't a hundred

2 percent say.

3      Q.   Okay.  Do you remember whether he was

4 Caucasian or black?

5      A.   No.  No.

6      Q.   Okay.  Now, did you observe Peter and A.D.

7 harassing that passenger?

8      A.   No.

9      Q.   Did anyone else tell you that they observed

10 Peter and A.D. harassing that passenger?

11      A.   No.

12      Q.   Okay.  So there was no harassment going on

13 between Peter and A.D. and that passenger?

14      A.   Yes.

15      Q.   That's correct, a correct statement?

16      A.   Yes.

17      Q.   Okay.

18          MR. MAYE:  John, do you want to take a break?

19 It's about an hour and forty minutes in.

20          MR. McKAY:  Oh, we did take a break.  We took

21 two breaks.

22          Let me just finish this line of questioning.

23          MR. MAYE:  That's fine.  I just want to make

24 sure that the court reporters are fine.

25          MR. McKAY:  You know, I have concerns about



 1 | all of them as well.

 2 |          MR. MAYE:  Okay.

 3 |          MR. McKAY:  But I know that we just recently

 4 | took two breaks.

 5 |          THE WITNESS:  Not when we -- not when we were

 6 | still on the record.  I did not get a break.

 7 |          MR. MAYE:  Taking a break is not a bad thing.

 8 | I'm not trying to disrupt you or . . .

 9 |     Q.   (By Mr. McKay)  So you decided to talk to the

10 | captain and the first officer about it.  And then it

11 | says "He advised us to do frequent walk-bys."  Who is

12 | "he"?

13 |     A.   The captain.

14 |     Q.   Rex Shupe?

15 |     A.   Yes.

16 |     Q.   Did you know him?

17 |     A.   No.

18 |     Q.   Have you ever flown with him again?

19 |     A.   Not that I believe so.

20 |     Q.   Had you ever flown with him previously?

21 |     A.   Not that I believe so.

22 |     Q.   And then as you see there, there's a

23 | redaction.  Do you know what was in that redaction?

24 |     A.   I believe it was Scott's observation.

25 |     Q.   Okay.  So would you read the sentence,



AMANDA L. NICKEL                                    December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                                  85

1   including what you remember to be what you wrote.

2        A.   I believe it said "Flight attendant Scott

3   then noticed the father's hand in between the child's

4   legs, near his genital area."

5        Q.   Okay.  And how did you know that flight

6   attendant Scott had noticed that?

7        A.   Because he came back and told us what his

8   observation was.

9        Q.   So he had left the group discussion and then

10  came back and made that observation?

11       A.   That's not how it happened.

12       Q.   Well, you said he came back.  That's why I

13  asked you the question.

14       A.   Correct.  But that's not the order of how

15  things happened.

16       Q.   Okay.  What is the order of how things

17  happened?

18       A.   Chelsie did a walk-by before we spoke to the

19  captain and first officer.

20       Q.   Had you already met before Chelsie did the

21  walk-by?

22       A.   Yes.

23       Q.   Okay.  So the four of you met in the front

24  galley?

25       A.   Like I said, I don't remember if Scott was



1  present during the beginning of that.  I cannot recall.

2  But I know I walked up to speak to the other girls.

3       Q.   Okay.  And the other girls were Anna and

4  Chelsie?

5       A.   Correct.

6       Q.   Okay.  And from -- and then Chelsie left that

7  meeting and did a walk-by.  Correct?

8       A.   Yes.

9       Q.   And came back and reported something?

10      A.   Yes.

11      Q.   And what did she report to you?

12      A.   She reported that she saw the father

13 caressing the son's way in -- or son's face.  I'm

14 sorry.

15      Q.   And she -- she came back and reported that

16 she had just seen that?

17      A.   Yes.

18      Q.   Okay.  So she reported to you at that time

19 that the father and son were awake?

20      A.   Yes.

21      Q.   Okay.  And -- okay.  So now the three of you

22 are back up to the -- in the front galley.

23      A.   Yes.

24      Q.   And what happened next?

25      A.   We decided that we needed to inform the



AMANDA L. NICKEL                                    December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                              87

1  captain and first officer, and that was about the time

2  either we called them for a break or they called us.  I

3  can't remember exactly.

4       Q.   Okay.  So the precipitant to calling the

5  captain and the first officer was Chelsie reporting

6  that a father was touching his son's face?

7            MR. MAYE:  Object to form.

8       A.   It was all of our observations together that

9  we . . .

10      Q.   (By Mr. McKay)  See, I have to be very clear,

11  and I know you're going to get mad at me about this,

12  but when you say "It was all of our observations" and

13  you've just talked about a specific observation, I have

14  to separate out.

15           Did you all see the father caress the face of

16  the son?

17      A.   No.

18      Q.   Only Chelsie saw that?

19      A.   Yes.

20      Q.   As far as you know?

21      A.   Yes.

22      Q.   Okay.  So when you say "It was all of our

23  observations," what you're saying is the fact that the

24  son looked at the father before answering Anna Bond?

25      A.   Uh-huh.  Yes.



1      Q.   You have to say yes or no.

2           The fact that he, A.D., seemed different from

3 your son?

4           MR. MAYE:  Object to form.

5      A.   That he seemed older than 12.

6      Q.   (By Mr. McKay)  Okay.  The fact that he

7 didn't use a word when he asked -- when you asked him

8 if he wanted something to eat or drink?

9           MR. MAYE:  Object to form.

10     A.   And acted very anxious, yes.

11     Q.   (By Mr. McKay)  Okay.  You determined that he

12 was acting anxiously?

13     A.   Yes.

14     Q.   Because he looked at his father?

15          MR. MAYE:  Object to form.

16     A.   And his physical movements at the time, the

17 way he was shaking his head very nervously.

18     Q.   (By Mr. McKay)  Well, how do you determine

19 somebody is shaking their head nervously as opposed to

20 just shaking their head to say no?

21          MR. MAYE:  Object to form.  Asked and

22 answered.

23     A.   Because he didn't just shake his head no

24 once.

25     Q.   (By Mr. McKay)  How many times did he shake



1   his head no?

2        A.   Several times.

3        Q.   Three?

4        A.   In a rapid succession.

5        Q.   And you felt that was unusual for somebody to

6   do?

7        A.   I felt like it was a very nervous action.  I

8   observed it.

9        Q.   Okay.  All right.  And what did you think was

10  going on there?

11            MR. MAYE:  Object to form.

12       A.   I didn't speculate.  It was just an

13  observation I made.

14       Q.   (By Mr. McKay)  But it's one that you

15  repeated to the group up in the forward galley, right?

16       A.   Yes.

17       Q.   Okay.  And because you -- it made you uneasy,

18  right?

19            MR. MAYE:  Object to form.

20       A.   Yes.

21       Q.   (By Mr. McKay)  Okay.  And so you report

22  this, and then Chelsie reports that she saw the father

23  touch the son's face?

24       A.   Caressed the son's face, yes.

25       Q.   Was that her word, "caress"?



1     A.   Yes.

2     Q.   It was her word?

3     A.   Yes.

4     Q.   Specifically?

5     A.   Yes.

6     Q.   Okay.  And you have a specific memory of

7  that?

8     A.   That is what I remember, yes.

9     Q.   Okay.

10    A.   And she also did a physical movement to show

11 us the exact motion he was using.

12    Q.   Could you -- could you repeat that?  Could

13 you show us?

14    A.   Like this.

15    Q.   Like somebody might touch their beard, sort

16 of?

17    A.   I don't have a beard, so I wouldn't know.

18    Q.   Okay.  Have you ever observed anybody stroke

19 their beard?

20         MR. MAYE:  Object to form.

21    A.   That was the observation she made on the

22 child's face.  It's not --

23    Q.   (By Mr. McKay)  I'm asking if you ever

24 observed anybody else in the world --

25    A.   Possibly.



AMANDA L. NICKEL                                  December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                            91

1      Q.    -- do that.

2      A.    But the child did not have a beard.

3      Q.    Okay.  So is that the reason why you

4   considered it unusual?

5            MR. MAYE:  Object to form.

6      A.    I didn't observe the caressing.  It is what

7   Chelsie reported.

8      Q.    (By Mr. McKay)  Understood.  Did the

9   caressing report make you further uneasy?

10     A.    Yes.

11     Q.    Okay.  And can you explain for the jury why

12  that made you uneasy?

13     A.    It was just a feeling.

14     Q.    It was just a feeling that you had?  What

15  kind of feeling was it?

16           MR. MAYE:  Object to form.

17     A.    An off feeling.  That's it.

18     Q.    (By Mr. McKay)  A feeling that this is wrong?

19     A.    That it's unusual and that it's giving me a

20  feeling that something may be off with the two.

21     Q.    Okay.  And when you say "may be off with the

22  two," you mean Peter and his son?

23     A.    Yes.

24           Can I use the bathroom, please?

25           MR. MAYE:  Yeah.



```
 1            MR. McKAY:  Yes.
 2            THE VIDEOGRAPHER:  The time is approximately
 3  10:48 a.m.  We're going off the record.
 4                 (A recess was taken.)
 5            THE VIDEOGRAPHER:  The time is approximately
 6  10:56 a.m.  We're going back on the record.
 7       Q.   (By Mr. McKay)  I just wanted to ask a
 8  question on timing.  We started at nine, and it was my
 9  understanding that that was a request that came from
10  you.  Is that correct?
11       A.   No.
12       Q.   Oh, it's not?  You didn't -- I'm just asking
13  if you had somewhere you had to be today or something.
14       A.   Not -- I have to pick my kids up from school
15  later.
16       Q.   Okay.  But that's going to be, like, after
17  two, right?
18       A.   Yes.
19       Q.   Okay.  All right.  No, I must have
20  misunderstood.  I just had heard that you had requested
21  to start at nine.
22       A.   No.
23       Q.   All right.
24            So I want to get back to this portion of your
25  statement where you mentioned "he told us to do
```



1 frequent walk-bys" and that you've identified as being

2 Captain Shupe.

3         Was he standing outside the cockpit at that

4 point?

5     A.   I believe so.

6     Q.   Okay.  And so did he sort of join your

7 discussion about what to do?

8     A.   He listened to what we told him, and that is

9 what he instructed us to do.

10     Q.   And did he indicate that as a pilot there

11 were certain instructions that pilots had as to what to

12 do in certain situations?

13     A.   I don't know the pilot training.

14     Q.   That wasn't my question.  Did Captain Shupe,

15 when he entered the discussion -- did he talk about

16 what the pilots needed to assess in order to make

17 decisions?

18     A.   He did not -- I don't recall him saying that.

19 He just gave us instructions and we followed them.

20     Q.   Okay.  You don't recall what he said about

21 what the pilots needed to do?

22     A.   No.

23     Q.   Okay.  The instructions that he gave you --

24 you say "instructions" in the plural.  So what were

25 those instructions?



AMANDA L. NICKEL                                    December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                                94

```
 1      A.   To do frequent walk-bys of the father and the
 2  son, and to report back to him to see if we noticed any
 3  other observations --
 4      Q.   Like what?
 5      A.   -- or any behavior.
 6      Q.   Like what?
 7      A.   Like if we noticed any more touching or
 8  anything like that.
 9      Q.   Okay.  And then after giving those
10  instructions, did he go back in the cockpit?
11      A.   I believe so.
12      Q.   Did the first officer come out?
13      A.   I believe so.
14      Q.   Okay.  Were you there when the first officer
15  came out?
16      A.   I can't specifically recall.
17      Q.   Okay.  So then the next thing in your
18  statement that you read talks about Scott observing
19  something subsequently.  And then in order to know what
20  Scott observed, then Scott must have come back up to
21  the front row where you were?
22      A.   Yes.
23      Q.   And what did Scott say?
24      A.   As I said before, Scott reported that he
25  noticed the father's hand in between the legs of the
```



1  child, near his genital area.

2      Q.   Okay.  Actually inserted down in between his

3  legs?

4      A.   Correct.

5      Q.   Okay.  And you've testified that because it

6  was dark, you couldn't even see what -- what the child

7  was wearing.

8      A.   At the time Scott did his observations, the

9  lights were on dim two, per the captain's -- actually,

10 per my suggestion to the captain.

11     Q.   What did you say to the captain?

12     A.   I said we could leave -- could we leave the

13 lights on dim two so that we could see if we observed

14 anything when we did our walk-bys.

15     Q.   So that was more of a question than a

16 suggestion?

17     A.   Yes.  And he said yes.

18     Q.   Okay.  So what had the lights been on when

19 you had observed him shaking his head?

20     A.   On dim two.  We leave them on dim two for

21 service during redeye flights.

22     Q.   Okay.  Okay.  Great.

23          And -- so Scott came back, said he had

24 observed the hand.  Did he indicate -- like, had he

25 leaned into the row or anything, or had he just walked



1  by?

2       A.   He didn't -- I don't recall him specifically

3  saying if he leaned in or not.

4       Q.   Okay.  And did you watch him do his walk-by?

5       A.   I watched him walk to the back of the plane

6  and then walk back up.

7       Q.   Okay.  So you didn't see him lean in to

8  the -- to row 17?

9       A.   Not that I recall.

10       Q.   Okay.  Would you recall if you had seen it?

11            MR. MAYE:  Object to form.

12       A.   I mean, if I saw it and I remembered, yes;

13  but I don't recall.

14       Q.   (By Mr. McKay)  Okay.  So Scott comes back;

15  he gives this report.  And then in your statement, you

16  say, "At that point it was decided to separate the

17  passengers."  Is that a correct statement?

18       A.   That's what I wrote, yes.

19       Q.   Okay.  So who made that decision?

20       A.   The captain.

21       Q.   Do you under -- did -- strike that.

22            Is this when -- is this after Scott and

23  Chelsie went into the cockpit?

24       A.   This was after their break was over.

25       Q.   Okay.  So the decision to separate the



1  passengers was after both pilots had returned to the

2  cockpit?

3      A.   Yes.

4      Q.   And the cart that had been placed to block

5  the aisle from the galley had been moved back?

6      A.   I don't believe so, because Scott -- from

7  what I recall, Scott and I went into the cockpit to

8  speak to the captain about what he observed.

9      Q.   I see.  So you went into the cockpit with

10 Scott?

11     A.   That is my recollection.

12     Q.   And was anyone else besides the two pilots

13 there at the time?

14     A.   Not in the cockpit.

15     Q.   Okay.  So you and Scott entered the cockpit

16 with the two pilots and closed the door?

17     A.   Yes.

18     Q.   Okay.  And what then was said in the cockpit?

19     A.   Scott told the captain and the first officer

20 what he observed.

21     Q.   And that was the hand between -- inserted

22 between the legs?

23     A.   Correct.

24     Q.   Okay.  And what happened next?  What did --

25 who spoke next?



 1      A.   I believe it was the captain who said we
 2 needed to immediately separate them.
 3      Q.   All right.  And did the captain say how that
 4 was to be accomplished?
 5      A.   No.  From my recollection, he left it up to
 6 us on how we best solve it, since we were the ones in
 7 the back of the plane.
 8      Q.   Did you say anything during this visit to the
 9 cockpit?
10      A.   I believe there may have been discussion
11 between us and Scott about how we were going to do it.
12      Q.   In the cockpit?
13      A.   Yes.
14      Q.   Okay.  And what was that discussion?
15      A.   I believe the discussion was that Scott was
16 going to be the one that went to move the child from
17 the row.  His -- I believe before he did that, he went
18 and spoke to some passengers in the back of the plane
19 that we label as able-bodied passengers, so that if
20 there was an escalation or anything, that we would have
21 some passengers available.
22      Q.   Okay.  Now I'm going to ask you some
23 questions about that statement.  First of all, how do
24 you label somebody an able-bodied passenger?
25      A.   It's mostly just by the look and demeanor of



1  them.  It's, I would say, predominantly males that have

2  not been drinking or anything.  We will -- that they're

3  able to do physically if there were to be a physical

4  threat.

5      Q.   And when they are so labeled, are they told

6  that?

7      A.   They're not told that they're an able-bodied

8  passenger, no.

9      Q.   Okay.  And you did mention, I believe, if I

10 heard you correctly, that Scott had previously

11 designated or labeled somebody in the back an

12 able-bodied passenger?

13     A.   After we spoke to the captain, yes, he went

14 and spoke to a few passengers in the back, yes.

15     Q.   Okay.  And I just have to be very clear, and

16 I apologize for all the questions, but after -- you say

17 "after we spoke to the captain."  So was this after you

18 spoke to the captain when he came out for his break?

19     A.   This was after we spoke to the captain in the

20 cockpit, Scott and I.

21     Q.   Okay.  So the discussion with the able-bodied

22 passengers didn't occur in the cockpit -- I'm sorry.

23 Strike that.

24          The discussion about specific able-bodied

25 passengers didn't occur in the cockpit?



```
 1      A.    No.
 2      Q.    Okay.  What did you and Scott discuss about
 3  how Scott was going to separate them?
 4      A.    I believe one of us said to the other -- I
 5  can't remember who said what, but it was going to be
 6  Scott was going to approach the row where the father
 7  and son was, and he was going to hit the call light,
 8  and at that point that would be my signal to turn the
 9  lights on bright all the way.
10      Q.    And why turn the lights on bright all the
11  way?
12      A.    So that we could -- so everyone could see
13  where they were and so that the child would be able to
14  see as he exited the row where to walk.
15      Q.    And so everyone could see this event of
16  separating the child from the parent?
17            MR. MAYE:  Object to form.
18      A.    I can't speculate who saw what on the plane,
19  the passengers.
20      Q.    (By Mr. McKay)  Whose decision was it to turn
21  the lights on bright?
22      A.    I don't remember who brought it up.  It may
23  have been my suggestion.
24      Q.    Okay.  And so was there anything else
25  discussed while you and Scott were in the cockpit?
```



1  Anything at all?

2      A.    The captain may have mentioned that he was in

3  communication with the ground control.  I'm not aware

4  exactly what those conversations were, but I believe

5  the captain had contacted them.

6      Q.    Did the first officer say anything?

7      A.    Not that I recall.

8      Q.    The -- did Scott say anything about how he

9  was going to accomplish the separation, other than

10  turning on the call light?

11      A.    I don't believe specific actions were

12  discussed what he was going to do.

13      Q.    Then did you leave the cockpit, you and

14  Scott?

15      A.    Yes.

16      Q.    Okay.  What did Scott do next?

17      A.    Like I said before, he went to the back of

18  the plane and spoke with some able-bodied passengers.

19      Q.    Do you recall what row they were in?

20      A.    No.

21      Q.    Can you estimate?  Like, were they in a

22  couple of rows?

23      A.    All I know is they were behind row 17.

24      Q.    Okay.  There's a lot of rows behind 17.

25      A.    I understand.



1      Q.   Do you remember how far back he walked to
2  talk to them?

3      A.   No.

4      Q.   Okay.  You don't remember anything about the
5  position he was in when he spoke to them?

6      A.   No.

7      Q.   Do you remember what the able-bodied
8  passengers looked like?

9      A.   No, because he didn't specifically tell me
10 which ones were the able-bodied passengers.

11     Q.   Did either one of the able-bodied passengers
12 stand up?

13     A.   One of them did, because we were going -- he
14 was going to sit on the aisle of the row that we placed
15 the child in.

16     Q.   Okay.  Now, do you know the concepts aircraft
17 left and aircraft right?

18     A.   Yes.  We don't necessarily use it much and --

19     Q.   Okay.  I don't want to confuse you.

20          Were the able-bodied passengers in the A, B,
21 C section or the --

22     A.   I don't recall.

23     Q.   -- D, E, F?

24     A.   I don't recall.  I don't know which ones he
25 labeled as A, B, Cs and spoke to.



1      Q.   Okay.  Do you recall what they were wearing?

2      A.   No.

3      Q.   Do you recall whether they were white or

4  black?

5      A.   No.

6      Q.   Do you -- were they both male?

7      A.   Like I said, I don't know the passengers that

8  he spoke to.  Only the one that he placed on the aisle

9  of where the child was sitting.

10      Q.   So you don't have any memory of what he

11  looked like?

12      A.   I did not see which passengers he stopped to

13  talk to to be able-bodied passengers.

14      Q.   Okay.  But you did see the one that stood up?

15      A.   And moved to the back row, yes.

16      Q.   Male or female?

17      A.   Male.

18      Q.   White or black?

19      A.   I believe he was Caucasian.

20      Q.   Okay.  Was he wearing a red shirt, a black

21  shirt, a white shirt?

22      A.   I don't recall.

23      Q.   Don't recall.

24           Okay.  What did Scott do after he spoke with

25  the able-bodied passenger and one of them got up?



1        A.   I believe that's when he approached the row
2   where the father and son were.
3        Q.   So he would have had to walk toward the front
4   of the plane to get to row 17?
5        A.   I believe so, yes.
6        Q.   And then what did you see?
7        A.   I saw him hit the call light.
8        Q.   Okay.  Anything else?
9        A.   No.  Well, I mean, he hit the call light.  I
10   turned the lights on.
11        Q.   All right.  Then what did you see?
12        A.   I saw him -- all I saw -- I didn't hear what
13   he was saying.  I was in the front of the plane.  That
14   the child got up and walked to the aisle and he walked
15   into the back row.
16        Q.   Did you see what the child was wearing?
17        A.   No.  I don't recall.
18        Q.   Did you see whether he had his shoes on?
19        A.   Not at that time.  I did not see whether he
20   had his shoes on.
21        Q.   You saw at some point later?
22        A.   Yes.
23        Q.   And what did you see?
24        A.   That he had no shoes on.
25        Q.   He had no shoes?



1      A.   Correct.

2      Q.   Okay.  Did you know where his shoes were?

3      A.   I would have assumed that they were in the

4 row he was sitting, but I can't speculate on that.

5      Q.   Okay.  And when did you observe him without

6 shoes?

7      A.   Some time after we moved him.  I believe when

8 I asked him if he wanted anything to eat or drink.

9      Q.   Okay.  Did you offer to bring his shoes to

10 him?

11     A.   I didn't know where the shoes were.

12     Q.   I see.

13     A.   And he did not ask for his shoes.

14     Q.   I see.  But you did observe that he had no

15 shoes?

16     A.   Correct.

17     Q.   And you thought that they were probably left

18 in the row where he had been taken from?

19     A.   I can't speculate.

20     Q.   They could have been anywhere on the plane?

21 Is that what you're saying?

22          MR. MAYE:  Object to form.

23     A.   I don't know where the shoes were.

24     Q.   (By Mr. McKay)  I see.  So that's why you

25 didn't bring them to him?



1          MR. MAYE:  Object to form.

2      A.   Didn't know where the shoes were.  He didn't

3  ask for them.

4      Q.   (By Mr. McKay)  When you, Scott, and the

5  captain were discussing separation, was there any

6  discussion about, instead, separating Peter from A.D.?

7      A.   That's not what our training is.

8      Q.   I see.  And what is your training?

9      A.   Our training is to remove the victim from the

10  situation.

11     Q.   And that is specifically based on the sexual

12  misconduct?

13     A.   And also threat level two.  Remove the victim

14  from the situation.

15     Q.   Threat level two?

16     A.   Correct.

17     Q.   Okay.  What is your understanding of threat

18  level two?

19     A.   Am I allowed to review it?

20          MR. MAYE:  You can go ahead.  You can --

21          THE WITNESS:  Oh, well, I mean, not that I

22  have it in front of me; but I know there is a section

23  in there that includes harassment or anything physical

24  to another person, we're supposed to remove the victim

25  from the situation.



AMANDA L. NICKEL                                December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                         107

1        Q.    (By Mr. McKay)  Okay.  And specifically
2  involves physical --
3        A.    I cannot recall exactly what threat level two
4  says.  It's not in front of me.
5        Q.    All right.  But you have answered one of my
6  questions by saying that threat level two mandates that
7  you remove what you call the victim?
8        A.    Correct.
9        Q.    Okay.  And you're sure of that?
10       A.    To my best recollection, yes.
11       Q.    Okay.  So was there any discussion about that
12 with the captain?
13       A.    He instructed us to separate them, and I
14 don't believe if exactly he was referring, but he said
15 we needed to move the child.  We -- in every situation,
16 you remove the victim.
17       Q.    That's your training?
18       A.    Yes.
19       Q.    I see.  Okay.  And you felt that A.D. was the
20 victim?
21       A.    Yes.
22       Q.    Okay.  Now, at this point you had not spoken
23 with A.D. other than to offer him something to buy to
24 eat or drink, right?
25       A.    In regards to what?  Spoken to him about



 1  what?  I'm just trying to understand --

 2       Q.   I'm sorry.  Is that a difficult question?

 3            MR. MAYE:  Object to form.  She's asking you

 4  to repeat the question or rephrase the question.

 5       A.   Spoken to him about what?

 6       Q.   (By Mr. McKay)  At the point where the

 7  determination was made to separate A.D. from his

 8  father --

 9       A.   Uh-huh.  Yes.

10       Q.   -- at that point in time you had only spoken

11  with A.D. to offer him something to buy to eat or

12  drink?  Correct?

13       A.   Yes.

14       Q.   Okay.  You had not asked him about his

15  relationship with his father?

16       A.   That's not in our job description.

17       Q.   I'm sorry.  You see, the problem here is that

18  these are yes-or-no questions.  Okay?

19            MR. MAYE:  They're not proper questions.

20       Q.   (By Mr. McKay)  He's allowed to make his

21  objections.

22            MR. MAYE:  I object -- I object to the form

23  of the question.

24       Q.   (By Mr. McKay)  And that's exactly what he's

25  allowed to do.  So --



 1              MR. MAYE:  So if you're asking a leading
 2   question --
 3              MR. McKAY:  I'm sorry.  No, no, no, no, no.
 4              MR. MAYE:  If you're asking a leading
 5   question, she should have an opportunity to clarify.
 6              MR. McKAY:  You are allowed to object to the
 7   form of the question, and that's that.
 8              MR. MAYE:  Yeah, yeah, but --
 9              MR. McKAY:  You are not allowed to coach the
10   witness.
11              MR. MAYE:  I'm not coaching the witness.
12              MR. McKAY:  Good.
13              MR. MAYE:  I object to the form --
14              MR. McKAY:  Got it.
15              MR. MAYE:  -- and now you're not properly
16   instructing the witness about responding to a question.
17   So I'm responding to that.
18              MR. McKAY:  That's coaching.
19              MR. MAYE:  Object to form.
20              MR. McKAY:  Thank you.
21              MR. MAYE:  Please rephrase.
22        Q.   (By Mr. McKay)  So you had not -- okay.  Had
23   you had any conversation at that point in time with the
24   child about his relationship to his father?
25        A.   It is not my job and my training to do that.



1      Q.   Had you at that point in time had a

2  conversation with the child about his relationship to

3  his father?

4      A.   Like I've said four times now, it is not in

5  my job description to question passengers.

6           MR. MAYE:  Well, he's asking did you.

7           MR. McKAY:  Thank you, Mr. Maye.

8           THE WITNESS:  No.  It's not in my training.

9      Q.   (By Mr. McKay)  "No" is fine.  Is the answer

10  no?  Is that a correct answer?

11     A.   No, it's not in my training, is my answer.

12     Q.   Okay.  And you hadn't spoken, I presume, with

13  the father about his relationship to his son?

14     A.   Like I said, questioning them is not in my

15  training.

16     Q.   Is that a no?

17     A.   I answered it the way I answered it.

18     Q.   Is that a no?

19     A.   No, it's not in my training.

20     Q.   Thank you.  Right.

21          What happened next?

22     A.   We moved the child to the back row.

23     Q.   Now, when you say "we," were you involved in

24  that movement?

25     A.   I followed Scott with the child to the back



1  row.

2      Q.   Where at this point was the able-bodied

3  passenger?

4      A.   The one that we moved, he was sitting in the

5  aisle of the row where we moved the child.

6      Q.   Was he sitting in the aisle of the row before

7  you got there with the child?

8      A.   No.  Oh, yes, yes, he was.  He was -- that

9  wasn't his original seat, is what I'm trying to say.

10     Q.   Okay.  Now, let's go back to the point in

11 time where you observed Scott pushing the call button.

12     A.   Uh-huh.  Yes.

13     Q.   You remember that?

14     A.   Yes.

15     Q.   Okay.  Where was the able-bodied passenger at

16 that moment in time?

17     A.   Sit -- the one that we moved, he was sitting

18 on the aisle of the row where we moved the child.

19     Q.   So prior to Scott pushing the call button, he

20 had actually placed the -- or reseated the able-bodied

21 passenger to that last row?

22     A.   One of them, yes.

23     Q.   Yes.  Okay.  So the able-bodied passenger, by

24 your recollection, was not present at row 17 when Scott

25 pushed the call button?



```
 1        A.   Yes.

 2        Q.   He was not?

 3        A.   Yes.

 4        Q.   That's a correct statement, he was not?

 5        A.   Well, you tell me to say correct and then you

 6   tell me to say yes or no.  Yes, he was not present --

 7   present near row 17.

 8        Q.   That's very clear.

 9        A.   He was in row -- the last row.

10        Q.   Thank you very much.

11             Okay.  So then you and Scott brought the

12   child back to the back row?

13        A.   Yes.

14        Q.   And told him to sit in the window seat?

15        A.   Yes.

16        Q.   Okay.  And what was said to him at that

17   point?

18        A.   I know there was a conversation that Scott

19   had with him why we moved him, and the child spoke back

20   and said that that was his father and that this has

21   happened times in the past.

22        Q.   Multiple times?

23        A.   Correct.

24        Q.   That's what you heard?

25        A.   From Scott.  I was not present at the
```



 1  conversation.

 2       Q.   Oh.

 3       A.   Scott told me that.

 4       Q.   Where were you?

 5       A.   In the back galley.

 6       Q.   Okay.  What were you doing?

 7       A.   My job.

 8       Q.   And specifically what about your job were you

 9  doing in the back galley?

10       A.   I may have been doing something with the

11  service carts or -- I don't recall exactly what I was

12  doing; but that is my position, is to be in the back

13  galley.

14       Q.   All right.  What position were you on this

15  flight?

16       A.   The D flight attendant.

17       Q.   And what does the D flight attendant do?

18       A.   We have various responsibilities, but we're

19  mostly in charge of, like I said, the aft part of the

20  plane, the safety, the service, all of that.

21       Q.   All right.  And so that's what you were doing

22  when Scott was talking to the child?

23       A.   Like I said, I don't remember exactly what I

24  was doing in the back galley.

25       Q.   And -- but you do remember Scott relaying to



1   you what he had said to the child?

2        A.   Yes.

3        Q.   And what the child had said to him?

4        A.   Yes.

5        Q.   But you don't -- you didn't hear it with your

6   own ears?

7        A.   No.

8        Q.   Okay.  All right.  And you specifically

9   indicate in your statement to the police and the FBI

10  that the able-bodied passenger was, quote-unquote,

11  guarding the child.

12       A.   Yes.

13       Q.   And what did you feel he was guarding him

14  from?

15       A.   From any possible safety issues to the child.

16       Q.   So in your --

17       A.   It's per our training.

18       Q.   So in your understanding, the child -- and

19  this is -- I'm sorry.  This is Frontier training?

20       A.   Yes.

21       Q.   Okay.  So your understanding, the child

22  couldn't go anywhere, right?

23       A.    If he needed to get up to use the restroom,

24  he could have gotten up.

25       Q.   That was his option, to use the restroom?



1      A.   Correct.

2      Q.   All right.  Was he allowed to go back and sit

3 with his father?

4      A.   No.

5      Q.   Was he allowed to walk to the front of the

6 plane?

7      A.   There would be no need for him to walk to the

8 front of the plane.

9      Q.   So he wasn't allowed to do that?

10     A.   I didn't say he's not allowed.

11          MR. MAYE:  Object to form.

12     Q.   (By Mr. McKay)  So are you saying that he was

13 free to walk to the front of the plane?

14     A.   If he had a reason to, he didn't ask.  There

15 may have been an occupied bathroom in the back and then

16 he may need to use the bathroom in the front of the

17 plane.

18     Q.   So again, it was limited to use of the

19 lavatory?

20          MR. MAYE:  Object to form.

21     A.   That's the only reason passengers get up on a

22 plane.

23     Q.   (By Mr. McKay)  The able-bodied passenger

24 that Scott interacted with, do you remember him?

25     A.   Vaguely, yes.



1        Q.   When he stood up, did he use the lavatory?

2        A.   I don't remember him using the lavatory.  He

3   could have.  It was a long flight.

4        Q.   Well, that would be the only reason for him

5   to stand up, wouldn't it?

6        A.   Correct.  Yes.

7        Q.   Okay.  Because that's -- you said the only

8   reasons passengers are allowed to stand up is to use

9   the lavatory.

10       A.   I didn't say allowed.  I said that's the

11  reason passengers use to stand up, is to use the

12  bathroom.  They are instructed at all other times to be

13  seated with their seat belt fastened.

14       Q.   When you -- I'm sorry.  Even when the seat

15  belt light is off?

16       A.   I didn't say that, did I?

17       Q.   When you -- I'm sorry.  Strike that.

18            You say, then, "I escorted" blank "off the

19  plane to police."  Is that the child?

20       A.   Yes.

21       Q.   Okay.  And you personally escorted him off

22  the plane to the police?

23       A.   I walked him up to the front of the plane

24  while -- where they were waiting, yes.

25       Q.   So when you went to the row that he was in --



1  and what row was that?  What number?

2       A.   I believe it was the last row, 31.

3       Q.   31.  When you went to row 31, did you say

4  anything to the child?

5       A.   I don't recall.  I know he asked us a

6  question.

7       Q.   What did he ask?

8       A.   He asked where his belongings were,

9  specifically his backpack.

10      Q.   Okay.  And what did you say to him?

11      A.   I said, "They may be where you were sitting

12  in row 17.  We can look."

13      Q.   Okay.  Did you look?

14      A.   Yes.

15      Q.   And did you find the backpack?

16      A.   No.

17      Q.   Okay.  Did you see the shoes there?

18      A.   They were not there.  Nothing was left.

19      Q.   Nothing was left?

20      A.   Correct.

21      Q.   Okay.  And did you say anything to him at

22  that point when you were at row 17?

23      A.   I said, "Your stuff isn't there."

24      Q.   What is --

25      A.   "Your dad must have taken it."  I don't



 1  remember him saying anything else.

 2      Q.   And then when you took him to the police, was

 3  that off the plane?

 4      A.   I can't recall if they were specifically

 5  standing in the forward galley or if they were off the

 6  plane, but I know they were in the general area.

 7      Q.   General area of the --

 8      A.   The front of the plane.

 9      Q.   Okay.  But you don't remember whether it was

10  on or off the plane?

11      A.   There was many officers there, so I can't

12  recall if they were standing right outside the main

13  cabin door or in the galley.

14      Q.   And who did you deliver the child to?

15      A.   Law enforcement.

16      Q.   Got it.  But was there a particular person

17  representing law enforcement?

18      A.   Not someone that said, "Hey, give him to me."

19      Q.   Okay.  So how did you accomplish the delivery

20  of the child?

21      A.   I walked him up to the front and one of them

22  said, "Go with me."

23      Q.   There you go.  So someone did say something

24  to that effect?

25      A.   I mean, he walked off the plane with law



 1  enforcement.

 2       Q.   All right.

 3       A.   That was the gist of it.

 4       Q.   What did you do?

 5       A.   I then -- I may have gotten my stuff first

 6  and walked off or the police officers told us that we

 7  had to make a statement and sat down.  I don't remember

 8  the exact order.

 9       Q.   When did you make an incident report to the

10  airline?

11       A.   I did not.

12       Q.   Do you know whether anybody else did?

13       A.   The flight -- flight attendant A may have.

14  It's usually their job, when there's an incident, to be

15  the one to make the report.

16       Q.   Always?

17            MR. MAYE:  Object to form.

18       A.   Most -- I'm not familiar with every case that

19  there's an incident.

20       Q.   (By Mr. McKay)  Did you ensure that someone

21  did make an incident report?

22       A.   In what way?

23       Q.   Any way.

24       A.   How would I ensure it?

25       Q.   I don't know.  I don't work there.  What --



 1  what --

 2      A.   I never saw these people again after the

 3  flight.  Never had conversations with them.

 4      Q.   Got it.  But in terms of an incident report,

 5  who made one?

 6      A.   I don't know.

 7      Q.   Do you know if one was made?

 8      A.   I don't.

 9      Q.   So you never inquired of anybody whether they

10  made an incident report?

11      A.   Like I said, I did not see them after that

12  day.

13      Q.   Did not see who?

14      A.   The crew.

15      Q.   Okay.

16      A.   The rest of the crew.

17      Q.   All right.  So you have mentioned many times

18  your training, right?

19      A.   Yes.

20      Q.   And you had training from Frontier?

21      A.   Yes.

22      Q.   And you follow that training?

23      A.   I try to, yes.

24      Q.   Okay.  Good.  And when you get a must-read --

25      A.   Yes.



1      Q.    -- you read it?

2      A.    I have to.

3      Q.    And -- well, do you read it?

4      A.    Yes.

5      Q.    All right.  Do you understand how "I have to"

6    is different than "I do"?

7      A.    Well, it's required of me to read it; and

8    yes, I do read it.

9      Q.    That's great.  Thank you.

10          So when you got this sexual misconduct one,

11   you read it, you understood it, and you indicated that

12   you had read it?

13     A.    Yes.

14     Q.    Okay.  Do you have that in front of you

15   there?

16     A.    Yes.

17     Q.    All right.  So if you would turn your

18   attention to the second page, Item No. 6.

19          Would you read that to me, please.

20     A.    "Flight attendants must submit an incident

21   report within 24 hours of the flight."

22     Q.    Okay.  But you didn't do that?

23     A.    No.

24     Q.    And you don't know whether anybody else did?

25     A.    I don't -- can't testify to what everyone



 1  else did.

 2      Q.   So how do you know whether that was followed

 3  or not?

 4           MR. MAYE:  Object to form.

 5      A.   Like I said, I'm not aware of the actions of

 6  the other crew members after that night.

 7      Q.   (By Mr. McKay)  All right.  Does it indicate

 8  which flight attendant is supposed to do the report?

 9      A.   No.

10      Q.   But you didn't do one?

11      A.   I did not.

12      Q.   Okay.  Now, the last sentence of your

13  statement to the police and the FBI says "I did give"

14  blank -- and I assume "blank" is the child?

15      A.   Uh-huh.

16      Q.   You have to say yes or no.

17      A.   Yes.

18      Q.   -- "a beverage which was untouched during the

19  flight and he was acting very nervous."

20           Is that a correct statement?

21      A.   Yes.

22      Q.   All right.  And what type of beverage did you

23  give him?

24      A.   I gave him a can of apple juice with a cup of

25  ice.



1       Q.   All right.  And did you charge him for that?

2       A.   No.

3       Q.   All right.  Is that allowed?

4       A.   In the situation, yes.

5       Q.   And where would you look to find that?

6            MR. MAYE:  Object to form.

7       A.   I don't know if it's in the manual or not,

8  but we're -- we wanted to keep him comfortable.

9       Q.   (By Mr. McKay)  Why?

10      A.   Because we thought there was a threat to his

11 safety.

12      Q.   Did you give him his shoes?

13      A.   I didn't know where his shoes were, and he

14 did not ask for them.

15      Q.   Okay.  And you noticed that he never touched

16 the apple juice?

17      A.   Correct.

18      Q.   What was he doing?

19      A.   He was sitting in the seat.  Didn't ask to

20 get up, didn't ask for his belongings.  At one point --

21      Q.   How many --

22      A.   -- he was messing with, like, the window

23 shade when I went to look over him; and he real quick

24 grabbed his hand away, like he was doing something

25 wrong -- doing something wrong.



1      Q.    Did you think he was doing something wrong?

2      A.    Not messing -- no.  There was nothing he was

3  doing that was wrong while he was sitting there, no.

4      Q.    What do you mean, "messing with"?

5      A.    Like moving the window shade up and down.

6      Q.    Like a 12-year-old kid?

7      A.    Yes.

8      Q.    Okay.  Why did you tell the police that he

9  was acting very nervous?

10     A.    Because every time I glanced over at him,

11  whatever he was doing, he would look at me and stop

12  doing it as if he thought he was doing something wrong.

13     Q.    As if?  That was your conclusion?

14     A.    Yes.

15     Q.    He might have been afraid of you, right?

16           MR. MAYE:  Object to form.

17     A.    I can't speculate on that.

18     Q.    (By Mr. McKay) The -- is that the only

19  reason that you said he was acting very nervous?

20     A.    Those actions together, yes.

21     Q.    Okay.  And what were you intending to convey

22  to the police by saying that?

23           MR. MAYE:  Object to form.

24     A.    I wasn't trying to convey anything.  I was

25  just making an observation and wrote it down.



1      Q.   (By Mr. McKay)  All right.  Did you have any

2   further contact with the police after writing this

3   statement?

4      A.   No.

5      Q.   Was there anything that you discussed with

6   the police before you wrote this statement?

7      A.   I believe we may have verbally talked about

8   what we wrote in it, but I can't remember exactly.

9      Q.   Do you know Chelsie Bright?

10      A.   Not personally.  That was the only flight

11   I've worked with her on.

12      Q.   Okay.  So I just want to make sure I've

13   covered every --

14           So all of these flight attendants that you

15   worked with on Flight 2067, you never worked with

16   again?

17      A.   To my best recollection, yes, I have never

18   worked with them again.

19      Q.   Okay.  And you had never worked with them

20   previously?

21      A.   To my recollection, no.

22      Q.   All right.  Have you been informed in any way

23   of what other people have said in their depositions?

24      A.   No.

25      Q.   When did you get off the plane?



1        A.    After I was done making -- writing my

2    statement.

3        Q.    Okay.  So you delivered your statement and

4    you left?

5        A.    Yes.

6        Q.    And where did you go after that?

7        A.    We went out to the gate area and the captain

8    debriefed us, I mean, if that's the right word,

9    debriefed us.

10       Q.    Okay.  About the situation or just about the

11   flight?

12       A.    No, about the situation.

13       Q.    Okay.  And what did the captain say?

14       A.    He basically said kudos to all of us for

15   doing our job and making the situation go smoothly, was

16   the gist of it.  I can't remember exactly what was

17   said, but I know he said good job to us for following

18   our training and . . .

19       Q.    All right.  Have you received any warnings or

20   reprimands or anything of that sort from Frontier --

21       A.    No.

22       Q.    -- for this?

23       A.    No.

24       Q.    Have you received any commendations for this?

25       A.    No.



```
 1        Q.   Okay.  As far as you know, was everything
 2   done in accordance with the way Frontier wants things
 3   to be done?
 4        A.   It was done in accordance with our training.
 5        Q.   So would that be the way that Frontier wants
 6   things to be done?
 7        A.   It was done in -- according to our training.
 8        Q.   Your training by Frontier?
 9        A.   Correct.
10        Q.   Have you ever been convicted of a crime?
11        A.   No.
12        Q.   When you testified about Captain Shupe being
13   out of the cockpit and up there in the front galley --
14   do you remember that?
15        A.   Yes.
16        Q.   Okay.  And I know you testified that there
17   were times when Scott was present and times when he
18   wasn't present.
19        A.   Yes.
20        Q.   Okay.  When the captain said to make frequent
21   walk-bys and to inform him of any other observations,
22   was Scott present for that?
23        A.   I believe so.
24        Q.   Okay.  How would you describe Scott's
25   demeanor during all of this discussion?
```



AMANDA L. NICKEL                                      December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                                    128

1        A.   Calm.

2        Q.   Okay.  How about after he reseated and during

3   the time that he reseated the child?

4        A.   Calm throughout the whole situation.

5        Q.   How was it that Scott became the person to

6   move the child?

7        A.   To the best of my recollection, I think it

8   was just -- I'm trying to look for the right word.

9             I think Scott just took on that role when the

10  captain told us to separate them.

11       Q.   So he basically volunteered?

12       A.   I wouldn't say that.  I'm just -- I don't

13  remember exactly what words were used, but I believe it

14  was maybe Scott felt it was his duty or responsibility

15  to because he was a male flight attendant and if

16  anything did become physical.

17       Q.   Okay.  All right.  But it was -- one way or

18  the other, it was Scott's decision?

19       A.   I can't say for sure if it was Scott said,

20  "I'm doing it" or if the captain said to him, "Maybe

21  you should do it."  I can't remember exactly how that

22  conversation went.

23       Q.   All right.  After the child was moved to row

24  31, did you see Scott sit down in row 31?

25       A.   I can't recall if he did or not.  I don't



1  believe he sat down in the row, but I can't recall.

2       Q.   Okay.  Because there were times when you were

3  not observing?

4       A.   He never -- because the other passenger was

5  on the aisle, so I don't -- Scott never sat in the

6  middle of them or anything.

7       Q.   And you're sure of that?

8       A.   To the best of my recollection, yes.

9       Q.   Okay.  But there are times when you didn't --

10  when you weren't watching row 31, right?

11      A.   Correct.  But I was vigilant of -- or knew

12  where Scott was.  I mean, you don't necessarily sit in

13  a row next to a passenger.  That's not in our job.

14      Q.   All right.  I'm not asking about your

15  specific job at this point.  I'm just asking about your

16  observations.

17      A.   And my observations were I don't -- I don't

18  believe Scott was ever sitting in the middle seat.

19      Q.   Okay.  But you would agree with me there were

20  times when you were doing your job, as you said, that

21  you were not looking at row 31?

22      A.   I was not looking at 30 -- row 31 every

23  second of the flight.

24           MR. McKAY:   Okay.  Those are the only

25  questions that I have today, but I'm just going to



 1  adjourn because we do have some outstanding discovery
 2  issues.
 3          THE WITNESS:  What does that mean?  I have to
 4  come back?
 5          MR. MAYE:  No, I don't know what he means --
 6          THE WITNESS:  Okay.
 7          MR. MAYE:  -- but I do have a few follow-up
 8  questions.
 9          THE WITNESS:  Okay.
10                      EXAMINATION
11  BY MR. MAYE:
12      Q.   You testified earlier that before a decision
13  is made to separate a suspected victim of violence or
14  sexual misconduct, you don't interview those involved
15  or you don't conduct any, you know, investigation
16  involving asking questions of the suspected
17  perpetrator, suspected victim.  Is that right?
18          MR. McKAY:  Objection to the form of the
19  question; and no, that was not her testimony.
20      A.   Correct.  It is not in our training to
21  question the victim or the perpetrator.  We leave that
22  to law enforcement so that we don't try and escalate a
23  situation.
24      Q.   (By Mr. Maye)  And when you say "escalate the
25  situation," what do you mean?  What could happen if you



 1  started interviewing the suspected perpetrator?

 2          MR. McKAY:  Objection to the form of the

 3  question.

 4      A.   The perpetrator could get angry; there could

 5  be physical violence to other passengers or to crew.

 6      Q.   (By Mr. Maye)  And why do you separate a

 7  suspected victim from the suspected perpetrator on a

 8  flight?

 9          MR. McKAY:  Objection to the form of the

10  question.

11      A.   For the safety of the victim and other

12  passengers, the -- yeah, for the safety.

13      Q.   (By Mr. Maye)  And is that based on your

14  training?

15      A.   Yes.

16      Q.   What about Frontier guidelines and policies?

17      A.   In Frontier's guidelines, you're supposed to

18  separate -- always separate the victim.  They tell us

19  specifically you need to -- several rows need to be in

20  between the victim and the perpetrator; we're not

21  supposed to question the victim or the perpetrator,

22  just make the victim comfortable and wait for law

23  enforcement when they land.

24      Q.   And as a flight attendant, can you move the

25  suspected victim without notifying the captain?



1          MR. McKAY:  Objection to the form of the

2   question.

3      A.   Actually, in the sexual misconduct training,

4   it says to separate them first and then notify the

5   pilot.

6      Q.   (By Mr. Maye)  In this case you didn't do

7   that, right?

8          MR. McKAY:  Objection to the form of the

9   question.

10     A.   Correct.

11     Q.   (By Mr. Maye)  You first contacted the

12  captain, correct?

13     A.   Yes.

14         MR. McKAY:  Objection to the form of the

15  question.

16     Q.   (By Mr. Maye)  And why did you do that?

17     A.   Because we wanted to make sure we were making

18  the right decision in this case.

19     Q.   When Scott separated A.D. from his father,

20  did you observe the demeanor of Mr. DelVecchia?

21         MR. McKAY:  Objection to the form of the

22  question.

23     A.   I observed that there wasn't any yelling or

24  screaming or any arguing at that time.  I noticed the

25  father stand up as the son exited the row.  There was a



1  very brief discussion, only a few words spoken at that

2  time, until later when the father came back to the back

3  of the plane to speak to us.

4        Q.   (By Mr. Maye)  At any point did you observe

5  A.D. crying at all?

6        A.   No.

7        Q.   What are the potential risks of not

8  separating a potential victim from the suspected

9  perpetrator during a flight?

10          MR. McKAY:  Objection to the form -- sorry.

11  Objection to the form of the question.

12       A.   There could be continued harassment,

13  touching, continued threat to his safety if we hadn't

14  separated them.

15       Q.   (By Mr. Maye)  So by separating A.D. from his

16  father, you were removing a potential safety threat to

17  A.D.?

18          MR. McKAY:  Objection to the form of the

19  question.

20       A.   Yes.

21       Q.   (By Mr. Maye)  Do you recall if the race of

22  Mr. DelVecchia or the child were -- was relayed to the

23  captain?

24          MR. McKAY:  Objection to the form of the

25  question.



AMANDA L. NICKEL                                    December 11, 2019
DELVECCHIA Vs. FRONTIER AIRLINES                                   134

```
 1      A.   Not that I recall.  No race was mentioned of
 2  either.
 3            MR. MAYE:  I have no further questions.
 4  Thanks.
 5                     FURTHER EXAMINATION
 6  BY MR. McKAY:
 7      Q.   You certainly conveyed your unease to the
 8  captain, didn't you?
 9      A.   In what regards to -- in what time when we
10  spoke to the captain?
11      Q.   At some point during the flight, you told the
12  captain you were uneasy about the situation of Peter
13  and A.D. traveling together on the plane?
14      A.   I relayed to the captain my observations,
15  yes.
16      Q.   Which included your unease?
17      A.   It included what -- I told him exactly what I
18  had observed.
19      Q.   Just as you told the police later in your
20  statement, right?
21      A.   Yes.
22      Q.   Okay.  At no point during the flight did A.D.
23  indicate to you that he was being molested, did he?
24      A.   We -- I did not ask him, and he did not say
25  anything in regards to that.
```



1      Q.   So he never stated to you or to another

2   flight attendant, as far as you know, that he was being

3   molested?

4      A.   Not that I recall.

5      Q.   And no other passenger indicated to you that

6   they observed A.D. being molested by his father?

7      A.   I did not question any passengers.  It's not

8   our job.

9      Q.   So that would be a no?

10     A.   It would be that I did not ask any passengers

11  about the incident.

12     Q.   Nor did any passengers tell you that they saw

13  that A.D. was being molested?

14     A.   None said anything to me, no.  It was not

15  discussed.

16     Q.   And no flight attendant told you that they

17  had received any statement from a passenger that they

18  saw this alleged molestation occurring?

19     A.   They did not say anything to me if they did.

20     Q.   So all you have to base your conclusion that

21  this alleged molestation happened was the statement of

22  Scott that he had seen hands inserted between the legs,

23  right?

24          MR. MAYE:  Object to form.

25     A.   I didn't allege any molestation.



 1      Q.   (By Mr. McKay)  No one said you did.

 2      A.   You just said "alleged molestation," and I

 3 said I did not allege molestation.

 4      Q.   Okay.

 5      A.   This was not my decision.  This was the

 6 captain's decision after we gave him all of our

 7 observations.

 8      Q.   My apologies.  It's a difference in

 9 terminology.

10         So the conclusion that there had been some

11 molestation, right or wrong, came from the statement by

12 Scott that he had seen something?

13      A.   I didn't come to any conclusion.

14         MR. MAYE:  Objection.  Hold on.  Hold on.

15 Object to form.

16         THE WITNESS:  I didn't come to any

17 conclusions.

18      Q.   (By Mr. McKay)  Okay.

19      A.   I reported what I saw and I went by the

20 captain's instructions.

21      Q.   But you do believe that the sexual misconduct

22 must-read is somehow connected to what happened on

23 Flight 2067?

24      A.   I believe -- yes.

25      Q.   Okay.  Fair enough.  All right.



1            And that is based on the physical contact

2    that Scott claimed to have seen?  Right?

3            MR. MAYE:  Object to form.

4        A.   I didn't base any decisions on this.  It was

5    not my decision to separate them.  It was the captain.

6        Q.   (By Mr. McKay) All right.  But you

7    participated in the meeting in which it was -- a

8    decision was made, right?

9        A.   Yes, and I relayed to him my personal,

10   individual observations.

11       Q.   Okay.

12       A.   As did everyone else.

13       Q.   Got it.

14           MR. McKAY:  That's all I have for now.  But,

15   yes, we may reconvene.  I reserve the right to do so.

16           MR. MAYE:  I have no further questions.

17           THE VIDEOGRAPHER:  This concludes the video

18   deposition of Amanda Nickel.  The time is approximately

19   11:43 a.m.  We're going off the record.

20                   (Whereupon, the deposition

21                    adjourned at 11:43 a.m.)

22

23

24

25



```
 1                 CERTIFICATE OF REPORTER

 2   STATE OF NEVADA   )
                       )     ss:
 3   COUNTY OF CLARK   )

 4           I, Judith Payne Kelly, a Certified Court

 5   Reporter licensed by the State of Nevada, do hereby

 6   certify that I reported the deposition of AMANDA LEE

 7   NICKEL, commencing on Wednesday, December 11, 2019, at

 8   9:01 a.m.

 9           Prior to being deposed, the witness was duly

10   sworn by me to testify to the truth; and I thereafter

11   transcribed my said shorthand notes into typewriting

12   and that the typewritten transcript is a complete, true

13   and accurate transcription of my said shorthand notes;

14   that review of the transcript was not requested.

15           I further certify that I am not a relative,

16   employee or independent contractor of counsel or of any

17   party involved in the proceeding, nor a person

18   financially interested in the proceeding, nor do I have

19   any other relationship that may reasonably cause my

20   impartiality to be questioned.

21           IN WITNESS WHEREOF, I have set my hand in my

22   office in the County of Clark, State of Nevada, this

23   23rd day of December, 2019.
                          Judith Payne Kelly
24           _____
             Judith Payne Kelly, RMR, CCR No. 539
25
```



EXHIBIT
WIT: Michel
DATE: 12/11/19
RPTR: JPK

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER
19AZF0229 DELVECCHIA FRONTIER 203

```
FFT                    PRINTED:
                       Summary  -           Report  - by Date/Eqpt/Pos

ID #                319
Qual1:                     -FA
Qual2:                     -
Qual3:                     -
Qual4:                     -
Certificate# : 4070438    NICKEL AMANDA LEE
```

| A/C | POS | CODE | DESCRIPTION | S/U | TrgDate | BaseMonth | Instructor# | Hrs/min. | Lndgs | Cls | FAA |
|-----|-----|------|-------------|-----|---------|-----------|-------------|----------|-------|-----|-----|
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 12NOV19 | NOV | 421025 | 6:00 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 12NOV19 | NOV | 405593 | 2:00 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 12NOV19 | NOV | 427554 | 3:00 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 12NOV19 | NOV | 428082 | 1:00 | 00 | 00 | |
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 14NOV18 | NOV | 414537 | 5: | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 14NOV18 | NOV | 427042 | 2: | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 14NOV18 | NOV | 407278 | 3: | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 14NOV18 | NOV | 410358 | 1: | 00 | 00 | |
| | | NHAZ | New Base Set Haz-Mat per 121.1007(c) | | 14NOV18 | NOV | 427042 | 1: | 00 | 00 | |
| | | IOE | Initial Operating Experience | | 09DEC17 | DEC | 424455 | 6:03 | 00 | 00 | |
| 319 | | IEMV | Initial Emergency Training (hands on) | | 28NOV17 | NOV | 401361 | : | 00 | 00 | |
| 319 | | IDIFF3 | Initial Differences Training 319/318 | | 28NOV17 | | 410358 | : | 00 | 00 | |
| 319 | | ICC | Initial Competency Check | | 28NOV17 | | 401361 | : | 00 | 00 | |
| | | ISEC | Initial Security Training F/A | | 28NOV17 | NOV | 405593 | 14: 0 | 00 | 00 | |
| | | IHAZ | Initial Haz-Mat record per 121.1007(c) | | 28NOV17 | NOV | 424845 | 2: 0 | 00 | 00 | |
| | | IH2O | Initial Over Water Training | | 28NOV17 | | 410986 | 5: 0 | 00 | 00 | |
| | | IGS | Initial Ground Training | | 28NOV17 | NOV | 401361 | : | 00 | 00 | |
| | | IDIFF4 | Initial Differences Training 320/319/318 | | 28NOV17 | | 410358 | : | 00 | 00 | |
| | | IDIFF321 | Initial Differences for the 321 | | 28NOV17 | | 410358 | : | 00 | 00 | |
| | | ICRM | Initial Crew Resource Management | | 28NOV17 | NOV | 405593 | : | 00 | 00 | |
| | | IBI | Initial Basic Indoc | | 28NOV17 | NOV | 401361 | : | 00 | 00 | |

END OF REPORT

Page _1_ of _2_

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**VOLUNTARY STATEMENT**

Event # 19.0300.137169

| THIS PORTION TO BE COMPLETED BY OFFICER | | |
|---|---|---|
| Specific Crime | Date Occurred 3/28/19 | Time Occurred 1900 |
| Location of Occurrence Frontier Flight -2067 | Sector/Beat | ☐ City ☐ County |

Your Name (Last / First / Middle)                                                                  Date of Birth    Social Security #        b6 b7C

| Race | Sex | Height | Weight | Hair | Eyes | Work Schdl. (Hours) Varies | (Days Off) Varies | Business / School Frontier |
|---|---|---|---|---|---|---|---|---|

Residence Address: (Number & Street)      Bldg./Apt.# City              State  Zip Code    Res. Phone
                                                                                               Bus. Phone:

Bus. (Local) Address: (Number & Street) 5757 Wayne Newton Blvd, Las Vegas   Bldg./Apt.# City  State Zip Code 89119   Occupation Flight Attendant   Depart Date (if visitor)
McCarran

Best **place** to contact you during the day    Best **time** to contact you during the day    Can You Identify ☒ Yes
cell phone                                        daytime                                       the Suspect?  ☐ No

**DETAILS**  I was working Flight #2067 RDU-LAS 3/28/19, when I noticed two passengers being moved from the exit row to another row due to one passenger being a minor. They were originally seated in 13D & 13E and moved to 17 E & F. I assumed by the look of the younger passenger that he had been moved due to a language barrier, but FA [        ]   b6 b7C
said it was due to age, passenger stated he was only [        ]  The passenger did not look [        ] and the two passengers together gave me uneasy feeling so I kept an eye on them. Shortly after takeoff, during service, the [        ] was sleeping so I asked [        ] if he wanted anything to eat or drink and he very anxiously shook his head no, without speaking. I voiced my concerns to the other FA's, at which point we decided to speak

I HAVE READ THIS STATEMENT AND I AFFIRM TO THE TRUTH AND ACCURACY OF THE FACTS CONTAINED HEREIN. THIS STATEMENT WAS
COMPLETED AT (LOCATION) 5757 Wayne Newton Blvd
ON THE 28th DAY OF March AT 10:10 (AM / PM) 2012.

Witness/Officer: _____                                                              b6 b7C
Witness/Officer: _____
LVMPD 85 (REV. 6-08)

EXHIBIT 2
WIT: Su chel
DATE: 12/11/19
RPTR: JPK

19AZF0229 DELVECCHIA FRONTIER 0120

LAS VEGAS METROPOLITAN POLICE DEPARTMENT
**CONTINUATION**

Event #: 190300137169

to the Captain and First Officer about it. He advised
us to do frequent walk-by's [FA] then noticed
At that
point it was decided to separate the passengers. We
removed                  and placed him in the last row
with another passenger not involved guarding him.
I escorted                 off the plane to police.
I did give            a beverage which was untouched
during the flight and he was acting very nervous.

b6
b7C

19AZF0229 DELVECCHIA FRONTIER 0121