**EXHIBIT 8**

**Deposition of First Officer Shawn Mullin**

**(SSI Material Redacted)**

```
1              UNITED STATES DISTRICT COURT

2                 DISTRICT OF NEVADA

3

4   PETER DELVECCHIA, et al,        )
                                    )
5          Plaintiff,               )
                                    )
6             vs.                   ) CASE NO.  2:19-CV-01322-KJD-NJK
                                    )
7   FRONTIER AIRLINES, INC., et al, )
                                    )
8          Defendants.              )
    _____)

9

10

11

12

13

14

15

16

17

18

19        DEPOSITION OF SHAWN EDWARD MULLIN

20       Taken on Tuesday, December 10, 2019

21              At  10:00 a.m.

22           At Titolo Law Office

23         9950 West Cheyenne Avenue

24              Las Vegas, Nevada

25   REPORTED BY:  SHIFRA MOSCOVITZ, CCR NO. 938
```



SHAWN E. MULLIN                                December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                        2

```
 1 │ APPEARANCES:
   │
 2 │  For Plaintiffs:
   │
 3 │                  JOHN D. MCKAY, ESQ.
   │                  PARK AVENUE LAW
 4 │                  127 W. Fairbanks Avenue
   │                  #519
 5 │                  Winter Park, Florida
   │                  (800)391-3654
 6 │
   │
 7 │
   │
 8 │  For Plaintiffs:
   │
 9 │                  TIM TITOLO
   │                  TITOLO BRAIN AND INJURY LAW
10 │                  9950 W. Cheyenne Avenue
   │                  Las Vegas, Nevada 89129
11 │                  (702)869-5100
   │
12 │
   │
13 │
   │
14 │  For Defendants:
   │
15 │                  BRIANE T. MAYE, ESQ.
   │                  ADLER MURPHY & MCQUILLEN LLP
16 │                  20 South Clark Street
   │                  Suite 2500
17 │                  Chicago, Illinois 60603
   │                  (312)345-0700
18 │
   │
19 │
   │
20 │
   │
21 │  Also Present:  MONICA HAYWORTH, VIDEOGRAPHER
   │                  PETER DELVECCHIA
22 │
   │
23 │
   │
24 │
   │
25 │
```



```
 1                          EXAMINATION

 2    WITNESS:                                    PAGE
      Shawn Edward Mullin
 3

 4    Examination by
      Mr. McKay                                   4,122,134
 5
      Mr. Maye                                    115,132
 6

 7

 8

 9                           EXHIBITS

10    EXHIBIT                                     PAGE

11    Exhibit 1          Notice of Deposition        9

12    Exhibit 2          Printouts of ACARS Messages    61

13    Exhibit 3          photographs from employee records 76

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1            LAS VEGAS, NEVADA; DECEMBER 10, 2019

 2                       10:00  A.M.

 3                         -oOo-

 4   (NRCP Rule 30(b)(4) waived by the parties prior to the

 5   commencement of the deposition.)

 6   (FRCP Rule 30(b)(5) waived by the parties prior to the

 7   commencement of the deposition.)

 8   Thereupon--

 9                  SHAWN ADAM MULLIN,

10   was called as a witness, and having been first duly sworn,

11   was examined and testified as follows:

12                       EXAMINATION

13   BY MR. MCKAY:

14            VIDEOGRAPHER:  This is media number one to

15        the video recorded deposition of Shawn Edward

16        Mullin in the matter of Peter Delvecchia et al.

17        versus Frontier Airlines Incorporated, et al,

18        being heard before the United States District

19        Court for the District of Nevada, case number

20        2:19-cv-01322-KJD-NJK.  This deposition is

21        being held at Titolo Law Office, 9950 West

22        Cheyenne Avenue, Las Vegas, Nevada, starting at

23        10:04 a.m.  My name is Monica Hayworth, and I

24        am the videographer.  The court reporter is

25        Shifra Moscovitz, with Esquire Deposition
```



1      Solutions.  Counsel will you please introduce

2      yourselves and your affiliations and the

3      witness will then be sworn.

4          MR. MCKAY:  John McKay of Park Avenue Law,

5      for the Plaintiffs.

6          MR. TITOLO:  Tim Titolo, for the

7      Plaintiffs.

8          MR. MAYE:  Brian Maye for Frontier

9      Airlines.

10                  (Witness sworn in.)

11     Q.   Would you please state your full name?

12     A.   Shawn Edward Mullin.

13     Q.   And Mr. Mullin, where do you live?

14     A.   Las Vegas.

15     Q.   Okay.  Can I get a residents address?

16     A.   Sure, 353 East Bonneville, Unit 820, Las

17  Vegas, Nevada 89101.

18     Q.   Thank you.  Have you ever had your

19  deposition taken before?

20     A.   I have not.

21     Q.   Okay.  Let me just explain a few things so

22  we are all on the same page here.  This is obviously

23  a meeting in a lawyers' office and with lawyers

24  present, but it's also a proceeding that is adjunct

25  to a court proceeding.  And that's the lawsuit



1  between Peter Delvecchia and AD, a minor.  And we

2  are going to be referring to him throughout as AD.

3  And against Frontier Airlines and others.  And even

4  though this is not in a courtroom, the important

5  thing to understand is that your testimony given

6  today is treated precisely as it would be if you

7  were sitting in a witness seat in a courtroom, is

8  that understood?

9       A.   Understood.

10      Q.   And you have been placed under oath.  And

11  so any penalties that apply to not being truthful in

12  the courtroom would apply to not being truthful

13  here, is that understood?

14      A.   Understood.

15      Q.   Okay.  Beyond that there is just sort of a

16  few housekeeping things.  If we go on for more than

17  an hour, we will probably try to break after about

18  an hour, but if for any reason at all you need a

19  break prior to that, just let me know.  It is

20  informal enough that we can make those arrangements.

21  The only thing I ask is that there not be a pending

22  question when we take a break?

23      A.   Understood.

24      Q.   Okay.  And then very important, and I will

25  remind you as we go along, if necessary, is that the



1  court reporter here on the end of the table is

2  taking down everything that we say for an official

3  transcript.  And because of that we have to be

4  sensitive to certain facts that we can't change.

5  One is that she can't type two people talking at the

6  same time.  So there will be times, perhaps when we

7  will forget that and you will start to answer a

8  question before I am finished, and I will just have

9  to remind you that you have to wait until I am

10  completely finished before you begin your answer and

11  I will extend the same courtesy to not begin a new

12  question before you finish answering the previous

13  one.  The other thing is that we have to be very

14  careful not to use what we call nonverbal responses,

15  you can't shrug, nod your head, say hmm or anything

16  like that because that is nearly impossible to

17  transcribe accurately, is that understood?

18       A.   Understood.

19       Q.   Okay, thank you.  So you testified that

20  you live on East Bonneville here in Las Vegas.  Do

21  you live with anyone there?

22       A.   My wife.

23       Q.   Okay.  What is your wife's name?

24       A.   Abingdon Chelsea Mullin.

25       Q.   Abingdon?



 1        A.    Yes.

 2        Q.    How long have you lived there?

 3        A.    I think five years, I think January it was

 4   five years.

 5        Q.    Does anyone else live there besides you

 6   and your wife?

 7        A.    No.

 8        Q.    What would you consider to be your work

 9   address?

10        A.    I believe the, well, it's at the Las Vegas

11   McCarran Airport.  I think the address is on Wayne

12   Newton, but I don't know the number.  I can look it.

13        Q.    Is there a physical office for Frontier

14   there?

15        A.    There is an office for the chief pilot

16   that does administrative work, but the head quarters

17   is in Denver.  So there is not any management

18   personnel other than the chief pilot there.

19        Q.    Is that Mr. Hussey?

20        A.    Yes.

21        Q.    Is that spelled H-U-S-S-E-Y?

22        A.    I believe so, yes.

23        Q.    What is the first name?

24        A.    Devin.

25        Q.    D-E-V-I-N?



1        A.   Yes.

2        Q.   And so if you needed to report to a

3   supervisor, then it would be Mr. Hussey at the

4   airport?

5        A.   Yes, he generally has normal business

6   hours for that, obviously we operate 24 hours a day,

7   so we have a hotline that we can call after hours.

8        Q.   Okay.  And if I were to ask you who your

9   immediate supervisor is, would it be Mr. Hussey?

10       A.   Yes.

11       Q.   Okay.  I am going to ask the court

12   reporter to mark a document and then I will show it

13   to you.

14                  (Exhibit 1 was marked for

15                  identification.)

16               All right.  So what has been placed

17   in front of you there is Deposition Exhibit 1.  And

18   I will represent that this is the notice of today's

19   deposition.  And if you go to the fourth page, there

20   is a subpoena to testify.  Let me know when you have

21   gotten there?

22       A.   Yes.

23       Q.   Okay.  And do you see where there is a

24   check mark beside the word production?

25       A.   Yes.



1    Q.   Okay.  And it then it has a description of

2    certain items that are to be produced today.  Have

3    you seen that before today?

4    A.   I didn't understand it, but I have seen

5    this paper, yes.

6    Q.   Did you have a chance to discuss it with

7    your attorney?

8    A.   No.

9    Q.   Okay.  Let me ask you this, did you bring

10   any documents that are responsive to that?

11   A.   I don't believe I have any, anything other

12   than company related manuals, that would be

13   pertaining to this situation, so I don't have any

14   communications to bring.

15   Q.   Let me just make sure that I understand

16   that.  Then you are saying that as you read through

17   the description of materials there on the subpoena,

18   you believe that there is nothing that you would

19   have that meets that description, other than company

20   manuals?

21   A.   Correct.  I don't have any of those items

22   that are listed.  I don't think I was ever in

23   possession of any of those, outside of the

24   interactions we had in the flight deck.

25   Q.   Okay.  And those were not documented, is



1  that what you are saying?

2      A.   Not by me personally.  I mean the

3  communication we had with the company through the

4  ACARS electronic system was always, I assume, to be

5  kept by the company.

6      Q.   Yes, we will get into that a little later.

7  And that's ACARS, A-C-A-R-S, correct?

8      A.   Correct.

9      Q.   So you did mention some company manuals,

10 which company manuals were you referring to?

11     A.   Our Flight Operations Manuals.  We have

12 three of them, the first one generally talks about

13 general practices and behaviors and environmental,

14 the second manual is specific to aircraft operations

15 and the third one is the aircraft system.  So really

16 the flight operation manual one.

17     Q.   Okay.  And can we refer to those as FLM's?

18     A.   Yes.

19     Q.   Let me start with number two.  Number two

20 is a, you said aircraft operations, is that aircraft

21 type specific?

22     A.   Yes.

23     Q.   And so if you are flying the A320 there

24 would be a FLM number 2 that would apply

25 specifically to operating the A320?



1      A.   We only have one FLM number two, it covers

2   the differences within the family of aircraft.  The

3   A320 family for us.  So just one manual for the

4   freedom aircraft we fly.

5      Q.   Does Frontier fly other types of aircraft,

6   other than the A320 family?

7      A.   No.

8      Q.   So the FLM number 2 then is something that

9   every pilot for Frontier would have?

10     A.   Correct.

11     Q.   And then Number 3, I presume since it's

12  aircraft systems is also specific to the A320

13  family?

14     A.   Correct.

15     Q.   So let me center down on FLM Number 1, and

16  that you said it was general practices and

17  behaviors, and I think you mentioned environmental

18  issues?

19     A.   It describes, you know, who the

20  responsible parties are for us, who our chain of

21  command is going to be, lists a lot of what would

22  generally be HR related items, but HR related items

23  that are specific to us in the flight deck, whereas

24  we have other procedures and stuff like that.

25     Q.   Is FLM number one carried with you in the



1    flight deck?

2         A.   Yes.

3         Q.   Does FLM number one include the

4    descriptions of threat levels?

5         A.   Yes.

6         Q.   Okay.  And is it your testimony that you

7    did not bring FLM number one today?

8         A.   No, I have that today, I have it on my

9    phone, it's a digital copy.

10        Q.   Oh, I see.

11        A.   So I have the company manuals with me, I

12   can reference any of those, if you want me to.

13        Q.   Thank you.  Yes, I would like you to?

14             MR. MCKAY:  Counsel is there a way that we

15        can get that?

16             MR. MAYE:  Well, John that's SSI material,

17        so we can't produce that today.

18             MR. MCKAY:  Are you saying the entire FLM

19        1 is SSI?

20             MR. MAYE:  It is SSI.  It's marked by the

21        company as SSI, I don't know if it's all SSI, I

22        think Tara will discuss with you the process.

23             MR. MCKAY:  I know the process for SSI,

24        but just trying to understand here globally

25        that the company has marked the entire volume



1      one of the FLM as SSI.

2              MR. MAYE:  Right.

3              MR. MCKAY:  And that was the company's

4      doing as opposed to TSA's doing?

5              MR. MAYE:  That's right.  It's standard

6      for all manuals to be marked SSI, and then if

7      we respond to documents, then we have to

8      identify the documents, provide it to TSA, TSA

9      does a designation and we go from there.

10             MR. MCKAY:  All right.  Well, I believe I

11     have requested those, but let me ask you this,

12     to the extent that he references some portion

13     of the FLM manual, he is allowed to do that,

14     correct?

15             MR. MAYE:  If he has ultimately determined

16     that the content is SSI, then we will have to

17     deal with the sealing of record, if it needs to

18     go to court or redactions, whatever.

19             MR. MCKAY:  We can talk freely about it

20     today, but to the extent that there is an SSI

21     determination by the TSA, we can come back and

22     seal portions of the deposition?

23             MR. MAYE:  That's right.

24     Q.   All right.  Mr. Mullin, have you reviewed

25  anything in preparation for your deposition today?



1       A.   I constantly review things, it's as a

2    matter of practice, but yes, I have looked at the

3    threat levels and items recently, but nothing

4    specifically for today.  I mean it was just stuff I

5    always like to be familiar with.

6       Q.   All right.  For your comfort let me say

7    that I constantly review things too.  But what I am

8    asking about specifically are things that you

9    reviewed specifically because you knew you were

10   coming in for your deposition today?

11      A.   When I first got the notice I did look to

12   see if there was any additional information that we

13   may or may not have referenced at the time.  And I

14   looked at it then, but not in the last 24/48 hours,

15   I have prepared to that extent for this meeting,

16   yes.

17      Q.   All right.  So what I need to understand

18   today, so we are all on the same page is what

19   exactly you looked at because you knew you were

20   coming in here today?

21      A.   Just the FLM volume one, and reviewing

22   items that pertain to handling of passengers and

23   safety related concerns and kind of how I am suppose

24   to make sure, the crew is suppose to make those

25   determinations on what sections are applicable at



1   the time.

2       Q.   All right.  And what did you decide in

3   looking at this were sections that were applicable

4   to what you understand to be the subject matter of

5   this lawsuit?

6       A.   I think the first thing that I found is

7   just that the entirety of the manual is driven from

8   identifying options and assessing the material and

9   trying to make the safest course of action with what

10  we have.  And one of the things that we address as

11  pilots is that the view out the front of the window

12  or the view that we are actually, or the actions

13  that we are taking is never perfect.  So there is

14  always variables that we have to address.  So the

15  manual describes kind of talking about always try to

16  ear on the side of caution.  And give yourself the

17  most opportunities and most options, as you continue

18  your flight.  Specifically, as I looked up safety,

19  it talks about the threat levels that you mentioned

20  earlier and what clarifies a certain level of

21  threat.  Those particular levels of threat, I think

22  the ones you were describing, we can look it up.

23  They pertain to a ███████████████████████████████

    ████████████████████████████████████████████████

25      Q.   Sure.



1      A.    So I don't think it was directly

2  applicable, as I read through it, especially as you

3  get beyond level two and on, it had zero application

4  to what we are talking about.

5      Q.    Right, because beyond level two and on is

6  talking ████████████████████████████████████████

████████████████████████████████   right?

8      A.    Yes.

9      Q.    So you looked at safety and specifically

10  within safety you looked at threat levels.  What

11  else did you look at?

12      A.    I performed several searches through the

13  manual.  The search for safety or passenger

14  reassignment.

15      Q.    Did you find something for passenger

16  reassignment?

17      A.    Not in my manuals, no.

18      Q.    What else did you search for?

19      A.    Give me a second to think.

20      Q.    Sure.

21      A.    I looked up, like up I am trying to think

22  of the word that I typed.  I was trying to look up

23  something to described the situation that we were

24  given in the cockpit.  So I was looking up

25  inappropriate or just passenger comfort.



1      Q.   Okay.

2      A.   I went through probably five or six

3   searches in the course of five minutes and didn't

4   come up with many other than the safety manuals.

5   Are manual is very specific of what happens in front

6   of the door, not necessarily what happens behind the

7   door.

8      Q.   So you ran a bunch of searches that you

9   felt describe what you had been presented with and

10  at least from the standpoint of the FLM part one, is

11  it fair to say that you came up with nothing other

12  than the threat level discussions?

13     A.   Yes.

14     Q.   Okay.  And that is the only documentary

15  information that's provided to you by Frontier for

16  programs dealing with a situation like that?

17          MR. MAYE:  Objection to form.

18     Q.   Let me ask it a different way.  Is there

19  anything else that Frontier provides to you that you

20  might have consulted concerning the information that

21  was provided by the flight attendants?

22     A.   As a pilot, I don't believe we have

23  anything that relates to that.  The only procedures

24  that I have ever seen that address our interactions

25  with passengers and the public, in general, has to



1  do with when we are on the ground, and how we

2  perceive ourselves and how we interact with the crew

3  and the other passengers as we are in and out of the

4  airport or before the cockpit door is closed.

5       Q.   So items like professionalism, comportment

6  and uniform, those sorts of things?

7       A.   Yes, I mean that the -- we have, every

8  station has a person designated to handle disputes.

9  And while the door is open, and I mean the door that

10 the passenger does embark from, that person is

11 always going to be somebody stationed at the

12 airport.  It's not us.  So we are to defuse a

13 situation as much as possible and offer as much,

14 gather the appropriate people to allow them to make

15 the appropriate decisions.  Once the door is closed,

16 the cockpit door is also closed at that time before

17 that.  So we deal with operating aircraft as safely

18 as possible and trying to take the information we

19 have received, not only from the crew members that

20 are working in the back, but the information that we

21 have accessible to us and the crew members we can

22 talk to on the ground, and operate the aircraft as

23 safely as possible.

24       Q.   When you mention that you ran a search for

25 passenger reassignment, can you just explain what



1  you meant by reassignment?

2       A.   Um, I was trying to find something that

3  described a procedure for if a passenger likes to

4  move or if a passenger asked to move or if there was

5  a passenger that was in a, you know, there is a

6  larger passenger that maybe was discomforting them

7  or something like that.  And our manuals don't

8  describe anything relating to the passengers other

9  than when it talks about medical history.  And if

10 there is something going on in the back, what

11 information we should try to gather, but our, it

12 doesn't describe our interaction with the passengers

13 because we don't have any.

14      Q.   Okay.  What I was specifically wondering

15 about was the term reassignment.  Did you mean

16 assigning a passenger a different seat than the one

17 the passenger was in?

18      A.   Yes.

19      Q.   Okay.  Let me just get some back up and

20 get some basic information here.  How long have you

21 been employed with Frontier?

22      A.   August 6th of 2018, almost a year and a

23 half.

24      Q.   And where did you work before?

25      A.   Most recently I was flying corporate in



1  Las Vegas.  I flew for a private individual, and I
2  had a business teaching people how to fly.
3       Q.   Okay.  So you hadn't worked for an airline
4  prior to working for Frontier?
5       A.   I worked at Spirit Airlines in 2016 to
6  2017.
7       Q.   What did you do for Spirit?
8       A.   I was a first officer there as well.
9       Q.   And where were you based?
10      A.   Atlantic City, Fort Lauderdale and Las
11 Vegas.
12      Q.   Okay.
13      A.   Treatings in Fort Lauderdale there as
14 well, so I came all around.
15      Q.   I am sorry, I didn't hear you.
16      A.   Sorry, I came all around.  Many places.
17      Q.   So in just a year of working for Spirit
18 you were assigned to three different bases?
19      A.   Yes.
20      Q.   Have you worked for any other airline
21 besides Frontier and Spirit?
22      A.   No.
23      Q.   When you decided to seek employment with
24 Frontier, did you file an application with them?
25      A.   Yes.



1       Q.   And that was a written application?

2       A.   Yes.

3       Q.   All right.  Now, who keeps documents

4   pertaining to your being hired and things along

5   those lines, do you know?

6       A.   I think those fall under several

7   categories.  The chief pilot's office I think

8   handles a lot of initial inquiries, the HR

9   department handles a lot of the filtering.  And that

10  process, because I think I have heard that process

11  is in the process of changing.  And then we also

12  have the attorney department, which manages all of

13  our actual FAA records and history and stuff like

14  that.

15      Q.   We talked a little bit about the chief

16  pilot being Devin Hussey.  Was he the chief pilot on

17  March 28, 2019?

18      A.   Yes.

19      Q.   Okay.  Let me just get a little bit of

20  your qualifications here.  You have an ATP.  Okay.

21  And from the FAA, also private privileges for roto

22  craft?

23      A.   Correct.

24      Q.   And commercial for single engine C, is

25  that right?



1      A.   Correct.

2      Q.   Okay.  You are type righted to fly the

3   A320 family of air craft as a PIC?

4      A.   Correct.

5      Q.   Have you ever flown as a PIC?

6      A.   Yes.

7      Q.   Okay.

8      A.   Not at Frontier.

9      Q.   Not at Frontier.  Where did you fly as

10   PIC?

11      A.   I flew an A320 from Kansas City.  No, from

12   Roswell to Kansas City.  That's the extent of it.

13      Q.   Okay.  Very good.  So that was just a

14   fairy flight or reposition?

15      A.   Yes.

16      Q.   All right.  Now, I want to ask you about

17   flight 2067 on March 28, 2019 flight for Frontier

18   from Raleigh-Durham to Las Vegas.  So you are

19   familiar with that flight?

20      A.   Correct.

21      Q.   And were you the first officer on that

22   flight?

23      A.   Yes.

24      Q.   Now, where did that day, and I mean March

25   28, where did that day begin for you work wise?



 1          A.    I don't remember.  I believe it was in

 2    Raleigh, but I honestly don't remember.

 3          Q.    Did you fly a flight prior to this flight

 4    from Raleigh to Las Vegas?

 5          A.    I don't recall if it was that day or the

 6    day prior.

 7          Q.    Okay.  Either way whether it was that day

 8    or the day prior was that with Captain Shoop?

 9          A.    Yes, the day prior was.

10          Q.    Okay.  And had you flown with him before

11    that flight, the day before?

12          A.    I do not believe so.

13          Q.    So you didn't know him well?

14          A.    No, that's very common.  There is enough

15    pilots, captains that I could theoretically never

16    fly with the same one again.

17          Q.    Sure.  Do you know how many pilots there

18    are for Frontier?

19          A.    Yes, roughly 1400 or so.  We have 120 in

20    each seat in Las Vegas.

21          Q.    You have 120 for each seat?

22          A.    Yes.

23          Q.    So 240 pilots are assigned to the Las

24    Vegas base?

25          A.    Yes, I think it's 118 next month, it



1  changes every month.

2      Q.   When is the last time that you spoke with

3  Captain Shoop?

4      A.   In a formal capacity was that flight.  I

5  believe I think he was commuting to his home on a

6  flight I was operating as a pilot, so I saw him in

7  the boarding area and said hi, that was it.

8      Q.   Well, I wasn't necessarily restricting the

9  to formal capacity.  So let's talk about all

10 capacities.  That's the last time you spoke with

11 Captain Shoop?

12     A.   Yes, I don't even think I have his phone

13 number.  But the last time I saw him, it was

14 probably in the last six weeks.  He was going from

15 Las Vegas to Salt Lake to go home or something.

16     Q.   All right.  So you didn't speak with him

17 after his deposition was taken the other day?

18     A.   No.

19     Q.   Okay.  Did you speak with anybody who told

20 you what he said in his deposition?

21     A.   No.

22     Q.   Did you review any transcript of any type

23 from the deposition?

24     A.   No.

25     Q.   Okay.  All right.  Getting back to this



1   flight then, 2067 from Raleigh to Las Vegas, what

2   was the first point in that flight where you became

3   aware that there was something going on with respect

4   to a man traveling with a child?

5        A.   Um, I believe it was an hour-ish, maybe 45

6   minutes into the flight.  The flight attendants

7   typically will call us after they finish their

8   called service where they offer drinks and food.

9   And normally the conversation is very short.  Just

10  do you guys need a break, we are free for a second.

11  And that was the first time I think the captain took

12  that call.  But I remember he said that there was

13  something they were working on in the back and

14  didn't really elaborate on much of it.

15       Q.   Okay.  Let me get into what is probably

16  going to seem like unnecessary nitty gritty details

17  here.  But first of all, which of the two pilots was

18  flying this leg?

19       A.   I believe the Captain Shoop was.

20       Q.   Okay.  You don't recall yourself being the

21  pilot flying?

22       A.   I could check my logbook.  I have that

23  with me, as well.

24       Q.   Could you check that please?

25       A.   Can you give me my phone?



1          MR. MAYE:   Sure.

2      Q.   I apologize, I forgot to ask Captain Shoop

3   and so the spot lights is on you.  Let's take a

4   break.

5          VIDEOGRAPHER:   The time is approximately

6      10:32 a.m. we are going off the record.

7          (Whereupon, an off the record discussion

8      was held.)

9          Video, the time is approximately 10:35, we

10     are going back on the record.

11     Q.   All right, sir.  Did you have a chance

12  during the break to check your log box?

13     A.   I did.

14     Q.   And who was the pilot flying that leg?

15     A.   That leg Captain Shoop was flying.

16     Q.   Captain Shoop, okay, now for the nitty

17  gritty details.  When somebody calls on the intercom

18  to the -- if a flight attendant calls to the

19  cockpit, what is the process for taking the call?

20  Let me put it this way, let me tell you why I am

21  asking.  That may make it easier.  Is it in the

22  nature of flipping a switch so the two of you can

23  hear it through your headsets?

24     A.   That's, there is many variables to this

25  question.



1          Q.    Okay.

2          A.    But I think the answer you are looking for

3     is when the flight attendants call it rings.  So it

4     flashes and rings at us, so we know it.  The, either

5     pilot can select to have the speaker on or off.  The

6     sound always also goes through our headsets.

7          Q.    Okay.

8          A.    When we are speaking with the flight

9     attendants or making PA announcements, it's very

10    common practice to turn the speaker off for the

11    pilot that's going to be communicating because it's

12    really sensitive for feedback.  We wear our headsets

13    at all times below 18,000 feet.  And I would say 50

14    percent of the time above 18,000 feet.  When our

15    headsets are on, our selections of who listens to

16    what is completely independent.  When our headsets

17    are off, we can vary volumes at three or four

18    different locations for both of us.  So a lot of

19    times I may monitor a second frequency on a low

20    volume, even if it is coming on, they can't hear it,

21    there is enough background noise that hearing stuff

22    across a cockpit is relatively difficult to make out

23    anything.

24          Q.    So just to dispel a concept and there is

25    not a situation where the captain picks up a, like a



1   telephone handset and listens?

2        A.   That can happen, as well, yes.

3        Q.   So on this particular instance, when we

4   are talking about the first call from a flight

5   attendant, first of all, how was it received by

6   Captain Shoop, was it on the handset or was it over

7   a speaker?

8        A.   I don't remember, it's very uncommon that

9   they use the phone handset.  It is very common,

10  90 percent of the time they answer it on their

11  headset, on the headset with the mike boom that we

12  would use to communicate with ATC.  The telephone

13  one only talks to the back or a PA.

14       Q.   Okay.  Did you listen to this initial

15  call?

16       A.   I don't believe so, no.

17       Q.   Okay.  How did you find out then what the

18  flight attendant said to Captain Shoop?

19       A.   After the -- after they completed a

20  conversation, generally the second crew member is

21  informed of what was going on.  You know, is it,

22  they give you a status, are most people sleeping or

23  are they awake, does everyone have, passengers ask

24  if they could find a smoother ride, if it's too

25  bumpy.  And we just kind of give them a general



1  update.  So the second crew member gets informed of,

2  generally as much as possible so we are both aware

3  of everything as possible.  So after they finished

4  their conversation we just described what was going

5  on back there, you know, they typically ask us, like

6  I said, if we want a break, which they have to set

7  up for and secure the front of the cabin.  So that's

8  a process.  And we typically discuss those things.

9      Q.   To the best of your recollection, after

10  Captain Shoop received this call, what did he say to

11  you then?

12      A.   Um, I don't remember specifics of the

13  words that he used, but I do remember that there was

14  a conversation, he said that the flight attendants

15  had a potential situation in the back that they were

16  going to monitor.  And he told them just to monitor

17  the situation and to call back if any additional

18  information came up.

19      Q.   All right.  Now that certainly must have

20  piqued your curiosity?

21      A.   Sure.

22      Q.   Did you ask him what was the nature of the

23  situation?

24      A.   Yes, I mean he said it was two passengers

25  that were seated next to each other.  That one of



1  the passengers was a younger child and the other

2  passenger was an older gentleman.  They appeared to

3  be traveling together, but the interactions that

4  they, the flight attendants told were just something

5  that they wanted to monitor, that they were

6  concerned.  And if the situation had to continue

7  that it could have been a situation we don't want --

8  we want to avoid.

9       Q.   Got it.  But those generalities, if that's

10 the way it was described to you, as a normal human

11 being you probably would have said, well, what the

12 heck is going on back there, right?

13           MR. MAYE:  Object to form.

14      Q.   You can go ahead and answer.

15      A.   I don't, that, it wouldn't be that common

16 for those kind of conversations to happen.  That

17 each of us crew members, the front and the back have

18 our own duties, so it's common that we will say,

19 hey, I am going to check on something, I will let

20 you know later on.  But that's not uncommon for me

21 to hear, between the captain and I, that's a little

22 more infrequent.  And yes, I mean, generally, we

23 would ask more questions, and we just discussed it

24 for a second.

25      Q.   What did you discuss?



1      A.   We discussed if there was any, if there is

2  anything that we feel that we should inform the

3  flight attendants of extra steps to take or...

4      Q.   Sure.

5      A.   Or extra information that they could

6  gather.

7      Q.   Yes.  And of course in order to have that

8  conversation, you would need to know more specifics

9  than just there is an older gentleman traveling with

10  a younger child?

11          MR. MAYE:  Object to form.

12      Q.   You can answer.  He just didn't like my

13  question.

14          MR. MAYE:  Yes, I don't like it.

15      A.   I don't believe that's the case.  I mean

16  it's very common for the flight attendants to give

17  us very broad information about passengers and

18  information.  And I mean it's, all of us have our

19  own duties, so that's not uncommon at all.

20      Q.   I understand that.  You and Captain Shoop

21  have duties to fly the aircraft?

22      A.   You mean the front and back.

23      Q.   Yes.  And you have duties that you try to

24  keep up in the front of airplane, but then if

25  somebody calls you and says there is a situation in



 1   the back, you understand that it could very well

 2   involve one or both of you, right?

 3          MR. MAYE:  Object to form.

 4      A.   I don't know how -- I don't understand.

 5      Q.   Well, you, for instance, you testified

 6   about threat levels?

 7      A.   Correct, yes.

 8      Q.   And so if somebody from the flight

 9   attendant group were to call the cockpit and provide

10   information that starts to make you think about

11   threat level assessment, that's something that would

12   involve either of the first officer or the captain

13   or even both of them, isn't it?

14      A.   Only from a standpoint that we wouldn't,

15   we would separate ourselves from the back for the

16   remainder of the flight.  I mean we would address

17   items with our SOCR company procedure, our company

18   back in Denver, and try to resolve the situation as

19   quickly as possible.  It wouldn't involve us going

20   back there.

21      Q.   No, I wasn't saying that it would involve

22   you going back there.  I was suggesting that it

23   could involve more than the sphere of looking out

24   the windshield and flying the airplane?

25      A.   Yes.



1        Q.   Because you do have duties with respect to
2    certain types of threats, right?
3        A.   That's a true statement, yes.
4        Q.   Okay.  So if the flight attendant calls
5    you and says there is a situation and we are going
6    to monitor it, it would be important to know whether
7    that step, a particular passenger might be getting
8    ill or a particular passenger might be making
9    threats about the safety in the airplane?
10       A.   Correct.  And it was clear that neither of
11   those was the situation.
12       Q.   And how was it clear, that's my question?
13       A.   They said that it was a, there was a
14   potential of an inappropriate situation in between
15   two passengers and some sort of sexual or you know
16   situation.  It wasn't that a passenger was throwing
17   up or feeling nauseous, it wasn't that there was
18   violence happening, but it was just that they were
19   not sure of the extent of the situation, but they
20   wanted to address it more and they wanted to let us
21   know and see if we have any input for items that
22   they could check additionally or steps that they
23   should act on, and if we had any additional
24   procedures that they were unaware of.
25       Q.   Okay.  So they were, to your recollection,



1   when the flight attendants called Captain Shoop, it
2   was relayed to you that she was asking for whether
3   there were further instructions from the cockpit?
4        A.   I don't believe the call was for
5   additional steps.  I believe the call was
6   informative, but during the course of that, you
7   know, typically end a conversation like that is, is
8   there anything else you can think of or something
9   general of that nature.  It wasn't, she wasn't
10  looking for direct guidance, or I don't know if it's
11  a he or she that called up.  But the flight
12  attendant was not looking for direct step by step
13  guidance from us.  They were saying, hey, these are
14  the things we are going to accomplish, is there
15  anything else you can think of?
16       Q.   And part of the information that was
17  provided led you to understand that there was
18  something involving inappropriateness, is that
19  right?
20       A.   Yes.
21       Q.   And something involving sexual conduct?
22       A.   Yes.
23       Q.   Okay.  How about descriptions of the
24  passengers.  You mentioned that there was a
25  description of an older gentleman with a younger



1   child, right?

2       A.   Yes.

3       Q.   How about color of skin?

4       A.   No, not initially, I don't remember that

5   being brought up at all.

6       Q.   Do you remember it being brought up later?

7       A.   At some point in the flight they gave us a

8   description so we could have a description of the

9   passengers, because we didn't have their names so we

10  tried to gather as much information as possible, but

11  yes, it wasn't used as a descriptive term when the

12  conversation began at all.

13      Q.   How about seat numbers?

14      A.   I believe, I don't know, I am, I wasn't on

15  the phone call, so I don't remember specifics and

16  that's not typically something we would share with

17  each other in the cockpit, because it doesn't really

18  matter to us.

19      Q.   And along those lines, let me ask, you

20  don't have anything in the cockpit that you could

21  refer to that would connect a passenger name with a

22  seat?

23      A.   No, we don't in the cockpit at all.  I

24  have no idea what the flight attendants have or

25  don't have access to, but we have, with the



1 exception of passengers that need assistant or have

2 emotional support animals, we get those passengers

3 listed as far as their seat, so we can assist them

4 in the event of an emergency or just in the event we

5 get there.

6      Q.   How do you get those types of names, is

7 that through an ACARS message?

8      A.   No, it's a printout we receive, we call it

9 the Specials Report.  So it tells us that's the name

10 of the report that we request any special services.

11 It includes things as general as if we need ice or

12 wheelchairs or anything like that.  So they print

13 off the Specials Report when we leave.

14      Q.   And that comes in the packet that you get

15 from the station?

16      A.   No, it comes later on because they have to

17 board all the passengers before they can print it,

18 to see if the passengers actually made it on the

19 flight.

20      Q.   I see.  So it's actually printed after

21 everybody is seated?

22      A.   Yes, it's printed by the gate agent at the

23 station.  And I know they give one to us, I don't

24 know if they give one to the flight attendants or

25 not.  And they give it to us, right, they come in



1  and collect a couple of pieces of paper from us and

2  deliver a couple of pieces of paper to us right

3  before we leave.

4       Q.   Now, with this flight 2067, do you

5  remember whether or not there was a Specials report

6  given to you?

7       A.   I don't remember, it's delivered probably

8  75 percent of the time, 80 percent of the time.

9       Q.   Just so I understand your testimony,

10  though, if their names, if a particular passenger is

11  involved in the flight attendant's call, were not

12  included on the specials report, you would not have

13  any referenced material that would have told you

14  their names, right?

15       A.   Correct.

16       Q.   Okay.  And I believe you said you weren't

17  sure -- strike that.  Do you know which flight

18  attendant initially called the cockpit?

19       A.   I don't.

20       Q.   Okay.  After you and Captain Shoop

21  discussed the contents of that first call, what

22  happened next?

23       A.   I mean, through the course of this entire

24  action obviously we are going to be flying the

25  aircraft.



1      Q.   Yes.

2      A.   So my primary duty, and crews especially

3   was to work the radios and communicate with ATC and

4   Captain Shoop's primary duty was to fly the

5   aircraft.  So I know that he and I discussed it,

6   just if there is anything we can talk about, I

7   remember the initial, after the initial call from

8   the flight attendants, he and I discussed it very

9   briefly.  It was just, hey, you know, if this

10  becomes more of an issue we need to look into

11  additional steps, is there anything you can think of

12  that we should look at.  And we both maybe did a

13  couple of searches in our manuals to see if there is

14  anything that addressed it, kind of, I think Captain

15  Shoop and I were discussing things in a way that he

16  would allow him to formulate kind of a checklist or

17  a plan, say, hey, if this we do that.  And that's

18  kind of how we run our lives is, we take as much

19  information in and if it reaches a certain

20  threshold, then we act upon it accordingly, if not

21  we continue to the next option and stuff.  So I

22  think he and I were just discussing things so that

23  he could formulate that work flow.

24      Q.   And when you say you were looking at

25  things, that would have be the FLM Part 1?



1        A.    Correct.

2        Q.    And did each of you have that on your

3    phones?

4        A.    On our Ipads, when we are on the aircraft.

5        Q.    I see, on a tablet?

6        A.    Yes, it's our electronic flight bag is

7    managed through a controlled software that's on our

8    Ipads.

9        Q.    So when you were looking for things then,

10   were you looking specifically at the threat levels?

11       A.    I do know that we looked at the threat

12   levels, I looked at the threat levels, I am not sure

13   what he looked at.  I looked at the threat levels to

14   see what they meant and kind of what the designators

15   are for each one.  And there is many.  And I also

16   did use a cursory search for anything related to

17   passenger safety or anything of that nature, just to

18   see if I could find anything, but I couldn't come up

19   with anything in the time.  And, you know, as

20   typically is the case when we are flying the

21   aircraft, we have to divvy up those responsibilities

22   and their level of threat and level of importance.

23   So I did that for a while until I got busy flying

24   the aircraft again and then they hadn't called back.

25   So initially I just I assumed that there was not



1  anything additional going on, so we kind of just

2  flew for a while.

3       Q.   I assume the aircraft was on auto pilot at

4  this point?

5       A.   Generally at that point, yes.

6       Q.   Okay.  And Captain Shoop was the pilot

7  flying, you were the pilot monitoring?

8       A.   Correct.

9       Q.   So when you say you had to get back to

10  flying the airplane, that would be more of the

11  monitoring?

12       A.   Yes, monitoring, and as the pilot

13  monitoring it's typically my job to input any routes

14  and if we get any reroutes from ATC, and then the

15  Captain will, or the pilot flying will then verify

16  them.  It requires two steps of verification for any

17  of those things, yes.

18       Q.   One of things I have asked for in this

19  case and have not received is a log of the actual

20  flight route flown.  Do you remember on this

21  particular date whether there was any unusual or

22  different routing from the typical routing of this

23  flight?

24       A.   This was one of my first few times going

25  to Raleigh.  I probably had only been there three or



1   four times total.  So unusual routing would be
2   really hard for me to define at that point.  I
3   didn't feel that it was excessive, it wasn't a very
4   far north routing or very far south routing that I
5   remember.  I don't remember any significant weather,
6   as far as thunderstorms or things we had to avoid
7   from that standpoint.  It was good weather for the
8   course of the flight.
9        Q.   Let's take look at what you were looking
10  at then, could you bring up threat level one,
11  please?
12       A.   It's not the easiest to read on the phone,
13  sorry.
14       Q.   That's all right.  Take your time.
15       A.   Okay.
16       Q.   All right.  So tell me what is threat
17  level one?
18       A.   ████████████████████████████████
19       Q.   ██████
20       A.   ██████████████████████████████
     █████████████████████████████████████
     ██████████████████████████████████████
     ███████████████████████████████████████
     ████████████████████████████████████
     ████████████████████████████████████





```
 1
```

```
19        MR. MAYE:  Can I just interject.  So this
20   whole area, can you kind of highlight this area
21   because we will have to identify this as SSI,
22   this whole area, sensitive security
23   information.
24        MR. MCKAY:  From where I asked about
25   threat level.
```





1  ████████████████████████████████████████

      ████████████████████

3        Q.   Without getting too far afield to things

4  that go beyond what we are here for today.  Did you

5  determine that anything in what the flight attendant

6  told Captain Shoop fit this category of threat level

7  one?

8        A.   The first call, no.  I think we identified

9  it as a potential situation, but not, it's not a

10  threat yet, it hasn't been a threat directly at us

11  or a crew member or the flight.  But in that

12  conversation that Captain Shoop and I had, we

13  discussed kind of what would cause it in our

14  interpretation to move into this.

15       Q.   And I note that you used a word that the

16  flight attendant also used which was situation.  Is

17  there a definition in any of your materials or your

18  training at Frontier that you would be able to tell

19  the jury defines a situation?

20            MR. MAYE:  Object to form.

21       A.   I mean I think, there is a Webster

22  definition of a situation, I don't know how to

23  interpret that question.

24       Q.   Okay.

25       A.   I don't know how you are implying that



1   question and I don't know how I should answer.

2        Q.   I try not to imply, I just ask questions.

3   What I am asking, in your mind, what is a situation?

4        A.   A situation in my interpretation would be,

5   a situation is something that is a feeling or a

6   result of multiple inputs.  It could be, you know,

7   as you walk down the hallway, is the floor slippery,

8   that's a situation that you have to address.

9        Q.   Sure.

10       A.   And it's interpreted, I think is the best

11  method.

12       Q.   Okay, well, let's talk about these

13  multiple?

14       A.   I am sorry, it uses decision making, it

15  allows us, I think the FAA describes situation

16  awareness and situational training and stuff that

17  emphasizes the pilot and crews' ability to take in

18  the information and make the best possible course of

19  action from there.

20       Q.   Okay.  And what you have described as an

21  FAA definition, that's for a pilot flying an

22  airplane?

23       A.   Yes.

24       Q.   But to analogize what we are talking about

25  here, it's points of information that need to be



1  interpreted in order to make a decision?

2       A.   Correct.

3       Q.   So the points of information you have

4  received at this point are that an older gentleman

5  is traveling with a younger child.  And that

6  something, you don't know what, is felt to have been

7  inappropriate.  And something, you don't know any

8  details of was felt by somebody to fall in the

9  category of sexual, is that a fair statement so far?

10      A.   I believe that's correct up to the point

11 of the first communication we had with the flight

12 attendant.

13      Q.   All right.  So undefined inappropriate and

14 undefined sexual all combined with older gentleman

15 flying with younger gentleman?

16      A.   Correct.

17      Q.   So that's sort of the universal data point

18 that you had at that point?

19      A.   Correct.

20      Q.   So you looked at threat level one and

21 determined that they didn't, those data points

22 didn't lead to any conclusion under threat level

23 one?

24      A.   Correct.

25      Q.   Now, what is threat level two?







```
22      Q.   What is SOC?
23      A.   It's our operation center.
```

ESQUIRE
DEPOSITION SOLUTIONS



███████████████████████████████████

███████████████████████████████████

████████████████████

```
 4          MR. MAYE:  Can I just, I am sorry, just to

 5     be clear, can we go off the record for a

 6     second, just so we are clear on what we are

 7     going to do with this information.

 8          VIDEOGRAPHER:  The time is approximately

 9     11:09 a.m. we are going off the record.

10                    (Whereupon, an off-the-record

11                     discussion was held.)

12          The time is approximately 11:29 a.m. we

13     are going back on the record.
```

███████████████████████████████████

███████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████

████████████████

█████████████████████████████████

████████████████████████████████

████████████



```
1          A.    Correct.

2          Q.    Okay.  Are there more than one what you

3    have read to me?

4          A.    We completed threat level one.

5          Q.    You did complete threat level one?

6          A.    Yes.

7          Q.    So we covered at the gate, we covered

8    taxiing and we covered in flight?

9          A.    Correct.

10         Q.    And we covered those completely?

11         A.    Correct.

12         Q.    Okay.  On threat level two, did we, yes,

13   we did talk about what the definition was, right,

14   did you read, I think you did?

15         A.    Before we went back?

16   ████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████████████████████████
████████████████████████████████████
███████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████
██████████████████████████████████████████████████
██████████████████
████████████████████████████████████████████████
```





1

21          (Whereupon, the record was read

22          by the reporter.)

8          Q.   And let me just ask you this, in general,
9     did any of the information that you received from
10    the flight attendants cause you to make a decision
11    that there was a threat level two?
12         A.   At what point?
13         Q.   Okay.  Right now we are at the point where
14    there has been an initial call from a crew member.
15         A.   At this point, no.
16         Q.   Okay.  I can't remember if I asked you, do
17    you know who the crew member was that called?
18         A.   I don't remember, I said I can't remember.
19         Q.   Thank you.  As you can see I have a very
20    short memory span.  With respect to the actions in
21    the cockpit, what happened next?
22         A.   So we went through this, the initial phone
23    call from the cabin, we discussed our actions and
24    kind of what our game plan, to us, what would
25    indicate an increasing level of threat, and what



1  courses of action we would seem as being most

2  appropriate as we continue the flight.

3      Q.   All right.  Did there come a time when you

4  received more information from any member of the

5  cabin crew?

6      A.   Yes.

7      Q.   And what happened?

8      A.   I believe it was initially, it's always

9  going to be initiated by a phone call.  So they

10  called us initially and at this point I believe one

11  or both of us needed to go to the bathroom.  So

12  that's how it initiated was, do you guys need a

13  break, how are you doing.  And the, I believe the

14  cabin, the captain went first.

15      Q.   To take a break?

16      A.   To take a break.

17      Q.   All right.

18      A.   And the process is that is securing the

19  front galley and allowing one of the flight

20  attendants to come in.  And after we verify it's all

21  secure, and once they are inside then one of us can

22  leave and only one of us can leave at a time.

23      Q.   Does the other still have on oxygen?

24      A.   Yes, depending on your altitude but at

25  cruise, yes.



1        Q.    So a flight attendant came in, you went on

2    oxygen, Captain Shoop went out to use the rest room?

3        A.    Correct.

4        Q.    Do you remember which flight attendant it

5    was?

6        A.    It was a female flight attendant,

7    initially, I don't remember who.

8        Q.    In your experience, would it have been one

9    of the designated positions who came in, for

10   instance the A?

11       A.    Often times it's either, I think it's the

12   A and C that are in the front.  Often times it is

13   the A, but that's not always the case.

14       Q.    Okay.

15       A.    And I don't know, I know that after

16   Captain Shoop went to the bathroom, he came back in,

17   we transferred our controls of the aircraft again,

18   and I went out to go to the bathroom.  After I came

19   back in, I know that we sat down and the flight

20   attendant stayed and we had continued to have a

21   conversation.  The captain and her had a

22   conversation about what was going on.

23       Q.    So you weren't a participant in that

24   conversation?

25       A.    I was a bystander, as if anyone was in



1   this room.  You know, and knew what was going on and

2   was kind of formulating my own thoughts, but...

3        Q.   Well, tell me what you heard?

4        A.   To the extent of my interactions for that

5   conversation would just be to help clarify the

6   stories as they were being so told between the two

7   people.

8        Q.   Okay.  Let's go through those stories

9   then, what was the flight attendant saying to the

10  captain?

11       A.   So at this point they gave us an update

12  on.

13       Q.   I am sorry, you have to be very specific.

14  You are saying they now, do you mean the female

15  flight attendant?

16       A.   Yes.

17       Q.   Okay.

18       A.   This particular situation was, there was

19  only one flight attendant in the cockpit with us at

20  the time.

21       Q.   And now, I am going to stop you again and

22  ask you not to summarize what was said, but instead

23  to the best of your memory to say what was said?

24       A.   What I remember is that there is, to

25  clarify, I guess, there is two or three



1   conversations that we are going to talk about in the

2   next five minutes, I guess, but part of that is, my

3   order of operations might be slightly off, but what

4   I remember is that the next pieces of information

5   that I remember learning was that the passengers

6   that were in the back that they called us about, had

7   also been passengers that a different flight

8   attendant had resat earlier in the flight prior to

9   the flight.  They described the interactions of the

10  two of them at that time and these were separate

11  flight attendants.  So at this point I am in the

12  cockpit getting this information from a particular

13  female flight attendant about what another female

14  flight attendant saw, so we are definitely playing

15  telephone.

16       Q.   Got it.  Before we get too far.  A

17  different flight attendant, who is also female, you

18  understood had reseated the passengers from their

19  original two seats to a different two seats prior to

20  the flight taking off, correct?

21       A.   Correct.

22       Q.   Okay.  And now you have a different female

23  flight attendant in the cockpit after each of you

24  has used the restroom and she is relating to you

25  what the first female flight attendant told her, is



1  that right?

2       A.   She was giving an update on the situation.

3  Part of that update was additional information

4  that's new to me.

5       Q.   Uh-huh.

6       A.   Which was that the same two passengers had

7  been resat earlier in the flight.

8       Q.   Did she say why?

9       A.   I don't remember from then.  I know that

10  it was a young child, an older gentleman.

11  Generally, that's because the child is too young or

12  one of them was unable to perform the duties that

13  are required in, I believe, they were sitting in the

14  exit row.

15       Q.   But that's just a general understanding,

16  and not specifically what was told to you?

17       A.   Yes, from, I don't remember that now.

18       Q.   Okay.  How about the descriptions of the

19  passengers, was that then added to in this

20  discussion?

21       A.   I don't believe at this point I know

22  anything additional.  I do learn this, that

23  information relatively soon, but at the point of

24  this conversation I don't believe I have learned

25  that yet.



1      Q.   And when you say that, just so we are

2   clear for the record, you mean?

3      A.   More descriptions of these individuals, of

4   who they were, where they were and I guess what they

5   look like.

6      Q.   Yes, and what they look like being that

7   one is African American and one is Caucasian?

8      A.   Correct.

9      Q.   Okay.

10      A.   At this point I don't believe I knew that

11   yet.  So we are discussing with the flight attendant

12   kind of what their procedures are, if they have any

13   procedure.  We were discussing with the single

14   flight attendant what their procedures are and what

15   our procedures are and if we have anything

16   additional.  I believe it was, at some point up to

17   now we have sent off our first information up to SOC

18   to just kind of keep them in the loop.

19      Q.   This would be an ACARS message?

20      A.   I believe so, yes.

21      Q.   I am going to mark them in a second.  But

22   if you need to refer to them now, that would be

23   fine?

24      A.   I am happy to look it up.

25      Q.   Let's go ahead and mark it as Exhibit 2,



 1  please.

 2                      (Exhibit 2 was marked for

 3                      identification.)

 4              The court reporter is showing you

 5  what has been marked as Exhibit 2.  And I will

 6  represent to you that these were produced to me with

 7  the representation that they are printouts of ACARS

 8  messages back and forth from your flight.  If there

 9  is any reason you dispute that, be sure to let me

10  know?

11      A.   All right.  It looks appropriate, I have

12  never seen them in this format, they print them on

13  receipt paper to us.

14      Q.   All right.  There are ten that are visible

15  and there is another three that have been redacted.

16      A.   They look like performance data.

17      Q.   Okay.  And from my understanding of the

18  documents, it reads from back to front, so that ten

19  would be the earliest, is that also your

20  understanding?

21      A.   Correct.

22      Q.   Okay.  So number ten says there seems to

23  be inappropriate touching between an older male and

24  a younger male, 12 year old original seats 13D, 13E,

25  flight attendants are uncomfortable, do you see



1   that?

2          A.    Correct.

3          Q.    Is that what you wrote?

4          A.    I don't believe I wrote this, but I can't

5   remember.

6          Q.    All right.  I will tell you that Captain

7   Shoop looked at it and said that the end part there,

8   where it says flight attendants are uncomfortable

9   and there is a letter R for the word ARE, he

10  believes he wouldn't have done that.  He says a

11  younger man would have done that.  Do you agree with

12  that?

13         A.    It's possible, it's difficult to type on

14  that thing and we are limited to the number of

15  characters.  So I try to abbreviate when possible,

16  but I don't remember.

17         Q.    So any way, you would agree with me that

18  is at 1:47; zulu time 3:29?

19         A.    Correct.

20         Q.    So that would be the time in flight, if we

21  were to look at the flight in universal coordinated

22  time, that somebody from the cockpit, either you or

23  Captain Shoop sent an ACARS message with this

24  information?

25         A.    Correct.



1      Q.   So at that point you would have already
2   had the information that they have been received?
3      A.   Correct.
4      Q.   So you think this was during the in person
5   visit from the female flight attendant?
6      A.   It was, it was right around that time.
7   And so I am guessing it was either during or just
8   after the first flight attendant.  I am sure we will
9   move back to it, but other flight attendants ended
10  coming in to the cockpit so the captain and I could
11  hear multiple versions of their story to try to make
12  sure we are getting the most correct information.
13  So I don't know at what point we sent it, but it was
14  definitely after we figured out that they been
15  moved.
16     Q.   Now.  Item number nine is also at 1:47
17  zulu.  So within the same minute, somebody sent to
18  dispatch the message, we need some inputs from you
19  and SOC, correct?
20     A.   Correct.
21     Q.   And SOC again is operations?
22     A.   Yes.
23     Q.   All right.  So dispatch and operations are
24  24 different things?
25     A.   Yes, dispatch is a group of people that,



1  you know, we think of them as one unit, but they

2  oversee flights that are going in an in flight.  SOC

3  is kind of the management hierarchy of that group.

4  So they are all within the same office and

5  realistically within the same room most of the time,

6  but different duties.

7       Q.   Okay.  And so what you are saying is that

8  you have this situation, as you described it,

9  involving quote-unquote inappropriate touching

10  between an older male and younger male, 12 years

11  old.  And you have provided that information and

12  asked for input from dispatch and SOC, correct?

13       A.   Correct.

14       Q.   Okay.  What happens next then, as you

15  remember, not necessarily with respect to the ACARS,

16  just what you remember, in general?

17       A.   So like I mentioned a second ago, the

18  first flight attendant left the cockpit, another

19  flight attendant came in.

20       Q.   May I ask, was that a simultaneous event

21  that, in other words that they basically passed each

22  other in the doorway or was there a lag of time

23  between one leaving and one coming back in?

24       A.    It wasn't five or ten minutes, it was

25  seconds of interchange.  Typically the first flight



1   attendant will come in and then the second flight

2   attendant goes out, because you can't open the door

3   from the outside.  So they both have to be in there

4   for the same time, but I don't believe they stayed

5   in the cockpit together.

6        Q.   Let me stop and get some just identifying

7   information.  The first flight attendant who came

8   in, the female, did you understand her to be the one

9   who had made the initial call into the cockpit?

10       A.   I don't know, and I would not remember her

11  voice because I didn't listen to it, so I don't

12  know.

13       Q.   But then in your recollection after you

14  and she and the captain had a discussion about

15  information needed, then she left, correct so far?

16       A.   Correct.

17       Q.   And then did a female or male flight

18  attendant come in after her?

19            MR. MAYE:  Object to form.

20            MR. MCKAY:  Aren't those the only two

21       options?

22       Q.   What was the gender of the flight

23  attendant who entered the cockpit after the female

24  flight attendant departed?

25       A.   There was two more flight attendants that



1   entered the cockpit, not at the same time initially,

2   but I believe the next flight attendant was a

3   female, and then it was the male or could have been

4   the male and then the female.  I don't remember what

5   order they came in.

6        Q.   Okay.  But the female was different than

7   the one that had just left?

8        A.   Correct.

9        Q.   Okay.  So a male and a female come in, and

10  you don't remember whether they came in

11  simultaneously?

12       A.   They came in at different times, I am not

13  sure which one was there first as the third person

14  in the cockpit for maybe a series of minutes.  And

15  then the flight attendants that were behind the door

16  called us up and said that one of the other flight

17  attendants want to come in and talk, as well.  That

18  flight attendant came in so there was two flight

19  attendants and us two in the cockpit at the same

20  time, and that point it was one male, one female

21  attendant and then us two in the cockpit.

22       Q.   Was that unusual for flight attendants to

23  all be at the front of the aircraft?

24       A.   No, we try to, we try to minimize the

25  amount of telephone that we have to play, and we



1   have to play some.  So especially when there was two

2   people that had observed situations, we would want

3   to hear it from both of them.  So a time is

4   typically of the essence and most of the stuff that

5   we do in the aircraft, so we try to get that

6   information quickly.  You know, it's, in this

7   situation it was not uncommon because there was

8   already one person in the cockpit.  If no one was in

9   the cockpit if we hadn't gone to the bathroom right

10  then, they probably would have done this on the

11  phone because two people can be on the phone at the

12  same time, but that wasn't the case, they were

13  already up in the front to guard the cockpit door.

14  So leaving two on that side to guard two of us

15  inside was fine.

16       Q.   Okay.  And I apologize for on this, but

17  like you in this situation, my job is to get

18  specific and accurate information.  So I am going to

19  backtrack a little bit.  You had the phone call that

20  you testified about and then a, from a female flight

21  attendant, from a flight attendant, I am sorry.  And

22  then next is a flight attendant entering the cockpit

23  while you and the captain use the bathroom at

24  different times?

25       A.   Sure.



1    Q.   And then she remained, and there was a

2    discussion.  And this discussion involved both her

3    providing information and also your discussion about

4    the threat level issues, right or the FLM issues?

5        A.   It wasn't specifically about the FLM

6    issues, it was just what procedures does she have,

7    it wasn't necessarily threat levels it was, they

8    have many more procedures relating to passengers

9    than we do.

10       Q.   Sure.  That's their job.

11       A.   That's their job.  So we just asked if

12   they had anything in particular that they needed to

13   address, and then we addressed anything that we had

14   which we couldn't find anything.  And just we were

15   working together collaboratively to try to come up

16   with a series of events that would be either that

17   would have caused it to escalate, if it was to go

18   down that path, and if it didn't, we could continue

19   as planned and not make any immediate actions.

20       Q.   Okay.  So if I understand this correctly,

21   and based on what you have testified to earlier,

22   this discussion about where this situation might go

23   has to do with not only flight attendants protocols,

24   but also the protocols in your FLM, fair statement?

25       A.   Yes.



1      Q.    Okay.  And from your standpoint, since you

2    don't know their protocols, you can talk about what

3    is in the FLM, right?

4      A.    Correct.

5      Q.    So the discussion on the pilot side was,

6    well, unless there is physical contact it really

7    doesn't come into our sphere of what is in the FLM,

8    right?

9      A.    Correct.

10     Q.    Okay.  So after that discussion then, the

11   female flight attendant leaves and then two more

12   flight attendants come in?

13     A.    Yes, not at the same time, there was a

14   point at which the female, I don't know if it was

15   another female.  The female left, one flight

16   attendant came in, two minutes later the other one

17   came in.

18     Q.    Okay.  First one in is female?

19     A.    I don't remember.

20     Q.    Second one in?

21     A.    After they both were in, there was a male

22   and female.  I don't know which one came first or

23   second.

24     Q.    So it might have been the male that came

25   in second?



1       A.    I believe it was.

2       Q.    Okay.

3       A.    But I am not positive.

4       Q.    What was said at that point, that you

5   remember?

6       A.    So we had identified that, you know, we

7   had at that point, the captain and I had received

8   information of what had happened, when they got

9   removed or reseated prior to the flight.

10      Q.    I have to stop you there because that's

11  the first time you have mentioned what had happened.

12  What did you understand had happened when they were

13  reseated that was of significance to this

14  discussion?

15      A.    The flight attendant said that as she

16  approached one of the, the child, that the child

17  seemed timid or meek and kind of shied away from the

18  situation, just seemed to be in a situation where

19  there was an overbearing presence.  You know, didn't

20  have any direct interactions and just kind of said

21  hey, how old are you, or I don't know what she

22  asked, but she just kind of goes up and tries to

23  make conversation.  And just said that it was, that

24  the situation felt extremely controlled and that

25  there was, you know, control being put on one person



1  by another person is kind of where she thought, but

2  they got up and they communicated fine, and went to

3  the other seat and it was fine.

4        Q.   Let me ask you this.  Did she say the

5  older gentleman had answered the age question for

6  the younger child?

7        A.   I don't remember.

8        Q.   Okay.  Did she --

9        A.   Based, I don't know, I don't know, I would

10  just say I assume, but I don't know, I wasn't there

11  so I can't say that.

12        Q.   You assume that was what she was relaying

13  to you?

14        A.   The way she implied the situation was that

15  the child was not answering, was very kind of

16  reserved and either was, yes, and it was very

17  reserved, I guess, in that situation, just kind of

18  looking for permission or acceptance or, you know,

19  something to kind of go through and yes, that's

20  where I was, the conversation I was getting from

21  her, that's kind of where it would be at, I guess.

22        Q.   And she was the one that had reseated

23  them?

24        A.   I believe so.

25        Q.   Did she say anything more that was unusual



1    as she reseated them?

2          A.    At the time of reseating, no.

3          Q.    What she relays to you is this overbearing

4    situation, but I don't hear anything there about

5    inappropriate touching.  So how did that get into

6    your ACARS message?

7          A.    Because the situation that they called us

8    up for, 45 minutes later was that there was

9    inappropriate touching or interactions between the

10   two of them.

11         Q.    So what did you understand to be

12   inappropriate about the touching?

13         A.    That the, from what I was told or what I

14   remember, that the child was sitting and the adult

15   was the male was leaning over and kind of on top of

16   the person, the child, and had their hand down in

17   between their legs.

18         Q.    That's what you understood from the first

19   message 45 minutes into the flight?

20         A.    Correct.  And at that point, what I

21   remember is that one of the flight attendants

22   attempted to wake the adult up.

23         Q.    I am sorry, the adult was asleep?

24         A.    I don't know.  They tried to get the

25   adult's attention and I don't know how they did it,



1  I wasn't there.  They were able to get the attention

2  of the adult and the adult said, oh, okay, no

3  problem and kind of stood up is what I gathered, or

4  sat up.  And then we continued and they said, hey,

5  that was when they had called us was after that

6  interaction is when they called us after the 45

7  minute mark.

8       Q.  Okay.  So the first call that you

9  received.  And this is all what you got from Captain

10  Shoop because the first call you didn't listen to?

11      A.  Correct.

12      Q.  So the first call 45 minutes into the

13  flight, according to Captain Shoop's relaying the

14  information to you, there had been a situation where

15  they saw the adult, as you put it, on top of the

16  child with his hand between the child's legs.  That

17  somehow they had gotten the adult's attention, they

18  don't know whether he was -- you don't know whether

19  he was asleep or not.  He said something like, oh,

20  okay, had stood up?

21      A.  No, just sat up.

22      Q.  Sat up.  Okay, and all that information...

23      A.  Put himself back to his position in his

24  seat, and then they continued on.

25      Q.  Okay.  They continued on, meaning the



1  flight continued and?

2      A.   Yes, the flight attendants continued

3  monitoring.

4      Q.   Everything was fine?

5      A.   The flight attendants, you know, are on

6  the look out for, you know, passengers get sick or

7  anything.  So they were always just monitoring

8  passengers.

9      Q.   Okay.  But all of this information about

10  the hand between the legs being on top of the child

11  and possibly being asleep, and saying something like

12  oh, okay, and sitting up straight, all of that was

13  part of the first call that Captain Shoop relayed to

14  you?

15      A.   Not all of that detail was there.  I mean

16  it wasn't until, it wasn't until the flight

17  attendant started approaching the cockpit and we

18  were able to talk to them that I was able to get

19  specifics and the details.

20      Q.   What specifics in what I just said did you

21  receive after the 45 minute call?

22      A.   So at the 45 minute call I believe that

23  they, the flight attendants told us at least that it

24  was inappropriate.  I don't know what specifics

25  there was.  But I know then after the flight



1  attendants came into the cockpit is when they

2  described to us the details of what had happened or

3  transpired, and the events up to that point.

4       Q.   Okay.  As you sit here today, you don't

5  know whether the hand that was supposedly between

6  the legs was something that occurred prior to the 45

7  minute call or between the 45 minute call and the

8  in-person visit to the cockpit?

9       A.   I don't know if the first time that was

10  reported to us was prior to or after the 45 minute

11  call or just after that, later on in the flight,

12  when all, when there was two flight attendants in

13  the cockpit with us, the consensus of the story that

14  the captain and I tried to come up with the most

15  correct source of it.  So taking the things that

16  were consistent between each of them.  At that point

17  it then led us to a point where the adult male had

18  been interacted with twice or asked twice to kind of

19  correct his inappropriate situation with the child.

20       Q.   Okay.  Let me stop you there?

21       A.   Can I go to the bathroom?

22       Q.   Sure.  I thought you said can I go back

23  now.  Yes, you can certainly go to the bathroom.

24  And we will go off the record.

25            VIDEOGRAPHER:  The time is approximately



1      12:01 p.m., we are going off the record.

2           (Whereupon, an off the record discussion

3      was held.)

4                The time is approximately 12:14 p.m.

5   we are going back on the record.

6      Q.   Okay.  Before we took a break you had

7   mentioned different flight attendants coming in and

8   out, and I would like to have marked as Exhibit, I

9   think this is 3 or 2.  Just so you know I am

10  probably going to refer to 2 again in a minute, so

11  don't push it too far away.

12                     (Exhibit 3 was marked for

13                      identification.)

14                Looking at Number 3, these are some

15  photographs from employee records that had been

16  produced to us by your company.  And I am wondering

17  if you are able to identify the first flight

18  attendant who entered the cockpit from those?

19     A.   It was not Scott.

20     Q.   Okay.

21     A.   But...

22     Q.   Would it help if I told you their

23  positions?

24     A.   Um, it doesn't.

25     Q.   It doesn't make a difference?



1      A.    Yes, I don't think.

2      Q.    Okay.

3      A.    I didn't know which seat the A and the D

4  sit in, it doesn't make a difference.

5      Q.    Okay.

6      A.    I want to say it was Anna, she looks the

7  most familiar, but I don't know.

8      Q.    Okay.  All right.  So you said that by the

9  time of the, well, at some point, let me put it that

10  way.  At some point you determined that the data

11  points that you had of information included a fact

12  that the adult had been spoken to twice about his

13  conduct, is that a fair statement?

14      A.    Correct.

15      Q.    Okay.  And that was information that was

16  relayed to you by the flight attendants who came

17  into the cockpit?

18      A.    Yes.

19      Q.    And at this point had you and Captain

20  Shoop given any instructions to the flight

21  attendants?

22      A.    Specific instructions as far as moving

23  additional people, no.  We had discussed with them

24  about, you know, for them to tell us if anything

25  else happened, but it was just more I think at what



1  point where are we at?

2      Q.   Yes.

3      A.   At some point.

4      Q.   Yes, we are at the point where the first

5  flight attendant to enter the cockpit is standing in

6  the cockpit.  So let's take it from that point?

7      A.   Yes.

8      Q.   And you have told them to let you know if

9  there is additional information?

10         MR. MAYE:  I am sorry, at the 45 minute

11     mark?

12         MR. MCKAY:  Forty-five minute mark is a

13     call so this is later.

14     A.   Later.  So when the first flight attendant

15  comes in, no, we didn't give them any instructions

16  at that point, other than collection, no new

17  instructions, just collect more information, keep us

18  informed.  My interpretation is that's probably

19  about when we sent the messages and stuff.

20     Q.   Okay.  But at that point the message does

21  indicate that they had been moved so, and with

22  specific seat numbers.  So at that point the first

23  flight attendant had told you that?

24     A.   Yes.

25     Q.   Okay.  So had you had, at this point with



1  the first flight attendant in the cockpit, was there

2  discussion about the FLM's?

3       A.   Yes.

4       Q.   Okay.  And the flight attendant was in on

5  those discussions?

6       A.   Yes.

7       Q.   Okay.  So then, that flight attendant

8  leaves and two more flight attendants come in,

9  correct?

10       A.   Correct.

11       Q.   But at different times, perhaps?

12       A.   Yes.

13       Q.   And that's a yes?

14       A.   Yes.

15       Q.   Okay.  And was the, and the second one

16  would have been Mr. Warren?

17       A.   Correct.

18       Q.   Okay and he came in after the other female

19  flight attendant?

20       A.   Um I believe so, I am not positive on the

21  order, but I think he was the last one in.

22       Q.   Okay.  And he is the one, is he the one

23  that said that he had seen the hand between the

24  legs?

25       A.   He is one of them, one of the other flight



1    attendants had said that to me as well.

2         Q.   A female?

3         A.   Yes, one of the female flight attendants

4    had said that as well, yes.

5         Q.   Okay.  And that was after the first flight

6    attendant left?

7         A.   Correct.

8         Q.   Okay.  And who was it that told you that

9    the adult had by this point been spoken to twice?

10        A.   I don't recall.

11        Q.   Okay.  Are you familiar with something

12   called sky speed?

13        A.   No.

14        Q.   Have you ever seen that term in any

15   company documents?

16        A.   No.

17        Q.   What happened then after the two flight

18   attendants are in the cockpit providing information,

19   was there any determination made at that point of

20   anything with respect to the FLM?

21        A.   I believe this is about the location, it

22   was, yes, I think both the flight attendants were in

23   the cockpit is when we made the determination that

24   we should reseat the child and separate the

25   situation.



1      Q.   And what was the basis for that decision?

2      A.   Making sure the safety of the child was

3   paramount to us and we were avoiding any

4   inappropriate or potentially dangerous situations

5   that could arise.

6      Q.   Now, had you at that point received any

7   information about who the adult and child were?

8      A.   With respect to what?

9      Q.   Flames?

10     A.   No.

11     Q.   Okay.  Family relationship?

12     A.   No, only that they were sitting together

13  and they were moved once.  So I would assume that

14  they were family or traveling together.

15     Q.   Could you have asked dispatch and/or SOC

16  for at least their names?

17     A.   It's possible.

18     Q.   It's possible that you could have done it?

19     A.   Yes, but even if we would have asked, it's

20  not incredibly accurate, they would have had, you

21  know, passengers move into the incorrect seats

22  occasionally.  So in the past we have done that, we

23  have gotten incorrect information and still had to

24  work with it through the passengers themselves.

25     Q.   I see.



1      A.   So we could have asked, sure, but it

2    wouldn't have made a difference in our decisions.

3      Q.   Somebody could have asked the passengers

4    themselves, couldn't they?

5      A.   Sure, we knew that they were traveling

6    together, that they had sat together and moved

7    together, so it was safe to say they were together

8    in that situation.

9      Q.   Was there any attempt made to ask them why

10   they were traveling together?

11     A.   No, I mean people travel for many reasons,

12   and I don't think anyone asked.

13     Q.   Was there any attempt made to ask them

14   their names?

15     A.   I don't know that, I don't know if that's

16   a yes or no, I didn't ask them, so.

17     Q.   You didn't ask anybody to find out what

18   their names are?

19     A.   I did not ask that, no.

20     Q.   Was there a discussion that they couldn't

21   be related to each other?

22     A.   No.

23     Q.   Was there at this point in time, with four

24   people in the cockpit, was there a discussion about

25   their different races?



1    A.   There was no discussion about it.  I mean
2  I think it was used as a descriptor by somebody, but
3  I don't know, it was not a relevant fact in our
4  determinations of the captain and I making a
5  decision.
6    Q.   So well one of the flight attendants you
7  are saying said the older man is white and the
8  younger child is black?
9         MR. MAYE:  Object to form.
10   Q.   Is that correct?
11   A.   I don't know that they said the older man
12 was white.  I know that it was a young African
13 American child.  But I don't remember when they said
14 anything about the adult.
15   Q.   But somehow you knew it was not an African
16 American adult traveling with an African American
17 child?
18   A.   Yes, I don't know how that came up, it
19 would have been with one of the flight attendants.
20   Q.   But you never saw, right?
21   A.   No.
22   Q.   So you would have had to have been told
23 that information by one of the flight attendants?
24        MR. MAYE:  Object to form.
25   Q.   Let me ask it a different way.  Since you



1   never saw them, you could only find out their race

2   by being told, right?

3        A.   Yes.

4        Q.   And the only people that would have

5   communicated that information to you were the flight

6   attendants?

7        A.   Yes.

8        Q.   Okay.  Now, you, yourself, never saw the

9   adults touch the child?

10       A.   Correct.

11       Q.   Okay.  Who made the decision to separate

12   the two passengers?

13       A.   I think the four of us collectively had.

14   Like I said, earlier the captain and I had discussed

15   with the first flight attendant about what could

16   lead us to a situation where we would want to

17   separate them or what other outcomes we would have

18   to the extent of landing immediately, and as all

19   four flight attendants are in the cockpit, the

20   amount of information and the details that we had

21   received had led us down the track that we should

22   separate them and make sure to diffuse the situation

23   as best we can in the current in environment.

24       Q.   So the decision was made based on new

25   information which was A, that the adult's hand was



1    between the legs of the child, B, and that the adult

2    had been told twice about his behavior relative to

3    the child?

4         A.   Yes.

5         Q.   Okay.  And at that point you say

6    collectively you have made a decision, but the

7    decision is ultimately the captain's decision, is it

8    not?

9         A.   Yes.

10        Q.   You would agree with that?

11        A.   Yes, I mean the captain and SOC share

12   joint responsibility for the flight, but once we are

13   in the air the captain is the one that we look to,

14   to make that decision.

15        Q.   And at this point you had asked SOC for

16   information as soon as possible, right, in your

17   ACARS message?

18        A.   Correct.

19        Q.   What did you receive back from SOC and/or

20   dispatch after that request?

21        A.   So we are on number eight?

22        Q.   Okay.  What does that say?

23        A.   So it says, did the flight attendants

24   witness the inappropriate touching or was it

25   recorded by another passenger or the younger male?



1      Q.   Okay.  So that's something that you

2   received back from the ground at 1:53 zulu, correct?

3      A.   Correct.

4      Q.   And what would be how long after your

5   first?

6      A.   Six minutes.

7      Q.   Six minutes later.  They are asking if it

8   was witnessed by flight attendants or reported by

9   another passenger or reported by the younger male,

10  right?

11     A.   Correct.

12     Q.   Okay.  And at this point nobody had

13  actually asked the younger male anything, had they?

14     A.   About, I mean one of the flight attendants

15  said she tried to ask him about his age and move

16  him.  She said she asked him that question.

17     Q.   Well, that was before the flight took off?

18     A.   Yes.

19     Q.   But after this information about

20  inappropriate touching, nobody had asked the child

21  if it was inappropriate?

22     A.   Correct, not at this point.

23     Q.   Okay.  And inappropriate, I mean just in

24  general would mean nonconsensual, right?

25     A.   Yes, or depending on the age discrepancy,



1   really it could be any kind of sexual related

2   touching.

3        Q.   Are you an expert on that?

4        A.   No, not at all.  I tried to avoid any of

5   those situations.

6        Q.   Okay.  You would agree with me that some

7   touching can be nonsexual, right?

8             MR. MAYE:  Object to form.

9        Q.   Can some touching of another person be

10  nonsexual?

11       A.   That's a personal view for both people, I

12  don't know how to answer that question.  Is there

13  touching that I view as being nonsexual, yes, do I

14  know other people that have the same view as me, no.

15       Q.   If you and I sat together, let's say I was

16  in the middle seat and you were in the window seat

17  and my hand brushed up against your leg, would you

18  consider that sexual?

19       A.   Me personally, no, but my wife has

20  definitely, and she has had situations with people.

21  So I wouldn't say that every one has the same view

22  of that.

23       Q.   So it kind of depends on context?

24       A.   Context, context is a very good

25  definition, yes.



1      Q.   All right.  And also about whether or not

2   it's consensual?

3      A.   Sure.

4      Q.   Okay.  Now, at this point in time when the

5   decision is made to separate these two people, is it

6   an accurate statement that as far as you knew,

7   nobody had asked either the adult or the child

8   whether the contact was nonconsensual?

9      A.   Correct.

10      Q.   Okay.  And in fact, I think you testified

11   that somehow you knew that the adult might have been

12   asleep at the time?

13           MR. MAYE:  Object to form.

14      A.   I corrected myself and I said I don't know

15   that he was asleep or just not paying attention, but

16   I know that the flight attendants were able to get

17   his attention quite easily from what I heard.  So

18   again, we are playing telephone, so I am not sure.

19      Q.   If someone were asleep and their hand

20   touched the passenger next neck to them, you would

21   agree with me that would be a non intentional

22   action?

23           MR. MAYE:  Object to form.

24      A.   I think it depends on the context, again.

25      Q.   Well, if the context is that the person



1   touching another person is asleep, do you believe

2   that that's an intentional act?

3          MR. MAYE:  Object to form.

4      A.   I don't know how people react to it.  I

5   mean I know that when I sleep I can sleep pretty

6   still and I don't, you know, it depends on the

7   situation.  I don't roll around down the tarmac or

8   the airport if I was taking a nap as a passenger, so

9   it's.

10     Q.   Do you sleep on the tarmac?

11     A.   No, I meant like I have seen passengers

12  that like lay out across, you know, underneath, you

13  know the...

14     Q.   The airplane?

15     A.   No not the airplane, but in the terminal.

16  That's the word I was looking for.

17     Q.   I got you.  Let's bring it within the

18  realm of your decision making?

19     A.   Sure.

20     Q.   At the point where the four of you jointly

21  made this decision, you didn't have any information

22  as to whether the contact between the adult or I

23  should say the alleged contact between the adult and

24  child was consensual or not, did you?

25         MR. MAYE:  Object to form.



SHAWN E. MULLIN                                    December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                          90

 1       A.    No, didn't have any difference to us.

 2       Q.    And it didn't also, you didn't also have

 3   any information about whether it was intentional or

 4   not, did you?

 5            MR. MAYE:  Object to form.

 6       A.    Correct.

 7       Q.    Okay.  Would that have made any difference

 8   to your decision making if it was intentional or

 9   not?

10       A.    I don't believe so.

11       Q.    Even though the note that you testified

12   about earlier said to disregard unintentional

13   conduct?

14       A.    You are talking about the security levels?

15       Q.    The torrets and the epilepsy that you

16   testified to?

17       A.    That was specifically to medical

18   conditions related to torrets and epilepsy.  So if

19   you are having a seizure, you are going to have a

20   seizure, you know, there is you, your question was

21   asking about conscious decision versus subconscious

22   decisions.  That's completely different.

23       Q.    All right.  So you thought it was

24   appropriate to separate the 12 year old boy from his

25   traveling companion?



1        A.    From whoever it was, yes.

2        Q.    But didn't know who it was?

3        A.    We didn't know the extent other than that

4   they were traveling together, correct.

5        Q.    You didn't know that they were father and

6   son?

7        A.    Correct.

8        Q.    And you didn't take any action to try to

9   find that out?

10        A.    No.

11        Q.    Okay.  So in the end, you ended up

12   separating a 12 year old boy from his father for the

13   duration of the flight, correct?

14        A.    Correct.

15        Q.    And that separation was done through Mr.

16   Scott Warren?

17        A.    I wasn't there, I don't remember.

18        Q.    Well you were there in the cockpit?

19        A.    Yes, but I didn't see it, I don't

20   remember.

21        Q.    Well, did anybody say who was going to

22   separate them?

23        A.    In the cockpit, when the four of us were

24   talking, I don't remember that.

25        Q.    Well, did at any other time, did anybody



1   say who was going to separate them?

2        A.   No, not that I could remember.

3        Q.   But you came to understand that Mr. Warren

4   had separated them, didn't you?

5        A.   After the flight, when the flight

6   attendant said we are giving their statements and

7   she is in situations like that, yes, but at the time

8   I didn't understand any of that.

9        Q.   So after the flight you became aware that

10  Scott Warren had separated them?

11       A.   Yes.

12       Q.   Okay.  Now, before we get into all the way

13  at the end of the flight.  I want to look more at

14  these ACARS messages, because number seven, if you

15  will take a look at that is describes as an air crew

16  message, so that would have been from the cockpit to

17  the ground, correct?

18       A.   Correct.

19       Q.   Okay.  And that was at 1:55 zulu, correct?

20       A.   Yes.

21       Q.   And that was two minutes after the ACARS

22  message that's asked whether anybody witnessed it,

23  right?

24       A.   Correct.

25       Q.   Okay.  And what did this message say?



1       A.   Number seven?

2       Q.   Yes.

3       A.   The flight attendants witnessed it,

4   period.  They are separated now.

5       Q.   Okay.  So between receiving the request

6   for more information at 1:53 and sending a response

7   at 1:55, you knew that the two passengers had been

8   separated, right?

9       A.   Correct.

10      Q.   Okay.  Do you, based on these zulu times,

11   do you know about when, when you became aware that

12   the two had been separated?

13      A.   I am guessing plus or minus right then, I

14   mean 1:55 zulu.

15      Q.   So you think it was within those two

16   minutes?

17      A.   Yes.

18      Q.   Okay.  So how did you find out that they

19   had been separated?

20      A.   I think after, I don't remember specifics.

21   My, our normal procedure would be to have the flight

22   attendants call us and let us know how a situation

23   is going, so that would be my guess.

24      Q.   Your guess is it's one of the flight

25   attendants called to report back the result of



1  separating?

2       A.   Yes.

3       Q.   Do you know whether it was Mr. Warren or

4  somebody else?

5       A.   No.

6       Q.   Were you told at that point that Mr.

7  Warren had punched the older adult four times in the

8  back of his head?

9       A.   No.

10      Q.   When did you find that out?

11           MR. MAYE:   Object to form.

12      A.   The first time I was made aware of that

13  was in the last 48 hours.

14      Q.   The last 48 hours of today?

15      A.   Yes.

16      Q.   Okay.  And how were you made aware of

17  that?

18      A.   I think it was one of the other flight

19  attendants that hasn't done their deposition yet.

20  She and I were talking, and she had heard the rumor

21  about that.

22      Q.   Was that Ms. Nichol?

23      A.   I don't know.

24      Q.   Well, you know who you were talking to,

25  don't you?



1          MR. MAYE:  I am going to object to the

2      extent this is attorney client privilege, and

3      this is discussion.

4          MR. MCKAY:  I am sorry, don't coach him,

5      please.

6          MR. MAYE:  Hold on.  I am objecting to the

7      attorney client privilege.

8          MR. MCKAY:  Good.

9          MR. MAYE:  And if what he is talking is a

10     conversation.

11         MR. MCKAY:  If you are coaching him that's

12     not allowed.

13         MR. MAYE:  John.

14         MR. MCKAY:  I understand attorney client

15     privilege.  The man has just testified he was

16     speaking to a fight attendant, unless the

17     flight attendant an attorney in the State of

18     Nevada who is representing him, then I think

19     you need...

20         MR. MAYE:  Unless I was present.

21     A.   It was yesterday at a meeting with all

22  four of us.

23     Q.   I see.  Thank you.  Are you aware that

24  your company documents reference the fact that

25  Mr. Delvecchia was punched four times in the back of



1   his head?

2        A.   No.

3        Q.   Have you read any of the materials that is

4   written in the PNR for Mr. Delvecchia?

5        A.   No.

6        Q.   Okay.  Have you discussed any of the

7   contents of that material with anyone?

8        A.   Excluding the conversation yesterday, no.

9        Q.   Okay.

10        A.   And I don't think it was, I don't know if

11   anyone has read that.

12        Q.   All right.  Anyone meaning anybody who was

13   on the flight?

14        A.   Yes.

15        Q.   All right.  Did you know that the result

16   of the separation was that the child,

17   Mr. Delvecchia's son, was confined to the back of

18   the airplane bare foot for the duration of the

19   flight?

20        A.   Not at that time.

21        Q.   And there was still about two hours left

22   on the flight, wasn't there?

23        A.   Yes, maybe.  I can look at the time stamp

24   here, but yes, we were not at descent yet, so

25   probably an hour and a half or two hours, at least.



1    Q.   And you did know that he was put in the

2    back row with an able body passenger next to him?

3    A.   He was put in an empty row and an able

4    body passenger was put in the aisle, yes.

5    Q.   Was that because of your agreement in the

6    cockpit?

7    A.   I don't know if we talked specifically

8    about that situation.  I know that they said we have

9    open seats.  And from conversations I have had since

10   this time in other situations that we have had to

11   resolve in the aircraft, I know that's their normal

12   procedure to put an able body passenger and kind of

13   make sure the situation can be diffused if it was to

14   escalate.

15   Q.   On flight 2067, did you know who the able

16   body passenger was?

17   A.   No.

18   Q.   Did you know whether that was person was a

19   flight marshal?

20   A.   No.

21   Q.   Are you informed if there is a flight

22   marshal on a flight as a pilot?

23   A.   Yes.

24   Q.   Okay.  Was there a flight marshal on this

25   flight 2067?



SHAWN E. MULLIN                                    December 10, 2019
PETER DELVECCHIA vs FRONTIER AIRLINES                           98

1        A.    I don't believe so.

2        Q.    Do you know whether the able body

3    passenger was an employee of Frontier?

4        A.    I don't know.

5        Q.    Okay.  Did you, you said you came to

6    understand later that Mr. Delvecchia's son was

7    barefoot in the back row.  How did you come to know

8    that?

9        A.    I heard that yesterday, as well.

10       Q.    Okay.  Now, did you ever go back to see

11   with your own eyes the situation in the back of the

12   plane?

13       A.    No.

14       Q.    Okay.  Did you know that Mr. Delvecchia

15   tried to get back to his son and was blocked from

16   doing so by Mr. Warren?

17             MR. MAYE:  Object to form.

18       A.    I wouldn't have any knowledge of that.

19       Q.    Okay.  Did you speak to the police after

20   the flight landed?

21       A.    I spoke to them, yes, they didn't ask for

22   a statement from me, I don't believe the captain

23   either.

24       Q.    Were you still aboard the plain when that

25   happened?



1      A.   Yes.

2      Q.   So did you wait to deplane until after all

3  the passengers were off?

4      A.   Myself?

5      Q.   Yes.

6      A.   Yes, where, I have a lot of duties after

7  we get there to do, so yes.

8      Q.   So by the time the police entered the

9  plane and asked you questions, were there any

10  passengers left?

11      A.   I don't believe so.  I mean, yes, I don't

12  believe so.

13      Q.   Did you watch the passengers deplane?

14      A.   No.

15      Q.   Was the cockpit door closed when that

16  happened?

17      A.   Not during, not for the duration of the

18  deplaning.  No, it's typically opened pretty

19  quickly.  I have to go out and check the aircraft,

20  to make sure that everything is, do a post flight

21  inspection and go back and continue finishing our

22  tasks that we have to upfront.  So the north door is

23  typically opened at that point.

24      Q.   Well, during all that time, between the

25  time the plane landed and the time that you are back



1   in the aircraft talking to the police, did you at

2   any time see Mr. Delvecchia or his son?

3        A.   After I came back to the aircraft.

4        Q.   After doing your walk around?

5        A.   Yes.

6        Q.   Okay.

7        A.   So I left the aircraft, went outside and

8   came outside, takes several minutes, I believe that

9   the child was talking to some law enforcement, but I

10  don't remember.  I think they were standing on the

11  jet bridge, I can't remember.

12       Q.   Did you hear anything that was said?

13       A.   No.

14       Q.   You just knew they were talking?

15       A.   Yes.

16       Q.   Was the father there?

17       A.   I honestly didn't know what he looked

18  like.  So after seeing him here, yes, but I couldn't

19  have described him to you back then so I wouldn't

20  have known.  I know that there was another passenger

21  on the jet bridge, I didn't know who they were.

22       Q.   Okay.  I just had to be very clear because

23  of the transcript and the possibility that what you

24  just said might be misconstrued?

25       A.   Absolutely.



1    Q.   Did you or did you not see Peter

2    Delvecchia on the jet bridge after your walk around?

3    A.   I wouldn't have known who he was at that

4    time.  I saw another passenger, so I saw the child.

5    I saw a child that would be talking to the law

6    enforcement, and I saw an adult on the jet bridge,

7    as well.  That was the extent of it.

8    Q.   I see.  And you don't know who the adult

9    was?

10   A.   I didn't know the names of either one of

11   them.

12   Q.   Did you, well, as you sit here today, we

13   see Peter Delvecchia across the table from you, is

14   it your testimony that's the other passenger you saw

15   on the jet bridge?

16   A.   I can't remember.

17   Q.   Why do you say that it was a passenger as

18   opposed to say either law enforcement or a Frontier

19   employee?

20   A.   Wasn't in a law enforcement or Frontier

21   employee uniform.  So it was somebody that was

22   traveling that was not working for the company,

23   therefore the police or law enforcement.

24   Q.   Could it have been a plain clothes police

25   officer?



1        A.    That's possible.

2        Q.    Okay.  So we can't restrict it to be a

3   passenger?

4        A.    Sure.

5        Q.    Okay.

6        A.    There was one plain clothes police

7   officer, but when he came down the jet bridge, he

8   had his badge on the outside of his shirt, so he

9   knew it wasn't him.

10       Q.    All right.  Do you remember when it was,

11  what police officer you spoke to?

12       A.    No.  It was a plain clothes officer that I

13  believe was a metro officer that was in plain

14  clothes, that was all I can remember.

15       Q.    All right.  What did you and he discuss?

16       A.    He just asked what my role was, where I

17  was seated during the flight.  And he said, oh, the

18  flight attendants are the ones that would have

19  interacted with this, and he just went to talk with

20  the flight attendants more.

21       Q.    Did you understand what it was that he was

22  called for?

23       A.    I mean, as in many different situations

24  that's very normal course of action is for us just

25  to allow the law enforcement to figure out what is



1  going on.

2      Q.   But I mean law enforcement was there

3  because you and Captain Shoop had asked for that,

4  correct?

5      A.   Correct.

6      Q.   And, in fact, if you go to number six on

7  the ACARS, it says confirm that we are set for our

8  arrival with LEO, right?

9      A.   Yes.

10      Q.   Okay.  And that's an air crew message at

11  3:11 zulu, right?

12      A.   Correct.

13      Q.   And that was sent by either you or Captain

14  Shoop?

15      A.   Correct.

16      Q.   Do you know which of you sent it?

17      A.   No.

18      Q.   And so at 3:11 zulu, the aircraft was

19  still in the air, right?

20      A.   Yes.

21      Q.   And you are saying that you need people on

22  the ground from Frontier to confirm that you are set

23  for arrival with law enforcement officers, right?

24      A.   Correct.

25      Q.   And then it says, also is there further



 1 | info on this adult dot dot, they are still
 2 | separated.  See that?
 3 |      A.   Yes.
 4 |      Q.   And you are still seeking information on
 5 | the adult passenger, right?
 6 |      A.   Correct.
 7 |      Q.   Why?
 8 |      A.   I mean that's our normal course of action
 9 | to try to continue to seek as much information as we
10 | possibly can get.
11 |      Q.   All right.  What was the response that you
12 | got three minutes later?
13 |      A.   LEO's will meet the flight, no new
14 | information on adult.
15 |      Q.   So even the people on the ground are
16 | saying they don't have any information on the adult
17 | passenger to you?
18 |      A.   Correct.
19 |      Q.   Okay.  And then at 3:37 zulu, number four,
20 | sorry, number, yes, number four, description special
21 | request.  At 3:37, do you know who sent that?
22 |      A.   No.
23 |      Q.   Okay.  Let me just ask this, did it come
24 | from the cockpit or did it come from the ground?
25 |      A.   Yes, that's a cockpit.



1      Q.   How do you know that?

2      A.   The special request is what we send, this

3   next one is what we get back.

4      Q.   Okay.  Down in the text portion, begins

5   with the number 6393, could you see that?

6      A.   Yes.

7      Q.   What does that mean?

8      A.   I have no idea.

9      Q.   But it's something that you either you or

10  Captain Shoop wrote?

11     A.   No, my guess is it's a code that tells it

12  what to respond with, because the specials request

13  is different place, it's not like a free text box

14  where you can only just type in text.  We select

15  different options as we go down.

16     Q.   All right.  Now, this is several minutes

17  later from number five, and it says again, just

18  confirm we will have LEO's standing by at the gate.

19  We will deplane the adult and child last.  That's

20  something that either you or Captain Shoop wrote?

21     A.   Correct.

22     Q.   Do you know which of the two wrote it?

23     A.   No.

24     Q.   But why are you still seeking confirmation

25  if you already received it in number five?



1      A.   Because we are constantly getting updates.

2   I mean we check the weather many times throughout

3   the flight, we want to keep getting updates.

4      Q.   Well, they have already told you law

5   enforcement officers will meet the flight, but were

6   you concerned about the possibility that they

7   wouldn't?

8      A.   No, that's a different person.  So the air

9   crew message is with dispatch.  The special request

10  is with gate crews, security coordinator in Las

11  Vegas.

12     Q.   I see.  So the air crew message goes to a

13  different place than the special request message?

14     A.   Correct.

15     Q.   Okay.

16     A.   That's why it has a coded stuff, so it's,

17  if we are communicating with dispatch, all that's

18  not available to the ground personnel.

19     Q.   Why did you decide that the adult and

20  child would be deplaned last?

21     A.   Well, for many different reasons, but

22  several different reasons.  We have had situations

23  in the past, whenever there is some sort of

24  disturbance or commotion, we try to keep the

25  situation as diffused as possible, and just there



 1  was no violence being asked about, so we allowed the

 2  other passengers to deplane first and to allow every

 3  one to stay back and work out whatever situation we

 4  had to work out, and hopefully everything will turn

 5  out well.

 6        Q.  So you confirm there was no violence in

 7  the situation?

 8        A.  Correct.

 9        Q.  Okay.  The next thing is item number 3, at

10  3:43 zulu.  It says up length from KLAS OPS, that

11  would be Las Vegas Operations?

12        A.  Correct.

13        Q.  And there is a lot of information about

14  wheelchairs and gates and things.  And then it says

15  copy, they will meet the flight.  If there is

16  anymore witnesses, please deplane them last, as

17  well, so they can give statements.  Do you see that?

18        A.  Correct.

19        Q.  And that was a request that was made by

20  the operations personnel at McCarran Airport in Las

21  Vegas?

22        A.  Correct.

23        Q.  Okay.  Did you hold back any witnesses so

24  they could give statements?

25        A.  I don't know.  We passed the information



1  along to the flight attendants.  Like I said, I was

2  not, I deplaned to go do my duties, but I don't

3  know.

4      Q.   When you came back from doing your duties

5  did you see any witnesses being held back by the

6  flight attendants?

7      A.   Like I said, I know there was at least one

8  additional passenger that was on the jet bridge, I

9  don't know, I believe, yes, I believe there was one

10  other, but I don't remember who.

11      Q.   Okay.  Did the crew take any witness

12  statements from any passengers?

13      A.   I don't know.

14      Q.   Did anybody follow up with you for

15  Frontier after the flight?

16      A.   No.

17      Q.   Did you on your own give any statement to

18  Frontier?

19      A.   Excuse me, I spoke with the chief pilot in

20  Las Vegas, Devin Hussey in Las Vegas.

21      Q.   Yes.

22      A.   Just to let him know that it happened and

23  if there was any additional information, to let me

24  know.  He had made a comment that Mr. Shoop had also

25  given information that had already submitted



1  information regarding the flight and he shouldn't
2  need any additional information from myself because
3  we both were getting the same information.
4      Q.   What caused you to contact Mr. Hussey to
5  make that statement?
6      A.   I mean I make it a point to.  Well, his
7  office is in our crew room, so if I get to the
8  airport during business hours I often see him and
9  catch up on items about what is going on, and I kind
10  of make it a point to keep him informed of whatever
11  information I can.
12      Q.   Was this a face to face conversation or
13  phone call?
14      A.   Face to face, yes.
15      Q.   And how soon after the flight was it?
16      A.   Within two days, maybe, next day, I don't
17  think it was the next day because I think we got
18  back late, but I think it was within 24 hours.
19      Q.   And it was definitely after Captain Shoop
20  had spoken to Mr. Hussey?
21      A.   Yes.
22      Q.   Yes.  Okay.  Have you received any kind of
23  warning, reprimand or job consequences of any type
24  as a result of this incident on Flight 2067?
25      A.   No.



1      Q.    Do you know if any other Frontier

2   employees who were part of the crew on the flight

3   did?

4      A.    I am a unaware.

5      Q.    Okay.  As far as you know, has Frontier

6   indicated to you that it believes anything improper

7   happened on the flight?

8      A.    I am not aware of their position.

9      Q.    But they have not communicated anything to

10  you of that nature that they are unhappy with how

11  the flight?

12     A.    They had not spoken to me about that, no.

13     Q.    We will take a little break, five minutes?

14        VIDEOGRAPHER:  The time is approximately

15     12:53 p.m. we are going off the record.

16        (Whereupon, an off the record discussion

17     was held.)

18        The time is approximately 12:59 p.m. we

19     are going back on the record.

20     Q.    Mr. Mullin, I have a couple of more

21  questions.  Just want to confirm a couple of things.

22  There was the joint decision amongst all the flight

23  attendants and pilots to separate the gentleman and

24  the child.  And then I think you said that you

25  called back to find out if there was anything more



1  to the situation, is that true?

2       A.   I don't believe so.  I believe the flight

3  attendants called us.

4       Q.   That's right, somebody called to report

5  back to you the resolution of the situation?

6       A.   Correct.

7       Q.   How long after the decision was made do

8  you think that occurred -- oh, I think you testified

9  it was within those two minutes, wasn't it?

10       A.   No that was when I was made aware of them

11  being moved, but I believe when the two flight

12  attendants left the cockpit, the decision had been

13  made to move them.  So at that point that could have

14  initiated the message that said hey, they are being

15  moved or they are moved.

16       Q.   Well, it says they are already separated,

17  doesn't it?

18       A.   Yes, and there is a lot of delays in

19  getting communication and so a lot of times, you

20  can't beat very much in the future.  But I believe

21  the phone call that came, excuse me, the phone call

22  that came back from the flight attendants was

23  probably ten or 15 minutes, something like that,

24  which whatever the time frame was, it seemed

25  reasonable for them to put the front galley back



1   together to all kind of go back to their stations,

2   go discuss this with the passengers and ask them to

3   be moved.  And it all seemed logical to me.

4        Q.   Did you get any further reports or did you

5   seek any further reports after that to find out how

6   things were going with either the child or the older

7   gentleman?

8        A.   I think as we mentioned in a couple of the

9   ACARS, nothing had changed, there was no, whenever

10  we had discussed or had a discussion with the flight

11  attendants, I didn't do those phone calls, but I

12  believe that there was information that the, to the

13  extent of has anything changed, that kind of

14  situation.

15       Q.   So you think there were calls where that,

16  where they were brought up?

17       A.   There is typically one call every

18  hour-ish.  So it's maybe 45 minutes, depending on

19  what is going on and how much time is remaining on

20  the flight.  I want to say there was probably two.

21  So they probably called us once after they got it

22  situated, and then one other is what makes sense to

23  me.

24       Q.   And nothing was brought to your attention

25  about either the father being struck in the head or



1    the son being unhappy back in the back of the plane?

2          A.   Nothing, other than the extent that the

3    flight attendant said that they asked the child if

4    he wanted anything, they gave him some juice and a

5    cup of ice, and just kind of offered to give him

6    anything he needed to make sure that he was as

7    comfortable as possible.

8          Q.   They told you all that?

9          A.   What they offered, they did tell us they

10   gave him some juice and they offered him some snacks

11   and he said he didn't want it.

12         Q.   That's the extent of what they told you?

13         A.   Yes.

14         Q.   But all the part of anything he needs to

15   be comfortable, that was your addition to it,

16   correct?

17         A.   Correct.

18         Q.   Now, you have worked for Frontier since

19   early August of 2018, correct?

20         A.   Correct.

21         Q.   Have you, during that period of time to

22   the present, have you worked with any members of

23   this flight crew on other flights?

24         A.   I don't believe so, but it's very often

25   that I will only meet one or two of the flight



1  attendants and there could be three are four or

2  five, so I don't know, I don't believe so.

3      Q.   Well, do you know, outside of this case,

4  do you know any of these flight attendants?

5      A.   No.

6      Q.   You don't interact with them socially?

7      A.   No.

8      Q.   And you didn't, to your recollection, you

9  didn't work with them previously?

10     A.   Correct.

11     Q.   Okay.  So when these people are giving you

12 information about their observations and

13 conclusions, these are people you have never met

14 before?

15     A.   Correct.

16     Q.   Okay.  Now, during this time, from

17 August 6th of 2018 to the present, how many other

18 times have you called or been a member of a flight

19 crew that called for law enforcement officers to

20 meet the flight?

21     A.   I don't know a specific number.  I can, I

22 want to say two other times.

23     Q.   All right.  And for those two other times,

24 what was the situation that caused law enforcement

25 to be called?



1      A.   Well, it wasn't for law enforcement to be
2    called specifically, it was just to have services
3    come and help us, both times were for medical
4    related issues of the passengers.  So it's EMT's and
5    medical and police, and everyone would come whenever
6    we do that.
7      Q.   So both of those were medical emergencies?
8      A.   Yes.
9      Q.   So they didn't involve any kind of threat
10   level emergency?
11     A.   No.
12     Q.   That's all I have for now.  I note for the
13   record that there is an awful lot of discovery
14   issues that may impact whether or not we have to
15   have you back for a deposition.  So I will adjourn
16   for my part, Mr. Maye may have some questions.
17                        EXAMINATION
18   BY MR. MAYE:
19     Q.   How did you first learn about the flight
20   attendants concerns regarding Peter Delvecchia and
21   AD?
22     A.   Um, first concern was via phone call 45
23   minutes into the flight.
24     Q.   And do you remember what was communicated
25   regarding their concerns, the flight attendants



1   concerns?

2        A.   That there was a situation between a young

3   male passenger and an older gentleman, that the

4   interactions and physical touching were

5   inappropriate from their view or maybe they wanted

6   to keep an eye on it.

7        Q.   What directives were given by you or the

8   captain in response to this phone call?

9             MR. MCKAY:  Objection.  Asked and

10            answered.  Go ahead.

11       Q.   Go ahead.

12       A.   I am sorry.  So what steps did we take or

13   what directions?

14       Q.   What directives did you give the flight

15   attendants in response to the current concerns

16   shared with the cockpit?

17            MR. MCKAY:  Same objection.

18       A.   Sorry.

19            MR. MCKAY:  I just make objections for the

20            record.  Just pretend I am not saying them.

21       A.   Okay, sorry.

22       Q.   That's all right.

23       A.   I am trying to think about it.  So what

24   directions did we give.  We gave the direction to

25   collect additional information, to be mindful of the



1   situation, try to monitor it to the best of their

2   abilities, and keep us informed of any additional

3   information that they become aware of or any changes

4   in the behavior or interactions, I guess.

5        Q.   And when did you next communicate with the

6   flight attendants regarding Mr. Delvecchia and AD?

7             MR. MCKAY:   Same objection.

8        A.   It was in the cockpit, after the flight

9   attendants had offered us, we had call for a break,

10  they came in, and after we both went to the

11  bathroom, we had the discussion with three different

12  flight attendants, one and then...

13       Q.   Well, let's start with the first one.

14  First flight attendant came into the cockpit.  And

15  what did she discuss with you?

16            MR. MCKAY:   Same objection.

17       A.   She discussed the, she told us that she

18  was the flight attendant to ask them to be reseated

19  out of the emergency exit row.  In moving them

20  noticed that the child acted in an abnormal fashion,

21  kind of meek or worried or just had a concerning

22  type of interaction with the student, with the

23  child.  And that was kind of the extent of her

24  knowledge, firsthand knowledge.  And she had

25  described that was the same passengers that the



1  other flight attendant had brought up to our

2  attention later on.

3       Q.   And when you testified that you believe

4  this may have been Anna Bond?

5            MR. MCKAY:  Objection, also to the form of

6       the question, but same objection.

7       Q.   That came into the cockpit first?

8       A.   Yes.

9       Q.   And was the information communicated by

10 this flight attendant in the cockpit the same

11 subject matter that was communicated in the phone

12 call earlier?

13      A.   Yes.

14      Q.   And at some point that flight attendant

15 left the cockpit and another female flight attendant

16 came into the cockpit?

17           MR. MCKAY:  Objection to the form of the

18      question.

19      A.   I believe, yes, I am not sure if the male

20 flight attendant came in first or the female flight

21 attendant came in first, yes, but the female flight

22 attendant left and I believe a female flight

23 attendant came in.

24      Q.   And how long was the female flight

25 attendant in the cockpit before Scott came in?



1        A.    I would say two to five minutes.

2        Q.    And do you know what Scott was doing

3   between the time the second flight attendant came

4   into the cockpit until the time he himself came into

5   the cockpit?

6        A.    At the time I didn't know that he was

7   coming in, after he came in the other flight

8   attendant that was already in the cockpit had said

9   that they had asked Scott to go back to the back of

10  the airplane and to walk back to the front of the

11  airplane just to kind of look at all the passengers,

12  make sure everyone was doing okay, because there was

13  three of them in the cockpit or in the front galley

14  at that time.  On that walk, I guess, Scott had

15  observed some additional, what he thought was

16  inappropriate interactions, and when he came to the

17  cockpit, he asked to approach the cockpit and talk

18  to us about them.

19       Q.    When you say additional inappropriate

20  actions?

21       A.    Repeated.

22       Q.    Repeated whatever.  Had you learned from

23  that second flight attendant that there was some

24  inappropriate touching going on?

25       A.    Yes, that's what she was telling us at



1   that time.  And she told us that they had asked all

2   the flight attendants to kind of go take a look and

3   see if in their own mind thought that was normal or

4   an abnormal type of interaction, just to make sure

5   it wasn't somebody's judgment over another person's.

6   They wanted to get multiple people to see what was

7   going on.

8        Q.   And what touching did she relay to you at

9   that time?

10       A.   The consistent story was that the

11  gentleman was kind of leaning over and kind of, you

12  know, I said on top, I don't mean sitting on, but

13  laying kind of on the side and that was his arm was

14  down in between the child's legs.

15       Q.   What about any touching of the face?

16            MR. MCKAY:   Objection to the form of the

17       question.

18       A.   At that time the, this is an hour into the

19  flight, hour and a half into it flight, there was

20  not any of that, but one of the flight attendants

21  had mentioned that there was some facial caressing

22  that was going on between the two of them, that she

23  had witnessed at some point during the flight, I

24  don't know if it was, I don't know when she

25  witnessed it.  I know we were made aware of it



1    during this conversation that we were putting all

2    the information together with the two flight

3    attendants in the cockpit and us.

4        Q.   So when you were in the cockpit with the

5    two flight attendants, you became aware of facial

6    touching and touching of the crotch?

7            MR. MCKAY:  Objection to the form of the

8        question.

9        A.   As well as the child's just initial

10   interaction with Anna, when she asked him about the

11   seat or their position in row 13.  The child was

12   acting very hesitant and reserved and meek and from

13   what I had heard the adult was kind of controlling

14   the situation and then these other instances all

15   kind of combined together.

16       Q.   And at that point a decision was made by

17   the captain to separate AD from Mr. Delvecchia,

18   right?

19           MR. MCKAY:  Objection to the form of the

20       question, conflicts with prior testimony.

21       Q.   Go ahead and answer.

22       A.   Yes, it was, you know, we had four of us

23   in the cockpit that we were discussing this and had

24   discussed our courses of action that would lead to

25   us separating them.  We got to this point and I



1  believe there was the captain that said I think we

2  reached that point or we have reached that point and

3  we should separate them for now and let, you know,

4  more information come to light and maybe we can

5  address the situation differently.

6      Q.   And what was the reason or the objective

7  in separating AD from Mr. Delvecchia?

8          MR. MCKAY:  Objection to the form of the

9      question.

10     A.   I would say that all of our decisions were

11 driven off of making sure that the child was handled

12 in the safest course of action as possible.  We are

13 trying to make sure there was not anything

14 inappropriate happening that couldn't be stopped if

15 we could make anything and limit those interactions

16 we wanted to do that.  So it was just trying to

17 separate the environment and diffuse the situation

18 as peacefully as possible.

19     Q.   Thank you.

20                      EXAMINATION

21 BY MR. MCKAY:

22     Q.   Mr. Mullin, well, this is interesting.  So

23 you sat here for two hours, sir, and answered

24 questions under oath from me, many of those

25 questions being what were the specifics of the



 1   information that was provided to you by the flight

 2   attendants.  Do you remember those two hours, sir?

 3           MR. MAYE:  Objection to form.

 4       A.   Yes.

 5       Q.   Okay.  You remember those two hours and

 6   then we took a little break and you sat in here with

 7   your attorney, and then now that your attorney --

 8           MR. MAYE:  Object to form.

 9           MR. MCKAY:  I am sorry, I was talking.

10       Did you hear me talking?

11           MR. MAYE:  Object to form.

12           MR. MCKAY:  You have an objection to the

13       form and that's noted.  Thank you.

14       Q.   So you were seated here with your attorney

15   and now all of a sudden in response to his questions

16   you have a great deal more detail about what was

17   said to you by the flight attendants, don't you?

18           MR. MAYE:  Object to form.

19       A.   No, it's the same details.

20       Q.   Was it, because you never mentioned any

21   facial touching to me, did you?

22       A.   You didn't ask me about it.

23       Q.   I asked you what information was provided

24   to you by the flight attendants, sir.  I asked you

25   for the specifics, you sat here and said oh I just



 1  don't remember.

 2          MR. MAYE:  John, is there a question?

 3          MR. MCKAY:  I am sorry was I talking

 4      again?

 5          MR. MAYE:  I am wondering if there is a

 6      question.

 7          MR. MCKAY:  Can you hear me talking?

 8          MR. MAYE:  Object to form.

 9          MR. MCKAY:  Okay.  Thank you very much.

10      You have an objection to the form of the

11      question, that's noted for the record, thank

12      you.

13      Q.   Do you remember that, sir?

14      A.   Yes.

15      Q.   And you were like, oh, I just gosh, I

16  can't remember, but I remember that there was some

17  discussion about the hands between the legs, right,

18  you remember that?

19      A.   You asked specifics about what was going

20  on between the conversation the flight attendants

21  gave me at each specific event and I answered those.

22      Q.   So you are saying that if we look back at

23  the record and read every single question that I

24  asked you.  There would be no question whatsoever

25  where it would have been appropriate for you to



1  bring up the facial touching, is that your testimony

2  here, sir?

3          MR. MAYE:  Object to form.

4      A.   I can't remember every question you asked

5  so I can't answer that question say yes or no, but

6  like I said, the time in the situation where I was

7  made aware of that was while all of us were having

8  our conversation in the cockpit of the airplane.  It

9  was four of us in there, that was one of the pieces

10 of information that became relevant to that time.

11     Q.   It was one?

12     A.   You asked me when did I make the decision

13 or the captain make the decision to have him moved,

14 you didn't, I believe I answered the question as

15 clearly as I could.

16     Q.   So you don't think there was any question

17 I asked you during the past two hours that would

18 have justified a response that you were told there

19 was some facial touching?

20         MR. MAYE:  Object to form.

21     A.   I believe that there is, everyone is going

22 to have different relevant parts.  And as the series

23 of questions that I was just asked, I answered the

24 questions in the quickest way and the clearest way

25 that I could, as they come up, and it seems I did



1  for you.  I don't think there is any difference.

2       Q.   Your memory just got a new relevant point

3  between the time that I left the room and the time

4  that Mr. Maye started asking you questions.  How did

5  that happen?

6            MR. MAYE:  Object to form.

7       A.   It didn't make any difference, I don't

8  know what you mean.

9       Q.   I mean that all of a sudden there is a new

10  data point in your testimony?

11       A.   Yes, you asked a different question, he

12  asked specifically if that happened, and I said,

13  yes.  That's when it happened, that's when I was

14  made aware of it.

15       Q.   That's the first time that when he asked

16  you the leading question, that's the first time you

17  were made aware of it?

18       A.   No, that's the first time I thought of it

19  in this conversation in this context.

20       Q.   All right.  So when were you told that

21  there was facial touching?

22       A.   At some point when the flight attendants

23  were in the cockpit and we were trying to put all

24  the data points together, and as we were sorting

25  those out, one of the flight attendants mentioned



1   that there was, like I said, I don't know when it

2   occurred, but they had said that was one of the

3   elements that had occurred.

4        Q.   And that's when there were multiple flight

5   attendants in the cockpit with the pilots?

6        A.   From my memory, yes, there was one male

7   flight attendant and one female flight attendant and

8   the two pilots.

9        Q.   And that's the first time you ever heard

10  about facial touching?

11       A.   That's the first time that I can recall

12  it, yes.

13       Q.   Okay.  You would agree with me that you

14  heard what you have testified to as a consistent

15  story prior to that point, and that all involved the

16  older gentleman leaning on the child and having his

17  hands supposedly between the legs or as Mr. Maye put

18  it in his crotch, is that accurate?

19       A.   Yes.

20       Q.   Okay.  Now, with respect to facial

21  touching, is that something that's typically brought

22  to your attention in the cockpit?

23       A.   No.

24       Q.   Have you ever witnessed other people

25  engaged in facial touching?



1      A.    I think just as you asked me earlier, what

2    is appropriate touching, it's the same thing.

3      Q.    I am sorry, the question was whether or

4    not you ever witnessed other people engaged in

5    facial touching?

6      A.    Yes.

7      Q.    Have you called the police in those

8    instances?

9      A.    No, not always.

10     Q.    Not always?

11     A.    I mean depends on what the situation, the

12   circumstances were.  You know, I have had situations

13   in the past where I haven't made the phone call to

14   the police, but the police have been called for

15   situations like that.

16     Q.    What have you called the police about?

17     A.    I have not called the police on any of

18   them.

19     Q.    No, have you called the police about

20   anything?

21     A.    Personally?

22     Q.    Yes.

23     A.    Other than to report house fires or

24   something like that, no.

25     Q.    Okay.  So what were the situations where



1  others called the police about facial touching that

2  you were aware of it?

3          MR. MAYE:  Object to form.

4      A.   I would say the facial touching being the

5  only event, you know, that they were interacting of,

6  and there was none, but you know, I have been aware

7  of, I have been privied to conversations of stories

8  that many people have told me about times where they

9  have had to, have people touch them inappropriately,

10  I don't think that's.

11      Q.   On the face?

12      A.   Yes.  That's one of the locations.

13          MR. MAYE:  Object to form.

14      A.   They were touching inappropriately on

15  their face, it was unwanted, unsolicited,

16  nonconsensual type, and it was done in a manner that

17  was not willing, I guess.  I don't know what the

18  best word is.

19      Q.   Okay.  With respect to the information

20  provided to you about Peter Delvecchia, touching his

21  son's face, was it unwanted?

22      A.   I can't make that determination.

23      Q.   Was it nonconsensual?

24      A.   I can't make that determination.

25      Q.   Was it inappropriate?



1          MR. MAYE:  Object to form.

2      A.   I physically can't make that

3   determination.  I have to take the information

4   that's delivered to me.

5      Q.   Why can't you make that determination?

6      A.   Because I didn't see him.

7      Q.   Fair point.  Did you ask him?

8      A.   No, I mean.

9          MR. MAYE:  Object to form.

10     A.   There was to point where anyone tried to,

11  he never tried to communicate with us or interact

12  with us and I am not going to go back there in the

13  cabin in the middle of the flight.

14     Q.   Okay.  Let me make sure I understand.  If

15  a passenger doesn't choose to inform you of whether

16  or not something is consensual it's okay for you to

17  take that passenger's child away from them and place

18  them in another row?

19         MR. MAYE:  Object to form.

20     Q.   Is that okay, sir?

21     A.   That's not the question of the situation,

22  our situation.

23     Q.   Well, that's the question I am asking you?

24     A.   I was addressing, the question is not

25  relevant to our procedures.



1     Q.   You know you don't get to make that
2  decision.  I am asking you a question and I would
3  appreciate if you would just listen to the question?
4     A.   Sure.
5     Q.   And answer the question that was asked.
6  Okay.  Can we agree on that?
7     A.   Sure.
8     Q.   Okay.  So if a passenger doesn't choose to
9  inform you whether or not some contact is consensual
10 or appropriate, then is it okay for you, as the
11 pilot to take that person's child away from them and
12 put them into another row of the airplane?
13          MR. MAYE:  Object to form.
14     A.   No, that's not the situation that we had
15 addressed and talked about for the last
16 two-and-a-half hours.
17     Q.   That wasn't my question.
18     A.   No.
19          MR. MAYE:  He is answering your question.
20     Q.   It's not appropriate, is it?
21     A.   I answered it.
22          MR. MAYE:  That's what your attorney is
23          saying, you don't have to say everything that
24          he says.
25     A.   I said no twice.



1     Q.   It's not appropriate, we can agree on

2   that?

3     A.   Yes.

4     Q.   Okay great.

5                               EXAMINATION

6   BY MR. MAYE

7     Q.   I have follow up.  Was the decision by you

8   and the captain to separate AD from his father based

9   on the information that there was inappropriate

10  touching, was that, the decision to separate AD from

11  his father, was that an appropriate decision?

12            MR. MCKAY:  Objection to the form.

13    A.   Yes.

14    Q.   And why was it appropriate?

15            MR. MCKAY:  Objection to the form.

16    A.   Our goal is to create the safest

17  environment for all of our passengers at the whole,

18  at any time.  And any time that we are made aware of

19  or the flight attendants are aware of to witness any

20  inappropriate situation that can be inappropriate or

21  unsafe for any passenger we try to diffuse the

22  situation and separate the passengers.  And that's

23  what we are always trying to do, is create the

24  safest environment possible.

25    Q.   And Mr. McKay, right before I asked you



1   these questions, asked a question about the

2   appropriateness of your decision to separate AD from

3   Mr. Delvecchia.  And your response to his question

4   was no, and I am not sure you understood the

5   question?

6            MR. MCKAY:  Objection to the form.

7       Q.   When you said no, what did you mean by

8   saying no?

9            MR. MCKAY:  Same objection.

10      A.   He said my lack of knowing if it's

11  consensual or nonconsensual, is that good enough for

12  me to separate two people or Mr. Delvecchia from his

13  son.  And I said no, that's not enough information.

14  But that wasn't the reason we separated them, so

15  that's.

16      Q.   You separated them because you had

17  additional information?

18      A.   Correct.

19      Q.   What was that additional information?

20           MR. MCKAY:  Objection to the form.

21      A.   It was that there was several leading

22  factors that all seemed inappropriate.  Not only the

23  interactions of the child, but also the touching and

24  the inappropriate situations that had been witnessed

25  by multiple flight attendants throughout an hour and



1  a half of the flight.

2        Q.   Okay.  Thank you.

3                      EXAMINATION

4  BY MR. MCKAY:

5        Q.   Those are touching of a face and a hand

6  supposedly between the legs, is that it?

7        A.   And that child's interaction with the

8  first flight attendant that asked them to move

9  seats.

10       Q.   Which was meek?

11       A.   Meek and timid and not, you know,

12  overpowered I guess is the, I don't know what the

13  word is that they said, but those are the words that

14  remind me of it.

15       Q.   If a child passenger is observed to be

16  meek, and the parents of the child traveling with

17  the child puts their hand on the child, then that

18  makes it appropriate to take the child away from the

19  parent, correct?

20            MR. MAYE:  Object to form.

21       A.   It's not the situation, and no.

22       Q.   Okay.  And is this, your responses to

23  Mr. Maye's questions, were those based on your

24  training by Frontier?

25       A.   Which responses, the course of action?



1      Q.    Well, the course of action you took in

2   ensuring the safest trip for the passenger?

3      A.    That's what all of our manuals state, and

4   the most commonly used word in our manual is

5   maintaining safety.  And safety is paramount for all

6   of us.  Yes, that's following our guidance and

7   trying to create the safest environment possible.

8      Q.    Now, you have said all of our manuals.

9   And you mentioned at the beginning of your

10  testimony, three flight operations manuals, correct?

11     A.    Yes.

12     Q.    Are those the manuals you are talking

13  about?

14     A.    Yes.

15     Q.    So within the four corners, so to speak,

16  or cover to cover flight operations manual number

17  one, we would find guidance for the situation?

18     A.    No, like I spoke to you at the beginning

19  of this conversation, all of our manuals are guides

20  for us to use as we move forward.  They were not

21  instruction manuals for how you put together a VCR,

22  it's about how do we deal with situations and take

23  as much information as possible and try to come up

24  with the safest course of action that we can for all

25  of our passengers.



1    Q.   And I want you to make sure you understand

2  this is not a case about putting together a VCR,

3  this is a case about being punched four times in the

4  back of his head and his son being taken to the back

5  of the airplane barefoot and crying for over an

6  hour.  Do you understand that?

7           MR. MAYE:  Object to form.

8    A.   That's the first time I have heard some of

9  that information.  So I understand that now that you

10  have told me, but until you spoke of that, that was

11  not my interpretation of any of the events that

12  occurred.

13    Q.   Because you didn't go to find out?

14    A.   No, because that was not the information

15  that was derived or delivered to us, as we asked

16  about it, as it was occurring.

17    Q.   No one told you that Scott Warren punched

18  the guy?

19           MR. MAYE:  Object to form.

20    A.   No one said that to me, no.

21    Q.   Nobody told you that the boy was in back

22  barefoot and crying and cold in the back row?

23    A.   I was aware that he was barefoot, but that

24  was information that came about yesterday in the

25  meeting, but not until then.



1      Q.   But nobody on the plane told you that?

2      A.   No.   They said they tried to interact with

3   him.   They tried to interact with the child and ask

4   him what was going on.   And they offered him juice

5   and other things and didn't do anything.   Didn't

6   drink any of it or eat any of it.

7      Q.   Now, when we began this deposition you

8   said the other day you had done multiple searches of

9   your flight operations manual volume one and had

10  found nothing on this situation.   And later in your

11  deposition you talked about the contents concerning

12  the threat levels and we had some discussion about

13  that.   And now all of a sudden these manuals are

14  broad based guides for how to deal with this

15  situation?

16         MR. MAYE:   Object to form.

17     A.   That's not what I said.   I had said I

18  hadn't, I had done some multiple searches and I

19  hadn't found anything other than the safety or the

20  security threat levels that was relevant to any of

21  the discussions, and even in that, it's not hundred

22  percent applicable.

23     Q.   Have you ever been convicted of a crime?

24     A.   No, other than speeding tickets.

25     Q.   That's all I have.



1        MR. MAYE:  No further questions.

2        VIDEOGRAPHER:  This concludes the video

3    deposition of Shawn Edward Mullin on Tuesday

4    December 10th, 2019.  The time is approximately

5    1:31 p.m.  We are going off the video record.

6                    (The deposition concluded at

7                    1:31 p.m.)

8                    *  *  *  *  *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    CERTIFICATE OF DEPONENT

 2     PAGE      LINE      CHANGE
       _____

 3     _____

 4     _____

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13     _____

14     _____

                        *  *  *  *  *
15
            I, SHAWN EDWARD MULLIN, deponent herein, do hereby
16     certify and declare under penalty of perjury the within and
       foregoing transcription to be my deposition in said action;
17     that I have read, corrected and do hereby affix my signature
       to said deposition.
18
                      _____
19                    SHAWN EDWARD MULLIN, Deponent

20

21

22

23

24

25
```



1                    CERTIFICATE OF REPORTER

2

3          I, Shifra Moscovitz, Certified Court Reporter,

4   State of Nevada, do hereby certify:

5          That I reported the deposition of SHAWN EDWARD

6   MULLIN, commencing on Tuesday, December 10, 2019, at 10:00

7   a.m.

8          That prior to being deposed, the witness was duly

9   sworn by me to testify to the truth.  That I thereafter

10  transcribed my said shorthand notes into typewriting and

11  that the typewritten transcript is a complete, true and

12  accurate transcription of my said shorthand notes.  That

13  prior to the conclusion of the proceedings, the reading and

14  signing was requested by the witness or a party.

15         I further certify that I am not a relative or

16  employee of counsel of any of the parties, nor a relative or

17  employee of the parties involved in said action, nor a

18  person financially interested in the action.

19         In witness whereof, I hereunto subscribe my name

20  at Las Vegas, Nevada, this 26th day of December, 2019.

21  _____

22          SHIFRA MOSCOVITZ, CCR No. 938

23

24

25



1     Timothy R. Titolo, Esq.
      Nevada Bar No. 003617
2     TITOLO LAW OFFICE
      9950 West Cheyenne Ave.
3     Las Vegas, Nevada 89129
      (702) 869-5100
4     tim@titololaw.com

5

6     John D. McKay, Esq.
      *Admitted pro hac vice*
      PARK AVENUE LAW LLC
7     127 W. Fairbanks Ave. No. 519
      Winter Park, Florida 32789
8     (800) 391-3654
9     johndmckayatty@gmail.com

10    ***Attorneys for Plaintiffs PETER DELVECCHIA and***
11    ***A.D., a Minor***

12

13

14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA

15    PETER DELVECCHIA, et al.,       )     **Case No: 2:19-CV-01322-KJD-NJK**
                                             )
16              Plaintiffs,      )
17                                     )     **PLAINTIFFS' NOTICE OF**
18    vs.                                 )     **DEPOSITION OF SHAWN MULLIN**
                                             )
19                                     )
20    FRONTIER AIRLINES, INC., et al.,   )
                 Defendants.      )
21    _____ )

22

23          PLEASE TAKE NOTICE that the undersigned attorney for Plaintiffs, Peter DelVecchia

24    individually and as next friend of A.D., a minor, will take the deposition of the person named herein,

25    at the time and place specified below, upon oral examination before a Notary Public or other person

26    authorized to administer oaths, to be recorded by stenographic and audiovisual means, for discovery

27

28

PLAINTIFFS' NOTICE OF DEPOSITION OF SHAWN MULLIN
Page 1 of 3

Defendant's Exhibit

1    ʄʰᵘ⁴/ʰᶦⁿ
    ¹²/₁₀/₁₉
ⓔ-ESQUIRE

1   and use as evidence, and for all other purposes permitted by the Federal Rules of Civil Procedure.

2   The deposition will continue from day to day until completed. The particular details are:

3

        **Deponent:**     **Shawn Edward Mullin, 353 E. Bonneville Ave. Unit 820, Las Vegas, NV**

4

        **Date:**         **December 10, 2019**

5

6        **Time:**         **10:00 a.m. PST**

7        **Place:**        **Titolo Law Office**
                         **9950 West Cheyenne Avenue**

8                         **Las Vegas, NV 89129**

9

10    DATED this 2nd day of December, 2019.

11

12                                   John D. McKay (admitted *pro hac vice*)

13                                   PARK AVENUE LAW LLC
                                     127 W. Fairbanks Ave., No. 519

14                                   Winter Park, FL 32789
                                     johndmckayatty@gmail.com

15                                   (800) 391-3654

16                                   Timothy R. Titolo (Nev. Bar. No. 3617)

17                                   TITOLO LAW OFFICE
                                   9950 West Cheyenne Avenue

18                                   Las Vegas, Nevada 89129
                                   (702) 869-5100

19                                   tim@titololaw.com

20                                   ***Attorneys for Plaintiffs Peter DelVecchia And A.D., a Minor***

21

22

23

24

25

26

27

28                            **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 2, 2019, pursuant to prior agreement of counsel

permitting electronic service by email, I served the foregoing First Supplemental Initial Disclosures

on counsel for Defendants by email addressed to the following persons:

> Brian T. Maye, Esq.
> Tara Shelke, Esq.
> ADLER MURPHY & McQUILLEN LLP
> 20 South Clark Street, Suite 2500
> Chicago, Illinois 60603
> Email: bmaye@amm-law.com
>      tshelke@amm-law.com

> Charles A. Michalek, Esq.
> ROGERS, MASTRANGELO, CARVALHO & MITCHELL
> 700 South Third Street
> Las Vegas, Nevada 89101
> Email: cmichalek@rmcmlaw.com

PLAINTIFFS' NOTICE OF DEPOSITION OF SHAWN MULLIN
Page 3 of 3

AO 88A  (Rev. 02/14) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Nevada

| | | |
|---|---|---|
| PETER DELVECCHIA, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   2:19-cv-01322-KJD-NJK |
| | ) | |
| FRONTIER AIRLINES, et al. | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        Shawn Edward Mullin, 353 E. Bonneville Ave. Unit 820, Las Vegas, NV 89101

*(Name of person to whom this subpoena is directed)*

☑ *Testimony:* **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Titolo Law Office | Date and Time: |
|---|---|
| 9950 West Cheyenne Ave. | |
| Las Vegas, Nevada 89129 | 12/10/2019 10:00 am |

The deposition will be recorded by this method:   Stenographic and audiovisual

☑ *Production:* You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material: Any and all notes, memoranda, emails, or other documents pertaining to the passengers seated in seats 17E and 17F on Frontier Airlines Flight 2067 between RDU and LAS on March 28, 2019, including, without limitation, notifications received from flight attendants, the decision to separate them, the request for law enforcement officers to meet the flight at LAS, and any post-landing actions.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    12/02/2019

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                     *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Peter DelVecchia
_____ , who issues or requests this subpoena, are:

John D. McKay, Esq., Park Avenue Law LLC, 127 W. Fairbanks Ave. #519, Winter Park, FL 32789; (800) 391-3654; johndmckayatty@gmail.com

**Notice to the person who issues or requests this subpoena**
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  2:19-cv-01322-KJD-NJK

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❑ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____                  _____
                                                      *Server's signature*

                                                    _____
                                                      *Printed name and title*

                                                    _____
                                                      *Server's address*

Additional information regarding attempted service, etc.:

| Print | Save As... | Add Attachment | Reset |

AO 88A  (Rev.  02/14) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    (i) is a party or a party's officer; or
    (ii) is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    (i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    (ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    (i) fails to allow a reasonable time to comply;
    (ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
    (iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    (iv) subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    (i) disclosing a trade secret or other confidential research, development, or commercial information; or
    (ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    (i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    (ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    (i) expressly make the claim; and
    (ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## 20190328 - 2067 RDULAS

**Generated** 

3.

Time 03/29 0343z

SMI CMD

Description Uplink - FROM KLAS OPS

Flight F92067

Tail N230FR

Dep KRDU

Arr KLAS

DSP ID No Value

Freetext FROM KLAS OPS

ETA 2150

WHEELCHAIRS 5

ELEC CART

ICE BAGS

UMS

GATE D22

GATE AVAIL AT ARRIVAL Y

GND PWR Y

AIR START N

AIR COND Y

NEXT FLIGHT 2000

NEXT DEST ATL

-COPY THEY WILL MEET THE FLT IF THERE IS ANYMORE WITNESSES PLEASE DEPLANE THEM LAST AS WELL SO THEY CAN GIVE STATEMENTS....

Defendant's Exhibit

2 Mullh

12/10/19

② ESQUIRE

4.
        Time 03/29 0337z

        SMI M14

  Description Special Request

      Flight F92067

        Tail N230FR

        Dep No Value

        Arr KLAS

   DSP ID DDL

     Freetext 6393,JUST CONFIRM WE WILL,HAVE LEOS STANDING BY,AT THE GATE.,WE WILL DEPLANE THE,ADULT AND CHILD LAST

---

5.
        Time 03/29 0314z

        SMI CMD

  Description Uplink - LEOS WILL MEET T

      Flight F92067

        Tail N230FR

        Dep KRDU

        Arr KLAS

   DSP ID No Value

     Freetext LEOS WILL MEET THE FLIGHT.

           NO NEW INFO ON ADULT.

---

6.
        Time 03/29 0311z

        SMI A81

  Description Aircrew Message

      Flight F92067

        Tail N230FR

        Dep No Value

        Arr No Value

   DSP ID DDL

     Freetext CONFIRM THAT WE ARE SETFOR OUR ARR WITH LEO.ALSO IS THERE FURTHER INFO ON THIS ADULT..THEY ARE STILL SEPARATED

---

7.
        Time 03/29 0155z

        SMI A81

  Description Aircrew Message

      Flight F92067

        Tail N230FR

        Dep No Value

        Arr No Value

   DSP ID DDL

     Freetext THE FAS WHITNESSED IT. THEY ARE SEPERATED NOW

---

8.
        Time 03/29 0153z

        SMI CMD

  Description Uplink - did the FAs witn

      Flight F92067

        Tail N230FR

Dep KRDU
Arr KLAS
DSP ID No Value
Freetext did the FAs witness the inappropriate touching or was it reported by another passenger
or the younger male.....

---

9.
Time 03/29 0147z
SMI A81
Description Aircrew Message
Flight F92067
Tail N230FR
Dep No Value
Arr No Value
DSP ID DDL
Freetext WE NEED SOME INPUT FROMYOU..AND SOC

---

10.
Time 03/29 0147z
SMI A81
Description Aircrew Message
Flight F92067
Tail N230FR
Dep No Value
Arr No Value
DSP ID DDL
Freetext THERE SEEMS TO BE SOME IINAPPROIATE TOUCHINGBETWEEN AN OLDER MALEND A YOUNGER MALE..12YOORIGINAL SEATS 13D 13EFLT ATTS R UNCOMFORTABL