CHARLES A. MICHALEK, ESQ.
Nevada Bar No. 5721
ROGERS, MASTRANGELO, CARVALHO & MITCHELL
700 South Third Street
Las Vegas, Nevada 89101
Phone: (702) 383-3400
Email: cmichalek@rmcmlaw.com

Brian T. Maye (admitted *pro hac vice*)
Richard C. Harris (admitted *pro hac vice*)
HINSHAW & CULBERTSON
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
Phone: (312) 422-5713
Email: bmaye@hinshawlaw.com
          rharris@hinshawlaw.com

***Attorneys for Defendants Frontier Airlines, Inc.,
Scott Warren, and Rex Shupe***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | | |
|---|---|---|
| PETER DELVECCHIA, individually and as next friend of A.D., a Minor, | ) ) ) | Case No.: 2:19-cv-01322-KJD-DJA |
| *Plaintiffs*, | ) ) ) ) | **DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| v. | ) ) ) | |
| FRONTIER AIRLINES, INC., SCOTT WARREN, and REX SHUPE, | ) ) ) | |
| *Defendants*. | ) ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

Defendants FRONTIER AIRLINES, INC. ("Frontier"), SCOTT WARREN, and REX SHUPE (collectively "Defendants") hereby file this Reply in Support of their Motion for Summary Judgment, and in support thereof state the following:

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.   __INTRODUCTION__

No evidence in this case supports a reasonable inference that Defendants acted out of racial animus rather than concern for the safety of a minor. Plaintiffs were granted "broad avenues of relevant discovery" (ECF No. 120, p. 3), but they have identified nothing to support their conjecture about what was going through the minds of several airline employees whose common carrier duties included protecting passengers from potential or perceived threats posed by other passengers. *See*, e.g., *Arnold v. AMTRAK*, 13 F. App'x 573, 578 (9th Cir. 2001) (discussing the common carrier's "degree of diligence demanded under the circumstances" and whether the carrier should have done more to protect a child from an adult passenger).

Plaintiffs' countless irrelevant factual allegations are meant only to muddy the waters and distract from the lack of pretextual evidence. The material facts set forth by Defendants remain unchanged. Captain Rex Shupe was piloting a commercial aircraft carrying nearly 180 passengers and crewmembers when he received two reports from flight attendants describing their concerns of what they perceived to be inappropriate touching involving an adult male and a boy. The first report was that an adult male was rubbing or "stroking" a boy's face in a manner that concerned the flight attendant. The second report was that the man's hand was seen resting on the boy's crotch. Captain Shupe, who was ultimately responsible for the safety of the aircraft and its passengers, instructed the crew to separate the man from the boy for the remainder of the flight. He additionally contacted ground personnel to report the possible inappropriate touching and requested that Las Vegas Metro Police meet the flight on its arrival to address the flight attendants' concerns.

These undisputed facts should guide the Court in dismissing Plaintiffs' claims. There is no evidence to support Plaintiffs' theory that the entire crew acted in concert to intentionally discriminate against them based on their races. For these reasons and those stated below, this Court should grant Frontier's Motion for Summary Judgment and dismiss Plaintiffs' claims in their entirety with prejudice.

## II.   __REPLY TO PLAINTIFFS' STATEMENT OF FACTS__

Plaintiffs' 20+ pages of factual assertions are mostly irrelevant and meant to distract the Court from their inability to show pretext. Several of the "facts" asserted by Plaintiffs are also misleading and/or completely false. Defendants have endeavored to address the many falsehoods asserted by Plaintiffs while

also keeping the present Reply brief within the allowable page limit, and Defendants reserve the right to address any additional issues as necessary at oral argument.

This case is not about whether Plaintiffs "enjoy a close bond" or "frequently hike and cycle together and have a goal of hiking in all the national parks together." *See* ECF No. 303, pp. 6. This case is about whether race was the but-for cause of Captain Shupe's in-flight decisions to separate Peter from A.D. and report the FAs' concerns to law enforcement officers. *See Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020); *Takieh v. Banner Health*, No. 21-15326, 2022 U.S. App. LEXIS 4224, at *5 (9th Cir. Feb. 16, 2022). Unable to support a cogent theory that Captain Shupe's decisions were based on race rather than a concern for the safety of a minor, Plaintiffs rely on false themes and exaggerated language in an attempt to impute racist motives to the entire crew, and to Frontier at large. Plaintiffs allege discrete acts of racial discrimination that are incompatible with such a broad and generalized theory of intent, which is why their lawsuit ultimately fails. *See FDIC v. Henderson,* 940 F.2d 465, 471 n.11 (9th Cir. 1991) (a plaintiff cannot impute to the defendant racist motives "simply by conjuring a generalized, largely-unattributed specter of racism").

A.   **There is no evidence that the FAs initial perceptions of Plaintiffs were based on race**

Plaintiffs accuse FA Bright-Sakurada of immediately "labeling" them as "the situation." ECF No. 303, pp 7-8. This is based on FA Bright-Sakurada's statement in her police report that she told the captain about the adult male "stroking" the boy's face up and down, "because the situation made all of us feel uncomfortable."[1] ECF No. 266:5, p. 119:21-23; 266-8, p. 3. Contrary to Plaintiffs' implications, FA Bright-Sakurada's use of the term "situation" was an innocuous post-incident description of the events, and not a discriminatory pre-incident "labeling."

---

[1] FA Bright-Sakurada testified as follows:

  **A…I had done a trash run 30 seconds later, had seen it, came back, still saw it. And I just -- yeah, that's exactly what I told [the Captain].** ECF No. 266-5, p. 72:12-14.

  **A. … So I did a trash run… And as – as I was – I was going past 17, I did see the older gentleman lean over and just – just went like this, up and down, up and down, up and down. And it was just a very awkward thing to see.**

  Q. Because he was white and the boy was black?

  **A. No. Because I would – even my mom wouldn't do that to me, just sit there and stroke my face up and down.** ECF No. 266-5, p. 48:4-13.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs also claim FA Nickel was racially motivated based on her statements that she thought they were reseated away from the exit row due to a language barrier rather than A.D.'s young age. ECF No. 303, p. 7. However, FA Anna Bond explained that young age and language barrier are the two most likely reasons for a passenger being reseated from the exit row. She testified:

> "If they are old enough and they are willing and able, it's usually a language barrier where they are not able to speak English, so we do have to move them, **so a lot of the times it's either age or language**." (Emphasis added) ECF No. 281-4, p. 52:19-23.

Thus, given the two most likely possibilities, it is unremarkable that FA Nickel guessed there was a language barrier rather than the age restriction, or that she did so based on her impressions that A.D. looked older and taller than her own 12-year-old son. *See* ECF No. 303, p. 7. It is further unremarkable that FA Nickel felt "uneasy" when she learned A.D. had paused and looked to Peter before revealing his age. *Id.* at p. 8. In short, that FA Nickel questioned A.D.'s age and was concerned that he paused before answering a FA's question does not help establish a reasonable inference that FA Nickel and her fellow crewmembers acted out of racial animus in reporting concerns of inappropriate touching of a minor.  More significantly, FA Bond and FA Nickel are not defendants and did not make the decision to move A.D. to a different seat. That decision was made by Captain Shupe based on perceived inappropriate touching observed by FA Bright-Sakurada and FA Warren. FA Bright-Sakurada testified that prior to the facial touching, nothing that FA Bond said to her caused her to be uncomfortable or concerned about Plaintiffs. ECF No. 266:5, p. 60:5-22. FA Bright-Sakurada further testified that prior to the facial touching, she did not feel that A.D. was unsafe. *Id.* at p. 65:1-11.[2]

**B.      Sgt. Obasi's references to the FAs' alleged statements are inadmissible hearsay**

Plaintiffs' references to Sergeant Obasi's testimony about what he heard from a "white female FA, believed to be Bright-Sakurada" (ECF No. 303, p. 9) contain inadmissible hearsay statements that do not qualify for any exception under Fed. R. Evid. 801. Sergeant Obasi's opinion as to whether race played a role in Defendants' actions is also improper and lacks foundation. *See* ECF No. 303, p. 23. None of this testimony can be relied upon to create a genuine issue of material fact, and it should thus be ignored.

---

[2] No crew member ever uttered the words or accuse Peter Delvecchia of "human trafficking." This is evidenced by the fact that Captain Shupe notified law enforcement via the ACARS message that inappropriate touching may have occurred. Captain Shupe never mentioned "human trafficking."

Notably, the only proper opinion offered by Sergeant Obasi was that, based on what was told to Captain Shupe, the Captain did the right thing by notifying law enforcement. See ECF No. 266-7, 78:9-:80-21.

### C.     Frontier's "Inflight Flyer" and related training do not show discriminatory intent

Air carriers are required to train flight attendants on "recognizing and responding to potential human trafficking victims." 49 U.S.C. § 44734.[3] Plaintiffs note that Frontier sent an "Inflight Flyer" to its FAs which they assert is somehow relevant to establishing the subject FAs intent in this case. ECF No. 303, p. 8. Despite their arguments to the contrary, Plaintiffs' assertions regarding Frontier's "Inflight Flyer" signal their improper use of a negligence theory to prove an intentional tort.

The Inflight Flyer simply informed Frontier's FAs that signs of potential human trafficking include a passenger who "appears nervous" or "prevents the child/person from answering questions" or provides "evasive" answers. *Id.* Plaintiffs attempt to establish Frontier's alleged negligence by emphasizing that the document "did not contain any other specific indicia of human trafficking" and that FA Bond could not recall an anti-discrimination training component built into its human trafficking training. *Id.* Plaintiffs' clear implication is that the incident could have been avoided if Frontier had provided better training. But even assuming Frontier's FAs suspected human trafficking in this case (which is disputed but nonetheless irrelevant), Plaintiffs' unmistakable allegations of negligent training (which are vehemently denied) provide no support for their claims of intentional discrimination. As this Court has already ruled: "Plaintiffs allege that Frontier's negligence resulted in flight attendants conducting their duties in ways that were not racially neutral. However, a cause of action for negligent racial discrimination does not exist." ECF No. 121, p. 6.

A prime example of Plaintiffs' clear negligence allegations is their charge that Frontier did not make "significant changes" to its employee training after the Department of Transportation ("DOT") issued guidance to all commercial air carriers on anti-discrimination training in January 2017. ECF No. 303, p. 10. However, during Frontier's Fed. R. Civ. P. 30(b)(6) deposition, its corporate designee testified that around the time the guidance was issued, Frontier was regularly communicating with the DOT and understood it was compliant with DOT anti-discrimination training guidelines. Exbibit 6, pp. 216:1-12;

---

[3] FA Bright-Sakurada was, therefore, correct in testifying that human trafficking "is something that [Frontier's FAs] always look for." ECF No. 266-5, p. 61:5-9. *See* ECF No. 303, p. 8.

221:2-5; 222:12 – 223:1; 227:22 – 228:1. Regardless, even if Frontier was not in compliance with certain DOT training guideless, it would not support claims such as Plaintiffs' in this case, which are based on allegations of discrete and intentional acts of race-based discrimination.

### D.    Frontier's crewmembers acted in compliance with Frontier's procedures

Plaintiffs incorrectly claim Frontier's corporate designee testified to written "protocols" that "require" a FA to ask another crewmember to "independently verify suspicious passenger activity before reporting it to a captain." ECF No. 303, p. 10. As the corporate designee explained during Frontier's deposition, Frontier's FAs are trained that they "*should*" get confirmation from another crewmember and then "communicate their suspicions," but also that these types of training "procedures" have "flexibility," and "critical thinking" is required on a case-by-case basis, because "not every situation is cookie cutter." Ex. 6, pp. 60:16-19; 84:10 – 85:5. Frontier's corporate designee testified that, based on his investigation, the crewmembers' actions were in compliance with Frontier's procedures because the FAs reported two independent instances of possible inappropriate touching. Even though the reports involved two different types of touching – the first on the face and the second on the crotch – the second event nonetheless confirmed there was cause for concern. *Id.* Ex. 6, p. 311:6-13.

### E.    Captain Shupe had no knowledge of Plaintiffs' races until after they were separated

Captain Shupe was clear, consistent, and unequivocal during his deposition that he was unaware of Plaintiffs' races when he made the decision to have them separated and send the ACARS messages. ECF No. 266-4, pp. 16:11-15; 25:11-17; 72:23 – 73:7. Nonetheless, to support their theory that Captain Shupe lied about his lack of prior knowledge of Plaintiffs' races, Plaintiffs spend much time attempting to identify factual inconsistencies as to the circumstances of when each crewmember was in the cockpit and who said what to whom therein. ECF No. 303, pp. 12-15. For example, Plaintiffs incorrectly rely on First Officer ("FO") Shawn Mullin's testimony to suggest that he gained knowledge of Plaintiffs' races and passed it along to Captain Shupe before Captain Shupe sent the ACARS messages. *Id.* at 14, 16, 30, n. 26. However, FO Mullin testified only that while the FAs did not convey any details regarding Plaintiffs' races when they first reported their concerns, he did learn this information "relatively soon" thereafter. Ex. 8 at 59:15 - 60:8.

Contrary to Plaintiffs' claims, FO Mullin did not elaborate or specify when he learned of Plaintiffs' races, and there is nothing connecting FO Mullin's knowledge to that of Captain Shupe. Thus, Plaintiffs' assertions that Captain Shupe's had prior knowledge of Plaintiffs' races are unsupported by any evidence and only serve to demonstrate the glaring hole in their claims of intentional discrimination. *See, e.g.,* ECF No. 303, p. 31 (claiming "Shupe and Mullin jointly made the ACARS report requesting the involvement of law enforcement officers after they became aware that the FAs were focused on the fact Peter is white and A.D. is Black."). Even if Captain Shupe had been aware of the races of Plaintiffs, which he did not, there is no evidence that his decision to separate Plaintiffs was based on racial animus.

### F.   Captain Shupe had no duty to conduct his own independent investigation

Plaintiffs also suggest Captain Shupe was negligent for failing to send another FA to speak with Peter and A.D. to confirm "that nothing was objectionable about any contact between them." ECF No. 303, pp. 14-15. However, as Defendants established in their Motion for Summary Judgment, the law does not require commercial airline pilots to investigate the accuracy of flight attendant reports of suspicious passenger conduct involving a child. ECF No. 266, p. 10. Such investigations are better reserved for trained law enforcement officers. Frontier's corporate designee noted the problem with an FA seeking confirmation of inappropriate touching from a suspected minor victim:

> I think when you look at the safety of an individual, in this case the child, not everybody will report what's occurring to them… it appears that the intent was in the safety of the child, whether it was reported by the child or an observation of – of another adult to ensure the safety. And in accordance with the procedure they did separate them and simply contact law enforcement to let law enforcement utilize their tools and resources and expertise, which is well beyond that of a flight attendant training, to come up with a solution that was – that was reasonable. Ex. 10, pp. 308:22 – 309:10.

In sum, Plaintiffs' unfounded assertions of Captain Shupe's alleged negligence do not create any material factual issues regarding whether he intentionally discriminated against them. To the contrary, because Captain Shupe was unaware of Plaintiffs' races, Plaintiffs cannot prove that his decisions were based on racial animus, and their claims therefore fail as a matter of law.

### G.   Angelica Paulo's testimony supports Defendants

Angelica Paulo worked as a gate agent (GA) employed by Worldwide Flight Services ("WFS") when the subject flight landed in Las Vegas. Plaintiffs mistakenly rely on GA Paulo's speculation

regarding the number of discrimination complaints received by Frontier, but the testimony they cite is important for a different reason.

GA Paulo was present outside the subject aircraft when the crewmembers deboarded. *See* Plaintiffs Exhibit 29 (filed under seal), p. 43:10-16. Plaintiffs note that GA Paulo reported: "Per child, this was not the first incident that [Plaintiffs] have been separated in this manner." ECF No. 303, pp. 25. GA Paulo testified that she did not believe she spoke directly with A.D., and she made her report based on discussions with a FA or another GA. Plaintiffs' Ex. 29, p. 48:3-14. Importantly, FA Warren also reported that A.D. told him Plaintiffs "had been separated before on a flight." ECF No. 266, p. 5. Thus, during the time A.D. was separated from Peter aboard the subject flight, A.D. unquestionably told FA Warren that Plaintiffs had previously been "separated in this manner" or "separated before on a flight." After all, how else could FA Warren have learned this information to provide in his report? Nonetheless, Plaintiffs dispute these reports and claim "Peter and A.D. have never been separated on a flight before." ECF No. 303, p. 20. Rather, they assert, law enforcement officers "questioned them separately" after a previous flight landed in Salt Lake City. ECF No. 303, p. 20. According to Peter, Plaintiffs fell asleep during the prior flight with A.D.'s head resting on Peter's shoulder, and a passenger "reported it to an airline attendant." ECF No. 266-1, p. 81; 8-16.

Plaintiffs' quibbling over whether the prior similar incident at the airport in Salt Lake City technically involved a "separation" while aboard an aircraft is entirely irrelevant. What matters is that A.D. told FA Warren about a prior similar incident. As noted in Defendants' Motion, Plaintiffs' prior experiences with law enforcement officers were related to their public displays of affection, and are thus relevant to Plaintiffs' claims that they suffered extreme emotional distress during the time they were separated aboard the subject flight – as Peter was confident the law enforcement officers in Las Vegas would clear Plaintiffs of any wrongdoing within "five minutes." ECF No. 266, p. 25; ECF No. 266-1, p. 73:19-21. The fact that A.D. notified FA Warren about a prior similar incident involving a different flight is further relevant to defeating A.D.'s false imprisonment and sexual assault claims. Thus, regardless of whether A.D. also told FA Warren that he felt safe or denied knowledge of any inappropriate touching by Peter, his report to FA Warren of a prior similar incident justified FA Warren's actions in keeping A.D. separated from Peter until trained law enforcement officers could investigate.

Plaintiffs also mistakenly rely on GA Paulo's testimony that she thought a different carrier with whom she has experience received less race-based discrimination complaints than Frontier. ECF No. 303, p. 25. As noted, GA Paulo worked for WFS, not Frontier, so she is unqualified to testify regarding the complaints received by Frontier at large. Nonetheless, to the extent GA Paulo has knowledge of Frontier's passenger removal incidents at LAS, she notably rejected the suggestion that the majority of the passengers removed from Frontier flights are "people of color."

> Q.      Have you seen people removed from Frontier flights at Las Vegas airport?
> **A:      From Frontier? Oh, yes. Plenty of times.**
> Q.      Plenty of times. And what were those for?
> **A:      All kinds of reasons. Besides being noncompliant, being drunk, being, you know, belligerent, or any kind of reason.**
> Q.      And were those often people of color?
> **A:      Often? I mean, there was – I don't recall the percent of each race. No. It's just whenever it happens, you know, they are removed.**
> Q.      Would it be fair to say there were fewer white people removed from planes than people with color?
> **A:      That would <u>not</u> be a fair statement.** Ex. 29, p. 85:1-16.

### H.      Paragraph 96 of Plaintiffs' Response is inappropriate and inadmissible

Paragraph 96 of Plaintiffs' Response inappropriately maligns Frontier by parroting unsubstantiated hearsay statements made by unknown individuals as depicted in the prior complaint materials produced in discovery by Frontier. These materials are cited by way of incorporation into Plaintiffs' Exhibit 6 (filed under seal), which consists of the deposition transcript and expert report of Matthew Hughey, PhD, purportedly a "world-renowned sociologist" who reviewed the crewmembers' deposition transcripts and concluded the crewmembers "were all motivated by racial stereotypes and racial animus." ECF No. 303, p. 43. Plaintiffs (through Dr. Hughey's inadmissible report) have simply collected the worst instances of unfounded accusations involving racial slurs and euphemisms and thrown them out to create a "generalized, largely-unattributed specter of racism." *See Henderson,* 940 F.2d at 471 n.11.

The statements referenced in Paragraph 96 are not only inadmissible hearsay, but they are also far more prejudicial than probative of anything relevant to this case. Judge Albregts even ruled that the complaints referenced in Paragraph 96 were "too tenuous" to have any relevance during Frontier's Rule 30(b)(6) deposition. ECF No. 250, p. 30. Moreover, setting aside their inadmissibility and lack of

relevance, allowing the statements referenced by Plaintiffs into evidence would require countless "mini-trials" to determine their accuracy and context. By way of example, the prior complaints quoted in Paragraph 96 referencing the n-word did not involve any Frontier employees. Instead, those complaints involved airport-based personnel employed by various third-parties. The prior complaints also include statements by passengers who complained about having to pay additional fees for carry-on luggage (Ex. 6's Ex. 1 at bottom p. 13), who had to pay to sit in the exit row (*id.* at pp. 15-16), and a passenger named Mohammad who did not receive a credit card application (*id.* at p. 22). None of these complaints have anything to do with whether the subject crewmembers intentionally discriminated against Plaintiffs in this case based on their races. The Court should disregard Paragraph 96 altogether and further strike it from the record, as the contents derive exclusively from materials that have been marked as confidential under the Court's protective order. Their purpose is simply to inflame the court and prejudice Frontier.

## III.    REPLY TO PLAINTIFFS' EVIDENTIARY OBJECTIONS

Defendants' Exhibit I is the FBI's written report of its investigation. Plaintiffs object to two specific statements therein that are attributed to Peter: (1) that an FA "angrily poked him in the back" to wake him; and (2) that law enforcement officers were called in the past to investigate Peter's "possible inappropriate behavior." Plaintiffs argue that these statements are "inadmissible because they are hearsay pursuant to Fed. R. Evid. 801, and not within any exception." ECF No. 303. P. 27. Plaintiffs' objections are meritless, as statements by a party opponent are not hearsay in the first instance.[4]

A law enforcement officer's written reports, including the officer's statements and observations, are generally admissible under the hearsay exception for public records contained in Fed. R. Evid. 803(8). *Liberty Insurance Corp. v. Hohman*, No. 2:21-cv-01622-GMN-VCF, 2023 U.S. Dist. LEXIS 91622, at *10 (D. Nev. May 24, 2023). While a report based on the officer's observation and knowledge may be admitted, any statements attributed to other persons are hearsay. *Colvin v. United States*, 479 F.2d 998, 1003 (9th Cir. 1979). However, it is axiomatic that "an admission by a party is not hearsay," and such statements are admissible for the truth of the matter asserted. *Hidalgo v. Garrett*, No. 3:16-cv-00618-MMD-CSD, 2022 U.S. Dist. LEXIS 172479, at *21 (D. Nev. Sep. 23, 2022) (citing NRS 51.035(3); *Cohan v. Provident Life & Accident Insurance Co.*, 140 F. Supp. 3d 1063, 1068 (D. Nev. 2015) (holding that,

---

[4] Plaintiff Peter Delvecchia also described these prior incidents in response to Frontier's Interrogatories.

pursuant to Fed. R. Evid. 804(b)(3)(A), the plaintiff's statements reflected in an investigator's report were not hearsay); *see also Mayshack v. Gonzales*, 437 F. App'x 615, 619 (9th Cir. 2011) (noting that statements against one's own interests are further admissible under Fed. R. Evid. 804(b)(3)(A)).

Here, the statement in Exhibit I that an FA "angrily poked him in the back" is a statement attributed to Peter DelVecchia, a party opponent. It is not hearsay and is admissible for the truth of the matter asserted – that Peter was "angrily poked" in the back. The statement is also against Peter's own interests, as he now claims to have suffered a concussion and extreme emotional distress after being "punched… repeatedly in the back of the head." ECF No. 303, p. 49. Thus, even if the statement were considered hearsay, it would qualify for the exception under Fed. R. Evid. 804(b)(3)(A). The same is true for Peter's statement that law enforcement officers were previously called to investigate Peter's "possible inappropriate behavior." In short, both of the statements identified by Plaintiffs are admissible because they were both made by a party opponent and they were both against the speaker's own interests.

Plaintiffs further argue that allowing the statement attributed to Peter in the FBI report regarding "possible inappropriate behavior" is inadmissible because it is more prejudicial than probative, asserting that "Peter has never been found to have acted inappropriately toward A.D." ECF No. 303, p. 28. However, Defendants do not rely on the attributed statement to prove that Peter indeed committed inappropriate behavior toward A.D. in the past. For the same reasons stated above, Defendants rely on the attributed statement only to establish that Peter was questioned before by law enforcement officers about his "possible inappropriate behavior" toward A.D., which bears directly on Plaintiffs' claims of suffering extreme emotional distress during the time they were separated aboard the subject flight. For these reasons, the Court should overrule Plaintiffs' Objections to Defendants' Statement of Facts.

## IV.   REPLY TO PLAINTIFFS' ARGUMENTS

### A.  Frontier cannot be held vicariously liable

Plaintiffs' entire case against Frontier relies on a flawed application of vicarious liability principles. Plaintiffs quote *Bains LLC v. ARCO Products Co.,* 405 F.3d 764, 774 (9th Cir. 2005) to argue Frontier can be held vicariously liable under 42 U.S.C. § 1981 for compensatory and punitive damages. *Bains* involved claims that a gasoline company terminated a transporter's contract based on racial discrimination. There was testimony that a supervisor (Lawrence) was present on multiple occasions when

a company employee (Davis) used racial slurs directed at the plaintiffs' drivers. The Ninth Circuit held that the defendant company could be held vicariously liable for Davis's conduct if Lawrence – the supervisor – "chose to back up Davis." *Id.* at 774.

Plaintiffs seize on this language from *Bains* to assert that Captain Shupe "as the senior representative of Frontier on the subject flight…renders Frontier liable for failing to protect Peter and A.D." ECF No. 303, p. 44. Plaintiffs equate Captain Shupe with supervisor Lawence in *Bains*. See ECF No. 303, p. 44-45. Captain Shupe, however, never "backed up" previous racially motivated conduct of any Frontier employees, much less the flight attendants involved in the subject flight. Plaintiffs next imply that Frontier "backed up" the alleged conduct of employees involved in the prior complaints by failing to adequately address the unrelated discrimination prior complaints that Frontier produced in discovery. *Id.* at p. 46. However, as noted above, the *Bains* court focused on whether the **same supervisor** or decisionmaker "backed up" the **same employee** who had a history of making racially derogatory remarks. Here, there is no evidence that same "supervisor" or decisionmaker involved in the prior complaints was the same supervisor or decisionmaker involved with the subject flight. Indeed, there is no evidence that any of the crewmembers were involved in any of the prior complaints. Therefore, Frontier could not be held vicariously liable for Captain Shupe's or FA Warren's alleged intentional tort claims, including intentional racial discrimination.

## B.      The plain language of 49 U.S.C. §44941

Plaintiffs ignore the plain language of 49 U.S.C. §44941(a) to argue that it (a) "is not intended to apply here" because, according to Plaintiffs, it was enacted only to prevent terrorism and "threats against air travel" which, according to Plaintiffs, do not include threats of child endangerment. ECF No. 303, p. 28. Plaintiffs' assertions are unsupported and frivolous. The plain language of a statute is controlling unless a clearly expressed legislative intent is to the contrary, or unless applying the plain language would lead to absurd results. *State Compensation Insurance Fund v. Zamora*, 616 F.3d 1001, 1006 (9th Cir. 2010). Nothing about §44941(a) justifies deviating from its plain language. By including the term "threat to… passenger safety," Congress clearly intended to cast a broad net covering more than just reports of suspected terrorist threats. There is also nothing inconsistent about immunizing airline and their employees for reporting suspected terrorist threats and as well as threats to individual passengers.

Through their ACARS messages and written reports to the Las Vegas Metro Police Department ("LVMPD"), the Defendant crewmembers undoubtedly made "voluntary disclosure[s] of any suspicious transaction relevant to a possible violation of law or regulation, relating to… passenger safety." Because the ACARS messages and written reports were made "to any… local law enforcement officer, or any airport or airline security officer," Defendants "shall not be civilly liable to any person under any law or regulation of the United States." 49 U.S.C. §44941(a).

In sum, applying the plain statutory language of §44941(a), this Court should hold that Defendants are not liable for the ACARS messages or their written and verbal statements to law enforcement officers and airport and airline security officers. This Court should further follow *Ilczyszyn v. Southwest Airlines Co.*, 80 Cal. App. 5th 577, 579-80 (2022), and rule that Defendants' immunity covers not only their voluntary disclosures, but also the conduct flowing from their voluntary disclosures, including their actions to separate Plaintiffs until trained law enforcement officers could investigate the FAs' concerns.

## C.   This case is distinguishable from *Abdallah v. Mesa Air Group*

Plaintiffs rely on the Fifth Circuit's recent decision in *Abdallah v. Mesa Air Group Inc.*, 83 F.4th 1006 (5th Cir. 2023), to argue that §44941(a) does not afford immunity to "things that occurred solely because of the airline's actions." ECF No. 303, pp. 29. However, *Abdallah* is factually distinguishable and should not be read to narrowly constrict the extent of §44941(a) immunity. The airline captain in *Abdallah* spoke with multiple ground personnel and law enforcement officers in relaying a flight attendant's concerns about two men from Middle Eastern countries. The flight attendant repeatedly referenced what she presumed to be the individuals' racial ethnicities and was adamant that she would not fly with a "brother named Issam." *Abdallah*, 83 F.4th at 1010-1011. After ground personnel conducted a full search of the aircraft and investigated the involved individuals' flight histories, the Ground Security Coordinator concluded that there was no safety risk. Nonetheless, the captain "unilaterally delayed takeoff until the 90-minute mark," at which point all passengers were required to deplane. *Id*. The captain explained that she was "suspicious because Osama bin Laden's son had just been assassinated by the U.S. Government, and she was fearful of 9/11." *Id*. at 1011. In this context, the *Abdallah* court held:

Although § 44941(a) grants immunity for any communications made between Mesa and external security agents — and to any impact that 'flowed from the decisions made by such law enforcement officers,' *Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 276 (2d Cir. 2015), it does

not grant immunity for things that occurred solely because of the airline's actions. The parties agree that the decision to delay the flight was Mesa's alone. They also agree that the security officials told Hewitt that there was no safety concern and that the plane should take off. Therefore, § 44941(a) does not grant immunity for Mesa's decision to cancel the flight or for other actions and statements attributable only to the airline. *Abdallah*, 83 F.4th at 1012-1013.

Drawing from *Abdallah*, Plaintiffs argue that §44941(a) could only apply in this case to "the pilot's requests to law enforcement to meet the flight" and cannot apply to any other actions that "did not flow from any decisions made by law enforcement officers." ECF No. 303, p. 30. Defendants agree with the *Abdallah* decision insofar as it denies immunity for actions taken contrary to the recommendations of security and law enforcement officers. However, *Abdallah* did not involve defamation claims, and the court was concerned only with a § 1981 claim for racial discrimination. *Id.* at 1011. The facts in *Abdallah* are nothing like those at issue here, and the case should not be read to support such a narrow application of §44941(a) immunity as Plaintiffs would apply. At the very least, Defendants' §44941(a) immunity applies to shield them from Plaintiffs' defamation claims arising from the ACARS messages and written reports for the LVMPD. As noted, Defendants respectfully maintain that this Court should further follow the reasoning in *Ilczyszyn* and hold that by enacting §44941(a), Congress "intended to confer upon air carriers the greatest possible degree of protection," stretching beyond "defamation or other reputation-based torts." *Ilczyszyn*, 80 Cal. App. 5th at 599, 601.

**D.    This case is distinguishable from *Eid v. Alaska Airlines***

Plaintiffs rely on *Eid v. Alaska Airlines, Inc.,* 621 F.3d 858 (9th Cir. 2010) to argue that Captain Shupe and FO Mullin "should have been aware" the FAs were "tainted" by their own racial animus, and Captain Shupe was "required to know a good deal more" before he made the ACARS reports indicating possible inappropriate touching of a minor. ECF No. 303, p. 31. Plaintiffs further argue that the *Karrani* case relied upon by Defendants[5] contradicts *Eid* and that, pursuant to *Eid*, "a Captain cannot rely passively on a flight attendant's gut feelings, especially absent evidence of a safety threat." *Id.* at p. 43.

Plaintiffs are wrong to rely on *Eid*, which did not involve discrimination claims and was focused only on the immunity granted to airline pilots for passenger removal decisions made aboard international flights. The plaintiffs in *Eid* were a group of Egyptian passengers who occupied most of the first-class

---

[5] *See Karrani v. JetBlue Airways Corp.*, No. C18-1510 RSM, 2019 U.S. Dist. LEXIS 127944 (W.D. Wash. July 31, 2019).

seats on a flight from Vancouver to Las Vegas. A FA became increasingly upset after an in-flight dispute with one of the plaintiffs. When the FA called the cockpit and stated she had "lost control of the first-class cabin," the pilots immediately diverted the flight for an emergency landing in Reno. A third-party witness maintained that the FA was "completely irrational" and that the plaintiffs had done nothing wrong. Even though the police and TSA cleared the plaintiffs to continue flying, the captain refused to let them reboard. *Eid*, 621 F.3d at 862-64.

The *Eid* court was focused on the "Tokyo Convention," which generally grants immunity to the captain of an international flight for a reasonable passenger removal decision. *Id.* at 864, 866. The court likened the reasonableness standard from the Tokyo Convention to the standard for granting passenger removal immunity for domestic flights under 49 U.S.C. § 44902(b). *Id.* at 868, 869. The Ninth Circuit reversed the district court's grant of summary judgment for the defendant airline, noting the captain asked no questions to clarify the FAs statement that she had "lost control" of the first-class cabin, did not look through the cockpit window which provided a clear view of the first-class cabin, and acknowledged he "had no idea what went on back there." *Id.* at 869. The *Eid* court held:

> We certainly agree that the captain must be able to act decisively in an emergency and, in doing so, rely on communications from his crew. A jury may reasonably conclude that there was no emergency here. None of the passengers had made any threats, brandished a weapon or touched a flight attendant. Nor had any of the flight crew informed the captain that any of the passengers had done anything to endanger the plane. Even assuming the truth of everything that Captain Swanigan and his crew now say happened, a jury could conclude that the captain acted unreasonably in diverting the plane to Reno, forcing plaintiffs to disembark, turning them over to the authorities and then refusing to let them re-board the flight after the police had cleared them. *Eid*, 621 F.3d at 872.

Plaintiffs cite an abbreviated version of the above quote from *Eid*, and assert "[t]he same is true here." ECF No. 303, pp. 32. The same is clearly not true here. Unlike the captain in *Eid*, Captain Shupe did not make a rash decision upon the first FA Report. Rather, Captain Shupe consulted with all four FAs before he decided to have Plaintiffs separated. After FA Bright-Sakurada reported her concerns about the "stroking of the face," FA Warren reported "that there was a hand near the [minor's] crotch." *Id.* at p. 23:21 – p. 24:3. Captain Shupe testified: "For us to – to take action with a passenger, we don't take that lightly. And so I also called back the third flight attendant and the fourth one and talked to them individually on the phone." *Id.* at p. 24:9-12. All four FAs agreed that separating Plaintiffs was the proper

action in the moment. ECF No. 266-4, p. 30:8-11. Thus, whereas the captain in *Eid* made an unreasonable decision to divert the aircraft for an emergency landing and unreasonably denied the plaintiffs reboarding, Captain Shupe made a reasonable decision to have Plaintiffs separated for the duration of the flight until trained law enforcement officers could conduct a proper investigation.

### E.   Defendants are also entitled to immunity under NRS 432B.160

Plaintiffs incorrectly argue that Defendants have "failed to give notice that they intended to rely on NRS 432B.160." ECF No. 303, p. 34. An affirmative defense must provide fair notice of the issue involved. To satisfy the pleading standard for an affirmative defense, the defendant must simply state what the defense is. *Walker v. Charter Communs. Inc.*, No. 3:15-cv-00556-RCJ-VPC, 2016 U.S. Dist. LEXIS 84510, at **6, 8 (D. Nev. June 29, 2016).

Plaintiffs acknowledge Defendants' preservation of an affirmative defense that they are entitled to immunity, qualified or otherwise, under both state and federal law. ECF No. 303, p. 34. Defendants have also argued throughout this litigation that they are immune from liability under 49 U.S.C. §44941(a). To overcome this immunity, Plaintiffs must establish that Defendants acted knowingly and with actual malice by making false reports of inappropriate touching. Similarly, establishing immunity for reporting child abuse under NRS 432B.160(3) requires Plaintiffs to overcome the presumption that Defendants acted in good faith. As Defendants noted in their underlying Motion, the same reasons Plaintiffs cannot show actual malice in the crewmember reports also means they cannot overcome a presumption of good faith. ECF No. 266, p. 11, n. 7.

### F.   Plaintiffs wrongly claim to have direct evidence of discriminatory intent

Direct evidence of discriminatory intent is evidence which proves the fact of discriminatory animus without need for inference or presumption. *Rashdan v. Geissberger*, 764 F.3d 1179, 1184 (9th Cir. 2014) (a dental school supervisor's comment that an Egyptian dental student performed "Third World Dentistry" was not direct evidence of discriminatory intent and showed no discriminatory animus because it was directed toward the student's work and not her nationality).

Here, Plaintiffs argue they have direct evidence of discriminatory intent because FA Nickel assumed they were reseated due to a language barrier rather than A.D.'s young age, and she was "shocked" to learn he was only 12 years old and felt "uneasy" about Plaintiffs' relationship. Assuming this all to be

true, it would not be direct evidence of discriminatory intent and would require unreasonable and far reaching presumptions and inferences to support such a claim. FA Bond testified that passengers are typically unqualified to sit in an exit row due to either the age restriction or a language barrier, so it makes sense that the FAs would couch their testimony in terms of age restrictions or language barriers. It does not imply racism much less direct evidence of racism.

Plaintiffs baldly assert that "although Nickel attempted to confine the discussion to A.D.'s height and age, [her assumption about a language barrier] had to have been based on his Ethiopian facial features as well—it is not a given that tall children do not speak English." ECF No. 303, p. 37. This argument underscores the weakness of Plaintiffs' discrimination claims. Their strongest evidence, and the evidence they believe is direct evidence of discrimination, is pure speculation and would require far too many illogical inferences and presumptions to be evidence of discriminatory intent.

In stark contrast to this case, the *Abdallah* case discussed above involved direct evidence of intent to discriminate on the basis of race or ethnicity. The FA in that case directly referenced what she presumed to be the involved individuals' racial ethnicities and stated she would not fly with a "brother named Issam." For added measure, the captain ignored the recommendations of security agents that it was safe to fly due to her suspicions regarding Osama bin Laden's son and the September 11 terrorist attacks. *Abdallah*, 83 F.4th at 1010-1011. Both of these comments from *Abdallah* illustrate the speaker's unapologetic and specific intent to discriminate against a passenger – by refusing to fly with them – based solely on their race or ethnicity. The comments identified by Plaintiffs in this case come nowhere close to what was said in *Abdallah*. *See* ECF No. 303, p. 37.

G.     **Plaintiffs cannot show a *prima facie* case of intentional discrimination based on race**

Plaintiffs curiously dedicate an entire page of their oversized brief to advocating for use of the "markedly hostile manner" standard for establishing a *prima facie* case under § 1981. As Defendants noted in their Motion for Summary Judgment, the standard advocated by Plaintiffs was applied by the well-reasoned decision in *Karrani v. JetBlue Airways Corp.*, No. C18-1510 RSM, 2019 U.S. Dist. LEXIS 127944, at *11 (W.D. Wash. July 31, 2019). To establish a *prima facie* case of racial discrimination in this case, Plaintiffs must prove by the preponderance of the evidence that: (1) they are members of a protected class; (2) they attempted to contract for certain services; (3) they were denied the right to contract

for those services; and (4) such services were available to similarly-situated individuals who were not members of Plaintiff's protected class, or such services were provided in a "markedly hostile manner" which a reasonable person would find objectively discriminatory. *Lindsey v. SLT Los Angeles, LLC*, 447 F.3d 1138, 1145 (9th Cir. 2006); *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 872 (6th Cir. 2001). This is the same test identified by Plaintiffs. *See* ECF No. 303, p. 38.

Plaintiffs assert that at the summary judgment stage, "the requisite degree of proof necessary to establish a *prima facie* case is minimal and does not even need to rise to the level of a preponderance of the evidence." *Lyons v. England,* 307 F.3d 1092, 1112 (9th Cir. 2002). However, even accepting this to be the proper evidentiary standard, a § 1981 plaintiff cannot avoid summary judgment by relying solely on his or her own subjective belief that the defendant's action was unnecessary or unwarranted. *Cornwell v. Electra Central Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006). Yet, that is precisely what Plaintiffs have attempted to do here.

Importantly, in determining whether a defendant's actions rise to the level of being "markedly hostile," the Sixth Circuit courts referenced in *Lindsey* consider whether the conduct is: (1) contrary to the manifest financial interests of the merchant; (2) outside widely-accepted business norms; and (3) arbitrary on its face, such that the conduct supports a rational inference of discrimination. *See Keck v. Graham Hotel Systems*, 566 F.3d 634, 641 (6th Cir. 2009). Plaintiffs' allegations of corporate-wide discriminatory animus in this case are so profoundly contrary to Frontier's manifest financial interests that they cannot support a reasonable inference of racial discrimination by the crewmembers aboard the subject flight. Captain Shupe's decision to separate a child passenger from a potential threat was, indeed, consistent with Frontier's manifest financial interests.

Plaintiffs further rely on their own self-serving allegations of post-separation conduct to further promote their claims of a generalized, "largely-unattributed specter of racism." *Henderson,* 940 F.2d at 471 n.11. Upon reporting the FAs' concerns of inappropriate touching of a minor and requesting the assistance of LVMPD when the flight landed in Las Vegas, Captain Shupe had no choice but to order that Peter also be separated from A.D. for the duration of the flight. *See Arnold*, 13 F. App'x at 578 (discussing the common carrier's "degree of diligence demanded under the circumstances" whether the carrier should have done more to protect a child from an adult passenger). As was argued in Defendants' Motion for

Summary Judgment, and will be discussed further below, Plaintiffs' tort claims relating to conduct that allegedly occurred after the in-flight separation are belied by the undisputed facts and the policies supporting Defendants' ATSA immunity under 49 U.S.C. §44941(a). Moreover, the issue here is what was in the minds of Defendants when Captain Shupe made his decisions to report the FAs' concerns to ground personnel and order Plaintiffs to be separated in the cabin – not what was in the minds of Defendants after those decisions were made. Plaintiffs cite no cases for the proposition that post-incident conduct can be used as *prima facie* evidence of pre-incident intent. Accordingly, this Courts should focus on the alleged evidence of pre-incident discriminatory intent and find it is insufficient to state a *prima facie* case under § 1981.

**H.     Plaintiffs cannot show that Defendants' explanations for their actions are pretextual**

Plaintiffs continue to mistakenly argue that Defendants' explanations for their actions are pretextual because Defendants failed to investigate their familial relationship and determine they were father and son. As was succinctly stated in *Cupp v. Delta Air Lines, Inc.*, No. 4:22cv29, 2023 U.S. Dist. LEXIS 58732, at *15 (E.D. Va. Mar. 3, 2023), "[a] familial relationship does not necessarily negate suspicions of child abuse, and a failure to properly train employees, without more, rises to the level of negligence at best." Plaintiffs largely ignore *Cupp* and make only the unsupported assertion the case "illustrate[s] how innocuous expressions of parental love are falsely interpreted as sexual perversion and human trafficking when the accuser does not accept the adult is the child's parent." ECF No. 303, p. 29.

Plaintiffs have no basis to claim the crewmembers in *Cupp* refused to accept that the adult was the child's parent, and they have no basis to make such a claim about Peter and A.D. in this case. Just as with the Virginia immunity statute at issue in *Cupp*, ATSA immunity under 49 U.S.C. §44941(a) imposes no requirement on a party to investigate and inquire before reporting potential child abuse. *See Cupp*, No. 4:22cv29, 2023 U.S. Dist. LEXIS 58732, at *10.

**I.     Plaintiffs' claims for IIED, Battery, and Assault cannot survive**

There are no factual issues precluding dismissal of Plaintiffs' claims for intentional infliction of emotional distress ("IIED"), as Nevada courts typically determine whether the defendant's conduct may be regarded as sufficiently "extreme and outrageous" to result in liability for IIED. *Tarr v. Narconon Fresh Start*, 72 F. Supp. 3d 1138, 1143 (D. Nev. 2014). Here, Plaintiffs have no evidence beyond their

own self-serving testimony to support their exaggerated claims regarding FA Warren's physical conduct. *See* ECF No. 303, p. 47. In fact, the only testimony from an objective, percipient, third-party witness belies Plaintiffs' claims.

The story told by Christopher Higgins is consistent with FA Warren's testimony, and is drastically different than the story told by Plaintiffs. Higgins is a seasoned police officer with no reason to fabricate his testimony that FA Warren maintained a calm demeanor, said nothing about Plaintiffs' races, and separated A.D. from Peter in a courteous and professional matter. *See* ECF No. 266, p. 24. Plaintiffs continue to stand by their wild and unbelievable claims that FA Warren "attack[ed] Peter with multiple blows to the head causing a concussion," and "assaulted A.D. by reaching for his genitals while he was trapped against the wall of the aircraft cabin." ECF No. 303, p. 47. To support these claims, Plaintiffs recklessly assert that Higgins was "a savvy and evasive witness in his deposition" who "attempted to protect Warren," and that his testimony is "unbelievable" and a jury could infer from Higgins' prevarication that something worth lying about had occurred there." ECF No. 303, pp. 49, 50.

Plaintiffs have no evidence to support any of this and rely only on their own exaggerations. The Court should not allow such tactics to prevail. To avoid a dismissal of their IIED claims, Plaintiffs must demonstrate that the crew's actions were "extreme and outrageous," and that they suffered stress so severe and of such intensity that no reasonable person could be expected to endure it. *Watson v. Las Vegas Valley Water Dist.,* 378 F. Supp. 2d 1269, 1279 (D. Nev. 2005). Because the only objective evidence in this case contradicts Plaintiffs' IIED, battery and assault claims, the Court should dismiss them with prejudice.

### J.    A.D.'s false imprisonment claim is not supported by any evidence

To establish a claim for false imprisonment under Nevada law, in addition to satisfying the ordinary elements (intent to confine the plaintiff within fixed boundaries and conscious of the harm caused by the confinement), a plaintiff must also show that the defendant used force or threats of any character. *May v. Cal. Hotel & Casino*, 2016 Nev. App. Unpub. LEXIS 516, *2-3 (Nev. App. 2016). Submission to the mere verbal direction of another, without more, does not constitute false imprisonment. *Id.* Here, the undisputed facts show that FA Warren was acting in the best interest of A.D. There is simply no evidence that he used force or threats, or intended to harm A.D. Further, A.D. was not confined to any fixed

boundaries. A.D.'s movement was no more restricted than Peter's movement in that the two were merely prevented from contacting each other.

### K.   Plaintiffs' punitive damages claims must be dismissed

The federal standard for allowing punitive damages is similar to the standard imposed under Nevada state law. Punitive damages are available to § 1981 plaintiffs who can show that the defendant engaged in intentional discrimination "with malice or with reckless indifference to the federally protected rights of [the] aggrieved individual." *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 529 (1999). Contrary to Plaintiffs' conclusory assertions, there is no evidence in this case tending to suggest that Defendants acted with malice or with reckless indifference to any of Plaintiffs' federally protected rights, and there is no evidence that such conduct was "ratified by Frontier." See ECF No. 303, p. 52.

Finally, regarding Plaintiffs' assertion that punitive damages can be awarded against an employer on the basis of vicarious liability (*see id.*), as noted, there is no evidence that any of the same supervisors or decisionmakers involved with any of the other complaints had any connection whatsoever with this case. Thus, even if Plaintiffs could show that Captain Shupe's decisions in this case were racially motivated (they cannot), Plaintiffs are unable to hold Frontier vicariously liable, because there is no evidence that Frontier "backed up" a racially motivated decision. Moreover, as previously explained, Plaintiffs' allegations against Captain Shupe are mere negligence allegations which do not rise to the level of intentional conduct. For these reasons, Plaintiffs' punitive damages claims must be dismissed.

## V.   <u>CONCLUSION</u>

For all of the reasons argued by Defendants, the Court should grant Defendants' Motion for Summary Judgment and dismiss Plaintiffs' claims in their entirety, including their claims for punitive damages, and grant such further relief as the Court deems necessary and just.

DATED this 5th day of January, 2024          Respectfully submitted,

/s/ *Brian T. Maye*
Brian T. Maye (admitted *pro hac vice*)
Richard C. Harris (admitted *pro hac vice*)
HINSHAW & CULBERTSON
151 North Franklin Street, Suite 2500
Chicago, Illinois 60606
Phone: (312) 422-5713
Email: bmaye@hinshawlaw.com

rharris@hinshawlaw.com

Charles A. Michalek (Nevada Bar No. 5721)
ROGERS, MASTRANGELO, CARVALHO &
MITCHELL
700 South Third Street
Las Vegas, Nevada 89101
Phone: (702) 383-3400
Email: cmichalek@rmcmlaw.com

*Attorneys for Defendants Frontier Airlines, Inc.,
Scott Warren & Rex Shupe*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 5, 2024, I caused the foregoing to be electronically filed with the United States District Court for the District of Nevada using the CM/ECF system.

By: *<u>/s/ Brian T. Maye</u>*