**EXHIBIT 29**

**Deposition of Angelica Paulo**
**(Former Frontier ground handling supervisor, as WFS employee)**

**(Redacted)**

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF NEVADA

3

4

5

6
   PETER DELVECCHIA, et al.,

7              Plaintiffs,

8        vs.                    CASE NO. 2:19-CV-01322-KJD-DJA

9
   FRONTIER AIRLINES, INC.,

10  et al.,

11             Defendants.
   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

12

13

14

15          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

16                       ANGELICA PAULO

17

18                       March 15, 2022

19                        10:06 a.m.

20

21                     Las Vegas, Nevada

22

23        Reported By:  Robin A. Ravize, CCR #753
                       NV Firm Lic. #008F
24

25



1          APPEARANCES OF COUNSEL VIA VIDEOCONFERENCE

2

   On Behalf of the Plaintiffs Peter DelVecchia and A.D., a
3  Minor:

4       TITOLO LAW OFFICE
        TIMOTHY R. TITOLO, ESQ.
5       9950 West Cheyenne Avenue
        Las Vegas, Nevada  89129
6       702.869.5100
        E-mail:  tim@titololaw.com

7
        PARK AVENUE LAW, LLC
8       JOHN D. McKAY, ESQ.
        201 Spear Street, Suite 1100
9       San Francisco, California  94105
        434.531.9569
10      E-mail:  johndmckayatty@gmail.com

11
   On Behalf of the Defendants:
12
        ALDER, MURPHY & McQUILLEN, LLP
13      BRIAN T. MAYE, ESQ.
        20 South Clark Street, Suite 2500
14      Chicago, Illinois  60603
        312.345.0700
15      E-mail:  bmaye@amm-law.com

16
   Also Present:
17
        LAURA VELASCO, Remote Videographer
18

19

20

21

22

23

24

25



ANGELICA PAULO
PETER DELVECCHIA vs FRONTIER AIRLINES

March 15, 2022
3

```
 1                      INDEX OF EXAMINATION

 2   WITNESS:  Angelica Paulo

 3   EXAMINATION                                    PAGE

 4   By Mr. McKay                          6, 82, 108
     By Mr. Maye                        62, 106, 111
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

1                         INDEX TO EXHIBITS

2    Plaintiffs'                Description              Page

3    Exhibit 1        Passenger PNR Details for E95Z4G
                      of Frontier Airlines               61
4
                      (Original Exhibit 1 has been
5                      attached to the original
                       transcript.)
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



```
 1                    LAS VEGAS, NEVADA

 2            TUESDAY, MARCH 15, 2022; 10:06 A.M.

 3                         -o0o-

 4        THE REPORTER:  My name is Robin Ravizé, a Nevada

 5   certified shorthand reporter, and this deposition is being

 6   held via videoconferencing equipment.

 7              Counsel off the record have expressed their

 8   agreement that this deposition may take place with the

 9   remote administration of the oath and remote reporting of

10   the deposition.

11                      *  *  *  *

12        THE VIDEOGRAPHER:  Good morning.  We are now on the

13   record, and the time is 10:06 a.m. Pacific time on

14   March 15th, 2022.  This begins the videoconference

15   deposition of Angelica Adrineda Paulo.  And this is taken in

16   the matter of Peter DelVecchia versus Frontier Airlines,

17   Inc., et al.  And this is filed in the United States

18   District Court for the District of Nevada, case number

19   2:19-CV-01322-KJD-DJA.

20              My name is Laura Velasco and I'm the remote

21   videographer today.  Our court reporter is Robin Ravize, and

22   we are from Esquire Deposition Solutions.

23              Will everyone present, can you please state

24   your name and who you represent, after which our court

25   reporter will swear in the witness.
```



1          MR. McKAY:  My name is John McKay and I represent

2     the DelVecchias who are the plaintiffs.

3          MR. TITOLO:  Tim Titolo, Nevada co-counsel for the

4     plaintiffs.

5          MR. MAYE:  Brian Maye for the defendants.

6

7                    ANGELICA PAULO,

8               having been first duly sworn,

9          was examined and testified as follows:

10

11                     EXAMINATION

12    BY MR. McKAY:

13          Q.    Thank you.

14               Good morning, Ms. Paulo.  How are you today?

15          A.    Good.  How are you?

16          Q.    Good, thanks.

17               Have you ever been to a deposition before?

18          A.    Never.

19          Q.    So I will spend a few minutes just telling

20    you what's going on.  And don't feel like you have to

21    memorize everything.  We will help you along as we proceed.

22               If you need to do something different, we

23    will tell you.  But this is kind of a hybrid of an in-court

24    and an out-of-court proceeding.  In the old days before the

25    pandemic, this would occur at a court reporter's office or a



1  lawyer's conference room.  And we would all be sitting

2  around at a big conference room table.

3            But now circumstances being what they are, we

4  are doing it by zoom.  But the concept is the same.

5            We are taking down your deposition testimony

6  as though you were sitting in a courtroom in a witness

7  stand, and it's like a court proceeding in that respect

8  because at some point in the future even though there's no

9  judge present today, a judge will probably read the

10 transcript or watch the videotape.

11           And for that judge, he will be -- and they

12 are both male in this case -- they will be looking at your

13 testimony precisely as though you were sitting in their

14 courtroom testifying.

15           And so they understand if you've been placed

16 under oath, then they expect you to testify as though you

17 were placed under oath in a courtroom.

18           Is that understood?

19     A.    Understood.

20     Q.    Okay.

21           And it's not like a courtroom in the sense

22 that if someone rings your doorbell and you have to go let

23 them in, or if your phone rings or the dog wants to go out,

24 you can certainly tell us and that's fine.  We can take a

25 few minutes off the record.



1          Just be sure -- we do ask that if there was a

2   question pending, that you go ahead and close the loop by

3   answering the question before we take a break, okay?

4          A.    Okay.

5          Q.    And then a couple little things that -- this

6   is the part that we will remind you about so you don't have

7   to memorize it.

8          But for one thing, the court reporter is

9   taking down every word that is said, including what I'm

10  saying right now.  And one thing that really messes her up

11  is if we both talk over each other.

12         So even though that's pretty normal in a

13  conversational setting, we have to be a little bit formal

14  here and wait until the other person is finished talking

15  before we begin our response; is that okay?

16         A.    Understood.

17         Q.    And you're doing a very good job of this so

18  far.  But just be sure that as we get further into things

19  that you don't answer things with an uh-huh or a nod of the

20  head because that's very difficult for the court reporter to

21  transcribe, all right?

22         A.    Understood.

23         Q.    Any time you don't understand what I'm

24  asking, just say so.  And I will either explain it or I'll

25  rephrase the question, or I'll maybe drop it entirely.



1          A.     Okay.

2          Q.     So just let me know.

3                 If you do answer a question, we will all

4     assume that you understood it.

5          A.     Okay.

6          Q.     So with that said, let me just get all of the

7     housekeeping done.

8                 Are you at                        in

9     Henderson, Nevada?

10         A.     Correct.

11         Q.     Do you have any plans to move from there in

12    the near future?

13         A.     No, sir.

14         Q.     Okay.

15                The reason I'm asking that question is that

16    we may need to have your testimony at the actual trial.  And

17    if we do, we need to know where to find you.

18         A.     Okay.

19         Q.     Is there anybody else that lives at that

20    address?

21         A.     Yes.

22         Q.     Is that your fiance?

23         A.     Yes.

24         Q.     And what is his name?

25         A.     Ricky Craig.



1        Q.     And it sounds like -- from the discussion off

2   the record before we started, it sounds like you will be

3   Mrs. Craig at some point in the near future; is that

4   right?

5        A.     In a couple of weeks, yes.

6        Q.     Okay.  Great.  Congratulations.

7        A.     Thank you.

8        Q.     How are you currently employed, if at all?

9        A.     Okay.

10              I'm not currently employed.

11       Q.     What I'm going to be asking you about today

12   is your former employment at Worldwide Flight Services here

13   in Nevada.

14       A.     Okay.

15       Q.     So when were you first employed by

16   Worldwide?

17       A.     Back in 2008.

18       Q.     Okay.

19              Do you remember the month?

20       A.     August.

21       Q.     Okay.

22              And just for the court reporter's benefit, I

23   just want to clarify.  Worldwide for this particular company

24   is two words; is that correct?

25       A.     No.  Worldwide is one word.



1          Q.     Oh, okay.  You need to tell whoever runs

2     their website, I think it shows up as two.

3                But in any event, maybe I'm wrong.  Somewhere

4     along the way, I saw it as two.  Let me just see.  No, I'm

5     wrong.  It says Worldwide is one word.

6                Well, I'm frequently wrong, so nothing new

7     about that.

8                So in 2008, you started at Worldwide Flight

9     Services.  And what were you doing at that time for them?

10         A.     I was a service representative for an

11    airline, AirTran Airways.

12         Q.     And what did that entail?

13         A.     Just a typical check-in of the passengers,

14    boarding --

15         Q.     Okay.

16         A.     -- (inaudible.)

17         Q.     Go ahead.  What were you saying it

18    involved?

19         A.     Oh, check in passengers, boarding and baggage

20    claim as well.

21         Q.     So basically, was that everything from the

22    point where they arrived at the airport until they got on

23    the plane?

24         A.     Yes, sir.

25         Q.     And then if they were arriving at the



1  airport, then it involved getting their baggage as well?

2        A.     Correct.

3        Q.     How did you find out -- once you got hired,

4  how did you find out how that was to be done?

5        A.     We had training, formal training in Atlanta,

6  Georgia.

7        Q.     And who conducted that training?

8        A.     It was AirTrans, AirTrans employees, yes.

9        Q.     So you, as a Worldwide employee, traveled to

10  AirTran and AirTran trained you to do what they wanted you

11  to do; is that right?

12        A.     Correct, yes.

13        Q.     And at any time did your position change at

14  Worldwide?

15        A.     Yes.

16        Q.     And when was that?

17        A.     When AirTran Airways was bought out with

18  Southwest, I was laid off at the time.  I then shortly

19  became a dispatcher for their crew shuttle service with

20  Worldwide.

21              And about a year after that, I came on as the

22  Frontier supervisor.

23        Q.     And when you say "their crew shuttle," whose

24  crew shuttle was that?

25        A.     Worldwide Flight Services.



1          Q.     And is that a service that they do to move
2    airline employees around?

3          A.     That is correct.

4          Q.     So I don't think we need to get into too many
5    details about the crew shuttle.  But what did you do to
6    become the supervisor for Frontier?

7                 Did you have to make an application for that
8    job?

9          A.     My manager at the time had requested that I
10   accept the position.

11         Q.     Oh, okay.

12                And who was your manager?

13         A.     Cassie Guillory.

14         Q.     Do you know how Guillory spelled, by any
15   chance?

16         A.     G-u-i-l-l-o-r-y.

17         Q.     Thank you.

18                So when Ms. Guillory told you about the
19   position with Frontier or for Frontier, was Frontier a new
20   client for Worldwide at that time?

21         A.     Not entirely new, but fairly new.  It must be
22   maybe a year or two.  Maybe just a year since they acquired
23   the contract.

24         Q.     Do you remember what month and year you took
25   the position as the supervisor?



1       A.     I don't remember the year, to be completely

2   honest.

3       Q.     Okay.  That's fine.  Maybe we can get at it

4   this way.

5              Do you remember how long you worked with

6   AirTran?

7       A.     Four years.

8       Q.     And you were the dispatcher for the crew

9   shuttle for --

10      A.     One year.

11      Q.     So roughly speaking then, it was about five

12  years after August 2008?

13      A.     Roughly.

14      Q.     Okay.

15             So sometime around the middle of 2013?

16      A.     Give or take.

17      Q.     So let's talk about your introduction to the

18  Frontier way of doing things.

19             How did you get trained for that?

20      A.     Initially, I shadowed the current

21  supervisor.

22      Q.     Okay.

23             And who was the current supervisor then?

24      A.     My apologies.  I can't remember her last

25  name.  I want to say her first name was Jessica.



1              If you'll allow me some time, I could

2    probably look her up.  I think it was Jessica Esteban.

3         Q.    Okay.  Let's go with that.  It's not that

4    important that we get the name exact.

5              But I just wanted to go through more of the

6    process.

7              So was Jessica then showing you how Jessica

8    had been trained?

9         A.    She was showing me the ropes as far as how

10   the operation ran.

11        Q.    Okay.

12        A.    Shortly after -- they were in the middle of

13   transitioning systems, check-in systems.  So I was initially

14   told not to learn it until they got the new system.

15             And then from there, I was trained by one of

16   their trainers.

17        Q.    Do you remember what the name of the new

18   system was?

19        A.    The new system?

20        Q.    Yes.  Was it Navitaire?

21        A.    Navitaire.

22        Q.    I think that's N-a-v-i-t-a-i-r-e; is that

23   right?

24        A.    It sounds about right, yes.

25        Q.    Okay.



 1                    Did you attend a Frontier-run training for
 2      your job?
 3           A.    Run training?
 4           Q.    Well, like you did with AirTran, did you do a
 5      similar thing with Frontier in Denver?
 6           A.    I was not flown out for training.  Trainers
 7      typically come to the station to train the agents there.
 8           Q.    Oh, okay.
 9                    So the trainers came from Frontier's offices
10      in Denver?
11           A.    I couldn't tell you exactly where the offices
12      were.  I'm assuming it was Denver, but I'm not sure.
13           Q.    But you knew that they were Frontier
14      employees?
15           A.    Correct.
16           Q.    Okay.
17                    And what sort of training did these Frontier
18      employees provide to you?
19           A.    Just how to work the system.  And we also
20      have online training, too.  I don't know if that's ...
21           Q.    Yeah.  That's important.
22                    What type of -- can you describe to us the
23      online trainings that you had?
24           A.    A lot of videos, questionnaires at the end,
25      things like that.



1        Q.    Okay.

2              And were those created by Frontier?

3        A.    Yes.

4        Q.    Was it important to know how things were done

5   by Frontier so that you could do them in place of Frontier's

6   employees?

7        A.    Yes, of course.

8        Q.    Okay.

9              So what did the position entail then as

10  supervisor for the Frontier account at Las Vegas?

11       A.    What does it entail?

12       Q.    What if you had to describe to somebody what

13  you did, what would you have said?

14       A.    Just to ensure that the operation was run

15  smoothly; advise the agents where to go, what to do, things

16  like that.

17       Q.    And when you say "the agents," what were the

18  agents doing?

19             I mean, was it the same thing you described

20  for AirTran, basically?

21       A.    Yes.  Check in, go to the gates.  That's

22  it.

23       Q.    So just to sort of break it down for someone

24  trying to understand this, assuming a passenger has bought a

25  ticket for a Frontier flight and takes a taxi to the



1  airport, that passenger is going to go to the Frontier

2  check-in counter, right?

3       A.    Correct.

4       Q.    And that would be staffed by people under

5  your supervision?

6       A.    Correct.

7       Q.    And then you yourself were under supervision

8  by Frontier, right?

9       A.    Correct.

10      Q.    Now, do you remember who at Frontier was

11 supervising you?

12      A.    At that time?

13      Q.    Yes.

14      A.    At the very beginning, we did not have a

15 Frontier manager there at that time.

16      Q.    Okay.  Did you at some point later?

17      A.    Yes.

18      Q.    Do you remember when that started?

19      A.    I cannot recall when he joined Las Vegas.  My

20 apologies.  I don't remember.

21      Q.    Oh, that's correct.  Okay.

22            What we are involved in with respect to the

23 lawsuit is something that happened on the 28th of March of

24 2019.

25            Would it be fair to say that the manager from



1    Frontier was in place by then?

2           A.     Yes.

3           Q.     And do you remember what his name was?

4           A.     Eric -- his name is very difficult.

5    Srangsriwong.

6           Q.     Do you know how it's spelled?

7           A.     I don't.  I'm sorry.

8           Q.     Is there anything you could do to help the

9    court reporter out?

10          A.     I could try to look him up.

11          Q.     Okay.  Take your time.

12          A.     Okay.

13          MR. MAYE:  I found the spelling.

14          MR. McKAY:  Oh, okay.

15          MR. MAYE:  It's S-r-a-n-g-s-r-i-w-o-n-g.

16          MR. McKAY:  Okay.  Great.  Thank you, Brian.

17   BY MR. McKAY:

18          Q.     We will just call him "Eric," if that's all

19   right.

20                 So Eric then had an office at Las Vegas

21   airport and was on-site full-time?

22          A.     Yes.

23          Q.     And his responsibilities were to make sure

24   that the operation that you were running was being run to

25   Frontier's standards?



ANGELICA PAULO                                            March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                            20

1        A.    Yes.

2        Q.    So we started off with the fictitious

3   passenger who arrives by taxi and goes to the counter.  Then

4   that person would check in and get a boarding pass, if they

5   hadn't already gotten one online; is that right?

6        A.    Correct.

7        Q.    And that would involve interaction with

8   somebody who worked under you?

9        A.    Correct.

10        Q.    And they might check a bag.  And if so,

11   somebody who worked under you would take care of the bag; is

12   that right?

13        A.    Correct.

14        Q.    And then they would go to their gate through

15   security.  And once they arrived at the gate, there would

16   also be employees who you supervised working the gate,

17   right?

18        A.    Correct.

19        Q.    And all of these people, did they wear some

20   kind of uniform?

21        A.    Yes.

22        Q.    And what did the uniform say as to what

23   company was displayed?

24        A.    Frontier.

25        Q.    Frontier, okay.



```
1                    Did Frontier supply those uniforms?

2          A.     Yes.  I want to say, yeah, they did.

3          Q.     And the gates that you worked at, were those

4   gates that were leased by Frontier from the airport?

5          A.     Mostly leased, yes.

6          Q.     And the counter space as well was something

7   that Frontier had arranged for with the airport?

8          A.     Yes.

9          Q.     Okay.

10                 So there really wasn't any way to do your job

11  without using Frontier's locations at the airport, was

12  there?

13         A.     Correct.

14         Q.     Do you know whether there was a written

15  contract between Frontier and your company?

16         A.     I mean, I would assume so.  However, I've

17  never physically seen a written contract.

18         Q.     Did you ever, for instance, get e-mails or

19  memos that referenced it?

20         A.     No, I don't recall.

21         Q.     That's fine.

22                 How many flights a day did your company

23  handle for Frontier?

24         A.     It varies.  Towards the end, it might have

25  been roughly around 30, 40 flights a day.  When they first
```



1  started, it was completely different.

2       Q.    So by the time of March 2019, basically how

3  many hours a day did your company provide services to

4  Frontier?

5       A.    How many hours a day?  I couldn't tell you

6  how many hours, to be honest.  I don't recall.

7       Q.    Was it pretty much a full day?

8       A.    Yes, yes.  We were typically running a

9  full-day operation.  Counters typically opened around, I

10 want to say 4:00 in the morning, depending on when the first

11 flight is, to about -- our last flight is about 1:00, 1:30

12 in the morning, sometimes 2:00.

13      Q.    So just a couple of hours' break in between,

14 essentially?

15      A.    Yeah.

16      Q.    And did Frontier provide the signage that

17 went over the check-in counter and around the gate areas?

18      A.    Yes, they did.

19      Q.    So the scheduling that you did, that was all

20 based on how Frontier scheduled its flights in and out of

21 Las Vegas?

22      A.    Correct.

23      Q.    If you hired a new person to work under you,

24 did you have to go and find somebody who had already been

25 trained?



1       A.      No, not initially.  For customer service they

2  go through about a two-week training with the Frontier

3  trainer.

4       Q.      Oh, with the Frontier trainer.  Oh, okay.

5               So a person could be hired with no skills,

6  and then they would be trained by Frontier, and then they

7  would arrive to work for you?

8       A.      Yes.

9       Q.      Okay.

10              And that was all training on Frontier's

11  policies and procedures?

12       A.      Yes.

13       Q.      How was -- let's start with you.

14              How was your pay computed?  Were you on a

15  salary?  Were you working hourly or what?

16       A.      I was salary.

17       Q.      Okay.

18              How about people that worked for you?  Were

19  they hourly?

20       A.      Hourly.

21       Q.      So the compensation was never, for example,

22  by the task?

23              For instance, you know, you get 47 people

24  onto a certain flight, we will pay you; it wasn't like that,

25  was it?



ANGELICA PAULO                                          March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                          24

1          A.     No, it wasn't like that.

2          Q.     It was by the clocking in and clocking out

3    number of hours in between?

4          A.     Correct.

5          Q.     And when you were salaried, was that on the

6    basis of long-term contracts?  What was your contract like

7    with Worldwide?

8          A.     What do you mean?

9          Q.     When you took the job as supervisor, was

10   there a contract with a certain number of years, or was it

11   just a contract for as long as it was working out for both

12   of you?

13         A.     The latter.

14         Q.     Did there ever come a time when you had to

15   fire anybody?

16         A.     Several times, yes.

17         Q.     And what sort of things -- I don't want to

18   get into anybody's names or anything.  But what sort of

19   things caused somebody to be fired?

20         A.     A majority of the time, attendance issues,

21   performance issues, unprofessional, things like that.

22         Q.     And was there input from Eric about any of

23   that?

24         A.     He does not typically have any input as far

25   as hiring and firing employees.  Very rarely.  Maybe less



1   than a handful will he suggest that employees should no

2   longer be working that counter.

3        Q.    But he did have that power, if he wanted to

4   exercise it?

5        A.    Of course.

6        Q.    To your understanding, did customers who came

7   to the airport think that you and your employees were

8   working for Frontier?

9        MR. MAYE:  Object to form.

10       THE WITNESS:  I'm sorry?

11   BY MR. McKAY:

12       Q.    Let me ask it a different way.

13            You know, I didn't explain that part.  I left

14   that out.  Since there's no judge here, Mr. Maye might make

15   objections.  And if he asks you questions, I might make

16   objections.

17            And it's completely bizarre because nothing

18   happens to the objections.  They just get written down.  And

19   at some point in time, the lawyers might ask the judge to

20   rule on the objections.  But that's based entirely on the

21   transcript.

22            So because there's not a judge here, nobody

23   pounds a gavel and says "Sustained" or "Overruled" or

24   anything.  We just go on as though the objection hadn't been

25   made.



1             But since he did object to the way I phrased

2   the question, I'm going to rephrase it.

3             You sometimes interacted with employees in

4   your role, didn't you?

5        A.    Yes.

6        Q.    Did the employees you interacted with think

7   that you were a Frontier employee ever?

8        A.    My employees?

9        Q.    No, no.

10            When you interacted with a passenger, a

11  Frontier passenger, did the Frontier passengers often think

12  that you were a Frontier employee?

13       A.    Yes.

14       Q.    Was it routine for you to tell them that you

15  weren't?

16       A.    No.

17       Q.    And as far as the people who worked under

18  you, for instance, at the check-in counter, as far as you

19  knew, did people think they were Frontier employees?

20       A.    As far as I know, the passengers assumed we

21  were Frontier employees, correct.

22       Q.    Let me go on to the reservation system, the

23  Navitaire system.  And before I get into the Navitaire

24  details, was there any other Frontier software that any of

25  your employees worked with?



1           A.      Navitaire was the main one.  NetTracer, I

2      want to say, is a different system.

3           Q.      Is that the baggage --

4           A.      The baggage service.

5           Q.      Anything else?

6           A.      There is.  I just cannot remember.  It's an

7      internet system, basically.  I can't remember the name of it

8      right now.

9           Q.      What about the complaint software that they

10     call Right Now Technology where, if a customer makes a

11     complaint, it's logged into this software program?

12               Did you have any access to something like

13     that?

14          A.      I don't recall that, no.

15          Q.      If a customer made a complaint about

16     anything, really, involving their travel, how did you

17     communicate that complaint to Frontier?

18          A.      Typically Frontier requests that all

19     complaints are called in.  A customer would call it into the

20     Frontier call center.

21          Q.      I see.

22               So if somebody informed you that they were

23     unhappy about something, would you then give them the phone

24     number for the call center?

25          A.      After listening to their issue, yes.  I would



1    also document what they say under their reservation as

2    well.

3            Q.    Oh, okay.

4                  So you would put it into the Navitaire

5    system?

6            A.    Correct.

7            Q.    So who could read that?  Once you put

8    something into the Navitaire system for a passenger, who is

9    the audience that could potentially read that?

10           A.    I guess any employee who would sign in would

11   have access to that.

12           Q.    And would that also include other Worldwide

13   employees that were working for Frontier?

14           A.    Correct.

15           Q.    Okay.

16           A.    It's our way to communicate with --

17           Q.    I'm sorry.  Go ahead and finish.

18           A.    I said that's one way to communicate with

19   each other so that we know what the story is before the

20   customer even gets to us.

21           Q.    Okay.

22                 So you could find out about the background on

23   a customer by looking in the Navitaire system?

24           A.    Correct.

25           Q.    And I assume that -- or I don't know.  But



1  does Worldwide have contracts with Frontier at other

2  airports?

3          A.    Yes.  A few.  I can't remember which ones

4  they are.

5          Q.    And I forgot to ask you this.  The things

6  that you do for Frontier, were those things that Frontier

7  could have chosen to do for itself with its own employees?

8          MR. MAYE:  Object to form.

9          THE WITNESS:  Do I still answer?

10 BY MR. McKAY:

11         Q.    Yeah, you still answer.

12         A.    I suppose they can, yes.  Some airlines hire

13 their own employees to do our services.

14         Q.    And your services are known in the industry

15 as ground handling?

16         A.    Correct.

17         Q.    Okay.

18                So you're saying that airlines do their own

19 ground handling; is that correct?

20         A.    Yes.

21         Q.    Do you know if Frontier does any of its own

22 ground handling?

23         A.    No, I don't believe they do.  But I couldn't

24 be 100 percent positive.

25         Q.    Okay.



1              Do you know whether they use other companies

2   other than Worldwide at their airports for ground handling?

3          A.    Yes.  They use several companies.

4          Q.    Do you know what those companies are?

5          A.    I don't know all of them.  I would assume

6   it's the typical ones.  I'm sorry.  I couldn't tell you.

7          Q.    That's okay.

8          A.    Swissport I want to say.  I don't know if

9   they employ DGS.  I didn't really keep up with the rest of

10  them.

11         Q.    That's fine.

12               What I was getting to is, do -- strike that.

13               Does everyone who does ground handling

14  services for Frontier use Navitaire now?

15         MR. MAYE:  Object to the form.

16         THE WITNESS:  Yes, sir.  I believe so.

17  BY MR. McKAY:

18         Q.    And was that the case in March of 2019 as

19  well?

20         A.    I believe so, yes.

21         Q.    So when you log into Navitaire, are you able

22  to see entries that are made by other Worldwide employees?

23         A.    Any employee that has access to Navitaire.

24         Q.    So that would be a yes?

25         A.    Yes.



1      Q.      And are you able to see entries that are put

2  into Navitaire by Frontier employees?

3      A.      Yes, I do.

4      Q.      And if another company like Swissport or DGS

5  is doing ground handling for Frontier and they put entries

6  into Navitaire, are you able to see those entries as well?

7      A.      Yes.

8      Q.      Because it's all one system, right?

9      A.      Yes.

10      Q.      What did you understand about what Frontier

11  wanted you to put into Navitaire?

12      A.      What do you mean?  I'm sorry.

13      Q.      So I'm trying to understand how you use

14  Navitaire.

15              First of all, Navitaire is Frontier's

16  program, right?

17      A.      It's not owned by Frontier, but ...

18      Q.      I'm sorry.  Yes.  I think you probably would

19  be a better lawyer than I am.

20              So yes, that's right.  They have a license to

21  it, right?

22      A.      Right.

23      Q.      But you were trained on Navitaire by Frontier

24  people, right?

25      A.      Yes.



1    Q.    And when you received that training, what did

2    they indicate that they wanted you to do with Navitaire?

3    A.    As far as the comments are concerned?

4    Q.    Yes.

5    A.    Just state the facts.

6    Q.    Did you ever receive any kind of criticism

7    from Frontier employees that you were putting certain things

8    into the comments into Navitaire?

9    A.    Me personally?

10   Q.    Yes.

11   A.    From Frontier employees?

12   Q.    Right.

13   A.    Not that I recall.

14   Q.    Did you ever become aware of anybody at

15   Frontier saying, "Hey, some of your employees are putting

16   things into Navitaire, comments that they shouldn't be"?

17   A.    I've had a few complaints about that issue,

18   yes.

19   Q.    So let's talk about that.

20         What sort of things did they complain about

21   being put into Navitaire by your employees?

22   A.    Mostly, it's -- they are basically stating

23   using foul language, things like that.  They are writing

24   what passengers say verbatim and they could have softened it

25   a little bit, things like that.



ANGELICA PAULO                                           March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                          33

1        Q.    Do you remember any specific occurrences?

2        A.    I can't recall any right now, off the top of

3   my head.

4        Q.    Do you remember the subject matter of what a

5   customer had said that was put in verbatim?

6        A.    Honestly, we were cussed out pretty often.

7   So I couldn't pinpoint one single occurrence.

8        Q.    Do you remember why you were cussed out

9   pretty often?

10       A.    For various things.  A lot of times it's just

11  enforcing the policies and fees, things like that.

12       Q.    Did you ever get any passengers who

13  complained that you were discriminating against them?

14       A.    We get that complaint pretty often.

15       Q.    And do you think there was ever any validity

16  to it?

17       A.    No, sir.

18       Q.    Did you ever have conversations with anybody

19  at Frontier about discrimination complaints?

20       A.    A complaint about me?

21       Q.    No.

22             Did you ever have -- in your capacity as a

23  supervisor, did you ever have any discussions with Frontier

24  management about the subject of passengers making

25  discrimination complaints?



1          A.     I'm sure I brought it up a few occurrences

2    here and there to Eric.  However, I couldn't recall, you

3    know, the specifics of them.

4          Q.     Do you remember what Eric said in response?

5          A.     To the discrimination?  I don't recall.  I'm

6    sorry.

7          Q.     Did Eric ever give you any kind of

8    instructions about how to handle discrimination

9    complaints?

10         A.     Special instructions?  No.

11         Q.     Or any instructions?

12         A.     Not that I can recall.

13         Q.     Other than the instances where foul language

14   had been input verbatim into the Navitaire system, can you

15   recall any other complaints from Frontier about what was

16   being put into the "Comments" section by Worldwide

17   employees?

18         A.     Not off the top of my head.

19         Q.     Okay.

20                And I think you said you were never

21   criticized for anything that you put into the comments,

22   right?

23         A.     Not that I recall, no.

24         Q.     Okay.

25                So as far as you understand, Frontier was



1    happy with everything you put into the Navitaire system?

2           A.    I believe so.

3           Q.    All right.

4                 I'm going to show you now by sharing my

5    screen a particular document.

6                 Are you able to see this document on your

7    screen?

8           A.    Yes.

9           Q.    And at the top left is the Frontier logo,

10   right?

11          A.    Correct.

12          Q.    And then the next thing down in the center of

13   the page says "Passenger PNR Details for E95Z4G," correct?

14          A.    Correct.

15          Q.    What is a PNR?

16          A.    Basically, their reservation.

17          Q.    To your knowledge, does it stand for

18   passenger name record?

19          A.    I can't remember what the acronym is for, to

20   be perfectly honest.

21          Q.    Okay.

22                But basically, it's your understanding that

23   it's the passenger's reservation?

24          A.    Yes.

25          Q.    And at the end, we have this number E95Z4G.



1   Is that a particular record locator for a customer?

2         A.    Correct.

3         Q.    And a record locator indicator is what

4   identifies a passenger and a passenger's reservation?

5         A.    Correct.

6         Q.    So are you able to tell, by looking at this,

7   who the passengers were that are part of this record

8   locator?

9         A.    Yes.

10        Q.    And that's Peter and A██████ DelVecchia?

11        A.    Yeah.

12        Q.    Now, up at the top there's something that

13  says "Total amount paid $702.08."

14              Do you know what that is?

15        A.    How much they paid for the ticket, I'm

16  assuming.

17        Q.    And then to the left of it, it says "Booking

18  date 2/28/2019."

19              Would that be the date that the passenger, or

20  passengers, made the reservation and paid for the

21  reservation?

22        A.    Yes.

23        Q.    So down below there where it says

24  "Passengers" and "Flights," there's the DelVecchias' names

25  and the next line or the next column over says "Date of



 1   birth."

 2              Do you see that?

 3        A.    Yes.

 4        Q.    And do you understand that to be each of the

 5   passenger's date of birth?

 6        A.    Yes.

 7        Q.    And then the next column over is their gender

 8   and then the next column over says "Segment number."

 9              What does the segment number mean?

10        A.    If it's the first leg of their trip.  It

11   depends how many legs of their trips.

12        Q.    So let's say a simple roundtrip from Raleigh,

13   Durham to Las Vegas, followed by Las Vegas back to Raleigh,

14   Durham, that would involve two segments?

15        A.    If they had a connection flight, it will show

16   two.

17        Q.    I'm sorry.  Let's keep it simple with nonstop

18   flights.

19              So if it's just one nonstop flight out and

20   one nonstop flight back, would that be two segments?

21        A.    I don't believe so, no.  I can't -- I don't

22   think so, no.

23        Q.    I'm sorry.  I think I've confused you here.

24              So Segment No. 1, tell me what that is in the

25   context of this reservation?



1         A.      That's Segment No. 1, so their flight from

2    Las Vegas to Raleigh.

3         Q.      In the other direction, actually -- the

4    departure.  I'm sorry.  I'm sorry.

5                 You are absolutely right, once again.  This

6    is -- the first row is the flight from Las Vegas to Raleigh

7    on April 3rd of 2019.

8                 Do you see that?

9         A.      Yes.

10        Q.      So I guess I was thinking incorrectly that

11   the one roundtrip reservation there would be segment No. 1

12   going out and a segment No. 2 coming back.  But that's not

13   actually the way it is in this system, is it?

14        A.      No, it doesn't appear so.

15        Q.      Okay.

16                So for each of the flights, they are segment

17   No. 1 on this particular system?

18        A.      Yes.

19        Q.      Okay.  All right.

20                I didn't mean to get so confusing here on

21   something so unimportant.

22                So the departure station is where the flight

23   would be taking off from; is that fair?

24        A.      Yes.

25        Q.      And the check-in location could be either



 1  that airport or perhaps online, right?

 2        A.    Correct.

 3        Q.    And then it gives the date that they checked

 4  in and the time that they checked in, right?

 5        A.    Yes.

 6        Q.    And then the time of departure, is that the

 7  flight's actual time of departure?

 8        A.    I would assume so, yes.

 9        Q.    And then the next column shows whether they

10  had boarded the flight or not, correct?

11        A.    Correct.

12        Q.    And the next column shows the arrival

13  station.  That would be the airport where the flight

14  landed?

15        A.    Right.

16        Q.    And then the time of arrival would be the

17  time of the flight landing?

18        A.    Yes.

19        Q.    Now, these times, as you see up above, it

20  says "All time displayed in this PNR portal are in Mountain

21  time."

22              Was that your understanding of how Frontier

23  displayed the time in the PNRs?

24        A.    I honestly never paid attention to that, no.

25        Q.    Okay.  Fair enough.  All right.



800.211.DEPO (3376)
EsquireSolutions.com

1          So the next segment down has a title "Booking

2   Contact," and that's just the information on how to get in

3   touch with the person that made the booking, right?

4          A.     Yes.

5          Q.     And then we have a section that says "Booking

6   comments," and this is what we were just talking about

7   before, right, where you could go in and put a comment into

8   the PNR?

9          A.     Yes.

10         Q.     And now I want to draw your attention to the

11  one at the bottom that has your name -- the row at the

12  bottom, I should say, of this Exhibit 1.

13         And first of all, that is your name in the

14  first column, correct?

15         A.     Yes.

16         Q.     And what's the number in the column to the

17  right?  Do you need me to go back up to the top?

18         It says "Created Agent ID."  Does that mean

19  anything to you?  It's okay if you don't remember.

20         A.     I don't recall that number.

21         Q.     All right.

22         And then there's a column that says "Created

23  Agent Code," and the number is 760576.  Does that mean

24  anything to you?

25         A.     That was my employee number.



1        Q.     Okay.

2               Now, was that an employee number with

3    Worldwide or with Frontier?

4        A.     That was my Worldwide employee number.  That

5    was before AirTran, before they changed the number to a

6    Frontier number.

7        Q.     And at some point, you did change to a

8    Frontier number?

9        A.     Yes.

10       Q.     Do you remember why that was?

11       A.     I guess they just wanted to make everything

12   uniform.  But that's what I assumed.

13       Q.     I'm sorry.  Go ahead.

14       A.     That's what I assumed it was.

15       Q.     How did they tell you about that?  Did they

16   just announce that they were going to be issuing you

17   Frontier numbers, employee numbers?

18       A.     My manager mentioned it to me.

19       Q.     And that was Eric?

20       A.     And Cassie.

21       Q.     Cassie, okay.

22              The next says "Created date."  Would that be

23   the date that you put in the comment?

24       A.     Yes.

25       Q.     And then it says "Created time."  Would that



1   be the time that you put in the comment?

2         A.    Yes.

3         Q.    Now, this one said 2:05 a.m. on March 29 of

4   2019.  So this is what I'm trying to figure out.

5               Would that have been 2:05 a.m. Mountain time,

6   so that it was actually 1:05 a.m. your time in Las Vegas?

7         A.    I'm not sure.

8         Q.    And then the next column is "Comment."  Would

9   this be something that you wrote?

10        A.    Is that something I would write?  Yes.

11        Q.    So you typed this into the Navitaire

12  reservation system?

13        A.    Correct.

14        Q.    And the first sentence is "Metro met inbound

15  FLT 2067."  What does that mean?

16        A.    The police had arrived when the inbound

17  Flight No. 2067 came in.

18        Q.    Okay.  And that is stated in the past tense.

19              Given the date and the time, was it your

20  understanding that this is something you wrote after the

21  flight had already landed at Las Vegas?

22        A.    Right.

23        Q.    The next sentence says "Per FA, all crew

24  members witnessed inappropriate touching of minor child."

25              What do you mean by FA?



1        A.     The flight attendant A.  They were assigned

2   letters on the flight, so it was A flight attendant.

3        Q.     Now, prior to writing this, did you speak

4   with flight attendant A?

5        A.     Yeah.  When we met the flight, the A was the

6   one that opened the door and advised us of the situation.

7        Q.     And as you sit here today, do you remember

8   this situation?

9        A.     I have a vague memory of it, yes.

10       Q.     Were you the person outside the door when she

11  opened the door?

12       A.     One of them, yes.  I can't remember how many

13  other employees were with me at the time.

14       Q.     So you were present with some of your

15  employees?

16       A.     I believe so, yes.

17       Q.     And you knew that there was a situation

18  already before the flight landed, right?

19            MR. MAYE:  Object to form.

20            THE WITNESS:  Do I know it?

21  BY MR. McKAY:

22       Q.     Let me ask it another --

23       A.     I want to say yes.

24       Q.     Okay.

25       A.     I was -- I'm sorry.  Go ahead.



1      Q.    Was there any particular reason that you and

2    your employees met this particular flight?

3      A.    I can't remember or recall how I was made

4    aware of the situation.  A lot of times when I do have to

5    meet a certain inbound flight, the captain would request it

6    via ACARS.

7      Q.    ACARS, right?

8      A.    Correct.

9      Q.    And tell us what ACARS is.

10     A.    It's basically a messaging from the plane to

11   ground service.

12     Q.    When a plane uses ACARS to message ground

13   service, where does the message appear at your station?

14     A.    Where does it appear?

15     Q.    Yeah.  Does it appear on the computer

16   screen?

17     A.    Yes.

18     Q.    Okay.

19            And is there a particular software that it

20   appears on?

21     A.    Yes.

22     Q.    What software is that?

23     A.    I can't recall the name of the internet.

24   It's the one I couldn't remember.  I'm sorry.

25     Q.    Oh, okay.



1              So you think that something came in through
2   ACARS about Flight No. 2067 on March 28 or 29?
3        A.    That would be my best guess.
4        Q.    It's not normal for you, the supervisor, to
5   meet a flight, is it?
6        A.    If it requires a higher --
7              (Remote disconnection.)
8   BY MR. McKAY:
9        Q.    Do you remember what your answer was,
10  Ms. Paulo?
11       A.    I said it requires a higher up.  I don't
12  remember verbatim what I said.
13       Q.    Yeah.  I think that was it -- if it requires
14  a higher up.
15             And then I asked if she met every Frontier
16  flight.
17             And would you just repeat your answer?
18       A.    No.
19       Q.    And then we got into flight attendant A.
20             So flight attendant A made a statement about
21  all crew members witnessing inappropriate touching of minor
22  child.  And you heard that statement made by flight
23  attendant A; is that right?
24       A.    Correct.
25       Q.    And that was made just outside the door --



1          A.     Correct.

2          Q.     -- of the airplane?

3          A.     Correct.

4          Q.     And did you, at that time, speak with any

5    other crew members?

6          A.     I can't -- I want to say yes.  But to be

7    completely honest, I don't remember it 100 percent.

8                 Typically, the A flight attendant and the B

9    flight attendant are up in the galley and they aren't

10   usually the ones that's speaking to me.

11         Q.     Okay.

12                And I see you mentioned FB in the next

13   sentence.  Was that flight attendant B?

14         A.     Yes.

15         Q.     So "FB witnessed touching of thighs."

16                And who said that to you?

17         A.     I can't remember if it was A or B.

18         Q.     Okay.

19                Do you remember what either flight attendant

20   A or flight attendant B looked like?

21         A.     No.

22         Q.     Do you remember whether they were male,

23   female or male and female?

24         A.     I want to say they were both females.  A was

25   definitely female.  I can't recall the B.



1        Q.     Okay.

2               Is it your understanding that flight

3    attendant A and flight attendant B are normally the two who

4    were assigned to the front aircraft, and therefore, are at

5    the door when the doors open?

6        A.     Most of the time, yes.

7        Q.     If Frontier instead has flight attendant A

8    and flight attendant C in the front, if that is true, do you

9    think you spoke to flight attendant A and flight attendant

10   C?

11       MR. MAYE:  Object to form.

12       THE WITNESS:  I can't be sure.

13   BY MR. McKAY:

14       Q.     You're not sure, okay.  But the two female

15   flight attendants who were at the door when it opened told

16   you the information that you put into this comment, right?

17       A.     Correct.

18       Q.     And then you say in the third sentence -- or

19   the fourth sentence, "Father was escorted away by Metro

20   separate from child to police station."

21              Is that something that you witnessed

22   personally?

23       A.     The police station -- I mean, I didn't follow

24   them to the police station.  But the father was escorted

25   away by Metro.



1    Q.    And that's something you witnessed?

2    A.    Correct.

3    Q.    And then the next sentence says "Per child,

4  this was not the first incident that they have been

5  separated in this manner."

6          Is that something the child said to you?

7    A.    I don't think the child spoke to me directly.

8  I don't recall the child speaking to me directly.  I want to

9  say it was an agent that told me that, or it could have been

10 a flight attendant.  I can't recall.

11   Q.    Okay.

12         But it certainly was not the child, correct?

13   A.    I want to say I'm 99 percent sure it wasn't

14 the child itself -- himself.

15   Q.    Okay.

16         And then your last sentence says "Checked

17 luggage pulled and held in BSO."

18         What does that mean?

19   A.    Baggage service office.  So if they are not

20 able to claim their baggage right away, we will hold it.  We

21 will make sure we pull it off and hold it for them.

22   Q.    Okay.

23         In this case, you knew they were going to the

24 police station so they wouldn't be able to go down and

25 retrieve their bags from the carousel, right?



```
 1            A.    I believe so, yeah.

 2            Q.    Okay.

 3                  So let's go back up to the top of this

 4     comment that you wrote, and the first sentence, "Metro met

 5     inbound Flight No. 2067," that's something that you

 6     personally witnessed, right?

 7            A.    Yes.  Metro was there when they arrived.

 8            Q.    So you knew when you wrote that sentence that

 9     it was true?

10            A.    Okay.

11            Q.    Okay.

12                  Well, "yes" or "no"?

13            A.    Yes.

14            Q.    I mean, you saw it with your own eyes,

15     right?

16            A.    Yes.

17            Q.    Now, the next sentence, "All crew members

18     witnessed inappropriate touching of minor child," that's not

19     something you witnessed with your own eyes, is it?

20            A.    Correct.

21            Q.    So whether or not that was true depended on

22     whether or not flight attendant A was telling you the truth,

23     right?

24            A.    Correct.

25            Q.    Did you know flight attendant A?
```



1          A.      Not personally.

2          Q.      Did you know her at all?

3          A.      Just another flight attendant.  I don't know

4    them personally, no.

5          Q.      So you didn't know whether she was a truthful

6    person or not, did you?

7          A.      That's correct.  I would assume.

8          Q.      Now, when you put this into the comments

9    section, you're stating it as though it's true, right?

10         A.      That's why I put "per FA" because that's what

11   she had told me.

12         Q.      So you're saying that per the flight

13   attendant A, the following is true:  All crew members

14   witnessed inappropriate touching of the minor child, fair?

15         A.      Fair.

16         Q.      And the other female flight attendant who was

17   there when the door was opened told you that she witnessed

18   touching of the thighs?

19         A.      I don't recall if it was the A flight

20   attendant that told me that the B flight attendant had told

21   her --

22         Q.      Okay.

23         A.      -- or if the B flight attendant told me.

24         Q.      All right.

25                 But one way or the other, touching of the



 1  thighs was not something that you saw through your own eyes,

 2  right?

 3         A.    Right.

 4         Q.    And so when you put this into the booking

 5  comments or into the Navitaire comments, you were stating

 6  the fact that you didn't know whether it was true or not,

 7  right?

 8         A.    I just wrote what was told to me.

 9         Q.    Okay.

10               And again, you didn't have any way of

11  verifying that, did you?

12         A.    No.

13         Q.    Okay.

14               Now, "Father was escorted away by Metro

15  separate from child" was something that you witnessed with

16  your own eyes, right?

17         A.    They were separated for some time, yes.

18         Q.    Okay.  I'll get back to that.

19               And you were told that they were going to the

20  police station, right?

21         A.    I want to say yes.  I'm not 100 percent

22  sure.

23         Q.    Okay.

24               But at least as far as the father being

25  escorted away by the Metro police in a manner separate from



1  the child, that's something you could vouch for because you

2  were there and you saw it, right?

3          A.    Correct.

4          Q.    Okay.

5                And then we have the statement "Per child,

6  this was not the first incident that they have been

7  separated in this manner."  That's something that was not

8  told to you by the child, right?

9          A.    I don't recall who had mentioned it.

10         Q.    But you're 99 percent sure it wasn't the

11 child?

12         A.    I'm pretty sure it wasn't the child.

13         Q.    So when you say "per child," et cetera, this

14 wasn't actually told to you by the child?

15         A.    I couldn't recall.  I can't recall.  I'm

16 sorry.

17         Q.    Well, you were 99 percent sure a second ago

18 that you did not speak to the child.

19         A.    Uh-huh.

20         Q.    You have to say "yes."

21         A.    I'm sorry.

22                Did I speak to the child?  No, I don't think

23 I did.  I've heard him speak, but I wasn't engaging in

24 conversation.

25         Q.    Okay.



1          When you say "per child, this was not the
2    first incident that they have been separated in this
3    manner," are you actually saying that this is something that
4    someone told to you?
5          A.    I can't recall if I overheard him saying it
6    to someone else or if someone else told me that information.
7    I don't recall it.
8          Q.    So it's fair to say you don't have a memory
9    of how you got that information, right?
10         A.    That's fair to say.
11         Q.    And it's also fair to say that you don't know
12   whether it was true or not, right?
13         A.    That's just what I heard.
14         Q.    So it's fair to say you don't know whether it
15   was true or not?
16         A.    That's fair.
17         Q.    When you say "checked luggage pulled and held
18   in BSO," that's something you knew yourself, right?
19         A.    I didn't personally pull the luggage.  I
20   would assume I had called our agents in BSO to have those
21   bags pulled.
22         Q.    Okay.
23              So it was something that you were at least
24   involved in ordering?
25         A.    Yes.



1          Q.     So of all of the information that you put in

2     here, some of it you knew was true and some of it you didn't

3     know if it was true or not, right?

4          A.     Some of it was hearsay.

5          Q.     And the hearsay was all the stuff that had to

6     do with what happened on the plane, right?

7          A.     Correct.

8          Q.     And hearsay is something that is not

9     generally treated as being 100 percent accurate, right?

10         MR. MAYE:  Objection to form.

11    BY MR. McKAY:

12         Q.     In your experience?

13         A.     In my experience, yes.

14         Q.     I mean, people say things that they heard,

15    and then in your experience, you find out that they were

16    wrong, right?

17         A.     Once in awhile.

18         Q.     Okay.

19                So when you hear something that's being

20    related to you as hearsay, it's something you have some

21    doubts about normally, right?

22         MR. MAYE:  Object to form.

23         THE WITNESS:  I suppose it would depend on who and

24    what it was about.

25    ////



1   BY MR. McKAY:

2        Q.    If it was something that was relayed to you

3   by somebody you didn't know, it would be normal to have some

4   doubts, wouldn't it?

5        MR. MAYE:  Object to form.

6        THE WITNESS:  If it was a professional employee, I

7   would assume that it was correct.

8   BY MR. McKAY:

9        Q.    Do you believe that all Frontier employees

10  speak the truth at all times?

11       A.    At all times, no.  We are all human.

12       Q.    Right.

13             It would be kind of naive to believe that

14  certain people speak the truth just because of who hires

15  them, right?

16       A.    Correct.

17       Q.    So if somebody in a Frontier uniform tells

18  you something and you don't know that person, you don't have

19  any way to know whether they are telling you the truth or

20  not if you haven't actually seen what they are talking

21  about, right?

22       MR. MAYE:  Object to form.

23       THE WITNESS:  I guess I wouldn't have any reason to

24  doubt what they say, depending on what it is they are

25  talking about.



 1   BY MR. McKAY:

 2        Q.    Well, if they are talking about an unusual

 3   situation on a plane that you haven't witnessed --

 4        A.    Uh-huh.

 5        Q.    -- would you believe there's no room for

 6   doubt?

 7        MR. MAYE:  Object to the form.

 8        THE WITNESS:  I guess not 100 percent on it, no.

 9   BY MR. McKAY:

10        Q.    Do you know a gentleman named Lawrence

11   Caravalho?

12        A.    Yes, sir.

13        Q.    And who is he?

14        A.    He was my supervisor.

15        Q.    I guess earlier we were talking about a

16   different supervisor.  So when did Mr. Caravalho become your

17   supervisor?

18        A.    I don't recall the month or date -- month or

19   year.

20        Q.    Let's make it easy.  Was he your supervisor

21   at the time you wrote this comment on March 29 of 2019?

22        A.    Yes, he was.

23        Q.    And he was also an employee of Worldwide?

24        A.    Correct.

25        Q.    And if we go up, there is an entry from



```
 1   Lawrence Caravalho which is dated 3/28/2019 at 8:06 p.m. and

 2   it says "Called LEO police per SOC, SCSM, separated A█████

 3   from Peter found inappropriate touching from Peter to A█████.

 4   LEO has been called to meet the flight."

 5               Do you know what he's saying there?

 6        A.    Yes.

 7        Q.    All right.  Let's take it a clause at a time

 8   here.

 9               "Called LEO Police per SOC."  What does that

10   mean to you?

11        A.    SOC, I don't know what the acronym stands

12   for.  It's basically our center of operations that ensures,

13   you know -- that all of our Frontier flights are running

14   smoothly.

15        Q.    Let me stop you for a second.

16               Is SOC run by Frontier or by Worldwide?

17        A.    Correct.  Frontier.

18        Q.    "LEO Police," what does that mean to you?

19        A.    Metro.

20        Q.    LEO is an acronym for law enforcement

21   officer, in your understanding; is that right?

22        A.    Yes.

23        Q.    And then SCSM, what does that mean to you?

24        A.    I can't remember the acronym.  But it's the

25   customer service center of SOC.
```



1        Q.     So also a Frontier center?

2        A.     Yes.

3        Q.     And then the information that he wrote in the

4   rest of the sentence -- "separated A███ from Peter found

5   inappropriate touching from Peter to A███," do you know

6   where Mr. Caravalho got that information?

7        A.     He was there when the flight landed.

8        Q.     Okay.

9               But look at the time, though, 8:06 p.m.  Do

10  you know what time the flight landed?

11       A.     I don't recall.  I'm sorry.

12       Q.     Well, I was going to ask you if it's

13  something that you can find on the PNR?

14       A.     I'm sorry.  Can you scroll up?

15       Q.     Yeah.

16       A.     Okay.

17       Q.     So the departure date is March 28th of 2019

18  and time of arrival is 11:27 p.m.; am I correct in saying

19  that?

20       A.     Okay.

21       Q.     So if you get down to his note, it's that

22  same date of March 28th, 2019.  His note is right here at

23  8:07 p.m.  That's more than three hours before the flight

24  landed, isn't it?

25       A.     I would assume the system recognizes that we



1  were in separate time zones.  I'm not -- I'm not sure.

2        Q.    It says at the top in red with an asterisk

3  "All time displayed in this PNR portal are in Mountain

4  time."

5        A.    Okay.

6        Q.    It does say that, right?

7              Okay.  So if it says "all time," would you

8  understand that to mean all time displayed in this document?

9        A.    I would assume so.  It's March.

10       Q.    March 28th, 2019 at 8:06 p.m.?

11       A.    Right.  But the departure was March 27th,

12  correct?

13       Q.    No.

14       A.    Raleigh to --

15       Q.    The departure date is 3/28/2019.  The

16  check-in date was 3/27.

17       A.    Uh-huh.  Check-in date March -- okay.  And

18  the departure -- I'm sorry.

19       Q.    The departure date from RDU is 3/28/2019.

20       A.    Correct.

21       Q.    Time of departure 5:59 p.m., time of arrival

22  11:27 p.m.

23             So that's after Mr. Caravalho's comment was

24  created, isn't it?

25       A.    Yes.



1      Q.    And if you look at the last sentence, it says

2   LEO," which you've already said is law enforcement officers,

3   "has been called to meet the flight."  That's not saying

4   that the flight has landed and that the LEO has met the

5   flight.  It's just that they have been called to meet the

6   flight, right?

7      A.    Yes.

8      Q.    Okay.

9            So isn't it fair to say that at the time

10  Mr. Caravalho wrote his message, that the flight is still in

11  the air and has not yet landed in Las Vegas?

12     A.    I mean, the comment that he has separated

13  A▮▮▮▮ from Peter sounds like it had already happened.

    He did not separate them in flight.

15     Q.    Well, do you have any knowledge of what

16  happened along those lines?

17     A.    Do I have knowledge of what happened with the

18  timeline?

19     Q.    Well, what happened on the flight in terms of

20  separation.

21     A.    I don't believe they were separated.  They

22  were just seen by flight attendants and they had suspicions

23  of the situation.

24     Q.    What do you base that belief on?

25     A.    Just from what they had told me when the



 1 | plane arrived.
 2 |         Q.     Did you speak with anybody about this case at
 3 | any time?
 4 |         A.     What do you mean?
 5 |         Q.     I mean, have you discussed the allegations of
 6 | this case with anybody at any time prior to right now, other
 7 | than in this deposition?
 8 |         A.     No.
 9 |         Q.     Did you have a conversation with anybody
10 | prior to the deposition about your deposition testimony?
11 |         A.     No.
12 |         Q.     Have you ever spoken with Mr. Maye or anybody
13 | from his office?
14 |         A.     No.
15 |         Q.     Have you ever spoken with me prior to today's
16 | deposition?
17 |         A.     No.
18 |         MR. McKAY:  And let me just for the record identify
19 | the document we have been looking at as A. Paulo Depo
20 | Exhibit 1, and it is 16 pages and it is Bates-stamped
21 | 19AZF0229 DelVecchia Frontier 0897 on the first page and
22 | 0912 on the last page.
23 |                 (Exhibit 1 was marked for identification,
24 |                 and is attached hereto.)
25 | ////



 1  BY MR. McKAY:

 2          Q.    Ms. Paulo, is there anything more about this

 3  flight that you know that I haven't asked you about?

 4          A.    Not that I can recall.

 5          MR. McKAY:  All right.  Mr. Maye may have some

 6  questions for you.

 7          MR. MAYE:  Okay.  John, do you want to take that

 8  exhibit down?

 9          MR. McKAY:  Yes, I will.

10          MR. MAYE:  I'll put it up on --

11          MR. McKAY:  Did you want to back up?  I'm sorry.

12          MR. MAYE:  No.  I can put it up on my end.

13

14                        EXAMINATION

15  BY MR. MAYE:

16          Q.    Ms. Paulo, can I call you "Angelica"?  Is

17  that all right?

18          A.    That's fine.

19          Q.    Okay.

20                Angelica, at the time of this incident of

21  8/2019, you were employed by WFS?

22          A.    Yes.

23          MR. McKAY:  Objection to form.

24  BY MR. MAYE:

25          Q.    And you've never been employed by Frontier?



1          A.     That is correct.

2          Q.     And the employees of who you supervised at

3    the McCarran International Airport, they were employees of

4    WFS?

5          A.     Yes.

6          Q.     And your manager was a WFS employee, correct?

7          A.     Correct.

8          MR. McKAY:  Objection to form.

9    BY MR. MAYE:

10         Q.     And Eric was not your manager, right?

11         A.     Correct.  He was a station manager.

12         Q.     Regarding your entry in the reservation about

13   Mr. DelVecchia's flights -- and let me just pull it up here.

14                Do you see Exhibit 1 on the screen?

15         A.     I do.

16         Q.     And on Page 0898, there appears to be an

17   entry by you, "Metro met inbound Flight No. 2067," that's an

18   entry that you made into the reservation of Mr. DelVecchia,

19   and you were obligated to make that entry into the

20   reservation system as part of your duties as a WFS

21   supervisor?

22         MR. McKAY:  Objection to form.

23         THE WITNESS:  Yes.

24   BY MR. MAYE:

25         Q.     And are you obligated to make such entries



1  when law enforcement is called?

2          MR. McKAY:  Objection to form.

3          THE WITNESS:  I'm sorry?

4  BY MR. MAYE:

5          Q.    I said, are you required to make a

6  reservation entry when law enforcement is called?

7          A.    Yes.

8          MR. McKAY:  Objection to form.

9  BY MR. MAYE:

10         Q.    In this case you made this entry because law

11 enforcement was called or requested to meet the subject

12 flight?

13         MR. McKAY:  Objection to form.

14         THE WITNESS:  I mean, that is not the only reason

15 why I made a comment.

16 BY MR. MAYE:

17         Q.    What were the other reasons?

18         A.    Besides the unusual situation, you know, any

19 complaints that had happened during the flight, I would have

20 to record it.

21         Q.      So upon learning of a report of

22 inappropriate touching on the flight, as part of your duties

23 as the WFS supervisor, you were obligated to make this entry

24 into Mr. DelVecchia's reservation?

25         MR. McKAY:  Objection to form.



 1          THE WITNESS:  Yes.
 2   BY MR. MAYE:
 3          Q.    And is it a part of your duties and
 4   responsibilities to speak with and talk to flight attendants
 5   about circumstances that led to law enforcement being
 6   requested?
 7          A.    Yes.
 8          Q.    And so part of your duties include speaking
 9   with flight attendants, correct --
10          MR. McKAY:  Objection to form.
11          THE WITNESS:  Yes.
12   BY MR. MAYE:
13          Q.    -- or making an entry in the reservation
14   system regarding what you learned about the circumstances on
15   the flight?
16          A.    Yes.
17          MR. McKAY:  Objection to form.
18   BY MR. MAYE:
19          Q.    And the process of speaking with the flight
20   attendants and making an entry into the reservation, is this
21   all the same process or part of the same steps you take when
22   addressing, I guess, unusual circumstances on a flight?
23          MR. McKAY:  Objection to form.
24          THE WITNESS:  Yes.
25   ////



1   BY MR. MAYE:

2          Q.    It's all the same process?

3          A.    Yes.

4          MR. McKAY:  Objection to form.

5   BY MR. MAYE:

6          Q.    And these are steps that you would routinely

7   take when you were required to get involved in a

8   circumstance on a flight?

9          A.    Yes.

10         MR. McKAY:  Objection to form.

11  BY MR. MAYE:

12         Q.    Did you retain any copies of any reports

13  related to this incident?

14         A.    No.

15         Q.    And wouldn't you agree that when you were

16  speaking to the flight attendants about this incident, that

17  the information they were providing to you was -- or they

18  were providing you, the information was a part of their

19  duties as a flight attendant?

20         MR. McKAY:  Objection to form.

21  BY MR. MAYE:

22         Q.    Do you agree?

23         A.    I agree.

24         Q.    And is there any reason to doubt the veracity

25  or the truthfulness of what the flight attendants were



1   relaying to you at that time?

2          MR. McKAY:  Object to the form and asked and

3   answered.

4          THE WITNESS:  Not at that time.

5   BY MR. MAYE:

6          Q.    And a part of your duties in inquiring about

7   the circumstances on the subject flight involves your having

8   to speak with the flight crew, correct?

9          A.    Correct.

10         MR. McKAY:  Object to the form.

11  BY MR. MAYE:

12         Q.    That's a part of your process, right?

13         A.    Correct.

14         MR. McKAY:  Object to the form.

15  BY MR. MAYE:

16         Q.    And a part of your process is to also record

17  in the reservation what you had learned?

18         MR. McKAY:  Objection to form.

19         THE WITNESS:  Correct.

20  BY MR. MAYE:

21         Q.    And that's what you did in this case?

22         A.    Correct.

23         Q.    You mentioned that the system that you

24  utilized was the Navitaire system, right?

25         A.    Correct.



1        Q.     What information do you need to access a

2    particular passenger's reservation?

3        A.     I would need as little as the last name

4    and --

5        Q.     So --

6    MR. McKAY:  Well, can you let her answer.

7    THE WITNESS:  I'm sorry.  Yeah.  That's it.

8    MR. MAYE:  I think she answered.

9    BY MR. MAYE:

10       Q.     So you would need a passenger's last name?

11       A.     Correct.

12       Q.     And in this case, you would have typed in

13   Mr. DelVecchia's last name to access his reservation?

14       A.     I could access it through other means.  Seat

15   numbers would be one way as well.

16       Q.     Okay.

17              How would you know what flight --

18   withdrawn.

19              If you were looking up the reservation of the

20   passenger, you would have to know the flight number,

21   correct?

22       A.     Not necessarily.

23       Q.     I'm sorry.  If you were using the seat number

24   to find the passenger --

25       A.     Oh, yes.  If I was using a seat number,



1   correct.

2          Q.     So you could either find the passenger

3   through the last name, or you could put in the flight number

4   and the seat number?

5          A.     Correct.

6          Q.     Okay.

7                 And what if you didn't have the passenger's

8   name or the passenger's flight number; would you be able to

9   access the passenger's reservation?

10          A.     If I didn't know their name, their seat

11  number, no.  It would be very difficult to.

12          Q.     And after you made this entry into

13  Mr. DelVecchia's reservation, did you go back at any time to

14  review his reservation?

15          A.     After I made the comment, I don't believe I

16  looked at it afterwards.

17          Q.     Okay.

18                 And there would be no reason for you to look

19  at it, correct?

20          MR. McKAY:  Objection to form.

21          THE WITNESS:  No.

22  BY MR. MAYE:

23          Q.     And there would be no reason for, say,

24  another WFS employee a week after the incident to access

25  Mr. DelVecchia's PNR, right?



1          A.     Object.

2          MR. McKAY:  Objection to form and it calls for

3    speculation.

4          THE WITNESS:  I guess if there was another incident

5    that made them look at the reservation.  I can't tell you.

6    BY MR. MAYE:

7          Q.     If there was another incident involving

8    Mr. DelVecchia?

9          A.     Correct.

10         Q.     When you worked as a gate agent, what were

11   the reasons you would access someone's reservation, the

12   various reasons?

13         A.     Besides being aware of unusual situations,

14   perhaps we are researching whether or not they paid certain

15   fees or I guess things of that nature.

16         Q.     So if a passenger were at the gate and you

17   were boarding the passenger, you could access the

18   reservation to determine whether or not they paid for a

19   bag?

20         A.     Correct.

21         Q.     Is there any reason to access a passenger's

22   reservation if you're not specifically dealing with that

23   passenger on a related issue?

24         MR. McKAY:  Objection to form.

25               Are you proposing her as an expert witness



1  here, Mr. Maye?

2  BY MR. MAYE:

3        Q.    You can go ahead and answer.

4        A.    I'm sorry.  Could you repeat the question?

5        Q.    So you just testified that one of the reasons

6  you access a reservation is if you're the gate agent and you

7  want to know if the passenger had paid for a bag, right?

8        A.    That would be an example.

9        Q.    That's an example.

10             If you were not specifically dealing with a

11  passenger regarding a baggage issue or a ticketing issue,

12  would there be any reason for you to access the passenger's

13  reservation?

14        MR. McKAY:  Objection to form, calls for

15  speculation.

16        THE WITNESS:  Nothing that I can think of.

17  BY MR. MAYE:

18        Q.    Do you recall how many police officers

19  arrived at the gate for this flight?

20        A.    I don't recall the specific number, no.

21        Q.    Do you recall if there was just one or more

22  than one?

23        A.    They normally walk in with at least their

24  partner.  In this situation, it could have been more.

25        Q.    Do you observe the police officers



1  interviewing Mr. DelVecchia or his son?

2          A.    I was not immediately present in that

3  conversation, no.

4          Q.    Were you in the vicinity at the gate when the

5  police officers were speaking with Mr. DelVecchia and his

6  son?

7          MR. McKAY:  Objection to the form, asked and

8  answered.

9          THE WITNESS:  I don't believe I was in the vicinity

10 in order for me to hear what they were saying.  But I was in

11 the gate.

12 BY MR. MAYE:

13         Q.    So you were in the vicinity to observe them

14 being interviewed, but you couldn't hear what they were

15 saying?

16         A.    Correct.

17         Q.    How about, did you observe the police

18 officers interviewing the flight attendants and the

19 pilots?

20         A.    It's customary for the flight attendants to

21 be speaking to the law enforcement regarding the situation.

22              As far as the pilots are concerned, I don't

23 recall if they spoke to the captain.  I would assume they

24 said a few words, but the captain was not a witness.  So ...

25         Q.    Do you recall whether law enforcement



 1  escorted Mr. DelVecchia and his child out of the area after

 2  they completed interviews of the flight crew?

 3          A.    I don't recall.  I'm going to -- I don't know

 4  if they were fully complete with the interview process with

 5  the flight crew.  I know they spoke to them before, you

 6  know, pulling out the passenger.

 7          Q.    Okay.

 8                So it's your recollection that law

 9  enforcement interviewed flight attendants before they

10  removed -- or before the passengers deplaned?

11          A.    Correct.

12          Q.    From your experience, have you seen other

13  flights that requested that law enforcement meet the

14  aircraft?

15          A.    Many flights, yes.

16          Q.    And in those circumstances, do the police

17  officers -- after interviewing the relevant individuals,

18  have you seen police officers then allow the passengers to

19  go?

20          MR. McKAY:  Objection to the form.

21          THE WITNESS:  Yes.

22  BY MR. MAYE:

23          Q.    And have you seen instances where passengers

24  are brought to the police station?

25          A.    I don't physically see them being brought to



1   the police station.  But several times it has been mentioned

2   to me by the officer that they will be taken down there.

3          Q.     And from your observations, is it the police

4   officer who makes the decision whether or not the passenger

5   is released or brought to the police station?

6          A.     It is their decision, yes.

7          Q.     Did the police officers speak to you about

8   what you had learned?

9          A.     I don't recall.

10          Q.     You mentioned that Jessica Esteban was your

11   supervisor, right?

12          MR. McKAY:  Objection to form.

13          THE WITNESS:  When I first started, yes.

14   BY MR. MAYE:

15          Q.     Was she a WFS employee?

16          A.     Yes.

17          Q.     You mentioned that in approximately 2013, you

18   started working -- you became assigned to the Frontier

19   counter, correct?

20          A.     Correct.

21          Q.     At that time there was no station manager?

22          A.     Correct.

23          Q.     Do you recall when Eric started as the

24   station manager?

25          A.     I don't recall, no.



1          Q.    Was it closer to 2019 or closer to 2013?

2          A.    Probably closer to 2013.

3          Q.    Do you recall if -- whether there was no

4   station manager for a year or two or four years?  Any

5   recollection?

6          A.    I want to say maybe just a year or two.

7          Q.    Okay.

8                As the station manager, Eric didn't supervise

9   WFS employees, correct?

10          MR. McKAY:  Object to the form.

11          THE WITNESS:  Correct.

12   BY MR. MAYE:

13          Q.    You were responsible for supervising WFS

14   employees, right?

15          MR. McKAY:  Objection to the form.

16          THE WITNESS:  Correct.

17   BY MR. MAYE:

18          Q.    And you had the responsibility to hire and

19   fire WFS employees, right?

20          A.    Correct.

21          Q.    Eric didn't have the authority to hire and

22   fire WFS employees, right?

23          MR. McKAY:  Objection to the form.

24          THE WITNESS:  Did he have authority?  He could

25   request them off the contract, but he really can't fire



1  them.

2  BY MR. MAYE:

3       Q.    You said on a handful of occasions he would

4  suggest to you, "Hey, maybe this person isn't the right

5  fit," right?

6       A.    Right.

7       Q.    But he didn't have the authority to go after

8  and just fire WFS employees, right?

9       A.    No.

10      Q.    And Eric didn't control WFS employees,

11 right?

12      MR. McKAY:  Objection to the form.

13      THE WITNESS:  What do you mean "control"?

14 BY MR. MAYE:

15      Q.    Control their movements or their assignments;

16 he wasn't responsible for their discipline or performance

17 evaluations?

18      MR. McKAY:  Objection to the form.

19      THE WITNESS:  Not to that extent.

20 BY MR. MAYE:

21      Q.    Would you agree that WFS employees were

22 trained not to discriminate against passengers?

23      MR. McKAY:  Objection to the form.

24      THE WITNESS:  That is correct.

25 ////



ANGELICA PAULO                                    March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                        77

 1  BY MR. MAYE:

 2       Q.    And would you agree that WFS employees knew

 3  that committing racial discrimination was wrong?

 4       A.    That is correct.

 5       Q.    And that it was prohibited?

 6       A.    Correct.

 7       MR. McKAY:  Objection to the form.

 8  BY MR. MAYE:

 9       Q.    You personally -- as a WFS employee, were you

10  ever given the impression that committing racial

11  discrimination was something that Frontier tolerated?

12       MR. McKAY:  Objection to the form.

13       THE WITNESS:  Tolerated?  It's not tolerated.

14  BY MR. MAYE:

15       Q.    And as a WFS employee, you had an expectation

16  that if a WFS employee had committed racial discrimination,

17  that employee would be disciplined, right?

18       MR. McKAY:  Objection to the form.

19       THE WITNESS:  Correct.

20  BY MR. MAYE:

21       Q.    When you worked for AirTran, did passengers

22  make discrimination complaints against AirTran?

23       MR. McKAY:  Objection to the form.

24       THE WITNESS:  That was long ago.  Not that I

25  recall.



1   BY MR. MAYE:

2        Q.    You mentioned that while you worked as a WFS

3   employee, you were aware of passengers making complaints of

4   discrimination, right?

5        A.    They would blurt it out every once in awhile

6   when they were upset.

7        Q.    What was the context?  What were the

8   circumstances regarding these passengers making such

9   accusations?

10       A.    Mostly when they are just either upset that

11  we are enforcing the policy regarding fees or any kind of

12  policies that they don't agree with.

13            They, most of the time, would throw out

14  basically a race card.

15       Q.    You earlier said -- I'm sorry.  I'm sorry.

16       A.    I'm sorry.

17       Q.    I cut you off there.  I apologize.

18            And you had testified earlier that none of

19  these claims had merit?

20       MR. McKAY:  Objection to the form.

21       THE WITNESS:  Correct.  Yes.

22  BY MR. MAYE:

23       Q.    And were you ever accused of racial

24  discrimination by a passenger being racist?

25       A.    I think just about every gate agent has been,



1   yes.

2        Q.    And what was the race of the passenger, or

3   passengers, who accused you of committing racial

4   discrimination?

5        A.    They were every race.

6        Q.    Caucasian?

7        A.    Caucasian.

8        Q.    Asian?

9        A.    Asian.

10        Q.    African-American?

11        A.    African-American, Middle Eastern.  Just about

12   every race out there.  Everyone out there tries to claim

13   that we are racist, yes.

14        Q.    And are you a racist?

15        A.    No.

16        MR. McKAY:  Objection to form.

17   BY MR. MAYE:

18        Q.    You're someone who wouldn't tolerate other

19   WFS employees committing racial discrimination?

20        A.    That's correct.

21        Q.    And when these passengers accused you of

22   racial discrimination, would you agree that there was no

23   basis for that?

24        A.    That is correct.

25        Q.    Just to clarify something, earlier you were



```
 1   asked some questions about the statement that you noted in

 2   the report -- "Per child this was not the first incident

 3   that they have been separated in this manner."

 4           A.    Uh-huh, yes.

 5           Q.    Is it accurate that you testified that it's

 6   possible that you overheard the child say that to another

 7   agent?

 8           A.    That's possible, yes.

 9           MR. McKAY:  Objection to the form.

10   BY MR. MAYE:

11           Q.    Regarding the Frontier flight crew involved

12   in this incident, would you characterize them as

13   professional?

14           A.    Yes.

15           MR. McKAY:  Objection to the form.

16   BY MR. MAYE:

17           Q.    Did you ever speak with Lawrence about his

18   involvement in this case?

19           A.    About his involvement?

20           Q.    Yeah.  His being assigned to this flight and

21   being involved in -- or what his involvement was.

22           A.    Can you clarify?

23           Q.    Yeah.  I'm sorry.

24                 Did you ever speak to Lawrence about his

25   making an entry into the Navitaire system regarding calling
```



1  law enforcement?

2        A.   Any agents that is involved with a situation,

3  they were asked to always input, comment in the reservation

4  as to what had happened.

5        Q.   I guess I'm trying to understand, if you and

6  Lawrence were there at the same time --

7        A.   I'm sorry.  Just a second, if you don't

8  mind.

9        THE VIDEOGRAPHER:  Do you want to go off the record,

10  Counsel?

11        MR. McKAY:  Sure.  Let's go off.

12        THE VIDEOGRAPHER:  Going off the record.  The time

13  is 11:56 a.m. Pacific time.

14             (Brief pause in the proceedings.)

15        THE VIDEOGRAPHER:  Going back on the record.  The

16  time is 12:00 p.m.

17  BY MR. MAYE:

18        Q.   Angelica, do you remember who the gate agent

19  was that was assigned to this flight?

20        A.   I don't recall, no.

21        Q.   Do you know who actually called and requested

22  that law enforcement meet the aircraft?

23        A.   I don't remember those details, no.

24        Q.   Do gate agents, is that part of their duties

25  to call or contact law enforcement and request their



1   presence at an arriving flight?

2         A.    In situations such as these, I want to say

3   they were not the ones that called.

4         Q.    Who would have -- in your experience, who

5   would have called law enforcement and requested their

6   presence?

7         A.    Multiple other people could have called.  It

8   could have been the -- if it was an ACARS message that came

9   through first, it could have been -- I'm sorry.  The

10  dispatcher could have -- I'm sorry.  The office agent could

11  have called law enforcement.

12            Any other supervisor who might have been

13  contacted by SOC first might have called law enforcement.  I

14  don't recall who did.

15        Q.    You said office agent.  Is that a WFS

16  employee at the airport?

17        A.    Correct.

18        MR. MAYE:  That's all I've got.  No more questions

19  for me.

20        MR. McKAY:  Ms. Paulo, I've got a few more, and then

21  we will let you go.

22

23                    FURTHER EXAMINATION

24  BY MR. McKAY:

25        Q.    You had testified about AirTran before.



1   AirTran is the airline that used to be ValuJet; is that

2   right?

3          A.    I don't recall their history --

4          Q.    Okay.

5          A.    -- but I want to say yes.

6          Q.    Before AirTran was acquired by Southwest, it

7   operated similar to Frontier as a low-cost airline, right?

8          A.    I'm sorry?

9          Q.    I said, before AirTran was acquired by

10  Southwest Airlines, it operated similar to Frontier, in that

11  it was a low-cost budget airline, right?

12         A.    It was considered a low cost carrier at that

13  time.  However, extremes of low costs have gotten up there

14  recently.

15         Q.    Would you consider Frontier to be an extreme

16  of low cost?

17         A.    Yes, yes.

18         Q.    And Spirit as well?

19         A.    Yes.

20         Q.    So in the four years that you did ground

21  handling for AirTran, you don't recall hearing a complaint

22  of discrimination, right?

23         A.    You know what?  Now that I've had some time

24  to think about it, yes.  I do recall sometimes where I was

25  accused of being a racist.



1        Q.      How many?  Like a couple?

2        A.      A lot less than Frontier, yes.

3        Q.      But with Frontier, I think you said every

4    gate agent has been accused by a passenger of being racist

5    or of discrimination?

6        A.      I'm sure.  It's come up pretty often.

7        Q.      And it's involved every race you testified,

8    right?

9        A.      It's involved just about everybody that's

10   upset with any kind of policies that they don't agree

11   with.

12       Q.      Well, what's the difference between your

13   experience with AirTran where there were only a couple of

14   complaints and with Frontier with a lot of complaints?

15              What do you see as being the difference?

16       A.      A lot of fee policies.  There's a lot more

17   fees with Frontier than there was with AirTran.

18       Q.      So the pinch point, so to speak, is when

19   people are told that they need to pay fees that they don't

20   want to pay?

21       A.      Correct.

22       Q.      And sometimes people say that they have paid

23   a fee, right, that they are told that they haven't paid?

24       A.      There would be times where we had to

25   research.



1    Q.    Have you seen people removed from Frontier

2  flights at Las Vegas airport?

3    A.    From Frontier?  Oh, yes.  Plenty of times.

4    Q.    Plenty of times.

5         And what were those for?

6    A.    All kinds of reasons.  Besides being

7  noncompliant, being drunk, being, you know, belligerent, or

8  any kind of reason.

9    Q.    And were those often people of color?

10   A.    Often?  I mean, there was -- I don't recall

11  the percent of each race.

12        No.  It's just whenever it happens, you know,

13  they are removed.

14   Q.    Would it be fair to say there were fewer

15  white people removed from planes than people with color?

16   A.    That would not be a fair statement.

17   Q.    Do you think it's 50/50?

18   A.    It could be.  Like I said, I don't really pay

19  attention to race when it comes to that matter.

20   Q.    So would the fairest answer be, you really

21  haven't looked at any statistics on that question?

22   A.    I have not looked at statistics, no.

23   Q.    You said it was -- in response to

24  Mr. Maye's question about your prior testimony saying that

25  it was possible that you heard the child say that they had



1  been separated before, were you ever around the child when

2  he was not being questioned by the police?

3         A.    Was I around?  No, I don't recall being

4  around the child when he was speaking to police, no.

5         Q.    And you've already testified that you could

6  not hear what either he or his father were saying when they

7  were being questioned by the police, right?

8         A.    Correct.

9         Q.    Let me just ask you -- I forgot to ask this

10 before.  Why did you leave Worldwide Flight Services?

11        A.    I was terminated from Eric's request.

12        Q.    And why was that?

13        A.    Not responsive enough on e-mails or, say,

14 just overall performance, I guess.

15        Q.    So first of all, Eric is the station manager,

16 right?

17        A.    Correct.

18        Q.    And Eric is a manager and employee of

19 Frontier?

20        A.    Correct.

21        Q.    And Eric got you fired?

22        A.    He had requested I be removed from the

23 operation, and Worldwide did not have a position for me at

24 the time.

25        Q.    So you were fired?



1          A.    Correct.

2          Q.    And that was based on Eric's request?

3          A.    Correct.

4          Q.    And what specifically was the issue that Eric

5   found to be a problem?

6          A.    There's not one incident, if that's what

7   you're asking.

8          Q.    Okay.

9                Tell me then, if you had to describe from

10  Eric's standpoint, what he was unhappy with about your

11  performance, what would Eric say?

12         A.    I guess I was not responsive enough on

13  e-mails.  That's one -- the reason why my general manager

14  had mentioned was just not being responsive enough.

15               It was very hard to be responsive when you

16  have an operation that's run short staffed.  So the e-mail

17  response was not immediate.

18         Q.    Okay.

19               And whose decision was it regarding how many

20  people were on the staff?

21         A.    Whose decision was it?

22         Q.    Yes.  If short staffing was a problem, where

23  did the buck stop as far as how many people were employed in

24  the staff?

25         A.    We have had meetings about staffing pretty



1  frequently.  It's just -- I mean, we are constantly hiring.

2  And you lose them as quickly as we hire.  So it was a

3  struggle.

4          Q.    Well, was Frontier involved in those

5  meetings?

6          A.    Oh, of course.  Yes.

7          Q.    So Frontier had a say in how many people were

8  working?

9          A.    Yes.

10         Q.    Did they want less people working?

11         A.    No.  More.

12         Q.    They wanted more people working?

13         A.    Of course.

14         Q.    But you felt that the end result was that you

15  were understaffed?

16         A.    That's the normal situation.

17         Q.    So you felt that that was the case?

18         A.    At that time?  I can't recall if I was short

19  staffed at that time.

20               There's times when we were adequate.

21         Q.    All right.

22               Well, you said that it was difficult to

23  respond to an e-mail in a timely fashion when you were

24  understaffed.

25               Did I understand that correctly?



1            A.      Yes, you did.  Uh-huh.

2            Q.      And you said that Eric had a problem with

3    your not being responsive to e-mails, right?

4            A.      Correct.

5            Q.      And what were these e-mails about?

6            A.      Multiple -- a multitude of stuff.  I couldn't

7    recall every little thing.  I'd get about 200 e-mails a

8    day.

9            Q.      But your office is at McCarran Airport,

10   right?

11           A.      Correct.

12           Q.      And you were physically at McCarran Airport,

13   correct?

14           A.      Correct.

15           Q.      And Eric's office is at McCarran Airport?

16           A.      Correct.

17           Q.      And Eric is physically at McCarran Airport?

18           A.      Correct.

19           Q.      Were you both physically at the airport

20   during the same times?

21           A.      Typically.

22           Q.      So couldn't Eric just have walked out of his

23   office and asked you in person this information that he

24   wanted?

25           A.      The e-mails are not necessarily from him.  It



ANGELICA PAULO                                      March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                           90

1  could be all kinds of people.

2       Q.    So he was overseeing your e-mail responses to

3  other people in Frontier?

4       A.    If he's cc'd in, yes.  Most of the time, he

5  is.

6       Q.    Did you and Eric get along?

7       A.    Yes, for the most part.

8       Q.    Well, how about -- you say "for the most

9  part."  Were there --

10      A.    We are cordial.

11      Q.    Okay.

12            And did somebody replace you after you were

13  terminated?

14      A.    From what I hear, yes.

15      Q.    Okay.

16            Did you know that person?

17      A.    Not personally.  But she was the manager for

18  another contract.

19      Q.    Okay.

20            And do you know what her name is?

21      A.    I don't recall her last name.  I want to say

22  her first name was Lisa.  I can't remember her last name.

23      Q.    Is Lisa Caucasian?

24      A.    Correct.

25      Q.    Now, you testified that -- strike that.



1           Do you have any plans to file any kind of

2    legal action against Frontier?

3           A.    No.

4           Q.    Do you have any plans to file any legal

5    action against Worldwide Flight Services?

6           A.    No.

7           Q.    You testified about awareness of flights

8    where other things have happened.  Have you ever been aware

9    of any flight where a flight attendant hit a passenger?

10          A.    Hit a passenger?

11          Q.    Yes.

12          A.    Not that I recall.

13          Q.    And you've been involved with the comings and

14   goings of, I would say, hundreds of flights?

15          A.    Thousands, yes.

16          Q.    Thousands of flights, okay.

17          So in thousands of flights, you can't recall

18   ever hearing of a flight attendant hitting a passenger?

19          A.    No.

20          Q.    Have you ever, in these thousands of flights,

21   heard about a situation where a flight attendant took a

22   parent's child away from them during a flight?

23          A.    During a flight?

24          Q.    Yeah.

25          A.    No.  During a flight, not that I recall.



1          Q.     Would you consider either of those things to
2    be an appropriate thing to happen on an airline flight?
3          MR. MAYE:  Object to form.
4          THE WITNESS:  No.
5    BY MR. McKAY:
6          Q.     You testified previously that you said the
7    captain was not a witness.  Can you explain that?
8          A.     I mean, he's not in the cabin with the
9    passengers when all of this is happening.  He's flying the
10   plane.
11         Q.     But on a long cross-country flight, there's
12   periods when the flight is being operated on auto pilot,
13   right?
14         A.     Correct.
15         Q.     So theoretically, a captain could get
16   involved in a situation, right?
17         A.     Theoretically --
18         MR. MAYE:  Object to form.
19         THE WITNESS:  -- but it's not policy.
20   BY MR. McKAY:
21         Q.     Did you witness the police officers
22   interviewing any other passengers other than the ones who
23   were accused in this incident?
24         A.     Not that I recall.
25         Q.     If it had happened, do you think you would



1   have seen it?

2         A.    Most of the time, I do.  However, I can't be

3   in all places at once.  They could have spoken at the gate

4   area when I was in the jet bridge.  I'm not sure.

5         Q.    Or baggage claim, for instance?

6         A.    Or that.

7         Q.    From the moment the door was opened when the

8   flight landed, was there a period of time where the

9   passengers were held in the plane?

10         A.    Yes.

11         Q.    Do you remember how long that was?

12         A.    Like -- I don't recall how long, no.  It must

13   have been just a few minutes.

14         Q.    Would it have been possible for the police to

15   have interviewed other passengers during that time onboard

16   the plane?

17         A.    While onboard a plane?

18         Q.    Yeah.

19         A.    I can't imagine that they would.  I mean,

20   theoretically, it could happen.  But like I said, I wouldn't

21   assume that would be their policy to do so.

22         Q.    I guess what I'm asking is, like, length of

23   time.  Was there enough time for a police officer to have

24   gone onboard and interviewed other passengers before they

25   started?



1          A.    The length of time?  I wouldn't think so.

2    But it could have happened.

3          Q.    You testified in response to Mr. Maye's

4    questions that you knew the last name.  You could see the

5    PNR.

6          A.    Uh-huh.

7          Q.    And if you knew the flight number and the

8    seat number, you could see a particular PNR?

9          A.    Yes.

10          Q.    And then you said, otherwise, it would be

11    very difficult?

12          A.    Correct.

13          Q.    But it would be possible?

14          A.    It's possible.

15          Q.    And in what ways would it be possible to do

16    that?

17          A.    For instance, had I known the situation -- if

18    I don't have a seat number or last name, if I knew it was a

19    gentleman traveling with a minor, I would look for parties

20    of two, male, a certain age.

21                I would be able to look at their date of

22    birth and make assumptions from there.

23          Q.    Are people able to search the comments in the

24    same way that you would do, say, a Google search or a Bing

25    search?



1          A.      No.

2          Q.      Can you put in key words and pull up matching

3     PNRs?

4          A.      No.

5          Q.      But you can put in dates of birth and

6     genders?

7          A.      No, no, no.  If I knew what the flight number

8     was, I would be able to see all of the passengers on that

9     flight.

10         Q.      I see, okay.

11                 Can you just randomly pull up a PNR?

12         A.      I guess it's possible, yes.

13         Q.      Now, the Flight No. 2067 that landed at

14    Las Vegas, for the DelVecchia reservation, that was the

15    first of a round-trip flight, right, the first flight of a

16    round-trip itinerary is what I should say?

17         A.      I believe so, yes.

18         Q.      So if the DelVecchias, either one of them,

19    had called Frontier prior to boarding the second flight,

20    that would have caused somebody to open up their PNR,

21    right?

22         A.      Yes.

23         Q.      And do you know whether that occurred?

24         A.      I don't know.

25         Q.      And also, if you go into a PNR, you can read



1   the comments that somebody has put in there before you,

2   correct?

3           A.      Yes.

4           Q.      For instance, you read Mr. Caravalho's,

5   right?

6           A.      Yes.

7           Q.      Did you speak with Mr. Caravalho in person

8   about this flight before it landed?

9           A.      Before it landed?

10          Q.      Uh-huh.

11          A.      If we were in the same room together when we

12  received that call, I'm assuming so, yes.

13          Q.      Do you recall speaking with Mr. Caravalho

14  about this flight after it landed?

15          A.      A lot of times we would talk about the

16  unusual circumstances that happened in that day, yes.

17          Q.      So you spoke with him?

18          A.      I don't recall.  I think so.  I don't recall

19  the conversation itself.

20          Q.      Do you recall any other complaints that

21  concerned this Flight No. 2067 on that date?

22          A.      No.

23          Q.      Any other special circumstances involving

24  another passenger?

25          A.      Another passenger?



ANGELICA PAULO                                          March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                              97

1        Q.     Yes.

2        A.     I don't recall.

3        Q.     Does that mean that there could have been or

4   that you don't think there were?

5        A.     There could have been.  But that was the most

6   memorable situation.

7        Q.     And why was it memorable?

8        A.     Just it never happened before.  It was

9   unusual.

10       Q.     And what was it about the flight that had

11  never happened before?

12       A.     Just the fact that, you know, the accusations

13  of sexual harassment.

14       Q.     Okay.

15              That's the only thing?

16       A.     A possible -- what did he say?  A possible

17  abduction.  I'm not sure if I'm using the right word.  But

18  the flight attendants wasn't sure if they were related.

19              So this could have been -- what's the word?

20  I'm not sure if child abduction is the right word.

21       Q.     Sex trafficking?

22       A.     Trafficking maybe, yes.  Yes.

23       Q.     And what was it about them that she said

24  raised doubts about whether they were related?

25       A.     What was it about --



1    Q.    Yeah.  Why did the flight attendant have

2    questions about whether they were related?

3    A.    I mean, she did mention that he was Caucasian

4    and the young boy was not; and, you know, that he was being

5    touched in inappropriate ways.

6    Q.    Well, that doesn't -- the accusation that

7    somebody is being touched doesn't really affect whether they

8    are related or not, does it?

9    A.    I mean, there's different ways that you touch

10   certain people.  And just -- this is not one of them, I

11   guess.

12   Q.    Well, the subject is, why do you think there

13   were questions raised about whether or not these two were

14   related.  And you brought up the fact that the father was

15   Caucasian and the child was not.

16         The child was black, right?

17   MR. MAYE:  Object to form.

18   THE WITNESS:  He was.

19   BY MR. McKAY:

20   Q.    So you have a white dad and a black son,

21   right?

22   A.    Okay.  Yes.

23   Q.    Now, did the flight attendant indicate

24   whether she had asked to see their boarding passes?

25   A.    I don't recall that question being brought



1  up.

2       Q.    Well, if they both have the same last name,

3  wouldn't that be an indication that they were related?

4       A.    That could be.  However, it's hard to prove

5  the last name of a child, if the child does not require an

6  ID.

7       Q.    But the child requires a boarding pass to get

8  on the plane.

9       A.    That's correct.  However, the child can check

10 in without showing ID.  So they could literally board with

11 any name, so long as an adult vouches that that is their

12 name.

13      Q.    So if there is a white adult traveling with a

14 black child, there are concerns, in your mind, that the

15 white adult might be lying about the black child's last

16 name?

17      MR. MAYE:  Object to form.  That's not what she

18 said.

19           You can answer.

20      THE WITNESS:  That, you know, can happen.

21 BY MR. McKAY:

22      Q.    Well, a lot of things can happen.  But one

23 thing that can happen is that a white parent has a black

24 child, isn't it?

25      A.    Yeah.  Of course.



ANGELICA PAULO                                      March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                        100

1          Q.    Okay.  So again, back to this.

2                Again, what was it that raised questions

3     about whether or not they were related?

4          MR. MAYE:  Object to form.

5          THE WITNESS:  I couldn't tell you.  I didn't -- I

6     wasn't the flight attendant who made the accusation.  But

7     if -- I would assume if they see something out of -- I

8     wouldn't say out of place, but if they see something

9     unusual, they see a child and they can't directly tell who

10    the parents are, they keep an eye on that child.  And that's

11    probably what had happened.

12                And --

13    BY MR. McKAY:

14         Q.    Now, if a white parent is traveling with a

15    white child, you don't know exactly who the child's parents

16    are, do you?

17         A.    No.  Just from their behavior, I suppose.

18         Q.    Whose behavior?  The parent or the child?

19         A.    Typically, both.

20         Q.    So if a white parent is traveling with a

21    white child and there is no suspicious behavior, then you

22    assume that the white child is the child of the white

23    parent?

24         A.    The assumption is yes.

25         Q.    Now, you said that this was the first time



1  this unusual situation had happened in your experience, but

2  you've seen many times when the police have been called,

3  right?

4         A.    Yes.

5         Q.    So the police hadn't been called before

6  because of allegations like this?

7         A.    I personally, no.  But I couldn't tell you if

8  it's happened before or with other people, other agents,

9  other airlines.

10        Q.    But it was an unusual situation to you with

11 nine years of experience doing ground handling and thousands

12 of flights under your belt, this was an unusual experience

13 because of the types of allegations being made and the fact

14 that the police had been called; is that a fair statement?

15        A.    That's not the first accusation of a possible

16 child abduction.  But it's up there.

17        Q.    Well, you said this was a first.  So what was

18 the first incident?

19        A.    Well, it was the aspect of -- I'm not sure

20 what I'm trying to think of right now.

21              To be honest, I'm not sure.

22        Q.    Well, you were a minute ago when you said it

23 was a first.  So I'm trying to find out why it was a first.

24        A.    The first what?  I'm sorry.  Could you repeat

25 that?



1          Q.    You said it was an unusual situation and the

2     first, in your experience.

3                Now, you have previously had LEOs called to

4     meet a flight, right?

5          A.    Yes.

6          Q.    You've previously had allegations of child

7     abduction, right?

8          A.    Uh-huh.

9          Q.    You have to say "yes" or "no."

10         A.    Oh, I'm sorry.  Yes.

11         Q.    So I'm still trying to find out why you

12    identified this as so unusual, that it was a first?

13         A.    I might have misspoken.  It might not have

14    been the first.  But it does stick to my mind for me to

15    remember it after all of these years, yeah.

16         Q.    Well, it stuck out for a reason.  And what

17    was the reason?

18         A.    I'm not sure.

19         Q.    Well, I still need to know why you said that.

20         MR. MAYE:  Objection.  She said she was not sure.

21         MR. McKAY:  I know what she said, Brian.  I'm

22    actually able to hear her.

23         MR. MAYE:  I know.  But I think --

24         MR. McKAY:  So I think that I want to find out what

25    it was about this situation that made it unique, in her



ANGELICA PAULO                                              March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                              103

1  experience.

2          THE WITNESS:  Okay.  So it was, A, the accusation of

3  a possible abduction, and I guess it's the fact that it

4  was -- I don't know.

5  BY MR. McKAY:

6          Q.    A white dad and a black child?

7          A.    It could be.

8          MR. MAYE:  Object to form.

9          WITNESS:  It could be.

10 BY MR. McKAY:

11         Q.    Go ahead.

12         A.    I remember it because of the two, I mean.

13 But ...

14         Q.    You remember it because of what?  I'm sorry.

15 That they were different races?

16         A.    I remember the situation.  I mean, I couldn't

17 tell you what stuck out.

18         Q.    The dog wants back in.

19         A.    No.  My husband just came in.

20         Q.    So did you ever, at any time, entertain any

21 doubts about whether the accusations were true or not?

22         A.    I mean, there's always going to be some

23 doubts.  I understand that there's adoptions and whatnot.

24 So ...

25         Q.    So did you have some doubts as to whether the



ANGELICA PAULO                                    March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                        104

1   allegations were true or not?

2          A.     I wasn't 100 percent on it.  But, you know,

3   I do have to follow protocol and see if (inaudible).

4          Q.     You did make a statement in the booking?

5          A.     Say that again.

6          Q.     You said you had "to follow protocol and ..."

7                 What was after that?

8          A.     Just follow, you know -- take precautions

9   first.

10         Q.     Okay.

11                And those precautions included the comments

12  that you put in Exhibit 1?

13         A.     That included calling Metro and have them

14  sort out the situation.

15         Q.     Did you talk to Metro after they had

16  investigated?

17         A.     No.

18         Q.     Did you talk to the FBI after the FBI

19  completed its investigation?

20         A.     No.

21         Q.     Did you know the FBI were involved?

22         A.     No.

23         Q.     When you talk about the protocols, those are

24  the protocols that Frontier maintains?

25         A.     Which protocols?



1        Q.    Well, you said that you had to follow

2   protocols.  Those were the protocols that the Frontier

3   employees had trained you in?

4        MR. MAYE:  Object to form.

5        THE WITNESS:  I'm sorry.  We talked about several

6   different protocols.  So I'm talking about once we call

7   Metro, we typically have Metro take care of the situation.

8             They would only really ask me anything if

9   future travel of Frontier is involved.

10  BY MR. McKAY:

11       Q.    Well, future travel with Frontier was

12  involved in this case, wasn't it?

13       A.    Yes.

14       Q.    So did they ask you anything about that?

15       A.    No.

16       Q.    There are some comments in Exhibit 1 from

17  some other people.  Let me just bring it up for a second to

18  get the names.  Okay.

19             We have a Kathia Robles Cabral.  Do you know

20  that person?

21       A.    No.

22       Q.    Claudette Patero, do you know that person?

23       A.    No.

24       Q.    Okay.

25             Daniela Cruz Velasquez, do you know that



1   person?

2          A.    No.

3          MR. McKAY:  All right.  That's all I have.

4               Brian, do you have any more questions?

5          MR. MAYE:  I just have one or two.

6

7                    FURTHER EXAMINATION

8   BY MR. MAYE:

9          Q.    Angelica, in Exhibit 1, it shows in the entry

10  that you made into the reservation that you identified the

11  passengers who were separated as father and child.

12              Were you made aware at some point, speaking

13  with the flight attendants, that this was a father and son?

14         A.    I want to say after it was mentioned that it

15  was not their first time, I assumed that was his -- the

16  child's statement that they are related.

17         Q.    Do you recall anyone telling you that they

18  are father and son, or are you saying that you noted that

19  based on hearing that the child said "This isn't the first

20  instance it's happened"?

21         A.    Well, the flight crew mentioned that they

22  don't know if that was a father and son.  But it was, I

23  guess, in my head confirmed when he mentioned it.

24         Q.    When the child said "this is not the first

25  time this has happened"?



1        A.      Right.

2        Q.      And you testified earlier that it's possible

3    that you overheard the child saying that to another gate

4    agent?

5        A.      I can't recall.

6        MR. McKAY:  Objection.  That is not her testimony.

7        MR. MAYE:  Yes, it was her testimony.

8        THE WITNESS:  I can't recall if it was a gate agent

9    or the flight attendant that was in (inaudible).

10   BY MR. MAYE:

11       Q.      So it's possible that you overheard the

12   child --

13              (Interruption in the proceedings.)

14       THE WITNESS:  I'm so sorry about that.

15   BY MR. MAYE:

16       Q.      Oh, that's totally fine.

17              So your testimony is that it's possible that

18   you heard the child telling someone that this was not the

19   first time that this has happened?

20       MR. McKAY:  Objection to the form of the question.

21   BY MR. MAYE:

22       Q.      I'm sorry.  That is correct?

23       A.      That is correct.

24       Q.      If a gate agent doesn't know the name of a

25   passenger and doesn't know the flight number, is there any



1   way for that gate agent to locate the passenger's

2   reservation?

3        A.    Doesn't know the flight number or the name?

4        Q.    Correct.

5        A.    I don't believe so.

6        MR. MAYE:  I have no further questions.

7              Thanks, Angelica.  I appreciate it.

8        MR. McKAY:  I'm sorry.  But we have to go back to

9   this because if we keep having different versions of the set

10  of facts, then we just have to inquire into them now.

11

12                     FURTHER EXAMINATION

13  BY MR. McKAY:

14       Q.    This is testimony, by the way.  This is you

15  saying what you know.  This can't be you saying what you

16  think might possibly have happened.

17             Do you understand that?

18       A.    Okay.

19       Q.    Okay.

20             So you know that you were never in the

21  vicinity of the child when he wasn't being questioned by the

22  police; you've told me that already, right?

23       A.    By the police, yeah.

24       Q.    By the police, okay.

25             So if you were never around the child when



ANGELICA PAULO                                       March 15, 2022
PETER DELVECCHIA vs FRONTIER AIRLINES                        109

1  the child wasn't being questioned by the police --

2          A.    Yes.

3          Q.    -- then the only time you were around the

4  child was when the child was being questioned by the police,

5  right?

6          A.    No.  I recall the father was escorted out of

7  the jet bridge by the police while the son was sitting at

8  the end of the jet bridge with other agents around him.

9          Q.    Which end?

10         A.    Where the jet bridge meets the aircraft.

11         Q.    And you say "with other agents around him."

12 Agents of what?

13         A.    I can't recall if it was a flight attendant

14 or another gate agent.

15         Q.    But there were no police present?

16         A.    They were present.  They weren't interviewing

17 him at the time.

18         Q.    And is it your testimony that you were

19 listening to the child talking at that point?

20         A.    Once again, I can't recall if I heard it from

21 the agent or from when the child was speaking to an agent.

22         Q.    Okay.

23               So that's the important distinction.  Are you

24 testifying here under oath that you heard the child making

25 statements?



1       A.      I heard the child speaking.  But that one

2  particular statement, once again, I cannot recall if that

3  was hearsay or directly from the child at that point.

4       Q.      Okay.

5              And so you cannot say under oath that you

6  heard the child saying that he had been separated before?

7       MR. MAYE:  Object to form.

8       THE WITNESS:  That's correct.  Not directly from the

9  child.  Not 100 percent, no.

10  BY MR. McKAY:

11      Q.      You cannot say that.  You have to testify

12  about what you know.  And you do not know that you heard it

13  from the child, right?

14      A.      I do not know if I heard it from the child,

15  correct.

16      Q.      Okay.  All right.

17      MR. McKAY:  So this is the end of the deposition

18  and --

19      MR. MAYE:  I'm sorry, John.  I want to follow up

20  here --

21      MR. McKAY:  All right.

22      MR. MAYE:  -- because, obviously, you just went

23  through that.  So I have a right to --

24      MR. McKAY:  I was here when it happened.

25  ////



1                  FURTHER EXAMINATION

2   BY MR. MAYE:

3        Q.    So, Angelica, on this last point of how you

4   learned that the child said "This was not the first time

5   this has happened," it's possible that you heard it from the

6   child when he spoke to or told either the flight attendant

7   or gate agent, correct?

8        A.    Correct.

9        MR. McKAY:  Objection to the form of the question

10  and it conflicts with her prior testimony.

11       MR. MAYE:  No, that's not true, John.  It doesn't

12  conflict.  It doesn't conflict.

13       MR. McKAY:  She just testified that she cannot

14  testify that she heard it from the child.  So now you're

15  trying to spin that as "Is it possible that you did."

16       MR. MAYE:  No, no.

17       MR. McKAY:  That is speculation.

18       MR. MAYE:  Nope --

19       MR. McKAY:  You cannot ask the witness to

20  speculate.

21       MR. MAYE:  Whatever, John.

22       MR. McKAY:  Yeah, whatever.  That's the law.  That's

23  what you learn in law school.

24       MR. MAYE:  Okay.

25       MR. McKAY:  So I don't want you to testify about



1  possibilities because anything is possible, right?  There

2  might be a God.  There might be things -- you know, there

3  might be ghosts, right?

4              But we have to testify about what you

5  observed when the plane landed.  And we have to know the

6  truth because this may be the only time that we get to talk

7  to you, and we can't leave here hearing about what you think

8  might be possible because that's not what we are here for.

9              We are here to learn about what you observed.

10 And I need to make this perfectly clear, and I need to hear

11 it from you.

12             Did you hear the child with your own ears --

13 did you hear the child say "This has happened to us before,"

14 "yes" or "no"?

15        MR. MAYE:  Object to form.

16        MR. McKAY:  That's all you need to say.  Thank you.

17        THE WITNESS:  I can't say for sure I heard it

18 directly from the child.

19        MR. McKAY:  Thank you very much.  All right.

20             Now, the court reporter has made notes of

21 what happened today and is going to -- and they are very

22 good notes, by the way.

23             She is going to turn this into a transcript,

24 and the transcript can be printed out and you can review it,

25 if you'd like to proofread it, and make sure everything is



1  correct, or you can tell her today that you're comfortable

2  with her printing it up without you proofreading it.

3              But we need to know before you sign off today

4  which you prefer.

5         THE WITNESS:  I'm comfortable with it.

6         MR. McKAY:  You're comfortable with waiving?

7         THE WITNESS:  I suppose so, yes.

8         MR. McKAY:  Okay.  That's all we have.

9              Thank you very much.  I appreciate you taking

10 the time.

11        THE WITNESS:  You're welcome.

12        MR. MAYE:  Thank you, Angelica.

13        THE WITNESS:  Thank you.

14        THE VIDEOGRAPHER:  And if, Counsel, John and Brian,

15 if you can just briefly stay on the record so I can get your

16 video orders down, please.

17        MR. McKAY:  Angelica, you're free to leave.

18        THE COURT:  Counsel McKay, did you want a copy?

19        MR. McKAY:  Yeah.  Like I told you before, only

20 electronic.

21        THE VIDEOGRAPHER:  Of the video?

22        MR. McKAY:  Of the video, yes.  Yeah, I think an

23 electronic copy the video.

24        THE VIDEOGRAPHER:  Okay.  Sure.

25             And then, Counsel Maye, did you want a copy



1   of the video?

2          MR. MAYE:  Yes, please.

3          THE COURT:  Synced to your transcript?

4          MR. MAYE:  No, not necessary.

5          THE VIDEOGRAPHER:  Just DVD.  Okay.  All right.

6              This concludes today's videoconference

7   deposition of Angelica Paulo.  We are going off the record

8   on March 15th, 2022 and the time is 12:44 p.m. Pacific time.

9              Thank you, everybody.

10         (REVIEW AND SIGNATURE WAIVED BY DEPONENT.)

11          (PROCEEDINGS ADJOURNED AT 12:44 P.M.)

12                      *   *   *   *

13

14

15

16

17

18

19

20

21

22

23

24

25



```
1                    REPORTER'S CERTIFICATE

2    STATE OF NEVADA    )
                        ) ss.
3    COUNTY OF CLARK    )

4              I, Robin A. Ravizé, a Certified Shorthand Reporter

5    in Clark County, State of Nevada, do hereby certify:

6              That I reported the taking of the deposition of

7    Angelica Paulo on March 15, 2022, commencing at the hour of

8    10:06 a.m.;

9              That prior to being examined, the witness was by

10   me duly sworn to testify to the truth, the whole truth, and

11   nothing but the truth;

12             That I thereafter transcribed my said shorthand

13   notes into typewriting and that the typewritten

14   transcription of said deposition is a complete, true, and

15   accurate transcription of my said shorthand notes taken down

16   at said time; and that review of the transcript was not

17   requested.

18             I further certify that I am not a relative nor

19   employee of an attorney or counsel involved in said action,

20   nor a person financially interested in said action.

21             IN WITNESS WHEREOF, I have hereunto set my hand in

22   my office in the County of Clark, State of Nevada this

23   31st day of March, 2022.

24                              Robin A. Ravizé, CCR No. 753

25
```





**FRONTIER**
LOW FARES DONE RIGHT

**PASSENGER PNR DETAILS FOR E95Z4G**

**DOT Compliant #-**

**DOT Analyst**

*All time displayed in this PNR portal are in Mountain Time(MT)

**SUMMARY**

| PNR | Booking Channel | Booking Date | Total Amount Paid | Voucher Issued |
|---|---|---|---|---|
| E95Z4G | Navitaire | 02/28/2019 | $702.08 | $0.00 |

**PASSENGERS & FLIGHTS**

| First Name | Last Name | Date Of Birth | Gender | Segment Number | Flight Number | Seat | Departure Date | Departure Station | Check In Location | Check In Date | Check In Time | Time Of Departure | Boarding Status | Arrival Station | Time Of Arrival |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ■■■er | ■■a | ■■■■7 | Male | 1 | 2066 | 13F | 04/03/2019 | LAS | LAS | 04/03/2019 | 09:03 PM | 12:50 AM | Boarded | RDU | 05:04 AM |
| ■■■a | ■■■hi | ■■■3 | Male | 1 | 2066 | 13E | 04/03/2019 | LAS | LAS | 04/03/2019 | 09:03 PM | 12:50 PM | Boarded | RDU | 05:04 AM |
| ■■a | ■■a | ■■■7 | Male | | 2066 | 13E | 04/03/2019 | LAS | LAS | 04/03/2019 | 09:03 PM | 12:50 AM | Boarded | RDU | 05:04 AM |
| ■■■er | ■■■hi | ■■■3 | Male | 1 | 2067 | 13E | 03/28/2019 | RDU | RDU | 03/27/2019 | 07:48 PM | 05:59 PM | Boarded | LAS | 11:27 PM |
| ■■ | ■■■■ | ■■7 | Male | 1 | 2067 | 13D | 03/28/2019 | RDU | RDU | 03/27/2019 | 07:48 PM | 05:59 PM | Boarded | LAS | 11:27 PM |

**BOOKING CONTACT**

©2019 - Frontier Airlines

A. Paulo Depo.
3/15/2022
EXHIBIT 1

**EXHIBIT**
**1**



LOW FARES DONE RIGHT

| First Name | Last Name | Email Address | Home Phone | Other Phone |
|---|---|---|---|---|
| peter | delvecchia | p█████v@h████ | █████ | 9██████-█35 |

©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

BOOKING COMMENTS

| Created Agent Name | Created Agent Id | Created Agent Code | Created Date | Created Time | Comment |
|---|---|---|---|---|---|
| AppSupport MassPNR | 7822380 | MassPNR | 03/25/2019 | 08:08 AM | Email sent to p█████@████ 72 Hour Pre-Flight |
| AppSupport MassPNR | 7822380 | MassPNR | 03/27/2019 | 07:20 PM | Email sent to pe██████ 24 Hour Pre-Flight |
| Jakitta Floyd | 8421678 | cx91993573 | 03/28/2019 | 04:41 PM | pax checked one bag but would like a refund for the other |
| Lawrence Caravalho | 4764578 | wf971730 | 03/28/2019 | 08:06 PM | . Called Leo Police per SOC, SCSM, seperated inapropriate touching █████ from Peter found inapropriate touching from Peter To ██████ Leo has been called to meet the flight. |
| ANGELICA PAULO | 3077967 | 760576 | 03/29/2019 | 02:05 AM | Metro met inbound flt 2067. Per FA, all crew members witnessed inappropriate touching of minor child. FB witnessed touching of thighs. Father was escorted away by metro separate from child to |

©2019 - Frontier Airlines

| Agent | Number | PNR | Date | Time | Notes |
|---|---|---|---|---|---|
|  |  |  |  |  | police station. Per child, this was not the first incident that they have been separated in this manner. Checked luggage pulled and held in BSO. |
| AppSupport MassPNR | 7822380 | MassPNR | 04/03/2019 | 02:21 AM | Email sent to ▮▮▮▮ 24 Hour Pre-Flight |
| Claudette Patero | 7608248 | S1110671 1 | 04/03/2019 | 06:29 PM | Peter called in due to the incident that happened for their flight// according to pax he is currently in the Metro and will be filling a complaint against frontier for what happened// advised to transfer the call to Customer Relations// |
| Kathia Robles Cabral | 7163853 | csu1207885 | 04/03/2019 | 07:03 PM | ***pax is uncomfortable flying with the flight attendant - Kevin, if he is on this flight please accomodate the pax and courtesy change him to a different flight home on a flight.kevin is not on. ***  phone call notes: pulled out from the flight bc he was accused that he was holding his son wrong. |

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

FRONTIER
LOW FARES DONE RIGHT

| AppSupport MassPNR | 7822380 | MassPNR | 04/04/2019 | 09:02 AM | Email sent to ██████████ Post-flight |
|---|---|---|---|---|---|

he says that this was a racist act, he is filing a law suit. he is in the metro, FBI told him to file a complaint with us, filing a complaint with us due to the flight attendant and is currently working with the police department. fell asleep and someone took his son to the back of the plane, said that they accused him to inappropriately touching his son. flight attendant mocked him, him and his son were both questioned by the FBI. does not want to take the flight back home with the same flight attendant. flight attendants name was Kevin and he is 5'10 about 30. was screaming at him then put his hands on his sons crotch area to explain to him how he was holding his son. He does not want to ta


FRONTIER
LOW FARES DONE RIGHT

| | | | | Employee Number | Station |
|---|---|---|---|---|---|
| Daniela Cruz Velasquez | 5364601 | S11035818 | 04/16/2019 | 12:51 PM | TRASFER TO CR DEPARMENT |
| Daniela Cruz Velasquez | 5364601 | S11035818 | 04/16/2019 | 12:48 PM | CALLED TO CHEKC THE STATUS OF HER COMPLAINT |

**RECORD HISTORY**

| Created Date | Created Time | History Code | Detail | Employee Number | Station |
|---|---|---|---|---|---|
| 02/28/2019 | 06:59 AM | IS | 2<br>2/28/2019 13:59:42 | Website | WWW |
| 03/27/2019 | 07:48 PM | AB | 0 0422594475 0 1 LAS<br>2067 False peter<br>delvecchia  F9 | Website | WWW |
| 03/27/2019 | 07:48 PM | AB | 0 0422594476 0 1 LAS<br>2067 False a ▉<br>delv ▉ F9 | Website | WWW |
| 03/27/2019 | 07:48 PM | CI | 3/28/2019 19:59:0<br>3/28/2019 19:59:0<br>3/28/2019 22:27:0 RDU<br>LAS F9 2067  13E peter<br>delvecchia delVec 32 | Website | WWW |
| 03/27/2019 | 07:48 PM | CI | 3/28/2019 19:59:0<br>3/28/2019 19:59:0 | Website | WWW |
| 03/27/2019 | 07:48 PM | BP | 3/28/2019 19:59:0<br>3/28/2019 19:59:0<br>3/28/2019 22:27:0 RDU<br>LAS F9 2067  13D<br>▉ 33 | Website | WWW |

©2019 - Frontier Airlines

*CONFIDENTIAL– SUBJECT TO PROTECTIVE ORDER*

©2019 – Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

| Date | Time | Code | Details | Reference | Location |
|---|---|---|---|---|---|
| 03/27/2019 | 07:48 PM | BP | 3/28/2019 22:27:0 RDU LAS F9 2067 13E peter delvecchia delvec 32 / 3/28/2019 19:59:0 / 3/28/2019 22:27:0 RDU LAS F9 2067 13D ▮▮ 33 | Website | WWW |
| 03/28/2019 | 04:41 PM | RB | 87923445 0422594476 / 0 1 LAS 2067 False ▮▮ F9 | CX91993573 | RDU |
| 03/28/2019 | 04:41 PM | CB | 87923444 0422594475 / 0 1 LAS 2067 False peter delvecchia F9 | CX91993573 | RDU |
| 03/28/2019 | 04:41 PM | BT | 3/28/2019 0:0:0 F9 2067 peter delvecchia 0422594475 LAS 0 Pounds | CX91993573 | RDU |
| 03/28/2019 | 05:27 PM | BD | 3/28/2019 19:59:0 / 3/28/2019 19:59:0 / 3/28/2019 22:27:0 RDU LAS F9 2067 13E peter delvecchia delvec 32 | CX91928596 | RDU |
| 03/28/2019 | 05:27 PM | BD | 3/28/2019 19:59:0 / 3/28/2019 19:59:0 / 3/28/2019 22:27:0 RDU LAS F9 2067 13D ▮▮ 33 | CX91928596 | RDU |
| 03/29/2019 | 02:05 AM | CC | P ▮▮ / 27278 US US en-US / 919 ▮▮ | 760576 | LAS |

©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

| | | | 2 0 P<br>9   pe<br>e   27278 US US<br>2 0 | | |
|---|---|---|---|---|---|
| 04/03/2019 | 09:03 PM | CB | 0 042280 5973 0 1 RDU<br>2066 False  peter<br>delvecchia  F9 | WF973505 | LAS |
| 04/03/2019 | 09:03 PM | AB | 0 042280 5973 0 1 RDU<br>2066 False  peter<br>delvecchia  F9 | WF973505 | LAS |
| 04/03/2019 | 09:03 PM | CI | 4/3/2019 23:50:0<br>4/3/2019 23:50:0<br>4/4/2019 7:4:0 LAS RDU<br>F9 2066  13F  peter<br>delvecchia delvec 118 | WF973505 | LAS |
| 04/03/2019 | 09:03 PM | CI | 4/3/2019 23:50:0<br>4/3/2019 23:50:0<br>4/4/2019 7:4:0 LAS RDU<br>F9 2066  13E<br>119 | WF973505 | LAS |
| 04/03/2019 | 09:03 PM | BP | 4/3/2019 23:50:0<br>4/3/2019 23:50:0<br>4/4/2019 7:4:0 LAS RDU<br>F9 2066  13F  peter<br>delvecchia delvec 118 | WF973505 | LAS |
| 04/03/2019 | 09:03 PM | BP | 4/3/2019 23:50:0<br>4/3/2019 23:50:0<br>4/4/2019 7:4:0 LAS RDU<br>F9 2066  13F  peter<br>delvecchia delvec 118 | WF973505 | LAS |

**FRONTIER**
LOW FARES DONE RIGHT

**RNI**

| Reference Number | Created Date | Created Time | Modified Date | Modified Time | Resolution | Verbatim | Comment Text | |
|---|---|---|---|---|---|---|---|---|
| | | | | | 4/3/2019 23:50:0 4/3/2019 23:50:0 4/4/2019 7:4:0 LAS RDU F9 ██66  13E ██ ████ 119 | 4/3/2019 23:50:0 4/3/2019 23:50:0 4/4/2019 7:4:0 LAS RDU F9 ██66  13E ██ ████ 119 | WF973505 | LAS |
| 04/03/2019 | | 09:03 PM | | BP | 4/3/2019 23:50:0 4/3/2019 23:50:0 4/4/2019 7:4:0 LAS RDU F9 2066  13E ████ d█████ 119 | 4/3/2019 23:50:0 complain about a flight attendant, he wants further | WF973505 | LAS |
| 04/04/2019 | | 12:12 AM | | BD | 4/3/2019 23:50:0 4/3/2019 23:50:0 F9 2066  13F peter delvecchia delvec 118 | 4/3/2019 23:50:0 about a flight attendant, he wants further | WF988536 | LAS |
| 04/04/2019 | | 12:12 AM | | BD | 4/3/2019 23:50:0 4/3/2019 23:50:0 4/4/2019 7:4:0 LAS RDU F9██66 ██ ████ 119 | "pax called in to complain about a flight attendant, he wants further | WF988536 | LAS |
| 190403-000748 | 04/03/2019 | 01:13 PM | 05/04/2019 | 05:13 PM | "4/3/2019- Kathia filing a complaint about the flight attendant Kevin, outside of frontiers | "pax called in to complain about a flight attendant, he wants further | "From:Grimes, Jason B. &lt; Sent:Thursday, April 18, 2019 5:50 AM To:Anderson, Matthew &lt; &gt;; Inflight DIA MGR &lt;██████ &gt;Subject:RE: Passenger Complaint - 3/28/19 - F9 2067 RDU-LAS - Pax in 13D, 13E  Hello Matthew, I have the following responses for this complaint.  Hello, My story: As the C, I went to brief the exit row before MCD closed. As I briefed I noticed a boy sitting in the exit row. I had asked him | |

©2019 - Frontier Airlines

**FRONTIER**
LOW FARES DONE RIGHT

| | | |
|---|---|---|
| liability, will put a note on his reservation and say that he is uncomfortable with kevin that we can courtsay move the pax to a flight he is not on. when boarding advise him to ask the agent to look at his reservation notes we were able to figure out a way to find out what flight attendants are working the flight, there is no kevin on this upcoming flight, however, still making the not under his reservation." | investigation to be done about this situation." | how old he was to make sure he is 15 or older. He had answered "12" I asked him if he was traveling on his own and he pointed at a man sitting next to him. (The boy was in 13E the man was in 13D). I had asked the gentleman sitting in 13D if he wanted me to separate them move them together since the boy is not allowed to sit in the exit row because of the age requirement. The man had answered "together" Because it was a full flight, I had asked for two volunteers sitting next to each other to move to the exit row. A man and a women had volunteered (17EF, if I am remembering correctly). After the switch was made, I briefed the new passengers sitting the the exit row and headed to the back of the aircraft to notify the B and the D flight attendant that I had moved people out of the aircraft because of age requirement. The B and the D flight attendant was shocked as I said age instead of language. The little boy did not look 12, and the relationship they had looked very awkward. I did not interact with either the man or the boy after that. The B and the D flight attendant had dealt with most of it since the boy and the man was sitting in their section.  — Anna Bond▇▇▇   When the C briefed the exit row, she noticed a child in the row. He said he was 12 years old. He was black. When she began to find him a new seat, an older white man, early 50s, says &quot;This is my son.&quot; She moved them to row 17 E and F. While doing service and trash, about 25 minutes into the flight, the A, C and D flight attendants noticed the older man rubbing the boys face in a way that made them uncomfortable. They asked me to check it out. As I walked from the front to the rear, I noticed the man&#39;s hand on the boys crotch. I walked back up to the front again and his hand was still there. Both appeared to be sleeping. We informed the captain and he told us to separate the two. I put the boy in row 31F (and placed an ABP in 31D) and left the older man in 17. I spoke with the boy and he said that was his dad. He was adopted when he was three. And that they have been separated before on another flight. He asked could he go back and sit by his dad. I asked him if he knew that his dad&#39;s hand was on his crotch. He said no. It took about 10-12 minutes after I separated them for the dad to come to the back and see what was going on. I told him I saw where his hand was and that&#39;s why you were separated. The man asked me &quot;did he tell you where my hand was?&quot; I told him &quot;no, I saw it |

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

19AZF0229 DEVELCCHIA FRONTIER 0906

myself&quot;: He spoke to the boy briefly, asked if he was alright, and went back to his seat. He did not come check on the boy for the remaining 3+ hours of the flight. He also deplaned without waiting for the boy to come up from the last row.   Jason Grimes Jason Grimes ORD inflight Supervisor p. 773.985.0718

""From:Gahm, Grant Sent:Wednesday, April 17, 2019 11:56 AMTo:Anderson, Matthew &gt;Cc:Jenkins, Joy &gt;Subject:RE: F9 2067 - 3/28/19 - RDU-LAS - Law Enforcement Called Matthew, I don't have anything beyond this other than knowing that FBI did not arrest the person nor are there likely to be any charges filed. I can reach out to the FBI in LAS and ask them if there is anything further but honestly, I don't think there is or they would have been in touch. I'll ask inflight if they have anything further but the initial response is that the FA's acted appropriately. That being said, we really wouldn't give the pax any more information than what they already know and yes, if he wants more, then yes, he needs to contact law enforcement. I'm certain that they gave him their contact. Grant Gahm Security Operations/ Alternate AOSC

""From:Anderson, Matthew Sent:Wednesday, April 17, 2019 10:55 AMTo:Gahm, Grant &gt;Cc:Jenkins, Joy &gt;Subject:F9 2067 - 3/28/19 - RDU-LAS - Law Enforcement Called Hi Grant – A gentleman involved in an incident on the above flight reached out complaining about his treatment on-board, alleging that it was discrimination. From what I could gather based on notes found and the PIR, the flight attendant's witnessed what they determined to be inappropriate touching of a child by the adult – and called for police to meet the aircraft upon landing. The call notes indicate that the FBI was involved. I'm not exactly sure what the passenger is specifically reaching back out for – but a previous email from a customer relations agent indicated that an investigation would be conducted – so I suspect the passenger wants to know the results of the investigation. Would we have any details regarding this incident, and is there anything we can share with the passenger? Or is it best to refer the passenger to law enforcement for any updates?  Matthew

©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

Anderson Customer Relations Advocate

'''From:Anderson, Matthew Sent:Wednesday, April 17, 2019 10:37 AMTo:Inflight DIA MGR

&lt;                         &gt;Subject:Passenger Complaint - 3/28/19 - F9 2067 RDU-LAS - Pax in 13D, 13E  HI In-flight- Hoping we could gather some statements from the crew in regards to this one – I found a PIR, but no associated cabin submitters – but there's some notes in the reservation that the FA's witnessed inappropriate touching between these two passengers (adult + child). Could we get statements from all the FA's that witnessed the event as to what they saw? Passenger is alleging that this was done because he is white and his child is black – although I'm confident that is not the case given the gravity of what the FA's said they saw – and that they took action in the interest of the child. Any information we can gather, including witness statements if we have them, is greatly appreciated. I'll include the call recap below from our CR agents.  Call 1: pulled out from the flight bc he was accused that he was holding his son wrong, he says that this was a racist act,he is filing a law suit. he is in the metro, FBI told him to file a complaint with us. filing a complaint with us due to the flight attendant and is currently working with the police department. fell asleep and someone took his son to the back of the plane, said that they accused him to inappropriately touching his son. flight attendant mocked him, him and his son were both questioned by the FBI. does not want to take the flight back home with the same flight attendant.  Call 2: spoke to FBI about it, interviewed 8 ppl sitting around. Some ppl saw a guy get punched in the back of the neck during flight. He is having health problems. FLB charged it as racist incident. Son is black and white, adopted, flight attendant put hand on sons crotch to demonstrate what happened. Flight attendant separated pax and his son because FA say pax holding his son incorrectly and &quot;touching his crotch&quot; Pax had fell asleep on the plane and was woken by being hit on the back of the head 4 times by flight attendant. Then flight attendant separated them and demonstrated how pax was touching kids crotch by touching the kids crotch again. Skyspeed comments mention all attendants say inappropriate touching. Skyspeed comments

©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

FRONTIER
LOW FARES DONE RIGHT

mention that the child mentioned they have been separated before for similar incident.   Matthew Anderson Customer Relations

Advocate

""Thank you for sharing your feedback. Please be assured your message is important to us and is being reviewed in the order it was received. A specialist will respond as soon as possible. "" spoke to FBI about it, interviewed 8 ppl sitting around. Some ppl saw a guy get punched in the back of the neck during flight. He is having health problems. FLB charged it as racist incident. Son is black and white, adopted. flight attendant put hand on sons crotch to demonstrate what happened. Flight attendant separated pax and his son because FA say pax holding his son incorrectly and &quot;touching his crotch&quot; Pax had fell asleep on the plane and was woken by being hit on the back of the head 4 times by flight attendant. Then flight attendant separated them and demonstrated how pax was touching kids crotch by touching the kids crotch again. Skyspeed comments mention all attendants say inappropriate touching. Skyspeed comments mention that the child mentioned they have been separated before for similar incident.  Send to Denver team, and send email including details.  ""Hello Peter,  Thank you for reaching out to Frontier Airlines with your concerns onboard the aircraft on March 28, 2019 when traveling from Raleigh Durham to Las Vegas. We are sorry to hear about the experience you encountered with one of our flight attendants.  Frontier has zero tolerance for discrimination in any form, indeed we strive to create an atmosphere of mutual respect among employees and our guests. We have a well deserved reputation of delivering a consistently high level of service to our customers. I&#39;m very sorry if this was not your experience.  Based on the information provided, we don&#39;t feel the described behavior was based on discrimination or prejudice, however, we do take any claim of this nature very seriously. We assure you an investigation into the events and interactions you described will be conducted. While all communications, both verbal and written, between Frontier Management and our employees are necessarily proprietary, be assured an internal investigation will be handled to conclusion.  Thank you for bringing this to our immediate attention.  Regards, Kathia Frontier Airlines



LOW FARES DONE RIGHT

©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

19AZF0229 DEVELCCHIA FRONTIER 0909

**FARE**

| First Name | Last Name | Charge Type | Charge Amount |
|---|---|---|---|
| peter | delvecchia | FarePrice | $125.00 |

*********************************************** P.S. We
want your feedback! Please fill out our survey and you will be
entered to win 2 FREE round-trip tickets on Frontier Airlines up to a
value of $400. Click the link to take the survey:
https://www.surveymonkey.com/r/5LK82K
*********************************************** """ pulled
out from the flight bc he was accused that he was holding his son
wrong, he says that this was a racist act, he is filing a law suit, he is in
the metro, FBI told him to file a complaint with us. filing a complaint
with us due to the flight attendant and is currently working with the
police department. fell asleep and someone took his son to the back
of the plane, said that they accused him to inappropriately touching
his son. flight attendant mocked him, him and his son were both
questioned by the FBI. does not want to take the flight back home
with the same flight attendant. flight attendants name was Kevin
and he is 5&#39;10 about 30. was screaming at him then put his
hands on his sons crotch area to explain to him how he was holding
his son. He does not want to take this flight with this flight attendant
and want to be put on a different airline to avoid the situation. pax
advised that the flight attendant took his son. he really wants some
investigating outside of frontiers liability, will put a note on his
reservation and say that he is uncomfortable with Kevin that we can
courtesy move the pax to a flight he is not on. okayed by sup Willow.
when boarding advise him to ask the agent to look at his reservation
notes. we were able to figure out a way to find out what flight
attendants are working the flight, there is no kevin on this upcoming
flight, however, still making the not under his reservation. if pax
fights further, I will be sending this to denver team assist, as was
advised by willow. "

©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

**FRONTIER**
LOW FARES DONE RIGHT

| Name | Last Name | Fee Type | Amount |
|---|---|---|---|
| peter | delvecchia | IncludedTravelFee | $8.72 |
| peter | delvecchia | TravelFee | $19.00 |
| peter | delvecchia | TravelFee | $5.60 |
| peter | delvecchia | TravelFee | $4.20 |
| peter | delvecchia | TravelFee | $4.50 |
| peter | delvecchia | FarePrice | $44.00 |
| peter | delvecchia | TravelFee | $4.20 |
| peter | delvecchia | TravelFee | $4.50 |
| peter | delvecchia | TravelFee | $5.60 |
| peter | delvecchia | TravelFee | $19.00 |
| peter | delvecchia | IncludedTravelFee | $3.07 |
| peter | delvecchia | FarePrice | $44.00 |
| peter | delvecchia | FarePrice | $125.00 |
| a… | delvecchia | TravelFee | $4.20 |
| a… | delvecchia | TravelFee | $4.50 |
| a… | delvecchia | TravelFee | $5.60 |
| a… | delvecchia | TravelFee | $19.00 |
| a… | delvecchia | IncludedTravelFee | $8.72 |
| a… | delvecchia | FarePrice | $44.00 |
| a… | delvecchia | IncludedTravelFee | $3.07 |
| a… | delvecchia | TravelFee | $19.00 |



**FRONTIER**
LOW FARES DONE RIGHT

|  |  |  |
|---|---|---|
|  |  | TravelFee | $5.60 |
| - |  | TravelFee | $4.50 |
|  |  | TravelFee | $4.20 |

**ANCILLARY**

| First Name | Last Name | Charge Code | SSRCode | Charge Amount |
|---|---|---|---|---|
| peter | delVecchia | PBNDL |  | $0.00 |
| peter | delVecchia | PBNDL |  | ($115.44) |
|  |  | PBNDL |  | $0.00 |
|  |  | PBNDL |  | ($115.44) |

**PAYMENT**

| Payment Method Type | Payment Method | Account Number(Last 4-digits) | Account Name | Payment Amount |
|---|---|---|---|---|
| ExternalAccount | Visa | 7103 | peter delVecchia | $702.08 |

**BAG**

| Baggage ID | Check In Time |
|---|---|
| 88128350 | 09:03 PM |
| 87923444 | 07:48 PM |

©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*

19AZF0229 DEVELCCHIA FRONTIER 0911

©2019 - Frontier Airlines

# FRONTIER
## LOW FARES DONE RIGHT

| 87923445 | 07:48 PM |
|----------|----------|

**RETURNING CUSTOMERS**

| PNR | Booking Date |
|-----|--------------|
| MYZGSG | 05/01/2018 |

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*