**<u>EXHIBIT 2</u>**

**Expert Report of Captain Vickie R. Norton, BSME, MSc, ATP**

**Contains Sensitive Security Information (SSI) per Protective Order (ECF No. 126)**

 Los Angeles ⋏ Vancouver ⋏ Toronto

September 27, 2022

**MEA File Number: 515557**

Park Avenue Law, LLC
201 Spear Street, Suite 1100
San Francisco, CA 94105

<u>**Attention: Mr. John McKay**</u>

**Re: Frontier Airlines Flight 2067**
**Incident Date: March 28, 2019**
**Your Case No. 2:19-cv-01322-KJD–DJA**

Attached please find our expert report for the above-captioned matter, prepared in accordance with the Federal Rules of Civil Procedure, Rule 26(a) (2). The conclusions can be found on page 13. The analyses behind these conclusions are described in earlier sections of the report.

If you have any questions or additional requirements, please call. Thank you for asking us to assist you in this matter.

Yours very truly,
**MEA Forensic Engineers & Scientists Inc**

Vickie R. Norton, BSME, MSc, ATP
Project Engineer/Airline Transport Pilot

Enclosure: Expert Witness Rule 26 Report



Los Angeles ⚛ Vancouver ⚛ Toronto

# Expert Witness Rule 26 Report

Re:                     Frontier Airlines Flight 2067
Accident Date:          March 28, 2019
Case No:                2:19-cv-01322-KJD-DJA

**Prepared for:**

Mr. John McKay
Park Avenue Law LLC
201 Spear Street, Suite 1100
San Francisco, CA 94105

**Principal Author:**

Vickie R. Norton, BSME, MSc, ATP
Project Engineer

Report Date:            September 27, 2022

MEA File Number:        515557

## TABLE OF CONTENTS

1.0   QUALIFICATIONS.................................................................. 1
2.0   INSTRUCTIONS.................................................................... 1
3.0   BACKGROUND ..................................................................... 1
4.0   SECURITY THREAT LEVELS.......................................... 4
5.0   IMPROPER PROCEDURES ............................................ 9
6.0   CONCLUSIONS AND OPINIONS.....................................13

APPENDIX A - CURRICULUM VITAE OF VICKIE R. NORTON, BSME, MSC, ATP
APPENDIX B - LIST OF MATERIALS AND DATA CONSIDERED
APPENDIX C - CREWMEMBER DIFFERING ACCOUNTS
APPENDIX D - COMPENSATION
APPENDIX E - PUBLICATIONS
APPENDIX F - DEPOSITION AND TRIAL TESTIMONY



## 1.0 QUALIFICATIONS

I, Vickie R. Norton, BSME, MSc, ATP, am responsible for the contents of this report. I am a project engineer with MEA Forensic, leading the Aviation Division for our Los Angeles office since January 2009. I am also a current, full-time captain for a major U.S. airline for the last 26 years with 16,000+ hours of flight time and approximately 8,200 hours as Pilot-in-Command (PIC) in Federal Aviation Regulations (FAR) Part 121 commercial scheduled service. I have been involved in the investigation of a wide variety of aircraft accidents and incidents for MEA since 2009, relying on my advanced degrees in Mechanical Engineering (BS) and Aviation/Aviation Safety (MSc), as well as my 34+ years of experience in the aviation sector. My curriculum vitae is attached in Appendix A.

## 2.0 INSTRUCTIONS

I was asked to review the materials listed in Appendix B and determine if the actions/omissions of the flight and cabin crew of Frontier Airlines Flight 2067 on March 28, 2019 were in accordance with industry-standard established and trained procedures/protocol, particularly with regard to in-flight security procedures regarding sexual misconduct and/or suspected human trafficking. Additionally, I examined whether the acts/omissions of the flight and cabin crew were in accordance with Frontier's own policies and procedures per the pilots' Flight Operations Manual (FOM) and the Flight Attendant Manual (FAM).

More specifically, my focus was to review the description of events and opine as to the spectrum of decisions made by the flight crew with respect to the separation of a minor child, ▇▇▇▇▇▇▇▇▇▇ (hereafter, AD) from his father, Peter DelVecchia (hereafter, PD). This analysis required consideration of all available information, including flight crew statements, actions and sworn deposition testimony evaluated against both Frontier's *own* operational and security-based training, procedures and protocols as well as those established throughout the industry and accepted as standard.

My analysis was further complicated by highly inconsistent and contradictory testimony provided by the entire flight crew; nevertheless, I attempted to exclude hearsay, speculation, unsubstantiated allegations, biases or opinions contained in individual flight crewmember statements and focus solely upon Frontier's own established guidelines for dealing with these (alleged) types of incidents. To assist the reader, a synopsis of crewmembers' conflicting accounts of the events which transpired on Frontier Flight 2067 is attached as Appendix C. Furthermore, I relied upon the analysis, opinions and conclusions of Ms. Lord-Jones, the Flight Attendant expert in this matter.

I am aware that my duty as an expert witness is to assist the Court and not act as an advocate for any party. This report has been prepared in accordance with that duty. If called upon to give oral or additional written testimony, I will provide said testimony in accordance with that duty.

## 3.0 BACKGROUND

Undisputed is the fact that PD and AD were initially seated in an exit row prior to departure; however, it was revealed during the exit-row safety briefing that AD was 12 years old and therefore unable to remain there due to a Federal Aviation Administration (FAA) requirement that exit row passengers be a minimum of 15 years old. This is an inquiry that Frontier's own Gate Agent should have made during the boarding process to avoid



subsequently inconveniencing the DelVecchias and two additional passengers by having to re-seat them, (potentially also delaying the flight's departure).

This situation represented the first encounter with the father/son pair by a member of the crew, the "C" Flight Attendant (FA), Anna Bond. The verbal exchange and subsequent relocation/seat exchange transpired uneventfully with no further issues noted, and FA Bond never again interacted with or spoke to the DelVecchias for the remainder of the flight.

After departure, the *sole* communication by any crewmember with the DelVecchias prior to their separation was during the beverage service provided by the "D" FA, Amanda Nickel. Upon approaching their row, Nickel asked AD if he would like something to drink. She testified that AD looked to his father; however, PD had fallen asleep, so AD merely shook his head "no" without verbally responding. (Notable is that all beverages other than water cost money on Frontier flights, a fact that AD would have been aware of from the cabin announcement prior to departure.)

Despite the entirely benign and brief nature of both encounters between Bond and Nickel and the DelVecchias (and without *ever* speaking to them herself), the "A" FA, Chelsie Bright-Sakurada, notified the Captain, Rex Shupe, and the First Officer (FO) Shawn Mullin, that she had observed "inappropriate touching between the adult and the minor." In his deposition, Shupe stated that "(S)he mentioned that there was a stroking on the face...she didn't give too many details other than there was touching on the face." (Shupe depo p. 15). Additionally, Shupe testified that someone stroking another person's face would not normally be cause for concern, but it was Bright-Sakurada's call to the cockpit asking for permission to come up and discuss it that made it an "unusual" situation. (Shupe depo p.18).

At no time when being presented with this information did Capt. Shupe utilize any leadership skills or logical attempts at data-gathering or fact-finding. In addition to not instructing Bright-Sakurada to determine the nature of PD and AD's relationship and make *certain* that the touching was nonconsensual, (e.g., ask non-threatening and targeted questions, ask to see boarding passes, etc.), Shupe also failed to contact his Dispatcher to ascertain same, (which would have been the most reasonable, straightforward and expeditious course of action). Only *after* taking the action to separate the DelVecchias did Shupe query Dispatch, asking, "ALSO IS THERE FURTHER INFO ON THIS ADULT." (9AZF0229 DELVECCHIA FRONTIER 0101). It is further notable that Dispatch replied three minutes later, "LEOS WILL MEET THE FLIGHT. NO NEW INFO ON ADULT." (9AZF0229 DELVECCHIA FRONTIER 0101). This is also a critical omission by Dispatch, as they had the opportunity to inform Shupe that PD and AD shared the same name, but did not. Shupe also testified at length that he himself could not go back and talk to the DelVecchias; however, the FAs are in his charge as Pilot-in-Command (PIC) and he could have very easily (and *should* have) directed Bright-Sakurada to gather additional information. In his deposition, Shupe agreed that at any time during the process he could have done exactly that, but did not. (Shupe depo p.52).

These were *critical* omissions by the PIC, as clearly the knowledge that PD and AD shared a surname and were, in fact, father and son would have shed a completely different light on the allegation of "inappropriate touching" and borne out the fact that it was a simple, consensual and loving expression of parental comfort. Of note, in his depo, Shupe agreed that if the passengers had responded that they are father and child and nothing was objectionable about their contact with each other, it would have been a nonissue. (Shupe depo p.52). Shupe further agreed that "inappropriate" means "nonconsensual" and that,



in order to determine if something is nonconsensual, you have to ask the persons involved if they consented. (Shupe depo p.53).

Shupe then instructed the FAs to conduct frequent "walk-bys" and report back to him, *specifically*, if there was an observation of "any more touching" between PD and AD. (Nickel depo, p.93-94). Shortly thereafter, a fourth FA, Scott Warren (having had *no* prior interaction with the DelVecchias), walked the length of the cabin and returned to the cockpit to directly relay to Shupe his "observation" that PD was now sexually molesting AD, (specifically that PD had his hand on AD's crotch area). Critically, Warren also *omitted* telling Shupe that both father and son were actually asleep at the time. Of note, Shupe testified that he agreed he wouldn't consider someone to be sexually molesting someone if the alleged molester is asleep. (Shupe depo p.23).

(Note: There are multiple, conflicting accounts regarding both the timing and purpose of Warren's cabin walk-through (or "trash run"), as well as conflicting testimony regarding specific verbiage used by Warren to describe the alleged molestation. Pertinent conflicting crewmember testimony is summarized in Appendix C.)

After receiving the "report" from Warren, Shupe testified that he solicited information from FAs Bond and Nickel regarding their observations. Bond did not go into detail regarding her own observations, only saying there "was something unusual about the two" and that "she was uncomfortable with the situation." Nickel said she had not "observed anything," but "agreed there was a situation." (Shupe depo p.21, 24-27). It is further notable that

Shupe, despite testifying under oath that "the buck stops with me," then made the ultimate decision to separate AD from PD with all four FAs "present," (presumably Bright-Sakurada and Warren in the cockpit, and Bond and Nickel on the intercom) and agreed that "everyone in the cockpit agreed that the best thing to do was to separate them." (Shupe depo. p.30). This crucial decision was made irrespective of the fact that Shupe made no further attempt(s) to obtain any additional significant or relevant information, despite the myriad resources at his disposal.

What PIC Shupe *should* have said during this discussion was that they (the pilots) had no formal training on sexual misconduct/suspected human trafficking, and asked what FA training/protocols were and if the FAs believed they were required. Subsequent to that, if Shupe's decision *was* to carry out the FA protocol, the FAs should have been directed to follow their required actions and report back, prior to even *considering* separating the DelVecchias. As detailed further in Section 5.0, none of the guidance provided to the FAs by Frontier for these suspected types of incidents was ever followed.

Instead, Shupe then directed FA Warren to return to the cabin and physically separate AD from PD; a task Warren accomplished, (after neither having asked for nor been given specific guidance from Shupe as to how to carry this out). Once again, multiple conflicting accounts and sworn testimony is in evidence as to how the separation was achieved; however, for the purposes of my investigation, the critical fact is that it was *not* done in accordance with any of Frontier's established policies or procedures. This will also be discussed further in Section 5.0.



been made to separate the DelVecchias, because he "wanted to back that up, just to make sure..." (Shupe depo p.33).

█████ ████████████████████

A thorough understanding of the background, intent, identification of and required actions of the security threat levels is essential for the reader at this juncture.

In order to assist the reader's understanding and ensure that the discussion is germane to the matter at hand, a "generic" description of this information will be avoided, replaced in its stead by Frontier's *own* description of the purpose and definition of the ███████████

████████████████████████████

Specific and actual verbiage from ████████████████████████ follows:

### LEVELS OF THREAT

████████████████████████████████████████████

(This information is included to draw attention to the fact that, despite Shupe ultimately requesting law enforcement to meet the aircraft and also arriving at the (incorrect) conclusion that this was ██████████████████████████████
or FA onboard Frontier Flight 2067.)





Nothing in evidence suggests that the DelVecchias were anything but compliant and model passengers.







CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER



In addition to the information provided to all crewmembers regarding the security Threat Levels, Frontier FAs have been provided additional, very specific guidance regarding incidences of reported sexual misconduct and/or suspected human trafficking.





CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER



CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER

The latter is a bi-weekly briefing bulletin used to educate FAs on important topics; the bulletin listed as *Memo 19-06, January 25, 2019*, dealt with the topic of suspected human trafficking. (Note: Again, Flight 2067 occurred just over two months after this publication was issued, so this critical information should have *also* been top-of-mind for the FAs.)

In part, the January 25, 2019 *INFLIGHT FLYER* reads:

*If you suspect a passenger may be a victim of human trafficking:*

- *Initiate non-threatening conversation and ask targeted questions: (Where they are traveling; are they going on vacation or visiting relatives; where they are staying; who will be meeting them; what they will be doing, etc.*

- *Take note if traveling companion(s) appears nervous or prevents the child/person from answering questions or if their answers seem evasive.*

- *Contact the Captain and inform him/her of your suspicions. Provide specific details of the situation and explain why you believe the behavior exhibits signs of human trafficking.*

- *The Captain will evaluate the information and if appropriate, involve law enforcement to resolve the concerns.*

The purpose of providing this information to the reader is to delineate in Section 5.0 which procedures were followed improperly and which were not followed at all.

## 5.0 IMPROPER PROCEDURES

As highlighted above, a multitude of Frontier Airlines' procedures and policies were either improperly followed, only partially followed, or not followed whatsoever. This is true of the Gate Agent, FAs, Pilots and Dispatcher working Flight 2067.

Gate Agent: Beginning chronologically with the Gate Agent, the DelVecchias were initially allowed to board Flight 2067 with seats in an exit row, despite the fact that AD was a minor child under 15 years of age. This problem could and should have been rectified by the agent prior to boarding, as it is the Gate Agent's responsibility to verify exit row eligibility upon scanning the boarding passes of passengers seated in exit rows, and Frontier's agent clearly failed to do so.





3. Incomplete and inaccurate information was provided to Shupe regarding the level and nature of the "threat," as Shupe was never told the DelVecchias were sleeping.

Moreover, irrespective of whatever "suspicions" had arisen for the FAs (which were never actually clarified; i.e., whether PD was engaged in sexual misconduct and/or that AD was being trafficked), Frontier's _own_ procedures and guidance for either/both incident(s) were not followed, as detailed below.

Specifically with regard to sexual misconduct (SM), the first requirement is that it be **reported** to a FA. There is no testimony I've reviewed from any of the four FAs or the two pilots to indicate that a report of SM was ever made by _any_ individual.

Nevertheless, if the assumption is that suspected SM was the protocol being followed (despite it _not_ having been reported), the next requirement is to advise the affected individual who has reported the misconduct that they are being removed from the situation and subsequently do so. In this case, the "individual" would have been AD, (had he actually reported the "misconduct," which he did not). Further, the "affected" individual is to be advised that he/she is being moved by using this specific verbiage: "_For your safety, we are removing you from the situation. The pilot will be notified, and Law Enforcement will meet the aircraft upon arrival at the gate._" Instead, FA Warren testified that he did not tell AD why he was being moved as it was happening. (Warren depo p. 84).

Next, an able-bodied passenger (ABP) should have been seated next to the _accused_. In this case, the "accused" would have been PD, had AD actually accused him of anything, (which, once again, he did not). Instead, the ABP, Christopher Higgins, was improperly seated at the end of the row near the rear of the aircraft where _AD_ was relocated.

The next step in the protocol would be to notify the flight deck crew of the incident. As the pilots were already aware of the FAs' concerns and Shupe had already ordered Warren to separate the DelVecchias, the SM protocol was clearly not being followed in its intended order by either the pilots _or_ the FAs. More significantly, the FAs are then instructed as per the protocol, "_Do not engage in discussion about the incident._" In _direct_ contradiction to this requirement, FA Warren testified that he intentionally sat next to AD after (inappropriately) moving him and engaged AD in a prolonged and unauthorized conversation about the "event," (including asking him upsetting and shockingly insensitive questions regarding the location of his father's hand near his crotch, etc.).

Next, the FAs were required to make an announcement asking all passengers to remain seated upon landing, and not to open the main cabin door (MCD) until a law enforcement officer (LEO) was present. Additionally, they were to provide the LEO with the name of the "affected individual" (i.e., AD) and the seat number of the "accused" (i.e., PD). I have reviewed no evidence that any of these required actions occurred.

Finally, the FAs were required by Frontier to submit an Incident Report within 24 hours of the flight. Instead, each of the four FAs testified to the fact that they had not done so, with no explanation as to the reason(s) for their non-compliance.

Specifically with regard to suspected human trafficking (HT), the FAs were required to first initiate non-threatening conversation and ask targeted questions to gather information and assess potential risk to the child: (e.g., where they are traveling; are they going on vacation or visiting relatives; where they are staying; who will be meeting them; what they will be doing, etc.). This _critical_ first required action was never undertaken by any of the



four FAs. Moreover, the "A" (lead) FA, Bright-Sakurada, never even attempted to _speak_ to the DelVecchia family in order to make an assessment.

Next, the FAs were required to take note if the traveling companion(s), (in this case, PD) appears nervous or prevents the child/person from answering questions or if their answers seem evasive. As a reminder, FA Bond had the initial interaction with the DelVecchias during the exit row briefing, and testified that AD had answered _for himself_ that he was twelve years old. (The reader is directed to Appendix C for the differing accounts that followed; however, it is critical to note that Bond didn't feel the need to notify Bright-Sakurada or Captain Shupe of anything unusual about the interaction immediately after reseating the DelVecchias.) Secondly, nothing about both PD and AD each subsequently _falling asleep_ during the flight would suggest that either were nervous or that AD was somehow under duress. It is further notable that AD was asleep, as if he _was_, in fact, being trafficked and/or held against his will, he could have capitalized upon the opportunity when PD was asleep to subtly get the attention of one of the FAs in order to alert them and/or ask for help. Similarly, it is illogical that PD would allow himself to fall asleep and provide such an opportunity for AD if he were, in fact, trafficking him.

Next, per the HT protocol, the FAs were required to contact Captain Shupe and inform him of their suspicions. (Specifically, as per Frontier's procedures, the other FAs were required to go through Bright-Sakurada as the "A" FA, who should have then been the sole FA to contact Shupe. Once again, this requirement was not followed.) The "A" FA should have then provided **specific details of the situation** to Shupe and explained why the FAs believed the behavior exhibited signs of human trafficking. Obviously, this was all but impossible, as the FAs never even followed the initial requirement to ask questions and gather information from the DelVecchia family.

The next step in the suspected HT protocol would have been for Captain Shupe to evaluate the information and if appropriate, involve law enforcement to resolve the concerns. As the FAs didn't follow the procedures and protocols required by their training, including not reasonably providing Shupe with a complete and accurate set of information, the result was the omission of critical information required for Shupe to make the best decision possible. Instead, he ordered that a minor child unnecessarily and traumatically be separated from his father.

The final requirement per the HT protocol per ▇▇▇▇▇▇▇ was for the FAs to submit an Incident Report within 24 hours fully describing the suspicious activity/event. Once again, each of the four FAs testified to the fact that they had not done so, with no explanation as to the reason(s) for their non-compliance.


Pilots: Throughout the event, Captain Shupe did not follow Frontier's required protocol regarding the recognized chain-of-command during abnormal and emergency situations in which the "A" FA acts as liaison to the flight deck and coordinates cabin crew actions as instructed by the captain. (FOM Sec. 15.20, p.1). Additionally, Shupe testified to allowing more than one FA in the cockpit during flight, which is a violation of Frontier's security procedures. (FOM Sec 50.20 p.7; FRONTIER 1004 and 1087).

As previously stated, Shupe testified about the lack of guidance the pilots have with regard to SM or "inappropriate touching." It is therefore even _more_ inexplicable that Shupe ultimately ordered the DelVecchias to be separated by relying solely upon surveillance by the FAs, that was specifically directed toward, and limited to "touching," when the relevant protocols require the collection of information through verbal interactions with the affected



passengers. It is further incomprehensible that Shupe would not ask the FAs to walk him through their _required procedures and protocols_ for SM and/or HT and subsequently direct the FAs to carry them out before making any decision as to the appropriate course of action. If it somehow didn't occur to Shupe to direct the FAs to first seek information directly from the DelVecchias, then following the FA protocols would have led him to that course of action, anyway. Shupe's refusal to ask for information from the passengers themselves is not only inexplicable but suggests that he had prejudged them to be engaging in improper conduct before completing a comprehensive effort to gather all of the relevant facts.



Dispatch: As previously mentioned, Dispatch failed to take any initiative to determine additional information regarding the DelVecchias, (such as a shared surname) or offer Shupe any assistance from Frontier's Security department in order to assist in his decision-making. These failures, in addition to the absence of any formal training or guidance from Frontier for their pilots in the event of SM or suspected HT, contributed to the poor (and incorrect) decision to separate AD from his father.

## 6.0 CONCLUSIONS AND OPINIONS

1.) Captain Shupe was the Pilot-in-Command of Frontier Flight 2067 on March 28, 2019, and had authority over all assigned crewmembers on the flight throughout the flight duty time.

2.) Captain Shupe was the designated Inflight Security Coordinator (ISC) on Flight 2067 and was responsible for, among other things, crew coordination and awareness, passenger comfort and satisfaction, and compliance with all regulations, company policies and procedures.

4.) Captain Shupe was trained and expected to utilize good communication that minimized opportunities for misunderstandings and inaccurate assumptions.

5.) Captain Shupe was trained and expected to properly use his authority and leadership to reach a resolution consistent with the highest standards of safety and professionalism.

6.) Captain Shupe was trained and expected to identify, assess and counter any issue or event threatening the safety of the flight, and not introduce additional threats or errors by failing to do so.

7.) Captain Shupe did not follow his training and guidance in accordance with #1-6, above, throughout Flight 2067.

10.) The Frontier Gate Agent failed to ascertain AD's age before allowing him to occupy an exit row seat.

11.) The FAs failed to follow Frontier's procedures and guidance regarding sexual misconduct.

12.) The FAs failed to follow Frontier's procedures and guidance regarding suspected human trafficking.

14.) The Dispatcher for Flight 2067 failed to provide any additional information or guidance to the pilots to assist in their decision-making.

15.) Frontier failed to provide any formal training, procedures or guidance to pilots with regard to addressing sexual misconduct or suspected human trafficking.



14

I may use portions or all of the documents and data listed in Appendix B, as well as any photographs, video, computer-generated animations and/or any exhibit prepared or used by other experts in this matter to support or supplement my conclusions.

The above conclusions are subject to supplementation depending upon the receipt of any additional information relevant to this case and not previously reviewed.



## Appendix A - Curriculum Vitae of Vickie R. Norton, BSME, MSc, ATP

**VICKIE R NORTON,** BSME MSc ATP
**PROJECT ENGINEER/AIRLINE TRANSPORT PILOT**

### EDUCATION

Masters of Science Aviation/Aviation Safety, Florida Institute of Technology, 2014.
Bachelor of Science Mechanical Engineering, Michigan Technological University, 1988.

### PROFESSIONAL ASSOCIATIONS

Human Factors and Ergonomics Society, 2015
National Association of Professional Women, 2015
The Honor Society of Phi Kappa Phi, 2014
Lawyer-Pilots Bar Association, 2010
Airline Pilots Association, since 1995
Aircraft Owners and Pilots Association, since 1994
Southern California Professional Engineers Association, 1989 to 1994

### PROFESSIONAL EXPERIENCE

### MEA FORENSIC ENGINEERS & SCIENTISTS

Project Engineer, 2009 to Present

Responsible for technical investigations involving aircraft accident/incident reconstruction, system/powerplant malfunctions and failure analysis, operational, maintenance, regulatory and human factors effects. Case analysis includes NTSB report review; aircraft design/operating envelope, component design, assembly and installation; compliance with and adequacy of maintenance manuals and required inspection, repair and overhaul schedules, Service Bulletins and Airworthiness Directives; pilot-in-command training, licenses, ratings, proficiency and recency of experience; preflight planning and prevailing weather conditions, and the potential effects of "third party" (non-pilot) error, e.g. Air Traffic Control, flight dispatch, aircraft fueling/loading, airfield lighting/signage defects, etc.

### UNITED AIRLINES

Captain, 1995 to Present

Responsible for the safe operation and the final authority of commercial flights operated under FAA Part 121

Scheduled Air Carriers for United Airlines, 15,000+ flight hours with over 8,000 hours as Pilot–in-Command at UAL. Type rated in the B767, B757, B737 and A-320; B747 Flight Engineer qualified. Experienced in operations in the domestic U.S., Alaska, Hawaii and Canada; Latin America, including Mexico City and San Salvador, and the Pacific Rim, including Narita, Osaka, Beijing, Shanghai, Seoul, Guam and Saipan. Currently qualified and operating as a Los Angeles–based Boeing 737 Captain.

### RENO AIR EXPRESS

First Officer, 1994-1995

Operated British Aerospace Jetstream 31/32 twin turboprop aircraft as Second-in-Command for commercial flights under FAA Part 135 rules for commuter flights. Experienced in operations including no-autopilot, winter ops/icing, mountain flying and short-field takeoff and landing procedures.

### MCDONNELL DOUGLAS CORPORATION/DOUGLAS AIRCRAFT COMPANY, (DAC)

Project Engineer/Team Leader, 1989-1994

Mechanical engineering applications ranging from product development through flight test, certification and product support engineering. Managed in-house design teams and commercial vendors from initial RFP through FAA certification. Authored technical information for airline training and maintenance manuals. Performed Failure Mode Analysis of both pre-certification as well as failed in-service components, including stress, strain, vibration and



metallurgical analysis.  Participated in multiple Twinjet and Trijet on-site flight test programs in locations ranging from Edwards AFB, CA to Yuma, AZ to Roswell, N.M. Oversaw and certified vendor design and dynamometer testing through company FAA Designated Engineering Representative (DER) status.  Member of joint FAA/DAC Weekly Accident/Incident Investigations Board, including failure sequences through analysis and overlay of digital flight data and cockpit voice recorders.  Primary FAA/NTSB contact for DAC Brake Systems and Engineering Department. Presented various DAC engineering reports and accident/incident summaries at annual Team Conference and industry events, as well as FAA/NTSB hearings.

## MAJOR PROJECTS

Commercial aircraft steel brake performance/certification through FAR Part 25 aircraft flight testing and laboratory dynamometer testing.  All testing was full-spectrum to include light weight and speed configurations up to and including maximum kinetic energy rejected takeoffs, (RTO's).

Re-established commercial aircraft industry steel brake wear limits as a result of investigation of major U.S. airline runway overrun.  Affected aircraft were DC-8/DC-9/DC-10 and MD-80 series; brake wear limits were adjusted downward to reflect operation in a field-worn condition.  Deposition given in U.S. District Court, Southern District of New York case of Goodyear Tire and Rubber Co. vs. McDonnell Douglas Corp., 1993.

MD-80 series aircraft landing gear vibration induced by brake and antiskid systems, resulting in multiple landing gear failures on touchdown.  Investigation included detailed systems analysis of hydraulic response, hydraulic cross-talk and servo control valves integrated with MD-80 landing gear, braking system and antiskid control unit logic.

MD-80 series aircraft foreign object debris (FOD) investigation into the aft-mounted engines "fodding" when operating on non-grooved runways or those otherwise contaminated by standing water, snow or slush.  Resulted in design and installation of nose landing gear-mounted spray deflectors.

MD-11 initial carbon brake development, full spectrum FAR Part 25 flight testing and integration with upgraded (from DC-10) antiskid, autobrake and brake temperature–monitoring/tire pressure–indicating systems and their associated software.

## PUBLICATIONS

Norton VR, Bailey MN (2011). Aircraft Accident Investigation: Eight Tips for Deploying an Aviation Expert. The Advocate, pp 82-86.

Norton VR (2015). Pilot Duty of Care and the Role of the Human Factors Expert. MEA Forensic Publications, Aviation Series.

## LECTURES AND PRESENTATIONS

March 2016 – Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

May 2015 - Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

November 2014 – Human Factors Considerations in General Aviation Accident Investigations, 2014 International Air and Transportation Safety Bar annual conference in New York, NY.

July 2014 – Pilot Duty of Care and the Role of the Human Factors Expert, 2014 American Association for Justice annual convention in Baltimore, MD.

April 2014 – Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

April 2013 – Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

May 2012 – Introduction to Aerospace Engineering, Long Beach State University, Long Beach, CA.

July 2011 – Court Reporting Tips from an Expert Witness, Sage College School of Court Reporting, Moreno Valley, CA.

May 2011 – Introduction to Aerospace Engineering, guest speaker at Long Beach State University, Long Beach, CA.

July 2010 – Top Three Things a Commercial Airline Pilot Would Change to Improve Aviation Safety. Aviation Section, American Association for Justice 2010 Annual Convention, Vancouver, BC.

May 2010 – Introduction to Aerospace Engineering, guest speaker at Long Beach State University, Long Beach, CA



February 2010 – Captain/Dispatcher Joint Authority under Part 121. Lawyer-Pilots Bar Association Winter Meeting, Hawks Cay Resort, FL.

## PROFESSIONAL DEVELOPMENT/TRAINING

2016 – 50th Annual SMU Air Law Symposium, Dallas, TX.

2014 – Fatigue Risk Management Systems (FRMS), Capstone Project, Florida Institute of Technology.

2014 – Aviation Security, Florida Institute of Technology.

2014 – 48th Annual SMU Air Law Symposium, Dallas, TX.

2013 - Aircraft Accident Investigation, Florida Institute of Technology.

2013 – 47th Annual SMU Air Law Symposium, Dallas, TX.

2013 – Safety Management Systems, Florida Institute of Technology.

2013 – Advanced Aviation Physiology, Florida Institute of Technology.

2012 – Complex Aviation Systems, Florida Institute of Technology.

2012 – Human Factors in Man-Machine Systems, Florida Institute of Technology.

2012 – 46th Annual SMU Air Law Symposium, Dallas, TX.

2011 – Lawyer Pilots Bar Association, Carlsbad, CA.

2011 – 45th Annual SMU Air Law Symposium, Dallas, TX.

2010 – American Association for Justice 2010 Annual Convention, Vancouver, BC.

2010 – 44th Annual SMU Air Law Symposium, Dallas, TX.

2010 – Lawyer-Pilots Bar Association (LPBA) Winter Meeting, Hawks Cay Resort, FL.

2009 – USC Viterbi School of Engineering, Aviation Safety & Security: "Legal Aspects of Aviation Safety" Course.

2008 – FAA/United Airlines Runway Incursion/Operational Safety Course.

2005 – Private Rotorcraft - Helicopter license.

2004 – A-320 Type Rating.

2002 – United Airlines/FAA Advanced Security Training. (Domestic and International Operations)

2001 – 737 Type Rating.

1998-2001 – FAA Part 121 Extended Twin-Engine Over Water Operations (ETOPS)

1998 – 757/767 Type Rating.

1995 – Present - Annual Recurrent Qualification Training, United Airlines.

1995 – Present - FAA/UAL Security Training.

1995 – Present - Emergency Evacuation Training.

1995 – Present - Hazardous Materials Training.

1995 – Present - Takeoff and Landing Performance Calculations, (i.e. cluttered runway, bleeds-off, thrust-reverser inoperative, etc.)

1995 – Present - Windshear/Microburst Training and Recovery.

1995 – Present - Aircraft Unusual Attitude/Upset and Recovery.

1995 – Present - Winter Operations Training and Procedures.

1995 – Present - Proficiency Training/Proficiency Checks on currently qualified fleet in 9-18 month intervals.



1995 - 747 Flight Engineer License.

1995 - United Airlines "Actual Fire" Course. (Identification by fire type, location; methods of fighting)

1994-Present – Emergency Procedures Training for Commercial and Transport Category Aircraft Systems Failures/Engine Failures/Fires/Shutdowns.

1994-1996 - Consultant FAA DER with "Systems and Equipment" designation by FAA authorizing office ANM-130L.

1994 - Certified Flight Instructor (CFI) Airplane Single Engine Land, Ground Instructor. (non-current)

1992-Present – FAA Air Traffic Control Procedures/Airspace Requirements.

1991 - Awarded Company (Douglas Aircraft Co.) FAA Designated Engineering Representative (DER) with "Systems and Equipment" designation by FAA authorizing office ANM-130L.

1990-1994 – NTSB Probable Cause Report review/analysis.

1990-1994 - Presenter at annual Douglas Aircraft Company/Industry "Team Conference" Meetings.

1990-1992 – MD-11 FAR Part 25 Certification/Flight Test.

1990 - Accident Investigation Assistance Seminar. (Douglas Aircraft Company)

1989-1991 – Major Air Carrier Brake Overhaul/Maintenance Compliance Analysis.

1989 – Failure Mode Effects Analysis (FMEA) and Fault Tree Analysis (FTA) of Transport Category Aircraft Brake, Antiskid and Autobrake Systems.



## Appendix B - List of Materials and Data Considered

- Documents:
  1. Complaint
  2. DelVecchia 7th Supplemental Disclosures:
     - Records from Wright State University
     - State of Arizona Dept of Child Safety
     - Cleveland Clinic Health System
     - National Heritage Academies
     - Warrensville Heights High School
     - UNC Health
     - Raleigh Neurology Associates
     - Duke Health
     - Susan Snider, LCSW
     - Three Oaks Behavioral Health & Wellness
  3. Frontier Documents:
     - 19AZF0229 DelVecchia Frontier 0085-0121
     - 19AZF0229 DelVecchia Frontier 0122-0143
     - 19AZF0229 DelVecchia Frontier 0144-0196
     - 19AZF0229 DelVecchia Frontier 0197-0200
     - 19AZF0229 DelVecchia Frontier 0201-0204
     - 19AZF0229 DelVecchia Frontier 0205-0208
     - 19AZF0229 DelVecchia Frontier 0209-0247
     - 19AZF0229 DelVecchia Frontier 0262-0267
     - 19AZF0229 DelVecchia Frontier 0268
     - 19AZF0229 DelVecchia Frontier 0269
     - 19AZF0229 DelVecchia Frontier 0294-0297
     - 19AZF0229 DelVecchia Frontier 0298-0604
     - 19AZF0229 DelVecchia Frontier 0605-0630
     - 19AZF0229 DelVecchia Frontier 0631-0660
     - 19AZF0229 DelVecchia Frontier 0661-0689
     - 19AZF0229 DelVecchia Frontier 0702-705
     - 19AZF0229 DelVecchia Frontier 0706-709
     - 19AZF0229 DelVecchia Frontier 0710-718
     - 19AZF0229 DelVecchia Frontier 0720-0735
     - 19AZF0229 DelVecchia Frontier 0736-0895
     - 19AZF0229 DelVecchia Frontier 0896
     - 19AZF0229 DelVecchia Frontier 0897-0912
     - 19AZF0229 DelVecchia Frontier 1135-1427
     - 19AZF0229 DelVecchia Frontier 0913-0935
     - 19AZF0229 DelVecchia Frontier 0936-0976
     - 19AZF0229 DelVecchia Frontier 0977-1077
     - 19AZF0229 DelVecchia Frontier 1078-1134
     - 19AZF0229 DelVecchia Frontier 1442-1589



- Code of Ethics (Frontier 1442-1452)
- 05.05 Page 2 of Employee Handbook (Frontier 441)
- LVMPD 001-003
- Standards of Conduct (Frontier 1428-1440)

- Depositions:
    1. ███ DelVecchia
    2. Alexis Franzese
    3. Amanda DelVecchia
    4. Amanda Nickel
    5. Anna Bond
    6. Chelsie Bright
    7. Christopher Campbell
    8. Christopher Higgins
    9. Gayle DelVecchia
    10. Leslie Bryant
    11. Lori Merritt
    12. Peter DelVecchia
    13. Rex Shupe
    14. Scott Warren
    15. Shawn Mullin



## **Appendix C – Crewmembers' Differing Accounts**

### **Chelsie Bright/Sakurada:**

Bright/Sakurada was designated as the "A" flight attendant during Frontier Flight 2067. She uses her maiden name, "Bright" with Frontier. (References to her use "Bright/Sakurada" to avoid confusion, as her deposition transcript refers to her by her married name.) She is a white female and was 26 years on the date of the incident. Bright/Sakurada never once interacted with or spoke to the DelVecchias, (despite being the "A" flight attendant who should have been the direct and sole liaison to the cockpit, as per Frontier's procedures).

Bright/Sakurada testified that she only went into the cockpit once, and that Scott Warren came in after her, based on a call from the cabin saying that he had additional information. She claims she did not call the cockpit until after the meeting of all four flight attendants in the front galley and their collective agreement that they felt "uncomfortable" upon learning that Bright/Sakurada and Nickel had seen the face-touching. (Nickel denied in her deposition ever seeing it.) That conversation also included Bond reporting falsely that Peter had answered for ▇▇▇ and had insisted that he sit against the window in Row 17, (which Bond later denied in her deposition). She claims that Captain Shupe suggested taking a bathroom break when she called, but that she entered the cockpit and delivered her report before either pilot left. She testified she was still talking to both of the pilots when the call came that Warren wanted to come up to the cockpit. Warren then entered and said that he had seen Peter's hand resting on ▇▇▇ crotch. (In Bright/Sakurada's version, only she and Warren enter the cockpit.)

### **Scott Warren:**

Warren was designated as the "B" flight attendant during Frontier Flight 2067. He is a black male and was 35 years old on the date of the incident. Warren is the only flight attendant who claimed to have seen Peter DelVecchia commit an act of sexual molestation, and he is the only one who reported the alleged "observation" to the Captain.

Warren claims that someone requested him from inside the cockpit (not that he or someone else called saying he had something to add, as conflicting testimony suggests). He said the pilots already knew about the face-touching when he entered the cockpit, and he cannot recall whether another flight attendant entered *after* him. He said that the Captain did the talking when he arrived the first time, and asked him to "go have a look" at the DelVecchias. He stated that he then walked to the back, returned to the front, and knocked on the cockpit door. He was allowed in, and reported to the pilots that he had seen Peter's hand on ▇▇▇ penis. (There is multiple, conflicting testimony regarding exactly what Warren said.) Warren also admitted in his deposition that he withheld from his report to the Captain that he had observed both of the DelVecchias sleeping during his "trash run." Warren said he was then instructed by Shupe to separate the DelVecchias, and exited the cockpit to strategize with the other flight attendants about how to accomplish that. No other FA or pilot account matches Warren's, up to the point of Shupe telling him to separate Peter and ▇▇▇ (In Warren's version, it is conceivable that someone might have been in the cockpit prior to him and had departed by the time he arrived, and Nickel might have entered *after* him.)



**Amanda Nickel**:

Nickel was designated as the "D" flight attendant during Frontier Flight 2067. She is a white female and was 39 years old on the date of the incident. Her only direct interaction with the DelVecchias was to ask ███ ████ if he wanted a drink during the beverage service. She testified that ████ looked to Peter after being asked, saw that he had fallen asleep, and then shook his head "no" without saying anything.

In opposition to Bright/Sakurada's account, Nickel testified that nobody had directly witnessed the face-touching when the flight attendants met in the forward galley, and Bright/Sakurada left the meeting to do a trash run and reporting having just seen it when she returned. Nickel further testified that only Bright/Sakurada had seen it, but a general feeling of "discomfort" about the DelVecchias led to "safety" concerns and the subsequent call to Shupe. Nickel said Bright/Sakurada called the cockpit, and the pilots immediately took a restroom break. Presumably, Bright/Sakurada delivered her report upon entering, as Nickel testified that Shupe then came out and addressed the other three flight attendants in the galley about the DelVecchias, instructing them to perform frequent "walk-bys" and to report any observations such as "more touching." Nickel said Shupe then returned to the cockpit. Warren, who had been present for Shupe's instructions, then walked from the front of the cabin to the back and returned, at which point he said he had seen Peter's hand "in between" ████ legs in the genital area. Nickel said she and Warren then entered the cockpit, and Bright/Sakurada was no longer there. (In her version, Bright/Sakurada, Warren and her all entered the cockpit, although Bright/Sakurada entered and left alone.)

**Bond**:

Anna Bond was designated as the "C" flight attendant during Frontier Flight 2067. She is a white female and was 24 years old on the date of the incident. Her only direct interaction with the DelVecchias was during the pre-departure exit-row briefing, when she saw ████ seated in the exit-row seat, 13E. She testified that ████ "looked like a young child," so she asked him his age, and that he answered, "twelve." She then explained to Peter that the minimum age requirement for an exit row was 15 and asked him if he would like them to be reseated together, and Peter responded yes. Bond then located a couple in row 17 who were willing to be relocated to the exit row, and the DelVecchias and that couple then exchanged seats, with nothing notable about the interaction. Bond never again interacted with or spoke to the DelVecchias during the remainder of the flight.

Bond recalled that all four flight attendants met in the front galley prior to Bright/Sakurada calling the cockpit. She recalled Bright/Sakurada entering the cockpit, and one of the pilots exiting and speaking to the remaining three of them about Peter and ████ Bond said it was then that "Scott had an idea saying, let me go up and do a walk through in the cabin, and see if there is anything suspicious while the Captain is out here." (She later corrected herself and noted that she did not remember whether it was the Captain or the FO.) She testified that she thought Warren's idea "would help the situation." She said Scott then entered the cockpit after returning from his walk. Assuming the pilot in the galley was Shupe, Bond's account closely matches Nickel's. According to Bond, she never entered the cockpit during the flight. (However, First Officer Shawn Mullin specifically identified her as the first flight attendant to enter the cockpit, and said that she gave a firsthand report of her "observations" of the DelVecchias in the exit row and during reseating to Row 17).



(Under Bond's version, Bright/Sakurada and Warren entered the cockpit. She does not mention Nickel entering).

## Captain Rex Shupe:

Shupe was the Captain and Pilot-in-Command of Frontier Flight 2067.

Shupe testified the day after Bright/Sakurada, in the same city and after having met with Attorney Tara Shelke; (Shelke had also attended Bright/Sakurada's deposition). Although Shupe denied knowing what Bright/Sakurada had said, his version is similar to hers. Shupe testified to Bright/Sakurada entering the cockpit and delivering the report about face-touching, and that, while she was there, Warren then entered the cockpit after someone called and said that he had additional information to share. Shupe said he then ordered the passengers separated based on Threat Level 2, but that he did not consult the text of the Threat Levels until after both flight attendants had exited the cockpit. Shupe claims that he did not know the DelVecchias were father and son, or that one was black and one was white, but knew it was a man traveling with a male child. His version included nothing about First Officer Mullin other than to say he couldn't recall what Mullin added to the conversation, "if anything." (Under Shupe's version, Bright/Sakurada and Warren enter the cockpit.)

## First Officer Shawn Mullin:

Mullin was the First Officer and Second-in-Command of Frontier Flight 2067.
In Mullins's account, there was an initial call to the cockpit that was delivered only over the phone and only to Captain Shupe via his headset. The report was that the flight attendants were "working on something in the back" that was a "potential situation" involving an older gentleman traveling with a younger child and unspecified "inappropriateness" of an unspecified "sexual" nature, and that Captain Shupe told them to continue to monitor it and report back. After ending the call, Shupe briefed Mullin, and they both began searching their Flight Operations Manual to formulate a "game plan" and "checklist" of actions to take if the situation became "an increasing level of threat." He says the flight attendants were also seeking additional procedures. He does not know what Shupe looked at exactly, but he knows he (Mullin) looked at the Threat Levels. At the time of the initial call, they did not think there was either a Threat Level 1 or a Threat Level 2. They did not yet know the skin colors of the DelVecchias or their names, but they later got information on skin colors from one of the flight attendants when they asked for a more specific description because they did not have their names. He said there was then a second call to the cockpit asking if they wanted to take a bathroom break which they did. A "female" flight attendant entered, and Shupe exited first. When Shupe came back in, they transferred controls and Mullin exited for his bathroom break. When he returned, the flight attendant stayed and she and Captain Shupe had a "conversation about what was going on." Mullin then sent the first of two ACARS messages, then the flight attendant exited the cockpit. Subsequently, another flight attendant entered, followed by a second flight attendant. He could not recall the exact order, but it was either another female and then the male, or the male and then another female. Either way, both of the remaining two flight attendants were eventually in the cockpit simultaneously. Mullin thinks it was a "series of minutes" between them, and that the second one came in after the flight attendants who were outside the cockpit door called, saying that another flight attendant wanted to enter to report additional information. (Thus, the third had to be Warren, making



the second Nickel, as Bond testified that she never entered the cockpit—however, Mullin later identified the *first* flight attendant to enter the cockpit as being Bond). He thinks both flight attendants reported that Peter's hand was in between ██████ legs, and also that Peter had been asked twice to stop his conduct relative to ███ He said that "the four of us collectively" made the decision to separate the two by reseating ████ (Under his version, Bond, Warren and one other female FA entered the cockpit, with Bond entering first and leaving before anyone else entered.)

### Witness Christopher Higgins (the Able-Bodied Passenger):

Higgins was a passenger on Frontier Flight 2067 and is a detective with the Wake Forest Police Department and former NYPD detective who was off-duty during the flight. He was enlisted by Warren (inappropriately as per Frontier's procedures) to serve as an able-bodied passenger after the DelVecchias were separated in order to ensure Peter stayed away from ████ for the remainder of the flight. Higgins testified that he saw First Officer Mullin standing in the front galley, outside of the cockpit, observing as Warren separated the DelVecchias. (Higgins depo. p. 109). According to Shupe's testimony, this would have had to have been *after* Shupe "declared" a Threat Level 2. Additionally, this directly contradicts Mullin's testimony that he was in the cockpit and did not see the actual separation take place. (Mullin depo p. 91).



## <u>Appendix D – Compensation</u>

The compensation to be paid to my employer, MEA Forensic, for my review, analysis, expert report, travel, depositions and trial testimony for this case is at the rate of $475.00 per hour, and is in no way predicated upon the outcome of the case.



**Appendix E – Publications**

Norton VR, Bailey MN (2011). Aircraft Accident Investigation: Eight Tips for Deploying an Aviation Expert. The Advocate, PP 82-86.

Norton, VR (2015). Pilot Duty of Care and the Role of the Human Factors Expert. MEA Forensic Publications, Aviation Series.



## Appendix F – Deposition and Trial Testimony

### Trials

| Date | Case Name | Law Office | Venue |
|------|-----------|------------|-------|
| May 1, 2013 | Jaspers vs. Bonde | Law Offices of Frank W. Mitchell | Las Vegas, NV |
| June 15, 2015 | IARDC vs. In Re Ribbick Law | Illinois Attorney Registration & Disciplinary Commission | Chicago, IL |
| July 8, 2019 | Ilczyszyn vs. SWA | Balaban & Spielberger | Oakland, CA |
| June 22, 2022 | Walker vs. Messina | Lane Powell | Seattle, WA. |
| August 26, 2022 | Boeing/USDOJ DPA | Paul Cassell, Professor of Law | Fort Worth, TX. |

### Arbitrations

| Date | Case Name | Law Office |
|------|-----------|------------|
| December 12, 2016 | Messina vs. Walker/Mc Air | Lane Powell |

### Depositions

| Date | Case Name | Law Office |
|------|-----------|------------|
| September 1, 1993 | Goodyear Tire & Rubber vs. McDonnell Douglas | Bryan Cave & Associates |
| May 9, 2012 | Jaspers vs. Bonde | Law Offices of Frank W. Mitchell |
| July 10, 2012 | Crews/Becker vs. Forward Technologies | Law Office of Cozen O'Connor |
| June 24, 2014 | Rohera vs. Raytheon Aircraft Company | Greene Broillet & Wheeler |
| November 15, 2016 | Pamir Airways vs. Honeywell | Kreindler & Kreindler |
| July 31, 2018 | Ilczyszyn vs. SWA | Balaban & Spielberger |
| July 26, 2019 | Woods vs. Boeing | Friedman & Rubin |
| August 15, 2019 | Ward vs. USA | United States Dept of Justice |
| March 17, 2021 | Mijac vs. USA | United States Dept of Justice |
| July 21, 2021 | Bohnel, Martinez, Hill, Pollack, Lynam vs. Jet Blue | Friedman Rubin |
| September 28, 2021 | Woods/Welland vs. Boeing | Littlepage Booth & Leckman |
| October 14, 2021 | Foster/Whitaker vs. United States | United States Dept of Justice |
| September 14, 2022 | Banjeree/Kumar vs. United States | United States Dept of Justice |

