## EXHIBIT 10

**Transcript of Frontier Airlines, Inc. Rule 30(b)(6) Deposition
With Exhibits**

**(Contains material designated "Confidential" by
Frontier per Protective Order (ECF No. 37))**

**(Contains SSI Material)**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
Case No. 2:19-CV-01322-KJD-DJA

------------------------------------------------

VIDEO-RECORDED 30(B)(6) DEPOSITION OF FRONTIER
AIRLINES, INC.,
AS GIVEN BY:  SHAWN CHRISTENSEN
VOLUME I
September 25, 2023

------------------------------------------------

PETER DELVECCHIA, et al.,
Plaintiffs,
v.
FRONTIER AIRLINES, INC., et al.,
Defendants.

------------------------------------------------

APPEARANCES:

     PARK AVENUE LAW, LLC
          By John D. McKay, Esq.
             201 Spear Street
             Suite 1100
             San Francisco, California 94105
             434.531.9569
             Johndmckayatty@gmail.com
             Appearing on behalf of Plaintiffs
     HINSHAW & CULBERTSON, LLP
          By Eric Cunningham, Esq.
             Richard C. Harris, Esq.
             151 N. Franklin Street
             Suite 2500
             Chicago, Illinois 60606
             312.422.5717
             ecunningham@hinshawlaw.com
             Rharris@hinshawlaw.com
             Appearing on behalf of Defendants

Also Present:
          Roger Stuart, Video Technician



Page 2

1          Pursuant to Notice and the Federal Rules of

2    Civil Procedure, the Video-Recorded 30(b)(6)

3    Deposition of FRONTIER AIRLINES, LLC, as given by

4    SHAWN CHRISTENSEN, VOLUME I, called by Plaintiffs, was

5    taken on Monday, September 25, 2023, commencing at 10:02

6    a.m., at 216 16th Street, Suite 600, Denver, Colorado,

7    before Pamela J. Hansen, Registered Merit Reporter

8    and Certified Realtime Reporter.

9

                         *   *   *   *   *   *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 3

1                    I N D E X
2    30(B)(6) DEPOSITION OF FRONTIER AIRLINES,
     INC., AS GIVEN BY SHAWN CHRISTENSEN, VOLUME I
3
4    EXAMINATION                                    PAGE
5    MR. MCKAY                                         7
6
7                  INDEX OF EXHIBITS
8                                              INITIAL
     EXHIBIT        DESCRIPTION                REFERENCE
9

10   Exhibit 1       Plaintiffs' Sixth Amended        16
                     Notice of Live Video
11                   Deposition of Defendant
                     Frontier Airlines, Inc.
                     Pursuant to Fed. R. Civ. P.
12                   30(b)(6) (September 25-26,
                     2023)
13
     Exhibit 2       Training records                 21
14
     Exhibit 3       Inflight Flyer Inflight          33
15                   Bi-Weekly Briefing, January
                     25, 2019
16
     Exhibit 4       Frontier Airlines Recurrent      44
17                   Training, Security Updated:
                     11/21/2019 (SSI)
18
     Exhibit 5       Flight Attendant Manual,         79
19                   20.50 Human Trafficking
20   Exhibit 6       Inflight Must Reads,             80
                     3/15/2019
21
     Exhibit 7       Non-Discrimination Policy        95
22
     Exhibit 8       CUS, REF:   FAM 15.35 Customer  103
23                   Amenities, Concerns and
                     Service Recovery - CUS
24
25



Page 4

| | EXHIBIT | DESCRIPTION | INITIAL REFERENCE |
|---|---|---|---|
| 1 | | | |
| 2 | | | |
| 3 | Exhibit 9 | Threat Level 2:  Physically Abusive Behavior, with attachments (SSI) | 111 |
| 4 | | | |
| 5 | Exhibit 10 | Summaries made by pilots | 185 |
| 6 | Exhibit 11 | DOT Guidance for Airline Personnel on Non-discrimination in Air Travel | 206 |
| 7 | | | |
| 8 | Exhibit 12 | Flight Attendant Manual Rev 61 09/01/17, 20.15 Cabin Security (SSI) | 233 |
| 9 | | | |
| 10 | Exhibit 13 | Passenger PNR Detail for DelVecchias | 236 |
| 11 | | | |
| 12 | Exhibit 14 | Excerpts from Employee Handbook, Rev 36 3/20/17 | 159 |
| 13 | Exhibit 15 | Code of Ethics | 237 |
| 14 | Exhibit 16 | Excerpts from Flight Operations Manual – Volume 1, Rev 8-18 11/12/18 (SSI) | 239 |
| 15 | | | |
| 16 | Exhibit 17 | Training record of Captain Rex Tyler Shupe | 242 |
| 17 | | | |
| 18 | Exhibit 18 | Excerpt from Flight Operations Manual – Volume 1, Rev 1-17 04/19/17 (SSI) | 244 |
| 19 | | | |
| 20 | Exhibit 19 | 20190328 – 2067 RDULAS, Generated Jun 11 2019 18:34 | 245 |
| 21 | Exhibit 20 | Flight Attendant Manual, Rev 61 09/01/17, Seating Configuration (SSI) | 248 |
| 22 | | | |
| 23 | Exhibit 21 | 4/17/2019 email to Grimes from Warren re Inquiry for Flight 2067 RDU-LAS 03/28/2019 Incident | 250 |
| 24 | | | |
| 25 | | | |


MAGNA
LEGAL SERVICES

Page 5

|  | EXHIBIT | DESCRIPTION | INITIAL REFERENCE |
|---|---|---|---|
| | Exhibit 22 | 4/17/2019 email to Grimes from Bond re Inquiry for Flight 2067 RDU-LAS 03/28/2019 Incident | 252 |
| | Exhibit 23 | Passenger Incident Report, Effective Date: 07/27/17 | 252 |
| | Exhibit 24 | Flight Attendant Manual, Rev 60 12/21/16, 20.05 General Security Procedures (SSI) | 253 |
| | Exhibit 25 | Flight Attendant Manual, Rev 61 09/01/17, 20.15 Cabin Security (SSI) | 255 |
| | Exhibit 26 | Flight Attendant Manual, Rev 61 09/01/17, 20.20 Levels of Threat (SSI) | 255 |

PREVIOUSLY MARKED EXHIBITS

|  | | | INITIAL REFERENCE |
|---|---|---|---|
| | Exhibit 10 | Email string, top email dated 12/13/2017 re Discrimination claim | 224 |



Page 6

```
 1                    *  *  *  *  *  *  *
 2                P R O C E E D I N G S
 3            THE VIDEOGRAPHER:  We are now on the
 4    record.  This begins Clip No. 1 in the 30(b)(6)
 5    deposition of Defendant Frontier Airlines,
 6    Incorporated, given by Shawn Christensen in the
 7    matter of Peter DelVecchia, et al., versus Frontier
 8    Airlines, Incorporated, et al.
 9            Today is September 25th, 2023, and the
10    time is approximately 10:02 a.m.  This deposition is
11    being taken at 216 16th Street in Denver, Colorado at
12    the request of Park Avenue Law, LLC.
13            The videographer today is Roger Stuart of
14    Magna Legal Services, and our court reporter today is
15    Pam Hansen of Magna Legal Services.
16            Will counsel, please, and all parties
17    present, state their appearances and whom they are
18    representing, and then our court reporter will please
19    swear in our witness.
20            MR. MCKAY:  All right.  Thank you, Roger.
21    I'm John McKay.  I represent the plaintiffs.
22            But may I ask that you do the case
23    number and the court in which the case is pending?
24            THE VIDEOGRAPHER:  Absolutely.  Sorry,
25    Counsel.
```



Page 7

```
1              This is for and by the United States
2   District Court for the District of Nevada, Case
3   No. 2:19-CV-01322-KJD-DJA.
4              Thank you, Counsel.
5              MR. MCKAY:  Thank you.
6              MR. CUNNINGHAM:  Good morning.  Eric
7   Cunningham, representing Frontier Airlines and the
8   witness Shawn Christensen.  Also with me is Richard
9   Harris.
10                  SHAWN CHRISTENSEN,
11  having been first duly sworn, was examined and
12  testified as follows:
13              THE VIDEOGRAPHER:  Thank you.  Please
14  begin, Counsel.
15                      EXAMINATION
16  BY MR. MCKAY:
17      Q      Thank you, sir.
18              MR. CUNNINGHAM:  I'm sorry, I don't mean
19  to interrupt.  If we can please keep track of the
20  time when we go on and off the record, that would be
21  wonderful.  Thank you.
22              THE VIDEOGRAPHER:  That's what I do.
23  Thank you.
24              MR. CUNNINGHAM:  Oh, I didn't hear you say
25  it, but I probably missed it.
```



Page 8

```
 1        Q       (BY MR. MCKAY)   Mr. Christensen, I'm John

 2   McKay, and I represent Peter DelVecchia and his son,

 3   who's identified in the record as A.D. because of

 4   court rules of confidentiality on minors.

 5              How are you today?

 6        A       Doing well as can be, sir.

 7        Q       All right.   Good.   Have you ever had the

 8   pleasure of having your deposition taken before?

 9        A       I have, yes, sir.

10        Q       Okay.   So a good bit of this you probably

11   have heard before, but just for standard

12   instructions, I'm just going to mention this is a

13   court proceeding even though it doesn't occur in a

14   courtroom.   The lady who just swore you in is legally

15   authorized to administer oaths on behalf of the

16   Court, and the record that she's taking down will

17   probably be read by one or both of the federal judges

18   assigned to this case.

19              The consequences for not being truthful

20   are precisely the same as they would be if you were

21   sitting in a courtroom in front of those judges.

22              Do you understand that?

23        A       Yes.

24        Q       Okay.   She will be taking down every word

25   that is being said, and because of that we have to be
```



1   a little bit careful and perhaps artificial in the

2   way we respond to each other.  I need to ask that you

3   wait until I have finished a question before you

4   begin answering it, even if you can anticipate what

5   it is I'm asking for.

6          In normal conversation it would be very

7   normal to just jump in and answer as the questioner

8   is sort of trailing off at the end, but unfortunately

9   in this context it makes it impossible for the court

10  reporter to take down what we are both saying.  She

11  can't write down what's happening if two people are

12  talking at the same time.

13         It is very common to forget that as we get

14  in the heat of it, and I'll be sure to remind you if

15  we have to break up our question and answer a little

16  bit.  Is that okay?

17     A     It sounds good, sir.

18     Q     Okay.  Also, you definitely don't need to

19  call me sir, but be sure that when you answer, you do

20  so both orally and verbally.  So use your words if

21  you would, please, because nods of the head she can't

22  take down either.

23         We will probably take breaks because I

24  have you here, under the rules, for seven hours on

25  the record.  And the on the record is important



Page 10

1  because when we take a break we're off the record and

2  that time doesn't count.

3          But we can take a break at any time.  And

4  the only proviso, if you request a break, is that

5  there not be a question pending.  Because when we do

6  take a break, you're free to speak with your

7  attorneys who are here today, but nobody wants a

8  discussion about how to answer a pending question.

9  So just wait until you've given your answer and then

10 say, Hey, I'd like to take a break, and -- and we can

11 go off the record for a few minutes and then come

12 back and get back on the record.

13          Is that okay?

14     A    Yes, it is.

15     Q    All right.  I'm going to begin this

16 morning just -- I know that you hold a senior

17 position with the airline, Frontier Airlines, but I

18 want to get into the details of that, if I may.

19          What is your current position with

20 Frontier?

21     A    My current position is the director of

22 operations.

23     Q    And for laypeople, what does that mean?

24     A    It is a -- almost a regulatory entity for

25 the safety and compliance of the airline, overseeing



Page 11

1    different entities.

2         Q    Okay.  So when you say it is an entity,

3    you mean the director of operations is an entity

4    within the corporation?

5              MR. CUNNINGHAM:  Objection, form.

6         A    Can you define -- what do you mean by

7    entity within the corporation?

8         Q    (BY MR. MCKAY)  I guess I'm trying to

9    define what you meant by entity.  So when you said

10   "it is an entity," I'm trying to understand whether

11   you work for a different company from Frontier.

12        A    No.  It's a position within Frontier

13   Airlines.

14        Q    Okay.

15        A    Yes, sir.

16        Q    Okay.  And, I'm sorry, sometimes attorneys

17   get hyper-technical.  And within the attorney world,

18   when we say "entity," that often means a company.  So

19   that's why I was asking you that.

20             So you work for Frontier Airlines.  That's

21   who -- the name on the check that you receive, I

22   presume?

23        A    Yes, sir.

24        Q    Okay.  And you said that you are

25   responsible for ensuring certain things.  What --



1    what sort of things do you ensure?

2              MR. CUNNINGHAM:  Objection to the form,

3    mischaracterizes.

4         A    So the director of operations is a

5    position within Frontier Airlines that reports to the

6    FAA.  So it's almost like a liaison between the

7    corporate and the regulator as the Federal Aviation

8    Administration.

9         Q    (BY MR. MCKAY)  Okay.  And just so the

10   record is clear, I want to make sure that when you

11   and I said "ensure," that's E-N-S-U-R-E; is that

12   right?

13        A    Correct.

14        Q    Okay.  So we're not talking about an

15   insurance policy or something like that?

16        A    No.

17        Q    Okay.

18        A    No.

19        Q    All right.  So you -- would it be fair to

20   say that -- that your job is to make certain that the

21   regulations of the Federal Aviation Administration

22   are being followed by the company?

23             MR. CUNNINGHAM:  Objection, form,

24   foundation, and seeks legal opinion.

25        Q    (BY MR. MCKAY) And I will just point out,



1  because I didn't in my instructions, that your -- you

2  have two lawyers here today, and your lawyers can

3  make objections.  They do so for the record.  And

4  what that means is that someone may or may not read

5  those objections down the line, but I typically don't

6  respond to them and I don't have any requirement to

7  respond to them.

8           So we just go on as though the objection

9  hadn't been said for our purposes today unless he

10  instructs you not to answer, which is a rare

11  occurrence and creates a different procedure.  But

12  just so you know, just wait until one of your

13  attorneys has finished whatever they're saying, and

14  then you can answer the question.

15           I think we were at the point where I was

16  asking about this "ensure" term, and we were -- I was

17  asking if it is part of your job to see that the

18  employees of Frontier Airlines are following

19  regulations published by the FAA?

20           MR. CUNNINGHAM:  Objection, form and

21  foundation.

22           You may answer.

23      A    Yes.

24      Q    (BY MR. MCKAY)  Okay.  And how long have

25  you occupied this position?



Page 14

```
 1       A       Officially, I think August 4th of this
 2  year, so less -- less than two months.
 3       Q       And what did you do, if anything, for
 4  Frontier Airlines prior to that?
 5       A       I was the chief pilot.
 6       Q       And what does the chief pilot do?
 7       A       Very similar to the director of
 8  operations, but also oversee the roughly 2100, 2,100
 9  pilots at Frontier Airlines.
10       Q       Okay.  And when you say oversee the
11  pilots, what does that entail?
12       A       It's very broad in -- in scope, from if
13  they have problems at home, you know, needing a leave
14  of absence or something, we can help them with that,
15  to if there's something that they have a question on,
16  myself and my team, we just simply assist them as
17  needed.
18       Q       Would it be fair to say that you're the
19  boss to whom employed pilots of Frontier Airlines
20  report?
21               MR. CUNNINGHAM:  Objection, form.
22       A       Yes, and I also have base chief pilots
23  that they'll report to.  So they don't report
24  directly to me.  They'll report to their base chief
25  pilot, and then base chief pilots up to me.
```



1       Q       (BY MR. MCKAY)  Okay.  I think that's

2   pretty clear.  And how long were you chief pilot?

3       A       It was late 2017 until roughly July of

4   this year, so I'll ballpark about six years.

5       Q       Did you work for Frontier prior to that?

6       A       I did.

7       Q       For whom did you work prior to that?

8       A       I'm sorry, can you rephrase the question

9   one more time?

10      Q       Yeah, sure.  I'm talking about before you

11  became chief pilot for Frontier Airlines, which was

12  your previous position --

13      A       Correct.

14      Q       -- did you work for Frontier Airlines?

15      A       Yes.

16      Q       Oh, I'm sorry, I may have misheard you.

17  What did you do for Frontier Airlines prior to being

18  chief pilot?

19      A       I was a captain with them.

20      Q       So you were a pilot?

21      A       Yes, sir.

22      Q       Okay.  And you were a captain of an A320

23  aircraft?

24      A       Yes.

25      Q       Okay.  Is that -- the A320 model line, is



Page 16

1    that the only type of aircraft that Frontier

2    operates?

3         A    Yes.

4         Q    All right.  And should I understand that

5    you are here today to testify about Frontier

6    Airlines' corporate knowledge about certain subjects?

7         A    Yes.

8         Q    Okay.  I am going to now show you what I'm

9    having marked as Deposition Exhibit 1.

10             (Exhibit 1 marked.)

11        Q    (BY MR. MCKAY)  And Deposition Exhibit 1

12   is the deposition notice that has brought us here

13   today.  Have you seen this document before?

14        A    Yes, sir.

15        Q    Okay.  And there are 38 numbered subject

16   areas, but one of them has been taken out, leaving

17   37.  Are you here to testify as to Frontier Airlines,

18   Inc.'s knowledge regarding all 37?

19        A    Yes.

20        Q    Okay.  Let me skip ahead to one of them at

21   this point.  What is the net worth of Frontier

22   Airlines, Incorporated as of today's deposition?

23             MR. CUNNINGHAM:  Objection, form and

24   foundation.

25        A    That I don't know.  I did speak with our



Page 17

1    general counsel on that, and it is within the Form

2    10Q that's filed, and I think the last one was

3    completed and filed in August of 2023 ending in Q2,

4    so June of 2023.

5         Q       (BY MR. MCKAY)  And is that a document

6    that you are able to access?

7         A       Yes.

8         Q       And did you access it in preparation for

9    today's deposition?

10        A       I did.

11        Q       And what did the document say for net

12   worth and/or shareholder equity?

13               MR. CUNNINGHAM:  Objection to the form of

14   the question.

15               Do you want me to clarify?

16               MR. MCKAY:  No.

17               MR. CUNNINGHAM:  It's just an unfair

18   question.

19        A       I don't recall.  It -- it was a lot of

20   finance, and I'm sure they -- they can read it

21   differently.  So I'm not sure what the number is

22   that -- that will be utilized.

23        Q       (BY MR. MCKAY)  All right.  Well, I'm

24   going to go to the portion of the deposition notice,

25   Exhibit 1, which includes this question, and that is



Page 18

1    Item No. 23.  Could you turn to that, sir, on Page 13

2    of Exhibit 1?

3         A     Okay.

4         Q     Do you see that?

5         A     I do.

6         Q     Okay.  And Item No. 23 is one of the Rule

7    30(b)(6) subject areas, and it reads, "Frontier's net

8    worth as of the date of the deposition (or as of the

9    most recent accounting period)."

10            Did I read that correctly?

11        A     You did.

12        Q     Now, is Q2, as you mentioned it, the most

13   recent accounting period?

14        A     That's the most recent accounting period

15   that I could find for the Form 10Q.

16        Q     Okay.  And when you found that, what was

17   the net worth of the company that was stated there?

18            MR. CUNNINGHAM:  Objection, form and

19   foundation.

20        A     I -- I don't recall.  There was a -- a lot

21   of numbers in there.  I'm not sure what -- what would

22   be utilized.

23        Q     (BY MR. MCKAY)  Did you ask anybody at

24   Frontier Airlines to interpret those numbers for you?

25        A     I did not.  I did -- in my conversation



Page 19

```
 1   with general counsel, there's multiple numbers that
 2   could be utilized by finance for that purpose.  And
 3   so he referenced me to the Form 10Q as probably the
 4   most secure -- or not secure, but the -- I guess the
 5   governing document that the government would have to
 6   be able to identify that number.
 7        Q    I understand that, and I'm asking you now
 8   to identify that number, and you're not able to do
 9   so?
10        A    No, sir.
11        Q    Okay.  Did -- what did you anticipate you
12   were going to say when we got to Section 23 -- or
13   Paragraph No. 23 of the deposition notice?
14             MR. CUNNINGHAM:  Objection to form and
15   foundation.
16        A    I was going to answer the question the
17   best I could, sir.
18        Q    (BY MR. MCKAY)  Which is that you don't
19   know?
20             MR. CUNNINGHAM:  Objection.  He answered
21   the question.  He referred you to a public document.
22             MR. MCKAY:  I'm sorry, that's -- you can
23   object to the form of the question and that's pretty
24   much it.
25        A    I don't know the number, sir.
```



MAGNA
LEGAL SERVICES

Page 20

1      Q      (BY MR. MCKAY)  Okay.  So as you sit here

2    today as the corporate designee of Frontier Airlines,

3    Inc., you're saying that you do not have the

4    corporation's knowledge to answer No. 23, correct?

5      A      Correct, outside of it's within the Form

6    10Q.

7      Q      Now, I'm going to be referring today to

8    Flight 2067, and I'm going to be referring to the

9    flight attendants and I'm going to be referring to

10   the pilots, and I want to make sure that we're all on

11   the same page about that.  I assume you have a Flight

12   2067 probably every day; is that right?

13     A      I don't know.

14     Q      Okay.  But you have several of them?

15            MR. CUNNINGHAM:  Objection, form.

16     A      I don't know.

17     Q      (BY MR. MCKAY)  Okay.  Well --

18     A      Several flights?

19     Q      All right.  It's not that important.  What

20   I want to make sure is that when I say Flight 2067,

21   you understand that that's the flight that

22   operated -- that Frontier operated between Raleigh

23   Durham International Airport and Las Vegas

24   International Airport on March 28 of 2019; is that

25   correct?



Page 21

```
 1      A      Correct.

 2      Q      Okay.  Now, when I refer to the flight

 3 attendants, I'm referring to the four flight

 4 attendants who were working on that Flight 2067; is

 5 that correct?

 6      A      Correct.

 7      Q      Okay.  And when I refer to the pilots, I'm

 8 referring to the two pilots that were operating

 9 Flight 2067 or were flying Flight 2067 that day,

10 correct?

11      A      Correct.

12      Q      Okay.

13             MR. MCKAY:  Have this marked as 2, please.

14             (Exhibit 2 marked.)

15      Q      (BY MR. MCKAY)  What I'm showing you now

16 has been marked as Deposition Exhibit 2, and I'll

17 represent that it is a four-page document that's been

18 Bates stamped as DelVecchia Frontier 204 through --

19 oh, I'm sorry.  It got stapled backwards, but it

20 should be 2000 -- I'm sorry -- 201 through 204.  It

21 doesn't really matter what the order is.  There's one

22 page for each of the flight attendants of Flight

23 2067.  Do you agree with that?

24      A      I do.

25      Q      Okay.  So on the first page we have an
```



Page 22

1    Anna Bond.  And on the second page we have a Chelsie

2    Adriann Bright.  On the third page we have an Amanda

3    Lee Nickel, spelled N-I-C-K-E-L.  And on the fourth

4    page we have a Scott Alexander Warren, W-A-R-R-E-N.

5    Is that right?

6          A     Correct.

7          Q     And, first of all, are these business

8    records of Frontier that are kept in the ordinary

9    course of its business?

10         A     Can you explain --

11         Q     Sure.  Is it normal for Frontier Airlines

12   as a corporation to maintain the information that's

13   shown on this Exhibit 2?

14         A     Yes.

15         Q     Okay.  And does the person at Frontier

16   who -- or persons, plural, who input this

17   information, does that person have firsthand

18   knowledge of what they're putting down on the

19   document?

20               MR. CUNNINGHAM:  Objection, form and

21   foundation.

22         A     Can you -- can you ask the question --

23         Q     (BY MR. MCKAY)  Sure.

24         A     -- in a different way?

25         Q     When you look at information like shown --



Page 23

1    that is shown on Exhibit 2, are you confident that

2    whoever put the information in there probably did so

3    accurately?

4              MR. CUNNINGHAM:   Objection, form and

5    foundation.

6         A    Yes.

7         Q    (BY MR. MCKAY)   Okay.   And so as far as

8    the corporation is concerned, when something like

9    this is pulled up and put onto a piece of paper, you

10   assume that it's accurate?

11        A    Yes.

12        Q    Okay.   Now, does Exhibit 2 accurately show

13   what training was given to these four flight

14   attendants up to the date of the Flight 2067 on March

15   28 of 2019?

16        A    It appears -- it appears so, yes.

17        Q    Okay.   Now, I do note that in some cases

18   there are some entries at the top that postdate

19   Flight 2067.   So those would be -- for instance, on

20   the first page there appear to be four items that

21   were dated 22 October 2019.   So those would have been

22   given after Flight 2067, correct?

23        A    Correct.

24        Q    Okay.   And as --

25        A    And -- I'm sorry.



Page 24

```
1        Q     Yeah, go ahead.  I'm -- I'm not trying to
2   trick you.
3        A     I know.
4        Q     I'm just excluding from my previous
5   question a few entries that occurred after the
6   flight.
7        A     Understood, and I was just referencing to
8   make sure that -- you said the first page.  I was
9   just taking a gander for all -- all the pages.
10       Q     Yeah, I -- I think that, you know, when we
11  go to Ms. Bright's page, it looks like the last --
12  the entry at the top is November of '18, 2018.  So
13  that would have been before the flight, correct?
14       A     Correct.
15       Q     Okay.  And then when we turn to
16  Ms. Nickel's --
17              MR. CUNNINGHAM:  Sorry.  Objection to the
18  form of the question.
19              Go ahead.
20       Q     (BY MR. MCKAY)  When we turn to
21  Ms. Nickel's page, we've got four entries from
22  November of 2019, which would have been after the
23  flight, correct?
24       A     Correct.
25       Q     Okay.  And when we go to Mr. Alexander's
```



Page 25

```
1    page, we have four entries from August 2019, which

2    would have been after the flight, correct?

3        A       Correct.

4        Q       Okay.  But with the exception of those

5    2019 entries that we've just discussed, the records

6    before you there for Exhibit 2 cover all of the

7    training given to these four flight attendants from

8    the beginning of their employment to the date of

9    Flight 2067, correct?

10       A       Correct.

11       Q       Okay.  I notice on one of these pages

12   there is -- yeah.  If you look on the first page,

13   about -- it looks like about the eighth entry from

14   the bottom, there is one that is preceded by the

15   initials IBI, and then the description is Initial

16   Basic Indoc, I-N-D-O-C, given on 26 October of 2016.

17               What is Basic Indoc?

18       A       It stands for basic indoctrination.  It is

19   a comprehensive overview of the rules, regulations

20   and policies that the flight attendants are expected

21   to comply with.

22       Q       And how long a course is that in hours?

23       A       For Basic Indoc, I don't know.

24       Q       Okay.  But you would agree with me that on

25   the 26th of October, there was also an Initial
```



Page 26

1    Security Training F/A, correct?

2         A    It looks like it was the day prior.

3         Q    Oh, I'm sorry, I -- I read that date

4    wrong.  Okay.

5              On the day of Basic Indoc, there would

6    have been Initial Ground Training, Initial Competency

7    Check, and Initial Emergency Training (Hands On).  Is

8    that correct?

9         A    Correct.

10        Q    Okay.  Let's start with Initial Ground

11   Training.  What happens in that class?

12        A    So -- okay.  So ground training, that

13   would be -- that's like a comprehensive what goes on

14   onboard the aircraft, so a lot of emergency

15   procedures and -- and things like that.

16        Q    Okay.  So it's connected to being on the

17   airplane?

18        A    It -- for the most part, yes.

19        Q    Okay.  But when the airplane is on the

20   ground?

21        A    Not necessarily.  It's a lot of -- again,

22   it's a -- it could be in the air, on the ground,

23   preflight checks, kind of what the roles and

24   responsibilities are.

25        Q    Okay.



```
1       A       And maybe the best way I can put this is,
2    maybe on the procedure side.  So I refer -- going
3    back to a previous answer, so indoc, indoctri- --
4    basic indoctrination I referred to as policy.  That
5    would be more procedure --
6       Q       Okay.  So --
7       A       -- would be the best way to explain that.
8       Q       -- ground training equals procedure and
9    indoc equals policy.  Is that what you were saying?
10              MR. CUNNINGHAM:  Objection, form.
11      A       Yes.
12      Q       (BY MR. MCKAY)  Okay.  Now, the next one
13   is Initial Competency Check, and I note that it has
14   an aircraft reference to the left of 319.  What does
15   that mean?
16      A       So you referred earlier to the Airbus 320
17   series.  319 is a -- the Airbus series of the 320
18   incorporates the Airbus 318, the 319, the 320, and
19   the 321.  It's just the way that the record was
20   updated.  319 was the -- the aircraft that was
21   utilized.  We used to have the largest fleet of 319s
22   prior to transitioning over.
23      Q       Okay.
24      A       So back when this was created, 319 was
25   simply the air -- model aircraft.
```



Page 28

```
 1      Q      Okay.  But if you received a competency
 2   check on a 319, then that -- would that carry over to
 3   a 320?
 4      A      Yes, sir.
 5      Q      Okay.  All right.
 6      A      Well --
 7      Q      With differences training, right?
 8      A      Yes.
 9      Q      And the differences training would show
10   you the -- the areas that are not similar to the 319?
11      A      Correct.
12      Q      Okay.  So what happens in an Initial
13   Competency Check?
14      A      I'm not familiar with the -- the full
15   check of what goes on in there.
16      Q      Okay.  How about Initial Emergency ·
17   Training, also referenced for the 319?
18      A      Yeah.  And so that is specific with hands
19   on.  And so we have to physically do hands-on
20   training with the different equipment onboard the
21   aircraft and the associated doors, and things like
22   that.
23      Q      Is this like emergency slides and things
24   like that?
25      A      Yes, sir.
```



```
 1      Q      Okay.  And -- and is that extensive
 2  training?
 3      A      Can you define extensive?
 4      Q      Well, I mean, does it take more than an
 5  hour?
 6      A      Yes.
 7      Q      Okay.  And these other things, do they --
 8  that you've just discussed, do they take more than an
 9  hour?
10      A      I think it's variable --
11             MR. CUNNINGHAM:  Objection, form.
12             THE DEPONENT:  Oh, excuse me.
13             MR. CUNNINGHAM:  Go ahead.
14      A      I think it's variable on time.
15      Q      (BY MR. MCKAY)  Okay.  Do you know who the
16  instructor for Basic Indoc is?
17      A      I don't.
18      Q      Okay.  I see that there are numbers there.
19  Are those employee numbers in the instructor column?
20      A      Yes.
21      Q      Okay.  Do you know what documents are
22  covered in Basic Indoc, if any?
23      A      Yes.
24      Q      And what are they?
25      A      We have quite a few.  Well, not quite a
```



Page 30

1   few.  So the -- the primary one is going to be the

2   Flight Attendant Manual.  They also have -- and I may

3   have the names slightly wrong, but the Inflight

4   Service -- Service Manual or Inflight Service Guide.

5   I think those are probably the -- the two primary

6   ones that they utilize on -- onboard the aircraft

7   that a flight attendant will have with them.

8        Q     Okay.  And how many flight attendants are

9   there in the company?

10       A     I don't know.  Are you referring to today

11  or back in 2019?

12       Q     Well, is there a way of just ballparking

13  it?

14             MR. CUNNINGHAM:  Objection, form.

15       A     Ballpark, today, I'd estimate 4,000.

16       Q     (BY MR. MCKAY)  Okay.

17       A     3500 to 4,000, somewhere in there.

18       Q     And the classes we're talking about were

19  in 2016, so that's seven years ago.  Do you have any

20  idea how many there were back then?

21       A     I don't.

22       Q     Okay.  Do you know how the company makes

23  certain that the trainees who receive this training

24  have read and understood the documents that you just

25  described?



Page 31

1     A     I'm sorry, can you rephrase or -- or ask

2  the question one more time, please?

3     Q     Sure.  So you mentioned that there's a

4  Flight Attendant Manual that is covered in Basic

5  Indoc, and then there's also a services manual?

6     A     It's an Inflight Service Guide, but it's

7  the in flight portion of service.

8     Q     Okay.

9     A     Yeah.

10    Q     And how does the company know that the

11  trainee understands the contents of those documents?

12    A     They'll be tested on those -- on those

13  items.

14    Q     Okay.  And so for each of the employees

15  that's named in Exhibit 2, there would have been test

16  results for them?

17          MR. CUNNINGHAM:  Objection, form.

18    A     I don't know.  I don't know.

19    Q     (BY MR. MCKAY)  As we sit here today, is

20  there a way that one could verify how they did on the

21  tests that were given in Basic Indoc?

22    A     I would need to -- short answer is

23  perhaps.

24    Q     Okay.  And -- and who would have that

25  information?



Page 32

1        A       It would be -- probably the best person

2    would be the inflight records manager, but I don't

3    know if he's also an instructor.

4        Q       Okay.  Do you know whether those test

5    results get put into an employee's employee file?

6        A       I don't know.  I don't think so.

7        Q       Okay.  All right.

8        A       And may I expand on -- on that --

9        Q       Yes.

10       A       -- just a little bit?  So what they look

11   for is a -- a percentage, and that percentage would

12   be corrected up to 100 percent.  If they don't pass,

13   then there's additional retraining or they go a

14   separate -- a separate route.  So there's -- there's

15   a requirement.

16               These are simply kind of the output files

17   after that.  So there may be -- you know, if they got

18   a 95, they'll correct that up to 100 percent, and

19   once it's passed and that's what goes in here.

20       Q       Well, it would be important to know, would

21   it not, if somebody only got a 40 percent?

22       A       It would be -- it would have to be

23   corrected up and -- and reflected appropriately.

24       Q       But would the company keep records of the

25   fact that the initial result was 40 and that it was



Page 33

1    then corrected up?

2         A    That I don't know.

3         Q    Is there anything on Exhibit 2 which shows

4    any training given to these four individuals on the

5    subject of human trafficking?

6         A    No.

7              MR. CUNNINGHAM:  Objection, form.

8         Q    (BY MR. MCKAY)  The answer is no?

9         A    No.

10        Q    Okay.  Now I want to show you a different

11   document which we'll mark as Exhibit 3.

12             (Exhibit 3 marked.)

13        Q    (BY MR. MCKAY)  Are you familiar with

14   Exhibit 3?

15        A    Yes.

16        Q    Okay.  And Exhibit 3 is a document, a

17   one-page document Bates-stamped Frontier 0122.  And

18   what is Exhibit 3?

19        A    Exhibit 3 is an Inflight Flyer Inflight

20   Bi-Weekly Briefing.

21        Q    Is this something that's published by

22   Frontier?

23        A    Define published by Frontier.

24        Q    Is this something that Frontier creates?

25        A    Frontier as a corporation, no.  As a



Page 34

1    department, yes.

2        Q     Okay.  You mean a department within

3    Frontier created this document?

4        A     Correct.

5        Q     Okay.  And as you sit here today, do you

6    assume that they did so accurately?

7        A     I have no reason to believe otherwise.

8        Q     Okay.  Now, I will represent to you that

9    in previous depositions in this case the four flight

10   attendants, or at least some of them, mentioned that

11   this was the first and only training document they

12   received on the subject of human trafficking.  Do you

13   have any reason to dispute that?

14       A     Based on some of the documents that were

15   produced, it looks like they did have human

16   trafficking in the initial and recurrent training.

17       Q     Okay.  We'll get to some of those

18   documents in a bit, and we'll -- we'll look at the

19   dates specifically of those documents, but let's stay

20   with this one for the time being.

21             Does this document indicate the procedures

22   to be followed by a flight attendant if that flight

23   attendant suspects a passenger may be a victim of

24   human trafficking?

25             MR. CUNNINGHAM:  Objection, form.



Page 35

```
 1      A      And can you -- can you restate the
 2  question one more time, please?
 3      Q      (BY MR. MCKAY)  Sure.  Looking at Exhibit
 4  3, does it state the procedures that a Frontier
 5  Airlines flight attendant is supposed to follow if
 6  that flight attendant suspects a passenger may be a
 7  victim of human trafficking?
 8              MR. CUNNINGHAM:  Same objection.
 9              You may answer.
10      A      I wouldn't call it necessarily the
11  procedure as much as a guide for them to reference.
12      Q      (BY MR. MCKAY)  Why would you not call it
13  procedures?
14      A      When I -- when you define procedure, a
15  procedure is -- it is very defined.
16      Q      Okay.  What is a procedure?
17      A      So I'm going to define procedure for this
18  context as a checklist.  Okay?  So as a commercial
19  pilot in an airline transport, if we have something
20  to comply with it would be very defined.  Master
21  switch off, hit this button.  This provides a
22  background and guidance of what you may be looking
23  for.
24              So I -- I would differentiate between a
25  procedure and guidance that they can reference to get
```



MAGNA

LEGAL SERVICES

Page 36

```
 1    additional information if -- you know, as they
 2    progress through.
 3         Q     Well, a pilot's checklist doesn't always
 4    indicate more than guidance, does it?
 5              MR. CUNNINGHAM:  Objection, form.
 6         Q     (BY MR. MCKAY)  Let me ask you this way.
 7         A     Yes.
 8         Q     If -- if a -- if a pilot's checklist says,
 9    Check oil pressure correct, that doesn't tell you a
10    specific oil pressure that is supposed to be shown on
11    the oil pressure gauge, does it?
12         A     It could be a green arc --
13              MR. CUNNINGHAM:  Objection.
14              THE DEPONENT:  Oh, sorry.
15              MR. CUNNINGHAM:  It's beyond the scope.
16              But go ahead.
17         A     It could be a green arc.  It could be a
18    specific number or a specific range that you're
19    looking for.
20         Q     (BY MR. MCKAY)  But it might be just
21    guidance that says check it, correct?
22              MR. CUNNINGHAM:  Objection, form.
23         A     Yes.
24         Q     (BY MR. MCKAY)  Okay.
25         A     For a specific reason, yes.
```



Page 37

1      Q      Okay.  So -- so a pilot's checklist is not

2  necessarily going to define the end result that is

3  expected?

4              MR. CUNNINGHAM:  Objection, form.

5      A      Fair statement.

6      Q      (BY MR. MCKAY)  okay.  So similarly --

7      A      It's a pro- -- I'm sorry, my apology.  It

8  is a step along the process, yes.

9      Q      Sure.  And this Exhibit 3 has some steps

10  to follow, too, doesn't it?

11     A      Yes.

12     Q      And the first step or the first bullet

13  point is, "Initiate non-threatening conversation and

14  ask targeted questions."

15             Did I read that correctly?

16     A      Yes.

17     Q      And then there's even some specific

18  questions in the indented bullet point.  The first

19  one says, "Ask where they are traveling; are they

20  going on vacation or visiting relatives?"

21             Did I read that correctly?

22     A      Yes.

23     Q      And then the second indented bullet point

24  says, "Ask where they are staying, who will be

25  meeting them, what they will be doing, et cetera."



MAGNA
LEGAL SERVICES

Page 38

1          Did I read that correctly?

2     A    Yes.

3     Q    Okay.  So the first bullet point and its

4  indented sub-bullet points provide guidance to the

5  flight attendant to initiate a conversation with the

6  suspected victim of human trafficking.  Would that be

7  a fair statement?

8     A    Yes.

9     Q    Okay.  And was that done by any of the

10  four flight attendants on Flight 2067?

11          MR. CUNNINGHAM:  Objection, form,

12  foundation.

13     A    I know that there was a conversation that

14  occurred that they were going to Death Valley and

15  some others.  When that occurred I can't recall, but

16  it sounds like there may have been a conversation,

17  but when and where, that I don't remember.

18     Q    (BY MR. MCKAY)  You don't have any

19  knowledge as to when such a conversation would have

20  occurred?

21     A    I know that -- that it did occur.  I don't

22  know the timeline, no.

23     Q    It could have been after they were already

24  separated, the father and son, correct?

25          MR. CUNNINGHAM:  Objection, form.



```
                                                         Page 39

 1       A       It -- it may have.  I -- that I can't

 2   remember.

 3       Q       (BY MR. MCKAY)  Okay.  And are you

 4   positive that it occurred at all?

 5       A       Yes.

 6       Q       You're positive that there was a

 7   discussion that involved going to Death Valley?

 8       A       At some point there was, but timeline

 9   wise, I don't -- I don't recall.

10       Q       And you're positive that that occurred on

11   the flight while the flight was in the air?

12               MR. CUNNINGHAM:  Objection, form.

13       A       No.

14       Q       (BY MR. MCKAY)  Okay.

15       A       I'm -- I'm basing it off of my reading of

16   the -- of the depositions and -- and the documents,

17   but there's a tremendous number of documents.

18   Putting everything in a timeline is a little bit

19   difficult.

20       Q       Do you know who initiated that

21   conversation that you're referring to?

22               MR. CUNNINGHAM:  Objection, form.

23       A       No.

24       Q       (BY MR. MCKAY)  Okay.  All right.  Is

25   there anything in the bullet point guidance that
```



Page 40

1   states that you should not talk to the passenger that

2   you suspect may be a victim of human trafficking?

3              MR. CUNNINGHAM:  Objection, form.  You're

4   referring only to Exhibit 3 or --

5              MR. MCKAY:  Correct.

6        A    I'm sorry, can you -- can you ask the

7   question one more time, please?

8        Q    (BY MR. MCKAY)  Sure.  If you look at

9   Exhibit 3, is there anything in the guidance bullet

10  points that instructs the flight attendant not to

11  engage in conversation with the passenger the flight

12  attendant suspects may be a victim of human

13  trafficking?

14       A    There's nothing that -- that says not

15  to -- to talk with the individuals that I can see

16  here.

17       Q    And other than initiating conversation,

18  whose responsibility is it under the bullet points of

19  Exhibit 3 to take action about the suspected human

20  trafficking with law enforcement?

21             MR. CUNNINGHAM:  Objection, form,

22  foundation, legal conclusion.

23       A    So it defines it as the captain will

24  evaluate the information, and if appropriate, involve

25  law enforcement to resolve the concerns.



Page 41

1      Q      (BY MR. MCKAY)   So it's the captain.

2      A      Correct.

3             MR. CUNNINGHAM:   Same objections.

4      Q      (BY MR. MCKAY)   And the captain has the

5   responsibility, if appropriate, of informing law

6   enforcement?

7      A      Correct.

8      Q      Is there anything in the bullet point

9   guidance in Document 3, Exhibit 3, that says the

10   captain will separate the suspected victim of human

11   trafficking from that person's traveling companion?

12      A      There's nothing in this document that

13   states that, no.

14      Q      Okay.   And when you said that the captain

15   will evaluate the information, what information is

16   that?

17      A      It would be the information that -- that

18   they would receive from the flight attendants.

19   Again, the -- the flight deck is the -- say the

20   consolidation of information that the captain deems

21   necessary to -- to receive.

22      Q      And if you look at the third bullet point

23   down, where it says, "Provide specific details of the

24   situation and explain why you believe the behavior

25   exhibits signs of human trafficking," do you see



Page 42

1    that?

2         A    I do.

3         Q    And is that an instruction to the flight

4    attendant?

5              MR. CUNNINGHAM:  Objection, form,

6    foundation.

7         A    It appears to be so, yes.

8         Q    (BY MR. MCKAY)  Okay.  And with respect to

9    the case that's brought us here today, what were the

10   specific details of the situation that the flight

11   attendants provided to Captain Shupe?

12        A    From my understanding, is it was a

13   touching of the face by an adult on a child.

14        Q    And you believe that that is an indication

15   of human trafficking?

16             MR. CUNNINGHAM:  Objection, form, and it

17   calls for opinions beyond the scope.

18        A    I was not there so I don't know.

19        Q    (BY MR. MCKAY)  We're going to get into

20   the specific indications of human trafficking, so

21   let's -- let's hold that thought for a moment.

22             Was there anything else that the flight

23   attendants told Captain Shupe they believed explained

24   signs of human trafficking or showed signs of human

25   trafficking?



Page 43

```
 1      A      I don't believe that human trafficking was
 2  a discussion that -- that -- that came up.
 3      Q      I'm sorry.  What?
 4              MR. CUNNINGHAM:  I object to the form.
 5      Q      (BY MR. MCKAY)  You are saying, having --
 6  having just told me that the flight attendant told
 7  Captain Shupe of the specific detail of face touching
 8  and showing me that that was part of Bullet Point 3
 9  of Document Exhibit 3, which carries the title Human
10  Trafficking, and has the text, "If you suspect a
11  passenger may be a victim of human trafficking
12  contact the captain," now you're saying that there
13  was no discussion of human trafficking?
14              MR. CUNNINGHAM:  Objection, form.
15      A      Based on the documents that I've read, I
16  never saw anything about human trafficking but,
17  rather, starting off with the -- with the touching.
18      Q      (BY MR. MCKAY)  Did you read the
19  deposition of Chelsie Bright?
20      A      I did, but I don't recall the details.  If
21  you can --
22      Q      Okay.
23      A      If you can provide the details, I'd be
24  more than happy to review it.
25      Q      All right.  You don't recall Chelsie
```



Page 44

1    Bright testifying about suspected human trafficking?

2         A    I don't.

3         Q    You don't recall her saying that human

4    trafficking is when somebody is with a guardian

5    they're not supposed to be with?

6              MR. CUNNINGHAM:  Objection, form.

7         A    I -- I don't recall.

8         Q    (BY MR. MCKAY)  So you may have said it,

9    you just don't recall?

10        A    Correct.

11             MR. MCKAY:  What is that beeping?

12             MR. CUNNINGHAM:  I don't know.

13             THE DEPONENT:  I think it's the center.

14             THE VIDEOGRAPHER:  It sounds like it's the

15   phone.

16             MR. MCKAY:  All right.  Let's go off the

17   record, then.

18             THE VIDEOGRAPHER:  The time is 10:52.  We

19   are going off the record off of the first clip in the

20   deposition of Shawn Christensen.

21             (Discussion off the record.)

22             (Exhibit 4 marked.)

23             THE VIDEOGRAPHER:  The time now is 10:55

24   a.m.  We are back on the record.  This is the

25   beginning of Clip No. 2 in the deposition of Shawn



Page 45

1  Christensen.

2           Thank you, Counsel.

3      Q      (BY MR. MCKAY)  All right.

4  Mr. Christensen, I have put in front of you now what

5  has been marked as Deposition Exhibit 4.  And it's a

6  multiple-page document starting with Bates

7  No. Frontier 0728 and ending with Frontier 0735.

8           And I'll note for the record that this is

9  a document requiring special handling because it is

10  marked under the protective order that is specially

11  entered for sensitive security information.

12           First of all, do you recognize what this

13  document is?

14  ████ ██ ██ ██ ██ ██ ██ █ ██ ██ ██
█ ██ ██ ████
█  █ ██ ██ ██ ██ ██ ██ ██
█ ██ -- █ ██ ██ ██ ██ ██ ██ ██ ██
█ ██ ██ ██ ██ ██ █ ██ ██
█ ██ ██ █ █ ██ ██ ██ ██                So
█ ██ ██ ██ ██ █ █ ██
█      ██ ██ ██ █ ██ ██
█ ███
█  █ ██ ██
█  █ ██ ██ ██ ██ ██ █
█ ██ ██ ██ ██ ██ ██



Page 46

1    ████████  ████████  ████████    ████████

2                Does that mean anything to you?

3         A    Yes.

4         Q    And what is that?

5         A    So this is for the -- I'm sorry, I'm

6    kicking something down here.

7         Q    That's okay.

8         A    Long legs.

9    ████████████  ███  ████  ████  ████████  ███  ████████

██  ███  ██  ████████  ████  ████  ████████  ████  ██  ██  ████████

██  ████████  ████████  ████  ████████  ███  ██  ████

12        Q    Now, you would agree with me that November

13   21st of 2019 is subsequent to the Flight 2067 that

14   brings us here today, wouldn't you?

15        A    Correct.  It occurred after the event.

16        Q    Okay.  So did this exist prior to Flight

17   2067?

18        A    I don't know.

19        Q    Okay.  If anything existed prior to Flight

20   2067, would it have been produced to the plaintiffs

21   instead of something that was created in November of

22   2019?

23             MR. CUNNINGHAM:  Objection, form,

24   foundation.

25        A    I -- I assume.  I don't know.



1      Q     (BY MR. MCKAY)  Okay.  Are you able to --

2  if you would refer back to Exhibit 2, are you able to

3  show on Exhibit 2 where this particular November 21

4  of 2019 recurrent training was given to the four

5  flight attendants?

6              MR. CUNNINGHAM:  Objection, form.

7      A     So I'll use -- just for a reference, I'll

8  use Exhibit No. 2, 204, for Anna Bond.

9      Q     (BY MR. MCKAY)  Yes.

10      A     So it looks like the security training

11  would have been signed off on 22 October of 2019, and

12  then previously 19 October of 2018, and then

13  previous -- so it looks like on a yearly basis in

14  October time frame.

15      Q     But you'd agree with me that October 22 of

16  2019 predates November 21 of 2019?

17      A     Yes.

18      Q     So you can't say for certain that this

19  specific document that was created on 11/21/2019 was

20  what was shown to Ms. Bond on either of the dates

21  that you just testified to?

22              MR. CUNNINGHAM:  Objection, form,

23  foundation.

24      A     No.

25      Q     (BY MR. MCKAY)  Okay.  So you don't know



Page 48

1   what documents were shown to her on those dates, do

2   you?

3        A    No.

4        Q    Okay.  And would that same answer be true

5   for the other three flight attendants?

6        A    Give me one second.

7             Yes, I would say that that's true.

8        Q    Okay.  So looking at Exhibit 4, ▮▮ ▮▮▮





Page 49





3  that?

















Page 54

1        Q









1

2

Yes.

And do you agree with me that that is a

















```
 1
 2
 3
```

```
21   In the case that brings us here today, you
     previously mentioned a flight attendant who claimed
22   to have witnessed some face touching.  Do you
23   remember that?
24        A     Yes.
25        Q     And you said you read all the depositions,
```



Page 61

1    right?

2                MR. CUNNINGHAM:   Objection.

3        Q      (BY MR. MCKAY)   Flight attendants'

4    depositions.

5        A      I believe I did, yes.

6        Q      Okay.  Can you tell me as you sit here

7    today how many flight attendants personally witnessed

8    the alleged face touching?

9        A      Based on my recollection, I -- I thought

10   three of them had witnessed it and/or communicated it

11   amongst each other.

12       Q      Well, now, "and/or communicated it amongst

13   each other" requires me to ask some more questions.

14   How many --

15       A      Sorry.

16       Q      -- actually testified under oath that they

17   personally witnessed the face touching that Flight

18   Attendant Chelsie Bright Sakurada testified to in her

19   deposition?

20       A      I can't be certain of that level of

21   detail.

22       Q      Do you recall, for instance, Flight

23   Attendant Nickel stating that she never saw it?

24       A      I don't recall that level of detail from

25   the deposition, no.



Page 62

1      Q      Do you recall Flight Attendant Bond

2   testifying that she never saw it?

3      A      I don't recall that level of detail, no.

4      Q      Do you recall Flight Attendant Warren

5   testifying that he didn't see it?

6      A      I do recall that Flight Attendant Warren

7   did not see it.  He was brought in after the fact.

8      Q      Okay.  All right.  So would it be fair to

9   say that the only one you recall testifying to having

10  seen the alleged face touching was Flight Attendant

11  Chelsie Bright Sakurada?

12     A      That would be a fair characterization.

13     Q      And she did not get another crew member or

14  another passenger to verify the observation, did she?

15            MR. CUNNINGHAM:  Objection, form.

16     A      So my recollection was that was when Scott

17  Warren was brought in, into the conversation, as a

18  confirmation of what they may have seen.

19     Q      (BY MR. MCKAY)  He -- you just testified

20  that he testified -- and correctly, that he testified

21  that he didn't see it.

22     A      He did not see the face touching, correct.

23     Q      Okay.  So she did not get confirmation

24  from another crew member or another passenger of the

25  face touching that she later reported to the captain,


MAGNA
LEGAL SERVICES

Page 63

1    did she?

2              MR. CUNNINGHAM:  Objection, form.

3         A     The face touching, not -- I don't recall.

4         Q     (BY MR. MCKAY)  Okay.  Now, Flight

5    Attendant Warren is the one who claimed to have seen

6    the hand in the crotch, correct?

7         A     Correct.

8         Q     And Flight Attendant Warren didn't get

9    another crew member or a passenger to verify his

10   observation of the alleged hand in the crotch, did

11   he?

12             MR. CUNNINGHAM:  Objection, form,

13   foundation.

14        A     Not that I can recall.

15        Q     (BY MR. MCKAY)  So Flight Attendant Bright

16   Sakurada reported something to the captain as an

17   observation that made her uncomfortable without

18   following this guideline to get somebody else to

19   confirm it, correct?

20             MR. CUNNINGHAM:  Objection, form and

21   foundation.

22        A     Correct to the face touching.

23        Q     (BY MR. MCKAY)  And Flight Attendant

24   Warren reported to the captain and first officer that

25   he had seen Mr. DelVecchia's hand in his son's crotch



Page 64

1    without getting anybody else to confirm it, correct?

2        A    ████ ████ ████ █████ ███████ ███████

3        █  ████ █ ███ █ ███ █ ███ ████ ██████ █████

     █ █████ ███ ███ ████ █████ ██████ █ ███

     █ █████ █████ ███ █████

6            MR. CUNNINGHAM:  Objection, form,

7    foundation, beyond scope, calls for opinion.

8        A    It sounds like there was a discussion that

9    occurred -- after the incident of the face

10   touching -- excuse me -- after the incident of the

11   face touching, it sounds like a discussion occurred

12   for the confirmation of -- which was when Scott

13   Warren walked to the back of the aircraft to confirm.

14           So it sounds like one -- the initial face

15   touching started the discussion.  And then Scott

16   Warren was going to be the confirmation.  But they --

17   they observed two -- two separate items.

18       Q    (BY MR. MCKAY)  So again, neither one of

19   those separate items was confirmed by a second

20   person.  Is that a correct statement?

21       A    To the best of my recollection, correct.

22       Q    Okay.  Let's go on that same document, if

23   you would, please, to Page 731, 0731, and that is the

24   page that has at the top a -- what appears to be an

25   image that has a caption "Human Trafficking" but the


MAGNA
LEGAL SERVICES

Page 65

1    actual content of the image is all black.

2            Do you see that?

3        A    I do, yes.

4        Q    And then beneath the black square or black

5    rectangle is the writing, ███ ████ █ ████████

█    ██ █ ██ ██ ████

█        █    ████

█        █    ██████ █████ █████ ███ ███████

█        █    ███ █ ██ ███

█        █    ███ ██ █████ ██ ████ █████ ████

█    ██████████ ██ ████ █████

█        ███ █████ █████ ██████ █████ ████

█    ████████

█        █    █ █████

█        █    ███ ███ ███████ ██ ██

█        █    █ ████████ ███████ ███ ████████

█    ██ ██ ██████ █ ████████ ████

█        █    █ ███████ ████ █████ ███ ███

█        █    ███ ██████ ████ ██████████ ███

█    ███ ███ ████ ███ █████ █ ███████ ████

█    ███ ████ ██ ████ ██████ ████ ███ █

█    ██ ████ █ █████████ ████████ █ ██

█    ███ ██████ ███ █ █████ ███ ██████ █

█        █    ███ ███ ████ ███ █ ████ ████ █





14      Q      And Frontier is an operator?

15      A      Correct.

16      Q      Okay.

17      A      Yes, sir.  And it came out -- so the 16 is

18   the year that it came out, so 2016.  019 is -- they

19   go sequentially, ███ █ ███ ███ ███ ███ ███ ███

██   ███ ███ ███ █ ███ ███ ███ ███ ███.

21      ███ ███ █ ███ ███ ███ ███ ███

██   ███ ███ ███ ███ ███ ███ ███

██   ███ ███ ███ ███ ███.

24      Q      Okay.  And do you think as you sit here

25   today that -- that the information that's in this





Page 67

1   training ████ ███ ██ ██ ██ ███

2       A      █ ██ ██ ██ ██ ██ ██ ██

3   ██ ▌ -- ██ ▌ ██ ███ ▌ ████ ██ ▌ ██







1　██　██

2　█　███████████████████████

3　█　████████████████████████

██████████████████████████████

█████████████████████████████

██████████████████████████████

███████████████████████

███████████████████████

███████████████████████████████

███████████████████████████████

██　█　██

██　████████████████████████

██　█████

██　████████████████████

██　████████████

██　█　(BY MR. MCKAY)   Okay.   Now, what

17　indication was there that A.D. was afraid of

18　uniformed individuals?   Was there any?

19　　　　MR. CUNNINGHAM:   Objection, form,

20　foundation.

21　　A　I don't recall seeing that.

22　　Q　(BY MR. MCKAY)   You didn't see that?

23　　A　I don't recall it, no.

24　　Q　Okay.   And if you had seen it, you would

25　recall it, right?









1

2

3   it?

4

5











Page 74

1    Chelsie Bright Sakuruda -- Sakurada deposition,

2    correct?

3         A       Yes, sir.

4         Q       And you -- do you recall in her deposition

5    she testified that Anna Bond, after doing the exit

6    row briefing and reseating the DelVecchias, came to

7    her and told her that when he asked A.D.'s age, Peter

8    DelVecchia answered for A.D.? Do you remember that

9    part?

10        A       I -- I don't remember that level of

11   detail, but it may have occurred, yes.

12        Q       And did you read Anna Bond's deposition?

13        A       I did.

14        Q       And Anna Bond testified that that never

15   occurred, that the -- that Peter never answered for

16   A.D., correct?

17        A       Again, I -- without referencing it, I -- I

18   can't be certain.

19   ███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████

███████████████████████████████

███████████████

███████████████████████████████████████████

███████████████████████████████████████████████████







Page 76

```
 1              Go ahead.

 2        A     Holistically, yes.

 3        Q     (BY MR. MCKAY)  I'm sorry, what?

 4        A     Holistically, yes.

 5        Q     Okay.

 6        A     ███ ██ ███ █████ ██ █
█ ████ ██ ██ ███
█    █    ███ ████ █ ██ █ ██ ██ ███
█  ██ ██ ████ ██ ██ ████ ██ ██ ███
█  ████ ███
█    █
█    █  ██ █ ██ █ ████ ██ ██ █
█  ██ ███ ████ █ ██ ██ █ ██ ██
█    █  ██
█    █  ███ █ ██ █ ████ ████
█  ██ █ ██ ████ ██ █ ███ ███ ███
█  █ ██ ██ ████ █ ████ ██ ██ █
█  ███ ████ ████ ███ ████
█  ██████
█        ██ ██ ██ ██
█    █    ██ ██
█    █    ███ █ ███ ██ ████ ██
█  ██ ████ ████ ██ █ ██ ██ ████
█  ██ █████ ██ █ █ ██ ██████
█        ██ █ ████ ████
```



Page 77







Page 79

```
 1   point, do you mind --
 2       Q     Yes, absolutely.  Do you want to take a
 3   break?
 4       A     Yeah, if you --
 5       Q     Let's do so.
 6             THE VIDEOGRAPHER:  The time now is 11:39
 7   a.m.  We are going off the record.  This is the end
 8   of Clip No. 2 in the deposition of Shawn Christensen.
 9             (Recess taken.)
10             (Exhibit 5 marked.)
11             THE VIDEOGRAPHER:  The time now is 11:56
12   a.m.  We are back on the record.  This is the
13   beginning of Clip No. 3 in the deposition of Shawn
14   Christensen.
15             Thank you, Counsel.
16       Q     (BY MR. MCKAY)  Mr. Christensen, I've
17   shown -- or I've given you what's been marked as
18   Exhibit 5.  It is a page from the Flight Attendant
19   Manual, and it's Bates numbered Frontier 0125.  The
20   heading on the page is ████ ████ ███
     ██      ██ ██ ████
     ██      █  ████
     ██      █   ███ ███ ████ █ ████████ ██ ██
     ██ █ █ ███ ██ ██ █████
     ██      █  ███ █ ████ ███ ██ ██ ████ █
```





```
21      Q      Okay.  Inflight refers to a division of --
22  of the company, does it not?
23      A      By division, a department within, yes.
24      Q      Okay.
25      A      Yes.
```



Page 81

```
 1        Q      So is it fair to say that Inflight covers
 2    the flight attendants department?
 3        A      ██
 4        ■    ████  ██ ██ ██ ██ ██ ██
   ■  ████  ██  ████  █  ████  ██  █  ███
   ■  ████  ██  █  ███  ██  █████  ████
   ■  ████  ██  █  ██  ████
   ■        █    ████
   ■        █  ██ ██  █  ██ ██ ██ ███  █
   ██  ██  --  █  ███  █  █████  ██  ██  ██  ██  ███
   ██  ███  ███  ██  █  ███  █  ████  █  ██  ████
   ██  ███  ██  ██  ██  █████  ███  █  ██  ███
   ██        █    ██
   ██        █    ███
   ██          ██ ██  ██  █  ██ ██ ██ ██
   ██  ████  ███  ██  ██
   ██        █    ████  ███  ██ ██ █ ██ ████
   ██  ██  ██ ██  ███  █ ██ ███
   ██        █    ████
   ██        █  ██ █ █ ██ ██ ██ ██ ██ ███ █
   ██  █ ██  ███  █ ██  ██  ███  █ ██  ███
22        A      Yes, sir.
23        Q      Okay.  What is -- in a nutshell, what
24    is -- what is being accomplished, if anything, by
25    this -- sending this document out to flight
```



Page 82

1    attendants?

2            MR. CUNNINGHAM:   Object to the form of the

3    question.

4       A       Typically, a must read is a reinforcement

5    of existing policy.

6       Q       (BY MR. MCKAY)   Okay.   So -- go ahead.

7       A       Or potentially an amendment or a slight,

8    subtle change of some sort.   So it's typically an

9    existing policy that you're either refreshing or for

10   some other reason they're -- they're getting it back

11   out.

12      Q       If it was a brand-new policy, would there

13   be a different document sent out?

14      A       Typically they would do a revision to the

15   Flight Attendant Manual itself, is the standard

16   process for that.

17      Q       Okay.   So then from looking at this,

18   because it's captioned and sent out the way it was,

19   this would be a revision of an existing policy?

20           MR. CUNNINGHAM:   Objection, form,

21   mischaracterizes testimony.

22      A       Maybe not a revision or simply a

23   reinforcement of existing.

24      Q       (BY MR. MCKAY)   Okay.

25      A       Yeah.



Page 83

1      Q      And the first sentence says, ▮▮▮▮▮▮

▮ ▮▮▮▮ ▮▮ ▮▮▮▮▮ ▮▮ ▮ ▮▮ ▮▮▮

▮ ▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮ ▮▮ ▮

▮ ▮▮▮ ▮▮▮

▮      ▮▮ ▮ ▮▮ ▮▮▮▮

▮    ▮   ▮▮

▮    ▮  ▮▮▮ ▮ ▮ ▮ ▮ ▮▮▮ ▮▮▮▮

▮ ▮ ▮ ▮▮▮▮ ▮▮ ▮ ▮ ▮

▮  ▮

▮    ▮▮ ▮▮ ▮▮ ▮▮▮ ▮▮

▮  ▮▮▮

▮  ▮  ▮  ▮▮ ▮ ▮▮ ▮▮ ▮ ▮ ▮▮ ▮

▮ ▮▮▮ ▮▮ ▮▮▮▮ ▮▮▮ ▮▮ ▮▮ ▮▮

▮ ▮▮▮ ▮▮▮ ▮ ▮ ▮ ▮▮ ▮▮ ▮ ▮ ▮

▮  ▮▮

16      Q      (BY MR. MCKAY)   And what is the basis for

17   your making that distinction?

18      A      Again, going back, typically pol- --

19   there's policy and procedure, and we typically try

20   and keep it black and white.  Procedure -- again, a

21   procedure is something that you can follow, but

22   something like this, where it's very ill defined, I

23   want to refer to it more as a guide.

24          Again, there's -- there's things in here

25   that you can go down, but it is a guide as you



Page 84

1    progress through because everything changes.   And if

2    you simply put a cookie-cutter identifier to, in this

3    case, sexual misconduct, there may be things that

4    are -- are applicable or not.

5              So it is a guide that -- it's based on the

6    conditions of what's going on.

7        Q     What type of training is given to flight

8    attendants so that they recognize something as being

9    a guide rather than a procedure?

10       A     Again, we refer to it as a procedure, but

11   it's guidance that -- there is flexibility within

12   that -- that procedure.   So -- and I just want to try

13   and clarify it a little bit.   Maybe I didn't do a

14   good job.

15       Q     Well, no, that's fine, you're -- you're

16   using the words okay, but I'm trying to understand,

17   if I'm a flight attendant and I receive this and it

18   says must read --

19       A     Uh-huh.

20       Q     -- and it says procedures, how am I to

21   understand that there's flexibility?

22       A     The other -- so part of what we're looking

23   for is also for flight attendants to exercise their

24   judgment and critical thinking.

25             And so based on the way that this reads,



Page 85

```
1    we want them to follow this as much as possible.

2    However, not every situation is cookie cutter.  And

3    so they have to utilize their -- their critical

4    thinking to identify what -- you know, where there

5    may be some flex here or there.

6         Q      And where does it say that in this

7    document?

8         A      Let me look through it.

9         Q      Sure.

10        A      And --

11        Q      Take your time.

12        A      Yeah.

13               And it doesn't say that in this document.

14        Q      So I go back to my previous question.  Is

15   there specific training you can point me to that

16   tells a flight attendant that when they receive a

17   document titled "Must Read" that gives them things

18   that are labeled as procedures, that they have

19   flexibility in implementing them?

20               MR. CUNNINGHAM:  Objection, form and

21   foundation.

22        A      I can't think of a specific slide or

23   anywhere that I can point to that defines that, no.

24        Q      (BY MR. MCKAY)  Okay.  Now, this document

25   says, ███ ██ █████ ███ █ ████ ███ █████
```



Page 86

1 ██████████████ ██ █ ██████████████ ██ ███████

███████████ ██ █ ████████ ██ █ ██████████████

█ █████████ ██ █ ████████████ ████████ █

█ ████████████ ████ ████████ ███████ ████████

█ █ ████████ █████ ████ ████ ████ ████ ███

█ ███████ ████ ████ ████ █ ████ ████ █████

█ ██████ █ ████ ████ ███████

█ █ ████

█ █ ██████ ████ ████ ████ ████ ████ █████

█ ████████ ████ ████ █████ █ ████ ████ ████

█ ██████████ █████████ ████████ █████████

█ ████████

█ ████ █ ████ ████ ███████

█ █ ████

█ ████ ████ ████ ████ ████ █████

█ ██████ ████ ████ █ ████ ████ ████ ████ █

█ ████ █████ ████████████

18          MR. CUNNINGHAM:   Objection, form and

19   foundation.

20          A     I would consider anything to be flexible

21   based on the circumstances.

22          Q     (BY MR. MCKAY)   So once again we have

23   procedures being given to Frontier flight attendants

24   that you're testifying would be implemented

25   differently depending on each of the several thousand


MAGNA
LEGAL SERVICES

Page 87

```
 1    flight attendants that work for the company?
 2              MR. CUNNINGHAM:  Objection, form,
 3    mischaracterizes testimony.
 4         A    Based on the multiple variances that may
 5    occur, yes, I think they do need to have that -- that
 6    flexibility within the confines of this document.
 7         Q    (BY MR. MCKAY)  And in saying so, in
 8    testifying to that, are you testifying from the
 9    standpoint of Frontier as a corporation?
10         A    Yes.
11         Q    Okay.  Is this Exhibit 6 a document that a
12    department of Frontier created?
13         A    Based on it indicating Inflight Must Read,
14    yes.
15         Q    Okay.  And was it created in the ordinary
16    course of Frontier's business or that department's
17    business?
18              MR. CUNNINGHAM:  Objection, form,
19    foundation, legal conclusion.
20         A    I don't -- I believe it was created in the
21    course of normal business, yes.
22         Q    (BY MR. MCKAY)  Do you have any reason to
23    believe that it states anything inaccurately?
24         A    I have no reason to believe that.
25         Q    ███████  █  ███  ███  ███  ███  ████
```



Page 88

1 ██████ ██ ██ ██ ██ ██ ██████ ██ ███

  █ ████ ██ ██ ██ ████ ████ ██ ██

  █ █████ ███

  █ ███ ██ █████ ██

  █ █ █ ██ ████

  █ █ ██ █ ███ █ ██ ███ ██ ██

  █ ████ ██ ███ ██████ ██ ██████

  █ █████ ████ ██ ████ ████ █

  █ █████ ███ ██ ████ ██ ██

  █ ████ █████ ███ ██ ██ ████

  █ ████ ███ ███ ███ ████ ██

  █ ███ ████ █ ████ ████

  █ ████ ███ ███

  █ █ ███ ████

15      Q      (BY MR. MCKAY)   How many days do flight

16 attendants have to input their confirmation codes?

17      A      My recollection, talking with Inflight, is

18 it's 30 days from the date of the memo or prior to

19 their next flight, whichever occurs earlier.

20      Q      All right.   So I guess, first of all, it

21 depends on the date of the memo and the date they saw

22 the memo, right?

23           MR. CUNNINGHAM:   Objection, form,

24 mischaracterizes.

25      A      I'm sorry, can you ask the question one


MAGNA
LEGAL SERVICES



1    more time?

2

3

24        Q        (BY MR. MCKAY)   Are you able to access

25    that data?



Page 90

```
 1      A     I -- I don't know.

 2      Q     Was the data destroyed?

 3            MR. CUNNINGHAM:  Objection, form,

 4   foundation, beyond the scope.

 5      A     I don't know.

 6      Q     (BY MR. MCKAY)  So as we sit here today,

 7   we ███████ ███ ████ ███ ████ ██████

 ██ ████████ ████ ████████████ ██████  if at all, correct?

 9            MR. CUNNINGHAM:  Foundation.

10            Go ahead.

11      A     Correct.

12      Q     (BY MR. MCKAY)  And if they did receive

13   it, ██ ████ █ ████ ████████ ████ ██████ ███████

14            MR. CUNNINGHAM:  Objection, form,

15   foundation.

16      A     Correct.

17      Q     (BY MR. MCKAY) ██████ ███ ██ ████████
```





Page 91







Page 93

1     A     Perhaps.

2     Q     (BY MR. MCKAY)  Okay.  Airbus makes the

3  aircraft, right?

4     A     They do.

5  ██  ████ ██ ██ ██ ██ ██ █ ██████

██ ██████ ██ █ ██ ███ ██ ████ ███ ████

█ ██ ███ █████ ███ ██ ██ ██ ████

█ █████ █ ██ ████

9          MR. CUNNINGHAM:  Foundation.

10    A     Perhaps.  And I'm going to lay a little

11  context on --

12    Q     (BY MR. MCKAY)  Okay.

13    A     -- on this.  I'll use the example of a

14  landing light, for example.  Frontier, when we turn

15  the lights on, we go this way (indicating).  So

16  the -- just describe it as pulling my hand towards my

17  face on the overhead panel to turn the lights on.

18  ████ ████ ██ ██ ██ ██ ██

19  ████ ██ ██ ██ ██ █ ██ ██ ███

█ ████ ████ ████

█ ██ █ ██ █ ████ ████ ████

█ ████ ████ █ ███ ████ ███ ██

█ █ █ █ ████ ████ ████ ██ ███ █

█ ██ █ ████ ██████ ██████ ██████ █

█ █ ███ ██ ████ ████ ████ ████



Page 94



```
 1   ███ ██ ██ ██████  ██████  ██
 2   ████ ██████████ ██ █ █████ ██████
 3   █ ███ ████ ██████
 4        Q    Okay.  And I thank you for that.  I'm
 5   going to just pick at it just a little bit, if you'll
 6   bear with me.
 7        A    Uh-huh.
 8        Q    ████ █████████ █████ ██ ██████ █
     ██ █ ███ ██ ██ ██ █████ █ ████ ███
     ██ ██████ █████ ██████ █████ ████
     ██ █ ██
     ██ █ ████ █████ █ ████ ████ ███
     ██ ███ █████ ███ ██████ ████ ██ █
     ██ ██████ █ █████ ████ ██████ █
     ██ ████ ██████ ████ █████
     ██ █ ███ █████ ████ ████ █████
     ██ █ ███ █████ ████ ████ ████ █
     ██ ███ █████ ████ ██ █ █
     ██ █████ ████ █████ █████ ████
     ██ ███ ████ ██████ ██████ █████
     ██ █ ████ ████ ████ █████
     ██ ███ █████ ████ ██ ███ ████
     ██ ██ ████ ████ █████ ████
24        Q    (BY MR. MCKAY)  Okay.  All right.  Moving
25   along, we are going to switch topics.
```



1            MR. MCKAY:  And it's 12:16.  Would you

2    prefer that we take a lunch break and then come back

3    and start talking about something completely

4    different?

5            MR. CUNNINGHAM:  Are you okay?

6            THE DEPONENT:  I'm fine to keep going.

7        Q    (BY MR. MCKAY)  You want to keep going?

8        A    Sure.

9        Q    Okay.

10            MR. HARRIS:  Let's just pick a time now to

11    make it easy.

12            MR. CUNNINGHAM:  About 1:00?

13            MR. MCKAY:  1:00, okay.

14            Mr. Videographer, can you tell us when

15    it's 1:00?

16            THE VIDEOGRAPHER:  I can do that.  Thank

17    you, Counsel.

18            MR. MCKAY:  Thank you, sir.

19            So this will be 7.

20            (Exhibit 7 marked.)

21        Q    (BY MR. MCKAY)  I am showing you now what

22    the court reporter has marked as Exhibit 7.  And

23    this -- unfortunately, the printer obliterated part

24    of the Bates number, so I'll see if I can get -- yes.

25    It is -- the actual Bates number of this document is



MAGNA
LEGAL SERVICES

Page 96

1    Frontier 0264.  And this was produced by Frontier

2    from its ████████ ██████ ██████ ██████ ████████

     █ ██████ ██████ ██████ ████ █

     █ ██████

5              Did I read that correctly?

6       A     You did.  And may I ask a question?

7       Q     Yeah, sure.

8       A     May I write the number on here just if we

9    reference it later?

10      Q     Yeah.  It is --

11      A     02- --

12      Q     -- 0264.  And I apologize, when it

13   printed, for some reason it obliterated the last two

14   digits there.

15      A     Okay.  And I do have that document as you

16   just previously read as well.

17      Q     Okay.

18            MR. CUNNINGHAM:  I'll just note for the

19   record, this is confidential and subject to

20   protective order.

21            Are we sure we know who's listening in or

22   on this call?

23            MR. MCKAY:  That's a good point.  Why --

24            MR. HARRIS:  Does he need to be on?

25            MR. MCKAY:  Yeah, that's the question, is



Page 97

```
 1   does this person need to be listening in, especially
 2   if we don't know who they are.  Can we just -- just
 3   end -- do we have the ability to end the
 4   transmission?
 5            THE VIDEOGRAPHER:  This is Roger, the
 6   videographer.  I was asked by our front desk through
 7   the court reporting firm to start this.  So I have no
 8   idea who's on it, who's requested it, or whatever.
 9   So it is up to counsel.
10            MR. MCKAY:  Well, let's go off the record
11   for a second, then.
12            THE VIDEOGRAPHER:  Absolutely.  The time
13   is 12:20 p.m., and we are going off the record.  This
14   is the end of Clip No. 3 in the deposition of Shawn
15   Christensen.
16            (Discussion off the record.)
17            THE VIDEOGRAPHER:  The time now is 12:23
18   p.m., and we are back on the record.  This is the
19   beginning of Clip No. 4 in the deposition of Shawn
20   Christensen.
21            Thank you, Counsel.
22       Q    (BY MR. MCKAY)  Mr. Christensen, we're
23   back on Exhibit 7.  And, first of all, is Exhibit 7 a
24   page from the ▆▆▆▆  ▆▆▆▆  ▆▆▆▆▆▆  ▆▆▆▆▆▆
     ▆▆  ▆▆▆▆▆▆▆
```



MAGNA

LEGAL SERVICES

Page 98

```
 1        A     Yes.

 2        Q     Okay.  Would this be part of that indoc

 3   that we discussed earlier?

 4        A     Perhaps.

 5        Q     Okay.  I -- I wanted to ask about the

 6   date. █ ██ ██ ████████████████████ ██ ██

     █ █████ ██ █ ██ █████████ ██ █ ████████ ██

     █ ███████ █ █ ██ -- ██ █ ██ ██ ██ ████

     █ ██████ ████████ █

     ██ █ ██ ████████ █ ██ ██ ████████ ██ ███

     ██ ████ ████████████ ██ █ █ ██ █ ██ ██

     ██ █████

13        Q     Okay.  So that being the case, then, as

14   far as we know, this document was issued after Flight

15   2067; is that right?

16        A     Correct.

17        Q     Do we have any knowledge of whether this

18   information would have been given to the four flight

19   attendants of Flight 2067?

20        A     I'm sorry, can you ask the question one

21   more time?

22        Q     Sure.  Do we have any way of knowing

23   whether the information on Exhibit 7 was provided in

24   any format to the four flight attendants of Flight

25   2067?
```



Page 99

```
1                MR. CUNNINGHAM:  Objection, form.

2                Go ahead.

3        A      No.

4        Q      (BY MR. MCKAY)  Okay.  What is the subject

5   matter of this Exhibit 7?

6        A      ███ ███ ███ ████████
██ ██████
██      █      ███ ██ ██ ██ ██ ██ ██ ██
██   ████ ████ ████████ ██ ████ ██ ██
██   ████████ █ ██ █ ██ ███████
██      █      ██ ██  █ ██ █
██      █      ██ ██
██      █      -- ██ ██ ██ ██ ████ ████
██      █      ██ ██ ██ █ ██ ████ █
██   ████████████████ ████ ██ ██ ██
██   ██████ ████ ███ ██ ████ ██ ████████
██   ██ ████ ████ ████ ████ ██ ██
██   ██ ████ ██ ██ ██ ██ ████████ ██ █
██   ████ ████ █ ██ ██ ████ ████
██   ██████ █ █████ ██ █ █ ████████
██   ██████
██            ██ █ ██ ██ ████ ████████
██      █      ██ ██ ██ ██ ████
██      █      ██ ██ ███ ████ ██ █ █
██      █      ██ ██ ████ ██ █ █ ███
```

Page 100

1   individual," but one word.  Content was correct.

2        Q     Okay.  And I'm -- let me reread the second

3   sentence, then.

4   ███████████████████████████████████████

5   of" -- oh -- ████████████████████████████

    ███████████████████████████████████████

    ███████████████████████████████████ --

    ███████████████████████████

    ██    █    █████████

    ██    █    ████    █████████████████

    ██    ████████████    ███████████████

    ██    ████████████████████    ██ █

    ██    ██████████    ████    ██    ██████

    ██    ████████    ██    ██████    █████████

    ██    ███    ████    ████    ████    █████

    ██    ██ ███

    ██         ███ █ ███ █████

    ██         █    ███    ███

    ██         █    ████    ██    █████ ██

    ██    ███████████████████

21            MR. CUNNINGHAM:  Objection, form,

22   foundation.

23        A     Verbatim, I don't know without cross

24   referencing against our Employee Handbook or another

25   document, but it -- it looks similar.


MAGNA
LEGAL SERVICES





Page 102

1 ███ █ ███ ███ █ █ █ ██ ███ █ ███

██ ███ ███ ██ █ ███ ██ ██

█ ███

█ ███ ██ ███ █ ███ ███ █ ███

█ ██

█ █ ███ █ ███ █ █ ██ ███

█ ███ ███ ███ ███ ███ ███

█ ███ ███ ██ ███ ███ ███

█ ███ ███ █ ██ ██ █ ██ █ █ ███

██ ███ ██ ███

██ █ ███

██ ███ ██ ██ ███ ███

██ ███

██ █ ███ ███                    All right.  And if they've

15  bought a ticket, they'll be accepted as a passenger,

16  right?

17           MR. CUNNINGHAM:  Same.

18      A    Correct.

19      Q    (BY MR. MCKAY)  Okay.  But it doesn't say

20  anything more, does it?

21      A    No.

22      Q    Okay.

23           MR. CUNNINGHAM:  I'm going to interpose

24  the same objections there.

25           Go ahead, please.



Page 103

```
 1       Q       (BY MR. MCKAY)  So the information that's

 2   provided at least as of September 13 of 2019

 3   essentially says, We'll sell anybody a ticket and

 4   anybody can get onboard, right?

 5               MR. CUNNINGHAM:  Same objections.

 6       A       Correct.

 7       Q       (BY MR. MCKAY)  Okay.  And do we have any

 8   information whatsoever -- does the corporation have

 9   any information whatsoever that would inform us as to

10   whether or not the four flight attendants of Flight

11   2016 (sic) ever read this document, Exhibit 7?

12       A       Could you ask the question one more time?

13       Q       Do we have any data or information of any

14   kind that Frontier Airlines can provide us that would

15   tell us whether the four flight attendants of Flight

16   2016 -- sorry -- Flight 2067 ever read the contents

17   of Exhibit 7?

18               MR. CUNNINGHAM:  Foundation.

19       A       No.

20       Q       (BY MR. MCKAY)  Okay.

21               MR. MCKAY:  Let's go to Exhibit 8.

22               (Exhibit 8 marked.)

23       Q       (BY MR. MCKAY)  I'm showing you now what's

24   been marked as Exhibit 8, which seems to suffer from

25   the same printing problem, so let me find the Bates
```



Page 104

1   number.

2          The Bates number of this document is

3   Frontier 0265, and it's a one-page document bearing

4   the title at the top left ███████████████ ████

   ██ ████████ █████████ █████████ ████████████

   ██ ██ █████████   Is that correct?

       A    Correct.

       Q    And do you know what this document is?

       A    ██ █ ██ ██ ██ █ ██ ██ ██ ████████

   ██ ████████████ ████████

11      Q    Okay.

12      A    One of the slides.

13      Q    All right.  And again we -- we have the

14  date of September 13 of 2019.  And would that mean

15  that this particular document was generated on that

16  date?

17      A    Correct.  The same as Exhibit No. 7, it's

18  a part of the same revision cycle that was --

19      Q    Okay.

20      A    -- issued on that date.

21      Q    ██ ████ ██ ███████ ████ ██████

22  ██████████████ █████   Is that correct?

23      A    Correct.

24      Q    Okay.  And just skipping down to the

25  language down below the image, the black and white



Page 105

1    print, the first bullet point says, ███ ██████ ███

███ ██ ██████ ████ ██ ██ ██████ ██ ███ ████

███ █████ ██ █████ ██████ █████

4              Did I read that correctly?

5        A    Yes, sir.

6          █   ███ ██ ██ ████ ███ ██ █ ██████

█ ███████ ██ ████ ██ █ ████ ██ ██ ██ ████

8    ██████████   █ ████████████ ███ ████████ ' "

9              Did I read that correctly?

10       A    Yes.

11         █   ███ ██ ██ ████ ██ █ ██████ ██ ████

12   ███ █ █████ ██████ ████ ████████████ █ █

█ █████ ████████ █████ ████ ████ ████████

14             Did I read that correctly?

15       A    Yes.

16       Q    And the last bullet point is a █████ █

17   █ ████████ █ ████ ██ ██ ██ ██████         'I feel

█ ████ █ █ █████ ██████ ✏'

19             Did I read that correctly?

20       A    Yes.

21         █   ██████ ██ ██ ████ ██ █████ ██████

█ ██████ ██ ██

█   █   ██

█   █   ████ ███ ██ █████

█   █   ██████ ██ ██ █ ████ █ █████



Page 106

1   attendant can utilize if there's something that they

2   see that they want to maybe bring to someone's

3   attention. ███ ██ ████ ████ █ ██████████ ██████

4   ██████ ███ ██ ██████████ █ ██████████████

█ ██████ █ ███ ███ █████ ██████

6       Q    Sure.

7       A    █ ██ ████ ████ ██████ █ ██ ██

█ ██████ ██ █████ ████████ ██ ████

█ ███████ ███ █ ████ █ ████ █ ████████

█ ████████ ████ █ █ ████ ██ █████ ██

█ ██████████ ████ ████ █ ██████ ███

█ █ ██ █ ██ █████

█   █ █ ███

█   █ ███ ████ ██ █ ██

█ █████████ █

█   █ ██████

█   █ █████

█ █████ ███ ████ ██ ████ ████

█ ████ ██ ██████ ███ ██ ████ ████

█ █████ ██ ██ █ █████ █████

█   █ ███ █ ███ ███

█   █ ████ █ ████ ██ ██ ████

█ █████████ █ ██ █ ████ ███ ██ ██

█ █ ██ █████████ ██ ████ █████



















1       ███   ███ ███  █  ███ ████ ████  █ ███

2  █  ██

3                 (Exhibit 9 marked.)

4        Q      (BY MR. MCKAY)  All right.  I'm showing

5  you now what's been marked as Exhibit 9.  It's a

6  multipage document starting with Frontier 0724 on the

7  first page and ending with Frontier 0727 on the last

8  page.  And I'll note for the record this has been

9  stamped as sensitive security information.

10                Do you recognize that document, sir?

11       A      May I ask a question?

12       Q      Absolutely.

13       A      The numbers got cut off.  Do you mind if

14  we just verify the pages?

15       Q      Oh, I'm so sorry.  Okay.  Let's -- yeah.

16       A      May I read it off the way that I see here?

17       Q      Yes, please.

18       A      So at the bottom, indicates Frontier

19  07204, the very first page?

20       Q      The very first page.  I have perhaps

21  pulled up the wrong document, then.

22       A      I thought you said -- 07204 is what I

23  wrote in.  I may have --

24       Q      I'm sorry, yeah, okay.  So we're looking

25  at two different numbering systems.  So I'm going to



```
                                                    Page 112
 1    have you look to the right at the bottom to where it

 2    says Frontier 0720.

 3              Do you have that?

 4       A      Yes.

 5       Q      Okay.

 6       A      I'm sorry.  I accidentally wrote in 4.  I

 7    thought you were adding it in.  My apologies.

 8       Q      So that's the Bates stamping that

 9    Frontier's counsel put on the document before

10    producing it to us.

11       A      Yes, sir.

12       Q      Okay.  So then the next page in that same

13    location, even though it's a bit obliterated by the

14    boilerplate at the bottom, it says Frontier 0721.  Do

15    you have that?

16       A      I do.

17       Q      Okay.  And then the next one down,

18    Frontier 0722?

19       A      It gets cut off.

20       Q      Oh, I'm sorry, maybe I did that wrong.

21    Can I take a look at it?

22       A      Yes.  I just want to make sure that

23    we're --

24       Q      Yeah.

25       A      -- referencing the same.
```



Page 113

```
 1        Q      Oh, you're -- you are absolutely right.
 2   Let me see.  Okay, yes.
 3              So that third page should be 0722.  I see.
 4   And then the next -- yeah, okay.  I apologize, it's
 5   just the way that the printer decided to expand the
 6   page when it printed.  But the next one is 0722 and
 7   the page after that is 0723, and then it picks up
 8   with 0724, 0725, 0726, and ending finally with 0727.
 9        A      Correct, yes, sir.
10        Q      Okay.  Thanks.
11              Now, do you recognize what these documents
12   are?  And if -- if I have put together documents that
13   are from different sources, please let me know.  I
14   only know what is -- has been produced to me.  So
15   this is our time to figure out if we've put together
16   documents from different books.
17        A      Yes, it does look familiar.
18              THE DEPONENT:  And bless you.
19        Q      (BY MR. MCKAY)  So let's go with maybe
20   just identifying each page.  ███ ████  ████  ███  ████
21   ███  █████ ███  ███  ████████  ████  ████   ███
██  ███ ██  ███████
██      █  █████
██      █  ███  ████  █  ████  █  ████  ████  ████  ███
██  █  ████  ███  ███  ███████  ████  █████
```





Page 114







Page 116

1          Q      Okay.  Now, the next one is a bit more

2     ambiguous to me because the heading doesn't seem to

3     indicate the source, but it looks like the other

4     training documents that we've seen.

5               Would it be fair to say that it's a

6     training document?

7          A      I think that's fair, yes.

8          Q      Okay.  And then the next page is similar.

9     Would it be fair to say -- and that one is Frontier

10    0725.  Is that also a training material?

11         A      It looks like it would be sequential.  So

12    it would be a part of the training material, yes.

13         Q      Okay.  And can we say the same thing for

14    Frontier 0726?

15         A      I think that's a fair identification of

16    that document, yes.

17         Q      Okay.  And how about for the last page,

18    would that also be a training document?

19         A      The -- it looks like it would be, yes.

20         Q      Okay.  Great.  Thank you.

21               Let's go back up to the top, then.  And

22    actually, what I just want to cover at the moment

23    is -- I apologize, it's the third page in.  There is

24    a box, and the box has a title that says in big,

25    bold, caps, underlined, ▓▓▓▓▓▓   ▓▓▓▓





1   ███████████   ██████   ████████

2          Do you understand what that box is

3   depicting?

4      A    I do.

5      Q    Okay.  What is that?





Page 118



1  ████ ████████ ████ ████████ ████ ███

2  A  ████ ████ ████ ███

3  Q  ███ ██ ████ ████

4  A  ████ ████████ ████ ████ ████ ███

5  Q  ████ ████ ████ ████ █████

6  A  ███

7  Q  ████ ██ ████

8  ████████ ██ █ ██ ████████ █ ██ ███████

██ ████ █ ██ █ ████ ████ █ ██ █ ████ ████

██ ████ █████ ██ █ ██ █ ████ █ █████ ███

██ █████ ████ ██████ ████ █ █ ███████ █ ████

██ ██████

██ █ ███

██ █ ████ ████ ████ ████ █ █ ████ ██████

██ █ ████████ ████████

██ █ ███

██ █  Okay.  And as you look at them today, do

18  you have any reason to believe that any of them are

19  inaccurate?

20  A  No.

21  Q  Okay.  And when I say "any of them," I

22  mean any of the content of them is inaccurate.

23  A  No.  I believe it to be accurate.

24  Q  ████ ███ ████ ████ ████ █ ████

25  about the ███ ████ ████ ████ ███ ███



Page 120

1  ███████ ███ ██ ███ ██ ███ ██ ██ ███

█ ███ ██ ██ ███ ███ ██ ██

█ ███ ██ █ ███ █ ███ ███

█ █ ██

5      Q      And created in the ordinary course of

6  Frontier's business?

7      A      Yes.

8      Q      Do you have any reason to believe that the

9  contents of either of those two pages is inaccurate

10  in any fashion?

11      A      No, sir.

12      Q      Okay.  And with respect to the first two

13  pages, does that -- do those pages ████ ██

█ ███ ██ ███ ██ ███ ██ --

█ ███ █ ██ ██ ██ ███ ███ ██

█ █ ██ ██ ██ █ ██ ██ █

█ █ ██

█ ██ ██ █ ███

█ ███ ███

█ ██ ███ ███ ██

█ ███

█ ██ ██ ██ ██ ██ ██

█ ███ █ ██ ███ ███

█ █ ███ ██ ███

█ █ ███











Page 125

```
 1              MR. MCKAY:  It is 1:00 in two minutes, so
 2    why don't we go ahead and take a break here and take
 3    a lunch break.
 4              MR. CUNNINGHAM:  Sure.
 5              MR. MCKAY:  Okay.
 6              THE VIDEOGRAPHER:  The time now is 12:59
 7    p.m.  We are going off the record.  This is the end
 8    of Clip No. 4 in the deposition of Shawn Christensen.
 9              (Noon recess taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```


MAGNA
LEGAL SERVICES

Page 126

1                    AFTERNOON SESSION
2              THE VIDEOGRAPHER:  The time now is 2:08
3    p.m.  We are back on the record.  This begins Clip
4    No. 5 in the deposition of Shawn Christensen.
5              Thank you, Counsel.
6                 EXAMINATION (Continued)
7    BY MR. MCKAY:
8         Q     All right.  Mr. Christensen, we're back on
9    the record after a lunch break.  You do understand
10   that you're still under oath from this morning,
11   right?
12        A     Yes, sir.
13        Q     Okay.  I wanted to re-cover what we talked
14   about the first thing this morning about the net
15   worth.  Is there any question that I could ask you
16   here today that would result in you giving me a
17   numerical value for Frontier's net worth?
18        A     No, sir.
19        Q     Okay.  And just for clarification, when
20   you mentioned the Q2 or Quarterly 2 statement, is
21   that the one that goes to the Department of
22   Transportation or the one that goes to the Securities
23   and Exchange Commission?
24        A     It's the Form 10Q.  In all honesty, I
25   didn't pay attention to the header.  I just typed in



Page 127

1  Form 10Q and it popped up and had about a hundred --

2  I feel like 150-ish pages --

3       Q     Okay.

4       A     -- of documentation.

5       Q     Okay.  I -- I'm going to guess that that's

6  the SEC 10Q, but I don't know.

7       A     Based on what I saw, it -- it tends to

8  head that direction, yes, sir.

9       Q     Okay.  Thank you.

10            I'm going to go back now to our Exhibit 9.

11  [redacted]







































Page 138

1  ███████ ████ ██  ██ ███ ███ ██

2  ██ ███ ███ █ ███ ███

3          MR. CUNNINGHAM:   Objection, form.

4     A    Can you define "up to them," being --

5     Q    (BY MR. MCKAY)   Shupe and Mullin.

6     A    No.

7     Q    Well, wait a minute.   You said that all of

8  these are -- are guidance, and they are things that

9  they can interpret as they see fit, didn't you?

10    A    ███

11    █  ███ ██ ██ ███ ██ ███ ██ █

   ██ █████ █ █ █ ██ █ ████

   ██ ███ ██ ██ ██ ██ ████

   ██ ████ ██ ██ ████ ███ ████

   ██ ████ ██ ██ ████ ██

   ██ ███ ███

17         MR. CUNNINGHAM:   Objection, form.

18    A    They can always prepare for it, yeah.

19    Q    (BY MR. MCKAY)   But they can decide not to

20 prepare for it.

21         MR. CUNNINGHAM:   Objection, form.

22    Q    (BY MR. MCKAY)   Right?

23    A    Sure.

24    Q    Sure.

25    A    Yeah.









Page 140





















Page 145

```
1              ██   ███████    ████████   ████
2        A     ███████  ██  █████████   ████████
3   yeah.
4        Q    ██████  ██████   ██  ██████   ██ █
```











Page 148

1 ███ █ ████ ████ █ ████ ███ ███ ███

█ ████ ██ ████ ████ █ ████ ███ █████

█ █ █████ ████ ████ ███ ██ ██ ██ --

█ ███ ██ ██ █ █ █ ███ ███ █ █

█ █████

6     Q     Was Peter DelVecchia attempting to hijack

7 Flight 2067?

8           MR. CUNNINGHAM:  Objection, form --

9     A     No.

10           MR. CUNNINGHAM:  -- and foundation.

11     Q     (BY MR. MCKAY)  Was Peter DelVecchia

12 engaged in a fight on Flight 2067?

13     A     I -- I don't see any indication of a

14 fight, no.

15     Q     So what other conditions can you think of

16 that would have justified hitting Peter DelVecchia in

17 the back of his head?

18     A     I -- just reading through witness

19 testimony, I don't see anything that a flight

20 attendant did hit Mr. DelVecchia in the back of the

21 head.

22     Q     Did you read Mr. DelVecchia's deposition?

23     A     I did.

24     Q     Did you read his son's deposition?

25     A     I did.


MAGNA
LEGAL SERVICES

Page 149

1     Q     Did you read his daughter's depositions?

2     A     I did.

3     Q     Did you read his girlfriend's deposition?

4     A     I don't recall the girlfriend.

5     Q     Franzese?

6     A     I may have.  I just don't recall it.

7     Q     Did you read his neurologist's

8  depositions?

9        A     I don't know if I read the neurologist as

10  much as notes or testimony indicating.

11     Q     Well, Peter DelVecchia says that he -- he

12  testified under oath that he was hit in the back of

13  the head.  So why do you discount that testimony?

14     A     It's only one-sided, and I'm not going to

15  make a side that one side is right or wrong, but I

16  was not there and I cannot testify that he was or was

17  not hit in the head.

18     Q     So he might have been hit in the head?

19     A     He might have.

20     Q     By your flight attendant?

21     A     By my flight attendant or somebody else or

22  not at all.

23     Q     And he might have exhibited symptoms of a

24  concussion?

25     A     Perhaps, if testimony is true.



Page 150

1        Q        Okay.   Do you have any reason to believe

2     that any of the individuals I just mentioned were

3     testifying untruthfully?

4        A        I wasn't there.   I've got no reason to

5     believe that anybody is right, wrong, or indifferent.

6     That's -- that's not what I'm here for.

7        Q        Okay.   But you are here to testify about

8     the company's positions on its documents.   And I'm

9     asking you what condition might justify Peter

10    DelVecchia being struck in the back of the head on

11    Flight 267 -- 2067 by your flight attendant Scott

12    Warren?

13               MR. CUNNINGHAM:   Objection, form and

14    beyond the scope.

15       A        I don't know.

16       Q        (BY MR. MCKAY)   Did you do any

17    investigation as to whether or not he was struck in

18    the head?

19       A        I -- can you expand -- maybe rephrase the

20    question specifically?

21       Q        Well, it's one of the items on the

22    deposition notice, Exhibit 1.   Did you do any

23    investigation into the accuracy of his statement that

24    he was struck in the back of the head?

25               MR. CUNNINGHAM:   Objection, form.



Page 151

```
1        A     I personally did not, no.

2        Q     (BY MR. MCKAY)  Okay.  And back to the

3   original question, can -- can you think of a

4   situation that would provide a condition that would

5   justify Flight Attendant Scott Warren striking Peter

6   DelVecchia in the back of the head on Flight 2067?

7              MR. CUNNINGHAM:  Objection, form, beyond

8   the scope.

9        A     No.

10       Q     (BY MR. MCKAY)  Is it ever appropriate for

11  a flight attendant to discuss with a minor passenger

12  an allegation that the minor passenger's father was

13  sexually molesting him?

14             MR. CUNNINGHAM:  Objection to the form.

15       A     It -- conditional.

16       Q     (BY MR. MCKAY)  Is your answer for

17  everything going to be "conditional"?

18             MR. CUNNINGHAM:  Object to the form of

19  that question, too.

20       A     Perhaps.

21       Q     (BY MR. MCKAY)  Okay.  So again, flight

22  attendants basically can do whatever they want.  Is

23  that what we should take from this?

24             MR. CUNNINGHAM:  Objection, form, and

25  mischaracterizes testimony.
```



Page 152

1        A       I think that it's important to know that

2    flight attendants should use critical thinking based

3    on their observations to make a -- a decision.

4        Q       (BY MR. MCKAY)  Do you think it's

5    important toward that goal of critical thinking to

6    provide them with the means by which to engage in

7    critical thinking?

8                MR. CUNNINGHAM:  Objection, calls for an

9    opinion, not facts.  It's outside the scope.

10       A       Can you rephrase, please?

11       Q       (BY MR. MCKAY)  Sure.  Did you just

12   testify that it's important for a flight attendant to

13   use critical thinking?

14       A       Yes.

15       Q       Okay.  Does critical thinking involve the

16   application of certain standards?

17       A       Yes, I'd agree.

18       Q       Okay.  How does a flight attendant obtain

19   the standards on which to judge their decisions?

20       A       I think it varies.  It could be

21   experience.  It could be a multitude of things.

22       Q       Well, if you hire 2,000 flight attendants,

23   isn't it reasonable to assume that they've come from

24   2,000 different sets of experiences?

25                MR. CUNNINGHAM:  Objection, form.



Page 153

1      A      Likely, yes.

2      Q      (BY MR. MCKAY)  So how do you create an

3    environment for ensuring passengers' safety that

4    enforces certain standards toward the flight

5    attendants' critical thinking?

6             MR. CUNNINGHAM:  Objection, form.

7      A      We -- we lay a foundation through --

8    through policy and -- and guidelines, and within

9    those confines kind of work through the scenario.  If

10   they need to communicate with somebody else, we

11   talked about the CUS earlier, the, you know, concern,

12   uncomfortable, and safety.

13            You know, we provide -- we provide them

14   different tools to utilize and a foundational

15   policy/guidance for them to reference based on the

16   conditions that they're seeing.  Not -- one size does

17   not fit all in a lot of what we do.  We operate in

18   the gray a lot.

19     Q      (BY MR. MCKAY)  If a flight attendant that

20   Frontier hires comes from a background in which that

21   person has been taught that black people should have

22   black children and white people should have white

23   children, how do you ensure that that flight

24   attendant isn't going to make decisions on a Frontier

25   flight that would discriminate against black people



Page 154

1    with white children or white people with black

2    children?

3              MR. CUNNINGHAM:  Objection, form and

4    foundation, and beyond the scope.

5         A    Can you rephrase that question, please?

6         Q    (BY MR. MCKAY)  Sure.  You just testified

7    that if you -- if Frontier goes out and hires 2,000

8    flight attendants, it's likely that they have 2,000

9    different sets of experiences that they bring with

10   them to the job, right?

11        A    Correct.

12        Q    Okay.

13        A    Potentially.

14        Q    And potentially one set of experiences

15   could be an experience that tells them that black

16   people should have black children and white people

17   should have white children, correct?

18             MR. CUNNINGHAM:  Same objections.

19        A    Correct.

20        Q    (BY MR. MCKAY)  Okay.  That exists in this

21   world, right?

22             MR. CUNNINGHAM:  Object -- same

23   objections.

24        A    Unfortunately it does, yes.

25        Q    (BY MR. MCKAY)  Okay.  So what steps does



Page 155

1  Frontier Airlines take with its flight attendants to

2  ensure that they don't use those sets of experiences

3  to -- in their critical thinking to make decisions

4  about what to do when they see a white passenger with

5  a black child or a black passenger with a white

6  child?

7          MR. CUNNINGHAM:  Same objections.

8      A     I think some of that is covered within the

9  training, within our anti-discrimination, which is

10 covered in the █████████ ████████ ████████ █ █ █

   █ ████████ ████████

12         Again, we -- I'd say flight attendants

13 might be one of the most diverse groups within the --

14 the entire company, and the way that we standardize

15 that is through policy governed from the company

16 level down.

17     Q     (BY MR. MCKAY)  Are you saying that if you

18 have a diverse group of flight attendants, then you

19 can just assume that they will not act in

20 discriminatory ways?

21     A     No.  We -- we try and provide that

22 guidance, that we are a non-discriminatory air

23 carrier, regardless of their background.

24     Q     All right.  What does that mean, we are a

25 non-discriminatory air carrier?  What does that mean?



Page 156

1      A      We'll take anybody that wants to fly on

2   Frontier to go to wherever they'd like and have a

3   good time, whether it's vacation or family or

4   whatever the case may be.

5      Q      And what specific criteria exists in that

6   statement that you just made that tell that flight

7   attendant, who came from a discriminatory background,

8   a background that tells that person that white people

9   should have white children and black people should

10  have black children, what specifics in that statement

11  that you just testified to indicate to that flight

12  attendant that they should not take action against a

13  couple of passengers that are comprised of people of

14  two different races?

15         MR. CUNNINGHAM:  Objection, form,

16  foundation, beyond the scope, and improper

17  hypothetical.

18     A      I'm sorry, can you rephrase the question?

19  I apologize.

20         MR. MCKAY:  She'll read it back.

21         (Requested record read.)

22     A      I think that's covered in our

23  ████████████████████████  ███  ██████████

██  ██████████

██       ██      (BY MR. MCKAY)  You keep referring to one



Page 157

1   in the Employee Handbook.  Is it different from the

2   one that we just talked about that's given to flight

3   attendants during their training?

4        A       Without comparing the two, I -- I don't

5   know.  They look relatively similar, and it would be

6   the same one that the -- that the pilots would sign

7   for as well.

8        Q       Which one is the one the pilots would sign

9   for?

10       A       Employee Handbook.

11       Q       Are you telling me that all six employees

12  involved in 2067, the four flight attendants and the

13  two pilots, signed documents acknowledging that they

14  had read certain documents?

15       A       I believe so, if I remember reading all

16  the documentation correctly.

17       Q       All right.  And what is it they signed and

18  what does it say?

19       A       If you can produce it, I -- I could read

20  it.  I -- I can't remember.

21               MR. CUNNINGHAM:  Let me interpose an

22  objection to the form.

23       A       Oh.  I --

24       Q       (BY MR. MCKAY)  Okay.

25       A       Yeah, I need to reference the document.



Page 158

1       Q       Well, you just did in your testimony.

2    So I'm --

3       A       Yeah.

4       Q       -- asking you what you're talking about.

5       A       Generically speaking, because I can't

6    quote it exactly, but the -- we sign a document

7    indicating that we're familiar and responsible for

8    the contents of the ████████ ████████ ████ ████

████ ████████ █ ████ ████ ████████ █ ████████

█ ████████ █ ████████████.

11      Q       █ ████████ ████ ████████ ████

█ ████████ ████████ ████████ ████████ ████

█ ████████ ████████ ████████ ████████

14              MR. CUNNINGHAM:  Objection, form, and

15   beyond the scope.

16      A       I don't know.

17      Q       (BY MR. MCKAY)  Do you think it's

18   possible?

19      A       Everything is possible.

20      Q       Okay.  How many pages does the Employee

21   Handbook have?

22      A       I -- I don't know.  It's not a -- it's not

23   too long of a read to get through in in -- a day or

24   less than a day.

25      Q       Does anybody test them on its contents?



Page 159

1       A       Not that I'm aware of.

2       Q       Does anybody watch them read it?

3       A       2019, not that I can recall or -- I don't

4    know.  In 2019 I don't know.

5       Q       You don't have any way of knowing whether

6    the four flight attendants and the two pilots on this

7    flight ever turned a page in the Employee Handbook,

8    do you?

9       A       No.

10              MR. CUNNINGHAM:  Objection, form.

11      Q       (BY MR. MCKAY)  Okay.  Hang on just a

12   second, let me see if I can find --

13              MR. MCKAY:  Let's go off the record for a

14   second.

15              THE VIDEOGRAPHER:  The time now is 2:47

16   p.m., and we are going off the record.  This is the

17   end of Clip No. 5 in the deposition of Shawn

18   Christensen.

19              (Discussion off the record.)

20              (Exhibit 14 marked.)

21              THE VIDEOGRAPHER:  We are back on the

22   record.  The time now is 2:51.  This is the beginning

23   of Clip No. 6 in the deposition of Shawn Christensen.

24              Thank you, Counsel.

25      Q       (BY MR. MCKAY)  Mr. Christensen, I'm



Page 160

1    showing you what's been marked out of order as

2    Exhibit 14.  It is a three-page document bearing

3    Bates numbers at the bottom Frontier 1428, 1429, and

4    then it skips to 1431.  Is that what you have in

5    front of you?

6         A    Yes.

7         Q    Okay.

8         A    Yes.  Excuse me.

9         Q    And I see at the top that it's titled

10   ███████ ███████ ████████ █ ████ ███████ ████ ██

     ██ █████ ████ █ ███ ████ ██████

     ██ █ ████

     ██ █ █████ ████ ██████ █████ ████████ █

     ██ ██████ █ ██ ████

     ██ █ ████

     ██ █ ████ █████ ███████ ████████████

     ██ █████ █████ █ █████ ██████ ██████ █████████

     ██ █████ ████ ████ █████████ █████████

19             Do you see that?

20        A    Yes.

21        Q    Okay.  Take a minute to read that, and

22   then let me know if this is what you were just

23   referring to in your testimony.

24        A    It is.

25        Q    Okay.  And I'm going to just go ahead and





1    read.   The first paragraph says,













Page 164



21    (BY MR. MCKAY)  You said it attempts to

22    educate the newly hired flight attendant about what

23    are legally-recognized bases that are protected.  And

24    I'm asking you how Frontier Airlines as a corporation

25    knows that it's been successful in educating the



Page 166

1     newly hired flight attendant?

2     ██    ████    ██████    █████

3        █    ██ ██ ████ ██ ████ ██ ██

█ ██ ██ ██ ██ ██ ██ ██ ████ ██

█ ████ ██ █ █████ ████

█     █    ████ ████    ████ ████ ██

█        ████ ██████    ████ ████

█     █    ██ ██ █ ████ ██

█        █    (BY MR. MCKAY)  Okay.  Are you aware as

10    you sit here today that a family unit consisting of

11    members of different races is itself a legally

12    protected -- legally protected basis for

13    discrimination?

14        A     I would say yes, it -- it identifies race,

15    color in there.

16        Q     Well, it doesn't.  It says -- it says race

17    in the singular and color in the singular.  Where

18    does it say a family unit consisting of people of

19    different races and colors?

20        A     It doesn't specifically identify that.

21      █    ███ ██ ██ ████ ████ ██ ███

█ ████ ████ ██████ ██ █ ████ ██ █████

█ ██ ██ █ ████ ██ █ █ ████ ████

█ ████ ██ ██

█     ███ ██████    ████ ██ █

██████████
SERVICES



```
1    ▮    ▮  --

2       ▮ ▮▮▮▮▮ ▮ ▮ ▮▮ ▮▮▮▮

3    ▮    ▮▮ ▮▮▮▮▮ ▮

4    ▮    ▮▮▮ ▮▮ ▮▮ ▮ ▮▮ ▮▮ ▮ ▮▮
```

(lines redacted)

```
23            It's the policy, but again, guidelines are
23    what we should look at as our -- our basis for how we
24    conduct ourselves.
25        Q    Okay.  So when you testified earlier about
```



Page 168

1  guidelines and how they should be followed or not

2  followed given the case, this is similar, right?

3  These are guidelines?

4       A    Correct.  Well --

5       Q    And the last sentence of the paragraph --

6            MR. CUNNINGHAM:  He wasn't finished with

7  his answer.  Sorry.

8       A    I'm sorry.

9       Q    (BY MR. MCKAY)  That's all right.

10      A    To your point, it is policy, and policy --

11  again, we can -- I look at it as guidelines,

12  opportunities within the confines of how we operate.

13  ██    ██  ██    ██ ██ ██ ██  ████

██ ████████ ██ █ █ ██ ██  ██ ██  ████ ████  ██ █

██ █ ██ █ ██ █ █ ██  ██ ██ ██ ██  ██

██ ████  ████  █ ██  █████

17            Did I read that correctly?

18      A    Yes.

19  ██    ██  ██ █ ██  ██  ████  ██

20  ██ ██ ██  █ ██ ██  ██  ██

21  █    ████

22  █    ██  ██  ██  ██ ██  ████

██ ████ ██ ██ █ ██ ██  ████

██ ████ █ ██ █ ████ █ ██ █ ██

██ ██ ██ █ ██ █ ████



1　[redacted]

2　[redacted]

3　[redacted]

4　[redacted]

5　[redacted]

6　[redacted]

7　[redacted]

8　　A　　Sure.  You're striking somebody on the

9　back of the head.

10　　Q　　(BY MR. MCKAY)  Without provocation,

11　right?

12　　A　　Without provocation, yeah.

13　　Q　　Okay.  And that might result in corrective

14　action, up to and including termination of

15　employment, right?

16　　A　　Yes.

17　　Q　　So why wasn't there any further action

18　with respect to Mr. Warren, who was accused of

19　hitting Mr. DelVecchia in the back of his head?

20　　　　MR. CUNNINGHAM:  Objection, form and

21　foundation.

22　　A　　Again, it was an accusation that would

23　need to be investigated.

24　　Q　　(BY MR. MCKAY)  Well, it's been four

25　years.  Has it been investigated?



Page 170

```
 1        A       I'd say by Frontier and police and
 2   Metro -- excuse me, not Metro -- well, Metro police,
 3   excuse me, in Vegas, the FBI, and now in -- in
 4   litigation.  So I think it's been under review for
 5   some time, yes.
 6        Q       You think the FBI investigated whether or
 7   not Scott Warren hit Peter DelVecchia in the back of
 8   his head?
 9        A       That I don't know.
10        Q       Do you have any basis to believe that's
11   the case?
12        A       No.
13        Q       Do you know whether Metro, as you put
14   it -- do you mean the Las Vegas Metro Police
15   Department?
16        A       Yes.
17        Q       Do you think that they've investigated
18   whether Scott Warren hit Peter DelVecchia in the back
19   of his head?
20        A       I don't know.
21        Q       You don't have any reason to believe
22   they -- they have, do you?
23        A       Based on what I've read, I -- I don't see
24   that that may have been cause as part of their
25   investigation.
```



Page 171

1      Q      So they didn't investigate it; is that
2   what you're saying?
3             MR. CUNNINGHAM:  Objection, form and
4   foundation.
5      A      Based on -- on what I've read, no.
6      Q      (BY MR. MCKAY)  All right.  So what has
7   Frontier Airlines done to investigate it?
8      A      We've spoken -- we, meaning Frontier
9   Airlines, have spoken with -- well, can you rephrase
10  the question, please, specifically?
11     Q      What has Frontier Airlines done to
12  investigate whether Scott Warren struck Peter
13  DelVecchia in the back of his head on Flight 2067?
14     A      As far as I know, Frontier has not
15  investigated the striking of the back of the head.
16     Q      So nothing whatsoever would be the answer?
17            MR. CUNNINGHAM:  Objection, form and
18  foundation.
19     A      Correct.
20     Q      (BY MR. MCKAY)  Okay.  On the fourth
21  paragraph down, there is a -- well, first, the
22  opening sentence is, ███████████ ██ ████████████

███ █████ ██ ███ ████████ █████ ████ ███ ███ ███
███ ████ ██ ████ █████████ ██████ ████ ███ ████
███ ██ █ ███ ██ ████████ ████████ █



Page 172

1   ████████████████████

2           Do you see that?

3   A    I do.

4   Q    And did I read it correctly?

5   A    Yes.

6   Q    Are you aware that Peter DelVecchia called

7   Frontier Airlines and told them that Scott Warren had

8   identified himself -- when requested by Peter

9   DelVecchia for his name, had identified himself as

10  Kevin?

11  A    I do remember reading that, yes.

12  Q    Okay.  And that's even in the complaint in

13  this case, isn't it?

14  A    I believe it is, yes.

15  Q    And Mr. Warren testified in his deposition

16  that he's never been known as Kevin, correct?

17  A    To the best of my recollection, that's

18  correct.

19  Q    Would Scott Warren telling Peter

20  DelVecchia that his name is Kevin fit within the

21  definitions of dishonesty, falsification, or

22  misrepresentation?

23           MR. CUNNINGHAM:  Objection, form.

24  A    Yes.

25  Q    (BY MR. MCKAY)  Why has Scott Warren not



Page 173

1    been disciplined for telling Peter DelVecchia that

2    his name is Kevin?

3          A     I don't know.

4                MR. CUNNINGHAM:  Objection, form.

5          Q     (BY MR. MCKAY)  Okay.  Did you -- did you

6    inquire of anybody about that?

7          A     We inquired on -- on investigation, not

8    specifically surrounding the name Kevin.

9          Q     Okay.  Why didn't you investigate

10   specifically around his giving Peter DelVecchia a

11   false name of Kevin?

12               MR. CUNNINGHAM:  Objection, form.

13         A     That I don't know.

14         Q     (BY MR. MCKAY)  You don't know why you

15   didn't investigate that?

16               MR. CUNNINGHAM:  Objection, form.

17         A     No.

18         Q     (BY MR. MCKAY)  Okay.  Now, it says in

19   the, I guess, fifth paragraph, ████ ████ ████
     ██ ████████████ ███ ███ ████████ ██████ ██ ████ ████████
     ██ ████████ ██ ████ ████ ████████ ███████████ ███████████
     ██ ████ ██ ██ ████████████ ██████ ███ ███ ███ ████████ ███████
     ██ ██████████ ███████████████ █"

24               Did I read that correctly?

25         A     Yes.



Page 174

1        Q       Okay.  And then it says, ███ ███ ████████
████ ████ ████ █████ ████████ █████ ████████ ████ █████ ████
████ ██████ █████ ██ ██ ████████ ████████ ████████ ██ ██ █████
████ ██████ ██████ ██ ██ ███ ██ ██████ ████ █
████ ████████

6                Did I read that correctly?

7        A       Yes.

8        Q       And you are an employee of Frontier

9  Airlines, correct?

10       A       Correct.

11       Q       Have you informed any supervisor or

12  manager or the human resources department that Scott

13  Warren identified himself to a passenger as Kevin?

14       A       No.

15       Q       Why not?

16       A       I have not.  That was a part of the -- the

17  findings as the investigation continued.

18       Q       What investigation?

19       A       Fron- -- when we got the complaint,

20  Frontier investigated, and Inflight management ended

21  up speaking with the -- with Mr. Warren.

22       Q       Okay.  And what did they find out?

23       A       To the best of my knowledge and my

24  research, is that there was no wrongdoing.

25       Q       Okay.  And who -- to whom did they speak?



1              MR. CUNNINGHAM:  Objection, form.

2        A      To the best of my knowledge, I believe

3    they spoke with most, if not all, of the flight

4    attendants.

5        Q      (BY MR. MCKAY)  On Flight 2067?

6        A      Yes.

7        Q      Which would include Mr. Warren himself,

8    correct?

9        A      Yes.

10       Q      And Ms. Bond and Ms. Nickel and Ms. Bright

11   or Sakurada, right?

12       A      To the best of my knowledge, they -- they

13   tried to communicate with all of them to get their --

14   their input, yes.

15       Q      Okay.  And you're aware that Ms. Bond,

16   Ms. Nickel, and Ms. Bright were nowhere in the

17   vicinity of Row 17 at the time that Peter DelVecchia

18   says that he was struck in the head by Scott Warren.

19   Are you aware of that?

20              MR. CUNNINGHAM:  Objection, form.

21       A      Based on what I've read, it appears that

22   way.

23       Q      (BY MR. MCKAY)  Okay.  So would their

24   input on this issue have had much value to finding

25   out whether or not Scott Warren hit Peter DelVecchia?



Page 176

1              MR. CUNNINGHAM:  Objection, form and

2    foundation.

3        A    I don't know.

4        Q    (BY MR. MCKAY)  Probably not, right?

5              MR. CUNNINGHAM:  Same.

6        A    I don't know.

7        Q    (BY MR. MCKAY)  I mean, if -- if you're

8    charged with investigating a traffic accident and you

9    ask somebody in the next town over who was at the

10   public library at the time the accident happened,

11   that person probably wouldn't lend a lot of value to

12   the investigation, would they?

13             MR. CUNNINGHAM:  Objection, form.

14       A    In that situation, no.

15       Q    (BY MR. MCKAY)  Okay.

16       A    Again, situationally dependent.

17       Q    So basically, of the people who were there

18   when Peter DelVecchia says he was struck by Scott

19   Warren, your Inflight Services department only asked

20   Mr. Warren?

21             MR. CUNNINGHAM:  Objection, form and

22   foundation.

23       A    Can you rephrase?  Only asked

24   Mr. Warren --

25       Q    (BY MR. MCKAY)  Whether or not he hit



Page 177

```
 1   Peter DelVecchia.

 2              MR. CUNNINGHAM:   Same.

 3        A      Yeah, I don't know what questions were or

 4   were not asked.  I -- I was not there.

 5        Q      (BY MR. MCKAY)  You weren't there, but

 6   it's part of your duties today to testify as to the

 7   corporation's knowledge of the investigation into

 8   whether or not Scott Warren hit Peter DelVecchia in

 9   the head, correct?

10        A      Correct.

11        Q      Okay.  So you understand that you had a

12   duty to find out what the corporation knows, not what

13   Shawn Christensen knows, right?

14        A      Correct.

15        Q      And what did you find out about what the

16   corporation knows?

17        A      At this point, I didn't see that anything

18   came of Mr. DelVecchia allegedly being hit in the

19   head.

20        Q      What do you mean, nothing came of it?

21        A      I don't recall seeing any notes or

22   anything indicating that Mr. Warren had actually

23   struck Mr. DelVecchia in the head, other than

24   Mr. DelVecchia's -- well, a few dep- --

25   testimonies --
```



Page 178

```
 1        Q     Okay.

 2        A     -- through depositions.

 3        Q     Mr. DelVecchia says, Yes, I was hit in the

 4   head.   Mr. Warren says, No, I didn't hit him in the

 5   head.   Am -- am I correct so far?

 6        A     Yes.

 7        Q     What backs up Mr. Warren?

 8        A     Inflight conducted an investigation

 9   associated with the events that occurred on Flight

10   2067.

11        Q     Yeah, and they asked Mr. Warren, Did you

12   hit Peter DelVecchia in the head, right?

13              MR. CUNNINGHAM:  Objection, form,

14   foundation.

15        A     Without looking at notes, I -- I don't

16   know if that exact question was asked.

17        Q     (BY MR. MCKAY)  They asked Mr. Warren

18   whether or not it happened; would that be fair?

19              MR. CUNNINGHAM:  Same.

20        A     I don't know.

21        Q     (BY MR. MCKAY)  So you don't know what

22   they asked?

23        A     I don't.

24        Q     Okay.  Now, what over on the Peter

25   DelVecchia side we have is that his son, family
```



MAGNA
LEGAL SERVICES

1    members, girlfriend, and two neurologists say that he

2    was hit in the head hard enough to have a concussion.

3    What of that information was considered by Inflight

4    Services in making their determination that there was

5    nothing to come of it?

6              MR. CUNNINGHAM:  Objection, form, and

7    beyond the scope.

8        A    I don't know.  I don't know what

9    information they had at the time of the

10   investigation.

11       Q    (BY MR. MCKAY)  But all you know is that

12   they asked the flight attendants?

13       A    Asked the flight --

14             THE DEPONENT:  I'm sorry.

15             MR. CUNNINGHAM:  No.  Form objection.

16       A    I'm sorry, asked the flight attendants --

17       Q    (BY MR. MCKAY)  For their views on whether

18   or not Scott Warren hit Mr. DelVecchia in the head.

19       A    I can't testify that they ever did ask

20   that.

21       Q    Okay.  So they may not have asked

22   anything.

23             MR. CUNNINGHAM:  Objection, form.

24       Q    (BY MR. MCKAY)  Correct?

25       A    During the discussion, I'm sure there was



Page 180

1    a question, but I don't know what --

2         Q    Don't speculate, please.  Just tell us

3    what the corporation knows about what happened in the

4    investigation.  You don't know, do you?

5              MR. CUNNINGHAM:  Objection, form.

6         A    Simply the confines of moving passengers,

7    specifically the DelVecchias, to a different row, the

8    touching of the face, the discussion that ensued, and

9    that the touching of the crotch, alleged touching of

10   the crotch.

11        Q    (BY MR. MCKAY)  What does that have to do

12   with getting hit in the head?

13        A    Nothing.

14        Q    Gotcha.

15             All right.  ■■ ■■ ■■■ ■■ ■ ■■ ■



1 ████████ ██ ████ ████ ████ ███ █

██ ████ ███ ██ ██ ██ █ ███ ██ ██ ██

█ ████ ████ ████ ██ ██ ██ ███

█ ████ █ █ ████ ██ ███ ████

█ ████ ████ █ ██ ████

█ █ ████ ████ ████ ████ ████ ██ ██

█ ████

8          Is there anything that we haven't covered

9    this morning that fits into those categories?

10          MR. CUNNINGHAM:  Objection, form.

11    A      That was a lot.  From what you read, it

12    sounds like we covered a lot.

13    Q      (BY MR. MCKAY)  Okay.  We covered

14    everything?

15          MR. CUNNINGHAM:  Objection, form and

16    foundation.

17    A      I don't know.

18    Q      (BY MR. MCKAY)  Well --

19    A      We covered a lot.

20    Q      All right.  I'm going to direct you back

21    to Exhibit No. 1, and this is Question No. 1.  And

22    feel free to take a moment to read that.  And if

23    there is anything that covers any of those subjects

24    that we haven't talked about yet, now would be the

25    time to bring it up.



Page 182

1        A       The best of my recollection, I think we --

2    we covered it all.

3        Q       Okay.  Thank you.

4                Why -- as of the date of Flight 2067, why

5    did Frontier not provide a written manifest of

6    passenger names to the cabin crew?

7        A       That I don't know.  That I don't know.

8        Q       Okay.  And is it fair to say that they

9    also didn't have any way of -- of looking up

10   passenger names on an electronic manifest from the

11   cabin?

12               MR. CUNNINGHAM:  Objection, form and

13   foundation.

14       A       Not that I know of, no.

15       Q       (BY MR. MCKAY)  Okay.  Couldn't a flight

16   manifest, had there been one, have been looked at to

17   see that Peter and his son had the same last name?

18       A       I'm sorry, can you -- can you rephrase the

19   question, please?

20       Q       Sure.  If Frontier Airlines had provided a

21   written manifest of -- and I understand manifest is a

22   list of all of the passengers on the flight.  Is that

23   a fair statement?

24       A       We can define it as that.  That's fair.

25       Q       Okay.  And -- and Frontier used to provide


MAGNA
LEGAL SERVICES

1    that to the cabin crew at the beginning of a flight,

2    didn't it?

3         A    Yes, it -- at some point that stopped, and

4    I don't recall when.

5         Q    Okay.  Ms. Bright, the flight attendant,

6    says that her understanding was that it stopped so

7    that Frontier could save money.  Is that your

8    understanding as well?

9              MR. CUNNINGHAM:  Objection, form,

10   foundation, beyond the scope.

11        A    I don't know why it was stopped.

12        Q    (BY MR. MCKAY)  Okay.  Subject Area No. 2

13   says that you would be here today to testify about

14   the reason why flight -- why Frontier did not provide

15   a manifest.

16             THE VIDEOGRAPHER:  You were twisting the

17   microphone.  Sorry.

18             MR. MCKAY:  Oh, does that create a

19   problem?

20             THE VIDEOGRAPHER:  Yes.

21             MR. MCKAY:  Sorry about that.  I'll twist

22   something else.

23        Q    (BY MR. MCKAY)  So Subject Area No. 2 of

24   Deposition Exhibit 1, the deposition notice, says

25   that you would be here today to testify about "the



Page 184

1  reason why Frontier did not provide a manifest of

2  passengers' names to the crew of Flight 2067, and the

3  availability of such a manifest to members of

4  Frontier's flight operations center during Flight

5  2067," which we'll get to in a second.

6          But what's the reason why they didn't?

7      A     That I don't know.  I reached out to a

8  couple individuals that may have had knowledge, and

9  we just don't know.

10     Q     Okay.  So Frontier doesn't know why it

11  stopped providing a manifest?

12     A     Yeah, correct.

13     Q     Okay.  But the manifest could be available

14 if Frontier's flight operations were contacted; is

15 that a fair statement?

16     A     No.

17     Q     Okay.  All right.  If there had been a

18 manifest like the good old days, could that have been

19 referred to by the four flight attendants to see that

20 Peter and his son had the same last name?

21          MR. CUNNINGHAM:  Objection, form, improper

22 hypothetical.

23     A     They could see the same last name, yes.

24     Q     (BY MR. MCKAY)  Okay.  Could they have

25 also asked to see their boarding passes?



1        A      Certainly.

2        Q      Would the boarding passes have their

3   surnames on them?

4        A      I believe they do, yeah.

5        Q      Okay.  So why didn't they?

6        A      I don't know --

7               MR. CUNNINGHAM:  Objection, form and

8   foundation.

9        A      I don't know if they did or didn't.

10       Q      (BY MR. MCKAY)  Well, we know they didn't,

11   I can tell you that.  I mean, there's no dispute

12   about that, that these people were -- were acted upon

13   and separated without anybody checking to see their

14   boarding passes or checking a flight manifest.  We

15   know that.

16               So why didn't they?

17       A      I don't know.

18       Q      Why didn't they engage them in

19   conversation to find out if they were father and son

20   traveling to Death Valley for -- for a vacation prior

21   to separating them?

22       A      That I don't know.

23       Q      All right.

24               (Exhibit 10 marked.)

25       Q      (BY MR. MCKAY)  I'm showing you what's



Page 186

1    been marked as Exhibit 10.  And I will tell you that

2    this is the way in which it was provided to me by

3    Frontier.  That is mighty small print.  But I will

4    also represent that on the pages following the first

5    page, I have blown up certain paragraphs to a

6    readable size.  I assure you I have changed nothing

7    in the text of those paragraphs.

8              For reference, they are a blowup -- the

9    first page is a blowup of the very first entry.  The

10   second page is a blowup of the fourth entry.  The

11   third page is the tenth entry.  And the fourth page

12   is the 13th entry.  And again, I have just blown them

13   up to 12 point font, but I haven't changed anything

14   else there.

15             Now, first of all, do you understand what

16   this document is?

17        A     I'm going to --

18        Q     All right.  I -- I can represent to you

19   that Frontier 0719, which is the -- the cover page --

20        A     ██████

21        █  █████████ █ █ █ ████

███ ████ ████████ █ ████ █ █ ██ ████ █

█ ██ ██ ████ █ ██ ████ █████ █ ███

█ ██████ █ ███ ██ █ █ ███ ████

█ ██████ █████ █████ ████ ███





































Page 195















Page 199



1

8          MR. CUNNINGHAM:  Object to form and

9    foundation.

10       A     Yes.

11       Q     (BY MR. MCKAY)  For approximately ███,

12   right?

13          MR. CUNNINGHAM:  Same objection.

14       A     That I don't know.

15       Q     (BY MR. MCKAY)  Okay.  And he had not only

16   purchased the ticket but was the father of A.D.,

17   right?

18       A     That I don't know.  Again, they -- they

19   could see last names, but --

20       Q     ███

21       A     -- █████████████████████

22



























Page 206

```
 1        Q      (BY MR. MCKAY)   Okay.

 2               MR. MCKAY:   Let's move on to Exhibit 11,

 3      please.

 4               (Exhibit 11 marked.)

 5        Q      (BY MR. MCKAY)   And I've moved on to

 6      Subject Area No. 3.   And these documents that are

 7      marked as Exhibit 11 start at P000748 and they end up

 8      at P000780, and they are sequential.

 9               I'll represent to you that these are

10      documents that were published by the United States

11      Department of Transportation.

12               Have you seen these before?

13        A      I have, yes, sir.

14        Q      Okay.   Do you recall seeing them when they

15      first came out?

16        A      I don't.

17        Q      All right.   Did you check with the company

18      about anybody who did see them when they first came

19      in?

20        A      Yes.

21        Q      Okay.   And who was that?

22        A      It was Ms. Trista Miller.   T-R-I-S-T-A,

23      Miller, standard spelling, two Ls.

24        Q      And who is she?

25        A      Ooh.   I'm sure I'm going to not get this
```


MAGNA
LEGAL SERVICES

Page 207

1  right, but she's our senior director of -- or, excuse

2  me -- yeah, senior director of, I believe it's

3  disabilities and escalations is her title, but

4  that -- I might be wrong on that.

5      Q    Okay.  Now, summarizing the first several

6  pages, this was a document issued by the Department

7  of Transportation's Office of General Counsel Office

8  of Aviation Enforcement and Proceedings, in

9  Washington, D.C.  And it's titled "Guidance for

10 Airline Personnel on Non-discrimination in Air

11 Travel."

12          Is that correct?

13     A    Correct.

14     Q    Okay.  And the first paragraph reads,

15 "This guidance is intended to assist airline

16 employees and contractors ('airline personnel')

17 understand their legal objection under 49 USC section

18 mark 40127(a), and other Federal anti-discrimination

19 statutes..."

20          And then there's a note call for Footnote

21 1 where it says, "The Department has also interpreted

22 49 USC double section mark 41310(a), 41712, and 41702

23 as prohibiting discrimination against air travelers."

24          And then back to the body, "...not to

25 discriminate on the basis of race, color, national



Page 208

```
 1    origin, religion, sex or ancestry in air travel."
 2    The Trans -- "The Department of Transportation
 3    ('Department') recognizes the very important and
 4    difficult job of the airlines to provide a safe and
 5    secure travel environment.  At the same time, it is
 6    important that this function be carried out in a
 7    non-discriminatory manner."
 8               Did I read that correctly?
 9         A    Yes.
10         Q    Summarizing, this is a publication by the
11    Office of General Counsel of the Department of
12    Transportation that provides guidelines for airline
13    personnel to do their jobs in a non-discriminatory
14    manner, does it not?
15         A    Yes.
16         Q    Okay.  And the Page 000754 shows a news
17    release dated January 13 of 2017 titled "DOT Issues
18    Guidance Documents to Prevent Airline
19    Discrimination."
20               Is that correct?
21         A    Correct.
22         Q    Okay.  And the next document back is
23    000755, being the first page, and from the same
24    office.  It's titled "Passenger(s)'," with an S
25    apostrophe, "Right to Fly Free from Discrimination."
```



Page 209

```
 1              Is that correct?

 2      A       Correct.

 3      Q       Okay.  And if you go to Page 000760, at

 4  the top of the page there's a title "Airline

 5  Personnel Decision-Making Process," underlined.

 6              Do you see that?

 7      A       I do.

 8      Q       And it says, "To ensure compliance with

 9  the law, airline personnel should," colon, and then

10  there are six items.  No. 1 says, "Be comprehensive:

11  Before taking any action, airline personnel should

12  conduct a comprehensive evaluation of the facts known

13  at the time, considering the totality of the

14  circumstances.  A comprehensive evaluation should

15  include whether a passenger's appearance is the

16  determinative factor causing concern.  In other

17  words, airline personnel should ask themselves - but

18  for the passenger's perceived race, color, national

19  origin, religion, sex, or ancestry, would I be

20  concerned that his or her behavior rises to the level

21  of a potential threat to security or safety?"

22              Did I read that correctly?

23      A       You did.

24      Q       No. 2 says, "Ensure Effective

25  Communication:  Communicate by actively participating
```



Page 210

```
1    in information exchange with the passenger,

2    co-workers, and other air travelers (if appropriate

3    and applicable) to clarify and confirm the facts and

4    details involved in the situation."

5            Did I read that correctly?

6    A    You did.

7    Q    No. 3 says, "Follow Airline Protocol and

8    Decision-Making Process:  In conducting an inquiry,

9    airline personnel should follow their company's

10   protocol and decision-making processes, and relevant

11   government agencies'," S apostrophe, "directives, to

12   resolve the situation appropriately."

13           Did I read that correctly?

14   A    You did.

15   Q    No. 4 says, "Assess Each Situation

16   Individually:  Focus on the specific facts and

17   details to ensure that any basis for taking action

18   based on perceived suspicious behavior is reasonable.

19   A passenger's perceived race, color, national origin,

20   religion, sex or ancestry alone is not a reasonable

21   basis.  All passengers have the right to fly free

22   from all forms of unlawful discrimination."

23           Did I read that correctly?

24   A    You did.

25   Q    No. 5 says, "Inquire about the Potential
```



Page 211

1     Threat:  Ask yourself if you appropriately carried

2     out the airline's obligation to inquire.  For

3     example," colon, first bullet point, "Did you speak

4     to the passenger;" second bullet point, "Have you

5     consulted your co-workers about your concern;" third

6     bullet point, "Did you follow company policy and

7     utilize your training; and," fourth bullet point,

8     "Have you intentionally or inadvertently considered

9     any stereotypes in your inquiry?"

10              Did I read that correctly?

11        A     You did.

12        Q     No. 6 says, "Resolve and Remedy the

13    Situation:  Airlines should include conflict

14    resolution techniques in their procedures and

15    protocols, e.g., active listening, self-awareness,

16    validating frustrations, anti-bias and

17    anti-discrimination techniques, and honest

18    communication.  Airline personnel should employ the

19    suggested techniques and attempt to resolve the

20    situation by taking the appropriate action in

21    compliance with the law and established airline

22    policy.  Explain your decision to persons involved,

23    including co-workers and, when appropriate, to

24    passengers."

25              Did I read that correctly?



Page 212

1          A      You did.

2          Q      "Taken together, these principles are

3    summarized by the acronym," all in caps with bolding,

4    "BE FAIR:  Be Comprehensive.  Ensure Effective

5    Communication.  Follow Airline Protocol and

6    Decision-Making Process.  Assess each situation

7    individually, considering cultural awareness factors.

8    Inquire about the potential threat.  Resolve and

9    remedy the situation."

10              Did I read that correctly?

11         A      You did.

12         Q      Now, what did Ms. Miller tell you that she

13   did or did not do in response to seeing these

14   documents when they were published by the Department

15   of Transportation?

16         A      She did indicate that -- that we received

17   them from outside counsel.  I don't recall what they

18   did with them afterwards.

19         Q      Okay.  You don't recall seeing any

20   anti-bias training implemented afterwards, do you?

21              MR. CUNNINGHAM:  Objection, form.

22         A      I don't know if anti-bias was already

23   incorporated or not.  So I don't know if it was

24   before or after this document.

25         Q      (BY MR. MCKAY)  You didn't see any new



1   anti-bias training, did you, as a result of this

2   document?

3       A       Not that I can recall, no, sir.

4       Q       Okay.  And when you say you think that

5   anti-bias training was already in there, are you

6   talking about what we've already talked about this

7   morning?

8       A       Yes, some of the training documents.

9       Q       The dis- -- anti-discrimination policy.

10  Is that what you're talking about?

11      A       Okay.  Yeah, correct, anti-discrimination

12  policy.

13      Q       All right.  So you're not aware of any

14  specific training that would combine the performance

15  of ordinary functions like being on the lookout for

16  unusual behavior with anti-bias factors such as

17  questioning yourself as to whether you are doing --

18  are applying stereotypes to your decision-making

19  process, are you?

20              MR. CUNNINGHAM:  Objection, form.

21      A       In this -- in this time frame, I can't

22  recall.  I don't know if I'm thinking of current or

23  past, so I don't want to mix and match.  So I -- as

24  of right now, I don't know.

25      Q       (BY MR. MCKAY)  All right.  Now, attached



Page 214

1    starting at Page 765, there's a Consent Order with

2    American Airlines, Inc.  Did you discuss this with

3    Ms. Miller as well?

4        A     We -- we didn't go too much into it.  I

5    had reviewed it beforehand, but, yeah, we didn't --

6    we didn't discuss this, that I can recall, with

7    Ms. Miller.

8        Q     All right.  And are you aware that the

9    Consent Order had to do with a number of

10   discrimination complaints that were made against

11   American Airlines?

12       A     Yes, sir.

13       Q     Okay.  And are you aware that American

14   Airlines was ordered by the Department of

15   Transportation to spend no less than $1.5 million

16   within three years of 2004 on anti-bias training?

17       A     Timeline wise, I'd have to go through

18   the -- the entire document.  Referencing P000768,

19   under "Accordingly," it does state in Bullet No. 4,

20   "The cost of training shall be no less than 1.5

21   million by the date of three" -- so let me see when

22   the -- I guess this was in 2004.  So it's -- let's

23   see -- three years after the service date of this

24   order.  So 2007, I believe.

25       Q     Yes.  And that "Upon completion of that



1    training, and in no event later than the 14 months

2    after the service date of this order and every 12

3    months thereafter for two subsequent years, American

4    shall submit a sworn statement from an appropriate

5    company official certifying that all flight and cabin

6    crew members and passenger service agents have

7    received the civil rights training required under

8    this order."

9              Do you see that?

10   A     Yes.

11   Q     Okay.  Now, why wouldn't Frontier

12   Airlines, upon seeing this 2004 Consent Order and the

13   Department of Transportation's guidance documents in

14   2017, have implemented civil rights training as well?

15             MR. CUNNINGHAM:  Objection, form and

16   foundation, beyond the scope.

17   A     To the best of my recollection, I -- I

18   believe the conversation ensued that we may not have

19   seen the Consent Order for American Airlines.

20   Q     (BY MR. MCKAY)  Okay.  But you did see the

21   guidance document from the Department of

22   Transportation?

23   A     Correct.

24   Q     So I'll ask you, with respect to that

25   alone, why didn't the company implement civil rights



1    training as a result of receiving the DOT document?

2              MR. CUNNINGHAM:  Objection, form.

3       A    So the DOT document is referencing federal

4    anti-discrimination statutes, not to discriminate on

5    the basis -- and, I'm sorry, I'm just looking at 748.

6       Q    (BY MR. MCKAY)  Okay.

7       A    -- on the basis of race, color, national

8    origin, religion, sex, ancestry in travel, and that

9    kind of defines that anti-discrimination section that

10   we looked at a little bit earlier.

11             So I -- I do feel that we were in

12   compliance with the DOT guidance.

13      Q    The --

14      A    And it is -- I'm sorry.

15      Q    Go ahead.

16      A    And it is guidance.  So I think the intent

17   of what we were doing met the intent of the guidance.

18      Q    The fourth paragraph reads, "It is our

19   understanding that most," with most underlined,

20   "airlines already have training on non-discrimination

21   against passengers in air travel.  The Department

22   encourages all," underlined all, "airlines to

23   implement comprehensive anti-bias training to help

24   prevent and reduce incidents of unlawful

25   discrimination.  We also encourage airlines to



1    incorporate this guidance into their training

2    programs as an additional tool.  Last, this guidance

3    is not prescriptive, and there may be alternative

4    measures, techniques, or procedures that can be

5    effective for preventing unlawful discrimination

6    against air travelers."

7            Did I read that correctly?

8      A     You did.

9      Q     Okay.  We discussed some anti-

10   discrimination policies that are written in your

11   documents today.  Now, one of them in the airline --

12   sorry -- the flight attendant training materials

13   simply says that, you know, we'll sell a ticket to

14   anybody, but doesn't really get into how to avoid

15   applying stereotypes in the performance of duties

16   such as recognizing unusual behaviors.

17           Would you agree with me with that?

18           MR. CUNNINGHAM:  Objection, form, and

19   mischaracterizes testimony.

20     A     I think we do have a -- I think we did

21   review a slide earlier of -- when we were looking at

22   the different pictures, and I think I was referencing

23   the different talking points of looking at that

24   picture and, you know, identifying threat, no threat.

25     Q     (BY MR. MCKAY)  Well, was there a white



Page 218

1    father with an Ethiopian black child depicted in that

2    picture?

3        A    No.

4        Q    Okay.  But there was a woman whose face

5    was half cat, right?

6        A    Yes.

7        Q    Okay.

8        A    Yeah.

9        Q    And as far as the specific document that

10   we looked at, as you testified, we don't even have

11   any way that that -- of knowing that that was

12   presented to the four flight attendants of Flight

13   2067, do we?

14            MR. CUNNINGHAM:  Objection, form.

15       A    Without looking, I don't remember.  I

16   don't know if that was initial, recurrent.  Let me

17   take a look just to --

18       Q    (BY MR. MCKAY)  Well, you can take a look.

19   It was dated after the --

20       A    Oh, okay.

21       Q    -- the date of the flight.

22       A    And I believe that -- here we go.

23       Q    The one I'm talking about is Exhibit 7.

24       A    Exhibit 7?

25       Q    Yeah, and it's dated September 13 of 2019.



Page 219

```
 1        A       I'm all out of order here.

 2                Okay, for the non-discrimination policy?

 3        Q       Yeah.

 4        A       I was looking for the --

 5        Q       Oh, 14 is the one that you may be looking

 6   for.

 7        A       It was Exhibit 4.

 8        Q       Oh, sorry.

 9        A       No -- yeah, Exhibit 4.  So that was --

10   that was a part of recurrent training.  But

11   the security -- okay.  So the update occurred after

12   the event.

13        Q       Yeah, okay.

14        A       I just wanted to verify.

15        Q       So again, we don't know for certain that

16   the same materials were covered with the flight

17   attendants on Flight 2067.

18        A       Correct.

19        Q       Okay.

20                MR. CUNNINGHAM:  And, John, I don't want

21   to interrupt your deposition.  We've been going for

22   about two hours.

23                MR. MCKAY:  Yeah, let's take a break.

24                MR. CUNNINGHAM:  Okay.

25                MR. MCKAY:  Yeah, absolutely.
```



Page 220

1          THE VIDEOGRAPHER:   The time now is 4:07

2    p.m.   We are going off the record.   This is the end

3    of Clip No. 6 in the deposition of Shawn Christensen.

4          (Recess taken.)

5          THE VIDEOGRAPHER:   We are back on the

6    record.   The time now is 4:23 p.m. -- I'm sorry --

7    4:24 p.m., and this is the beginning of Clip No. 7 in

8    the deposition of Shawn Christensen.

9          Thank you, Counsel.

10     Q    (BY MR. MCKAY)   Mr. Christensen, I just

11   want to get back to your discussion that you had with

12   Ms. Miller, is that right, Trista?

13     A    Correct, yes.

14     Q    Okay.

15     A    Yeah.

16     Q    So when the company received these

17   documents in 2017 as they were published by the

18   General Counsel's Office of the Department of

19   Transportation, why didn't the company make a

20   connection to the multiple complaints of

21   discrimination that they were receiving even with the

22   training that they already had in place?   Why didn't

23   the company decide, Hey, we need to do something,

24   too?

25          MR. CUNNINGHAM:   Objection, form, assumes



Page 221

1   facts not in evidence.

2        A      The discussion that we had was that the

3   number of discrimination complaints was -- was very

4   low, and that we were -- we felt that we were

5   compliant with -- with the guidelines set forth.

6        Q      (BY MR. MCKAY)  Now, the Court ordered

7   Frontier to produce discrimination complaints for the

8   five years preceding the March 28, 2019 Flight 2067.

9   So that five years would have gone back to 2014,

10  correct?

11       A      Correct.

12       Q      Okay.  And as you've already testified,

13  there's 4- or 5,000 pages that were produced relative

14  to those complaints.

15              MR. CUNNINGHAM:  Objection,

16  mischaracterizes testimony.

17       Q      (BY MR. MCKAY)  So --

18              MR. CUNNINGHAM:  Sorry, ask your question.

19       Q      (BY MR. MCKAY)  So that's not a small

20  amount of complaints, is it?

21              MR. CUNNINGHAM:  Objection, form,

22  mischaracterizes testimony.

23       A      The 4- to 5,000, I was ballparking, is all

24  the documents in totality, not necessarily just for

25  complaints.



Page 222

```
1        Q      (BY MR. MCKAY)   But in terms of numbers of

2    complaints, we -- we calculated that there were two

3    or more complaints of discrimination a week during

4    that five-year period, and that only included

5    domestic flights.

6               MR. CUNNINGHAM:   Objection, form.

7        A      Number wise, I want to say there was, I

8    think, 300, approximate, was the number that we were

9    looking at.  So whatever that equates to --

10       Q      (BY MR. MCKAY)   So --

11       A      -- per week.

12       Q      Right.  So if you divide that by the

13   number of weeks in -- in five years, you -- you get a

14   pretty good frequency of complaints.  And my question

15   is, why didn't that fact trigger some -- some

16   reaction by Frontier to the Department of -- of

17   Transportation's guidance for non-discrimination?

18       A      So as a part of our -- our discussion,

19   the -- at that time Trista and her team were actually

20   meeting with the DOT daily.  And this was a

21   discussion that we also had with a Mrs. Joy Jenkins,

22   who was the senior manager working under Trista.

23              And the general consensus is that overall,

24   Frontier was -- was doing a good job of -- of

25   accepting and addressing as we -- specifically on
```



Page 223

1    anti-discrimination as we had those discussions.

2         Q     Now, let's be clear about complaints,

3    because there are complaints that go to the DOT from

4    passengers, right?

5         A     Correct.

6         Q     And there are complaints that get made by

7    passengers directly to Frontier, correct?

8         A     Correct.

9         Q     And in order to make a complaint to the

10   Department of Transportation, a passenger has to know

11   that that's a possibility, don't they?

12        A     Yes.

13        Q     Okay.  But it's obvious, isn't it, that a

14   passenger can make a complaint to Frontier itself,

15   right?

16              MR. CUNNINGHAM:  Objection, form.

17        A     Yes.

18        Q     (BY MR. MCKAY)  So naturally there's going

19   to be more complaints directly to Frontier than there

20   are going to be complaints to the Department of

21   Transportation; isn't that fair to say?

22              MR. CUNNINGHAM:  Objection, foundation.

23        A     Yeah, potentially.

24        Q     (BY MR. MCKAY)  Okay.  So when you say you

25   determined that there were not that many complaints,



Page 224

1    is -- is that a view that was shared by your Customer

2    Relations department?

3        A    It is.  The totality of the number of

4    complaints against the number of passengers carried

5    we felt was relatively low.

6        Q    Okay.  I'm going to show you what's been

7    previously marked in this case as Elizabeth

8    Zimmermann Deposition Exhibit 10.  And I'll represent

9    that --

10       A    I'm sorry, sir?

11       Q    Yeah.

12       A    Did you need to mark this?

13       Q    No, because it's in -- it's marked in a

14   different deposition.

15       A    Thank you.

16       Q    It's already an exhibit in the case.

17   Okay.

18       A    Thank you.

19       Q    So do you know Elizabeth Zimmermann or

20   know who she is?

21       A    I know the name.  I don't know her

22   personally.

23       Q    Okay.  Ms. Zimmermann testified in a

24   deposition in this case that she has worked for years

25   with the Customer Relations department, and she



Page 225

1    identified this as an email response that she got

2    from a ███████ ████████ █████████████ ██ ██ ██ ████







Page 226



1       Q

14              So we can agree, though, that Frontier

15      Airlines received the Department of Transportation

16      guidance documents and determined that it did not

17      choose to do anything different from what it had been

18      doing on the subject of anti-discrimination.  Is that

19      a fair statement?

20              MR. CUNNINGHAM:  Objection, form and

21      foundation.

22        A     Based on my discussion, it sounds like we

23      felt like we were complying.  I don't know if there

24      were subtle changes made or not, but in general there

25      was not significant changes as a result, from my



Page 228

1    understanding.

2       Q    (BY MR. MCKAY)   Did Trista Miller discuss

3    with you what additional training would have cost the

4    company?

5       A    No.

6       Q    Okay.  Did you find any instances in

7    preparation for the deposition today in which flight

8    attendants or gate agents had been disciplined by

9    Frontier Airlines for violating Frontier Airlines'

10   anti-discrimination policies?

11      A    On behalf of flight attendants, I can say

12   that the answer is no.  The gate -- the gate agents

13   are part of the business partner, and I don't have an

14   answer on that one.

15      Q    Okay.  So you don't have any information

16   that would tell us one way or another about that?

17          MR. CUNNINGHAM:  Objection, form.  He's

18   not speaking as to the other for Frontier.

19      Q    (BY MR. MCKAY)   Okay.  Well, we're going

20   to have to find out about that a little bit here

21   because this deposition is the knowledge of Frontier,

22   corporate knowledge, which includes the knowledge of

23   people acting on its behalf.

24          So did you make any inquiry of the several

25   companies that hired the gate agents to see whether


MAGNA
LEGAL SERVICES

1   any of them had disciplined anybody for violating

2   Frontier's anti-discrimination policies?

3       A     No.

4       Q     Okay.  So no inquiry was made?

5       A     No.

6       Q     Okay.  But you did make --

7       A     Okay, sorry, I just want to make sure.  No

8   inquiry for non-Frontier employees, just to clarify.

9       Q     Okay.  But those non-Frontier employees,

10  again, are agents of Frontier, are they not?

11            MR. CUNNINGHAM:  Objection, form, and

12  legal conclusion.

13      A     They are our business partners.

14      Q     (BY MR. MCKAY)  And those employees wear

15  Frontier uniforms?

16      A     Sometimes yes.  Sometimes they're the

17  third-party business vendor.

18      Q     Okay.  They are trained in the procedures

19  and policies of Frontier Airlines?

20      A     Yes, and we can accept if they work for

21  another air carrier if it's an equivalent level of

22  training.

23      Q     They perform jobs that at one point in

24  time in the past was -- were performed by direct

25  employees of Frontier?



Page 230

```
 1      A      I'm sorry, can you ask that one more time,

 2   please?

 3      Q      Your station agents, employees, perform

 4   jobs that a -- in the past were performed by direct

 5   employees of Frontier Airlines?

 6             MR. CUNNINGHAM:  Objection to form.  I

 7   think it was misstated.

 8      A      Yes.

 9      Q      (BY MR. MCKAY)  Okay.

10      A      Yeah.

11      Q      All right.  Let's go back to Frontier's

12   flight attendants who are hired by Frontier and act

13   as flight attendants on Frontier flights.  Okay?

14      A      Yes.

15      Q      With respect to that group of employees,

16   you did an investigation to see whether any of them

17   had ever been disciplined for violating Frontier's

18   anti-discrimination policy; is that right?

19      A      Yes.

20      Q      And what you found is that none of them

21   have ever been disciplined for violating Frontier's

22   anti-discrimination policy; is that correct?

23      A      Correct.

24      Q      Does that -- strike that.

25             Did you find any instances where any
```



1  Frontier employee flight attendants had been given

2  additional training individually specifically because

3  there was a finding that they had violated Frontier's

4  anti-discrimination policy?

5      A     Can you state that question one more time,

6  please?

7      Q     Sure.  I previously asked you about

8  discipline.

9      A     Yep.

10     Q     But now I'm asking you about whether

11  anybody was sent for additional training because of a

12  finding that they had violated the anti-

13  discrimination policy of Frontier.

14     A     No.

15     Q     Okay.  Are you aware that the Customer

16  Relations department in those documents that were

17  provided, those thousands of pages of documents, the

18  Frontier Customer Relations department on several

19  occasions informed complaining passengers that

20  Frontier has a zero tolerance policy for

21  discrimination?  Were you aware of that?

22     A     I can recall reading some of them.  I

23  don't know if that was a standard that they utilized,

24  but -- so, yes, I -- I do recall.

25     Q     How is that zero tolerance policy for



Page 232

1   discrimination communicated by Frontier to its

2   employees?

3       A    I believe that's still through the

4   Employee Handbook, as one -- one means.

5       Q    Tell me the other means.

6       A    The Employee Handbook is the one that I

7   can think of most prominently that we would

8   reference.  If it's other places, it may be a copy-

9   paste, but Employee Handbook is the governing

10  document for that.

11      Q    How many years have you worked for

12  Frontier?

13      A    9-1/2, approximately.

14      Q    During those 9-1/2 years, have you ever

15  received anything other than the Employee Handbook

16  that informed you that Frontier has a, quote-unquote,

17  zero tolerance policy for discrimination?

18      A    Not that I can recall off the top of my

19  head.

20      Q    Okay.  Pardon me, I'm just -- for your

21  benefit, I'm going past several things we've already

22  discussed.

23      A    Okay.

24      Q    So I'm just catching up.

25           MR. MCKAY:  12, please.



```
 1            (Exhibit 12 marked.)

 2     Q     (BY MR. MCKAY)  Showing you what's been

 3   marked now as Exhibit 12, and it is a two-page

 4   document.  The first page is Frontier 1003.  The

 5   second page -- is it cut off?

 6     A     No.  There's an extra copy.

 7     Q     Oh, that would be mine.  Thank you.

 8           And the second page then is Frontier 1004.

 9           Do you see that?

10     A     Let's see.  I've got 03.  Yes, got it.

11     Q     Okay.  And at the top of the first page it

12   says "Frontier Flight Attendant Manual," and a

13   revision of September 1, 2017.  Is that correct?

14     A     Yes.

15     Q     And for the record, I'll just point out

16   that this is marked under the SSI protective order.
```

17 ████ ████ ██ ██ ████ ███ ██ ████

██ ████ ███████ ██████ ██ █████

██ ████████ ███████ ██ ██ ████ ██ ██

██ ██████

██    █    Correct.

██    █   ████ ██ ██ ████ ██ ██████

██ ██████ ██ ██ ██ ██ ██ ██ █ ████

██ ██ ██ ████ █ ████ ██ ████ ██████ ██ █

██ ██ ██████











Page 236

1   business?

2        A    Yes.

3        Q    And as far as you know, it is accurately

4   stating the information that it contains?

5        A    Yes.

6             MR. MCKAY:   13, please.

7             (Exhibit 13 marked.)

8        A    I hope you guys aren't picking up my

9   stomach rumbling on the --

10            MR. CUNNINGHAM:   Remember, there's candy

11  out there.

12       Q    (BY MR. MCKAY)   All right.   Showing you

13  what's been marked now as Deposition Exhibit 13, and

14  it is a multipage document starting with Frontier

15  0897 and ending with Frontier 0912.   And I'll

16  represent to you that it's been previously identified

17  as the PNR or passenger name record for the

18  DelVecchias.

19            Does that seem accurate to you?

20       A    Yes.

21       Q    Okay.   And is this also a document that's

22  created by Frontier?

23       A    Yes.

24       Q    And is it created in the ordinary course

25  of its business?



A Yes.

Q And as far as you know, does it accurately state the information that has been included on it?

A I'm sorry, can you restate the question one more time, please?

Q Sure. Is it -- is it created by an employee and/or agents of Frontier who have knowledge of the information that's contained in it?

A Yes.

Q Okay. All right. That's all I have on that.

MR. MCKAY: 15.

(Exhibit 15 marked.)

Q (BY MR. MCKAY) Showing you now what the court reporter has marked as Exhibit 15. And this states at the top that it's [redacted]

A Correct.

Q Okay. And it runs from Bates No. Frontier 1442 to Frontier 1452; is that correct?

A Correct. And I'm -- quick search, and it's all sequential. Yes. Thank you.

Q Okay.

MR. MCKAY: The gentlemen who are here who

Page 238

1   have joined the case after it started, just make a

2   note that I think these Bates numbers were -- were

3   replicated on other documents.  When I say 1442, that

4   reminds me that you just -- you may find other

5   documents with the same Bates number.

6          Q      (BY MR. MCKAY)  All right.  Do you -- do

7   you know what this document is.

8          A      Yes.

9          Q      Okay.  And obviously it says it's a Code

10  of Ethics.  Is that a correct description of it?

11         A      Yes, sir.

12         Q      And where would one find this Code of

13  Ethics in the documents of Frontier Airlines?

14         A      We can find it online.  I believe it's

15  under our human resources page.

16         Q      Okay.  Is this a document that Frontier

17  has created in the ordinary course of its business?

18         A      I believe it has, yes.

19         Q      Okay.  And as far as you know, is the

20  information in it accurately presented?

21         A      I believe it is, yes.

22         Q      Okay.  Do you know of anybody who has ever

23  been subjected to discipline for violating it?

24         A      No.

25         Q      Okay.



Page 239

```
 1            MR. MCKAY:  16, please.

 2            (Exhibit 16 marked.)

 3      Q     (BY MR. MCKAY)  I'm showing you now what's

 4   been marked as Deposition Exhibit 16.  And this is a

 5   two-page document starting with Frontier 1078 and

 6   going to Frontier 1079.  It is a document protected

 7   under the SSI protective order. ████ ██ █ █ ████

     █ ██ ██ ████ ███ ████ ███████ ████ █ ███

     █ ████ █ █ █ ████████ ██ █ ██████         Is

10   that correct?

11      A     Yes.

12      Q     ████ ████ ██ ██ ███ ██ ███

     █ ████ ████ ██████ ██████ ████ █ ██ █ ███ █ ██

     █ ████ ████ ██ ████ ████ ████ █ █████ █

     █ ████ ████ ██ █ ████ █████ ████ █ ████ █

     █ ██████ ████ ████ ████ ████ ████ █ ████

     █ ████ ██ █ ███ ██████ ████ █ ███ ████

     █ ████

19            Did I read that correctly?

20      A     Yes.

21      Q     Okay.  Just a couple of things.  First of

22   all, the pilot is always the pilot in command; is

23   that right -- the captain is always the pilot in

24   command?  Sorry.

25      A     For the most part, yes.
```



Page 240

1      Q      Okay.

2      A      And I'm going to be -- sorry.

3      Q      No, I -- I was just curious, actually.   If

4   he's the pilot not flying, is he the PIC?

5      A      He is still the pilot in command, correct.

6      Q      Okay.

7      A      Yeah.

8      Q      All right.   So when could a captain not be

9   the pilot in command?

10      A      If he becomes incapacitated or something

11   where he can no longer perform his duties and

12   responsibilities.

13      Q      Okay.

14      A      Yeah.

15      Q      Great.   Thank you.

16             And he has authority over all assigned

17   crew members on the flight.   Does that include the

18   flight attendants?

19      A      Yes, sir.

20      Q      Okay.   And throughout the flight duty

21   time, would that include the time that the airplane

22   is in the air?

23      A      ████

24   █   ████   ████   ███████   ██████   ██████

██   ██   ██████████   ████   ████   ██████   ████   ████



Page 241

1  ███ ███ ███ ███ ████ █ ██ ███
█ █████ ███ █ █████ ████ ███ ███
█ ██ █ █████ ██ █████ ██ ███ █ ██
█ █████

5          Did I read that accurately?

6     A    Yes.

7     Q    And is it accurate?

8     A    Yes.

9     Q    ███ ██ ████████ ██ ███
█ ███ ████ ███ ██ ██ █████ ███ █ ████ █
█ █████ ███ █ █ ████ █ █ ███████ ██ █
█ ████ █ ███ █ ██ █ ███ ████ ██ ███ ███
█ ████ ██ █ ███ █████ ██████
█ ████ █████ ████ █ █████ ███
█ ████ ███ █ ███ ████ ████ █
█ ████

17         Did I read that correctly?

18    A    Yes, sir.

19    Q    And is it accurate?

20    A    Yes, sir.

21    Q    ███ ██ ██ ███
22    █    ███ ██ █ █ ███ ████ ███ ████
23   █████████ ██ ██ ██ ███ ███
24   ████ █ ██ ███ █ ███ ██
25   ██ ██ ██ █ ███ ██ ███





Page 242

Q    (BY MR. MCKAY)   Showing you now what the court reporter has marked as Exhibit 17.   And I will represent to you that this is what was produced to us


MAGNA
LEGAL SERVICES

Page 243

1    I think back at the end of 2019 as the training





Page 244

1      Q      What you talked about previously?

2      A      Correct, yes, sir.

3      Q      Okay.  Perfect.

4             MR. MCKAY:  18, please.

5             (Exhibit 18 marked.)

6      Q      (BY MR. MCKAY)  I'm showing you what's

7  been marked now as Exhibit 18.  And it is also under

8  the SSI protective order.  ████ ██ ██ ████ █████





1

MR. MCKAY:  19, please.

(Exhibit 19 marked.)

(BY MR. MCKAY)  Showing you now what's

25    been marked as Exhibit 19, it starts at Frontier 0294



Page 246

1    and goes through 0297.  And it's already been

2    identified in the two pilots' depositions as being

3    the ACARS messages sent during Flight 2067.  Does

4    that appear to be what it is?

5          A     Yes.

6          Q     Okay.

7          A     And just for clarification, ACARS, in

8    case it -- Aircraft Communication Addressing and

9    Reporting System.

10         Q     So, first of all, is it a document created

11   by Frontier?

12         A     Ooh.

13         Q     Let me ask it another way.  Is it a

14   document that is regularly kept by Frontier in the

15   course of its business?

16         A     Ooh.  It is --

17               MR. CUNNINGHAM:  Objection, beyond the

18   scope, foundation.

19         Q     (BY MR. MCKAY)  Let me ask it another way.

20         A     Yeah.

21         Q     Can I?

22         A     Yes, please.

23         Q     Is this a document that compiles messages

24   received from the flight deck of Flight 2067 that are

25   received by a department of Frontier?



Page 247

```
 1        A      Yes.

 2        Q      Okay.  And as far as you know, is

 3   everything accurately stated in the document?

 4        A      Yes.

 5        Q      Okay.  I have already asked questions

 6   of -- of the pilots.  So what I am specifically

 7   interested in is this field that says "Freetext."

 8               Do you see that?

 9        A      I do.

10        Q      Do you know what, in the first numbered

11   one, where it says 0, what that means?

12        A      I don't.

13        Q      Okay.  How about the second one where it

14   says 82?

15        A      I don't.

16        Q      Okay.  How about the fourth one, where the

17   first item says ████

18        A      █ ████

19        Q      ████  ██ ██ ████  ████  ████

20   numbers?

21     █  ██ ██ ██ ████ ██  ██ █ ████  ████████
```



Page 248

1    ███████ ████████ ▌ █████ ██ █████ ██.

2        Q       To your knowledge and your investigation,

3    do those codes impart anything of meaning to

4    Frontier's recipients of them?

5        A       No, sir.

6        Q       Okay.  Good enough.  Thank you.

7                MR. MCKAY:  I don't know where we are.

8    20?

9                THE REPORTER:  20.

10               MR. MCKAY:  Okay.  That will be 20, then.

11               (Exhibit 20 marked.)

12       Q       (BY MR. MCKAY)  All right.  This is

13   Exhibit 20, and it's the seating configuration from

14   the Flight Attendant Manual dated September 1 of

15   2017.  It bears Bates No. 1077, and it is protected

16   under the SSI protective order for some reason.

17               ██ ██ ███████  █████

18   █         ██

19   █         ███ ██ █ ██ ███ ██ ██ ██ ██
     █ ██ █████ █████ ███ ██ █ █ ██
     █ ██████ ██ █ █ █ █ ██ ██████
     █ ██ ███ ███ ██████ ██ ██ ██
     █ ████ █ █ █ █ ███ ██████
     █ █████ ████ ███ ██ ███ ██ ████
     █ ██ ██ ██ █████ ██ █████







Page 250

1 ██████ █ █ █ ████ █████ ███ █ ███

█ ███ ███ █████ ████ ████ ███

█ ████

█ ██ ███

█ █ ████ ████ ████ █ ████ ████ ███ ███

█ █ ████ ███ ███ ███ ██ ███ ████

█ ████ ███ ████ ████ ███ ███ ████

█ ████ ████ ████ ███ ██ ███

█ ████ ██████ ██ █████ ████ █████

█ █ ██

█ ██

█ █ ████ ████ █ █ █████

█ █████

█ █ ███

█ █ ███

█ █ ████ ███ ████

█ ███ ███ ██

█ ████ █ ████

Q     (BY MR. MCKAY)   I'm showing you now what's

been marked as Exhibit 21.   And it's Bates

No. Frontier 1 -- sorry -- 0105.   And it purports to

22  be a deposition -- an email -- it's time to stop --

23  an email between Scott Warren and Jason Grimes dated

24  Wednesday, April 17 of 2019.

25                As far as you know, is this a record kept



Page 251

1    by Frontier in the ordinary course of its business?

2         A      Can you define a record in the ordinary

3    course of business?

4         Q      Sure.  Does -- does Frontier Airlines have

5    a system for employees to send emails to each other?

6         A      Ooh.

7         Q      I didn't think it was that difficult a

8    question.

9         A      It -- well, I'll explain and hopefully

10   that will clarify.

11        Q      All right.

12        A      We had emails.  We took emails away, and

13   we didn't get company emails back until about 2021.

14   So Jason Grimes, as a supervisor in Chicago, would

15   have had an email.  Scott Warren may or may not have,

16   depending on when he came into the company.

17        Q      Okay.

18        A      So...

19        Q      Well, luckily this is received by Jason

20   Grimes.

21        A      Yes.

22        Q      So it would have been received on an email

23   system that was provided for Mr. Grimes by Frontier?

24        A      That's a fair statement, yes.

25        Q      Okay.  And -- and so can we agree that



Page 252

1    this is a document that is maintained by Frontier?

2         A     Yes.  So based on your definition, yes.

3         Q     Okay.

4         A     Yes, sir.

5         Q     Thank you.  That's all I have on that.

6               MR. MCKAY:  21?  22.  I'm almost done,

7    gentlemen.

8               (Exhibit 22 marked.)

9         Q     (BY MR. MCKAY)  All right.  No. 22 seems

10   to also be an email to Mr. Grimes, but this time from

11   Anna Bond.  Would it fall into the same description

12   as far as a company record?

13        A     Yes, sir.

14        Q     Okay.

15              MR. MCKAY:  Nothing further on that.  23.

16              (Exhibit 23 marked.)

17        Q     (BY MR. MCKAY)  I'm showing you now what's

18   been marked as Exhibit 23.  It seems to be a form

19   that says "Frontier Passenger Incident Report," with

20   an effective date of July 27 of 2017.  Is that

21   correct?

22        A     Correct.

23        Q     And this particular version has been

24   filled out with an incident date of March 28, 2019,

25   and a passenger name of DelVecchia/Peter.  Is that



1   right?

2        A        Yes, sir.

3        Q        Is this the incident report that was

4   created by Angelica Paulo, P-A-U-L-O, on behalf of

5   Frontier?

6        A        Yes, sir.

7        Q        Okay.  And is it a business record of

8   Frontier?

9        A        Yes, sir.

10       Q        Okay.  Thank you.  That's all I have on

11   that.

12                MR. MCKAY:  All right.  24.

13                (Exhibit 24 marked.)

14       Q        (BY MR. MCKAY)  Document 24 is covered by

15   the SSI protective order, and it is captioned

■ ■■■■ ■■■■■ ■■■ ■■ ■■

■ ■■■ ■■■ ■■ ■ I ■■■■ ■

■ ■■ ■ ■ ■■ ■ ■ ■ ■■ ■ ■■

■ ■■ ■ ■ ■■■

■        ▮        Yes, sir.

■        ▮        Is this a page from the Flight Attendant

■   ■■

23       A        Yes, sir.

24       Q        Okay.  And like the --

25                MR. CUNNINGHAM:  I'm sorry, John.  I just



Page 254

```
1    note that it's subject to protective order, SSI.
2              MR. MCKAY:  Oh, I'm sorry, I thought I
3    said that.  I apologize.
4              MR. CUNNINGHAM:  Maybe you did and I
5    missed it.
6              MR. MCKAY:  Okay.  So, yes, it is an SSI
7    document.
8         Q    (BY MR. MCKAY)
```



Page 255

1    Frontier Airlines?

2         A      Yes.

3         Q      Okay.  All right.

4                MR. MCKAY:   25.

5                (Exhibit 25 marked.)

6         Q      (BY MR. MCKAY)  I'm showing you what's

7    been marked now as Exhibit 25, also under the SSI

8    protective order, titled "Frontier Flight Attendant

9    ████████ ████ ████ ███████ ████ █████ ███ ███

█ █████ █████ █████ ████ █████ ████ ███ ███

█ ██████ ████ █ █████ ██████ ██████ █ █ █ ███

█ ████ ████████████████

█ ███ █ █ ███ ████ █ ████ ████ █

█ █████

15      █    ████ ███

16      █    █████

17           ███ █ ████ ██ ██

18           █████ ██████

19        Q      (BY MR. MCKAY)  All right.  Showing you

20   now what's been marked as Exhibit 26.  It's Frontier

21   1005 through Frontier 1009.  ████ ████ ██ ██ █

█ ███ █ █ ███ ██ █ █ █ ████ ████ ████ ████

█ ███ ██ ██████ ████ █████

█ ████ █ ████ █ ████ █████ ███ █

█ ████ ████ ████ █████ ██████







Page 257

1 ████████████ ████████████

██  █  █ ██ ██ ██ ██ ██ ██ ██ ██ ██

██ ███ ███ █ ██ ███ ██ ██ ███

██  █  ██ ██ ██ ██ ██ █ ███ ██

██ ███ ███ ███ ██ █

██  ██ █ █ ██ ██ ██ ██ ███

██ ████

██  █  ██ ██

██  █      Okay.  Did you interview Las Vegas Chief

10   Pilot Devin Hussey concerning Flight 2067?

11        A      I did.

12        Q      What did Mr. Hussey tell you that he knew?

13        A      Essentially, the -- the -- what we

14   believed to be the facts of the case.

15   Approximately -- he couldn't remember the exact time

16   frame, but approximately within 24 to 36 hours after

17   the event Captain Rex Shupe had contacted Devin,

18   indicated that the flight attendants had indicated

19   that there was inappropriate touching; that he

20   decided, in coordination with the flight attendants,

21   to separate the adult and the child and to contact

22   law enforcement and to essentially have law

23   enforcement meet the aircraft.

24        Q      And when you used the pronoun "he" in that

25   description, was that Captain Shupe?



Page 258

```
 1        A      Correct, yes.

 2        Q      Okay.  Did Mr. Hussey say that he had

 3   started any kind of investigation regarding Flight

 4   2016 -- 2067?  Sorry.

 5        A      No.

 6        Q      Okay.

 7        A      That was -- essentially the investigation

 8   was the conversation that they had, and it was

 9   determined that based on their conversation, Captain

10   Hussey was confident that the situation had been

11   handled appropriately based on the facts and

12   conditions that he had the discussion with Captain

13   Rex Shupe on.

14        Q      Okay.  With respect to the complaints of

15   human trafficking that were produced by Frontier and

16   that we discussed a little bit with respect to

17   Exhibit 10, has Frontier ever done anything more than

18   ask the flight attendants and flight crews what

19   happened?

20               MR. CUNNINGHAM:  Objection, form,

21   foundation.

22        A      That I don't know.

23        Q      (BY MR. MCKAY)  Okay.  Is it -- to your

24   understanding, is it normal practice for Frontier to

25   reach out to, say, other passengers on the flight or
```



1    even to the complainant themselves to get more

2    information about a situation?

3         A      Perhaps.  I'm not familiar once a report

4    is made to Inflight, and in my case the chief pilot's

5    office will get that information, and if we see that

6    come through, we'll typically pass that to security.

7         Q      Okay.  Have you ever seen any indication

8    of an investigation being conducted of a

9    discrimination complaint or a human trafficking

10   complaint where the investigation involved asking

11   people for information who were not employed by

12   Frontier or its gate agents?

13              MR. CUNNINGHAM:  Objection, form.

14        A      I have not, and I don't recall any --

15   either Inflight or anybody indicating that either.

16        Q      (BY MR. MCKAY)  And I asked you in the

17   context of discrimination, but let me ask it in the

18   context of human trafficking complaints.  Has any

19   employee of Frontier ever been disciplined for making

20   a false or incorrect allegation of human trafficking

21   concerning a passenger?

22              MR. CUNNINGHAM:  Object to form,

23   foundation.

24              Go ahead.

25        A      I'm sorry, I -- I heard him start



Page 260

1    breathing.

2            Not that I'm aware of.

3    Q    (BY MR. MCKAY)   Okay.

4            THE DEPONENT:   Sorry, Eric.

5            MR. CUNNINGHAM:   No, that's okay.

6    Q    (BY MR. MCKAY)   There are some complaints

7    that have been produced to us of discrimination in

8    which the N word was used and others where Customer

9    Relations agreed that the passenger had been

10   mistreated.   Even in those instances, was there no --

11   was there no discipline of -- of the people involved?

12           MR. CUNNINGHAM:   Objection, beyond the

13   scope.

14   A    That I don't know.   If -- if you have

15   documentation that I can review, I can take a look.

16   Q    (BY MR. MCKAY)   Well, you've already said

17   that -- that -- that no employee has been disciplined

18   for violating the anti-discrimination policy.   So I

19   guess it's a follow-up question saying, even where

20   such things like using certain language or where the

21   Customer Relations department felt that there was

22   impropriety?

23           MR. CUNNINGHAM:   Objection.   This topic

24   has been stricken.   And object to the form.

25           MR. MCKAY:   Well, the -- I know what


MAGNA
LEGAL SERVICES

1   you're saying, and the specific topic about it, yes,

2   was -- was stricken.  And I -- I just want to clarify

3   that if there was -- let me -- let me strike anything

4   having to do with the N word, and -- and you're

5   right, I forgot about that.  Let me -- let me strike

6   anything dealing with that.

7        Q     (BY MR. MCKAY)   But in the event where a

8   Customer Relations department person might say, you

9   know, I agree with you, this was not appropriate,

10  maybe here's a $100 coupon, even in those instances

11  nobody got disciplined; is that right?

12             MR. CUNNINGHAM:   Objection, form,

13  foundation.

14       A     No.

15       Q     (BY MR. MCKAY)   Not right or they didn't

16  get disciplined?

17       A     They -- they did not get disciplined.

18       Q     Okay.  Thank you.  That's --

19       A     And I would like to qualify that.  I'm

20  only speaking for pilots and flight attendants in

21  that circumstance.

22       Q     Okay.  That's fine.

23       A     Yeah.

24       Q     Did you obtain any information on the

25  templates that human resources -- Customer Relations



Page 262

1    uses?

2         A     Yes, sir.

3         Q     Do you -- do you have the -- the text of

4    those templates with you?

5         A     I -- I don't.

6         Q     Okay.  So how many templates are there?

7         A     I believe the number they -- "they"

8    meaning Mrs. Trista Miller and Mrs. Joy Jenkins --

9    had indicated were somewhere in the whereabouts of

10   potentially 300, and that was just kind of a ballpark

11   figure of what they were thinking was in that realm.

12        Q     And were they able to actually obtain

13   those 300 templates to look at them?

14        A     I didn't ask for -- for all the templates.

15   They kind of described what they were, just in -- in

16   general context.

17        Q     Were there any documents that told

18   Customer Relations employees which templates to use

19   in which circumstances?

20        A     They described that more as what they

21   would train on during their on-the-job training of

22   the different types of templates and what those

23   templates could be utilized for at the appropriate

24   time.

25        Q     So one would have to have been through



Page 263

1    on-the-job training to know what the standards were

2    for employing certain templates?

3            MR. CUNNINGHAM:  Objection, form.

4       A    I think that would be a fair

5    qualification.

6       Q    (BY MR. MCKAY)  Okay.  And those standards

7    came from management?

8            MR. CUNNINGHAM:  Objection, form.

9       A    Management and -- and experience.

10      Q    (BY MR. MCKAY)  Okay.  So did you inquire

11   as to any memoranda or discussions from company

12   management to customer relations about how they

13   should respond to complaints of discrimination?

14           MR. CUNNINGHAM:  Objection, form.

15      A    No.

16      Q    (BY MR. MCKAY)  Okay.  So you don't -- as

17   you sit here, you don't know anything about that?

18           MR. CUNNINGHAM:  Same.

19      A    And can you rephrase the question one more

20   time?

21      Q    (BY MR. MCKAY)  Sure.  Item 37 was,

22   "Discussions between Frontier's senior management and

23   Inflight management during the period between March

24   28, 2014 and March 28, 2019 concerning how the number

25   and/or frequency of passenger discrimination



Page 264

1    complaints could be reduced."

2              Is -- did you inquire into that?

3        A    Yes, we did have a discussion.

4        Q    Okay.  And what did you find out?

5        A    That the overall percentages and relative

6    frequency relatively low, that the company was

7    comfortable with the training that had been provided,

8    simply because I think the number was well below less

9    than 1/10 of 1 percent, somewhere in there.  So it

10   was -- it was extremely low, and they met -- "they"

11   meaning the executives met on a weekly -- or

12   actually, on a daily basis at that point to go

13   over -- over complaints.

14       Q    Did those meetings produce minutes?

15       A    That I don't know.

16       Q    Okay.  But essentially your understanding

17   is that senior management of the company didn't feel

18   there was a problem with its employees the number of

19   times that there were complaints of discrimination?

20             MR. CUNNINGHAM:  Objection, form.

21       A    The company did not have a concern.  And I

22   would like to qualify, while not management, the --

23   one of the Inflight instructors did talk with Trista

24   Miller about thoughts on how they can improve

25   training on different functions, but not as a result



Page 265

1    of those discussions.  Just simply by process

2    improvement, how do we get better at what we do as a

3    business.

4         Q     (BY MR. MCKAY)  Do you know whether that

5    occurred before Flight 2067 or after Flight 2067?

6         A     That I don't know.

7         Q     Okay.  I think when I read 37 I meant to

8    read 35, which was, "The details of any instructions

9    that any person in Frontier's management has given to

10   any person assigned to Frontier's Customer Relations

11   Department (regardless of whether the recipient was

12   in a managerial position or a non-managerial position

13   and including, without limitation, any of the

14   Customer Relations employees working on the 'Denver

15   Team' of Customer Relations) about how the recipient

16   or the employees working under the recipient should

17   respond to complaints alleging racial discrimination,

18   ethnic discrimination, or other forms of

19   discrimination, and/or about how such persons should

20   code, classify, or index complaints that contain

21   allegations of discrimination."

22             Did you inquire into that?

23        A     I did.

24        Q     And what did you find?

25        A     Let me try and break it down here.  All



Page 266

1  right.

2           The Denver team is what I would qualify as

3  the highest level of the Customer Relations function,

4  commonly referred to as a customer advocate.  And

5  they came to Frontier with a background in customer

6  relations.

7           And so anything that met the level, in

8  this case complaints alleging racial discrimination,

9  ethnic discrimination, or other forms of

10  discrimination, if it was a discrimination function,

11  they would -- in the forms, they would go through and

12  classify that.  I guess -- I think it's a DOT

13  category that's tracked.  And then they would add the

14  details of that, and from there process it as -- as

15  they saw fit based on -- on their experience.

16           And then if -- if needed, if they had

17  questions, they could elevate that to the next level

18  if it was something that was outside of their --

19  their comfort level of their experience and training.

20      Q     What's the next level, then, above

21  Customer Relations?

22      A     So from the customer advocate level, then

23  it would go to the senior manager -- I'm going to

24  probably mess this up so I apologize -- the senior

25  manager of disabilities and escalations I think was


MAGNA
LEGAL SERVICES

Page 267

1    the title, Mrs. Joy Jenkins.

2         Q      All right, but that all gets to the Denver

3    team, right?

4         A      Of -- well --

5                MR. CUNNINGHAM:   Objection, form.

6         Q      (BY MR. MCKAY)   So -- so that I can

7    understand, is the Denver team the top of the

8    Customer Relations pyramid?

9         A      Yes.

10        Q      Okay.  And you were saying that the Denver

11   team representatives can deal with the complaint as

12   they see fit; is that correct?

13        A      Correct.

14        Q      Okay.

15        A      And so I'll just use the -- the terms

16   interchangeably, Denver team and customer advocate.

17        Q      Okay.  Are they the same thing?

18        A      The customer advocates are the individuals

19   on the Denver team.

20        Q      Okay.  So the group of customer advocates

21   is the Denver team?

22        A      Yes, sir.

23        Q      Okay.  And it's the customer advocates who

24   came from a background of corporate customer

25   relations?



Page 268

1        A      Generally speaking, yes.  So they --
2    they've had experience previously, either at Frontier
3    or elsewhere, in customer advocacy.
4        Q      Okay.
5               MR. MCKAY:  All right.  That's all I have.
6    Thank you very much.
7               THE DEPONENT:  Thank you, sir.
8               MR. MCKAY:  You do have the right to read
9    and sign the deposition or you can waive it.  It's --
10              THE DEPONENT:  I'm going to have to -- I
11   need some help here.
12              MR. CUNNINGHAM:  Yeah.  We're not -- how
13   much time?  We can go off the record now.
14              MR. MCKAY:  Oh, did you guys have some
15   follow-up?  I'm sorry.
16              MR. CUNNINGHAM:  We might have.
17              THE VIDEOGRAPHER:  Do you want to go off
18   the record?
19              MR. CUNNINGHAM:  Sure.
20              THE VIDEOGRAPHER:  Okay.  The time now is
21   5:28 p.m.  We are going off the record.  This is the
22   end of Clip No. 7 in the deposition of Shawn
23   Christensen.
24              (Recess taken.)
25              THE VIDEOGRAPHER:  The time now is 5:35



Page 269

1    p.m., and we are back on the record.  This is the

2    beginning of Clip No. 8 in the deposition of Shawn

3    Christensen.

4            MR. CUNNINGHAM:  Okay.  Mr. McKay, you

5    have finished your direct examination; is that

6    correct?

7            MR. MCKAY:  Yes, I have.

8            MR. CUNNINGHAM:  Okay.  We will -- given

9    the hour, we will resume tomorrow morning.

10           THE VIDEOGRAPHER:  Okay.  All right.  The

11   time now is 5:36 p.m.  This concludes today's

12   proceedings.  This is the end of Clip No. 8 in the

13   deposition of Shawn Christensen.

14           (The deposition adjourned at 5:36 p.m.,

15   September 25, 2023.)

16

17

18

19

20

21

22

23

24

25



Page 270

1    STATE OF COLORADO )

2                     )    ss.    REPORTER'S CERTIFICATE

3    COUNTY OF DENVER )

4              I, Pamela J. Hansen, do hereby certify that

5    I am a Registered Merit Reporter and Certified

6    Realtime Reporter; that previous to the commencement

7    of the examination, the deponent was duly sworn to

8    testify to the truth.

9              I further certify that this deposition was

10   taken in shorthand by me at the time and place herein

11   set forth, that it was thereafter reduced to

12   typewritten form, and that the foregoing constitutes

13   a true and correct transcript.

14             I further certify that I am not related to,

15   employed by, nor of counsel for any of the parties or

16   attorneys herein, nor otherwise interested in the

17   result of the within action.

18             In witness whereof, I have affixed my

19   signature this 29th day of September, 2023.

20                    *Pamela J. Hansen*

21

22             Pamela J. Hansen, CRR, RPR, RMR

23

24

25





**Magna**
## Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**



**A**

**A-C-A-R-S**
189:20

**A.D**
8:3 69:17 70:3,10,13
70:19,23 71:23
72:24,25 73:20 74:8
74:16 118:22
199:16 248:22

**A.D.'s**
72:6 74:7

**a.m**
2:6 6:10 44:24 79:7
79:12

**A320**
15:22,25

**A320s**
94:10

**ability**
97:3

**able**
17:6 19:6,8 47:1,2
58:7,9,22 89:24
117:15 188:3
197:22 198:4
226:10 262:12

**aboard**
198:21 234:19

**absence**
14:14

**absolutely**
6:24 79:2 97:12
111:12 113:1 121:8
219:25

**abusive**
4:3 114:3 127:14,18
128:1,5,14

**ACARS**
189:19,23 191:22
199:1 246:3,7

**accept**
229:20

**acceptable**
169:1

**accepted**

102:15
**accepting**
222:25
**accepts**
100:13 101:23
**access**
17:6,8 89:24
**accessibility**
67:8
**accident**
176:8,10
**accidentally**
112:6
**accompanies**
72:1
**accompanying**
194:21 196:9
**accompanying'**
195:10
**accomplished**
81:24
**accounting**
18:9,13,14
**accuracy**
92:17 150:23
**accurate**
23:10 50:20 119:23
143:12 188:5 200:2
236:19 241:7,19
243:3 244:11
245:14 253:19
256:23
**accurately**
23:3,12 34:6 236:3
237:2 238:20 241:5
247:3
**accusation**
169:22 201:15
**accused**
169:18 192:6 205:16
205:21
**acknowledge**
81:11
**acknowledging**
157:13
**acronym**

80:20 105:1 106:3,13
109:2 123:13 212:3
**acronyms**
106:5
**act**
60:5 155:19 174:2
230:12
**acted**
185:12
**acting**
228:23
**action**
40:19 118:12 139:5
156:12 163:12
164:1 168:15
169:14,17 173:22
209:11 210:17
211:20 270:17
**actions**
49:13,16 58:8 171:23
189:8 196:12
**active**
211:15
**actively**
209:25
**activities**
191:11
**activity**
205:17,22
**activity/event**
75:17
**acts**
241:10
**actual**
65:1 95:25 115:7
162:5
**add**
266:13
**adding**
112:7
**additional**
32:13 36:1 69:4
109:8 203:10,14
217:2 228:3 231:2
231:11
**address**

109:20 124:14
**addressed**
204:15
**addressing**
222:25 246:8
**adjourned**
269:14
**adjust**
91:3 107:3
**administer**
8:15
**Administration**
12:8,21
**adolescent**
68:22 70:25
**Adriann**
22:2
**adult**
42:13 68:21 70:24
180:23 257:21
**advise**
129:23 132:12,13
256:10
**advising**
130:4,5
**advocacy**
268:3
**advocate**
266:4,22 267:16
**advocates**
267:18,20,23
**affect**
250:8
**affixed**
270:18
**afraid**
68:11 69:17
**AFTERNOON**
126:1
**age**
74:7 102:1,9 162:9
204:23
**age.'**
100:16
**agencies'**
210:11



**agent**
188:13,20 197:5,5
201:6
**agents**
215:6 228:8,12,25
229:10 230:3 237:7
259:12
**ages**
204:4,23,25
**ago**
30:19 122:1 163:9
244:23
**agree**
21:23 25:24 46:12
47:15 56:24 109:16
152:17 164:7
217:17 227:14
251:25 261:9
**agreed**
195:2 260:9
**Aha**
191:4
**ahead**
16:20 24:1,19 29:13
36:16 57:19 58:16
59:25 72:15 76:1
78:22 82:6 90:10
99:2 102:25 118:15
125:2 146:6 160:25
187:4 193:12
205:11 216:15
250:4 259:24
**air**
4:6 26:22 27:25
39:11 66:22 100:14
101:24 129:25
130:1,4 131:24
135:22,25 137:8,16
138:13 141:14
155:22,25 162:12
162:17 164:18
207:10,23 208:1
210:2 216:21 217:6
229:21 240:22
241:25
**Airbus**

27:16,17,18 91:10
92:11,24 93:2,7
94:10
**aircraft**
15:23 16:1 26:14
27:14,20,25 28:21
30:6 64:13 91:10
92:14,22 93:3 115:3
115:7,10,15 118:17
127:22 135:10
136:7,22 137:9
140:2 147:24,24
189:25 191:25
195:16 196:3
204:10 235:3
239:16 241:25
242:5,10 246:8
248:24 256:14
257:23
**airline**
4:5 10:17,25 35:19
65:5 67:8 93:22,24
147:8,10 207:10,15
207:16 208:12,18
209:4,9,11,17 210:7
210:9 211:18,21
212:5 217:11
**airline's**
94:19 211:2
**airliner**
141:9
**airlines**
1:5,11 2:3 3:2,11,16
6:5,8 7:7 10:17
11:13,20 12:5 13:18
14:4,9,19 15:11,14
15:17 16:17,22
18:24 20:2 22:11
35:5 45:25 57:6
93:18 94:10,15 96:2
100:12 101:22
102:10 103:14
104:4 107:16,20
129:5,14 130:2,6,15
130:18 131:3,18,23
132:2,5,9 134:14

139:4 140:6,7 142:9
142:12 146:11,22
146:23 155:1
158:12 161:1,24
164:25 165:24
167:8 171:7,9,11
172:7 174:9 182:20
208:4 211:13 214:2
214:11,14 215:12
215:19 216:20,22
216:25 227:15
228:9 229:19 230:5
237:17 238:13
241:2 251:4 255:1
257:7
**Airlines'**
16:6 228:9
**airplane**
26:17,19 110:11
135:7 205:16
240:21
**airport**
20:23,24 133:1 141:2
141:17 142:11
**al**
1:8,11 6:7,8
**alarm**
77:19
**alerted**
137:8
**Alexander**
22:4
**Alexander's**
24:25
**allegation**
151:12 259:20
**allegations**
86:10 265:21
**alleged**
61:8 62:10 63:10
180:9 181:1
**allegedly**
177:18 195:11
**alleging**
265:17 266:8
**allow**

49:14 233:23
**alternative**
144:13,25 217:3
**Amanda**
22:2
**ambiguous**
116:2
**Amended**
3:9
**amendment**
82:7
**Amenities**
3:23
**American**
214:2,11,13 215:3,19
**amount**
144:17 221:20
**ancestry**
162:8,8 208:1 209:19
210:20 216:8
**and/or**
17:12 60:14 61:10,12
68:19 70:20 237:7
263:25 265:19
**Angelica**
253:4
**animals**
99:18 100:4
**Anna**
22:1 47:8 74:5,12,14
252:11
**announcement**
109:20
**answer**
9:7,15,19 10:8,9
13:10,14,22 19:16
20:4 27:3 31:22
33:8 35:9 48:4
57:25 68:16,17
142:5 151:16 168:7
171:16 228:12,14
**answered**
19:20 74:8,15
**answering**
9:4 73:14,20
**answers**



49:14 57:4 73:15,20
**anti-**
217:9 231:12
**anti-bias**
211:16 212:20,22
213:1,5,16 214:16
216:23
**anti-discrimination**
155:9 156:23 158:10
160:18 207:18
211:17 213:9,11
216:4,9 223:1
227:18 228:10
229:2 230:18,22
231:4 243:17
260:18
**anticipate**
9:4 19:11
**anybody**
18:23 64:1 102:7
103:3,4 150:5 156:1
158:12,25 159:2
161:15 173:6
185:13 206:18
217:14 229:1
231:11 238:22
259:15
**anymore**
110:18
**apologies**
112:7
**apologize**
67:18 96:12 113:4
116:23 123:14,15
123:24 124:12
156:19 254:3
266:24
**apology**
37:7
**apostrophe**
68:23 208:25 210:11
**apparently**
52:21 55:8
**appear**
23:20 49:3,6,16,23
186:24 246:4

**appearance**
68:20,22 70:20,24
140:23 209:15
**appearances**
1:13 6:17
**appeared**
73:19 186:21 194:18
**Appearing**
1:18,23
**appears**
23:16,16 42:7 46:10
52:9 53:19 54:17
55:18 56:4 64:24
73:13 79:25 143:13
143:13 144:17
175:21 203:4
**applicable**
78:18 84:4 210:3
**application**
152:16
**applies**
161:17 162:25
**apply**
245:16
**applying**
213:18 217:15
**appreciate**
99:19 100:8
**appropriate**
40:24 41:5 130:8
132:25 133:12
139:5 144:23
151:10 180:24,25
188:19 193:22
194:1,8 202:12
203:6 210:2 211:20
211:23 215:4 261:9
262:23
**appropriately**
32:23 193:18 204:7
204:20 210:12
211:1 258:11
**appropriateness**
189:19 193:2
**approximate**
204:25 222:8

**approximately**
6:10 195:7 199:11
204:3,4 232:13
257:15,16
**April**
79:23 244:10 250:24
**arc**
36:12,17
**area**
181:3 183:12,23
196:24 206:6 234:5
235:3
**areas**
16:16 18:7 28:10
**armed**
110:13 138:15 139:2
**arrival**
196:4 204:10
**arrived**
201:13
**artificial**
9:1
**ashamed**
68:13 70:10
**Asian**
54:18 55:8 201:21
202:23 203:2
**asked**
74:7 97:6 122:5
164:14 176:19,23
177:4 178:11,16,17
178:22 179:12,13
179:16,21 184:25
194:22,24 196:10
203:25 204:8 225:7
231:7 247:5 259:16
**asking**
9:5 11:19 13:16,17
19:7 54:5 141:24,25
145:19 150:9 158:4
165:24 231:10
259:10
**asks**
92:16
**assess**
163:3 165:2 210:15

212:6
**assessment**
234:17
**assigned**
8:18 239:16 240:16
242:9 265:10
**assist**
14:16 207:15
**associated**
28:21 94:1 178:9
**assume**
20:11 23:10 34:6
46:25 49:20 50:2
51:24 67:3 92:17,24
152:23 155:19
189:14
**assumes**
220:25
**assumption**
50:5 187:13
**assure**
186:6
**ATC**
129:23,24 130:4
132:12,13 135:2,6
135:11,12,16
136:12,15 242:8,16
**attached**
110:20 213:25
**attachments**
4:3
**attempt**
121:23 127:21 143:5
143:16 211:19
**attempting**
147:23 148:6
**attempts**
165:21
**attendant**
3:18 4:8,21 5:6,8,10
30:2,7 31:4 34:22
34:23 35:5,6 38:5
40:10,12 42:4 43:6
60:21 61:18,23 62:1
62:4,6,10 63:5,8,15
63:23 76:24 77:4



79:18 80:19 82:15
84:17 85:16 89:4
96:2 97:24 101:4,17
104:5,10 106:1
107:6,7 108:1
113:21 114:7,15,18
117:20 119:9 122:8
122:10 127:12
128:13 143:25
144:21 145:5
146:10,25 148:2,20
149:20,21 150:11
151:5,11 152:12,18
153:19,24 156:7,12
161:11,17 163:11
163:24,25 164:25
165:7,17,22 166:1
166:22 181:1 183:5
187:10,25 189:17
190:12 192:9,16,25
193:7 197:7,8 201:3
203:25 204:5,8
217:12 233:12
235:13,19 243:8
244:18 248:14
253:16,21 255:8,25

**attendant's**
59:22

**attendants**
20:9 21:3,4,22 23:14
25:7,20 30:8 34:10
38:10 41:18 42:11
42:23 47:5 48:5,10
48:22 50:14 54:23
55:11,15 56:14 57:6
58:24 59:19 60:13
61:7 69:10 72:24
81:2,6 82:1 84:8,23
86:23 87:1 88:1,10
88:16 90:7 98:19,24
102:2 103:10,15
108:23 114:20
118:21 120:14
128:13 143:11
145:19,20 151:22
152:2,22 154:8

155:1,12,18 157:3
157:12 159:6 175:4
179:12,16 180:17
180:23 181:5
184:19 186:25
187:9,14 189:21,23
191:23 192:14,15
194:17,20,22,24
195:8,18,23 196:10
202:5 218:12
219:17 228:8,11
230:12,13 231:1
233:24 234:5 235:2
235:21 240:18
241:24 244:24
256:10 257:18,20
258:18 261:20

**attendants'**
61:3 153:5

**attention**
106:3 124:19 126:25
254:9

**attorney**
11:17 164:15

**attorneys**
10:7 11:16 13:13
65:10,24 270:16

**August**
14:1 17:3 25:1

**authority**
239:14,16 240:16

**authorized**
8:15

**authorizes**
142:16

**availability**
184:3

**available**
184:13 203:5

**Avenue**
1:14 6:12

**aviation**
12:7,21 106:5 207:8

**avionics**
247:24,25

**avoid**

217:14

**aware**
146:24 159:1 166:9
172:6 175:15,19
200:6 213:13 214:8
214:13 231:15,21
260:2

**awareness**
212:7 241:14 244:15

———————
## B
———————

**B**
187:10 189:12
190:11,12 192:15
192:15,21 194:19

**B-E-S-W-I-C-K**
225:2

**back**
10:12,12 27:3,24
30:11,20 44:24
45:17,19 47:2 58:6
64:13 75:20 79:12
82:10 83:18 85:14
95:2 97:18,23
113:25 116:21
126:3,8 127:10
144:22 146:12
148:17,20 149:12
150:10,24 151:2,6
156:20 159:21
161:22 163:8 169:5
169:9,19 170:7,18
171:13,15 181:20
193:16 195:3 198:9
207:24 208:22
220:5,11 221:9
230:11 242:1 243:1
250:9 251:13 269:1

**background**
35:22 153:20 155:23
156:7,8 266:5
267:24

**backs**
178:7

**backwards**
21:19

**bad**
89:3

**badges**
254:12

**balance**
234:10

**ballpark**
15:4 30:15 262:10

**ballparking**
30:12 221:23

**base**
14:22,24,25 225:3,21
226:22

**based**
34:14 43:15 51:17
61:9 84:5,25 86:21
87:4,13 91:7 92:21
94:22 107:12,14
127:7 128:23 129:2
134:2 135:8 139:8
143:14,19 146:8
148:4 152:2 153:15
162:2 170:23 171:5
175:21 188:17
192:5 193:21 205:3
205:12 210:18
227:22 250:5 252:2
258:9,11 266:15

**bases**
165:23

**basic**
25:16,17,18,23 26:5
27:4 29:16,22 31:4
31:21

**basically**
66:13 102:6 131:22
151:22 176:17
197:18

**basing**
39:15

**basis**
47:13 83:16 162:3,13
162:18 163:2
164:15 165:2,8,10
166:12,24 167:23
170:10 202:20,25



207:25 210:17,21
216:5,7 264:12
**Bates**
21:18 45:6 79:19
80:13 95:24,25
103:25 104:2 112:8
160:3 237:20 238:2
238:5 244:8 248:15
249:5,5 250:20
253:18
**Bates-stamped**
33:17
**bear**
91:17 94:6
**beard**
53:9
**bearing**
80:13 104:3 160:2
**bears**
248:15
**beeping**
44:11
**beginning**
25:8 44:25 79:13
97:19 159:22
161:23 183:1 220:7
269:2
**begins**
6:4 100:10 126:3
**behalf**
1:18,23 8:15 228:11
228:23 253:4
**behaving**
117:21
**behavior**
4:3 41:24 48:23
49:12 56:14 59:8
75:1,6 86:2 114:3
117:1 118:9,11,14
127:14,18 128:1,5
128:10,14,15 169:1
189:22 191:23
209:20 210:18
213:16 256:11,14
**behavior/**
68:5

**behaviors**
49:11,13,16 58:8,21
59:20 143:6,18
217:16
**believe**
34:7 41:24 42:14
43:1 50:24 61:5
75:1 78:19,23 87:20
87:23,24 89:9,14
117:11 119:18,23
120:8 122:6 150:1,5
157:15 170:10,21
172:14 175:2 185:4
188:11 201:1 207:2
214:24 215:18
218:22 232:3
238:14,18,21 262:7
**believed**
42:23 195:15,19
257:14
**beneath**
53:7,13 65:4 99:9
127:17 128:4 144:9
144:15 233:18
**benefit**
232:21
**best**
19:17 27:1,7 32:1
64:2,21 134:4
172:17 174:23
175:2,12 182:1
196:3 215:17
249:19
**Beswick**
225:2 226:14,20
227:13
**Beth**
225:15
**better**
77:22 265:2
**beyond**
36:15 42:17 54:13
56:16 57:2 64:7
88:13 89:22 90:4
91:25 92:16 106:24
137:21 139:7

142:14 147:2
150:14 151:7 154:4
156:16 158:15
165:18 179:7
183:10 193:20
203:8 215:16
246:17 248:25
260:12
**Bi-Weekly**
3:15 33:20
**big**
116:24
**bit**
8:10 9:1,16 32:10
34:18 39:18 45:18
45:20 53:8 76:9
84:13 92:11 94:5
112:13 116:1 194:6
216:10 228:20
258:16
**black**
65:1,4,4 83:20 99:9
100:6 104:25
117:16 153:21,22
153:25 154:1,15,16
155:5,5 156:9,10
218:1
**blacked**
65:11,16
**blank**
65:24
**bless**
67:12 113:18
**blow**
142:12
**blown**
186:5,12
**blowup**
51:2 186:8,9,10
**Blue**
69:5
**boarding**
51:23,25 184:25
185:2,14 201:12
233:18 255:12
**body**

207:24
**boilerplate**
112:14
**bold**
49:14 105:7,12,17
116:25
**bolding**
212:3
**Bond**
5:3 22:1 47:8,20 62:1
74:5,14 175:10,15
252:11
**Bond's**
74:12
**books**
113:16
**boss**
14:19
**bottom**
25:14 81:9,10 111:18
112:1,14 142:19,24
143:1,2 160:3
234:25 237:17
239:12 244:14
249:23
**bought**
102:15 188:13
198:11
**box**
56:19 116:24,24
117:2,6 118:5 144:6
145:18 239:13
**box/snack**
201:23
**boxing**
142:21
**boyfriend**
200:9
**branch**
199:2
**brand-new**
82:12 161:10
**break**
9:15 10:1,3,4,6,10
79:3 95:2 125:2,3
126:9 198:2 219:23


MAGNA
LEGAL SERVICES

265:25
**breaks**
9:23
**breathing**
260:1
**brief**
256:20
**briefing**
3:15 33:20 74:6
**bright**
22:2 43:19 44:1
61:18 62:11 63:15
74:1 92:3 175:10,16
183:5
**Bright's**
24:11
**brighter**
92:8
**bring**
49:13 106:2 122:23
154:9 181:25
201:19
**bringing**
124:18
**brings**
46:14 60:20 117:8
**broad**
14:12 86:1
**broader**
115:14
**brought**
16:12 42:9 62:7,17
**bullet**
37:12,18,23 38:3
39:25 40:9,18 41:8
41:22 43:8 48:21
49:9 58:5,6 60:3
64:4 65:23 67:6
68:5,6,10,15,18,21
68:23 71:12,18,25
72:10 74:19,24 75:5
75:15,22,23 76:6,13
76:22 77:7,12,17
78:7,10,11,11,12,13
78:14,15,15,17
105:1,6,11,16

121:21 129:22
130:9,20 133:11
134:13 143:1
144:11 171:24
211:3,4,6,7 214:19
235:1 241:1,9 242:6
244:18 249:7
254:10,18
**business**
22:7,9 87:16,17,21
119:15 120:6 161:6
228:13 229:13,17
236:1,25 238:17
245:12 246:15
251:1,3 253:7
254:25 255:13
257:26 265:3
**button**
35:21 52:10 91:8
**buy**
102:9

---
**C**
---

**C**
1:20 6:2 105:7
107:13 194:24
241:12
**cabin**
4:8 5:9 90:21 114:20
120:14,15 121:13
182:6,11 183:1
189:11 215:5
233:18,24 234:6
242:2 255:9 256:11
**cabinet**
131:8
**calculated**
222:2
**California**
1:16
**call**
9:19 35:10,12 96:22
118:15 174:4 187:9
195:8 207:20
**called**
2:4 89:16 120:19

123:12 172:6
187:10,25 189:12
192:21 201:6
**calls**
42:17 52:18 54:13
56:16 57:1 64:7
73:23 152:8 164:16
193:19 203:8
**candy**
236:10
**capital**
77:23,24 105:6,11,16
241:10,11,12
**capitalized**
66:4 77:18
**caps**
76:23 77:8,13 78:2
90:23 116:25 128:5
128:19 212:3
**captain**
4:16 15:19,22 40:23
41:1,4,10,14,20
42:11,23 43:7,12
62:25 63:16,24
74:20,25 75:7
107:16 118:15
128:19,24 129:12
132:13,21 133:18
133:21 137:24
186:23 192:3,11
239:14,15,23 240:8
241:1,10 242:4,7
243:2,16,20 256:11
257:3,17,25 258:9
258:12
**caption**
49:21 64:25
**captioned**
55:6 71:8 76:18
82:18 244:14
253:15
**card**
117:7,9,11 118:6,8
118:21,23 122:1,6
122:10,18,23 123:4
180:21

**careful**
9:1 83:13
**carefully**
48:23
**carried**
208:6 211:1 224:4
**carrier**
99:21 100:13 101:23
155:23,25 229:21
**carriers**
66:23
**carries**
43:9
**carry**
28:2
**cartoon**
53:2
**case**
1:3 6:22,23 7:2 8:18
34:9 42:9 57:8,9
60:20 84:3 98:13
114:22 156:4 168:2
170:11 172:13
186:22 195:19
197:6,22 199:5
204:14,18 224:7,16
224:24 238:1
241:25 246:8
257:14 259:4 266:8
**cases**
23:17 205:6
**cat**
218:5
**catching**
232:24
**categories**
181:9
**category**
240:25 266:13
**Catering**
233:19
**Caucasian**
201:22 202:23 203:3
**cause**
170:24
**caused**



256:9
causing
209:16
cease
116:25 118:1
center
44:13 55:6 132:18,22
184:4 197:14
198:12
certain
11:25 12:20 16:6
30:23 47:18 61:20
74:18 88:5 94:14
136:23 152:16
153:4 157:14 186:5
219:15 260:20
263:2
certainly
185:1 234:8,24
CERTIFICATE
270:2
Certified
2:8 270:5
certify
270:4,9,14
certifying
215:5
cetera
37:25 202:3
Chain
239:13
change
82:8
changed
186:6,13
changes
84:1 227:24,25
characteristics
162:7
characterization
62:12
charged
176:8
chart
56:3,6,9
cheek

11:21 26:7 27:13
28:2,13,15 36:9,21
188:19 206:17
checked
201:18 202:9
checking
185:13,14
checklist
35:18 36:3,8 37:1
checks
26:23
Chelsie
22:1 43:19,25 61:18
62:11 74:1
Chicago
1:21 251:14
chief
14:5,6,22,24,25 15:2
15:11,18 107:20
226:22 257:9 259:4
child
42:13 155:5,6 195:15
218:1 257:21
child'
201:19
child/person
73:14
children
71:19 153:22,23
154:1,2,16,17 156:9
156:10 194:17,18
196:9,21,24 197:23
198:8 204:7,19,22
children's
196:6
choose
227:17
Christensen
1:5 2:4 3:2 6:6 7:8,10
8:1 44:20 45:1,4
79:8,14,16 97:15,20
97:22 125:8 126:4,8
159:18,23,25
177:13 220:3,8,10
268:23 269:3,13
circumstance

261:21
circumstances
86:21 133:7,10
144:12,18,24 146:2
146:8 180:22,24
195:2 209:14
262:19
citizenship
162:11
Civ
3:11
civil
2:2 162:12,17 164:18
215:7,14,25
claim
5:16 225:9,10 226:7
226:13
claimed
60:21 63:5
claiming
70:24
Claims
68:21
clarification
55:21 126:19 246:7
clarify
17:15 84:13 115:17
135:21 198:9,10
210:3 229:8 251:10
261:2
class
26:11
classes
30:18
classic
249:12
classify
265:20 266:12
clear
12:10 15:2 81:6
196:22 223:2
click
49:3 65:20,23 67:14
click/slide
65:17,18
clicked

49:7,23
clicking
52:10
clicks
49:15
clip
6:4 44:19,25 79:8,13
97:14,19 125:8
126:3 159:17,23
220:3,7 268:22
269:2,12
close
68:15
clothing
68:19 70:19
co-workers
210:2 211:5,23
cockpit
140:1
code
4:13 81:11 88:2
109:15 110:7
237:16 238:9,12
265:20
codes
88:7,16 247:23 248:3
coding
109:10
coercion
86:3
College
78:15
colon
67:3 68:6 71:18
72:17 78:10 100:11
127:14 128:5,19
209:9 211:3 244:17
254:17
color
100:14 101:24 102:7
162:4 165:11
166:15,17 207:25
209:18 210:19
216:7
Colorado
2:6 6:11 270:1



colors
166:19
column
29:19
combine
213:14
come
10:11 95:2 110:12
121:6 152:23 179:5
248:19 259:6
comes
67:1 108:1,3 113:21
114:10 119:25
120:1 153:20
comfort
241:14 266:19
comfortable
194:25 264:7
coming
146:17
command
239:13,15,22,24
240:5,9
commencement
270:6
commencing
2:5
commercial
35:18 78:8 191:11
Commission
126:23
committed
86:2,4 161:2,24
common
9:13 120:19,22 128:2
128:9 129:3 197:5
256:8
commonly
266:4
communicate
60:8,18 153:10
175:13 198:16
209:25
communicated
61:10,12 201:16
232:1 235:21

communication
209:25 211:18 212:5
246:8
communications
189:8 197:20
companies
228:25
companion
41:11
companion(s)
73:12
company
11:11,18 12:22 18:17
30:9,22 31:10 32:24
80:22 87:1 109:21
155:14,15 167:10
188:20 189:24
191:24 199:2
200:12 206:17
211:6 215:5,25
220:16,19,23 228:4
242:8,16 251:13,16
252:12 254:12
263:11 264:6,17,21
company's
150:8 210:9
comparing
157:4
competency
26:6 27:13 28:1,13
compiles
246:23
complainant
259:1
complaining
231:19
complaint
172:12 174:19 201:8
201:9 223:9,14
259:9,10 267:11
complaints
214:10 220:20 221:3
221:7,14,20,25
222:2,3,14 223:2,3
223:6,19,20,25
224:4 225:16,23

226:1,5,15,18,21
258:14 259:18
260:6 263:13 264:1
264:13,19 265:17
265:20 266:8
completed
17:3
completely
95:3
completion
214:25
compliance
10:25 209:8 211:21
216:12 242:7
compliant
221:5
complies
118:11
comply
25:21 35:20 89:9,17
89:18,19 118:14
complying
227:23
component
67:7
compound
198:1
comprehensive
25:19 26:13 209:10
209:12,14 212:4
216:23
comprised
156:13
concept
120:23
concepts
102:3
concern
77:19 153:11 190:22
196:9 209:16 211:5
264:21
concerned
23:8 105:8,8 106:8
107:2,7 108:2,7,11
108:21 109:4
110:21 189:13

190:14 192:22
195:9,14,18 197:9
204:1 209:20
concerning
257:10 259:21
263:24
concerns
3:23 40:25
concluded
199:23
concludes
269:11
conclusion
40:22 87:19 164:16
167:2 187:17
225:25 229:12
concussion
147:11,17 149:24
179:2
condition
51:17 58:3 150:9
151:4
conditional
145:2,8 146:7,15,16
147:14,19 148:3
151:15,17
conditionally
145:2
conditions
84:6 129:2 135:9
139:8 146:10,25
147:5,21 148:4,15
153:16 258:12
conduct
155:10 158:9 160:14
167:6,14,24 173:20
180:23 209:12
242:9
conducted
178:8 259:8
conducting
210:8
confident
23:1 248:20 258:10
confidential
96:19



confidentiality
8:4 86:11
configuration
4:22 248:13,21,24
249:14,16 250:9
configurations
250:13
confines
87:6 153:9 168:12
180:6
confirm
60:18 63:19 64:1,13
193:8 210:3
confirmation
60:7,8,13,17 62:18
62:23 64:12,16 88:2
88:7,16 89:13
confirmed
64:19 197:8,8
conflict
121:24 123:7,7
124:23 180:20
211:13
conforms
118:3
confront
77:8
confusing
196:22
congregate
235:2
connected
26:16
connection
220:20
consensus
201:19 222:23
consent
86:3 214:1,9 215:12
215:19
consequences
8:19 118:10
consider
54:7 86:20 106:11
128:20,24 169:4
242:2

considered
58:25 179:3 211:8
considering
209:13 212:7
considers
180:22,25
consistent
132:11
consisting
166:10,18,22
consolidation
41:20
constitutes
270:12
consulted
211:5
cont'd
67:23
contact
43:12 74:20 132:16
132:21 133:19
140:1 257:21
contacted
184:14 257:17
contain
265:20
contained
237:8
contains
236:4
content
65:1 99:23 100:1
119:22 145:18
contents
31:11 80:7 103:16
120:9 158:8,25
166:5
context
9:9 35:18 54:7 55:24
59:16 76:7 93:11
101:1 124:5 129:17
131:11,21 136:1
186:24 187:7
259:17,18 262:16
contexts
54:4

contextual
57:20 134:1,2
contextually
128:17 135:9
continue
76:15 195:2
continued
67:23 126:6 174:17
continuing
137:4
contractors
207:16
Control
129:25 130:1,5
135:22,25 137:9,16
138:13 141:15
controlling
72:6
controls
72:1
conversant
98:7
conversation
9:6 18:25 37:13 38:5
38:13,16,19 39:21
40:11,17 56:20 57:7
57:12,17 58:2 62:17
72:12 73:4 124:6
143:5,17,19 185:19
215:18 258:8,9
cookie
85:2
cookie-cutter
84:2
coordinated
204:9
coordination
241:13 257:20
coordinator
241:11,23 242:3
copy
233:6
copy-
232:8
corporate
12:7 16:6 20:2

228:22 267:24
corporation
11:4,7 22:12 23:8
33:25 57:6 87:9
103:8 165:24
177:12,16 180:3
corporation's
20:4 177:7
correct
12:13 15:13 20:4,5
20:25 21:1,5,6,10
21:11 22:6 23:22,23
24:13,14,23,24 25:2
25:3,9,10 26:1,8,9
28:11 32:18 34:4
36:9,21 38:24 40:5
41:2,7 44:10 46:15
51:9 60:1 62:22
63:6,7,19,22 64:1,2
64:5,20,21 65:7
66:15 67:11 70:8
71:15 73:10 74:2,16
77:1,6,10,11,16,22
77:25 78:4,5 79:21
79:22,24 80:1,4,5
81:8,19 90:8,11,13
90:16,18,19 94:12
98:16 99:13 100:1,9
101:5,7,10,18
102:11,18 103:6
104:6,7,17,22,23
107:17 109:7
110:13,14,24 113:9
113:22,23,25 114:1
114:5,8,9,12,13
115:16,24,25
120:25 122:19
123:5,25 124:2,4,11
124:13,16,21
127:16 128:11
130:7,19 131:6,7,9
131:15 132:3,9,15
134:5,18 136:4,10
137:5,6,22 138:2
139:21 140:4,18,19
140:24 141:13



142:6,13,24 143:23
144:3 145:12
154:11,17,19
160:11,12,14 164:2
168:4 171:19
172:16,18 174:9,10
175:8 177:9,10,14
178:5 179:24
184:12 187:22
188:23 189:1
190:13,17,20 191:8
191:19 192:1,2
193:3 195:24
197:10,11,25 199:7
199:25 200:1 201:1
202:10 204:21,24
204:25,25 207:12
207:13 208:20,21
209:1,2 213:11
215:23 219:18
220:13 221:10,11
223:5,7,8 225:6
230:22,23 233:13
233:20,21 234:2
237:18,19,21,22
238:10 239:10
240:5 242:12,18
243:5 244:2 245:2,6
245:9,10 250:15
252:21,22 256:4
258:1 267:12,13
269:6 270:13
**corrected**
32:12,23 33:1
**corrective**
168:15 169:13
173:22
**correctly**
18:10 37:15,21 38:1
48:25 49:4,18 56:22
58:11 60:10 62:20
65:6 67:10 68:25
71:21 72:3,13,21
73:16 74:22 75:3,8
75:18 76:25 77:15
77:20 83:5 86:7,13

90:25 96:5 99:22
100:17 105:4,9,14
105:19 118:18
122:11 123:7
127:15,23 128:7,21
130:23 136:13
143:8 144:19
157:16 162:15
163:6 167:11
168:17 169:2 172:4
173:24 174:6 190:1
193:24 195:4,20
196:14 197:1 202:7
204:16 208:8
209:22 210:5,13,23
211:10,25 212:10
217:7 225:19 234:1
235:5,15 239:19
241:17 244:20
254:13,19,23
256:21
**corresponding**
50:9
**cost**
214:20 228:3
**counsel**
6:16,25 7:4,14 17:1
19:1 45:2 79:15
95:17 97:9,21 112:9
126:5 159:24 207:7
208:11 212:17
220:9 270:15
**Counsel's**
220:18
**count**
10:2
**counter**
196:19
**COUNTY**
270:3
**couple**
156:13 163:13 164:1
184:8 239:21
**coupon**
261:10
**course**

22:9 25:22 87:16,21
119:14 120:5
235:25 236:24
238:17 245:11
246:15 251:1,3
**court**
1:1 6:14,18,23 7:2
8:4,13,16 9:9 80:11
95:22 97:7 145:13
221:6 237:15
242:24
**courtesy**
161:25
**courtroom**
8:14,21
**cover**
25:6 53:3 71:6
115:14 116:22
186:19
**covered**
29:22 31:4 80:7
104:21 155:8,10
156:22 181:8,12,13
181:19 182:2
219:16 253:14
255:22 257:5
**covers**
81:1 181:23
**create**
153:2 183:18 201:14
234:20
**created**
27:24 34:3 46:21
47:19 50:16 87:12
87:15,20 119:12,14
120:3,5 235:25
236:22,24 237:6
238:17 245:11
246:10 253:4
**creates**
13:11 33:24
**crew**
58:19 60:7,14,17
62:13,24 63:9 105:2
118:11,12,14
120:15,15 129:22

135:17 137:18
140:1,14 182:6
183:1 184:2 196:2
201:3 215:6 239:16
240:17 241:13
**crew's**
121:13
**crews**
58:7,9,22 60:6,16
134:23 187:13
258:18
**criminal**
205:17,22
**criteria**
156:5 163:11
**critical**
84:24 85:3 152:2,5,7
152:13,15 153:5
155:3
**CRO**
201:7
**cross**
100:23
**crotch**
63:6,10,25 180:9,10
**CRR**
270:22
**CSA**
196:19 197:3,4
**CULBERTSON**
1:19
**cultural**
212:7
**Cunningham**
1:19 7:6,7,18,24 11:5
12:2,23 13:20 14:21
16:23 17:13,17
18:18 19:14,20
20:15 22:20 23:4
24:17 27:10 29:11
29:13 30:14 31:17
33:7 34:25 35:8
36:5,13,15,22 37:4
38:11,25 39:12,22
40:3,21 41:3 42:5
42:16 43:4,14 44:6



44:12 46:23 47:6,22
48:12 49:24 50:4,22
51:10,15 52:1,16,23
53:5,11,16,21 54:12
54:20 55:1 56:10,15
57:1,18,24 58:14
59:9,23 61:2 62:15
63:2,12,20 64:6
65:12 69:14,19
70:15 72:7 73:1,22
75:25 78:20,22 82:2
82:20 83:10 85:20
86:18 87:2,18 88:4
88:12,23 89:21 90:3
90:9,14 91:11,24
92:15,25 93:9 94:20
95:5,12 96:18 99:1
100:21 101:6,11,19
102:12,17,23 103:5
103:18 107:10
108:18,24 119:1
120:20 125:4 129:1
129:6,15 131:13
132:7,14,23 133:4
133:16,22 134:9,19
134:24 135:13,19
136:9,18 137:10,20
138:3,17,21 139:6
139:15 140:9,17
141:4,7 142:3,14
143:21 144:2 145:1
145:7,11 146:4,14
147:1,13,18 148:8
148:10 150:13,25
151:7,14,18,24
152:8,25 153:6
154:3,18,22 155:7
156:15 157:21
158:14 159:10
162:20 163:14,19
164:3,21 165:18
166:2,7,25 167:2
168:6 169:7,20
171:3,17 172:23
173:4,12,16 175:1
175:20 176:1,5,13

176:21 177:2
178:13,19 179:6,15
179:23 180:5
181:10,15 182:12
183:9 184:21 185:7
187:16 188:24
190:5,24 191:7,18
192:13 193:10,19
198:23 199:8,13
200:3,20 202:13
203:7,16 205:9,18
205:25 212:21
213:20 215:15
216:2 217:18
218:14 219:20,24
220:25 221:15,18
221:21 222:6
223:16,22 226:2,19
227:20 228:17
229:11 230:6
236:10 246:17
248:25 250:2
253:25 254:4
256:25 258:20
259:13,22 260:5,12
260:23 261:12
263:3,8,14,18
264:20 267:5
268:12,16,19 269:4
269:8
**curious**
54:9 55:4 240:3
**current**
10:19,21 213:22
**cursory**
187:6
**CUS**
3:22,23 104:22 105:1
153:11 180:21
**cushions**
202:2
**customer**
3:22 96:3 104:5
124:18 197:4
198:14 224:1,25
225:23 226:17

231:15,18 260:8,21
261:8,25 262:18
263:12 265:10,14
265:15 266:3,4,5,21
266:22 267:8,16,18
267:20,23,24 268:3
**customers**
241:4
**cut**
111:13 112:19 233:5
**cutter**
85:2
**cycle**
104:18

---

### D

**D**
1:15 3:1 6:2
**D-I-M**
90:22
**D.C**
207:9
**daily**
222:20 264:12
**Dallas**
187:21
**damage**
127:21
**dangerous**
59:8
**dark**
53:14 67:15
**data**
89:19,25 90:2 103:13
**date**
5:5 18:8 23:14 25:8
26:3 79:23 80:2
81:17 88:18,21,21
98:6 104:14,16,20
113:24 114:7,12
115:23 182:4
214:21,23 215:2
218:21 227:6
237:18 239:9 243:3
252:20,24 253:17
256:2

**dated**
5:15 23:21 208:17
218:19,25 244:10
248:14 250:23
**dates**
34:19 47:20 48:1,9
**daughter's**
149:1
**day**
20:12 21:9 26:2,5
99:17 158:23,24
270:19
**days**
80:3 81:21 87:25
88:15,18 110:10
184:18
**de-escalation**
123:13
**deal**
267:11
**dealing**
114:2 261:6
**Death**
38:14 39:7 70:7
185:20
**December**
227:12 253:18
**decide**
138:14,19 139:12
140:7,15,20,22
220:23
**decided**
113:5 141:11 189:24
257:20
**deciding**
163:12
**decision**
146:20 152:3 203:11
211:22
**decision-making**
209:5 210:8,10 212:6
213:18
**decisions**
152:19 153:24 155:3
**deck**
41:19 120:15 129:22



134:23 135:17
136:2 137:18
187:10 189:9,12
192:21 195:8,12
235:13 244:19
245:1 246:24
256:15,18,23
**declare**
135:8
**declared**
129:12 132:6
**decrease**
91:5
**deems**
41:20
**defend**
144:16
**Defendant**
3:10 6:5
**Defendants**
1:12,23
**Defense**
131:1,2 134:7,15,17
138:1 139:14
140:21
**define**
11:6,9 29:3 33:23
35:14,17 37:2 138:4
161:20 164:10
165:9,14 182:24
251:2
**defined**
35:15,20 49:11 83:22
**defines**
40:23 85:23 216:9
**definitely**
9:18
**definition**
127:18 128:1 164:7
252:2 256:19
**definitions**
172:21
**defuse**
121:23
**deliberate**
127:21

**delivering**
241:3
**DelVecchia**
1:8 6:7 8:2 21:18
72:6 73:19 74:8
118:22 148:6,11,16
148:20 149:11
150:10 151:6
169:19 170:7,18
171:13 172:6,9,20
173:1,10 175:17,25
176:18 177:1,8,18
177:23 178:3,12,25
179:18 199:6
**DelVecchia's**
63:25 148:22 177:24
**DelVecchia/Peter**
252:25
**DelVecchias**
4:10 74:6 180:7
198:21 236:18
**demand**
78:8
**Denver**
2:6 6:11 187:20
189:24 191:25
200:24 201:12,20
265:14 266:2 267:2
267:7,10,16,19,21
270:3
**dep-**
177:24
**departed**
195:3
**department**
34:1,2 80:23 81:2
87:12 119:11 120:3
126:21 131:1,2,3,5
131:8 134:7,15,17
138:1 139:14
140:21 170:15
174:4,12 176:19
206:11 207:6,21
208:2,11 212:14
214:14 215:13,21
216:21 220:18

222:16 223:10,20
224:2,25 226:16,17
227:2,15 231:16,18
246:25 260:21
261:8 265:11
**Department'**
208:3
**department's**
87:16
**dependent**
58:18 59:12 143:23
144:4 147:14,19
176:16
**depending**
59:21 86:25 122:15
251:16
**depends**
51:11,12 88:21
**depicted**
218:1
**depicting**
117:3,6
**depiction**
50:20
**deponent**
29:12 36:14 44:13
67:12 78:21 95:6
113:18 179:14
260:4 268:7,10
270:7
**deposition**
1:4 2:3 3:2,10 6:5,10
8:8 16:9,11,12,22
17:9,24 18:8 19:13
21:16 43:19 44:20
44:25 45:5 52:17
61:19,25 74:1,4,12
79:8,13 97:14,19
125:8 126:4 148:22
148:24 149:3
150:22 159:17,23
172:15 183:24,24
219:21 220:3,8
224:8,14,24 225:12
228:7,21 236:13
239:4 248:20

250:22 268:9,22
269:2,13,14 270:9
**depositions**
34:9 39:16 60:25
61:4 149:1,8 178:2
246:2
**derivation**
106:12
**descent**
55:8
**describe**
93:16 94:2
**described**
30:25 262:15,20
**describing**
75:17
**description**
3:8 4:1 5:1 25:15
163:5 238:10 243:4
252:11 257:25
**designee**
20:2
**desk**
97:6
**despite**
88:8
**destination**
68:12 70:3
**destroyed**
90:2
**detail**
4:10 43:7 61:21,24
62:3 74:11 94:3,23
**details**
10:18 41:23 42:10
43:20,23 74:25
200:16 210:4,17
265:8 266:14
**determination**
179:4
**determinative**
209:16
**determine**
163:25 188:3 197:23
204:8
**determined**



223:25 225:11
227:16 258:9
**determining**
204:11 256:9
**developed**
83:2 105:2 106:16,20
106:21
**develops**
197:17
**Devin**
257:10,17
**DFW**
187:20,20
**diagram**
52:15
**dictate**
144:13,24
**dictionary**
161:12
**differ**
59:21
**difference**
100:7 108:4,21
110:20 114:15,17
114:25 146:3
**differences**
28:7,9 93:23 94:1
250:6,7
**different**
11:1,11 13:11 22:24
28:20 33:10 53:23
54:4 59:17 82:13
86:6 93:20,22 94:15
94:16,18 95:4 100:5
106:3 108:12
111:25 113:13,16
121:6 152:24
153:14 154:9
156:14 157:1
163:13 166:11,19
166:23 180:7 188:3
188:9,15 217:22,23
224:14 227:17
255:11 262:22
264:25
**differentiate**

35:24
**differently**
17:21 59:14 86:25
**difficult**
39:19 208:4 251:7
**digits**
96:14
**diligence**
202:17
**DIM**
90:22,24 91:2,3,6,9
91:19,23 92:3,3,3,4
92:11,13 93:5,21
94:2
**dinosaur**
53:2
**direct**
181:20 229:24 230:4
254:8 269:5
**directed**
245:4
**direction**
93:20 94:14 127:8
**directives**
210:11
**directly**
14:24 197:19 223:7
223:19
**director**
10:21 11:3 12:4 14:7
146:21 193:15
207:1,2
**dis-**
213:9
**disabilities**
207:3 266:25
**disability**
100:15 101:25 102:8
162:10
**discipline**
231:8 238:23 260:11
**disciplined**
173:1 228:8 229:1
230:17,21 259:19
260:17 261:11,16
261:17

**Disciplining**
171:22
**discount**
149:13
**discovery**
181:6
**discretion**
257:3
**discretionary**
133:20
**discriminate**
153:25 161:15
207:25 216:4
**discriminating**
162:2
**discrimination**
5:15 162:14 166:13
180:19 207:23
208:19,25 210:22
214:10 216:25
217:5,10 220:21
221:3,7 222:3 225:9
225:10 226:7,13
231:13,21 232:1,17
259:9,17 260:7
263:13,25 264:19
265:17,18,19,21
266:8,9,10,10
**discriminatory**
155:20 156:7
**discuss**
108:8 151:11 181:1
195:13 214:2,6
228:2
**discussed**
25:5 29:8 98:3 217:9
232:22 258:16
**discussing**
196:2
**discussion**
10:8 39:7 43:2,13
44:21 64:8,11,15
70:6 97:16 159:19
179:25 180:8
220:11 221:2
222:18,21 227:22

258:12 264:3
**discussions**
223:1 263:11,22
265:1
**dishonesty**
171:25 172:21
**dispatch**
189:20 191:22 196:5
196:5 197:10,12,13
197:21,22 198:4,10
198:17 199:1 204:9
**dispatcher**
197:16 198:18
247:22
**dispel**
56:21 57:13
**display**
77:18
**disposal**
117:24 122:8 123:2
**dispute**
34:13 185:11
**disregarded**
204:15
**disruption**
256:19
**disruptive**
256:13
**distinct**
256:7
**distinction**
83:17
**distracted**
234:14
**District**
1:1,2 7:2,2
**disturbances**
256:9
**diverse**
99:16 155:13,18
**diversion**
128:20,25 234:21
**divert**
133:1
**divide**
222:12



division
80:21,23
divorced
190:22
document
16:13 17:5,11 19:5
19:21 21:17 22:19
33:11,16,17 34:3,11
34:21 41:9,12 43:9
45:6,9,13,19,22
47:19 48:16 50:21
55:6,19 56:13,19
57:21 64:22 69:2
75:21,22 80:7,13
81:17,25 82:13 85:7
85:13,17,24 87:6,11
89:7,14 95:25 96:15
98:14 100:25
103:11 104:2,3,8,15
104:21 111:6,10,21
112:9 114:19 116:6
116:16,18 119:8
134:13 157:25
158:6 160:2 164:10
164:13 167:5
186:16 199:23
202:19 203:13
207:6 208:22
212:24 213:2
214:18 215:21
216:1,3 218:9
225:12 232:10
233:4,17 235:24,24
236:14,21 238:7,16
239:5,6 243:18,19
245:8 246:10,14,23
247:3 252:1 253:14
254:7
documentation
127:4 157:16 260:15
documents
29:21 30:24 31:11
34:14,18,19 39:16
39:17 43:15 48:1
66:22 69:4 113:11
113:12,16 116:4

119:11 120:3 121:7
121:10 129:19
150:8 157:13,14
181:6 193:5 200:11
206:6,10 208:18
212:14 213:8
215:13 217:11
220:17 221:24
227:16 231:16,17
238:3,5,13 245:8
262:17
DOD
130:21,25 131:14
134:20 142:16
doing
8:6 37:25 59:7 72:19
74:5 122:22 165:16
198:19 202:16
213:17 216:17
222:24 227:18
domestic
222:5
domicile
226:23
door
242:2 256:15,16
doors
28:21
DOT
4:5 208:17 216:1,3
216:12 222:20
223:3 266:12
double
207:22
doubted
189:18 193:2
due
202:16
duly
7:11 270:7
duration
205:7
duress
109:25 110:8
Durham
20:23

duties
177:6 188:12 217:15
240:11,24
duty
177:12 239:17
240:20 254:18

_____ E _____

E
3:1 6:2,2 194:21
E-N-S-U-R-E
12:11
e.g
211:15
earlier
27:16 88:19 98:3
132:11 134:12
143:14,19 153:11
167:25 216:10
217:21
easy
95:11
ecunningham@hin...
1:22
educate
165:22 166:21
educating
165:25
educational
142:18
effective
5:5 209:24 212:4
217:5 252:20
efficiency
241:15
eighth
25:13
either
9:22 47:20 65:25
82:9 120:9 143:25
249:20 259:15,15
268:2
electronic
182:10
element
190:21 205:7

elements
190:18
elevate
266:17
Elizabeth
224:7,19
email
4:23 5:2,15,15 225:1
226:8 227:1 250:22
250:23 251:15,22
252:10
emails
251:5,12,12,13
embedded
67:15
emergency
26:7,14 28:16,23
115:4
employ
211:18
employed
14:19 146:11 259:11
270:15
employee
4:11 29:19 32:5
100:24 155:11
156:23 157:1,10
158:8,13,20 159:7
160:10 161:19
164:24 166:5
171:22 174:8
192:10 225:22
231:1 232:4,6,9,15
237:7 243:25
259:19 260:17
employee's
32:5 171:23
Employee/Crew
254:10
employees
13:18 31:14 132:2
134:13 157:11
162:2 163:1,2 167:9
207:16 229:8,9,14
229:25 230:3,5,15
232:2 251:5 254:11



254:16 262:18
264:18 265:14,16
**employing**
263:2
**employment**
25:8 167:10 168:16
169:15 173:23
**empty**
201:13
**encompassing**
86:1
**encourage**
216:25
**encourages**
216:22
**endanger**
78:2
**ended**
174:20 200:8
**enforce**
245:5
**enforcement**
40:20,25 41:6 118:16
130:13,14 133:13
133:19 163:4 165:4
196:3,16,25 207:8
257:22,23
**enforces**
153:4
**engage**
40:11 56:20 57:7,11
57:16 58:1 152:6
185:18 233:24
**engaged**
106:11 148:12
**engaging**
58:21 77:9 205:17,22
**engine**
249:13
**engineer**
247:22
**engineers**
93:7
**enjoy**
106:4
**enlarged**

45:17,19
**Enroute**
244:14
**ensued**
180:8 215:18
**ensure**
12:1,11 13:16 118:8
153:23 155:2 209:8
209:24 210:17
212:4
**ensuring**
11:25 153:3
**entail**
14:11
**enter**
81:11
**entered**
45:11 88:3
**entire**
147:24 155:14 164:9
214:18
**entirely**
133:20 138:2 140:23
**entities**
11:1
**entitled**
104:22
**entity**
10:24 11:2,3,7,9,10
11:18
**entries**
23:18 24:5,21 25:1,5
**entry**
24:12 25:13 186:9,10
186:11,12
**environment**
153:3 208:5
**equals**
27:8,9
**equates**
222:9
**equipment**
28:20
**equity**
17:12
**equivalent**

229:21
**Eric**
1:19 7:6 260:4
**error**
250:1
**escalated**
196:11
**escalations**
207:3 266:25
**especially**
71:19 97:1
**Esq**
1:15,19,20
**essentially**
103:3 145:9 257:13
257:22 258:7
264:16
**establish**
121:23
**established**
167:9 211:21
**estimate**
30:15
**et**
1:8,11 6:7,8 37:25
202:3
**Ethics**
4:13 237:16 238:10
238:13
**Ethiopian**
218:1
**ethnic**
265:18 266:9
**evaluate**
40:24 41:15
**evaluation**
209:12,14
**evasive**
73:15,21
**event**
46:15 120:16 121:2
215:1 219:12
257:17 261:7
**events**
78:9 178:9
**everybody**

109:21
**evidence**
59:24 221:1
**exact**
76:6 93:23 178:16
257:15
**exactly**
158:6 192:18 227:2
**examination**
3:4 7:15 126:6 269:5
270:7
**examined**
7:11
**example**
58:13 93:13,14 94:10
109:9,18 118:5
163:23 211:3
**examples**
58:23 59:1,3 109:4,7
187:3
**exceeds**
52:17
**exception**
25:4
**excerpt**
4:17 50:13
**Excerpts**
4:11,14
**exchange**
126:23 210:1 227:1
227:13
**excluding**
24:4
**excuse**
29:12 64:10 106:17
108:15 139:23
160:8 170:2,3 201:8
207:1 247:21
**executives**
264:11
**exempt**
65:5
**exercise**
84:23
**exercised**
117:24


MAGNA
LEGAL SERVICES

**exhausted**
144:14
**exhibit**
3:8,9,13,14,16,18,20
  3:21,22 4:1,2,4,5,8
  4:10,11,13,14,16,17
  4:19,21,23 5:1,2,5,6
  5:8,10,15 16:9,10
  16:11 17:25 18:2
  21:14,16 22:13 23:1
  23:12 25:6 31:15
  33:3,11,12,14,16,18
  33:19 35:3 37:9
  40:4,9,19 41:9 43:9
  44:22 45:5 47:2,3,8
  48:8 50:12,20 55:5
  64:4 75:21 79:10,18
  80:10,12 87:11
  95:20,22 97:23,23
  98:23 99:5 103:11
  103:17,21,22,24
  104:17 111:3,5
  119:10 127:10
  129:21 150:22
  159:20 160:2
  181:21 183:24
  185:24 186:1 206:2
  206:4,7 218:23,24
  219:7,9 224:8,16
  233:1,3 236:7,13
  237:13,15 239:2,4
  242:22,24 244:5,7
  245:16,17,23,25
  248:11,13 249:3
  250:18,20 252:8,16
  252:18 253:13
  255:5,7,18,20
  258:17
**exhibited**
149:23
**exhibits**
3:7 5:14 41:25 75:2
**exist**
46:16
**existed**
46:19 48:9

**existing**
82:5,9,19,23
**exists**
144:12,24 154:20
  156:5
**exit**
74:5
**expand**
32:8 113:5 150:19
**expected**
25:20 37:3
**experience**
107:12 152:21
  154:15 263:9
  266:15,19 268:2
**experiences**
152:24 154:9,14
  155:2
**experiencing**
59:13
**explain**
22:10 27:7 41:24
  75:1 211:22 249:21
  251:9
**explained**
42:23 195:14
**explaining**
92:12
**explanation**
256:20
**extended**
235:3
**extensive**
29:1,3
**extra**
233:6
**extremely**
264:10
**eye**
90:21 234:7
**eyes**
91:6 139:4

———————
**F**
———————
**F**
66:3

**F/A**
26:1
**FAA**
12:6 13:19 49:3,6
  66:3,7 67:1,2 69:2
**face**
42:13 43:7 53:19
  54:18 55:9 60:22
  61:8,17 62:10,22,25
  63:3,22 64:9,11,14
  69:12,15 93:17,19
  142:22 180:8
  205:22 218:4
**faces**
54:24,25 55:12,16
**fact**
32:25 62:7 83:8
  131:8 132:4 191:10
  196:23 202:22
  203:2 222:15
**factor**
209:16
**factors**
163:4 212:7 213:16
**facts**
152:9 209:12 210:3
  210:16 221:1
  257:14 258:11
**failure**
168:14,19
**fair**
12:19 14:18 37:5
  38:7 48:11 49:20
  57:17 59:6 62:8,12
  76:8 81:1 83:8
  99:10 115:8 116:5,7
  116:9,15 122:13
  124:6,7,7,19,20
  140:2 141:3 142:2
  144:25 178:18
  182:8,23,24 184:15
  187:15 212:4
  223:21 227:19
  234:17 251:24
  263:4
**fall**

252:11
**falls**
256:12
**false**
173:11 259:20
**falsification**
171:25 172:21
**FAM**
3:22 80:19 114:15
**familiar**
28:14 33:13 66:7
  69:6 92:4 94:23
  109:8 113:17 158:7
  259:3
**family**
156:3 164:1 166:10
  166:18,22 178:25
**far**
23:7 51:6 98:14
  108:22 109:1 137:4
  166:8 171:14 178:5
  218:9 236:3 237:2
  238:19 245:14
  247:2,23 248:23
  250:25 252:12
**fashion**
120:10
**father**
38:24 72:24 151:12
  185:19 196:6
  197:23 198:8
  199:16,24 218:1
**father/son**
199:21
**FBI**
170:3,6
**features**
68:22 70:25
**February**
237:18
**Fed**
3:11
**federal**
2:1 8:17 12:7,21
  162:13 207:18
  216:3



**feel**
105:17 127:2 181:22
200:15 216:11
264:17
**feeling**
105:13 109:5
**feline**
53:19 54:17
**fellow**
60:7,17
**felt**
188:19 221:4 224:5
227:23 260:21
**field**
247:7
**fifth**
173:19
**fight**
148:1,12,14
**fighter**
131:11,14,17 132:1
135:4 136:12 138:1
138:16 139:2,13,25
140:24 141:1,6,8,16
142:1,11,21
**fighters**
130:22 131:10,14
134:7,15,17 135:1
140:21
**fighting**
148:1
**figure**
53:14 113:15 118:4,5
262:11
**file**
32:5
**filed**
17:2,3 137:5
**files**
32:16
**filled**
252:24
**finally**
113:8
**finance**
17:20 19:2

**find**
18:15 103:25 121:11
143:6,17 159:12
174:22 177:12,15
185:19 188:21
228:6,20 230:25
238:4,12,14 264:4
265:24
**finding**
175:24 204:19 231:3
231:12
**findings**
174:17
**fine**
84:15 95:6 261:22
**finish**
57:24 142:4
**finished**
9:3 13:13 168:6
201:12 269:5
**fired**
168:20
**firm**
97:7
**first**
7:11 21:25 22:7
23:20 24:8 25:12
34:11 37:12,12,18
38:3 44:19 45:12
49:9 50:12 63:24
67:6 68:10 71:16
76:22 77:7 78:10
83:1 88:20 97:23
99:15,22 105:1
111:7,19,20 113:20
114:2 117:8 119:9
119:10 120:12
121:13,14,21
122:15 126:14
127:11 129:22
137:25 161:1
162:15 167:7,11
171:21 186:4,9,9,15
186:23 187:19
188:5 194:15 195:4
197:3 206:15,18

207:5,14 208:23
211:3 233:4,11
235:1 239:12,21
240:25 246:10
247:10,17 254:17
255:21,22 256:6
**firsthand**
22:17
**fit**
68:20 70:20 138:9
153:17 172:20
266:15 267:12
**fits**
181:9
**five**
221:8,9 222:13
**five-year**
222:4
**flaps**
110:12
**fleet**
27:21
**flex**
85:5
**flexibility**
84:11,21 85:19 86:16
87:6
**flexible**
86:20
**flight**
3:18 4:8,14,17,21,24
5:3,6,8,10 20:8,9,11
20:20,21 21:2,3,4,9
21:9,22,22 23:13,14
23:19,22 24:6,13,23
25:2,7,9,20 30:2,7,8
31:4,7 34:9,22,22
35:5,6 38:5,10,10
39:11,11 40:10,11
41:18,19 42:3,10,22
43:6 46:13,16,19
47:5 48:5,10,22
50:14 54:23 55:11
55:15,22 56:3,5,9
56:14 57:6 58:24
59:19,22 60:12,21

61:3,7,17,22 62:1,4
62:6,10 63:4,8,15
63:23 69:9 72:23
76:24 77:3 78:18
79:18 80:3,19 81:2
81:5,21,25 82:15
84:7,17,23 85:16
86:23 87:1 88:1,1,1
88:10,10,11,15,19
89:4 90:7 96:2
97:24 98:14,18,19
98:24,24 101:4,16
102:1,10 103:10,10
103:15,15,16 104:5
104:10 105:25
107:5,6 108:1,22
113:21 114:7,11,15
114:16,18,20,21
115:22 117:20
118:20,21 119:9,25
120:2,14,15 121:6
121:15 122:7,10
127:12 128:13,13
129:20,22 134:23
135:17,23 136:2,7
136:16 137:4,5,8,17
137:18,19 139:9
140:13 142:9,13
143:11,25 144:21
145:5,19,20 146:10
146:23,25 147:4
148:1,7,12,19
149:20,21 150:11
150:11 151:5,6,11
151:21 152:2,12,18
152:22 153:4,19,23
153:25 154:8 155:1
155:12,18 156:6,11
157:2,12 159:6,7
161:11,16 163:11
163:24,25 164:25
165:7,17,22 166:1
166:22 171:13
175:3,5 178:9
179:12,13,16
180:17,23,25 181:4


MAGNA
LEGAL SERVICES

182:4,15,22 183:1,5
183:14 184:2,4,4,14
184:19 185:14
186:25 187:8,10,10
187:13,14,20,25
189:9,12,17,21,22
190:12 191:23
192:9,14,15,16,21
192:25 193:7
194:11,16,20,22,24
195:7,8,8,12,18,23
196:10 197:7,8,17
198:20 199:1
200:24 201:3 202:1
202:5 203:20,25
204:5,8 205:8 215:5
217:12 218:12,12
218:21 219:16,17
221:8 226:11 228:7
228:11 230:12,13
231:1 233:12,19,24
234:5,7,19 235:2,12
235:13,19,21 239:8
239:17,17 240:17
240:18,20 241:2,13
241:24,25 243:3,8,9
243:12,12,17,21
244:9,17,18,19,23
245:1,3,18 246:3,24
246:24 248:14,24
253:16,21 255:8,25
256:10,15,18,23
257:10,18,20 258:3
258:18,18,25
261:20 265:5,5
**flights**
20:18 90:21 139:11
140:7 222:5 230:13
242:10
**Florida**
194:11,12
**flows**
115:4
**fly**
115:3 139:11 156:1
208:25 210:21

**Flyer**
3:14 33:19 75:21,22
76:10
**flying**
21:9 115:7 140:6
240:4
**focus**
121:14 210:16
**follow**
35:5 37:10 75:23
83:21 85:1 109:24
120:16 140:15,16
144:1 168:19 187:3
210:7,9 211:6 212:5
**follow-up**
260:19 268:15
**followed**
12:22 34:22 168:1,2
**following**
13:18 45:15 63:18
186:4 244:16
254:17
**follows**
7:12 193:4 256:20
**FOM**
114:16 239:8
**font**
186:13
**food**
201:23
**Footnote**
207:20
**force**
86:3 144:7,8,15,17
145:24,24 147:6
**foregoing**
270:12
**forget**
9:13
**forgot**
245:7 261:5
**form**
11:5 12:2,23 13:20
14:21 16:23 17:1,13
18:15,18 19:3,14,23
20:5,15 22:20 23:4

24:18 27:10 29:11
30:14 31:17 33:7
34:25 36:5,22 37:4
38:11,25 39:12,22
40:3,21 42:5,16
43:4,14 44:6 46:23
47:6,22 48:13 49:25
50:22 51:10,15 52:1
52:16 54:12 55:1
56:10,15 57:18
58:14 59:9,23 62:15
63:2,12,20 64:6
65:12 67:4 69:6,14
69:19 70:15 72:7
73:1,22 75:25 78:20
82:2,20 83:10 85:20
86:18 87:2,18 88:4
88:12,23 89:21 90:3
90:14 91:11,24
92:15,19 99:1
100:21 101:6,11
102:12 107:10
108:18,24 119:1
120:20 126:24
127:1 129:1,6,15
131:13 132:7,14,23
133:4,16,22 134:9
134:19 135:13
136:9,18 137:10,20
138:3,17,21 139:6
139:15 140:9,17
141:4 142:3,14
143:21 144:2 145:1
145:7 146:4,14
147:1,13 148:8
150:13,25 151:7,14
151:18,24 152:25
153:6 154:3 156:15
157:22 158:14
159:10 162:20
163:14 164:3
165:18 166:2,7,25
169:7,20 171:3,17
172:23 173:4,12,16
175:1,20 176:1,13
176:21 178:13

179:6,15,23 180:5
181:10,15 182:12
183:9 184:21 185:7
187:16 188:24
190:5,24 191:7,18
192:13 193:10
198:23 199:8 200:3
202:13 203:7,16
205:9,18 212:21
213:20 215:15
216:2 217:18
218:14 220:25
221:21 222:6
223:16 226:2,19
227:20 228:17
229:11 230:6
248:25 250:2
252:18 256:25
258:20 259:13,22
260:24 261:12
263:3,8,14 264:20
267:5 270:12
**format**
98:24
**former**
107:16
**forms**
210:22 265:18 266:9
266:11
**Fort**
187:21
**forth**
221:5 270:11
**fortunately**
201:13
**found**
18:16 188:8 199:6
230:20
**foundation**
12:24 13:21 16:24
18:19 19:15 22:21
23:5 38:12 40:22
42:6 46:24 47:23
48:12 49:24 50:23
51:15 52:17 54:13
56:16 58:15 59:10



59:24 63:13,21 64:7
65:13 69:20 70:16
72:8 73:1,23 83:11
85:21 86:19 87:19
88:13 89:22 90:4,9
90:15 91:12,25
92:16,25 93:9 94:20
100:22 101:12
102:13 103:18
120:21 129:7
135:14 137:11,21
139:7 140:10 141:5
142:4 148:10 153:7
154:4 156:16
169:21 171:4,18
176:2,22 178:14
181:16 182:13
183:10 185:8
188:25 190:6,25
193:20 199:9 200:4
202:14 203:8,17
205:10,19 215:16
223:22 226:3
227:21 246:18
250:3 257:1 258:21
259:23 261:13
**foundational**
57:21,22 153:14
**four**
21:3 23:13,20 24:21
25:1,7 33:4 34:9
38:10 47:4 72:23
88:1 90:7 98:18,24
103:10,15 118:20
157:12 159:6
169:24 180:16
184:19 187:3 205:4
218:12 243:9,11
256:6
**four-page**
21:17
**fourth**
22:3 68:13 78:1
120:1 171:20
186:10,11 211:7
216:18 247:16

**Fox**
249:9
**frame**
47:14 213:21 257:16
**framework**
129:13
**Francisco**
1:16
**Franklin**
1:20
**Franzese**
149:5
**free**
10:6 181:22 208:25
210:21
**Freetext**
247:7
**frequencies**
141:21
**frequency**
139:19,22,25 140:22
222:14 263:25
264:6
**frequently**
191:11
**frightened**
68:12 70:10
**Fron-**
174:19
**front**
8:21 45:4 50:19 67:2
97:6 160:5
**Frontier**
1:4,11 2:3 3:2,11,16
6:5,7 7:7 10:17,20
11:11,12,20 12:5
13:18 14:4,9,19
15:5,11,14,17 16:1
16:5,17,21 18:24
20:2,22 21:18 22:8
22:11,15 33:17,22
33:23,24,25 34:3
35:4 45:7,7,25 46:9
48:17 50:13,17
54:22 55:10 57:5,14
59:19 66:14 69:9

71:8,13 76:16 79:19
80:13 83:1 86:23
87:9,12 93:14,25
94:13,18 96:1,1,2
99:17,19 100:12
101:22 102:9
103:14 104:3,4
106:20,21 107:16
107:20 110:23
111:6,7,18 112:2,14
112:18 115:21
116:9,14 119:11
120:3 129:4,13
130:1,5,15,18 131:3
131:17,23 132:2,5,9
132:19 134:14,20
134:22,23,25
135:17,22 139:4,11
139:11 140:6,7
141:11 142:9,12,19
145:5 146:11,22,23
153:20,24 154:7
155:1 156:2 158:11
160:3,10 161:1,24
162:1,1 163:1,1,23
164:25 165:24
167:8 170:1 171:7,8
171:11,14 172:7
174:8,20 180:22,25
181:4 182:5,20,25
183:7,14 184:1,10
186:3,19 203:6
215:11 221:7
222:16,24 223:7,14
223:19 227:14
228:9,9,18,21
229:10,15,19,25
230:5,12,13 231:1
231:13,18,20 232:1
232:12,16 233:4,8
233:12 235:25
236:14,15,22 237:7
237:16,20,21
238:13,16 239:5,6
241:2 244:9,9 245:9
245:25 246:11,14

246:25 250:21
251:1,4,23 252:1,19
253:5,8,16,18
254:11 255:1,8,14
255:20,21 257:6
258:15,17,24
259:12,19 266:5
268:2
**Frontier's**
18:7 87:16 100:11,19
112:9 119:15 120:6
126:17 135:11
162:24 181:5 184:4
184:14 229:2
230:11,17,21 231:3
248:4 263:22 265:9
265:10
**Frontier-**
92:13
**frozen**
67:19
**frustrations**
211:16
**Ft**
194:12
**full**
28:14
**fully**
75:16
**function**
93:20 198:12 208:6
247:25 248:1 266:3
266:10
**functions**
197:15 213:15
264:25
**fundamentals**
167:8
**further**
108:8 118:12 169:17
252:15 270:9,14
**fuzzy**
79:25

**G**

**G**


MAGNA
LEGAL SERVICES

6:2
**galley**
90:23
**galleys**
250:9
**gander**
24:9
**gate**
51:25 110:11 188:12
188:20 196:17,24
197:5 201:5 228:8
228:12,12,25 242:1
242:2 259:12
**gathering**
60:6
**gauge**
36:11
**gender**
68:24 71:6 86:5,6
162:6
**general**
5:7 17:1 19:1 207:7
208:11 220:18
222:23 227:24
234:10 253:16
262:16
**Generally**
234:4 235:9 268:1
**generated**
4:20 104:15
**Generically**
158:5
**genetic**
162:10
**genital**
181:3
**gentleman**
53:8 54:17 55:8
204:3
**gentlemen**
237:25 252:7
**getting**
64:1 82:10 106:11
110:4,19 180:12
**gift'**
201:22

**girl**
188:2,15 189:13
190:15 192:22
202:22 203:2
**girlfriend**
149:4 179:1
**girlfriend's**
149:3
**girls**
204:4
**give**
48:6 60:5 68:16
102:1 118:21
147:11
**given**
1:5 2:3 3:2 6:6 10:9
23:13,22 25:7,16
31:21 33:4 47:4
50:13 58:23 59:1,4
79:17 84:7 86:23
98:18 101:3 107:7
109:4 118:24 121:5
134:13,22 139:8
143:11 145:19,20
157:2 168:2 180:16
181:4 195:1 202:25
231:1 243:16
244:23,24 265:9
269:8
**gives**
59:19 85:17
**giving**
123:4 126:16 173:10
201:22
**glad**
204:14
**glance**
250:5
**go**
7:20 10:11 13:8
17:24 24:1,11,19,25
29:13 32:13 36:16
44:16 57:19 58:16
59:25 64:22 66:19
67:25 72:15 76:1
78:22 82:6 83:25

85:14 90:10 91:22
93:15 97:10 99:2
102:25 103:21
113:19 115:4
116:21 125:2
127:10 129:19,20
142:19 143:1 146:6
156:2 159:13
160:25 161:22
187:4 193:12
197:21 205:11
209:3 214:4,17
216:15 218:22
223:3 230:11 250:4
259:24 264:12
266:11,23 268:13
268:17
**goal**
152:5
**goes**
26:13 28:15 32:19
92:7 126:21,22
154:7 246:1
**going**
8:12 10:15 16:8
17:24 19:12,16 20:7
20:8,9 27:2 30:1
35:17 37:2,20 38:14
39:7 42:19 44:19
59:21 64:16 70:7
73:5 75:11 76:16
77:2 79:7 80:8
83:18 84:6 91:16,22
93:10,19 94:5,25
95:6,7 97:13 102:23
109:23 111:25
115:14 125:7 127:5
127:10 134:11
135:10 136:22
140:15 141:9
142:25 146:19
149:14 151:17
153:24 159:16
160:25 163:8 167:5
181:20 186:17
201:24 202:1,1

204:6 206:25
219:21 220:2
223:18,20 224:6
228:19 232:21
239:6 240:2 249:2
249:13,20,21
266:23 268:10,21
**Golf**
78:13
**good**
7:6 8:7,10 9:17 56:25
78:25 84:14 96:23
114:14 119:7
140:19 146:16
156:3 184:18
200:22 222:14,24
242:19 248:6
**Google**
92:11
**Gotcha**
180:14
**governed**
155:15
**governing**
19:5 232:9
**government**
19:5 131:6 189:14
190:15 191:2
192:23 210:11
**govt**
189:14
**grabbing**
127:19
**graduated**
106:25
**Grand**
200:24
**gray**
153:18
**great**
108:17 116:20
226:18 240:15
**greater**
107:1
**green**
36:12,17 98:7 99:8


MAGNA
LEGAL SERVICES

100:6
**grilling**
201:24
**Grimes**
4:23 5:2 250:23
251:14,20,23
252:10
**grin**
53:8
**ground**
26:6,10,12,20,22
27:8 75:6,12,13
136:3,6
**group**
99:16 155:18 230:15
267:20
**groups**
155:13
**GRR**
200:24 202:1
**guaranteed**
147:5,12,16
**Guard**
131:24 139:19 140:8
**guardian**
44:4
**guess**
11:8 19:4 77:22
88:20 127:5 173:19
214:22 249:5
260:19 266:12
**guessing**
200:25
**guidance**
4:5 35:22,25 36:4,21
38:4 39:25 40:9
41:9 69:2 84:11
102:1 107:6 114:19
138:8 140:19
155:22 193:21
207:9,15 208:18
215:13,21 216:12
216:16,17 217:1,2
222:17 227:3,5,16
257:3
**guide**

30:4 31:6 35:11 58:2
83:15,23,25 84:5,9
167:9
**guideline**
63:18 167:14
**guidelines**
145:10 146:16 153:8
167:21,22 168:1,3
168:11,19 208:12
221:5
**guidelines/require...**
244:16
**guy**
201:21 202:4,23
203:3
**guys**
236:8 268:14

**H**

**half**
53:19,20 54:16 218:5
**hand**
54:18 55:9 63:6,10
63:25 93:16 181:2
189:16,18 190:19
191:2 192:10,24
193:1
**Handbook**
4:12 100:24 155:11
156:24 157:1,10
158:8,13,21 159:7
160:10 161:19
164:24 166:5 232:4
232:6,9,15 243:25
**handed**
80:12 195:13
**handled**
193:18 258:11
**handling**
45:9 96:3 104:5
105:3
**hands**
26:7 28:18
**hands-on**
28:19
**handwritten**

195:13
**Hang**
159:11
**Hansen**
2:7 6:15 270:4,22
**happen**
93:8 133:25
**happened**
73:8 176:10 178:18
180:3 193:16
198:22 227:2
258:19
**happening**
9:11 134:3 136:6
**happens**
26:11 28:12
**happy**
43:24
**hard**
147:10,16 179:2
**harm**
196:20
**Harris**
1:20 7:9 95:10 96:24
**head**
9:21 127:8 144:22
145:6 146:12,24
147:10,16 148:17
148:21 149:13,17
149:18 150:10,18
150:24 151:6 169:5
169:9,19 170:8,19
171:13,15 175:18
177:9,19,23 178:4,5
178:12 179:2,18
180:12 205:14
232:19 247:22
**headed**
48:18 66:2
**header**
126:25
**heading**
45:25 79:20 99:14
116:2 127:13
160:18 239:14
**hear**

7:24 109:21 141:16
142:1,7 204:13
**heard**
8:11 141:13 259:25
**heat**
9:14
**heighten**
56:21 57:12
**help**
14:14 105:2 143:5,17
167:9 216:23
226:10 268:11
**helpful**
49:17
**helps**
163:25
**heritage**
54:18
**hesitate**
117:14
**Hey**
10:10 220:23
**Hi**
225:15 226:8
**high**
92:7,7
**highest**
266:3
**highlighted**
168:13,23 233:22
235:1 244:15 254:9
255:11
**highlighting**
225:11
**hijack**
147:23 148:6
**him/her**
74:20
**HINSHAW**
1:19
**hints**
49:17
**hire**
152:22 161:10
165:16
**hired**



164:25 165:22
166:1,22 228:25
230:12
**hires**
153:20 154:7
**history**
158:11
**hit**
35:21 91:8 148:20
149:12,17,18 170:7
170:18 175:25
176:25 177:8,18
178:3,4,12 179:2,18
180:12
**hitting**
127:19 148:16
169:19
**hold**
10:16 42:21
**holding**
51:7
**holistic**
161:14
**Holistically**
76:2,4
**home**
14:13
**honest**
211:17
**honesty**
126:24
**hoodie**
53:14
**hope**
70:1 71:4 110:17
236:8
**hopefully**
251:9
**Horse**
78:14
**Hotline**
174:4
**hour**
29:5,9 269:9
**hours**
9:24 25:22 75:16

**house**
91:4
**HR**
174:4
**human**
3:19 33:5 34:12,15
34:24 35:7 38:6
40:2,12,19 41:10,25
42:15,20,24,24 43:1
43:9,11,13,16 44:1
44:3 53:20 64:25
65:19 66:2,21,21
67:9,22 69:10 71:17
75:2 79:20 144:12
144:23 146:13
174:3,12 180:17
186:25 189:15
190:4,7,15,22 191:4
191:10,15 192:23
195:19 196:7
197:25 199:25
201:4 202:21 203:1
204:6,12 205:1,5,6
238:15 258:15
259:9,18,20 261:25
**hundred**
127:1
**Hussey**
257:10,12 258:2,10
**hyper-technical**
11:17
**hyphen**
105:7,12,17
**hypothetical**
156:17 163:11
184:22 203:17

---
**I**
---
**I-N-D-O-C**
25:16
**I-T**
68:23
**I/we**
201:16
**IBI**

219:22 257:16

25:15
**idea**
30:20 56:25 90:7,13
90:18 97:8 107:5
**identical**
99:10,13
**identification**
116:15 146:20
254:11,12,22
**identified**
8:3 172:8,9 174:13
225:1 227:5 236:16
246:2 256:7
**identifier**
84:2
**identifies**
59:13 166:14 191:14
199:21 249:9
**identify**
19:6,8 85:4 146:19
166:20
**identifying**
113:20 217:24
**identity**
162:6
**IDs**
254:16,16
**ill**
83:22
**ILLEGAL**
117:1
**Illinois**
1:21
**image**
45:17,18 49:21,22
51:2,13 64:25 65:1
67:22 68:3 76:17
98:7 99:9 104:25
**immediately**
174:3
**impart**
248:3
**imparts**
109:10
**impending**
60:5

**implement**
215:25 216:23
**implementation**
102:2
**implemented**
86:24 212:20 215:14
**implementing**
85:19
**importance**
109:23
**important**
9:25 20:19 32:20
152:1,5,12 208:3,6
234:15
**importantly**
58:9
**impossible**
9:9
**improper**
156:16 184:21
**impropriety**
260:22
**improve**
264:24
**improvement**
265:2
**inaccurate**
119:19,22 120:9
**inaccurately**
87:23
**inadvertently**
211:8
**inappropriate**
68:19 70:19 189:22
191:24 194:6
257:19
**inappropriately**
127:20
**Inc.'s**
16:18
**incapacitated**
240:10
**incident**
4:24 5:4,5 64:9,10
75:16 83:2 252:19
252:24 253:3



incidents
216:24
include
50:9 175:7 180:16
209:15 211:13
240:17,21
included
52:14 55:6 56:13
69:12 222:4 237:3
includes
17:25 127:18 158:8
158:10 228:22
including
127:22 162:3,5,7
165:10,13 168:16
169:14 173:22
180:19 205:6
211:23 265:13
incorporate
217:1
incorporated
6:6,8 16:22 212:23
incorporates
27:18
incorrect
259:20
increase
78:8 91:5
increasing
67:8
indented
37:18,23 38:4
index
3:7 265:20
indicate
34:21 36:4 54:8,10
54:11 88:9 116:3
137:15 156:11
212:16 243:20
indicated
70:25 257:18,18
262:9
indicates
68:22 108:9 111:18
187:20 237:17
indicating

87:13 93:15 149:10
158:7 177:22
243:15 259:15
indication
42:14 69:17 70:2,4,9
70:11,12,18,23 72:5
118:23 148:13
259:7
indications
42:20
indicators
68:6 69:9
indifferent
150:5
individual
58:4 59:21 99:19
100:1,8 117:25
147:23 148:1
197:16
Individual(s)
60:4
individually
210:16 212:7 231:2
individuals
33:4 40:15 51:24
68:11 69:18 150:2
184:8 267:18
indoc
25:16,17,23 26:5
27:3,9 29:16,22
31:5,21 98:2
indoctri-
27:3
indoctrination
25:18 27:4
industry
67:8 78:16 106:5
inflight
3:14,14,20 30:3,4
31:6 32:2 33:19,19
46:10 75:21,22
76:10 80:14,18,21
81:1,4 87:13 88:11
88:17 89:4 90:8
174:20 176:19
178:8 179:3 225:3

225:21 226:16
241:10,22,24 242:3
259:4,15 263:23
264:23
InFO
66:3,3,7,12,19 67:1,2
inform
103:9 196:10
information
22:12,17,25 23:2
31:25 36:1 40:24
41:15,15,17,20
45:11 66:12,13,25
92:12,17 98:6,18,23
103:1,8,9,13 110:18
111:9 162:10
163:24 179:3,9
188:20 189:21
196:4 203:4,10,14
210:1 225:8 226:11
228:15 236:4 237:3
237:8 238:20 259:2
259:5,11 261:24
informed
174:11 187:9 194:17
196:6 231:19
232:16
informing
41:5
initial
3:8 4:1 5:1,13 25:15
25:25 26:6,6,7,10
27:13 28:12,16
32:25 34:16 50:8
64:14 96:2 97:24
101:4,16 104:4,9
218:16
initials
25:15
initiate
37:13 38:5 72:11
initiated
39:20
initiating
40:17
Initiative

69:5
injury
144:17
inner
189:16 190:19
192:25
input
22:16 88:16 175:14
175:24
inputs
247:19
inquire
173:6 210:25 211:2
212:8 263:10 264:2
265:22
inquired
173:7
inquiry
4:23 5:3 210:8 211:9
228:24 229:4,8
installed
94:14
instance
23:19 61:22 106:25
188:18 190:3
191:21 199:22
234:19
instances
64:3 186:25 228:6
230:25 260:10
261:10
instruction
42:3 49:2 67:14 81:6
129:21 141:13
142:1 144:1 244:23
244:24 245:1
instructions
8:12 13:1 118:12,15
121:2 134:22 242:9
242:17 265:8
instructor
29:16,19 32:3 49:10
49:15,23 67:14
instructors
264:23
instructs



13:10 40:10 143:16
**instrument**
56:5
**insurance**
12:15
**intelligence**
60:6
**intended**
207:15
**intent**
147:3 216:16,17
**intention**
94:9
**intentionally**
211:8
**interact**
105:2
**interacted**
199:2
**interaction**
197:18,18
**interactions**
162:25 180:20
**intercepted**
139:13
**intercepting**
139:2 140:2
**interception**
130:21 134:7,15,17
  138:1,15 140:21
**interchangeably**
267:16
**interested**
225:14 247:7 270:16
**interior**
127:22
**International**
20:23,24
**Internet**
92:18 93:24
**interpose**
102:23 157:21
**interpret**
18:24 86:15 133:2
  138:9
**interpretation**

86:17 134:3
**interpreted**
128:24 133:14
  207:21
**interrupt**
7:19 219:21
**interruption**
145:13
**interview**
257:9
**intimidation**
86:3
**investigate**
171:1,7,12 173:9,15
**investigated**
169:23,25 170:6,17
  171:15 174:20
**investigating**
143:6,18 176:8
**investigation**
150:17,23 170:25
  173:7 174:17,18
  176:12 177:7 178:8
  179:10 180:4
  230:16 248:2 258:3
  258:7 259:8,10
**invite**
86:16
**involve**
40:24 129:4 132:4
  152:15 171:23
**involved**
39:7 157:12 210:4
  211:22 259:10
  260:11
**involves**
129:13 200:24
**involving**
83:3
**iPhone**
52:9,10
**ISC**
241:12,21
**issuance**
227:6
**issue**

175:24
**issue.'**
105:18
**issued**
98:11,14 104:20
  207:6 227:3 254:11
**issues**
195:15 208:17
**item**
18:1,6 73:11 247:17
  263:21
**items**
23:20 31:13 50:9
  64:17,19 78:17
  106:4 150:21
  165:12,13 191:14
  209:10 243:11

―――――――――
       **J**
―――――――――
**J**
2:7 270:4,22
**January**
3:15 187:24 208:17
  227:7,7,8,11
**Jason**
250:23 251:14,19
**Jenkins**
222:21 262:8 267:1
**jet**
139:2 141:1 142:1
**jets**
131:11,15,17 135:4
  136:13 138:1,16
  139:14 140:1,24
  142:11
**jetway**
201:13,20
**job**
12:20 13:17 84:14
  154:10 208:4
  222:24
**jobs**
208:13 229:23 230:4
**John**
1:15 6:21 8:1 219:20
  253:25

Johndmckayatty@...
1:17
**joined**
238:1
**Joy**
222:21 262:8 267:1
**judge**
152:19
**judges**
8:17,21
**judgment**
84:24
**July**
15:3 252:20
**jump**
9:7
**Jun**
4:20
**June**
17:4
**justified**
148:16
**justify**
150:9 151:5

―――――――――
       **K**
―――――――――
**keep**
7:19 32:24 83:20
  95:6,7 143:2 156:25
  196:12 234:7
**kept**
22:8 246:14 250:25
**Kevin**
172:10,16,20 173:2,8
  173:11 174:13
**kick**
91:16
**kicking**
46:6 127:20
**kids**
196:18,18
**kind**
26:23 32:16 91:4,16
  103:14 106:10
  108:15 123:12,15
  153:9 194:23 196:8



196:17 198:1 200:7
201:23 216:9 234:6
258:3 262:10,15
**kiss**
188:2
**knew**
137:16 257:12
**know**
10:16 13:12 14:13
16:25 19:19,25
20:13,16 24:3,10
25:23 29:15,21
30:10,22 31:10,18
31:18 32:3,4,6,17
32:20 33:2 36:1
38:13,21,22 39:20
42:18 44:12 46:18
46:25 47:25 48:9
49:8 50:1,6,7,10
52:2,19,24 53:6,12
53:17 54:15,21,22
56:12 58:23 59:1,3
65:10,18,22,25
66:19,20,20 74:20
81:15 85:4 88:5
89:12,23 90:1,5
91:7,13,15,21 92:1
92:21,24 93:23
96:21 97:2 98:14
100:23 101:16
104:8 105:21
106:10,12,15,19,22
108:22 109:1,22
110:18 113:13,14
118:1,1 121:11
123:10 127:6 135:6
135:16 136:6,15,23
137:4 149:9 150:15
152:1 153:11,13
157:5 158:16,22
159:4,4 160:22
161:11,17,20
162:22 163:20
165:1,7,15 166:8
170:9,13,20 171:14
173:3,13,14 176:3,6

177:3 178:16,20,21
179:8,8,11 180:1,4
181:17 182:7,7,14
183:11 184:7,9,10
185:6,9,10,15,17,22
186:22 188:8
193:15 199:14,18
200:5,10 203:9,18
203:21 212:22,23
213:22,24 217:13
217:24 218:16
219:15 223:10
224:19,20,21,21
226:4,24 227:23
231:23 236:3 237:2
238:7,19,22 245:14
247:2,10,19 248:7
248:23 250:25
258:22 260:14,25
261:9 263:1,17
264:15 265:4,6
**knowing**
98:22 159:5 218:11
**knowledge**
16:6,18 20:4 22:18
38:19 98:17 137:14
174:23 175:2,12
177:7 184:8 226:22
228:21,22,22 237:7
248:2 249:20
**known**
89:9 139:19 172:16
209:12
**knows**
109:21 135:11
165:25 177:12,13
177:16 180:3
**Kudos**
201:3

_____ **L** _____

**labeled**
85:18 160:13
**lady**
8:14 52:9
**land**

141:2,17 142:10
**landed**
192:1
**landing**
90:24 93:14 94:17,18
94:19 118:16
128:20,25 142:22
**language**
76:9 104:25 118:4
161:18 168:24
233:23 260:20
**large**
78:9 99:16
**largest**
27:21
**Las**
20:23 170:14 257:9
**late**
15:3
**latitude**
121:5
**launch**
142:11
**law**
1:14 6:12 40:20,25
41:5 118:16 130:13
130:14 133:13,19
163:3 165:3 196:3
196:16,25 209:9
211:21 257:22,22
**laws**
162:13
**lawsuit**
88:8
**lawyers**
13:2,2
**lay**
93:10 153:7
**laypeople**
10:23
**lead**
173:22 187:17
**learned**
194:20
**leave**
14:13 56:8

**leaving**
16:16 108:14 202:3
**LED**
94:21
**Lee**
22:3
**left**
27:14 45:24 52:8,20
52:25 104:4 196:24
203:10
**legal**
6:14,15 12:24 40:22
87:19 162:21
164:16 167:2
207:17 229:12
**legally**
8:14 162:17 166:11
166:12,23
**legally-recognized**
162:3 163:2 164:15
165:1,8,10,23
**legitimate**
256:17
**legs**
46:8
**lend**
176:11
**LEO**
130:8,12 133:12
204:10
**LEO's**
204:11
**let's**
26:10 34:19 42:21,21
44:16 48:15 50:11
50:25 52:7,7 64:22
75:20 79:5 95:10
97:10 103:21
111:15 113:19
116:21 119:8
121:14 129:19
137:3 142:19
159:13 160:16
200:23 203:19
206:2 214:22
219:23 223:2 227:4



230:11 233:10
**letter**
105:7
**letters**
107:4
**level**
4:2 61:20,24 62:3
74:10 94:3,22 114:3
120:16 121:3,15,16
127:13 128:2,6,9,11
129:11,11,20 132:5
133:19 137:9,17
138:12 139:12
140:13,14 155:16
209:20 229:21
256:12,13,20,24
266:3,7,17,19,20,22
**levels**
5:11 120:23 121:2,6
129:4 255:22 256:5
256:7
**liable**
166:4
**liaison**
12:6
**library**
176:10
**life**
128:10,15 144:12,23
146:13
**light**
93:14 94:17,18,19
**lighting**
90:22 91:5,5
**Lightning**
69:5
**lights**
90:23 93:15,17,18
**limitation**
265:13
**limited**
162:4 165:11,14
171:24
**line**
13:5 15:25 167:20
168:25 225:10

226:6
**lines**
65:21
**list**
68:4 182:22
**listed**
165:10 173:19
**listen**
123:14,22 124:9
140:7
**listening**
96:21 97:1 141:25
142:10 211:15
**lists**
165:11
**litigation**
170:4 181:7
**little**
9:1,15 32:10 39:18
53:8 79:25 83:13
84:13 92:11 93:10
94:5 194:6 216:10
228:20 258:16
**Live**
3:10
**LLC**
1:14 2:3 6:12
**LLP**
1:19
**local**
162:13
**location**
112:13 136:23
**lockdown**
256:24
**lockdown,'**
256:14
**long**
13:24 15:2 25:22
46:8 51:7 158:23
**longer**
89:8 240:11
**look**
22:25 25:12 32:10
34:18 40:8 41:22
48:15 50:25 52:7

69:10 75:20 85:8
93:23 99:13 112:1
112:21 113:17
119:17 157:5
161:12,14 167:23
168:11,23 187:2
198:4,18 202:15
203:19 218:17,18
260:15 262:13
**looked**
182:16 216:10
218:10
**looking**
35:3,22 36:19 48:8
54:6 65:20 82:17
84:22 111:24 164:9
178:15 182:9 187:7
193:14 216:5
217:21,23 218:15
219:4,5 222:9
**lookout**
213:15
**looks**
24:11 25:13 26:2
34:15 47:10,13 53:1
65:21 100:25 104:9
113:20,24 116:3,11
116:19 193:22
198:11 243:5,9,11
**lot**
17:19 18:20 26:14,21
59:11 106:5 153:17
153:18 176:11
181:11,12,19
**louder**
52:5
**Louis**
194:13
**low**
92:7,7 221:4 224:5
264:6,10
**Ls**
206:23
**luckily**
251:19
**luminescence**

91:8 93:6 94:19
**lunch**
95:2 125:3 126:9

## M

**Magna**
6:14,15
**magnitude**
107:1 108:17
**main**
242:2
**maintain**
22:12
**maintained**
252:1
**maintenance**
241:15
**making**
83:17 179:4 259:19
**male**
188:15
**man**
51:7 52:8,21 194:21
194:22 195:10
196:8,17,23 200:7
201:22 202:23
203:3 204:11
**management**
89:8,15 121:24 123:8
124:23 174:20
180:21 263:7,9,12
263:22,23 264:17
264:22 265:9
**manager**
32:2 174:3,12 198:14
222:22 266:23,25
**managerial**
265:12
**mandating**
133:25
**manifest**
182:5,10,16,21,21
183:15 184:1,3,11
184:13,18 185:14
**manipulation**
86:4



**manner**
117:22 208:7,14
**manual**
3:18 4:8,14,18,21 5:6
  5:8,10 30:2,4 31:4,5
  79:19 80:19 82:15
  113:21 114:7,11,16
  114:16,18,21,22
  115:23 119:10
  120:1,2 127:12
  128:13 140:13
  233:12 235:20
  239:8 244:10 245:4
  245:18 248:14
  253:16,22 255:9,25
**map**
55:19
**March**
20:24 23:14 81:18
  221:8 252:24
  263:23,24
**marital**
162:8
**mark**
33:11 72:16 207:18
  207:22 224:12
**marked**
5:14 16:9,10 21:13
  21:14,16 33:12
  44:22 45:5,10 79:10
  79:17 80:10 95:20
  95:22 103:22,24
  111:3,5 159:20
  160:1 185:24 186:1
  206:4,7 224:7,13
  233:1,3,16 236:7,13
  237:13,15 239:2,4
  242:22,24 244:5,7
  245:23,25 248:11
  250:18,20 252:8,16
  252:18 253:13
  255:5,7,18,20
**markers'**
256:8
**marks**
100:12

**Master**
35:20
**match**
213:23
**material**
116:10,12 145:20
**materials**
50:13 71:13 75:24
  97:25 101:17
  143:11 145:18
  191:9 217:12
  219:16
**math**
81:20
**matter**
6:7 21:21 76:12 99:5
**McKay**
1:15 3:5 6:20,21 7:5
  7:16 8:1,2 11:8 12:9
  12:25 13:24 15:1
  16:11 17:5,16,23
  18:23 19:18,22 20:1
  20:17 21:13,15
  22:23 23:7 24:20
  27:12 29:15 30:16
  31:19 33:8,13 35:3
  35:12 36:6,20,24
  37:6 38:18 39:3,14
  39:24 40:5,8 41:1,4
  42:8,19 43:5,18
  44:8,11,16 45:3
  47:1,9,25 48:15
  50:2,11,25 51:12,19
  52:4,20,25 53:7,13
  53:18,24 54:16,22
  55:4 56:12,18 57:5
  57:22 58:5,19 59:18
  60:1 61:3 62:19
  63:4,15,23 64:18
  65:15 67:13 69:16
  69:22 70:18 72:10
  73:7,25 76:3 78:24
  79:16 80:8,11 81:15
  81:17 82:6,24 83:16
  85:24 86:22 87:7,22
  88:6,15 89:2,24

90:6,12,17 91:15
92:2,19,23 93:2,12
94:24 95:1,7,13,18
95:21 96:23,25
97:10,22 99:4 101:1
101:8,15,21 102:14
102:19 103:1,7,20
103:21,23 107:15
108:20 109:3 111:1
111:4 113:19 119:3
120:24 125:1,5
126:7 129:3,10,18
131:16 132:10,16
132:25 133:6,18,24
134:11,21 135:6,16
135:21 136:11,20
137:13,23 138:5,19
138:22 139:10,18
140:12,18 141:10
142:8,17 143:24
144:5 145:4,9,12,14
145:17 146:9,21
147:9,15,20 148:11
150:16 151:2,10,16
151:21 152:4,11
153:2,19 154:6,20
154:25 155:17
156:20,25 157:24
158:17 159:11,13
159:25 162:23
163:16,22 164:6,23
165:21 166:6,9
167:4 168:9 169:10
169:24 171:6,20
172:25 173:5,14,18
175:5,23 176:4,7,15
176:25 177:5
178:17,21 179:11
179:17,24 180:11
181:13,18 182:15
183:12,18,21,23
184:24 185:10,25
187:19 189:2 190:9
191:3,9,20 192:17
193:14,23 198:25
199:11,15 200:6,21

202:18 203:12,19
205:13,21 206:1,2,5
212:25 213:25
215:20 216:6
217:25 218:18
219:23,25 220:10
221:6,17,19 222:1
222:10 223:18,24
226:6 227:1 228:2
228:19 229:14
230:9 232:25 233:2
236:6,12 237:12,14
237:25 238:6 239:1
239:3 242:21,23
244:4,6 245:22,24
246:19 248:7,10,12
249:4 250:6,17,19
252:6,9,15,17
253:12,14 254:2,6,8
255:4,6,17,19 257:4
258:23 259:16
260:3,6,16,25 261:7
261:15 263:6,10,16
263:21 265:4 267:6
268:5,8,14 269:4,7
**MCO**
203:20
**mean**
7:18 10:23 11:3,6
  27:15 29:4 34:2
  46:2 53:25 58:17,17
  93:21,25,25 102:6
  104:14 108:4,12
  109:14 119:22
  121:15 122:17
  130:12 132:17
  145:10 146:17
  147:25 155:24,25
  161:4 170:14 176:7
  177:20 185:11
  189:4 226:21
  234:18 235:20
  245:3
**meaning**
109:11 110:20 171:8
  248:3 262:8 264:11


MAGNA
LEGAL SERVICES

means
11:18 13:4 108:17
109:22 152:6
161:11 232:4,5
247:11
meant
11:9 110:12 265:7
measures
217:4
meet
72:20 118:16 189:25
191:25 195:16
196:3 204:10
257:23
meeting
37:25 222:20
meetings
264:14
member
62:13,24 63:9 118:11
118:12 162:12
254:10
member's
118:14
members
60:7,14,17 105:3
166:11 179:1 184:3
215:6 239:17
240:17
memo
88:18,21,22
memoranda
263:11
memory
200:22
mental
162:10
mention
8:12 190:7
mentioned
18:12 31:3 34:10
60:21 70:5 121:7
123:1 126:20 150:2
181:5
merely
49:17

Merit
2:7 270:5
mess
266:24
message
199:1
messages
189:20 191:22 246:3
246:23
met
196:17,18 216:17
264:10,11 266:7
methods
144:14
Metro
170:2,2,2,13,14
microphone
183:17
middle
160:16
mighty
186:3
Miller
206:22,23 212:12
214:3,7 220:12
228:2 262:8 264:24
million
214:15,21
Milwaukee
203:22
mind
79:1 111:13 143:2
mine
233:7
minor
151:11,12 180:23
181:2,3
minors
8:4
minute
67:18 138:7 160:21
minutes
10:11 122:1 125:1
163:9 195:7 244:22
264:14
mischaracterization

164:22
mischaracterizes
12:3 59:24 82:21
87:3 88:24 108:25
139:16 143:22
146:5 151:25
193:11 217:19
221:16,22
misconduct
80:20 83:3 84:3 86:1
86:4,10 180:18
181:1 191:5,16
misheard
15:16
misrepresentation
172:1,22
missed
7:25 254:5
missile
142:12
misstated
230:7
mistreated
260:10
mix
213:23
mixed-race
164:1
MKE
203:20,21
model
15:25 27:25
models
94:22
molester
192:7
molesting
151:13
moment
42:21 116:22 146:18
146:18 181:22
225:16,24 226:15
Monday
2:5
money
183:7

monitor
130:22 139:18
140:22 141:12,22
monitoring
141:14
month
227:2
months
14:2 215:1,3
morning
7:6 10:16 126:10,14
181:9 213:7 269:9
mother
196:19
mother's
200:8
move
66:1 67:21 119:8
200:23 206:2
moved
194:24 206:5
movement
72:2,6 94:8
moving
94:24 144:5 180:6
Mullin
137:25 138:5,14
139:5
multipage
111:6 236:14
multiple
19:1 87:4 141:21
192:15 195:23
197:15 220:20
multiple-page
45:6
multitude
152:21
Myers
194:12

---
N
---

N
1:20 3:1 6:2 77:23
260:8 261:4
N-I-C-K-E-L



22:3
**N230FR**
249:10
**name**
11:21 172:9,20 173:2
173:8,11 182:17
184:20,23 224:21
236:17 243:23
252:25
**named**
31:15
**names**
30:3 182:6,10 184:2
188:4,9,16,22
199:19
**national**
100:14 101:24 102:8
131:24 162:9
207:25 209:18
210:19 216:7
**naturally**
223:18
**nature**
86:2 107:12
**NBA**
78:12
**NCAA**
78:12
**near**
51:24 181:2
**nearest**
141:2,17
**necessarily**
26:21 35:10 37:2
88:14 108:13 132:2
134:25 135:4
161:17 191:17
221:24
**necessary**
41:21 118:13 133:1,3
133:8 196:12
**need**
9:2,18 31:22 52:5
60:13 71:6 86:10,16
87:5 96:24 97:1
122:14 135:4

146:19 153:10
157:25 169:23
193:23 220:23
224:12 268:11
**needed**
14:17 57:8 110:12
122:25 123:19
167:14 195:16
266:16
**needing**
14:13
**neither**
58:9,22 64:18
**nervous**
68:13 70:10 73:13,19
**net**
16:21 17:11 18:7,17
126:14,17
**neurologist**
149:9
**neurologist's**
149:7
**neurologists**
179:1
**neutral**
86:12
**Nevada**
1:2 7:2
**never**
43:16 61:23 62:2
74:14,15 169:1
172:16
**new**
165:7,16 212:25
249:17,17 256:7
**newly**
165:22 166:1,21
**news**
201:15 208:16
227:11
**NHL**
78:12
**nice**
201:25
**Nickel**
22:3 61:23 175:10,16

**Nickel's**
24:16,21
**night**
90:21
**nods**
9:21
**non-compliant**
117:25
**non-discriminating**
99:20 100:13 101:23
**non-discrimination**
3:21 4:6 99:6,15
100:20 101:3
162:25 207:10
216:20 219:2
222:17
**non-discriminatory**
155:22,25 208:7,13
**non-essential**
189:8
**non-Frontier**
229:8,9
**non-managerial**
265:12
**non-threatening**
37:13 72:11
**noncompliance**
118:2
**Noon**
125:9
**normal**
9:6,7 22:11 87:21
119:14 258:24
**Nos**
80:13
**note**
23:17 27:13 45:8
48:23 71:25 73:12
96:18 111:8 128:4
128:18,19 191:21
195:14 207:20
238:2 254:1
**noted**
53:3 201:21
**notes**
149:10 177:21

178:15
**notice**
2:1 3:10 16:12 17:24
19:13 25:11 81:9
106:23 116:25
150:22 183:24
189:15 190:15
191:2 192:23
**noticed**
189:17 192:10 193:1
**noticing**
56:14
**notify**
75:6
**November**
24:12,22 46:11,12,21
47:3,16 249:9
**number**
6:23 17:21 19:6,8,25
36:18 39:17 71:12
89:18 94:22 95:24
95:25 96:8 104:1,2
214:9 221:3 222:7,8
222:13 224:3,4
226:18 238:5 262:7
263:24 264:8,18
**numbered**
16:15 79:19 244:8
247:10
**numbering**
111:25
**numbers**
18:21,24 19:1 29:18
29:19 111:13 160:3
222:1 238:2 247:20
**numeral**
127:13
**numerical**
126:17
**nutshell**
81:23

_____

**O**

**O**
6:2 66:3 77:24
**oath**



61:16 126:10
149:12
**oaths**
8:15
**object**
19:23 43:4 82:2
107:10 151:18
154:22 164:21
199:8 259:22
260:24
**objected**
164:15
**objection**
11:5 12:2,23 13:8,20
14:21 16:23 17:13
18:18 19:14,20
20:15 22:20 23:4
24:17 27:10 29:11
30:14 31:17 33:7
34:25 35:8 36:5,13
36:22 37:4 38:11,25
39:12,22 40:3,21
42:5,16 43:14 44:6
46:23 47:6,22 48:12
49:24 50:4,22 51:10
51:16 52:1,16 54:12
55:1 56:10,15 57:1
57:18 58:14 59:9,23
61:2 62:15 63:2,12
63:20 64:6 65:12
69:14,19 70:15 72:7
73:2,22 75:25 78:20
82:20 83:10 85:20
86:18 87:2,18 88:4
88:12,23 89:21 90:3
90:14 91:11,24
92:15 94:20 99:1
100:21 101:6,11
102:12 108:18,24
119:1 120:20 129:1
129:6,15 131:13
132:7,14,23 133:4
133:16,22 134:9,19
135:13 136:9,18
137:10,20 138:3,17
138:21 139:6,15

140:9,17 141:4
142:3,14 143:21
144:2 145:1,7 146:4
146:14 147:1,13
148:8 150:13,25
151:7,14,24 152:8
152:25 153:6 154:3
156:15 157:22
158:14 159:10
162:20 163:14
164:3 165:18 166:2
166:7,25 169:7,20
171:3,17 172:23
173:4,12,16 175:1
175:20 176:1,13,21
178:13 179:6,15,23
180:5 181:10,15
182:12 183:9
184:21 185:7
187:16 188:24
190:5,24 191:7,18
192:13 193:10,19
198:23 199:13
200:3,20 202:13
203:7,16 205:9,18
205:25 207:17
212:21 213:20
215:15 216:2
217:18 218:14
220:25 221:15,21
222:6 223:16,22
226:2,19 227:20
228:17 229:11
230:6 246:17
248:25 250:2
256:25 258:20
259:13 260:12,23
261:12 263:3,8,14
264:20 267:5
**OBJECTIONABLE**
117:1
**objections**
13:3,5 41:3 52:23
53:5,11,16,21 54:20
101:19 102:24
103:5 154:18,23

155:7
**obligation**
211:2
**obliterated**
95:23 96:13 112:13
**observant**
71:18
**observation**
62:14 63:10,17
**observations**
60:14 152:3
**observe**
48:22 193:8
**observed**
59:20 64:17 75:6
197:7 244:17
**observing**
195:23
**obtain**
152:18 261:24
262:12
**obvious**
108:15 223:13
**obviously**
67:19 108:16 238:9
**occasions**
231:19
**occupied**
13:25
**occur**
8:13 38:21 75:12
86:5 87:5 171:23
**occurred**
24:5 38:14,15,20
39:4,10 46:15 64:9
64:11 74:11,15
178:9 219:11 265:5
**occurrence**
13:11
**occurring**
73:4 146:8
**occurs**
88:19
**October**
23:21 25:16,25 47:11
47:12,14,15

**odd**
195:1
**of**
194:23 196:8,17
**offer**
60:8
**office**
207:7,7 208:11,24
220:18 259:5
**officer**
63:24 130:13 137:25
186:23
**officers**
130:14 133:13,20
**official**
201:9 215:5
**Officially**
14:1
**oh**
7:24 15:16 21:19
26:3 29:12 36:14
45:16 52:5 100:5
111:15 112:20
113:1 145:4 157:23
167:16 183:18
200:11 218:20
219:5,8 227:7 233:7
254:2 268:14
**oil**
36:9,10,11 78:16
**okay**
8:10,24 9:16,18
10:13 11:2,14,16,24
12:9,14,17 13:24
14:10 15:1,22,25
16:8,15,20 18:3,6
18:16 19:11 20:1,14
20:17 21:2,7,12,25
22:15 23:7,12,17,24
24:15,25 25:4,11,24
26:4,10,12,16,19,25
27:6,12,23 28:1,5
28:12,16 29:1,7,15
29:18,21 30:8,16,22
31:8,14,24 32:4,7
33:10,16 34:2,5,8



36:24 37:1,6 38:3,9
39:3,14,24 41:14
42:8 43:22 45:24
46:7,16,19 47:1,25
48:4,8,15 49:9
50:11,16,19,25 51:6
51:12 52:4,6,20,25
53:7,13,18,24 54:16
55:18 56:2,5,8,12
56:18 57:5 59:3
60:3 61:6 62:8,23
63:4 64:22 65:15
66:16,24 67:6 68:2
68:10 69:12,16,24
70:2,9,12,23 71:5
71:12,16,23,25 72:5
72:10,23 73:11,18
74:19,24 75:13 76:5
76:8,15,21,22 77:2
77:7,12 78:1,6,24
80:2,6,17,21,24
81:4,9,14,23 82:6
82:17,24 84:16
85:24 86:9,15 87:11
87:15,25 90:17,20
91:18 92:2,6,23
93:2,5,12 94:4,12
94:24 95:5,9,13
96:15,17 98:2,5,13
99:4,8,14,24 100:2
100:10,19 101:1,21
102:19,22 103:7,20
104:11,19,24
105:21,24 106:23
107:5,23 108:1,10
108:14,20 109:9,18
110:2,6,9,15,25
111:15,24 112:5,12
112:17 113:2,4,10
113:24 114:2,6,10
114:23 115:6,12,18
116:1,8,13,17,20
117:5,13,17 118:3
118:20 119:3,7,17
119:21,24 120:12
120:18,24 121:5,9

121:13,20,21,25
122:17,20 123:1,6
123:10,18 124:5,22
124:25 125:5
126:13,19 127:3,5,9
127:17 128:4,12,18
130:4,8,14,17,20,25
131:2,10,16,20
132:1,4,16,21,25
133:24 134:6
135:25 136:5,11
137:1,7,13,23
138:11 139:10
140:5,12,15 141:1
141:10,20 142:8,17
143:10,14 144:5,21
145:9 150:1,7 151:2
151:21 152:15,18
154:12,20,25
157:24 158:20
159:11 160:7,16,21
160:25 161:22
162:23 163:8,22
164:6,20 166:9,21
167:4,16,21,25
168:22 169:4,13
171:20 172:12
173:5,9,18 174:1,22
174:25 175:15,23
176:15 177:11
178:1,24 179:21
181:13 182:3,8,15
182:25 183:5,12
184:10,13,17,24
185:5 187:6,7,19,23
188:18 189:2,6,10
190:11 191:15,20
192:6,9,20 193:4,14
193:23 194:4,15
195:22 196:1 197:6
198:7,25 199:15,20
200:6,18 201:2
202:4,18 204:12,18
205:1,4,13 206:1,14
206:21 207:5,14
208:16,22 209:3

212:19 213:4,11
214:13 215:11,20
216:6 217:9 218:4,7
218:20 219:2,11,13
219:19,24 220:14
221:12 223:13,24
224:6,17,23 225:7
226:12 228:6,15,19
229:4,6,7,9,18
230:9,13 231:15
232:20,23 233:11
233:22 234:3,12,18
234:25 235:10,17
235:24 236:21
237:10,20,24 238:9
238:16,19,22,25
239:12,21 240:1,6
240:13,20,24 241:9
242:6,19 243:7,13
243:19 244:3,13,22
245:7,20 246:6
247:2,5,13,16,19
248:6,10,19 249:6
249:15,25 250:6,11
251:17,25 252:3,14
253:7,10,24 254:6
254:25 255:3 256:5
257:4,9 258:2,6,14
258:23 259:7 260:3
260:5 261:18,22
262:6 263:6,10,16
264:4,16 265:7
267:10,14,17,20,23
268:4,20 269:4,8,10
**old**
89:7 110:10 184:18
**older**
94:21 201:22 202:23
203:3 204:2,11
**Olympics**
78:14
**on-the-job**
262:21 263:1
**onboard**
26:14 28:20 30:6
83:4 99:17 103:4

105:3
**once**
32:19 86:22 241:25
259:3
**one-page**
33:17 104:3
**one-sided**
149:14
**ones**
30:6 75:12
**online**
238:14
**ooh**
198:14 206:25
246:12,16 251:6
**open**
242:2
**opened**
256:15
**opening**
171:22
**operate**
153:17 168:12
242:10
**operated**
20:22,22 92:14 142:9
**operates**
16:2
**operating**
21:8 131:17
**operation**
241:13
**operations**
4:14,18 10:22 11:3
12:4 14:8 114:11,16
114:21 115:22
120:1,2 132:18,22
146:22 184:4,14
193:15 197:14
198:12 239:8
241:16 244:9 245:4
245:18
**operator**
66:14
**operators**
66:13


MAGNA
LEGAL SERVICES

opinion
12:24 52:18 53:22
54:13 56:16 57:2
64:7 73:23 152:9
162:21 203:8
opinions
42:17 193:20
opportunities
168:12
opposed
187:14
option
91:13 249:13
options
196:2 249:17,24
orally
9:20
order
21:21 45:10 96:20
136:6 160:1 214:1,9
214:24 215:2,8,12
215:19 219:1 223:9
233:16 234:14
239:7 244:8 248:16
253:15 254:1 255:8
255:23
ordered
214:14 221:6
ordinary
22:8 87:15 120:5
213:15 235:25
236:24 238:17
245:11 251:1,2
organizations
109:15
orientation
100:15 101:25 102:9
162:5,6 165:12
origin
100:15 101:25 102:8
162:9 208:1 209:19
210:19 216:8
original
45:19 50:21 65:8
151:3
Orlando

203:20
outline
68:4 120:13
output
32:16
outside
20:5 54:7 106:21
109:1,3,7 129:4,13
130:5,17 132:5,8
136:2 141:7 152:9
212:17 266:18
outstanding
201:3
over-
58:9
overall
68:19 70:20 222:23
234:7 264:5
overcoat
51:7
overhead
93:17
overreact
58:22 59:16
overreacting
58:13,25
overreaction
59:14
oversee
14:8,10
overseeing
10:25
overview
25:19 187:6

P

P
3:11 6:2
P-A-U-L-O
253:4
p.m
97:13,18 125:7 126:3
159:16 220:2,6,7
268:21 269:1,11,14
P000748
206:7

P000768
214:18
P000780
206:8
PA
201:25
pad
53:2
page
3:4 18:1 20:11 21:22
21:25 22:1,2,4
23:20 24:8,11,21
25:1,12 45:15,18
48:16,16 51:1 55:5
58:6 64:23,24 65:8
65:11 67:20,21,25
71:7 76:16 79:18,20
81:11 90:21 97:24
111:7,8,19,20
112:12 113:3,6,7,20
113:21 114:2,6,10
115:22 116:8,17,23
119:25 120:1
121:14 127:11
129:21 142:21,23
144:6 159:7 160:16
186:5,9,10,11,11,19
194:10 200:23
208:16,23 209:3,4
214:1 233:4,5,8,11
233:22 238:15
239:13 240:24
249:23 253:21
255:10
pages
24:9 25:11 111:14
119:9,10,11 120:9
120:13,13 127:2
158:20 160:11
186:4 187:3 200:16
207:6 221:13
231:17 239:8
Pam
6:15
Pamela
2:7 270:4,22

panel
93:17
paper
23:9
paragraph
19:13 100:10 160:17
161:1 162:15,24
167:16 168:5,14,23
168:25 171:21
173:19 188:6 189:3
190:8 192:20
194:16 195:4,6
196:1,16 207:14
216:18 256:6,21
paragraphs
160:17 186:5,7
Pardon
232:20
parentheses
60:5 68:14,15 73:13
144:9
Park
1:14 6:12
part
13:17 26:18 43:8
57:3 69:4 74:9
84:22 94:22 95:23
98:2,10 101:16
104:9,18 116:12
120:18 132:19
133:20 143:10
163:4 170:24
174:16 177:6
219:10 222:18
228:13 239:25
participating
209:25
particular
47:3 93:5 104:15
135:18 139:19
163:5 165:16
188:18 199:5,22
252:23
parties
6:16 270:15
partner



161:6 228:13
**partners**
229:13
**pass**
32:12 259:6
**passed**
32:19 201:5
**passenger**
4:10 5:5 34:23 35:6
40:1,11 43:11 48:18
49:22 51:9 52:3,22
53:4,10,15,20 54:19
55:7,20 58:20 62:14
62:24 63:9 71:17
83:3 102:15 117:21
118:8,10,13 124:6,9
124:12 144:22
145:5 146:11 147:9
151:11 155:4,5
161:4,6,8,14 174:13
181:2 182:6,10
188:1 193:8 195:14
195:24 197:9
201:25 204:2 210:1
211:4 215:6 223:10
223:14 236:17
241:14 252:19,25
256:11 259:21
260:9 263:25
**passenger's**
151:12 181:3 209:15
209:18 210:19
**Passenger(s)'**
208:24
**passengers**
48:22 51:2,14 52:15
54:24 55:12,15
56:20 57:7,11 58:2
59:20 60:8,15,18
71:19 99:16,18,20
99:25 100:5,13
101:23 156:13
161:18 163:13
180:6,20,24 182:22
188:13 194:20
195:1,10,18 196:12

210:21 211:24
216:21 223:4,7
224:4 231:19
256:10 258:25
**passengers'**
153:3 184:2
**passes**
184:25 185:2,14
**paste**
232:9
**patrol**
162:12,17 164:18
**patron**
161:2,8,11,13,21,25
163:3 164:7,11
165:3
**patrons**
162:2 163:1
**Paulo**
253:4
**pay**
126:25
**pending**
6:23 10:5,8
**people**
9:11 86:6 129:4,13
130:17 132:4
153:21,22,25 154:1
154:16,16 156:8,9
156:13 166:18,23
176:17 185:12
228:23 259:11
260:11
**people's**
54:25 55:16
**perceived**
162:5 209:18 210:18
210:19
**percent**
32:12,18,21 264:9
**percentage**
32:11,11
**percentages**
264:5
**Perfect**
115:20 244:3 250:14

255:16
**perform**
229:23 230:3 240:11
**performance**
213:14 217:15
247:22
**performed**
229:24 230:4
**period**
18:9,13,14 162:1
222:4 235:14,17
263:23
**periods**
235:3
**person**
22:15,17 32:1 51:13
51:19 53:1,3,19
54:17 59:13,17
64:20 86:5 97:1
127:20 147:9
153:21 156:8
164:24 165:1
176:11 198:19
261:8 265:9,10
**person's**
41:11 127:21
**person(s)**
144:8
**personal**
226:21
**personally**
61:7,17 151:1 224:22
**personnel**
4:6 207:10 208:13
209:5,9,11,17 210:9
211:18
**personnel'**
207:16
**persons**
22:16 211:22 265:19
**perspective**
226:23
**pertaining**
242:9
**Peter**
1:8 6:7 8:2 72:5

73:19 74:7,15
118:22 148:6,11,16
149:11 150:9 151:5
170:7,18 171:12
172:6,8,19 173:1,10
175:17,25 176:18
177:1,8 178:12,24
182:17 184:20
199:6
**Philadelphia**
225:5
**Philadelphia/Trent...**
225:22
**PHL/TTM**
225:4
**phone**
44:15
**photo**
254:12
**physical**
144:7,8 145:24 162:9
168:25 169:6
180:22 198:19
**physically**
4:2 28:19 114:3
127:14,18 128:1,5
128:14
**PIC**
240:4
**pick**
94:5 95:10
**picking**
236:8
**picks**
113:7
**picture**
52:11 54:8,9,10 55:7
217:24 218:2
**pictures**
49:17 217:22
**piece**
23:9
**pilot**
14:5,6,25 15:2,11,18
15:20 35:19 107:15
107:20 108:2,5



131:23,24 133:8
135:3,11 188:19
197:19 239:15,22
239:22,23 240:4,5,9
248:1 257:10
**pilot's**
36:3,8 37:1 259:4
**pilots**
4:4 14:9,11,19,22,25
20:10 21:7,8 107:24
114:22 121:1,5
131:11,16 132:1
139:11 140:6 141:1
141:8,11,17 142:9
157:6,8,13 159:6
186:22,24 244:25
245:4 247:6 256:15
261:20
**pilots'**
246:2
**pistol**
51:7,20 52:8
**place**
49:15 81:11 181:2
204:13 220:22
270:10
**places**
232:8
**plaintiffs**
1:9,18 2:4 6:21 46:20
88:8
**Plaintiffs'**
3:9
**plan**
128:20,25 137:5
234:20
**plane**
121:16 234:21
**playoffs**
78:12
**pleasant**
72:11
**please**
6:16,18 7:13,19 9:21
21:13 31:2 35:2
40:7 55:3 57:24

64:23 101:14
102:25 111:1,17
113:13 115:8 118:1
118:1 152:10 154:5
165:6,20 171:10
180:2 182:19 187:4
192:19,19 206:3
230:2 231:6 232:25
236:6 237:5 239:1
244:4 245:22
246:22
**pleasure**
8:8
**plural**
22:16
**plus**
195:24
**PNR**
4:10 236:17
**point**
12:25 13:15 16:21
37:13,18,23 38:3
39:8,25 41:8,22
43:8 48:21 49:9
50:14 58:5,6 60:3
64:4 65:23 67:6
68:10,16,18,21,23
70:6 71:18,25 72:11
74:19,24 75:5,15
76:22 77:7,12,17
78:7,10,11,11,12,13
78:14,15,15,17 79:1
85:15,23 96:23
105:1,6,11,16
107:13 121:22
129:22 130:9,20
133:11 134:13
143:1 144:11
168:10 177:17
183:3 186:13 211:3
211:4,6,7 229:23
233:15 234:15
241:1,9 242:1,6
244:18 249:21
254:10,21 264:12
**points**

38:4 40:10,18 68:5,6
71:13 75:22,23 76:6
76:13 171:24
217:23 235:1
**pol-**
83:18
**police**
110:12 170:1,2,14
189:25 191:25
201:13,19
**policeman**
201:20
**policies**
25:20 174:2 217:10
228:10 229:2,19
242:8,16
**policy**
3:21 12:15 27:4,9
54:23 55:11,14 82:5
82:9,12,19 83:19
99:7,15 100:11,20
101:3,21 114:19,19
114:22 115:2,19
153:8 155:15
156:23 162:25
163:10 167:22
168:10,10 211:6,22
213:9,12 219:2
230:18,22 231:4,13
231:20,25 232:17
243:17 260:18
**policy/guidance**
153:15
**polite**
143:5,16
**popped**
127:1
**pops**
65:23
**portion**
17:24 31:7 255:11
**position**
10:17,19,21 11:12
12:5 13:25 15:12
265:12,12
**positions**

150:8
**positive**
39:4,6,10
**possession**
254:17
**possibility**
223:11
**possible**
77:14 85:1 158:18,19
165:9
**possibly**
52:10
**post**
243:11,12
**postdate**
23:18 243:9
**potential**
130:21 134:6,14,16
135:2 137:25
138:15 201:17
209:21 210:25
212:8 234:24
**potentially**
60:2 82:7 140:25
147:6 154:13,14
168:21 191:12
223:23 262:10
**practice**
258:24
**pre**
247:24
**preceded**
25:14
**preceding**
221:8 245:8
**precisely**
8:20
**precursor**
91:20
**predates**
47:16
**prefaced**
122:7
**prefer**
95:2
**preferably**



193:7
**preflight**
26:23
**pregnancy**
162:7,8
**preparation**
17:8 228:7
**prepare**
130:21 134:6,14,16
135:2 138:15,18,20
139:13 140:20
**prepared**
137:25
**prescriptive**
217:3
**present**
1:24 6:17 201:16
**presented**
218:12 238:20
**press**
227:6
**pressure**
36:9,10,11
**presume**
11:22
**pretty**
15:2 19:23 81:6
118:3 222:14 235:7
**prevent**
208:18 216:24
**prevented**
73:19
**preventing**
217:5
**prevention**
180:18
**prevents**
73:13
**previous**
15:12 24:4 27:3 34:9
47:13 85:14 89:11
270:6
**previously**
5:14 47:12 60:21
96:16 110:14 122:5
224:7 231:7 236:16

244:1 268:2
**primary**
30:1,5 114:19
**principles**
212:2
**print**
65:21 105:1 117:15
142:20 186:3
**printed**
96:13 113:6 123:20
**printer**
95:23 113:5
**printing**
103:25
**prior**
14:4 15:5,7,17 26:2
27:22 46:16,19
72:24 81:21 88:11
88:18 123:4 185:20
187:8 194:16
243:17,21
**pro**
162:5
**pro-**
37:7
**probably**
7:25 8:10,17 9:23
19:3 20:12 23:2
30:5 32:1 114:14
176:4,11 187:17
266:24
**problem**
103:25 108:16
124:14 136:24
137:17 183:19
264:18
**problems**
14:13
**procedurally**
83:13
**procedure**
2:2 13:11 27:2,5,8
35:11,14,15,16,17
35:25 83:14,19,20
83:21 84:9,10,12
115:2,5,19 193:4

202:12 203:6
**procedures**
5:7 26:15 34:21 35:4
35:13 83:2,7,8,12
84:20 85:18 86:23
120:14 193:17
211:14 217:4
229:18 242:8,16
253:17
**proceeding**
8:13
**proceedings**
207:8 269:12
**process**
37:8 82:16 115:4
209:5 210:8 212:6
213:19 265:1
266:14
**processes**
210:10
**produce**
157:19 221:7 264:14
**produced**
34:15 46:20 67:17
88:7 96:1 113:14
181:6 200:12
221:13 225:13
242:25 245:9
258:15 260:7
**producing**
112:10
**product**
241:3
**Professional**
78:13
**profiling**
180:19
**programs**
217:2
**progress**
36:2 84:1
**prohibiting**
207:23
**prohibits**
162:1
**prominently**

232:7
**promote**
147:7
**pronoun**
257:24
**property**
127:22
**protected**
162:13,18 165:23
166:12,12,23 239:6
248:15
**protecting**
202:5
**protection**
147:4
**protective**
45:10 96:20 195:16
233:16 239:7 244:8
248:16 253:15
254:1 255:8,23
**protocol**
210:7,10 212:5
**protocols**
211:15
**proud**
167:8
**provide**
38:4 41:23 43:23
74:25 103:14 151:4
152:6 153:13,13
155:21 163:10
182:5,25 183:14
184:1 208:4 225:8
**provided**
42:11 98:23 103:2
182:20 186:2
231:17 251:23
264:7
**provides**
35:21 59:15 163:24
208:12
**providing**
184:11
**proviso**
10:4
**provocation**


MAGNA
LEGAL SERVICES

169:6,10,12
**public**
19:21 109:20 176:10
**publication**
208:10 237:18
**published**
13:19 33:21,23
 206:10 212:14
 220:17
**pulled**
23:9 111:21
**pulling**
93:16
**pulls**
242:1
**punch**
142:22
**punctuation**
235:17
**purchase**
91:14 92:22 93:21
**purchased**
188:4,10,16,21 196:6
 197:24 198:5 199:3
 199:6,16,24
**purports**
250:21
**purpose**
19:2 80:20 145:21,23
**purposes**
13:9
**Pursuant**
2:1 3:11
**pushback**
187:8 194:16
**pushed**
89:7,10,14 195:3
**pushing**
127:19
**put**
23:2,9 27:1 32:5 45:4
 45:17 84:2 94:11
 112:9 113:12,15
 170:13 203:13
 234:9
**putting**

22:18 39:18
**pyramid**
267:8

---
**Q**

**Q2**
17:3 18:12 126:20
**qualification**
124:20 226:24 263:5
**qualify**
122:13 133:10
 161:13,13 226:20
 261:19 264:22
 266:2
**Quarterly**
126:20
**query**
198:13,18
**querying**
194:19
**question**
9:3,15 10:5,8 13:14
 14:15 15:8 17:14,18
 17:25 19:16,21,23
 22:22 24:5,18 31:2
 35:2 40:7 51:8 55:2
 55:10 57:25 72:16
 73:6 82:3 85:14
 88:25 89:3,11 92:19
 96:6,25 98:20 102:4
 103:12 109:13
 111:11 117:8,10
 118:8 121:20
 126:15 129:8
 134:10 145:11,14
 145:16 150:20
 151:3,19 154:5
 156:18 165:6
 171:10 178:16
 180:1 181:21
 182:19 198:1
 204:10 221:18
 222:14 231:5 237:4
 243:12 251:8
 260:19 263:19
**questionable**

118:11
**questioner**
9:7
**questioning**
194:23 204:20
 213:17
**questions**
37:14,18 57:4 61:13
 68:16 72:25 73:14
 73:20 167:6 177:3
 181:6 187:5 201:20
 204:7 247:5 266:17
**quick**
237:22 250:5
**quite**
29:25,25
**quotation**
100:12
**quote**
49:3,6 158:6
**quote-unquote**
200:7 232:16

---
**R**

**R**
3:11 6:2
**race**
100:14 101:24 102:7
 162:4 165:11
 166:14,16 207:25
 209:18 210:19
 216:7
**races**
78:14 156:14 163:13
 166:11,19,23
**racial**
180:18,19 265:17
 266:8
**radar**
136:22 137:7
**Raleigh**
20:22
**range**
36:18
**Rapids**
200:25

**rapport**
121:23
**rare**
13:10
**rate**
67:9
**RDU-LAS**
4:24 5:3
**RDULAS**
4:19
**re-**
129:16
**re-cover**
126:13
**reach**
198:17 258:25
**reached**
184:7
**react**
58:10,23
**reacting**
59:7
**reaction**
59:15 222:16
**read**
8:17 13:4 17:20
 18:10 26:3 30:24
 37:15,21 38:1 43:15
 43:18 48:25 49:4,18
 56:22 58:7,11 60:10
 60:25 65:6 67:10
 68:25 71:21 72:3,13
 72:21 73:16,25
 74:12,22 75:3,8,18
 75:23 76:25 77:2,15
 77:20 80:18 81:7,12
 82:4 83:5 84:18
 85:17,25 86:7,13
 87:13,25 88:10,11
 89:5 90:8,13,18,18
 90:25 96:5,16 99:22
 100:17 103:11,16
 105:4,9,14,19
 106:24 111:16
 118:1,18 123:7
 127:15,23 128:7,21



127:15,23 128:7,21
130:10,23 143:8,24
144:19 145:17
148:22,24 149:1,3,7
149:9 156:20,21
157:14,19 158:23
159:2 160:21 161:1
161:10 162:15
163:6 165:12 166:3
167:11 168:17
169:2 170:23 171:5
172:4 173:24 174:6
175:21 181:11,22
190:1 192:20 195:4
195:20 196:14
197:1 202:7 204:16
205:5 208:8 209:22
210:5,13,23 211:10
211:25 212:10
217:7 225:19 234:1
235:5,15 239:19
241:5,17 243:24
244:20 254:13,19
254:23 256:21
265:7,8 268:8
**readable**
186:6
**reader**
164:23
**reading**
39:15 52:21 148:18
157:15 158:13
172:11 199:23
231:22
**reads**
3:20 18:7 76:22 78:7
80:14 81:5 84:25
99:6 100:11 135:2
162:24 188:12
191:1,8 192:5
196:16 200:1 201:2
201:3 203:25
207:14 216:18
241:22 242:18
256:6 257:2
**ready**

248:19
**realize**
65:16,24
**really**
21:21 145:10 217:14
226:1
**realm**
133:10 262:11
**Realtime**
2:8 270:6
**reason**
34:7,13 36:25 50:24
82:10 87:22,24
96:13 117:14
119:18 120:8 150:1
150:4 170:21
183:14 184:1,6
234:9 248:16
**reasonable**
144:14,18 152:23
202:16 204:5
210:18,20
**reasons**
75:7 235:7
**recall**
17:19 18:20 38:15
39:9 43:20,25 44:3
44:7,9 61:22,24
62:1,3,4,6,9 63:3,14
69:7,21,23,25 71:1
71:2 73:3,4,6 74:4
149:4,6 159:3
177:21 183:4
206:14 212:17,19
213:3,22 214:6
231:22,24 232:18
243:22 259:14
**receive**
11:21 30:23 41:18,21
84:17 85:16 90:12
92:12
**received**
28:1 34:12 90:8
187:9 195:7 212:16
215:7 220:16
227:15 232:15

243:20 246:24,25
251:19,22
**receiving**
198:25 216:1 220:21
**recess**
79:9 125:9 220:4
268:24
**recipient**
265:11,15,16
**recipients**
248:4
**recognize**
45:12,21 58:8 84:8
111:10 113:11
248:17
**recognized**
256:8
**recognizes**
208:3
**recognizing**
217:16
**recollection**
61:9 62:16 64:2,21
88:17 172:17 182:1
215:17
**record**
4:16 6:4 7:20 8:3,16
9:25,25 10:1,11,12
12:10 13:3 27:19
44:17,19,21,24 45:8
77:22 79:7,12 96:19
97:10,13,16,18
111:8 125:7 126:3,9
156:21 159:13,16
159:19,22 220:2,6
233:15 236:17
243:2 245:9,17
250:25 251:2
252:12 253:7
254:25 255:13
257:6 268:13,18,21
269:1
**records**
3:13 22:8 25:5 32:2
32:24 243:8
**Recovery**

3:23
**rectangle**
65:5 67:16
**recurrent**
3:16 34:16 45:25
46:9 47:4 48:10
218:16 219:10
**red**
68:3 90:21 91:6
117:7,10,12 118:5,7
118:21,23 122:6,10
122:18,23 123:4
180:21
**reduce**
216:24
**reduced**
264:1 270:11
**ref-**
192:15
**REF**
3:22 67:2
**refer**
21:2,7 27:2 47:2
83:23 84:10 117:6
244:13
**reference**
3:8 4:1 5:1,14 27:14
35:11,25 47:7 66:3
66:22 67:3 80:19
90:20 96:9 109:25
121:18 153:15
157:25 186:8
191:10 232:8 249:3
249:25
**referenced**
19:3 28:17 67:4
189:14 190:15
191:1 192:16,23
**references**
66:21 226:11
**referencing**
24:7 74:17 100:24
112:25 214:18
216:3 217:22
**referred**
19:21 27:4,16 184:19



266:4
**referring**
20:7,8,9 21:3,8 30:10
    39:21 40:4 93:24
    122:3 131:14
    136:21 156:25
    160:23 163:21
    164:4 197:4 226:4
    241:24
**refers**
80:21 167:13
**reflected**
32:23
**refreshing**
82:9
**regarding**
16:18 102:2 245:1
    258:3
**regardless**
69:8 100:14 101:24
    102:7 155:23
    265:11
**regime**
138:13
**Registered**
2:7 270:5
**regularly**
246:14
**regulations**
12:21 13:19 25:19
    242:8,11,15,16
**regulator**
12:7
**regulatory**
10:24
**rehearsed**
68:15 70:14
**reinforcement**
82:4,23
**related**
106:9 204:9 270:14
**relations**
224:2,25 225:23
    226:17 231:16,18
    260:9,21 261:8,25
    262:18 263:12

265:10,14,15 266:3
    266:6,21 267:8,25
**relative**
221:13 226:13 264:5
**relatively**
157:5 224:5 264:6
**relatives**
37:20 72:18
**relayed**
196:4
**relaying**
189:20
**release**
197:17 208:17 227:6
    227:12
**relevant**
203:14 210:10
**relieved**
204:13
**religion**
100:15 101:25 102:8
    162:4 165:11 208:1
    209:19 210:20
    216:8
**remain**
90:24
**remaining**
86:11
**remedy**
211:12 212:9
**remember**
38:17 39:2 60:23
    74:8,10 142:20
    157:15,20 164:17
    172:11 200:16,18
    218:15 236:10
    257:15
**remind**
9:14
**reminds**
238:4
**removed**
195:1
**repeat**
101:13 145:15
**rephrase**

15:8 31:1 102:4,4
    109:12 122:4
    129:16 134:10
    150:19 152:10
    154:5 156:18 165:5
    165:20 171:9
    176:23 182:18
    263:19
**replicated**
238:3
**reply**
189:23
**report**
5:5 14:20,23,23,24
    75:16 174:2 252:19
    253:3 259:3
**reported**
62:25 63:16,24 83:4
    163:3 165:3 197:9
    201:5
**reporter**
2:7,8 6:14,18 9:10
    80:12 95:22 145:13
    237:15 242:24
    248:9 270:5,6
**REPORTER'S**
270:2
**reporting**
97:7 192:11 246:9
**reports**
12:5
**represent**
6:21 8:2 21:17 34:8
    51:1 88:6 186:4,18
    206:9 224:8 236:16
    242:25
**representative**
241:2
**representatives**
267:11
**representing**
6:18 7:7
**request**
6:12 10:4 94:15
    130:8 133:12 135:1
    254:22

**requested**
88:9 97:8 156:21
    172:8
**requests**
94:13
**required**
215:7
**requirement**
13:6 32:15
**requires**
61:13 162:21
**requiring**
45:9
**reread**
100:2 248:21
**rescue**
77:13
**research**
92:11,17 174:24
**reseating**
74:6
**resolution**
124:17 201:8,9
    211:14
**resolve**
40:25 210:12 211:12
    211:19 212:8
**resolved**
256:19
**resources**
174:4,12 238:15
    261:25
**respect**
42:8 120:12 161:25
    169:18 215:24
    230:15 245:7
    258:14,16
**respond**
9:2 13:6,7 136:13
    204:19 263:13
    265:17
**responded**
191:24 204:7
**response**
59:22 68:16 110:13
    130:9 133:12



193:22 194:1
212:13 225:1
**responses**
68:14 70:13 121:6
181:5
**responsibilities**
26:24 51:23 233:19
240:12,25 255:12
**responsibility**
40:18 41:5 242:4
**responsible**
11:25 158:7 241:3,12
242:7
**restate**
35:1 202:24 205:20
237:4
**result**
32:25 37:2 126:16
168:15 169:13
213:1 216:1 227:25
264:25 270:17
**resulted**
204:11
**results**
31:16 32:5
**resume**
269:9
**retraining**
32:13
**Rev**
4:8,12,15,18,21 5:6,8
5:10 96:3 98:9
104:6
**review**
43:24 170:4 200:14
217:21 260:15
**reviewed**
166:4 193:21 200:18
214:5
**revision**
79:23 80:2 82:14,19
82:22 98:6,10
104:18 113:24
114:7,12 115:23
160:10 233:13
239:9 244:10

253:17 256:2
**revisions**
98:8
**Rex**
4:16 243:2,16 257:17
258:13
**Rharris@hinshawl...**
1:23
**rheostats**
91:4
**Richard**
1:20 7:8
**right**
6:20 8:7 10:15 12:12
12:19 16:4 17:23
20:12,19 22:5 28:5
28:7 32:7 39:24
43:25 44:16 45:3,16
51:6 52:7 53:18
54:2 55:19 56:2,9
61:1 62:8 65:25
69:25 70:5,7 71:5,7
71:14 73:11 74:19
75:15 77:5 78:24
80:11 81:7,12,16,18
81:20,21 88:20,22
93:3,8 94:24 98:15
102:10,14,16 103:4
104:13 107:17,21
108:17 109:19
110:8,25 111:4
112:1 113:1 114:4
115:21 119:4,5,24
123:3,4,22 124:22
126:8,11 128:10,16
130:6,10 132:6,10
133:6,11 134:2
135:12,17 136:8,17
136:20 137:3,19
138:22 139:2,14,20
139:24 143:20
144:1 146:9 149:15
150:5 154:10,21
155:24 157:17
161:16 162:23
164:12 168:2,9,13

168:22 169:11,15
171:6 175:11 176:4
177:13 178:12
180:15 181:20
184:17 185:23
186:18 190:9,12,16
190:19 191:3,11
192:12 193:9,13
194:2,10 195:17
198:5 199:3,12,17
200:21 204:20
205:2 206:17 207:1
208:25 210:21
213:13,24,25 214:8
218:5 220:12
222:12 223:4,15
227:3,10 230:11,18
234:8,10,16,23
235:8,22 236:12
237:10 238:6
239:23 240:8 243:7
243:10 244:25
245:5 248:12 249:2
249:18 250:8
251:11 252:9 253:1
253:12 255:3,19
261:5,11,15 266:1
267:2,3 268:5,8
269:10
**rights**
215:7,14,25
**ring**
142:22
**rises**
209:20
**risk**
136:12
**RMR**
270:22
**Robert**
225:2 226:8,20
**Robinson**
109:20,22
**Roger**
1:25 6:13,20 97:5
**roles**

26:23
**Romeo**
249:10
**roughly**
14:8 15:3
**route**
32:14 68:20 70:21
**row**
74:6 175:17 180:7
194:19 248:22
250:1
**rows**
250:8
**RPR**
270:22
**RSW**
194:11 195:3
**Rule**
18:6
**rules**
2:1 8:4 9:24 25:19
55:22 56:3,5,9
242:11,15
**rumbling**
236:9
**run**
130:1 147:8
**runs**
237:20

---

**S**

**S**
6:2 60:4 68:23 73:12
105:16 107:14
144:9 208:24
210:11 241:11
**S-H-U-P-E**
243:2
**safe**
195:2 196:13 208:4
241:12
**safety**
10:25 67:7 105:17,18
106:9 108:15,15,16
109:11 117:22
147:3,4,11,15 153:3



153:12 195:9
209:21 234:7
**safety/looking**
202:5
**Sakurada**
61:18 62:11 63:16
74:1 175:11
**Sakuruda**
74:1
**San**
1:16
**satisfaction**
241:14
**save**
183:7
**saw**
43:16 61:23 62:2
69:7 73:18 88:21
127:7 188:1 189:15
192:24 193:9
244:22 266:15
**saying**
9:10 13:13 20:3 27:9
43:5,12 44:3 87:7
94:12 106:7 122:7
132:12 146:9,22
155:17 163:8,10
168:20 171:2
191:22 201:25
225:22 226:14
260:19 261:1
267:10
**says**
36:8,21 37:19,24
40:14 41:9,23 45:25
48:22 49:2,14 56:19
58:21 60:3 64:4
67:6,22 68:18 71:16
71:18,25 72:11,16
73:11 74:20,24 75:5
77:3,7,12,17 81:4
83:1 84:18,20 85:25
86:9 90:21 100:6,7
101:22 102:7 103:3
105:1 106:15 108:2
108:3 112:2,14

116:24 118:5,7
121:15 127:17
128:4 129:23
130:20 132:12
133:12 134:12
135:2 136:12
139:18 143:2,15
144:11,15 149:11
161:1 166:16,16
167:7 168:13,25
173:18 174:1
175:18 176:18
178:3,4 183:6,13,24
187:8,24 189:3,12
191:21 193:5
194:16 202:9
207:21 209:8,10,24
210:7,15,25 211:12
217:13 225:10,15
226:7,8 233:12,17
233:23 235:2,12
238:9 239:15 241:1
241:9 242:6,14
244:15,18 247:7,11
247:14,17 252:19
254:10,16
**scenario**
136:25 137:3,24
141:10 148:3,5
153:9
**scene'**
201:14
**schedule**
241:15
**scope**
14:12 36:15 42:17
52:17 54:14 56:16
57:2 64:7 88:13
89:22 90:4 91:25
92:16 137:21 139:7
141:7 142:15 147:2
150:14 151:8 152:9
154:4 156:16
158:15 165:19
179:7 183:10
193:20 203:8

215:16 246:18
249:1 260:13
**Scott**
22:4 62:16 64:12,15
150:11 151:5 170:7
170:18 171:12
172:7,19,25 174:12
175:18,25 176:18
177:8 179:18
250:23 251:15
**scramble**
135:3
**screens**
136:22
**scripted**
68:13 70:13
**SCSM**
198:14,17
**search**
237:22
**seat**
194:21,24 250:12
**seat/names**
202:9
**seating**
4:21 248:13,23
249:25 250:8
**seats**
194:19
**seats/names**
201:18
**SEC**
127:6
**second**
22:1 37:23 48:6,16
64:19 67:18 68:11
77:12 78:10 81:10
90:20 97:11 100:2
100:10 105:11
114:6 117:9 121:14
129:21 130:9
159:12,14 162:24
167:16,18,19 184:5
186:10 189:2 190:8
190:8 195:6 211:4
233:5,8,22 240:24

240:25 241:9
244:17 247:13
255:24
**section**
19:12 46:11 48:17
49:21 66:1 71:8
76:18 78:6 99:15,22
155:10 158:9
160:13 173:21
207:17,22 216:9
225:15 244:14
245:18 254:9 256:5
**sectional**
55:19 56:3,6,9
**secure**
19:4,4 208:5
**secured**
256:16
**Securities**
126:22
**security**
3:17 4:9 5:7,9 26:1
45:11 46:1,10 47:10
48:10 67:7 110:17
111:9 117:23
209:21 219:11
233:18 234:15
241:11,23 242:3,4
244:14 253:17
255:9 259:6
**see**
13:17 18:4 29:18
40:15 41:25 48:19
51:4 52:12 55:5
62:5,7,21,22 65:2
66:5 67:15,24 68:2
68:8 69:22 70:2,9
70:19,23 71:10 72:3
76:20 80:15 91:16
95:24 98:6 106:2,7
107:13 111:16
113:2,3 122:22
123:21 131:22
136:21 138:9 139:1
142:23 143:3,4,15
148:13,19 155:4



159:12 160:9,19
167:15 170:23
172:2 177:17
182:17 184:19,23
184:25 185:13
192:15 199:19
202:15 206:18
209:6 212:25
214:21,23 215:9,20
225:9,17 227:4
228:25 230:16
233:9,10 247:8
259:5 267:12
**seeing**
58:4 69:21 71:1
107:14 153:16
177:21 206:14
212:13,19 215:12
**seeks**
12:24
**seen**
16:13 62:10,18 63:5
63:25 65:8 69:24
71:2 116:4 206:12
215:19 259:7
**self-awareness**
211:15
**sell**
103:3 217:13
**send**
139:10 251:5
**sending**
81:25
**senior**
10:16 207:1,2 222:22
241:1 263:22
264:17 266:23,24
**sense**
147:25
**sensitive**
45:11 110:17 111:9
**sensitivity**
86:11
**sent**
81:5 82:13,18 139:14
189:19 191:22

225:3 231:11 246:3
**sentence**
83:1 85:25 86:9
100:3 167:7,11,13
167:19 168:5,14,24
171:22 188:11
190:8
**separate**
32:14,14 41:10 64:17
64:19 191:17
257:21
**separated**
38:24 185:13 192:3
205:7
**separately**
67:17
**separating**
72:24 185:21
**separation**
73:9
**September**
1:6 2:5 3:12 6:9
98:11 101:9,17
103:2 104:14
187:23 218:25
233:13 248:14
256:2 269:15
270:19
**sequential**
116:11 206:8 237:23
**sequentially**
66:19
**series**
27:17,17 78:11
**serious**
118:9
**seriousness**
256:9
**service**
3:23 30:4,4,4 31:6,7
90:23 162:11 197:5
198:14 214:23
215:2,6
**services**
6:14,15 31:5 78:9
176:19 179:4

195:16
**SESSION**
126:1
**set**
90:22,24 154:14
221:5 270:11
**sets**
152:24 154:9 155:2
**setting**
91:3,7
**settings**
91:21 92:5,9
**seven**
9:24 30:19
**severity**
122:16
**sex**
78:8 100:15 101:25
102:8 162:4 165:12
191:11 192:7 208:1
209:19 210:20
216:8
**sexual**
80:20 83:3 84:3
85:25 86:2,4,9
100:15 101:25
102:8 162:4 165:12
180:18 181:1
190:18,21 191:5,16
205:6
**sexually**
151:13
**shape**
67:4 69:6
**shared**
224:1
**shareholder**
17:12
**Shawn**
1:5 2:4 3:2 6:6 7:8,10
44:20,25 79:8,13
97:14,19 125:8
126:4 159:17,23
177:13 220:3,8
268:22 269:2,13
**She'll**

156:20
**shoot**
141:2,9,18
**short**
31:22 128:6,15
235:14
**shortened**
76:9
**shorthand**
270:10
**Shortly**
189:3 192:21
**show**
16:8 23:12 28:9
33:10 47:3 60:6
67:2 192:17 224:6
250:12
**showed**
42:24
**showing**
21:15 43:8 79:23
95:21 103:23 111:4
160:1 185:25 233:2
236:12 237:14
239:3 242:23 244:6
245:24 250:19
252:17 255:6,19
**shown**
22:13,25 23:1 36:10
47:20 48:1 76:18
78:7 79:17 254:22
**shows**
33:3 67:13 208:16
253:17
**Shupe**
4:16 42:11,23 43:7
137:24 138:5,13
139:5 243:2,16,20
257:17,25 258:13
**shut**
256:16
**sic**
103:11
**side**
27:2 149:15,15
178:25



sign
  157:6,8 158:6 166:3
  268:9
signature
  137:8 270:19
signed
  47:11 157:13,17
  158:12
significant
  227:25
signs
  41:25 42:24,24 48:18
  48:24 49:11,22 51:3
  51:14 52:3,15 55:7
  60:5,6 69:10 75:2
  143:4,16
similar
  14:7 28:10 92:13
  100:25 110:20
  116:8 157:5 168:2
similarly
  37:6
simple
  91:6
simply
  14:16 27:25 32:16
  52:2 57:12 58:1
  82:22 84:2 106:3,7
  109:4 180:6 204:15
  217:13 264:8 265:1
single
  226:23
singular
  166:17,17
sir
  7:17 8:6,9 9:17,19
  11:15,23 15:21
  16:14 18:1 19:10,17
  19:25 28:4,25 45:23
  66:10,17 67:5 68:2
  74:3 78:24 81:22
  95:18 100:18 105:5
  107:18,22,25
  108:16 111:10
  112:11 113:9
  120:11 121:19

122:21 124:24
126:12,18 127:8
130:11,16 131:4,19
146:21 194:14
200:22 206:13
213:3 214:12
224:10 238:11
240:19 241:18,20
242:18 244:2 248:5
249:4 250:16 252:4
252:13 253:2,6,9,20
253:23 254:14
255:15 256:1 257:8
262:2 267:22 268:7
sit
  20:1 31:19 34:5 61:6
  66:24 90:6 101:8,15
  135:22 140:5
  166:10 263:17
sitting
  8:21 52:21 136:5
  188:2 202:2
situation
  41:24 42:10 75:1
  85:2 109:5,6 121:24
  124:18 133:19
  135:18 136:21
  138:12 143:25
  145:6 146:17 151:4
  176:14 192:4
  194:25 195:13,17
  195:22,23 196:11
  196:20,21 197:7
  201:4 202:22 203:1
  204:1,12,14 210:4
  210:12,15 211:13
  211:20 212:6,9
  233:23 234:16
  258:10 259:2
situation.'
  105:8,13
situational
  58:18 59:12 143:23
  144:3
situationally
  144:4 176:16

situations
  105:3 191:17 205:4
six
  15:4 157:11 209:10
Sixth
  3:9
size
  153:16 186:6
sketch
  53:2
sketching
  53:2
skip
  16:20 75:12 76:17
  160:16
skipping
  104:24
skips
  160:4
slapping
  127:19
slide
  65:24 85:22 99:6
  217:21
slides
  28:23 104:12
slight
  82:7
slightly
  30:3
small
  45:18 186:3 221:19
snapshot
  50:6,7,8
SOC
  132:16,17,18 197:14
  197:19 198:13
softest
  202:2
solve
  123:15 124:1,15
somebody
  32:21 44:4 57:16
  59:7 63:18 106:11
  106:21 122:22
  131:22 136:16

149:21 153:10
169:5,8 176:9
234:21 250:1
somebody's
  142:22
someone's
  106:2
son
  8:2 38:24 178:25
  182:17 184:20
  185:19
son's
  63:25 148:24
soon
  202:3
sorry
  6:24 7:18 11:16 15:8
  15:16 19:22 21:19
  21:20 23:25 24:17
  26:3 31:1 36:14
  37:7 40:6 43:3
  45:16 46:5 48:17
  52:5,6 57:9,25
  61:15 72:16 76:3
  78:21,25 88:25 89:2
  98:20 99:24 101:13
  103:16 107:11
  109:12 111:15,24
  112:6,20 120:15
  122:4 129:8 141:24
  145:15,16 156:18
  162:8 165:5,20
  167:18 168:7,8,24
  179:14,16 182:18
  183:17,21 187:24
  194:5 200:17
  202:24 205:20
  216:5,14 217:12
  219:8 220:6 221:18
  224:10 227:7 229:7
  230:1 237:4 239:24
  240:2 250:21
  253:25 254:2 258:4
  259:25 260:4
  268:15
sort



9:8 12:1 82:8
234:20
**sound**
69:6
**sounded**
194:6
**sounds**
9:17 38:16 44:14
64:8,11,14 181:12
193:13 227:22
**source**
69:8 106:13 116:3
**sources**
113:13
**speak**
10:6 16:25 52:5
174:25 204:1 211:3
**speaking**
108:6 158:5 174:21
196:19,25 226:9
228:18 234:4 235:9
261:20 268:1
**Spear**
1:15
**special**
45:9 96:3 104:5
**specially**
45:10
**specific**
28:18 36:10,18,18,25
37:17 41:23 42:10
42:20 43:7 47:19
68:24 71:6 74:25
85:15,22 109:10
115:10 156:5
210:16 213:14
218:9 261:1
**specifically**
34:19 100:11 114:21
150:20 164:18
166:20 167:3
171:10 173:8,10
180:7 222:25 231:2
243:16 247:6
**specifics**
156:10

**speculate**
180:2
**speculation**
141:5 257:1
**spelled**
22:3
**spelling**
206:23
**spend**
214:15
**spent**
107:19
**spoke**
175:3 196:17 247:21
**spoken**
171:8,9
**sporting**
78:9
**Sports**
78:15
**spotted**
201:4
**spread**
234:6
**square**
65:4
**ss**
270:2
**SSI**
3:17 4:3,9,15,18,22
5:7,9,11 111:1
233:16 239:7 244:8
248:16 253:15
254:1,6 255:7,23
**St**
194:13
**stamped**
21:18 111:9
**stamping**
112:8
**stand**
130:25
**standard**
8:11 82:15 91:10
167:6 206:23
231:23

**standardize**
155:14
**standards**
152:16,19 153:4
155:10 158:9
160:13 167:14
173:20 263:1,6
**standpoint**
87:9 193:17
**stands**
25:18
**stapled**
21:19
**start**
26:10 65:19 95:3
97:7 161:22 206:7
259:25
**started**
64:15 238:1 258:3
**starting**
43:17 45:6 111:6
214:1 236:14 239:5
256:12
**starts**
245:25
**state**
6:17 35:4 53:22
162:13 192:14
214:19 231:5 237:3
270:1
**stated**
18:17 101:22 121:9
121:11 202:20
247:3
**statement**
37:5 38:7 48:11
57:17 60:12 64:20
99:10 101:18 115:8
124:7 126:20 140:3
140:24 141:3 142:2
144:25 147:22
150:23 156:6,10
158:12 164:5
182:23 184:15
187:15 188:17
215:4 227:19

251:24
**statements**
226:10
**states**
1:1 7:1 40:1 41:13
57:11,12 58:1,7
68:4 87:23 99:16
131:5 188:14 195:6
206:10 237:16
**stating**
61:23 191:24 236:4
**station**
118:16 196:5 230:3
**status**
162:6,9,11,11,12,12
162:17 164:19
**statutes**
207:19 216:4
**stay**
34:19
**staying**
37:24 72:19
**step**
37:8,12 50:12 128:6
128:15
**stepped**
195:12
**steps**
37:9 154:25
**stereotypes**
211:9 213:18 217:15
**sterile**
189:3,7 192:21
**STL**
196:4,5
**stomach**
236:9
**stop**
117:7 118:6,7,13,21
118:23 122:1,6,10
122:18,23 123:4
161:3 180:21
250:22
**stopped**
183:3,6,11 184:11
195:12


MAGNA
LEGAL SERVICES

78:25
**stops**
118:10
**stored**
88:3
**stories**
68:14
**story**
70:13
**strategy**
120:19,22 128:2,9
129:3 256:8
**Street**
1:15,20 2:6 6:11
**stricken**
260:24 261:2
**strike**
145:5 146:11 230:24
261:3,5
**strikes**
144:21
**striking**
151:5 169:4,8 171:15
195:11
**string**
5:15
**struck**
146:24 147:10,16
150:10,17,24
171:12 175:18
176:18 177:23
205:13
**Stuart**
1:25 6:13
**Studies**
78:7
**stupid**
234:20
**sub-bullet**
38:4 254:15,21
**subject**
16:15 18:7 33:5
34:12 76:12 96:19
99:4 181:4 183:12
183:23 206:6 225:9
226:6 227:18 254:1

**subjected**
238:23
**subjective**
107:11
**subjects**
16:6 115:15 181:23
191:15
**submit**
75:16 215:4
**subsequent**
46:13 215:3
**subtitle**
144:7
**subtle**
82:8 227:24
**successful**
122:9 165:16,25
**succinct**
256:19
**sudden**
139:1
**suffer**
103:24
**suggest**
75:11
**suggested**
201:22 211:19
**suit**
53:9
**suitable**
133:1
**Suite**
1:16,21 2:6
**summaries**
4:4 186:21
**summarize**
122:11
**summarized**
212:3
**summarizing**
207:5 208:10
**summary**
188:5
**Superbowl**
78:10
**supervisor**

174:3,11 201:12
225:3,21 251:14
**supervisor/CRO**
201:6
**supervisor/Denver**
201:18
**support**
187:12 225:25
**supposed**
35:5 36:10 44:5 64:5
105:22 165:2
**sure**
9:14,19 12:10 15:10
17:20,21 18:21
20:10,20 22:11,23
24:8 31:3 35:3 37:9
40:8 55:4 56:1 69:3
85:9 95:8 96:7,21
98:22 106:6,18
109:14 112:22
125:4 129:10 133:9
134:11 138:23,24
139:17 140:11
141:8 145:17
152:11 154:6 161:5
169:8 179:25
182:20 193:24
194:7 201:14
206:25 229:7 231:7
237:6 249:22 251:4
263:21 268:19
**surnames**
185:3
**surprised**
140:23
**surrounding**
78:9 164:18 173:8
**suspect**
40:2 43:10 57:16
71:16 75:6 77:9
163:5 193:6
**suspected**
38:6 40:19 41:10
44:1 58:19 59:8
186:25 201:4
202:21 203:1 205:5

**suspects**
34:23 35:6 40:12
**suspended**
256:17
**suspicion**
56:21,21 57:13 190:3
204:5
**suspicions**
60:9,19 74:21 75:17
**suspicions?'**
49:13
**suspicious**
48:18,23 49:16,22
51:2,9,14,18 52:3
52:15,22 53:4,10,14
53:20 54:1,2,3,7,19
55:7 56:14,20 57:7
57:11 58:1,8,20
68:5 210:18 256:13
256:18
**suspicious'**
49:12
**swear**
6:19
**swearing**
195:11
**switch**
35:21 93:19 94:9,25
**switches**
94:13
**swore**
8:14
**sworn**
7:11 215:4 270:7
**symptoms**
149:23
**system**
89:8,15 105:21
106:25 109:10
132:18,22 180:21
197:13,21 198:12
198:14 246:9
247:24 251:5,23
**systems**
111:25


MAGNA
LEGAL SERVICES

**T**
T
77:24
T-O-N-I
195:12
T-R-I-S-T-A
206:22
Tail
249:7
tails
99:18 100:4
take
9:10,22,23 10:1,3,6
    10:10 29:4,8 40:19
    49:15 50:11 73:12
    79:2 85:11 95:2
    112:21 125:2,2
    137:3 151:23 155:1
    156:1,12 160:21
    163:12 164:1
    181:22 187:2
    196:11 218:17,18
    219:23 260:15
take-off
90:24 189:4,5
taken
2:5 6:11 8:8 16:16
    50:6,7 79:9 121:17
    125:9 212:2 220:4
    248:22 268:24
    270:10
takes
50:8
talk
40:1,15 45:20 114:14
    264:23
talked
119:24 126:13
    153:11 157:2
    181:24 193:5 213:6
    244:1 255:10
talking
9:12 12:14 15:10
    30:18 51:18,23
    88:17 94:8 95:3

158:4 163:9 186:24
    192:18 213:6,10
    217:23 218:23
talks
243:25
targeted
37:14
tatoo
53:25
taught
107:24 108:22 121:1
    153:21
taxied
110:11
teach
57:6
teaches
54:23 69:9
teaching
55:11,14
team
14:16 222:19 266:2
    267:3,7,11,16,19,21
Team'
265:15
Technician
1:25
techniques
121:24 123:8,10
    124:23 211:14,17
    211:19 217:4
tell
36:9 61:6 80:17
    95:14 98:8 103:15
    114:17 115:9
    129:18 147:20
    156:6 180:2 185:11
    186:1 199:3 212:12
    228:16 232:5
    247:23 257:12
telling
157:11 172:19 173:1
tells
85:16 135:11,17
    154:15 156:8
    249:12

templates
261:25 262:4,6,13,14
    262:18,22,23 263:2
tends
127:7
tenth
186:11
term
13:16 86:1 189:7
termination
168:16 169:14
    173:23
terminology
108:4 197:5
terms
93:21 222:1 267:15
terrorists
234:19
test
31:15 32:4 158:25
tested
31:12
testified
7:12 47:21 61:16,18
    62:19,20,20 74:5,14
    121:25 134:12
    149:12 154:6
    156:11 167:25
    172:15 218:10
    221:12 224:23
    226:12
testify
16:5,17 149:16 150:7
    152:12 177:6
    179:19 183:13,25
    270:8
testifying
44:1 62:2,5,9 86:24
    87:8,8 150:3
testimonies
177:25
testimony
82:21 87:3 101:2
    122:7,11 132:11
    140:6 143:15
    148:19 149:10,13

149:25 151:25
    158:1 160:23
    193:11 217:19
    221:16,22
testing
162:7
tests
31:21
text
43:10 49:10 51:22
    56:18 66:1 76:17
    81:10 99:9 106:23
    186:7 244:15 262:3
thank
6:20 7:4,5,13,17,21
    7:23 45:2 55:25
    79:15 94:4 95:16,18
    97:21 99:14 115:20
    116:20 123:15
    124:3,17 126:5
    127:9 142:17
    159:24 182:3 194:9
    194:13 201:10,24
    203:23 220:9
    224:15,18 227:10
    233:7 237:23
    240:15 242:19
    245:20 248:6
    249:18 250:16
    252:5 253:10
    261:18 268:6,7
thanked
202:4
Thankfully
196:20
Thanks
113:10 226:9
they'd
156:2
thigh
189:16,16,18 190:19
    191:2 192:10,24,25
    193:1
thing
65:17,18 116:13
    126:14 198:21



247:25 267:17
**things**
11:25 12:1 26:15
  28:21,23 29:7 58:17
  72:16,17 83:24 84:3
  85:17 109:15 138:8
  140:13,14 142:20
  152:21 187:8,12
  232:21 239:21
  260:20
**think**
13:15 14:1 15:1 17:2
  24:10 29:10,14 30:5
  32:6 44:13 51:8,13
  51:22 52:14 54:10
  57:3 59:11 66:24
  71:5 80:6 83:14
  85:22 87:5 89:7
  92:12 102:6 106:9
  107:3 108:16
  109:18 110:4,10
  116:7,15 117:15
  118:3 122:13 124:7
  124:20 133:6 134:4
  140:16 145:6 146:2
  148:15 151:3 152:1
  152:4,20 155:8
  156:22 158:11,17
  161:20 164:10
  170:4,6,17 182:1
  197:4 199:21 200:2
  203:12 213:4
  216:16 217:20,20
  217:22 222:8
  226:17 230:7 232:7
  238:2 243:1,23
  251:7 257:4 263:4
  264:8 265:7 266:12
  266:25
**thinking**
84:24 85:4 152:2,5,7
  152:13,15 153:5
  155:3 213:22
  262:11
**third**
22:2 41:22 68:12

77:17 78:11 113:3
  114:10 116:23
  119:25 130:20
  167:18,20 168:22
  168:24,24 186:11
  196:1 211:5 242:6
**third-party**
229:17
**thought**
42:21 61:9 111:22
  112:7 189:21
  191:23 196:2 254:2
**thoughts**
264:24
**thousand**
86:25
**thousands**
231:17
**threat**
4:2 5:11 114:3
  117:22 120:16,23
  121:2,3,15,16
  127:13 128:2 129:4
  129:11,11,20 132:5
  133:19 135:3,7
  136:15 137:9,16
  138:12 139:12
  140:14 143:3,7,19
  144:12,23 146:12
  146:20 147:24
  209:21 211:1 212:8
  217:24,24 256:6,7
  256:12,12,20,24
**threatening**
128:10,15 256:13,18
**three**
48:5 61:10 106:3
  160:11 214:16,21
  214:23
**three-page**
160:2
**ticket**
102:9,15 103:3
  196:19 199:3,16
  217:13
**tickets**

188:4,9,14,16,21
  196:7 197:24 198:5
  198:11 199:7,24
**tie**
53:9
**time**
6:10 7:20 9:12 10:2,3
  15:9 29:14 31:2
  34:20 35:2 40:7
  44:18,23 47:14
  50:12,14 55:2 79:6
  79:11 85:11 89:1,6
  89:15 95:10 97:12
  97:17 98:21 101:14
  103:12 113:15
  114:14 125:6 126:2
  129:9 135:15 156:3
  159:15,22 170:5
  175:17 176:10
  179:9 181:25
  196:12 198:20
  201:11 208:5
  209:13 213:21
  220:1,6 222:19
  225:2 226:22
  229:24 230:1 231:5
  235:4,13,14 237:5
  239:18 240:21,21
  244:19 250:22
  252:10 257:15
  262:24 263:20
  268:13,20,25
  269:11 270:10
**timeline**
38:22 39:8,18 73:3,5
  73:7 214:17
**times**
189:16 192:25
  254:17 264:19
**title**
43:9 101:2 104:4
  116:24 207:3 209:4
  233:17 267:1
**titled**
68:5 80:14 85:17
  144:6 160:9 207:9

208:17,24 244:9
  255:8
**today**
6:9,13,14 8:5 10:7
  13:2,9 16:5,13 20:2
  20:7 30:10,15 31:19
  34:5 42:9 46:14
  60:20 61:7 66:25
  72:18 90:6 101:8,15
  119:17 126:16
  140:5 166:10 177:6
  183:13,25 217:11
  228:7
**today's**
16:22 17:9 269:11
**toilet**
52:21
**told**
42:23 43:6,6 74:7
  136:7,16 137:18
  138:12 172:7 204:2
  262:17
**tolerance**
231:20,25 232:17
**tolerated**
162:14 173:21
**tomorrow**
269:9
**Toni**
195:11
**tool**
105:25 117:20
  122:15,15 123:12
  123:16 217:2
**toolbox**
122:15
**tools**
117:24 122:1,2,8,9
  123:2,6,16 153:14
**top**
5:15 23:18 24:12
  45:24 56:19 64:24
  76:17 101:2 104:4
  116:21 127:11
  142:23,25 160:9
  209:4 232:18



233:11,23 237:16
267:7
topic
180:15 260:23 261:1
topics
94:25
totality
209:13 221:24 224:3
touch
54:24 55:12,15
touching
42:13 43:7,17 60:22
61:8,17 62:10,22,25
63:3,22 64:10,11,15
69:12,15 127:20
180:8,9,9 257:19
Tournaments
78:13
town
176:9
track
7:19
tracked
89:13 266:13
traffic
129:25 130:1,4
135:22,25 137:9,16
138:13 141:14
176:8 256:17
trafficker
68:17 192:7 201:17
trafficking
3:19 33:5 34:12,16
34:24 35:7 38:6
40:2,13,20 41:11,25
42:15,20,24,25 43:1
43:10,11,13,16 44:1
44:4 64:25 65:19
66:2,22 67:9,22
69:10 71:17 75:2
77:9 79:20 180:17
187:1 189:15 190:4
190:7,16,23 191:4
191:10,16 192:24
195:19 196:8
197:25 199:25

201:4 202:21 203:1
204:6,12 205:2,5,6
258:15 259:9,18,20
trailing
9:8
train
56:13 262:21
trained
229:18
trainee
31:11 58:24
trainees
30:23
training
3:13,17 4:16 23:13
25:7 26:1,6,7,11,12
27:8 28:7,9,17,20
29:2 30:23 33:4
34:11,16 46:1,9
47:4,10 48:11 50:13
56:13,19 57:3,10,15
57:23 59:18,20
60:12 67:1 71:13
75:24 84:7 85:15
96:3 97:24 101:4,17
104:5,10 116:4,6,10
116:12,18 143:11
145:18 155:9 157:3
180:16 181:4 211:7
212:20 213:1,5,8,14
214:16,20 215:1,7
215:14 216:1,20,23
217:1,12 219:10
220:22 228:3
229:22 231:2,11
243:1,8,16,21
245:17 262:21
263:1 264:7,25
266:19
trains
57:14
Trans
208:2
transcript
270:13
transgender

162:6
transitioning
27:22
transmission
97:4
transmitting
142:6
transport
35:19
Transportation
126:22 206:11 208:2
208:12 212:15
214:15 215:22
220:19 223:10,21
227:3,15
Transportation's
207:7 215:13 222:17
travel
4:7 68:20 70:21
100:14 101:24
207:11 208:1,5
216:8,21
travelers
207:23 210:2 217:6
traveling
37:19 41:11 71:20,23
72:17 73:12 185:20
194:18,23 196:18
196:23 200:8 204:3
treated
86:10
treating
161:2,25
tremendous
39:17
Trenton
225:5
trick
24:2
tried
175:13
tries
165:9,14
trigger
222:15
tripping

127:19
Trista
206:22 220:12
222:19,22 228:2
262:8 264:23
Trot
249:9
true
48:4,7 101:9 149:25
270:13
truly
143:3
truth
270:8
truthful
8:19
try
77:13 83:19 84:12
124:14 148:2
155:21 188:2
249:21 265:25
trying
11:8,10 24:1 54:8,9
54:10 84:16 115:16
turn
18:1 24:15,20 58:6
93:14,17,18 94:17
turned
159:7 198:7
turns
202:3
twice
49:15,23
twist
183:21
twisting
183:16
two
9:11 13:2 14:2 21:8
30:5 64:17,17 96:13
111:25 119:10
120:9,12 125:1
143:4,5,15 156:14
157:4,13 159:6
160:17 179:1
191:15 194:17,17



195:9 197:23 198:8
206:23 215:3
219:22 222:2 235:1
246:2
**two-page**
80:13 233:3 239:5
**Tyler**
4:16 243:2
**type**
16:1 84:7 197:21
**typed**
126:25
**types**
49:12 262:22
**typewritten**
270:12
**typically**
13:5 82:4,8,14 83:18
83:19 141:23,24
259:6
**typing**
248:1

**U**

**U**
105:11 107:14
**Uh-huh**
84:19 94:7 186:20
203:24
**uncomfortable**
63:17 105:12,13
106:9 107:1,8 108:3
108:11,21 109:5
110:21 153:12
188:1 189:23
**under-**
58:22 59:6,14
**underlined**
76:24 116:25 144:7
209:5 216:19,22
233:25 234:9
**underneath**
118:4
**underreact**
58:10 59:16
**underreacting**

59:4
**understand**
8:22 11:10 16:4 19:7
20:21 84:16,21
89:17 91:17 106:24
117:2 126:9 127:25
166:4 177:11
182:21 186:15
207:17 267:7
**understanding**
42:12 110:3 129:17
183:6,8 216:19
228:1 258:24
264:16
**understands**
31:11 118:9
**understood**
24:7 30:24 81:12
193:24 243:24
**unfair**
17:17
**unfortunate**
196:22
**unfortunately**
9:8 95:23 154:24
**unhighlighted**
225:14
**uniformed**
68:11 69:18 162:11
**uniforms**
229:15
**unique**
99:19,25 100:8
**unit**
166:10,18,22
**United**
1:1 7:1 68:4 131:5
206:10
**unknown**
92:17
**unlawful**
162:14 210:22
216:24 217:5
**unsupervised**
194:19
**unsure**

68:12 70:3
**untruthfully**
150:3
**unusual**
58:8,21 59:19 77:19
193:6 197:6 213:16
217:16
**unwelcome**
86:1
**update**
219:11
**updated**
3:17 27:20 46:1,11
**USC**
207:17,22
**use**
9:20 47:7,8 93:13
107:7 122:10,14
123:2 124:23 140:1
144:17 145:24
147:5 152:2,13
155:2 163:2 165:2
180:20 262:18
267:15
**uses**
83:7 262:1
**utilize**
30:6 66:23 85:3 89:8
106:1,4,4 107:13
114:20 117:21,23
123:12,17 146:1
153:14 189:7 211:7
**utilized**
17:22 18:22 19:2
27:21 58:3 122:2
145:25 231:23
262:23

**V**

**v**
1:10
**vacation**
37:20 72:18 156:3
185:20
**valid**
147:21

**validating**
211:16
**Valley**
38:14 39:7 70:7
185:20
**value**
99:19 100:8 126:17
175:24 176:11
**variable**
29:10,14
**variances**
87:4
**varies**
152:20
**Vegas**
20:23 170:3,14 257:9
**vendor**
229:17
**verbally**
9:20 192:6
**Verbatim**
100:23
**verification**
243:24
**verify**
31:20 62:14 63:9
111:14 187:3
219:14 256:16
**version**
252:23
**versus**
6:7 115:19
**veteran**
162:11
**VFR**
55:19,21 56:2
**vicinity**
175:17
**victim**
34:23 35:7 38:6 40:2
40:12 41:10 43:11
68:17 71:17 77:14
**video**
1:25 3:10 67:15,16
67:19
**Video-Recorded**



| | | | |
|---|---|---|---|
| 1:4 2:2 | 64:13 189:17 193:1 | **watch** | 222:3,11 226:9 |
| **videographer** | **want** | 159:2 193:16 | **weekly** |
| 6:3,13,24 7:13,22 | 10:18 12:10 17:15 | **way** | 264:11 |
| 44:14,18,23 79:6,11 | 20:10,20 33:10 50:5 | 9:2 22:24 27:1,7,19 | **weeks** |
| 95:14,16 97:5,6,12 | 79:2 83:12,23 84:12 | 30:12 31:20 36:6 | 222:13 |
| 97:17 125:6 126:2 | 85:1 95:7 106:2 | 67:4 69:6 82:18 | **weight** |
| 159:15,21 183:16 | 108:8 112:22 | 84:25 89:3 93:15 | 234:10 |
| 183:20 220:1,5 | 116:22 123:7 133:3 | 98:22 107:4 111:16 | **welcomed** |
| 268:17,20,25 | 133:8,15 134:8,16 | 113:5 155:14 159:5 | 99:17 |
| 269:10 | 135:4 139:13 140:8 | 175:22 182:9 186:2 | **welcomes** |
| **view** | 140:16 141:12 | 191:1,6,8 192:5 | 99:20 |
| 224:1 | 143:20 151:22 | 200:1 218:11 | **went** |
| **views** | 187:2 198:9 201:17 | 228:16 235:18 | 64:3 188:12 |
| 179:17 | 213:23 219:20 | 246:13,19 257:2 | **weren't** |
| **violated** | 220:11 222:7 229:7 | **ways** | 177:5 226:1 |
| 231:3,12 | 234:4,5 261:2 | 155:20 | **whatsoever** |
| **violates** | 268:17 | **we'll** | 103:8,9 171:16 |
| 174:2 | **wanted** | 33:11 34:17,18,18 | **whereabouts** |
| **violating** | 98:5 122:23 126:13 | 45:20 66:1 103:3 | 262:9 |
| 228:9 229:1 230:17 | 138:14 194:7,25 | 121:11 135:3 156:1 | **whereof** |
| 230:21 238:23 | 201:14 219:14 | 184:5 217:13 259:6 | 270:18 |
| 260:18 | **wants** | **we're** | **whichever** |
| **violations** | 10:7 128:25 132:13 | 10:1 12:14 20:10 | 88:19 |
| 173:20,20 | 132:22 156:1 | 30:18 42:19 51:17 | **white** |
| **violence** | **warrant** | 51:22 84:22 97:22 | 83:20 99:9 100:7 |
| 169:1,6 | 146:2 | 111:24 112:23 | 104:25 117:16 |
| **visiting** | **warrants** | 126:8 158:7 167:4 | 153:22,22 154:1,1 |
| 37:20 72:18 | 145:6 | 199:23 228:19 | 154:16,17 155:4,5 |
| **visual** | **Warren** | 268:12 | 156:8,9 217:25 |
| 55:22 56:2,8 | 4:23 22:4 62:4,6,17 | **we've** | **window** |
| **Volume** | 63:5,8,24 64:13,16 | 24:21 25:5 52:20 | 139:1 |
| 1:6 2:4 3:2 4:14,18 | 150:12 151:5 | 53:1 80:7 113:15 | **wise** |
| 114:11,22,23 115:1 | 169:18 170:7,18 | 116:4 171:8 193:21 | 39:9 73:5,8,8 214:17 |
| 115:2,3,9,14 239:9 | 171:12 172:7,15,19 | 213:6 219:21 | 222:7 |
| 244:10 | 172:25 174:13,21 | 232:21 241:23 | **witness** |
| **Volumes** | 175:7,18,25 176:19 | 257:4 | 6:19 7:8 148:18 |
| 114:25 115:1 | 176:20,24 177:8,22 | **wear** | 174:1 192:11 |
| | 178:4,7,11,17 | 229:14 | 270:18 |
| **W** | 179:18 248:22 | **wearing** | **witnessed** |
| **W-A-R-R-E-N** | 250:23 251:15 | 53:14 68:19 70:19 | 60:22 61:7,10,17 |
| 22:4 | **Washington** | **weather** | 195:15 |
| **wait** | 207:9 | 68:20 70:21 197:17 | **woman** |
| 9:3 10:9 13:12 138:7 | **wasn't** | 201:25 | 218:4 |
| **waive** | 150:4 168:6 169:17 | **Wednesday** | **women** |
| 268:9 | 193:16 195:17 | 250:24 | 71:19 |
| **walked** | 203:9 | **week** | **wonderful** |


MAGNA
LEGAL SERVICES

7:21
**word**
8:24 83:7,13 100:1
  105:7,12,17 109:25
  110:7 128:19 260:8
  261:4
**words**
9:20 84:16 86:15,16
  109:15 209:17
**work**
11:11,20 15:5,7,14
  87:1 130:15 131:17
  153:9 229:20
**worked**
224:24 232:11
**working**
21:4 222:22 265:14
  265:16
**works**
92:19 131:22
**world**
11:17 78:11 154:21
**worth**
16:21 17:12 18:8,17
  126:15,17 187:21
**wouldn't**
35:10 46:14 134:25
  141:12 142:7
  176:11 215:11
**write**
9:11 96:8
**write-up**
202:21,25 205:3
**write-ups**
187:13
**writer**
191:21 199:23
  203:13
**writing**
65:5
**written**
182:5,21 217:10
  248:21
**wrong**
26:4 30:3 111:21
  112:20 149:15

150:5 207:4
**wrongdoing**
174:24
**wrongful**
201:15
**wrote**
111:23 112:6

---

**X**

**X**
3:1 93:24

---

**Y**

**yeah**
15:10 24:1,10 25:12
  28:18 31:9 53:6
  55:23 57:15 79:4
  82:25 85:12 89:2
  92:1 96:7,10,25
  102:6 110:4,16
  111:15,24 112:24
  113:4 117:18
  120:22 134:25
  138:18,25 141:16
  145:3 157:25 158:3
  162:22 167:16
  169:12 177:3
  178:11 184:12
  185:4 194:8 200:13
  207:2 213:11 214:5
  218:8,25 219:3,9,13
  219:23,25 220:15
  223:23 224:11
  227:7,11 230:10
  235:11 240:7,14
  246:20 261:23
  268:12
**year**
14:2 15:4 66:18
  227:9,10,12
**yearly**
47:13
**years**
15:4 30:19 107:20
  169:25 214:16,23
  215:3 221:8,9

222:13 224:24
  232:11,14
**Yep**
225:15 226:14 231:9
**young**
71:19 188:2 194:18
  194:20 195:9
  197:23 198:8
  201:21 202:22
  203:2 204:4

---

**Z**

**zero**
231:20,25 232:17
**Zimmermann**
224:8,19,23 225:8
  226:8 227:13

---

**0**

**0**
247:11
**000754**
208:16
**000755**
208:23
**000760**
209:3
**0105**
250:21
**0122**
33:17
**0123**
80:13
**0124**
80:14
**0125**
79:19
**019**
66:18
**02-**
96:11
**0264**
96:1,12
**0265**
104:3
**0294**

**245:25**
**0295**
249:5
**0297**
246:1
**03**
233:10
**03/28/2019**
4:24 5:4
**04/19/17**
4:18
**07/27/17**
5:5
**0719**
186:19
**0720**
112:2
**07204**
111:19,22
**0721**
112:14 121:18
**0722**
112:18 113:3,6
  115:21
**0723**
113:7
**0724**
111:6 113:8 142:24
  142:25
**0725**
113:8 116:10 142:19
  143:1
**0726**
113:8 116:14
**0727**
111:7 113:8
**0728**
45:7
**0729**
45:18 48:17 58:6
**0731**
64:23
**0733**
71:8
**0734**
76:16



**0735**
45:7,14
**0897**
236:15
**09.13.2019**
96:4 98:9 104:6
**09/01/17**
4:8,21 5:9,11
**0912**
236:15

---
**1**

**1**
3:9 4:14,18 6:4 16:9
16:10,11 17:25 18:2
79:24 91:19 92:3,3
114:11,22 115:1,2
115:14 150:22
180:15 181:21,21
183:24 204:4,23,23
207:21 209:10
233:13 239:9
244:10 248:14
250:21 256:2,13,24
264:9
**1-17**
4:18
**1.5**
214:15,20
**1/10**
264:9
**1:00**
95:12,13,15 125:1
**10**
4:4 5:15 185:24
186:1 224:8 258:17
**10:02**
2:5 6:10
**10:52**
44:18
**10:55**
44:23
**100**
32:12,18 261:10
**1002**
253:19

**1003**
233:4
**1004**
233:8
**1005**
255:21
**1009**
255:21
**103**
3:22
**1077**
248:15
**1078**
239:5
**1079**
239:6
**1087**
244:9
**10Q**
17:2 18:15 19:3 20:6
126:24 127:1,6
**11**
4:5,20 206:2,4,7
**11-year-old**
188:15
**11/12/18**
4:15
**11/12/2018**
239:9
**11/21/2019**
3:17 46:1 47:19
**11:39**
79:6
**11:56**
79:11
**1100**
1:16
**111**
4:2
**12**
4:8 186:13 215:2
232:25 233:1,3
**12/13/2017**
5:15
**12/21/16**
5:7

**12:16**
95:1
**12:20**
97:13
**12:23**
97:17
**12:59**
125:6
**121.5**
130:22 139:19
140:22 141:12,25
142:6,10
**13**
4:10 18:1 81:21
87:25 101:9,17
103:2 104:14 204:4
204:22,23 208:17
218:25 227:7,8,11
227:12 236:6,7,13
**13th**
98:11 186:12
**14**
4:11 159:20 160:2
167:5 215:1 219:5
**1428**
160:3
**1429**
160:3
**1431**
160:4
**1442**
237:21 238:3
**1452**
237:21
**15**
4:13 81:18 237:12,13
237:15
**15.35**
3:22
**150-ish**
127:2
**151**
1:20
**159**
4:11
**16**

3:9 4:14 66:17 239:1
239:2,4 245:17
**1601**
66:19
**16019**
66:4,7 67:1
**16th**
2:6 6:11
**17**
4:16 175:17 194:21
242:21,22,24
245:16 250:24
**18**
4:17 24:12 66:20
244:4,5,7
**18:34**
4:20
**180-seat**
249:13
**185**
4:4
**186-seat**
249:16
**19**
4:19 47:12 244:10
245:22,23,25 249:3

---
**2**

**2**
3:13 4:2 21:13,14,16
22:13 23:1,12 25:6
31:15 33:3 44:25
47:2,3,8 67:18 79:8
90:23,24 91:2,3,6,9
92:3,11,13 93:5,21
94:2 114:3,23 115:1
115:3,9 120:16
121:15,16 126:20
127:13,13 128:2
129:11,20 132:5
133:19 137:9,17
138:12 139:12
140:14 183:12,23
189:19 209:24
**2,000**
152:22,24 154:7,8



**2,100**
14:8
**2:08**
126:2
**2:19-CV-01322-KJ...**
1:3 7:3
**2:47**
159:15
**2:51**
159:22
**20**
4:21 48:17 98:11
  248:8,9,10,11,13
**20,000**
98:11
**20.05**
5:7 253:16
**20.15**
4:8 5:9 233:17 255:9
**20.20**
5:11 256:5
**20.50**
3:19 79:20
**2000**
21:20
**2004**
214:16,22 215:12
**2007**
214:24
**2009**
114:8
**201**
1:15 21:20
**2014**
113:25 221:9 263:24
**2016**
25:16 30:19 66:18
  103:11,16 187:24
  193:17 253:18
  258:4
**2017**
15:3 114:11 115:23
  160:10 194:15
  208:17 215:14
  220:17 227:8,11
  233:13 237:18

**244**:11 248:15
  252:20 256:3
**2018**
24:12 47:12 201:2
  203:20
**2019**
3:15 4:20 20:24
  23:15,21 24:22 25:1
  25:5 30:11 46:11,13
  46:22 47:4,11,16,16
  79:24 81:18 98:12
  101:10,18 103:2
  104:14 159:3,4
  218:25 221:8 243:1
  243:5 250:24
  252:24 263:24
**20190328**
4:19
**2021**
251:13
**2023**
1:6 2:5 3:12 6:9 17:3
  17:4 269:15 270:19
**204**
21:18,20 47:8
**206**
4:5
**2067**
4:19,24 5:3 20:8,12
  20:20 21:4,9,9,23
  23:14,19,22 25:9
  38:10 46:13,17,20
  78:18 80:3 81:21
  88:1,2,10,11 98:15
  98:19,25 103:16
  118:21 137:4,8,17
  137:19 148:7,12
  150:11 151:6
  157:12 171:13
  175:5 178:10 182:4
  184:2,5 198:20
  199:1 218:13
  219:17 221:8
  243:14,17,21 246:3
  246:24 248:24
  257:10 258:4 265:5

**265**:5
**21**
3:13 4:23 47:3,16
  250:17,18,20 252:6
  253:18
**2100**
14:8
**216**
2:6 6:11
**21st**
46:11,13 187:24
**22**
5:2 23:21 47:11,15
  252:6,8,9
**224**
5:15
**23**
5:5 18:1,6 19:12,13
  20:4 252:15,16,18
**230**
249:9
**233**
4:8
**236**
4:10
**237**
4:13
**239**
4:14
**24**
5:6 75:16 253:12,13
  253:14 257:16
**242**
4:16
**244**
4:17
**245**
4:19
**248**
4:21
**25**
1:6 2:5 3:15 5:8
  255:4,5,7,17 269:15
**25-26**
3:12
**250**

**4**:23
**2500**
1:21
**252**
5:2,5
**253**
5:6
**255**
5:8,10
**25th**
6:9
**26**
5:10 25:16 255:17,18
  255:20
**2607**
137:19
**267**
150:11
**26th**
25:25
**27**
194:19,24 252:20
**28**
20:24 23:15 221:8
  252:24 263:24,24
**29th**
270:19

**3**

**3**
3:14 33:11,12,14,16
  33:18,19 35:4 37:9
  40:4,9,19 41:9,9
  43:8,9 75:21 79:13
  91:22,23 97:14
  128:6,9,11 189:19
  204:3 206:6 210:7
**3/15/2019**
3:20
**3/20/17**
4:12
**30**
88:18 195:7 250:12
**30-row**
248:20 249:24
  250:12



**30(b)(6)**
1:4 2:2 3:2,12 6:4
18:7
**300**
222:8 262:10,13
**31**
248:22 250:1
**312.422.5717**
1:22
**318**
27:18
**319**
27:14,17,18,20,24
28:2,10,17
**319s**
27:21
**320**
27:16,17,18 28:3
**321**
27:19
**33**
3:14
**35**
265:8
**3500**
30:17
**36**
4:12 257:16
**365**
89:9,17,18,19
**37**
16:17,18 263:21
265:7
**38**
16:15

**—— 4 ——**
**4**
3:16 44:22 45:5 48:8
50:12,20 55:5 64:4
97:19 112:6 125:8
155:10 158:9
160:13 210:15
214:19 219:7,9
249:7
**4-**

**200:15 221:13,23**
**4,000**
30:15,17
**4/17/2019**
4:23 5:2
**4:07**
220:1
**4:23**
220:6
**4:24**
220:7
**40**
32:21,25 162:9
**40-year-old**
188:14
**40127(a)**
207:18
**41310(a)**
207:22
**41702**
207:22
**41712**
207:22
**434.531.9569**
1:17
**44**
3:16
**49**
207:17,22
**4th**
14:1

**—— 5 ——**
**5**
3:18 79:10,18 126:4
159:17 210:25
**5,000**
200:16 221:13,23
**5:28**
268:21
**5:35**
268:25
**5:36**
269:11,14
**50.50.1**
118:5

**55**
67:18

**—— 6 ——**
**6**
3:20 80:9,10,12
87:11 159:23
211:12 220:3
**60**
5:7
**600**
2:6
**60606**
1:21
**61**
4:8,21 5:9,11
**63**
96:3 98:9,10 104:6
**6393**
247:17

**—— 7 ——**
**7**
3:5,21 95:19,20,22
97:23,23 98:23 99:5
103:11,17 104:17
204:4,22,23 218:23
218:24 220:7
268:22
**70**
204:3
**700**
199:11
**72453**
249:24 250:7
**72454**
249:24 250:7
**731**
64:23
**732**
67:25
**748**
216:5
**765**
214:1
**79**

**3:18**

**—— 8 ——**
**8**
3:22 103:21,22,24
269:2,12
**8-18**
4:15
**80**
3:20
**800-837-9023**
174:5
**82**
247:14

**—— 9 ——**
**9**
4:2 111:1,3,5 119:10
127:10 129:21
**9-1/2**
232:13,14
**94105**
1:16
**95**
3:21 32:18


MAGNA
LEGAL SERVICES

Page 271

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
Case No. 2:19-CV-01322-KJD-DJA

--------------------------------------------------

VIDEO-RECORDED 30(B)(6) DEPOSITION OF FRONTIER
AIRLINES, INC.,
AS GIVEN BY: SHAWN CHRISTENSEN
VOLUME II
September 26, 2023

--------------------------------------------------

PETER DELVECCHIA, et al.,
Plaintiffs,
v.
FRONTIER AIRLINES, INC., et al.,
Defendants.

--------------------------------------------------

APPEARANCES:

    PARK AVENUE LAW, LLC
        By John D. McKay, Esq.
            201 Spear Street
            Suite 1100
            San Francisco, California 94105
            434.531.9569
            Johndmckayatty@gmail.com
            Appearing on behalf of Plaintiffs
    HINSHAW & CULBERTSON, LLP
        By Eric Cunningham, Esq.
            Richard C. Harris, Esq.
            151 N. Franklin Street
            Suite 2500
            Chicago, Illinois 60606
            312.422.5717
            ecunningham@hinshawlaw.com
            Rharris@hinshawlaw.com
            Appearing on behalf of Defendants

Also Present:
            Roger Stuart, Video Technician



Page 272

1          Pursuant to Notice and the Federal Rules of

2   Civil Procedure, the Continued Video-Recorded

3   30(b)(6) Deposition of FRONTIER AIRLINES, LLC, as

4   given by SHAWN CHRISTENSEN, called by Plaintiffs, was

5   taken on Tuesday, September 26, 2023, commencing at

6   10:39 a.m., at 216 16th Street, Suite 600, Denver,

7   Colorado, before Pamela J. Hansen, Registered Merit

8   Reporter and Certified Realtime Reporter.

9

                        *  *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 273

```
 1                         I N D E X

 2    30(B)(6) DEPOSITION OF FRONTIER AIRLINES,

      INC., AS GIVEN BY SHAWN CHRISTENSEN, VOLUME II

 3

 4

      EXAMINATION                                    PAGE

 5

      MR. CUNNINGHAM                                  274

 6

      MR. MCKAY                                       298

 7

 8

 9                    INDEX OF EXHIBITS

10            (None)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



Page 274

```
 1                    *  *  *  *  *  *  *
 2                P R O C E E D I N G S
 3            THE VIDEOGRAPHER:  The time now is 10:39
 4  a.m.  Today's date is September 26, 2023.  This
 5  begins the video-recorded deposition given by Shawn
 6  Christensen.  This is going to be Volume 2.
 7            THE REPORTER:  And you are still under
 8  oath from yesterday.
 9            THE DEPONENT:  Yes, ma'am.  Thank you.
10                      EXAMINATION
11  BY MR. CUNNINGHAM:
12       Q    Okay.  Good morning, Mr. Christensen.
13       A    Good morning.
14       Q    We are carrying on from the first portion
15  of your deposition that began yesterday.  And you are
16  here as a Rule 30(b)(6) witness on behalf of Frontier
17  Airlines; is that correct?
18       A    Correct.
19       Q    Sir, what did you do to prepare for this
20  deposition?
21       A    I reviewed a tremendous amount of manuals.
22  I spoke with multiple individuals from multiple
23  departments.  Again, spoke with our attorneys.  I did
24  quite a bit.
25       Q    And what did Frontier do to help you
```



MAGNA
LEGAL SERVICES

Page 275

1  prepare for this deposition?

2      A      Frontier was -- was really good.  Once we

3  got the dates set, I spoke with my boss, just to kind

4  of let him know what was going on, the vice president

5  of flight operations.  Informed our vice president of

6  labor relations that we typically work with.

7          And I was able to -- my deputy, so to

8  speak, is the chief pilot, the new chief pilot.  So

9  he was willing and accepted a lot of the

10 responsibilities that I was working on at the time.

11         So they gave me a lot of time to do what I

12 needed to prepare, to communicate with those

13 individuals, and if I just needed time off to go and

14 really dig in as much as I could to get the answers

15 that I needed.

16     Q      The deposition notice contains 37 topics;

17 is that correct?

18     A      37, 39, yes, sir.

19     Q      And did you have personal knowledge as to

20 some of those topics?

21     A      I did.

22     Q      Did you not have personal knowledge as to

23 some of those topics?

24     A      I did.

25     Q      So what did you do to the extent that you



Page 276

1    did not have personal knowledge on a topic?

2         A     If it was something I could look up in a

3    manual set, I did that.  If I needed to communicate

4    with an individual from a certain department, I did

5    that.

6         Q     About how many people at Frontier did you

7    speak with in deposition -- excuse me, let me start

8    over.

9               About how many people at Frontier did you

10   speak with in preparation for this deposition?

11        A     Probably easily 10 to 15.

12        Q     And can you just let me know some of

13   the -- the departments or fields that these people

14   are in?

15        A     Yeah.  It was human resources, Inflight,

16   Inflight being flight attendants, Customer Relations,

17   legal, airport sales and operations.

18        Q     Do you have an estimate as to about how

19   many total hours you spent preparing for this

20   deposition?

21        A     I'd put it somewhere in the last few weeks

22   probably 70 plus hours, and prior to that, when I was

23   initially notified, I feel like a couple years ago,

24   more time, but that was a couple years ago.

25        Q     Okay.  So in response to the 30(b)(6)



Page 277

1    notice, you've spent 70, at least, 70, 7-0, hours

2    preparation?

3              MR. MCKAY:  Objection to the form of the

4    question.

5         A    Correct, 70 -- at least 70 hours.

6         Q    (BY MR. CUNNINGHAM)  I'll just ask it

7    another way.  How much time have you spent preparing

8    for the deposition since you received the 30(b)(6)

9    notice?

10        A    At -- at least 70 hours.

11        Q    And that's 7-0, correct?

12        A    7-0, correct.

13        Q    Did your involvement with this case begin

14   prior to that?

15        A    Yes.

16        Q    And about when did that happen?  When did

17   you first become involved in the case?

18        A    I want to say it was probably a year or

19   two ago.  2021, 2022 is kind of what I can remember.

20        Q    And what kind of things did you do when

21   you became involved in the case?

22             MR. MCKAY:  I'm going to object to the

23   line of questioning as exceeding the scope of direct.

24             MR. CUNNINGHAM:  Objection noted.

25        A    I started reviewing materials that were --



Page 278

1    that were presented.

2         Q    (BY MR. CUNNINGHAM)   And when you walked

3    into this deposition yesterday, did you feel that you

4    were prepared for all the topics on the deposition

5    notice?

6              MR. MCKAY:   Same objection.

7         A    I did.

8         Q    (BY MR. CUNNINGHAM)   And do you still feel

9    that you're prepared for all of the topics?

10             MR. MCKAY:   Same objection, and objection

11   to the form.

12        A    Yes, sir.

13        Q    (BY MR. CUNNINGHAM)   I believe there was

14   some discussion with Mr. McKay yesterday regarding

15   passenger manifests and whether they are need --

16   whether they must be made available to the crew on

17   the aircraft.

18             MR. MCKAY:   Objection to the form of the

19   question.

20             MR. CUNNINGHAM:   Okay.   There wasn't a

21   question yet.

22             MR. MCKAY:   Do you think?

23        Q    (BY MR. CUNNINGHAM)   Do you recall that

24   testimony?

25        A    Uh-huh.



1          MR. MCKAY:  Objection to the form of the

2  question.

3          MR. CUNNINGHAM:  What's the basis?

4          MR. MCKAY:  I just object.  That's what I

5  do.

6     Q     (BY MR. CUNNINGHAM)  Does Frontier need to

7  make passenger manifests available to the crew?

8          MR. MCKAY:  Objection to the form of the

9  question.

10     A     No.

11     Q     (BY MR. CUNNINGHAM)  Would you expect --

12  well, let me ask you this.  In your role as director

13  of operations at Frontier or your previous role as

14  chief pilot at Frontier, would you expect a

15  non-management Frontier employee such as a flight

16  attendant to know why any changes are made to

17  passenger manifest procedures?

18          MR. MCKAY:  Objection to the form of the

19  question.

20     A     No.

21     Q     (BY MR. CUNNINGHAM)  Has the Department of

22  Transportation ever audited Frontier regarding any

23  passenger complaints or criticisms of Frontier?

24          MR. MCKAY:  Objection to the form of the

25  question, and exceeds the scope of direct.



Page 280

```
1        Q       (BY MR. CUNNINGHAM)  Let me just ask you
2   this.  Has the D -- has the DOT audited Frontier?
3                MR. MCKAY:  Same objections.
4        A       Yes.
5        Q       (BY MR. CUNNINGHAM)  And please explain
6   that.
7        A       During my investigation with Customer
8   Relations, Mrs. Miller had indicated that Frontier
9   had been audited by the DOT circa 2016, and there
10  were no significant findings that -- that came from
11  that.  And --
12               MR. MCKAY:  Objection, motion to strike.
13               Sorry if I interrupted you.
14               THE DEPONENT:  No.  No.
15       A       And we haven't had one since.
16       Q       (BY MR. CUNNINGHAM)  And when you say no
17  major problems, does that include no problems
18  including incidents of racial discrimination?
19               MR. MCKAY:  Objection to the form of the
20  question, exceeds direct.  Motion to strike.
21       A       Correct.
22       Q       (BY MR. CUNNINGHAM)  In the course of your
23  investigation, did you have an opportunity to
24  determine whether there were any communications or
25  instructions between Frontier management and the
```



Page 281

```
 1    Denver team regarding how to handle racial

 2    discrimination complaints?

 3         A      I did ask those questions, yes.

 4         Q      Were there any instructions given by

 5    management to the Denver team on how to handle such

 6    complaints?

 7         A      No.

 8         Q      Did management ever instruct the Denver

 9    team or anybody else at Frontier to sweep

10    discrimination complaints under the rug, so to speak?

11              MR. MCKAY:  Objection to the form of the

12    question; it exceeds direct.

13         A      No.

14         Q      (BY MR. CUNNINGHAM)  Under the

15    circumstances of this case as known to you by way of

16    your investigation and discussed with Mr. McKay

17    yesterday, was it reasonable and appropriate for

18    Mr. DelVecchia and A.D. to have been separated by the

19    crew?

20              MR. MCKAY:  Objection to the form of the

21    question, and exceeds the scope of direct.

22         A      Yes.

23         Q      (BY MR. CUNNINGHAM)  Please explain that.

24         A      Anytime that there's an allegation of

25    inappropriate touching, the flight attendants, in the
```



Page 282

1    interest of the safety of individuals, should take

2    the appropriate actions based on their policies to --

3    you know, to ensure the safety of the individual.

4         Q        And in this case, what was it that caused

5    that response?

6         A        It was the allegation of the adult

7    touching -- inappropriately touching the child.

8         Q        Just once or more than once?

9         A        More than once.  The initial -- based on

10   my investigation, the initial discussion started

11   surrounding the touching of -- of the face by a

12   separate flight attendant.

13        Q        And then what happened?

14        A        That flight attendant brought it to the

15   attention of the other flight attendants, including

16   Scott Warren.  And Scott, being kind of a third party

17   to this, was sent to the back, you know, to walk the

18   cabin and verify, so to speak, what the initial

19   allegation had been from the previous flight

20   attendant.

21             And that's when he allegedly saw the

22   inappropriate touching of -- the adult touching --

23   inappropriately touching the child's crotch.

24        Q        And then what happened?

25             MR. MCKAY:  Objection, calls for a



Page 283

1    narrative.

2        Q      (BY MR. CUNNINGHAM)   Go ahead.

3        A      And again, based on my investigation, that

4    was when the decision was made to separate the adult

5    and child, and find an able-bodied person to sit with

6    -- with the child for the duration of the flight.

7        Q      And as the director of operations for

8    Frontier, do you believe that that was a reasonable

9    and appropriate step to take?

10              MR. MCKAY:   Objection to the form of the

11   question, and exceeds direct, and -- that's enough.

12       A      Based on my investigation, it seems

13   reasonable, yes.

14       Q      (BY MR. CUNNINGHAM)   Yesterday there were

15   some questions as to whether and how you knew if the

16   crew on the subject flight received information or

17   training on anti-discrimination.   Do you recall that?

18       A      I do.

19       Q      As part of your investigation, have you

20   determined whether or not the crew and each member of

21   the crew has acknowledged receiving training or

22   information on anti-discrimination?

23              MR. MCKAY:   Objection to the form of the

24   question.

25       A      Yes.



1      Q      (BY MR. CUNNINGHAM)   And what did you

2    determine in that regard?

3               MR. MCKAY:   Objection, calls for a

4    narrative.

5      A      That the -- each individual of the crew,

6    two pilots and four flight attendants, had signed

7    that they had received and acknowledged that they're

8    responsible for the contents of the Employee

9    Handbook, which includes anti-discrimination and the

10   items listed.

11     Q      (BY MR. CUNNINGHAM)   Yesterday Mr. McKay

12   asked you some questions with respect to the threat

13   level discussion.   Do you remember that?

14     A      I do.

15     Q      And do you remember that he asked you

16   questions about what pilots, quote, want, end quote,

17   to do?

18     A      Yes.

19     Q      And you answered those questions, correct?

20     A      I did.

21     Q      And what did you mean when you answered

22   those questions?

23     A      Everything that a crew does, pilots and

24   flight attendants, is, again, within the

25   reasonableness of the context of what's going on and



Page 285

1    the information available.

2         Q       So when you responded to the questions,

3    were you indicating what pilots subjectively wanted

4    to do or what they thought they should do or was best

5    to do?

6              MR. MCKAY:   Objection to the form of the

7    question.

8         A       It's, again, should, within the --

9    everything that we talk about is within the

10   reasonableness of the information available, and what

11   they should do, again, within the context and

12   confines of the safety of flight.

13        Q       (BY MR. CUNNINGHAM)   He asked you about

14   the possibility of a flight getting shot down by

15   United States fighters if the flight crew didn't

16   monitor frequency 121.5.   Do you recall that?

17        A       Yes.

18        Q       Can you explain, as a pilot and as the

19   former chief pilot and current director of

20   operations, how such a sequence would work?

21             MR. MCKAY:   Objection to the form of the

22   question, and exceeds direct.

23        A       So again, 121.5 is a -- is an emergency

24   freq or -- frequency, excuse me, or Guard frequency.

25   We will typically monitor that.   However, our primary



1    frequency for monitoring is the active Air Traffic

2    Control frequency that we're on with whatever agency.

3    ███ ████ ███ ████████ ███ ██ ████ █

█████████ ███ █████████ ████████ ███ █████

██ ████ █ ███████ ████████ ████████ ██ ████████

██ ███ █ ███████ █████ █████ ████████████ ██ █

█████████████ ███ ██ ████ ████████ █████████

█ █████

█    ███ █████ █████████ ███████ █████

██ █████████ █ ██ ██ █████████ ████ ███ ██ ██

██ █████████ █ ██████ █████████ ███ ██ ██ ███

██ ████ █████████ █████████.

13   ████ █████████ ████ ████

██ █████ ████████ █████ ██ ██ ████████ ███ █████

██ █████ ████ █████████ ██ ██ ██ █████████ ███ ██

██ ████ ████ ████ ██ █ █████████ ███

██ █████ █ ████ █████████ █████ ██ ████

██ █ █ ████ █████ ████████

██ ████████ ███ █ █████████ ████ ██

██ ████████ ██ █ ██ ███ ███ ██ ██ ██ █

██ ████ ██ █ ██ █████ █████████ ███ ██

██ █████

23           MR. MCKAY:  Objection, calls for

24   speculation.  Objection to the form of the question.

25       A    I can't think of a circumstance where that



Page 287

1    would occur, no.

2         Q     (BY MR. CUNNINGHAM)  And would Frontier

3    pilots do everything they could to avoid that

4    situation?

5              MR. MCKAY:  Objection, calls for

6    speculation.  Objection, calls for knowing what's on

7    somebody else's mind.  And objection to the form of

8    the question.

9         A     I'm sorry, can you repeat the question one

10   more time?

11             MR. CUNNINGHAM:  Could you read it back,

12   please?

13             (Requested record read.)

14             MR. MCKAY:  Same objections.

15        A     Yes, absolutely.

16        Q     (BY MR. CUNNINGHAM)  As part of your

17   investigation, did you determine whether A.D. told

18   Mr. Warren that a similar incident or incidents had

19   happened in the past?

20             MR. MCKAY:  Objection to the form of the

21   question.  Objection, it exceeds direct.

22        A     Based on my investigation, it appears that

23   he did.

24        Q     (BY MR. CUNNINGHAM)  If Frontier -- excuse

25   me, I'm going to start over.



Page 288

```
 1            If Frontier determined that a flight

 2   attendant had discriminated against a passenger,

 3   would there be consequences, up to and including

 4   termination?

 5            MR. MCKAY:  Objection to the form of the

 6   question.

 7       A    Yes.

 8       Q    (BY MR. CUNNINGHAM)  Does Frontier value

 9   its relationship with passengers?

10            MR. MCKAY:  Objection to the form of the

11   question.

12       A    Absolutely.  I think that's the foundation

13   of any business.

14       Q    (BY MR. CUNNINGHAM)  As part of your

15   investigation, did you review -- did you review

16   employment files of the crew on the subject flight?

17       A    I did.

18       Q    Did you discover any indication of any

19   discrimination by any of those crew members?

20            MR. MCKAY:  Objection to the form of the

21   question, and exceeds the scope of direct.

22       A    No.

23       Q    (BY MR. CUNNINGHAM)  In response to

24   Mr. McKay's questioning yesterday, I believe you

25   testified that crew are to use flexibility and
```



Page 289

1    critical thinking in addressing situations; is that

2    correct?

3         A    That's -- yes.

4         Q    And do they use Crew Resource Management?

5              MR. MCKAY:  Objection to the form of the

6    question, exceeds the scope of direct.

7         A    Yes.

8         Q    (BY MR. CUNNINGHAM)  Is Crew Resource

9    Management used to direct -- address the flexi- --

10   excuse me -- flexibility and critical thinking that

11   we just discussed?

12             MR. MCKAY:  Objection to the form of the

13   question, and exceeds direct.

14        A    Yes.

15        Q    (BY MR. CUNNINGHAM)  Was every member of

16   the subject crew trained on Crew Resource Management?

17             MR. MCKAY:  Objection to the form of the

18   question, and exceeds the scope of direct.

19        A    Yes.

20        Q    (BY MR. CUNNINGHAM)  Yesterday Mr. McKay

21   asked you if you had made invest- -- investigation

22   into third-party vendors, such as customer service

23   people.  Do you recall that testimony?

24             MR. MCKAY:  Objection, mischaracterizes

25   testimony.



Page 290

```
 1       A      I do.

 2       Q      (BY MR. CUNNINGHAM)   Do you remember

 3    testimony yesterday in response to Mr. McKay's

 4    questioning as to whether you made any investigation

 5    into whether -- excuse me -- into the, quote, agents,

 6    end quote, of Frontier?  Do you recall that?

 7       A      I do.

 8       Q      Do you know as a legal matter what an

 9    agent is?

10       A      I don't.

11       Q      Do you know whether customer service

12    agents, ramp personnel, or others who are not

13    employed by Frontier -- do you know who pays those

14    employees?

15              MR. MCKAY:  Objection to the form of the

16    question.

17       A      The third-party business partner.

18       Q      (BY MR. CUNNINGHAM)   And let me clean up

19    that question a little bit.  Who pays the third-party

20    vendors, or what was the expression that you just

21    used, third-party --

22       A      Our third-party business partners.

23       Q      Okay.  Third.  Who pays the third-party

24    business partners?

25              MR. MCKAY:  Objection to the form of the
```



Page 291

1    question, and exceeds direct.

2        Q      (BY MR. CUNNINGHAM)  Excuse me.  Who pays

3    the employees of the third-party business partners?

4            MR. MCKAY:  Same objections.

5        A      That -- the -- just a -- so the

6    third-party business partner, and I'll just reference

7    them as XYZ company, just to clarify.  So it's not

8    Frontier but that company.

9        Q      (BY MR. CUNNINGHAM)  Okay.  And who hires

10   and fires the employees of that third-party company?

11           MR. MCKAY:  Same objections.

12       A      That third-party business partner.

13       Q      (BY MR. CUNNINGHAM)  So as you sit here

14   today, do you know whether that third-party business

15   partner is or is not an agent of Frontier?

16           MR. MCKAY:  Objection to the form of the

17   question.

18       A      That I don't know.

19       Q      (BY MR. CUNNINGHAM)  In response to

20   Mr. McKay's questioning yesterday, you discussed a

21   number of policies and procedures.  Do you recall

22   that?

23           MR. MCKAY:  Objection to the form of the

24   question.

25       A      I do.



Page 292

1       Q       (BY MR. CUNNINGHAM)   Do you have any

2    reason to believe that any crew member of the subject

3    flight did not receive those policies and procedures?

4            MR. MCKAY:   Objection to the form of the

5    question.

6       A       I don't.

7       Q       (BY MR. CUNNINGHAM)   Did you receive any

8    indication that any such crew member did not read any

9    of the policies or procedures?

10           MR. MCKAY:   Objection to the form of the

11   question.

12      A       I don't.

13      Q       (BY MR. CUNNINGHAM)   Yesterday I believe

14   Mr. McKay asked you whether, as part of the FBI

15   investigation and/or the Las Vegas Metro Police

16   investigation, Mr. Warren struck Mr. DelVecchia in

17   the back of the head so as to cause concussion.   Do

18   you recall that?

19           MR. MCKAY:   Objection to the form.   That's

20   not at all what I asked.

21      Q       (BY MR. CUNNINGHAM)   Do you recall that

22   testimony or not?

23      A       I do.

24      Q       As part of your investigation, have you

25   determined whether the FBI or Las Vegas Metro was



Page 293

1   told that Mr. Warren struck Mr. DelVecchia in the

2   back of the head?

3           MR. MCKAY:  Objection to the form of the

4   question.

5       A   I'm sorry, can you ask the question one

6   more time?

7           MR. CUNNINGHAM:  Can you read it back,

8   please?

9           (Requested record read.)

10          MR. MCKAY:  Objection.  Same objections.

11      A   No.

12      Q   (BY MR. CUNNINGHAM)  Have you reviewed the

13  FBI report?

14      A   I did.

15      Q   And what did it indicate?

16          MR. MCKAY:  Objection to the form of the

17  question.

18      Q   (BY MR. CUNNINGHAM)  Let me ask you this.

19  Did -- did the FBI report indicate that Mr. Warren

20  struck Mr. DelVecchia in the back of the head?

21          MR. MCKAY:  Objection to the form of the

22  question.  That wasn't part of the FBI's inquiry.

23      A   No.

24      Q   (BY MR. CUNNINGHAM)  What, if anything,

25  does the FBI report indicate about any contact



Page 294

1   between Mr. Warren and Mr. DelVecchia?

2           MR. MCKAY:  Objection to the form of the

3   question, exceeds this gentleman's reason for being

4   here.  He's not here to testify about the FBI.  He's

5   here to testify about Frontier Airlines.

6           MR. CUNNINGHAM:  Noted.

7       Q    (BY MR. CUNNINGHAM)  Do you want it read

8   back?

9       A    No.  Based on the investigation, it -- it

10  appeared that Mr. DelVecchia had indicated that he

11  had been poked in the back.

12      Q    And did your investigation determine -- as

13  part of your investigation, was it determined whether

14  the FBI or Metro Police charged Mr. Warren with any

15  crime?

16          MR. MCKAY:  Objection to the form of the

17  question, exceeds direct.  And again, that's not what

18  this gentleman is here for.  It exceeds the scope of

19  the 30(b)(6).

20      A    No, sir.

21      Q    (BY MR. CUNNINGHAM)  Let's repeat.  I'm

22  not sure we got a clean question and -- question and

23  answer between all the objections.

24          MR. CUNNINGHAM:  Could you please read

25  back the question and answer?



```
 1              MR. MCKAY:  I will give the objections
 2    again.
 3              MR. CUNNINGHAM:  Well, that's -- John, I
 4    couldn't follow with all of that in between --
 5              MR. MCKAY:  That's fine.
 6              MR. CUNNINGHAM:  -- whether he actually
 7    answered the question as -- in substance or whether
 8    it was a yes, no, I did determine, I didn't
 9    determine.
10              MR. MCKAY:  All right.  That's fair.
11              MR. CUNNINGHAM:  I'll give you standing
12    objections on this stuff if you want it.
13              MR. MCKAY:  I'd like to have an objection
14    on that.
15              MR. CUNNINGHAM:  On this line only.
16              MR. MCKAY:  Yeah.  I mean, this -- this
17    line of questioning is this gentleman testifying
18    about what an FBI investigative report said, which
19    goes way beyond the scope of a 30(b)(6) deposition of
20    a corporate designee of Frontier Airlines answering
21    37 subject area inquiries that did not include the
22    text of the FBI report.
23              So, yes, I have an objection to all of
24    this.  And if you want to give me a standing
25    objection to that, then I won't interrupt your
```



Page 296

```
 1   rereading the question.
 2           MR. CUNNINGHAM:  I take exception and move
 3   to strike your testifying, speaking objection.
 4           MR. MCKAY:  Well, there's --
 5           (Court reporter interruption.)
 6           MR. MCKAY:  I am so sorry.  Go ahead.
 7           MR. CUNNINGHAM:  There's no standing
 8   objection allowed.
 9           MR. MCKAY:  Okay.
10           MR. CUNNINGHAM:  Read back the question
11   and the answer that I asked, that I and the witness
12   said, please.
13           (Requested record read.)
14     Q     (BY MR. CUNNINGHAM)  No, sir, you didn't
15   determine that, or no, sir, there was no charge made
16   against Mr. Warren?
17           MR. MCKAY:  I object to the form of the
18   question.  I object because this exceeds the scope of
19   direct.  I object because this exceeds the scope of
20   Rule 30(b)(6).  And I object because it's asking this
21   gentleman to insert hearsay into this deposition
22   record.
23     A     Based on my investigation, it didn't
24   appear that there were charges against Mr. Warren.
25     Q     (BY MR. CUNNINGHAM)  And would that have
```



Page 297

1    been something that Frontier would have considered as

2    part of its investigation?

3        A    Yes, sir.

4            MR. CUNNINGHAM:  We'd like to take a quick

5    break here just to make sure we've covered the

6    topics, but may be finished.

7            MR. MCKAY:  Okay.

8            THE VIDEOGRAPHER:  The time now is 11:11

9    a.m., and we are going off the record.  This is the

10   end of Clip No. 1 in the deposition of Shawn

11   Christensen, Volume No. 2.

12           (Recess taken.)

13           THE VIDEOGRAPHER:  The time now is 11:28

14   a.m.  We are back on the record.  This is the

15   beginning of Clip No. 2 in the deposition of Shawn

16   Christensen, Volume No. 2.

17           Thank you, Counsel.

18       Q    (BY MR. CUNNINGHAM)  Mr. Christensen, was

19   your testimony of yesterday, including your

20   conclusions, based on your review of documents

21   produced in this case?

22       A    Yes.

23           MR. CUNNINGHAM:  That's all I have.

24           MR. MCKAY:  All right.

25



Page 298

```
 1                        EXAMINATION
 2   BY MR. MCKAY:
 3        Q     Hi, Mr. Christensen.  Nice to see you
 4   again.
 5        A     Good morning.  Good afternoon, morning,
 6   yeah.
 7        Q     Let's --
 8        A     It's still morning.
 9        Q     Yeah, we've still got 31 minutes of
10   morning.
11              You talked about your investigation
12   finding, quote-unquote, allegations of inappropriate
13   touching.  Do you remember that?
14        A     Yes.
15        Q     Okay.  Let's just focus in on those.
16   Basically, you understand the set of such allegations
17   to include, one, Peter DelVecchia touching the face
18   of his son, and two, the allegation that Peter
19   DelVecchia had his hand on his son's crotch?
20              MR. CUNNINGHAM:  Object to the form.
21              Go ahead.
22        A     Yes.
23        Q     (BY MR. MCKAY)  Okay.  Now, with respect
24   to the allegation that Peter DelVecchia was touching
25   his son's face, that was an allegation made by the A
```



1   flight attendant?

2       A    I don't recall which one.  I know it

3   was -- well, I know it was a flight attendant, not

4   necessarily the A flight position, that position.

5       Q    Okay.  Let's focus in on that.  Do you

6   recall from your investigation that there was a

7   flight attendant whose name in the Frontier documents

8   is Chelsie Bright?

9       A    Yes.

10      Q    And when that flight attendant had her

11  deposition taken, she testified that her married name

12  is Sakurada.

13           Do you remember that?

14      A    Yes, that's --

15      Q    Okay.  If I call her Chelsie Bright, is --

16  is that okay?

17      A    Yes, sir.

18      Q    Okay.  Now, based on your investigation,

19  did you determine that Chelsie Bright was the flight

20  attendant who had actually claimed to see Peter

21  DelVecchia touching his son's face?

22      A    I believe it was Chelsie, by my

23  recollection, but that name sounds familiar as the

24  one -- one of the three other flight attendants.

25      Q    Did you happen to watch Ms. Bright's video



MAGNA
LEGAL SERVICES

Page 300

1    deposition?

2         A    I don't recall that I received the video.

3         Q    Okay.  So you didn't see her demonstrating

4    what it was that she saw Peter DelVecchia doing with

5    his son's face?

6         A    No, sir.

7         Q    Okay.  So your investigation did not

8    reveal anybody else on the crew seeing Peter

9    DelVecchia touch his son's face, right?

10             MR. CUNNINGHAM:  Objection, form, asked

11   and answered.

12        A    Correct, to the best of my recollection.

13        Q    (BY MR. MCKAY)  Okay.  And then you

14   testified that, if I understood your recent testimony

15   correctly, Scott Warren was sent to the back to

16   verify the first flight attendant's allegation of

17   inappropriate touching.  Is that right?

18        A    Correct, based on -- on my investigation,

19   reading through the depositions.

20        Q    Okay.  And when you read through the

21   depositions, what did you find about who sent Scott

22   Warren to the back of the aircraft?

23        A    To the best of my recollection, that was

24   kind of a decision that was made by I'll just say the

25   team, the team being the flight attendants on that



Page 301

1   discussion.

2          Q       Did you not see a discrepancy in the

3   individual testimonies of the flight attendants about

4   the decision by Scott Warren to go to the back of the

5   aircraft?

6          A       I'm sorry, can you -- can you repeat

7   that --

8          Q       Certainly.

9          A       -- one more -- yeah.

10         Q       Did you not see in reading the depositions

11  that the flight attendants testified differently

12  about why Scott Warren went to the back of the

13  aircraft?

14                 MR. CUNNINGHAM:   Objection, form.

15         A       I don't.  I didn't see a discrepancy, no.

16         Q       (BY MR. MCKAY)  Did you see Amanda

17  Nickel's testimony that Scott Warren volunteered to

18  go to the back because they needed additional

19  evidence of inappropriate touching?

20                 MR. CUNNINGHAM:   Objection, form.

21         A       That doesn't sound familiar.  And

22  actually, can I ask you to rephrase that question

23  perhaps?

24         Q       (BY MR. MCKAY)  All right.  You read all

25  four flight attendants' depositions?



Page 302

```
 1      A      Yes, sir.

 2      Q      You read both pilots' depositions?

 3      A      Yes, sir.

 4      Q      Okay.  Did you read in those depositions

 5   that there was a report by Chelsie Bright to Captain

 6   Shupe that she had seen Peter DelVecchia touching his

 7   son's face -- well, she had seen the man touching the

 8   boy's face, and that it made her feel uncomfortable?

 9      A      Yes.

10      Q      Okay.  Do you recall seeing that Captain

11   Shupe testified that he and First Officer Mullin then

12   consulted their Flight Operations Manuals?

13      A      I do recall that.  Timeline wise I

14   couldn't piece it together, but yes, they did.

15      Q      And did you see that the pilots determined

16   that there needed to be evidence of inappropriate

17   touching in order for Captain Shupe or First Officer

18   Mullin to contact law enforcement authorities?

19            MR. CUNNINGHAM:  Objection, form,

20   foundation.

21      A      That I don't recall.  I know that they

22   referenced the material, but timeline wise, I -- I

23   couldn't give you an accurate timeline for that.

24      Q      (BY MR. MCKAY)  Do you recall then there

25   being a discussion amongst the flight attendants that
```



```
 1   Captain Shupe wanted additional evidence of

 2   inappropriate touching to call the law enforcement

 3   officers?

 4              MR. CUNNINGHAM:  Same objections.

 5      A     I do recall that conversation occurring.

 6      Q     (BY MR. MCKAY)  And out of that

 7   conversation, when described by Flight Attendant

 8   Amanda Nickel, she testified that Mr. Warren

 9   volunteered to obtain additional information,

10   additional evidence of inappropriate touching,

11   correct?

12              MR. CUNNINGHAM:  Objection, exceeds the

13   scope of redirect.

14      A     I do recall that Mr. Warren was the

15   individual that was going to get additional

16   information, yes.

17      Q     (BY MR. MCKAY)  Mr. Warren did not confirm

18   Ms. Bright's allegation of so-called inappropriate

19   touching of the face, did he?

20              MR. CUNNINGHAM:  Objection, form, and

21   exceeds the scope of redirect.

22      A     I don't recall that, no.

23      Q     (BY MR. MCKAY)  Okay.  And when Mr. Warren

24   came back and reported that he had allegedly seen

25   Mr. DelVecchia's hand on his son's crotch, no other
```



Page 304

1    person saw the same thing, did they?

2            MR. CUNNINGHAM:   Same objections.

3        A    Correct.

4        Q    (BY MR. MCKAY)   Okay.   So in each instance

5    you have an unverified allegation of touching, do you

6    not?

7            MR. CUNNINGHAM:   Same objections.

8        A    Of the same type of touching.

9        Q    (BY MR. MCKAY)   Correct?

10       A    Correct.

11       Q    Okay.   Mr. Warren testified that when he

12   allegedly saw Peter DelVecchia's hand on his son's

13   crotch, both Peter DelVecchia and his son appeared to

14   be asleep.   Isn't that correct?

15           MR. CUNNINGHAM:   Same objections.

16       A    To the best of my recollection, yes.

17       Q    (BY MR. MCKAY)   And in Captain Shupe's

18   testimony, he testified that Mr. Warren omitted that

19   fact from his report to the pilots; isn't that

20   correct?

21           MR. CUNNINGHAM:   Same objections.

22       A    I can't recall that level of detail.

23   I'm -- I'm sorry.

24       Q    (BY MR. MCKAY)   Do you not recall

25   Captain Shupe saying that that would have been an



```
 1    important fact for Mr. Warren to have given him?
 2              MR. CUNNINGHAM:  Same objections.
 3        A     Perhaps.  I -- I don't recall.
 4        Q     (BY MR. MCKAY)  Okay.  Now, both Mr. Peter
 5    DelVecchia and his son denied to Mr. Warren that
 6    Peter's hand was on his son's crotch, didn't they?
 7              MR. CUNNINGHAM:  Same objections.
 8        A     To the best of my recollection, yes.
 9        Q     (BY MR. MCKAY)  That's unusual, isn't it,
10    for a sexual molestation allegation on a flight, to
11    have both parties deny that it occurred?
12              MR. CUNNINGHAM:  Same objections, and
13    argumentative.
14        A     That I don't know.
15        Q     (BY MR. MCKAY)  I mean, in Frontier's
16    sexual misconduct documents, don't they indicate that
17    it's often reported by the person who's been molested
18    that they've been molested?
19              MR. CUNNINGHAM:  Same objections.
20        A     I don't know if it qualifies it that way.
21        Q     (BY MR. MCKAY)  Well, it talks about
22    improper touching being reported to a flight
23    attendant, right?
24              MR. CUNNINGHAM:  Same.
25        A     It does.
```



Page 306

1      Q      (BY MR. MCKAY)   Okay.   And so wouldn't the

2   molestee typically be the person reporting it?

3            MR. CUNNINGHAM:   Same objections.

4      A      Not necessarily.

5      Q      (BY MR. MCKAY)   So sometimes a person

6   molests the person next to them and then rings the

7   call button and wants to report that they've molested

8   the person next to them?

9            MR. CUNNINGHAM:   Same objections, and

10   argumentative.

11      A      I wouldn't say the molester would be

12   ringing the call button.

13      Q      (BY MR. MCKAY)   Okay.   That's probably not

14   going to happen very often, is it?

15            MR. CUNNINGHAM:   Same.

16      A      I can't think of an instance where a

17   molester rings a call button, but --

18      Q      (BY MR. MCKAY)   Okay.   So --

19            MR. CUNNINGHAM:   I'm going to object to

20   this entire line as beyond the scope of redirect.

21      Q      (BY MR. MCKAY)   So wouldn't you just

22   naturally assume that if somebody rings a call button

23   and says, There's been molestation, it would likely

24   be the molestee?

25            MR. CUNNINGHAM:   Object to the form.



```
 1        A     I think that's reasonable.

 2        Q     (BY MR. MCKAY)  Okay.  So here in -- on

 3   Flight 2067, we have a situation where the flight

 4   attendant reports it, but the alleged molester and

 5   alleged molestee both say it didn't happen, right?

 6              MR. CUNNINGHAM:  Same objections.

 7        A     Yes.

 8        Q     (BY MR. MCKAY)  Yet the captain and the

 9   flight attendants decided to remove the son from his

10   father based solely on Mr. Warren's allegation,

11   didn't they?

12        A     Correct.

13              MR. CUNNINGHAM:  Objection, form,

14   foundation, and beyond the scope.

15        Q     (BY MR. MCKAY)  Did you happen to read the

16   deposition of the aisle seat passenger who was seated

17   next to Peter DelVecchia?

18        A     I did.

19        Q     Did you happen to notice in that

20   deposition that he didn't see Peter DelVecchia's hand

21   on his son's crotch?

22              MR. CUNNINGHAM:  Objection, beyond the

23   scope of redirect.

24        A     I do recall that.

25        Q     (BY MR. MCKAY)  Okay.  So again, you've
```



1    got a situation where the alleged molester denies it,

2    which I guess we can all assume would be reasonable,

3    but the alleged molestee denies it, and the only

4    other person in the row says he didn't see anything.

5    Yet under those circumstances, with that information,

6    your flight attendant, with the captain's permission,

7    took a child away from the child's parent for the

8    remaining three hours of the flight.  And --

9                MR. CUNNINGHAM:  Object --

10   Q    (BY MR. MCKAY)  -- my question to you,

11   sir, is how does that jibe with all of the testimony

12   you've given about the procedures of Frontier

13   Airlines?

14               MR. CUNNINGHAM:  Objection, form,

15   foundation, exceeds the scope of redirect and of the

16   30(b)(6).

17               Go ahead.

18   A    And, I'm sorry, can you repeat the

19   question, please?

20               (Requested record read.)

21               MR. CUNNINGHAM:  My objection is noted.

22   A    I think when you look at the safety of an

23   individual, in this case the child, not everybody

24   will report what's occurring to them.  When I --

25   based on the investigation and the conversations that



Page 309

1     ensued, depositions, it appears that the intent was

2     in the safety of the child, whether it was reported

3     by the child or an observation of -- of another adult

4     to ensure the safety.

5             And in accordance with the procedure they

6     did separate them and simply contact law enforcement

7     to let law enforcement utilize their tools and

8     resources and expertise, which is well beyond that of

9     a flight attendant training, to come up with a

10    solution that was -- that was reasonable.

11       Q      (BY MR. MCKAY)  Would you agree that to

12    ensure the safety of a passenger would be to do no

13    harm to the passenger?

14       A      I think that's reasonable -- a reasonable

15    expectation, and I'm sure it's subjective on what do

16    no harm is.

17             MR. CUNNINGHAM:  I need to interject an

18    objection to the form.

19             Go ahead.

20       Q      (BY MR. MCKAY)  How often does Frontier

21    take a child away from a parent, just in the normal

22    pursuance of its business?

23             MR. CUNNINGHAM:  Objection to the form,

24    foundation, and exceeds the scope of this deposition

25    and the scope of redirect.



Page 310

1        A       That I don't know.

2        Q       (BY MR. MCKAY)  Do you think it happens

3    often?

4                MR. CUNNINGHAM:  Same.

5        A       I -- I wouldn't think it would, no.

6        Q       (BY MR. MCKAY)  So if a flight attendant

7    takes a child and says, You've got to sit in the back

8    of the airplane, away from your father, and the child

9    says, That's my father, I want to be with my father,

10   don't you think that some harm could ensue from

11   forcibly taking the child away from the child's

12   parent?

13               MR. CUNNINGHAM:  Same objections, and

14   speculation.

15       A       That would be beyond the scope of my -- my

16   knowledge.

17       Q       (BY MR. MCKAY)  And you say that according

18   to the procedures, but we had testimony from you

19   yesterday that the procedures included getting

20   verification of allegations of unusual behavior,

21   didn't they?

22       A       Correct.

23       Q       Okay.  And again, in this case you don't

24   have any confirmation of the unusual behavior of face

25   touching and -- alleged face touching, and you don't


MAGNA
LEGAL SERVICES

1   have any verification of the unusual behavior of

2   alleged hand on the crotch.  So you don't have the

3   confirmation that the procedure calls for, do you?

4           MR. CUNNINGHAM:  Same objections, and

5   exceeds the scope.

6       A       Again, based on my investigation, they

7   looked at those as a confirmation, not necessarily of

8   the same type of touching but two independent

9   touching of an individual that -- not necessarily two

10  hand to the faces or two hand to the crotch, but two

11  touching that arose, their -- not suspicion, but

12  caught their attention I guess is maybe the best

13  word.

14      Q       (BY MR. MCKAY)  And hand on the crotch is

15  an allegation of a -- of a sexual nature.  Would you

16  agree with that?

17      A       Yes.

18      Q       Okay.  But what if the touching of the

19  face wasn't sexual in nature at all?  What would be

20  the justification for putting them both into the same

21  set of circumstances?

22          MR. CUNNINGHAM:  Objection, form,

23  foundation, and beyond the scope of redirect.

24      A       That I don't know.  I -- I wasn't there,

25  and I can't address what they may or not have seen.



Page 312

1    Q    (BY MR. MCKAY)   Well, neither were three

2  of the flight attendants and two of the pilots there

3  to see what they saw because what they saw was only

4  one person, wasn't it?

5    A    One person in two instances, yes.

6    Q    No -- well, we're talking face touching

7  now.

8    A    Face touching, yes, one -- one person.

9    Q    One person.  Okay.  And that one person

10  said she felt uncomfortable about it, but does that

11  necessarily make it a circumstance of a sexual

12  nature?

13         MR. CUNNINGHAM:  Same objections.

14    A    Not necessarily, no.

15    Q    (BY MR. MCKAY)  Okay.  One person might

16  feel uncomfortable about something that somebody else

17  might say, Well, that's perfectly normal, right?

18    A    I'd agree with that.

19    Q    And I think yesterday you testified that

20  flight attendants come from a myriad of backgrounds,

21  and so their personal feelings about what something

22  looks like to them might be entirely different from

23  the personal feelings of another flight attendant,

24  right?

25    A    I think that's --



```
 1                MR. CUNNINGHAM:  Same.
 2        A       I think that's a fair characterization.
 3        Q       (BY MR. MCKAY)  And isn't -- isn't that a
 4   good reason to get another flight attendant to look
 5   at what you're looking at and -- and to substantiate
 6   that it is in fact something disturbing?
 7                MR. CUNNINGHAM:  Same.
 8        A       Yes.
 9        Q       (BY MR. MCKAY)  Okay.  Now, you've
10   testified that each flight attendant acknowledged
11   with a signature responsibility for the contents of
12   the Employee Handbook.  Am I right on that?
13        A       Yes.
14        Q       Okay.  But again, as we testified -- as
15   you testified yesterday, you don't know for a fact
16   that they actually read the Employee Handbook, right?
17                MR. CUNNINGHAM:  Objection, form, asked
18   and answered, and it's beyond the scope of redirect.
19        A       Correct.
20        Q       (BY MR. MCKAY)  Okay.  And since you read
21   all their depositions, you would agree with me that
22   there wasn't a single flight attendant from Flight
23   2067 who testified that they remembered specifically
24   receiving training in anti-discrimination, correct?
25                MR. CUNNINGHAM:  Same objections.
```



Page 314

1        A        I don't re- -- I'm sorry, can you -- can

2    you ask that -- or, sorry, can you repeat -- repeat

3    the question?

4                (Requested record read.)

5        A        Correct, yeah.  I don't recall the -- the

6    question popping up.

7







1     [REDACTED]

2     [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

6        A      May I ask a question?

7        Q      All right.  Go ahead.

8        A      Is this under the confidential protective

9     order?

10       Q      Yes.

11              MR. CUNNINGHAM:  Is it SSI, is what he's

12    saying.

13       Q      (BY MR. MCKAY)  Yes, it's SSI.

14       A      Okay.  Can you rephrase the question,

15    please?

16       Q      So, yes, this is -- we're talking about

17    threat levels.  Anything about threat levels is SSI.

18    You understand that, right?

19       A      I just wanted to make -- make sure of that

20    before I continued.

21              MR. CUNNINGHAM:  And we'll stipulate that

22    the transcript -- I hope stipulate that the

23    transcript will be treated accordingly --

24              MR. MCKAY:  Sure.

25              MR. CUNNINGHAM:  -- as SSI.





Page 317

1

2    Q

3    question.



Page 318



















Page 322



Page 323

1 ████ ██ █████ ████
█ █████ ████ ████ ███
█ █ ████
█ █ ██ ██ ████ ████ ████ ████
█ ████ ██ █████████ ████████████
█ ██ ██ █ ████ █████ ███ ██ ██
█ ███ ██████ █████ ████ ████ ████
█ █ ███ ██ ██ ██ ███ ██ ██ █ --
█ ████ ███ ███ █████ █████ █ █
██ ████ ██ █ █ ████ ███ ██ ██ ██ ██
██ █ ████ ████ ███ █████ █ ███ ████ ███
██ █████ ███ █ ███ ████ ████ █ █
██ █ ███ ███ ████ ████ ███
██ ████ ██ ███ █ ███ ████ ████ ███
██ █ ██ ██ ███ ██ ████ █████
██ █ ████ ███ █████ █████
██ █ ██
██ ███ █ ████ ███
██ █ █ ████ █████ ████ ████
██ ████ ██ ███

21      Q      (BY MR. MCKAY)  Thank you.  Thank you very

22 much.

23            You testified, if I heard you correctly,

24 that if Frontier determines that discrimination

25 occurs, it would enforce its disciplinary measures,



Page 324

```
 1    up to and including termination.  Did I hear you
 2    right?
 3         A     Correct.
 4         Q     And you testified yesterday that no
 5    employee of Frontier Airlines has ever been
 6    disciplined for violating the anti-discrimination
 7    policy of Frontier Airlines, correct?
 8               MR. CUNNINGHAM:  Objection, form, exceeds
 9    scope.
10         A     Correct, within that window listed in the
11    30(b)(6).
12         Q     (BY MR. MCKAY)  Right, and that was
13    between 2014 and March 28 of 2019.
14         A     Correct.
15         Q     So for those five years, no employee of
16    Frontier Airlines ever committed any act of
17    discrimination against a passenger in the eyes of
18    Frontier Airlines, correct?
19               MR. CUNNINGHAM:  Objection to the form,
20    and it exceeds scope, and it mischaracterizes the
21    notice, which refers to complaints of racial
22    discrimination by passengers.
23               With that, you may answer.
24         A     Based on my investigation, no.
25         Q     (BY MR. MCKAY)  Your testimony yesterday
```



1    actually was broader.  You indicated yesterday in

2    response to my questions that -- that you were told

3    by other departments of Frontier Airlines, I assume

4    human resources, that there hasn't been any employee

5    disciplined for violating the anti-discrimination

6    policy.  Isn't that correct?

7                MR. CUNNINGHAM:  Objection, form, and

8    exceeds scope.

9        A       And so if I can clarify, I was not in the

10   position and a lot of folks that were in the

11   positions can't go back to when Frontier started.  So

12   if that was a misqualification, I apologize, but

13   within that window, no, there -- there has not.

14       Q       (BY MR. MCKAY)  Okay.  So in the eyes of

15   Frontier Airlines, within that window of five full

16   years, no employee of Frontier Airlines has ever

17   committed discrimination against a passenger?

18                MR. CUNNINGHAM:  Same objections.

19       A       Based on my investigation, no.

20       Q       (BY MR. MCKAY)  Okay.  And you mentioned

21   that you looked at the employee files of the crew

22   members of Flight 2067 and found no evidence of

23   discrimination, right?

24       A       Correct.

25       Q       And that would be because Frontier has not



Page 326

1  disciplined them for discrimination, correct?

2              MR. CUNNINGHAM:  Objection, form, beyond

3  scope, and argumentative.

4       A     Correct.

5       Q     (BY MR. MCKAY)  Okay.  You testified in

6  response to Mr. Cunningham's questions that you don't

7  know as a legal matter what an agent is.  Is that a

8  correct statement of your testimony?

9       A     Correct.

10      Q     So as you sit here today, you don't know

11  what the definition of an agent is legally?

12      A     No.

13      Q     Okay.  You testified yesterday, and I

14  believe also today, that you spoke with the general

15  counsel of Frontier Airlines.

16      A     Correct.

17      Q     Okay.  Did you discuss with the general

18  counsel the obligations of your testimony here

19  yesterday and today?

20      A     My obligations with the general counsel,

21  no.

22      Q     Okay.  So are you aware or --

23            MR. CUNNINGHAM:  I'd interject a privilege

24  objection.

25      Q     (BY MR. MCKAY)  Are you aware that the



Page 327

```
 1    obligations of a corporate designee such as yourself
 2    include knowledge that is possessed by a company's
 3    agents?
 4             MR. CUNNINGHAM:  Objection, possible
 5    privilege, and form, and beyond scope.
 6       A    And I'm sorry, can you ask the question
 7    one more time, please?
 8       Q    (BY MR. MCKAY)  Yeah, let me put it this
 9    way.  Are you here testifying that you don't have to
10    provide information about things that are known by
11    the company's agents who are performing duties for
12    the company?
13             MR. CUNNINGHAM:  Objection.  Same -- same
14    objections.
15       A    I think that would fall under privileged
16    conversation.
17       Q    (BY MR. MCKAY)  Fair enough.  You --
18    you've mentioned these third-party business partners.
19    Do you remember talking about those?
20       A    Yes, sir.
21       Q    Okay.  Do those include -- oh, I'm trying
22    to think of the name.  Oh, give me some of the names.
23    Unify, right?  They just changed their name.
24       A    That does not sound familiar.  Like here
25    in Denver we have Menzies --
```



Page 328

```
 1        Q     Yeah, Menzies.

 2        A     -- as an example.

 3        Q     Right, a big company that does contract

 4   work for airlines, right?

 5        A     Correct.

 6        Q     And then Delta had one in a consortium,

 7   and they just changed its name to something like

 8   Unify.  Do you guys use them?

 9        A     That does not sound familiar.

10        Q     Okay.  How about the -- the folks in Las

11   Vegas.  That's a different company, Worldwide

12   something or Global something?

13        A     It starts with W.  It's -- it may be WFS.

14   I'm not --

15        Q     Like Worldwide Flight Services or

16   something along those lines, right?

17        A     Correct, yeah.

18        Q     Okay.

19        A     I don't know where each one of the

20   locations that they worked at is, but yeah, that --

21   that would be an example of a third-party vendor.

22        Q     So those companies do what's called ground

23   handling?

24        A     Correct.

25        Q     And ground handling comprises things like
```



1    accepting checked luggage, taking it to the baggage

2    room, then putting it onto the correct plane,

3    marshalling in the aircraft to -- to the gates and to

4    the jetways, and hooking up air conditioning or

5    perhaps providing fuel, things like that, right?

6        A    Correct.

7        Q    Okay.  And many of those things in the

8    past, I think you agreed with me yesterday, were done

9    by Frontier employees.

10       A    Correct.

11       Q    And at some point in time Frontier made a

12   corporate decision to contract out those services to

13   other companies; is that right?

14       A    Correct.

15       Q    Okay.  And did you review any of the

16   testimony of some of the Worldwide Flight Service

17   employees who said that Frontier management had the

18   right to, if not fire people, to recommend people to

19   be fired?

20           MR. CUNNINGHAM:  Objection to the form,

21   and it exceeds scope of redirect.

22           MR. MCKAY:  Actually, it doesn't exceed

23   the scope of cross because you asked about it.

24       A    I don't recall that, no.

25       Q    (BY MR. MCKAY)  Okay.  I noticed in



Page 330

1    today's testimony in your responses to Mr. Cunningham

2    that you referred to Frontier's, quote, policies and

3    procedures, end quote.  Do you remember that?

4         A    I -- I may have.

5         Q    And yesterday you took great pains to --

6    to inform me that those same things were not

7    procedures, they were guidelines.  Do you remember

8    that?

9         A    I do.

10        Q    Okay.  All right.  In the course of your

11   work as -- as a pilot, have -- have you spent any

12   time in New York City?

13             MR. CUNNINGHAM:  Objection, form, and

14   beyond the scope of the notice.

15        A    As a pilot?

16        Q    (BY MR. MCKAY)  Yeah.

17        A    We have gone into Laguardia.  It's one of

18   our cities that we service.

19        Q    Okay.  Are you familiar with the fact that

20   New York City is divided into boroughs?

21        A    I am.

22        Q    Are you familiar --

23             MR. CUNNINGHAM:  Same objections.

24        Q    (BY MR. MCKAY)  -- that one of those --

25   are you familiar with the fact that one of those



Page 331

1    boroughs is the Bronx?

2        A    I am.

3        Q    Have you spent any time in the Bronx?

4            MR. CUNNINGHAM:  Objection to this whole

5    line of questioning.  Can you explain where this is

6    going, John?  It has nothing to do with your notice.

7            MR. MCKAY:  It does, actually.  It has to

8    do with your cross, but --

9            MR. CUNNINGHAM:  Well, then, can you lay

10   the foundation for it, please?

11           MR. MCKAY:  Well, why don't you just hang

12   on and I'll get there.  I'll ask two more questions.

13           MR. CUNNINGHAM:  Same objections.

14       A    When I was younger.

15       Q    (BY MR. MCKAY)  Okay.  Did you grow up in

16   the Bronx?

17       A    No.

18       Q    Okay.  So when you testified in response

19   to Mr. Cunningham's questions that you had seen in

20   the FBI report or notes that Peter DelVecchia had

21   told them he was, quote, poked, end quotes, in the

22   back, as you sit here today, you're not an expert on

23   what a native of the Bronx would mean when using the

24   word "poked," would you?

25           MR. CUNNINGHAM:  Same objections.



Page 332

1      A      No.

2      Q      (BY MR. MCKAY)  Okay.  Now, speaking of

3  the FBI, wasn't the FBI investigating what turned out

4  to be false allegations of human trafficking by Peter

5  DelVecchia and sexual molestation by Peter

6  DelVecchia?

7            MR. CUNNINGHAM:  Same objections.

8      A      They didn't -- from my understanding, my

9  investigation, they didn't -- the findings that they

10  had say that there was no cause to keep them and they

11  released them.

12      Q      (BY MR. MCKAY)  Right.  So they found that

13  there was no human trafficking being conducted by

14  Peter DelVecchia, and they found that there was no

15  sexual molestation conducted by Peter DelVecchia,

16  right?

17            MR. CUNNINGHAM:  Objection, form, and

18  beyond the scope of redirect.

19      A      Correct.

20      Q      (BY MR. MCKAY)  Okay.  So they hadn't been

21  asked by anyone to investigate Mr. Warren for

22  criminal activity, right?

23            MR. CUNNINGHAM:  Same objections.

24      A      I'm sorry, can -- can you rephrase,

25  please?



1      Q      (BY MR. MCKAY)  The -- the FBI had not

2  been asked by anyone to investigate Mr. Warren for

3  criminal activity.  Is that a fair statement?

4              MR. CUNNINGHAM:  Same.

5      A      Correct.

6      Q      (BY MR. MCKAY)  So it would also be a fair

7  statement that it would be reasonable that they would

8  not have made any finding as to whether or not

9  Mr. Warren committed a crime, right?

10             MR. CUNNINGHAM:  Objection, form,

11  speculation, foundation, and exceeds the scope of the

12  notice and of redirect.

13     A      I'm sorry.  Can you repeat the question,

14  please, or ask it again?  I'm sorry.

15     Q      (BY MR. MCKAY)  I'll ask it again.  If the

16  FBI was not asked to look into something, it would be

17  natural to assume that they would not make a finding

18  about that something, right?

19             MR. CUNNINGHAM:  Same objections.

20     A      That seems reasonable.

21             MR. MCKAY:  Okay.  Thank you.  I don't

22  have anything else.

23             MR. HARRIS:  Do you want to step out for a

24  second?

25             MR. CUNNINGHAM:  We would request a recess



Page 334

1   or a break, please.

2          MR. MCKAY:  Can we make it a lot shorter

3   than 16 minutes?

4          MR. CUNNINGHAM:  Yes.

5          MR. MCKAY:  Thank you.

6          THE VIDEOGRAPHER:  Off the record?  The

7   time is 12:14 p.m., and we are going off the record.

8   This is the end of Clip No. 2 in the deposition of

9   Shawn Christensen, Volume No. 2.

10         (Recess taken.)

11         THE VIDEOGRAPHER:  We are back on the

12  record.  The time is 12:20 p.m., and this is the

13  beginning of Clip No. 3 in the deposition of Shawn

14  Christensen, Volume 2.

15         Thank you, Counsel.

16         MR. CUNNINGHAM:  Mr. Christensen, thank

17  you very much.  I have no further questions.

18         MR. MCKAY:  And I have no further

19  questions either.  Thank you very much for coming in

20  today, sir.

21         THE DEPONENT:  Thank you.

22         MR. CUNNINGHAM:  So, Mr. McKay, is your

23  deposition complete?

24         MR. MCKAY:  Yes.  Well, except for perhaps

25  possible motions regarding the item he -- item or



Page 335

1    items that he didn't testify about, but that's

2    something that we can't deal with today.  So, yes, as

3    far as today goes, yes.

4              MR. CUNNINGHAM:  Okay.  We can't agree to

5    anything --

6              MR. MCKAY:  Right.

7              MR. CUNNINGHAM:  -- along those lines, of

8    course.  Okay.  So for today, and hopefully forever,

9    we are finished.

10             THE VIDEOGRAPHER:  No more questions?

11             MR. MCKAY:  No more questions.

12             THE VIDEOGRAPHER:  This concludes today's

13   proceedings.  We are off the record at 12:21.  This

14   is the end of Clip No. 3 in the deposition of Shawn

15   Christensen, Volume No. 2.

16             (The deposition concluded at 12:21 p.m.,

17   September 26, 2023.)

18

19

20

21

22

23

24

25



```
                                                        Page 336
  1            I, SHAWN CHRISTENSEN, do hereby certify
  2    that I have read the foregoing transcript and that
  3    the same and accompanying amendment sheets, if any,
  4    constitute a true and complete record of my
  5    testimony.
  6
  7
  8
                        _____
  9                     Signature of Deponent
                        ( ) No Amendments
 10                     ( ) Amendments Attached
 11            Acknowledged before me this
 12    _____ day of _____, 2023.
 13
 14            Notary Public: _____
 15            My commission expires _____
 16            Seal:
 17
 18
 19
 20
 21
 22
 23
 24
 25
```



Page 337

1   STATE OF COLORADO)

2                           )   ss.      REPORTER'S CERTIFICATE

3   COUNTY OF DENVER )

4           I, Pamela J. Hansen, do hereby certify that

5   I am a Registered Merit Reporter and Certified

6   Realtime Reporter; that previous to the commencement

7   of the examination, the deponent was duly sworn to

8   testify to the truth.

9           I further certify that this deposition was

10  taken in shorthand by me at the time and place herein

11  set forth, that it was thereafter reduced to

12  typewritten form, and that the foregoing constitutes

13  a true and correct transcript.

14          I further certify that I am not related to,

15  employed by, nor of counsel for any of the parties or

16  attorneys herein, nor otherwise interested in the

17  result of the within action.

18          In witness whereof, I have affixed my

19  signature this 29th day of September, 2023.

20

21          *Pamela J. Hansen*

22          Pamela J. Hansen, CRR, RPR, RMR

23

24

25





## Magna
### Key Contacts

Schedule a Deposition:
**Scheduling@MagnaLS.com | 866-624-6221**

Order a Transcript:
**CustomerService@MagnaLS.com | 866-624-6221**

General Billing Inquiries:
**ARTeam@MagnaLS.com | 866-624-6221**

Scheduling Operations Manager:
**Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)**

Customer Care:
**Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)**

Director of Production Services:
**Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)**

National Director of Discovery Support Services:
**Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)**

Billing Manager:
**Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)**

Director of Sales Operations:
**Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)**



**A**

**A.D**
281:18 287:17
**a.m**
272:6 274:4 297:9,14
**ability**
318:9,12,22
**able**
275:7 286:3,16
  314:25 320:21
**able-bodied**
283:5
**absolutely**
287:15 288:12 317:1
**ACARS**
286:4
**accepted**
275:9
**accepting**
329:1
**accompanying**
336:3
**accurate**
302:23
**acknowledged**
283:21 284:7 313:10
  336:11
**act**
324:16
**action**
337:17
**actions**
282:2
**active**
286:1,17 318:25
**activity**
332:22 333:3
**additional**
301:18 303:1,9,10,15
**address**
289:9 311:25
**addressing**
289:1
**adult**
282:6,22 283:4 309:3

**affixed**
337:18
**afternoon**
298:5
**agencies**
321:15,20
**agency**
286:2 322:13
**agent**
290:9 291:15 326:7
  326:11
**agents**
290:5,12 327:3,11
**ago**
276:23,24 277:19
**agree**
309:11 311:16
  312:18 313:21
  314:13 318:6
  319:18 335:4
**agreed**
329:8
**ahead**
283:2 296:6 298:21
  308:17 309:19
  316:7
**air**
286:1 317:11,22
  318:25 320:8
  321:14 322:7,17
  323:16 329:4
**Airbus**
319:4
**aircraft**
278:17 286:22
  300:22 301:5,13
  315:5 316:5 318:11
  318:16 323:9 329:3
**airline**
322:8
**airlines**
271:5,11 272:3 273:2
  274:17 294:5
  295:20 308:13
  319:5 322:6 324:5,7
  324:16,18 325:3,15

325:16 326:15
  328:4
**airplane**
310:8 323:5,14
**airport**
276:17
**aisle**
307:16
**al**
271:8,11
**allegation**
281:24 282:6,19
  298:18,24,25
  300:16 303:18
  304:5 305:10
  307:10 311:15
**allegations**
298:12,16 310:20
  332:4
**alleged**
307:4,5 308:1,3
  310:25 311:2
  322:15
**allegedly**
282:21 303:24
  304:12
**allowed**
296:8
**Amanda**
301:16 303:8
**amendment**
336:3
**Amendments**
336:9,10
**amount**
274:21
**and/or**
292:15
**announce**
314:19 315:13
**answer**
294:23,25 296:11
  314:25 324:23
**answered**
284:19,21 295:7
  300:11 313:18

**answering**
295:20
**answers**
275:14
**anti-discrimination**
283:17,22 284:9
  313:24 324:6 325:5
**anybody**
281:9 300:8
**Anytime**
281:24
**apologize**
325:12
**appear**
296:24
**APPEARANCES**
271:13
**appeared**
294:10 304:13
**Appearing**
271:18,23
**appears**
287:22 309:1
**appropriate**
281:17 282:2 283:9
  322:10
**appropriately**
286:16
**area**
295:21
**argumentative**
305:13 306:10
  317:19 318:15
  319:15 326:3
**ARINC**
286:5 319:8
**armed**
323:4
**arose**
311:11
**asked**
284:12,15 285:13
  289:21 292:14,20
  296:11 300:10
  313:17 317:23
  329:23 332:21



Page 2

333:2,16
**asking**
296:20
**asleep**
304:14
**associated**
317:22
**assume**
306:22 308:2 319:22
325:3 333:17
**assure**
318:2
**Attached**
336:10
**attendant**
279:16 282:12,14,20
288:2 299:1,3,7,10
299:20 303:7
305:23 307:4 308:6
309:9 310:6 312:23
313:4,10,22
**attendant's**
300:16
**attendants**
276:16 281:25
282:15 284:6,24
299:24 300:25
301:3,11 302:25
307:9 312:2,20
**attendants'**
301:25
**attention**
282:15 311:12
**attorneys**
274:23 337:16
**audited**
279:22 280:2,9
**authorities**
302:18
**available**
278:16 279:7 285:1
285:10 319:10
**AVENUE**
271:14
**avoid**
287:3 314:10

**aware**
315:24 321:16
326:22,25

**B**

**back**
282:17 287:11
292:17 293:2,7,20
294:8,11,25 296:10
297:14 300:15,22
301:4,12,18 303:24
310:7 317:2,7
325:11 331:22
334:11
**backgrounds**
312:20
**badgering**
318:19
**baggage**
329:1
**based**
282:2,9 283:3,12
286:13 287:22
294:9 296:23
297:20 299:18
300:18 307:10
308:25 311:6
320:11,13,22
324:24 325:19
**Basically**
298:16
**basis**
279:3
**began**
274:15
**beginning**
297:15 334:13
**begins**
274:5
**behalf**
271:18,23 274:16
**behavior**
310:20,24 311:1
**believe**
278:13 283:8 288:24
292:2,13 299:22

**aware**
326:14
**best**
285:4 300:12,23
304:16 305:8
311:12
**beyond**
295:19 306:20
307:14,22 309:8
310:15 311:23
313:18 322:12
326:2 327:5 330:14
332:18
**big**
328:3
**bit**
274:24 290:19
**black**
286:14
**borderline**
318:19
**boroughs**
330:20 331:1
**boss**
275:3
**boy's**
302:8
**break**
297:5 334:1
**Bright**
299:8,15,19 302:5
**Bright's**
299:25 303:18
**broadcasts**
317:4
**broader**
325:1
**Bronx**
331:1,3,16,23
**brought**
282:14
**bubble**
321:10
**bunch**
323:12
**business**
288:13 290:17,22,24

291:3,6,12,14
309:22 327:18
**button**
306:7,12,17,22

**C**

**C**
271:20 274:2
**cabin**
282:18
**California**
271:16
**call**
299:15 303:2 306:7
306:12,17,22
323:20
**called**
272:4 286:5 328:22
**calls**
282:25 284:3 286:23
287:5,6 311:3
**captain**
302:5,10,17 303:1
304:17,25 307:8
**captain's**
308:6
**carrying**
274:14
**case**
271:3 277:13,17,21
281:15 282:4
286:20 297:21
308:23 310:23
319:7 322:16
**caught**
311:12
**cause**
292:17 332:10
**caused**
282:4
**certain**
276:4
**Certainly**
301:8
**CERTIFICATE**
337:2



MAGNA
LEGAL SERVICES

Certified
272:8 337:5
certify
336:1 337:4,9,14
changed
327:23 328:7
changes
279:16
chaos
321:23 322:5
characterization
313:2
charge
296:15
charged
294:14
charges
296:24
chatter
286:10 320:7
checked
329:1
Chelsie
299:8,15,19,22 302:5
Chicago
271:21
chief
275:8,8 279:14
285:19
child
282:7 283:5,6 308:7
308:23 309:2,3,21
310:7,8,11
child's
282:23 308:7 310:11
Christensen
271:5 272:4 273:2
274:6,12 297:11,16
297:18 298:3 334:9
334:14,16 335:15
336:1
circa
280:9
circumstance
286:25 312:11
320:16

circumstances
281:15 286:20 308:5
311:21 320:23
cities
330:18
City
330:12,20
Civil
272:2
claimed
299:20
clarify
291:7 317:8 325:9
clean
290:18 294:22
Clip
297:10,15 334:8,13
335:14
Colorado
272:7 337:1
come
309:9 312:20 319:13
320:25
coming
317:20 334:19
commencement
337:6
commencing
272:5
commission
336:15
committed
324:16 325:17 333:9
common
315:10 317:9
communicate
275:12 276:3 286:4
317:10
communication
286:7
communications
280:24
companies
328:22 329:13
company
286:6 291:7,8,10

317:24 327:12
328:3,11
company's
327:2,11
complaints
279:23 281:2,6,10
324:21
complete
334:23 336:4
comprises
328:25
concluded
335:16
concludes
335:12
conclusions
297:20
concussion
292:17
conditioning
329:4
conditions
320:11 322:24
conducted
332:13,15
confidential
316:8
confines
285:12
confirm
303:17
confirmation
310:24 311:3,7
conform
314:20
consequences
288:3
considered
297:1
consortium
328:6
constitute
336:4
constitutes
337:12
consulted

302:12
contact
293:25 302:18 309:6
contains
275:16
contents
284:8 313:11
context
284:25 285:11 320:4
320:17 321:25
contextually
286:13
continued
272:2 316:20
contract
328:3 329:12
Control
286:2 317:11,22
318:25 320:9
321:15 322:7,17
323:16
conversation
303:5,7 327:16
conversations
308:25
corporate
295:20 327:1 329:12
correct
274:17,18 275:17
277:5,11,12 280:21
284:19 289:2
300:12,18 303:11
304:3,9,10,14,20
307:12 310:22
313:19,24 314:5
315:5 324:3,7,10,14
324:18 325:6,24
326:1,4,8,9,16
328:5,17,24 329:2,6
329:10,14 332:19
333:5 337:13
correctly
300:15 323:23
counsel
297:17 326:15,18,20
334:15 337:15


MAGNA
LEGAL SERVICES

**COUNTY**
337:3
**couple**
276:23,24
**course**
280:22 330:10 335:8
**Court**
271:1 296:5
**covered**
297:5
**crew**
278:16 279:7 281:19
283:16,20,21 284:5
284:23 285:15
288:16,19,25 289:4
289:8,16,16 292:2,8
300:8 315:5 316:4
322:9,14 323:14
325:21
**crime**
294:15 333:9
**criminal**
332:22 333:3
**critical**
289:1,10
**criticisms**
279:23
**cross**
329:23 331:8
**crotch**
282:23 298:19
303:25 304:13
305:6 307:21 311:2
311:10,14
**CRR**
337:22
**CULBERTSON**
271:19
**Cunningham**
271:19 273:5 274:11
277:6,24 278:2,8,13
278:20,23 279:3,6
279:11,21 280:1,5
280:16,22 281:14
281:23 283:2,14
284:1,11 285:13

286:18 287:2,11,16
287:24 288:8,14,23
289:8,15,20 290:2
290:18 291:2,9,13
291:19 292:1,7,13
292:21 293:7,12,18
293:24 294:6,7,21
294:24 295:3,6,11
295:15 296:2,7,10
296:14,25 297:4,18
297:23 298:20
300:10 301:14,20
302:19 303:4,12,20
304:2,7,15,21 305:2
305:7,12,19,24
306:3,9,15,19,25
307:6,13,22 308:9
308:14,21 309:17
309:23 310:4,13
311:4,22 312:13
313:1,7,17,25
314:22 315:6,15
316:11,21,25 317:6
317:19 318:8,14,18
319:14 320:1,18
321:8,18 322:2,11
322:23 323:7,18
324:8,19 325:7,18
326:2,23 327:4,13
329:20 330:1,13,23
331:4,9,13,25 332:7
332:17,23 333:4,10
333:19,25 334:4,16
334:22 335:4,7
**Cunningham's**
314:8 326:6 331:19
**current**
285:19
**customer**
276:16 280:7 289:22
290:11

_____ **D** _____

**D**
271:15 273:1 274:2
280:2

**date**
274:4
**dates**
275:3
**day**
336:12 337:19
**deal**
335:2
**decided**
307:9
**decision**
283:4 300:24 301:4
329:12
**deck**
286:7
**declares**
322:9
**Defendants**
271:12,23
**Defense**
315:24 321:14 322:5
**defer**
319:16
**definition**
326:11
**Delta**
328:6
**DelVecchia**
271:8 281:18 292:16
293:1,20 294:1,10
298:17,19,24
299:21 300:4,9
302:6 304:13 305:5
307:17 331:20
332:5,6,14,15
**DelVecchia's**
303:25 304:12
307:20
**demonstrating**
300:3
**denied**
305:5
**denies**
308:1,3
**Denver**
272:6 281:1,5,8

327:25 337:3
**deny**
305:11
**department**
276:4 279:21 315:23
321:14 322:5
**departments**
274:23 276:13 325:3
**deponent**
274:9 280:14 334:21
336:9 337:7
**deposition**
271:4 272:3 273:2
274:5,15,20 275:1
275:16 276:7,10,20
277:8 278:3,4
295:19 296:21
297:10,15 299:11
300:1 307:16,20
309:24 334:8,13,23
335:14,16 337:9
**depositions**
300:19,21 301:10,25
302:2,4 309:1
313:21
**deputy**
275:7
**described**
303:7
**designee**
295:20 327:1
**detail**
304:22
**determine**
280:24 284:2 287:17
294:12 295:8,9
296:15 299:19
**determined**
283:20 288:1 292:25
294:13 302:15
**determines**
323:24
**different**
312:22 316:3 328:11
**differently**
301:11



dig
275:14
direct
277:23 279:25
  280:20 281:12,21
  283:11 285:22
  287:21 288:21
  289:6,9,13,18 291:1
  294:17 296:19
direction
315:23
director
279:12 283:7 285:19
disciplinary
323:25
disciplined
324:6 325:5 326:1
discover
288:18
discrepancy
301:2,15
discretion
314:15
discriminated
288:2
discrimination
280:18 281:2,10
  288:19 323:24
  324:17,22 325:17
  325:23 326:1
discuss
326:17
discussed
281:16 286:5 289:11
  291:20
discussion
278:14 282:10
  284:13 301:1
  302:25
distraction
286:11
DISTRICT
271:1,2
disturbing
313:6
divided

330:20
document
319:25
documents
297:20 299:7 305:16
  318:1,1,3
doing
300:4
DOT
280:2,9
drive
320:5
duly
337:7
duration
283:6
duties
327:11

**E**

E
273:1 274:2,2
easily
276:11
ecunningham@hin...
271:22
either
334:19
else's
287:7
ELT
319:2
emergency
285:23 315:11
  322:24 323:6
employed
290:13 337:15
employee
279:15 284:8 313:12
  313:16 324:5,15
  325:4,16,21
employees
290:14 291:3,10
  329:9,17
employment
288:16

enforce
323:25
enforcement
302:18 303:2 309:6,7
  321:15 322:6,7,15
ensue
310:10
ensued
309:1
ensure
282:3 309:4,12
entire
306:20
entirely
312:22
envision
286:19,19
Eric
271:19
Esq
271:15,19,20
estimate
276:18
et
271:8,11
event
321:24
everybody
308:23 321:23 322:9
everyday
317:15
evidence
301:19 302:16 303:1
  303:10 325:22
examination
273:4 274:10 298:1
  337:7
example
318:23 328:2,21
exceed
329:22
exceeding
277:23
exceeds
279:25 280:20
  281:12,21 283:11

285:22 287:21
288:21 289:6,13,18
291:1 294:3,17,18
296:18,19 303:12
303:21 308:15
309:24 311:5 320:2
321:9 323:7 324:8
324:20 325:8
329:21 333:11
exception
296:2
excuse
276:7 285:24 287:24
  289:10 290:5 291:2
**EXHIBITS**
273:9
expect
279:11,14
expectation
309:15 320:20
expert
331:22
expertise
309:8
expires
336:15
explain
280:5 281:23 285:18
  331:5
expression
290:20
extent
275:25
eyes
324:17 325:14

**F**

F16
314:10 315:3 323:4,8
  323:10,15
face
282:11 298:17,25
  299:21 300:5,9
  302:7,8 303:19
  310:24,25 311:19
  312:6,8


MAGNA
LEGAL SERVICES

faces
311:10
fact
304:19 305:1 313:6
    313:15 330:19,25
fair
295:10 313:2 327:17
    333:3,6
fall
327:15
false
332:4
familiar
299:23 301:21
    327:24 328:9
    330:19,22,25
far
335:3
father
307:10 310:8,9,9
FBI
292:14,25 293:13,19
    293:25 294:4,14
    295:18,22 331:20
    332:3,3 333:1,16
FBI's
293:22
Federal
272:1
feel
276:23 278:3,8 302:8
    312:16
feelings
312:21,23
feels
322:17
felt
312:10
fields
276:13
fighter
314:10,19 315:12,17
    315:19,22,25 316:4
    317:5
fighters
285:15 286:21

files
288:16 325:21
find
283:5 300:21 323:15
finding
298:12 333:8,17
findings
280:10 332:9
fine
295:5
finished
297:6 335:9
fire
329:18
fired
329:19
fires
291:10
first
274:14 277:17
    300:16 302:11,17
five
324:15 325:15
flexi-
289:9
flexibility
288:25 289:10
flight
275:5 276:16 279:15
    281:25 282:12,14
    282:15,19 283:6,16
    284:6,24 285:12,14
    285:15 286:7,14
    288:1,16 292:3
    299:1,3,4,7,10,19
    299:24 300:16,25
    301:3,11,25 302:12
    302:25 303:7
    305:10,22 307:3,3,9
    308:6,8 309:9 310:6
    312:2,20,23 313:4
    313:10,22,22
    320:12 325:22
    328:15 329:16
flying
323:4,8,10,14

focus
298:15 299:5
folks
325:10 328:10
follow
295:4
followed
317:25
FOM
320:15
forcibly
310:11
foregoing
336:2 337:12
forever
335:8
form
277:3 278:11,18
    279:1,8,18,24
    280:19 281:11,20
    283:10,23 285:6,21
    286:24 287:7,20
    288:5,10,20 289:5
    289:12,17 290:15
    290:25 291:16,23
    292:4,10,19 293:3
    293:16,21 294:2,16
    296:17 298:20
    300:10 301:14,20
    302:19 303:20
    306:25 307:13
    308:14 309:18,23
    311:22 313:17
    314:22 315:15
    317:6 318:8,14
    319:14 320:1,18
    321:8,18 322:11,23
    323:18 324:8,19
    325:7 326:2 327:5
    329:20 330:13
    332:17 333:10
    337:12
former
285:19
forth
337:11

found
325:22 332:12,14
foundation
288:12 302:20
    307:14 308:15
    309:24 311:23
    321:19 331:10
    333:11
four
284:6 301:25
Francisco
271:16
Franklin
271:20
freq
285:24
frequencies
318:4
frequency
285:16,24,24 286:1,2
    286:12,17 314:18
    315:2,8,10 317:11
    317:22 319:1
Frontier
271:4,11 272:3 273:2
    274:16,25 275:2
    276:6,9 279:6,13,14
    279:15,22,23 280:2
    280:8,25 281:9
    283:8 287:2,24
    288:1,8 290:6,13
    291:8,15 294:5
    295:20 297:1 299:7
    308:12 309:20
    314:9 317:24
    318:17 319:5
    320:14,24 323:24
    324:5,7,16,18 325:3
    325:11,15,16,25
    326:15 329:9,11,17
Frontier's
305:15 322:21 330:2
fuel
329:5
full
325:15



**further**
334:17,18 337:9,14

**G**

**G**
274:2
**G-U-A-R-D**
317:4
**gates**
329:3
**gee**
323:13
**general**
326:14,17,20
**gentleman**
294:18 295:17
296:21
**gentleman's**
294:3
**getting**
285:14 310:19
318:19
**give**
295:1,11,24 302:23
315:4 318:23
327:22
**given**
271:5 272:4 273:2
274:5 281:4 305:1
308:12 314:21
315:25
**Global**
328:12
**go**
275:13 283:2 296:6
298:21 301:4,18
308:17 309:19
316:7 317:7 325:11
**goes**
295:19 335:3
**going**
274:6 275:4 277:22
284:25 286:9,15
287:25 297:9
303:15 306:14,19
319:7,20 320:4

331:6 334:7
**good**
274:12,13 275:2
298:5,5 313:4
**great**
330:5
**ground**
321:16 328:22,25
**group**
321:4
**grow**
331:15
**Guard**
285:24 317:4,12
323:19
**guess**
308:2 311:12
**guidance**
322:18
**guide**
320:22
**guidelines**
330:7
**guys**
328:8

**H**

**hand**
286:11 298:19
303:25 304:12
305:6 307:20 311:2
311:10,10,14
**Handbook**
284:9 313:12,16
**handle**
281:1,5
**handling**
328:23,25
**hang**
331:11
**Hansen**
272:7 337:4,22
**happen**
277:16 299:25
306:14 307:5,15,19
321:6

**happened**
282:13,24 287:19
**happens**
310:2
**harm**
309:13,16 310:10
**Harris**
271:20 333:23
**head**
292:17 293:2,20
**hear**
286:16 317:4 319:2
320:8 324:1
**heard**
323:23
**hearsay**
296:21
**help**
274:25
**Hey**
319:1
**Hi**
298:3
**HINSHAW**
271:19
**hires**
291:9
**hooking**
329:4
**hope**
316:22
**hopefully**
335:8
**hours**
276:19,22 277:1,5,10
308:8
**human**
276:15 325:4 332:4
332:13

**I**

**II**
271:6 273:2
**Illinois**
271:21
**important**

305:1
**improper**
305:22
**inappropriate**
281:25 282:22
298:12 300:17
301:19 302:16
303:2,10,18 322:16
**inappropriately**
282:7,23
**incident**
287:18
**incidents**
280:18 287:18
**include**
280:17 295:21
298:17 327:2,21
**included**
310:19
**includes**
284:9 321:13
**including**
280:18 282:15 288:3
297:19 322:25
324:1
**independent**
311:8
**INDEX**
273:9
**indicate**
293:15,19,25 305:16
**indicated**
280:8 294:10 325:1
**indicating**
285:3
**indication**
288:18 292:8
**individual**
276:4 282:3 284:5
301:3 303:15
308:23 311:9
321:11
**individuals**
274:22 275:13 282:1
**Inflight**
276:15,16



inform
330:6
information
283:16,22 285:1,10
   303:9,16 308:5
   327:10
Informed
275:5
initial
282:9,10,18
initially
276:23
inoperative
318:24 319:13,16,19
inquiries
295:21
inquiry
293:22
insert
296:21
instance
304:4 306:16
instances
312:5
instruct
281:8
instruction
315:4 316:4
instructions
280:25 281:4 314:20
   315:9,25 317:14
intent
309:1 317:9 323:10
intention
314:19
intentions
315:13 323:15
intercept
323:11
interest
282:1
interested
337:16
interject
309:17 326:23
interrupt

295:25
interrupted
280:13
interruption
296:5
invest-
289:21
investigate
332:21 333:2
investigating
332:3
investigation
280:7,23 281:16
   282:10 283:3,12,19
   287:17,22 288:15
   289:21 290:4
   292:15,16,24 294:9
   294:12,13 296:23
   297:2 298:11 299:6
   299:18 300:7,18
   308:25 311:6
   324:24 325:19
   332:9
investigative
295:18
invite
321:23
invoke
322:5
involved
277:17,21
involvement
277:13 321:13
item
334:25,25
items
284:10 323:12 335:1

J

J
272:7 337:4,22
jets
322:18
jetways
329:4
jibe
353

308:11
John
271:15 295:3 331:6
Johndmckayatty@...
271:17
justification
311:20

K

keep
332:10
kind
275:3 277:19,20
   282:16 300:24
knew
283:15
know
275:4 276:12 279:16
   282:3,17 290:8,11
   290:13 291:14,18
   299:2,3 302:21
   305:14,20 310:1
   311:24 313:15
   320:6 323:10 326:7
   326:10 328:19
knowing
287:6
knowledge
275:19,22 276:1
   310:16 327:2
known
281:15 315:10 317:4
   327:10

L

labor
275:6
Laguardia
330:17
language
317:10
Las
292:15,25 328:10
launching
323:5
law

271:14 302:18 303:2
   309:6,7 321:15
   322:6,15
lay
331:9
legal
276:17 290:8 326:7
legally
326:11
let's
294:21 298:7,15
   299:5 318:17,17
   319:22
level
284:13 304:22
   314:14 315:4,9
   317:17,25 319:23
   321:7,25 322:9
levels
316:17,17 320:22
   321:2
limit
318:17
line
277:23 295:15,17
   306:20 331:5
lines
328:16 335:7
listed
284:10 324:10
listen
318:5
listening
317:3 318:24,25
little
290:19
LLC
271:14 272:3
LLP
271:19
local
322:6
locations
328:20
look
276:2 308:22 313:4



320:21 333:16
**looked**
311:7 325:21
**looking**
313:5
**looks**
312:22
**lot**
275:9,11 286:10
320:7,7 325:10
334:2
**luggage**
329:1

**M**

**ma'am**
274:9
**major**
280:17
**making**
317:17
**man**
302:7
**management**
280:25 281:5,8 289:4
289:9,16 329:17
**manifest**
279:17
**manifests**
278:15 279:7
**manual**
276:3 320:15
**manuals**
274:21 302:12
**March**
324:13
**married**
299:11
**marshalling**
329:3
**material**
302:22
**materials**
277:25
**matter**
290:8 326:7

**McKay**
271:15 273:6 277:3
277:22 278:6,10,14
278:18,22 279:1,4,8
279:18,24 280:3,12
280:19 281:11,16
281:20 282:25
283:10,23 284:3,11
285:6,21 286:23
287:5,14,20 288:5
288:10,20 289:5,12
289:17,20,24
290:15,25 291:4,11
291:16,23 292:4,10
292:14,19 293:3,10
293:16,21 294:2,16
295:1,5,10,13,16
296:4,6,9,17 297:7
297:24 298:2,23
300:13 301:16,24
302:24 303:6,17,23
304:4,9,17,24 305:4
305:9,15,21 306:1,5
306:13,18,21 307:2
307:8,15,25 308:10
309:11,20 310:2,6
310:17 311:14
312:1,15 313:3,9,20
314:7,24 315:8,17
316:13,24 317:1,2
317:13,20 318:11
318:16,21 319:18
320:13,24 321:12
321:22 322:4,20,25
323:13,21 324:12
324:25 325:14,20
326:5,25 327:8,17
329:22,25 330:16
330:24 331:7,11,15
332:2,12,20 333:1,6
333:15,21 334:2,5
334:18,22,24 335:6
335:11
**McKay's**
288:24 290:3 291:20
**mean**

284:21 295:16
305:15 320:6 321:4
331:23
**means**
286:6
**measures**
323:25
**mechanism**
316:3
**member**
283:20 289:15 292:2
292:8 322:14
**members**
288:19 325:22
**memo**
322:8
**mentioned**
325:20 327:18
**Menzies**
327:25 328:1
**Merit**
272:7 337:5
**Metro**
292:15,25 294:14
**Miller**
280:8
**mind**
287:7
**minutes**
298:9 334:3
**mischaracterizes**
289:24 324:20
**misconduct**
305:16
**misqualification**
325:12
**missiles**
323:5
**molestation**
305:10 306:23 332:5
332:15
**molested**
305:17,18 306:7
**molestee**
306:2,24 307:5 308:3
**molester**

306:11,17 307:4
308:1
**molests**
306:6
**monitor**
285:16,25 286:17
315:9 317:21 318:4
318:9,12,12 319:2
319:20 320:6,6
322:21,24
**monitoring**
286:1 315:22 319:24
323:19
**morning**
274:12,13 298:5,5,8
298:10
**motion**
280:12,20
**motions**
334:25
**move**
296:2
**Mullin**
302:11,18
**multiple**
274:22,22 286:6
**myriad**
312:20

**N**

**N**
271:20 273:1 274:2
**name**
299:7,11,23 327:22
327:23 328:7
**names**
327:22
**narrative**
283:1 284:4
**native**
331:23
**natural**
333:17
**naturally**
306:22
**nature**



311:15,19 312:12
**necessarily**
299:4 306:4 311:7,9
  312:11,14 315:7
**need**
278:15 279:6 286:15
  309:17 317:12
  322:17
**needed**
275:12,13,15 276:3
  301:18 302:16
**neither**
312:1
**NEVADA**
271:2
**new**
275:8 317:8,17
  330:12,20
**Nice**
298:3
**Nickel**
303:8
**Nickel's**
301:17
**non-management**
279:15
**normal**
309:21 312:17 317:9
  317:15
**Notary**
336:14
**noted**
277:24 294:6 308:21
**notes**
331:20
**notice**
272:1 275:16 277:1,9
  278:5 307:19
  324:21 330:14
  331:6 333:12
**noticed**
329:25
**notification**
321:24
**notified**
276:23

**number**
291:21

**O**

**O**
274:2
**oath**
274:8
**object**
277:22 279:4 296:17
  296:18,19,20
  298:20 306:19,25
  308:9 315:15
**objection**
277:3,24 278:6,10,10
  278:18 279:1,8,18
  279:24 280:12,19
  281:11,20 282:25
  283:10,23 284:3
  285:6,21 286:23,24
  287:5,6,7,20,21
  288:5,10,20 289:5
  289:12,17,24
  290:15,25 291:16
  291:23 292:4,10,19
  293:3,10,16,21
  294:2,16 295:13,23
  295:25 296:3,8
  300:10 301:14,20
  302:19 303:12,20
  307:13,22 308:14
  308:21 309:18,23
  311:22 313:17
  314:22 317:6,19
  318:8,14 319:14
  320:1,18 321:8,18
  322:11,23 323:7,18
  324:8,19 325:7
  326:2,24 327:4,13
  329:20 330:13
  331:4 332:17
  333:10
**objections**
280:3 287:14 291:4
  291:11 293:10
  294:23 295:1,12

303:4 304:2,7,15,21
  305:2,7,12,19 306:3
  306:9 307:6 310:13
  311:4 312:13
  313:25 315:6
  318:18 322:2
  325:18 327:14
  330:23 331:13,25
  332:7,23 333:19
**obligations**
326:18,20 327:1
**observation**
309:3
**obtain**
303:9
**occur**
287:1
**occurred**
305:11
**occurring**
303:5 308:24
**occurs**
323:25
**Officer**
302:11,17
**officers**
303:3 322:6,7,15
**oh**
327:21,22
**okay**
274:12 276:25
  278:20 290:23
  291:9 296:9 297:7
  298:15,23 299:5,15
  299:16,18 300:3,7
  300:13,20 302:4,10
  303:23 304:4,11
  305:4 306:1,13,18
  307:2,25 310:23
  311:18 312:9,15
  313:9,14,20 315:2
  315:21 316:14
  317:2 319:22
  320:13 325:14,20
  326:5,13,17,22
  327:21 328:10,18

329:7,15,25 330:10
  330:19 331:15,18
  332:2,20 333:21
  335:4,8
**omitted**
304:18
**once**
275:2 282:8,8,9
**operated**
319:5
**operates**
318:17
**operating**
323:9
**operations**
275:5 276:17 279:13
  283:7 285:20
  302:12 317:15
  320:15
**operative**
319:23
**opportunity**
280:23
**options**
323:13
**order**
302:17 316:9
**outside**
286:7

**P**

**P**
274:2
**p.m**
334:7,12 335:16
**PAGE**
273:4
**pains**
330:5
**Pamela**
272:7 337:4,22
**parent**
308:7 309:21 310:12
**PARK**
271:14
**part**



283:19 287:16
288:14 292:14,24
293:22 294:13
297:2
**parties**
305:11 321:14
337:15
**partner**
290:17 291:6,12,15
**partners**
290:22,24 291:3
327:18
**party**
282:16 286:4 319:7
**passenger**
278:15 279:7,17,23
288:2 307:16
309:12,13 324:17
325:17
**passengers**
288:9 324:22
**pays**
290:13,19,23 291:2
**people**
276:6,9,13 289:23
321:5 329:18,18
**perfectly**
312:17
**performing**
327:11
**permission**
308:6
**person**
283:5 304:1 305:17
306:2,5,6,8 308:4
312:4,5,8,9,9,15
**personal**
275:19,22 276:1
312:21,23
**personnel**
290:12
**Peter**
271:8 298:17,18,24
299:20 300:4,8
302:6 304:12,13
305:4 307:17,20

331:20 332:4,5,14
332:15
**Peter's**
305:6
**piece**
302:14
**pilot**
275:8,8 279:14
285:18,19 314:10
314:12,19 315:3,17
315:19,21 316:4
317:16,21 320:5
323:9 330:11,15
**pilot's**
323:15
**pilots**
284:6,16,23 285:3
287:3 302:15
304:19 312:2 314:9
315:11,13,22,25
317:5 320:20
**pilots'**
302:2
**place**
337:10
**plain**
317:10
**Plaintiffs**
271:9,18 272:4
**plane**
314:20 329:2
**please**
280:5 281:23 287:12
293:8 294:24
296:12 308:19
316:15 322:3 327:7
331:10 332:25
333:14 334:1
**plus**
276:22
**point**
329:11
**poked**
294:11 331:21,24
**Police**
292:15 294:14

**policies**
282:2 291:21 292:3,9
330:2
**policy**
324:7 325:6
**popping**
314:6
**portion**
274:14
**position**
299:4,4 325:10
**positions**
325:11
**possessed**
327:2
**possibility**
285:14 323:5
**possible**
327:4 334:25
**preparation**
276:10 277:2
**prepare**
274:19 275:1,12
**prepared**
278:4,9
**preparing**
276:19 277:7
**present**
271:24 320:23
**presented**
278:1
**president**
275:4,5
**previous**
279:13 282:19 317:7
337:6
**primary**
285:25
**prior**
276:22 277:14
**privilege**
326:23 327:5
**privileged**
327:15
**probably**
276:11,22 277:18

306:13 321:1
**problems**
280:17,17
**procedurally**
321:1
**procedure**
272:2 309:5 311:3
**procedures**
279:17 291:21 292:3
292:9 308:12
310:18,19 317:18
317:25 319:23
320:25 321:17
322:21 323:12
330:3,7
**proceedings**
335:13
**produced**
297:21
**production**
317:24
**protective**
316:8
**provide**
316:4 327:10
**providing**
329:5
**Public**
336:14
**purpose**
315:24 317:3
**purposes**
315:11
**pursuance**
309:22
**Pursuant**
272:1
**put**
276:21 327:8
**putting**
311:20 329:2

-----
**Q**

**qualifies**
305:20
**qualify**



314:11
**question**
277:4 278:19,21
   279:2,9,19,25
   280:20 281:12,21
   283:11,24 285:7,22
   286:24 287:8,9,21
   288:6,11,21 289:6
   289:13,18 290:16
   290:19 291:1,17,24
   292:5,11 293:4,5,17
   293:22 294:3,17,22
   294:22,25 295:7
   296:1,10,18 301:22
   308:10,19 314:3,6
   314:23 315:1 316:6
   316:14 317:3,8
   322:3 327:6 333:13
**questioning**
277:23 288:24 290:4
   291:20 295:17
   331:5
**questions**
281:3 283:15 284:12
   284:16,19,22 285:2
   314:8 325:2 326:6
   331:12,19 334:17
   334:19 335:10,11
**quick**
297:4
**quite**
274:24
**quote**
284:16,16 290:5,6
   330:2,3 331:21
**quote-unquote**
298:12
**quotes**
331:21

──────── **R** ────────

**R**
274:2
**racial**
280:18 281:1 324:21
**radio**

318:24 319:17 320:7
**radios**
319:4,6,9,19,22
**ramp**
290:12
**re-**
314:1
**read**
287:11,13 292:8
   293:7,9 294:7,24
   296:10,13 300:20
   301:24 302:2,4
   307:15 308:20
   313:16,20 314:4
   336:2
**reading**
300:19 301:10
**really**
275:2,14
**Realtime**
272:8 337:6
**reason**
292:2 294:3 313:4
   322:21
**reasonable**
281:17 283:8,13
   307:1 308:2 309:10
   309:14,14 322:1
   333:7,20
**reasonableness**
284:25 285:10 320:4
**recall**
278:23 283:17
   285:16 289:23
   290:6 291:21
   292:18,21 299:2,6
   300:2 302:10,13,21
   302:24 303:5,14,22
   304:22,24 305:3
   307:24 314:5
   329:24
**receive**
292:3,7
**received**
277:8 283:16 284:7
   300:2 318:1

**receiving**
283:21 313:24
**recess**
297:12 333:25
   334:10
**recollection**
299:23 300:12,23
   304:16 305:8
**recommend**
329:18
**record**
287:13 293:9 296:13
   296:22 297:9,14
   308:20 314:4 334:6
   334:7,12 335:13
   336:4
**redirect**
303:13,21 306:20
   307:23 308:15
   309:25 311:23
   313:18 329:21
   332:18 333:12
**reduced**
337:11
**reference**
291:6 320:21
**referenced**
302:22
**referred**
330:2
**refers**
324:21
**regard**
284:2
**regarding**
278:14 279:22 281:1
   334:25
**Registered**
272:7 337:5
**related**
337:14
**relations**
275:6 276:16 280:8
**relationship**
288:9
**released**

332:11
**remaining**
308:8
**remember**
277:19 284:13,15
   290:2 298:13
   299:13 327:19
   330:3,7
**remembered**
313:23
**remove**
307:9
**repeat**
287:9 294:21 301:6
   308:18 314:2,2
   333:13
**rephrase**
301:22 316:14 322:3
   332:24
**report**
293:13,19,25 295:18
   295:22 302:5
   304:19 306:7
   308:24 331:20
**reported**
303:24 305:17,22
   309:2
**reporter**
272:8,8 274:7 296:5
   337:5,6
**REPORTER'S**
337:2
**reporting**
306:2
**reports**
307:4
**request**
333:25
**Requested**
287:13 293:9 296:13
   308:20 314:4
**requesting**
322:15
**require**
319:24
**requirement**



286:3
**requires**
320:17 321:25
**rereading**
296:1
**Resource**
289:4,8,16
**resources**
276:15 309:8 325:4
**respect**
284:12 298:23
**respond**
315:23
**responded**
285:2
**responding**
315:3
**response**
276:25 282:5 288:23
 290:3 291:19 314:7
 325:2 326:6 331:18
**responses**
330:1
**responsibilities**
275:10
**responsibility**
313:11
**responsible**
284:8
**result**
337:17
**reveal**
300:8
**review**
288:15,15 297:20
 329:15
**reviewed**
274:21 293:12
**reviewing**
277:25
**rewrite**
320:14,15,19
**Rharris@hinshawl...**
271:23
**Richard**
271:20

**right**
295:10 297:24 300:9
 300:17 301:24
 305:23 307:5
 312:17,24 313:12
 313:16 316:2,7,18
 318:21 319:9,20,24
 322:20 324:2,12
 325:23 327:23
 328:3,4,16 329:5,13
 329:18 330:10
 332:12,16,22 333:9
 333:18 335:6
**ringing**
306:12
**rings**
306:6,17,22
**RMR**
337:22
**Roger**
271:25
**role**
279:12,13
**room**
329:2
**row**
308:4
**RPR**
337:22
**rug**
281:10
**Rule**
274:16 296:20
**Rules**
272:1
_____
          **S**
_____
**S**
274:2
**safety**
282:1,3 285:12
 286:11 308:22
 309:2,4,12
**Sakurada**
299:12
**sales**

276:17
**San**
271:16
**saw**
282:21 300:4 304:1
 304:12 312:3,3
**saying**
304:25 316:12
**says**
306:23 308:4 310:7,9
 318:3 319:24
**scope**
277:23 279:25
 281:21 288:21
 289:6,18 294:18
 295:19 296:18,19
 303:13,21 306:20
 307:14,23 308:15
 309:24,25 310:15
 311:5,23 313:18
 320:2 321:9 322:12
 323:7 324:9,20
 325:8 326:3 327:5
 329:21,23 330:14
 332:18 333:11
**Scott**
282:16,16 300:15,21
 301:4,12,17
**scramble**
322:18
**Seal**
336:16
**seat**
307:16
**seated**
307:16
**second**
333:24
**see**
298:3 299:20 300:3
 301:2,10,15,16
 302:15 307:20
 308:4 312:3 319:2
**seeing**
300:8 302:10
**seen**

302:6,7 303:24
 311:25 331:19
**sent**
282:17 300:15,21
 321:23
**separate**
282:12 283:4 309:6
**separated**
281:18
**separately**
286:4
**September**
271:6 272:5 274:4
 335:17 337:19
**sequence**
285:20
**service**
289:22 290:11
 329:16 330:18
**services**
328:15 329:12
**set**
275:3 276:3 298:16
 311:21 337:11
**sexual**
305:10,16 311:15,19
 312:11 332:5,15
**Shawn**
271:5 272:4 273:2
 274:5 297:10,15
 334:9,13 335:14
 336:1
**sheets**
336:3
**shoot**
286:21 314:19
**shooting**
323:11
**shorter**
334:2
**shorthand**
337:10
**shot**
285:14 314:10,12
**Shupe**
302:6,11,17 303:1



304:25
**Shupe's**
304:17
**signal**
319:2
**signature**
313:11 336:9 337:19
**signed**
284:6
**significant**
280:10
**similar**
287:18
**simply**
309:6 322:8
**single**
313:22
**sir**
274:19 275:18
278:12 294:20
296:14,15 297:3
299:17 300:6 302:1
302:3 308:11
317:23 318:13
319:25 327:20
334:20
**sit**
283:5 291:13 310:7
326:10 331:22
**situation**
286:19 287:4 307:3
308:1 314:15 315:4
315:22 319:12
321:7 323:6
**situations**
289:1
**so-called**
303:18
**solely**
307:10
**solution**
309:10
**somebody**
287:7 306:22 312:16
**son**
298:18 304:13 305:5

307:9
**son's**
298:19,25 299:21
300:5,9 302:7
303:25 304:12
305:6 307:21
**sorry**
280:13 287:9 293:5
296:6 301:6 304:23
308:18 314:1,2
317:23 327:6
332:24 333:13,14
**sound**
301:21 327:24 328:9
**sounds**
299:23
**speak**
275:8 276:7,10
281:10 282:18
321:20 322:13,14
**speaking**
296:3 332:2
**Spear**
271:15
**specifically**
313:23
**speculation**
286:24 287:6 310:14
322:12 333:11
**spent**
276:19 277:1,7
330:11 331:3
**spoke**
274:22,23 275:3
326:14
**ss**
337:2
**SSI**
316:11,13,17,25
**standing**
295:11,24 296:7
**start**
276:7 287:25
**started**
277:25 282:10
325:11

**starts**
328:13
**STATE**
337:1
**statement**
326:8 333:3,7
**States**
271:1 285:15
**step**
283:9 333:23
**stipulate**
316:21,22
**strategy**
317:9
**Street**
271:15,20 272:6
**strike**
280:12,20 296:3
323:1
**struck**
292:16 293:1,20
**Stuart**
271:25
**stuff**
295:12
**subject**
283:16 288:16
289:16 292:2
295:21
**subjective**
309:15 320:11
**subjectively**
285:3
**substance**
295:7
**substantiate**
313:5
**Suite**
271:16,21 272:6
**sure**
294:22 297:5 309:15
316:19,24 320:19
**surrounding**
282:11
**suspicion**
311:11

**sweep**
281:9
**sworn**
337:7

—————— T ——————

**take**
282:1 283:9 296:2
297:4 309:21
**taken**
272:5 297:12 299:11
334:10 337:10
**takes**
310:7
**talk**
285:9 322:19 323:16
**talked**
298:11 321:12
**talking**
312:6 316:16 319:12
320:11 327:19
**talks**
305:21
**team**
281:1,5,9 300:25,25
**Technician**
271:25
**tell**
315:12 316:2 319:1
**telling**
320:9
**termination**
288:4 324:1
**testified**
288:25 299:11
300:14 301:11
302:11 303:8
304:11,18 312:19
313:10,14,15,23
314:7 318:2 323:23
324:4 326:5,13
331:18
**testify**
294:4,5 335:1 337:8
**testifying**
295:17 296:3 327:9


MAGNA
LEGAL SERVICES

**testimonies**
301:3
**testimony**
278:24 289:23,25
290:3 292:22
297:19 300:14
301:17 304:18
308:11 310:18
324:25 326:8,18
329:16 330:1 336:5
**text**
295:22
**thank**
274:9 297:17 323:21
323:21 333:21
334:5,15,16,19,21
**thing**
304:1 320:22
**things**
277:20 327:10
328:25 329:5,7
330:6
**think**
278:22 286:25
288:12 306:16
307:1 308:22
309:14 310:2,5,10
312:19,25 313:2
314:8,11,12,13
317:8 319:18
321:22 322:4,10
327:15,22 329:8
**thinking**
289:1,10
**third**
282:16 286:4 290:23
319:7
**third-party**
289:22 290:17,19,21
290:22,23 291:3,6
291:10,12,14
327:18 328:21
**thought**
285:4
**threat**
284:12 286:21

**three**
314:14 315:3,9
316:17,17 317:17
317:25 319:23
320:22 321:2,6,24
322:9
**three**
299:24 308:8 312:1
319:6,9
**time**
274:3 275:10,11,13
276:24 277:7
287:10 293:6 297:8
297:13 316:1 322:1
327:7 329:11
330:12 331:3 334:7
334:12 337:10
**timeline**
302:13,22,23
**times**
316:1
**today**
291:14 326:10,14,19
331:22 334:20
335:2,3,8
**today's**
274:4 330:1 335:12
**told**
287:17 293:1 325:2
331:21
**tools**
309:7
**topic**
276:1
**topics**
275:16,20,23 278:4,9
297:6
**total**
276:19
**touch**
300:9
**touching**
281:25 282:7,7,11,22
282:22,23 298:13
298:17,24 299:21
300:17 301:19
302:6,7,17 303:2,10

303:19 304:5,8
305:22 310:25,25
311:8,9,11,18 312:6
312:8 322:16
**Traffic**
286:1 317:11,22
318:25 320:8
321:15 322:7,17
323:16
**trafficking**
332:4,13
**trained**
289:16 315:19
321:21
**training**
283:17,21 309:9
313:24
**transcript**
316:22,23 336:2
337:13
**Transportation**
279:22
**treated**
316:23
**tremendous**
274:21
**true**
336:4 337:13
**truth**
337:8
**trying**
315:12 316:2 327:21
**Tuesday**
272:5
**tune**
318:20
**tuned**
319:7
**turn**
286:12,16 314:15
320:8
**turned**
332:3
**tweaking**
321:2
**two**

277:19 284:6 298:18
311:8,9,10,10 312:2
312:5 331:12
**type**
286:20 304:8 311:8
**typewritten**
337:12
**typically**
275:6 285:25 306:2
319:6

------

**U**

**U.S**
286:21
**Uh-huh**
278:25 323:3
**uncomfortable**
302:8 312:10,16
**understand**
298:16 315:21
316:18
**understanding**
332:8
**understood**
300:14
**Unify**
327:23 328:8
**United**
271:1 285:15
**unusual**
305:9 310:20,24
311:1
**unverified**
304:5
**use**
288:25 289:4 317:9
328:8
**utilize**
309:7

------

**V**

**v**
271:10
**value**
288:8
**Vegas**



292:15,25 328:11
**vendor**
328:21
**vendors**
289:22 290:20
**verification**
310:20 311:1
**verify**
282:18 300:16
**vice**
275:4,5
**video**
271:25 299:25 300:2
**video-recorded**
271:4 272:2 274:5
**VIDEOGRAPHER**
274:3 297:8,13 334:6
334:11 335:10,12
**violating**
324:6 325:5
**Volume**
271:6 273:2 274:6
297:11,16 334:9,14
335:15
**volunteered**
301:17 303:9

**W**

**W**
328:13
**walk**
282:17
**walked**
278:2
**want**
277:18 284:16 294:7
295:12,24 310:9
318:4 320:20
333:23
**wanted**
285:3 303:1 316:19
**wants**
306:7 314:12
**Warren**
282:16 287:18
292:16 293:1,19

294:1,14 296:16,24
300:15,22 301:4,12
301:17 303:8,14,17
303:23 304:11,18
305:1,5 332:21
333:2,9
**Warren's**
307:10
**wasn't**
278:20 293:22
311:19,24 312:4
313:22 332:3
**watch**
299:25
**way**
277:7 281:15 295:19
305:20 327:9
**we'll**
286:17 316:21
**we're**
286:2 312:6 316:16
317:11 320:10
**we've**
297:5 298:9
**weeks**
276:21
**went**
301:12
**WFS**
328:13
**whereof**
337:18
**white**
286:14
**willing**
275:9
**window**
324:10 325:13,15
**wise**
302:13,22
**witness**
274:16 296:11
337:18
**word**
311:13 331:24
**work**

275:6 285:20 328:4
330:11
**worked**
328:20
**working**
275:10
**Worldwide**
328:11,15 329:16
**wouldn't**
306:1,11,21 310:5
318:7 323:8,9
**write**
321:6

**X**

**X**
273:1
**XYZ**
291:7

**Y**

**yeah**
276:15 295:16 298:6
298:9 301:9 314:5
320:3 327:8 328:1
328:17,20 330:16
**year**
277:18
**years**
276:23,24 324:15
325:16
**yesterday**
274:8,15 278:3,14
281:17 283:14
284:11 286:5
288:24 289:20
290:3 291:20
292:13 297:19
310:19 312:19
313:15 318:2
321:13 324:4,25
325:1 326:13,19
329:8 330:5
**York**
330:12,20
**younger**

331:14

**Z**

**0**

**1**

**1**
297:10
**10**
276:11
**10:39**
272:6 274:3
**11:11**
297:8
**11:28**
297:13
**1100**
271:16
**12:14**
334:7
**12:20**
334:12
**12:21**
335:13,16
**121.5**
285:16,23 286:8,10
314:16 315:2,8,13
315:22 317:3 318:4
318:9,12,24 319:20
319:24 322:22,24
**15**
276:11
**151**
271:20
**16**
334:3
**16th**
272:6

**2**

**2**
274:6 286:20 297:11
297:15,16 314:14
315:4,9 317:17,25
319:23 321:7,25



322:9 334:8,9,14
335:15
**2:19-CV-01322-KJ...**
271:3
**201**
271:15
**2014**
324:13
**2016**
280:9
**2019**
324:13
**2021**
277:19
**2022**
277:19
**2023**
271:6 272:5 274:4
335:17 336:12
337:19
**2067**
307:3 313:23 325:22
**216**
272:6
**2500**
271:21
**26**
271:6 272:5 274:4
335:17
**274**
273:5
**28**
324:13
**298**
273:6
**29th**
337:19

_____
3
_____
**3**
334:13 335:14
**30(b)(6)**
271:4 272:3 273:2
274:16 276:25
277:8 294:19
295:19 296:20

308:16 324:11
**31**
298:9
**312.422.5717**
271:22
**320**
319:4
**37**
275:16,18 295:21
**39**
275:18

_____
4
_____
**434.531.9569**
271:17

_____
5
_____

_____
6
_____
**600**
272:6
**60606**
271:21

_____
7
_____
**7-0**
277:1,11,12
**70**
276:22 277:1,1,5,5
277:10

_____
8
_____

_____
9
_____
**94105**
271:16



1   MARGARET A. MCLETCHIE, Nevada Bar No. 10931
    **MCLETCHIE LAW GROUP, PLLC**
2   602 South 10ᵗʰ Street
3   Las Vegas, NV 89101
    Telephone: (702) 728-5300 / Fax: (702) 425-8220
4   Email: efile@nvlitigation.com

5   JOHN D. MCKAY (*pro hac vice*)
    **PARK AVENUE LAW LLC**
6   201 Spear Street, Suite 1100
7   San Francisco, CA 94105
    Telephone: (434) 531-9569 / Fax: (407) 264-6551
8   Email: johndmckayatty@gmail.com

9   *Counsel for Plaintiffs Peter DelVecchia and A.D., a Minor*

10

11              **UNITED STATES DISTRICT COURT**
12               **FOR THE DISTRICT OF NEVADA**

13
    PETER DELVECCHIA, *et al.*,          )   **Case No: 2:19-CV-01322-KJD-DJA**
14                                        )
                     Plaintiffs,          )
15                                        )
                                          )
16                                        )   **PLAINTIFFS' SIXTH AMENDED NOTICE**
    vs.                                   )   **OF LIVE VIDEO DEPOSITION OF**
17                                        )   **DEFENDANT FRONTIER AIRLINES, INC.**
                                          )   **PURSUANT TO FED. R. CIV. P. 30(b)(6)**
18                                        )   **(SEPTEMBER 25-26, 2023)**
19   FRONTIER AIRLINES, INC., *et al.*,   )
                                          )
20                   Defendants.          )
21   ──────────────────────────────────  )

22
23        PLEASE TAKE NOTICE that the undersigned attorney for Plaintiffs, Peter DelVecchia

24   individually and as next friend of A.D., a minor, will take the remote videotaped deposition of

25   Defendant Frontier Airlines, Inc., through its designated representatives, pursuant to Fed. R. Civ. P.

26   30(b)(6), on the dates and times specified below, upon oral examination before a Notary Public or

27   other person authorized to administer oaths, to be recorded by stenographic and audiovisual means,

28
              PLAINTIFFS' 6TH AMENDED NOTICE OF DEPOSITION OF DEFENDANT
                            FRONTIER AIRLINES, INC.
                                 Page 1 of 11

1   for discovery and use as evidence, and for all other purposes permitted by the Federal Rules of Civil

2   Procedure. The deposition will continue from day to day until completed. The details are:

3       **Deponent:**       **FRONTIER AIRLINES, INC.**

4       **Dates:**          **September 25 and 26, 2023, although the deposition will continue**
5                           **from day to day until completed. See below for initial breakdown**
6                           **of topics by day**

7       **Time:**           **Beginning at 10:00 a.m. MST each day**

8       **Place:**          **AB Litigation Services (Agren Blando Court Reporting & Video)**
                            **216 16th Street, Suite 600**
9                           **Denver, CO 80202**

10          Pursuant to Fed. R. Civ. P. 30(b)(6), the deponent party (hereinafter "Frontier") must

11  designate one or more officers, directors, or managing agents, or designate other persons who consent
12

13  to testify on its behalf, to testify on the following list of subjects. As used in the list of subjects,

14  "Flight 2067" means the Frontier flight operating with that flight number between RDU and LAS on

15  the evening of March 28, 2019. The persons designated must testify about information known or

16  reasonably available to the company, including the knowledge of any employees or agents of the
17

18  company.

19                                      SUBJECT LIST

20                          **Day One (September 25, 2023):**

21   1.  The specific details of all training given by Frontier to Flight Attendants Anna Bond, Chelsie

22      Bright (Sakurada), Amanda Nickel and/or Scott Warren (hereinafter the "Subject Flight

23      Attendants") prior to March 28, 2019 on the topics of: (a) passengers engaged in, or suspected
24
        to be engaged in, human trafficking; (b) sexual misconduct by passengers against other
25
        passengers; (c) the prevention of racial discrimination (including, without limitation, racial

26      profiling) in interactions with passengers; (d) conflict management, including, without

27

28              PLAINTIFFS' 6TH AMENDED NOTICE OF DEPOSITION OF DEFENDANT
                                FRONTIER AIRLINES, INC.
                                      Page 2 of 11

limitation, the "CUS" system and use of the "Red Stop Card"; (e) circumstances in which Frontier considers physical contact by flight attendants with adult and minor passengers is appropriate; (f) circumstances in which Frontier considers it appropriate for a flight attendant to discuss alleged sexual misconduct with a minor passenger and to place a hand on or near the minor passenger's genital area; and any other training given by Frontier to the Subject Flight Attendants that is mentioned in Frontier's responses to discovery questions and/or documents produced by Frontier in this litigation.

2. The reason why Frontier did not provide a manifest of passengers' names to the crew of Flight 2067, and the availability of such a manifest to members of Frontier's flight operations center during Flight 2067.

3. Frontier's knowledge of the Department of Transportation (DOT) "Guidance for Airline Personnel on Non-discrimination in Air Travel" (January 2017); DOT News Release dated January 13, 2017; DOT "Passengers' Right to Fly Free from Discrimination" (January 2017); DOT Consent Order, Docket OST 2003-15046 (Feb. 27, 2004); DOT Order, Docket OST-2004-17197 (Feb. 24, 2004); DOT Consent Order, Docket OST-2011-0003 (Nov. 1, 2011); Consent Order, Docket OST-2012-0002 (May 2, 2012), documents Bates Stamped P000748-P000780, and any and all actions taken by Frontier relating to the subject matter of those documents, including the reasons for such actions (or inaction).

4. Frontier's policy against discrimination toward passengers, how it is communicated to its employees, what policies and/or procedures (if any) are in place that could impose any consequences for an employee who fails to follow the policy (such as, for example, disciplinary measures and/or retraining), and the number of times between March 28, 2014 and March 28, 2019 that any employees were subjected to any such consequences as a result

1  of a finding that the employees had failed to follow the policy. In addition, the facts and

2  circumstances that led to any such consequences.

3     5.  The contents of Frontier's Flight Attendant Manual ("FAM") and training materials that

4  mention any of the following subjects: (a) human trafficking; (b) sex trafficking; (c) sexual

5  misconduct by passengers against other passengers; (d) child abuse and/or child molestation

6  by passengers against other passengers; (e) racial profiling as it relates to interactions with

7  passengers; (f) racial discrimination as it relates to interactions with passengers; (g) the

8  classification of passengers as Threat Levels One and/or Two, and procedures to be followed

9  upon making such classification(s); (h) the prohibitions against flight attendants all

10  congregating in one area of the aircraft during flight, or allowing all flight attendants to

11  become focused on a single issue during flight; and (i) the prohibition against more than one

12  flight attendant being in the cockpit at the same time.

13     6.  The text of the "Relationships with Customers" subsection of the "COMPETITION AND

14  FAIR DEALING" section of Frontier's "Code of Ethics" contained within its Employee

15  Handbook produced in this action, how that text is communicated to employees, whether

16  employees are specifically trained and/or tested on its contents and meaning, what policies

17  and/or procedures (if any) are in place that could impose any consequences for an employee

18  who fails to follow the "Relationships with Customers" subsection (such as, for example,

19  disciplinary measures and/or retraining), and the number of times between March 28, 2014

20  and March 28, 2019 that any employees were subjected to any such consequences as a result

21  of a finding that the employees had failed to follow the "Relationships with Customers"

22  subsection. In addition, the facts and circumstances that led to any such consequences.

7. Why no investigation or disciplinary action against Defendant Scott Warren resulted from Peter DelVecchia's 2019 complaint to Frontier that Warren had falsely identified himself as "Kevin," struck Peter DelVecchia on the head and physically took his child away from him during the flight.

8. The text of the "COMPLIANCE WITH LAWS AND REGULATIONS" section of Frontier's "Code of Ethics" contained within its Employee Handbook produced in this action, how that text is communicated to employees, whether employees are specifically trained and/or tested on its contents and meaning, what policies and/or procedures (if any) are in place that could impose any consequences (such as, for example, disciplinary measures and/or retraining) for an employee who fails to follow the "COMPLIANCE WITH LAWS AND REGULATIONS" section in circumstances where the laws and regulations involved were those that apply to discrimination against passengers on the basis of race or ethnicity, and the number of times between March 28, 2014 and March 28, 2019 that any employees were subjected to any such consequences as a result of a finding that the employees had failed to follow the "COMPLIANCE WITH LAWS AND REGULATIONS" section in circumstances where the laws and regulations involved were those that apply to discrimination against passengers on the basis of race or ethnicity. In addition, the facts and circumstances that led to any such consequences.

9. All information known to Frontier about the employment histories and records of the Subject Flight Attendants, regardless of whether or not documents containing such information has already been produced, and including, without limitation, the contents of their employee files labeled "Confidential/EEOC," "Confidential/Investigations," and "Recruitment/Flight Attendant Hired," as well as any information concerning disciplinary actions, demerits,

warnings (including, without limitation, documented verbal warnings or DVWs), adverse

employment actions, demotions, investigations, and/or demerit points accumulated for each of

the Subject Flight Attendants.

10. [Protective Order Granted].

11. Frontier's creation and publication of "Inflight Must Read" Number 19-13 dated March 15,

2019 on the subject of "Sexual Misconduct."

12. Frontier's creation and publication of Revision 63 to Frontier's FAM dated 04/01/19 titled

"20.50 Human Trafficking."

13. Frontier's Employee Handbook, "Standards of Conduct" Section 4, including, without

limitation, policies on physical violence and dishonesty, falsification and misrepresentation.

**Day Two (September 26, 2023):**

14. The authority of the Pilot in Command and Captain during a flight, and FOM provisions

describing the authority.

15. Any and all training given by Frontier to pilots Rex Shupe and/or Shawn Mullin (hereinafter

the "Subject Pilots") on the topics of: (a) passengers engaged in, or suspected to be engaged

in, human trafficking; (b) sexual misconduct by passengers against other passengers; (c) child

abuse and/or child molestation by passengers against other passengers; (d) the avoidance of

racial discrimination as it relates to interactions with passengers; (e) the avoidance of racial

profiling as it relates to interactions with passengers; (f) the classification of passengers as

Threat Levels One and/or Two, and procedures to be followed upon making such

classification(s); (g) information gathering requirements before taking action against a

passenger; and any other training given by Frontier to the Subject Pilots that is mentioned in

1    Frontier's responses to discovery questions and/or documents produced by Frontier in this

2    litigation.

3    16. The contents of Frontier's Flight Operations Manual ("FOM") that mention any of the

4    following subjects: (a) human trafficking; (b) sex trafficking; (c) sexual misconduct by

5

6    passengers against other passengers; (d) child abuse and/or child molestation by passengers

7    against other passengers; (e) racial profiling as it relates to interactions with passengers; (f)

8    racial discrimination as it relates to interactions with passengers; or (g) the classification of

9    passengers as Threat Levels One and/or Two, and procedures to be followed upon making

10   such classification(s).

11

12   17. Why no investigation was conducted, or discipline imposed, relating to Captain Rex Shupe's

13   and First Officer Mullin's failure to follow written procedures for a Threat Level 2 on Flight

14   2067 including, without limitation, failing to lock down the cockpit, failing to notify Air

15   Traffic Control, failing to consider diversion to a different airport, and failing to prepare for

16   interception by DoD fighters.

17

18   18. Why no investigation was conducted, or discipline imposed, relating to Captain Rex Shupe's

19   and First Officer Mullin's failure to follow written procedures on Flight 2067 requiring that

20   no more than one flight attendant be permitted in the cockpit at any one time.

21   19. All facts known by Las Vegas Chief Pilot Devin Hussey concerning Plaintiffs, Flight 2067

22   conducted on March 28, 2019 between RDU and LAS (hereinafter "Flight 2067"), and/or any

23   investigation conducted into the facts and circumstances of Flight 2067.

24

25   20. The contents of all Skyspeed and/or ACARS messages concerning the events on Frontier

26   Flight 2067 between KRDU and KLAS on March 28, 2019 involving Plaintiffs, the identities

27   of all persons who authored, received, saw and/or had access at any time to those messages,

28

PLAINTIFFS' 6TH AMENDED NOTICE OF DEPOSITION OF DEFENDANT
FRONTIER AIRLINES, INC.
Page 7 of 11

the method(s) by which such messages were stored, and the meaning of all numerical codes used in the messages, including, without limitation, "6393."

21. All information known to Frontier about the employment histories and records of the Subject Pilots, regardless of whether or not documents containing such information has already been produced, and including, without limitation, the contents of their employee files labeled "Confidential/EEOC," "Confidential/Investigations," and "Recruitment/Flight Attendant Hired," as well as any information concerning disciplinary actions, demerits, warnings (including, without limitation, documented verbal warnings or DVWs), adverse employment actions, demotions, investigations, and/or demerit points accumulated for each of the Subject Pilots.

22. All communications between the cockpit of Flight 2067 and/or Frontier's flight operations center and the Airport Communications Center of LAS concerning Plaintiffs and the request for law enforcement officers to meet the flight when it landed.

23. Frontier's net worth as of the date of the deposition (or as of the most recent accounting period).

24. The factual bases for any affirmative defenses pleaded by Frontier in this action.

25. Any and all statements obtained from passengers on Flight 2067 other than Plaintiffs, relating to any of the matters alleged by Plaintiffs in this action.

26. All interrogatory answers provided as of the date of the deposition by Frontier.

27. The content of documents produced as of the date of the deposition by Frontier. Plaintiffs intend to inquire into the content of all documents referenced in the other numbered topics of this Notice as well as those that are not referenced in the other topics but have been listed on **Exhibit A**. The nature of the questions about the documents referenced in the other topics of

this Notice is implicit in the wording of those topics. Questions about the other documents listed on **Exhibit A** are set forth on **Exhibit B**.

28. Information obtained by Frontier or its agents, including, without limitation, its investigators and attorneys, that confirms, supports or refutes Plaintiffs' allegation that Flight Attendant Scott Warren struck Plaintiff Peter DelVecchia.

29. Information obtained by Frontier or its agents that confirms, supports or refutes Plaintiffs' allegation that Flight Attendant Scott Warren sexually assaulted Plaintiff A.D.

30. The details of investigations conducted by Frontier concerning the human trafficking incident reports produced by Frontier to Plaintiffs up to the date of the deposition.

31. The details of disciplinary actions against any Frontier employee, and/or additional training provided to any Frontier employee, relating to the subject matter of the human trafficking incident reports produced by Frontier to Plaintiffs up to the date of the deposition.

32. The details of investigations conducted by Frontier concerning the passenger/customer complaints of discrimination produced by Frontier to Plaintiffs that are listed on **Exhibit A** hereto.

33. The details of disciplinary actions against any Frontier employee, and/or additional training provided to any Frontier employee, relating to the subject matter of the passenger/customer complaints of discrimination produced by Frontier to Plaintiffs that are listed on **Exhibit A** hereto.

34. The details of all communications with the Department of Transportation concerning the subject matter of the passenger/customer complaints of discrimination produced by Frontier to Plaintiffs that are listed on **Exhibit A** hereto.

35. The details of any instructions that any person in Frontier's management has given to any person assigned to Frontier's Customer Relations Department (regardless of whether the recipient was in a managerial position or a non-managerial position and including, without limitation, any of the Customer Relations employees working on the "Denver Team" of Customer Relations) about how the recipient or the employees working under the recipient should respond to complaints alleging racial discrimination, ethnic discrimination, or other forms of discrimination, and/or about how such persons should code, classify, or index complaints that contain allegations of discrimination.

36. The content of the "Customer Relations Templates" described by Elizabeth Zimmerman in her deposition, and instructions regarding the use of such templates to respond to passenger complaints of discrimination.

37. Discussions between Frontier's senior management and Inflight management during the period between March 28, 2014 and March 28, 2019 concerning how the number and/or frequency of passenger discrimination complaints could be reduced.

38. Details of the destruction in May, 2020 of the database that contained crewmember assignments for past flights, or the rendering of that database as no longer searchable.


DATED this 7th day of September, 2023.

John D. McKay

*Attorney for Plaintiffs Peter DelVecchia*
*And A.D., a Minor*

1

## **CERTIFICATE OF SERVICE**

2

3      I HEREBY CERTIFY that on September 7, 2023, pursuant to prior agreement of counsel

4    permitting electronic service by email, I served the foregoing Sixth Amended Notice of Deposition

5    on counsel for Defendants by email addressed to the following persons:

6
              Brian T. Maye, Esq.
7              Lawrence S. Gosewisch, Esq.
              Richard C. Harris, Esq.
8              HINSHAW & CULBERTSON LLP
              151 N. Franklin Street, Suite 2500
9              Chicago, Illinois 60606
              Email: bmaye@hinshawlaw.com
10                    lgosewisch@hinshawlaw.com
                      rharris@hinshawlaw.com
11
12             Charles A. Michalek, Esq.
              ROGERS, MASTRANGELO, CARVALHO & MITCHELL
13             700 South Third Street
              Las Vegas, Nevada 89101
14             Email: cmichalek@rmcmlaw.com
15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' 6TH AMENDED NOTICE OF DEPOSITION OF DEFENDANT
FRONTIER AIRLINES, INC.
Page 11 of 11

**EXHIBIT A**

**(The following list contains the Bates numbers of discrimination complaints produced by Frontier pursuant to the Court's May 8, 2020 and March 29, 2021 Orders compelling production, ECF No. 83 and 120, respectively. All of the Bates numbers are preceded by the prefix "19AZF0229 DELVECCHIA FRONTIER")**

1135
1136-37
1138-39
1140-41
1142-1143
1144-45
1146-47
1148
1149-50
1151-52
1153-54
1155-59
1160-66
1167-76
1177-78
1179-80
1181-82
1183-84
1185-90
1199-1201
1202-04
1205-06
1207-08
1217-24
1236-37
1238-39
1240-46
1254-60
1261-64
1272-78
1287-89
1293-97
1298-1303
1304-05
1328-29
1330-38

1339-44
1363-64
1365-66
1367-72
1373-76
1377-84
1387-88
1400-12
1413-19
1420-21
1442-56
1457-58
1459
1460-69
1470-77
1481-1508
1499-1500
1514-24
1525-30
1531
2125-27
2128-29
2142-44
2147-56
2161-62
2172-73
2174-84
2197-98
2251-56
2266-73
2284-93
2294-2305
2315-16
2317-26
2335
2343-48
2364-65
2366-67
2384-94
2427-41
2442-43
2446-67
2470-81
2482-90

2491
2534-37
2560-65
2566-78
2664
2702-13
2714-15
2724-31
2742-43
2744-51
2768-85
2946-53
3068-80
3092-99
3123-24
3227-34
3269-72
3296-3303
3304
3305-12
3388-3427
3454-56
3481-93
3526-36
3537-54
3555
3564-77
3613-16
3619-25
3626-38
3730-37
3738-44
3753-62
3764-72
3773-80
3866-75
3908-13

**EXHIBIT B**

With respect to each of the discrimination complaint summaries referenced by Bates numbers on Exhibit A, Plaintiffs' counsel intend to ask the following specific questions:

1.      Did Frontier conduct any investigation that involved asking: (a) the complaining customer; (b) any other passenger or customer who witnessed the incident; or (c) any law enforcement officer(s) who responded to the incident, specific questions about the facts of the alleged incident of discrimination to attempt to determine exactly what transpired?

2.      If Frontier did not interview a person listed in Question 1(a) through (c), why did it not do so?

3.      Does Frontier believe that solely asking its employees or agents whether they committed discrimination was a sufficiently thorough investigation of the incident? If so, why?

4.      If the summary indicates that the complaining customer was informed that a further investigation of the incident would be conducted by Frontier, was a further investigation actually conducted? What were the findings of that investigation?

5.      If the complaining customer was informed that a further investigation would be conducted, and no such further investigation was conducted, why was the complaining customer provided false information?

6.      Did Frontier determine that any employee or agent committed an act of discrimination as alleged by the complaining customer?

7.      If Frontier did determine that any employee or agent committed an act of discrimination as alleged by the complaining customer, what measures were taken to ensure that the employee or agent would not repeat acts of discrimination in the future?

8.      If Frontier did determine that any employee or agent committed an act of discrimination as alleged by the complaining customer, what measures were taken to ensure that the terms of a non-discrimination policy were reinforced among Frontier's other employees and agents?

9.      What standards existed at the time of the complaint concerning the types of vouchers to be offered to passengers who complained of discrimination?

```
        FYT                  PRINTED:
                             Summary  -              Report - by Date/Eqpt/Pos

ID #                    BOND  ANNA
Qual1:          319      -YA
Qual2:                   -
Qual3:                   -
Qual4:                   -
Certificate# : 3937309
```

| A/C | POS | CODE | DESCRIPTION | S/U | TrgDate | BaseMonth | Instructor# | Hrs/Min. | Lodgs | Cls | FAA |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 22OCT19 | OCT | 428082 | 6: 0 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 22OCT19 | OCT | 427042 | 2: 0 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 22OCT19 | OCT | 427554 | 3: 0 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 22OCT19 | OCT | 405593 | 1: 0 | 00 | 00 | |
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 19OCT18 | OCT | 414537 | 5: 0 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 19OCT18 | OCT | 422845 | 2: 0 | 00 | 00 | |
| | | RHAZ | Recurrent Haz-Mat record per 121.1007(c) | | 19OCT18 | OCT | 422845 | 1: 0 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 19OCT18 | OCT | 401361 | 3: 0 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 19OCT18 | OCT | 410358 | 1: 0 | 00 | 00 | |
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 18OCT17 | OCT | 427796 | 6:00 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 18OCT17 | OCT | 414537 | 2:00 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 18OCT17 | OCT | 427796 | 3:00 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 18OCT17 | OCT | 405593 | 1:00 | 00 | 00 | |
| | | IOE | Initial Operating Experience | | 08NOV16 | NOV | 405384 | 7:12 | 00 | 00 | |
| 319 | | IEMV | Initial Emergency Training (hands on) | | 27OCT16 | OCT | 401361 | : | 00 | 00 | |
| 319 | | ICC | Initial Competency Check | | 27OCT16 | OCT | 401361 | : | 00 | 00 | |
| | | IGS | Initial Ground Training | | 27OCT16 | OCT | 401361 | : | 00 | 00 | |
| | | IBI | Initial Basic Indoc | | 27OCT16 | OCT | 401361 | : | 00 | 00 | |
| | | ISEC | Initial Security Training F/A | | 26OCT16 | OCT | 422972 | 14:00 | 00 | 00 | |
| | | ICRM | Initial Crew Resource Management | | 26OCT16 | OCT | 422972 | : | 00 | 00 | |
| | | IH2O | Initial Over Water Training | | 24OCT16 | | 401361 | 5: | 00 | 00 | |
| | | IHAZ | Initial Haz-Mat record per 121.1007(c) | | 19OCT16 | OCT | 421020 | 2: | 00 | 00 | |
| 319 | | IDIFF3 | Initial Differences Training 319/319 | | 14OCT16 | | 421020 | : | 00 | 00 | |
| | | IDIFF4 | Initial Differences Training 320/319/318 | | 14OCT16 | | 421020 | : | 00 | 00 | |
| | | IDIFF321 | Initial Differences for the 321 | | 14OCT16 | | 421020 | : | 00 | 00 | |

END OF REPORT

CONFIDENTIAL  INFORMATION SUBJECT

19AZF0229 DELVECCHIA FRONTIER 204



EXHIBIT
2
Frontier

```
        FFT            PRINTED: ████
                       Summary  -  ████  Report - by Date/Eqpt/Pos

ID #  ████        BRIGHT  CHELSIE  ADRIANN
Qual1.  ████  319      -FA
Qual2:                 -
Qual3:                 -
Qual4:                 -
Certificate# : 3937832
```

| A/C | POS | CODE | DESCRIPTION | S/U | TrgDate | BaseMonth | Instructor# | Hrs/min. | Lndgs | Cls | FAA |
|-----|-----|------|-------------|-----|---------|-----------|-------------|----------|-------|-----|-----|
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 09NOV18 | NOV | 421025 | 5: 0 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 09NOV18 | NOV | 422845 | 2: 0 | 00 | 00 | |
| | | REAZ | Recurrent Haz-Mat record per 121.1007(c) | | 09NOV18 | NOV | 422845 | 1: 0 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 09NOV18 | NOV | 407278 | 3: 0 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 09NOV18 | NOV | 405593 | 1: 0 | 00 | 00 | |
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 20NOV17 | NOV | 422845 | 6: 0 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 20NOV17 | NOV | 421020 | 2: 0 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 20NOV17 | NOV | 427796 | 3: 0 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 20NOV17 | NOV | 421020 | 1: 0 | 00 | 00 | |
| | | IOE | Initial Operating Experience | | 29NOV16 | NOV | 404186 | 9:30 | 00 | 00 | |
| 319 | | IEMV | Initial Emergency Training (hands on) | | 17NOV16 | NOV | 401361 | 0: | 00 | 00 | |
| 319 | | ICC | Initial Competency Check | | 17NOV16 | NOV | 401361 | 0: | 00 | 00 | |
| | | IGS | Initial Ground Training | | 17NOV16 | NOV | 401361 | 50: | 00 | 00 | |
| | | IBI | Initial Basic Indoc | | 17NOV16 | NOV | 401361 | 0: | 00 | 00 | |
| | | ISEC | Initial Security Training F/A | | 16NOV16 | NOV | 422972 | 14: 0 | 00 | 00 | |
| | | ICRM | Initial Crew Resource Management | | 16NOV16 | NOV | 422972 | 0: 0 | 00 | 00 | |
| | | IH2O | Initial Over Water Training | | 14NOV16 | NOV | 422972 | 5: 0 | 00 | 00 | |
| | | IHAZ | Initial Haz-Mat record per 121.1007(c) | | 09NOV16 | NOV | 424890 | 2: 0 | 00 | 00 | |
| 319 | | IDIFF3 | Initial Differences Training 319/318 | | 04NOV16 | | 401361 | : | 00 | 00 | |
| | | IDIFF4 | Initial Differences Training 320/319/318 | | 04NOV16 | | 401361 | : | 00 | 00 | |
| | | IDIFF321 | Initial Differences for the 321 | | 04NOV16 | | 401361 | : | 00 | 00 | |

END OF REPORT

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

```
        FPT              PRINTED:
                         Summary   -              Report - by Date/Eqpt/Pos

ID #                NICKEL  AMANDA  LEE
Qual1        319    -FA
Qual2:              -
Qual3:              -
Qual4:
Certificate# : 4070438
```

| A/C | POS | CODE | DESCRIPTION | S/U | TrgDate | BaseMonth | Instructor# | Hrs/min. | Lndgs | Cls | FAA |
|-----|-----|------|-------------|-----|---------|-----------|-------------|----------|-------|-----|-----|
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 12NOV19 | NOV | 421025 | 6:00 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 12NOV19 | NOV | 405593 | 2:00 | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 12NOV19 | NOV | 427554 | 3:00 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 12NOV19 | NOV | 428082 | 1:00 | 00 | 00 | |
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 14NOV18 | NOV | 414537 | 5: | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 14NOV18 | NOV | 427042 | 2: | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 14NOV18 | NOV | 407278 | 3: | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 14NOV18 | NOV | 410358 | 1: | 00 | 00 | |
| | | NHAZ | New Base Set Haz-Mat per 121.1007(c) | | 14NOV18 | NOV | 427042 | 1: | 00 | 00 | |
| | | IOE | Initial Operating Experience | | 09DEC17 | DEC | 424455 | 6:03 | 00 | 00 | |
| 319 | | IEMV | Initial Emergency Training (hands on) | | 28NOV17 | NOV | 401361 | : | 00 | 00 | |
| 319 | | IDIFF3 | Initial Differences Training 319/318 | | 28NOV17 | | 410358 | : | 00 | 00 | |
| 319 | | ICC | Initial Competency Check | | 28NOV17 | NOV | 401361 | : | 00 | 00 | |
| | | ISEC | Initial Security Training F/A | | 28NOV17 | NOV | 405593 | 14: 0 | 00 | 00 | |
| | | IHAZ | Initial Haz-Mat record per 121.1007(c) | | 28NOV17 | NOV | 424845 | 2: 0 | 00 | 00 | |
| | | IH2O | Initial Over Water Training | | 28NOV17 | | 410986 | 5: 0 | 00 | 00 | |
| | | IGS | Initial Ground Training | | 28NOV17 | NOV | 401361 | : | 00 | 00 | |
| | | IDIFF4 | Initial Differences Training 320/319/318 | | 28NOV17 | | 410358 | : | 00 | 00 | |
| | | IDIFF321 | Initial Differences for the 321 | | 28NOV17 | | 410358 | : | 00 | 00 | |
| | | ICRM | Initial Crew Resource Management | | 28NOV17 | NOV | 405593 | : | 00 | 00 | |
| | | IBI | Initial Basic Indoc | | 28NOV17 | NOV | 401361 | : | 00 | 00 | |

END OF REPORT

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

19AZF0229 DELVECCHIA FRONTIER 203

FTT                    PRINTED:
                       Summary  -          Report - by Date/Rqpt/Pos

ID #                 WARREN  SCOTT  ALEXANDER
Qual1.        319       -FA
Qual2:                  -
Qual3:                  -
Qual4:                  -
Certificate# : 4037763

| A/C | POS | CODE | DESCRIPTION | S/U | TrqDate | BaseMonth | Instructor# | Hrs/min. | Lndgs | Cls | FAA |
|-----|-----|------|-------------|-----|---------|-----------|-------------|----------|-------|-----|-----|
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 08AUG19 | AUG | 428845 | 6: | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 08AUG19 | AUG | 428082 | 2: | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 08AUG19 | AUG | 407278 | 3: | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 08AUG19 | AUG | 405525 | 1: | 00 | 00 | |
| 319 | | REMV | Recurrent Emergency Training (hands on) | | 07AUG18 | AUG | 421025 | 5: | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 07AUG18 | AUG | 414537 | 2: | 00 | 00 | |
| | | RGS | Recurrent Ground Training | | 07AUG18 | AUG | 407278 | 3: | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 07AUG18 | AUG | 426388 | 1: | 00 | 00 | |
| | | NHAE | New Base Set Haz-Mat per 121.1007(c) | | 07AUG18 | AUG | 426388 | 1: | 00 | 00 | |
| | | IOE | Initial Operating Experience | | 04SEP17 | SEP | 423712 | 8:44 | 00 | 00 | |
| 319 | | IEMV | Initial Emergency Training (hands on) | | 30AUG17 | AUG | 401361 | : | 00 | 00 | |
| 319 | | IDIFF3 | Initial Differences Training 319/318 | | 30AUG17 | | 424840 | : | 00 | 00 | |
| 319 | | ICC | Initial Competency Check | | 30AUG17 | AUG | 401361 | : | 00 | 00 | |
| | | ISEC | Initial Security Training F/A | | 30AUG17 | AUG | 405593 | 14:00 | 00 | 00 | |
| | | IHAZ | Initial Haz-Mat record per 121.1007(c) | | 30AUG17 | AUG | 410986 | 2:00 | 00 | 00 | |
| | | IWZO | Initial Over Water Training | | 30AUG17 | | 410358 | 5:00 | 00 | 00 | |
| | | IGS | Initial Ground Training | | 30AUG17 | AUG | 401361 | : | 00 | 00 | |
| | | IDIFF4 | Initial Differences Training 320/319/318 | | 30AUG17 | | 424890 | : | 00 | 00 | |
| | | IDIFF321 | Initial Differences for the 321 | | 30AUG17 | | 424890 | : | 00 | 00 | |
| | | ICRM | Initial Crew Resource Management | | 30AUG17 | AUG | 405593 | : | 00 | 00 | |
| | | INI | Initial Basic Indoc | | 30AUG17 | AUG | 401361 | : | 00 | 00 | |

END OF REPORT

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19AZF0229 DELVECCHIA FRONTIER 201



EXHIBIT 3

**Inflight Bi-Weekly Briefing**

Memo 19-06
January 25, 2019

## Human Trafficking

January is National Slavery and Human Trafficking Prevention month.

If you suspect a passenger may be a victim of human trafficking:



**JANUARY**
**National Slavery & Human Trafficking Awareness Month**

- Initiate non-threatening conversation and ask targeted questions:

  - Ask where they are traveling; are they going on vacation or visiting relatives?

  - Ask where they are staying, who will be meeting them, what they will be doing, etc.

- Take note if traveling companion(s) appears nervous or prevents the child/person from answering questions or if their answers seem evasive.

- Contact the Captain and inform him/her of your suspicions. Provide specific details of the situation and explain why you believe the behavior exhibits signs of human trafficking.

- The Captain will evaluate the information and if appropriate, involve law enforcement to resolve the concerns.

- At the gate, the captain will notify a GSC.

- The GSC, Captain, and Frontier SOC will evaluate the facts and a joint decision will be made regarding the passengers' continued travel.

- Complete an Incident Report within 24 hours.

If suspected behavior is observed while on the ground, you may contact the Department of Homeland Security Tip Line at **866-347-2423**.

Human Trafficking tips are investigated through Immigration and Customs Enforcement Agency, so the number contains two acronyms to make it memorable, **866-DHS-2-ICE**.

You may also report an incident of suspected human trafficking online at www.ice.gov/tips.

### In This Issue

- Human Trafficking
- Sharing a FlyTab?
- FAM Revision 63
- Complimentary Beverages & Snacks
- Deadheading Crew
- Kids Fly Free
- Safety Information Cards
- Inflight Training
- Catering Corner
- Announcements

### Manual Information

FAM Rev. #62 - 01/29/2018
ISS Rev. #19 - 12/27/2016

**Comply365 App**
Version 3.4.0.955

**AspexGO App**
Version 2019.1 12/27/2018

Frontier Airlines, Inc. - Proprietary and Confidential - For Internal Use Only

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER 19AZF0229 DELVECCHIA FRONTIER 0122



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS
CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO
KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE
TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.





SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS
CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO
KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE
TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER
ACTION.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER REGARDING SENSITIVE SECURITY INFORMATION



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER REGARDING SENSITIVE SECURITY INFORMATION



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

FRONTIER 0732



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

FRONTIER 0733

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER REGARDING SENSITIVE SECURITY INFORMATION



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.





**Flight Attendant Manual**

Rev. 63 04.01.19

You can also report online at www.ice.gov/tips



DELVECCHIA FRONTIER 0125

Fr
by
un
int
an

Se
re

On

19AZF0229 DELVECCHIA FRONTIER 0123



By entering this confirmation code, I acknowledge I have read and understand this memo: 

Frontier Airlines, Inc. - Proprietary and Confidential - For Internal Use Only

19AZF0229 DELVECCHIA FRONTIER 0124





This document has been prepared for the exclusive use and benefit of Initial Flight Attendant training at Frontier Airlines and is solely for the purpose for which it is provided. The content of this document is proprietary and confidential information of Frontier Airlines. No part of this document may be reproduced, distributed or communicated to any third party without prior written consent.  70





This document has been prepared for the exclusive use and benefit of Initial Flight Attendant training at Frontier Airlines and is solely for the purpose for which it is provided. The content of this document is proprietary and confidential information of Frontier Airlines. No part of this document may be reproduced, distributed or communicated to any third party without prior written consent. 70

CONFIDENTIAL  SUBJECT TO PROTECTIVE ORDER     19AZF0229 DELVECCHIA FRONTER 026



SENSITIVE SECURITY INFORMATION -- DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

20.20  Pg. 4          Uncontrolled copy when downloaded or printed.
                      Refer to the Controlled Document Library for the most current version of this document.

FRONTIER 07201

Security





SENSITIVE SECURITY INFORMATION — DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

Security          Uncontrolled copy when downloaded or printed.          20.20  Pg. 5

Refer to the Controlled Document Library for the most current version of this document.

FRONTIER 0721

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER REGARDING SENSITIVE SECURITY INFORMATION



SENSITIVE SECURITY INFORMATION — DESTROY PRINTED PAGES UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANS-PORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

FRONTIER 0

CONFIDENTIAL — SUBJECT TO PROTECTIVE ORDER REGARDING SENSITIVE SECURITY INFORMATION



SENSITIVE SECURITY INFORMATION — DESTROY PRINTED PAGES UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANS- PORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

**Security**

**50.50  Pg. 5**

Uncontrolled copy when downloaded or printed.
Refer to the Controlled Document Library for the most current version of this document.

FRONTIER 0



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION, UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

FRONTIER 0725



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.



SENSITIVE SECURITY INFORMATION WARNING: THIS RECORD MAY CONTAIN SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 CFR PART 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A 'NEED TO KNOW,' AS DEFINED IN 49 CFR PART 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTY OR OTHER ACTION.

FRONTIER 0727

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER











CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

E. Zimmerman Depo.
3/17/2022
Exhibit 10



Hi Beth,

Yep, there are so many complaints at the moment...

Hello Robert,
This was quite some time ago and to be honest I have no recollection of the incident. I do however ask people with smaller bags to place them under the seat to make space for roller boards. Sorry I can't be of more help.
Jenai

I was the B flight attendant on that flight and I stay in the galley during boarding. The C FA works the cabin.
Angela



Hi Robert,

Thanks again for speaking with me last week and all your help, were you able to get any statements?



Thanks
Beth

**From:** Beswick, Robert
**Sent:** Wednesday, December 6, 2017 8:10 AM

FRONTIER 0765

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE GENERAL COUNSEL
OFFICE OF AVIATION ENFORCEMENT AND PROCEEDINGS
WASHINGTON, DC

### Guidance for Airline Personnel on Non-discrimination in Air Travel

This guidance is intended to assist airline employees and contractors ("airline personnel") understand their legal obligation under 49 U.S.C. § 40127(a), and other Federal anti-discrimination statutes,[1] not to discriminate on the basis of race, color, national origin, religion, sex or ancestry in air travel. The Department of Transportation ("Department") recognizes the very important and difficult job of the airlines to provide a safe and secure travel environment. At the same time, it is important that this function be carried out in a non-discriminatory manner.

This guidance supersedes prior guidance that the Department has issued in the area of non-discrimination in air travel. It is intended to address particular situations where passengers may be denied boarding or removed from aircraft before take-off. The Department recognizes that once the aircraft is airborne, decisions based on safety and security considerations may have to be made very quickly and with limited information.

The guidance provides practical and useful decision-making techniques for airline employees and contractors to use when distinguishing between situations where a legitimate safety or security concern exists and situations in which concerns are based on assumptions and stereotypes related to a passenger's race, color, national origin, religion, sex, or ancestry. This guidance also demonstrates the application of these techniques and tools to promote appropriate non-discriminatory responses to possible safety or security concerns through illustrative scenarios.

It is our understanding that most airlines already have training on non-discrimination against passengers in air travel. The Department encourages all airlines to implement comprehensive anti-bias training to help prevent and reduce incidents of unlawful discrimination. We also encourage airlines to incorporate this guidance into their training programs as an additional tool. Last, this guidance is not prescriptive, and there may be alternative measures, techniques, or procedures that can be effective for preventing unlawful discrimination against air travelers.

This guidance document pertains solely to the activities and authorities under the purview of the U.S. Department of Transportation and does not address aviation security requirements or procedures under the jurisdiction of the Transportation Security Administration, U. S. Department of Homeland Security.

---

[1] The Department has also interpreted 49 U.S.C. §§ 41310(a), 41712, and 41702 as prohibiting discrimination against air travelers.



P000748

**Airline Personnel Decision-Making Process**

To ensure compliance with the law, airline personnel should:

1. **Be Comprehensive:** Before taking any action, airline personnel should conduct a comprehensive evaluation of the facts known at the time, considering the totality of the circumstances. A comprehensive evaluation should include whether a passenger's appearance is the determinative factor causing concern. In other words, airline personnel should ask themselves - but for the passenger's perceived race, color, national origin, religion, sex, or ancestry, would I be concerned that his or her behavior rises to the level of a potential threat to security or safety?

2. **Ensure Effective Communication:** Communicate by actively participating in information exchange with the passenger, co-workers, and other air travelers (if appropriate and applicable) to clarify and confirm the facts and details involved in the situation.

3. **Follow Airline Protocol and Decision-Making Process:** In conducting an inquiry, airline personnel should follow their company's protocol and decision-making processes, and relevant government agencies' directives, to resolve the situation appropriately.

4. **Assess Each Situation Individually:** Focus on the specific facts and details to ensure that any basis for taking action based on perceived suspicious behavior is reasonable. A passenger's perceived race, color, national origin, religion, sex or ancestry alone is not a reasonable basis. All passengers have the right to fly free from all forms of unlawful discrimination.

5. **Inquire about the Potential Threat:** Ask yourself if you appropriately carried out the airline's obligation to inquire. For example:
   - Did you speak to the passenger;
   - Have you consulted your co-workers about your concern;
   - Did you follow company policy and utilize your training; and
   - Have you intentionally or inadvertently considered any stereotypes in your inquiry?

6. **Resolve and Remedy the Situation:** Airlines should include conflict resolution techniques in their procedures and protocols, *e.g.*, active listening, self-awareness, validating frustrations, anti-bias and anti-discrimination techniques, and honest communication. Airline personnel should employ the suggested techniques and attempt to resolve the situation by taking the appropriate action in compliance with the law and established airline policy. Explain your decision to persons involved, including co-workers and, when appropriate, to passengers.

Taken together, these principles are summarized by the acronym, **BE FAIR**:
   Be Comprehensive
   Ensure Effective Communication
   Follow Airline Protocol and Decision Making Process
   Assess each situation individually, considering cultural awareness factors
   Inquire about the potential threat
   Resolve and remedy the situation.

2

P000749

### Illustrative Scenarios

The Department understands that complex scenarios may arise quickly and require airline personnel to respond promptly, sometimes under tight timeframes and stressful conditions. These situations may require additional questioning, screening, searches, or requests for support from appropriate authorities for safety or security reasons. We have provided the following examples to illustrate possible ways to resolve a situation effectively while respecting all passengers' rights.

**Scenario 1:** Two men are seated together onboard the aircraft before take-off, and are whispering in a foreign language. One of the men is also holding a book that appears to be written in Arabic. A third passenger seated nearby overhears their conversation and informs airline personnel that he feels "uncomfortable" with the two individuals. The third passenger believes they are of Arab or South Asian descent, that they are speaking in a foreign language, which he thinks is Arabic, and holding a book in a foreign language, which he thinks may be the Quran. The third passenger notifies the flight attendant.

**Action:** Airline personnel have an obligation to conduct an objective and comprehensive inquiry considering the totality of the circumstances before taking action. Crew members should follow airline protocol for these situations and rely on their training to accomplish an objective inquiry. The pilot, who has ultimate authority for the safety of the flight, may rely on the cabin crew to make an accurate fact-based assessment of the situation. A decision is proper if based on an analysis of the facts known at the time before acting.

Before taking action, you should consider whether these passengers' behavior would concern you but for their appearance, *i.e.*, would you be concerned if they did not appear to be of Arab descent, speak in a foreign language, or hold a book written in Arabic that appears to be the Quran? You should ask yourself: "If I had observed this exact behavior in non-Arab men speaking English, would you still be concerned?" If the answer is no, and if there is no other information possibly indicating a potential threat to security or safety, you may be discriminating against the passengers on the basis of their religion or national origin if you remove them from the airplane.

Your inquiry might also include observing the passengers in question and, if necessary, speaking directly with them. You should also consider conferring with your colleagues and be sure to relay your factual observations rather than just feelings, beliefs or opinions. It is important to ensure that your inquiry is not based on cultural stereotypes and is focused on first-hand observable behaviors that support a reasonable and rational evaluation of the facts leading to the security concerns. In this scenario, it is not permissible to remove the passengers on the basis that they are speaking Arabic, they appear to be of South Asian descent, and are holding a book written in Arabic or another foreign language. It is also impermissible to remove the passenger simply because he is holding a book that appears to be the Quran.

If, while conducting an objective fact-based inquiry considering the BE FAIR analysis, you become aware of additional facts or information indicating that the passengers may pose a safety or security risk to the flight, you should take appropriate action in compliance with the law and established airline policy. If that results in removal of a passenger, it is important that the removal

3

be conducted respectfully and as discreetly as possible. Alternatively, if you conclude that the passengers in question do not pose a security risk, consider offering to move the third passenger to another seat or offering to rebook him on another flight, if that passenger remains uncomfortable with the other passengers' presence.

**Scenario 2**: A bearded male passenger with a tan complexion boards the aircraft. Prior to take off, the passenger goes to the aircraft lavatory and remains for an extended period of time. Upon returning to his seat, the passenger begins making hand gestures and whispering under his breath. A flight attendant, perceiving the passenger to be nervous, becomes concerned with his behavior and advises the pilot in command of his observations. The pilot then asks that the passenger be removed from the aircraft for questioning. The passenger is not provided any explanation for his removal, except that a flight attendant says he was acting suspiciously and nervously. The airline rebooks the passenger on another flight without first contacting authorities to determine if additional security screening is appropriate.

**Action:** In Scenario 2, there are two distinct issues to consider. First, was the passenger removed for discriminatory reasons, and second, should the airline have contacted appropriate authorities to determine if additional screening of the passenger after being removed was appropriate?

Airline personnel should first conduct a comprehensive evaluation of the facts known at the time, considering the totality of the circumstances. In this comprehensive analysis, airline personnel should ask themselves - but for the passenger's appearance, would we be concerned that his behavior may indicate a possible threat to security or safety? If you had observed this exact behavior in an individual who did not have physical characteristics similar to this passenger, would you still be concerned? If the answer is no, then taking action with respect to the passenger without first attempting to learn more information would likely be considered unlawful discrimination based on the passenger's religion or national origin.

In this scenario, a tactful conversation with the passenger, in question, may provide a reasonable explanation. You should speak directly with the passenger in question to make your own fact-based assessment of his behavior. For example, you may wish to inquire as to the passenger's health to make sure that he was not ill or required any assistance. Alternatively, the passenger may have been preparing for prayer as some religious communities do. His hand gestures and whispering under his breath after he returned to his seat may also be consistent with prayer. The simple task of active listening and communication may lead to a resolution of the situation in a non-confrontational and respectful manner.

If, while conducting an objective fact-based inquiry considering the BE FAIR analysis, you become aware of additional facts or information indicating that the passenger may pose a security or safety risk, take appropriate action in compliance with the law and established airline policy. Appropriate action may include removing the passenger from the aircraft to further investigate the potential security concern. If removal of the passenger is deemed necessary, it should be done in a respectful and discreet manner. For example, airline personnel may approach the passenger to request that he step onto the jet way to discuss the matter instead of questioning him in his seat, within earshot of other passengers. Removal by law enforcement generally should be reserved for

4

P000751

situations where the passenger will not comply with instructions or is disruptive. Flight attendants should try to use neutral language, so as not to raise concern among other passengers.

If the passenger is removed from the flight, airline personnel generally should contact the appropriate authorities and request that they follow their relevant security procedures, which may include additional screening of the passenger. A failure to contact the appropriate authorities in connection with removing a passenger from a flight may suggest that the decision to remove the passenger from the flight was motivated by unlawful discrimination rather than reasonable concern for the safety and security of the flight.

**Scenario 3:** A Sikh man wearing a traditional turban is removed from a commercial airline . His removal was prompted by specific facts and circumstances unrelated to his appearance, perceived race, national origin, religion or ancestry/ethnicity. The passenger is then subjected to additional screening and cleared to fly by the appropriate authorities. However, the pilot refuses to allow the passenger to re-board even though there is time to do so. The passenger is then rebooked on another flight.

**Action:** At the outset, airline personnel should focus on a comprehensive evaluation of the situation based on the totality of the circumstances. Here, the passenger has completed additional security screening and has been cleared to fly by the appropriate authorities. As such, the carrier should allow that individual to re-board the same aircraft so long as the aircraft has not yet departed and there is no other legitimate reason for refusing to carry the passenger. If a pilot continues to refuse to allow the passenger on board after he has been cleared to fly by the appropriate authorities, the Department would likely consider the pilot's decision to be unlawful discrimination and an unfair practice absent additional facts and information.

**Scenario 4:** A woman wearing a headscarf boards the aircraft with her two children. She is one of the last passengers to board and finds that she and her children are seated separately. The passenger begins to negotiate her seating arrangement with other passengers so that she may sit with her children. The flight is running late and the flight attendant advises her repeatedly to take her assigned seat without attempting to resolve the seating situation. The woman becomes upset, refuses to sit down despite repeated requests, and insists on sitting with her children. The pilot is informed about the problem, and he advised the flight attendant to have the passenger removed from the flight.

**Action:** Airline personnel should consider the totality of the circumstances. In other words, ask yourself - but for the passenger's appearance, would I be concerned that her behavior may indicate a safety or security threat? If you had observed this exact behavior in an individual who did not wear a head scarf, would you still be concerned? If the answer is no, taking action with respect to the passenger without first attempting to learn more information would likely be considered unlawful discrimination against the passenger based on her religion or national origin.

Communicate with the passenger and attempt to understand the passenger's concerns. Time permitting, employ creative techniques that may help resolve the problem in a less confrontational manner (*e.g.*, incentivize passengers to change their seats with vouchers or miles) as allowed under airline policy. In this scenario, the passenger and her children are the last to board and the flight is

5

P000752

running late, which may reduce the amount of time that a flight attendant may spend to resolve the matter.

If, while conducting an objective fact-based investigation using the BE FAIR analysis, you determine that the passenger's failure to comply with repeated instructions from the flight crew may pose a safety or security risk, take appropriate action in compliance with the law and established airline policy. A passenger's failure to comply with airline personnel instructions is grounds for denial of boarding or removal from a flight.[2] We recommend clearly explaining the pilot's decision to the passenger and ensuring that the passenger is treated with dignity and respect.

**Summary:** A passenger's race, color, national origin, religion, sex, or ancestry may not be the determinative factor in finding that a passenger may present a security or safety risk. Airlines should instead undertake a comprehensive analysis considering the totality of the circumstances. Airline personnel should take steps to conduct an objective, fact-based inquiry to ensure that a decision is reasonable and rational and follows company policy. If you conclude, after a fact-based inquiry, that a passenger may pose a safety or security threat and should be removed from a flight, it is important that the removal be conducted respectfully and with discretion. Always consider whether any situation may be resolved in a non-confrontational manner to avoid escalation. At all times, airline personnel should comply with the law and the airline's applicable policies and protocols.

---

[2] *See* 14 C.F.R. §§ 91.3(a), 121.533(e), and 121.580.

6

P000753

**DOT ISSUES GUIDANCE DOCUMENTS TO PREVENT..., 2017 WL 127996 (2017)**

2017 WL 127996 (D.O.T.)

U.S. Department of Transportation (D.O.T.)

**(NEWS RELEASE)**

DOT ISSUES GUIDANCE DOCUMENTS TO PREVENT AIRLINE DISCRIMINATION

January 13, 2017

WASHINGTON - The U.S. Department of Transportation (DOT) today issued two guidance documents emphasizing that federal law guarantees all passengers the right to fly free from discrimination. The documents supersede prior non-discrimination guidance issued by the Department and were developed in collaboration with representatives of airlines and civil rights organizations.

The first document, *Guidance for Airline Personnel on Nondiscrimination in Air Travel,* contains example scenarios to help airline employees and contractors understand their legal obligation not to discriminate on the basis of race, color, national origin, religion, sex, or ancestry in air travel. The second document, *Passengers' Right to Fly Free from Discrimination,* uses a question-and-answer format to assist the flying public understand their rights when flying on commercial airlines.

"DOT is committed to protecting the civil rights of all passengers, regardless of race, color, national origin, religion, sex, or ancestry," said U.S. Transportation Secretary Anthony Foxx. "These guidance documents will help passengers understand their rights and help airline employees avoid behavior that violates the law."

"The goal of ensuring the security of our national air transportation system is consistent with our nation's longstanding civil rights laws," said Acting General Counsel Molly Moran. "These guidance documents seek to ensure equal treatment of all air travelers by educating air travelers and providing airline employees the necessary tools to make fact-based decisions about what constitutes threatening or suspicious behavior in compliance with the law."

In November 2016, the Department began reporting more detailed information about discrimination complaints that it receives in its monthly *Air Travel Consumer Report.* The report now specifically identifies the numbers of complaints by protected class: race, color, national origin, religion, sex, or ancestry/ethnicity. Prior reports listed only the total number of discrimination-related complaints sent to the Department. The enhanced reporting is intended to provide more transparency regarding the number of complaints that the Department receives in each of the protected classes.

DOT's Office of General Counsel's investigates all complaints alleging discriminatory treatment by airline personnel and pursues enforcement cases against airlines for unlawful discrimination. Members of the public who feel they have been the subject of discriminatory actions or treatment by airlines may file a complaint with the Department at http://airconsumer.dot.gov/escomplaint/ConsumerForm.cfm.

The *Guidance for Airline Personnel on Nondiscrimination in Air Travel* and *Passengers' Right to Fly Free from Discrimination* are available at https://www.transportation.gov/airconsumer/latest-news.

Media Contact: Caitlin Harvey
Office of Public Affairs
1200 New Jersey Ave, SE
Washington, DC 20590
United States

P000754

UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE GENERAL COUNSEL
OFFICE OF AVIATION ENFORCEMENT AND PROCEEDINGS
WASHINGTON, D.C.

## Passengers' Right to Fly Free from Discrimination

Federal law guarantees all passengers the right to fly free from all forms of unlawful discrimination. Likewise, the Department of Transportation (the Department or "DOT") is committed to protecting the civil rights of all passengers, irrespective of race, color, national origin, religion, sex or ancestry. The Department is committed to ensuring that a passenger's right to fly free from unlawful discrimination is not compromised while also balancing important safety and security concerns. This fact sheet is intended to assist the flying public in understanding their right to fly on commercial airlines free from discrimination.

**Question 1:** What role does the Department play in aviation safety and civil rights?

The Department is tasked with the role of ensuring a safe flying experience while ensuring the protection of civil rights for all passengers. The Federal Aviation Administration (FAA) (a sub-agency within the Department) and the Department's Office of Aviation Enforcement and Proceedings (OAEP), which is located in the Office of the Secretary of Transportation's Office of the General Counsel, each play a key role in carrying out this function.

The FAA is charged with the responsibility of regulating airline safety, and OAEP is responsible for enforcing the statutes that prohibit unlawful discrimination by airlines against air travelers because of their race, color, national origin, religion, sex, or ancestry.[1] OAEP works with the Department's Aviation Consumer Protection Division (ACPD), which processes and investigates consumer and civil rights complaints.

**Question 2:** Which federal agency is responsible for aviation security?

DOT does not have jurisdiction over aviation security. Rather, the Transportation Security Administration (TSA), which is part of the U.S. Department of Homeland Security, has responsibility over civil aviation security, including the screening of passengers and property at airports and deployment of Federal Air Marshals on designated foreign and domestic flights. TSA imposes various requirements upon travelers and the aviation industry to ensure a secure aviation environment. This fact sheet document pertains solely to activities and authorities under the purview of the Department of Transportation. Additional information on TSA aviation security activities is available here: https://www.tsa.gov/travel/frequently-asked-questions.

---

[1] *See* 49 U.S.C. § 40127. The Department has also interpreted 49 U.S.C. §§ 41310(a), 41712, and 41702 as prohibiting discrimination against air travelers.

1

**Question 3:** What are my rights when I fly on a commercial airline?

All passengers have the right to fly free from all forms of unlawful discrimination. In particular, you are entitled to the following protections:

- Individuals may not be denied boarding or removed from a commercial airline because they appear to be Muslim, Arab, Sikh, and/or South Asian; because they speak Arabic, Farsi, or another foreign language; or because they speak with an accent that may lead another person to believe they are Muslim, Arab, Sikh, or South Asian. Likewise, a person may not be removed from a commercial airline because they are reading materials that are in Arabic, Farsi, or any other foreign language.
- Individuals may not be denied boarding or removed from a commercial airline based on their appearance or mode of dress that is associated with a particular national origin or religion. For example, removal of a woman because her hair is covered or because she is wearing a veil is unlawful discrimination. Similarly, removal of a man from a commercial airline because he has a long beard or hair covering is unlawful discrimination. Likewise, preventing a man from boarding a commercial airline because he is wearing a turban is unlawful discrimination.
- Individuals who are, or may be perceived to be, Muslim, Arab, Sikh, and/or South Asian have the right to be treated with the same respect and dignity as persons of other races, colors, national origins, and religions, and all persons should be treated in a polite, respectful, and friendly manner.

**Question 4:** Can I be denied boarding or removed from a flight by a commercial airline?

Yes, under certain circumstances. Federal law allows U.S. and foreign airlines to refuse to transport a passenger if the airline determines that the passenger is, or might be, a threat to safety or security.[2] This determination may be made by the pilot in command of the flight (or other airline personnel such as a Ground Security Coordinator). Decisions cannot be arbitrary. The Department's OAEP will look at whether the denial of boarding or removal was justified based on specific facts and circumstances known at the time. The pilot bears the ultimate responsibility of ensuring the safety of the aircraft.

Before making a determination to deny a passenger boarding or remove a passenger from a flight based on safety or security reasons, the airline has the responsibility to conduct a reasonable inquiry into the facts supporting such action. Note, however, that the airline's discretion is not unfettered. Federal law guarantees all passengers the right to fly free from all forms of unlawful discrimination. A passenger's race, color, national origin, religion, sex, or ancestry may not be the determinative factor in a commercial airline's decision to deny boarding or remove a passenger from a flight.

---

[2] Passengers may also be denied boarding for business reasons, such as the flight being oversold, because of drunkenness or other bad behavior, or for other reasons consistent with the airline's contract of carriage.

P000756

**Question 5:** What happens if a commercial airline refuses to allow me to board or asks me to leave the aircraft because of security or safety concerns?

You should cooperate with all airline requests or instructions, such as moving to the loading bridge for a private conversation. If a commercial airline denies you boarding or removes you from a flight for safety or security reasons, airline personnel may contact the appropriate authorities to determine if additional screening is necessary. Additional screening may involve TSA, the Federal Bureau of Investigation (FBI), and/or other federal, state, or local law enforcement agencies, depending on the level of screening deemed necessary under the circumstances.

If you believe that a commercial airline has denied you boarding or removed you from a flight on the basis of your race, color, national origin, religion, sex, or ancestry, you should contact the DOT to file a complaint.[3]

**Question 6:** What is a reasonable basis for airline personnel to remove a passenger from a flight?

There are many circumstances that could result in airline personnel determining that a passenger should be removed from a flight because he or she may pose a threat to safety or security, or is disruptive. However, a passenger's race, color, national origin, religion, sex, or ancestry may not be the determinative basis for the decision to remove him or her from the flight. While the pilot in command has broad discretion when it comes to the safety and security of the aircraft, the airline does not have a license to unlawfully discriminate.

The determination of whether or not an airline's decision to remove a passenger from a flight is lawful is driven by the facts and circumstances known to the pilot or airline personnel at the time of the incident. DOT suggests that airline personnel conduct a comprehensive evaluation of the facts known at the time, considering the totality of the circumstances. Such an evaluation should include whether a passenger's race, color, national origin, religion, sex or ancestry is the sole or determinative factor causing concern. DOT suggests that airline personnel, in the course of their evaluation, ask themselves, *"But for this person's perceived race, color, national origin, religion, sex, or ancestry, would I believe there is a need to remove this passenger from the flight?"* If the answer is "no," then removing the passenger would likely be considered unlawful discrimination against the passenger.

**Question 7:** How should I respond if I am asked to deplane?

Even if you do not like an airline's actions, a failure to comply with airline personnel instructions is a ground for denying you boarding or removing you from a flight. Therefore, all passengers should cooperate fully with airline personnel. In the event that you believe that you have been unlawfully discriminated against, you may file a complaint with the airline and the Department of Transportation and an investigation will be conducted. You may also contact or retain an attorney to assist you with the filing of such a complaint.

---

[3] *See* http://airconsumer.dot.gov/escomplaint/ConsumerForm.cfm.

P000757

**Question 8:** How do I deal with a passenger who feels "uncomfortable" with my presence?

If you are faced with a situation where another passenger expresses discomfort with your presence and/or exhibits hostile behavior toward you, do not engage with the passenger. Rather, you should report any unlawful or harassing behavior by another passenger to airline personnel immediately.

**Question 9:** What are my rights after I have been denied boarding or removed from a flight, completed additional screening, and been cleared to fly by appropriate authorities?

If you have been removed from a plane and have been cleared to fly by appropriate authorities, you should be allowed to re-board the flight if it has not yet departed and the airline does not have any business or other legitimate reason for refusing to carry you on that flight. However, an airline is not required to delay departure of a flight in order to allow time for additional security screening and resolution of any safety or security concerns. In the event that your original flight has departed, you should be rebooked on the next available flight. Airlines are advised that passengers should be treated with respect and dignity at all times.

**Question 10:** Who should I contact if I believe that my rights have been violated?

If you feel that you have been the subject of discriminatory actions or treatment by a commercial airline, you may file a complaint with the specific airline and DOT's Aviation Consumer Protection Division.[4] Complaints to DOT may be filed using our web form, available at: http://airconsumer.dot.gov/escomplaint/ConsumerForm.cfm. Complaints may also be mailed to the following address:

> Aviation Consumer Protection Division (C-75)
> U.S. Department of Transportation
> 1200 New Jersey Ave. S.E.
> Washington, DC 20590

---

[4] You may file a complaint yourself or retain an attorney to assist you.

4

P000758

**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF THE GENERAL COUNSEL**
**OFFICE OF AVIATION ENFORCEMENT AND PROCEEDINGS**
**WASHINGTON, DC**

## Guidance for Airline Personnel on Non-discrimination in Air Travel

This guidance is intended to assist airline employees and contractors ("airline personnel") understand their legal obligation under 49 U.S.C. § 40127(a), and other Federal anti-discrimination statutes,[1] not to discriminate on the basis of race, color, national origin, religion, sex or ancestry in air travel. The Department of Transportation ("Department") recognizes the very important and difficult job of the airlines to provide a safe and secure travel environment. At the same time, it is important that this function be carried out in a non-discriminatory manner.

This guidance supersedes prior guidance that the Department has issued in the area of non-discrimination in air travel. It is intended to address particular situations where passengers may be denied boarding or removed from aircraft before take-off. The Department recognizes that once the aircraft is airborne, decisions based on safety and security considerations may have to be made very quickly and with limited information.

The guidance provides practical and useful decision-making techniques for airline employees and contractors to use when distinguishing between situations where a legitimate safety or security concern exists and situations in which concerns are based on assumptions and stereotypes related to a passenger's race, color, national origin, religion, sex, or ancestry. This guidance also demonstrates the application of these techniques and tools to promote appropriate non-discriminatory responses to possible safety or security concerns through illustrative scenarios.

It is our understanding that most airlines already have training on non-discrimination against passengers in air travel. The Department encourages all airlines to implement comprehensive anti-bias training to help prevent and reduce incidents of unlawful discrimination. We also encourage airlines to incorporate this guidance into their training programs as an additional tool. Last, this guidance is not prescriptive, and there may be alternative measures, techniques, or procedures that can be effective for preventing unlawful discrimination against air travelers.

This guidance document pertains solely to the activities and authorities under the purview of the U.S. Department of Transportation and does not address aviation security requirements or procedures under the jurisdiction of the Transportation Security Administration, U. S. Department of Homeland Security.

---

[1] The Department has also interpreted 49 U.S.C. §§ 41310(a), 41712, and 41702 as prohibiting discrimination against air travelers.

1

**Airline Personnel Decision-Making Process**

To ensure compliance with the law, airline personnel should:

1. **Be Comprehensive:** Before taking any action, airline personnel should conduct a comprehensive evaluation of the facts known at the time, considering the totality of the circumstances. A comprehensive evaluation should include whether a passenger's appearance is the determinative factor causing concern. In other words, airline personnel should ask themselves - but for the passenger's perceived race, color, national origin, religion, sex, or ancestry, would I be concerned that his or her behavior rises to the level of a potential threat to security or safety?

2. **Ensure Effective Communication:** Communicate by actively participating in information exchange with the passenger, co-workers, and other air travelers (if appropriate and applicable) to clarify and confirm the facts and details involved in the situation.

3. **Follow Airline Protocol and Decision-Making Process:** In conducting an inquiry, airline personnel should follow their company's protocol and decision-making processes, and relevant government agencies' directives, to resolve the situation appropriately.

4. **Assess Each Situation Individually:** Focus on the specific facts and details to ensure that any basis for taking action based on perceived suspicious behavior is reasonable. A passenger's perceived race, color, national origin, religion, sex or ancestry alone is not a reasonable basis. All passengers have the right to fly free from all forms of unlawful discrimination.

5. **Inquire about the Potential Threat:** Ask yourself if you appropriately carried out the airline's obligation to inquire. For example:
   - Did you speak to the passenger;
   - Have you consulted your co-workers about your concern;
   - Did you follow company policy and utilize your training; and
   - Have you intentionally or inadvertently considered any stereotypes in your inquiry?

6. **Resolve and Remedy the Situation:** Airlines should include conflict resolution techniques in their procedures and protocols, *e.g.*, active listening, self-awareness, validating frustrations, anti-bias and anti-discrimination techniques, and honest communication. Airline personnel should employ the suggested techniques and attempt to resolve the situation by taking the appropriate action in compliance with the law and established airline policy. Explain your decision to persons involved, including co-workers and, when appropriate, to passengers.

Taken together, these principles are summarized by the acronym, **BE FAIR:**

**B**e Comprehensive
**E**nsure Effective Communication
**F**ollow Airline Protocol and Decision Making Process
**A**ssess each situation individually, considering cultural awareness factors
**I**nquire about the potential threat
**R**esolve and remedy the situation.

2

P000760

**Illustrative Scenarios**

The Department understands that complex scenarios may arise quickly and require airline personnel to respond promptly, sometimes under tight timeframes and stressful conditions. These situations may require additional questioning, screening, searches, or requests for support from appropriate authorities for safety or security reasons. We have provided the following examples to illustrate possible ways to resolve a situation effectively while respecting all passengers' rights.

**Scenario 1:** Two men are seated together onboard the aircraft before take-off, and are whispering in a foreign language. One of the men is also holding a book that appears to be written in Arabic. A third passenger seated nearby overhears their conversation and informs airline personnel that he feels "uncomfortable" with the two individuals. The third passenger believes they are of Arab or South Asian descent, that they are speaking in a foreign language, which he thinks is Arabic, and holding a book in a foreign language, which he thinks may be the Quran. The third passenger notifies the flight attendant.

**Action:** Airline personnel have an obligation to conduct an objective and comprehensive inquiry considering the totality of the circumstances before taking action. Crew members should follow airline protocol for these situations and rely on their training to accomplish an objective inquiry. The pilot, who has ultimate authority for the safety of the flight, may rely on the cabin crew to make an accurate fact-based assessment of the situation. A decision is proper if based on an analysis of the facts known at the time before acting.

Before taking action, you should consider whether these passengers' behavior would concern you but for their appearance, *i.e.*, would you be concerned if they did not appear to be of Arab descent, speak in a foreign language, or hold a book written in Arabic that appears to be the Quran? You should ask yourself: "If I had observed this exact behavior in non-Arab men speaking English, would you still be concerned?" If the answer is no, and if there is no other information possibly indicating a potential threat to security or safety, you may be discriminating against the passengers on the basis of their religion or national origin if you remove them from the airplane.

Your inquiry might also include observing the passengers in question and, if necessary, speaking directly with them. You should also consider conferring with your colleagues and be sure to relay your factual observations rather than just feelings, beliefs or opinions. It is important to ensure that your inquiry is not based on cultural stereotypes and is focused on first-hand observable behaviors that support a reasonable and rational evaluation of the facts leading to the security concerns. In this scenario, it is not permissible to remove the passengers on the basis that they are speaking Arabic, they appear to be of South Asian descent, and are holding a book written in Arabic or another foreign language. It is also impermissible to remove the passenger simply because he is holding a book that appears to be the Quran.

If, while conducting an objective fact-based inquiry considering the BE FAIR analysis, you become aware of additional facts or information indicating that the passengers may pose a safety or security risk to the flight, you should take appropriate action in compliance with the law and established airline policy. If that results in removal of a passenger, it is important that the removal

3

be conducted respectfully and as discreetly as possible. Alternatively, if you conclude that the passengers in question do not pose a security risk, consider offering to move the third passenger to another seat or offering to rebook him on another flight, if that passenger remains uncomfortable with the other passengers' presence.

**Scenario 2**: A bearded male passenger with a tan complexion boards the aircraft. Prior to take off, the passenger goes to the aircraft lavatory and remains for an extended period of time. Upon returning to his seat, the passenger begins making hand gestures and whispering under his breath. A flight attendant, perceiving the passenger to be nervous, becomes concerned with his behavior and advises the pilot in command of his observations. The pilot then asks that the passenger be removed from the aircraft for questioning. The passenger is not provided any explanation for his removal, except that a flight attendant says he was acting suspiciously and nervously. The airline rebooks the passenger on another flight without first contacting authorities to determine if additional security screening is appropriate.

**Action:** In Scenario 2, there are two distinct issues to consider. First, was the passenger removed for discriminatory reasons, and second, should the airline have contacted appropriate authorities to determine if additional screening of the passenger after being removed was appropriate?

Airline personnel should first conduct a comprehensive evaluation of the facts known at the time, considering the totality of the circumstances. In this comprehensive analysis, airline personnel should ask themselves - but for the passenger's appearance, would we be concerned that his behavior may indicate a possible threat to security or safety? If you had observed this exact behavior in an individual who did not have physical characteristics similar to this passenger, would you still be concerned? If the answer is no, then taking action with respect to the passenger without first attempting to learn more information would likely be considered unlawful discrimination based on the passenger's religion or national origin.

In this scenario, a tactful conversation with the passenger, in question, may provide a reasonable explanation. You should speak directly with the passenger in question to make your own fact-based assessment of his behavior. For example, you may wish to inquire as to the passenger's health to make sure that he was not ill or required any assistance. Alternatively, the passenger may have been preparing for prayer as some religious communities do. His hand gestures and whispering under his breath after he returned to his seat may also be consistent with prayer. The simple task of active listening and communication may lead to a resolution of the situation in a non-confrontational and respectful manner.

If, while conducting an objective fact-based inquiry considering the BE FAIR analysis, you become aware of additional facts or information indicating that the passenger may pose a security or safety risk, take appropriate action in compliance with the law and established airline policy. Appropriate action may include removing the passenger from the aircraft to further investigate the potential security concern. If removal of the passenger is deemed necessary, it should be done in a respectful and discreet manner. For example, airline personnel may approach the passenger to request that he step onto the jet way to discuss the matter instead of questioning him in his seat, within earshot of other passengers. Removal by law enforcement generally should be reserved for

4

situations where the passenger will not comply with instructions or is disruptive. Flight attendants should try to use neutral language, so as not to raise concern among other passengers.

If the passenger is removed from the flight, airline personnel generally should contact the appropriate authorities and request that they follow their relevant security procedures, which may include additional screening of the passenger. A failure to contact the appropriate authorities in connection with removing a passenger from a flight may suggest that the decision to remove the passenger from the flight was motivated by unlawful discrimination rather than reasonable concern for the safety and security of the flight.

**Scenario 3:** A Sikh man wearing a traditional turban is removed from a commercial airline . His removal was prompted by specific facts and circumstances unrelated to his appearance, perceived race, national origin, religion or ancestry/ethnicity. The passenger is then subjected to additional screening and cleared to fly by the appropriate authorities. However, the pilot refuses to allow the passenger to re-board even though there is time to do so. The passenger is then rebooked on another flight.

**Action:** At the outset, airline personnel should focus on a comprehensive evaluation of the situation based on the totality of the circumstances. Here, the passenger has completed additional security screening and has been cleared to fly by the appropriate authorities. As such, the carrier should allow that individual to re-board the same aircraft so long as the aircraft has not yet departed and there is no other legitimate reason for refusing to carry the passenger. If a pilot continues to refuse to allow the passenger on board after he has been cleared to fly by the appropriate authorities, the Department would likely consider the pilot's decision to be unlawful discrimination and an unfair practice absent additional facts and information.

**Scenario 4:** A woman wearing a headscarf boards the aircraft with her two children. She is one of the last passengers to board and finds that she and her children are seated separately. The passenger begins to negotiate her seating arrangement with other passengers so that she may sit with her children. The flight is running late and the flight attendant advises her repeatedly to take her assigned seat without attempting to resolve the seating situation. The woman becomes upset, refuses to sit down despite repeated requests, and insists on sitting with her children. The pilot is informed about the problem, and he advised the flight attendant to have the passenger removed from the flight.

**Action:** Airline personnel should consider the totality of the circumstances. In other words, ask yourself - but for the passenger's appearance, would I be concerned that her behavior may indicate a safety or security threat? If you had observed this exact behavior in an individual who did not wear a head scarf, would you still be concerned? If the answer is no, taking action with respect to the passenger without first attempting to learn more information would likely be considered unlawful discrimination against the passenger based on her religion or national origin.

Communicate with the passenger and attempt to understand the passenger's concerns. Time permitting, employ creative techniques that may help resolve the problem in a less confrontational manner (*e.g.*, incentivize passengers to change their seats with vouchers or miles) as allowed under airline policy. In this scenario, the passenger and her children are the last to board and the flight is

5

running late, which may reduce the amount of time that a flight attendant may spend to resolve the matter.

If, while conducting an objective fact-based investigation using the BE FAIR analysis, you determine that the passenger's failure to comply with repeated instructions from the flight crew may pose a safety or security risk, take appropriate action in compliance with the law and established airline policy. A passenger's failure to comply with airline personnel instructions is grounds for denial of boarding or removal from a flight.[2]  We recommend clearly explaining the pilot's decision to the passenger and ensuring that the passenger is treated with dignity and respect.

**Summary:**  A passenger's race, color, national origin, religion, sex, or ancestry may not be the determinative factor in finding that a passenger may present a security or safety risk. Airlines should instead undertake a comprehensive analysis considering the totality of the circumstances. Airline personnel should take steps to conduct an objective, fact-based inquiry to ensure that a decision is reasonable and rational and follows company policy. If you conclude, after a fact-based inquiry, that a passenger may pose a safety or security threat and should be removed from a flight, it is important that the removal be conducted respectfully and with discretion. Always consider whether any situation may be resolved in a non-confrontational manner to avoid escalation. At all times, airline personnel should comply with the law and the airline's applicable policies and protocols.

---

[2] *See* 14 C.F.R. §§ 91.3(a), 121.533(e), and 121.580.

6



**UNITED STATES OF AMERICA**
**DEPARTMENT OF TRANSPORTATION**
**OFFICE OF HEARINGS**
**WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 27th day of February, 2004

| | |
|---|---|
| American Airlines, Inc.<br>Violations of 49 U.S.C. §§40127, 41310, 41702 and 41712 | **Served: February 27, 2004,**<br><br>**Docket OST 2003-15046** |

### CONSENT ORDER

This order closes an enforcement proceeding involving American Airlines, Inc.'s (American)[1] compliance with Federal statutes prohibiting air carriers from subjecting any air traveler to discrimination on the basis of race, color, national origin, religion, sex or ancestry. The consent order directs American to cease and desist from future violations and to provide civil rights training to its flight and cabin crews and customer service representatives.

Shortly after the terrorist attacks of September 11, 2001, the Office of Aviation Enforcement and Proceedings (Enforcement Office) began to receive complaints against American (and other carriers) from individuals removed from flights or denied boarding on flights allegedly because those persons were, or were perceived to be, of Arab, Middle Eastern or Southeast Asian descent and/or Muslim. Because of concerns about these complaints, the Enforcement Office requested information from American regarding incidents occurring between September 11, 2001, and December 31, 2001, involving the removal or denied boarding of a passenger for safety/security reasons.

Federal law is clear. An airline cannot refuse passage to an individual because of that person's race, color, national origin, religion, sex, or ancestry. 49 U.S.C. § 40127(a). Similarly, 49 U.S.C. § 41310 prohibits air carriers and foreign air carriers from engaging in unreasonable discrimination against individuals on flights between the U.S. and foreign points, 49 U.S.C. § 41702 requires that U.S. carriers provide safe and adequate transportation, and 49 U.S.C. § 41712 prohibits unfair and deceptive practices and, therefore, prohibits invidiously discriminatory practices on the part of U.S. carriers. This proceeding was instituted on April 25, 2003, with the filing of a Notice of Enforcement Proceeding and Assessment of Civil Penalties and related Complaint based on the Enforcement Office's investigation of American's compliance with the aforementioned statutes.

---

[1] In each instance in this consent order in which the name American Airlines or American appears, it shall refer to and be binding upon American Airlines, Inc., American Eagle, Inc., and all their subsidiary or wholly-owned air carriers.

In responding to the Enforcement Office's allegations, American states that it did not and does not discriminate against passengers on the basis of race, color, national origin, religion, sex or ancestry. According to American, it has a diverse workforce which serves a diverse customer base. American contends that diversity is a major part of American's business, and all of American's policy and training reflect this fact. While American acknowledges that pilots-in-command must have reasonable grounds before removing passengers or denying them boarding from flights for safety or security reasons, American further contends that, as a matter of law, the pilot-in-command must not allow a passenger to depart on a flight if he or she believes that carriage of that passenger is or might be inimical to safety. 49 U.S.C. § 44902(b), 14 CFR 91.3 and 49 CFR 1544.215(c). In addition, American asserts that the pilot-in-command must make that decision based upon the facts and circumstances presented to him or her at that time, taking into account the time constraints under which the decision must be made and the general security climate in which the events unfold. According to American, the circumstances that play a part in the pilot-in-command's decision include the heightened actual dangers arising from the increased risk of terrorist acts, the catastrophic consequences in the case of air travel of any failure to detect such acts in advance, and the necessity that pilots-in-command must make safety decisions on short notice without the opportunity to make an extensive investigation. American opines that the pilot-in-command may rely without further inquiry upon the representations of other crewmembers or other responsible authorities with respect to safety and security.[2]

With respect to the eleven instances cited in the complaint, American states that ten of the eleven occurred in the months immediately following the September 11 tragedies when airport security was still adjusting to the new travel environment. American asserts that in eight of those instances the pilot-in-command of the aircraft made a decision that security issues raised by the passenger's conduct and/or documentation, and not the passenger's protected status, could not be resolved before departure. In many of those instances, according to American, law enforcement authorities, including some who were employees of the Department, were advising the pilot-in-command on the scene. American asserts that in the ninth instance the passenger was removed by and at the behest of local law enforcement authorities. American argues that in each instance the security questions were resolved on the ground and the passenger was put on the next departing flight. With respect to the eleventh instance, which occurred in October 2002, American states that the passenger was removed for additional screening and was reboarded on his scheduled flight. American contends that in each instance, the decision to require further screening was responsible and lawful and that discovery in the case supports this conclusion.[3]

As a legal matter, American contends that there is no jurisdictional basis for enforcement action: pursuant to 49 U.S.C. § 46301(d)(2) and given the amount initially in controversy, American asserts that exclusive jurisdiction rests with the district courts of the United States for the alleged

---

[2] The Enforcement Office strongly disagrees with this position. It is the Enforcement Office's position that a pilot-in-command's failure to inquire independently into the reasons for such action is inconsistent with carriers' legal obligations.

[3] The Enforcement Office disagrees with American's assertions. Nothing learned during discovery in this case dissuades the office that strong evidence exists indicating American acted inconsistently with the applicable civil rights laws in removing and denying boarding to passengers on its flights.

2

violations of section 40127; and sections 41310 and 41702 do not create an administrative remedy for discrimination on the basis of protected status.[4]

American further emphasizes that all of the alleged incidents occurred shortly after September 11, 2001 a period of unprecedented security concerns and tension for all participants in the nation's air transportation system, especially American one of the two carriers that lost employees, passengers and aircraft in the attacks. During the period following September 11, American states that it was scrupulous in exercising its authority and responsibility under section 44902(b), and remains so today. As one of two carriers that were direct victims of the attack, American points out that it is particularly sensitive to claims that its employees acted in disregard of the law regarding aircraft security following September 11. American, having thoroughly investigated the complaints in question, remains resolute in its conviction that none of its employees, in conducting themselves as they did under extremely difficult and historically unprecedented, circumstances, acted wrongly or with intent to violate any law.

American states that, even though it continues to deny strenuously that any violation of Federal law occurred, it made more sense to settle this matter with the Enforcement Office than to continue with costly and protracted litigation to vindicate the actions of its employees. This is especially the case as the Enforcement Office is willing to settle the matter without the assessment of civil penalties, but rather a commitment by American to incorporate civil rights training into existing training programs for pilots, flight attendants, and customer service representatives. According to American, since it is already fully committed to vigorous compliance with the country's civil rights laws, this training will serve simply to reinforce the company's commitment to these core civil rights protections, an objective to which American is fully committed in any event.

The Enforcement Office recognizes that the September 11 terrorist attacks were unprecedented and clearly created a difficult situation for the airline industry, acting pursuant to FAA-approved security programs, in trying to protect passengers and crew from further attacks. Nonetheless, based on its review of the post-September 11 incidents in which American removed or failed to board passengers purportedly for safety/security reasons, the Enforcement Office believes that some passengers were denied boarding or were removed from flights because, or principally because, of the passenger's ethnic background. Even though the Enforcement Office does not dispute that the American employees involved believed they were acting to ensure the safety and security of passengers and crew, the Enforcement Office believes some passengers were denied boarding or removed from flights in a manner inconsistent with the carrier's non-discrimination obligations under Federal law.

The Enforcement Office has carefully considered all the information provided by American, but continues to believe that enforcement action is warranted. In order to end the litigation, the Enforcement Office and American have reached a settlement of this matter. Without admitting

---

[4] American raised these arguments in a motion to dismiss in this proceeding which was denied by the Administrative Law Judge in an order issued on August 21, 2003. See American Airlines Inc., OST-2003-15046-18.

3

any violations of the law occurred, and without waiving its legal arguments as set forth above, American consents to the issuance of this order to cease and desist from future violations of 49 U.S.C. §§ 40127, 41310, 41702, and 41712 and to provide civil rights training to its flight and cabin crewmembers, as well as its customer service representatives. The Deputy General Counsel and the Enforcement Office believe that this settlement is appropriate and serves the public interest and creates an incentive for all carriers to comply fully with the civil rights laws enforced by the Department of Transportation.[5]

**ACCORDINGLY,**

1.  Based on the above discussion, we approve this settlement and the provisions of this order as being in the public interest;

2.  We find that American Airlines, Inc., acted in a manner inconsistent with the requirements of 49 U.S.C. §§ 40127, 41310, 41702 and 41712 when it removed from or refused to board on its flights certain individuals as discussed above;

3.  We order American Airlines, Inc., and all other entities owned and controlled by it or under common ownership and control with it, and their successors and assigns to cease and desist from future violations of 49 U.S.C. §§ 40127, 41310, 41702 and 41712, as described above;

4.  We order American Airlines, Inc., and its successors and assigns to provide civil rights training to its flight and cabin crewmembers and passenger service representatives. The total cost of the training shall be no less than $1.5 million and shall be expended by a date three years after the service date of the order.[6] Upon the completion of that training, and in no event later than the 14 months after the service date of this order and every 12 months thereafter for two subsequent years, American shall submit a sworn statement from an appropriate company official certifying that all flight and cabin crewmembers and passenger service agents have received the civil rights training required under this order.

5.  Any failure by American Airlines, Inc., to conduct the training in accordance with ordering paragraph 4 or to document it adequately to the Enforcement Office shall

---

[5] Additionally, this consent order will settle any and all complaints that could be asserted against American alleging violations of 49 U.S.C. §§ 41310, 41702, 41705 or 41712 arising out of or relating to incidents where American removed from a flight or failed to board a passenger on the basis of the passenger's assumed ethnic background or national origin occurring on or after September 11, 2001, and through the service date of this order.

[6] The Department has contracted with a company to develop an easy to understand technical assistance manual that details the responsibilities of air carriers under Federal nondiscrimination statutes and to develop a model training program, which will include, at a minimum, an overview of the applicable laws and regulations, a cultural awareness component and a job-specific training segment. To support the Department in its mission of ensuring nondiscrimination in air transportation, American has agreed to share with the Department's contractors its civil rights training materials for possible inclusion in the Department's technical assistance manual and model training program.

4

P000768

constitute a continuing violation of this consent order and subject American to enforcement action; and

6.   This order makes no findings of violations with respect to any individual incident of alleged civil rights violations and the findings herein shall have no effect in any proceeding not before the Department of Transportation.

This order is issued under authority assigned in 14 CFR 385.11(d) and shall become a final order of the Department 30 days after its service unless a timely petition for review is filed or the Department takes review on its motion.


By:

                                        BURTON S. KOLKO
                                        Administrative Law Judge


(SEAL)


        *An electronic version of this document is available on the World Wide Web at*
        *http://dms.dot.gov/reports/reports_aviation.asp*

5

P000769

Order 2004-2-22



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
on the 24th day of February, 2004.

| | |
|---|---|
| **Information Directive Concerning**<br><br>**Frontier Airlines**<br>**Under 49 U.S.C. § 41708(b)** | **Docket OST-2004-17197**<br>**Served: February 24, 2004** |

ORDER

By this order Frontier Airlines (Frontier) is directed to answer certain questions, provide information and/or produce documents that are necessary to enable the Department to determine whether Frontier on a particular occasion violated federal statutes prohibiting air carriers from discriminating against passengers based on their race, color, national origin, religion, sex, or ancestry. The Department may require air carriers and foreign air carriers to provide information, special reports, records, papers, documents, and specific answers to questions upon which information is deemed necessary. 49 U.S.C. § 41708(b); 14 CFR 385.15(c), (d); see also Information Directive Concerning Lufthansa German Airlines Under 49 U.S.C. § 41708(b), No. 94-11.3, 1994 WL 614035, *1 (DOT Nov. 3, 1994).

The Department, through its Office of the Assistant General Counsel for Aviation Enforcement and Proceedings (Enforcement Office), has the duty and authority under various laws, including 49 U.S.C. §§ 40127, 41310 and 41702, to investigate allegations of unlawful discrimination. See American Airlines, No. 2003-15046-18 (DOT August 21, 2003). In this connection, the Department receives informal complaints from consumers who believe they have been discriminated against on the basis of their race, color, national origin, religion, sex and/or ancestry. (See, 14 CFR 302.403.) Upon receipt of such complaints, the Enforcement Office implements a structured and informal investigation procedure that it follows, when warranted, with each such informal passenger complaint it receives. This process necessarily involves the cooperation and provision of information by air carriers. In the past, virtually all air carriers

have participated in these investigations by voluntarily and frankly answering questions and providing requested information.

It is under 14 CFR 302.403 that the Enforcement Office received the complaint at issue. The complainant, Maria Aguirre, alleges that Frontier Airlines, through its employees, discriminated against her because she is Hispanic. Upon its receipt, the complaint was referred informally to Frontier with a request that it send a substantive written response to the complainant (with a copy to the Enforcement Office) specifically addressing the facts alleged in the complaint and providing any relevant explanatory information. The referral also requested that Frontier provide the Enforcement Office information regarding prior discrimination complaints against any specific individual or individuals employed by Frontier accused by the complainant of discriminatory conduct.

Frontier did not provide the Enforcement Office with a complete response to this request for information in that it failed to produce (1) the name of the employee or employees involved in the incident at issue, (2) a statement of whether these employees have been the subject of previous discrimination complaints of any type, (3) an explanation of each such discrimination complaint filed against these employees, and (4) a description of any action taken by Frontier in response to each discrimination complaint made against these employees. This information is essential if the Enforcement Office is to investigate Ms. Aguirre's allegations properly.

In response to Frontier's incomplete response, the Enforcement Office made several unsuccessful attempts to obtain the information from Frontier informally. The Enforcement Office sent two email requests to Frontier requesting the information. In addition, the Enforcement Office sent Frontier a letter requesting that it provide the information and explaining the basis and authority for such request. Despite these informal requests, Frontier continues to refuse to produce the requested information voluntarily. Frontier argues that release of the name of the individuals alleged to have discriminated against Maria Aguirre would be an invasion of such employees' privacy rights. Frontier asserts that it would not release such information without first receiving consent.

Frontier's reason for not providing the requested information is without merit. It is important to note that the Department does not release the names, addresses or other personal identifying information of individuals whose names appear in documents in investigation files without their consent. See 5 U.S.C. §552(b)(7)(C). As a further protection, Frontier may file the requested information with a request for confidentiality as described in 14 CFR 302.12.

Therefore, in light of Frontier's refusal to provide the requested information voluntarily and pursuant to 49 U.S.C. § 41708(b) we direct Frontier to file a full and complete response to the Department's request for information, under oath, within 7 days of the date of this order.[1] The requested information is necessary so that the Enforcement Office may properly complete its

---

[1] Frontier must provide information in response to the four questions listed above. In a February 3, 2004, fax sent to the Enforcement Office, Frontier asserted that it had already provided an answer to questions two, three and four. Contrary to this assertion, Enforcement Office records show that Frontier has not responded to any of these questions. Additionally, to the extent that Frontier has not fully responded to the allegations in the complaint and provided relevant mitigating information, it should do so in response to this order.

P000771

investigation, which is conducted as part of its duty to enforce federal antidiscrimination statutes against air carriers, and to allow the Enforcement Office to make a fully informed decision regarding the allegations in the complaint at issue. Failure by Frontier to file the information sought will constitute a violation of this order and 49 U.S.C. § 41708(b) and subject it to enforcement action. Pursuant to 49 U.S.C. § 46301, Frontier would be subject to a civil penalty of up to $25,000 for violations of this order and 49 U.S.C. § 41708, and $25,000 for each day the violations continue.

This order is issued under the authority contained in 49 CFR 1.57a and 14 CFR 385.15.

**ACCORDINGLY:**

1.  Pursuant to the provisions of 49 U.S.C. § 41708(b), the Department directs Frontier Airlines to submit the (1) name of the employee or employees involved in the above-described incident involving alleged discrimination against Maria Aguirre, (2) a statement whether those employees have been the subject of previous discrimination complaints of any type, (3) an explanation of each discrimination complaint filed against those employees, and (4) a description of action taken by Frontier in response to each discrimination complaint made against those employees;

2.  Frontier Airlines shall submit with the information described in ordering paragraph 1 a sworn statement as to the completeness and truthfulness of the information provided; and

3.  Frontier Airlines shall deliver the information described in ordering paragraphs 1 and 2 within 7 days of the service date of this order, to the Department's Office of Aviation Enforcement and Proceedings, 400 7th Street, S.W., C-70, Room 4116, Washington, DC 20590.

BY:
ROSALIND A. KNAPP
DEPUTY GENERAL COUNSEL

An electronic version of this document is available on the World Wide Web at:
http://dms.dot.gov

3

P000772

Order 2011-11-2



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
On the First day of November, 2011

| | |
|---|---|
| **United Air Lines, Inc.**<br>**Compliance with 49 U.S.C. §§ 40127, 41702,**<br>**41310, and 41712** | **Docket OST-2011-0003**<br>**Served: November 1, 2011** |

**CONSENT ORDER**

This order concerns violations by United Air Lines, Inc. ("United") of the Federal statutes prohibiting U.S. and foreign air carriers from subjecting any air traveler to discrimination on the basis of race, color, national origin, religion, sex or ancestry. The order directs United to cease and desist from future violations and assesses the carrier $60,000 in civil penalties.

Federal law is clear that an airline cannot refuse passage to or otherwise discriminate against an individual because of that person's race, color, national origin, religion, sex, or ancestry. Specifically, 49 U.S.C. § 40127(a) provides that an "air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry," 49 U.S.C. § 41702 requires that U.S. carriers provide safe and adequate transportation, and 49 U.S.C. § 41310 prohibits air carriers and foreign air carriers from unreasonably discriminating against any person in foreign air transportation. Finally, 49 U.S.C. § 41712 prohibits unfair and deceptive practices by air carriers. Each of these provisions has been interpreted to prohibit air carriers from discriminating on the basis of race, color, national origin, religion, sex, or ancestry. See American Airlines Inc., OST-2003-15046-18 (Aug. 21, 2003) and United Air Lines, Inc., Order 2003-11-13 (Nov. 19, 2003).

The Office of Aviation Enforcement and Proceedings ("Enforcement Office") investigated United's compliance with the above-cited statutory prohibitions following a complaint that six members of a United Arab Emirates (UAE) armed forces delegation were removed from and denied re-boarding on United flight 227 at the Denver International Airport on December 9, 2009, because they were perceived to be of Arab or Middle Eastern descent. While the Enforcement Office believes that there was insufficient evidence to conclude that the initial decision to remove the six member delegation from United flight 227 to conduct secondary screening was discriminatory, the evidence disclosed that United violated the law when it failed to re-board the passengers on the same flight after law enforcement officials determined that they

2

were not a security threat.  Once an individual who has been removed from an aircraft because of security concerns has been found to not be a security threat, the carrier must allow that individual to re-board the same aircraft and take his/her flight so long as the aircraft has not yet departed as was the case here. It is the view of the Enforcement Office that United's failure to expeditiously re-board the passengers on flight 227 was a violation of 49 U.S.C. §§ 40127, 41702, 41310, and 41712.

In mitigation, United states that it cooperated fully in the Department's investigation, and while its commitment to safety and security is always paramount, it is equally committed to the non-discriminatory and equal treatment of each of its passengers at all times.  United further states that immediately after appropriately resolving its initial concerns, it made an operational decision to re-accommodate the passengers on a flight leaving from a nearby gate, a decision which was in no way motivated by discrimination.  United strongly feels that it upheld its responsibilities as an air carrier by ensuring the passengers were transported to their ultimate destination.  United stresses that its choice to re-accommodate the passengers on a nearby flight to the same destination, arriving at a nearly identical time, was made for purely operational reasons.  Finally, United disagrees that the failure to re-board the passengers on the original flight warrants a determination of discrimination where no such intent was present and its Contract of Carriage necessarily permits such operational flexibility.

The Enforcement Office has carefully considered all the information provided by United, but continues to believe that enforcement action is warranted. To avoid litigation, the Enforcement Office and United have reached a settlement of this matter. Without admitting any violations of the law occurred, United consents to the issuance of an order to cease and desist from future violations of 49 U.S.C. §§ 40127, 41702, 41310 and 41712, and to the assessment of a civil penalty of $60,000. The Enforcement Office believes that this settlement is appropriate and serves the public interest and creates an incentive for all carriers to comply fully with the civil rights laws enforced by the Department of Transportation.

This order is issued under the authority contained in 49 CFR 1.57a and 14 CFR 385.15.

ACCORDINGLY,

1.  Based on the above discussion, we approve this settlement and the provisions of this order as being in the public interest;

2.  We find that United Air Lines, Inc., engaged in discriminatory conduct in violating 49 U.S.C. §§ 40127, 41702, 41310, and 41712 when it denied boarding on UA flight 227 to the members of the UAE delegation as discussed above;

3.  We order United Air Lines, Inc., and all other entities owned and controlled by it or under common ownership and control with it, and their successors and assigns, to cease and desist from future violations of 49 U.S.C. §§ 40127, 41702, 41310, and 41712;

4.  We assess United Air Lines, Inc., a civil penalty of $60,000, which shall be due and payable within 30 days from the date of issuance of this order. Failure to pay the penalty as ordered

3

shall subject United Air Lines, Inc., to the assessment of interest, penalty, and collection charges under the Debt Collection Act, and to possible additional enforcement action for failure to comply with this order; and

5. Payments shall be made by wire transfer through the Federal Reserve Communications System, commonly known as "Fed Wire," to the account of the U.S. Treasury. The wire transfer shall be executed in accordance with the instructions contained in the Attachment to this order. Failure to pay the compromise penalty assessment as ordered will subject United Air Lines, Inc., to an assessment of interest, penalty, and collection charges under the Debt Collection Act, and to possible enforcement action for failure to comply with this order.

This order will become a final order of the Department 10 days after its service unless a timely petition for review is filed or the Department takes review on its own initiative.

BY:

ROSALIND A. KNAPP
DEPUTY GENERAL COUNSEL

(SEAL)

*An electronic version of this document is available at* www.regulations.gov.

Order 2012-5-2



**UNITED STATES OF AMERICA
DEPARTMENT OF TRANSPORTATION
OFFICE OF THE SECRETARY
WASHINGTON, D.C.**

Issued by the Department of Transportation
On the Second day of May, 2012

---

| | |
|---|---|
| **Atlantic Southeast Airlines, Inc.**<br>**Compliance with 49 U.S.C. §§ 40127(a), 41702,**<br>**41310, and 41712** | **Docket OST-2012-0002**<br>**Served: May 2, 2012** |

## CONSENT ORDER

This order concerns violations by Atlantic Southeast Airlines, Inc. ("Atlantic Southeast" or the "Carrier"),[1] of the Federal statutes prohibiting U.S. and foreign air carriers from subjecting any air traveler to discrimination on the basis of race, color, national origin, religion, sex or ancestry. The order directs Atlantic Southeast to cease and desist from future violations and assesses the carrier $25,000 in civil penalties.

Federal law is clear that an airline cannot refuse passage to or otherwise discriminate against an individual because of that person's race, color, national origin, religion, sex, or ancestry. Specifically, 49 U.S.C. § 40127 provides that an "air carrier or foreign air carrier may not subject a person in air transportation to discrimination on the basis of race, color, national origin, religion, sex, or ancestry." 49 U.S.C. § 41310 prohibits air carriers and foreign air carriers from unreasonably discriminating against any person in foreign air transportation, and 49 U.S.C. § 41702 requires that U.S. carriers provide safe and adequate transportation. Finally, 49 U.S.C. § 41712 prohibits unfair and deceptive practices by air carriers. Each of these provisions has been interpreted to prohibit air carriers from discriminating on the basis of race, color, national origin, religion, sex, or ancestry. See American Airlines Inc., OST-2003-15046-18 (Aug. 21, 2003) and United Air Lines, Inc., Order 2011-11-2 (Nov. 1, 2011).

The Office of Aviation Enforcement and Proceedings ("Enforcement Office") investigated Atlantic Southeast Airline's compliance with the above-cited statutory prohibitions following allegations that two religious leaders (Imams) were removed and denied re-boarding on flight 5452, operated as a Delta Connection flight by Atlantic Southeast, at the

---

[1]     Effective January 1, 2012, Atlantic Southeast Airlines, Inc. acquired and merged with ExpressJet Airlines, Inc. The combined company also changed its name to "ExpressJet Airlines, Inc." as of that date.

2

Memphis International Airport on May 6, 2011, because their previous removal from the aircraft by Delta security officials and the search of the passengers' seating areas by law enforcement officials resulted in passenger concern and unrest. While the Enforcement Office finds that the initial decision to remove the Imams from Atlantic Southeast flight 5452 to conduct secondary screening was not discriminatory, the evidence in the Enforcement Office's view disclosed that Atlantic Southeast violated the law when it failed to re-board the passengers on flight 5452 after law enforcement officials and its mainline carrier partner's security officials determined that they were not a security threat and cleared them for travel. Once an individual who has been removed from an aircraft because of security concerns has been found to not be a security threat, the carrier must allow that individual to re-board the same aircraft and take his/her flight so long as the aircraft has not yet departed unless a valid safety or security concern exists.   The Enforcement Office believes that the removed individuals should have been re-boarded in this case.

In mitigation, the Carrier maintains that no Atlantic Southeast employee made any decision or took any action with regard to any Atlantic Southeast passenger based on that passenger's race, color, national origin, religion, sex, or ancestry.  In that regard, the Carrier notes that Federal law also provides air carriers the authority and responsibility to "refuse to transport a passenger or property the carrier decides is, or might be, inimical to safety" (49 U.S.C. § 44902(b)) and establishes that "[t]he pilot in command of an aircraft is directly responsible for, and is the final authority as to the operation of the aircraft."  14 CFR § 91.3(a).  The Carrier further states that even though it continues to strenuously deny that any violation of Federal law occurred, it has elected to settle this matter with the Enforcement Office rather than to engage in costly and protracted litigation.

The Carrier maintains that there is no Federal law, regulation, or guidance that speaks directly to the unique circumstances with which the Atlantic Southeast employees were faced.  It further asserts the following to demonstrate that no discrimination occurred: (1) Atlantic Southeast had initially boarded and was already in the process of transporting all passengers on flight 5452 when its mainline carrier partner's gate staff boarded the aircraft and requested identification for the Imams, which was collected by the flight attendant and returned several minutes later; (2) Atlantic Southeast then began transporting all passengers boarded on flight 5452, which left the gate without incident, and did not discriminate against any of them based on any protected classification; (3) Atlantic Southeast's mainline carrier partner's gate staff recalled the flight due to "security concerns" and the captain was directed to return the aircraft to the gate without further information; (4) following removal of the two passengers and their bags from the aircraft by the mainline carrier's personnel, two uniformed TSA officials boarded the aircraft, put on gloves and conducted an on-board search in the areas where the two passengers were removed – in full view of a plane full of passengers; (5) upon repeated requests for more information on the nature of the security issue, the captain was told only that one of the passengers was on the "No Fly" list; (6) during and after the TSA search, passengers became visibly upset, with at least one passenger crying audibly and asking to get off the aircraft because she thought something was wrong; (7) shortly thereafter and now delayed over one hour, flight 5452 departed the gate without the removed passengers on board but was then called back due to "security" reasons for the second time; (8) the mainline carrier partner's personnel advised the captain that TSA had cleared the two removed passengers and requested that they be re-boarded on flight 5452; (9) in light of the foregoing circumstances and the events witnessed by the

P000777

3

passengers and crew, the captain exercised what he believed was his discretion as pilot-in-command to not re-board the removed passengers due to safety concerns; and (10) the two removed passengers were transported to their destination on another Atlantic Southeast flight later that day without incident.

The Carrier believes that these circumstances supported the captain's judgment that it was unreasonable to re-board the two removed passengers based on legitimate safety concerns. It further argues that but for the captain's inability to obtain information and the two intervening acts of the removal of the passengers and the search of the aircraft, in neither of which Atlantic Southeast played any role, Atlantic Southeast would have transported the Imams on flight 5452 without incident – as it had already attempted to do. Rather, the Carrier maintains that the captain's decision was an appropriate exercise of discretion based on the intervening acts of its mainline carrier partner's personnel and the TSA that created legitimate safety concerns, and was not based on any protected classification. According to the Carrier, there was a valid safety and/or security concern present and this scenario does not fit the generic circumstance described by the Enforcement Office where an individual was simply not permitted to re-board the same aircraft that had not yet departed. Atlantic Southeast's aircraft had departed and was called back to the gate – not once but twice, which only served to increase the distress of passengers and en route safety concerns. Finally, Atlantic Southeast disagrees that the failure to re-board the Imams on the original flight warrants a determination of discrimination where no such intent was present and its contract of carriage necessarily permits such operational flexibility.

The Enforcement Office has carefully considered all the information provided by Atlantic Southeast, but continues to believe that enforcement action is warranted. To avoid litigation, the Enforcement Office and Atlantic Southeast have reached a settlement of this matter. Without admitting any violations of the law occurred, Atlantic Southeast consents to the issuance of an order to cease and desist from future violations of 49 U.S.C. §§ 40127, 41310, 41702, and 41712 and to the assessment of a civil penalty of $25,000. The Enforcement Office believes that this settlement is appropriate and serves the public interest and creates an incentive for all carriers to comply fully with the civil rights laws enforced by the Department of Transportation.

This order is issued under the authority contained in 49 CFR 1.57a and 14 CFR 385.15.

ACCORDINGLY,

1. Based on the above discussion, we approve this settlement and the provisions of this order as being in the public interest;

2. We find that Atlantic Southeast Airlines, Inc., engaged in discriminatory conduct in violation of 49 U.S.C. §§ 40127, 41310, 41702, and 41712 when it denied boarding on Atlantic Southeast flight 5452 to two Imams, as discussed above;

3. We order Atlantic Southeast Airlines, Inc., and all other entities owned and controlled by it, and their successors and assigns, to cease and desist from future violations of 49 U.S.C. §§ 40127, 41310, 41702, and 41712;

4

4. We assess Atlantic Southeast Airlines, Inc., a civil penalty of $25,000, which shall be due and payable within 30 days from the date of issuance of this order. Failure to pay the penalty as ordered shall subject Atlantic Southeast Airlines, Inc., to the assessment of interest, penalty, and collection charges under the Debt Collection Act, and to possible additional enforcement action for failure to comply with this order;

5. We order Atlantic Southeast Airlines, Inc., to provide civil rights training to the flight and cabin crewmembers of the flight described above. That training must cover the incident covered in this order and make clear that in the absence of a valid safety or security concern, passenger or crew unrest is not an acceptable basis to deny boarding. Upon completion of that training, but no later than 14 months after the service date of the order, Atlantic Southeast Airlines, Inc., shall submit a sworn statement from an appropriate company official certifying that the flight and cabin crewmembers have received the civil rights training required under this order;

6. Any failure of Atlantic Southeast Airlines, Inc., to conduct the training or document it adequately to the Enforcement Office in accordance with ordering paragraph 5 shall constitute a continuing violation of this consent order and subject Atlantic Southeast Airlines, Inc., to enforcement action; and

7. Payment of the penalty shall be made by wire transfer through the Federal Reserve Communications System, commonly known as "Fed Wire," to the account of the U.S. Treasury. The wire transfer shall be executed in accordance with the instructions contained in the Attachment to this order. Failure to pay the compromise penalty assessment as ordered will subject Atlantic Southeast Airlines, Inc., to an assessment of interest, penalty, and collection charges under the Debt Collection Act and to possible enforcement action for failure to comply with this order.

P000779

5

This order will become a final order of the Department 10 days after its service unless a timely petition for review is filed or the Department takes review on its own initiative.

BY:

ROSALIND A. KNAPP
DEPUTY GENERAL COUNSEL

(SEAL)

*An electronic version of this document is available at*

*www.regulations.gov*

CONFIDENTIAL-SUBECT TO PROTECTIVE ORDER AND SSI PROTECTIVE ORDER



SENSITIVE SECURITY INFORMATION — DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER AND SSI PROTECTIVE ORDER



SENSITIVE SECURITY INFORMATION -- DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE
DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR
OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER
ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.



©2019 - Frontier Airlines

"CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER"     19AZF0229 DEVELCCHIA FRONTIER 0897









©2019 - Frontier Airlines

*CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER*    19AZF0229 DEVELCCHIA FRONTIER 0900



©2019 - Frontier Airlines

'CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER' 19AZF0229 DEVELCCHIA FRONTIER 0901



©2019 · Frontier Airlines

"CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER"

19AZF0229 DEVELCCHIA FRONTIER 0902



©2019 - Frontier Airlines

"CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER"

19AZF0229 DEVELCCHIA FRONTIER 0903



©2019 - Frontier Airlines

*CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER*   19AZF0229 DEVELCCHIA FRONTIER 0904



©2019 - Frontier Airlines

*CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER*   19AZF0229 DEVELCCHIA FRONTIER 0905



©2019 - Frontier Airlines

"CONFIDENTIAL- SUBJECT TO PROTECTIVE ORDER"    19AZF0229 DEVELCCHIA FRONTIER 0906



©2019 · Frontier Airlines

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   19AZF0229 DEVELCCHIA FRONTIER 0907



©2019 - Frontier Airlines

"CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER"     **19AZF0229 DEVELCCHIA FRONTIER 0908**



©2019 - Frontier Airlines

*CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER*

19AZF0229 DEVELCCHIA FRONTIER 0909



©2019 - Frontier Airlines

*CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER*

19AZF0229 DEVELCCHIA FRONTIER 0910



©2019 - Frontier Airlines

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER   19AZF0229 DEVELCCHIA FRONTIER 0911



©2019 - Frontier Airlines

"CONFIDENTIAL  SUBJECT TO PROTECTIVE ORDER"       19AZF0229 DEVELCCHIA FRONTIER 0912

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER





**STANDARDS OF CONDUCT**

19AZF0229 DELVECCHIA FRONTIER 1428



**STANDARDS OF CONDUCT**

Uncontrolled copy when downloaded or printed. 19AZF0229 DELVECCHIA FRONTIER 1429
Refer to the document management library for the latest current revision of this document.

STANDARDS OF CONDUCT

19AZF0229 DELVECCHIA FRONTIER 1431

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER





19AZF0229 DELVECCHIA FRONTIER 1442

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Frontier Airlines, Inc. — February 2017

2

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



19AZF0229 DELVECCHIA FRONTIER 1444

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Frontier Airlines, Inc. – February 2017

4

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Frontier Airlines, Inc. – February 2017

5

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Frontier Airlines, Inc. – February 2017

6

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Frontier Airlines, Inc. – February 2017

7

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Frontier Airlines, Inc. – February 2017

8

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



Frontier Airlines, Inc. – February 2017                                             9

19AZF0229 DELVECCHIA FRONTIER 1450

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



19AZF0229 DELVECCHIA FRONTIER 1451

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER



19AZF0229 DELVECCHIA FRONTIER 1452

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER AND SSI PROTECTIVE ORDER



Uncontrolled copy when downloaded or printed.   19AZF0229 DELVECCHIA FRONTIER 1078
Refer to the Controlled Document Library for the most current version of this document.

```
FTT             PRINTED: 04OCT19 1018
                Summary  - All Training Report - by Date/Eqpt/Pos

ID # 423812     SNUPE  REX  TYLER
Qual1: LAS -319     -CA
Qual2:              -
Qual3:              -
Qual4:              -
Certificate# ATP: 3232474        Certificate # COM:            Certificate # FE :
Date of Medical:  23APR19
```

| A/C | POS | CODE | DESCRIPTION | S/U | TrgDate | BaseMonth | Instructor# | Hrs/min. | Ldgs | Cls | FAR |
|-----|-----|------|-------------|-----|---------|-----------|-------------|----------|------|-----|-----|
| | | IRETF | Initial Opset/Loss Trng Flight | | 16MAY19 | | 404385 | 3: 0 | 00 | 03 | |
| | | RCRM | Recurrent Crew Resource Management | | 15MAY19 | APR | 425180 | 3: 0 | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 14MAY19 | APR | 425180 | 2: 0 | 00 | 00 | |
| | | IRETG | Initial Opset/Loss Trng Ground | | 14MAY19 | | 435180 | 2: 0 | 00 | 00 | |
| | | NSHAZ | Reset Base Month Hazardous Material | | 25FEB19 | FEB | CBT | : | | | |
| | | RCRM | Recurrent Crew Resource Management | | 11MAY18 | APR | 413061 | 3: | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 10MAY18 | APR | 426502 | 1: | 00 | 00 | |
| | | NSHAZ | Reset Base Month Hazardous Material | | 09MAR18 | FEB | CBT: | | | | |
| | | NSHAS | Reset Base Month Hazardous Material | | 18JUN17 | JUN | CBT | : | | | |
| | | RCRM | Recurrent Crew Resource Management | | 10MAY17 | APR | 413061 | : | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 09MAY17 | APR | 400518 | : | 00 | 00 | |
| | | NSHAZ | Reset Base Month Hazardous Material | | 21FEB17 | FEB | CBT | : | | | |
| | | DIFFNEO | Differences Training for NEO Engines | | 15SEP16 | | CBT | : | | | |
| | | UCRM | Upgrade Crew Resource Management | | 25APR16 | APR | 413061 | : | 00 | 00 | |
| | | USEC | Upgrade Security Training | | 21APR16 | APR | 425180 | : | 00 | 00 | |
| | | UHAZ | Upgrade Hazardous Material | | 21APR16 | APR | 425180 | : | 00 | 00 | |
| | | IDF321CA | Initial CA Differences for the 321 | | 21APR16 | | 425180 | : | 00 | 00 | |
| | | NSHAZ | Reset Base Month Hazardous Material | | 19FEB16 | FEB | | : | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 10FEB16 | FEB | 423814 | : | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 09FEB16 | FEB | 423814 | : | 00 | 00 | |
| | | IDF321FO | Initial FO Differences for the 321 | | 16OCT15 | | | :00 | 00 | 00 | |
| | | RCRM | Recurrent Crew Resource Management | | 13MAR15 | FEB | 413061 | : | 00 | 00 | |
| | | RSEC | Recurrent Security Training | | 12MAR15 | FEB | 400518 | : | 00 | 00 | |
| | | NSHAZ | Reset Base Month Hazardous Material | | 23FEB15 | FEB | | : | 00 | 00 | |
| | | IDRUG | Initial Drug Test | | 14APR14 | APR | | : | 00 | 00 | |
| | | IBACK | Initial Background Check | | 14APR14 | | | : | 00 | 00 | |
| | | ISEC | Initial Security Training | | 11FEB14 | FEB | 412180 | : | 00 | 00 | |
| | | IHAZ | Initial Hazardous Material | | 10FEB14 | FEB | 412180 | : | 00 | 00 | |
| | | ICRM | Initial Crew Resource Management | | 10FEB14 | FEB | 410706 | : | 00 | 00 | |
| | | IBI | Initial Basic Indoctrination | | 07FEB14 | | 412180 | 40:00 | 00 | 00 | |
| 319 | CA | RLC | Recurrent Line Check | | 11JUL19 | JUN | 405607 | 2:13 | 00 | 00 | |
| 319 | | NHS2 | Reset Base Month Home Study 2 | | 15JUN19 | JUN | CBT | : | | | |
| 319 | CA | RPC | Recurrent Proficiency Check | | 17MAY19 | MAY | 403230 | 04:00 | 03 | 03 | |
| 319 | CA | RGS | Recurrent Ground School | | 15MAY19 | APR | 425180 | 5: 0 | 00 | 00 | |
| 319 | | NHS1 | Reset Base Month Home Study 1 | | 25FEB19 | FEB | CBT | : | | | |
| 321 | CA | AUTOLAND | Initiate Autoland | | 04NOV18 | NOV | 402858 | 04:00 | 00 | 03 | |

19AZF0229 DELVECCHIA FRONTIER 0141



| 320 | CA | AUTOLAND | Initiate Autoland | 04NOV18 | NOV | 402858 | 04:00 | 00 | 03 | |
| 319 | CA | RPT | Recurrent Proficiency Training | 04NOV18 | NOV | 402858 | 04:00 | 03 | 03 | |
| 319 | CA | AUTOLAND | Initiate Autoland | 04NOV18 | NOV | 402858 | 04:00 | 00 | 03 | |
| 319 | | WHS3 | Reset Base Month Home Study 3 | 31OCT18 | OCT | | CBT: | | | |
| 319 | | WHS2 | Reset Base Month Home Study 2 | 30JUN18 | JUN | | CBT | | | |
| 319 | CA | RLC | Recurrent Line Check | 20MAY18 | JUN | 402901 | 02:47 | 00 | 01 | |
| 319 | CA | RPC | Recurrent Proficiency Check | 12MAY18 | MAY | 405414 | 03:50 | 04 | 04 | |
| 319 | CA | RGS | Recurrent Ground School | 11MAY18 | APR | 426502 | 5: | 00 | 00 | |
| 319 | | MREM | Reset Base Months Emergency Drills | 11MAY18 | MAY | 426502 | 2: | 00 | 00 | |
| 319 | | WHS1 | Reset Base Month Home Study 1 | 09MAR18 | FEB | | CBT: | | | |
| 321 | CA | AUTOLAND | Initiate Autoland | 19NOV17 | NOV | 404408 | 04:00 | 00 | 04 | |
| 320 | CA | AUTOLAND | Initiate Autoland | 19NOV17 | NOV | 404408 | 04:00 | 00 | 04 | |
| 319 | CA | RPT | Recurrent Proficiency Training | 19NOV17 | NOV | 404408 | 04:00 | 04 | 04 | |
| 319 | CA | AUTOLAND | Initiate Autoland | 19NOV17 | NOV | 404408 | 04:00 | 00 | 04 | |
| 319 | | WHS3 | Reset Base Month Home Study 3 | 10OCT17 | OCT | | CBT | : | | | |
| 319 | CA | RLC | Recurrent Line Check | 28JUL17 | JUN | 401541 | 2:21 | 00 | 01 | |
| 319 | | WHS2 | Reset Base Month Home Study 2 | 18JUN17 | JUN | | CBT | : | | | |
| 321 | CA | AUTOLAND | Initiate Autoland | 11MAY17 | MAY | 404408 | 4: 0 | 00 | 04 | |
| 320 | CA | AUTOLAND | Initiate Autoland | 11MAY17 | MAY | 404408 | 4: 0 | 00 | 04 | |
| 319 | CA | RPC | Recurrent Proficiency Check | 11MAY17 | MAY | 404408 | 4: 0 | 04 | 04 | |
| 319 | CA | AUTOLAND | Initiate Autoland | 11MAY17 | MAY | 404408 | 4: 0 | 00 | 04 | |
| 319 | CA | RGS | Recurrent Ground School | 10MAY17 | APR | 405578 | : | 00 | 00 | |
| 319 | | WHS1 | Reset Base Month Home Study 1 | 21FEB17 | FEB | | CBT | : | | | |
| 319 | | WHS3 | Recurrent Home Study 3 | 03NOV16 | NOV | | : | | | |
| 321 | CA | AUTOLAND | Initiate Autoland | 14OCT16 | OCT | 414675 | 04:00 | 00 | 04 | |
| 320 | CA | AUTOLAND | Initiate Autoland | 14OCT16 | OCT | 414675 | 04:00 | 00 | 04 | |
| 319 | CA | RPT | Recurrent Proficiency Training | 14OCT16 | NOV | 414675 | 04:00 | 04 | 04 | |
| 319 | CA | AUTOLAND | Initiate Autoland | 14OCT16 | OCT | 414675 | 04:00 | 00 | 04 | |
| 319 | | WHS2 | Recurrent Home Study 2 | 22JUN16 | JUN | | : | 00 | 00 | |
| 319 | CA | UOE | Upgrade Operating Experience | 11JUN16 | | 400869 | 26:28 | 10 | 10 | |
| 319 | CA | ULC | Upgrade Line Check | 11JUN16 | JUN | 400869 | 2:33 | 00 | 01 | |
| 319 | CA | UFAAOBS | Upgrade FAA Observation | 10JUN16 | | 400261 | 04:30 | 00 | 01 | SAIA/F9D |
| 321 | CA | AUTOLAND | Initiate Autoland | 20MAY16 | MAY | 405476 | 04:00 | 00 | 02 | |
| 320 | CA | AUTOLAND | Initiate Autoland | 20MAY16 | MAY | 405476 | 04:00 | 00 | 02 | |
| 319 | CA | ULOFT | Upgrade Loft | 20MAY16 | | 405476 | 04:00 | 02 | 02 | |
| 319 | CA | CAT3IL | CAT 3 Landing Qualification | 20MAY16 | | 405476 | 04:00 | 02 | 02 | |
| 319 | CA | AUTOLAND | Initiate Autoland | 20MAY16 | MAY | 405476 | 04:00 | 00 | 02 | |
| 319 | | RNAV | Radar Navigation Approach | 20MAY16 | | 405476 | 04:00 | 00 | 02 | |
| 319 | CA | UPC | Upgrade Proficiency Check | 18MAY16 | MAY | 405414 | 02:00 | 04 | 04 | |
| 319 | CA | UFTS | Upgrade Flight Training Simulator | 17MAY16 | | | : | 00 | 04 | |
| 319 | CA | UGS | Upgrade Ground School | 26APR16 | APR | 425180 | : | 00 | 00 | |
| 319 | | UEM | Upgrade Emergency Drills Training | 22APR16 | APR | 425180 | : | 00 | 00 | |
| 319 | CA | ILOBS | Initial International Line Observation | 07APR16 | | | 02:00 | 02 | 02 | |
| 319 | | WHS1 | Reset Base Month Home Study 1 | 17FEB16 | FEB | | : | 00 | 00 | |
| 321 | FO | AUTOLAND | Initiate Autoland | 11FEB16 | FEB | 414675 | 04:00 | 00 | 03 | |
| 320 | FO | AUTOLAND | Initiate Autoland | 11FEB16 | FEB | 414675 | 04:00 | 00 | 03 | |
| 319 | FO | RPT | Recurrent Proficiency Training | 11FEB16 | MAR | 414675 | 04:00 | 03 | 03 | |
| 319 | FO | AUTOLAND | Initiate Autoland | 11FEB16 | FEB | 414675 | 04:00 | 00 | 03 | |
| 319 | FO | RGS | Recurrent Ground School | 10FEB16 | FEB | 423814 | : | 00 | 00 | |
| 319 | | RREM | Reset Base Months Emergency Drills | 09FEB16 | FEB | 423814 | : | 00 | 00 | |
| 319 | | RHS3 | Recurrent Home Study 3 | 22OCT15 | OCT | | :00 | 00 | 00 | |

19AZF0229 DELVECCHIA FRONTIER 0142

| 319 |    | RHS2     | Recurrent Home Study 2              | 24JUN15 | JUN |        | :00   | 00 | 00 |
| 320 | FO | AUTOLAND | Initiate Autoland                   | 14MAR15 | MAR | 401873 | 03:10 | 00 | 04 |
| 319 | FO | RPC      | Recurrent Proficiency Check         | 14MAR15 | MAR | 401873 | 03:10 | 04 | 04 |
| 319 | FO | AUTOLAND | Initiate Autoland                   | 14MAR15 | MAR | 401873 | 03:10 | 00 | 04 |
| 319 | FO | RGS      | Recurrent Ground School             | 13MAR15 | FEB | 413061 | :     | 00 | 00 |
| 319 |    | RREM     | Reset Base Months Emergency Drills  | 12MAR15 | MAR | 408518 | :     | 00 | 00 |
| 319 |    | RHS1     | Reset Base Month Home Study 1       | 23FEB15 | FEB |        | :     | 00 | 00 |
| 319 |    | RHS3     | Reset Base Month Home Study 3       | 19OCT14 | OCT | CBT    | :     | 00 | 00 |
| 319 |    | CKS      | Qualified On CKS                    | 28JUN14 |     |        | :     |    |    |
| 319 |    | RHS2     | Reset Base Month Home Study 2       | 25JUN14 | JUN |        | :     | 00 | 00 |
| 319 | FO | IOE      | Initial Operating Experience        | 05MAY14 | MAY | 405414 | 39:09 | 10 | 10 |
| 319 |    | ILC      | Initial Line Check                  | 05MAY14 | MAY | 405414 | 04:00 | 00 | 02 |
| 319 |    | RNAV     | Radar Navigation Approach           | 22APR14 |     |        | :     | 00 | 00 |
| 319 | FO | ILOFT    | Initial Loft                        | 02APR14 |     | 401873 | 04:00 | 04 | 04 |
| 319 | FO | CATIII   | CAT 3 Landing Qualification         | 02APR14 | APR | 401873 | 04:00 | 00 | 04 |
| 319 | FO | AUTOLAND | Initiate Autoland                   | 02APR14 | APR | 401873 | 04:00 | 00 | 04 |
| 319 | FO | IPC      | Initial Proficiency Check           | 25MAR14 | MAR | 400514 | 02:50 | 03 | 03 |
| 319 | FO | IFTS     | Initial Flight Training Simulator   | 24MAR14 | MAR | 410770 | :     | 00 | 00 |
| 319 | FO | IGS      | Initial Ground School               | 26FEB14 | FEB | 407806 | :     | 00 | 00 |
| 319 |    | IHS3     | Initial Home Study 3                | 26FEB14 | FEB | 412180 | :     | 00 | 00 |
| 319 |    | IHS2     | Initial Home Study 2                | 26FEB14 | FEB | 412180 | :     | 00 | 00 |
| 319 |    | IHS1     | Initial Home Study 1                | 26FEB14 | FEB | 412180 | :     | 00 | 00 |
| 319 |    | IEM      | Initial Emergency Drills Training   | 11FEB14 | FEB | 412180 | :     | 00 | 00 |

END OF REPORT

19AZF0229 DELVECCHIA FRONTIER 0143





EXHIBIT
18
Frontier

SENSITIVE SECURITY INFORMATION — DESTROY PRINTED PAGES UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

Uncontrolled copy when downloaded or printed.   19AZF0229 DELVECCHIA FRONTIER 1087
Refer to the Controlled Document Library for the most current version of this document.

# 20190328 - 2067 RDULAS

### Generated Jun 11 2019 18:34

1.

Time **03/29 0436z**

SMI **ARR**

Description **In Event**

Flight **F92067**

Tail **N230FR**

Dep **KRDU**

Arr **KLAS**

DSP ID **DDL**

Freetext - **0**

---

2.

Time **03/29 0427z**

SMI **ARR**

Description **On Event**

Flight **F92067**

Tail **N230FR**

Dep **KRDU**

Arr **KLAS**

DSP ID **DDL**

Freetext - **82,**

---

3.

Time **03/29 0343z**

SMI **CMD**

Description **Uplink - FROM KLAS OPS**

Flight **F92067**

Tail **N230FR**

Dep **KRDU**

Arr **KLAS**

DSP ID **No Value**

Freetext FROM KLAS OPS

    ETA 2158

    WHEELCHAIRS 5

    ELEC CART

    ICE BAGS

    UMS

    GATE D22

    GATE AVAIL AT ARRIVAL Y

    GND PWR Y

    AIR START N

    AIR COND Y

    NEXT FLIGHT 2000

    NEXT DEST ATL

    -COPY THEY WILL MEET THE FLT IF THERE IS ANYMORE WITNESSES PLEASE DEPLANE THEM LAST AS WELL SO THEY CAN GIVE STATEMENTS....



*CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER* 19AZF0229 DELVECCHIA FRONTIER 0294

**4.**

| | |
|---|---|
| Time | 03/29 0337z |
| SMI | M14 |
| Description | Special Request |
| Flight | F92067 |
| Tail | N230FR |
| Dep | No Value |
| Arr | KLAS |
| DSP ID | DDL |
| Freetext | 6393,JUST CONFIRM WE WILL,HAVE LEOS STANDING BY,AT THE GATE.,WE WILL DEPLANE THE,ADULT AND CHILD LAST |

**5.**

| | |
|---|---|
| Time | 03/29 0314z |
| SMI | CMD |
| Description | Uplink - LEOS WILL MEET T |
| Flight | F92067 |
| Tail | N230FR |
| Dep | KRDU |
| Arr | KLAS |
| DSP ID | No Value |
| Freetext | LEOS WILL MEET THE FLIGHT. NO NEW INFO ON ADULT. |

**6.**

| | |
|---|---|
| Time | 03/29 0311z |
| SMI | A81 |
| Description | Aircrew Message |
| Flight | F92067 |
| Tail | N230FR |
| Dep | No Value |
| Arr | No Value |
| DSP ID | DDL |
| Freetext | CONFIRM THAT WE ARE SETFOR OUR ARR WITH LEO.ALSO IS THERE FURTHER INFO ON THIS ADULT..THEY ARE STILL SEPARATED |

**7.**

| | |
|---|---|
| Time | 03/29 0155z |
| SMI | A81 |
| Description | Aircrew Message |
| Flight | F92067 |
| Tail | N230FR |
| Dep | No Value |
| Arr | No Value |
| DSP ID | DDL |
| Freetext | THE FAS WHITNESSED IT. THEY ARE SEPERATED NOW |

**8.**

| | |
|---|---|
| Time | 03/29 0153z |
| SMI | CMD |
| Description | Uplink - did the FAs witn |
| Flight | F92067 |
| Tail | N230FR |

Dep KRDU

Arr KLAS

DSP ID No Value

Freetext did the FAs witness the inappropriate touching or was it reported by another passenger
or the younger male.....

**9.**

Time 03/29 0147z

SMI A81

Description Aircrew Message

Flight F92067

Tail N230FR

Dep No Value

Arr No Value

DSP ID DDL

Freetext WE NEED SOME INPUT FROMYOU..AND SOC

**10.**

Time 03/29 0147z

SMI A81

Description Aircrew Message

Flight F92067

Tail N230FR

Dep No Value

Arr No Value

DSP ID DDL

Freetext THERE SEEMS TO BE SOME IINAPPROIATE TOUCHINGBETWEEN AN OLDER MALEND A YOUNGER MALE..12YOORIGINAL SEATS 13D 13EFLT ATTS R UNCOMFORTABL

**11.**

Time 03/29 0137z

SMI CMD

Description Uplink - FROM KLAS OPS

Flight F92067

Tail N230FR

Dep KRDU

Arr KLAS

DSP ID No Value

Freetext FROM KLAS OPS

ETA 2051

WHEELCHAIRS

ELEC CART

ICE BAGS 5

UMS

GATE D22

GATE AVAIL AT ARRIVAL  Y

GND PWR  Y

AIR START N

AIR COND  Y

NEXT FLIGHT  2000

*CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER* 19AZF0229 DELVECCHIA FRONTIER 0296

NEXT DEST  ATL

HELLO - GATE D22, GATE CODE 022. TURNING FLT 2000 TO ATL IS DEPARTING @ 0005. SEE U GUYS IN LAS - THNX

---

**12.**

| | |
|---|---|
| Time | 03/29 0132z |
| SMI | M14 |
| Description | Special Request |
| Flight | F92067 |
| Tail | N230FR |
| Dep | No Value |
| Arr | KLAS |
| DSP ID | DDL |
| Freetext | 6393,,,,, |

---

**13.**

| | |
|---|---|
| Time | 03/29 0002z |
| SMI | DEP |
| Description | Off Event |
| Flight | F92067 |
| Tail | N230FR |
| Dep | KRDU |
| Arr | KLAS |
| DSP ID | DDL |
| Freetext | -  354,044224 |

---

**14.**

| | |
|---|---|
| Time | 03/28 2351z |
| SMI | DEP |
| Description | Out Event |
| Flight | F92067 |
| Tail | N230FR |
| Dep | KRDU |
| Arr | KLAS |
| DSP ID | DDL |
| Freetext | -  ,, |

*CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER*  19AZF0229 DELVECCHIA FRONTIER 0297

**SENSITIVE SECURITY INFORMATION — DESTROY UPON REVISION**

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

19A2F0229 DELVECCHIA FRONTIER 1077

████████████████████████████

When the C briefed the exit row, she noticed a child in the row. He said he was 12 years old. He was black. When she began to find him a new seat, an older white man, early 50s, says "This is my son." She moved them to row 17 E and F. While doing service and trash, about 25 minutes into the flight, the A, C and D flight attendants noticed the older man rubbing the boys face in a way that made them uncomfortable. They asked me to check it out. As I walked from the front to the rear, I noticed the man's hand on the boys crotch. I walked back up to the front again and his hand was still there. Both appeared to be sleeping. We informed the captain and he told us to separate the two. I put the boy in row 31F (and placed an ABP in 31D) and left the older man in 17. I spoke with the boy and he said that was his dad. He was adopted when he was three. And that they have been separated before on another flight. He asked could he go back and sit by his dad. I asked him if he knew that his dad's hand was on his crotch. He said no. It took about 10-12 minutes after I separated them for the dad to come to the back and see what was going on. I told him I saw where his hand was and that's why you were separated. The man asked me "did he tell you where my hand was?" I told him "no, I saw it myself". He spoke to the boy briefly, asked if he was alright, and went back to his seat. He did not come check on the boy for the remaining 3+ hours of the flight. He also deplaned without waiting for the boy to come up from the last row.



EXHIBIT
21
Frontier

19AZF0229 DELVECCHIA FRONTIER 0105

Hello,
  My story:
As the C, I went to brief the exit row before MCD closed.
As I briefed I noticed a boy sitting in the exit row.  I had asked him how old he was to make
sure he is 15 or older.  He had answered "12"
I asked him if he was traveling on his own and he pointed at a man sitting next to him. (The
boy was in 13E the man was in 13D). I had asked the gentleman sitting in 13D if he wanted
me to separate them move them together since the boy is not allowed to sit in the exit row
because of the age requirement.
The man had answered "together"
Because it was a full flight, I had asked for two volunteers sitting next to each other to move to
the exit row.  A man and a women had volunteered (17EF, if I am remembering correctly).
After the switch was made, I briefed the new passengers sitting the the exit row and headed to
the back of the aircraft to notify the B and the D flight attendant that I had moved people out
of the aircraft because of age requirement.

The B and the D flight attendant was shocked as I said age instead of language.  The little boy
did not look 12, and the relationship they had looked very awkward.

I did not interact with either the man or the boy after that.  The B and the D flight attendant
had dealt with most of it since the boy and the man was sitting in their section.


— Anna Bond ▇▇▇



EXHIBIT
22
Frontier



"CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER"   19AZF0229 DELVECCHIA FRONTIER 0103

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER AND HPA PROTECTIVE ORDER



SENSITIVE SECURITY INFORMATION — DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

Security                    Uncontrolled copy when downloaded on updated          20.05  Pg. 1
                                                        19AZF0229 DELVECCHIA FRONTIER 1002
Refer to the Controlled Document Library for the most current version of this document

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER AND SSI PROTECTIVE ORDER



SENSITIVE SECURITY INFORMATION — DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE
DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR
OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION.   UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER
ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

**Security**   Uncontrolled copy when downloaded or printed.   **20.15  Pg. 1**
19AZF0229 DELVECCHIA FRONTIER 1003
Refer to the Controlled Document Library for the most current version of this document.



SENSITIVE SECURITY INFORMATION — DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

Security          Uncontrolled copy when downloaded or printed.          20.20  Pg. 1

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER AND SSI-PROTECTIVE ORDER



SENSITIVE SECURITY INFORMATION -- DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE
DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR
OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER
ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

20.20  Pg. 2          Uncontrolled copy when downloaded or printed.          Security
                                        19AZF0229 DELVECCHIA FRONTIER 1006
          Refer to the Controlled Document Library for the most current version of this document.

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER AND SSI PROTECTIVE ORDER



SENSITIVE SECURITY INFORMATION — DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER AND SSI PROTECTIVE ORDER



SENSITIVE SECURITY INFORMATION — DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.

Uncontrolled copy when downloaded or printed. **Security**

19AZF0229 DELVECCHIA FRONTIER 1008

Refer to the Controlled Document Library for the most current version of this document.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER AND SSI PROTECTIVE ORDER



SENSITIVE SECURITY INFORMATION — DESTROY UPON REVISION

WARNING: THIS RECORD CONTAINS SENSITIVE SECURITY INFORMATION THAT IS CONTROLLED UNDER 49 C.F.R. PARTS 15 AND 1520. NO PART OF THIS RECORD MAY BE DISCLOSED TO PERSONS WITHOUT A "NEED TO KNOW," AS DEFINED IN 49 C.F.R. PARTS 15 AND 1520, EXCEPT WITH THE WRITTEN PERMISSION OF THE ADMINISTRATOR OF THE TRANSPORTATION SECURITY ADMINISTRATION OR THE SECRETARY OF TRANSPORTATION. UNAUTHORIZED RELEASE MAY RESULT IN CIVIL PENALTIES OR OTHER ACTION. FOR U.S. GOVERNMENT AGENCIES, PUBLIC DISCLOSURE GOVERNED BY 5 U.S.C. 552 AND 49 C.F.R. PARTS 15 AND 1520.