**EXHIBIT 15**

**Deposition of Captain Vickie R. Norton, BSME, MSc, ATP**

**Contains Sensitive Security Information (SSI) per Protective Order (ECF No. 126)**

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PETER DELVECCHIA, et al.,          )
                                   ) No. 2:19-cv-01322-
            Plaintiffs,            )     KJD-DJA
                                   )
        vs.                        )
                                   )
FRONTIER AIRLINES, INC., et        )
al.,                               )
                                   )
            Defendants.            )
_____      )


REMOTE VIDEO-RECORDED DEPOSITION OF

CAPTAIN VICKIE NORTON

VOLUME

————————————————————————————————————


Wednesday, March 8, 2023




STENOGRAPHICALLY REPORTED BY:  JAIMIE PORTER, CSR
13751


JOB NO.:  941574



Page 2

```
 1                      APPEARANCES
 2   For the Plaintiffs (via Zoom videoconference):
 3           PARK AVENUE LAW, LLC
             BY:  JOHN D. McKAY, ATTORNEY AT LAW
 4           201 Spear Street, Suite 1100
             San Francisco, California 94105
 5           Phone: 434-531-9569
             Email: johndmckayatty@gmail.com
 6
 7   For the Defendant FRONTIER AIRLINES, INC. (via Zoom
     videoconference):
 8
             ADLER MURPHY & McQUILLEN, LLP
 9           BY:  BRIAN T. MAYE, ATTORNEY AT LAW
             20 South Clark Street, Suite 2500
10           Chicago, Illinois 60603
             Phone: 312-345-0700
11           Email: bmaye@amm-law.com
12
     Also Present (via Zoom videoconference):
13
             Delron Simpson, videographer
14
15
16
17
18
19
20
21
22
23
24
25
```

**MAGNA** >

1                         INDEX

2                                              Pages

3    Examination

4         By Mr. Maye ...............................6

5

6    Signature Page ............................129

7

8

9                        EXHIBITS

10

11    Exhibit 1     Expert Witness Rule 26 Report .....9

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 4

1          BE IT REMEMBERED that under the applicable

2     sections of the Code of Civil Procedure of the State

3     of California and Federal Rules of Court, on

4     Wednesday, the 8th day of March, 2023, commencing at

5     the hour of 8:02 AM, before me, JAIMIE PORTER, a

6     Certified Shorthand Reporter in and for the State of

7     California, appeared via Zoom videoconference,

8                    CAPTAIN VICKIE NORTON,

9     called as a witness by the Defendants in the

10    above-entitled action, whom, per Code of Civil

11    Procedure Section 2025.320 and Federal Rules of

12    Court Rule 30, I placed under oath as the Certified

13    Shorthand Reporter by virtue of Code of Civil

14    Procedure Section 2093(b), to tell the truth, the

15    whole truth, and nothing but the truth, and who was

16    examined and testified as follows:

17          THE VIDEOGRAPHER:  Good morning.  We're

18    going on the record at 10:02 AM on Wednesday,

19    March 8, 2023.  This begins Media No. 1 in the

20    deposition of Captain Vickie Norton in the matter of

21    Peter DelVecchia versus Frontier Airlines, et al.,

22    filed in the United States District Court, District

23    of Nevada.  This is case number

24    2:19-cv-01322-KJD-NJK.

25          This deposition is being taken remotely

**MAGNA**

Page 5

1   using virtual technology at the request of Adler

2   Murphy & McQuillen.  Please note that the quality of

3   recording depends on the quality of camera and

4   Internet connection of participants.  What is seen

5   from the witness and heard on screen is what will be

6   recorded.  Audio and video recording will continue

7   to take place unless all parties agree to go off the

8   record.

9           The court reporter is Jaimie Porter of

10  Magna Legal Services.  I'm the videographer, Delron

11  Simpson of Magna Legal Services.  I'm not related to

12  any party in this action nor am I financially

13  interested in the outcome.

14          Will counsel and all parties present state

15  their appearance and whom they represent beginning

16  with the noticing attorney.

17          MR. MAYE:  Brian Maye for defendants.

18          MR. McKAY:  John McKay for the DelVecchias,

19  the plaintiffs.

20          Just a correction, Mr. Videographer, the

21  last three characters of the case number are now DJA

22  rather than NJK.  There was a change in judge

23  assignments.

24          THE VIDEOGRAPHER:  Thank you, Counsel.

25          Will the court reporter please swear in the



Page 6

1    witness.

2              (Whereupon the witness was placed under

3              oath.)

4              THE VIDEOGRAPHER:  We may proceed.

5                        EXAMINATION

6    BY MR. MAYE:

7        Q.    Good morning, Captain Norton.  How are you?

8        A.    Good morning, Mr. Maye.  I'm well.  How are

9    you?

10       Q.    I'm fine.

11             Can you please state your full name for the

12   record?

13       A.    Vickie Renee Norton.

14       Q.    And can you give us a brief overview of

15   your educational background?

16       A.    Sure.  I have a bachelor's of science in

17   mechanical engineering from Michigan Technological

18   University and a master's of science in aviation and

19   aviation safety from the Florida Institute of

20   Technology.

21       Q.    And what's your current profession?

22       A.    I'm a full-time captain for United

23   Airlines, and I am also employed by MEA Forensic as

24   an aviation accident and incident expert witness.

25       Q.    And when did you start your career with



Page 7

1    United Airlines?

2        A.    June 26th of 1995.

3        Q.    Okay.  And do you maintain a file related

4    to this case?

5        A.    I do.

6        Q.    What's contained in that file?

7        A.    I believe you have my -- my report,

8    everything listed in, I believe, Appendix B is what

9    my file is comprised of.

10       Q.    Is there anything that's contained in your

11   report that's not listed -- I'm sorry.  Is there

12   anything contained in your file that's not listed in

13   your report?

14       A.    There are one or two things that I have

15   received in the last couple of days.  I'm happy to

16   pull those together on a break and let you know what

17   they are.

18       Q.    Okay.  Do you have any email correspondence

19   related to this case?

20       A.    No.

21       Q.    Do you have any handwritten notes regarding

22   this case?

23       A.    Just with regard to my preparation for

24   deposition.

25       Q.    And are those notes a part of your case



Page 8

```
 1   file?

 2        A.   No.

 3        Q.   Can you make sure you preserve those

 4   notes --

 5        A.   Certainly.

 6        Q.   -- for us?

 7        A.   Sure.

 8        Q.   And who retained you in this case?

 9        A.   Mr. McKay.

10        Q.   How many hours have you worked on this

11   case?

12        A.   Again, I can have my -- my project

13   coordinator pull that together on a break if you'd

14   like.  I -- I don't know.  It's been going on for I

15   think at least four years, so ...

16        Q.   Okay.  What is your area of expertise in

17   this case?

18        A.   Well, I'm a -- as I mentioned, I'm a

19   full-time Part 121 airline transport pilot captain,

20   so I -- my area of expertise is with regard to

21   overall command of a commercial aircraft and

22   everything that transpires when I'm piloting command

23   interactions with flight attendants and everyone

24   else I have to deal with as -- as PIC.

25        Q.   And what were you retained to do in this
```

Page 9

1   case?

2      A.   Well, consistent with what I wrote in my

3   report, I was asked to review the -- the materials

4   and opine as to the standard of care exercise by the

5   Frontier Airlines' crew and ascertain whether their

6   actions were in accordance with industry standard --

7   with their own, really, procedures and protocol in

8   this -- in this case.

9      Q.   So you were -- you were asked to give

10  opinions on whether Frontier complied with their own

11  policies in this case?

12     A.   Yes, specifically with regard to the

13  decisions made by both the flight attendants and the

14  flight deck, specifically the captain during this

15  incident.

16     Q.   Showing the witness what has been marked as

17  Exhibit 1.

18          (Exhibit 1, Expert Witness Rule 26 Report,

                was marked for identification.)

19  BY MR. MAYE:

20     Q.   Is this the report you prepared related to

21  this case, Captain Norton?

22     A.   It -- it appears to be, sir, yes.

23     Q.   And did you create this yourself?

24     A.   I sure did.

25     Q.   Did anyone assist you in preparing the



1   report?

2       A.   I'm sorry.  You broke up a little, sir.

3       Q.   Did anyone assist you in preparing this

4   report?

5       A.   No, sir.

6       Q.   Were any content in the report prepared by

7   anyone other than you?

8       A.   Well, there's content that I referenced

9   that comes from Frontier's own policies and

10  procedures that -- but -- but no one else prepared

11  my report per se.  I -- I incorporated those

12  policies and procedures into the report for

13  reference and clarity, but nothing else was prepared

14  by anyone else.  I don't know if that answers your

15  question.

16      Q.   Yeah, that's fine.

17           On page 13, there's a section titled

18  "Conclusions and Opinions."

19           Do you see that?

20      A.   Yes, sir.

21      Q.   No. 10, there's a statement, "the Frontier

22  gate agent failed to ascertain AD's age before

23  allowing him to occupy an exit row seat."

24           You've never been employed as a gate agent;

25  correct?

1      A.    That's correct.

2      Q.    Never went through -- gone through training

3   for a gate agent position?

4      A.    That's correct.

5      Q.    You do not have any -- any expertise

6   regarding the gate agent position; correct?

7      A.    I don't agree with that.

8      Q.    Why don't you agree with that?

9      A.    I've been a commercial airline pilot for

10  approaching 30 years, and I, on a daily basis

11  multiple times a day when I'm at work, interact with

12  gate agents and understand their roles and

13  responsibilities, although I've not formally been

14  trained as a gate agent.

15     Q.    So are you representing today that -- that

16  you're qualified to serve as an expert on gate agent

17  duties and responsibilities?

18     A.    Well, sir, as I just said, what I'm -- what

19  I'm qualified to do is speak to the relationship

20  that I have as pilot in command with my gate agents

21  and understand their basic roles and

22  responsibilities with respect to boarding my

23  aircraft.

24     Q.    So that a no or a yes?

25           MR. McKAY:   Objection to the form of the



Page 12

1   question.

2          THE WITNESS:  I am -- I -- I don't know.  I

3   don't believe there are gate agent experts,

4   quote/unquote, to my knowledge.  I don't believe

5   there's anyone more qualified than a 30-year pilot

6   in command to speak to what the inherent roles and

7   responsibilities of gate agents are while we board

8   an aircraft that I'm about to sign for and take

9   command of.

10      BY MR. MAYE:

11      Q.   So you think you'd be more qualified to

12   testify about gate agent issues than a 30-year

13   veteran gate agent?

14          MR. McKAY:  Objection to the form of the

15   question.  Argumentative.

16          THE WITNESS:  I -- I don't believe I -- I

17   testified to that.  I -- I do know what the gate

18   agent's basic roles and responsibilities are.  I

19   don't have a better answer than that for you, sir.

20      BY MR. MAYE:

21      Q.   Well, all I -- I just -- you just said that

22   you -- you don't know of anyone who is more

23   qualified than you to discuss the -- the basic

24   duties of -- and responsibilities of gate agent.

25          And so I'm asking you, do you think a

Page 13

1  person that has served as a gate agent for 30 years

2  with United Airlines is more qualified than you to

3  testify about the duties and responsibilities of a

4  gate agent?

5       MR. McKAY:  Objection.  Argumentative.  And

6  Frontier hasn't presented such an expert, so I don't

7  know why you're inquiring.

8       THE WITNESS:  Sir, it's just a -- I'll --

9  I'll -- if I sat in a room with a 30-year gate

10 agent, if -- if there are.  Normally they burn out

11 before that, but yeah.  Someone who is trained to do

12 that position, I -- I'm sure I could learn a few

13 things.  What I can tell you is that it's a basic

14 responsibility of gate agents and they do it

15 routinely every day to ascertain someone's age

16 before they put them in an exit row.  That's it.

17    BY MR. MAYE:

18    Q.   Okay.  Okay.  I'm not asking that.

19       I'm asking, do you believe you're more

20 qualified to testify as an expert than a 30-year

21 gate agent at United?

22       MR. McKAY:  Objection.  Assumes facts not

23 in evidence.  Frontier has not presented such an

24 expert, disclosed such an expert.  And

25 argumentative.



1          THE WITNESS:  Yes, sir.  I can't answer

2     your question.  I wouldn't know.  In my -- 30-year

3     gate agent, I don't know one.  So we have two-year

4     gate agents and one-year gate agents at United that

5     I routinely have to educate with regard to boarding

6     protocol, and I don't know how that speaks to

7     training, but that's the best answer I have for you.

8          BY MR. MAYE:

9          Q.   Do you believe you're more qualified to

10    testify as an expert regarding gate agent issues

11    than a senior customer service manager at United?

12          MR. McKAY:  Objection.  Argumentative.

13          THE WITNESS:  I don't know what a senior

14    customer service manager at United is.

15          BY MR. MAYE:

16          Q.   Are you familiar with a unit at United

17    Airlines related to customer service?

18          A.   Sure, broadly.

19          Q.   And is a gate agent included in that -- the

20    customer service unit or division at United?

21          A.   I -- I would have to look up the org chart

22    and to be able to give you a -- an answer that's

23    accurate.  I -- I don't know, sir.

24          Q.   Do you know if a gate agent is considered a

25    customer service agent?

Page 15

1      A.    Broadly, I -- my assumption would be yes.

2  Once again, the -- the answer I gave you in the

3  prior question would apply.

4      Q.    So -- so you don't know if a gate agent is

5  considered a customer service agent?

6           MR. McKAY:  Objection.  Argumentative and

7  inconsistent with her testimony.

8           THE WITNESS:  It's the same answer I just

9  gave you, sir.

10     BY MR. MAYE:

11     Q.    See, I -- I -- the answer, I'll object to

12  the answer because I don't believe it was

13  responsive.

14          So I'll -- I'll ask it again, do you -- is

15  it fair to say that you do not know whether a gate

16  agent is considered a customer service agent?

17          MR. McKAY:  Objection.  Asked and answered.

18  Inconsistent with her testimony.  And argumentative.

19          THE WITNESS:  I'm -- I'm happy to -- to

20  call somebody at United on a break and I -- I -- my

21  assumption again, sir, is that customer service is a

22  very broad category.  I would have to look in our

23  organizational chart to tell you exactly what

24  sub-tier gate agents fall under.  I -- I'm sure

25  broadly under the 30,000-foot view of customer

MAGNA

1    service, I -- I'm sure we'll find gate agents in

2    there somewhere.  I didn't create our employment

3    tiers and I can't speak to them, so ...

4        BY MR. MAYE:

5        Q.   Do you know what company employed the gate

6    agent who was assigned to the subject flight?

7        A.   Would you repeat the question, please?

8        Q.   Yes.

9             Do you know what company -- or -- or strike

10   that.

11            In No. 10, you say the Frontier gate agent.

12            So is it your testimony that -- that you

13   believe that the gate agent was employed by

14   Frontier, agent regarding the --

15       A.   That --

16       Q.   -- subject flight?

17       A.   That is my -- that is my assumption and

18   understanding, yes.  I mean, it's -- it -- to

19   clarify, if it's not a direct employee, if the gate

20   agent was not a district employee of Frontier, then

21   my assumption is that they are contracted by

22   Frontier and, therefore, are operating as a

23   representative of Frontier while the aircraft is

24   being boarded.

25       Q.   Do you know what company employed the gate

**MAGNA**

1    agent who was assigned to the subject -- subject

2    flight?

3        A.    No.

4        Q.    Would you agree that your statement in

5    No. 10 does not state what the industry standard is

6    with respect to gate agent duties?

7        A.    I'm sorry, could you repeat that?

8        Q.    Would you agree that your statement in

9    No. 10 does not state what the industry standard is

10   with respect to gate agent duties?

11       A.    No.

12       Q.    Why would you not agree to that statement?

13       A.    Because it's a very -- the statement on its

14   face simply states that there's an industry standard

15   to occupy the exit row seat, which is 15 years of

16   age or older, and the gate agent failed to ascertain

17   the age of the individual before giving him a

18   boarding pass that allowed him to occupy the exit

19   seat.

20       Q.    Would you agree in that No. 10 simply

21   states, "The Frontier gate agent failed to ascertain

22   A.D.'s age before allowing him to occupy the exit

23   row seat."  And is that -- is that what No. 10

24   states?

25       A.    That is exactly what No. 10 states.



Page 18

1    Q.   Okay.  Now, but in No. 10, there's nothing

2    said or stated in No. 10 about what the industry

3    standard is with respect to what a gage agent --

4    gate agent has to do in its role in boarding

5    process?

6         MR. McKAY:  Objection.  Counsel, it's a

7    federal aviation regulation.  Is she required to

8    cite every regulation when she gives an opinion?

9    BY MR. MAYE:

10   Q.   Go ahead, ma'am.

11   A.   Sir, it's -- it's -- these are conclusions

12   and opinions.  They're -- they're -- they're

13   summaries of things that have been covered

14   previously in my report.  So if you'd like, I'd

15   go -- I'd like to refer you back to my report where

16   I talk about specifically -- I mean, these are

17   conclusions and opinions that summarize things that

18   preceded these conclusions and opinions in my

19   report.  So there's more information about this.

20   It's merely a summary of one of my opinions.

21   Q.   So -- so is the answer -- do you agree with

22   me that there's nothing in No. 10 regarding industry

23   standard?

24   A.   No, I don't agree with you.

25   Q.   And where in No. 10 does it state the

Page 19

1    industry standard with respect to a gate agent's

2    duties in a boarding processing?

3        A.   It's a reference, sir, to -- once again, to

4    what was carefully and thoroughly delineated in my

5    report, just like all the rest of the conclusions

6    and opinions are.  That's -- that's standard for

7    Rule 26 report protocol, that at the end of your

8    report, you summarize your conclusions and opinions

9    after you have laid them out previously in your

10   report, and that's what was done here in --

11       Q.   Okay.  I appreciate that, but there's

12   nothing in No. 10 about an industry standard;

13   correct?

14       A.   Not correct.

15       Q.   Well, can you -- can you -- can you read in

16   No. 10 where it states what the industry standard

17   is?

18            MR. McKAY:  Objection.  Argument- --

19            THE WITNESS:  The industry -- the

20   industry --

21       BY MR. MAYE:

22       Q.   No, ma'am.  I'm asking you to read from

23   No. 10.

24            MR. McKAY:  Objection.  Argumentative.

25   / / /



Page 20

```
 1      BY MR. MAYE:

 2      Q.    Where in No. 10 does it say what the

 3   industry standard is?

 4      A.    Where --

 5            MR. McKAY:  Brian, do we need to call the

 6   Judge?  Brian, you're harassing the witness.  Do we

 7   need to call the Judge?

 8            MR. MAYE:  John, please.

 9            MR. McKAY:  Brian --

10            (Simultaneous cross-talk.)

11            MR. MAYE:  She's not answering the

12   questions, John.

13            (Simultaneous cross-talk.)

14            MR. MAYE:  The answer is -- the answer is

15   no.  The answer is it's not there.  You know, we

16   just started --

17            (Simultaneous cross-talk.)

18            MR. MAYE:  -- speaking objections --

19            MR. McKAY:  Brian, I've asked you not to

20   talk over me, and we're going to call the Judge if

21   you insist --

22            MR. MAYE:  We are going to call the Judge

23   because you already -- you've already had extended

24   speaking objections.

25            MR. McKAY:  Let's call.
```

1          (Simultaneous cross-talk.)

2          MR. McKAY:  Let's call.

3          MR. MAYE:  Let's call him.  Okay.

4          MR. McKAY:  You go ahead.

5          MR. MAYE:  Let me -- okay.  I'll arrange

6  for it or do you want me to continue?  Should I call

7  the Judge or do you want me to continue?

8          MR. McKAY:  If you're going to stop

9  harassing her over this point, which is adequately

10  explained at the bottom of page 1 of her report and

11  the top of page 2, why don't you go read that before

12  you ask her further questions on this.

13          MR. MAYE:  Okay.  I'll -- I'll move on.

14      BY MR. MAYE:

15      Q.   But, ma'am, I would like you to be

16  responsive to my questions.

17      A.   I have been, sir.

18      Q.   We're going to be here all day if you

19  refuse to respond --

20      A.   I have all day, sir.

21      Q.   Okay.  Great.

22          Would you agree to a deposition of more

23  than seven hours?

24          MR. McKAY:  No.

25          THE WITNESS:  That's my counsel's ...



1          MR. McKAY:  No is the answer.

2     BY MR. MAYE:

3     Q.   Okay.  No. 11, "The flight attendants

4     failed to follow Frontier's procedures and guidance

5     regarding sexual misconduct."

6          You've never been employed as a flight

7     attendant; correct?

8     A.   That's correct.

9     Q.   And you've never gone through a training

10    for the flight attendant position?

11    A.   I have not gone through training for the

12    flight attendant position.  I have gone through

13    extensive training alongside flight attendants

14    throughout my 30-year career.

15    Q.   So you -- so the answer is no, you have not

16    gone through --

17         MR. McKAY:  Objection.  Argumentative.

18    BY MR. MAYE:

19    Q.   -- training for the flight attendant

20    position?

21         MR. McKAY:  Objection.  Argumentative.

22         THE WITNESS:  I believe that's what I just

23    stated, sir.

24    BY MR. MAYE:

25    Q.   Okay.  And have you ever testified as an

Page 23

1    expert for in-flight issues?

2        A.   As they relate to the interaction of the

3    flight crew and flight attendants, certainly.

4        Q.   Have you -- have you testified as an

5    in-flight expert, not in relation to how the flight

6    attendant-pilot relationship works, but exclusively,

7    have you testified as an expert for in-flight

8    issues?

9            MR. McKAY:  Objection to the form.

10            THE WITNESS:  You're -- you're jumbling the

11    question, sir, because the first part of the

12    question you say as in-flight expert and then you

13    say in-flight issues, so if you want to clean that

14    up, I'll -- I'll answer it.

15        BY MR. MAYE:

16        Q.   Have you testified as an expert exclusively

17    in a case for in-flight issues?

18        A.   Yes.

19        Q.   What -- what case is that?

20        A.   I'll find it on a break.  I've had

21    turbulence cases, medical cases.  I -- if you're

22    going to state in-flight issues -- I think I -- I

23    mean, I think I can help you.  I am not holding

24    myself out as an in-flight expert, i.e., a flight

25    attendant --



1    Q.   Okay.

2    A.   -- a trained flight attendant, but --

3    Q.   Okay.  Thank you.

4    A.   Does that help you?

5    Q.   Yes.  It does help me.  Thank you.  Great.

6       No. 14, the dispatcher for Flight 2067

7 failed to provide any additional information or

8 guidance to the pilots to assist in their

9 decision-making.

10       Have you ever been employed as a

11 dispatcher?

12    A.   No, sir.

13    Q.   Have you ever gone through training for the

14 dispatcher position?

15    A.   No, sir.

16    Q.   Have you ever testified

17 exclusively -- strike that.

18       Have you ever testified as an expert

19 exclusively on dispatcher issues?

20    A.   Exclusively?

21    Q.   Yes.

22    A.   If you -- if you mean to say that the only

23 issue in the case was relative to dispatcher actions

24 solely, then the answer is no.  However, I will -- I

25 will add that I share joint responsibility under the

Page 25

1  federal aviation relations with the dispatcher.

2  So -- so every commercial Part 121 flight that has a

3  dispatcher involved, which is every flight, has an

4  element to be considered with respect to dispatcher

5  actions.  So when you say solely, no, but that's

6  not a -- that's really not a fair representation of

7  the world as it exists.

8      Q.   Are you testifying in this case as an

9  expert on dispatch issues?

10     A.   That is a component of my expert testimony,

11 yes.

12     Q.   Do you believe you're qualified as an

13 expert on dispatch issues?

14     A.   Yes, I do.

15     Q.   And -- and that's based on what?

16     A.   30 years of a joint responsibility in

17 dispatching Part 121 commercial passenger flights

18 safely hand-in-hand with a dispatcher under the

19 federal aviation regulations.

20     Q.   But you've never served as a dispatcher?

21     A.   Correct.

22     Q.   You ever supervised dispatchers?

23     A.   Supervised, no.  Sat alongside, yes, had

24 them in my cockpit jump seat, yes.

25     Q.   Okay.  Ma'am, it's going to be a long day



Page 26

```
 1   if -- if you keep on adding commentary that's not
 2   responsive to my questions --
 3           MR. McKAY:  That was responsive to your
 4   question, Counsel.
 5      BY MR. MAYE:
 6      Q.   I respectfully ask that you just respond to
 7   my questions.
 8           MR. McKAY:  Counsel, please don't tell the
 9   witness not to answer questions that you --
10           MR. MAYE:  John -- John, I appreciate your
11   comment.  I can ask the witness to be responsive to
12   my questions.
13           MR. McKAY:  Are -- are you a judge?
14           MR. MAYE:  Please, John.
15      BY MR. MAYE:
16      Q.   No. 15 says, "Frontier failed to provide
17   any formal training procedures or guidance to pilots
18   with regard to addressing sexual misconduct or
19   suspected human trafficking."
20           Do you agree that training, procedures and
21   guidance to pilots with regard to addressing sexual
22   misconduct or sexual -- excuse me, suspected human
23   trafficking are not required under FAA regulations?
24      A.   Clearly they're not or --
25      Q.   Okay.  Thank you.
```

Page 27

```
 1    A.    -- I'm -- I'm not aware that they are.

 2    Q.    Thank you.

 3          Would you agree that training, procedures

 4    and guidance to pilots with regard to addressing

 5    sexual misconduct and suspected human trafficking

 6    are not required under industry standards?

 7          MR. McKAY:  Objection to the form.

 8          THE WITNESS:  The question is too broad for

 9    me to -- to be able to answer.  I mean, whose

10    industry standards?  I mean, ICAO ...

11    BY MR. MAYE:

12    Q.    Are -- are there any industry standards

13    that require pilots in the United States to be

14    trained with respect to addressing sexual misconduct

15    and human trafficking?

16    A.    Not that I'm aware.

17    Q.    Would you agree that Frontier's operations

18    manual has been approved by the FAA?

19    A.    I -- I would agree.

20    Q.    Would you agree that Frontier's operations

21    manual is consistent with industry standards?

22    A.    Again, we're back to industry standards and

23    I don't know what -- what -- I would need a

24    definition of that, whose -- whose industry

25    standards we're -- we're comparing it to.
```



1     Q.   Are you aware of any industry standards

2  that Frontier's operations manual is inconsistent

3  with?

4     A.   I -- I -- same answer as I just gave you,

5  sir.

6     Q.   And what -- what was that answer?

7     A.   That I don't know the -- the industry --

8  the industry standard you're referencing, whether

9  it's ICAO, another major -- a major airline, another

10  low-cost carrier.  I don't know whose standard

11  you're referencing, so it makes it impossible to

12  answer.

13     Q.   Well, I'm asking you, are you aware of

14  any -- any industry standard that Frontier's

15  operations manual violates or is inconsistent with?

16     A.   Well, first of all, sir, you're referencing

17  their operations manual, and I don't say anything

18  about that in No. 15.  I -- I -- I said formal

19  training, procedures or guidance.

20          I can tell you that at United Airlines,

21  where I work, in my quarterly required

22  computer-based training, there's an entire module

23  dealing with this, and in Captain Shupe's

24  deposition, he testified that he's received no

25  training.  So if -- if you want, I'll just reference



1   my own airline and it appears that I've received

2   more training, procedures and guidance than Captain

3   Shupe had.

4       Q.   Okay.  Other than United, are you aware of

5   any -- any industry standards -- or strike that.

6            Ma'am, I'm asking about Frontier's

7   operations manual.

8       A.   Well, but you've referencing No. 15, sir,

9   and I don't --

10      Q.   No, ma'am --

11      A.   -- know anything about an operations

12  manual.

13      Q.   -- ma'am.  Okay.  Forget about 15, okay?

14      A.   Okay.

15      Q.   Ma'am, are you aware of any industry

16  standard that Frontier's operations manual violates

17  or is inconsistent with?

18      A.   What section of their operations manual?

19      Q.   Their entire manual, every piece of the

20  manual.

21      A.   I haven't read their entire manual, sir.

22      Q.   Okay.  So is -- the answer is no?

23      A.   The answer is I haven't read their entire

24  manual, so I'm unable to answer your question.

25      Q.   Parts of the manual that you have read that



Page 30

1    are identified in your report, are those portions

2    inconsistent with any industry standards?

3         A.    I -- I don't know what the benchmark

4    industry standards you're referring to.  I -- I can

5    only answer comparatively to the knowledge I

6    possess, which is my own manual and over the many

7    years of testifying, other -- other airlines

8    manuals.

9         Q.    So -- so you're not able to compare the

10   policies and procedures operations manual that

11   you've reviewed with any industry standards?

12        A.    Sir, this is going to be a long line of

13   questioning if we can't identify what you're -- what

14   you are referencing in terms of industry standards.

15   Are you talking about ICAO?

16        Q.    All of them.  All of them.  Any -- any

17   industry standard that you're aware of.  Have you --

18   let's say this, have you compared the procedures

19   that you've reviewed in the operations manual with

20   any industry standards?

21        A.    Are we specifically referring to the --

22   the -- the pilots?  Are we -- are we talking

23   about -- I mean, there's a bunch of manuals in

24   question in here, right.  We've got the flight

25   attendant's manual.  We've got the pilot's flight



1  manual, the pilot's FOM --

2       Q.   Well --

3       A.   -- are we talking about all of them and

4  some?

5       Q.   Ma'am -- okay, I -- the question was the

6  operations manual.  I'm not talking about the flight

7  attendant manual because you're not a flight

8  attendant expert.  I'm talking about the operations

9  manual, the --

10      A.   The pilot's FOM --

11           MR. McKAY:  Objection - sorry.  Objection

12  to the form of the question.

13      BY MR. MAYE:

14      Q.   Yes, the pilot's operation manual, the

15  flight operations manual, sections that you have

16  referenced in your report, have you compared any of

17  those to any industry standards in preparing your

18  report?

19      A.   I don't have a different answer than the

20  one I just gave you.  I -- I don't know which

21  industry standards you're talking about.  I know

22  what my own major airline [sic].  I know what

23  American's says, I know what Delta's says.  I -- I

24  mean -- I don't feel like we really have to do this

25  to one another.  I -- I know that what is in their



1   manual is reasonably consistent with -- with what is

2   in my own and other -- and other major airline

3   manuals.  I mean, does that help?

4        Q.   It helps a little, but my question is, did

5   you take the provisions from the manual that --

6   that -- the flight ops manual that's referenced in

7   your report, did you take those provisions and

8   compare them side by side with any industry

9   standards?

10            MR. McKAY:  Objection to the form.

11            THE WITNESS:  My own -- my own airline.

12   BY MR. MAYE:

13        Q.   Okay.  And -- and did you do anything else?

14        A.   I don't know what that means.  Did I --

15        Q.   Well, you --

16        A.   -- do anything else, what do you mean?

17        Q.   Did you compare them to any -- any other

18   standard?  You just said -- I said did you compare

19   it to anything and you said, "My own airline."  And

20   I said, okay, did you compare --

21        A.   I also just testified previously, sir,

22   that -- that I'm aware of what -- what is -- what

23   are in other major Airlines' manuals and -- and that

24   it's reasonably consistent.  There's some verbiage,

25   you know, changes and there are some minor

1   definitions that don't line up, but, yes, I -- and I

2   don't have to put them side by side.  I've been

3   doing this for 30 years.

4       Q.   I know.  I understand that.  I'm just

5   asking, did you?

6       A.   Yes.

7       Q.   With industry standards?

8       A.   I'm -- I don't have a response for your

9   continuing to say industry standards other than what

10  I've given you.

11      Q.   Okay.  So you -- you can't identify --

12      A.   You're not defining that for me.  If you

13  want to define --

14      Q.   But you're the -- you're the expert.  I

15  mean, I'm asking you, did you compare them to any

16  industry standards?  And you can't -- did you or

17  didn't you?

18          MR. McKAY:  Brian, is there a way that you

19  can conduct this deposition with -- without being so

20  harassing and -- and jumping on everything she says?

21  I'm asking.  And, also, is there a way that you can

22  refrain from stepping on what she says or stepping

23  on what I'm saying?  Just asking.

24          MR. MAYE:  I bust [sic].

25  / / /



Page 34

```
 1        BY MR. MAYE:
 2        Q.    So, ma'am, you mentioned -- can you -- can
 3    you identify one industry organization that has --
 4    that establishes standards for your industry?
 5        A.    The Federal Aviation Administration.
 6        Q.    Okay.  And all the provisions that you
 7    reviewed from Frontier's operations manual were
 8    consistent with the federal regulations; correct?
 9        A.    They appear to be, yes.
10        Q.    Okay.  Can you name another industry
11    standard organization?
12        A.    I -- I don't -- I would need to understand
13    the context of how -- how you're -- what -- what
14    you're looking for.
15        Q.    Okay.  I guess I'll move on.
16              So -- so you can't -- you can't name
17    another organization that -- that --
18        A.    Of course I can.
19        Q.    Okay.  Then --
20        A.    I mean, the -- I can name the European
21    aviation safety -- I mean, the -- the Transport --
22    Transport Canada.  I don't -- the NCSV, the ICAO.
23        Q.    How about one applies to the -- to U.S.
24    carriers.
25        A.    The Federal Aviation Administration sets
```

MAGNA

Page 35

1   the rules and regulations for United States Part 112

2   carriers.

3       Q.   So that's the only organization, that

4   you're aware, that sets industry standards with

5   respect to U.S. carriers?

6           MR. McKAY:   What kind of standards?

7   Objection to the form of the question.   What

8   standards are you talking about?

9   BY MR. MAYE:

10      Q.   Ma'am, you can answer.

11      A.   I have answered, sir.   I don't have another

12  answer than the one I just gave you.

13      Q.   Okay.   So would you agree that the training

14  Frontier pilots received was approved by the FAA?

15      A.   Training in -- in what regard?

16      Q.   Their overall training.

17      A.   I would agree that there is an FAA-approved

18  protocol for training.   I -- I can't speak to how it

19  was effected or how it was provided to the pilots.

20  I have no knowledge of that.

21      Q.   I'm not asking that, ma'am.   I'm asking,

22  would you agree that Frontier's training -- the

23  training program, the content, the substance of

24  their training to the pilots, was approved by the

25  FAA?



1          MR. McKAY:  Objection to the form.

2     BY MR. MAYE:

3     Q.   If you know; maybe you don't know.

4     A.   I have to assume that the content was

5     approved or -- or there'd be a halt in training.

6     Yes, the -- the content of the training is FAA

7     approved, of course.

8     Q.   Page 1 of your report, your Section 2.0,

9     last paragraph says, "I am aware that my duty as an

10    expert witness is to assist the court and not act as

11    an advocate for any party.  This report has been

12    prepared in accordance with that duty."

13         Is it your testimony that your

14    interpretation of the facts in this case is not

15    slanted in any way in favor of plaintiffs?

16    A.   Could you ask that again, please?

17    Q.   Sure.

18         Is it your testimony that your

19    interpretation of the facts in this case, as

20    reflected in your report, is not slanted in any way

21    in the favor of plaintiffs?

22         MR. McKAY:  Objection to the form.  I don't

23    understand it.

24         THE WITNESS:  Yeah.  I'm having a hard time

25    following whether -- whether I'd say yes or no.  I

Page 37

1   mean, if you're asking am I biased toward the

2   plaintiffs in -- in all the discovery materials I

3   read and in preparation of my report, my answer is,

4   no, I am not biased.  I -- I read the evidence and

5   prepared my report.

6       BY MR. MAYE:

7       Q.   Okay.  So in -- in viewing the facts, in

8   making determinations about the facts, your

9   determinations are unbiased and neutral.

10          Is that what you're saying?

11      A.   Yes, sir.

12      Q.   Okay.  And are all of your statements in

13  your report objective statements?

14      A.   Yes.

15      Q.   How about the conclusions in your report,

16  are they based on objective analysis?

17      A.   Yes.

18      Q.   You've been paid by plaintiffs to

19  prepare -- to prepare this report; correct?

20      A.   Yes.

21      Q.   And you've been paid by the plaintiffs to

22  provide opinions in this case; correct?

23      A.   Yes.

24      Q.   Page 2 --

25          MR. McKAY:  Sorry.  Is there a question?



Page 38

```
 1              MR. MAYE:  Yeah, there will be.  Yeah.
 2    Sorry.  I'm trying to find the passage.
 3              (Certified reporter interruption.)
 4              THE VIDEOGRAPHER:  Going off the record.
 5    The time is 10:48 AM.  We're off the record.
 6              (Recess at 8:48 a.m. to 8:51 a.m.)
 7              THE VIDEOGRAPHER:  We're back on the
 8    record.  The time is 10:51 AM.
 9         BY MR. MAYE:
10         Q.    Ma'am, the third paragraph you state that,
11    "Upon approaching their row, Nickel asked A.D. if he
12    would like something to drink.  She testified that
13    A.D. looked to his father; however, P.D. had fallen
14    asleep, so A.D. merely shook his head no without
15    verbally responding," and then you state in
16    parenthesis, "Notable is that all beverages other
17    than water cost money on Frontier flights, a fact
18    that A.D. would have been aware of from the cabin
19    announcement prior to departure."
20              What was the purpose of noting that
21    beverages cost money on Frontier flights and that
22    A.D. would have been aware of that?
23         A.    Merely to point out that he looked to his
24    father to -- that it is possible that he would look
25    to his father to ask if they could purchase a
```

Page 39

 1   beverage or if he had permission to do so.  However,

 2   his father was asleep, so not wanting to wake him,

 3   he just said no and moved on.

 4       Q.   Well, what's -- why -- why is the fact that

 5   Frontier charges for drinks relevant to piloting

 6   issues?

 7       A.   I didn't state that it was relevant --

 8   relevant to piloting issues.

 9       Q.   But I guess -- then -- then why is this

10   statement in this report if it's not relevant to

11   piloting issues?

12       A.   I don't understand the question.  I'm

13   sorry.

14       Q.   I'm -- I'm asking -- highlighted two

15   sentences, how -- is it relevant in any way to

16   piloting issues?

17            MR. McKAY:  Objection to the form.

18            THE WITNESS:  I -- I don't believe I

19   represented anywhere in the report that this had

20   anything to do with piloting issues.

21   BY MR. MAYE:

22       Q.   So if it's not -- so if these sentences are

23   not relevant to piloting issues, I'm asking, what is

24   the purpose of your including it in this report?

25       A.   The -- the pilot in command, sir, is

Page 40

```
 1   responsible for the conduct of all of the employees
 2   under his or her charge throughout the duration of
 3   the flight.  So if -- if you want to broadly address
 4   piloting issues, my responsibility as pilot in
 5   command and, in this case, Captain Shupe's
 6   responsibility as pilot in command, extends quite
 7   broadly over the conduct of all of the employees
 8   under this charge, so if you -- you want to tie that
 9   to piloting issues, that's -- it's laying a
10   foundation for the conduct of the flight attendants
11   and laying out what -- how the -- this family was
12   communicated with or -- or the lack of
13   communication, really, with this family throughout
14   the course of this flight.  It's foundational and
15   contextual.
16        Q.   So specifically, how is these two sentences
17   relevant to your opinions about the performance of
18   Captain Shupe in this case?
19             MR. McKAY:  Objection to the form of the
20   question.
21             THE WITNESS:  Well, we -- there's --
22   there's a lot of space between A -- A and B.  A and
23   C in this case.  I mean, this was, as I mentioned,
24   as the report states, the sole communication with
25   this family by any crew member, prior to their
```



Page 41

1    separation, was this communication.  And I attempt

2    to pause [sic] it a very reasonable explanation for

3    what the flight attendant, at least initially --

4    there's so much conflicting testimony with these

5    flight attendants, but what -- what a reasonable

6    explanation for what they may have observed during

7    this sole communication might have been.  That's it.

8         BY MR. MAYE:

9         Q.   And why did you note that A.D. would have

10   been aware that beverages cost money on Frontier

11   flights?  Why -- why is that --

12        A.   If --

13        Q.   -- relevant -- why -- why did you note that

14   in the context of laying the foundation for

15   communication issues?

16        A.   Because simply that, had his father been

17   awake, he would have been able to look to him and

18   ask if he could purchase a beverage if he wanted a

19   Pepsi or -- or whatever it was.  However, his father

20   wasn't awake, so he likely decided not to wake and

21   not make a decision that -- to spend money that he

22   might not have permission to spend.  It's pretty

23   simple.

24        Q.   Wouldn't that have been true if the

25   beverages were free?



```
 1          MR. McKAY:  Objection to the form.
 2          THE WITNESS:  No.
 3      BY MR. MAYE:
 4      Q.   No.
 5           Why do you say that?
 6      A.   Because there'd be no money being spent.  I
 7  mean -- I don't -- I don't really -- I mean, he's --
 8  he's not -- he's wanting to have permission perhaps
 9  to -- to purchase something.  However, his father is
10  asleep.  He doesn't want to wake him.  If it were
11  free, I'm sure he would just, you know, have said
12  sure, I'll take a Pepsi.
13      Q.   So -- but you're speculating; right?
14          MR. McKAY:  Objection to the form.
15  Argumentative.
16          THE WITNESS:  It is a -- of course --
17      BY MR. MAYE:
18      Q.   Okay.
19      A.   -- but it -- it's a fairly reasonable
20  explanation for not wanting to wake his father who's
21  already asleep.  I -- I can't imagine too many
22  alternate scenarios.
23      Q.   Ri- -- well, the alter- -- alternate
24  scenario is, the soda was free or A.D. did -- he
25  assumed it was free and when he was asked whether
```

Page 43

1    he -- he wanted a soda, he looked at his father for

2    permission for the free soda and his father was

3    asleep.

4             MR. McKAY:  Objection to the form.

5        BY MR. MAYE:

6        Q.   That's the alternative position.

7             MR. McKAY:  Same objection.

8        BY MR. MAYE:

9        Q.   Would you agree?

10       A.   No, I wouldn't.  I don't find that

11   credible.

12       Q.   That's interesting.

13            MR. McKAY:  Objection to the form.

14       BY MR. MAYE:

15       Q.   You just agreed that you're speculating,

16   but the alternative scenario you find not credible.

17            How do you reconcile that?

18            MR. McKAY:  Objection to the form.

19   Argumentative.

20            THE WITNESS:  I don't reconcile it.  That's

21   the most re- -- I've sat in the back of a thousand

22   airplanes deadheading and watched families interact

23   with their children and it's -- it's the most

24   reasonable explanation that I could come up with.

25   It certainly is more reasonable than the scenario



Page 44

```
 1   developed by the flight attendants later or

 2   something they didn't even consider amongst

 3   themselves.

 4       BY MR. MAYE:

 5       Q.   So you believe that in -- in noting this,

 6   that the beverages were -- the beverages cost money,

 7   then A.D. would have been aware of that from the

 8   cabin announcements, you believe that that's an

 9   objective observation?

10       A.   I sure do.

11       Q.   So you believe that -- or -- or you agree

12   that -- you're speculating that A.D., a 12-year-old,

13   would have been aware that beverages cost money

14   based on hearing the cabin announcements?

15            MR. McKAY:  Objection to the form.

16   Argumentative.

17            THE WITNESS:  I don't know what -- what

18   A.D. being 12 years of age, he -- he certainly is of

19   sound mind and capable of hearing and if he was

20   paying attention to the announcement, which he

21   appears to be a very bright young man, he would have

22   heard it and know.  Yeah, I don't -- I don't know

23   what his age has -- has to do with it.

24       BY MR. MAYE:

25       Q.   No, I didn't ask that.  I said do you agree
```

MAGNA ⊙

Page 45

1  that you're speculating that he would have heard

2  that announcement?

3          MR. McKAY:  Objection to the form.

4  Argumentative.

5          THE WITNESS:  It's -- the announcement

6  was -- was made.  Am I speculating as to whether he

7  listened or heard it?

8      BY MR. MAYE:

9      Q.   Correct.

10     A.   It's not his first flight either.  So if

11 he's not aware just from -- from this flight, he's

12 likely aware from prior flights he's taken.  I --

13 you know, it's just not a big reach.

14     Q.   So I'm sorry.  I wasn't clear on your

15 answer.

16          So you don't agree that you're speculating

17 that A.D. would have been aware that beverages cost

18 money because he would have heard the announcement?

19          MR. McKAY:  Objection to the form of the

20 question.  Brian, may I just ask politely that as

21 far as what's going on inside your brain in response

22 to her answers, could you just keep that to yourself

23 when asking questions.

24          MR. MAYE:  John, she -- she already said

25 that she was speculating.  Now, she's saying she --



1    she's not speculating.

2              (Simultaneous cross-talk.)

3              MR. McKAY:  Understood, but -- but your

4    own --

5              MR. MAYE:  Okay.

6              MR. McKAY:  -- full impressions of her

7    answers aren't really relevant, and I'm just asking

8    if you would please keep them off the record.

9              MR. MAYE:  I'll do what I want to do, John,

10   okay?

11             MR. McKAY:  It's not okay, actually.

12   That's -- that's suggesting that you want to act in

13   an unprofessional way --

14             MR. MAYE:  No, I'm acting professionally.

15   I will -- I will act professionally, which I believe

16   I'm doing, and I appreciate -- I would appreciate it

17   if you keep your objections to nonspeaking

18   objections.

19             MR. McKAY:  I'm trying my best.

20        BY MR. MAYE:

21        Q.   I'll try this one more time, ma'am.

22             So are you speculating when you say that

23   A.D. would have been aware of the cost -- would have

24   been aware that sodas cost money because he would

25   have heard the announcement?  Are you speculating

Page 47

1   when you make that statement?

2       A.   I am assuming that to be true based upon

3   his prior experiences on flights as well as paying

4   attention to the announcements for this flight, yes;

5   if you want to call it speculating, I think it's --

6   I don't think it's speculation.  Personally, I think

7   it's a very reasonable assumption.

8       Q.   Okay.  The next paragraph, "Despite the

9   entire benign and brief nature of both encounters

10  between Bond" -- strike that.

11          Earlier, I asked you what the purpose of

12  noting this exchange, and you said that you wanted

13  to point out with foundation that this was the only

14  communication the flight attendants had with A.D.,

15  but that -- that's not accurate, right, because in

16  this paragraph, you go on to talk about an encounter

17  with flight attendant Bond?

18          MR. McKAY:  Objection to the form.

19  Argumentative.  You picked the sentence out of

20  context.  The beginning of the paragraph said,

21  "After departure of the sole communication."

22          MR. MAYE:  Noted, John.

23      BY MR. MAYE:

24      Q.   Ma'am, so I asked you what the -- what the

25  purpose or the relevance of -- of noting the -- the



Page 48

1  beverage and the cost of the beverage and you said

2  you wanted to establish that this was the sole

3  communication.  So let's just clarify, and I

4  appreciate Mr. McKay's comment, so were you

5  meaning -- meaning to say the relevance of that

6  paragraph is only to establish the communication

7  with A.D. after departure?

8      A.   I don't understand your question, sir.

9      Q.   I earlier asked you what the reason you --

10 this -- this paragraph, what was the relevance to

11 piloting issues.  And it's my recollection that you

12 said it was to establish a foundation regarding the

13 communication between the flight attendants and A.D.

14 And this represents the only communication that they

15 had with A.D. prior to his being moved and what I'm

16 asking you is, did you mean to say that this was the

17 only communication they had with A.D. after

18 departure before the move?

19     A.   What I meant to say is exactly what my

20 report says, sir, which is the sole communication,

21 and it's not just A.D.; it's with the family.  It's

22 with Peter DelVecchia and A.D.  The only interaction

23 or communication by any crew member prior to the

24 separation after the aircraft was airborne was the

25 beverage service communication.  That --



Page 49

1      Q.    Okay.

2      A.    -- that's what that says.

3      Q.    Okay.  And -- and that's the -- that's the

4  relevance of putting that -- those two sentences in

5  there, in your report?

6      A.    Which two sentences?

7      Q.    The two sentences that I -- I just

8  highlighted -- or I'm sorry.  There's three

9  sentences.

10     A.    There's a lot more than two sentences in

11 there.

12     Q.    Yeah, sorry.  There's the three sentences.

13 This -- this paragraph that I've highlighted, so

14 that's -- that's the reason you've written this

15 statement is to establish that this was the only

16 communication between the flight attendants and the

17 plaintiffs after departure and before the

18 separation.

19     A.    Yes, sir.  And the relevance is that there

20 are procedures and protocol which the flight

21 attendants failed to follow subsequent to this,

22 prior to this family being separated.

23     Q.    Okay.  So the next paragraph, "Despite the

24 entire benign and brief nature of both encounters

25 between Bond and Nickel and the DelVecchias,"



1  parenthesis, "and without ever speaking to them

2  herself, a flight attendant, Chelsie

3  Bright-Sakurada, notified the captain, Rex Shupe,

4  and the first officer, Shawn Mullin, that she had

5  observed inappropriate touching between the adult

6  and the minor."

7       How is this observation of yours relevant

8  to piloting issues?

9    A.   That -- that is not an observation of mine,

10  sir.  I -- I don't know what you mean by observation

11  of mine.

12   Q.   That's how I'm characterizing this

13  sentence, your observation.  Okay.  I'll say -- let

14  me -- well, I'll say it differently.  Your -- your

15  interpretation of the facts -- would you agree this

16  is your interpretation of the facts based on your --

17  your review of the testimony of witnesses?

18       MR. McKAY:  Objection to the form.

19       THE WITNESS:  I don't -- I don't -- you're

20  going to have to rephrase the question, please.  I

21  don't understand what it is.

22   BY MR. MAYE:

23   Q.   Is -- your statement that I've highlighted,

24  "Despite the entirely benign and brief nature of

25  both encounters between Bond and Nickel and the



Page 51

1    DelVecchias and without ever speaking to them

2    herself, the A flight attendant, Chelsie

3    Bright-Sakurada, notified the captain, Rex Shupe,

4    and the first officer, Shawn Mullin, that she had --

5    she had observed inappropriate touching between the

6    adults."  What I'm asking you is, you characterize

7    the -- the encounters between Bond and Nickel and

8    the DelVecchias as "benign and brief" in nature.

9         Is that your interpretation of the

10   encounters between Bond and Nickel and the

11   DelVecchias based on your review of the testimony in

12   this case?

13   A.   Yes.

14   Q.   Okay.  And how is your characterization of

15   the encounters as "benign and brief" relevant to

16   pilot -- piloting issues in this case?

17   A.   Once again, sir, I didn't suggest that it

18   was.

19   Q.   Then what is -- what is the purpose, then,

20   for this to be included in your report if it's not

21   relevant to piloting issues?

22   A.   I -- I guess, sir, what -- what we --

23   what -- where our disconnect is, is that as I -- as

24   I previously stated, when we did this about the last

25   paragraph, as pilot in command, just like Captain



Page 52

1    Shupe was in this -- in this matter, I have a

2    responsibility to follow my procedures and protocol,

3    as well as insuring that those under my charge,

4    i.e., the flight attendants, do the same.  That is

5    how we come full circle to what your -- you continue

6    to refer to as piloting issues and this paragraph

7    and what you have highlighted on the screen right

8    now, is to underscore the fact that any

9    communication, however brief and benign it was --

10   and I refer to the preflight cooperation and

11   removing the -- the DelVecchias from the exit row,

12   which was not -- did not pose a problem for them.

13   They did not push back or argue -- argue.  They just

14   changed seats through no fault of their own.  That

15   was benign and brief as well as the incredibly

16   benign and brief beverage service communication

17   somehow later became an issue for these flight

18   attendants, and Captain Shupe, as pilot in command,

19   is responsible for the conduct of these flight

20   attendants and them following their prescribed

21   procedures and protocol and that's how it ties into,

22   quote/unquote, piloting issues.

23        Q.   By characterizing the encounters as "benign

24   and brief," are you suggesting or making a

25   commentary about the -- the veracity or the



1   integrity of -- of what flight attendant Sakurada --

2   Sakurada observed?

3          MR. McKAY:  Objection to the form.

4          THE WITNESS:  I don't understand the

5   question.  Would you please rephrase that?

6       BY MR. MAYE:

7       Q.   Sure.

8            Are you suggesting that what flight

9   attendant Sakurada observed should not have been

10  perceived as inappropriate touching?

11         MR. McKAY:  Objection to the form.

12         THE WITNESS:  I -- I can't -- I can't get

13  inside flight attendant Sakurada's mind to perceive

14  what she described as affection between a father and

15  a son being inappropriate; I can't.  What -- what

16  the intent there is that there was no interaction.

17  She never spoke to them.  She never directly

18  interacted with them.  That -- that there was a

19  complete lack on her part of any effort to discern

20  the relationship, ask questions, do anything that is

21  specified in her manual if she suspects something

22  inappropriate and -- and that's exactly what

23  these -- these folks had not been disruptive,

24  argumentative, caused any kind of a scene.  There

25  were merely sitting as father and son on a flight.



Page 54

```
 1     BY MR. MAYE:

 2     Q.    Okay.  So you're -- you're not challenging

 3   whether or not flight attendant Bright-Sakurada's

 4   observation of inappropriate touching was

 5   misperceived?

 6             MR. McKAY:   Objection to the form.

 7             THE WITNESS:   No. I am challenging that.

 8             (Simultaneous cross-talk.)

 9             THE WITNESS:   I don't believe -- I -- I do

10   not hold the opinion that a father touching his

11   son's face in a -- that a father touching his son's

12   face is somehow deemed to be inappropriate.

13     BY MR. MAYE:

14     Q.    But I -- I thought you said that you -- you

15   can't get into the head of flight attendant

16   Bright-Sakurada?

17     A.    Well, I can't, but I can get into my own

18   head and tell you I've -- I've seen a picture and

19   her own testimony of what the facial touching looked

20   like and I -- I personally cannot conceive how that

21   would be perceived as inappropriate.  My parents

22   touched my face that way my entire childhood.   I

23   touch my nephew's face that way right now and he's

24   22 years old, so that's --

25     Q.    You -- you --
```

Page 55

1     A.    -- I can't get into her head, but --

2     Q.    Right.  You --

3     A.    -- she did no -- nothing to try and discern

4  or get more information.

5     Q.    I'm not talking about what happened after.

6  I'm talking about what she perceived.  You have no

7  reason or no basis to challenge whether her

8  perception was, you know, an honest, good-faith

9  perception of what she observed?

10          MR. McKAY:  Objection as to the form of the

11  question.  Argumentative.

12          THE WITNESS:  Well, sir, I think I just

13  stated my basis to challenge that would be my own

14  life experience and -- and what I observed her --

15  her later in her own deposition demonstrating as the

16  touching.  That would be my -- my -- my challenge.

17     BY MR. MAYE:

18     Q.    So -- so what you're saying -- so you're

19  testifying that you believe she misperceived what

20  she saw?

21     A.    I have no -- I'm not a -- a psychologist or

22  a human factors expert -- well, I am a human factors

23  expert in aviation, but I'm -- I'm not -- I'm trying

24  to help here.  I don't know what -- what she

25  perceived.  I can tell you what I have reviewed in



1   discovery evidence that she said she witnessed and

2   it's completely incongruent with being described as

3   inappropriate.  And not only that, she -- she made

4   no effort to gather any more information about her

5   perception.

6        Q.   Ma'am, I'm sorry.  I'm -- I'm not talking

7   about what happened after.  I'm talking about her

8   observation of the touching of the face, the

9   stroking of the face.  She perceived that as

10  inappropriate touching; now, I know that -- that

11  you've said that based on the description, you

12  wouldn't consider it inappropriate.

13        What I'm asking is, are you testifying that

14  you believe her observation was not an honest,

15  authentic, good-faith observation of what she saw?

16        MR. McKAY:  Objection.  Asked and answered.

17  Objection.  Argumentative.

18        THE WITNESS:  I didn't characterize one way

19  or the other, sir.  I just --

20   BY MR. MAYE:

21        Q.   Okay.

22        A.   -- I just said after observing what she

23  perceived to be -- this is what she did.  She went

24  to the cockpit and reported this.  I didn't -- I

25  didn't accuse her of being not in good faith --

Page 57

1      Q.    Okay.

2      A.    -- and I'm not doing that now.

3      Q.    Okay.  I just want to be clear on that.

4            So you're not -- you're not saying that she

5      misperceived what she saw?

6            MR. McKAY:  Objection to form --

7            THE WITNESS:  I'm not saying that she did

8      or that she didn't.

9            MR. MAYE:  Okay.

10           THE WITNESS:  I -- and I understand you

11     don't want me to keep going about what happened

12     later.  I'm saying --

13     BY MR. MAYE:

14     Q.    We'll get into that.

15     A.    Okay.

16     Q.    We'll get into it later.

17     A.    All right.

18           MR. McKAY:  Maybe.

19           MR. MAYE:  I'm sorry, John?

20           MR. McKAY:  I'm sorry, Brian?  What?

21           MR. MAYE:  I'm sorry, did you say

22     something?

23           MR. McKAY:  I don't think so.

24           MR. MAYE:  Okay.  I thought you said

25     something.



```
 1      BY MR. MAYE:

 2      Q.   Would you agree based on your review of the

 3  testimony that flight attendant Sakurada was

 4  troubled by what she observed going on between

 5  Mr. DelVecchia and A.D.?

 6      A.   She appeared to be since she asked for a --

 7  she asked to come up to the cockpit.

 8      Q.   The next -- you know, I'm sorry.  I have

 9  a -- I'm a little under the weather -- under the

10  weather.  Can we take a five-minute break so I can

11  just get some water?

12      A.   Sure.

13      Q.   Okay.

14           THE VIDEOGRAPHER:  Going off the record.

15  The time is 11:22 AM.  We're off the record.

16           (Recess at 9:22 a.m. to 9:27 a.m.)

17           THE VIDEOGRAPHER:  We're back on the

18  record.  The time is 11:27 AM.

19      BY MR. MAYE:

20      Q.   Captain, the next -- next paragraph, you

21  state that Captain Shupe should have attempted to

22  data gather or -- or fact find.

23           What -- what facts do you believe that

24  Captain Shupe should have attempted to gather?

25      A.   I believe he should have in -- in -- by his
```

Page 59

1  own testimony, he had no training in suspected human

2  trafficking or suspected sexual molestation-type

3  issues, so I believe he should have asked -- I'm

4  just going to refer to her as Chelsie because it's

5  easier than her hyphenated name.

6      Q.   Okay.

7      A.   He should have asked his A flight

8  attendant, Chelsie, to share with him what her

9  formal training/guidance/protocol was and if she

10  felt that this was, in fact, a situation that

11  warranted proceeding under that protocol, I believe

12  he could have asked his dispatcher for their --

13  their names in order to ascertain the relationship.

14  I believe he could have directed her to go back and

15  do the same, ask for their boarding passes, initiate

16  nonthreating conversation as part of their protocol,

17  ask where they're traveling to.  There are -- there

18  are many things along those lines that Captain Shupe

19  could -- could have done at that point and neglected

20  to do, failed to do.

21      Q.   You mentioned a protocol; what protocol are

22  you talking about?

23      A.   Well, the -- the Frontier flight attendant

24  have both, as I mentioned in my report, guidance

25  with regard to suspected human trafficking and/or



Page 60

1    suspected sexual molestation.  It's -- it's outlined

2    in my report.  They -- they have guidance that has

3    been provided to them and none of that was followed.

4         Q.   So you're -- you're testifying that the

5    captain should have inquired about whether

6    Mr. DelVecchia and A.D. were related?

7         A.   Well, certainly that would be a logical

8    place to start.  An adult --

9         Q.   And --

10        A.   Go ahead.

11        Q.   Okay.  If you had been the captain on an

12   United flight and the flight attendant told you that

13   an adult was touching a child's face in a -- a

14   sexual manner that made the flight attendant

15   uncomfortable, is -- is it United's policy for you

16   to ask the two people involved whether they're

17   related?

18        MR. McKAY:  Objection to the form of the

19   question.

20        BY MR. MAYE:

21        Q.   Before -- before actually taking action?

22        MR. McKAY:  Objection to the form of the

23   question.

24        THE WITNESS:  I don't believe there is

25   testimony in any of the discovery materials that --

MAGNA

Page 61

1    that the facial touching was mentioned to be in a

2    sexual manner, just that there was a, I guess,

3    stroking of the face.  I don't -- I -- I don't

4    believe I reviewed anything that actually used the

5    word sexual.  So I -- I would say that I'm unable to

6    answer the question based on you phrasing it that

7    way.

8         BY MR. MAYE:

9         Q.   I'm saying -- ma'am, are you objecting to

10   my question?

11              MR. McKAY:   Objection to the form of the

12   question.

13        BY MR. MAYE:

14        Q.   I don't understand.

15        A.   I'm just saying that there's no -- there's

16   no evidence that I've reviewed that said the facial

17   touching was sexual and of course --

18        Q.   That's fine, ma'am, but, ma'am, I'm asking

19   the questions and this the question I'm posing to

20   you and I ask that you answer it, okay.  I'm asking

21   if -- if you were a captain on a United flight and

22   the flight attendant told you that an adult was

23   touching a child's face in a sexual manner that made

24   the flight attendant uncomfortable, are you saying

25   that you would ask the flight attendant to ask the



Page 62

1   two people involved whether they are related before

2   you acted?

3           MR. McKAY:  Objection to the form of the

4   question.  Objection.  Argumentative.  Objection.

5   Harassing the witness.

6           THE WITNESS:  I certainly would gather more

7   information to find out why the flight attendant was

8   uncomfortable and I could certainly imagine that I

9   would ask what their protocol was, and after

10  reviewing it, I would ask him or her to go back and

11  initiate that protocol which would begin by asking

12  nontargeting questions, such as is provided in their

13  protocol.

14      BY MR. MAYE:

15      Q.   So is it United's protocol for a pilot to

16  respond to a report by a flight attendant of

17  observed sexual misconduct to direct the flight

18  attendant to ask if the two individuals involved are

19  related before taking action?

20          MR. McKAY:  Objection to the form.

21  Argumentative.  Harassing.

22          THE WITNESS:  Well, that's a big jump from

23  where we just were I -- again, as pilot in command,

24  sir, I would listen to the flight attendant's

25  concerns and then as per my training and



Page 63

```
1    responsibility, I would gather all of the

2    information I could regarding the flight attendant's

3    concerns, i.e., specific descriptions of what was

4    involved.  We were discussing facial touching and

5    now your -- your next question is sexual misconduct.

6    I -- I don't know -- you would have to tell me what

7    was directly observed or what I'm being told, but

8    these are very generalized broad terms that you're

9    now using, and I'm -- as pilot in command, I'm going

10   to gather all of the information I can before I make

11   any decision about which action I'm going to take.

12        BY MR. MAYE:

13        Q.   You didn't answer my question, but -- so

14   I'll ask -- I'll ask a different question.

15             MR. McKAY:  Objection.  Argumentative.

16   Harassing.

17             Brian, can we just ask questions and not

18   provide commentary?

19        BY MR. MAYE:

20        Q.   Okay.  Does United Airlines require a pilot

21   to inquire about two passengers' relationship,

22   whether or not they're related, when one passenger

23   is observed committing sexual misconduct against

24   another passenger?  Is -- is a -- is a United pilot

25   obligated to ask about whether the two are related
```



Page 64

1   before the pilot directs that the victim is moved

2   away from the perpetrator?

3       A.   First of all, I'm going to substitute pilot

4   in all of your questions with captain.

5       Q.   I'm sorry, captain.

6       A.   Because there are two pilots.

7       Q.   I understand.

8       A.   And once again, my authority as captain --

9   you -- you can't outline every specific chain of

10  events in a dynamic sequence of events or -- what --

11  what have you.  What I am required to do as captain,

12  what Captain Shupe was required to do, is -- is

13  thoughtfully and thoroughly gather all the

14  information possible prior to making an impactful

15  decision, such as separating family members as

16  happened in this case.

17      Q.   Okay.  I -- I'll object to the response.

18           MR. McKAY:  Brian --

19  BY MR. MAYE:

20      Q.   And I will ask -- ask it again.

21           MR. McKAY:  Brian, can you just ask the

22  questions, please?

23  BY MR. MAYE:

24      Q.   Captain, I'll ask the question again.

25           Does United require its PICs to inquire

Page 65

1    about whether passengers involved in a sexual

2    misconduct -- involved in suspected sexual

3    misconduct, does United require the PIC to inquire

4    about whether the passengers are related before the

5    pilot separates the victim from the perpetrator?

6          MR. McKAY:  Objection.  Assumes facts not

7    in evidence.  Objection to the form of the question.

8

9          MR. MAYE:  So --

10        MR. McKAY:  Sorry, are we still asking?

11        MR. MAYE:  Go ahead, John --

12        MR. McKAY:  Objection to the form of the

13    question.  Objection.  Argumentative.  Objection.

14    Harassing the witness.

15        MR. MAYE:  John --

16        MR. McKAY:  Hi.

17        MR. MAYE:  -- regarding your objections,

18    can I ask that you simply object to form?

19        MR. McKAY:  That's not the only thing I can

20    object to, so no.

21        MR. MAYE:  Well, I guess -- I guess we'll

22    have to next break, I'll -- I'll have to look into

23    this because it's my understanding you are limited

24    to form.  I'll have to look into that further and we

25    can have a discussion about that.



1      BY MR. MAYE:

2          Q.    So, ma'am, do you understand my question?

3      I'm asking you about United's policy.   Does United

4      require you to inquire about whether the two

5      involved, the two passengers involved in a sexual

6      misconduct allegation, about their -- whether

7      they're related?   Does United require that?

8          A.    United requires the captain to ensure that

9      the policies and procedures required of the flight

10     attendants are followed and so in your hypothetical,

11     if I were the captain, my responsibility would be

12     to -- if I didn't know specifically what my flight

13     attendant prescribed policy and procedure was, I

14     would ask them to share it with me, and that's how

15     we would get to the first item on -- what I -- I

16     guess the closest thing we can imagine, either the

17     sexual -- suspected sexual misconduct or suspected

18     human trafficking checklist was and that would lead

19     us to asking some targeted questions, so that's how

20     we would get there.

21         Q.    Okay.   I guess I'll -- I'll try this again.

22             MR. McKAY:   Asked and answered.   Please,

23     Brian, move on.

24             MR. MAYE:   I'm not going to move on.

25             MR. McKAY:   That's your answer.   She's not

Page 67

1   going to give you your sound bite because it doesn't

2   comport with reality.  So just move on.  We -- we

3   can't sit here all day trying to get your sound bite

4   in because she's not going to agree to it.  You do

5   this every deposition, and it really is a waste of

6   time and --

7           MR. MAYE:  It's my deposition.

8           MR. McKAY:  -- and harassing to the

9   deponent.

10          MR. MAYE:  It's not harassing.

11          MR. McKAY:  She is not a --

12          (Simultaneous cross-talk.)

13          MR. McKAY:  She's not going to say what you

14   want her to say.

15          MR. MAYE:  But I have a right to ask

16   questions, John.

17          MR. McKAY:  You have a right to ask

18   questions.  You have a right to receive the answers

19   and then you need to move on.

20          (Simultaneous cross-talk.)

21          MR. MAYE:  I don't -- I don't have to move

22   on.

23          MR. McKAY:  You cannot keep asking the same

24   question trying to get your sound bite that you're

25   never, ever, ever, ever going to get.



1           MR. MAYE:  Thank you.  It's noted.  It's

2    noted for the record.

3       BY MR. MAYE:

4       Q.   Ma'am, does United have a policy in its

5    operations manual --

6           MR. McKAY:  You got a call from somebody

7    coming in.

8       BY MR. MAYE:

9       Q.   Does United have in its operations manual a

10   protocol, a specific protocol, regarding responding

11   to suspected sexual misconduct?

12      A.   You are referring -- you keep referring to

13   operations manual.  Are you -- are you talking about

14   my FOM, the pilot's flight operations manual?

15      Q.   Yes.

16      A.   It does not.

17      Q.   Okay.  So there's nothing in United's

18   operations manual about the pilot having to inquire

19   about whether pass- -- passengers involved in

20   suspected human trafficking must be asked whether

21   they're related?

22          MR. McKAY:  Objection to the form.

23   Objection --

24          (Simultaneous cross-talk.)

25          THE WITNESS:  That's not accurate.

MAGNA

Page 69

1          MR. MAYE:  Okay.  So it does.

2          (Certified Reporter interrupted for

           clarification of the record.)

3          MR. McKAY:  It's objection to the form.

4    Objection.  Asked and answered.  Thank you.

5      BY MR. MAYE:

6      Q.   So are you saying there -- there is a

7    provision in the United's operations manual that

8    specifically directs pilots to inquire about the --

9    the family relationship between passengers involved

10   in -- in suspected sexual misconduct before the

11   pilot can take action?

12     A.   I'm -- I'm trying to explain, sir, that

13   there's a pass-through in my manual, for lack of a

14   better word, that instructs me to ensure that the

15   flight attendants are acting in accordance with the

16   policies and procedures in their manual, all of

17   which are not incorporated in my flight operations

18   manual.  However, if there is a -- an event or an

19   occurrence in flight and I don't have a reference

20   for what their policies and procedures are, what my

21   flight operations manual instructs me to do is call

22   them up, look at their manual, go through their

23   policies and procedures, ensure that they have been

24   followed, and in so doing, in this case, one of the

25   first things that would have happened and did not,



Page 70

 1    is that I would have directed my A flight attendant

 2    to initiate nonthreatening conversation and try to

 3    arrive at some of these answers to clarify the

 4    situation.

 5        Q.    So you're relying on the United flight

 6    attendant manual provision for your opinion that

 7    the -- the flight attendants here -- or no.   I'm

 8    sorry.   Strike that.

 9            So you're relying on a United flight

10    attendant manual provision for your opinion that

11    Captain Shupe should have asked Chelsie Bright, the

12    A flight attendant, for her flight attendant manual

13    so you could -- strike that.

14            So your opinion is that Captain Shupe

15    should have ultimately, through the flight attendant

16    or through dispatch, inquired about whether

17    Mr. DelVecchia and A.D. were related before they

18    were moved; correct?

19        A.    I certainly do hold that opinion, not --

20        Q.    Okay.

21        A.    -- not one or the other, both.   I mean,

22    those -- those are both very --

23        Q.    Okay.

24        A.    -- easy --

25        Q.    Okay.

Page 71

1      A.    -- things to do.  And I'm not relying upon

2  my United, I'm relying upon Frontier's own policies

3  and procedures.  It really has nothing to do with

4  United.

5      Q.   So -- so is your opinion based solely on

6  your interpretation of Frontier's policies?

7      A.    Frontier's own policies and procedures is

8  what I was tasked to review to ensure that they were

9  followed.  I will tell you in fairness that in my

10  opinion, it's consistent with what I would have

11  done --

12      Q.   Okay.

13      A.    -- had I been PIC on this flight --

14      Q.   Okay.

15      A.    -- as United captain in the absence of my

16  own for my policies and procedures because there's

17  no other way for me to ensure that my flight

18  attendant are, in fact, following theirs --

19      Q.   Okay.

20      A.    -- other than to go through it with them.

21      Q.   Okay.  So if you were the captain on a

22  flight -- bless you.

23      A.    Thank you.

24      Q.   If you were a captain on a flight on

25  which -- on which a flight attendant observed sexual



Page 72

1    misconduct -- in the mind of the flight attendant,

2    the flight attendant observed sexual misconduct, you

3    would respond by having the flight attendant ask the

4    passengers involved whether or not they were related

5    because the United flight attendant manual directs

6    that flight attendants ask about whether the

7    passengers involved in sexual misconduct are

8    related?

9         MR. McKAY:  Objection to the form.

10   Objection.  Assumes facts not in evidence.  And

11   argumentative.

12        THE WITNESS:  No, sir.  That's not what I

13   testified to.

14   BY MR. MAYE:

15   Q.   What -- what protocol at United then

16   supports your testimony that you would ask the

17   flight attendant to inquire about the passengers

18   familial relatedness?

19   A.   Sir, I never testified that there was a

20   protocol at United that I would ask that.  There's a

21   protocol at Frontier, the airline --

22   Q.   So there's -- so there's?

23   A.   -- in which was -- please allow me to

24   finish.  What I'm testifying to is that the pilot in

25   command at X airline, mine, Frontier's, American's,



Page 73

1    whoever, is responsible to ensure that what is in

2    the flight attendant manual with respect to their

3    policies and procedures are followed before I take

4    action and that I gather all the information I'm

5    capable of gathering before I make a decision about

6    how to --

7         Q.   I understand.  I understand.

8              MR. McKAY:  Whoa, whoa, whoa.  Stop,

9    please, Brian.  You're not allow- --

10             MR. MAYE:  John --

11             MR. McKAY:  -- to talk --

12             (Simultaneous cross-talk.)

13             MR. MAYE:  John, I -- we're about to call

14   the Judge here because --

15             MR. McKAY:  That's fine.

16             MR. MAYE:  She is not being responsive.

17   She's -- this is dragging on --

18             MR. McKAY:  No, no.  She's --

19             (Simultaneous cross-talk.)

20             MR. McKAY:  -- give you your sound bite.

21             MR. MAYE:  She's avoiding my questions and

22   we're -- I'll not be finished by seven hours, and

23   I'm not going to let it continue.

24             MR. McKAY:  Let me -- let me refer you to

25   a -- a particular standing order that says treat the



Page 74

1    witness with respect --

2            MR. MAYE:  Okay.

3            MR. McKAY:  Counsel must not interrupt the

4    witness who is answering the question by asking a

5    question --

6            MR. MAYE:  I didn't -- I didn't --

7            MR. McKAY:  Pass the baton and the

8    microphone to the witness.  Let the witness

9    finish --

10           MR. MAYE:  Okay.  Noted.

11           MR. McKAY:  The questioning attorney --

12           MR. MAYE:  Noted, John.  Please stop.

13           MR. McKAY:  -- the attorney for the

14   witness --

15           MR. MAYE:  It's noted, John.  Please stop.

16           MR. McKAY:  -- that the witness may have to

17   complete his or her answer.

18           MR. MAYE:  John, please stop.  It's noted.

19           MR. McKAY:  Please stop talking when I'm

20   talking.

21           MR. MAYE:  You can send me the revision.

22   You can email it to me, okay?

23       BY MR. MAYE:

24       Q.   Ma'am --

25           MR. McKAY:  It's common knowledge.  It's

MAGNA

1  professionalism.

2          MR. MAYE:  I did not cut her off.

3          MR. McKAY:  Yes, you did, many, many times.

4          MR. MAYE:  No, I did not.

5          MR. McKAY:  She asked you to allow her to

6  finish the question -- answer.

7          MR. MAYE:  Please, John.  Please.

8          MR. McKAY:  Please, Brian.

9          MR. MAYE:  Can I ask my questions, please?

10     BY MR. MAYE:

11     Q.    Okay.  Now, ma'am, is there a specific

12  protocol in the United flight attendant manual that

13  requires you to inquire about whether two passengers

14  involved in a sexual misconduct -- involved in a

15  suspected sexual misconduct, is there a provision in

16  the flight attendant manual that requires you to

17  direct the flight attendant to inquire about whether

18  the two involved are related?

19     A.    Sir, I'm not here to testify to what's in

20  my proprietary United Airlines materials.  I'm here

21  to testify about what's in Frontier's manuals and

22  that's what I've done.

23          MR. McKAY:  Answered.  Move on.

24     BY MR. MAYE:

25     Q.    So are your opinions in your report and



Page 76

1   your opinions here today based solely on your

2   interpretation of Frontier's policies and procedures

3   and your review of the facts in this case?

4       A.   Could you ask that again please or have the

5   court reporter read it back.

6            MR. MAYE:  Please read it back, Jaimie.

7            (Record read.)

8            THE WITNESS:  Yes.  In combination with my

9   extensive experience as operating as a pilot in

10  command.

11  BY MR. MAYE:

12      Q.   Are your opinions based at all on the

13  policies and procedures at United Airlines?

14      A.   No.

15      Q.   Okay.  Are your opinions in your report, or

16  your opinions here today in this deposition, based

17  on any FAA regulations?

18           MR. McKAY:  Objection to the form.

19  BY MR. MAYE:

20      Q.   Any specific FAA regulations?

21      A.   I mean, I guess we could go through each

22  and every opinion and conclusion and see if there's

23  a -- a tie into an FAR.  Is that -- is that what

24  you're asking?

25      Q.   No.  I'm asking if your opinion that



Page 77

1    Captain Shupe -- that Captain Shupe should have

2    required the flight attendant, the A flight

3    attendant, to inquire about whether Mr. DelVecchia

4    and A.D. were -- were related that -- that specific

5    opinion, is that based on a specific industry

6    standard or a specific FAA regulation?

7              MR. McKAY:  Objection to the form.

8              THE WITNESS:  I'll give you the fairest

9    answer I think I can.  There's an -- an overarching

10   FAR that says the pilot in command is the final

11   authority for the command and conduct of the flight

12   as well as the safety and security of all of the

13   passengers under his or her charge.  So it's a

14   pretty large umbrella.

15        BY MR. MAYE:

16        Q.   Okay.  So -- so you're -- there's no

17   specific regulation or industry standard, but you

18   believe that there's a -- a general regulation,

19   overarching regulation, that supports your opinions

20   regarding Captain Shupe inquiring into the -- the

21   relationship between A.D. and Mr. DelVecchia?

22        A.   I agree with everything except the last

23   half of your sentence and that would be restated as

24   Captain Shupe insuring that the flight attendants

25   under his charge followed their policies and



Page 78

1   procedures before he made a decision as -- as to

2   what his action was going to be.

3       Q.    Is there a Frontier policy, a specific

4   policy, that requires a flight attendant to inquire

5   into whether -- well, strike that.

6             Is there a specific Frontier policy

7   requiring the captain to inquire into whether two

8   passengers involved in suspected sexual misconduct

9   are related?

10      A.    I don't have an -- an answer different than

11  the one I've given you for the last four times, sir.

12  The captain has to ensure there is a specific --

13  there are two specific Frontier policies, one

14  references human trafficking, one references

15  sexual -- suspected sexual misconduct.  And the

16  captain is required to make sure that the flight

17  attendant follows either/or both of those because

18  they are under his charge and before an action is

19  taken, those procedures are -- they have been

20  trained and they should be followed.

21      Q.    Where in the two policies that you've

22  referenced, the sexual misconduct policy,

23  Frontier's, and Frontier's human trafficking

24  policy -- or strike that.

25            Are you testifying that Frontier's sexual



Page 79

1    misconduct policy dictates that before a victim is

2    moved away from the perpetrator following a

3    suspected sexual misconduct, that Frontier flight

4    attendant must ask the two passengers involved

5    whether they are related?

6              MR. McKAY:  Objection to the form of the

7    question.

8              THE WITNESS:  No, sir.  My testimony is

9    that -- and -- and to be clear, we're not sure which

10   policy, quote/unquote, the flight attendants were

11   actually following, if any.  It appears to be some

12   strange hybrid or amalgam of -- of two different

13   policies or they got to pick and choose which parts

14   they wanted to pay attention to.  So I don't -- I

15   don't really know how to answer your question

16   because we -- we are never afforded the opportunity

17   of the flight attendants saying which policy or

18   procedure they were actually attempting to follow.

19   They're outlined specifically in my report with --

20   with specificity and, quite frankly, neither policy

21   or procedure was followed.

22   BY MR. MAYE:

23        Q.   Where in Frontier's policies does it say

24   that if an adult is touching a child in an

25   inappropriate fashion or if an adult is suspected of



1    committing sexual misconduct against a child that a

2    flight attendant should not take action until after

3    the flight attendant establishes whether the adult

4    and child involved are related?  Where -- where does

5    it say that in the Frontier manual?

6              MR. McKAY:  Objection --

7              THE WITNESS:  There is no reference to

8    adult or child in a Frontier manual.

9         BY MR. MAYE:

10        Q.   Where in Frontier's policies, manuals,

11   protocols, does it say that if a passenger is

12   observed committing sexual misconduct against

13   another passenger that the flight attendant cannot

14   act until that flight attendant inquires about

15   whether the two passengers involved are related?

16             MR. McKAY:  Objection to the form.

17             THE WITNESS:  Sir, I would just refer you

18   to Frontier's actual policy regarding sexual

19   misconduct.

20        BY MR. MAYE:

21        Q.   Okay.  Let's go to that.

22        A.   Which I think might help us move along.

23        Q.   Sure.

24             So starting on page -- the bottom of

25   page 7, going to page 8, you include the substance

1    of Frontier's policy regarding responding to sexual

2    misconduct, and where --

3            Do you see that, ma'am?

4        A.    I do.

5        Q.    Where in here does it say that a flight

6    attendant must inquire about whether two passengers

7    involved in a suspected sexual misconduct are

8    related before the flight attendant moves victim?

9        A.    Well, in fairness, sir, you're jumping to

10   the middle -- once again, my testimony would be that

11   I -- I don't have any evidence that this is the

12   protocol that was actually being followed or -- or

13   that's what Chelsie said she was going to -- to do

14   or that the Captain -- that Captain Shupe instructed

15   her to do, because the way that this actually begins

16   is that sexual misconduct is reported to a flight

17   attendant.  That's -- that's Frontier's policy, that

18   sexual misconduct by the victim is reported to a

19   flight attendant.  I -- I don't see anywhere in this

20   policy that it -- it says that the flight attendant

21   gets to declare sexual misconduct on behalf of a

22   victim.

23       Q.    Okay.  Thank you for that.  I -- I'll -- I

24   guess I'll rephrase the question.

25           Do you see anywhere in Frontier's sexual



1  misconduct policy -- I'm not referring -- I'm not

2  talking about the facts of this case, ma'am, okay.

3  I'm talking about this policy.

4        Does this policy anywhere state that after

5  sexual misconduct is suspected that a flight

6  attendant is required to inquire about whether the

7  passengers involved were related before moving the

8  victim away from the perpetrator?

9        MR. McKAY:  Objection to the form of the

10 question.  Argumentative.

11       THE WITNESS:  Well, you just misstated the

12 policy, sir, because nowhere in the policy does it

13 say that sexual misconduct is suspected.  So I can't

14 answer the question as you phrased it.

15    BY MR. MAYE:

16    Q.   Okay.  We'll get to that in a second.

17 I'll -- I'll ask it this way.

18       If a passenger reports that sexual

19 misconduct has been committed against that passenger

20 by the passenger seated next to that passenger,

21 where in this policy does it say that the flight

22 attendant must inquire about whether the two

23 passengers involved were related before -- before

24 the flight attendant moves the victim away from the

25 perpetrator?



Page 83

1        A.    So the beginning of the hypothetical is

2    that the sexual misconduct is actually reported to a

3    flight attendant by the victim; do I have that

4    correct?

5        Q.    That's correct.

6        A.    It -- if that is the way, then the

7    procedure and protocol does not require that if the

8    sexual misconduct is reported by the victim.

9        Q.    What if flight attendant learns that the

10   two involved were related, does the flight attendant

11   under this policy still have an obligation to

12   immediately move the affected passenger?

13            MR. McKAY:  Objection to the form.

14            And may I ask, is this still connected to

15   your hypothetical where the victim has reported it

16   to the flight attendant?

17            MR. MAYE:  Yes.

18            MR. McKAY:  Okay.

19            THE WITNESS:  Yeah.  I'm -- I -- could you

20   restate that, please?

21            MR. MAYE:  Sure.

22            THE WITNESS:  I'm -- I'm a little lost.

23       BY MR. MAYE:

24       Q.    Hypothetically, passenger reports sexual

25   misconduct has been committed and -- and you agree



Page 84

1    that under this policy, the flight attendant has --

2    is -- is not required to inquire about whether the

3    two passengers are related; correct?

4        A.   If it has been reported to the flight

5    attendant, I agree that that is not in the policy

6    anywhere that I -- that I can see.

7        Q.   And under this policy, the flight attendant

8    must immediately --

9             (Certified Reporter interrupted for

               clarification of the record.)

10   BY MR. MAYE:

11       Q.   I said the flight attendant must

12   immediately move the affected passenger; correct?

13       A.   Yes.   Once the incident has been reported

14   to the flight attendant, that is correct.

15            THE VIDEOGRAPHER:   Counsel, this is the

16   videographer, Counsel Brian.   Can we take a short

17   break to change the media?

18            MR. MAYE:   Sure.

19            THE VIDEOGRAPHER:   This marks the end of

20   media No. 1.   The time is 12:08 PM.   We're off the

21   record.

22            (Recess at 10:08 a.m. to 10:17 a.m.)

23            THE VIDEOGRAPHER:   This marks the beginning

24   of media No. 2.   The time is 12:17 PM.   We're back

25   on the record.

Page 85

1          MR. MAYE:   Jaimie, can you read the last

2    question?

3          (Record read.)

4    BY MR. MAYE:

5    Q.    Okay.  So the same hypothetical, but this

6    time, the flight attendant is aware that the two

7    involved are related.  Under this policy, what is

8    required in terms of -- or strike that.

9          Does the information that the two involved

10   are related change or impact the obligation of the

11   flight attendant regarding responding to the

12   reported sexual misconduct?

13   A.    Just for clarification and you just said

14   responding to the reported sexual misconduct, I'm

15   just clarifying that it has been reported.  Does the

16   information that they're related change the flight

17   attendant's obligation, my answer is no.

18   Q.    Okay.  While you've been a captain at

19   United, have you ever encountered a scenario or

20   situation similar to what we have in this case in

21   which a flight attendant reports perceived sexual

22   misconduct, perceived inappropriate touching,

23   followed by a second flight -- flight attendant

24   reporting that an adult had -- same -- same adult

25   had his hand on the child's crotch.



Page 86

1          Have you encountered that situation at

2     United?

3          A.    No.

4          Q.    There -- excuse me.  So in this case you're

5     opining that -- well, strike that.

6               If while at United a flight attendant

7     reported observing an adult stroking the face of a

8     child for an extended period of time, which made the

9     flight attendant very uncomfortable and then a

10    second flight attendant observed that same adult

11    with his -- his or her hand on the child's crotch,

12    and you ordered that the child be separated after

13    conducting your investigation, had you learned that

14    the adult and the child were related, would you then

15    return the child back with the parent once you

16    learned that the child and the adult were related?

17         A.    If -- if we're going to do this, then we're

18    going have to take the abject hypothetical one --

19    one stage at a time because you're assuming that --

20    that I would have ordered them separated and -- and

21    all of these assumptions in this hypothetical are

22    made, so I mean I'm -- I'm --

23         Q.    Okay.  No.  No.  No.  No.  We'll go step by

24    step.

25               So you're the captain and you learned from

Page 87

1     a flight attendant that adult is stroking the face

2     of a child in an inappropriate manner that's making

3     the flight attendant very uncomfortable.

4          A.    Okay.  Well, that's kind of where we have

5     to stop if --

6          Q.    Right.  Sure, sure.

7          A.    -- we're going to do this step by step.

8                Okay.  So --

9          Q.    And what -- what is your response to that?

10         A.    So I -- I haven't really, quote/unquote,

11    learned anything.  It's been reported to me by one

12    of my flight attendants that he or she is

13    uncomfortable and has witnessed facial touching,

14    stroking, however we are characterizing the -- the

15    physical act from an adult to a child, so that's --

16    that's kind of where we're stopping.  So I really

17    haven't learned anything other than what the flight

18    attendant has reported to me and observed has made

19    him or her uncomfortable.  So stopping the

20    hypothetical at that point, I would feel a -- a

21    pressing need to gather more information to have it

22    described to me, even demonstrated on self, asked

23    how long it's been going on.  What is it about, the

24    observed behavior that is making her, in this case,

25    feel uncomfortable; does the minor child appear to



1    be in distress or not receptive to the touching.  I

2    mean, at that point, there's a bunch of things that

3    should have been asked and clarified.

4         Q.   I'm -- I'm -- it's a hypothetical.  I'm

5    asking how you respond.  I'm not talking about our

6    case, okay?

7         A.   I understand.  And -- and, sir, I'm telling

8    you what I would have -- those are all questions I

9    would have asked at that point and --

10        Q.   Okay.

11        A.   -- and perhaps more.

12        Q.   Okay.  And at that point, you're satisfied

13   that the touching is concerning.  It concerns you

14   and what do you do then?

15        A.   Well, I guess -- and I'm really trying

16   here, Mr. Maye, the only way I would be convinced

17   that I was concerned is if I had answers to some of

18   those questions.  If I didn't, and it was just the,

19   quote/unquote, gut feel or the -- the uncomfortable

20   nature of what the flight attendant was feeling, I

21   wouldn't be convinced.  I don't have the luxury of

22   stepping back to observe it myself, unfortunately,

23   after 9/11, but -- so the only way I can drill down

24   and share the level of discomfort that my flight

25   attendant is feeling is to garner more information,



Page 89

1   so if -- if I'm proceeding and you're going to --

2   and you're going to ask -- well, just that.  I mean,

3   if I -- if I get answers to all those questions and

4   if the minor child looks uncomfortable, questions

5   have been asked of them in accordance with their

6   protocol and -- and the answers aren't adequate or

7   they're in line with raising more suspicions, then

8   I'll meet you where we are and we can go forward.

9        Q.   Okay.  So -- so you're satisfied.  You --

10  you're --

11       A.   Okay.  So -- so now it looks uncomfortable,

12  although it's -- it's merely facial touching --

13       Q.   Uh-huh.

14       A.   -- at this juncture, but it seems off

15  and --

16       Q.   Uh-huh.

17       A.   -- responses to inquires back up the

18  hypothetical that maybe there's something amiss.

19       Q.   Uh-huh.

20       A.   I'll -- I'll go forward with you from that

21  point.

22       Q.   Okay.  And what do you do now?

23       A.   So then now I ask the flight attendants

24  to -- in the absence of my own information in my

25  flight operations manual, I ask for their



Page 90

1    specific -- I ask them which of the two possible

2    protocols, human trafficking or sexual misconduct,

3    they -- they believe this might fall into, and we

4    simultaneously review their policies and procedures

5    while asking my first officer to ACARS dispatch to

6    gather more information about these two.

7           I -- I certainly would have, as part of

8    ending at phase one, asked them some of these

9    nontargeted questions in accordance with the policy

10   and procedure.  And if I didn't receive suitable

11   answers to those or there were still suspicions

12   after taking all those steps, then I would ask

13   dispatch to help me out, give me further information

14   about the passengers.

15   Q.   So the -- so under this hypothetical, the

16   flight attendants tell you that they suspect sexual

17   misconduct.  So they believe that's the policy that

18   applies?

19   A.   Well, sir, again, we're back to -- there --

20   there is not a policy for suspected sexual

21   misconduct and that's where we're -- that's where

22   we're getting sideways with each other.  There is a

23   policy for reported sexual misconduct.  There's no

24   policy, however, for the flight attendants to

25   declare sexual misconduct on behalf of a victim.



Page 91

1    Q.   So I -- that's fine.

2         So -- so under the hypothetical, flight

3    attendant -- your -- the flight attendant tells you

4    that she observes the stroking of the face, makes

5    her very uncomfortable.  You're satisfied that --

6    that her concerns are warranted.  You become

7    concerned and your next step is to ask the flight

8    attendant at -- at United which of their policies

9    applies?

10   A.   No, sir.  That's not what I said.

11   Q.   Okay.  So I'm -- well, I thought you did.

12   You said you -- you -- you're not sure which policy

13   applies and --

14   A.   I guess the problem is, we would have to

15   know which policy road, if you will, we were going

16   down when they first came up to the cockpit so we

17   would know how to proceed subsequent to that so I

18   could get some answers about whether or not -- if

19   it's suspected -- if the flight attendant believes

20   she may have witnessed some act of sexual

21   misconduct, under the policy since it's not then

22   reported to her, I would think the next logical step

23   would be to go back and ask the family, ask

24   specifically the minor child if he's doing okay.

25   If -- if he needs anything, if he's uncomfortable,



Page 92

1    all of the -- it -- it's -- again, it's just amalgam

2    of these two protocols, but their training provides

3    some commonsense leeway for them to go back and

4    assess whether this minor child is really

5    uncomfortable or is really a victim, quote/unquote,

6    here.  And the only way that I would proceed from

7    that point, personally, is if the flight attendant

8    went back, attempted to ask some questions, was shut

9    down by the adult or -- or they were nonresponsive,

10   if the child appeared to be distressed or -- at --

11   at that point, the only way the hypothetical would

12   continue to what I would do next is -- is if -- is

13   if that happened.

14       Q.   So I just want to clarify.  We're talking

15   about your role as a captain at United.  That's the

16   hypothetical.  The flight attendant communicates to

17   you that she or he has observed inappropriate

18   stroking of the face, makes the flight -- flight

19   attendant very uncomfortable, you, after asking some

20   questions, getting a good description, you share in

21   concerns?

22            MR. McKAY:  Objection to the form.

23   You're -- you're inserting now elements of this case

24   that were not in it before.

25            MR. MAYE:  Okay.  That's noted.

MAGNA

Page 93

1        BY MR. MAYE:

2        Q.    And at that point, I asked what do you do

3    at that point and then -- and then you said, "Well,

4    you have to determine which policy applies."

5             Which policies at United could potentially

6    apply in that situation?

7        A.    Sir, again, I'm not -- I'm not here to

8    testify as to proprietary information about my

9    employer.  I'm -- I'm not going to go down the road

10   of which policies at United Airlines apply.  I'm

11   going -- I -- and hopefully you can respect that,

12   but --

13       Q.    I -- go ahead.

14       A.    I have -- I have -- we're here to talk

15   about a Frontier Airlines flight and I have their

16   policies and procedures right here in front of me

17   and I've delineated in my report.  And furthermore,

18   what I said was what I'd -- what I'd really need to

19   know from a professional flight attendant is if

20   she's concerned enough to come to my cockpit and

21   want to have a discussion about facial touching,

22   what I would ask is what her suspicions are.  Does

23   she suspect this minor child is being trafficked.

24   Does she suspect that there is unwelcomed sexual

25   molestation.  Quite frankly, it's very difficult for



Page 94

1  me to read down this hypothetical road when I'm just

2  being told there was facial touching.

3      Q.   So you earlier testified that your opinions

4  are based on your review of Frontier's policies,

5  your review of the facts in this case and your

6  experience as a pilot at United?

7          MR. McKAY:  Objection to the form.  She did

8  not say that specifically.

9          THE WITNESS:  I believe I said, sir, my

10  experience in almost 30 years as a Part 121

11  commercial ATP and now captain, I -- I'm really not

12  here to testify as to the proprietary United

13  Airline's policy and procedures.

14      BY MR. MAYE:

15      Q.   Are you here today testifying based

16  on -- or strike that.

17          Are your opinions in your report and your

18  opinions here today based on your review of

19  Frontier's policies and your review of the facts in

20  this case?

21      A.   I have the exact same answer to the exact

22  same question that I gave you earlier and that is

23  yes.

24      Q.   Okay.

25      A.   In addition to my experience, training,



Page 95

1    and -- and role that I still have currently as a --

2    a full-time airline pilot in command.

3        Q.   And did you receive the -- the bulk of your

4    training at United Airlines?

5        A.   Comprehensively over my 30-year career,

6    yes, the -- now, the bulk of my training has been --

7    I mean, it depends on which training we're referring

8    to.  I mean, I have general aviation experience; I

9    have flight instructor experience; I -- if we're

10   going to lump training into one big umbrella, then

11   the answer would be yes.

12       Q.   And has most of your experience as a 121

13   pilot been at United?

14       A.   Yes.

15       Q.   So your experience -- or strike that.

16            Has all of your experience as a captain

17   been at United?

18       A.   As a captain, yes.

19       Q.   Okay.  So if your opinions in this report

20   and your opinions here today are, in part, based on

21   your experience at United, then it's an area that we

22   need to explore because you've testified that you're

23   basing your opinions on your experience at United

24   and so I'm asking --

25         MR. McKAY:  Brian, I'm sorry, I'd have to



Page 96

1    object.  The witness has stated that she can't

2    testify to proprietary materials at United.  Now,

3    you've placed us under a protective order for the

4    proprietary materials of Frontier.  I'm sure you can

5    understand that she's not in a position to expose

6    specifics of proprietary materials from her

7    employer.  That's what she's told you.

8            MR. MAYE:  Okay.  Noted.

9        BY MR. MAYE:

10       Q.   So, ma'am, so I -- I've given you a

11   hypothetical about how you would respond as a United

12   pilot to a situation in which a -- a child passenger

13   is -- a flight attendant observes an adult passenger

14   inappropriately touching, stroking the face of -- of

15   a child that makes the flight attendant

16   uncomfortable.  That's reported to you.  And you

17   then are -- are convinced that it's -- it's

18   concerning enough to take the next steps to respond

19   and --

20       A.   Well, I think we need to talk about in this

21   hypothetical how I become convinced of that.

22       Q.   The -- the flight attendant describes to

23   you the -- the extent of the touching, the nature of

24   the touching, and the -- the flight attendant

25   explains to you that the touching is not the kind of



1  touching that is appropriate between a parent and a

2  child?

3          MR. McKAY:  I'm sorry.  I'm confused here.

4  Is there some way that you can tell all of us what

5  sexual face touching entails?  I don't -- I'm trying

6  to imagine it and having a very difficult time.

7  BY MR. MAYE:

8      Q.   Okay, ma'am.  You can -- you can answer the

9  question.

10     A.   Yeah.  My answer would be that I will

11  listen to my flight attendant recount to me her

12  concerns.  And, however, that's not going to be

13  sufficient for me -- just her -- as I've already

14  explained, I would direct her to go get more

15  information.  Just -- I am not going to be going to

16  be convinced -- I don't care what --

17     Q.   And --

18     A.   May I finish?  I don't -- it's not going to

19  be sufficient to listen to a flight attendant

20  recount that an adult is stroking the face of a

21  child for me to make the leap to sexual misconduct

22  if that is all that's being reported.  What I have

23  testified to and I will -- I will reiterate is that

24  I would require her to go back and get more

25  information.



1    Q.    And what information would you require her

2  to get?

3    A.    Again, I would require her to go back and

4  attempt to initiate a nonthreatening conversation

5  between the two of them, ask if the minor child is

6  okay, needed anything, if it was -- everything in

7  accordance with their training, sir.  You have all

8  the information.  Ask if they're going on vacation.

9  Ask -- I mean, like make a direct observation by

10  interacting and speaking to the family to try and

11  validate whether her concerns were justified or not.

12    Q.    I think -- I think again we're getting

13  confused.  You said "their training."  We're not

14  talking about Frontier.  We're talking about United.

15    A.    And I'm not going to speak to United's

16  training --

17    Q.    But you just --

18    A.    -- so your hypothetical --

19    Q.    Okay.  Let me -- I'll just try to make this

20  very -- very simple.  The -- the -- the -- you're

21  the captain.  A United flight attendant tells you,

22  I've observed which I believe is sexual misconduct

23  by an adult on a child.  Flight attendant describes

24  it to you in a way that you're convinced that this

25  is concerning.

MAGNA

1        MR. McKAY:  And -- and again, I'm sorry,

2   Brian, but -- I'm sorry to interrupt, but can you

3   please tell us what is this concerning face

4   touching --

5        MR. MAYE:  No, no, John.  John, I didn't --

6   I changed -- I changed it back to -- just -- it's --

7   it's some sexual -- sexual physical contact that is

8   established --

9        MR. McKAY:  Okay.  The law defines sexual

10  contact as involving genitals.  You know that.  I

11  know that.  How are we -- how have we moved into

12  sexual face touching and what does it entail?

13       MR. MAYE:  Okay.  It's noted for the

14  record.

15       MR. McKAY:  No, it's -- it's making an

16  impossible and improper --

17       MR. MAYE:  Okay.

18       MR. McKAY:  -- hypothetical.

19       MR. MAYE:  Thanks.  Okay.  Noted for the

20  record.

21    BY MR. MAYE:

22    Q.   So, ma'am, so an adult has touched a child

23  in a sexual nature.  The flight attendant is

24  convinced it's sexual misconduct.  The flight

25  attendant comes to you, explains to you what she saw



Page 100

1  and --

2      A.   And specifically what does she tell me?

3  Because I -- I can't answer your question without --

4      Q.   Why not because the -- the hypothetical is

5  going to be that you are convinced that it is a

6  legitimate suspicion and then the question is, what

7  do you do next at United?

8          MR. McKAY:  Objection to the form.

9          THE WITNESS:  I -- I can't answer without

10  telling you how I'm convinced or not.  I can't tell

11  you what my next step would be until I know that I

12  have sufficient information to be convinced.  You're

13  not even telling me what the -- the flight attendant

14  is reporting to have seen.

15      BY MR. MAYE:

16      Q.   But, ma'am, the hypothetical establishes

17  that that has been met.

18          MR. McKAY:  Objection to the form.  That's

19  an improper hypothetical.

20      BY MR. MAYE:

21      Q.   Okay.  So for a hypothetical -- then let's

22  do this, a hypothetical, the -- the flight attendant

23  observes the adult rubbing the genitals of the

24  child.  That's the hypothetical.  The flight

25  attendant comes up to you and says, this is what I

MAGNA

1   saw.  It's very concerning, and we want to separate

2   the child from the adult.

3         What -- what do you do as a United pilot in

4   that scenario?

5         A.   I gather more information.

6         Q.   And what -- what information are you

7   looking for?

8         A.   Whether the conduct -- I mean, there's a --

9   there's a -- likely a seat mate.  I go back and

10  instruct the flight attendant to ask the nonrelated,

11  nonaffecting adult in the seat if they've observed

12  any such behavior.  I certainly go back and directly

13  ask the child if they are okay and/or if they would

14  like to be moved.  I gather more information.

15        Q.   Okay.  So let me get this straight.  As a

16  captain at United, if a flight attendant came up to

17  you and said, well, I just observed an adult rubbing

18  the genitals of a child and it's -- and I'm very

19  concerned about it and I -- and I recommend that we

20  move the child away from the adult, your -- your

21  testimony is that you would not immediately move the

22  child.  You would ask the flight attendant to ask a

23  nearby passenger if they observed the touching.

24        Is that the first thing you would -- you

25  would do?



Page 102

```
 1              MR. McKAY:   Objection.   Asked and
 2    answered --
 3              THE WITNESS:   Well, sir, the hypothetical
 4    is so out of the realm of anything that would happen
 5    at United or anywhere else because the first thing a
 6    flight attendant anywhere, I -- I would assume,
 7    would be trained to do if they observed direct
 8    sexual misconduct and a -- a victim recoiling or --
 9    from that would be to enlist some help, and they're
10    trained to do that without even coming to us first.
11    So you're -- you're -- I know what you're trying --
12    I know --
13        BY MR. MAYE:
14        Q.   Ma'am --
15        A.   I know what you're trying to get to, but
16    this is not the situation we had here.   We had --
17        Q.   That's fine.
18        A.   We had a --
19        Q.   That's fine.
20        A.   -- situation in which a flight attendant
21    talked about an adult touching the face of a child.
22        Q.   Okay.
23        A.   So it's this weird amalgam of --
24        Q.   Uh-huh.
25        A.   -- let's assume facts not in evidence
```

MAGNA

Page 103

1    and -- and I can't -- I will tell you that at

2    United, and I'm not going to reference specific

3    policies or procedures, but I will tell you that

4    they are -- my flight attendants, and I believe

5    industry wide-flight attendants, will intervene if

6    the safety or security of a passenger is in

7    immediate risk.

8         So the hypothetical falls flat just -- just

9    on -- on its face there.  They're not going to take

10   the time to come up and talk to me or they're going

11   to intervene.  If they think this child is in

12   jeopardy, they're not going to take the time to come

13   up and talk to me; they're going to intervene to try

14   to get some help.  So it's just --

15        Q.   Okay.  So --

16        A.   -- it's just not a good hypothetical.

17        Q.   That's fine, but it's my hypothetical, but

18   I'll -- I'll ask you a question about what you just

19   said.

20        So at United, if a flight attendant

21   believes that a passenger is at risk, there's a

22   safety threat.  The flight attendant can immediately

23   move that passenger away from the threat without

24   consulting the captain?

25        A.   That -- that doesn't represent what I



Page 104

1    testified to.  What I said is the flight attendant

2    will -- will intervene, will ask the alleged victim

3    or what they perceive to be an alleged victim if

4    they're okay, if they need assistance, et cetera.

5    That would be the first step.

6         Q.   Can a flight attendant at United -- can a

7    flight attendant at United immediately move a

8    passenger who reports being sexually violated

9    without the flight attendant consulting the captain

10   or conducting any further inquiry?

11        A.   I'm -- I'm not going to testify to United

12   policies and procedures.

13        Q.   Okay.  So -- so essentially, I'm not able

14   to explore whether you're qualified to testify as an

15   expert because you refuse to testify about your

16   experience at United; is that fair?

17             MR. McKAY:  Objection.  That's -- that's

18   argument, Brian, and --

19        BY MR. MAYE:

20        Q.   Is that fair, ma'am?

21             MR. McKAY:  -- it's based on your

22   hypothetical.  You asked the hypothetical bringing

23   in United Airline's procedures.  She testified that

24   she's not at liberty to talk about them, so it's a

25   bad hypothetical.  It's -- it's not a bad deponent.

Page 105

1      BY MR. MAYE:

2      Q.   So -- okay.  So why can't -- okay.  So --

3           MR. McKAY:  Yeah.  You can ask other

4      questions.

5      BY MR. MAYE:

6      Q.   In this -- in this -- in this -- so we'll

7      go back to a hypothetical -- strike that.

8           Ma'am, you -- you just testified about what

9      United flight attendants can do in certain

10     situations.

11          Aren't -- aren't you revealing protocols

12     and procedures at United?

13     A.   I testified, sir, in general terms to the

14     extent to which my professional flight attendants

15     are trained and entitled to act if they witness a

16     direct threat to a passenger's safety or a reported

17     threat and I'm not going to go in further detail

18     than that.

19     Q.   So back to our hypothetical, you're --

20     you're the captain on a flight, a United flight, and

21     the flight attendant observes an adult rubbing the

22     genitals of a child, reports it to you, and you're

23     very concerned, and at that point, according to your

24     testimony, you would have the flight attendant go

25     back and ask questions to the two passengers



1    involved; is that your testimony?

2         A.    No, it certainly isn't.

3              (Certified Reporter interrupted for

               clarification of the record.)

4              MR. McKAY:  Let's just say objection to the

5    form.

6         BY MR. MAYE:

7         Q.    So what you would do at that point?  You

8    observed -- excuse me -- you -- the flight attendant

9    told you that he or she observed an adult rubbing

10   the genitals of a child.  I thought I heard you say

11   that you would direct the flight attendant to go

12   back and talk to the passenger seated near them, but

13   I guess I misheard you.

14             (Simultaneous cross-talk.)

15             MR. McKAY:  Hypothetical -- I'm sorry.  In

16   this hypothetical, is the child clothed?  Is the --

17   is the adult, like, wiping off a spill from the lap

18   of the child?  How old is the child?  There's a

19   whole lot of issues here that aren't really covered

20   in your hypothetical.

21        BY MR. MAYE:

22        Q.    The hypothetical is, it's an adult.  The

23   child is 12 years old.  The adult is rubbing the --

24   the genitals in a sexual manner.

25             MR. McKAY:  Are they exposed?

MAGNA

Page 107

1          MR. MAYE:  They are not exposed.  John, I

2     appreciate your input and I ask --

3          MR. McKAY:  Thank you.  I'm doing my job

4     here.

5          MR. MAYE:  Please stop.

6          MR. McKAY:  Doing my job?

7     BY MR. MAYE:

8     Q.    The child is clothed and the flight

9     attendant is alarmed.  The flight attendant

10    determines it's sexual in nature and the child is at

11    risk.  The flight attendant comes up to you and

12    says -- explains everything and says, we recommend

13    moving the child away from this adult.

14          How do you respond to that as a captain at

15    United?

16    A.    I -- I don't know, sir, because I've never

17    been in that circumstance.  And once again, you're

18    mixing up -- we first started talking about the

19    flight attendant coming up and reporting just the

20    facial touching, at which point I said I would

21    gather more information.  So now it's turned into --

22    Q.    Yeah.

23    A.    -- direct observation of rubbing of the

24    genitals to which I then responded that I don't

25    believe a flight attendant would -- if they really



1   felt a direct observation that this child was at

2   risk in real time and they observed this, would take

3   the time to come up to the cockpit without

4   intervening, so, again, I don't -- I can't get on

5   board with the -- the hypothetical.

6       Q.   So you're refusing to answer a question

7   with a hypothetical?

8           MR. McKAY:  No, she's not.

9           THE WITNESS:  I'm not refusing to answer.

10  I'm telling you that it's not the way it would

11  happen in the real world.

12      BY MR. MAYE:

13      Q.   Ma'am, listen.  This is the hypothetical,

14  the flight attendant --

15          MR. McKAY:  Please don't say listen.

16  That's --

17          (Simultaneous cross-talk.)

18      BY MR. MAYE:

19      Q.   The flight attendant came up to you looking

20  for guidance.  The flight attendant said this is

21  what I saw.  We want to separate the child from the

22  adult.

23          What is your response to that?

24      A.   I don't have a different response than I've

25  already given you, sir.  It's not -- that --

1    that's -- that is not the way the -- the scenario

2    would develop onboard the flight.

3         Q.   And --

4              (Simultaneous cross-talk.)

5              MR. McKAY:  Do you want -- do you want

6    me to talk when you're asking a question?  Would you

7    like me to talk through your questions?

8              MR. MAYE:  We're going to have to take a

9    break because I think we have to talk to the Judge.

10             MR. McKAY:  If you're going to talk through

11   my objections, then I think it's only fair that I

12   talk through your questions.

13             Is that how you want to conduct the

14   deposition?

15             MR. MAYE:  Excuse me?

16             MR. McKAY:  If you are going to talk over

17   my objections, then I think it's only fair that I

18   talk over your questions.

19             Is that how you want to do this?

20             MR. MAYE:  I don't know what you're talking

21   about, John.

22             MR. McKAY:  Yeah.  Well, you keep talking

23   over me when I am trying to make an objection.

24             MR. MAYE:  Wait --

25             MR. McKAY:  And I have said --



Page 110

```
 1              (Simultaneous cross-talk.)

 2              MR. MAYE:  Go ahead, John.

 3              (Simultaneous cross-talk.)

 4              MR. McKAY:  Professional --

 5              MR. MAYE:  If you have an objection, go

 6    ahead, John.  Go ahead with your objection.

 7              MR. McKAY:  Thank you.

 8              MR. MAYE:  That -- you're --

 9              MR. McKAY:  Thank you.

10              MR. MAYE:  -- you're obstructing this

11    deposition.

12              MR. McKAY:  No, I'm not.  I'm asking you --

13              MR. MAYE:  Go ahead.  If you have an

14    objection, go ahead.

15              MR. McKAY:  I'm asking you to stop talking

16    when I am making an objection --

17              MR. MAYE:  I will do that.  I will do that.

18              MR. McKAY:  I have sent you two emails

19    asking you, as a matter of professionalism, that you

20    refrain from doing that in depositions because

21    you've done it repeatedly in depositions.  And I'm

22    asking you to let me talk when I'm talking, to let

23    the deponent talk when she's answering your question

24    and to stop stepping on everybody because they're

25    not meeting your expectations.  You get to ask
```

Page 111

1    questions, and at end of your question, you pass the

2    mic --

3            MR. MAYE:  That's noted.

4            MR. McKAY:  -- to the deponent.

5            MR. MAYE:  Noted.

6            MR. McKAY:  -- and if the -- if the

7    attorney for the other side needs to make an

8    objection, the attorney for the other side is

9    allowed to make the objection.  If you don't like --

10           MR. MAYE:  It's noted.

11           MR. McKAY:  -- the objection, you don't get

12   to just start chattering during the middle of it.

13   That's unprofessional.

14           MR. MAYE:  Noted.

15           MR. McKAY:  Thank you.  Now, do you --

16           MR. MAYE:  Do you have an objection?

17           MR. McKAY:  -- want to take a break?  Is

18   that what you're asking?

19           MR. MAYE:  Pardon?

20           MR. McKAY:  I thought you were asking for a

21   break.  Are you --

22           MR. MAYE:  No, I'll proceed.  I -- I'm

23   considering contacting the Court because --

24           MR. McKAY:  I think that would be a good

25   idea.  There's a lot of --



Page 112

1           (Simultaneous cross-talk.)

2           MR. MAYE:   The witness is refusing to

3    answer questions.

4           MR. McKAY:   No, she's not refusing.

5    She's --

6           MR. MAYE:   John -- John, I thought you just

7    said --

8           (Simultaneous cross-talk.)

9           MR. McKAY:   You're doing it again.

10          MR. MAYE:   I thought you just said we

11   shouldn't be interrupting each other.

12          MR. McKAY:   Yeah.

13          MR. MAYE:   Now I'm talking and you're

14   interrupting me.   I'll proceed with -- I'll proceed

15   with a question.

16    BY MR. MAYE:

17    Q.   Ma'am, so back -- back to the hypothetical,

18   I'm not asking whether or not this is something that

19   you've seen before or -- what I'm asking is if this

20   is what you encountered as a pilot, as a captain at

21   United Airlines, a -- an adult is rubbing the

22   genitals in a sexual manner of -- of a 12-year-old

23   child, who is clothed, and the flight attendant is

24   alarmed, concerned that the child's unsafe, and the

25   flight attendant comes to you and says, I recommend



1    we move the child away from the adult, how do you

2    respond as the captain of that flight at United?

3           MR. McKAY:  Objection to the form.

4           THE WITNESS:  I respond by asking her

5    specifically what she observed, for how long,

6    whether the minor child appeared to be in distress,

7    if she's sure that perhaps something wasn't spilled

8    in the child's lap or if she misperceived what she

9    saw.

10          I -- I -- I then begin a series of targeted

11   questions to the flight attendant because I can't be

12   her eyes and ears.  I can listen to what she

13   believes she observed.

14          But once again, you're not going to like

15   the answer, but if -- if -- if that's really what a

16   flight attendant believes he or she directly

17   observed and a minor 12-year-old child is -- is in

18   danger real time, I believe what I'm going to be

19   told is, we saw this.  It was verified.  We took

20   action, and they've already been separated.

21   That's -- that's the best I can do with your

22   hypothetical, sir.

23       BY MR. MAYE:

24       Q.   Okay.  So is there ever a situation that

25   you can envision where a -- strike that.



Page 114

1          So, ma'am, I'm a little -- I don't really

2    understand just so you're -- are you -- are you

3    saying that you don't know how to respond to the

4    hypothetical or you have no -- not -- you don't have

5    enough experience to respond to that hypothetical or

6    you're simply just refusing to respond to my

7    hypothetical?

8          MR. McKAY:  Objection to the form.

9          THE WITNESS:  I just gave you a response,

10   sir.  I -- I gave you a response.  You're not a

11   captain.

12      BY MR. MAYE:

13      Q.   You did not.

14      A.   Yes, I did, sir.  I told you that what

15   would happen is not in accordance -- I mean, we

16   can -- we can do hypotheticals all day.  We can talk

17   about engines departing the pylon and things that

18   won't happen.

19          What I told you, sir, is that in my best

20   effort, honestly, to respond to your hypothetical,

21   if a flight attendant came up, the first thing I

22   would ask my flight attendant is if you really

23   believe you observed that, what are you doing up

24   here and why didn't you separate them already.

25   What -- what -- why are we -- but are you sure,

Page 115

1   first of all.  Have we -- so, I mean --

2        Q.   Okay.  So that's --

3        A.    -- I've really done the best I can do

4   to ...

5        Q.   Okay.  So it sounds like we're -- thank

6   you.  I appreciate that.  It sounds like we're

7   getting somewhere.  It's -- it's taking a while.

8             MR. McKAY:  Brian, please.

9             MR. MAYE:  If --

10            (Simultaneous cross-talk.)

11            THE WITNESS:  And the only response -- the

12  only -- the only reason I'm telling you this -- and

13  let's just be clear.  This is -- this is only in

14  response to -- I -- I -- the flight attendant is

15  reporting that they directly witnessed an --

16  BY MR. MAYE:

17       Q.   Right.

18       A.    -- abject act of sexual molestation,

19  genital --

20       Q.   Right.

21       A.    -- touching, rubbing, a victim in

22  distress --

23       Q.   Right.  Yes.

24       A.    -- that's the -- now, that's the new

25  hypothetical, and that's my answer to that --



Page 116

1       Q.   Okay.  So --

2       A.    -- and only that.

3       Q.   Okay.  So based on this hypothetical that I

4    gave, not -- not --

5       A.   Which one?  Because we've had like three.

6       Q.   The -- the hypothetical that I last gave

7    and you responded that if that -- if the flight

8    attendant came up to you and explained that, your

9    response would be here, wait a second here, why

10   didn't you separate the child from the adult; is

11   that -- is that correct?

12      A.    With -- with everything I just stated, if

13   there -- if I am being reported and -- and, again,

14   the hypothetical doesn't work because in the -- in

15   that case, what the flight attendant would have come

16   up to the cockpit and reported was a direct

17   observation of sexual molestation and they're

18   intervening and a victim in distress and them having

19   followed through with their procedures and protocol

20   after they verified what was happening -- and I

21   would be being informed at that point in your

22   hypothetical that this had occurred.  They had done

23   what they're trained to do and separated and

24   followed their procedures and protocol and they were

25   simply coming to the cockpit to report to me what

1   had already happened.  Please don't point your

2   finger at me.

3       Q.   No, no, ma'am, I'm not pointing my finger

4   at you.  I'm putting my finger straight up in the

5   air.  And what I'm asking you, you just changed the

6   hypothetical there.  You responded -- you responded

7   that based on the hypothetical that I gave, that the

8   flight attendant had not yet moved the child and you

9   said you would tell the flight attendant that you

10  were surprised the child had not been moved.  So my

11  question is, under the -- under the hypothetical

12  that I gave, if the flight attendant came up to you,

13  told you everything we talked about and the child

14  had not been moved, would you, at that point, direct

15  the flight attendant to immediately move the child

16  away from the adult?

17      A.   So what's missing from your hypothetical is

18  the fact that I'm supposed to rely only upon the

19  observation of the flight attendant.  That was your

20  first hypothetical.  And what I'm telling you is if

21  a professional flight attendant had not only

22  observed that behavior, but then intervened, asked

23  the alleged victim if this was, in fact, happening

24  and verified that there was an act of unwanted

25  sexual touching or molestation and then separated



Page 118

1   the two, that's -- that is what I'm talking about.

2       Q.   Okay.  So if the flight attendant came up

3   to you and said I observed an adult rubbing the

4   genitals of a 12-year-old child, the child appears

5   to be in distress, I'm very alarmed and concerned

6   about this, and I recommend that we move the child

7   away from the adult and then you ask, well, have you

8   talked to any passengers near the two passengers to

9   verify that this happened and the flight attendant

10  said, no, I didn't, but I'm telling you that this is

11  what I saw and I'm very concerned about the child,

12  at that point, would you direct the flight attendant

13  to move the child away from the adult?

14         MR. McKAY:  Objection to the form.

15         THE WITNESS:  I can't give you a better

16  answer than I -- every -- every time we go down this

17  hypothetical road, something changes a little bit

18  and I've already -- I've already told you that -- I

19  mean, first it was there's just an observation of

20  the rubbing, but the child didn't appear to be in

21  distress.  Now in this latest hypothetical, the

22  child does appear to be in distress.  And my best

23  answer is that a trained flight attendant, if -- if

24  a victim appears to be in distress, is -- is going

25  to act at that point and ask if they're okay and

Page 119

1    need to be moved.

2              (Certified Reporter interrupted for

               clarification of the record.)

3              THE WITNESS:  Ask if they're okay and if

4    they would like to be moved.

5        BY MR. MAYE:

6        Q.   And if the flight attendant did not do

7    that, if the flight attendant didn't ask the child

8    if the child was okay and didn't ask the child if

9    the child wanted to be moved and you became aware of

10   that, would you require the flight attendant to ask

11   those questions before deciding to move the child?

12       A.   I would require to see the flight

13   attendant's protocol, go through it with him or her

14   and see if -- if all of the actions had been -- had

15   been taken in accordance with their policy and

16   procedure.

17       Q.   Of United's policies and procedures?

18       A.   I am not talking about United, sir.

19       Q.   So you're -- you're not going to respond to

20   the hypothetical that I've given?

21             MR. McKAY:  Objection to the form.

22             THE WITNESS:  I don't know any other way to

23   respond.  It's -- it is fluid and abject and -- and

24   not in accordance with -- I've -- I've really have

25   done my best to try and respond, sir.  I mean, I



Page 120

```
 1   think I've given you a lot of really good
 2   information about what --
 3       BY MR. MAYE:
 4       Q.    No, I -- I --
 5       A.    -- what a pilot in command would do when
 6   something is reported to them, but they do not have
 7   the luxury of actually witnessing how to interpret
 8   what they're being told in the absence of -- I mean,
 9   there -- there's so much more -- and quite honestly,
10   this abject hypothetical that we're talking about
11   is -- is -- has nothing to do with what we're here
12   to talk about.
13       Q.    So if -- if a flight attendant came up to
14   you and said I -- I observed an adult rubbing the
15   genitals of a child and it's sexual in nature; I'm
16   very concerned, I'm worried, and I recommend -- and
17   I've -- and I've done nothing else; I haven't talked
18   to the child; I haven't talked to the adult, but I
19   have observed this closely; I've observed rubbing of
20   the genitals by the adult; it's alarming and I would
21   like to move the child, what is your response to
22   that --
23           MR. McKAY:  Objection to the form.
24       BY MR. MAYE:
25       Q.    -- as a United pilot?
```

Page 121

1          MR. McKAY:  Objection to the form.

2          THE WITNESS:  Let's stop talking about as a

3    United pilot, because, again, this -- this is where

4    we're just going to be dead in the water.

5          Here's -- here's the problem, sir, for --

6    for a flight attendant to observe closely an adult

7    rubbing the genitals of a child infers that this

8    flight attendant would have to stand in the row

9    and -- and stand there for a period of time directly

10   observing this behavior and do nothing else -- stand

11   there long enough to believe they know what they've

12   seen and that it's gone on for some period of time

13   and do nothing else or not engage the alleged

14   perpetrator or alleged victim.  That's why I'm

15   having a problem with this abject hypothetical,

16   because that's not in accordance with any flight

17   attendant's training.

18   BY MR. MAYE:

19   Q.   Okay.  So if -- if that's true then and you

20   learn that the flight attendant had not yet moved

21   the child, would you then direct the flight

22   attendant to move the child immediately?

23          MR. McKAY:  Objection to the form.

24          THE WITNESS:  If that's -- I'll do my best

25   here, once again.  If that's actually what's being



Page 122

1    reported, then quite honestly, I have to question

2    the flight attendant's judgment and lack of -- I

3    mean, if they really directly observed a -- a child

4    in distress and did nothing, but come up and report

5    it to me, then -- then I have to actually question

6    their judgment, including whether they're really --

7    they really saw what they think they saw.  How long

8    did they stand there, what -- I mean, et cetera.  I

9    mean, I -- I'm trying to be reasonable with you,

10   but --

11       BY MR. MAYE:

12       Q.   Okay.  So I understand.  So -- so you're --

13   so you're testifying that at that point --

14           MR. McKAY:  I'm sorry.  You just cut her

15   off.

16           MR. MAYE:  I did not cut her off, John.

17   She was done.

18       BY MR. MAYE:

19       Q.   Ma'am, would you agree you were done?

20       A.   You may continue.  I don't -- go ahead.

21       Q.   So are you testifying that at that point,

22   you would question the -- the competence of the

23   flight attendant or the -- you would question the

24   perception of the flight attendant and you would not

25   direct the flight attendant to move the child away

1   from the adult?

2       A.    I would certainly have more questions for

3   the flight attendant with regard to what -- what

4   they perceived that they saw.  And yeah, we would

5   have a discussion, a further discussion, about -- I

6   mean, depending on where we are in this

7   hypothetical.

8       Q.    Okay.

9       A.    As I said, how long they stood there, is

10  there another passenger in the road, did you get one

11  of your other colleagues or was this so imminent,

12  this threat to this minor child so imminent that you

13  should have intervened and didn't.  I mean, there's

14  a whole bunch of different ways this hypothetical

15  could go.  And -- and once again, sir, with all due

16  respect, I know you're doing your job, but this is

17  not what happened on this flight.

18      Q.    And your response that you would question

19  the competence of the flight attendant and question

20  her -- her perception, is that based on your -- is

21  that because on United policy or is that based on

22  your overall experience as a pilot?

23          MR. McKAY:  Objection to form.

24          THE WITNESS:  Did you say United policy?

25  Is that --



Page 124

1      BY MR. MAYE:

2          Q.   Yes.  Yeah.

3          A.   Again, I'm -- I'm -- I don't know how many

4      more times I can say it, but I'm not going to

5      testify about United policies, so no, it's not.  I

6      have had flight attendants in my charge for decades

7      now and I will tell you that sometimes they have

8      interactions with passengers that make them

9      emotional or -- or get them upset.  Sometimes we

10     have to drill down on what really happened to start

11     an event and -- and where we really are with respect

12     to what has to happen next.  And so it is my job as

13     captain to try and make sure that I objectively

14     gather all of the information I can, even if a

15     flight attendant is upset or disturbed by something,

16     because I don't have the luxury of stepping back

17     behind the door after 9/11.  And so I -- I,

18     therefore, don't have luxury of just taking, at face

19     value, what may or may not have been observed or --

20     I have to gather more information.

21         Q.   And how you explained you would respond to

22     the hypothetical, that's based on your personal

23     experience as a -- as a -- as a captain?

24              MR. McKAY:  Objection to the form.

25              THE WITNESS:  Well, the initial face

Page 125

1    touching hypothetical --

2        BY MR. MAYE:

3        Q.    No, no, no.  I'm sorry.  The -- the last --

4    the last hypothetical.  The last -- the hypothetical

5    we're on where you -- the flight attendant came up

6    to you, told you about the -- the adult was rubbing

7    the genitals in a sexual nature.  The flight

8    attendant was -- was concerned, went to you,

9    explained to you her concern.  She wanted to

10   immediately separate the child and you -- and you

11   said, well, you would have to question the, you

12   know, the competence of the flight attendant because

13   the flight attendant should have separated the child

14   right away, that hypothetical.

15       MR. McKAY:  Objection to the form.

16       BY MR. MAYE:

17       Q.    What I'm asking is, is that response based

18   on your personal experience as a captain?

19       MR. McKAY:  Objection to the form.

20       THE WITNESS:  I mean, certainly, sir.  All

21   of my responses to an extent covering what's in --

22   in my report to -- to the matter at hand, which

23   we're here to discuss, are peppered by my 30 years

24   of experience as an -- and 20 as a captain.  So it's

25   hard to -- I don't break that experience out of and



Page 126

1   separate that out of my testimony when I'm trying to

2   answer your questions.  I -- I don't know how best

3   to answer that, but, I mean, I have seen -- I've

4   seen it all.  Maybe not -- maybe not in your

5   hypothetical because, once again, I don't believe in

6   the real world it would go down the way your

7   hypothetical suggests, but yes.  I can't break my

8   decades of experience as a captain out of the

9   judgment about what I might do in your hypothetical.

10      BY MR. MAYE:

11      Q.   Are you aware of any FAA regulations or

12   guidelines or industry standards that dictate that

13   if a -- if an adult and child who are not -- I'm

14   sorry, if an adult and child are related, that no

15   action should be taken when -- strike that.

16          Are there any FAA regulations or industry

17   standards that dictate then that if an adult is

18   suspected of sexual misconduct and it's learned that

19   the -- strike that.  Let me start again.

20          Are there any FAA guidelines or industry

21   standards that dictate that if an adult who is

22   suspected of committing sexual misconduct against

23   the child and it is learned that the adult and child

24   are related, that no action should be taken with

25   respect to the suspected sexual misconduct?



Page 127

1              MR. McKAY:  Objection to the form.

2              THE WITNESS:  That -- that's a lot.  I

3    think I can -- I can make it easy because you

4    continue to refer to suspected sexual molestation

5    and there's -- the policies and procedures that are

6    in place, sir, are -- are with respect to actual

7    reported sexual misconduct.  There is no policy or

8    procedure or FAA regulation if -- if you want to

9    extend the question to that point regarding

10   suspected sexual molestation.  It's either reported

11   to a flight attendant, that -- that's what the

12   policy is.

13       BY MR. MAYE:

14       Q.   I'm asking about FAA regulations and

15   industry standards.

16              Are there any FAA regulations or industry

17   standards that state that if an adult is touching a

18   child in an inappropriate fashion that the pilot

19   should not take action if the adult and child are

20   related?

21              MR. McKAY:  Objection to the form.

22              THE WITNESS:  Once again, sir, the only

23   policies and procedures that are in place are for

24   reported sexual molestation or -- I misspoke.

25   Reported sexual misconduct.



1            MR. McKAY:  Brian, do you have a lot more?

2    I'm just seeing that it's the lunch hour.

3            MR. MAYE:  I do.

4            MR. McKAY:  You do.

5            Should we take a break for lunch?

6            MR. MAYE:  It's up to you guys.  Jaimie,

7    and, Captain Norton, and Delron, do you guys need a

8    lunch break?

9            THE WITNESS:  I'm -- I don't even know what

10   time it is.

11           THE VIDEOGRAPHER:  Counsel, can we go off

12   the record?

13           MR. MAYE:  Yes, please.

14           THE VIDEOGRAPHER:  Going off the record.

15   The time is 1:22 PM. We're off the record.

16           (Luncheon recess was taken at 11:22 PM.)

17           (The deposition was suspended at

18   11:45 a.m.)

19

20

21

22

23

24

25

MAGNA ⊙

Page 129

1    I have read the foregoing deposition transcript and
     by signing hereafter, approve same.

2

     Dated _____ .

3

4

5    _____
     (Signature of Deponent)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



Page 130

1    DEPOSITION OFFICER'S CERTIFICATE

2    STATE OF CALIFORNIA        )

                                )   ss.

3    COUNTY OF CONTRA COSTA  )

4         I, Jaimie Porter, hereby certify:

5         I am a duly qualified Certified Shorthand

6    Reporter, in the State of California, holder of

7    Certificate Number CSR 13751 issued by the Court

8    Reporters Board of California and which is in full

9    force and effect.  (Bus. & Prof. § 8016)

10        I am not financially interested in this action

11   and am not a relative or employee of any attorney of

12   the parties, or of any of the parties.  (Civ. Proc.

13   § 2025.320(a))

14        I am authorized to administer oaths or

15   affirmations pursuant to California Code of Civil

16   Procedure, Section 2093(b) and prior to being

17   examined, the deponent was first placed under oath

18   or affirmation by me.  (Civ. Proc. §§ 2025.320,

19   2025.540(a))

20        I am the deposition officer that

21   stenographically recorded the testimony in the

22   foregoing deposition and the foregoing transcript is

23   a true record of the testimony given.  (Civ. Proc. §

24   2025.540(a))

25        I have not, and shall not, offer or provide

**MAGNA**

1   any services or products to any party's attorney or

2   third party who is financing all or part of the

3   action without first offering same to all parties or

4   their attorneys attending the deposition and making

5   same available at the same time to all parties or

6   their attorneys.  (Civ. Proc. § 2025.320(b))

7       I shall not provide any service or product

8   consisting of the deposition officer's notations or

9   comments regarding the demeanor of any witness,

10  attorney, or party present at the deposition to any

11  party or any party's attorney or third party who is

12  financing all or part of the action, nor shall I

13  collect any personal identifying information about

14  the witness as a service or product to be provided

15  to any party or third party who is financing all or

16  part of the action.

17  (Civ. Proc. § 2025.320(c))

18

    Dated:_____

19

20

21  _____*Jaimie Porter*_____

22

23

24

25

**MAGNA**

1   DEPOSITION OFFICER'S CERTIFICATE
    (Civ. Proc. § 2025.520(e))
2
    STATE OF CALIFORNIA      )
3                            )  ss.
    COUNTY OF CONTRA COSTA )
4
5
        I, Jaimie Porter, hereby certify:
6
        I am the deposition officer that
7
    stenographically recorded the testimony in the
8
    foregoing deposition.
9
        Written notice pursuant to Code of Civil
10
    Procedure, Section 2025.520(a), having been sent,
11  the
12  deponent took the following action within the
13  allotted period with respect to the transcript of
    the
14
    deposition:
15
        (  ) In person, at the office of the
16  deposition officer, made the changes set forth on
    the
17
    original of the transcript.  (The parties attending
18
    the deposition have been notified of said changes.)
19
        (  ) Approved the transcript by signing it.
20
        (  ) Refused to approve the transcript by not
21
    signing it.
22
        (  ) By means of a signed letter, made the
23
    changes and approved or refused to approve the
24
    transcript as set forth therein.  (Said letter has
25
    been attached to the original transcript and copies
    been attached to the original transcript and copies

MAGNA

Page 133

1
        thereof mailed to all parties attending the
2
        deposition.)
3
             (  ) Failed to approve the transcript within
4
        the allotted time period.
5
        Dated _____
6
        _____
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



## A

**abject**
86:18 115:18 119:23
120:10 121:15
**able**
14:22 27:9 30:9
41:17 104:13
**above-entitled**
4:10
**absence**
71:15 89:24 120:8
**ACARS**
90:5
**accident**
6:24
**accurate**
14:23 47:15 68:25
**accuse**
56:25
**act**
36:10 46:12,15 80:14
87:15 91:20 105:15
115:18 117:24
118:25
**acted**
62:2
**acting**
46:14 69:15
**action**
4:10 5:12 60:21
62:19 63:11 69:11
73:4 78:2,18 80:2
113:20 126:15,24
127:19 130:10
131:3,12,16 132:12
**actions**
9:6 24:23 25:5
119:14
**actual**
80:18 127:6
**add**
24:25
**adding**
26:1
**addition**

94:25
**additional**
24:7
**address**
40:3
**addressing**
26:18,21 27:4,14
**adequate**
89:6
**adequately**
21:9
**Adler**
2:8 5:1
**administer**
130:14
**Administration**
34:5,25
**adult**
50:5 60:8,13 61:22
79:24,25 80:3,8
85:24,24 86:7,10,14
86:16 87:1,15 92:9
96:13 97:20 98:23
99:22 100:23 101:2
101:11,17,20
102:21 105:21
106:9,17,22,23
107:13 108:22
112:21 113:1
116:10 117:16
118:3,7,13 120:14
120:18,20 121:6
123:1 125:6 126:13
126:14,17,21,23
127:17,19
**adults**
51:6
**advocate**
36:11
**AD's**
10:22
**affection**
53:14
**affirmation**
130:18
**affirmations**

130:15
**afforded**
79:16
**age**
10:22 13:15 17:16,17
17:22 44:18,23
**agent**
10:22,24 11:3,6,14
11:16 12:3,12,13,24
13:1,4,10,21 14:3
14:10,19,24,25 15:4
15:5,16,16 16:6,11
16:13,14,20 17:1,6
17:10,16,21 18:3,4
**agents**
11:12,20 12:7 13:14
14:4,4 15:24 16:1
**agent's**
12:18 19:1
**agree**
5:7 11:7,8 17:4,8,12
17:20 18:21,24
21:22 26:20 27:3,17
27:19,20 35:13,17
35:22 43:9 44:11,25
45:16 50:15 58:2
67:4 77:22 83:25
84:5 122:19
**agreed**
43:15
**ahead**
18:10 21:4 60:10
65:11 93:13 110:2,6
110:6,13,14 122:20
**air**
117:5
**airborne**
48:24
**aircraft**
8:21 11:23 12:8
16:23 48:24
**airline**
8:19 11:9 28:9 29:1
31:22 32:2,11,19
72:21,25 95:2
**airlines**

1:6 2:7 4:21 6:23 7:1
9:5 13:2 14:17
28:20 30:7 32:23
63:20 75:20 76:13
93:10,15 95:4
112:21
**Airline's**
94:13 104:23
**airplanes**
43:22
**al**
1:3,6 4:21
**alarmed**
107:9 112:24 118:5
**alarming**
120:20
**allegation**
66:6
**alleged**
104:2,3 117:23
121:13,14
**allotted**
132:13 133:4
**allow**
72:23 73:9 75:5
**allowed**
17:18 111:9
**allowing**
10:23 17:22
**alongside**
22:13 25:23
**alter**
42:23
**alternate**
42:22,23
**alternative**
43:6,16
**amalgam**
79:12 92:1 102:23
**American's**
31:23 72:25
**amiss**
89:18
**analysis**
37:16
**and/or**



59:25 101:13
**announcement**
38:19 44:20 45:2,5
45:18 46:25
**announcements**
44:8,14 47:4
**answer**
12:19 14:1,7,22 15:2
15:8,11,12 18:21
20:14,14,15 22:1,15
23:14 24:24 26:9
27:9 28:4,6,12
29:22,23,24 30:5
31:19 35:10,12 37:3
45:15 61:6,20 63:13
66:25 74:17 75:6
77:9 78:10 79:15
82:14 85:17 94:21
95:11 97:8,10 100:3
100:9 108:6,9 112:3
113:15 115:25
118:16,23 126:2,3
**answered**
15:17 35:11 56:16
66:22 69:4 75:23
102:2
**answering**
20:11 74:4 110:23
**answers**
10:14 45:22 46:7
67:18 70:3 88:17
89:3,6 90:11 91:18
**appear**
34:9 87:25 118:20,22
**appearance**
5:15
**APPEARANCES**
2:1
**appeared**
4:7 58:6 92:10 113:6
**appears**
9:22 29:1 44:21
79:11 118:4,24
**Appendix**
7:8
**applicable**

4:1
**applies**
34:23 90:18 91:9,13
93:4
**apply**
15:3 93:6,10
**appreciate**
19:11 26:10 46:16,16
48:4 107:2 115:6
**approaching**
11:10 38:11
**appropriate**
97:1
**approve**
129:1 132:20,23
133:3
**approved**
27:18 35:14,24 36:5
36:7 132:19,23
**area**
8:16,20 95:21
**argue**
52:13,13
**argument**
19:18 104:18
**argumentative**
12:15 13:5,25 14:12
15:6,18 19:24 22:17
22:21 42:15 43:19
44:16 45:4 47:19
53:24 55:11 56:17
62:4,21 63:15 65:13
72:11 82:10
**arrange**
21:5
**arrive**
70:3
**ascertain**
9:5 10:22 13:15
17:16,21 59:13
**asked**
9:3,9 15:17 20:19
38:11 42:25 47:11
47:24 48:9 56:16
58:6,7 59:3,7,12
66:22 68:20 69:4

70:11 75:5 87:22
88:3,9 89:5 90:8
93:2 102:1 104:22
117:22
**asking**
12:25 13:18,19 19:22
28:13 29:6 33:5,15
33:21,23 35:21,21
37:1 39:14,23 45:23
46:7 48:16 51:6
56:13 61:18,20
62:11 65:10 66:3,19
67:23 74:4 76:24,25
88:5 90:5 92:19
95:24 109:6 110:12
110:15,19,22
111:18,20 112:18
112:19 113:4 117:5
125:17 127:14
**asleep**
38:14 39:2 42:10,21
43:3
**assess**
92:4
**assigned**
16:6 17:1
**assignments**
5:23
**assist**
9:25 10:3 24:8 36:10
**assistance**
104:4
**assume**
36:4 102:6,25
**assumed**
42:25
**Assumes**
13:22 65:6 72:10
**assuming**
47:2 86:19
**assumption**
15:1,21 16:17,21
47:7
**assumptions**
86:21
**ATP**

94:11
**attached**
132:25,25
**attempt**
41:1 98:4
**attempted**
58:21,24 92:8
**attempting**
79:18
**attendant**
22:7,10,12,19 23:25
24:2 31:7,8 41:3
47:17 50:2 51:2
53:1,9,13 54:3,15
58:3 59:8,23 60:12
60:14 61:22,24,25
62:7,16,18 66:13
70:1,6,10,12,12,15
71:18,25 72:1,2,3,5
72:17 73:2 75:12,16
75:17 77:2,3 78:4
78:17 79:4 80:2,3
80:13,14 81:6,8,17
81:19,20 82:6,22,24
83:3,9,10,16 84:1,5
84:7,11,14 85:6,11
85:21,23 86:6,9,10
87:1,3,18 88:20,25
91:3,3,8,19 92:7,16
92:19 93:19 96:13
96:15,22,24 97:11
97:19 98:21,23
99:23,25 100:13,22
100:25 101:10,16
101:22 102:6,20
103:20,22 104:1,6,7
104:9 105:21,24
106:8,11 107:9,9,11
107:19,25 108:14
108:19,20 112:23
112:25 113:11,16
114:21,22 115:14
116:8,15 117:8,9,12
117:15,19,21 118:2
118:9,12,23 119:6,7
119:10 120:13



121:6,8,20,22
122:23,24,25 123:3
123:19 124:15
125:5,8,12,13
127:11
**attendants**
8:23 9:13 22:3,13
23:3 40:10 41:5
44:1 47:14 48:13
49:16,21 52:4,18,20
66:10 69:15 70:7
72:6 77:24 79:10,17
87:12 89:23 90:16
90:24 103:4,5 105:9
105:14 124:6
**attendant's**
30:25 62:24 63:2
85:17 119:13
121:17 122:2
**attendant-pilot**
23:6
**attending**
131:4 132:17 133:1
**attention**
44:20 47:4 79:14
**attorney**
2:3,9 5:16 74:11,13
111:7,8 130:11
131:1,10,11
**attorneys**
131:4,6
**Audio**
5:6
**authentic**
56:15
**authority**
64:8 77:11
**authorized**
130:14
**available**
131:5
**AVENUE**
2:3
**aviation**
6:18,19,24 18:7 25:1
25:19 34:5,21,25

55:23 95:8
**avoiding**
73:21
**awake**
41:17,20
**aware**
27:1,16 28:1,13 29:4
29:15 30:17 32:22
35:4 36:9 38:18,22
41:10 44:7,13 45:11
45:12,17 46:23,24
85:6 119:9 126:11
**A.D**
17:22 38:11,13,14,18
38:22 41:9 42:24
44:7,12,18 45:17
46:23 47:14 48:7,13
48:15,17,21,22 58:5
60:6 70:17 77:4,21
**a.m**
38:6,6 58:16,16
84:22,22 128:18

---
**B**
---
**B**
7:8 40:22
**bachelor's**
6:16
**back**
18:15 27:22 38:7
43:21 52:13 58:17
59:14 62:10 76:5,6
84:24 86:15 88:22
89:17 90:19 91:23
92:3,8 97:24 98:3
99:6 101:9,12 105:7
105:19,25 106:12
112:17,17 124:16
**background**
6:15
**bad**
104:25,25
**based**
25:15 37:16 44:14
47:2 50:16 51:11
56:11 58:2 61:6

71:5 76:1,12,16
77:5 94:4,15,18
95:20 104:21 116:3
117:7 123:20,21
124:22 125:17
**basic**
11:21 12:18,23 13:13
**basing**
95:23
**basis**
11:10 55:7,13
**baton**
74:7
**beginning**
5:15 47:20 83:1
84:23
**begins**
4:19 81:15
**behalf**
81:21 90:25
**behavior**
87:24 101:12 117:22
121:10
**believe**
7:7,8 12:3,4,16 13:19
14:9 15:12 16:13
22:22 25:12 39:18
44:5,8,11 46:15
54:9 55:19 56:14
58:23,25 59:3,11,14
60:24 61:4 77:18
90:3,17 94:9 98:22
103:4 107:25
113:18 114:23
121:11 126:5
**believes**
91:19 103:21 113:13
113:16
**benchmark**
30:3
**benign**
47:9 49:24 50:24
51:8,15 52:9,15,16
52:23
**best**
14:7 46:19 113:21

114:19 115:3
118:22 119:25
121:24 126:2
**better**
12:19 69:14 118:15
**beverage**
39:1 41:18 48:1,1,25
52:16
**beverages**
38:16,21 41:10,25
44:6,6,13 45:17
**biased**
37:1,4
**big**
45:13 62:22 95:10
**bit**
118:17
**bite**
67:1,3,24 73:20
**bless**
71:22
**bmaye@amm-law....**
2:11
**board**
12:7 108:5 130:8
**boarded**
16:24
**boarding**
11:22 14:5 17:18
18:4 19:2 59:15
**Bond**
47:10,17 49:25 50:25
51:7,10
**bottom**
21:10 80:24
**brain**
45:21
**break**
7:16 8:13 15:20
23:20 58:10 65:22
84:17 109:9 111:17
111:21 125:25
126:7 128:5,8
**Brian**
2:9 5:17 20:5,6,9,19
33:18 45:20 57:20



63:17 64:18,21
66:23 73:9 75:8
84:16 95:25 99:2
104:18 115:8 128:1
**brief**
6:14 47:9 49:24
50:24 51:8,15 52:9
52:15,16,24
**bright**
44:21 70:11
**Bright-Sakurada**
50:3 51:3 54:16
**Bright-Sakurada's**
54:3
**bringing**
104:22
**broad**
15:22 27:8 63:8
**broadly**
14:18 15:1,25 40:3,7
**broke**
10:2
**bulk**
95:3,6
**bunch**
30:23 88:2 123:14
**burn**
13:10
**Bus**
130:9
**bust**
33:24

───── C ─────

**C**
40:23
**cabin**
38:18 44:8,14
**California**
2:4 4:3,7 130:2,6,8
130:15 132:2
**call**
15:20 20:5,7,20,22
20:25 21:2,3,6 47:5
68:6 69:21 73:13
**called**

4:9
**camera**
5:3
**Canada**
34:22
**capable**
44:19 73:5
**captain**
1:12 4:8,20 6:7,22
8:19 9:14,21 28:23
29:2 40:5,18 50:3
51:3,25 52:18 58:20
58:21,24 59:18 60:5
60:11 61:21 64:4,5
64:8,11,12,24 66:8
66:11 70:11,14
71:15,21,24 77:1,1
77:20,24 78:7,12,16
81:14,14 85:18
86:25 92:15 94:11
95:16,18 98:21
101:16 103:24
104:9 105:20
107:14 112:20
113:2 114:11
124:13,23 125:18
125:24 126:8 128:7
**care**
9:4 97:16
**career**
6:25 22:14 95:5
**carefully**
19:4
**carrier**
28:10
**carriers**
34:24 35:2,5
**case**
4:23 5:21 7:4,19,22
7:25 8:8,11,17 9:1,8
9:11,21 23:17,19
24:23 25:8 36:14,19
37:22 40:5,18,23
51:12,16 64:16
69:24 76:3 82:2
85:20 86:4 87:24

88:6 92:23 94:5,20
116:15
**cases**
23:21,21
**category**
15:22
**caused**
53:24
**certain**
105:9
**certainly**
8:5 23:3 43:25 44:18
60:7 62:6,8 70:19
90:7 101:12 106:2
123:2 125:20
**Certificate**
130:1,7 132:1
**Certified**
4:6,12 38:3 69:2 84:9
106:3 119:2 130:5
**certify**
130:4 132:5
**cetera**
104:4 122:8
**chain**
64:9
**challenge**
55:7,13,16
**challenging**
54:2,7
**change**
5:22 84:17 85:10,16
**changed**
52:14 99:6,6 117:5
**changes**
32:25 118:17 132:16
132:18,23
**characterization**
51:14
**characterize**
51:6 56:18
**characterizing**
50:12 52:23 87:14
**characters**
5:21
**charge**

40:2,8 52:3 77:13,25
78:18 124:6
**charges**
39:5
**chart**
14:21 15:23
**chattering**
111:12
**checklist**
66:18
**Chelsie**
50:2 51:2 59:4,8
70:11 81:13
**Chicago**
2:10
**child**
79:24 80:1,4,8 86:8
86:12,14,15,16 87:2
87:15,25 89:4 91:24
92:4,10 93:23 96:12
96:15 97:2,21 98:5
98:23 99:22 100:24
101:2,13,18,20,22
102:21 103:11
105:22 106:10,16
106:18,18,23 107:8
107:10,13 108:1,21
112:23 113:1,6,17
116:10 117:8,10,13
117:15 118:4,4,6,11
118:13,20,22 119:7
119:8,8,9,11 120:15
120:18,21 121:7,21
121:22 122:3,25
123:12 125:10,13
126:13,14,23,23
127:18,19
**childhood**
54:22
**children**
43:23
**child's**
60:13 61:23 85:25
86:11 112:24 113:8
**choose**
79:13



circle
52:5
circumstance
107:17
cite
18:8
Civ
130:12,18,23 131:6
131:17 132:1
Civil
4:2,10,13 130:15
132:9
clarification
69:2 84:9 85:13
106:3 119:2
clarified
88:3
clarify
16:19 48:3 70:3
92:14
clarifying
85:15
clarity
10:13
Clark
2:9
clean
23:13
clear
45:14 57:3 79:9
115:13
Clearly
26:24
closely
120:19 121:6
closest
66:16
clothed
106:16 107:8 112:23
cockpit
25:24 56:24 58:7
91:16 93:20 108:3
116:16,25
Code
4:2,10,13 130:15
132:9

colleagues
123:11
collect
131:13
combination
76:8
come
43:24 52:5 58:7
93:20 103:10,12
108:3 116:15 122:4
comes
10:9 99:25 100:25
107:11 112:25
coming
68:7 102:10 107:19
116:25
command
8:21,22 11:20 12:6,9
39:25 40:5,6 51:25
52:18 62:23 63:9
72:25 76:10 77:10
77:11 95:2 120:5
commencing
4:4
comment
26:11 48:4
commentary
26:1 52:25 63:18
comments
131:9
commercial
8:21 11:9 25:2,17
94:11
committed
82:19 83:25
committing
63:23 80:1,12 126:22
common
74:25
commonsense
92:3
communicated
40:12
communicates
92:16
communication

40:13,24 41:1,7,15
47:14,21 48:3,6,13
48:14,17,20,23,25
49:16 52:9,16
company
16:5,9,25
comparatively
30:5
compare
30:9 32:8,17,18,20
33:15
compared
30:18 31:16
comparing
27:25
competence
122:22 123:19
125:12
complete
53:19 74:17
completely
56:2
complied
9:10
component
25:10
comport
67:2
Comprehensively
95:5
comprised
7:9
computer-based
28:22
conceive
54:20
concern
125:9
concerned
88:17 91:7 93:20
101:19 105:23
112:24 118:5,11
120:16 125:8
concerning
88:13 96:18 98:25
99:3 101:1

concerns
62:25 63:3 88:13
91:6 92:21 97:12
98:11
conclusion
76:22
conclusions
10:18 18:11,17,18
19:5,8 37:15
conduct
33:19 40:1,7,10
52:19 77:11 101:8
109:13
conducting
86:13 104:10
conflicting
41:4
confused
97:3 98:13
connected
83:14
connection
5:4
consider
44:2 56:12
considered
14:24 15:5,16 25:4
considering
111:23
consistent
9:2 27:21 32:1,24
34:8 71:10
consisting
131:8
consulting
103:24 104:9
contact
99:7,10
contacting
111:23
contained
7:6,10,12
content
10:6,8 35:23 36:4,6
context
34:13 41:14 47:20



**contextual**
40:15
**continue**
5:6 21:6,7 52:5 73:23
  92:12 122:20 127:4
**continuing**
33:9
**CONTRA**
130:3 132:3
**contracted**
16:21
**conversation**
59:16 70:2 98:4
**convinced**
88:16,21 96:17,21
  97:16 98:24 99:24
  100:5,10,12
**cooperation**
52:10
**coordinator**
8:13
**copies**
132:25,25
**correct**
10:25 11:1,4,6 19:13
  19:14 22:7,8 25:21
  34:8 37:19,22 45:9
  70:18 83:4,5 84:3
  84:12,14 116:11
**correction**
5:20
**correspondence**
7:18
**cost**
38:17,21 41:10 44:6
  44:13 45:17 46:23
  46:24 48:1
**COSTA**
130:3 132:3
**counsel**
5:14,24 18:6 26:4,8
  74:3 84:15,16
  128:11
**counsel's**
21:25
**COUNTY**

130:3 132:3
**couple**
7:15
**course**
34:18 36:7 40:14
  42:16 61:17
**court**
1:1 4:3,12,22 5:9,25
  36:10 76:5 111:23
  130:7
**covered**
18:13 106:19
**covering**
125:21
**create**
9:23 16:2
**credible**
43:11,16
**crew**
9:5 23:3 40:25 48:23
**cross-talk**
20:10,13,17 21:1
  46:2 54:8 67:12,20
  68:24 73:12,19
  106:14 108:17
  109:4 110:1,3 112:1
  112:8 115:10
**crotch**
85:25 86:11
**CSR**
1:20 130:7
**current**
6:21
**currently**
95:1
**customer**
14:11,14,17,20,25
  15:5,16,21,25
**cut**
75:2 122:14,16

_____

**D**

**D**
2:3
**daily**
11:10

**danger**
113:18
**data**
58:22
**Dated**
129:2 131:18 133:5
**day**
4:4 11:11 13:15
  21:18,20 25:25 67:3
  114:16
**days**
7:15
**dead**
121:4
**deadheading**
43:22
**deal**
8:24
**dealing**
28:23
**decades**
124:6 126:8
**decided**
41:20
**deciding**
119:11
**decision**
41:21 63:11 64:15
  73:5 78:1
**decisions**
9:13
**decision-making**
24:9
**deck**
9:14
**declare**
81:21 90:25
**deemed**
54:12
**Defendant**
2:7
**defendants**
1:7 4:9 5:17
**define**
33:13
**defines**

99:9
**defining**
33:12
**definition**
27:24
**definitions**
33:1
**delineated**
19:4 93:17
**Delron**
2:13 5:10 128:7
**Delta's**
31:23
**DelVecchio**
1:3 4:21 48:22 58:5
  60:6 70:17 77:3,21
**DelVecchias**
5:18 49:25 51:1,8,11
  52:11
**demeanor**
131:9
**demonstrated**
87:22
**demonstrating**
55:15
**departing**
114:17
**departure**
38:19 47:21 48:7,18
  49:17
**depending**
123:6
**depends**
5:3 95:7
**deponent**
67:9 104:25 110:23
  111:4 129:5 130:17
  132:12
**deposition**
1:11 4:20,25 7:24
  21:22 28:24 33:19
  55:15 67:5,7 76:16
  109:14 110:11
  128:17 129:1 130:1
  130:20,22 131:4,8
  131:10 132:1,6,8,14



132:16,18 133:2
**depositions**
110:20,21
**described**
53:14 56:2 87:22
**describes**
96:22 98:23
**description**
56:11 92:20
**descriptions**
63:3
**Despite**
47:8 49:23 50:24
**detail**
105:17
**determinations**
37:8,9
**determine**
93:4
**determines**
107:10
**develop**
109:2
**developed**
44:1
**dictate**
126:12,17,21
**dictates**
79:1
**different**
31:19 63:14 78:10
79:12 108:24
123:14
**differently**
50:14
**difficult**
93:25 97:6
**direct**
16:19 62:17 75:17
97:14 98:9 102:7
105:16 106:11
107:23 108:1
116:16 117:14
118:12 121:21
122:25
**directed**

59:14 70:1
**directly**
53:17 63:7 101:12
113:16 115:15
121:9 122:3
**directs**
64:1 69:8 72:5
**discern**
53:19 55:3
**disclosed**
13:24
**discomfort**
88:24
**disconnect**
51:23
**discovery**
37:2 56:1 60:25
**discuss**
12:23 125:23
**discussing**
63:4
**discussion**
65:25 93:21 123:5,5
**dispatch**
25:9,13 70:16 90:5
90:13
**dispatcher**
24:6,11,14,19,23
25:1,3,4,18,20
59:12
**dispatchers**
25:22
**dispatching**
25:17
**disruptive**
53:23
**distress**
88:1 113:6 115:22
116:18 118:5,21,22
118:24 122:4
**distressed**
92:10
**district**
1:1,2 4:22,22 16:20
**disturbed**
124:15

**division**
14:20
**DJA**
5:21
**doing**
33:3 46:16 57:2
69:24 91:24 107:3,6
110:20 112:9
114:23 123:16
**door**
124:17
**dragging**
73:17
**drill**
88:23 124:10
**drink**
38:12
**drinks**
39:5
**due**
123:15
**duly**
130:5
**duration**
40:2
**duties**
11:17 12:24 13:3
17:6,10 19:2
**duty**
36:9,12
**dynamic**
64:10

---

**E**

**earlier**
47:11 48:9 94:3,22
**ears**
113:12
**easier**
59:5
**easy**
70:24 127:3
**educate**
14:5
**educational**
6:15

**effect**
130:9
**effected**
35:19
**effort**
53:19 56:4 114:20
**either**
45:10 66:16 127:10
**either/or**
78:17
**element**
25:4
**elements**
92:23
**email**
2:5,11 7:18 74:22
**emails**
110:18
**emotional**
124:9
**employed**
6:23 10:24 16:5,13
16:25 22:6 24:10
**employee**
16:19,20 130:11
**employees**
40:1,7
**employer**
93:9 96:7
**employment**
16:2
**encounter**
47:16
**encountered**
85:19 86:1 112:20
**encounters**
47:9 49:24 50:25
51:7,10,15 52:23
**engage**
121:13
**engineering**
6:17
**engines**
114:17
**enlist**
102:9



**ensure**
66:8 69:14,23 71:8
    71:17 73:1 78:12
**entail**
99:12
**entails**
97:5
**entire**
28:22 29:19,21,23
    47:9 49:24 54:22
**entirely**
50:24
**entitled**
105:15
**envision**
113:25
**essentially**
104:13
**establish**
48:2,6,12 49:15
**established**
99:8
**establishes**
34:4 80:3 100:16
**et**
1:3,6 4:21 104:4
    122:8
**European**
34:20
**event**
69:18 124:11
**events**
64:10,10
**everybody**
110:24
**evidence**
13:23 37:4 56:1
    61:16 65:7 72:10
    81:11 102:25
**exact**
94:21,21
**exactly**
15:23 17:25 48:19
    53:22
**Examination**
3:3 6:5

**examined**
4:16 130:17
**exchange**
47:12
**exclusively**
23:6,16 24:17,19,20
**excuse**
26:22 86:4 106:8
    109:15
**exercise**
9:4
**Exhibit**
3:11 9:17,18
**EXHIBITS**
3:9
**exists**
25:7
**exit**
10:23 13:16 17:15,18
    17:22 52:11
**expectations**
110:25
**experience**
55:14 76:9 94:6,10
    94:25 95:8,9,12,15
    95:16,21,23 104:16
    114:5 123:22
    124:23 125:18,24
    125:25 126:8
**experiences**
47:3
**expert**
3:11 6:24 9:18 11:16
    13:6,20,24,24 14:10
    23:1,5,7,12,16,24
    24:18 25:9,10,13
    31:8 33:14 36:10
    55:22,23 104:15
**expertise**
8:16,20 11:5
**experts**
12:3
**explain**
69:12
**explained**
21:10 97:14 116:8

124:21 125:9
**explains**
96:25 99:25 107:12
**explanation**
41:2,6 42:20 43:24
**explore**
95:22 104:14
**expose**
96:5
**exposed**
106:25 107:1
**extend**
127:9
**extended**
20:23 86:8
**extends**
40:6
**extensive**
22:13 76:9
**extent**
96:23 105:14 125:21
**eyes**
113:12

## F

**FAA**
26:23 27:18 35:14,25
    36:6 76:17,20 77:6
    126:11,16,20 127:8
    127:14,16
**FAA-approved**
35:17
**face**
17:14 54:11,12,22,23
    56:8,9 60:13 61:3
    61:23 86:7 87:1
    91:4 92:18 96:14
    97:5,20 99:3,12
    102:21 103:9
    124:18,25
**facial**
54:19 61:1,16 63:4
    87:13 89:12 93:21
    94:2 107:20
**fact**
38:17 39:4 52:8

58:22 59:10 71:18
    117:18,23
**factors**
55:22,22
**facts**
13:22 36:14,19 37:7
    37:8 50:15,16 58:23
    65:6 72:10 76:3
    82:2 94:5,19 102:25
**failed**
10:22 17:16,21 22:4
    24:7 26:16 49:21
    59:20 133:3
**fair**
15:15 25:6 104:16,20
    109:11,17
**fairest**
77:8
**fairly**
42:19
**fairness**
71:9 81:9
**faith**
56:25
**fall**
15:24 90:3
**fallen**
38:13
**falls**
103:8
**familial**
72:18
**familiar**
14:16
**families**
43:22
**family**
40:11,13,25 48:21
    49:22 64:15 69:9
    91:23 98:10
**far**
45:21 76:23 77:10
**fashion**
79:25 127:18
**father**
38:13,24,25 39:2



MAGNA ❯

41:16,19 42:9,20
43:1,2 53:14,25
54:10,11
**fault**
52:14
**favor**
36:15,21
**federal**
4:3,11 18:7 25:1,19
34:5,8,25
**feel**
31:24 87:20,25 88:19
**feeling**
88:20,25
**felt**
59:10 108:1
**file**
7:3,6,9,12 8:1
**filed**
4:22
**final**
77:10
**financially**
5:12 130:10
**financing**
131:2,12,15
**find**
16:1 23:20 38:2
43:10,16 58:22 62:7
**fine**
6:10 10:16 61:18
73:15 91:1 102:17
102:19 103:17
**finger**
117:2,3,4
**finish**
72:24 74:9 75:6
97:18
**finished**
73:22
**first**
23:11 28:16 45:10
50:4 51:4 64:3
66:15 69:25 90:5
91:16 101:24 102:5
102:10 104:5

107:18 114:21
115:1 117:20
118:19 130:17
131:3
**five-minute**
58:10
**flat**
103:8
**flight**
8:23 9:13,14 16:6,16
17:2 22:3,6,10,12
22:13,19 23:3,3,5
23:24 24:2,6 25:2,3
30:24,25 31:6,7,15
32:6 40:3,10,14
41:3,5 44:1 45:10
45:11 47:4,14,17
48:13 49:16,20 50:2
51:2 52:4,17,19
53:1,8,13,25 54:3
54:15 58:3 59:7,23
60:12,12,14 61:21
61:22,24,25 62:7,16
62:17,24 63:2 66:9
66:12 68:14 69:15
69:17,19,21 70:1,5
70:7,9,12,12,15
71:13,17,22,24,25
72:1,2,3,5,6,17 73:2
75:12,16,17 77:2,2
77:11,24 78:4,16
79:3,10,17 80:2,3
80:13,14 81:5,8,16
81:19,20 82:5,21,24
83:3,9,10,16 84:1,4
84:7,11,14 85:6,11
85:16,21,23,23 86:6
86:9,10 87:1,3,12
87:17 88:20,24
89:23,25 90:16,24
91:2,3,7,19 92:7,16
92:18,18 93:15,19
95:9 96:13,15,22,24
97:11,19 98:21,23
99:23,24 100:13,22
100:24 101:10,16

101:22 102:6,20
103:4,20,22 104:1,6
104:7,9 105:9,14,20
105:20,21,24 106:8
106:11 107:8,9,11
107:19,25 108:14
108:19,20 109:2
112:23,25 113:2,11
113:16 114:21,22
115:14 116:7,15
117:8,9,12,15,19,21
118:2,9,12,23 119:6
119:7,10,12 120:13
121:6,8,16,20,21
122:2,23,24,25
123:3,17,19 124:6
124:15 125:5,7,12
125:13 127:11
**flights**
25:17 38:17,21 41:11
45:12 47:3
**Florida**
6:19
**fluid**
119:23
**folks**
53:23
**follow**
22:4 49:21 52:2
79:18
**followed**
60:3 66:10 69:24
71:9 73:3 77:25
78:20 79:21 81:12
85:23 116:19,24
**following**
36:25 52:20 71:18
79:2,11 132:12
**follows**
4:16 78:17
**FOM**
31:1,10 68:14
**force**
130:9
**foregoing**
129:1 130:22,22

132:8
**Forensic**
6:23
**Forget**
29:13
**form**
11:25 12:14 23:9
27:7 31:12 32:10
35:7 36:1,22 39:17
40:19 42:1,14 43:4
43:13,18 44:15 45:3
45:19 47:18 50:18
53:3,11 54:6 55:10
57:6 60:18,22 61:11
62:3,20 65:7,12,18
65:24 68:22 69:3
72:9 76:18 77:7
79:6 80:16 82:9
83:13 92:22 94:7
100:8,18 106:5
113:3 114:8 118:14
119:21 120:23
121:1,23 123:23
124:24 125:15,19
127:1,21
**formal**
26:17 28:18 59:9
**formally**
11:13
**forth**
132:16,24
**forward**
89:8,20
**foundation**
40:10 41:14 47:13
48:12
**foundational**
40:14
**four**
8:15 78:11
**Francisco**
2:4
**frankly**
79:20 93:25
**free**
41:25 42:11,24,25



43:2
**front**
93:16
**Frontier**
1:6 2:7 4:21 9:5,10
10:21 13:6,23 16:11
16:14,20,22,23
17:21 26:16 35:14
38:17,21 39:5 41:10
59:23 72:21 78:3,6
78:13 79:3 80:5,8
93:15 96:4 98:14
**Frontier's**
10:9 22:4 27:17,20
28:2,14 29:6,16
34:7 35:22 71:2,6,7
72:25 75:21 76:2
78:23,23,25 79:23
80:10,18 81:1,17,25
94:4,19
**full**
6:11 46:6 52:5 130:8
**full-time**
6:22 8:19 95:2
**further**
21:12 65:24 90:13
104:10 105:17
123:5
**furthermore**
93:17

_____ G _____

**gage**
18:3
**garner**
88:25
**gate**
10:22,24 11:3,6,12
11:14,16,20 12:3,7
12:12,13,17,24 13:1
13:4,9,14,21 14:3,4
14:4,10,19,24 15:4
15:15,24 16:1,5,11
16:13,19,25 17:6,10
17:16,21 18:4 19:1
**gather**

56:4 58:22,24 62:6
63:1,10 64:13 73:4
87:21 90:6 101:5,14
107:21 124:14,20
**gathering**
73:5
**general**
77:18 95:8 105:13
**generalized**
63:8
**genital**
115:19
**genitals**
99:10 100:23 101:18
105:22 106:10,24
107:24 112:22
118:4 120:15,20
121:7 125:7
**getting**
90:22 92:20 98:12
115:7
**give**
6:14 9:9 14:22 67:1
73:20 77:8 90:13
118:15
**given**
33:10 78:11 96:10
108:25 119:20
120:1 130:23
**gives**
18:8
**giving**
17:17
**go**
5:7 18:10,15 21:4,11
47:16 59:14 60:10
62:10 65:11 69:22
71:20 76:21 80:21
86:23 89:8,20 91:23
92:3 93:9,13 97:14
97:24 98:3 101:9,12
105:7,17,24 106:11
110:2,5,6,13,14
118:16 119:13
122:20 123:15
126:6 128:11

**going**
4:18 8:14 20:20,22
21:8,18 23:22 25:25
30:12 38:4 45:21
50:20 57:11 58:4,14
59:4 63:9,11 64:3
66:24 67:1,4,13,25
73:23 78:2 80:25
81:13 86:17,18 87:7
87:23 89:1,2 91:15
93:9,11 95:10 97:12
97:15,15,18 98:8,15
100:5 103:2,9,10,12
103:13 104:11
105:17 109:8,10,16
113:14,18 118:24
119:19 121:4 124:4
128:14
**good**
4:17 6:7,8 56:25
92:20 103:16
111:24 120:1
**good-faith**
55:8 56:15
**Great**
21:21 24:5
**guess**
34:15 39:9 51:22
61:2 65:21,21 66:16
66:21 76:21 81:24
88:15 91:14 106:13
**guidance**
22:4 24:8 26:17,21
27:4 28:19 29:2
59:24 60:2 108:20
**guidelines**
126:12,20
**gut**
88:19
**guys**
128:6,7

_____ H _____

**half**
77:23
**halt**

36:5
**hand**
85:25 86:11 125:22
**handwritten**
7:21
**hand-in-hand**
25:18
**happen**
102:4 108:11 114:15
114:18 124:12
**happened**
55:5 56:7 57:11
64:16 69:25 92:13
117:1 118:9 123:17
124:10
**happening**
116:20 117:23
**happy**
7:15 15:19
**harassing**
20:6 21:9 33:20 62:5
62:21 63:16 65:14
67:8,10
**hard**
36:24 125:25
**head**
38:14 54:15,18 55:1
**heard**
5:5 44:22 45:1,7,18
46:25 106:10
**hearing**
44:14,19
**help**
23:23 24:4,5 32:3
55:24 80:22 90:13
102:9 103:14
**helps**
32:4
**Hi**
65:16
**highlighted**
39:14 49:8,13 50:23
52:7
**hold**
54:10 70:19
**holder**



130:6
**holding**
23:23
**honest**
55:8 56:14
**honestly**
114:20 120:9 122:1
**hopefully**
93:11
**hour**
4:5 128:2
**hours**
8:10 21:23 73:22
**human**
26:19,22 27:5,15
  55:22,22 59:1,25
  66:18 68:20 78:14
  78:23 90:2
**hybrid**
79:12
**hyphenated**
59:5
**hypothetical**
66:10 83:1,15 85:5
  86:18,21 87:20 88:4
  89:18 90:15 91:2
  92:11,16 94:1 96:11
  96:21 98:18 99:18
  100:4,16,19,21,22
  100:24 102:3 103:8
  103:16,17 104:22
  104:22,25 105:7,19
  106:15,16,20,22
  108:5,7,13 112:17
  113:22 114:4,5,7,20
  115:25 116:3,6,14
  116:22 117:6,7,11
  117:17,20 118:17
  118:21 119:20
  120:10 121:15
  123:7,14 124:22
  125:1,4,4,14 126:5
  126:7,9
**Hypothetically**
83:24
**hypotheticals**

114:16

_____

## I

**ICAO**
27:10 28:9 30:15
  34:22
**idea**
111:25
**identification**
9:18
**identified**
30:1
**identify**
30:13 33:11 34:3
**identifying**
131:13
**Illinois**
2:10
**imagine**
42:21 62:8 66:16
  97:6
**immediate**
103:7
**immediately**
83:12 84:8,12 101:21
  103:22 104:7
  117:15 121:22
  125:10
**imminent**
123:11,12
**impact**
85:10
**impactful**
64:14
**impossible**
28:11 99:16
**impressions**
46:6
**improper**
99:16 100:19
**inappropriate**
50:5 51:5 53:10,15
  53:22 54:4,12,21
  56:3,10,12 79:25
  85:22 87:2 92:17
  127:18

**inappropriately**
96:14
**incident**
6:24 9:15 84:13
**include**
80:25
**included**
14:19 51:20
**including**
39:24 122:6
**incongruent**
56:2
**inconsistent**
15:7,18 28:2,15
  29:17 30:2
**incorporated**
10:11 69:17
**incredibly**
52:15
**INDEX**
3:1
**individual**
17:17
**individuals**
62:18
**industry**
9:6 17:5,9,14 18:2,22
  19:1,12,16,19,20
  20:3 27:6,10,12,21
  27:22,24 28:1,7,8
  28:14 29:5,15 30:2
  30:4,11,14,17,20
  31:17,21 32:8 33:7
  33:9,16 34:3,4,10
  35:4 77:5,17 103:5
  126:12,16,20
  127:15,16
**infers**
121:7
**information**
18:19 24:7 55:4 56:4
  62:7 63:2,10 64:14
  73:4 85:9,16 87:21
  88:25 89:24 90:6,13
  93:8 97:15,25 98:1
  98:8 100:12 101:5,6

101:14 107:21
  120:2 124:14,20
  131:13
**informed**
116:21
**inherent**
12:6
**initial**
124:25
**initially**
41:3
**initiate**
59:15 62:11 70:2
  98:4
**input**
107:2
**inquire**
63:21 64:25 65:3
  66:4 68:18 69:8
  72:17 75:13,17 77:3
  78:4,7 81:6 82:6,22
  84:2
**inquired**
60:5 70:16
**inquires**
80:14 89:17
**inquiring**
13:7 77:20
**inquiry**
104:10
**inserting**
92:23
**inside**
45:21 53:13
**insist**
20:21
**Institute**
6:19
**instruct**
101:10
**instructed**
81:14
**instructor**
95:9
**instructs**
69:14,21



**insuring**
52:3 77:24
**integrity**
53:1
**intent**
53:16
**interact**
11:11 43:22
**interacted**
53:18
**interacting**
98:10
**interaction**
23:2 48:22 53:16
**interactions**
8:23 124:8
**interested**
5:13 130:10
**interesting**
43:12
**Internet**
5:4
**interpret**
120:7
**interpretation**
36:14,19 50:15,16
  51:9 71:6 76:2
**interrupt**
74:3 99:2
**interrupted**
69:2 84:9 106:3
  119:2
**interrupting**
112:11,14
**interruption**
38:3
**intervene**
103:5,11,13 104:2
**intervened**
117:22 123:13
**intervening**
108:4 116:18
**investigation**
86:13
**involved**
25:3 60:16 62:1,18

63:4 65:1,2 66:5,5
68:19 69:9 72:4,7
75:14,14,18 78:8
79:4 80:4,15 81:7
82:7,23 83:10 85:7
85:9 106:1
**involving**
99:10
**in-flight**
23:1,5,7,12,13,17,22
  23:24
**issue**
24:23 52:17
**issued**
130:7
**issues**
12:12 14:10 23:1,8
  23:13,17,22 24:19
  25:9,13 39:6,8,11
  39:16,20,23 40:4,9
  41:15 48:11 50:8
  51:16,21 52:6,22
  59:3 106:19
**item**
66:15
**i.e**
23:24 52:4 63:3

---
**J**
**Jaimie**
1:20 4:5 5:9 76:6
  85:1 128:6 130:4
  132:5
**jeopardy**
103:12
**job**
1:23 107:3,6 123:16
  124:12
**John**
2:3 5:18 20:8,12
  26:10,10,14 45:24
  46:9 47:22 57:19
  65:11,15 67:16
  73:10,13 74:12,15
  74:18 75:7 99:5,5
  107:1 109:21 110:2

110:6 112:6,6
122:16
**johndmckayatty@...**
2:5
**joint**
24:25 25:16
**judge**
5:22 20:6,7,20,22
  21:7 26:13 73:14
  109:9
**judgment**
122:2,6 126:9
**jumbling**
23:10
**jump**
25:24 62:22
**jumping**
33:20 81:9
**juncture**
89:14
**June**
7:2
**justified**
98:11

---
**K**
**keep**
26:1 45:22 46:8,17
  57:11 67:23 68:12
  109:22
**kind**
35:6 53:24 87:4,16
  96:25
**KJD-DJA**
1:4
**know**
7:16 8:14 10:14 12:2
  12:17,22 13:7 14:2
  14:3,6,13,23,24
  15:4,15 16:5,9,25
  20:15 27:23 28:7,10
  29:11 30:3 31:20,21
  31:22,23,25 32:14
  32:25 33:4 36:3,3
  42:11 44:17,22,22
  45:13 50:10 55:8,24

56:10 58:8 63:6
66:12 79:15 91:15
91:17 93:19 99:10
99:11 100:11
102:11,12,15
107:16 109:20
114:3 119:22
121:11 123:16
124:3 125:12 126:2
128:9
**knowledge**
12:4 30:5 35:20
  74:25

---
**L**
**lack**
40:12 53:19 69:13
  122:2
**laid**
19:9
**lap**
106:17 113:8
**large**
77:14
**latest**
118:21
**law**
2:3,3,9 99:9
**laying**
40:9,11 41:14
**lead**
66:18
**leap**
97:21
**learn**
13:12 121:20
**learned**
86:13,16,25 87:11,17
  126:18,23
**learns**
83:9
**leeway**
92:3
**Legal**
5:10,11
**legitimate**



**100:**6
**letter**
132:22,24
**let's**
20:25 21:2,3 30:18
48:3 80:21 100:21
102:25 106:4
115:13 121:2
**level**
88:24
**liberty**
104:24
**life**
55:14
**limited**
65:23
**line**
30:12 33:1 89:7
**lines**
59:18
**listed**
7:8,11,12
**listen**
62:24 97:11,19
108:13,15 113:12
**listened**
45:7
**little**
10:2 32:4 58:9 83:22
114:1 118:17
**LLC**
2:3
**LLP**
2:8
**logical**
60:7 91:22
**long**
25:25 30:12 87:23
113:5 121:11 122:7
123:9
**look**
14:21 15:22 38:24
41:17 65:22,24
69:22
**looked**
38:13,23 43:1 54:19

**looking**
34:14 101:7 108:19
**looks**
89:4,11
**lost**
83:22
**lot**
40:22 49:10 106:19
111:25 120:1 127:2
128:1
**low-cost**
28:10
**lump**
95:10
**lunch**
128:2,5,8
**Luncheon**
128:16
**luxury**
88:21 120:7 124:16
124:18

—————————
**M**
**Magna**
5:10,11
**mailed**
133:1
**maintain**
7:3
**major**
28:9,9 31:22 32:2,23
**making**
37:8 52:24 64:14
87:2,24 99:15
110:16 131:4
**man**
44:21
**manager**
14:11,14
**manner**
60:14 61:2,23 87:2
106:24 112:22
**manual**
27:18,21 28:2,15,17
29:7,12,16,18,19,20
29:21,24,25 30:6,10

30:19,25 31:1,6,7,9
31:14,15 32:1,5,6
34:7 53:21 68:5,9
68:13,14,18 69:7,13
69:16,18,21,22 70:6
70:10,12 72:5 73:2
75:12,16 80:5,8
89:25
**manuals**
30:8,23 32:3,23
75:21 80:10
**March**
1:16 4:4,19
**marked**
9:16,18
**marks**
84:19,23
**master's**
6:18
**mate**
101:9
**materials**
9:3 37:2 60:25 75:20
96:2,4,6
**matter**
4:20 52:1 110:19
125:22
**Maye**
2:9 3:4 5:17,17 6:6,8
9:19 12:10,20 13:17
14:8,15 15:10 16:4
18:9 19:21 20:1,8
20:11,14,18,22 21:3
21:5,13,14 22:2,18
22:24 23:15 26:5,10
26:14,15 27:11
31:13 32:12 33:24
34:1 35:9 36:2 37:6
38:1,9 39:21 41:8
42:3,17 43:5,8,14
44:4,24 45:8,24
46:5,9,14,20 47:22
47:23 50:22 53:6
54:1,13 55:17 56:20
57:9,13,19,21,24
58:1,19 60:20 61:8

61:13 62:14 63:12
63:19 64:19,23 65:9
65:11,15,17,21 66:1
66:24 67:7,10,15,21
68:1,3,8 69:1,5
72:14 73:10,13,16
73:21 74:2,6,10,12
74:15,18,21,23 75:2
75:4,7,9,10,24 76:6
76:11,19 77:15
79:22 80:9,20 82:15
83:17,21,23 84:10
84:18 85:1,4 88:16
92:25 93:1 94:14
96:8,9 97:7 99:5,13
99:17,19,21 100:15
100:20 102:13
104:19 105:1,5
106:6,21 107:1,5,7
108:12,18 109:8,15
109:20,24 110:2,5,8
110:10,13,17 111:3
111:5,10,14,16,19
111:22 112:2,6,10
112:13,16 113:23
114:12 115:9,16
119:5 120:3,24
121:18 122:11,16
122:18 124:1 125:2
125:16 126:10
127:13 128:3,6,13
**ma'am**
18:10 19:22 21:15
25:25 29:6,10,13,15
31:5 34:2 35:10,21
38:10 46:21 47:24
56:6 61:9,18,18
66:2 68:4 74:24
75:11 81:3 82:2
96:10 97:8 99:22
100:16 102:14
104:20 105:8
108:13 112:17
114:1 117:3 122:19
**McKAY**
2:3 5:18,18 8:9 11:25



12:14 13:5,22 14:12
15:6,17 18:6 19:18
19:24 20:5,9,19,25
21:2,4,8,24 22:1,17
22:21 23:9 26:3,8
26:13 27:7 31:11
32:10 33:18 35:6
36:1,22 37:25 39:17
40:19 42:1,14 43:4
43:7,13,18 44:15
45:3,19 46:3,6,11
46:19 47:18 50:18
53:3,11 54:6 55:10
56:16 57:6,18,20,23
60:18,22 61:11 62:3
62:20 63:15 64:18
64:21 65:6,10,12,16
65:19 66:22,25 67:8
67:11,13,17,23 68:6
68:22 69:3 72:9
73:8,11,15,18,20,24
74:3,7,11,13,16,19
74:25 75:3,5,8,23
76:18 77:7 79:6
80:6,16 82:9 83:13
83:18 92:22 94:7
95:25 97:3 99:1,9
99:15,18 100:8,18
102:1 104:17,21
105:3 106:4,15,25
107:3,6 108:8,15
109:5,10,16,22,25
110:4,7,9,12,15,18
111:4,6,11,15,17,20
111:24 112:4,9,12
113:3 114:8 115:8
118:14 119:21
120:23 121:1,23
122:14 123:23
124:24 125:15,19
127:1,21 128:1,4
**McKay's**
48:4
**McQUILLEN**
2:8 5:2
**MEA**

6:23
**mean**
16:18 18:16 23:23
24:22 27:9,10 30:23
31:24 32:3,16 33:15
34:20,21 37:1 40:23
42:7,7 48:16 50:10
70:21 76:21 86:22
88:2 89:2 95:7,8
98:9 101:8 114:15
115:1 118:19
119:25 120:8 122:3
122:8,9 123:6,13
125:20 126:3
**meaning**
48:5,5
**means**
32:14 132:22
**meant**
48:19
**mechanical**
6:17
**media**
4:19 84:17,20,24
**medical**
23:21
**meet**
89:8
**meeting**
110:25
**member**
40:25 48:23
**members**
64:15
**mentioned**
8:18 34:2 40:23
59:21,24 61:1
**merely**
18:20 38:14,23 53:25
89:12
**met**
100:17
**mic**
111:2
**Michigan**
6:17

**microphone**
74:8
**middle**
81:10 111:12
**mind**
44:19 53:13 72:1
**mine**
50:9,11 72:25
**minor**
32:25 50:6 87:25
89:4 91:24 92:4
93:23 98:5 113:6,17
123:12
**misconduct**
22:5 26:18,22 27:5
27:14 62:17 63:5,23
65:2,3 66:6,17
68:11 69:10 72:1,2
72:7 75:14,15 78:8
78:15,22 79:1,3
80:1,12,19 81:2,7
81:16,18,21 82:1,5
82:13,19 83:2,8,25
85:12,14,22 90:2,17
90:21,23,25 91:21
97:21 98:22 99:24
102:8 126:18,22,25
127:7,25
**misheard**
106:13
**misperceived**
54:5 55:19 57:5
113:8
**missing**
117:17
**misspoke**
127:24
**misstated**
82:11
**mixing**
107:18
**module**
28:22
**molestation**
60:1 93:25 115:18
116:17 117:25

127:4,10,24
**molestation-type**
59:2
**money**
38:17,21 41:10,21
42:6 44:6,13 45:18
46:24
**morning**
4:17 6:7,8
**move**
21:13 34:15 48:18
66:23,24 67:2,19,21
75:23 80:22 83:12
84:12 101:20,21
103:23 104:7 113:1
117:15 118:6,13
119:11 120:21
121:22 122:25
**moved**
39:3 48:15 64:1
70:18 79:2 99:11
101:14 117:8,10,14
119:1,4,9 121:20
**moves**
81:8 82:24
**moving**
82:7 107:13
**Mullin**
50:4 51:4
**multiple**
11:11
**Murphy**
2:8 5:2

**N**

**name**
6:11 34:10,16,20
59:5
**names**
59:13
**nature**
47:9 49:24 50:24
51:8 88:20 96:23
99:23 107:10
120:15 125:7
**NCSV**



34:22
**near**
106:12 118:8
**nearby**
101:23
**need**
20:5,7 27:23 34:12
67:19 87:21 93:18
95:22 96:20 104:4
119:1 128:7
**needed**
98:6
**needs**
91:25 111:7
**neglected**
59:19
**neither**
79:20
**nephew's**
54:23
**neutral**
37:9
**Nevada**
1:2 4:23
**never**
10:24 11:2 22:6,9
25:20 53:17,17
67:25 72:19 79:16
107:16
**new**
115:24
**Nickel**
38:11 49:25 50:25
51:7,10
**NJK**
5:22
**nonaffecting**
101:11
**nonrelated**
101:10
**nonresponsive**
92:9
**nonspeaking**
46:17
**nontargeted**
90:9

**nontargeting**
62:12
**nonthreatening**
70:2 98:4
**nonthreating**
59:16
**Normally**
13:10
**Norton**
1:12 4:8,20 6:7,13
9:21 128:7
**Notable**
38:16
**notations**
131:8
**note**
5:2 41:9,13
**noted**
47:22 68:1,2 74:10
74:12,15,18 92:25
96:8 99:13,19 111:3
111:5,10,14
**notes**
7:21,25 8:4
**notice**
132:9
**noticing**
5:16
**notified**
50:3 51:3 132:18
**noting**
38:20 44:5 47:12,25
**number**
4:23 5:21 130:7

**O**

**oath**
4:12 6:3 130:17
**oaths**
130:14
**object**
15:11 64:17 65:18,20
96:1
**objecting**
61:9
**objection**

11:25 12:14 13:5,22
14:12 15:6,17 18:6
19:18,24 22:17,21
23:9 27:7 31:11,11
32:10 35:7 36:1,22
39:17 40:19 42:1,14
43:4,7,13,18 44:15
45:3,19 47:18 50:18
53:3,11 54:6 55:10
56:16,17 57:6 60:18
60:22 61:11 62:3,4
62:4,20 63:15 65:6
65:7,12,13,13 68:22
68:23 69:3,4 72:9
72:10 76:18 77:7
79:6 80:6,16 82:9
83:13 92:22 94:7
100:8,18 102:1
104:17 106:4
109:23 110:5,6,14
110:16 111:8,9,11
111:16 113:3 114:8
118:14 119:21
120:23 121:1,23
123:23 124:24
125:15,19 127:1,21
**objections**
20:18,24 46:17,18
65:17 109:11,17
**objective**
37:13,16 44:9
**objectively**
124:13
**obligated**
63:25
**obligation**
83:11 85:10,17
**observation**
44:9 50:7,9,10,13
54:4 56:8,14,15
98:9 107:23 108:1
116:17 117:19
118:19
**observe**
88:22 121:6
**observed**

41:6 50:5 51:5 53:2,9
55:9,14 58:4 62:17
63:7,23 71:25 72:2
80:12 86:10 87:18
87:24 92:17 98:22
101:11,17,23 102:7
106:8,9 108:2 113:5
113:13,17 114:23
117:22 118:3
120:14,19,19 122:3
124:19
**observes**
91:4 96:13 100:23
105:21
**observing**
56:22 86:7 121:10
**obstructing**
110:10
**occupy**
10:23 17:15,18,22
**occurred**
116:22
**occurrence**
69:19
**offer**
130:25
**offering**
131:3
**office**
132:15
**officer**
50:4 51:4 90:5
130:20 132:6,16
**officer's**
130:1 131:8 132:1
**okay**
7:3,18 8:16 13:18,18
18:1 19:11 21:3,5
21:13,21 22:3,25
24:1,3 25:25 26:25
29:4,13,13,14,22
31:5 32:13,20 33:11
34:6,10,15,19 35:13
37:7,12 42:18 46:5
46:10,11 47:8 49:1
49:3,23 50:13 51:14



54:2 56:21 57:1,3,9
57:15,24 58:13 59:6
60:11 61:20 63:20
64:17 66:21 68:17
69:1 70:20,23,25
71:12,14,19,21 74:2
74:10,22 75:11
76:15 77:16 80:21
81:23 82:2,16 83:18
85:5,18 86:23 87:4
87:8 88:6,10,12
89:9,11,22 91:11,24
92:25 94:24 95:19
96:8 97:8 98:6,19
99:9,13,17,19
100:21 101:13,15
102:22 103:15
104:4,13 105:2,2
113:24 115:2,5
116:1,3 118:2,25
119:3,8 121:19
122:12 123:8
**old**
54:24 106:18,23
**older**
17:16
**onboard**
109:2
**once**
15:2 19:3 51:17 64:8
81:10 84:13 86:15
107:17 113:14
121:25 123:15
126:5 127:22
**one-year**
14:4
**operating**
16:22 76:9
**operation**
31:14
**operations**
27:17,20 28:2,15,17
29:7,11,16,18 30:10
30:19 31:6,8,15
34:7 68:5,9,13,14
68:18 69:7,17,21

89:25
**opine**
9:4
**opining**
86:5
**opinion**
18:8 54:10 70:6,10
70:14,19 71:5,10
76:22,25 77:5
**opinions**
9:10 10:18 18:12,17
18:18,20 19:6,8
37:22 40:17 75:25
76:1,12,15,16 77:19
94:3,17,18 95:19,20
95:23
**opportunity**
79:16
**ops**
32:6
**order**
59:13 73:25 96:3
**ordered**
86:12,20
**org**
14:21
**organization**
34:3,11,17 35:3
**organizational**
15:23
**original**
132:17,25,25
**outcome**
5:13
**outline**
64:9
**outlined**
60:1 79:19
**overall**
8:21 35:16 123:22
**overarching**
77:9,19
**overview**
6:14

_____
**P**
_____

**page**
3:6 10:17 21:10,11
36:8 37:24 80:24,25
80:25
**Pages**
3:2
**paid**
37:18,21
**paragraph**
36:9 38:10 47:8,16
47:20 48:6,10 49:13
49:23 51:25 52:6
58:20
**Pardon**
111:19
**parent**
86:15 97:1
**parenthesis**
38:16 50:1
**parents**
54:21
**PARK**
2:3
**part**
7:25 8:19 23:11 25:2
25:17 35:1 53:19
59:16 90:7 94:10
95:20 131:2,12,16
**participants**
5:4
**particular**
73:25
**parties**
5:7,14 130:12,12
131:3,5 132:17
133:1
**parts**
29:25 79:13
**party**
5:12 36:11 131:2,10
131:11,11,15,15
**party's**
131:1,11
**pass**
17:18 68:19 74:7
111:1

**passage**
38:2
**passenger**
25:17 63:22,24 80:11
80:13 82:18,19,20
82:20 83:12,24
84:12 96:12,13
101:23 103:6,21,23
104:8 106:12
123:10
**passengers**
63:21 65:1,4 66:5
68:19 69:9 72:4,7
72:17 75:13 77:13
78:8 79:4 80:15
81:6 82:7,23 84:3
90:14 105:25 118:8
118:8 124:8
**passenger's**
105:16
**passes**
59:15
**pass-through**
69:13
**pause**
41:2
**pay**
79:14
**paying**
44:20 47:3
**people**
60:16 62:1
**peppered**
125:23
**Pepsi**
41:19 42:12
**perceive**
53:13 104:3
**perceived**
53:10 54:21 55:6,25
56:9,23 85:21,22
123:4
**perception**
55:8,9 56:5 122:24
123:20
**performance**



40:17
**period**
86:8 121:9,12 132:13
133:4
**permission**
39:1 41:22 42:8 43:2
**perpetrator**
64:2 65:5 79:2 82:8
82:25 121:14
**person**
13:1 132:15
**personal**
124:22 125:18
131:13
**personally**
47:6 54:20 92:7
**Peter**
1:3 4:21 48:22
**phase**
90:8
**Phone**
2:5,10
**phrased**
82:14
**phrasing**
61:6
**physical**
87:15 99:7
**PIC**
8:24 65:3 71:13
**pick**
79:13
**picked**
47:19
**PICs**
64:25
**picture**
54:18
**piece**
29:19
**pilot**
8:19 11:9,20 12:5
39:25 40:4,6 51:16
51:25 52:18 62:15
62:23 63:9,20,24
64:1,3 65:5 68:18

69:11 72:24 76:9
77:10 94:6 95:2,13
96:12 101:3 112:20
120:5,25 121:3
123:22 127:18
**piloting**
8:22 39:5,8,11,16,20
39:23 40:4,9 48:11
50:8 51:16,21 52:6
52:22
**pilots**
24:8 26:17,21 27:4
27:13 30:22 35:14
35:19,24 64:6 69:8
**pilot's**
30:25 31:1,10,14
68:14
**place**
5:7 60:8 127:6,23
**placed**
4:12 6:2 96:3 130:17
**plaintiffs**
1:4 2:2 5:19 36:15,21
37:2,18,21 49:17
**please**
5:2,25 6:11 16:7 20:8
26:8,14 36:16 46:8
50:20 53:5 64:22
66:22 72:23 73:9
74:12,15,18,19 75:7
75:7,8,9 76:4,6
83:20 99:3 107:5
108:15 115:8 117:1
128:13
**PM**
84:20,24 128:15,16
**point**
21:9 38:23 47:13
59:19 87:20 88:2,9
88:12 89:21 92:7,11
93:2,3 105:23 106:7
107:20 116:21
117:1,14 118:12,25
122:13,21 127:9
**pointing**
117:3

**policies**
9:11 10:9,12 30:10
66:9 69:16,20,23
71:2,6,7,16 73:3
76:2,13 77:25 78:13
78:21 79:13,23
80:10 90:4 91:8
93:5,10,16 94:4,19
103:3 104:12
119:17 124:5 127:5
127:23
**policy**
60:15 66:3,13 68:4
78:3,4,6,22,24 79:1
79:10,17,20 80:18
81:1,17,20 82:1,3,4
82:12,12,21 83:11
84:1,5,7 85:7 90:9
90:17,20,23,24
91:12,15,21 93:4
94:13 119:15
123:21,24 127:7,12
**politely**
45:20
**Porter**
1:20 4:5 5:9 130:4
132:5
**portions**
30:1
**pose**
52:12
**posing**
61:19
**position**
11:3,6 13:12 22:10
22:12,20 24:14 43:6
96:5
**possess**
30:6
**possible**
38:24 64:14 90:1
**potentially**
93:5
**preceded**
18:18
**preflight**

52:10
**preparation**
7:23 37:3
**prepare**
37:19,19
**prepared**
9:20 10:6,10,13
36:12 37:5
**preparing**
9:25 10:3 31:17
**prescribed**
52:20 66:13
**present**
2:12 5:14 131:10
**presented**
13:6,23
**preserve**
8:3
**pressing**
87:21
**pretty**
41:22 77:14
**previously**
18:14 19:9 32:21
51:24
**prior**
15:3 38:19 40:25
45:12 47:3 48:15,23
49:22 64:14 130:16
**problem**
52:12 91:14 121:5,15
**Proc**
130:12,18,23 131:6
131:17 132:1
**procedure**
4:2,11,14 66:13
79:18,21 83:7 90:10
119:16 127:8
130:16 132:10
**procedures**
9:7 10:10,12 22:4
26:17,20 27:3 28:19
29:2 30:10,18 49:20
52:2,21 66:9 69:16
69:20,23 71:3,7,16
73:3 76:2,13 78:1



78:19 90:4 93:16
94:13 103:3 104:12
104:23 105:12
116:19,24 119:17
127:5,23
**proceed**
6:4 91:17 92:6
111:22 112:14,14
**proceeding**
59:11 89:1
**process**
18:5
**processing**
19:2
**product**
131:7,14
**products**
131:1
**Prof**
130:9
**profession**
6:21
**professional**
93:19 105:14 110:4
117:21
**professionalism**
75:1 110:19
**professionally**
46:14,15
**program**
35:23
**project**
8:12
**proprietary**
75:20 93:8 94:12
96:2,4,6
**protective**
96:3
**protocol**
9:7 14:6 19:7 35:18
49:20 52:2,21 59:11
59:16,21,21 62:9,11
62:13,15 68:10,10
72:15,20,21 75:12
81:12 83:7 89:6
116:19,24 119:13

**protocols**
80:11 90:2 92:2
105:11
**provide**
24:7 26:16 37:22
63:18 130:25 131:7
**provided**
35:19 60:3 62:12
131:14
**provides**
92:2
**provision**
69:7 70:6,10 75:15
**provisions**
32:5,7 34:6
**psychologist**
55:21
**pull**
7:16 8:13
**purchase**
38:25 41:18 42:9
**purpose**
38:20 39:24 47:11,25
51:19
**pursuant**
130:15 132:9
**push**
52:13
**put**
13:16 33:2
**putting**
49:4 117:4
**pylon**
114:17
**P.D**
38:13

___

**Q**

**qualified**
11:16,19 12:5,11,23
13:2,20 14:9 25:12
104:14 130:5
**quality**
5:2,3
**quarterly**
28:21

**question**
10:15 12:1,15 14:2
15:3 16:7 23:11,12
26:4 27:8 29:24
30:24 31:5,12 32:4
35:7 37:25 39:12
40:20 45:20 48:8
50:20 53:5 55:11
60:19,23 61:6,10,12
61:19 62:4 63:5,13
63:14 64:24 65:7,13
66:2 67:24 74:4,5
75:6 79:7,15 81:24
82:10,14 85:2 94:22
97:9 100:3,6 103:18
108:6 109:6 110:23
111:1 112:15
117:11 122:1,5,22
122:23 123:18,19
125:11 127:9
**questioning**
30:13 74:11
**questions**
20:12 21:12,16 26:2
26:7,9,12 45:23
53:20 61:19 62:12
63:17 64:4,22 66:19
67:16,18 73:21 75:9
88:8,18 89:3,4 90:9
92:8,20 105:4,25
109:7,12,18 111:1
112:3 113:11
119:11 123:2 126:2
**quite**
40:6 79:20 93:25
120:9 122:1
**quote/unquote**
12:4 52:22 79:10
87:10 88:19 92:5

___

**R**

**raising**
89:7
**reach**
45:13
**read**

19:15,22 21:11 29:21
29:23,25 37:3,4
76:5,6,7 85:1,3 94:1
129:1
**real**
108:2,11 113:18
126:6
**reality**
67:2
**really**
9:7 25:6 31:24 40:13
42:7 46:7 67:5 71:3
79:15 87:10,16
88:15 92:4,5 93:18
94:11 106:19
107:25 113:15
114:1,22 115:3
119:24 120:1 122:3
122:6,7 124:10,11
**realm**
102:4
**reason**
48:9 49:14 55:7
115:12
**reasonable**
41:2,5 42:19 43:24
43:25 47:7 122:9
**reasonably**
32:1,24
**receive**
67:18 90:10 95:3
**received**
7:15 28:24 29:1
35:14
**receptive**
88:1
**recess**
38:6 58:16 84:22
128:16
**recoiling**
102:8
**recollection**
48:11
**recommend**
101:19 107:12
112:25 118:6



120:16
**reconcile**
43:17,20
**record**
4:18 5:8 6:12 38:4,5
38:8 46:8 58:14,15
58:18 68:2 69:2
76:7 84:9,21,25
85:3 99:14,20 106:3
119:2 128:12,14,15
130:23
**recorded**
5:6 130:21 132:7
**recording**
5:3,6
**recount**
97:11,20
**refer**
18:15 52:6,10 59:4
73:24 80:17 127:4
**reference**
10:13 19:3 28:25
69:19 80:7 103:2
**referenced**
10:8 31:16 32:6
78:22
**references**
78:14,14
**referencing**
28:8,11,16 29:8
30:14
**referring**
30:4,21 68:12,12
82:1 95:7
**reflected**
36:20
**refrain**
33:22 110:20
**refuse**
21:19 104:15
**refused**
132:20,23
**refusing**
108:6,9 112:2,4
114:6
**regard**

7:23 8:20 9:12 14:5
26:18,21 27:4 35:15
59:25 123:3
**regarding**
7:21 11:6 14:10
16:14 18:22 22:5
48:12 63:2 65:17
68:10 77:20 80:18
81:1 85:11 127:9
131:9
**regulation**
18:7,8 77:6,17,18,19
127:8
**regulations**
25:19 26:23 34:8
35:1 76:17,20
126:11,16 127:14
127:16
**reiterate**
97:23
**relate**
23:2
**related**
5:11 7:3,19 9:20
14:17 60:6,17 62:1
62:19 63:22,25 65:4
66:7 68:21 70:17
72:4,8 75:18 77:4
78:9 79:5 80:4,15
81:8 82:7,23 83:10
84:3 85:7,10,16
86:14,16 126:14,24
127:20
**relatedness**
72:18
**relation**
23:5
**relations**
25:1
**relationship**
11:19 23:6 53:20
59:13 63:21 69:9
77:21
**relative**
24:23 130:11
**relevance**

47:25 48:5,10 49:4
49:19
**relevant**
39:5,7,8,10,15,23
40:17 41:13 46:7
50:7 51:15,21
**rely**
117:18
**relying**
70:5,9 71:1,2
**REMEMBERED**
4:1
**REMOTE**
1:11
**remotely**
4:25
**removing**
52:11
**Renee**
6:13
**repeat**
16:7 17:7
**repeatedly**
110:21
**rephrase**
50:20 53:5 81:24
**report**
3:11 7:7,11,13 9:3,18
9:20 10:1,4,6,11,12
18:14,15,19 19:5,7
19:8,10 21:10 30:1
31:16,18 32:7 36:8
36:11,20 37:3,5,13
37:15,19 39:10,19
39:24 40:24 48:20
49:5 51:20 59:24
60:2 62:16 75:25
76:15 79:19 93:17
94:17 95:19 116:25
122:4 125:22
**reported**
1:20 56:24 81:16,18
83:2,8,15 84:4,13
85:12,14,15 86:7
87:11,18 90:23
91:22 96:16 97:22

105:16 116:13,16
120:6 122:1 127:7
127:10,24,25
**reporter**
4:6,13 5:9,25 38:3
69:2 76:5 84:9
106:3 119:2 130:6
**Reporters**
130:8
**reporting**
85:24 100:14 107:19
115:15
**reports**
82:18 83:24 85:21
104:8 105:22
**represent**
5:15 103:25
**representation**
25:6
**representative**
16:23
**represented**
39:19
**representing**
11:15
**represents**
48:14
**request**
5:1
**require**
27:13 63:20 64:25
65:3 66:4,7 83:7
97:24 98:1,3 119:10
119:12
**required**
18:7 26:23 27:6
28:21 64:11,12 66:9
77:2 78:16 82:6
84:2 85:8
**requires**
66:8 75:13,16 78:4
**requiring**
78:7
**respect**
11:22 17:6,10 18:3
19:1 25:4 27:14



35:5 73:2 74:1
93:11 123:16
124:11 126:25
127:6 132:13
**respectfully**
26:6
**respond**
21:19 26:6 62:16
72:3 88:5 96:11,18
107:14 113:2,4
114:3,5,6,20 119:19
119:23,25 124:21
**responded**
107:24 116:7 117:6,6
**responding**
38:15 68:10 81:1
85:11,14
**response**
33:8 45:21 64:17
87:9 108:23,24
114:9,10 115:11,14
116:9 120:21
123:18 125:17
**responses**
89:17 125:21
**responsibilities**
11:13,17,22 12:7,18
12:24 13:3
**responsibility**
13:14 24:25 25:16
40:4,6 52:2 63:1
66:11
**responsible**
40:1 52:19 73:1
**responsive**
15:13 21:16 26:2,3
26:11 73:16
**rest**
19:5
**restate**
83:20
**restated**
77:23
**retained**
8:8,25
**return**

86:15
**revealing**
105:11
**review**
9:3 50:17 51:11 58:2
71:8 76:3 90:4 94:4
94:5,18,19
**reviewed**
30:11,19 34:7 55:25
61:4,16
**reviewing**
62:10
**revision**
74:21
**Rex**
50:3 51:3
**Ri**
42:23
**right**
30:24 42:13 47:15
52:7 54:23 55:2
57:17 67:15,17,18
87:6 93:16 115:17
115:20,23 125:14
**risk**
103:7,21 107:11
108:2
**road**
91:15 93:9 94:1
118:17 123:10
**role**
18:4 92:15 95:1
**roles**
11:12,21 12:6,18
**room**
13:9
**routinely**
13:15 14:5
**row**
10:23 13:16 17:15,23
38:11 52:11 121:8
**rubbing**
100:23 101:17
105:21 106:9,23
107:23 112:21
115:21 118:3,20

120:14,19 121:7
125:6
**Rule**
3:11 4:12 9:18 19:7
**rules**
4:3,11 35:1

———————
**S**
———————
**s**
17:22
**safely**
25:18
**safety**
6:19 34:21 77:12
103:6,22 105:16
**Sakurada**
53:1,2,9 58:3
**Sakurada's**
53:13
**San**
2:4
**sat**
13:9 25:23 43:21
**satisfied**
88:12 89:9 91:5
**saw**
55:20 56:15 57:5
99:25 101:1 108:21
113:9,19 118:11
122:7,7 123:4
**saying**
33:23 37:10 45:25
55:18 57:4,7,12
61:9,15,24 69:6
79:17 114:3
**says**
26:16 31:23,23 33:20
33:22 36:9 48:20
49:2 73:25 77:10
81:20 100:25
107:12,12 112:25
**scenario**
42:24 43:16,25 85:19
101:4 109:1
**scenarios**
42:22

**scene**
53:24
**science**
6:16,18
**screen**
5:5 52:7
**se**
10:11
**seat**
10:23 17:15,19,23
25:24 101:9,11
**seated**
82:20 106:12
**seats**
52:14
**second**
82:16 85:23 86:10
116:9
**section**
4:11,14 10:17 29:18
36:8 130:16 132:10
**sections**
4:2 31:15
**security**
77:12 103:6
**see**
10:19 15:11 76:22
81:3,19,25 84:6
119:12,14
**seeing**
128:2
**seen**
5:4 54:18 100:14
112:19 121:12
126:3,4
**self**
87:22
**send**
74:21
**senior**
14:11,13
**sent**
110:18 132:10
**sentence**
47:19 50:13 77:23
**sentences**



39:15,22 40:16 49:4
49:6,7,9,10,12
**separate**
101:1 108:21 114:24
116:10 125:10
126:1
**separated**
49:22 86:12,20
113:20 116:23
117:25 125:13
**separates**
65:5
**separating**
64:15
**separation**
41:1 48:24 49:18
**sequence**
64:10
**series**
113:10
**serve**
11:16
**served**
13:1 25:20
**service**
14:11,14,17,20,25
15:5,16,21 16:1
48:25 52:16 131:7
131:14
**services**
5:10,11 131:1
**set**
132:16,24
**sets**
34:25 35:4
**seven**
21:23 73:22
**sexual**
22:5 26:18,21,22
27:5,14 59:2 60:1
60:14 61:2,5,17,23
62:17 63:5,23 65:1
65:2 66:5,17,17
68:11 69:10 71:25
72:2,7 75:14,15
78:8,15,15,22,25

79:3 80:1,12,18
81:1,7,16,18,21,25
82:5,13,18 83:2,8
83:24 85:12,14,21
90:2,16,20,23,25
91:20 93:24 97:5,21
98:22 99:7,7,9,12
99:23,24 102:8
106:24 107:10
112:22 115:18
116:17 117:25
120:15 125:7
126:18,22,25 127:4
127:7,10,24,25
**sexually**
104:8
**share**
24:25 59:8 66:14
88:24 92:20
**Shawn**
50:4 51:4
**shook**
38:14
**short**
84:16
**Shorthand**
4:6,13 130:5
**Showing**
9:16
**Shupe**
29:3 40:18 50:3 51:3
52:1,18 58:21,24
59:18 64:12 70:11
70:14 77:1,1,20,24
81:14
**Shupe's**
28:23 40:5
**shut**
92:8
**sic**
31:22 33:24 41:2
**side**
32:8,8 33:2,2 111:7,8
**sideways**
90:22
**sign**

12:8
**Signature**
3:6 129:5
**signed**
132:22
**signing**
129:1 132:19,21
**similar**
85:20
**simple**
41:23 98:20
**simply**
17:14,20 41:16 65:18
114:6 116:25
**Simpson**
2:13 5:11
**Simultaneous**
20:10,13,17 21:1
46:2 54:8 67:12,20
68:24 73:12,19
106:14 108:17
109:4 110:1,3 112:1
112:8 115:10
**simultaneously**
90:4
**sir**
9:22 10:2,5,20 11:18
12:19 13:8 14:1,23
15:9,21 18:11 19:3
21:17,20 22:23
23:11 24:12,15 28:5
28:16 29:8,21 30:12
32:21 35:11 37:11
39:25 48:8,20 49:19
50:10 51:17,22
55:12 56:19 62:24
69:12 72:12,19
75:19 78:11 79:8
80:17 81:9 82:12
88:7 90:19 91:10
93:7 94:9 98:7
102:3 105:13
107:16 108:25
113:22 114:10,14
114:19 119:18,25
121:5 123:15

125:20 127:6,22
**sit**
67:3
**sitting**
53:25
**situation**
59:10 70:4 85:20
86:1 93:6 96:12
102:16,20 113:24
**situations**
105:10
**slanted**
36:15,20
**soda**
42:24 43:1,2
**sodas**
46:24
**sole**
40:24 41:7 47:21
48:2,20
**solely**
24:24 25:5 71:5 76:1
**somebody**
15:20 68:6
**someone's**
13:15
**son**
53:15,25
**son's**
54:11,11
**sorry**
7:11 10:2 17:7 31:11
37:25 38:2 39:13
45:14 49:8,12 56:6
57:19,20,21 58:8
64:5 65:10 70:8
95:25 97:3 99:1,2
106:15 122:14
125:3 126:14
**sound**
44:19 67:1,3,24
73:20
**sounds**
115:5,6
**South**
2:9



space
40:22
speak
11:19 12:6 16:3
35:18 98:15
speaking
20:18,24 50:1 51:1
98:10
speaks
14:6
Spear
2:4
specific
63:3 64:9 68:10
75:11 76:20 77:4,5
77:6,17 78:3,6,12
78:13 90:1 103:2
specifically
9:12,14 18:16 30:21
40:16 66:12 69:8
79:19 91:24 94:8
100:2 113:5
specificity
79:20
specifics
96:6
specified
53:21
speculating
42:13 43:15 44:12
45:1,6,16,25 46:1
46:22,25 47:5
speculation
47:6
spend
41:21,22
spent
42:6
spill
106:17
spilled
113:7
spoke
53:17
ss
130:2 132:3

stage
86:19
stand
121:8,9,10 122:8
standard
9:4,6 17:5,9,14 18:3
18:23 19:1,6,12,16
20:3 28:8,10,14
29:16 30:17 32:18
34:11 77:6,17
standards
27:6,10,12,21,22,25
28:1 29:5 30:2,4,11
30:14,20 31:17,21
32:9 33:7,9,16 34:4
35:4,6,8 126:12,17
126:21 127:15,17
standing
73:25
start
6:25 60:8 111:12
124:10 126:19
started
20:16 107:18
starting
80:24
state
4:2,6 5:14 6:11 17:5
17:9 18:25 23:22
38:10,15 39:7 58:21
82:4 127:17 130:2,6
132:2
stated
18:2 22:23 51:24
55:13 96:1 116:12
statement
10:21 17:4,8,12,13
39:10 47:1 49:15
50:23
statements
37:12,13
states
1:1 4:22 17:14,21,24
17:25 19:16 27:13
35:1 40:24
stenographically

1:20 130:21 132:7
step
86:23,24 87:7,7 91:7
91:22 100:11 104:5
stepping
33:22,22 88:22
110:24 124:16
steps
90:12 96:18
stood
123:9
stop
21:8 73:8 74:12,15
74:18,19 87:5 107:5
110:15,24 121:2
stopping
87:16,19
straight
101:15 117:4
strange
79:12
Street
2:4,9
strike
16:9 24:17 29:5
47:10 70:8,13 78:5
78:24 85:8 86:5
94:16 95:15 105:7
113:25 126:15,19
stroking
56:9 61:3 86:7 87:1
87:14 91:4 92:18
96:14 97:20
subject
16:6,16 17:1,1
subsequent
49:21 91:17
substance
35:23 80:25
substitute
64:3
sub-tier
15:24
sufficient
97:13,19 100:12
suggest

51:17
suggesting
46:12 52:24 53:8
suggests
126:7
suitable
90:10
Suite
2:4,9
summaries
18:13
summarize
18:17 19:8
summary
18:20
supervised
25:22,23
supports
72:16 77:19
supposed
117:18
sure
6:16 8:3,7 9:24 13:12
14:18 15:24 16:1
36:17 42:11,12
44:10 53:7 58:12
78:16 79:9 80:23
83:21 84:18 87:6,6
91:12 96:4 113:7
114:25 124:13
surprised
117:10
suspect
90:16 93:23,24
suspected
26:19,22 27:5 59:1,2
59:25 60:1 65:2
66:17,17 68:11,20
69:10 75:15 78:8,15
79:3,25 81:7 82:5
82:13 90:20 91:19
126:18,22,25 127:4
127:10
suspects
53:21
suspended



128:17
**suspicion**
100:6
**suspicions**
89:7 90:11 93:22
**swear**
5:25

**T**

**T**
2:9
**take**
5:7 12:8 32:5,7 42:12
58:10 63:11 69:11
73:3 80:2 84:16
86:18 96:18 103:9
103:12 108:2 109:8
111:17 127:19
128:5
**taken**
4:25 45:12 78:19
119:15 126:15,24
128:16
**talk**
18:16 20:20 47:16
73:11 93:14 96:20
103:10,13 104:24
106:12 109:6,7,9,10
109:12,16,18
110:22,23 114:16
120:12
**talked**
102:21 117:13 118:8
120:17,18
**talking**
30:15,22 31:3,6,8,21
35:8 55:5,6 56:6,7
59:22 68:13 74:19
74:20 82:2,3 88:5
92:14 98:14,14
107:18 109:20,22
110:15,22 112:13
118:1 119:18
120:10 121:2
**targeted**
66:19 113:10

**tasked**
71:8
**Technological**
6:17
**technology**
5:1 6:20
**tell**
4:14 13:13 15:23
26:8 28:20 54:18
55:25 63:6 71:9
90:16 97:4 99:3
100:2,10 103:1,3
117:9 124:7
**telling**
88:7 100:10,13
108:10 115:12
117:20 118:10
**tells**
91:3 98:21
**terms**
30:14 63:8 85:8
105:13
**testified**
4:16 12:17 22:25
23:4,7,16 24:16,18
28:24 32:21 38:12
72:13,19 94:3 95:22
97:23 104:1,23
105:8,13
**testify**
12:12 13:3,20 14:10
75:19,21 93:8 94:12
96:2 104:11,14,15
124:5
**testifying**
25:8 30:7 55:19
56:13 60:4 72:24
78:25 94:15 122:13
122:21
**testimony**
15:7,18 16:12 25:10
36:13,18 41:4 50:17
51:11 54:19 58:3
59:1 60:25 72:16
79:8 81:10 101:21
105:24 106:1 126:1

130:21,23 132:7
**thank**
5:24 24:3,5 26:25
27:2 68:1 69:4
71:23 81:23 107:3
110:7,9 111:15
115:5
**Thanks**
99:19
**theirs**
71:18
**thereof**
133:1
**thing**
65:19 66:16 101:24
102:5 114:21
**things**
7:14 13:13 18:13,17
59:18 69:25 71:1
88:2 114:17
**think**
8:15 12:11,25 23:22
23:23 47:5,6,6
55:12 57:23 77:9
80:22 91:22 96:20
98:12,12 103:11
109:9,11,17 111:24
120:1 122:7 127:3
**third**
38:10 131:2,11,15
**thoroughly**
19:4 64:13
**thought**
54:14 57:24 91:11
106:10 111:20
112:6,10
**thoughtfully**
64:13
**thousand**
43:21
**threat**
103:22,23 105:16,17
123:12
**three**
5:21 49:8,12 116:5
**tie**

40:8 76:23
**tiers**
16:3
**ties**
52:21
**time**
36:24 38:5,8 46:21
58:15,18 67:6 84:20
84:24 85:6 86:8,19
97:6 103:10,12
108:2,3 113:18
118:16 121:9,12
128:10,15 131:5
133:4
**times**
11:11 75:3 78:11
124:4
**titled**
10:17
**today**
11:15 76:1,16 94:15
94:18 95:20
**told**
60:12 61:22 63:7
94:2 96:7 106:9
113:19 114:14,19
117:13 118:18
120:8 125:6
**top**
21:11
**touch**
54:23
**touched**
54:22 99:22
**touching**
50:5 51:5 53:10 54:4
54:10,11,19 55:16
56:8,10 60:13 61:1
61:17,23 63:4 79:24
85:22 87:13 88:1,13
89:12 93:21 94:2
96:14,23,24,25 97:1
97:5 99:4,12 101:23
102:21 107:20
115:21 117:25
125:1 127:17



**trafficked**
93:23
**trafficking**
26:19,23 27:5,15
    59:2,25 66:18 68:20
    78:14,23 90:2
**trained**
11:14 13:11 24:2
    27:14 78:20 102:7
    102:10 105:15
    116:23 118:23
**training**
11:2 14:7 22:9,11,13
    22:19 24:13 26:17
    26:20 27:3 28:19,22
    28:25 29:2 35:13,15
    35:16,18,22,23,24
    36:5,6 59:1 62:25
    92:2 94:25 95:4,6,7
    95:10 98:7,13,16
    121:17
**training/guidance/...**
59:9
**transcript**
129:1 130:22 132:13
    132:17,19,20,24,25
    132:25 133:3
**transpires**
8:22
**transport**
8:19 34:21,22
**traveling**
59:17
**treat**
73:25
**troubled**
58:4
**true**
41:24 47:2 121:19
    130:23
**truth**
4:14,15,15
**try**
46:21 55:3 66:21
    70:2 98:10,19
    103:13 119:25

124:13
**trying**
38:2 46:19 55:23
    67:3,24 69:12 88:15
    97:5 102:11,15
    109:23 122:9 126:1
**turbulence**
23:21
**turned**
107:21
**two**
7:14 39:14 40:16
    49:4,6,7,10 60:16
    62:1,18 63:21,25
    64:6 66:4,5 75:13
    75:18 78:7,13,21
    79:4,12 80:15 81:6
    82:22 83:10 84:3
    85:6,9 90:1,6 92:2
    98:5 105:25 110:18
    118:1,8
**two-year**
14:3

**U**

**Uh-huh**
89:13,16,19 102:24
**ultimately**
70:15
**umbrella**
77:14 95:10
**unable**
29:24 61:5
**unbiased**
37:9
**uncomfortable**
60:15 61:24 62:8
    86:9 87:3,13,19,25
    88:19 89:4,11 91:5
    91:25 92:5,19 96:16
**underscore**
52:8
**understand**
11:12,21 33:4 34:12
    36:23 39:12 48:8
    50:21 53:4 57:10

61:14 64:7 66:2
    73:7,7 88:7 96:5
    114:2 122:12
**understanding**
16:18 65:23
**Understood**
46:3
**unfortunately**
88:22
**unit**
14:16,20
**United**
1:1 4:22 6:22 7:1
    13:2,21 14:4,11,14
    14:16,20 15:20
    27:13 28:20 29:4
    35:1 60:12 61:21
    63:20,24 64:25 65:3
    66:3,7,8 68:4,9 70:5
    70:9 71:2,4,15 72:5
    72:15,20 75:12,20
    76:13 85:19 86:2,6
    91:8 92:15 93:5,10
    94:6,12 95:4,13,17
    95:21,23 96:2,11
    98:14,21 100:7
    101:3,16 102:5
    103:2,20 104:6,7,11
    104:16,23 105:9,12
    105:20 107:15
    112:21 113:2
    119:18 120:25
    121:3 123:21,24
    124:5
**United's**
60:15 62:15 66:3
    68:17 69:7 98:15
    119:17
**University**
6:18
**unprofessional**
46:13 111:13
**unsafe**
112:24
**unwanted**
117:24

**unwelcomed**
93:24
**upset**
124:9,15
**U.S**
34:23 35:5

**V**

**vacation**
98:8
**validate**
98:11
**value**
124:19
**veracity**
52:25
**verbally**
38:15
**verbiage**
32:24
**verified**
113:19 116:20
    117:24
**verify**
118:9
**versus**
4:21
**veteran**
12:13
**Vickie**
1:12 4:8,20 6:13
**victim**
64:1 65:5 79:1 81:8
    81:18,22 82:8,24
    83:3,8,15 90:25
    92:5 102:8 104:2,3
    115:21 116:18
    117:23 118:24
    121:14
**video**
5:6
**videoconference**
2:2,7,12 4:7
**videographer**
2:13 4:17 5:10,20,24
    6:4 38:4,7 58:14,17



84:15,16,19,23
128:11,14
**VIDEO-RECORD...**
1:11
**view**
15:25
**viewing**
37:7
**violated**
104:8
**violates**
28:15 29:16
**virtual**
5:1
**virtue**
4:13
**VOLUME**
1:13
**vs**
1:5

**W**

**wait**
109:24 116:9
**wake**
39:2 41:20 42:10,20
**want**
21:6,7 23:13 28:25
33:13 40:3,8 42:10
46:9,12 47:5 57:3
57:11 67:14 92:14
93:21 101:1 108:21
109:5,5,13,19
111:17 127:8
**wanted**
41:18 43:1 47:12
48:2 79:14 119:9
125:9
**wanting**
39:2 42:8,20
**warranted**
59:11 91:6
**wasn't**
41:20 45:14 113:7
**waste**
67:5

**watched**
43:22
**water**
38:17 58:11 121:4
**way**
33:18,21 36:15,20
39:15 46:13 54:22
54:23 56:18 61:7
71:17 81:15 82:17
83:6 88:16,23 92:6
92:11 97:4 98:24
108:10 109:1
119:22 126:6
**ways**
123:14
**weather**
58:9,10
**Wednesday**
1:16 4:4,18
**weird**
102:23
**went**
11:2 56:23 92:8
125:8
**we'll**
16:1 57:14,16 65:21
82:16 86:23 105:6
**we're**
4:17 20:20 21:18
27:22,25,25 38:5,7
58:15,17 73:13,22
79:9 84:20,24 86:17
86:17 87:7,16 90:19
90:21,22 92:14
93:14 95:7,9 98:12
98:13,14 109:8
115:5,6 120:10,11
121:4 125:5,23
128:15
**we've**
30:24,25 116:5
**whoa**
73:8,8,8
**wide-flight**
103:5
**wiping**

106:17
**witness**
3:11 4:9 5:5 6:1,2,24
9:16,18 12:2,16
13:8 14:1,13 15:8
15:19 19:19 20:6
21:25 22:22 23:10
26:9,11 27:8 32:11
36:10,24 39:18
40:21 42:2,16 43:20
44:17 45:5 50:19
53:4,12 54:7,9
55:12 56:18 57:7,10
60:24 62:5,6,22
65:14 68:25 72:12
74:1,4,8,8,14,16
76:8 77:8 79:8 80:7
80:17 82:11 83:19
83:22 94:9 96:1
100:9 102:3 105:15
108:9 112:2 113:4
114:9 115:11
118:15 119:3,22
121:2,24 123:24
124:25 125:20
127:2,22 128:9
131:9,14
**witnessed**
56:1 87:13 91:20
115:15
**witnesses**
50:17
**witnessing**
120:7
**word**
61:5 69:14
**work**
11:11 28:21 116:14
**worked**
8:10
**works**
23:6
**world**
25:7 108:11 126:6
**worried**
120:16

**wouldn't**
14:2 41:24 43:10
56:12 88:21
**written**
49:14 132:9
**wrote**
9:2

**X**

**X**
72:25

**Y**

**yeah**
10:16 13:11 36:24
38:1,1 44:22 49:12
83:19 97:10 105:3
107:22 109:22
112:12 123:4 124:2
**years**
8:15 11:10 13:1
17:15 25:16 30:7
33:3 44:18 54:24
94:10 106:23
125:23
**young**
44:21

**Z**

**Zoom**
2:2,7,12 4:7

**1**

**1**
3:11 4:19 9:17,18
21:10 36:8 84:20
**1:22**
128:15
**10**
10:21 16:11 17:5,9
17:20,23,25 18:1,2
18:22,25 19:12,16
19:23 20:2
**10:02**
4:18
**10:08**



84:22
**10:17**
84:22
**10:48**
38:5
**10:51**
38:8
**11**
22:3
**11:22**
58:15 128:16
**11:27**
58:18
**11:45**
128:18
**1100**
2:4
**112**
35:1
**12**
44:18 106:23
**12-year-old**
44:12 112:22 113:17
118:4
**12:08**
84:20
**12:17**
84:24
**121**
8:19 25:2,17 94:10
95:12
**129**
3:6
**13**
10:17
**13751**
1:21 130:7
**14**
24:6
**15**
17:15 26:16 28:18
29:8,13
**1995**
7:2

--- 2 ---

**2**
21:11 37:24 84:24
**2.0**
36:8
**2:19-cv-01322**
1:3
**2:19-cv-01322-KJ...**
4:24
**20**
2:9 125:24
**201**
2:4
**2023**
1:16 4:4,19
**2025.320**
4:11 130:18
**2025.320(a))**
130:13
**2025.320(b))**
131:6
**2025.320(c))**
131:17
**2025.520(a)**
132:10
**2025.520(e))**
132:1
**2025.540(a))**
130:19,24
**2067**
24:6
**2093(b)**
4:14 130:16
**22**
54:24
**2500**
2:9
**26**
3:11 9:18 19:7
**26th**
7:2

--- 3 ---

**30**
4:12 11:10 13:1
25:16 33:3 94:10
125:23

**30,000-foot**
15:25
**30-year**
12:5,12 13:9,20 14:2
22:14 95:5
**312-345-0700**
2:10

--- 4 ---

**434-531-9569**
2:5

--- 6 ---

**6**
3:4
**60603**
2:10

--- 7 ---

**7**
80:25

--- 8 ---

**8**
1:16 4:19 80:25
**8th**
4:4
**8:02**
4:5
**8:48**
38:6
**8:51**
38:6
**8016**
130:9

--- 9 ---

**9**
3:11
**9/11**
88:23 124:17
**9:22**
58:16
**9:27**
58:16
**94105**

2:4
**941574**
1:23



UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA


PETER DELVECCHIA, et al.,            )
                                     )
            Plaintiffs,              )
                                     )
      vs.                            ) NO. 2:19-cv-01322-
                                     )     KJD-NJK
FRONTIER AIRLINES, INC., et al.,     )
                                     )
            Defendants.              )
_____)


VOLUME II

DEPOSITION OF

CAPTAIN VICKIE NORTON

(Via Videoconference)


Wednesday, March 8, 2023

1:53 p.m. - 6:39 p.m.



        Videoconference deposition of VICKIE NORTON, noticed
by the Defendant in the above-entitled action, taken before
Ruben Garcia, a shorthand reporter within and for the State
of California.

MAGNA ⊙

Page 135

1                    A P P E A R A N C E S
2
3       FOR THE PLAINTIFF:
        (Remotely)
4
                PARK AVENUE LAW
5               BY:   JOHN D. MCKAY, ESQ.
                201 Spear Street
6               Suite 1100
                San Francisco, California 94105
7               434.531.9569
                johndmckayatty@gmail.com
8
9
10      FOR THE DEFENDANT:
        (Remotely)
11
                ADLER MURPHY & GOSEWISCH
12              BY:   BRIAN T. MAYE, ESQ.
                20 South Clark Street
13              Suite 2500
                Chicago, Illinois 60603
14              312.345.0700
                bmaye@amm-law.com
15
16
17
18   Videographer:   Jesse Navarro
19
20
21
22
23
24
25



Page 136

1                    I N D E X

2

3    WITNESS:  CAPTAIN VICKIE NORTON

4

5                                                    PAGE

6    By Mr. Maye                                     137

7    By Mr. McKay                                    273

8    By Mr. Maye                                     284

9

10

11

12                  E X H I B I T S

13

14   EX.                DESCRIPTION              PAGE

15   Exhibit 2      Video presentation regarding    158

                    Blue Light Initiative

16

     Exhibit 3      Deposition transcript of        181

17                  Captain Shupe

18

19

20

21

22   INFORMATION TO BE SUPPLIED:

23                        (None)

24

25



Page 137

1    Videoconference Deposition, Wednesday, March 8, 2023

2

3                         + + + + +

4

5                    VICKIE NORTON,

6    having been previously sworn by the reporter, was

7              examined and testified as follows:

8

9         THE VIDEOGRAPHER:  Good afternoon.  We're

10   back on the record at 1:53 p.m., and this marks the        1:53PM

11   beginning of Media Number 3.  I am the videographer,

12   Jesse Navarro, and the court reporter is Ruben Garcia.

13              Counsel may proceed.

14

15                    EXAMINATION                             1:53PM

16   BY MR. MAYE:

17        Q    Captain, is there industry standard or

18   standard of care regarding how a captain is supposed

19   to respond to a passenger who reports being sexually

20   assaulted?                                                1:53PM

21        A    An industry standard?  Well, the

22   standard, we follow the protocol for what the flight

23   attendant's procedures are.  If there's a report of

24   actual sexual misconduct, unwanted sexual touching,

25   et cetera, then we follow the procedures outlined in      1:54PM



Page 138

1    the flight attendant's operations manual; flight          1:54PM

2    attendant manual.

3              Q    So you're not aware of any federal

4    regulation or industry standard or standard of care

5    other than what's in the United flight attendant       1:54PM

6    manual as to responding to sexual assault report by a

7    passenger?

8              MR. McKAY:  Objection to the form.

9              THE WITNESS:  Again, sir, I didn't state the

10   United flight attendant manual.  I just stated the     1:55PM

11   effective airline's flight attendant manual.  I mean,

12   if there's a physical assault, and that's what has

13   been determined, then we can go down the road of

14   actual something that's been reported as a physical

15   assault.                                                 1:55PM

16   BY MR. MAYE:

17             Q    Are you aware of any industry standard

18   or standard of care, other than what's -- strike that.

19             Are you aware of any federal

20   regulations regarding how a captain is required to     1:55PM

21   respond to reported sexual assault?

22             A    As in a specific Federal Aviation

23   Regulation with a number 121.55 kind of thing?

24             Q    Correct.

25             A    I am not aware of that.                  1:56PM



Page 139

1          Q    Are you aware of an industry standard          1:56PM

2    regarding how a captain is supposed to respond to

3    sexual assault that is reported by a flight attendant?

4          A    We'd have to break that -- I'm not sure

5    I understand.  So a flight attendant reports to have          1:56PM

6    observed a sexual assault?

7          MR. MAYE:  Court Reporter, can you read back

8    my question.

9               (Record read as follows:

10                  "Question:  Are you aware of          1:56PM

11                  an industry standard regarding how

12                  a captain is supposed to respond

13                  to sexual assault that is reported

14                  by a flight attendant?")

15          THE WITNESS:  Again, my question, sir, is          1:56PM

16    the flight attendant reports a sexual assault to me,

17    meaning the report was made by a passenger and now the

18    flight attendant is reporting it to me?

19    BY MR. MAYE:

20          Q    Yeah, let's start with that one.  It is          1:57PM

21    the same as a passenger reporting it, but I guess we

22    can -- I'm fine with that.  So are you aware of an

23    industry standard or a standard of care regarding how

24    a captain is supposed to respond to a sexual assault

25    that was reported by a passenger to a flight attendant          1:57PM



Page 140

```
1    and the flight attendant comes to the captain and      1:57PM

2    notifies the captain of the passenger's report of

3    sexual assault, are you aware of a standard of care or

4    industry standard and how a captain is supposed to

5    respond?                                               1:58PM

6           A     Yeah, and so that I can answer it

7    properly, is it reported and verified and the flight

8    attendants have acted already in accordance with their

9    protocol and that's what's being reported to me?

10          Q     I'll stick with the question that I        1:58PM

11   asked.

12          A     Well, unless I get clarification on my

13   question, I'm not really able to answer you.  I can

14   tell you more if you give me more information to act

15   on.                                                    1:58PM

16          Q     No.  I think the question is

17   sufficient.  So is your answer you don't know?

18          MR. McKAY:  Objection to the form.

19          THE WITNESS:  My answer is if it's --

20   there's two different -- there's two different roads    1:59PM

21   to go down.  That it has been reported to the flight

22   attendant and the flight attendant has already acted

23   to rectify it, or the flight attendant is somehow

24   ambiguous about the report and is looking for

25   guidance?  I mean, there's not one way to answer the    1:59PM
```



Page 141

1    question of it being reported without knowing what          1:59PM

2    else has happened.

3    BY MR. MAYE:

4            Q    Is there an industry standard or a

5    standard of care regarding how a captain is supposed        1:59PM

6    to respond to a flight attendant who suspects human

7    trafficking is occurring on the flight?

8            MR. McKAY:  Objection to the form.

9            THE WITNESS:  The standard is to refer the

10   flight attendant to their specific training with            1:59PM

11   regard to human trafficking and ensure that they have

12   gone through the protocol as to their training

13   policies and procedures for suspected human

14   trafficking.

15   BY MR. MAYE:                                                 2:00PM

16           Q    Is there a federal regulation that

17   you're relying on to answer that question?

18           A    Not that I'm aware of.

19           Q    Is there a standard of care or an

20   industry standard regarding how a captain responds to       2:00PM

21   a flight attendant reporting to the captain that the

22   flight attendant observed what she or he considered to

23   be a sexual assault?

24           MR. McKAY:  Objection to the form.

25           THE WITNESS:  I can't differentiate that            2:01PM



Page 142

1    question from the one that you asked prior, and I've        2:01PM

2    already answered.  Sexual assault, reported an

3    actual -- if we're talking about assault, we have to

4    be really careful with our adjectives.  So sexual

5    misconduct.  Assault crosses over into different          2:01PM

6    actions.  And once again, is it being reported as

7    witnessed or has it been verified?

8    BY MR. MAYE:

9           Q    Well, I'll stick with my question.

10          A    I'll stick with my answer.                    2:01PM

11          MR. McKAY:  I'll stick with my objection.

12   BY MR. MAYE:

13          Q    Is there a standard of care or an

14   industry standard regarding how a captain responds to

15   a report by another passenger that he or she observed    2:02PM

16   a sexual assault?

17          MR. McKAY:  Objection to the form.

18          THE WITNESS:  I don't believe there's an

19   industry standard.  I believe what would happen is the

20   passenger would report his or her observations,           2:02PM

21   perception, to a flight attendant, and it would go

22   from there, which would take us back to where we just

23   were, I would assume.  I mean, the only way for

24   another passenger to report, quote/unquote, would be

25   to tell a flight attendant.                               2:02PM



Page 143

```
 1   BY MR. MAYE:                                          2:03PM

 2          Q    As a captain with United Airlines, if

 3   you -- if it is reported to you by a flight attendant

 4   that a passenger has reported being sexually

 5   assaulted, is there an industry standard or a standard   2:03PM

 6   of care regarding how you are supposed to respond to

 7   that reported sexual assault?

 8          MR. McKAY:  Objection to the form.

 9          THE WITNESS:  The standard is the policies,

10   procedures, protocol listed in the flight attendant   2:03PM

11   manual.  I make sure that I ensure that the flight

12   attendants have followed them and then I go from

13   there.

14   BY MR. MAYE:

15          Q    And you're not willing to discuss the    2:04PM

16   substance of the United Airlines policy with respect

17   to responding to sexual assault --

18          MR. McKAY:  Objection to the --

19   BY MR. MAYE:

20          Q    -- is it fair to say?                    2:04PM

21          MR. McKAY:  Objection to the form.  She's

22   testified that she's not at liberty to do so.

23   BY MR. MAYE:

24          Q    You can answer, ma'am.

25          A    I'm not at liberty to do so.             2:04PM
```



Page 144

```
 1          Q     Does United know that you're testifying    2:04PM
 2   in this case as an expert?
 3          A     What do you mean, does United know that
 4   I notify them?
 5          Q     Yes.                                        2:05PM
 6          A     I'm not required to.  United is aware
 7   that I provide expert testimony and witnessing, and I
 8   have since January of 2009.  I have a -- I have
 9   permission to have outside employment.  They
10   understand the scope of that.  And what I am limited   2:05PM
11   to is nothing that involves United Airlines or
12   anything that would be a conflict of interest for me.
13   So they are not specifically aware that I'm testifying
14   in this case nor do they need to be.
15          Q     So in this case, your opinions on          2:05PM
16   how -- strike that.
17                Your opinions on how you would respond
18   to a suspected sexual misconduct is based on the
19   United flight attendant manual.  Is that fair?
20          MR. McKAY:  Objection.                           2:06PM
21          THE WITNESS:  No, it's not fair, sir.
22   BY MR. MAYE:
23          Q     Then maybe I missed something.  So as a
24   United pilot, is there an industry standard or
25   standard of care regarding how you respond to a report  2:07PM
```



Page 145

```
 1   of sexual misconduct that you received from a flight      2:07PM

 2   attendant who witnessed a sexual -- witnessed sexual

 3   misconduct committed by one passenger on another?

 4          MR. McKAY:  Objection to the form.

 5          THE WITNESS:  I've answered that at least           2:07PM

 6   four times, sir.  There's no different answer than the

 7   one I've already given you.

 8   BY MR. MAYE:

 9          Q    I thought you said it was based on the

10   United flight attendant manual.                            2:07PM

11          MR. McKAY:  Objection to the form.

12   BY MR. MAYE:

13          Q    And you just said, "No, that's not

14   true."

15          MR. McKAY:  Objection to the form.                  2:07PM

16          THE WITNESS:  You continue to ask me

17   questions that start with, "As a United pilot," and I

18   continue to reinforce the fact that I'm not here to

19   talk about United policies and procedures.  I'm here

20   to talk about Frontier's policies and procedures,         2:08PM

21   which I have methodically delineated in my report and

22   which form the basis for my opinion about what

23   happened on this flight.

24   BY MR. MAYE:

25          Q    As a captain, is there any industry           2:08PM
```



Page 146

1   standard or standard of care that dictates how a        2:08PM

2   captain responds to reported sexual misconduct

3   committed by one passenger on another?

4            A    It's the same answer I've already given

5   you, sir.                                               2:09PM

6            MR. McKAY:  Objection to form.

7   BY MR. MAYE:

8            Q    And what is that?

9            A    I ensure that the flight attendants

10  follow the training, policies and procedures provided   2:09PM

11  in their flight attendant manual.  And when that has

12  been accomplished, I take the situation from there.

13  Or captain -- I'm sorry.  I misspoke.  Not I.  The

14  captain in question would then proceed from there.

15           Q    And is there -- okay.  Strike that.       2:09PM

16                And you're not aware of a specific

17  federal regulation or standard of care regarding how a

18  captain is supposed to respond to reported sexual

19  assault or sexual misconduct?

20           MR. McKAY:  Objection to the form.            2:09PM

21           THE WITNESS:  A Federal Aviation Regulation,

22  I am not.

23  BY MR. MAYE:

24           Q    Are you aware of any standard of care

25  regarding how a captain is supposed to respond to       2:10PM

Page 147

1   reported sexual misconduct or sexual assault?          2:10PM

2          MR. McKAY:  Objection to the form.

3          THE WITNESS:  It's the same question, and I

4   have the same answer that I've repeatedly provided

5   you, sir.                                              2:10PM

6   BY MR. MAYE:

7          Q    Is that, the captain is supposed to

8   ensure that the flight attendant follows the flight

9   attendant manual of the particular air carrier?

10         A    Well, yeah.  But you also kind of threw  2:10PM

11  in sexual misconduct and sexual assault, and I

12  repeatedly tried to differentiate, when you use the

13  word "assault," whether it's physical, sexual or -- I

14  mean, "assault" in general takes us into a different

15  set of protocol.  So it's really not a fair question  2:10PM

16  to lump "reported sexual misconduct" and "assault"

17  into the same conceptual question.

18         Q    So you see a difference between

19  reported sexual assault and reported sexual

20  misconduct?                                            2:11PM

21         A    It's not what I see, sir.  I didn't

22  develop these policies, procedures or vernacular.

23  "Assault" is not the same thing as "misconduct" in our

24  world.

25         Q    What's the difference in your world?      2:11PM



Page 148

1          A     A physical assault is dealt with as a      2:11PM

2    threat to an individual's personal safety and

3    security.  Misconduct may not rise to that level,

4    would be my best answer.

5          Q     If a passenger was rubbing the genitals    2:12PM

6    of another passenger without consent, would that fall

7    under sexual assault or sexual misconduct?

8          A     I didn't write the rules, sir.  I don't

9    know.  It would depend on what the passenger reported

10   to the flight attendant was occurring and to what      2:12PM

11   degree.

12         Q     So just to be clear, in your

13   perspective, sexual misconduct is an act that is not

14   as severe as sexual assault?

15         MR. McKAY:  Objection to the form.               2:12PM

16         THE WITNESS:  Sir, I didn't write the policy

17   or procedure.  What I'm trying to share is an

18   interpretation of how I read it.  I believe there's

19   probably a wide, an A to Z.  It could be, I would

20   imagine one moment of unwanted touching all the way to 2:13PM

21   something that would constitute assault, and anything

22   in between, subject to the victim's interpretation of

23   what happened.

24   BY MR. MAYE:

25         Q     Does the victim's interpretation of        2:13PM

Page 149

```
 1    what happened dictate how a captain is supposed to       2:13PM
 2    respond to a reported sexual assault?
 3            MR. McKAY:  Objection to the form.
 4            THE WITNESS:  I don't fully understand your
 5    question, sir.                                             2:14PM
 6    BY MR. MAYE:
 7            Q    Say a flight attendant observed a woman
 8    being rubbed by a male passenger.  And the flight
 9    attendant determined it was inappropriate and
10    constituted sexual assault or sexual misconduct.  And     2:14PM
11    the victim said, "No, no, no.  It's all right.  He
12    just did it once and it's okay."
13            MR. McKAY:  Objection to the form.
14    BY MR. MAYE:
15            Q    When the passenger said that to the          2:15PM
16    flight attendant and relayed that to you, would you
17    then decide that nothing needed -- no action needed to
18    be taken?
19            MR. McKAY:  Objection to the form.
20            THE WITNESS:  I mean, are we starting -- is       2:15PM
21    this completely another different hypothetical that
22    we're starting here?
23            MR. MAYE:  It is, yeah.
24            THE WITNESS:  Because, again, we are back to
25    the problem of flight attendants reporting sexual         2:15PM
```



Page 150

1    misconduct on behalf of a victim, when that is not the      2:15PM

2    protocol.

3    BY MR. MAYE:

4           Q    I've given you my hypothetical.

5           MR. McKAY:  You have to give her a set of            2:15PM

6    protocols too to apply to the hypothetical.  This is

7    the problem we ran into with the other expert,

8    Ms. Lord-Jones.  You keep asking hypotheticals that

9    aren't tied to any particular protocol.  So how can

10   she tell you how she would apply the protocol if she        2:16PM

11   doesn't know what it is?

12   BY MR. MAYE:

13          Q    So Captain, as the PIC, if a flight

14   attendant tells you that she observed a male passenger

15   groping a female passenger, and she has determined a        2:16PM

16   sexual assault has been committed, is there a standard

17   of care that dictates how you are supposed to respond

18   to that situation?

19          MR. McKAY:  Objection to the form.

20          THE WITNESS:  We're back to the pre-lunch           2:16PM

21   break hypothetical, except now it's a male and a

22   female versus an adult and a child, and it's the same

23   question.  It's reported that she observed it, and I

24   have no more information than that.  So again, I would

25   start down the road of asking probing questions to         2:17PM

Page 151

1    ascertain her perception.  What she exactly saw.        2:17PM

2    Everything I answered with respect to the adult and

3    child previously, we've just substituted a man and a

4    woman now.

5    BY MR. MAYE:                                             2:17PM

6         Q    And is that -- what dictates your

7    response, is that based on a federal regulation, an

8    industry standard, or the air carrier's manual?

9         MR. McKAY:  Objection to the form.

10        THE WITNESS:  What dictates my response is        2:17PM

11   my responsibility as pilot in command to ensure that

12   the flight attendants have acted in accordance with

13   their training, procedures and protocol, follow the

14   guidance and training they've been given, and are now

15   reporting to me where they are in that process.         2:18PM

16   BY MR. MAYE:

17        Q    So just to clarify, I asked you if

18   there is a standard of care or industry standard on

19   how to respond to a report that a female passenger was

20   groped by a passenger, and you said this is what you   2:18PM

21   would do.

22             Is that the standard of care?

23        MR. McKAY:  Objection to the form.

24        THE WITNESS:  The standard of care, my

25   standard of care, is to ensure that my flight          2:18PM



Page 152

1   attendants have followed their training, procedures        2:18PM

2   and protocol with respect to the report they received.

3                And then when I'm convinced of that and

4   we have discussed everything surrounding that, then my

5   standard of care is to go from there and take whatever     2:19PM

6   next steps are necessary.

7   BY MR. MAYE:

8                Q    Is your standard of care based on a

9   federal regulation or an industry standard of care?

10               MR. McKAY:  Objection to the form.            2:19PM

11               THE WITNESS:  If it makes it easier, there

12  is no Federal Aviation Regulation, per se, that I am

13  aware of, as I have answered multiple times now,

14  dealing with the context in which you're asking these

15  questions, other than that I am the pilot in command     2:19PM

16  and exercise overall command authority and am

17  responsible for the flight attendants following their

18  procedures and protocol.

19  BY MR. MAYE:

20               Q    Is there a standard of care applied by   2:19PM

21  the industry with respect to how a captain is supposed

22  to respond to a report by a flight attendant of a

23  sexual assault observed?

24               MR. McKAY:  Objection to the form.

25               THE WITNESS:  I once again cannot            2:20PM

Page 153

1    differentiate that question from the same question    2:20PM

2    asked multiple times before, and I don't have a

3    different answer.

4    BY MR. MAYE:

5         Q    With respect to responding to a flight    2:20PM

6    attendant coming up to you saying, "Hey, I saw a

7    passenger, male passenger, grope a female passenger,

8    and I'm convinced it's a sexual assault.  I'm

9    concerned, but the female passenger told me that I

10   shouldn't have to worry about it and the guy is not    2:20PM

11   going to do it again," the fact that the female

12   passenger told the flight attendant that it wouldn't

13   happen again and not to worry about it, is that

14   something that would change your analysis or your

15   approach to responding to that reported sexual    2:21PM

16   assault?

17            MR. McKAY:  Objection to the form.

18            THE WITNESS:  I would proceed as I've

19   previously described.  I would work with the flight

20   attendant through their procedures and protocol, make    2:21PM

21   sure it had been -- all the necessary steps had been

22   taken and make a decision about how to proceed from

23   there.

24   BY MR. MAYE:

25       Q    And --    2:21PM



Page 154

```
 1            MR. McKAY:  Is "And" the question?         2:22PM

 2   Objection to the form.

 3   BY MR. MAYE:

 4        Q     In this case if Captain Shupe had asked

 5   if the plaintiffs were related, and you were told yes,  2:22PM

 6   would he still have grounds to separate A.D. from

 7   DelVecchia?

 8            MR. McKAY:  Objection to the form.

 9            THE WITNESS:  I don't understand the

10   question.  I mean, it would have given him more       2:23PM

11   information about the nature of their relationship.  I

12   don't know that he ever determined that he had grounds

13   to separate them.

14   BY MR. MAYE:

15        Q     So are you saying that -- strike that.    2:23PM

16            You testified that after Captain Shupe

17   learned about the facial stroking that concerned

18   flight attendant Chelsie Bright Sakurada, Captain

19   Shupe should have asked about whether the plaintiffs

20   were related.  Is that fair?                         2:24PM

21        A     I believe I testified that that was

22   certainly one of a number of actions he could have

23   taken to gather more information.

24        Q     And if all the actions, the additional

25   actions that you say that he should have taken were   2:24PM
```



Page 155

1    satisfied, and he believed that the facial touching          2:24PM

2    and hand on the crotch posed a potential threat to

3    A.D., and if that separation was necessary and

4    required, do you believe that if he had learned that

5    the plaintiffs were related, that he would not have          2:25PM

6    grounds or he would not be required, there would be no

7    basis for him to direct that A.D. be separated?

8            MR. McKAY:  Objection to the form.

9            THE WITNESS:  You're going to have to

10   restate that.  Too compound.  Sorry.                         2:25PM

11           MR. MAYE:  Okay.  I'll restate it.

12   BY MR. MAYE:

13           Q     If Captain Shupe, after he had spoken

14   to flight attendant Bright Sakurada, and after he

15   spoke with all the other flight attendants about the         2:26PM

16   separate inappropriate touching observed by them, do

17   you believe that his learning or his inquiring about

18   their relationship, whether they're related or not,

19   was a dispositive piece of information, that had he

20   known that, he would not have separated A.D.?                2:26PM

21           MR. McKAY:  Objection to the form.  Also

22   assumes facts not in evidence.

23           THE WITNESS:  Well, I think we're sort of

24   lumping -- every time you say when the Captain learned

25   of the facial touching, that was the first piece of          2:27PM



Page 156

1    information.  And to be clear, the materials I've        2:27PM

2    reviewed don't suggest that all four flight attendants

3    witnessed the inappropriate touching, if you will.

4    Miss Chelsie Bright reported the facial touching, and

5    Scott Warren reported the hand on or near the crotch,      2:27PM

6    various versions of that.  But the other two flight

7    attendants testified to not observing either of those

8    things.  So it's not all of the flight attendants.

9    And there's a chronology problem with what happened in

10   between the report of the facial touching and then        2:27PM

11   Scott Warren's subsequent report.

12              So if I'm able to answer your question,

13   it would have to start with, what would be done after

14   the report of the facial touching and then go from

15   there.                                                    2:28PM

16   BY MR. MAYE:

17       Q    Why would it make a difference, if at

18   all, if Captain Shupe had learned that plaintiffs were

19   father and son, in terms of what his duties and

20   responsibilities were in responding to the reported or    2:28PM

21   suspected sexual misconduct?

22       A    The first thing Captain Shupe was

23   reported was not sexual misconduct.  It was Chelsie

24   Bright's interpretation that somehow the facial

25   touching was inappropriate.  So at that point the          2:29PM



Page 157

1    closest protocol that I can imagine might be on her          2:29PM

2    mind, and what she testified to in her deposition, is

3    that human trafficking, they're always on the alert,

4    they're always on the lookout for human trafficking.

5    So assuming that that might have been what was in her        2:29PM

6    mind, there is a protocol that Captain Shupe could

7    have asked to see and requested that Ms. Bright follow

8    through with in order to gain more information at that

9    point in the flight, which was prior to Scott Warren's

10   report.  They all didn't come in at the same time.  So       2:29PM

11   yeah, just that.

12           Q    Are you familiar with the Blue Light

13   Initiative?

14           A    I'm sorry.  Say it again.

15           Q    Are you familiar with the Blue Light            2:30PM

16   Initiative?

17           A    I have heard it mentioned, not in

18   context to this matter, but I believe it has to do

19   with combating human trafficking, but I can't speak to

20   it, and I may be wrong about that.  I've heard the           2:30PM

21   term.

22           MR. MAYE:  I'm showing the witness what has

23   been marked as Exhibit 2, which is a video

24   presentation regarding the Blue Light Initiative.

25                                                                2:31PM



Page 158

```
 1              (Deposition Exhibit 2 was marked for          2:31PM

 2         identification.)

 3                   (Video plays.)

 4  BY MR. MAYE:

 5         Q    Do you know whether United teaches its       2:32PM

 6  flight attendants that human traffickers can involve

 7  family members?

 8              MR. McKAY:  Objection to the form.

 9              THE WITNESS:  Sir, I'm not going to respond

10  to anything with regard to United policies or           2:32PM

11  procedures.

12  BY MR. MAYE:

13         Q    Would you agree that air carriers are

14  required to train their crew members that human

15  trafficking can involve family members?                 2:32PM

16         A    I don't possess that knowledge.

17              MR. McKAY:  Brian, can I just ask what just

18  happened on screen?  Do we have an Exhibit 2?  Was it

19  meant to have been played?  What's going on?

20              MR. MAYE:  Oh, I'm sorry.  Hold on.          2:32PM

21  BY MR. MAYE:

22         Q    Can you see that?  Can you see that

23  video on the screen, ma'am?

24         A    I can see the video, yes.

25         Q    Have you ever reviewed the portion of       2:33PM
```



1   the video I'm about to play?  It's from two minutes 25      2:33PM

2   seconds to two minutes 50 seconds.  Let me just get

3   this right.  So I'm going to play a video from 2:25 to

4   2:50.  And I'm going ask that you review it.

5                   (Video plays.)                               2:34PM

6   BY MR. MAYE:

7           Q    Have you ever seen the content that I

8   just showed you?

9           A    In all honesty, I can't tell you.  We

10  receive some quarterly training, as I mentioned         2:34PM

11  earlier, and it's computer-based training.  There is a

12  module that speaks to suspected human trafficking.

13  It's primarily directed towards the flight attendants,

14  but we all receive it.  I don't know if that

15  particular video is part of it or not.  It's been some  2:35PM

16  time since I've taken that module.  So in all honesty,

17  I can't tell you.

18          Q    Are air carriers, if you know, are air

19  carriers instructed that its crew should report

20  suspected human trafficking immediately?                2:35PM

21          A    I don't know other than the training.

22  I mean, it follows that that would be part of the

23  flight attendant protocol.  And in fact, it is for

24  Frontier.  But I don't know.  I would suspect so.

25          Q    So you don't know what the industry        2:35PM



Page 160

1    standard is with respect to reporting suspicions of          2:35PM

2    human trafficking?

3              MR. McKAY:  Objection to the form.

4              THE WITNESS:  I would suspect that the,

5    quote/unquote, industry standard is the same as what's       2:36PM

6    listed in Frontier's directive to their flight

7    attendants through their in-flight flyer.

8    BY MR. MAYE:

9         Q    You said you suspect.  But do you know?

10        A    I don't know.                                       2:36PM

11        Q    Do you know if the Blue Light

12   Initiative dictates that when human trafficking is

13   suspected, the flight attendants first must establish

14   that the adult and child are not related?

15             MR. McKAY:  Objection to the form.                  2:36PM

16             THE WITNESS:  I have no information, as I

17   previously testified to about the so-called Blue Light

18   Initiative.

19             MR. McKAY:  Mr. Maye, you had another expert

20   that was thoroughly familiar with this that you didn't       2:37PM

21   ask any questions of about this.  But this is not the

22   expert who has studied the Blue Lightning Initiative.

23   BY MR. MAYE:

24        Q    Do you believe that one family member

25   can traffic another family member?                           2:38PM

**MAGNA**

```
 1          MR. McKAY:  Objection to the form.        2:38PM

 2          THE WITNESS:  I have no opinions about that,

 3     sir.

 4     BY MR. MAYE:

 5          Q    Do you believe that sexual misconduct  2:38PM

 6     by one family member against another can occur?

 7          MR. McKAY:  Objection to the form.

 8          THE WITNESS:  In general can sexual

 9     misconduct occur between family members?

10          MR. MAYE:  Yes.                            2:38PM

11          THE WITNESS:  I have heard of such cases.

12     BY MR. MAYE:

13          Q    If you received a report from a flight

14     attendant that they observed what they per perceived

15     to be a sexual assault, and then the flight attendant  2:38PM

16     told you that they believed that the two passengers

17     involved were related, would that cause you to not

18     inquire any further or to not take action with respect

19     to the reported sexual assault?

20          MR. McKAY:  Objection to the form.         2:39PM

21          THE WITNESS:  Again, sir, there was a lot in

22     that question.  The word "assault" versus

23     "misconduct," report, whether it was verified or not,

24     I can't glean any material difference between that

25     question and ones I've answered numerous times now.   2:39PM
```



Page 162

1   BY MR. MAYE:                                              2:39PM

2          Q    So you're refusing to answer that

3   question?

4          MR. McKAY:   Brian, please.

5          THE WITNESS:   I'll answer it the same way        2:39PM

6   I've answered it all morning.

7          MR. MAYE:   Okay.

8          THE WITNESS:   If it was a report of sexual

9   misconduct or a sexual assault just from a flight

10  attendant, and a passenger had not notified the flight   2:40PM

11  attendant of that, it was just a flight attendant

12  observation, same answer as before, I would ask to see

13  their protocol, ask what they suspected, and we would

14  have a conversation about next steps and how to garner

15  more information.                                        2:40PM

16  BY MR. MAYE:

17         Q    And after you did that, it was learned

18  that the passengers were related, would your inquiry

19  stop at that point?

20         MR. McKAY:   Objection.   Form.                   2:40PM

21         THE WITNESS:   I don't know what I've learned

22  with the "after that."   It would depend on what kind

23  of information was obtained after the initial report

24  and my directive to go through the protocol.   It would

25  first depend upon what was learned from that            2:41PM



Page 163

1    investigation.  I suspect if that was followed         2:41PM

2    properly, and in accordance with procedures, it would

3    be revealed whether or not the two individuals in

4    question were related.

5    BY MR. MAYE:                                            2:41PM

6         Q    And why is that important, if they're

7    related, in your analysis?

8         A    I didn't say that it was.  I said it

9    would likely be revealed.  If we're going to stick

10   with the facts at hand and what's being investigated   2:41PM

11   in this matter, initial report was "facial touching."

12   Why would that be important?  Well, if it was revealed

13   that Peter and A.D. were in fact father and son, it

14   would shed light on the nature of their relationship

15   and perhaps allow a different perspective into what     2:41PM

16   was being observed.

17        Q    And based on all the facts that you

18   observed and reviewed, had Captain Shupe learned

19   before directing that A.D. be separated, had he known

20   they were father and son -- strike that.  I'll move     2:42PM

21   on.

22             I'm missing page 2.  That's odd.

23        MR. McKAY:  I don't know where this copy

24   came from.  I have a complete copy.  But you talked

25   about page 2 earlier.                                   2:44PM



Page 164

```
 1          MR. MAYE:  So strange.                    2:44PM

 2          THE WITNESS:  We actually had page 2 up

 3   earlier.

 4          MR. MAYE:  There it is.  I don't know.

 5   That's weird.                                    2:44PM

 6   BY MR. MAYE:

 7          Q    The last paragraph on page 2, "These

 8   critical omissions by the PIC, as clearly the

 9   knowledge that Peter DelVecchia and A.D. shared a

10   surname and were, in fact, father and son would have  2:45PM

11   shed a completely different light on the allegation of

12   inappropriate touching and borne out the fact that it

13   was a simple consensual and loving expression of

14   parental comfort."

15          So are you saying that had the flight     2:45PM

16   attendants and Captain Shupe known that the Captain

17   and -- I'm sorry, that Mr. DelVecchia and A.D. were

18   father and son, that the captain and flight attendants

19   would have viewed the perceived inappropriate touching

20   as appropriate?                                  2:46PM

21          A    I think my report speaks for itself.  I

22   think it clearly, at the initial report from Chelsie

23   Bright, that there was facial touching, and she

24   perceived it to be inappropriate, instead of doing any

25   further research or asking any questions, had she been  2:46PM
```



Page 165

1    made aware that they were father and son, then perhaps     2:46PM

2    she could have looked at it through a different lens.

3    Perhaps he was a frightened flyer.  Perhaps he didn't

4    like to be on an airplane and his father was

5    comforting him.  I mean, there are a myriad other        2:46PM

6    perceptions she might have allowed herself to reach in

7    light of that knowledge.

8           Q    Would you agree that you're speculating

9    regarding the potential impact on Chelsie Bright

10   knowing that they were father and son?                   2:47PM

11          MR. McKAY:  Objection to the form of the

12   question.

13          THE WITNESS:  I would say that even Captain

14   Shupe in his own deposition testified to the same, and

15   he's the critical decision-maker.  So at the end of     2:47PM

16   the day, it really doesn't matter what Ms. Bright's

17   perception was if Captain Shupe had known and had been

18   made aware of the fact.  And he so testified in

19   accordance with that.

20   BY MR. MAYE:                                             2:47PM

21          Q    Okay.  So I'm sorry.  I don't believe

22   you answered my question.  My question is, would you

23   agree that you're speculating when you stated that

24   Chelsie Bright's perception of the facial stroking may

25   have been different had she known of the relationship    2:48PM



1    between Mr. DelVecchia and A.D.?                          2:48PM

2              MR. McKAY:  Objection to the form.

3              THE WITNESS:  I don't know.  Yes, I don't

4    know whether it would have affected her perception or

5    not.  Once again, if it affects Captain Shupe's,        2:48PM

6    that's really all that matters.

7    BY MR. MAYE:

8              Q    Are you aware that Chelsie Bright

9    testified that she believed that the touching was

10   inappropriate for a parent-child relationship?          2:48PM

11             A    I recall reading that she said that,

12   yes.  I recall she didn't know whether they were

13   parent or child, but said that regardless.

14             Q    She said it wouldn't have made a

15   difference, right?                                       2:49PM

16             A    Well, I don't know who designated

17   Chelsie Bright as a parent-child psychologist and

18   gives her any leeway to say what's appropriate between

19   an individual parent and that child.  So I don't find

20   it to be credible or really relevant.                   2:49PM

21             Q    If that's the case, the same would be

22   true of you, correct?

23             MR. McKAY:  Objection to the form.

24             THE WITNESS:  My opinion is not in my

25   report.  Mr. McKay asked Captain Shupe if he had known  2:49PM

Page 167

1    that they were father and son, would it impact his          2:49PM

2    opinion of the facial touching, and would it have been

3    a big deal.  We can go -- he's the one deciding to

4    separate them.  So it's not Ms. Bright's decision.

5    And it certainly wasn't mine.  I wasn't there.          2:50PM

6    BY MR. MAYE:

7          Q    You weren't there.  So given that you

8    weren't there, how are you able to judge whether or

9    not the facial stroking by Mr. DelVecchia on A.D. was

10   not inappropriate?          2:50PM

11         MR. McKAY:  Objection to the form.

12         THE WITNESS:  So not inappropriate, meaning

13   it was -- first of all, I don't know where I'm

14   allegedly judging anything about the facial stroking.

15   BY MR. MAYE:          2:51PM

16         Q    Okay.  Let me find the section for you.

17   We just went over it.  It says, "These were critical

18   omissions by the PIC, as clearly the knowledge that

19   Mr. DelVecchia and A.D. shared a surname and were, in

20   fact, father and son, would have shed a completely          2:51PM

21   different light on the allegation of inappropriate

22   touching and borne out the fact that it was a simple,

23   consensual loving expression of parental comfort."

24         How are you qualified or what makes you

25   qualified to give that opinion?          2:52PM



Page 168

1          MR. McKAY:  Objection to the form.                    2:52PM

2          THE WITNESS:  I read Mr. DelVecchia's

3     deposition in which he stated that that is exactly

4     what it was.

5     BY MR. MAYE:                                               2:52PM

6          Q    So you're just -- so you've accepted as

7     truth Mr. DelVecchia's testimony about the nature of

8     the touching?

9          MR. McKAY:  Objection to the form.

10         THE WITNESS:  I believe that any reasonable       2:53PM

11    person -- yes, I did read Mr. DelVecchia's account of

12    what happened, and his relationship was a very complex

13    relationship with his son, and I'm not a psychologist,

14    but yes, I do accept that that was the situation.  The

15    paragraph, however, in the report serves to enlighten   2:53PM

16    the reader that there was more than one way to

17    interpret this facial touching, and that really,

18    despite Ms. Bright's characterization of it, it would

19    have at least opened up the realm of possibility that

20    knowing this is father and son, that it was merely a    2:54PM

21    comforting gesture.

22    BY MR. MAYE:

23         Q    How do you square that with Chelsie

24    Bright's testimony that in her mind, this was not

25    appropriate touching for a parent-child relationship?   2:54PM



Page 169

```
 1        A    Quite frankly, sir, I don't square          2:54PM

 2   anything Ms. Bright said in her -- her deposition

 3   testimony contradicts herself and her flight

 4   attendants in multiple -- I don't square anything

 5   Ms. Bright said, to be quite frank.                   2:54PM

 6        Q    What are you saying?  You don't believe

 7   anything Ms. Bright has reported?  What is that based

 8   on?

 9        A    Well, part of my report, sir, there's

10   an appendix that lists the multiple conflicting       2:54PM

11   accounts of crew member testimony.  And I'm happy to

12   go through all of that.  It's just that.  It's very

13   difficult to discern when you read all four of these

14   flight attendants' testimony, deposition testimonies,

15   who's telling the truth.  If, in fact, any of them    2:55PM

16   are, because they all conflict with one another.

17        Q    Do you have expertise in judging

18   whether witnesses are testifying truthfully?

19        A    Well, I have expertise in reading

20   deposition testimony from one flight attendant that is 2:55PM

21   in direct contradiction to what the second flight

22   attendant said happened for the same event.

23        Q    What expertise is that?  You said you

24   have an expertise in reading deposition transcripts.

25   What kind of expert background do you have with       2:56PM
```



Page 170

1    respect to reading depositions?                          2:56PM

2           A    I'm not testifying that I'm an expert

3    in reading depositions, sir.  What I'm telling you is

4    that there are multiple conflicting witness

5    statements, flight attendant statements, as well as      2:56PM

6    pilot statements in this matter, that don't line up.

7    And you don't have to be an expert to discern one from

8    the other, what is being said when you're trying to

9    drill down to arrive at what really happened.

10          Q    My question earlier, I said how do you        2:56PM

11   square Chelsie Bright's testimony that this was, in

12   her mind, not appropriate touching for a parent-child

13   relationship, and your testimony that had she known

14   they were parent and child, maybe she would have had a

15   different perception.  And your response was you don't    2:57PM

16   square anything with what Chelsie Bright has said.

17          A    Actually, sir, I'm just going to

18   interrupt you because I didn't say that it would

19   change Ms. Bright's perception.  What I said was that

20   Shupe, Captain Shupe agreed in his depo that had he       2:57PM

21   known that, and nothing was objectionable about the

22   contact with each other, it would have been a non

23   issue.  My focus is on Captain Shupe.

24          Q    Okay.

25          A    And it may not have affected, as I just       2:58PM

Page 171

1   previously testified to.  Maybe it wouldn't have          2:58PM

2   affected Ms. Bright's perception of the event, and

3   don't know, I can't speak to why she saw it and

4   reacted the way she did or had the opinion about it

5   that she held.  I'm merely saying this would have         2:58PM

6   shed, certainly shed new light on the fact that -- and

7   given Captain Shupe one more data point to consider

8   whether this was inappropriate, non-consensual, and I

9   cited in his deposition testimony the fact that he

10  agreed that it might have made a difference.             2:58PM

11         Q    And it may not have made a difference,

12  right?

13         MR. McKAY:  Objection to the form.

14         THE WITNESS:  I don't believe that's what

15  his testimony is.  I mean, I'll read it for you.         2:58PM

16  BY MR. MAYE:

17         Q    We'll get to in a second, but I thought

18  you just said that it may have made a difference.  Did

19  you misspeak?

20         A    Well, let me be more clear.                  2:59PM

21         MR. McKAY:  Objection.  Form.

22         THE WITNESS:  What my report says is, "Of

23  note in his depo, Shupe agreed that if the passengers

24  had responded that they are father and child and

25  nothing was objectionable about their contact with      2:59PM



Page 172

1   each other, it would have been a non-issue."                  2:59PM

2   BY MR. MAYE:

3            Q     Was he -- sorry.

4            A     That is taken directly from Captain

5   Shupe's deposition testimony.                                 2:59PM

6            Q     Was he talking specifically about this

7   case?

8            A     That is my understanding, sir, yeah, he

9   was responding to Mr. McKay in a deposition about the

10  facial touching in this matter, yes.                          2:59PM

11           Q     And if he, in fact, was not talking

12  about this case specifically, and he actually said

13  that learning that they are father and son in this

14  case would not have caused him to change his course of

15  action, would that change your opinion about the        3:00PM

16  significance of Captain Shupe learning about the

17  father-son relationship between plaintiffs?

18           MR. McKAY:  Objection to the form.

19           THE WITNESS:  I'm sorry, sir.  I didn't

20  follow the question.                                          3:00PM

21           MR. MAYE:  Court Reporter, can you read that

22  back?

23                 (Record read as follows:

24                     "Question:  And if he, in

25                     fact, was not talking about this    3:00PM

MAGNA

Page 173

1              case specifically, and he actually        3:00PM

2              said that learning that they are

3              father and son in this case would

4              not have caused him to change his

5              course of action, would that            3:00PM

6              change your opinion about the

7              significance of Captain Shupe

8              learning about the father-son

9              relationship between plaintiffs?")

10        MR. McKAY:  Same objection.                   3:00PM

11        THE WITNESS:  The question starts out saying

12   "If, in fact, he's not talking about this case," and

13   then embedded in the question it says "in this case."

14   BY MR. MAYE:

15        Q    You were referring to testimony, and in   3:01PM

16   fact, you just read it, right?

17        A    I did just read an excerpt.

18        Q    That's the testimony that I'm talking

19   about initially, when I said, if that testimony, or in

20   that testimony that you just read, if he was not       3:01PM

21   talking about this case specifically, and he was

22   talking general terms, but then he was asked

23   specifically about this case, and in this case he

24   testified that it would not have changed his course of

25   action had he known if the plaintiffs were father and  3:01PM



Page 174

1    son, would that change your opinion about the        3:02PM

2    significance of the father-son relationship?

3            MR. McKAY:  Objection to the form and

4    assumes facts not in evidence.

5            THE WITNESS:  Sir, that's not what he        3:02PM

6    testified to, so I don't have a -- I mean, that's not

7    what happened here.  That's not what he said.

8    BY MR. MAYE:

9            Q    I understand.  But what I'm asking you,

10   if he did testify that way, if he said, "Specifically   3:02PM

11   in this case had I learned that they were father and

12   son, that wouldn't have changed my course of action, I

13   would have done the same thing," I'm asking you if he

14   had testified to that effect, would that change your

15   opinion that the father-son relationship had any       3:02PM

16   insignificance?

17           MR. McKAY:  Objection to the form.

18           THE WITNESS:  No, it doesn't change my

19   answer.  And again, my answer is that is information I

20   would have wanted as a captain.  It's logical          3:03PM

21   information to go get, and it's in line with what I

22   would have instructed the flight attendants, what

23   Captain Shupe should have instructed the flight

24   attendants to do, was to follow their protocol, and he

25   would have ascertained that information.                3:03PM

MAGNA

Page 175

1           You're asking me to opine about the        3:03PM

2    direct opposite of what he testified to.  So I don't

3    really know how to do that.

4    BY MR. MAYE:

5           Q    So you're not aware and you've never     3:03PM

6    considered testimony from Captain Shupe that in this

7    case he would not have changed course and it would not

8    have affected his decision-making had he known that

9    the plaintiffs were father and son?  You're not aware

10   of that testimony and you never considered that        3:04PM

11   testimony in forging your opinions in this report?

12          MR. McKAY:  Objection to the form.  There is

13   no such testimony.

14          THE WITNESS:  I have not reviewed any such

15   testimony in my materials, sir.  And I reviewed        3:04PM

16   Captain Shupe's deposition extensively.

17   BY MR. MAYE:

18          Q    Did flight attendants know or suspect

19   that the plaintiffs were father and son at any point

20   during the flight?                                     3:04PM

21          MR. McKAY:  Objection to the form of the

22   question.

23          THE WITNESS:  Once again, sir, there's so

24   much conflicting testimony, I really want to go back

25   through the depositions or the summaries.  I can       3:05PM



Page 176

```
 1   answer for specific flight attendants, but they even      3:05PM

 2   contradict themselves in their own deposition

 3   testimony about that.  I would have to go back through

 4   the depositions and review them.

 5   BY MR. MAYE:                                               3:05PM

 6        Q    Do you recall any of the flight

 7   attendants testifying that they were aware that the

 8   plaintiffs were father and son?

 9        A    I'm aware that after A.D. was moved out

10   of his father's care, he notified Scott Warren that      3:05PM

11   they were, in fact, father and son.  I also believe

12   there's testimony that Mr. DelVecchia did the same.

13   Again, I would have to dive back into the depositions.

14        Q    So if that's the case that Scott Warren

15   at some point became aware that they were father and     3:06PM

16   son and the decision wasn't made to move A.D. back to

17   his seat, would you agree that if Scott Warren had

18   learned of that information at that point, he did not

19   consider that information important or significant in

20   the context of what was happening?                       3:06PM

21        MR. McKAY:  Objection to the form of the

22   question.

23        THE WITNESS:  I don't know what Scott Warren

24   considered to be important or relevant.

25
```

MAGNA

Page 177

```
1   BY MR. MAYE:                                          3:06PM
2         Q    I'm just asking you to give an opinion.
3         MR. McKAY:   Objection to the form.
4         THE WITNESS:   I don't have an opinion about
5   what Mr. Warren was thinking, sir.                    3:07PM
6         MR. MAYE:   Okay.
7         THE WITNESS:   I can't offer an opinion as to
8   what he considered relevant or not.   I know he didn't
9   consider it relevant to tell Captain Shupe that both
10  P.D. and A.D. were asleep.                            3:07PM
11  BY MR. MAYE:
12        Q    How do you know that?   You just
13  testified that you can't give an opinion on what Scott
14  Warren thought was relevant or important.
15        A    Well, I know that he --                    3:07PM
16        Q    But now you're saying that you can?
17  What's the difference?
18        A    What I'm saying, sir, is that he didn't
19  consider -- it was a very relevant piece of
20  information in my opinion, and he didn't feel -- he    3:07PM
21  omitted that critical detail from his report to
22  Captain Shupe about what he observed between P.D. and
23  A.D.
24        Q    Would you agree that --
25        A    I have to -- I'm sorry.   Go ahead.        3:08PM
```



Page 178

```
 1          Q     Go ahead.  I'm sorry.                    3:08PM

 2          A     I have to assume that that omission was

 3   something he didn't consider relevant because he

 4   omitted it, and it was a fairly critical piece of

 5   information.                                          3:08PM

 6          Q     Would you agree that Scott Warren

 7   testified that he wasn't certain whether or not he had

 8   told the captain that plaintiffs appeared asleep at

 9   the time that he observed the hand on the crotch?

10          MR. McKAY:  Objection to the form of the       3:08PM

11   question.

12          THE WITNESS:  I would have to go back into

13   the deposition to see what Mr. Warren exactly said in

14   his deposition.

15   BY MR. MAYE:                                          3:08PM

16          Q     So you're testifying that you believe

17   the fact that Mr. Warren or Flight Attendant Warren

18   observed Mr. DelVecchia and A.D. asleep at the time he

19   observed the hand touching, but you don't know what

20   Mr. Warren was thinking at the time he provided        3:09PM

21   information to the captain about what he had observed

22   taking place between Mr. DelVecchia and A.D. at the

23   time the hand was on the crotch.  Is that fair?

24          MR. McKAY:  Objection to the form of the

25   question.                                             3:09PM
```

Page 179

```
 1              THE WITNESS:  Do I know what Mr. Warren was    3:09PM

 2   thinking?  Is that the question?

 3   BY MR. MAYE:

 4        Q    Yes.  When he was providing the

 5   information about his observations to Captain Shupe,   3:09PM

 6   and you said it was relevant information and it's

 7   information that he should have realized was relevant,

 8   what I'm asking is you don't know what exactly he was

 9   thinking at the time he did or did not provide that

10   information to Captain Shupe.  Is that fair?          3:10PM

11              MR. McKAY:  Objection to the form of the

12   question.

13              THE WITNESS:  I don't know what he was

14   thinking.  I do know what he was tasked to do, and

15   that was to provide Captain Shupe the most thorough   3:10PM

16   and complete description of his direct observations

17   that he could, and to omit the fact that both P.D. and

18   A.D. were asleep, paints a very incomplete picture for

19   Captain Shupe to then act upon.

20              MR. McKAY:  Brian, is this a good point for  3:11PM

21   a break.

22              MR. MAYE:  Yeah.  Sure.  Wait.  Hold on.

23   Yeah, that's fine.

24              THE VIDEOGRAPHER:  This marks the end of

25   Media Number 3.  The time is 3:11 p.m.  We're off the  3:11PM
```



Page 180

```
 1   record.                                               3:11PM

 2            (Recess.)

 3            THE VIDEOGRAPHER:   This marks the beginning

 4   of Media Number 4.   The time is 3:26 p.m.   We're back

 5   on the record.                                        3:26PM

 6   BY MR. MAYE:

 7        Q    Captain Norton, to the extent Flight

 8   Attendant Warren did not provide the information to

 9   Captain Shupe that the plaintiffs appeared to sleep at

10   the time he observed the hand on the crotch, were      3:26PM

11   there any facts in the case that you have reviewed

12   establishing why such information was not provided to

13   Captain Shupe?

14        A    Are you asking if I know why Scott

15   Warren did not report that?                            3:26PM

16        Q    Yes.

17        A    Is that your question?

18        Q    Yes, to the extent he did not report

19   it, are there any facts in the case that you have seen

20   that indicate the reason he did not provide such       3:26PM

21   information?

22        A    No, sir, I have no idea why he wouldn't

23   convey that information.

24        Q    Are you aware of any facts indicating

25   that Captain Shupe was aware that plaintiffs appeared   3:27PM
```



Page 181

1   sleeping at the time that Mr. Warren observed the hand      3:27PM

2   on the crotch?

3           A    I believe my report, if I may, I

4   believe that he testified that he didn't -- he wasn't

5   aware of it and that he agreed that he wouldn't           3:27PM

6   consider someone to be sexually molesting someone if

7   the alleged molester is asleep.  That's what I -- I

8   believe that the -- I could go back into his depo, but

9   I believe that line of questioning established that he

10  wasn't -- he hadn't been told that they were sleeping     3:27PM

11  and he didn't know at the time.

12          MR. McKAY:  Brian, I was just going to say

13  that according to my calculations, we've been on the

14  record for four hours and 20 minutes.

15          MR. MAYE:  Thanks, John.                           3:29PM

16              I'm showing the witness what has been

17  marked as Exhibit 3, which is the deposition

18  transcript of Captain Shupe, and directing the

19  witness' attention to page 52.

20          (Deposition Exhibit 3 was marked for              3:30PM

21            identification.)

22          MR. McKAY:  I think what you're looking for

23  is in Tara's cross.

24          MR. MAYE:  Pardon?

25          MR. McKAY:  I said I think what you're            3:31PM



Page 182

1    looking for is in Tara's cross.                        3:31PM

2          MR. MAYE:  Oh, okay.  Right.

3          MR. McKAY:  This is the part where he agreed

4    with me on 52.  And then she asked it a little

5    differently, and he said something a little different    3:31PM

6    in cross.

7          MR. MAYE:  Great.  Let me -- I'll come back

8    to that.

9    BY MR. MAYE:

10         Q    On page 3 of your report, you state --      3:32PM

11   oh, I see that.  Okay.  You state that Shupe then

12   instructed the flight attendant to conduct frequent

13   walk-bys and report back to him, specifically if there

14   was an observation of any more touching between

15   Mr. DelVecchia and A.D.  Shortly thereafter, a fourth    3:32PM

16   flight attendant, Scott Warren, parentheses, having no

17   prior interactions with the DelVecchias, end of

18   parentheses, walked the length of the cabin, returned

19   to the cockpit to directly relay to Shupe his

20   observation, in parentheses -- I'm sorry, quotations,    3:33PM

21   that Mr. DelVecchia is now sexually molesting A.D.

22         Do you see that?  And then you, in

23   parentheses, you say specifically that Peter

24   DelVecchia had his hand on A.D.'s crotch.

25         Where in anyone's testimony was it said         3:33PM

Page 183

 1   that Flight Attendant Warren said to Captain Shupe          3:33PM

 2   that Mr. DelVecchia was now molesting A.D.?

 3        A    I would have to go back through -- I

 4   would have to go back through the deposition testimony

 5   to specifically answer that.                                3:33PM

 6        Q    Are those your words, your description

 7   of what Flight Attendant Warren told Captain Shupe or

 8   are those the exact words that you believe Flight

 9   Attendant Warren told Captain Shupe?

10        A    Again, sir, I'd have to go back through          3:34PM

11   the deposition.  There were multiple, as I said, there

12   were -- there was conflicting, quite a bit of

13   conflicting testimony, as I stated in the next

14   paragraph, regarding the specific verbiage that was

15   used by Scott Warren to describe the -- to describe       3:34PM

16   what he witnessed.  And I can, I suppose, look at my

17   appendix C.

18        MR. McKAY:  Excuse me.  I can save the time.

19   It's right there in the report.  It says, "Parens,

20   specifically that P.D. had his hand on A.D.'s crotch      3:35PM

21   area."

22        THE WITNESS:  Yeah, I guess that's -- the

23   specifics, I believe that that is exactly what I

24   lifted from Scott Warren's testimony, was that P.D.

25   had his hand on A.D.'s crotch area.                        3:35PM



Page 184

1   BY MR. MAYE:                                          3:35PM

2          Q    So Flight Attendant Warren did not say

3   specifically that Peter DelVecchia was now sexually

4   molesting A.D.  Would you agree with that?

5          A    Again, sir, I would ask to --            3:35PM

6          MR. McKAY:  Objection.

7          THE WITNESS:  I would ask to go back into

8   his deposition.  I know that Ms. Bright Sakurada --

9   BY MR. MAYE:

10         Q    We're talking about Warren here.         3:36PM

11         A    Right.  I understand.  But there was

12  hearsay and there were flight attendants.  What did

13  Scott say and then what did Scott tell the captain.

14  And that's why my -- the paragraph subsequent to that

15  in parenthesis points out the multiple conflicting     3:36PM

16  accounts as well as the conflicting testimony

17  regarding what specific verbiage Scott Warren used.

18         Q    So you believe that Scott Warren used

19  conflicting language regarding his description of what

20  he observed?                                         3:36PM

21         MR. McKAY:  Objection to the form.

22         THE WITNESS:  Sir, there's so much

23  conflicting testimony between the flight -- I mean,

24  Scott Warren just himself, I -- I have a --

25

Page 185

1    BY MR. MAYE:                                              3:37PM

2        Q    I'm just asking about the description

3    to Captain Shupe about what he observed.  Did he say

4    something different than he saw A.D.'s -- he saw

5    Peter's hand on A.D.'s crotch area?                       3:37PM

6        A    Well, that's what my report says, so I

7    believe I lifted that from Mr. Warren's actual

8    deposition.

9        Q    So what I'm asking is, why did you

10   characterize what Flight Attendant Warren said to        3:37PM

11   Captain Shupe about his observation as "now he's

12   sexually molesting A.D."?

13       A    I don't know that I understand your

14   question.  I mean, that is what he actually reported

15   to Captain Shupe.                                         3:37PM

16       Q    No.  I'm sorry, I thought you just said

17   that what he reported to Captain Shupe was that Peter

18   DelVecchia's hand was on A.D.'s crotch.

19       A    Well, again, I would ask that I can go

20   back into Scott Warren's deposition.  I also have        3:38PM

21   descriptions of what Scott Warren told -- if you're

22   asking what he exactly told the captain, I have some

23   differing accounts of what he actually said for the

24   flight attendants' verbiage that they allege Scott

25   Warren used to describe what he observed with regard     3:38PM



Page 186

1   to the hand touching.                                    3:38PM

2          Q    What did Flight Attendant Warren tell

3   Captain Shupe about what he observed?

4          MR. McKAY:  Okay.  Let's let her look at the

5   deposition testimony.                                    3:39PM

6          MR. MAYE:  Okay.  Can we go off the record?

7          MR. McKAY:  Whatever you want to do.

8          MR. MAYE:  Let's go off the record.

9          THE VIDEOGRAPHER:  Going off the record.

10   The time is 3:39 p.m.                                   3:39PM

11                    (Recess.)

12          THE VIDEOGRAPHER:  The time is 3:45 p.m.

13   We're back on the record.

14   BY MR. MAYE:

15          Q    Captain Norton, in this sentence I've       3:45PM

16   highlighted in your report page 3, second paragraph --

17          MR. McKAY:  You're not sharing.

18          MR. MAYE:  Oh, shit.

19          MR. McKAY:  Can't say that on the record.

20          MR. MAYE:  Withdrawn.                            3:45PM

21   BY MR. MAYE:

22          Q    In the page 3, second paragraph, second

23   sentence, which I've highlighted, says, "Shortly

24   thereafter, a fourth flight attendant, Scott Warren,

25   having had no prior interaction with DelVecchias,       3:45PM

Page 187

1  walked the length of the cabin and returned to the          3:45PM

2  cockpit to directly relay to Shupe his observation

3  that Peter DelVecchia was now sexually molesting A.D,

4  parenthesis, specifically that P.D. had his hand on

5  A.D.'s crotch."                                              3:45PM

6           Now, is it true that Scott Warren

7  testified that he told Captain Shupe that

8  Mr. DelVecchia's hand was on A.D.'s crotch?

9           A    That is what I was just trying to find

10 for you, sir.  I don't believe I would have put it in    3:46PM

11 my report to read specifically that if that's not what

12 I read.

13          Q    Okay.  Now -- sorry.

14          A    Sorry.  There's also testimony from

15 the --                                                       3:46PM

16          Q    I know.  I'm going to ask you follow-up

17 question.  So with respect to the statement that P.D.

18 was now sexually molesting A.D., would you agree that

19 that's not based on what Flight Attendant Warren

20 specifically said about what he told Captain Shupe?       3:46PM

21          MR. McKAY:  Objection to the form of the

22 question.

23          THE WITNESS:  Again, sir, I wish I could

24 look it up for you, but it could be contextual.  I

25 think that the exact -- that the quote was that, and     3:47PM



Page 188

```
 1    I'm looking at other information of Chelsie and what      3:47PM
 2    was said, but that Mr. Warren stated that he saw
 3    Mr. DelVecchia's hand resting on the boy's crotch.
 4    And I wrote "crotch area."  So again, I think it's
 5    sort of the same concept, but I can't go into          3:47PM
 6    Mr. Warren's deposition without leaving --
 7    BY MR. MAYE:
 8            Q    So without going into his deposition,
 9    you don't recall Flight Attendant Warren ever
10    specifically saying to Captain Shupe that Peter        3:47PM
11    DelVecchia was now sexually molesting A.D.  Is that
12    fair?
13            MR. McKAY:  Objection to the form.
14            THE WITNESS:  Specifically, no, I don't.
15    BY MR. MAYE:                                            3:48PM
16            Q    So why did you characterize what Flight
17    Attendant Warren said to Captain Shupe as "now
18    sexually molesting A.D."?  What is the basis of your
19    description?
20            MR. McKAY:  Objection to the form.             3:48PM
21            THE WITNESS:  Again, sir, I think it was
22    lifted out of the term that was being used in
23    questioning during the deposition as well as the fact
24    that Chelsie Bright used the term in hers as well.
25
```

MAGNA

Page 189

1    BY MR. MAYE:                                          3:48PM

2          Q    Are you aware of any flight attendant

3    saying to any other flight attendant during this

4    flight, or any flight attendant stating to Captain

5    Shupe during this flight that they suspected that     3:48PM

6    Mr. DelVecchia was sexually molesting A.D. during this

7    flight?

8          MR. McKAY:  Objection to the form.

9          THE WITNESS:  No.  In fact, none of the

10   flight attendants listed any specific protocol that   3:49PM

11   they were allegedly following with regard to how they

12   treated the DelVecchias, as I testified to earlier.

13   BY MR. MAYE:

14         Q    So is that a "yes," that you're not

15   aware of any flight attendant stating during the      3:49PM

16   flight that Peter DelVecchia was sexually molesting

17   A.D.?

18         MR. McKAY:  Objection to the form.

19         THE WITNESS:  The specific verbiage, once

20   again, that Mr. Warren used in both what was told to   3:49PM

21   the other flight attendants and to Captain Shupe, I

22   think could be reasonably described as sexual

23   molestation.  Was that term specifically used from one

24   flight attendant to another flight attendant or to the

25   captain?  Not that I reviewed.                        3:50PM



Page 190

1   BY MR. MAYE:                                                3:50PM

2           Q    Fifth paragraph down --

3           MR. McKAY:   What page, Counsel?

4   BY MR. MAYE:

5           Q    This is page 3, fifth paragraph,              3:50PM

6   paragraph begins with "Shupe."

7                It says, "Shupe, despite testifying

8   under oath that 'The buck stops with me,' then made

9   the ultimate decision to separate A.D. from P.D. with

10  all four flight attendants present; presumably Bright   3:51PM

11  Sakurada and Warren in the cockpit, and Bond and

12  Nickel on the intercom, and agreed that everyone in

13  the cockpit agreed that the best thing to do was to

14  separate them."

15               Are you suggesting here that Captain         3:51PM

16  Shupe -- are you indicating here that Captain Shupe

17  got a consensus from the flight attendants about

18  separating A.D. from Mr. DelVecchia?

19          MR. McKAY:   Objection to the form.

20          THE WITNESS:   Am I indicating that that's       3:51PM

21  what he did?  I'm sorry.  I don't understand the

22  question.

23  BY MR. MAYE:

24          Q    Yes.  I'm trying to figure out what

25  this sentence means.                                    3:52PM

```
 1              One, are you saying that Captain Shupe   3:52PM

 2   got a consensus from the flight attendants about

 3   separating A.D. from Mr. DelVecchia before he actually

 4   directed that A.D. be separated from Mr. DelVecchia?

 5              MR. McKAY:  Objection to the form.         3:52PM

 6              THE WITNESS:  That's probably -- the first

 7   sentence is kind of dependent upon the second one,

 8   which, my point being, that the captain, who the buck

 9   does indeed stop with, made this critical decision

10   that only he could make, irrespective of the fact that  3:52PM

11   all he did was -- he directed no protocol, no

12   suspected human trafficking or suspected sexual

13   molestation protocols were followed.  Let me correct

14   myself.  There is no suspected sexual molestation, but

15   reported sexual molestation.                           3:53PM

16              So the point being, the buck does stop

17   with Captain Shupe, and in my opinion he had the

18   responsibility to engage some of the myriad resources

19   at his disposal to try to get more information before

20   making this critical decision to separate this family.  3:53PM

21   BY MR. MAYE:

22        Q    Well, didn't he consult with all four

23   flight attendants about the circumstances?

24        A    Bond and Nickel basically both

25   testified that they had nothing to offer with regard    3:53PM
```



Page 192

```
 1   to -- they observed nothing.  They didn't seem to.  So    3:53PM

 2   they had nothing --

 3          Q     Was it appropriate -- sorry, go ahead.

 4          A     Sorry?

 5          Q     Was it appropriate --                         3:54PM

 6          MR. McKAY:  Stop talking over each other,

 7   please.

 8   BY MR. MAYE:

 9          Q     Was it appropriate or permissible for

10   Captain Shupe to talk to all four flight attendants        3:54PM

11   about their observations and their views about the

12   circumstances before making a decision to separate

13   A.D. from Mr. DelVecchia?

14          A     Of course.  That would have been a --

15   that would have been a good first step.  That's not        3:54PM

16   what that paragraph does, though.  What my point is,

17   is that there were many other resources and other

18   actions that could and should have been taken that

19   were not before this decision was made and that

20   Captain Shupe had a responsibility to undertake those.     3:54PM

21          Q     And what are those?  You said myriad of

22   resources at his disposal.  What are those resources?

23          A     Well, the first thing would be to go to

24   ask his "A" flight attendant, who frankly should have

25   been by Frontier's own policy, should have been the        3:55PM
```



Page 193

1    only flight attendant in the cockpit, to produce her          3:55PM

2    flight attendant manual with the appropriate sections

3    so that, as we discussed previously, whatever

4    suspected protocol, the steps should have been

5    followed.  He could and should have queried his              3:55PM

6    dispatcher for more information regarding the

7    DelVecchias, which could have been done right after

8    the initial report.

9              The critical piece that we're missing

10   here is that there is a chronological piece to this          3:55PM

11   that kind of gets -- this all didn't happen all at

12   once and all in a vacuum.  It developed.  It continued

13   to escalate, beginning with somebody's first notice

14   that something was off but not explaining.  If someone

15   tells me as the captain, "I don't know.  Something is        3:56PM

16   just off about these people," I'm going to ask for

17   more details.  Really what happened here is that the

18   first concrete report of anything was Chelsie Bright's

19   report of the facial touching, which once again, I've

20   seen her demonstrate live what that facial touching         3:56PM

21   really was, and I know we've covered the facial

22   touching, I'm not an expert to talk about her

23   interpretation, but there was nothing that I witnessed

24   that would have been alarming about that.

25              But from a chronological standpoint,             3:56PM



Page 194

1   when that was first reported, we sort of have to pause    3:56PM

2   at that point because from that point forward, it was

3   incumbent upon Captain Shupe to say, "Okay, Chelsie,

4   what do you suspect?  What are you worried about?  Do

5   you have a policy or protocol that we can follow, and    3:57PM

6   let's under take that."

7          Q    Where in Frontier's flight operations

8   manual does it say that the captain is required to ask

9   the flight attendants for their flight attendant

10  manual and for the flight attendants to identify which    3:57PM

11  protocols apply under the circumstances, and then for

12  the captain to make a determination, if the flight

13  attendants are correct in their determination

14  regarding which protocols apply?

15         A    Well, sir, what other alternative does    3:58PM

16  a captain have when he or she is not in possession of

17  information about suspected human trafficking or

18  observed sexual -- inappropriate sexual touching.  The

19  flight attendants, as we discussed this earlier, are

20  the ones in possession of that.  If he has to search    3:58PM

21  his own manuals for guidance, then there's no other

22  reasonable recourse other than to review what the

23  flight attendants' guidance is before making a

24  decision.

25         Q    Can't the captain collect the facts and    3:58PM

MAGNA▶

Page 195

1    then apply critical thinking and come up with a                        3:58PM

2    reasonable solution based on his processing the

3    information gathered?

4              A    One would hope.  And the missing                        3:59PM

5    pieces, collect the facts.  All he collected was

6    hearsay.  He had no direct observation.  And there are

7    protocols and policies and procedures in place.  We

8    don't get to just sort of half-handed create our own.

9    They exist.  Ours exist and the flight attendants'

10   exist because they've been well thought out and         3:59PM

11   presumably they get you the most information and data

12   you can get as succinctly as you can get it.  And

13   there were two avenues, right, dispatch and going

14   through the flight attendant protocol.

15             Q    Let's first start with the dispatch.         3:59PM

16   So as a resource that you identify, you're opining

17   that Captain Shupe should have contacted dispatch to

18   find out if the plaintiffs were related.  Is that

19   fair?

20             A    To find out -- to glean, unearth any        4:00PM

21   information about them.  That the first thing

22   presumably that would have happened is that he would

23   have seen they, in fact, shared a surname.

24             Q    Okay.

25             A    These two individuals were initially        4:00PM



Page 196

1    seated in 13 -- in the exit row.  They could,                4:00PM

2    therefore, be identified.  And the first thing that

3    would become evident immediately is that they shared a

4    surname and were, in fact, father and son.  That could

5    have been gleaned in the first -- while Ms. Bright was       4:00PM

6    still in the cockpit.

7            Q    Are pilots trained that in the context

8    of human trafficking, the traffickers will use a

9    different name for the child so the trafficker and

10   child's names match?                                        4:01PM

11           MR. McKAY:  Objection to the form.

12           THE WITNESS:  I think I testified that

13   pilots really, other than the generic CBT training

14   that I'm aware of that human trafficking exists on our

15   aircraft or at least to be on the lookout for it,           4:01PM

16   don't receive training in what the actual traffickers

17   will do.  The flight attendants receive that training.

18   BY MR. MAYE:

19           Q    Would you agree that just because two

20   passengers' names, the surnames, match, that it's not       4:01PM

21   necessarily true that they are actually related?

22           MR. McKAY:  Objection to the form.

23           THE WITNESS:  I really don't have an opinion

24   about that.  I mean, certainly people are capable of

25   telling non-truths.  I think it would have been -- I        4:02PM

 1    think if you'll allow, the whole reason that I'm going    4:02PM

 2    down the road is that specifically if what was being

 3    suspected was human trafficking, which seems to fit at

 4    least the initial flight attendant's concerns, the

 5    protocol that exists would have had them go back and       4:02PM

 6    initiate some conversation and find out some relevant

 7    facts, at which point A.D. himself would have stated

 8    that P.D. was his father, which he ultimately told

 9    Scott Warren after they had been separated.

10    BY MR. MAYE:                                              4:02PM

11         Q    Regarding the resource of dispatch, any

12    information that could have been gleaned from

13    dispatch, other than whether they had the same

14    surnames?

15         A    I don't know what -- likely -- it's not        4:02PM

16    my area of expertise.  But I do believe they could

17    access their P&Rs, when they made the reservations,

18    had they traveled together before, those types of

19    things.  But that is outside my area of expertise.  I

20    think the critical piece for me is that it would have    4:03PM

21    been indicative that they shared a surname.

22         Q    If a flight attendant comes to you and

23    says, "I have observed an adult stroking the genitals

24    of a child," are you saying that the captain is

25    required to call dispatch and ask dispatch to provide    4:03PM



Page 198

```
 1    to the captain the P&R or P&Rs of the two passengers    4:03PM

 2    so the captain can analyze whether there's support for

 3    the potential separation of the child from the parent?

 4          MR. McKAY:  Objection to the form.

 5          THE WITNESS:  No, that's not what I           4:04PM

 6    testified to.

 7    BY MR. MAYE:

 8          Q    I'm wondering, so you said that you

 9    could call dispatch and ask for the P&R?

10          A    Yeah, I'm sticking with the -- that was  4:04PM

11    in response to us actually, what I thought we were

12    describing was the actual event that happened here.

13    My response was, when Ms. Bright entered the cockpit,

14    described the facial touching that was making her

15    uncomfortable, that contacting dispatch at that moment 4:04PM

16    was a resource that Captain Shupe had at his disposal

17    that he didn't utilize.  That's my testimony.

18          Q    Okay.  So say Captain Shupe contacted

19    dispatch and said, "Hey, do these two have the same

20    surname," and if he had gotten that information, how   4:05PM

21    would that have changed course of action from Captain

22    Shupe's point of view, his obligations?

23          A    Well, he testified to the fact that had

24    he known that, he wouldn't have considered -- I mean,

25    this is where we went off the rails to start with,     4:05PM
```



Page 199

1   right?  I mean, what would it have changed?  Captain        4:05PM

2   Shupe himself said had he known that, he wouldn't have

3   considered the touching to be an issue, or he would

4   have considered it a non-issue.  He also testified

5   that the only way to find out whether touching is       4:05PM

6   consensual or non-consensual is to go back and ask the

7   affected individuals.  And yet he didn't direct his

8   flight attendants to do that.  And that would be the

9   first step on Frontier's suspected human trafficking

10  policy and procedure.                                   4:06PM

11          Q    So you believe that Captain Shupe

12  should have contacted dispatch to find whether they

13  had the same surname, right?  That's one?

14          MR. McKAY:  Objection to the form.

15          THE WITNESS:  Actually, sir, what I            4:06PM

16  testified to is that he would have -- that he should

17  have contacted dispatch for any information they had

18  on the passengers, on the DelVecchias, which clearly

19  would have immediately revealed the surname, is my

20  testimony.  And anything else they may have had.        4:06PM

21  BY MR. MAYE:

22          Q    What is that based on, your opinion

23  that he should have contacted dispatch and asked for

24  any information on the two passengers, Mr. DelVecchia

25  and A.D.?  What's that based on?  That opinion.        4:06PM



Page 200

1          A     My opinion that he should have          4:07PM

2   contacted dispatch?

3          Q     Yes.

4          A     He's been alerted by his "A" flight

5   attendant of a potential situation on board his flight     4:07PM

6   concerning these two passengers.  So I mean, dispatch

7   is our one-stop shopping, if you will.  We go to them

8   with myriad questions and they have a host of

9   resources at their fingertips.  And it would be one of

10  the first things I would do, "Tell me what we know      4:07PM

11  about these two individuals."

12         Q     What I'm asking is, is that based on a

13  standard of care that you're aware of?  Based on the

14  industry standard that you're aware of, specifically?

15         MR. McKAY:  Objection to the form.            4:07PM

16         THE WITNESS:  Sir, it's just part of being a

17  captain.  It's how we're trained.  It's a resource

18  that is available at our fingertips to be utilized

19  anytime we are in need of information that we don't

20  have.  As I mentioned earlier, the dispatcher and I     4:08PM

21  share joint responsibility for planning the flight and

22  for ultimately, once it's airborne, it's my baby, but

23  dispatch is there to help me with any information I

24  need to answer questions I have or successfully

25  complete the flight.                                   4:08PM



Page 201

BY MR. MAYE:                                                        4:08PM

        Q    What I'm asking is your opinion that

when Captain Shupe learned from Chelsie Bright that

she observed the stroking of the face in a manner that

she deemed not parental-like and made her              4:08PM

uncomfortable, is there a federal regulation or is

there an industry standard or a standard of care that

you're familiar with, that dictates that Captain Shupe

was required to contact dispatch to ask for any

information about the two involved?                    4:09PM

        MR. McKAY:   Objection to the form.

        THE WITNESS:   Was he required to by Federal

Aviation Regulation?

        MR. MAYE:   Right.

        THE WITNESS:   No.  Does that alter my        4:09PM

opinion, my strong opinion that he was remiss in not

so doing?  It does not at all.  Why would you not?

BY MR. MAYE:

        Q    On page 12 of your report, in the

second paragraph from the bottom, you state that, "If   4:11PM

Captain Shupe had determined that what Flight

Attendant Bright Sakurada told him at the very

beginning was inappropriate touching, then according

to his later testimony, ███ ███ █ ████ ██

██ ███ ████ ██ █ ████ ████ ███ ███ ███   4:11PM



Page 202

1  ████████████                                        4:11PM

2           According to this opinion, would you

3  agree that you believe that Captain Shupe could have

4  separated Mr. DelVecchia and A.D. immediately without

5  further investigation after Flight Attendant Chelsie    4:12PM

6  Bright told him about the inappropriate stroking of

7  the face?

8           MR. McKAY:  Objection to the form.

9           THE WITNESS:  No, sir.  How it reads is if

10  he, being Captain Shupe, if he had determined that     4:12PM

11  what Bright Sakurada told him at the very beginning

12  was indeed inappropriate touching; i.e., if he was

13  able to verify that by going through the proper

14  protocol and following whatever protocol it was, ████

████ ████ ████ ████ ████ ████ ██ ████ ████ ████        4:12PM

██ ████ ██ -- ██ ██ ████ ██ ████ ████ ████

██ ████ ████

18           My word is "determined."  Not taking

19  her account for granted.  I used the word

20  "determined."                                          4:13PM

21  BY MR. MAYE:

22      Q    Right.  So if Captain Shupe had

23  determined, based on what a senior flight attendant

24  told him who he had great respect for and believed she

25  was an extraordinary flight attendant, and she tells   4:13PM



Page 203

1    him, "This is what I saw," and he determined, based on    4:13PM

2    that, he made the determination just based on that --

3           A    Well, that's not what that says, sir.

4    I didn't say he determined only based upon what she

5    said.  I said that he --                                   4:13PM

6           Q    I'm sorry.  You say -- I'll read it

7    again so we're clear on what you said.  ███ ███ ███

███ ██ ██ ████ ████ ████ ███ ████ ███

██ ████ ████ ████ ██ ████ ████ ███

██ ████ ████ ████ ████ ████ ███      4:14PM

██ ████ █ ████ ████ █ ████ ████ ████

██ ██ ████ ████ ██ ████ ██ ████

██ ████

14           So based on that, would you agree that

15   Captain Shupe could have moved A.D. without gathering   4:14PM

16   any further information after Flight Attendant Bright

17   Sakurada told him that this was inappropriate

18   touching, and he made a determination that it was

19   inappropriate touching?

20           A    No.                                         4:14PM

21           MR. McKAY:  Objection to the form.

22   BY MR. MAYE:

23           Q    So you disagree with that.  You believe

24   that what you wrote there doesn't say that?

25           A    Well, I've tried to -- I'll explain it    4:15PM



Page 204

```
 1   to you again.                                        4:15PM

 2           Q     Well, I'm trying to ask --

 3           MR. McKAY:  Whoa, whoa, whoa.  Stop cutting

 4   her off, please.

 5           MR. MAYE:  John, I appreciate your           4:15PM

 6   objection, but --

 7           MR. McKAY:  Let her answer.

 8           MR. MAYE:  -- I'm taking the deposition, and

 9   if the witness is not being responsive, and if the

10   witness is not answering questions, I have a right to 4:15PM

11   interject and try to direct the witness in the

12   appropriate direction.

13   BY MR. MAYE:

14           Q     And in this case, ma'am, I'm asking

15   you, one sentence that you wrote here, are you        4:15PM

16   disagreeing with my interpretation of that sentence?

17           A     Apparently I am.  And I've tried to

18   explain.  But the word "determined" means, the way I

19   wrote it, if Captain Shupe had listened to F.A. Bright

20   and her concerns, and subsequently, through his own   4:16PM

21   investigation, or however he decided to make a

22   determination that what she is -- what she had

23   initially come to the cockpit saying, inappropriate

24   touching, was in fact the case, or to his best ability

25   to ascertain that that was the case, then he wouldn't 4:16PM
```



Page 205

1   need to have done anything else; i.e., instructed them        4:16PM

2   to continue to walk the cabin and conduct frequent

3   walk-bys and report back to him about further

4   touching.

5   ██ ██ █ ██ █ ██ ██ █        4:16PM
    █   █████ █████ █████  which kind of takes this a bit

7   out of context as well.  But I do believe you're not

8   interpreting what I wrote to be what the intent is.

9           I didn't say that -- otherwise I would

10  have written, if he, Captain Shupe, had just taken        4:17PM

11  F.A. Bright Sakurada's word for what she observed and

12  done nothing else, and that was enough for him to make

13  a determination, ██ █ ███ ██ ██ █ ██
    █ ██ ██ ██ ███ ██ █ ██ ██
    █ ██ ██ ██ ██ ██ ██ ██ ██        4:17PM
    █ █ ██ ██ ██ ██ ██ ██
    █   █ ██ ██ █ ██ █ █ █
    █ ██ ██ ██ ██ ██
    █ ██ ██ ██ ██ ██ ██
    █ ██ ██ ██ ██ ██ ██        4:17PM
    █ ██ █ ██ ██ ██ ██
    █ ██ ██ ██ ██ ██ ██
    █ ██ ██ ██ ██ ██ ██
    █ ██ ██ ██ ██ ██
    █ ██        4:18PM



Page 206

1          MR. McKAY:  Objection to the form.          4:18PM

2          THE WITNESS:  Well, you keep saying the

3     "pilot."  Can the captain?

4     BY MR. MAYE:

5          Q    Can the captain?                        4:18PM

6          A    The problem here, and obviously we

7     probably wouldn't be having this discussion if that

8     weren't the case.  The captain can unilaterally make

9     any decision he or she wants to, but he or she darn

10    well better have a basis and done some fact-finding    4:18PM

11    and gathering to back it up, and be willing to face

12    the repercussions of making an incorrect decision.

13         Q    Okay.  You say the incorrect decision.

14    Does the ultimate determination of what actually

15    transpired between the two passengers who are involved  4:19PM

16    in the suspected sexual misconduct, is the ultimate

17    determination of what transpired between them have any

18    effect on whether or not the captain's decision was a

19    reasonable and proper decision?

20         MR. McKAY:  Objection to the form.          4:19PM

21         THE WITNESS:  I'm not sure I understand the

22    question, sir.

23    BY MR. MAYE:

24         Q    Say a flight attendant suspects human

25    trafficking, and the flight attendant follows the       4:20PM

MAGNA

Page 207

1    protocol and engages the passengers with some basic          4:20PM

2    conversation, "How are you?  Where are you headed?"

3    and the flight attendant still suspects that human

4    trafficking is happening.  And the flight attendant

5    tells the captain, "Captain, I suspect human              4:20PM

6    trafficking."  The captain then notifies law

7    enforcement.  Law enforcement meets the aircraft upon

8    arrival, and law enforcement interviews the passengers

9    involved in the suspected human trafficking.  And law

10   enforcement determines that it actually was not human      4:20PM

11   trafficking.

12             Does that conclusion by law enforcement

13   have any bearing on whether or not the captain made

14   the proper decision?

15             MR. McKAY:  Objection to the form.             4:21PM

16             THE WITNESS:  It certainly doesn't assuming

17   that the protocol was actually followed in the manner

18   that you described, which in our case it was not.

19   BY MR. MAYE:

20        Q    In our case you do not believe that the        4:21PM

21   human trafficking protocol was complied with?

22        A    It's not a matter of whether I believe

23   it or not.  There's not a single flight attendant or

24   pilot that testified that that procedure was followed

25   or that it was even brought up to the captain that it     4:21PM



Page 208

1   existed.  Let's review it.  We have it.  We know what        4:21PM

2   it is.

3             Q     Do you see any testimony that the

4   flight attendants said and determined that human

5   trafficking was suspected?                                   4:21PM

6             A     Sir, as I've testified to several times

7   already today, the flight attendants were -- they

8   didn't have any specific reference to anything other

9   than their discomfort about certain things which grew

10  over time.  They are provided these policies and         4:22PM

11  protocol to address such suspicions.  If they arise to

12  them, there's somewhere they can go.  There's

13  something they can do about it.  There is a policy in

14  place.

15            Q    Ma'am, I'm asking you -- I'm sorry.        4:22PM

16  I'm asking you if any flight attendant testified, or

17  if there was any statements provided by the flight

18  attendants that they suspected that Mr. DelVecchia and

19  A.D. were involved in human trafficking?

20            A    Ms. Bright in her deposition referred     4:22PM

21  to trafficking, and I can find -- well, I can't find

22  the exact without leaving this, but she referred to

23  the fact that trafficking is -- and that's the word

24  she used -- is always top of mind for them or always

25  on their mind.                                           4:23PM



Page 209

```
 1          Q    Absolutely.  That doesn't mean that        4:23PM

 2    flight attendants have made a determination that human

 3    trafficking is potentially in process or is occurring,

 4    right?  They're trying to keep an eye out for human

 5    trafficking, right?  They're trying to keep an eye out   4:23PM

 6    for human trafficking, signs of human trafficking,

 7    right?

 8          MR. McKAY:  Objection to the form.

 9          THE WITNESS:  Yes.  That is her testimony.

10    But obviously that's top of mind.  So there's no        4:23PM

11    other -- in the absence of Ms. Bright going into the

12    cockpit and saying "I believe there's sexual

13    misconduct taking place or that this individual, this

14    minor child might be deemed human trafficked," which

15    she said neither of those things, she just described   4:24PM

16    what she felt was facial touching that she felt was

17    inappropriate, my point is there's got to be a next

18    level -- where do we go from there?  And there's

19    guidance to help the flight attendants that they could

20    have shared with the captain and undertaken.  And that  4:24PM

21    was not done.

22    BY MR. MAYE:

23          Q    Are you saying that they should have

24    invoked the human trafficking policy even though they

25    didn't suspect human trafficking?                       4:24PM
```



Page 210

1          MR. McKAY:  Objection to the form.          4:24PM

2          THE WITNESS:  I don't know what they

3   suspected, sir, because they didn't identify -- they

4   were unclear.  And when I say "they," I'll be quite

5   clear.  It was quite a distance into the flight, over     4:24PM

6   an hour, hour and forty-five or something, after the

7   DelVecchias had been moved out of exit row, after the

8   beverage service had happened.

9              The only two flight attendants, as we

10  discussed earlier, had a brief and benign interaction     4:25PM

11  with the DelVecchias, and nothing was amiss, they were

12  causing no disturbance.  They were model passengers.

13  In fact, they were asleep.

14  BY MR. MAYE:

15         Q    Yes, that's right.  So why at that          4:25PM

16  point -- why at that point would they invoke the human

17  trafficking protocol if they didn't suspect human

18  trafficking?

19         MR. McKAY:  Objection to the form.

20         THE WITNESS:  Well, what did Ms. Bright          4:25PM

21  suspect when she was uncomfortable with the fact that

22  a father was touching his son's face?

23  BY MR. MAYE:

24         Q    Sexual misconduct.

25         MR. McKAY:  Objection to the form.              4:25PM

Page 211

```
 1   BY MR. MAYE:                                           4:25PM

 2        Q    Do you think it's possible that they

 3   never suspected human trafficking so they never

 4   invoked the human trafficking policy.  And then

 5   Chelsie Bright observed the inappropriate touching    4:25PM

 6   that she determined was sexual misconduct, and at that

 7   point they were guided by the sexual misconduct

 8   policy?

 9        MR. McKAY:  Objection to the form.

10        THE WITNESS:  I don't agree with that.           4:26PM

11   BY MR. MAYE:

12        Q    Okay.  Well, let me ask this.  At any

13   point did any flight attendant say that he or she

14   suspected that Mr. DelVecchia was human trafficking

15   A.D.?                                                  4:26PM

16        MR. McKAY:  Objection to the form.

17        THE WITNESS:  Not in so many words.  But

18   again, the deposition testimony of Ms. Bright, the

19   closest we can come to whatever -- she also didn't

20   walk in the cockpit and say that there was a sexual -- 4:26PM

21   she just said that there was inappropriate facial

22   touching.

23   BY MR. MAYE:

24        Q    I'm asking about human trafficking.

25        A    She also didn't walk into the cockpit       4:27PM
```



Page 212

```
 1   and say that there was sexual misconduct occurring.      4:27PM
 2   She just said that there was facial touching and it
 3   was making her -- it seemed inappropriate.
 4         Q    I'm asking about the human trafficking.
 5         MR. McKAY:  She just answered you.               4:27PM
 6         MR. MAYE:  No, she didn't.
 7         MR. McKAY:  Yeah, she did.
 8   BY MR. MAYE:
 9         Q    Did any flight attendant say that he or
10   she suspected human trafficking with respect to        4:27PM
11   Mr. DelVecchia and A.D.?
12         A    Chelsie Bright referred to it in her
13   deposition.
14         Q    What do you mean when she referred to
15   it?  Did she say that she suspected human trafficking?  4:27PM
16         A    I, again, if we want to go back into
17   the deposition --
18         Q    Yeah, let's do that.
19         A    -- I'll read you exactly what --
20         Q    Yeah, let's do that.  Let's do that.       4:27PM
21         A    I can't do it because --
22         MR. McKAY:  Page 61.
23         MR. MAYE:  Let's do that.  Let's go off the
24   record for a second.
25         MR. McKAY:  Sure.                                4:28PM
```

Page 213

```
 1             THE VIDEOGRAPHER:  Going off the record.       4:28PM

 2    The time is 4:28 p.m.

 3                      (Recess.)

 4             THE VIDEOGRAPHER:   The time is 4:31 p.m.

 5    We're back on the record.                               4:31PM

 6    BY MR. MAYE:

 7        Q    So after -- page 60, line 10, Mr. McKay

 8    asks Chelsie Bright, "Now, nothing that Anna Bond had

 9    said to you or that you observed, indicated that these

10    people were a risk to the safety of the flight?"        4:31PM

11                 "Answer:  Absolutely not."

12                 Line 14.

13                 "Mr. McKay:  Okay.  So again

14                 I ask, what was it that you were

15                 concerned about?"                          4:32PM

16                 "Answer, Chelsie Bright:

17                 Before the face rubbing, nothing."

18             MR. McKAY:  Whoa, whoa, whoa, what else did

19    she say there?  That wasn't her whole answer.

20             MR. MAYE:  Well --                             4:32PM

21             MR. McKAY:  Yeah, there's a lot more to

22    that.

23    BY MR. MAYE:

24        Q    I'll read it.  That's fine.

25                 "Before the face rubbing,               4:32PM
```



Page 214

```
 1          nothing.  I mean, we -- we were        4:32PM

 2          just there for the safety of the

 3          people.  We look around.  If we

 4          see anything that we have never

 5          seen before, we just kind of tell      4:32PM

 6          each other.  And then we are all

 7          aware of that person.  We all just

 8          keep an eye out a little better on

 9          the person that the one person --

10          the one flight attendant               4:33PM

11          mentioned."

12              "Question:  Well, what if one

13          of your fellow flight attendants

14          says, 'Hey, look at that lady with

15          the pink hat and the big feather       4:33PM

16          in it'?  That would be something

17          maybe you hadn't seen before,

18          right?"

19              "Answer:  Yeah."

20              "And then the rest of the          4:33PM

21          flight you're going to do

22          surveillance on that lady?"

23              "No, because her pink hat

24          didn't -- didn't -- she didn't

25          have nothing to do with anybody        4:33PM
```



Page 215

```
 1              else, I guess.  The concept that        4:33PM

 2              we are looking, we are always

 3              looking, trying to look for

 4              trafficking, I guess."

 5         MR. McKAY:  Boom.                             4:33PM

 6         MR. MAYE:  Excuse me, John.

 7    BY MR. MAYE:

 8         Q     "And that's something we always look

 9    for."

10              "Question:  Well, now that             4:33PM

11              we've gone from there wasn't a

12              risk to safety, it wasn't all that

13              concerning, to trafficking.  So

14              let's talk about that."  This is

15              Mr. McKay speaking.                    4:34PM

16              "Well, I -- first of all,

17              does the company instruct you to

18              look for trafficking?"

19              "Answer:  We have topics

20              about it.  I mean, there's            4:34PM

21              something -- there's newsletters

22              that are sent out or just topics

23              that are sent out in e-mail about

24              the subject.  And we're all aware

25              of it as flight attendants."          4:34PM
```



Page 216

1          "Question:  All right.  When          4:34PM

2      you say 'are sent out,' you mean

3      sent out by Frontier to its

4      employees?"

5          "Yes."                                 4:34PM

6          "Question:  And how often

7      have you received these things?"

8          "Answer:  Only a couple

9      times.  Maybe two or three."

10         "Question:  Two times you          4:34PM

11     received e-mails or newsletters

12     about trafficking?"

13         "Yes."

14     MR. McKAY:  And --

15  BY MR. MAYE:                                  4:35PM

16     Q    Did you see anywhere where Chelsie

17  Bright said that she suspected that Peter DelVecchia

18  was trafficking A.D.?

19         MR. McKAY:  Objection to the form.

20         THE WITNESS:  Can you scroll back up, sir,    4:35PM

21  on page 61 where Chelsie herself first mentions --

22  Mr. McKay, the line of questioning was clearly

23  Ms. Bright was being asked to provide her observations

24  on Peter and A.D. prior to this and her answer.

25



Page 217

```
 1   BY MR. MAYE:                                          4:35PM

 2        Q    Ma'am, I'm sorry.  Are you reading

 3   something or are you -- I'm not sure what you're --

 4   are you answering my question?

 5        MR. McKAY:  She's answering your question.      4:35PM

 6        THE WITNESS:  I'm attempting to answer your

 7   question.

 8        MR. McKAY:  You asked her where in that

 9   testimony she saw --

10        MR. MAYE:  Yes, I know.  I'm not               4:35PM

11   following --

12        MR. McKAY:  And she's responding.

13        MR. MAYE:  John, I'm sorry.

14   BY MR. MAYE:

15        Q    Ma'am, are you reading from the           4:36PM

16   transcript?

17        MR. McKAY:  She was.

18        THE WITNESS:  I was about to, as I was

19   answering your question.  You asked if any of the

20   flight attendants said -- this whole discussion is    4:36PM

21   regarding Peter and A.D., and Ms. Bright says, "I

22   guess the concept that we were looking, we are always

23   trying to look for trafficking, I guess."

24   BY MR. MAYE:

25        Q    Okay.                                      4:36PM
```



Page 218

1        A    So this whole conversation started with    4:36PM

2   did any of the flight attendants -- are you asking, if

3   you want to use specific verbiage, did they use Peter

4   and A.D.'s name in -- this whole conversation is about

5   Peter and A.D.'s behavior and what was allegedly amiss    4:36PM

6   and Ms. Bright used the word and introduced the

7   concept that they're always trying to look for

8   trafficking.

9        Q    So that's the basis of your opinion

10   that Chelsie Bright -- strike that.    4:37PM

11        Are you saying that it's your opinion

12   that Chelsie Bright testified that she suspected that

13   Mr. DelVecchia was trafficking A.D.?

14        A    I don't think there's any other way to

15   read her testimony than that the reason it was    4:37PM

16   concerning to her is that they are always trying to

17   look for trafficking.  So the next natural place to go

18   for that is why didn't she follow her company

19   procedures to assuage her fears that this might be a

20   trafficking situation.    4:37PM

21        Q    Right above that, 60.  It says line 10.

22             "Now, nothing that Anna Bond

23             had said to you or that you had

24             observed indicated that these

25             people were a risk to the safety    4:38PM



| | | |
|---|---|---|
| 1 | of the flight?" | 4:38PM |
| 2 | "Absolutely not." | |
| 3 | Is there anything in that question and | |
| 4 | answer that would indicate to you that Chelsie Bright | |
| 5 | suspected that Peter DelVecchia was human trafficking | 4:38PM |
| 6 | A.D.? | |
| 7 | MR. McKAY:  Objection to the form. | |
| 8 | THE WITNESS:  I don't think we can pick | |
| 9 | those two -- I think what is relevant is what was in | |
| 10 | her testimony above that, that allegedly, where she | 4:38PM |
| 11 | alleges that Flight Attendant Bond -- and they | |
| 12 | completely contradict one another in their own | |
| 13 | deposition testimony about how this whole thing | |
| 14 | started, and that was during the reseating the | |
| 15 | DelVecchias out of the exit row before the flight even | 4:39PM |
| 16 | departed. | |
| 17 | And Ms. Bright in her sworn deposition | |
| 18 | says that Ms. Bond felt uncomfortable regarding what | |
| 19 | she saw and experienced during that moving process; | |
| 20 | and Ms. Bond in her own deposition testimony | 4:39PM |
| 21 | completely refutes that and has a completely different | |
| 22 | story. | |
| 23 | BY MR. MAYE: | |
| 24 | Q    Ma'am, I'm asking about Chelsie Bright. | |
| 25 | Mr. McKay -- we'll go up a little more. | 4:39PM |



Page 220

1    Line 5, page 60.                                          4:39PM

2                    "Okay.  All right.  So

3                    because Anna Bond felt

4                    uncomfortable with what she had

5                    seen and described it as a              4:39PM

6                    situation, then you felt

7                    uncomfortable as well?"

8                        "Answer:  I don't feel I felt

9                    uncomfortable.  I was just more

10                   aware."                                 4:39PM

11          A    Yeah, so suddenly she's now paying

12   attention to --

13          Q    Hold on, ma'am.  Ma'am.  I haven't

14   asked a question.  Please stop.  I'm going to continue

15   reading.                                                4:40PM

16                   She said, "I don't feel I felt

17   uncomfortable.  I was just more aware."

18                       "Question:  Now, nothing that

19                   Anna Bond had said to you or you

20                   observed indicated these people        4:40PM

21                   were a risk to safety of the

22                   flight?"

23                       "Absolutely not."

24                       "Okay.  So again, I ask you,

25                   what was it that you were             4:40PM

MAGNA ⟩

Page 221

1        concerned about?"                                    4:40PM

2             "Answer:  Before the rubbing,

3        the face rubbing, nothing.  I

4        mean, we -- we were just there for

5        the safety of people.  We look         4:40PM

6        around."

7             So I'm asking you, prior to the --

8   prior to Flight Attendant Bright observing the facial

9   stroking, is there testimony that Flight Attendant

10  Chelsie Bright suspected that Peter DelVecchia was     4:41PM

11  trafficking A.D.?

12       MR. McKAY:  Objection to the form of the

13  question.  This is ridiculous.

14       THE WITNESS:  The testimony that I'm

15  referring to is on the next page in response to her    4:41PM

16  bringing up the concept of trafficking.  She was the

17  first person to use the word.  Mr. McKay didn't lead

18  her into that.  It was her word.  And the next natural

19  outcropping for a reasonable person would be to say,

20  "Well, you have procedures and protocol for that.      4:41PM

21  Why, if it's something you always look for, there's

22  some really simple things you can do, that the company

23  has provided to you that might help to assuage your

24  concerns, if that's something that's top of mind for

25  you."  And my point in my report is that none of that  4:42PM



Page 222

1   was done.                                                    4:42PM

2   BY MR. MAYE:

3          Q    My question is did Chelsie Bright

4   testify that she suspected that Peter DelVecchia was

5   trafficking A.D.?  Did she testify to that?  Did she          4:42PM

6   specifically say that in her testimony?

7          MR. McKAY:  Objection to the form of the

8   question.

9          THE WITNESS:  That is my interpretation of

10  her response on page 61, line 6 through 9.                     4:42PM

11  BY MR. MAYE:

12         Q    Okay.  Thank you.

13              And is that the entirety of your

14  opinion that Chelsie Bright testified that she

15  suspected that Peter DelVecchia was trafficking A.D.?          4:43PM

16         MR. McKAY:  Objection to the form of the

17  question.

18  BY MR. MAYE:

19         Q    Page 60 and 61.

20         MR. McKAY:  Objection to the form of the                4:43PM

21  question.  She's already testified that there were

22  more pages.

23  BY MR. MAYE:

24         Q    Ma'am?

25         A    The deposition testimony continues                 4:43PM

Page 223

1    under the same vein.  That was the beginning of the        4:43PM

2    discussion about trafficking, about what they -- I

3    mean, what the company instructs them to look for,

4    their instructional material, what --

5            Q    Let's go on.  We'll go on and read a          4:43PM

6    little more.

7            MR. McKAY:  Can you not read my question so

8    quickly, because actually, I don't talk that quickly.

9    I sort of drawl like a southerner.

10           MR. MAYE:  I'll try to do my best to mimic          4:44PM

11   you, John.

12           MR. McKAY:  Thank you.

13           THE REPORTER:  And if you could read just a

14   little bit slower, please.

15           THE WITNESS:  Mr. Maye, if you'll allow, can       4:44PM

16   I -- you're asking me the question.  Oh, you just took

17   it off the screen, but on subsequent pages there's a

18   discussion that, the entire discussion between

19   Mr. McKay and Ms. Bright --

20           MR. MAYE:  We'll --                                 4:44PM

21           MR. McKAY:  Let her talk, please.  Please.

22           MR. MAYE:  Are we off the record?

23           THE WITNESS:  No, you asked me if that was

24   the only -- are we off the record?

25           MR. McKAY:  No.  No, no.  Go ahead.               4:44PM



Page 224

```
 1              THE WITNESS:  You asked me if that was the      4:44PM

 2    only place that there was a reference or my intimation

 3    that Ms. Bright might have been following human

 4    trafficking or she wasn't really following the

 5    procedure, but be alerted to it.  And it continues      4:44PM

 6    throughout that testimony.  Mr. McKay asked and I'm --

 7              MR. MAYE:  Ma'am --

 8              THE WITNESS:  So you felt like --

 9              MR. MAYE:  I'm going to put this up in a

10    second, and then we will find -- you're trying to       4:45PM

11    direct me where it is.

12              MR. McKAY:  She did.

13              MR. MAYE:  I will put this up in a second.

14              MR. McKAY:  As the only one of us who was

15    there, I can tell you we talked about human             4:45PM

16    trafficking in that deposition.

17              MR. MAYE:  Yes, I know.  I know.  Okay.

18              MR. McKAY:  Because she brought it up.

19    Because Chelsie Bright brought it up.

20              MR. MAYE:  Yes.  Okay.  Fine.                 4:45PM

21              MR. McKAY:  Do I think she really suspected

22    human trafficking?  No.  I think she saw a black child

23    with a white man.

24              MR. MAYE:  Okay, John.  That's not

25    appropriate.                                            4:45PM
```

Page 225

1          MR. McKAY:  It's the theme of the case.          4:46PM

2          MR. MAYE:  Can we go off the record for a

3    second?

4          MR. McKAY:  Yeah.

5          THE VIDEOGRAPHER:  This marks end of Media          4:46PM

6    Number 4.  The time is 4:46 p.m.  We're off the

7    record.

8               (Recess.)

9          THE VIDEOGRAPHER:  This marks the beginning

10   of Media Number 5.  The time is 4:54 p.m.  We're back          4:54PM

11   on the record.

12   BY MR. MAYE:

13        Q    On page 65, Mr. McKay asks, "Didn't you

14   feel an obligation to question Anna Bond more about

15   why she was uncomfortable?"          4:54PM

16         MR. McKAY:  You're not sharing, Brian.

17         MR. MAYE:  Oh, Jesus.  Sorry.  Excuse me.

18   Here we go.

19   BY MR. MAYE:

20        Q    Page 65, "Didn't you feel an obligation          4:54PM

21   to question Anna Bond more about why she was

22   uncomfortable?"

23               "No, because there are

24               situations that arise all the time

25               that could make us feel          4:54PM



Page 226

```
 1              uncomfortable for just a moment          4:54PM
 2              and then, you know, nothing
 3              happens.  We still keep an eye on
 4              it, especially when it's a kid's
 5              safety."                                 4:54PM
 6                  "Question:  And you felt that
 7              A.D. was in an unsafe position?"
 8                  "Answer:  I would say that he
 9              wasn't.  I didn't feel that he was
10              unsafe at that time, no."                4:55PM
11              Next question.
12                  "Okay.  Now let's get back to
13              the concept of trafficking because
14              it appears your employer is intent
15              on educating all of you flight          4:55PM
16              attendants on this concept of
17              trafficking.  So I want to be
18              clear about what you understand
19              trafficking to be."
20              So on page 65, 66, 67, and 68, is there 4:55PM
21    anything -- and I'll scroll slowly -- is there
22    anything on these pages that support your view that
23    Chelsie Bright suspected -- I'm sorry.  Let me ask
24    this question.
25                  Are you aware of any testimony that  4:56PM
```



Page 227

1    Chelsie Bright told -- I think I probably asked this,        4:56PM

2    but told any of the other flight attendants that she

3    suspected that Peter DelVecchia was trafficking A.D.?

4          MR. McKAY:   Objection to the form of the

5    question.                                                    4:56PM

6          THE WITNESS:   With specificity using those

7    words, I already testified, no, that she didn't.

8    However --

9    BY MR. MAYE:

10         Q    I'm sorry --                                       4:56PM

11         MR. McKAY:   She just said "However."   That's

12   part of her answer.

13   BY MR. MAYE:

14         Q    Well --

15         A    However, we've skipped ahead --                    4:56PM

16         MR. MAYE:   John, I think that you understand

17   that witnesses can be nonresponsive at times.

18         MR. McKAY:   You don't get to --

19         MR. MAYE:   I do.

20         MR. McKAY:   In a deposition you are not the            4:57PM

21   judge of that.   If you ask her a question, as that

22   judge that I read you earlier says, you've passed the

23   mic to her and her answer is going to be stated.   Now,

24   you may not jump on her answer and stop her.

25         MR. MAYE:   John, okay.                                 4:57PM



Page 228

1        MR. McKAY:  She said "However" and you need        4:57PM

2   to let her finish after "However."

3        MR. MAYE:  I can communicate with the

4   witness and we can collectively agree that the

5   testimony should be directed in a different direction.    4:57PM

6   But I will let her answer.

7        MR. McKAY:  Thank you.

8        MR. MAYE:  But she answered my question.

9        MR. McKAY:  She said "However."

10       MR. MAYE:  Now, if she's answered my          4:57PM

11  question, I can move on.

12  BY MR. MAYE:

13       Q    Ma'am, so your answer was you're not

14  aware of any testimony indicating that Chelsie Bright

15  told anyone that she suspected human trafficking.  Is    4:57PM

16  that fair?

17       MR. McKAY:  Objection to the form of the

18  question.

19       THE WITNESS:  What I was going to say is we

20  left off previously before the break at 61, 62, and      4:58PM

21  now we're on 66.  And it's my recollection, I mean,

22  I'd like to review those pages and I apologize that I

23  can't pull it up for myself.  Scroll down a little

24  bit.

25       MR. McKAY:  Now you've made it smaller.  Can   4:58PM

MAGNA▶

Page 229

1    you make it large again?  Can't you give her control?    4:58PM

2         MR. MAYE:  No.

3         THE WITNESS:  No, it's okay.  Just keep

4    going down, if you would, please.

5              So this is what I recall, and this is    4:58PM

6    what I wanted to -- Mr. McKay asked, and this stuck in

7    my mind so I appreciate.  On 62 she was asked, "So you

8    felt that by labeling Peter and A.D. as a situation to

9    keep an eye on that you were following Frontier's

10   policies?"                                            4:59PM

11             And that was specifically with regard

12   to trafficking which was being discussed just above

13   that, and that was something that stick out in my

14   mind.  And you're asking did she tell another flight

15   attendant?  No, she did not.  And I want to answer    4:59PM

16   your question.

17        MR. MAYE:  Okay.

18        THE WITNESS:  But in her mind, this was --

19   and this whole thing started I think by my saying the

20   closest thing that I can get to that initially might    4:59PM

21   have been the concern or a reason to have their

22   awareness, you know, she was now aware, was that she

23   had trafficking in the back of her mind.  Yet she

24   testified she was following Frontier's policy with

25   regard to that, yet she never initiated any of the    5:00PM



Page 230

1    suspected human trafficking protocol that her employer    5:00PM

2    provided her.  That's all.

3    BY MR. MAYE:

4         Q    So let me ask you this.  If flight

5    attendants do not suspect human trafficking, do not    5:00PM

6    suspect human trafficking, then there's no reason to

7    implement or invoke the human trafficking policy

8    report or protocol.  Is that fair to say?

9         A    I think that's fair insofar as they

10   don't have to follow it to the letter.  If they have    5:00PM

11   some suspicions that they somehow can't identify or

12   put in a box, then I would opine that there's some

13   very good guidance in there that might help alleviate

14   any other concern they might have.  Initiating a

15   conversation.    5:01PM

16        Q    So are you saying that even though the

17   human trafficking policy may not perfectly fit the

18   circumstances, the flight attendants can certainly

19   rely on the content of the protocols for guidance

20   generally?    5:01PM

21        MR. McKAY:  Objection to the form of the

22   question.

23        THE WITNESS:  I think I'm saying there are

24   some useful tools in the protocol that the flight

25   attendants can put in their tool kit, if you will.    5:01PM



Page 231

1   That if they have some suspicions that they can't          5:01PM

2   quite put their finger on, or as Ms. Bright testified

3   to, sometimes there are things that make us

4   uncomfortable but we don't know why, and they abate or

5   they continue.                                             5:02PM

6            I think reasonable people could agree

7   that there are some good tools in there that give the

8   flight attendants some foundation to try and assuage

9   some of their concerns, even if it's not,

10  quote/unquote, human trafficking that they suspect.        5:02PM

11  BY MR. MAYE:

12  [redacted]

[redacted]

[redacted]

[redacted]                                                     5:02PM

[redacted]

             MR. McKAY:  Objection to the form of the

17  question.

18           THE WITNESS:  You'd have to be more

19  specific, sir, in terms of asking if I share the same

20  view.                                                      5:02PM

21  BY MR. MAYE:

22           Q   Well, you said that a flight attendant

23  may not necessarily suspect human trafficking but that

24  policy may not necessarily need to be invoked to the

25  letter, but there's certainly good guidance or it         5:03PM



Page 232

1  provides good guidance that the flight attendants can      5:03PM

2  utilize as a resource.   Is that fair?

3           MR. McKAY:   Objection to the form of the

4  question.   No that wasn't fair.   Objection.

5           THE WITNESS:   I would rely upon what I         5:03PM

6  previously said. ███ ██ ██████ █████ ██ █ █████ ███ ████

   █ ███████ ██████ █████ ██████ ██ ██ ████████ ██

   █ █████ ██ ████ █████ █████ ████ ███████ ███ ███

   █ ████ █████ █████ ██ █ ██████ ████ ████ ████ ██████

   ██ ███████ █████████ ███ ██████ ██████ ███████ █        5:04PM

   ██ █████ ██ ████ █████ ████████ ██ ██ ██████ ████ ███

   ██ ████████

13 BY MR. MAYE:

14           Q    With respect to human trafficking

15 policy, if flight attendants do not suspect human         5:04PM

16 trafficking, then there's no reason for -- there's no

17 obligation to implement or invoke the protocols set

18 forth in the policy.   Do you agree with that?

19           MR. McKAY:   Objection to the form of the

20 question.                                                 5:04PM

21           THE WITNESS:   I feel that there's a

22 distinction that has to be made between do they

23 suspect that that actually might be a potentiality but

24 they just haven't stated it to one another or -- I

25 mean, my opinion would be that if there's even a          5:05PM

Page 233

1   far-reaching suspicion that that could be in play, as      5:05PM

2   Ms. Bright alluded to, then the protocol should be

3   followed.

4   BY MR. MAYE:

5        Q    What I'm asking you is if the flight            5:05PM

6   attendants do not suspect human trafficking, are they

7   required to invoke the human trafficking policy and

8   implement the human trafficking policy?

9        MR. McKAY:  Objection to the form of the

10   question.  And assumes facts not in evidence.            5:05PM

11       THE WITNESS:  If they don't suspect it

12   whatsoever and have no reason to, then no.

13   BY MR. MAYE:

14       Q    And in this case, is it your testimony

15   that you believe that Chelsie Bright, based on her       5:05PM

16   testimony, suspected that Peter DelVecchia was

17   trafficking A.D.?

18       MR. McKAY:  Objection to the form of the

19   question.

20       THE WITNESS:  I believe her deposition              5:06PM

21   testimony reflects the fact that that was certainly a

22   consideration for her, yes.

23   BY MR. MAYE:

24       Q    And because of that, you believe that

25   the flight attendants were obligated to implement and    5:06PM



Page 234

```
1    invoke the human trafficking policy in this case?          5:06PM

2            A    Yes.

3            Q    And your opinions are based on your

4    interpretation of Chelsie Bright's testimony.  Is that

5    fair?                                                       5:06PM

6            MR. McKAY:  Objection to the form.

7            THE WITNESS:  Yes.  And there is additional

8    testimony we didn't cover with regard to Ms. Bright's

9    characterization and direct quoting of what Anna Bond

10   relayed to her during the exit row reseating event,         5:07PM

11   which as I said, Ms. Bond later, her testimony didn't

12   line up with that at all.  But to me that's where the

13   event started for both of them.

14   BY MR. MAYE:

15           Q    Okay.  So --                                   5:07PM

16           A    And they had a discussion about it.

17           Q    So your opinion that the human

18   trafficking policy should have been invoked, should

19   have been implemented, and should have been followed

20   to the T, is based on your interpretation of the           5:07PM

21   testimony of Anna Bond and Chelsie Bright.  Is that

22   fair?

23           MR. McKAY:  Objection to the form.

24           THE WITNESS:  I wouldn't say it's based upon

25   my interpretation.  It's based upon my directly            5:07PM
```



Page 235

1    reading what they testified to, that an adult          5:07PM

2    answering for a minor child might be an indication of

3    trafficking, et cetera, a bunch of things in there

4    that I said we didn't cover.  But they did have a

5    discussion about that.  And the closest possible       5:08PM

6    protocol at that point would be human trafficking.

7    BY MR. MAYE:

8         Q    Did you see anywhere where Chelsie

9    Bright said specifically, "I suspected that Peter

10   DelVecchia was engaged in trafficking of A.D."?        5:08PM

11        MR. McKAY:  Now you're just harassing her.

12   The question is compound.

13   BY MR. MAYE:

14        Q    Did you see that testimony anywhere?

15        A    Yeah, I've answered that, sir, already.      5:08PM

16        MR. McKAY:  I have to stop if you're

17   harassing her.  You know that.

18   BY MR. MAYE:

19        Q    So ma'am, your opinion that the human

20   trafficking policy should have been invoked is based   5:08PM

21   on your review or your view of the testimony by

22   Chelsie Bright and Anna Bond.  Is that fair?

23        MR. McKAY:  Objection to the form.

24        THE WITNESS:  It's based upon my review of

25   the conversation that Chelsie Bright in her sworn      5:09PM



Page 236

1    deposition testimony said that she had -- the          5:09PM

2    interaction she had with Anna Bond and the items they

3    discussed that were indicative of human trafficking as

4    they had been trained, and she delineated them.

5    BY MR. MAYE:                                            5:09PM

6         Q    Are your opinions that the human

7    trafficking policy should have been invoked, is that

8    based on anything else?

9         MR. McKAY:  Objection to the form.

10        THE WITNESS:  It's based on the fact that          5:09PM

11   they had been provided specific training, and only

12   less than two weeks prior.  I believe my report

13   alludes to when they were provided this protocol.  If

14   they were discussing amongst themselves even one or

15   two criteria that might give them pause, or cause them  5:10PM

16   to even bring trafficking to the forefront, then the

17   policy should have been invoked.

18   BY MR. MAYE:

19        Q    So your opinion is based on your

20   reading of their testimony?                             5:10PM

21        MR. McKAY:  Objection to the form.

22   BY MR. MAYE:

23        Q    Is that fair?

24        MR. McKAY:  Objection to the form.

25        THE WITNESS:  That's fair.                         5:10PM



Page 237

1    BY MR. MAYE:                                          5:10PM

2         Q    Now, if there was some concern or --

3    strike that.

4              When Chelsie Bright observed

5    Mr. DelVecchia stroking A.D.'s face in a manner that   5:11PM

6    she felt was not parent-like and made her

7    uncomfortable, and she brought this to the attention

8    of Captain Shupe, would you agree that at that point

9    Chelsie Bright suspected potential sexual misconduct

10   had been committed?                                    5:11PM

11        MR. McKAY:  Objection to the form.

12        THE WITNESS:  I don't know, sir.  She didn't

13   articulate anything other than the facial touching and

14   her being uncomfortable with it.

15   BY MR. MAYE:                                          5:12PM

16        Q    I thought she characterized it as not

17   parent-like, made her uncomfortable, and it concerned

18   her so much that she actually wanted to talk to the

19   pilot or the captain personally.  Based on those

20   facts, do you believe that at that point Chelsie       5:12PM

21   Bright possibly suspected that sexual misconduct had

22   been committed by Mr. DelVecchia against A.D.?

23        MR. McKAY:  Objection to the form.

24        THE WITNESS:  I believe that -- I believe

25   that we don't leave things open to interpretation.  I  5:12PM



Page 238

1   believe that if that's what she suspected, then that's          5:12PM

2   what she should have stated to Captain Shupe.

3   BY MR. MAYE:

4          Q     Well, she didn't ever tell Captain

5   Shupe that she suspected that Peter DelVecchia was               5:12PM

6   trafficking A.D., did she?

7          MR. McKAY:  Objection to the form.

8          THE WITNESS:  No, sir, in fact she didn't.

9   And I really think the whole reason we're here at all

10  is because there was no clear communication or effort            5:13PM

11  to fact-find or data-gather.  No, she didn't call the

12  cockpit when she was having a discussion with Ms. Bond

13  about things that were raising the hair on the back of

14  their neck because they were in their human

15  trafficking training.  Perhaps she should have gone to           5:13PM

16  the cockpit at that point.

17  BY MR. MAYE:

18         Q     So let me understand you.  Flight

19  Attendant Chelsie Bright notified the captain that she

20  observed Mr. DelVecchia stroking the face of A.D. in a           5:13PM

21  manner that she believed was not parent-like, and it

22  made her uncomfortable.  She was concerned, and she

23  brought this to the attention of the captain, and it's

24  your opinion that it's not possible that she was

25  suspecting potential sexual misconduct having been               5:14PM



Page 239

1    committed by Mr. DelVecchia against A.D.?                5:14PM

2         MR. McKAY:  Objection to the form.

3         THE WITNESS:  I don't believe that's my

4    testimony, sir.  What I testified to is that she

5    didn't state that that was a concern of hers.  And I     5:14PM

6    can't get inside her head.  The word "sexual," at the

7    point she relayed her concern to the captain was not

8    used, so I don't know what she thought.  And I already

9    testified to that at least five times, in addition to

10   describing watching Ms. Bright stroke her own face in    5:14PM

11   the deposition testimony, that seems completely

12   innocuous to me.  So to make the jump from why that

13   made her uncomfortable to sexual, and should I know or

14   glean from that that that's what she was thinking?  I

15   can't.                                                    5:15PM

16        MR. McKAY:  Brian, do you have any new

17   ground to cover because if you don't, this is just

18   harassing and I'm going to have to terminate it.

19        MR. MAYE:  Okay, John.  If you want to try

20   to terminate it, that's fine, and we can talk to the     5:15PM

21   judge.

22        MR. McKAY:  Well, my question for you is are

23   you going to cover anything new or are you just going

24   to circle around this same issue?

25        MR. MAYE:  I'm going to continue with my           5:15PM



Page 240

1    questions.                                              5:15PM

2          MR. McKAY:  Well, then I guess we'll find

3    out whether I terminate it.

4          MR. MAYE:  Okay.

5    BY MR. MAYE:                                            5:15PM

6          Q    So is it your testimony that you don't

7    believe that the sexual misconduct policy applied in

8    the circumstances of this case?

9          MR. McKAY:  Objection to the form.

10         THE WITNESS:  There are myriad circumstances    5:15PM

11   in this case.  You're going to have to be more

12   specific.

13   BY MR. MAYE:

14         Q    The fact that Chelsie Bright told the

15   captain that she suspect -- that she observed extended  5:16PM

16   stroking of the face by Mr. DelVecchia of A.D., it

17   made her uncomfortable, that she asked to have a --

18   asked to come into the cockpit to talk to the captain

19   about this, and then Flight Attendant Warren notified

20   the captain that he observed Peter DelVecchia's hand   5:16PM

21   on A.D.'s crotch, and that the flight attendants

22   recommended to the captain that they believe that A.D.

23   should be separated from Mr. DelVecchia.

24              Based on those facts, do you believe

25   that the sexual misconduct policy applied in this      5:16PM



Page 241

1    case?                                                        5:16PM

2            MR. McKAY:  Objection to the form of the

3    question.  Assumes facts not in evidence.

4            THE WITNESS:  Once again, sir, with all due

5    respect, you just skipped over the entire chronology        5:17PM

6    and escalating nature of what actually happened on

7    board the flight.  And the second part of my answer

8    would be that the sexual misconduct policy, as it is

9    written, requires the sexual misconduct be reported by

10   the victim as we've already discussed.                      5:17PM

11   BY MR. MAYE:

12           Q    Okay.  So do you believe that because

13   A.D. never reported sexual misconduct, that that

14   policy did not apply?

15           A    That mischaracterizes my testimony.            5:17PM

16   What I'm saying, sir, is that the -- throughout this

17   entire day you have alluded to a suspected sexual

18   molestation policy, when in fact there is no such

19   animal.  And --

20           Q    Can I ask you this?  I just asked you,         5:18PM

21   I'm trying to address this point with you.

22               The policy, which we can bring up, the

23   policy says, "Once an incident involving sexual

24   misconduct is reported to a flight attendant."  So

25   that's the beginning, right?                                5:18PM



Page 242

```
 1          A    No, actually, the beginning is at the      5:18PM

 2   top of the page.  But I'll let you go ahead.

 3          Q    What I'm asking, ma'am, is according to

 4   the policy, "Once an incident involving sexual

 5   misconduct is reported to a flight attendant," and     5:19PM

 6   then the policy goes on to explain the protocol

 7   regarding responding to that reported sexual

 8   misconduct.  Is that fair?

 9          A    I listed that the procedure that was

10   provided to the flight attendants regarding reported   5:19PM

11   sexual misconduct is -- I put it in my report in its

12   entirety there.

13          Q    So that's fair.  You agree with me?

14          A    That's fair.

15          MR. McKAY:  Objection.                          5:19PM

16   BY MR. MAYE:

17          Q    Now, if a flight attendant observes a

18   child get sexually assaulted by an adult on a flight,

19   is it your testimony that this policy doesn't apply

20   because the flight attendant observed it and it wasn't  5:20PM

21   the child that reported it?

22          MR. McKAY:  Objection to the form.

23   BY MR. MAYE:

24          Q    Is that your opinion?

25          A    Is that my opinion or testimony?  No.       5:20PM
```

Page 243

1    We've covered this ad infinitum before the lunch          5:20PM

2    break.  I've already testified that --

3              Q    Can this policy -- can this policy

4    apply even though a victim on a flight doesn't report

5    to the flight attendant that they've been sexually       5:21PM

6    assaulted?

7              A    I don't understand the question.  How

8    would it be -- under what theory then would we be

9    going through all or part of this?  Just a flight

10   attendant observation?                                   5:21PM

11             Q    That's right.  A flight attendant

12   observed a child get sexually assaulted by an adult.

13   The child doesn't report it.  The flight attendant

14   observes it.  And the child --

15             A    How do we know that the flight          5:21PM

16   attendant is observing what he or she thinks they're

17   actually observing?  How do we know that?

18             Q    Ma'am, what I'm asking you is if a

19   flight attendant observes sexual misconduct committed

20   against a child by an adult, and the child does not      5:22PM

21   report it, does this policy apply?

22             MR. McKAY:  Objection to the form of the

23   question.

24             THE WITNESS:  I believe I've answered it

25   previously, sir.  It's just -- it's not what this        5:22PM



Page 244

1   policy is written for.  And once again, I will state          5:22PM

2   for the record that there's no policy in place, this

3   or any other policy that I've reviewed, that allows

4   the flight attendant to make a determination of sexual

5   misconduct or sexual assault -- and we've talked about        5:22PM

6   the difference between those two words -- on behalf of

7   the victim.  That policy does not exist.

8   BY MR. MAYE:

9        Q   So are you saying Frontier does not

10  have a policy addressing how to respond to a situation        5:23PM

11  in which a flight attendant observes a passenger being

12  sexually assault by another passenger, and there's no

13  guidance or policy on how that flight attendant is

14  supposed to respond?

15       MR. McKAY:  Objection to the form of the                 5:23PM

16  question.

17       THE WITNESS:  Mr. Maye, we covered this ad

18  infinitum earlier, once again.  What I testified to,

19  and I will try to summarize it again, is that if a

20  flight attendant firmly believed with all of his or          5:23PM

21  her conviction that he or she was witnessing an

22  assault, take place in real time, they are trained --

23  they are trained to intervene for the safety and

24  security of the passenger.  Once they are sure about

25  what they're seeing, yes, period.  And that is not '          5:24PM



Page 245

1   what we're talking about here.                         5:24PM

2          MR. McKAY:  Okay.  Brian, if the next

3   question is on the same topic, I have to terminate the

4   deposition because --

5          MR. MAYE:  Okay.  John, I'm going to            5:24PM

6   continue with my deposition.  I'm going to continue

7   with my deposition.

8   BY MR. MAYE:

9          Q    Ma'am, so in this case, you don't

10  believe that this policy applied.  Is that what you're  5:24PM

11  saying?

12         MR. McKAY:  Okay, I'm terminating the

13  deposition.  You're harassing the witness.

14         MR. MAYE:  I'm not harassing the witness.

15         MR. McKAY:  You are.                            5:25PM

16         MR. MAYE:  Maybe I'm not the -- not that I'm

17  the quickest guy in the world, but I'm --

18         MR. McKAY:  Sorry.  You are.

19         MR. MAYE:  -- not sure I totally understand.

20         MR. McKAY:  I told you if you ask the next      5:25PM

21  question on the same topic --

22         MR. MAYE:  You're going to tell her --

23  you're going to terminate -- how can you terminate the

24  deposition?

25  '        MR. McKAY:  I can.                             5:25PM



Page 246

1          MR. MAYE:  What authority?                    5:25PM

2          MR. McKAY:  Harassing the witness allows an

3    attorney to terminate the deposition.

4          MR. MAYE:  Okay, so you're terminating it?

5          MR. McKAY:  Yes.                              5:25PM

6          MR. MAYE:  Okay.  We're going to bring this

7    up to the court.

8          MR. McKAY:  Good.  Thank you.

9          MR. MAYE:  Let's stay on the record so we

10   can note what Mr. McKay has done.  So I am not      5:25PM

11   finished with my deposition of Captain Norton.  I

12   still have additional questions to ask her.

13         MR. McKAY:  And I invited you to move on to

14   them.

15         MR. MAYE:  Okay.  We'll move on to those,     5:26PM

16   and then we'll come back to the other stuff.

17         MR. McKAY:  No, don't come back to the other

18   stuff.

19         MR. MAYE:  We'll try, and then we can go on

20   the record about your objections to it.             5:26PM

21         MR. McKAY:  If you have new questions about

22   new subjects to ask, go ahead.

23         MR. MAYE:  Okay.

24         MR. McKAY:  But I need some time to cross.

25   So you're getting very close to the end of six and a  5:26PM

MAGNA>

Page 247

```
 1   half hours.  You've got about 15 minutes left.        5:26PM

 2   BY MR. MAYE:

 3          Q    Ma'am, regarding your opinion that the

 4   sexual misconduct policy didn't apply, is that based

 5   on your review of the deposition testimony in this     5:26PM

 6   case?

 7          MR. McKAY:  Objection to the form of the

 8   question.

 9          THE WITNESS:  No.  And this doesn't feel

10   like a new topic, but no.                              5:27PM

11          MR. McKAY:  It is not.

12   BY MR. MAYE:

13          Q    You said "no"?

14          A    I said "no."

15          MR. McKAY:  Yeah.  And she said it's not a       5:27PM

16   new topic and she's right.  Do you have a new topic?

17          MR. MAYE:  I'm not sure if that's a topic we

18   covered.  She said "no."

19   BY MR. MAYE:

20          Q    So ma'am, your opinion that the policy      5:27PM

21   doesn't apply is based on something other than

22   deposition testimony?

23          MR. McKAY:  Objection to the form of the

24   question.

25          THE WITNESS:  The policy doesn't apply           5:27PM
```



Page 248

1    simply because the policy is intended to cover a          5:27PM

2    report of sexual misconduct to a flight attendant by a

3    victim of such misconduct.

4    BY MR. MAYE:

5            Q    And is that opinion based on -- strike       5:27PM

6    that.

7                 So you've made that opinion based on

8    the fact that -- just a reading of Frontier's policy.

9    You read the policy.  You've read what happened in the

10   case.  And you've determined that in this case A.D.       5:28PM

11   never reported he was sexually assaulted, so this

12   policy doesn't apply.  Is that fair?

13           MR. McKAY:  Objection to the form of the

14   question.

15           THE WITNESS:  Not only did he not report it.      5:28PM

16   Nobody bothered to ask him whether he was being --

17   whether any action was being taken against him that he

18   found objectionable.  So all of that, and then the

19   rest of my answer.

20   BY MR. MAYE:                                              5:29PM

21           Q    Regarding Number 3.  Well, let me ask

22   you this.

23                Let's go off the record for one second

24   so I can ask the videographer how much time we have

25   left.                                                     5:29PM

MAGNA

Page 249

1          THE VIDEOGRAPHER:  Counsel, did you say you      5:29PM

2    want to go off the record?

3          MR. MAYE:  Yes, please.

4          THE VIDEOGRAPHER:  Okay.  Going off the

5    record.  The time is 5:30 p.m.                         5:29PM

6               (Recess.)

7          THE VIDEOGRAPHER:  The time is 5:35 p.m.

8    We're back on the record.

9    BY MR. MAYE:

10         Q    Captain, have you played a management       5:35PM

11   role at United in developing policy regarding

12   responding to sexual misconduct?

13         A    I have not.

14         Q    Have you played a management role in

15   developing policy regarding responding to human       5:35PM

16   trafficking?

17         A    I have not.

18         Q    Have you had any bias training at

19   United with respect to conducting investigations?

20         A    I'm sorry.  Could you repeat that, sir?     5:35PM

21         Q    Have you had any bias training at

22   United with respect to conducting investigations?

23         A    When you say conducting investigations,

24   do you mean for this job, for my second job, or do you

25   mean investigations at United?                         5:36PM



Page 250

```
 1          Q    At United.                              5:36PM

 2          A    No, sir.

 3          Q    Have you had any training at United

 4  regarding conducting investigations at United?

 5          A    No.                                     5:36PM

 6          Q    Have you had any bias training at MEA

 7  Forensics with respect to conducting investigations?

 8          A    I wouldn't say formal bias training,

 9  but it is a part of our discussed protocol and policy

10  that we hold in very high esteem, that we are neutral  5:36PM

11  expert witnesses, which includes not being biased.

12          Q    Have you had any training at MEA

13  Forensics regarding conducting investigations?

14          A    Yes.

15          Q    When did you have that training?       5:37PM

16          A    Well, if you're talking about formal

17  training, it's -- I mean, I'm just talking about

18  ongoing -- when I joined the company in 2009, I was an

19  engineer that had participated in training and

20  investigation when I worked for McDonnell Douglas, but  5:37PM

21  I hadn't conducted them in the manner that MEA

22  Forensics conducts them.  So it's not formal training

23  where I could cite you -- I did do some training, I

24  think it's in my resumé, at USC Viterbi School of

25  Aviation.  But it would help if we could be more       5:38PM
```



```
 1    specific.                                            5:38PM

 2         Q    Is there an industry standard for

 3    pilots responding to suspected human trafficking?

 4         A    For pilots?

 5         Q    Yes.                                        5:38PM

 6         A    Well, sir, as we discussed pretty much

 7    all day, the standard is to ensure that the flight

 8    attendants comply with their industry standard

 9    provided training and then the pilots, the captain

10    specifically then, after ensuring that has happened,  5:38PM

11    then takes it from there and decides the next course

12    of action.

13         Q    And that industry standard is set forth

14    where?

15         A    As we've already discussed in the          5:38PM

16    global realm of what the duties and responsibilities

17    and standard of care for a pilot in command are, it's

18    just one of the myriad of responsibilities.

19         Q    So I'm sorry.  Can you identify a

20    specific federal regulation or standard of care       5:39PM

21    regarding what dictates what a pilot must do in

22    response to suspected human trafficking?

23         MR. McKAY:  Objection to the form of the

24    question.

25         THE WITNESS:  I testified several times          5:39PM
```



Page 252

1    earlier, sir, that there is no specific FAR that        5:39PM

2    covers pilot actions for suspected human trafficking.

3    Rather, as PIC, I, under the FAR that deems that I am

4    in command and control of the aircraft and responsible

5    for the safety and security of all of its occupants, I    5:39PM

6    ensure that the flight attendants follow their

7    guidance and training and protocols as part of my

8    responsibility as PIC.

9    BY MR. MAYE:

10          Q     Have you been in a position with United      5:40PM

11   to create manual changes?

12          A     We are all in a position to be able

13   to -- all pilots are in a position and have an avenue

14   by which they can suggest either correcting errata or

15   suggesting a better way to have manual -- information    5:40PM

16   that's in the manual read.

17          Q     Have you been involved in any manual

18   changes surrounding the topics of suspected human

19   trafficking or suspected sexual misconduct?

20          A     I have not.                                  5:41PM

21          Q     Do you know whether the FAA has

22   accepted any proposals regarding a pilot's response to

23   sexual misconduct?

24          A     I do not.

25          Q     Do you know if the FAA has accepted any     5:41PM



1   proposals regarding pilot's response to human          5:41PM

2   trafficking?

3            A    I do not.

4

5                                                          5:42PM

8            MR. McKAY:  Objection to form.

9            THE WITNESS:  I don't understand the

10  question.                                              5:42PM

11  BY MR. MAYE:

12           Q

13

                                                           5:42PM

                                                           5:43PM

         MR. McKAY:  Objection to the form.

         THE WITNESS:  Insofar as I understand your

23  question, sir, I would say no.

24  BY MR. MAYE:

25           Q    Absent a specific guideline, can a       5:43PM

Page 254

▮ ████ ███ ████ ██ ███ ████ ████                    5:43PM

▮ ████ █ ████ █ ████ █ ████ ██ █ ████

▮ ███ ████ ███ ████

4            MR. McKAY:  Objection to the form.

5            THE WITNESS:  I would ask you to explain      5:43PM

6    what it means by "taking portions."

7    BY MR. MAYE:

8            █ ████ █ ████ ████ ████ ████ ████

▮ ████ ████ ████ ████ ████ ████

▮ ██ ██ ████ ████                                      5:43PM

▮            MR. McKAY:  Objection to the form.

▮            THE WITNESS:  No.

13   BY MR. MAYE:

14           Q    When making a decision in flight about

15   responding to a safety concern, are flight conditions    5:44PM

16   a factor?

17           A    I don't understand the question.

18           MR. McKAY:  Objection to the form.

19   BY MR. MAYE:

20           Q    In how a captain is responding to a        5:44PM

21   certain scenario, a passenger issue in flight, flight

22   attendant notifies the captain that there's a

23   disruptive passenger, are the flight conditions that

24   the captain is facing or experiencing a factor in his

25   or her response to the passenger incident?              5:45PM

**MAGNA ⊙**

Page 255

```
 1              MR. McKAY:  Objection to the form.            5:45PM

 2              THE WITNESS:  Sir, do you mean the

 3    external --

 4              MR. MAYE:  Yes.

 5              THE WITNESS:  -- i.e., the weather          5:45PM

 6    conditions --

 7              MR. MAYE:  Yes.

 8              THE WITNESS:  -- whether I'm VFR or IMC or

 9    turbulent?

10              MR. MAYE:  Yes.                              5:45PM

11              THE WITNESS:  No, that is not a

12    consideration.

13    BY MR. MAYE:

14         Q    So do you -- you don't agree that it

15    would be important for you to know what the flight    5:45PM

16    conditions were during this flight in assessing

17    whether Captain Shupe properly responded to the

18    reported sexual misconduct on the subject flight?

19              MR. McKAY:  Objection to the form.

20              THE WITNESS:  It's irrelevant, sir.  I mean, 5:46PM

21    it's not relevant.

22    BY MR. MAYE:

23         Q    Okay.

24         A    That's why there are two pilots.

25              ▪ ▬ ▬ ▬ ▬ ▮ ▬ ▬ ▮              5:46PM
```



Page 256

1   applied in this case?                                    5:46PM

2           A     I do not.

3           Q     Why not?

4           A     For all the reasons my report

5   delineated. ███████ █ ██████ ██ ██ ██       5:47PM
█ ██████ ████ █ ████ ███ ██ ██ ███ ██ █
█ ████ █ █ █ █ ████ █ █ █ ████ ████
█ ████ █ █ █ ████ █ ████ ███ █ ████
█ ████ ████ ████

10          Q     We don't have much time, ma'am.          5:47PM

11          MR. McKAY:  You asked the question.

12          MR. MAYE:  I didn't ask her to go through

13  the background.

14          MR. McKAY:  Let her answer, please.

15          THE WITNESS:  Okay, sir, I'll try to make it    5:47PM

16  short.  I get it.

17                  ███ ███ ███ ███ ███ ███
█ ████ █ █ █ ███ █ ██ █ ████ █ ████ ███
█ ████ █ ████ ████ ████ ████ ████ ████
█ ██ ████ ████ ███ ██ ██ ████            5:47PM

21  BY MR. MAYE:

22          Q     So you don't believe that the safety

23  and security of the flight was at risk based on the

24  suspected sexual misconduct?

25          A     Do I believe the safety and security of   5:48PM

Page 257

```
 1   the flight was at risk?  No, I do not.                5:48PM

 2              █   ██ ██ ██ ██      ██ ██ █

     █ ██ ██ █ ██ ██ ██ ██ ██ ██ ██ ██

     █ ██ █ ██ ██ ██

 5              A    Are they of any use?                  5:48PM

 6              Q    As a resource.

 7              MR. McKAY:  Objection.  Asked and answered.

 8   Objection to the form.

 9              ██ ██ ██ █ █ ██ ██ ██ █

10   ██ ██ ██ █ ██ ██ █ ██ ██ ██            5:48PM

     █ ██ █ ██ ██ ██ ██ ██ █ ██ ██

     █ ██ ██ █ █ ██ █ █

13   BY MR. MAYE:

     █      █   ██ ██ ██ █ ██ ██ ██ ██

     █   ██ ██ ██ ██ ██ ██            5:49PM

     █      █   I would agree with that.

     █      █   And would you agree that Captain Shupe

18   did not reference or consult his ops manual until

19   after he made the decision to separate A.D. from

20   Mr. DelVecchia?                                       5:49PM

21              A    █ ██ ██ ██ ██

22              █   ██ █ ██ █ █ ██ ██ ██

     █ ██ ██ ██ ██

24              MR. McKAY:  Objection to the form.

25              ██ ██ ██ ██ ██ █ █        5:50PM
```



Page 258

 1  ████████ ████.                                    5:50PM

 2  BY MR. MAYE:

 3  ██ ███ ████ ██ ███████ ████ ███ ████

 4  ████ ████ █ █████ █████ ████ ████ ████

 5  ██ █ ████ ████ ██ ████ ████ ████ ████      5:51PM

 6          A    Yes.

 7          Q    Do you agree that law enforcement has

 8  significantly more training than flight attendants and

 9  pilots regarding determining whether a child is at

10  risk?                                             5:52PM

11          A    I don't have an opinion about that.  I

12  don't have enough information to answer that question,

13  sir.

14          Q    Do you agree that law enforcement has

15  significantly more training than flight attendants and  5:52PM

16  pilots regarding whether a child is potentially being

17  human trafficked?

18          A    I have no opinion or information on

19  that either.

20          Q    Are you familiar with the 119?         5:52PM

21          MR. McKAY:  Objection to the form.

22          THE WITNESS:  The 119?  You'll have to tell

23  me what -- not in those terms.

24  BY MR. MAYE:

25          Q    Are you familiar at all with The Big   5:52PM

MAGNA

Page 259

```
 1  Five?                                           5:52PM

 2          MR. McKAY:  Objection to the form.  Lacks

 3  any context.

 4          THE WITNESS:  Yeah, I don't know what we're

 5  talking about right now.                        5:52PM

 6  BY MR. MAYE:

 7          Q    Your opinions in this case -- strike

 8  that.

 9               Are you familiar with CAST?

10          MR. McKAY:  Objection to the form.  No     5:53PM

11  context.

12          THE WITNESS:  Are you saying an acronym?

13          MR. MAYE:  Yes.

14          THE WITNESS:  Could you spell out what the

15  acronym is.                                     5:53PM

16          MR. MAYE:  C-A-S-T.

17          THE WITNESS:  No, I'm not.  I thought you

18  were saying CAS, which must be something totally

19  different.

20  BY MR. MAYE:                                     5:53PM

21          Q    So you don't have access to CAST?

22          A    You'd have to tell me what it is, sir,

23  first.

24          Q    Okay.  So I guess you must not if you

25  don't know what it is.  Okay.                   5:53PM
```



Page 260

```
 1          MR. McKAY:  Objection to the form.      5:53PM
 2  Objection.  Motion to strike.
 3  BY MR. MAYE:
 4          Q    Do you have access to CAST?
 5          MR. McKAY:  You haven't told her what CAST   5:53PM
 6  is, or me.  CAST means to throw a fishing lure out
 7  into a lake.  I have access to that.  Is that what
 8  you're asking?
 9  BY MR. MAYE:
10          Q    Ma'am, do you have access to a system   5:54PM
11  referred to as C-A-S-T, CAST?
12          A    Can you spell out, sir, what the
13  acronym stands for, and I might be able to help?
14          MR. McKAY:  You're not going to explain it,
15  Brian?                                             5:54PM
16          MR. MAYE:  No, I don't think it's necessary.
17          MR. McKAY:  You asked.
18  BY MR. MAYE:
19          Q    Under the Frontier flight ops, would
20  you agree that the captain can elect to speak to any   5:55PM
21  flight attendant he chooses under any circumstances?
22          A    Under the Frontier FOM, I would have to
23  look that up.  I mean, in general terms a flight
24  attendant or a captain can just by his or her
25  authority, can speak to any or all of his flight   5:55PM
```



1  attendants.                                                    5:55PM

2          Q     Your conclusions and opinions on page

3  13, Number 7, you state that "Captain Shupe did not

4  follow his training and guidance in accordance with

5  Number 1 through 6 above, throughout Flight 2067."     5:56PM

6                With respect to Number 1, you say that

7  "Captain Shupe was the pilot in command of Frontier

8  Flight 2067 on March 28, 2019, and had authority over

9  all assigned crew members on the flight throughout the

10 flight time."                                          5:57PM

11                How did Captain Shupe not follow his

12 training and guidance with respect to being the pilot

13 in command and having authority over all assigned crew

14 members?

15         A     He did not direct the crew members       5:57PM

16 to -- his flight attendants to follow their applicable

17 policies and procedures.

18         Q     And is there a federal regulation

19 requiring the captain to instruct the flight

20 attendants to follow their protocols and procedures?   5:57PM

21         MR. McKAY:   Objection.   Asked and answered

22 multiple times.

23         THE WITNESS:   Yeah, the same one I refer you

24 back to every time we discuss this.

25



Page 262

1    BY MR. MAYE:                                              5:58PM

2           Q    Is that the general overarching --

3           A    Yes, sir.

4           Q    -- regulation?

5                Regarding Number 2, "Captain Shupe was       5:58PM

6    designated as the ISC on Flight 2067 and was

7    responsible for, among other things, crew coordination

8    and awareness, passenger comfort and satisfaction and

9    compliance with all regulations, company policies and

10   procedures."                                              5:58PM

11               How did Captain Shupe not follow his

12   training and guidance with respect to his being the

13   ISC?  I'll leave it at that.

14           MR. McKAY:  Objection to the form.

15           THE WITNESS:  Essentially it's the same          5:58PM

16   answers, sir, that we've discussed and that my report

17   details; that there were things that Captain Shupe

18   could have easily done to coordinate his crew and

19   enhance his own situational awareness with respect to

20   what was happening with the DelVecchias.  Certainly     5:59PM

21   didn't ensure the DelVecchias comfort and

22   satisfaction, and he didn't ensure that his flight

23   attendants follow their company policies and

24   procedures.

25

Page 263

1    BY MR. MAYE:                                    5:59PM

2         Q    And what is the regulation or industry

3    standard that you base that opinion on?  Again, the

4    overarching regulation?

5         A    Yes, sir.  Yeah.  You can just apply    5:59PM

6    that all the way down if that makes it easier.

7         Q    Number 3, "Captain Shupe was expected

8    to uphold the rules and regulations established by the

9    Department of Homeland Security for aircraft

10   operators.  This includes the appropriate use of the  6:00PM

11   security levels."

12        How did Captain Shupe not follow his

13   training and guidance with respect to Number 3?

14        MR. McKAY:  ███████ ██ ██ ███

15        ███ ████████ █████ ████ ██     6:00PM

██ ████ ██████ ████████ █████ ███ ████ ████ ████ ██████ █

██ ████ █████ ████ █ █████ ███ █ ████ █████

██ ████ ████ █ ████ █ ██ █ █████ █ ██████ ████ ███

██ ████ ████ ██ █ ██i ████ ████ ██ ██ ████

██ ████ ████ ████ ██ ████ ██ █████           6:00PM

██ ████████

██ ██ ██ ███

██     █ ████ ██ █ ████ ███ ████ ██████

██ █████ ██████ ████ ████ ██ █i ██ █████

25        MR. McKAY:  Objection to form.           6:01PM



Page 264

1          THE WITNESS:  Inexplicably he did, yes.          6:01PM

2    BY MR. MAYE:

3          Q     Number 4, "Captain Shupe was trained

4    and expected to utilize good communication that

5    minimize opportunities for misunderstandings and          6:01PM

6    inaccurate assumptions."

7          How did Captain Shupe not follow his

8    training and guidance with respect to Number 4?

9          A     As we've discussed the majority of the

10   day, Captain Shupe was trained and expected to          6:01PM

11   communicate with his flight attendants and give them

12   direction in a way that would uncover any ambiguity or

13   assuage any concerns, including instructing them to go

14   back and have a conversation with the DelVecchias, try

15   to gain, as we talked about earlier, more data points.          6:02PM

16   Speak to -- as far as dispatch, try to get some more

17   information.  Essentially --

18         Q     Putting your --

19         MR. McKAY:  You just cut her off.

20         MR. MAYE:  I'm sorry.          6:02PM

21         THE WITNESS:  He was trained and expected to

22   do any and all things within his power to not make an

23   assumption about what should happen to this family in

24   the absence of any viable information.

25



Page 265

1  BY MR. MAYE:                                          6:02PM

2        Q    Regarding your opinion that Captain

3  Shupe should have had the flight attendants go get

4  additional information from the DelVecchias, is that

5  based on the overarching regulation?                  6:03PM

6        MR. McKAY:  Objection to the form.

7        THE WITNESS:  It's based on the overarching

8  regulation, but it's also based upon training required

9  to become a captain in command of a transport-category

10 passenger-carrying aircraft.                           6:03PM

11 BY MR. MAYE:

12       Q    Is that based on any specific

13 regulation pertaining to responding to reported or

14 suspected sexual misconduct?

15       MR. McKAY:  Objection to the form.            6:03PM

16       THE WITNESS:  It's non-subject specific.  It

17 covers using -- it covers the bulk of his training

18 regarding -- I'm sorry.  Let me slow down.

19            Regardless of the situation at hand,

20 that is what the captain is expected to do always.     6:04PM

21 BY MR. MAYE:

22       Q    Number 5, "Captain Shupe was trained

23 and expected to properly use his authority and

24 leadership to reach a resolution consistent with the

25 highest standards of safety and professionalism."      6:04PM



Page 266

1        MR. McKAY:  Can you slow down, please.  I        6:04PM

2    can't imagine the court reporter can keep up with

3    that, Brian.

4        MR. MAYE:  Well, we're pressed for time and

5    it's right on the screen, but okay.                    6:04PM

6    BY MR. MAYE:

7        Q    Number 5, "Captain Shupe was trained

8    and expected to properly use his authority and

9    leadership to reach a resolution consistent with the

10   highest standards of safety and professionalism."      6:04PM

11            How is that not followed with respect

12   to his training and guidance?

13        A    In all the ways we've discussed

14   throughout the bulk of the day.  His failure to

15   utilize the dispatcher.  His failing to guide his      6:05PM

16   flight attendants to gather and seek more information

17   for him to make good decisions.  We've talked about

18   all of it.

19        Q    Number 6, "Captain Shupe was trained

20   and expected to identify, assess and counter any issue 6:05PM

21   or event threatening the safety of the flight, and not

22   introduce additional threats or errors by failing to

23   do so."

24            How did he not follow his training and

25   guidance with respect to Number 6?                     6:05PM



Page 267

1      A    He committed an egregious error, in my      6:05PM

2  opinion, by ordering the minor child, A.D., to be

3  separated from his father without any fact-finding or

4  data gathering, other than what was just being relayed

5  to him by flight attendant observations.               6:06PM

6      Q    Can a captain rely on observations made

7  by his or her flight attendants to make decisions

8  about how to respond in a reasonable fashion to a

9  safety concern in the cabin?

10      A    He or she can certainly take those         6:06PM

11  observations as one piece of the overall data used to

12  contribute to making a decision.

13      Q    Can a captain solely rely on the

14  observations of flight attendants in making a decision

15  regarding responding to a passenger safety concern?    6:06PM

16      A    I would say it would be unwise to rely

17  solely upon hearsay to make -- it depends on, again,

18  we're situationally dependent.  What's the concern in

19  the back.  What scenario are we talking about.  It

20  can't always be lumped into one category.              6:07PM

21         As I previously testified to, certainly

22  the observations of my flight attendants come into

23  play in my overall decision-making.  However, I would

24  opine that it's not my sole data point, especially

25  when I have the opportunity to gather more.            6:07PM



Page 268

1        Q     Is it permissible under the federal        6:07PM

2   regulations for a captain to solely rely on

3   observation of his flight attendants in responding to

4   a passenger safety concern?

5        MR. McKAY:  Objection to the form.        6:08PM

6        THE WITNESS:  There's not a Federal Aviation

7   Regulation that covers that topic.  Again, it's the

8   overarching PIC in command that we've talked about all

9   day.

10  BY MR. MAYE:        6:08PM

11       Q     So can a captain rely solely on

12  observations of flight attendants in responding to a

13  passenger safety concern in the cabin?

14       MR. McKAY:  Objection to the form.

15       THE WITNESS:  Can he?        6:08PM

16  BY MR. MAYE:

17       Q     Under the regulations.

18       A     It's not -- again, sir, it has nothing

19  to do with regulations.  Can he or she rely solely

20  upon that?  If that's the extent to which they want to        6:08PM

21  do their job, they have the ability to do that, which

22  is what "can" means.

23       Q     Okay.  It wouldn't be a violation of

24  any federal regulation for the pilot -- for the

25  captain to rely solely on the observations of flight        6:09PM



Page 269

1  attendants in responding to a passenger safety concern   6:09PM

2  in the cabin?

3          MR. McKAY:  Objection to the form.

4          THE WITNESS:  It would not violate an FAR.

5          MR. MAYE:  Okay.  Can we go off the record?   6:09PM

6          MR. McKAY:  No.

7          MR. MAYE:  We can't go off the record?

8          MR. McKAY:  No.  Finish your deposition,

9  please.

10         MR. MAYE:  I am probably finished.   6:09PM

11         MR. McKAY:  Okay.

12         MR. MAYE:  And I want to go off the record

13  to make sure I'm finished.

14         MR. McKAY:  You can finish right here.

15         MR. MAYE:  Let's go off the record, please.   6:09PM

16         MR. McKAY:  I don't want to go off the

17  record.

18         MR. MAYE:  Well, I want to go off the

19  record.

20         MR. McKAY:  Well, I don't.   6:09PM

21         MR. MAYE:  Okay.  Fine.

22             Court Reporter, can you note the time

23  right now.

24         THE REPORTER:  Sure.  It is 4:09.

25         THE WITNESS:  That's Pacific.  That's my   6:10PM



Page 270

1   time.  Just to be clear.                                    6:10PM

2          MR. MAYE:  Off the record.  Because I want

3   to know how much time I have left.

4          MR. McKAY:  I'm showing that you're at 09,

5   you're at six hours and 42 minutes.                         6:10PM

6          MR. MAYE:  Court Reporter, can we please go

7   off the record.

8          THE REPORTER:  Both counsel have to agree to

9   go off the record.  To go on the record, only one

10  counsel has to say "On the record."  But to go off the      6:10PM

11  record, you have to agree.

12         MR. MAYE:  That's fine.

13         THE VIDEOGRAPHER:  I'm sorry, are we staying

14  or going off?

15         MR. McKAY:  We are staying on the record.            6:10PM

16         THE VIDEOGRAPHER:  Okay.  Just making it

17  clear.  Thank you.

18  BY MR. MAYE:

19         Q    Does the captain have authority under

20  the regulations to direct that a passenger be moved         6:16PM

21  when the captain is notified by a flight attendant

22  that the flight attendant observed what she perceived

23  to be sexual misconduct?

24         MR. McKAY:  Objection to the form.

25         THE WITNESS:  It, again, sir, doesn't really         6:16PM

MAGNA▶

Page 271

1    have anything to do with the FARs.  The captain has        6:16PM

2    the authority as the PIC to act in accordance with

3    whatever he or she deems appropriate.

4    BY MR. MAYE:

5            Q    So the answer is yes, the captain does       6:17PM

6    have the authority?

7            MR. McKAY:  Objection to the form.

8            THE WITNESS:  Yes.

9    BY MR. MAYE:

10           Q    Is the captain required under the FARs        6:17PM

11   to conduct an investigation in flight after a flight

12   attendant has notified the captain that a passenger is

13   the victim of potential sexual misconduct?

14           MR. McKAY:  Objection to the form.

15           THE WITNESS:  Yeah, there's a lot to that.        6:17PM

16   BY MR. MAYE:

17           Q    Let me restate that.  Before a captain

18   moves a passenger that the captain understands was the

19   victim of inappropriate touching, does the captain

20   have to conduct any investigation before the captain    6:18PM

21   moves that person, that passenger, away from the

22   alleged perpetrator under the regulations?

23           MR. MAYE:  Objection to the form.

24           THE WITNESS:  For the I don't know how many

25   times, but the regulations don't specifically cover     6:18PM



Page 272

1    this area.  So if that's the extent of the question.          6:18PM

2    But the other part of that is after the captain has

3    determined -- and we're not covering how the captain

4    has made this determination other than through

5    hearsay, but if your question is just specific to the          6:18PM

6    regulation, we can continue to save more time, and I

7    will reiterate again that the regulations don't

8    specifically address this area.

9    BY MR. MAYE:

10          Q    So the captain does not have to conduct          6:19PM

11   an investigation before moving the passenger who was

12   the potential victim of sexual misconduct before the

13   captain decides to move that passenger away from the

14   perpetrator?

15          MR. McKAY:  Objection to the form.          6:19PM

16          THE WITNESS:  As we've discussed previously

17   sir, the captain may do -- may make whatever decision

18   he or she makes.  However, the captain must be

19   prepared to defend that decision and show that he or

20   she utilized best judgment and all available resources          6:20PM

21   before making, in this case, such an egregious

22   decision as to separate a minor child from his parent.

23   BY MR. MAYE:

24          Q    Captain Shupe's decision to separate

25   A.D. from his father was not a violation of any FARs;          6:20PM



Page 273

1    is that correct?                                        6:20PM

2           A    Asked and answered, sir.  It's not an

3    FAR situation.

4           Q    So the answer is --

5           A    It was not a violation.                     6:20PM

6           Q    -- it was not a violation.

7                I have no further questions.

8

9                         EXAMINATION

10   BY MR. McKAY:                                           6:20PM

11          Q    Captain Norton, I'm just going to ask

12   you a couple of questions here, and then hopefully we

13   can all end the day.

14               Did Captain Shupe have sufficient time

15   to conduct the type of investigation that you have     6:21PM

16   indicated was necessary?

17          A    In my opinion, he had more than

18   sufficient time to do that, yes.

19          Q    Can you expand on why that was?

20          A    When I attempted to look at the            6:21PM

21   timeline, from anything other than deposition

22   testimony, I looked at the record of the ACARS

23   transmissions and tried to match up timing in terms

24   of, we have what we call OOII times, out is pushing

25   back from the gate, parking brake release, off is      6:21PM



Page 274

1    leaving the ground.  In is touching -- I'm sorry.  On          6:21PM

2    is touching down, and in is setting the parking brake

3    at the destination gate.  And it's a flight of

4    four-ish, I have it written somewhere, but it's --

5          Q     About four hours and 45 minutes?                   6:22PM

6          A     Yeah, that's about right.  And the

7    initial report by Captain Shupe, and everyone's

8    testimony puts it in the ballpark that the initial

9    report by Ms. Bright was only an hour and change into

10   the flight.                                                    6:22PM

11         Q     And would that include having

12   sufficient time to have instructed the crew to have

13   witnesses deplane last so they could give statements

14   to the police?

15         A     Absolutely.                                        6:22PM

16         Q     And was that done?

17         A     Not to my knowledge.

18         Q     With respect to Item 10, and Mr. Maye,

19   since I don't have control, could you show that --

20   okay.  Thank you.  About ascertaining A.D.'s age, the          6:22PM

21   Frontier gate agent, I don't know if you remember,

22   many, many hours ago you were asked about that and

23   whether there was a standard of care.  Did you state

24   the applicable standard up in your report?

25         A     I believe I did.  It's a minimum of 15             6:23PM



1    years of age to occupy the exit seat is the standard.        6:23PM

2             Q      And who sets that standard?

3             A      That is set by the FAA.

4             Q      So that's not something that can be

5    waived by a gate attendant or a flight attendant?        6:23PM

6             A      No, sir, it's not.

7             Q      Is it necessary for a captain of an

8    airline flight to interact with flight attendants to

9    ascertain the facts of a situation?

10            A      I guess I would say it's situational.        6:23PM

11   It depends on the situation and what the information

12   the captain needs.

13            Q      Fair enough.  Let me ask it this way.

14   Is it necessary for the captain to be the manager

15   during the flight of the flight attendants?        6:24PM

16            A      It is.

17            Q      Do captains need to manage the actions

18   of flight attendants during a flight if a situation is

19   brought to their attention that involves something as

20   great as accusing a passenger of illegal activity?        6:24PM

21            A      Yes.

22            Q      And in order to manage them, does the

23   captain need to be aware of the protocols that the

24   flight attendants themselves have to follow?

25            A      Yes.        6:24PM



Page 276

1          Q     Did Frontier provide Captain Shupe with     6:24PM

2    any training on the protocols that the flight

3    attendants needed to follow for a claim of suspected

4    human trafficking or a claim of suspected sexual

5    molestation, sexual misconduct, I should say?          6:25PM

6          A     They did not.

7          Q     When you testified about the report by

8    Flight Attendant Nickel to the other flight attendants

9    that she saw A.D. shaking his head when she offered

10   him a soda, should she and the other flight attendants  6:25PM

11   have questioned the reason for assuming that it looked

12   like evidence of human trafficking?

13         MR. MAYE:  Object to form.

14         THE WITNESS:  If, in fact, the response led

15   them to that suspicion, then yes.                       6:25PM

16   BY MR. McKAY:

17         Q     And what guidance is available for

18   flight attendants to understand how to question

19   assumptions about passengers, especially passengers of

20   minority races?                                         6:26PM

21         A     I am not aware.  You'll have to restate

22   that.  I'm sorry.

23         Q     I'm sorry.  I think I asked you a

24   question outside of your particular area.  Strike

25   that.                                                   6:26PM



Page 277

```
 1              Do you think that in that situation        6:26PM

 2   where Flight Attendant Nickel was offering a soda to

 3   A.D. and it was established that A.D.'s father was

 4   asleep, if A.D. had been a victim of trafficking, what

 5   would you have expected such a victim to do if the       6:26PM

 6   adult was sound asleep?

 7              MR. MAYE:  Object to form.

 8              THE WITNESS:  As I understand the question

 9   you're asking, what would I reasonably expect a victim

10   of trafficking to do when given the opportunity to       6:27PM

11   alert an adult while the adult was asleep?  To alert a

12   safe adult?  I would assume that A.D. would capitalize

13   upon the opportunity to somehow signal that he was

14   under duress or needed help.

15   BY MR. McKAY:                                            6:27PM

16        Q    And did he do that?

17        A    No, sir.

18        Q    Why should Chelsie Bright have engaged

19   the DelVecchias in conversation before reporting to

20   the captain that they made her feel uncomfortable?       6:27PM

21        A    Well, because according to her

22   deposition testimony, that the closest we can get to

23   why she may have been uncomfortable was the suspicion

24   that perhaps A.D. was being trafficked or that there

25   was something untoward about their relationship.  And    6:28PM
```



Page 278

1   she's been provided training and a protocol to help       6:28PM

2   her assuage those concerns if, in fact, she has them.

3          Q    And if she didn't follow through with

4   those protocols on which she's been trained, does that

5   lead to any conclusion as to whether or not the          6:28PM

6   suspicion is valid?

7          MR. MAYE:  Object to form.

8          THE WITNESS:  I can only conclude that not

9   following a prescribed procedure for which you've been

10  given training is either indicative of the fact that     6:28PM

11  you weren't concerned or were somehow just not

12  following your training protocol for whatever reason.

13  BY MR. McKAY:

14         Q    Why didn't the flight attendants want

15  to talk to the DelVecchias?                              6:29PM

16         MR. MAYE:  Object to form.

17         THE WITNESS:  I have no idea, sir.

18  BY MR. McKAY:

19         Q    Would you as a captain have expected

20  the flight attendants to talk to them?                   6:29PM

21         MR. MAYE:  Object to form.

22         THE WITNESS:  As I previously testified

23  during the day, it would have been one of the first

24  things I would have asked them, the flight attendants,

25  to do, particularly Ms. Bright when she came to the      6:29PM



Page 279

1    cockpit, while I tried to gather additional          6:29PM

2    information about the DelVecchias from dispatch.

3    BY MR. McKAY:

4         Q    Is talking to passengers who are the

5    subject of concerns by flight attendants a good way to  6:29PM

6    gather important facts?

7         MR. MAYE:  Object to form.

8         THE WITNESS:  It absolutely is.

9    BY MR. McKAY:

10        Q    You've testified to Captain Shupe and      6:30PM

11   his interaction with Chelsie Bright.  I want to ask,

12   if he had inquired about the DelVecchias' familial

13   relationship, was it your testimony that he said that

14   would be a non-issue?

15        A    I believe my testimony is that I quoted    6:30PM

16   Captain Shupe in his deposition having said if he had

17   been aware that they were father and son, then the

18   facial touching will have been a non-issue.  But I'm

19   referencing my report, sir.

20        Q    Okay.  And we can look at that in your     6:30PM

21   report.

22             And if he had inquired of Flight

23   Attendant Warren what the status of the passengers was

24   in terms of being awake or asleep at the time that

25   Flight Attendant Warren reported allegedly seeing      6:31PM



Page 280

1    Peter's hand on A.D.'s crotch, would that have                    6:31PM

2    potentially led to a decision that there was nothing

3    to the report?

4         A    According to Captain Shupe's

5    deposition, he testified that -- I believe he agreed   6:31PM

6    with you that it would not be possible for misconduct

7    to be occurring if, in fact, the accused was asleep.

8         Q    And if it was impossible for misconduct

9    to have been occurring, then is it justified for

10   Captain Shupe to have ordered the two to be separated?  6:32PM

11        MR. MAYE:  Object to form.

12        THE WITNESS:  No.

13   BY MR. McKAY:

14        Q    There was a point at which there was

15   some confusing questioning about the trafficking       6:32PM

16   protocol, and I just wanted to clear up.  Are you

17   saying that a flight attendant who claims to be

18   concerned about trafficking does not have to follow

19   the Frontier trafficking protocol?

20        MR. MAYE:  Object to form.                        6:32PM

21        THE WITNESS:  No, sir, that is not what I

22   said.  I believe, and hope that I testified, that if

23   the flight attendant is at all concerned, or even has

24   such suspicions, that it is appropriate for the

25   trafficking protocol to be followed.                   6:33PM

Page 281

```
 1   BY MR. McKAY:                                          6:33PM

 2        Q    When you say "to be followed," is that

 3   to be followed piecemeal or in parts but not other

 4   parts, or does it have to be followed to the letter?

 5        A    It should be followed to the letter.        6:33PM

 6   It's laid out very clear and it's, frankly, not that

 7   complicated or time consuming.

 8        Q    You answered some questions about not

 9   having had bias training at United, quote/unquote, for

10   investigations.                                       6:33PM

11             Do you remember that?

12        A    I do.

13        Q    Have you had bias training at United

14   Airlines for other reasons?

15        A    Extensively.                                6:33PM

16        Q    Have those reasons included the

17   Department of Transportation recommendations for

18   anti-bias training?

19        A    I believe they have, yes.

20        Q    You have testified about a standard of    6:34PM

21   care, and you've used the terms "overarching

22   responsibility" as a pilot in command.  Is that the

23   standard of care that is the same -- that would be the

24   same one applied to all airline captains in the

25   airline industry in the United States?                6:34PM
```



Page 282

```
 1          A    It is.                                6:34PM

 2          Q    And is it something that is shared,

 3   where there are opinions shared amongst fellow

 4   captains in a way that they can be reviewed, peer

 5   reviewed so to speak, for accuracy?                6:34PM

 6          MR. MAYE:  Object to form.

 7          THE WITNESS:  I'm not sure I understand the

 8   question.  I'm sorry.

 9   BY MR. McKAY:

10          Q    These opinions, or these standards that  6:35PM

11   you've applied, are they standards, first of all, that

12   we could ask any airline captain whether they agree

13   with them and have them say that they do?

14          A    I would certainly hope so.

15          Q    And how is that shared amongst all of    6:35PM

16   you airline captains?

17          A    When you say "how is it shared," I'm

18   not really sure what you mean.  We're all trained --

19          Q    How do you end up using the same

20   standards?  Let me ask it that way.                 6:35PM

21          A    Through our training protocol.

22          Q    Okay.  And are those training protocols

23   that find their way to a common overarching authority

24   to make sure that they all say the same thing?

25          MR. MAYE:  Object to form.                   6:35PM
```



Page 283

1          THE WITNESS:  It's a very broad -- the          6:36PM

2  command authority bestowed upon us as captains is a

3  very broad responsibility.  I know I keep referring to

4  it as overarching.  I was hoping it was on my wall,

5  the standard, but certainly it's up to each individual   6:36PM

6  airline, how they choose to train their captains.

7               I don't know if I'm answering your

8  question.

9  BY MR. McKAY:

10         Q    I didn't mean to interrupt you, but         6:36PM

11  what I was getting at is while there may be

12  variations, do they generally all meet in a set of

13  standards that all airline captains would agree are

14  the same?

15          MR. MAYE:  Object to form.                       6:36PM

16          THE WITNESS:  Without being able to speak

17  for every airline captain, I would certainly hope so.

18  BY MR. McKAY:

19         Q    And why would you hope so?

20          MR. MAYE:  Object to form.                       6:37PM

21          THE WITNESS:  Because as Captain Shupe

22  stated in his deposition, ultimately irrespective of

23  anything that's occurring on the airplane, on the

24  ground, in flight, the buck stops with the captain,

25  and we all have to be confident in the adequacy of our  6:37PM



Page 284

```
 1    training and the immense responsibility that we have    6:37PM

 2    to ensure the safety and security of our crew and

 3    passengers for every flight that we undertake.

 4    BY MR. McKAY:

 5         Q    Okay.  And are the opinions that you         6:37PM

 6    have stated in your report and here in your testimony

 7    today made to a reasonable degree of certainty within

 8    that area of expertise?

 9              MR. MAYE:  Object to form.

10              THE WITNESS:  Absolutely.                     6:38PM

11              MR. McKAY:  That's all I have.  Thank you.

12

13                        FURTHER EXAMINATION

14    BY MR. MAYE:

15         Q    Captain Norton, the fact that Captain         6:38PM

16    Shupe did not ask Flight Attendant Warren whether the

17    plaintiffs appeared to be sleeping when he observed

18    the hand on the crotch, that was not a violation of

19    any federal regulations, correct?

20         A    Correct.                                      6:38PM

21         Q    And the fact that Captain Shupe did not

22    ask about the familial relationship between

23    Mr. DelVecchia and A.D. was not a violation of any

24    federal regulation, correct?

25         A    Not specifically, no.                         6:38PM
```



Page 285

1          MR. MAYE:  Thank you very much.  I have no          6:39PM

2    further questions.

3          MR. McKAY:  Thanks.  She will read and sign.

4          THE VIDEOGRAPHER:  Mr. McKay, do you need a

5    copy of the video and the transcript?          6:39PM

6          MR. McKAY:  Video and transcript only in PDF

7    form, please.  No paper copy.

8          THE VIDEOGRAPHER:  And the video, what

9    format did you want?

10          MR. McKAY:  Can you just do it by a          6:39PM

11    download?

12          THE VIDEOGRAPHER:  Yes, I can do that.  I'll

13    sign us off.

14                This concludes today's proceedings in

15    the deposition of Captain Vickie Norton.  The total          6:39PM

16    number of media used was five.  We're off the record.

17    The time is 6:39 p.m.

18                (Deposition concluded at 6:39 p.m.)

19

20

21

22

23

24

25

MAGNA ▶

Page 286

```
 1           D E P O S I T I O N   S I G N A T U R E   P A G E

 2

 3   Case Caption: Peter DelVecchia, et al. v Frontier Airlines,

                   Inc., et al.

 4   Assignment No.: 941574

 5

 6           DECLARATION UNDER PENALTY OF PERJURY

 7

 8

 9          I declare under penalty of perjury that I have

10   read the entire transcript of my deposition taken in the

11   above-captioned matter or the same has been read to me, and

12   the same is true and accurate, except for changes and/or

13   corrections, if any, as indicated by me on the DEPOSITION

14   ERRATA SHEET hereof, with the understanding that I offer

15   these changes as if still under oath.

16

17

18          Executed on this_____day of_____, 2023,

19   at_____,

20   _____.

21          (city)                        (state)

22

23          _____

24                  CAPTAIN VICKIE NORTON

25
```



Page 287

1                    DEPOSITION ERRATA SHEET

2                    Assignment No. 941574

3

4

5

6

7

8    Page No._____Line No._____Change to:

9    _____

10   _____.

11   Reason for change:

12   _____

13   _____.

14   Page No._____Line No._____Change to:

15   _____

16   _____.

17   Reason for change:

18   _____

19   _____.

20   Page No._____Line No._____Change to:

21   _____

22   _____.

23   Reason for change:

24   _____

25   _____.



Page 288

1  Page No._____Line No._____Change to:

2  _____

3  _____.

4  Reason for change:

5  _____

6  _____.

7  Page No._____Line No._____Change to:

8  _____

9  _____.

10  Reason for change:

11  _____

12  _____.

13  Page No._____Line No._____Change to:

14  _____

15  _____.

16  Reason for change:

17  _____

18  _____.

19

20

21

22  SIGNATURE_____DATE_____

23          CAPTAIN VICKIE NORTON

24

25



Page 289

```
 1

 2              CALIFORNIA CERTIFIED SHORTHAND REPORTER

 3

 4              I, RUBEN GARCIA, a Certified Shorthand Reporter

 5    of the State of California, do hereby certify:

 6              That the foregoing reporter videoconference

 7    proceedings were taken before me at the time herein set

 8    forth; that any witness in the foregoing proceedings, prior

 9    to testifying, were placed under oath; that every attempt

10    was made to ensure a verbatim record of the remote

11    proceedings which inherently have technical interference

12    and audio interruptions and issues.  Such transcript was

13    created by me using machine shorthand which was thereafter

14    transcribed under my direction.

15              I further certify that I am neither financially

16    interested in the action nor a relative or employee of any

17    attorney nor of any of the parties.

18              Reading and signing was requested.

19              IN WITNESS WHEREOF, I have this date subscribed

20    my name.  My certificate to the original may be attached to

21    certified copies electronically.

22

               Dated this 21st day of March, 2023.

23

24    ____Ruben Garcia_____

25    RUBEN GARCIA, CSR NO. 11305
```



**A**

abate
231:4
ability
204:24 268:21
able
140:13 156:12 167:8
202:13 252:12
260:13 283:16
above-captioned
286:11
above-entitled
134:21
absence
209:11 264:24
Absent
253:4,25
absolutely
209:1 213:11 219:2
220:23 274:15
279:8 284:10
ACARS
273:22
accept
168:14
accepted
168:6 252:22,25
access
197:17 259:21 260:4
260:7,10
accomplished
146:12
account
168:11 202:19
accounts
169:11 184:16
185:23
accuracy
282:5
accurate
286:12
accused
280:7
accusing
275:20

acronym
259:12,15 260:13
act
140:14 148:13
179:19 271:2
acted
140:8,22 151:12
action
134:21 149:17
161:18 172:15
173:5,25 174:12
198:21 248:17
251:12 289:16
actions
142:6 154:22,24,25
192:18 205:16
252:2 275:17
activity
275:20
actual
137:24 138:14 142:3
185:7 196:16
198:12
ad
243:1 244:17
addition
239:9
additional
154:24 234:7 246:12
265:4 266:22 279:1
address
208:11 241:21
256:18 272:8
addressing
244:10
adequacy
283:25
adjectives
142:4
ADLER
135:11
adult
150:22 151:2 160:14
197:23 235:1
242:18 243:12,20
277:6,11,11,12

afternoon
137:9
age
274:20 275:1
agent
274:21
ago
274:22
agree
158:13 165:8,23
176:17 177:24
178:6 184:4 187:18
196:19 202:3
203:14 211:10
228:4 231:6 232:18
237:8 242:13
255:14 257:15,16
257:17,21 258:7,14
260:20 270:8,11
282:12 283:13
agreed
170:20 171:10,23
181:5 182:3 190:12
190:13 280:5
ahead
177:25 178:1 192:3
223:25 227:15
242:2 246:22
air
147:9 151:8 158:13
159:18,18
airborne
200:22
aircraft
196:15 207:7 232:11
252:4 256:19 263:9
265:10
airline
275:8 281:24,25
282:12,16 283:6,13
283:17
Airlines
134:7 143:2,16
144:11 281:14
286:3
airline's

138:11
airplane
165:4 283:23
al
134:4,7 286:3,3
alarming
193:24
alert
157:3 277:11,11
alerted
200:4 224:5
allegation
164:11 167:21
allege
185:24
alleged
181:7 271:22
allegedly
167:14 189:11 218:5
219:10 279:25
alleges
219:11
alleviate
230:13
allow
163:15 197:1 223:15
allowed
165:6
allows
244:3 246:2
alluded
233:2 241:17
alludes
236:13
alter
201:15
alternative
194:15
ambiguity
264:12
ambiguous
140:24
amiss
210:11 218:5
analysis
153:14 163:7



analyze
198:2
and/or
286:12
animal
241:19
Anna
213:8 218:22 220:3
220:19 225:14,21
234:9,21 235:22
236:2
answer
140:6,13,17,19,25
141:17 142:10
143:24 145:6 146:4
147:4 148:4 153:3
156:12 162:2,5,12
174:19,19 176:1
183:5 200:24 204:7
213:11,16,19
214:19 215:19
216:8,24 217:6
219:4 220:8 221:2
226:8 227:12,23,24
228:6,13 229:15
232:8 241:7 248:19
256:14 258:12
271:5 273:4
answered
142:2 145:5 151:2
152:13 161:25
162:6 165:22 212:5
228:8,10 235:15
243:24 257:7
261:21 273:2 281:8
answering
204:10 217:4,5,19
235:2 283:7
answers
262:16
anti-bias
281:18
anybody
214:25
anyone's
182:25

anytime
200:19
apologize
228:22
Apparently
204:17
appeared
178:8 180:9,25
284:17
appears
226:14
appendix
169:10 183:17
applicable
261:16 274:24
applied
152:20 240:7,25
245:10 256:1
281:24 282:11
apply
150:6,10 194:11,14
195:1 241:14
242:19 243:4,21
247:4,21,25 248:12
257:3 263:5,24
appreciate
204:5 229:7
approach
153:15
appropriate
164:20 166:18
168:25 170:12
192:3,5,9 193:2
204:12 224:25
263:10 271:3
280:24
area
183:21,25 185:5
188:4 197:16,19
272:1,8 276:24
284:8
arrival
207:8
arrive
170:9
articulate

237:13
ascertain
151:1 204:25 275:9
ascertained
174:25
ascertaining
274:20
asked
140:11 142:1 151:17
153:2 154:4,19
157:7 166:25
173:22 182:4
199:23 216:23
217:8,19 220:14
223:23 224:1,6
227:1 229:6,7
240:17,18 241:20
256:11 257:7
260:17 261:21
263:18 273:2
274:22 276:23
278:24
asking
150:8,25 152:14
164:25 174:9,13
175:1 177:2 179:8
180:14 185:2,9,22
200:12 201:2
204:14 208:15,16
211:24 212:4 218:2
219:24 221:7
223:16 229:14
231:19 232:6 233:5
242:3 243:18 260:8
277:9
asks
213:8 225:13
asleep
177:10 178:8,18
179:18 181:7
210:13 277:4,6,11
279:24 280:7
assault
138:6,12,15,21 139:3
139:6,13,16,24
140:3 141:23 142:2

142:3,5,16 143:7,17
146:19 147:1,11,13
147:14,16,19,23
148:1,7,14,21 149:2
149:10 150:16
152:23 153:8,16
161:15,19,22 162:9
244:5,12,22
assaulted
137:20 143:5 242:18
243:6,12 248:11
assess
266:20
assessing
255:16
assigned
261:9,13
Assignment
286:4 287:2
assuage
218:19 221:23 231:8
264:13 278:2
assume
142:23 178:2 277:12
assumes
155:22 174:4 233:10
241:3
assuming
157:5 207:16 276:11
assumption
264:23
assumptions
264:6 276:19
attached
289:20
attempt
289:9
attempted
273:20
attempting
217:6
attendant
138:2,5,10,11 139:3
139:5,14,16,18,25
140:1,22,22,23
141:6,10,21,22



142:21,25 143:3,10
144:19 145:2,10
146:11 147:8,9
148:10 149:7,9,16
150:14 152:22
153:6,12,20 154:18
155:14 159:23
161:14,15 162:10
162:11,11 169:20
169:22 170:5
178:17 180:8
182:12,16 183:1,7,9
184:2 185:10 186:2
186:24 187:19
188:9,17 189:2,3,4
189:15,24,24
192:24 193:1,2
194:9 195:14
197:22 200:5
201:22 202:5,23,25
203:8,16 205:19
206:24,25 207:3,4
207:23 208:16
211:13 212:9
214:10 219:11
221:8,9 229:15
231:22 238:19
240:19 241:24
242:5,17,20 243:5
243:10,11,13,16,19
244:4,11,13,20
248:2 254:22
260:21,24 267:5
270:21,22 271:12
275:5,5 276:8 277:2
279:23,25 280:17
280:23 284:16
**attendants**
140:8 143:12 146:9
149:25 151:12
152:1,17 155:15
156:2,7,8 158:6
159:13 160:7,13
164:16,18 169:4,14
174:22,24 175:18
176:1,7 184:12

185:24 189:10,21
190:10,17 191:2,23
192:10 194:9,10,13
194:19,23 195:9
196:17 199:8 208:4
208:7,18 209:2,19
210:9 214:13
215:25 217:20
218:2 226:16 227:2
230:5,18,25 231:8
231:14 232:1,15
233:6,25 240:21
242:10 251:8 252:6
258:8,15 261:1,16
261:20 262:23
264:11 265:3
266:16 267:7,14,22
268:3,12 269:1
275:8,15,18,24
276:3,8,10,18
278:14,20,24 279:5
**attendant's**
137:23 138:1 197:4
**attention**
181:19 220:12 237:7
238:23 275:19
**attorney**
246:3 289:17
**audio**
289:12
**authority**
152:16 246:1 260:25
261:8,13 265:23
266:8 270:19 271:2
271:6 282:23 283:2
**available**
200:18 231:14
272:20 276:17
**avenue**
135:4 252:13
**avenues**
195:13
**Aviation**
138:22 146:21
152:12 201:13
250:25 268:6

**awake**
279:24
**aware**
138:3,17,19,25 139:1
139:10,22 140:3
141:18 144:6,13
146:16,24 152:13
165:1,18 166:8
175:5,9 176:7,9,15
180:24,25 181:5
189:2,15 196:14
200:13,14 214:7
215:24 220:10,17
226:25 228:14
229:22 275:23
276:21 279:17
**awareness**
229:22 262:8,19
**A.D**
154:6 155:3,7,20
163:13,19 164:9,17
166:1 167:9,19
176:9,16 177:10,23
178:18,22 179:18
182:15,21,24 183:2
183:20,25 184:4
185:4,5,12,18 187:3
187:5,8,18 188:11
188:18 189:6,17
190:9,18 191:3,4
192:13 197:7
199:25 202:4
203:15 208:19
211:15 212:11
216:18,24 217:21
218:4,5,13 219:6
221:11 222:5,15
226:7 227:3 229:8
233:17 235:10
237:5,22 238:6,20
239:1 240:16,21,22
241:13 248:10
257:19 263:20,23
267:2 272:25
274:20 276:9 277:3
277:3,4,12,24 280:1

284:23

———————————
**B**
**B**
136:12
**baby**
200:22
**back**
137:10 139:7 142:22
149:24 150:20
172:22 175:24
176:3,13,16 178:12
180:4 181:8 182:7
182:13 183:3,4,10
184:7 185:20
186:13 197:5 199:6
205:3 206:11
212:16 213:5
216:20 225:10
226:12 229:23
238:13 246:16,17
249:8 261:24
264:14 267:19
273:25
**background**
169:25 256:13
**ballpark**
274:8
**base**
263:3
**based**
144:18 145:9 151:7
152:8 163:17 169:7
187:19 195:2
199:22,25 200:12
200:13 202:23
203:1,2,4,14 233:15
234:3,20,24,25
235:20,24 236:8,10
236:19 237:19
240:24 247:4,21
248:5,7 256:23
265:5,7,8,12
**basic**
207:1
**basically**



191:24
**basis**
145:22 155:7 188:18
206:10 218:9
**bearing**
207:13
**beginning**
137:11 180:3 193:13
201:23 202:11
203:9 223:1 225:9
241:25 242:1
**begins**
190:6
**behalf**
150:1 244:6
**behavior**
218:5
**believe**
142:18,19 148:18
154:21 155:4,17
157:18 160:24
161:5 165:21
168:10 169:6
171:14 176:11
178:16 181:3,4,8,9
183:8,23 184:18
185:7 187:10
197:16 199:11
202:3 203:23 205:7
207:20,22 209:12
233:15,20,24
236:12 237:20,24
237:24 238:1 239:3
240:7,22,24 241:12
243:24 245:10
255:25 256:22,25
274:25 279:15
280:5,22 281:19
**believed**
155:1 161:16 166:9
202:24 238:21
244:20
**benign**
210:10
**best**
148:4 190:13 204:24

223:10 272:20
**bestowed**
283:2
**better**
206:10 214:8 252:15
**beverage**
210:8
**bias**
249:18,21 250:6,8
281:9,13
**biased**
250:11
**big**
167:3 214:15 258:25
**bit**
183:12 205:6 223:14
228:24
**black**
224:22
**Blue**
136:15 157:12,15,24
160:11,17,22
**bmaye@amm-law....**
135:14
**board**
200:5 241:7 256:19
**Bond**
190:11 191:24 213:8
218:22 219:11,18
219:20 220:3,19
225:14,21 234:9,11
234:21 235:22
236:2 238:12
**Boom**
215:5
**borne**
164:12 167:22
**bothered**
248:16
**bottom**
201:20
**box**
230:12
**boy's**
188:3
**brake**

273:25 274:2
**break**
139:4 150:21 179:21
228:20 243:2
**Brian**
135:12 158:17 162:4
179:20 181:12
225:16 239:16
245:2 260:15 266:3
**brief**
210:10
**Bright**
154:18 155:14 156:4
157:7 164:23 165:9
166:8,17 169:2,5,7
170:16 184:8
188:24 190:10
196:5 198:13 201:3
201:22 202:6,11
203:8,16 204:19
205:11 208:20
209:11 210:20
211:5,18 212:12
213:8,16 216:17,23
217:21 218:6,10,12
219:4,17,24 221:8
221:10 222:3,14
223:19 224:3,19
226:23 227:1
228:14 231:2 233:2
233:15 234:21
235:9,22,25 237:4,9
237:21 238:19
239:10 240:14
274:9 277:18
278:25 279:11
**Bright's**
156:24 165:16,24
167:4 168:18,24
170:11,19 171:2
193:18 234:4,8
**bring**
236:16 241:22 246:6
**bringing**
221:16
**broad**

283:1,3
**brought**
207:25 224:18,19
237:7 238:23
275:19
**buck**
190:8 191:8,16
283:24
**bulk**
265:17 266:14
**bunch**
235:3

---

**C**

---

**C**
135:1 183:17
**cabin**
182:18 187:1 205:2
267:9 268:13 269:2
**calculations**
181:13
**California**
134:23 135:6 289:2,5
**call**
197:25 198:9 238:11
273:24
**capable**
196:24
**capitalize**
277:12
**captain**
134:12 136:3,17
137:17,18 138:20
139:2,12,24 140:1,2
140:4 141:5,20,21
142:14 143:2
145:25 146:2,13,14
146:18,25 147:7
149:1 150:13
152:21 154:4,16,18
155:13,24 156:18
156:22 157:6
163:18 164:16,16
164:18 165:13,17
166:5,25 170:20,23
171:7 172:4,16



171:7 172:4,16
173:7 174:20,23
175:6,16 177:9,22
178:8,21 179:5,10
179:15,19 180:7,9
180:13,25 181:18
183:1,7,9 184:13
185:3,11,15,17,22
186:3,15 187:7,20
188:10,17 189:4,21
189:25 190:15,16
191:1,8,17 192:10
192:20 193:15
194:3,8,12,16,25
195:17 197:24
198:1,2,16,18,21
199:1,11 200:17
201:3,8,21 202:3,10
202:22 203:15
204:19 205:10,19
205:20,22 206:3,5,8
207:5,5,6,13,25
209:20 237:8,19
238:2,4,19,23 239:7
240:15,18,20,22
246:11 249:10
251:9 253:18 254:1
254:20,22,24
255:17 257:3,17
260:20,24 261:3,7
261:11,19 262:5,11
262:17 263:7,12,15
264:3,7,10 265:2,9
265:20,22 266:7,19
267:6,13 268:2,11
268:25 270:19,21
271:1,5,10,12,17,18
271:19,20 272:2,3
272:10,13,17,18,24
273:11,14 274:7
275:7,12,14,23
276:1 277:20
278:19 279:10,16
280:4,10 282:12
283:17,21,24
284:15,15,21

285:15 286:24
288:23
**captains**
275:17 281:24 282:4
282:16 283:2,6,13
**captain's**
206:18
**Caption**
286:3
**care**
137:18 138:4,18
139:23 140:3 141:5
141:19 142:13
143:6 144:25 146:1
146:17,24 150:17
151:18,22,24,25
152:5,8,9,20 176:10
200:13 201:7
251:17,20 274:23
281:21,23
**careful**
142:4
**carrier**
147:9
**carriers**
158:13 159:18,19
**carrier's**
151:8
**CAS**
259:18
**case**
144:2,14,15 154:4
166:21 172:7,12,14
173:1,3,12,13,21,23
173:23 174:11
175:7 176:14
180:11,19 204:14
204:24,25 206:8
207:18,20 225:1
233:14 234:1 240:8
240:11 241:1 245:9
247:6 248:10,10
256:1 257:14 259:7
272:21 286:3
**cases**
161:11

**CAST**
259:9,21 260:4,5,6
260:11
**category**
267:20
**cause**
161:17 236:15
**caused**
172:14 173:4
**causing**
210:12
**CBT**
196:13
**certain**
178:7 208:9 254:21
257:4
**certainly**
154:22 167:5 171:6
196:24 207:16
230:18 231:25
233:21 262:20
267:10,21 282:14
283:5,17
**certainty**
284:7
**certificate**
289:20
**certified**
289:2,4,21
**certify**
289:5,15
**cetera**
137:25 235:3
**change**
153:14 170:19
172:14,15 173:4,6
174:1,14,18 274:9
287:8,11,14,17,20
287:23 288:1,4,7,10
288:13,16
**changed**
173:24 174:12 175:7
198:21 199:1
**changes**
252:11,18 286:12,15
**characterization**

168:18 234:9
**characterize**
185:10 188:16
**characterized**
237:16
**Chelsie**
154:18 156:4,23
164:22 165:9,24
166:8,17 168:23
170:11,16 188:1,24
193:18 194:3 201:3
202:5 211:5 212:12
213:8,16 216:16,21
218:10,12 219:4,24
221:10 222:3,14
224:19 226:23
227:1 228:14
233:15 234:4,21
235:8,22,25 237:4,9
237:20 238:19
240:14 277:18
279:11
**Chicago**
135:13
**child**
150:22 151:3 160:14
166:13,19 170:14
171:24 196:9
197:24 198:3
209:14 224:22
235:2 242:18,21
243:12,13,14,20,20
258:9,16 267:2
272:22
**child's**
196:10
**choose**
232:8 283:6
**chooses**
260:21
**chronological**
193:10,25
**chronology**
156:9 241:5
**circle**
239:24



circumstances
191:23 192:12
   194:11 230:18
   240:8,10 260:21
cite
250:23
cited
171:9
city
286:21
claim
276:3,4
claims
280:17
clarification
140:12
clarify
151:17
Clark
135:12
classified
263:16,19
clear
148:12 156:1 171:20
   203:7 210:5 226:18
   238:10 270:1,17
   280:16 281:6
clearly
164:8,22 167:18
   199:18 216:22
close
246:25
closest
157:1 211:19 229:20
   235:5 277:22
cockpit
182:19 187:2 190:11
   190:13 193:1 196:6
   198:13 204:23
   209:12 211:20,25
   238:12,16 240:18
   279:1
collect
194:25 195:5
collected
195:5

collectively
228:4
combating
157:19
come
157:10 182:7 195:1
   204:23 211:19
   240:18 246:16,17
   267:22
comes
140:1 197:22
comfort
164:14 167:23 262:8
   262:21
comforting
165:5 168:21
coming
153:6
command
151:11 152:15,16
   251:17 252:4 261:7
   261:13 265:9 268:8
   281:22 283:2
committed
145:3 146:3 150:16
   237:10,22 239:1
   243:19 267:1
common
282:23
communicate
228:3 264:11
communication
238:10 264:4
company
215:17 218:18
   221:22 223:3
   250:18 262:9,23
complete
163:24 179:16
   200:25
completely
149:21 164:11
   167:20 219:12,21
   219:21 239:11
complex
168:12

compliance
262:9
complicated
281:7
complied
207:21
comply
232:8 251:8
compound
155:10 235:12
computer-based
159:11
concept
188:5 215:1 217:22
   218:7 221:16
   226:13,16
conceptual
147:17
concern
229:21 230:14 237:2
   239:5,7 253:5,20
   254:3,15 267:9,15
   267:18 268:4,13
   269:1
concerned
153:9 154:17 213:15
   221:1 237:17
   238:22 278:11
   280:18,23
concerning
200:6 215:13 218:16
concerns
197:4 204:20 221:24
   231:9,15 264:13
   278:2 279:5
conclude
278:8
concluded
285:18
concludes
285:14
conclusion
207:12 278:5
conclusions
261:2
concrete

193:18
conditions
254:15,23 255:6,16
conduct
182:12 205:2 258:4
   271:11,20 272:10
   273:15
conducted
250:21
conducting
249:19,22,23 250:4,7
   250:13
conducts
250:22
confident
283:25
conflict
144:12 169:16
conflicting
169:10 170:4 175:24
   183:12,13 184:15
   184:16,19,23
confusing
280:15
consensual
164:13 167:23 199:6
consensus
190:17 191:2
consent
148:6
consider
171:7 176:19 177:9
   177:19 178:3 181:6
consideration
233:22 255:12
considered
141:22 175:6,10
   176:24 177:8
   198:24 199:3,4
consistent
265:24 266:9
constitute
148:21
constituted
149:10
consult



191:22 257:18
**consuming**
281:7
**contact**
170:22 171:25 201:9
**contacted**
195:17 198:18
199:12,17,23 200:2
**contacting**
198:15
**content**
159:7 230:19
**context**
152:14 157:18
176:20 196:7 205:7
256:8 259:3,11
**contextual**
187:24
**continue**
145:16,18 205:2
220:14 231:5
239:25 245:6,6
272:6
**continued**
193:12
**continues**
222:25 224:5
**contradict**
176:2 219:12
**contradiction**
169:21
**contradicts**
169:3
**contribute**
267:12
**control**
229:1 252:4 274:19
**conversation**
162:14 197:6 207:2
218:1,4 230:15
235:25 264:14
277:19
**convey**
180:23
**conviction**
244:21

**convinced**
152:3 153:8
**coordinate**
262:18
**coordination**
262:7
**copies**
289:21
**copy**
163:23,24 285:5,7
**correct**
138:24 166:22
191:13 194:13
273:1 284:19,20,24
**correcting**
252:14
**corrections**
286:13
**counsel**
137:13 190:3 249:1
270:8,10
**counter**
266:20
**couple**
216:8 273:12
**course**
172:14 173:5,24
174:12 175:7
192:14 198:21
251:11
**court**
134:1 137:12 139:7
172:21 246:7 266:2
269:22 270:6
**cover**
234:8 235:4 239:17
239:23 248:1
271:25
**covered**
193:21 243:1 244:17
247:18
**covering**
272:3
**covers**
252:2 265:17,17
268:7

**create**
195:8 252:11
**created**
256:17 289:13
**credible**
166:20
**crew**
158:14 159:19
169:11 261:9,13,15
262:7,18 274:12
284:2
**criteria**
236:15
**critical**
164:8 165:15 167:17
177:21 178:4 191:9
191:20 193:9 195:1
197:20
**cross**
181:23 182:1,6
246:24
**crosses**
142:5
**crotch**
155:2 156:5 178:9,23
180:10 181:2
182:24 183:20,25
185:5,18 187:5,8
188:3,4 240:21
280:1 284:18
**CSR**
289:25
**cut**
264:19
**cutting**
204:3
**C-A-S-T**
259:16 260:11

————————————
**D**
————————————
**D**
135:5 136:1 286:1
**darn**
206:9
**data**
171:7 195:11 264:15

267:4,11,24
**data-gather**
238:11
**date**
288:22 289:19
**Dated**
289:22
**day**
165:16 241:17 251:7
264:10 266:14
268:9 273:13
278:23 286:18
289:22
**deal**
167:3
**dealing**
152:14
**dealt**
148:1
**decide**
149:17
**decided**
204:21
**decides**
251:11 272:13
**deciding**
167:3
**decision**
153:22 167:4 176:16
190:9 191:9,20
192:12,19 194:24
206:9,12,13,18,19
207:14 254:2,14
257:19 267:12,14
272:17,19,22,24
280:2
**decisions**
266:17 267:7
**decision-maker**
165:15
**decision-making**
175:8 267:23
**DECLARATION**
286:6
**declare**
286:9



**declared**
202:15 257:11,15
   263:18
**deemed**
201:5 209:14
**deems**
252:3 271:3
**defend**
272:19
**Defendant**
134:21 135:10
**Defendants**
134:8
**Define**
257:25
**degree**
148:11 284:7
**delineated**
145:21 236:4 256:5
**DelVecchia**
134:4 154:7 164:9,17
   166:1 167:9,19
   176:12 178:18,22
   182:15,21,24 183:2
   184:3 187:3 188:11
   189:6,16 190:18
   191:3,4 192:13
   199:24 202:4
   208:18 211:14
   212:11 216:17
   218:13 219:5
   221:10 222:4,15
   227:3 233:16
   235:10 237:5,22
   238:5,20 239:1
   240:16,23 257:20
   284:23 286:3
**DelVecchias**
182:17 186:25
   189:12 193:7
   199:18 210:7,11
   219:15 262:20,21
   264:14 265:4
   277:19 278:15
   279:2,12
**DelVecchia's**

**168:2,7,11 185:18**
   187:8 188:3 240:20
**demonstrate**
193:20
**departed**
219:16
**Department**
263:9 281:17
**depend**
148:9 162:22,25
**dependent**
191:7 267:18
**depends**
267:17 275:11
**deplane**
274:13
**depo**
170:20 171:23 181:8
**deposition**
134:11,20 136:16
   137:1 157:2 158:1
   165:14 168:3 169:2
   169:14,20,24 171:9
   172:5,9 175:16
   176:2 178:13,14
   181:17,20 183:4,11
   184:8 185:8,20
   186:5 188:6,8,23
   204:8 208:20
   211:18 212:13,17
   219:13,17,20
   222:25 224:16
   227:20 233:20
   236:1 239:11 245:4
   245:6,7,13,24 246:3
   246:11 247:5,22
   269:8 273:21
   277:22 279:16
   280:5 283:22
   285:15,18 286:10
   286:13 287:1
**depositions**
170:1,3 175:25 176:4
   176:13
**describe**
183:15,15 185:25

**described**
153:19 189:22
   198:14 207:18
   209:15 220:5
**describing**
198:12 239:10
**description**
136:14 179:16 183:6
   184:19 185:2
   188:19
**descriptions**
185:21
**designated**
166:16 262:6
**despite**
168:18 190:7
**destination**
274:3
**detail**
177:21
**details**
193:17 262:17
**determination**
194:12,13 203:2,18
   204:22 205:13,16
   205:21 206:14,17
   209:2 244:4 272:4
**determined**
138:13 149:9 150:15
   154:12 201:21
   202:10,18,20,23
   203:1,4,8 204:18
   208:4 211:6 248:10
   257:10 272:3
**determines**
207:10
**determining**
258:9 263:24
**develop**
147:22
**developed**
193:12
**developing**
249:11,15
**dictate**
149:1

**dictates**
146:1 150:17 151:6
   151:10 160:12
   201:8 251:21
**difference**
147:18,25 156:17
   161:24 166:15
   171:10,11,18
   177:17 244:6
**different**
140:20,20 142:5
   145:6 147:14
   149:21 153:3
   163:15 164:11
   165:2,25 167:21
   170:15 182:5 185:4
   196:9 219:21 228:5
   259:19
**differentiate**
141:25 147:12 153:1
**differently**
182:5
**differing**
185:23
**difficult**
169:13
**direct**
155:7 169:21 175:2
   179:16 195:6 199:7
   204:11 224:11
   234:9 261:15
   270:20
**directed**
159:13 191:4,11
   228:5
**directing**
163:19 181:18
**direction**
204:12 228:5 264:12
   289:14
**directive**
160:6 162:24
**directly**
172:4 182:19 187:2
   234:25
**disagree**



203:23
**disagreeing**
204:16
**discern**
169:13 170:7
**discomfort**
208:9
**discuss**
143:15 261:24
**discussed**
152:4 193:3 194:19
  210:10 229:12
  236:3 241:10 250:9
  251:6,15 262:16
  264:9 266:13
  272:16
**discussing**
236:14
**discussion**
206:7 217:20 223:2
  223:18,18 234:16
  235:5 238:12
**dispatch**
195:13,15,17 197:11
  197:13,25,25 198:9
  198:15,19 199:12
  199:17,23 200:2,6
  200:23 201:9
  264:16 279:2
**dispatcher**
193:6 200:20 266:15
**disposal**
191:19 192:22
  198:16
**dispositive**
155:19
**disruptive**
254:23
**distance**
210:5
**distinction**
232:22
**DISTRICT**
134:1,2
**disturbance**
210:12

**dive**
176:13
**doing**
164:24 201:17
  205:23
**Douglas**
250:20
**download**
285:11
**drawl**
223:9
**drill**
170:9
**due**
241:4
**duress**
277:14
**duties**
156:19 251:16

———————— E ————————

**E**
135:1,1 136:1,12
  286:1,1,1
**earlier**
159:11 163:25 164:3
  170:10 189:12
  194:19 200:20
  210:10 227:22
  244:18 252:1
  263:18 264:15
**easier**
152:11 263:6
**easily**
262:18
**educating**
226:15
**effect**
174:14 206:18
**effective**
138:11
**effort**
238:10
**egregious**
267:1 272:21
**either**

156:7 252:14 258:19
  278:10
**elect**
260:20
**electronically**
289:21
**embedded**
173:13
**employee**
289:16
**employees**
216:4
**employer**
226:14 230:1
**employment**
144:9
**enforcement**
207:7,7,8,10,12
  258:7,14
**engage**
191:18
**engaged**
235:10 277:18
**engages**
207:1
**engineer**
250:19
**enhance**
262:19
**enlighten**
168:15
**ensure**
141:11 143:11 146:9
  147:8 151:11,25
  232:11 251:7 252:6
  262:21,22 284:2
  289:10
**ensuring**
251:10
**entered**
198:13
**entire**
223:18 241:5,17
  286:10
**entirety**
222:13 242:12

**errata**
252:14 286:14 287:1
**error**
267:1
**errors**
266:22
**escalate**
193:13
**escalating**
241:6
**especially**
226:4 267:24 276:19
**ESQ**
135:5,12
**Essentially**
262:15 264:17
**establish**
160:13
**established**
181:9 263:8 277:3
**establishing**
180:12
**esteem**
250:10
**et**
134:4,7 137:25 235:3
  286:3,3
**event**
169:22 171:2 198:12
  234:10,13 263:16
  263:17,19 266:21
**events**
232:10
**everyone's**
274:7
**evidence**
155:22 174:4 233:10
  241:3 276:12
**evident**
196:3
**EX**
136:14
**exact**
183:8 187:25 208:22
**exactly**
151:1 168:3 178:13



179:8 183:23
185:22 212:19
**EXAMINATION**
137:15 273:9 284:13
**examined**
137:7
**excerpt**
173:17
**Excuse**
183:18 215:6 225:17
**Executed**
286:18
**exercise**
152:16
**Exhibit**
136:15,16 157:23
158:1,18 181:17,20
**exist**
195:9,9,10 244:7
256:9,18
**existed**
201:24 203:11 208:1
**exists**
196:14 197:5
**exit**
196:1 210:7 219:15
234:10 275:1
**expand**
273:19
**expect**
277:9
**expected**
263:7 264:4,10,21
265:20,23 266:8,20
277:5 278:19
**experienced**
219:19
**experiencing**
254:24
**expert**
144:2,7 150:7 160:19
160:22 169:25
170:2,7 193:22
250:11
**expertise**
169:17,19,23,24

197:16,19 284:8
**explain**
203:25 204:18 242:6
254:5 260:14
**explaining**
193:14
**expression**
164:13 167:23
**extended**
240:15
**extensively**
175:16 281:15
**extent**
180:7,18 268:20
272:1
**external**
255:3
**extraordinary**
202:25
**eye**
209:4,5 214:8 226:3
229:9
**e-mail**
215:23
**e-mails**
216:11

---

**F**

**FAA**
252:21,25 275:3
**face**
201:4 202:7 206:11
210:22 213:17,25
221:3 237:5 238:20
239:10 240:16
**facial**
154:17 155:1,25
156:4,10,14,24
163:11 164:23
165:24 167:2,9,14
168:17 172:10
193:19,20,21
198:14 209:16
211:21 212:2 221:8
237:13 279:18
**facing**

254:24
**fact**
145:18 153:11
159:23 163:13
164:10,12 165:18
167:20,22 169:15
171:6,9 172:11,25
173:12,16 176:11
178:17 179:17
188:23 189:9
191:10 195:23
196:4 198:23
204:24 208:23
210:13,21 233:21
236:10 238:8
240:14 241:18
248:8 276:14 278:2
278:10 280:7
284:15,21
**factor**
254:16,24
**facts**
155:22 163:10,17
174:4 180:11,19,24
194:25 195:5 197:7
233:10 237:20
240:24 241:3 275:9
279:6
**fact-find**
238:11
**fact-finding**
206:10 267:3
**failing**
266:15,22
**failure**
266:14
**fair**
143:20 144:19,21
147:15 154:20
178:23 179:10
188:12 195:19
228:16 230:8,9
232:2,4 234:5,22
235:22 236:23,25
242:8,13,14 248:12
275:13

**fairly**
178:4
**fall**
148:6
**familial**
279:12 284:22
**familiar**
157:12,15 160:20
201:8 258:20,25
259:9
**family**
158:7,15 160:24,25
161:6,9 191:20
264:23
**far**
252:1,3 264:16 269:4
273:3
**FARs**
271:1,10 272:25
**far-reaching**
233:1
**fashion**
267:8
**father**
156:19 163:13,20
164:10,18 165:1,4
165:10 167:1,20
168:20 171:24
172:13 173:3,25
174:11 175:9,19
176:8,11,15 196:4
197:8 210:22
263:20,23 267:3
272:25 277:3
279:17
**father's**
176:10
**father-son**
172:17 173:8 174:2
174:15
**fears**
218:19
**feather**
214:15
**federal**
138:3,19,22 141:16



146:17,21 151:7
152:9,12 201:6,12
251:20 261:18
268:1,6,24 284:19
284:24
**feel**
177:20 220:8,16
225:14,20,25 226:9
232:21 247:9
277:20
**fellow**
214:13 282:3
**felt**
209:16,16 219:18
220:3,6,8,16 224:8
226:6 229:8 237:6
**female**
150:15,22 151:19
153:7,9,11
**fifth**
190:2,5
**figure**
190:24
**financially**
289:15
**find**
166:19 167:16 187:9
195:18,20 197:6
199:5,12 208:21,21
224:10 240:2
282:23
**fine**
139:22 179:23
213:24 224:20
239:20 269:21
270:12
**finger**
231:2
**fingertips**
200:9,18
**finish**
228:2 269:8,14
**finished**
246:11 269:10,13
**firmly**
244:20

**first**
155:25 156:22
160:13 162:25
167:13 191:6
192:15,23 193:13
193:18 194:1
195:15,21 196:2,5
199:9 200:10
215:16 216:21
221:17 256:5
259:23 278:23
282:11
**fishing**
260:6
**fit**
197:3 230:17 253:16
**five**
239:9 259:1 285:16
**flight**
137:22 138:1,1,5,10
138:11 139:3,5,14
139:16,18,25 140:1
140:7,21,22,23
141:6,7,10,21,22
142:21,25 143:3,10
143:11 144:19
145:1,10,23 146:9
146:11 147:8,8
148:10 149:7,8,16
149:25 150:13
151:12,25 152:17
152:22 153:5,12,19
154:18 155:14,15
156:2,6,8 157:9
158:6 159:13,23
160:6,13 161:13,15
162:9,10,11 164:15
164:18 169:3,14,20
169:21 170:5
174:22,23 175:18
175:20 176:1,6
178:17 180:7
182:12,16 183:1,7,8
184:2,12,23 185:10
185:24 186:2,24
187:19 188:9,16

189:2,3,4,4,5,7,10
189:15,16,21,24,24
190:10,17 191:2,23
192:10,24 193:1,2
194:7,9,9,10,12,19
194:23 195:9,14
196:17 197:4,22
199:8 200:4,5,21,25
201:21 202:5,23,25
203:8,16 205:18
206:24,25 207:3,4
207:23 208:4,7,16
208:17 209:2,19
210:5,9 211:13
212:9 213:10
214:10,13,21
215:25 217:20
218:2 219:1,11,15
220:22 221:8,9
226:15 227:2
229:14 230:4,18,24
231:8,14,22 232:1
232:15 233:5,25
238:18 240:19,21
241:7,24 242:5,10
242:17,18,20 243:4
243:5,9,11,13,15,19
244:4,11,13,20
248:2 251:7 252:6
254:14,15,21,21,23
255:15,16,18
256:20,23 257:1
258:8,15 260:19,21
260:23,25 261:5,8,9
261:10,16,19 262:6
262:22 264:11
265:3 266:16,21
267:5,7,14,22 268:3
268:12,25 270:21
270:22 271:11,11
274:3,10 275:5,8,8
275:15,15,18,18,24
276:2,8,8,10,18
277:2 278:14,20,24
279:5,22,25 280:17
280:23 283:24

284:3,16
**flyer**
160:7 165:3
**focus**
170:23
**follow**
137:22,25 146:10
151:13 157:7
172:20 174:24
194:5 218:18
230:10 252:6 261:4
261:11,16,20
262:11,23 263:12
264:7 266:24
275:24 276:3 278:3
280:18
**followed**
143:12 152:1 163:1
191:13 193:5
205:15 207:17,24
232:10 233:3
234:19 266:11
280:25 281:2,3,4,5
**following**
152:17 189:11
202:14 217:11
224:3,4 229:9,24
278:9,12
**follows**
137:7 139:9 147:8
159:22 172:23
206:25
**follow-up**
187:16
**FOM**
260:22
**forefront**
236:16
**foregoing**
289:6,8
**Forensics**
250:7,13,22
**forging**
175:11
**form**
138:8 140:18 141:8



141:24 142:17
143:8,21 145:4,11
145:15,22 146:6,20
147:2 148:15 149:3
149:13,19 150:19
151:9,23 152:10,24
153:17 154:2,8
155:8,21 158:8
160:3,15 161:1,7,20
162:20 165:11
166:2,23 167:11
168:1,9 171:13,21
172:18 174:3,17
175:12,21 176:21
177:3 178:10,24
179:11 184:21
187:21 188:13,20
189:8,18 190:19
191:5 196:11,22
198:4 199:14
200:15 201:11
202:8 203:21 206:1
206:20 207:15
209:8 210:1,19,25
211:9,16 216:19
219:7 221:12 222:7
222:16,20 227:4
228:17 230:21
231:16 232:3,19
233:9,18 234:6,23
235:23 236:9,21,24
237:11,23 238:7
239:2 240:9 241:2
242:22 243:22
244:15 247:7,23
248:13 251:23
253:8,21 254:4,11
254:18 255:1,19
257:8,24 258:21
259:2,10 260:1
262:14 263:14,25
265:6,15 268:5,14
269:3 270:24 271:7
271:14,23 272:15
276:13 277:7 278:7
278:16,21 279:7

280:11,20 282:6,25
283:15,20 284:9
285:7
**formal**
232:9 250:8,16,22
**format**
285:9
**forth**
232:18 251:13 289:8
**forty-five**
210:6
**forward**
194:2
**found**
248:18
**foundation**
231:8
**four**
145:6 156:2 169:13
181:14 190:10
191:22 192:10
274:5
**fourth**
182:15 186:24
**four-ish**
274:4
**Francisco**
135:6
**frank**
169:5
**frankly**
169:1 192:24 281:6
**frequent**
182:12 205:2
**frightened**
165:3
**Frontier**
134:7 159:24 216:3
244:9 260:19,22
261:7 274:21 276:1
280:19 286:3
**Frontier's**
145:20 160:6 192:25
194:7 199:9 229:9
229:24 248:8
**fully**

149:4
**further**
161:18 164:25
201:25 202:5
203:12,16 205:3
273:7 284:13 285:2
289:15
**F.A**
204:19 205:11
**F.O**
263:16

_____

**G**

**G**
286:1,1
**gain**
157:8 264:15
**Garcia**
134:22 137:12 289:4
289:25
**garner**
162:14
**gate**
273:25 274:3,21
275:5
**gather**
154:23 266:16
267:25 279:1,6
**gathered**
195:3
**gathering**
203:15 205:23
206:11 267:4
**general**
147:14 161:8 173:22
260:23 262:2
**generally**
230:20 283:12
**generic**
196:13
**genitals**
148:5 197:23
**gesture**
168:21
**getting**
246:25 283:11

**give**
140:14 150:5 167:25
177:2,13 205:13
229:1 231:7 236:15
264:11 274:13
**given**
145:7 146:4 150:4
151:14 154:10
167:7 171:7 277:10
278:10
**gives**
166:18
**glean**
161:24 195:20
239:14
**gleaned**
196:5 197:12
**global**
251:16
**go**
138:13 140:21
142:21 143:12
152:5 156:14
162:24 167:3
169:12 174:21
175:24 176:3
177:25 178:1,12
181:8 183:3,4,10
184:7 185:19 186:6
186:8 188:5 192:3
192:23 197:5 199:6
200:7 208:12
209:18 212:16,23
218:17 219:25
223:5,5,25 225:2,18
242:2 246:19,22
248:23 249:2
256:12 264:13
265:3 269:5,7,12,15
269:16,18 270:6,9,9
270:10
**goes**
242:6
**going**
153:11 155:9 158:9
158:19 159:3,4



163:9 170:17
181:12 186:9
187:16 188:8
193:16 195:13
197:1 202:13
209:11 213:1
214:21 220:14
224:9 227:23
228:19 229:4
239:18,23,23,25
240:11 243:9 245:5
245:6,22,23 246:6
249:4 256:7 260:14
270:14 273:11
**good**
137:9 179:20 192:15
230:13 231:7,13,25
232:1 246:8 264:4
266:17 279:5
**GOSEWISCH**
135:11
**gotten**
198:20
**granted**
202:19
**great**
182:7 202:24 275:20
**grew**
208:9
**grope**
153:7
**groped**
151:20
**groping**
150:15
**ground**
239:17 274:1 283:24
**grounds**
154:6,12 155:6
**guess**
139:21 183:22 215:1
215:4 217:22,23
240:2 259:24
275:10
**guidance**
140:25 151:14

194:21,23 209:19
230:13,19 231:25
232:1 244:13 252:7
253:13,17 254:8
261:4,12 262:12
263:13 264:8
266:12,25 276:17
**guide**
266:15
**guided**
211:7
**guideline**
253:25
**guidelines**
253:4 254:1 257:2
**guy**
153:10 245:17

--- H ---

**H**
136:12
**hair**
238:13
**half**
247:1
**half-handed**
195:8
**hand**
155:2 156:5 163:10
178:9,19,23 180:10
181:1 182:24
183:20,25 185:5,18
186:1 187:4,8 188:3
240:20 265:19
280:1 284:18
**happen**
142:19 153:13
193:11 264:23
**happened**
141:2 145:23 148:23
149:1 156:9 158:18
168:12 169:22
170:9 174:7 193:17
195:22 198:12
210:8 241:6 248:9
251:10

**happening**
176:20 207:4 262:20
**happens**
226:3
**happy**
169:11
**harassing**
235:11,17 239:18
245:13,14 246:2
**hat**
214:15,23
**head**
239:6 276:9
**headed**
207:2
**heard**
157:17,20 161:11
**hearsay**
184:12 195:6 267:17
272:5
**held**
171:5
**help**
200:23 209:19
221:23 230:13
250:25 254:2
260:13 277:14
278:1
**hereof**
286:14
**Hey**
153:6 198:19 214:14
**high**
250:10
**highest**
265:25 266:10
**highlighted**
186:16,23
**hold**
158:20 179:22
220:13 250:10
**Homeland**
263:9
**honesty**
159:9,16
**hope**

195:4 280:22 282:14
283:17,19
**hopefully**
273:12
**hoping**
283:4
**host**
200:8
**hour**
210:6,6 274:9
**hours**
181:14 247:1 270:5
274:5,22
**human**
141:6,11,13 157:3,4
157:19 158:6,14
159:12,20 160:2,12
191:12 194:17
196:8,14 197:3
199:9 206:24 207:3
207:5,9,10,21 208:4
208:19 209:2,4,6,6
209:14,24,25
210:16,17 211:3,4
211:14,24 212:4,10
212:15 219:5 224:3
224:15,22 228:15
230:1,5,6,7,17
231:10,23 232:14
232:15 233:6,7,8
234:1,17 235:6,19
236:3,6 238:14
249:15 251:3,22
252:2,18 253:1
258:17 276:4,12
**hypothetical**
149:21 150:4,6,21
**hypotheticals**
150:8

--- I ---

**idea**
180:22 278:17
**identification**
158:2 181:21
**identified**



196:2
**identify**
194:10 195:16 210:3
  230:11 251:19
  266:20
**II**
134:10
**illegal**
275:20
**Illinois**
135:13
**imagine**
148:20 157:1 266:2
**IMC**
255:8
**immediately**
159:20 196:3 199:19
  202:4
**immense**
284:1
**impact**
165:9 167:1
**implement**
230:7 232:17 233:8
  233:25
**implemented**
234:19
**important**
163:6,12 176:19,24
  177:14 255:15
  279:6
**impossible**
280:8
**inaccurate**
264:6
**inappropriate**
149:9 155:16 156:3
  156:25 164:12,19
  164:24 166:10
  167:10,12,21 171:8
  194:18 201:23
  202:6,12 203:10,17
  203:19 204:23
  205:20,22 209:17
  211:5,21 212:3
  263:21 271:19

**incident**
241:23 242:4 254:25
**include**
274:11
**included**
281:16
**includes**
250:11 263:10
**including**
264:13
**incomplete**
179:18
**incorrect**
206:12,13
**incumbent**
194:3
**indicate**
180:20 219:4
**indicated**
213:9 218:24 220:20
  273:16 286:13
**indicating**
180:24 190:16,20
  228:14
**indication**
235:2
**indicative**
197:21 236:3 278:10
**individual**
166:19 209:13 283:5
**individuals**
163:3 195:25 199:7
  200:11
**individual's**
148:2
**industry**
137:17,21 138:4,17
  139:1,11,23 140:4
  141:4,20 142:14,19
  143:5 144:24
  145:25 151:8,18
  152:9,21 159:25
  160:5 200:14 201:7
  251:2,8,13 263:2
  281:25
**Inexplicably**

264:1
**infinitum**
243:1 244:18
**information**
136:22 140:14
  150:24 154:11,23
  155:19 156:1 157:8
  160:16 162:15,23
  174:19,21,25
  176:18,19 177:20
  178:5,21 179:5,6,7
  179:10 180:8,12,21
  180:23 188:1
  191:19 193:6
  194:17 195:3,11,21
  197:12 198:20
  199:17,24 200:19
  200:23 201:10
  202:1 203:13,16
  205:18,23 252:15
  258:12,18 264:17
  264:24 265:4
  266:16 275:11
  279:2
**inherently**
289:11
**initial**
162:23 163:11
  164:22 193:8 197:4
  274:7,8
**initially**
173:19 195:25
  204:23 229:20
**initiate**
197:6
**initiated**
229:25
**Initiating**
230:14
**Initiative**
136:15 157:13,16,24
  160:12,18,22
**innocuous**
239:12
**inquire**
161:18

**inquired**
279:12,22
**inquiring**
155:17
**inquiry**
162:18
**inside**
239:6
**insignificance**
174:16
**insofar**
230:9 253:22
**instruct**
215:17 261:19
**instructed**
159:19 174:22,23
  182:12 205:1
  274:12
**instructing**
264:13
**instructional**
223:4
**instructions**
205:14
**instructs**
223:3
**intended**
248:1
**intent**
205:8 226:14
**interact**
275:8
**interaction**
186:25 210:10 236:2
  279:11
**interactions**
182:17
**intercom**
190:12
**interest**
144:12
**interested**
289:16
**interference**
289:11
**interject**



204:11
**interpret**
168:17
**interpretation**
148:18,22,25 156:24
193:23 204:16
222:9 234:4,20,25
237:25
**interpreting**
205:8
**interrupt**
170:18 283:10
**interruptions**
289:12
**intervene**
244:23
**interviews**
207:8
**intimation**
224:2
**introduce**
266:22
**introduced**
218:6
**investigated**
163:10
**investigation**
163:1 202:5 204:21
250:20 271:11,20
272:11 273:15
**investigations**
249:19,22,23,25
250:4,7,13 281:10
**invited**
246:13
**invoke**
210:16 230:7 232:17
233:7 234:1
**invoked**
209:24 211:4 231:24
234:18 235:20
236:7,17
**invoking**
254:9
**involve**
158:6,15

**involved**
161:17 201:10
206:15 207:9
208:19 252:17
**involves**
144:11 275:19
**involving**
241:23 242:4
**in-flight**
160:7
**irrelevant**
255:20
**irrespective**
191:10 283:22
**ISC**
262:6,13
**issue**
170:23 199:3 239:24
254:21 266:20
**issues**
256:18 289:12
**Item**
274:18
**items**
236:2
**i.e**
202:12 205:1 255:5

---
**J**
---

**January**
144:8
**Jesse**
135:18 137:12
**Jesus**
225:17
**job**
249:24,24 268:21
**John**
135:5 181:15 204:5
215:6 217:13
223:11 224:24
227:16,25 239:19
245:5
**johndmckayatty@...**
135:7
**joined**

250:18
**joint**
200:21
**judge**
167:8 227:21,22
239:21
**judging**
167:14 169:17
**judgment**
272:20
**jump**
227:24 239:12
**justified**
280:9

---
**K**
---

**keep**
150:8 206:2 209:4,5
214:8 226:3 229:3,9
266:2 283:3
**kid's**
226:4
**kind**
138:23 147:10
162:22 169:25
191:7 193:11 205:6
214:5
**kit**
230:25
**KJD-NJK**
134:6
**know**
140:17 144:1,3 148:9
150:11 154:12
158:5 159:14,18,21
159:24,25 160:9,10
160:11 162:21
163:23 164:4 166:3
166:4,12,16 167:13
171:3 175:3,18
176:23 177:8,12,15
178:19 179:1,8,13
179:14 180:14
181:11 184:8
185:13 187:16
193:15,21 197:15

200:10 208:1 210:2
217:10 224:17,17
226:2 229:22 231:4
235:17 237:12
239:8,13 243:15,17
252:21,25 255:15
259:4,25 270:3
271:24 274:21
283:3,7
**knowing**
141:1 165:10 168:20
**knowledge**
158:16 164:9 165:7
167:18 274:17
**known**
155:20 163:19
164:16 165:17,25
166:25 170:13,21
173:25 175:8
198:24 199:2

---
**L**
---

**labeling**
229:8
**Lacks**
259:2
**lady**
214:14,22
**laid**
281:6
**lake**
260:7
**language**
184:19
**large**
229:1
**law**
135:4 207:6,7,8,9,12
258:7,14
**lead**
221:17 278:5
**leadership**
265:24 266:9
**learned**
154:17 155:4,24
156:18 162:17,21



162:25 163:18
174:11 176:18
201:3
**learning**
155:17 172:13,16
173:2,8
**leave**
237:25 262:13
**leaving**
188:6 208:22 274:1
**led**
276:14 280:2
**leeway**
166:18
**left**
228:20 247:1 248:25
270:3
**length**
182:18 187:1
**lens**
165:2
**letter**
230:10 231:25 281:4
281:5
**let's**
139:20 186:4,8 194:6
195:15 208:1
212:18,20,20,23,23
215:14 223:5
226:12 246:9
248:23 269:15
**level**
148:3 201:24 202:15
203:11 205:15,21
209:18 253:6,13,17
254:1,9 255:25
256:5 257:2,11,14
258:5 263:16,19,24
**levels**
205:6 231:13 232:7,9
253:16 254:10
256:6,8,9,17 257:23
263:11
**liberty**
143:22,25
**lifted**

183:24 185:7 188:22
**light**
136:15 157:12,15,24
160:11,17 163:14
164:11 165:7
167:21 171:6
**Lightning**
160:22
**limited**
144:10
**line**
170:6 174:21 181:9
213:7,12 216:22
218:21 220:1
222:10 234:12
287:8,14,20 288:1,7
288:13
**listed**
143:10 160:6 189:10
242:9
**listened**
204:19
**lists**
169:10
**little**
182:4,5 214:8 219:25
223:6,14 228:23
**live**
193:20
**logical**
174:20
**look**
183:16 186:4 187:24
214:3,14 215:3,8,18
217:23 218:7,17
221:5,21 223:3
260:23 273:20
279:20
**looked**
165:2 273:22 276:11
**looking**
140:24 181:22 182:1
188:1 215:2,3
217:22
**lookout**
157:4 196:15

**Lord-Jones**
150:8
**lot**
161:21 213:21
271:15
**loving**
164:13 167:23
**lump**
147:16
**lumped**
267:20
**lumping**
155:24
**lunch**
243:1
**lure**
260:6

---

**M**

**machine**
289:13
**majority**
264:9
**making**
191:20 192:12
194:23 198:14
206:12 212:3 254:2
254:14 267:12,14
270:16 272:21
**male**
149:8 150:14,21
153:7
**man**
151:3 224:23
**manage**
275:17,22
**management**
249:10,14
**manager**
275:14
**manner**
201:4 207:17 237:5
238:21 250:21
**manual**
138:1,2,6,10,11
143:11 144:19

145:10 146:11
147:9 151:8 193:2
194:8,10 252:11,15
252:16,17 257:18
**manuals**
194:21
**March**
134:15 137:1 261:8
289:22
**marked**
157:23 158:1 181:17
181:20
**marks**
137:10 179:24 180:3
225:5,9
**match**
196:10,20 273:23
**material**
161:24 223:4
**materials**
156:1 175:15
**matter**
157:18 163:11
165:16 170:6
172:10 207:22
286:11
**matters**
166:6
**Maye**
135:12 136:6,8
137:16 138:16
139:7,19 141:3,15
142:8,12 143:1,14
143:19,23 144:22
145:8,12,24 146:7
146:23 147:6
148:24 149:6,14,23
150:3,12 151:5,16
152:7,19 153:4,24
154:3,14 155:11,12
156:16 157:22
158:4,12,20,21
159:6 160:8,19,23
161:4,10,12 162:1,7
162:16 163:5 164:1
164:4,6 165:20



166:7 167:6,15
168:5,22 171:16
172:2,21 173:14
174:8 175:4,17
176:5 177:1,6,11
178:15 179:3,22
180:6 181:15,24
182:2,7,9 184:1,9
185:1 186:6,8,14,18
186:20,21 188:7,15
189:1,13 190:1,4,23
191:21 192:8
196:18 197:10
198:7 199:21 201:1
201:14,18 202:21
203:22 204:5,8,13
206:4,23 207:19
209:22 210:14,23
211:1,11,23 212:6,8
212:23 213:6,20,23
215:6,7 216:15
217:1,10,13,14,24
219:23 222:2,11,18
222:23 223:10,15
223:20,22 224:7,9
224:13,17,20,24
225:2,12,17,19
227:9,13,16,19,25
228:3,8,10,12 229:2
229:17 230:3
231:11,21 232:13
233:4,13,23 234:14
235:7,13,18 236:5
236:18,22 237:1,15
238:3,17 239:19,25
240:4,5,13 241:11
242:16,23 244:8,17
245:5,8,14,16,19,22
246:1,4,6,9,15,19
246:23 247:2,12,17
247:19 248:4,20
249:3,9 252:9
253:11,24 254:7,13
254:19 255:4,7,10
255:13,22 256:12
256:21 257:13

258:2,24 259:6,13
259:16,20 260:3,9
260:16,18 262:1
263:1,22 264:2,20
265:1,11,21 266:4,6
268:10,16 269:5,7
269:10,12,15,18,21
270:2,6,12,18 271:4
271:9,16,23 272:9
272:23 274:18
276:13 277:7 278:7
278:16,21 279:7
280:11,20 282:6,25
283:15,20 284:9,14
285:1
**ma'am**
143:24 158:23
204:14 208:15
217:2,15 219:24
220:13,13 222:24
224:7 228:13
235:19 242:3
243:18 245:9 247:3
247:20 256:10
260:10
**McDonnell**
250:20
**McKay**
135:5 136:7 138:8
140:18 141:8,24
142:11,17 143:8,18
143:21 144:20
145:4,11,15 146:6
146:20 147:2
148:15 149:3,13,19
150:5,19 151:9,23
152:10,24 153:17
154:1,8 155:8,21
158:8,17 160:3,15
160:19 161:1,7,20
162:4,20 163:23
165:11 166:2,23,25
167:11 168:1,9
171:13,21 172:9,18
173:10 174:3,17
175:12,21 176:21

177:3 178:10,24
179:11,20 181:12
181:22,25 182:3
183:18 184:6,21
186:4,7,17,19
187:21 188:13,20
189:8,18 190:3,19
191:5 192:6 196:11
196:22 198:4
199:14 200:15
201:11 202:8
203:21 204:3,7
206:1,20 207:15
209:8 210:1,19,25
211:9,16 212:5,7,22
212:25 213:7,13,18
213:21 215:5,15
216:14,19,22 217:5
217:8,12,17 219:7
219:25 221:12,17
222:7,16,20 223:7
223:12,19,21,25
224:6,12,14,18,21
225:1,4,13,16 227:4
227:11,18,20 228:1
228:7,9,17,25 229:6
230:21 231:16
232:3,19 233:9,18
234:6,23 235:11,16
235:23 236:9,21,24
237:11,23 238:7
239:2,16,22 240:2,9
241:2 242:15,22
243:22 244:15
245:2,12,15,18,20
245:25 246:2,5,8,10
246:13,17,21,24
247:7,11,15,23
248:13 251:23
253:8,21 254:4,11
254:18 255:1,19
256:11,14 257:7,24
258:21 259:2,10
260:1,5,14,17
261:21 262:14
263:14,25 264:19

265:6,15 266:1
268:5,14 269:3,6,8
269:11,14,16,20
270:4,15,24 271:7
271:14 272:15
273:10 276:16
277:15 278:13,18
279:3,9 280:13
281:1 282:9 283:9
283:18 284:4,11
285:3,4,6,10
**MEA**
250:6,12,21
**mean**
138:11 140:25
142:23 144:3
147:14 149:20
154:10 159:22
165:5 171:15 174:6
184:23 185:14
196:24 198:24
199:1 200:6 209:1
212:14 214:1
215:20 216:2 221:4
223:3 228:21
232:25 249:24,25
250:17 255:2,20
256:6 260:23
282:18 283:10
**meaning**
139:17 167:12
**means**
190:25 204:18 254:6
260:6 268:22
**meant**
158:19
**media**
137:11 179:25 180:4
225:5,10 285:16
**meet**
283:12
**meets**
207:7
**member**
160:24,25 161:6
169:11



**members**
158:7,14,15 161:9
  261:9,14,15
**mentioned**
157:17 159:10
  200:20 214:11
**mentions**
216:21
**merely**
168:20 171:5
**methodically**
145:21
**mic**
227:23
**mimic**
223:10
**mind**
157:2,6 168:24
  170:12 208:24,25
  209:10 221:24
  229:7,14,18,23
**mine**
167:5
**minimize**
264:5
**minimum**
274:25
**minor**
209:14 235:2 267:2
  272:22
**minority**
276:20
**minutes**
159:1,2 181:14 247:1
  270:5 274:5
**mischaracterizes**
241:15
**misconduct**
137:24 142:5 144:18
  145:1,3 146:2,19
  147:1,11,16,20,23
  148:3,7,13 149:10
  150:1 156:21,23
  161:5,9,23 162:9
  206:16 209:13
  210:24 211:6,7

212:1 237:9,21
238:25 240:7,25
241:8,9,13,24 242:5
242:8,11 243:19
244:5 247:4 248:2,3
249:12 252:19,23
255:18 256:24
265:14 270:23
271:13 272:12
276:5 280:6,8
**missed**
144:23
**missing**
163:22 193:9 195:4
**misspeak**
171:19
**misspoke**
146:13
**misunderstandings**
264:5
**model**
210:12
**module**
159:12,16
**molestation**
189:23 191:13,14,15
  241:18 276:5
**molester**
181:7
**molesting**
181:6 182:21 183:2
  184:4 185:12 187:3
  187:18 188:11,18
  189:6,16
**moment**
148:20 198:15 226:1
**morning**
162:6
**Motion**
260:2
**move**
163:20 176:16
  228:11 246:13,15
  272:13
**moved**
176:9 203:15 210:7

270:20
**moves**
271:18,21
**moving**
219:19 272:11
**Mullins**
263:16
**multiple**
152:13 153:2 169:4
  169:10 170:4
  183:11 184:15
  261:22
**MURPHY**
135:11
**myriad**
165:5 191:18 192:21
  200:8 240:10
  251:18

---
N
---

**N**
135:1 136:1 286:1,1
**name**
196:9 218:4 289:20
**names**
196:10,20
**natural**
218:17 221:18
**nature**
154:11 163:14 168:7
  241:6
**Navarro**
135:18 137:12
**navigating**
231:15
**near**
156:5
**necessarily**
196:21 231:23,24
**necessary**
152:6 153:21 155:3
  260:16 273:16
  275:7,14
**neck**
238:14
**need**

144:14 200:19,24
  205:1 228:1 231:24
  246:24 275:17,23
  285:4
**needed**
149:17,17 205:13
  276:3 277:14
**needs**
257:11 275:12
**neither**
209:15 289:15
**neutral**
250:10
**NEVADA**
134:2
**never**
175:5,10 211:3,3
  214:4 229:25
  241:13 248:11
  257:14 263:17
**new**
171:6 239:16,23
  246:21,22 247:10
  247:16,16
**newsletters**
215:21 216:11
**Nickel**
190:12 191:24 276:8
  277:2
**non**
170:22
**nonresponsive**
227:17
**non-consensual**
171:8 199:6
**non-issue**
172:1 199:4 279:14
  279:18
**non-subject**
265:16
**non-truths**
196:25
**Norton**
134:12,20 136:3
  137:5 180:7 186:15
  246:11 273:11



284:15 285:15
286:24 288:23
**note**
171:23 246:10
269:22
**notice**
193:13
**noticed**
134:20
**notified**
162:10 176:10
238:19 240:19
270:21 271:12
**notifies**
140:2 207:6 254:22
**notify**
144:4
**number**
137:11 138:23
154:22 179:25
180:4 225:6,10
248:21 261:3,5,6
262:5 263:7,13
264:3,8 265:22
266:7,19,25 285:16
**numerous**
161:25

———————————
**O**
———————————
**O**
286:1,1
**oath**
190:8 286:15 289:9
**Object**
276:13 277:7 278:7
278:16,21 279:7
280:11,20 282:6,25
283:15,20 284:9
**objection**
138:8 140:18 141:8
141:24 142:11,17
143:8,18,21 144:20
145:4,11,15 146:6
146:20 147:2
148:15 149:3,13,19
150:19 151:9,23

152:10,24 153:17
154:2,8 155:8,21
158:8 160:3,15
161:1,7,20 162:20
165:11 166:2,23
167:11 168:1,9
171:13,21 172:18
173:10 174:3,17
175:12,21 176:21
177:3 178:10,24
179:11 184:6,21
187:21 188:13,20
189:8,18 190:19
191:5 196:11,22
198:4 199:14
200:15 201:11
202:8 203:21 204:6
206:1,20 207:15
209:8 210:1,19,25
211:9,16 216:19
219:7 221:12 222:7
222:16,20 227:4
228:17 230:21
231:16 232:3,4,19
233:9,18 234:6,23
235:23 236:9,21,24
237:11,23 238:7
239:2 240:9 241:2
242:15,22 243:22
244:15 247:7,23
248:13 251:23
253:8,21 254:4,11
254:18 255:1,19
257:7,8,24 258:21
259:2,10 260:1,2
261:21 262:14
263:14,25 265:6,15
268:5,14 269:3
270:24 271:7,14,23
272:15
**objectionable**
170:21 171:25
248:18
**objections**
246:20
**obligated**

233:25
**obligation**
225:14,20 232:17
**obligations**
198:22
**observation**
162:12 182:14,20
185:11 187:2 195:6
243:10 268:3
**observations**
142:20 179:5,16
192:11 216:23
267:5,6,11,14,22
268:12,25
**observed**
139:6 141:22 142:15
149:7 150:14,23
152:23 155:16
161:14 163:16,18
177:22 178:9,18,19
178:21 180:10
181:1 184:20 185:3
185:25 186:3 192:1
194:18 197:23
201:4 205:11,19
211:5 213:9 218:24
220:20 237:4
238:20 240:15,20
242:20 243:12
270:22 284:17
**observes**
242:17 243:14,19
244:11
**observing**
156:7 221:8 243:16
243:17
**obtain**
205:18
**obtained**
162:23
**obviously**
206:6 209:10
**occupants**
232:12 252:5
**occupy**
275:1

**occur**
161:6,9
**occurring**
141:7 148:10 209:3
212:1 280:7,9
283:23
**odd**
163:22
**offer**
177:7 191:25 286:14
**offered**
276:9
**offering**
277:2
**oh**
158:20 182:2,11
186:18 223:16
225:17
**okay**
146:15 149:12
155:11 162:7
165:21 167:16
170:24 177:6 182:2
182:11 186:4,6
187:13 194:3
195:24 198:18
206:13 211:12
213:13 217:25
220:2,24 222:12
224:17,20,24
226:12 227:25
229:3,17 234:15
239:19 240:4
241:12 245:2,5,12
246:4,6,15,23 249:4
255:23 256:15
259:24,25 266:5
268:23 269:5,11,21
270:16 274:20
279:20 282:22
284:5
**omission**
178:2
**omissions**
164:8 167:18
**omit**



179:17
**omitted**
177:21 178:4
**once**
142:6 149:12 152:25
166:5 175:23
189:19 193:12,19
200:22 241:4,23
242:4 244:1,18,24
**ones**
161:25 194:20
**one-stop**
200:7
**ongoing**
250:18
**OOII**
273:24
**open**
237:25
**opened**
168:19
**operations**
138:1 194:7
**operators**
263:10
**opine**
175:1 230:12 267:24
**opining**
195:16
**opinion**
145:22 166:24 167:2
167:25 171:4
172:15 173:6 174:1
174:15 177:2,4,7,13
177:20 191:17
196:23 199:22,25
200:1 201:2,16,16
202:2 218:9,11
222:14 232:25
234:17 235:19
236:19 238:24
242:24,25 247:3,20
248:5,7 258:11,18
263:3 265:2 267:2
273:17
**opinions**

144:15,17 161:2
175:11 234:3 236:6
259:7 261:2 282:3
282:10 284:5
**opportunities**
264:5
**opportunity**
267:25 277:10,13
**opposite**
175:2
**ops**
257:18 260:19
**order**
157:8 263:19 275:22
**ordered**
280:10
**ordering**
267:2
**original**
289:20
**outcropping**
221:19
**outlined**
137:25
**outset**
201:25 203:11
**outside**
144:9 197:19 276:24
**overall**
152:16 267:11,23
**overarching**
262:2 263:4 265:5,7
268:8 281:21
282:23 283:4

_____
**P**
_____
**P**
135:1,1 286:1,1
**Pacific**
269:25
**page**
136:5,14 163:22,25
164:2,7 181:19
182:10 186:16,22
190:3,5 201:19
212:22 213:7

216:21 220:1
221:15 222:10,19
225:13,20 226:20
242:2 261:2 287:8
287:14,20 288:1,7
288:13
**pages**
222:22 223:17
226:22 228:22
**paints**
179:18
**paper**
285:7
**paradigm**
253:6,17 258:5
**paradigms**
254:9
**paragraph**
164:7 168:15 183:14
184:14 186:16,22
190:2,5,6 192:16
201:20
**Pardon**
181:24
**Parens**
183:19
**parent**
166:13,19 170:14
198:3 272:22
**parental**
164:14 167:23
**parental-like**
201:5
**parentheses**
182:16,18,20,23
**parenthesis**
184:15 187:4
**parent-child**
166:10,17 168:25
170:12
**parent-like**
237:6,17 238:21
**PARK**
135:4
**parking**
273:25 274:2

**part**
159:15,22 169:9
182:3 200:16
227:12 241:7 243:9
250:9 252:7 272:2
**participated**
250:19
**particular**
147:9 150:9 159:15
276:24
**particularly**
278:25
**parties**
289:17
**parts**
281:3,4
**passed**
227:22
**passenger**
137:19 138:7 139:17
139:21,25 142:15
142:20,24 143:4
145:3 146:3 148:5,6
148:9 149:8,15
150:14,15 151:19
151:20 153:7,7,7,9
153:12 162:10
205:24 244:11,12
244:24 254:21,23
254:25 257:22
258:1,3,4 262:8
267:15 268:4,13
269:1 270:20
271:12,18,21
272:11,13 275:20
**passengers**
161:16 162:18
171:23 196:20
198:1 199:18,24
200:6 206:15 207:1
207:8 210:12
276:19,19 279:4,23
284:3
**passenger's**
140:2
**passenger-carrying**



265:10
**pause**
194:1 236:15
**paying**
220:11
**PDF**
285:6
**peer**
282:4
**penalty**
286:6,9
**people**
193:16 196:24
213:10 214:3
218:25 220:20
221:5 231:6
**perceived**
161:14 164:19,24
270:22
**perception**
142:21 151:1 165:17
165:24 166:4
170:15,19 171:2
**perceptions**
165:6
**perfectly**
230:17 253:16
**period**
244:25
**perjury**
286:6,9
**permissible**
192:9 268:1
**permission**
144:9
**permitted**
205:18
**perpetrator**
205:25 271:22
272:14
**person**
168:11 214:7,9,9
221:17,19 271:21
**personal**
148:2
**personally**

237:19
**perspective**
148:13 163:15
**pertaining**
265:13
**Peter**
134:4 163:13 164:9
182:23 184:3
185:17 187:3
188:10 189:16
216:17,24 217:21
218:3,5 219:5
221:10 222:4,15
227:3 229:8 233:16
235:9 238:5 240:20
286:3
**Peter's**
185:5 280:1
**physical**
138:12,14 147:13
148:1
**PIC**
150:13 164:8 167:18
252:3,8 268:8 271:2
**pick**
219:8 232:7
**picture**
179:18
**piece**
155:19,25 177:19
178:4 193:9,10
197:20 267:11
**piecemeal**
281:3
**pieces**
195:5
**pilot**
144:24 145:17
151:11 152:15
170:6 205:17,17
206:3 207:24
237:19 251:17,21
252:2 253:17,18
254:8 261:7,12
268:24 281:22
**pilots**

196:7,13 231:15
251:3,4,9 252:13
253:7,14 255:24
258:9,16
**pilot's**
252:22 253:1
**pink**
214:15,23
**place**
178:22 195:7 208:14
209:13 218:17
224:2 244:2,22
**placed**
289:9
**PLAINTIFF**
135:3
**plaintiffs**
134:5 154:5,19 155:5
156:18 172:17
173:9,25 175:9,19
176:8 178:8 180:9
180:25 195:18
284:17
**planning**
200:21
**play**
159:1,3 233:1 267:23
**played**
158:19 249:10,14
**plays**
158:3 159:5
**please**
162:4 192:7 204:4
220:14 223:14,21
223:21 229:4 249:3
256:14 258:1 266:1
269:9,15 270:6
285:7
**point**
156:25 157:9 162:19
171:7 175:19
176:15,18 179:20
191:8,16 192:16
194:2,2 197:7
198:22 202:15
205:20 209:17

210:16,16 211:7,13
221:25 235:6 237:8
237:20 238:16
239:7 241:21
267:24 280:14
**points**
184:15 264:15
**police**
274:14
**policies**
141:13 143:9 145:19
145:20 146:10
147:22 158:10
195:7 208:10
229:10 261:17
262:9,23
**policy**
143:16 148:16
192:25 194:5
199:10 208:13
209:24 211:4,8
229:24 230:7,17
231:24 232:15,18
233:7,8 234:1,18
235:20 236:7,17
240:7,25 241:8,14
241:18,22,23 242:4
242:6,19 243:3,3,21
244:1,2,3,7,10,13
245:10 247:4,20,25
248:1,8,9,12 249:11
249:15 250:9
**portion**
158:25
**portions**
254:1,6
**posed**
155:2
**position**
226:7 252:10,12,13
**possess**
158:16
**possession**
194:16,20
**possibility**
168:19



possible
211:2 235:5 238:24
   280:6
possibly
237:21
post
256:18
potential
155:2 165:9 198:3
   200:5 231:15 237:9
   238:25 253:5,19
   254:3 271:13
   272:12
potentiality
232:23
potentially
209:3 258:16 280:2
power
264:22
prepared
272:19
prescribed
278:9
present
190:10
presentation
136:15 157:24
pressed
266:4
presumably
190:10 195:11,22
pretty
251:6
previously
137:6 151:3 153:19
   160:17 171:1 193:3
   228:20 232:6
   243:25 257:9
   267:21 272:16
   278:22
pre-lunch
150:20
primarily
159:13
prior
142:1 157:9 182:17

186:25 216:24
221:7,8 236:12
   289:8
probably
148:19 191:6 206:7
   227:1 269:10
probing
150:25
problem
149:25 150:7 156:9
   206:6
procedure
148:17 199:10
   207:24 224:5
   232:10 242:9 278:9
procedures
137:23,25 141:13
   143:10 145:19,20
   146:10 147:22
   151:13 152:1,18
   153:20 158:11
   163:2 195:7 218:19
   221:20 261:17,20
   262:10,24
proceed
137:13 146:14
   153:18,22
proceedings
285:14 289:7,8,11
process
151:15 209:3 219:19
processing
195:2
produce
193:1
professionalism
265:25 266:10
proper
202:13 206:19
   207:14
properly
140:7 163:2 255:17
   265:23 266:8
proposals
252:22 253:1
protocol

137:22 140:9 141:12
   143:10 147:15
   150:2,9,10 151:13
   152:2,18 153:20
   157:1,6 159:23
   162:13,24 174:24
   189:10 191:11
   193:4 194:5 195:14
   197:5 202:14,14
   207:1,17,21 208:11
   210:17 221:20
   230:1,8,24 233:2
   235:6 236:13 242:6
   250:9 278:1,12
   280:16,19,25
   282:21
protocols
150:6 191:13 194:11
   194:14 195:7
   230:19 232:17
   252:7 261:20
   275:23 276:2 278:4
   282:22
provide
144:7 179:9,15 180:8
   180:20 197:25
   216:23 253:17,18
   256:8 276:1
provided
146:10 147:4 178:20
   180:12 208:10,17
   221:23 230:2
   236:11,13 242:10
   251:9 253:14 278:1
provides
232:1
providing
179:4
psychologist
166:17 168:13
pull
228:23
pushing
273:24
put
187:10 224:9,13

230:12,25 231:2
   242:11
puts
274:8
Putting
264:18
P&R
198:1,9
P&Rs
197:17 198:1
P.D
177:10,22 179:17
   183:20,24 187:4,17
   190:9 197:8
p.m
134:16,16 137:10
   179:25 180:4
   186:10,12 213:2,4
   225:6,10 249:5,7
   285:17,18

## Q

qualified
167:24,25
qualify
257:22 258:4
quarterly
159:10
queried
193:5
question
139:8,10,15 140:10
   140:13,16 141:1,17
   142:1,9 146:14
   147:3,15,17 149:5
   150:23 153:1,1
   154:1,10 156:12
   161:22,25 162:3
   163:4 165:12,22,22
   170:10 172:20,24
   173:11,13 175:22
   176:22 178:11,25
   179:2,12 180:17
   185:14 187:17,22
   190:22 206:22
   214:12 215:10



216:1,6,10 217:4,5
217:7,19 219:3
220:14,18 221:13
222:3,8,17,21 223:7
223:16 225:14,21
226:6,11,24 227:5
227:21 228:8,11,18
229:16 230:22
231:17 232:4,20
233:10,19 235:12
239:22 241:3 243:7
243:23 244:16
245:3,21 247:8,24
248:14 251:24
253:10,12,23
254:17 256:11
258:12 272:1,5
276:18,24 277:8
282:8 283:8
**questioned**
276:11
**questioning**
181:9 188:23 216:22
280:15
**questions**
145:17 150:25
152:15 160:21
164:25 200:8,24
204:10 240:1
246:12,21 273:7,12
281:8 285:2
**quickest**
245:17
**quickly**
223:8,8
**quite**
169:1,5 183:12 210:4
210:5 231:2
**quotations**
182:20
**quote**
187:25
**quoted**
279:15
**quote/unquote**
142:24 160:5 231:10

281:9
**quoting**
234:9

_____

**R**

**R**
135:1 286:1
**races**
276:20
**rails**
198:25
**raising**
238:13
**ran**
150:7
**reach**
165:6 265:24 266:9
**reacted**
171:4
**read**
139:7,9 148:18 168:2
168:11 169:13
171:15 172:21,23
173:16,17,20
187:11,12 203:6
212:19 213:24
218:15 223:5,7,13
227:22 248:9,9
252:16 256:6 285:3
286:10,11
**reader**
168:16
**reading**
166:11 169:19,24
170:1,3 217:2,15
220:15 235:1
236:20 248:8
289:18
**reads**
202:9
**real**
244:22
**realized**
179:7
**really**
140:13 142:4 147:15

165:16 166:6,20
168:17 170:9 175:3
175:24 193:17,21
196:13,23 221:22
224:4,21 238:9
270:25 282:18
**realm**
168:19 251:16
**reason**
180:20 197:1 218:15
229:21 230:6
232:16 233:12
238:9 276:11
278:12 287:11,17
287:23 288:4,10,16
**reasonable**
168:10 194:22 195:2
206:19 221:19
231:6 254:2 267:8
284:7
**reasonably**
189:22 277:9
**reasons**
256:4 281:14,16
**recall**
166:11,12 176:6
188:9 229:5
**receive**
159:10,14 196:16,17
**received**
145:1 152:2 161:13
216:7,11
**Recess**
180:2 186:11 213:3
225:8 249:6
**recollection**
228:21
**recommendations**
281:17
**recommended**
240:22
**record**
137:10 139:9 172:23
180:1,5 181:14
186:6,8,9,13,19
212:24 213:1,5

223:22,24 225:2,7
225:11 244:2 246:9
246:20 248:23
249:2,5,8 269:5,7
269:12,15,17,19
270:2,7,9,9,10,11
270:15 273:22
285:16 289:10
**recourse**
194:22
**rectify**
140:23
**refer**
141:9 261:23
**reference**
208:8 224:2 253:18
257:18
**referencing**
279:19
**referred**
208:20,22 212:12,14
260:11
**referring**
173:15 221:15 283:3
**reflects**
233:21
**refusing**
162:2
**refutes**
219:21
**regard**
141:11 158:10
185:25 189:11
191:25 229:11,25
234:8
**regarding**
136:15 137:18
138:20 139:2,11,23
141:5,20 142:14
143:6 144:25
146:17,25 157:24
165:9 183:14
184:17,19 193:6
194:14 197:11
217:21 219:18
242:7,10 247:3



248:21 249:11,15
250:4,13 251:21
252:22 253:1,14
258:9,16 262:5
265:2,18 267:15
**regardless**
166:13 265:19
**regulation**
138:4,23 141:16
146:17,21 151:7
152:9,12 201:6,13
251:20 261:18
262:4 263:2,4 265:5
265:8,13 268:7,24
272:6 284:24
**regulations**
138:20 262:9 263:8
268:2,17,19 270:20
271:22,25 272:7
284:19
**reinforce**
145:18
**reiterate**
272:7
**related**
154:5,20 155:5,18
160:14 161:17
162:18 163:4,7
195:18 196:21
**relationship**
154:11 155:18
163:14 165:25
166:10 168:12,13
168:25 170:13
172:17 173:9 174:2
174:15 277:25
279:13 284:22
**relative**
289:16
**relay**
182:19 187:2
**relayed**
149:16 234:10 239:7
267:4
**release**
273:25

**relevant**
166:20 176:24 177:8
177:9,14,19 178:3
179:6,7 197:6 219:9
255:21
**relied**
263:18
**rely**
230:19 232:5 254:8
267:6,13,16 268:2
268:11,19,25
**relying**
141:17
**remember**
274:21 281:11
**remiss**
201:16
**remote**
289:10
**Remotely**
135:3,10
**repeat**
249:20
**repeatedly**
147:4,12
**repercussions**
206:12
**report**
137:23 138:6 139:17
140:2,24 142:15,20
142:24 144:25
145:21 151:19
152:2,22 156:10,11
156:14 157:10
159:19 161:13,23
162:8,23 163:11
164:21,22 166:25
168:15 169:9
171:22 175:11
177:21 180:15,18
181:3 182:10,13
183:19 185:6
186:16 187:11
193:8,18,19 201:19
205:3 221:25 230:8
236:12 242:11

243:4,13,21 248:2
248:15 256:4
262:16 274:7,9,24
276:7 279:19,21
280:3 284:6
**reported**
138:14,21 139:3,13
139:25 140:7,9,21
141:1 142:2,6 143:3
143:4,7 146:2,18
147:1,16,19,19
148:9 149:2 150:23
153:15 156:4,5,20
156:23 161:19
169:7 185:14,17
191:15 194:1 241:9
241:13,24 242:5,7
242:10,21 248:11
255:18 265:13
279:25
**reporter**
134:22 137:6,12
139:7 172:21
223:13 266:2
269:22,24 270:6,8
289:2,4,6
**reporting**
139:18,21 141:21
149:25 151:15
160:1 277:19
**reports**
137:19 139:5,16
205:19
**requested**
157:7 289:18
**required**
138:20 144:6 155:4,6
158:14 194:8
197:25 201:9,12,25
203:12 205:15
233:7 265:8 271:10
**requires**
241:9
**requiring**
261:19
**research**

164:25
**reseating**
219:14 234:10
**reservations**
197:17
**resolution**
265:24 266:9
**resource**
195:16 197:11
198:16 200:17
232:2 253:7 257:6
257:10
**resources**
191:18 192:17,22,22
200:9 272:20
**respect**
143:16 151:2 152:2
152:21 153:5 160:1
161:18 170:1
187:17 202:24
212:10 231:13
232:14 241:5
249:19,22 250:7
261:6,12 262:12,19
263:13 264:8
266:11,25 274:18
**respond**
137:19 138:21 139:2
139:12,24 140:5
141:6 143:6 144:17
144:25 146:18,25
149:2 150:17
151:19 152:22
158:9 244:10,14
253:5,19 267:8
**responded**
171:24 255:17
**responding**
138:6 143:17 153:5
153:15 156:20
172:9 217:12 242:7
249:12,15 251:3
254:2,15,20 265:13
267:15 268:3,12
269:1
**responds**



141:20 142:14
146:2
**response**
151:7,10 170:15
198:11,13 221:15
222:10 251:22
252:22 253:1
254:25 276:14
**responsibilities**
156:20 251:16,18
**responsibility**
151:11 191:18
192:20 200:21
252:8 281:22 283:3
284:1
**responsible**
152:17 252:4 262:7
**responsive**
204:9
**rest**
214:20 248:19
**restate**
155:10,11 271:17
276:21
**resting**
188:3
**resumé**
250:24
**returned**
182:18 187:1
**revealed**
163:3,9,12 199:19
**review**
159:4 176:4 194:22
208:1 228:22
235:21,24 247:5
**reviewed**
156:2 158:25 163:18
175:14,15 180:11
189:25 244:3 282:4
282:5
**ridiculous**
221:13
**right**
149:11 159:3 166:15
171:12 173:16

182:2 183:19
184:11 193:7
195:13 199:1,13
201:14 202:22
204:10 209:4,5,7
210:15 214:18
216:1 218:21 220:2
241:25 243:11
247:16 259:5 266:5
269:14,23 274:6
**rise**
148:3
**risk**
213:10 215:12
218:25 220:21
256:23 257:1
258:10
**road**
138:13 150:25 197:2
**roads**
140:20
**role**
249:11,14
**row**
196:1 210:7 219:15
234:10
**rubbed**
149:8
**rubbing**
148:5 213:17,25
221:2,3
**Ruben**
134:22 137:12 289:4
289:25
**rules**
148:8 263:8

— S —
**s**
135:1 136:12 182:24
183:20,25 185:4,5
185:18 187:5,8
218:4,5 237:5
240:21 274:20
277:3 280:1 286:1,1
**safe**

277:12
**safety**
148:2 213:10 214:2
215:12 218:25
220:21 221:5 226:5
231:15 232:11
244:23 252:5 253:5
253:5,19,20 254:3
254:15 256:20,22
256:25 258:3
265:25 266:10,21
267:9,15 268:4,13
269:1 284:2
**Sakurada**
154:18 155:14 184:8
190:11 201:22
202:11 203:9,17
**Sakurada's**
205:11
**San**
135:6
**satisfaction**
262:8,22
**satisfied**
155:1
**save**
183:18 272:6
**saw**
151:1 153:6 171:3
185:4,4 188:2 203:1
217:9 219:19
224:22 276:9
**saying**
153:6 154:15 164:15
169:6 171:5 173:11
177:16,18 188:10
189:3 191:1 197:24
204:23 206:2
209:12,23 218:11
229:19 230:16,23
241:16 244:9
245:11 259:12,18
280:17
**says**
167:17 171:22
173:13 183:19

185:6 186:23 190:7
197:23 202:17
203:3 214:14
217:21 218:21
219:18 227:22
241:23
**scenario**
253:15 254:21 257:4
267:19
**School**
250:24
**scope**
144:10
**Scott**
156:5,11 157:9
176:10,14,17,23
177:13 178:6
180:14 182:16
183:15,24 184:13
184:13,17,18,24
185:20,21,24
186:24 187:6 197:9
**screen**
158:18,23 223:17
266:5
**scroll**
216:20 226:21
228:23
**se**
152:12
**search**
194:20
**seat**
176:17 275:1
**seated**
196:1
**second**
169:21 171:17
186:16,22,22 191:7
201:20 212:24
224:10,13 225:3
241:7 248:23
249:24
**seconds**
159:2,2
**section**



sections
193:2
security
148:3 205:6 232:11
    244:24 252:5
    256:18,20,23,25
    263:9,11 284:2
see
147:18,21 157:7
    158:22,22,24
    162:12 178:13
    182:11,22 208:3
    214:4 216:16 235:8
    235:14
seeing
244:25 279:25
seek
266:16
seen
159:7 180:19 193:20
    195:23 214:5,17
    220:5
senior
202:23
sent
215:22,23 216:2,3
sentence
186:15,23 190:25
    191:7 204:15,16
separate
154:6,13 155:16
    167:4 190:9,14
    191:20 192:12
    205:24 257:19
    263:20,23 272:22
    272:24
separated
155:7,20 163:19
    191:4 197:9 202:4
    240:23 267:3
    280:10
separating
190:18 191:3
separation
155:3 198:3
serious

232:9
serves
168:15
service
210:8
set
147:15 150:5 232:17
    251:13 275:3
    283:12 289:7
sets
275:2
setting
274:2
severe
148:14
sexual
137:24,24 138:6,21
    139:3,6,13,16,24
    140:3 141:23 142:2
    142:4,16 143:7,17
    144:18 145:1,2,2
    146:2,18,19 147:1,1
    147:11,11,13,16,19
    147:19 148:7,7,13
    148:14 149:2,10,10
    149:25 150:16
    152:23 153:8,15
    156:21,23 161:5,8
    161:15,19 162:8,9
    189:22 191:12,14
    191:15 194:18,18
    206:16 209:12
    210:24 211:6,7,20
    212:1 237:9,21
    238:25 239:6,13
    240:7,25 241:8,9,13
    241:17,23 242:4,7
    242:11 243:19
    244:4,5 247:4 248:2
    249:12 252:19,23
    255:18 256:24
    265:14 270:23
    271:13 272:12
    276:4,5
sexually
137:19 143:4 181:6

182:21 184:3
    185:12 187:3,18
    188:11,18 189:6,16
    242:18 243:5,12
    244:12 248:11
shaking
276:9
share
148:17 200:21
    231:12,19
shared
164:9 167:19 195:23
    196:3 197:21
    209:20 282:2,3,15
    282:17
sharing
186:17 225:16
shed
163:14 164:11
    167:20 171:6,6
SHEET
286:14 287:1
shit
186:18
shopping
200:7
short
232:8 256:16
shorthand
134:22 289:2,4,13
Shortly
182:15 186:23
show
272:19 274:19
showed
159:8
showing
157:22 181:16 270:4
Shupe
136:17 154:4,16,19
    155:13 156:18,22
    157:6 163:18
    164:16 165:14,17
    166:25 170:20,20
    170:23 171:7,23
    172:16 173:7

174:23 175:6 177:9
    177:22 179:5,10,15
    179:19 180:9,13,25
    181:18 182:11,19
    183:1,7,9 185:3,11
    185:15,17 186:3
    187:2,7,20 188:10
    188:17 189:5,21
    190:6,7,16,16 191:1
    191:17 192:10,20
    194:3 195:17
    198:16,18 199:2,11
    201:3,8,21 202:3,10
    202:22 203:15
    204:19 205:10
    237:8 238:2,5
    255:17 257:17
    261:3,7,11 262:5,11
    262:17 263:7,12,15
    264:3,7,10 265:3,22
    266:7,19 273:14
    274:7 276:1 279:10
    279:16 280:10
    283:21 284:16,21
Shupe's
166:5 172:5 175:16
    198:22 272:24
    280:4
sign
285:3,13
signal
277:13
SIGNATURE
288:22
significance
172:16 173:7 174:2
significant
176:19
significantly
258:8,15
signing
289:18
signs
209:6
simple
164:13 167:22



221:22
**simply**
248:1
**single**
207:23
**sir**
138:9 139:15 144:21
145:6 146:5 147:5
147:21 148:8,16
149:5 158:9 161:3
161:21 169:1,9
170:3,17 172:8,19
174:5 175:15,23
177:5,18 180:22
183:10 184:5,22
187:10,23 188:21
194:15 199:15
200:16 202:9 203:3
206:22 208:6 210:3
216:20 231:19
235:15 237:12
238:8 239:4 241:4
241:16 243:25
249:20 250:2 251:6
252:1 253:23 255:2
255:20 256:15
258:13 259:22
260:12 262:3,16
263:5 268:18
270:25 272:17
273:2 275:6 277:17
278:17 279:19
280:21
**situation**
146:12 150:18
168:14 200:5
218:20 220:6 229:8
244:10 265:19
273:3 275:9,11,18
277:1
**situational**
262:19 275:10
**situationally**
267:18
**situations**
225:24

**six**
246:25 270:5
**skipped**
205:5 227:15 241:5
**sleep**
180:9
**sleeping**
181:1,10 284:17
**slow**
265:18 266:1
**slower**
223:14
**slowly**
226:21
**smaller**
228:25
**soda**
276:10 277:2
**sole**
267:24
**solely**
267:13,17 268:2,11
268:19,25
**solution**
195:2
**somebody's**
193:13
**son**
156:19 163:13,20
164:10,18 165:1,10
167:1,20 168:13,20
172:13 173:3 174:1
174:12 175:9,19
176:8,11,16 196:4
279:17
**son's**
210:22
**sorry**
146:13 155:10
157:14 158:20
164:17 165:21
172:3,19 177:25
178:1 182:20
185:16 187:13,14
190:21 192:3,4
203:6 208:15 217:2

217:13 225:17
226:23 227:10
245:18 249:20
251:19 264:20
265:18 270:13
274:1 276:22,23
282:8
**sort**
155:23 188:5 194:1
195:8 223:9
**sound**
277:6
**South**
135:12
**southerner**
223:9
**so-called**
160:17
**speak**
157:19 171:3 260:20
260:25 264:16
282:5 283:16
**speaking**
215:15
**speaks**
159:12 164:21
**Spear**
135:5
**specific**
138:22 141:10
146:16 176:1
183:14 184:17
189:10,19 208:8
218:3 231:19
232:10 236:11
240:12 251:1,20
252:1 253:4,25
265:12,16 272:5
**specifically**
144:13 172:6,12
173:1,21,23 174:10
182:13,23 183:5,20
184:3 187:4,11,20
188:10,14 189:23
197:2 200:14 222:6
229:11 235:9

251:10 271:25
272:8 284:25
**specificity**
227:6
**specifics**
183:23
**speculating**
165:8,23
**spell**
259:14 260:12
**spoke**
155:15
**spoken**
155:13
**square**
168:23 169:1,4
170:11,16
**standard**
137:17,18,21,22
138:4,17,18 139:1
139:11,23,23 140:3
140:4 141:4,5,9,19
141:20 142:13,14
142:19 143:5,5,9
144:24,25 146:1,1
146:17,24 150:16
151:8,18,18,22,24
151:25 152:5,8,9,20
160:1,5 200:13,14
201:7,7 251:2,7,8
251:13,17,20 263:3
274:23,24 275:1,2
281:20,23 283:5
**standards**
265:25 266:10
282:10,11,20
283:13
**standpoint**
193:25
**stands**
260:13
**start**
139:20 145:17
150:25 156:13
195:15 198:25
**started**



218:1 219:14
229:19 234:13
**starting**
149:20,22
**starts**
173:11
**state**
134:22 138:9 182:10
182:11 201:20
239:5 244:1 261:3
274:23 286:21
289:5
**stated**
138:10 165:23 168:3
183:13 188:2 197:7
227:23 232:24
238:2 283:22 284:6
**statement**
187:17
**statements**
170:5,5,6 208:17
274:13
**States**
134:1 281:25
**stating**
189:4,15
**status**
279:23
**stay**
246:9
**staying**
270:13,15
**step**
192:15 199:9
**steps**
152:6 153:21 162:14
193:4
**stick**
140:10 142:9,10,11
163:9 229:13
**sticking**
198:10
**stop**
162:19 191:9,16
192:6 204:3 220:14
227:24 235:16

**stops**
190:8 283:24
**story**
219:22
**strange**
164:1
**Street**
135:5,12
**strike**
138:18 144:16
146:15 154:15
163:20 218:10
237:3 248:5 259:7
260:2 276:24
**stroke**
239:10
**stroking**
154:17 165:24 167:9
167:14 197:23
201:4 202:6 221:9
237:5 238:20
240:16
**strong**
201:16
**stuck**
229:6
**studied**
160:22
**stuff**
246:16,18
**subject**
148:22 215:24
255:18 279:5
**subjects**
246:22
**subscribed**
289:19
**subsequent**
156:11 184:14
223:17
**subsequently**
204:20
**substance**
143:16
**substituted**
151:3

**successfully**
200:24
**succinctly**
195:12
**suddenly**
220:11
**sufficient**
140:17 273:14,18
274:12
**suggest**
156:2 252:14
**suggesting**
190:15 252:15
**Suite**
135:6,13
**summaries**
175:25
**summarize**
244:19
**SUPPLIED**
136:22
**support**
198:2 226:22
**suppose**
183:16
**supposed**
137:18 139:2,12,24
140:4 141:5 143:6
146:18,25 147:7
149:1 150:17
152:21 244:14
**sure**
139:4 143:11 153:21
179:22 206:21
212:25 217:3
244:24 245:19
247:17 269:13,24
282:7,18,24
**surname**
164:10 167:19
195:23 196:4
197:21 198:20
199:13,19
**surnames**
196:20 197:14
**surrounding**

152:4 252:18
**surveillance**
214:22
**suspect**
159:24 160:4,9 163:1
175:18 194:4 207:5
209:25 210:17,21
230:5,6 231:10,23
232:15,23 233:6,11
240:15
**suspected**
141:13 144:18
156:21 159:12,20
160:13 162:13
189:5 191:12,12,14
193:4 194:17 197:3
199:9 205:24
206:16 207:9 208:5
208:18 210:3 211:3
211:14 212:10,15
216:17 218:12
219:5 221:10 222:4
222:15 224:21
226:23 227:3
228:15 230:1
233:16 235:9 237:9
237:21 238:1,5
241:17 251:3,22
252:2,18,19 256:24
265:14 276:3,4
**suspecting**
238:25
**suspects**
141:6 206:24 207:3
**suspicion**
233:1 276:15 277:23
278:6
**suspicions**
160:1 208:11 230:11
231:1 280:24
**sworn**
137:6 219:17 235:25
**system**
260:10

———————————
T
———————————



**T**
135:12 136:12
234:20 286:1,1
**take**
142:22 146:12 152:5
161:18 194:6
244:22 254:1
267:10
**taken**
134:21 149:18
153:22 154:23,25
159:16 172:4
192:18 205:10
248:17 286:10
289:7
**takes**
147:14 205:6 251:11
**talk**
145:19,20 192:10
193:22 215:14
223:8,21 237:18
239:20 240:18
278:15,20
**talked**
163:24 224:15 244:5
264:15 266:17
268:8
**talking**
142:3 172:6,11,25
173:12,18,21,22
184:10 192:6 245:1
250:16,17 259:5
267:19 279:4
**Tara's**
181:23 182:1
**tasked**
179:14
**teaches**
158:5
**technical**
289:11
**technically**
257:3
**tell**
140:14 142:25
150:10 159:9,17

177:9 184:13 186:2
200:10 214:5
224:15 229:14
238:4 245:22
258:22 259:22
**telling**
169:15 170:3 196:25
**tells**
150:14 193:15
202:25 207:5
**term**
157:21 188:22,24
189:23
**terminate**
239:18,20 240:3
245:3,23,23 246:3
**terminating**
245:12 246:4
**terms**
156:19 173:22
205:23 231:19
258:23 260:23
273:23 279:24
281:21
**testified**
137:7 143:22 154:16
154:21 156:7 157:2
160:17 165:14,18
166:9 171:1 173:24
174:6,14 175:2
177:13 178:7 181:4
187:7 189:12
191:25 196:12
198:6,23 199:4,16
207:24 208:6,16
218:12 222:14,21
227:7 229:24 231:2
235:1 239:4,9 243:2
244:18 251:25
267:21 276:7
278:22 279:10
280:5,22 281:20
**testify**
174:10 222:4,5
**testifying**
144:1,13 169:18

170:2 176:7 178:16
190:7 289:9
**testimonies**
169:14
**testimony**
144:7 168:7,24 169:3
169:11,14,20
170:11,13 171:9,15
172:5 173:15,18,19
173:20 175:6,10,11
175:13,15,24 176:3
176:12 182:25
183:4,13,24 184:16
184:23 186:5
187:14 198:17
199:20 201:24
203:11 208:3 209:9
211:18 217:9
218:15 219:10,13
219:20 221:9,14
222:6,25 224:6
226:25 228:5,14
233:14,16,21 234:4
234:8,11,21 235:14
235:21 236:1,20
239:4,11 240:6
241:15 242:19,25
247:5,22 273:22
274:8 277:22
279:13,15 284:6
**Thank**
222:12 223:12 228:7
246:8 270:17
274:20 284:11
285:1
**Thanks**
181:15 285:3
**theme**
225:1
**theory**
243:8
**thing**
138:23 147:23
156:22 174:13
190:13 192:23
195:21 196:2

219:13 229:19,20
282:24
**things**
156:8 197:19 200:10
208:9 209:15 216:7
221:22 231:3 235:3
237:25 238:13
262:7,17 264:22
278:24
**think**
140:16 155:23
164:21,22 181:22
181:25 187:25
188:4,21 189:22
196:12,25 197:1,20
211:2 218:14 219:8
219:9 224:21,22
227:1,16 229:19
230:9,23 231:6
238:9 250:24
260:16 276:23
277:1
**thinking**
177:5 178:20 179:2,9
179:14 195:1
239:14
**thinks**
243:16
**thorough**
179:15
**thoroughly**
160:20
**thought**
145:9 171:17 177:14
185:16 195:10
198:11 237:16
239:8 259:17
**threat**
148:2 155:2 201:24
202:15 203:11
205:6,15,21 231:13
232:7,9 253:6,6,13
253:16,17,19 254:1
254:9,10 255:25
256:5,6,7,9,17
257:2,11,14,22,23



257:25 258:5,5
263:16,19,24
**threaten**
256:19
**threatened**
258:3
**threatening**
266:21
**threats**
266:22
**three**
216:9
**threw**
147:10
**throw**
260:6
**tied**
150:9
**time**
155:24 157:10
159:16 178:9,18,20
178:23 179:9,25
180:4,10 181:1,11
183:18 186:10,12
208:10 213:2,4
225:6,10,24 226:10
244:22 246:24
248:24 249:5,7
256:10 261:10,24
266:4 269:22 270:1
270:3 272:6 273:14
273:18 274:12
279:24 281:7
285:17 289:7
**timeline**
273:21
**times**
145:6 152:13 153:2
161:25 208:6 216:9
216:10 227:17
239:9 251:25
261:22 271:25
273:24
**timing**
273:23
**today**

208:7 284:7
**today's**
285:14
**told**
153:9,12 154:5
161:16 178:8
181:10 183:7,9
185:21,22 187:7,20
189:20 197:8
201:22 202:6,11,24
203:9,17 227:1,2
228:15 240:14
245:20 260:5
**tool**
230:25
**tools**
230:24 231:7,13
**top**
208:24 209:10
221:24 242:2
**topic**
245:3,21 247:10,16
247:16,17 268:7
**topics**
215:19,22 252:18
**total**
285:15
**totally**
245:19 259:18
**touching**
137:24 148:20 155:1
155:16,25 156:3,4
156:10,14,25
163:11 164:12,19
164:23 166:9 167:2
167:22 168:8,17,25
170:12 172:10
178:19 182:14
186:1 193:19,20,22
194:18 198:14
199:3,5 201:23
202:12 203:10,18
203:19 204:24
205:4,20,22 209:16
210:22 211:5,22
212:2 237:13

271:19 274:1,2
279:18
**traffic**
160:25
**trafficked**
209:14 258:17
277:24
**trafficker**
196:9
**traffickers**
158:6 196:8,16
**trafficking**
141:7,11,14 157:3,4
157:19 158:15
159:12,20 160:2,12
191:12 194:17
196:8,14 197:3
199:9 206:25 207:4
207:6,9,11,21 208:5
208:19,21,23 209:3
209:5,6,6,24,25
210:17,18 211:3,4
211:14,24 212:4,10
212:15 215:4,13,18
216:12,18 217:23
218:8,13,17,20
219:5 221:11,16
222:5,15 223:2
224:4,16,22 226:13
226:17,19 227:3
228:15 229:12,23
230:1,5,6,7,17
231:10,23 232:14
232:16 233:6,7,8,17
234:1,18 235:3,6,10
235:20 236:3,7,16
238:6,15 249:16
251:3,22 252:2,19
253:2 276:4,12
277:4,10 280:15,18
280:19,25
**train**
158:14 283:6
**trained**
196:7 200:17 236:4
244:22,23 264:3,10

264:21 265:22
266:7,19 278:4
282:18
**training**
141:10,12 146:10
151:13,14 152:1
159:10,11,21
196:13,16,17
236:11 238:15
249:18,21 250:3,6,8
250:12,15,17,19,22
250:23 251:9 252:7
258:8,15 261:4,12
262:12 263:13
264:8 265:8,17
266:12,24 276:2
278:1,10,12 281:9
281:13,18 282:21
282:22 284:1
**transcribed**
289:14
**transcript**
136:16 181:18
217:16 285:5,6
286:10 289:12
**transcripts**
169:24
**transmissions**
273:23
**transpired**
206:15,17
**Transportation**
281:17
**transport-category**
265:9
**traveled**
197:18
**treated**
189:12
**tried**
147:12 203:25
204:17 273:23
279:1
**true**
145:14 166:22 187:6
196:21 286:12



**truth**
168:7 169:15
**truthfully**
169:18
**try**
191:19 204:11
223:10 231:8
239:19 244:19
246:19 256:15
264:14,16
**trying**
148:17 170:8 187:9
190:24 204:2 209:4
209:5 215:3 217:23
218:7,16 224:10
241:21
**turbulent**
255:9
**two**
140:20,20 156:6
159:1,2 161:16
163:3 195:13,25
196:19 198:1,19
199:24 200:6,11
201:10 206:15
210:9 216:9,10
219:9 236:12,15
244:6 255:24
280:10
**type**
273:15
**types**
197:18

**U**

**U**
286:1
**ultimate**
190:9 206:14,16
**ultimately**
197:8 200:22 263:15
283:22
**unclear**
210:4
**uncomfortable**
198:15 201:6 210:21

219:18 220:4,7,9,17
225:15,22 226:1
231:4 237:7,14,17
238:22 239:13
240:17 277:20,23
**uncover**
264:12
**understand**
139:5 144:10 149:4
154:9 174:9 184:11
185:13 190:21
206:21 226:18
227:16 238:18
243:7 245:19 253:9
253:12,22 254:17
276:18 277:8 282:7
**understanding**
172:8 286:14
**understands**
271:18
**undertake**
192:20 284:3
**undertaken**
209:20
**unearth**
195:20
**unilaterally**
206:8
**United**
134:1 138:5,10 143:2
143:16 144:1,3,6,11
144:19,24 145:10
145:17,19 158:5,10
249:11,19,22,25
250:1,3,4 252:10
281:9,13,25
**unsafe**
226:7,10
**untoward**
277:25
**unwanted**
137:24 148:20
**unwise**
267:16
**uphold**
263:8

**USC**
250:24
**use**
147:12 196:8 218:3,3
221:17 254:8 257:3
257:5,10 263:10
265:23 266:8
**useful**
230:24
**utilize**
198:17 232:2 264:4
266:15
**utilized**
200:18 272:20

**V**

**v**
286:3
**vacuum**
193:12
**valid**
278:6
**variations**
283:12
**various**
156:6
**vein**
223:1 232:7
**verbatim**
289:10
**verbiage**
183:14 184:17
185:24 189:19
218:3
**verified**
140:7 142:7 161:23
**verify**
202:13
**vernacular**
147:22
**versions**
156:6
**versus**
150:12 161:22
**VFR**
255:8

**viable**
264:24
**Vickie**
134:12,20 136:3
137:5 285:15
286:24 288:23
**victim**
149:11 150:1 241:10
243:4 244:7 248:3
271:13,19 272:12
277:4,5,9
**victim's**
148:22,25
**video**
136:15 157:23 158:3
158:23,24 159:1,3,5
159:15 285:5,6,8
**videoconference**
134:13,20 137:1
289:6
**videographer**
135:18 137:9,11
179:24 180:3 186:9
186:12 213:1,4
225:5,9 248:24
249:1,4,7 270:13,16
285:4,8,12
**view**
198:22 226:22
231:12,20 232:6
235:21
**viewed**
164:19
**views**
192:11
**violate**
269:4
**violation**
268:23 272:25 273:5
273:6 284:18,23
**Viterbi**
250:24
**VOLUME**
134:10
**vs**
134:6



**W**

**Wait**
179:22
**waived**
275:5
**walk**
205:2 211:20,25
**walked**
182:18 187:1
**walk-bys**
182:13 205:3
**wall**
283:4
**want**
175:24 186:7 212:16
218:3 226:17
229:15 239:19
249:2 268:20
269:12,16,18 270:2
278:14 279:11
285:9
**wanted**
174:20 229:6 237:18
280:16
**wants**
206:9
**Warren**
156:5 176:10,14,17
176:23 177:5,14
178:6,13,17,17,20
179:1 180:8,15
181:1 182:16 183:1
183:7,9,15 184:2,10
184:17,18,24
185:10,21,25 186:2
186:24 187:6,19
188:2,9,17 189:20
190:11 197:9
240:19 279:23,25
284:16
**Warren's**
156:11 157:9 183:24
185:7,20 188:6
**wasn't**
167:5,5 176:16 178:7

181:4,10 213:19
215:11,12 224:4
226:9 232:4 242:20
**watching**
239:10
**way**
140:25 142:23
148:20 162:5
168:16 171:4
174:10 199:5
204:18 218:14
252:15 263:6
264:12 275:13
279:5 282:4,20,23
**ways**
266:13
**weather**
255:5
**Wednesday**
134:15 137:1
**weeks**
236:12
**weird**
164:5
**went**
167:17 198:25
**weren't**
167:7,8 206:8 278:11
**we'll**
171:17 219:25 223:5
223:20 240:2
246:15,16,19
**we're**
137:9 142:3 149:22
150:20 155:23
163:9 179:25 180:4
184:10 186:13
193:9 200:17 203:7
213:5 215:24 225:6
225:10 228:21
238:9 245:1 246:6
249:8 256:7 259:4
266:4 267:18 272:3
282:18 285:16
**we've**
151:3 181:13 193:21

215:11 227:15
241:10 243:1 244:5
251:15 262:16
264:9 266:13,17
268:8 272:16
**whatsoever**
233:12
**WHEREOF**
289:19
**white**
224:23
**whoa**
204:3,3,3 213:18,18
213:18
**wide**
148:19
**willing**
143:15 206:11
**wish**
187:23
**Withdrawn**
186:20
**witness**
136:3 138:9 139:15
140:19 141:9,25
142:18 143:9
144:21 145:5,16
146:21 147:3
148:16 149:4,20,24
150:20 151:10,24
152:11,25 153:18
154:9 155:9,23
157:22 158:9 160:4
160:16 161:2,8,11
161:21 162:5,8,21
164:2 165:13 166:3
166:24 167:12
168:2,10 170:4
171:14,22 172:19
173:11 174:5,18
175:14,23 176:23
177:4,7 178:12
179:1,13 181:16,19
183:22 184:7,22
187:23 188:14,21
189:9,19 190:20

191:6 196:12,23
198:5 199:15
200:16 201:12,15
202:9 204:9,10,11
206:2,21 207:16
209:9 210:2,20
211:10,17 216:20
217:6,18 219:8
221:14 222:9
223:15,23 224:1,8
227:6 228:4,19
229:3,18 230:23
231:18 232:5,21
233:11,20 234:7,24
235:24 236:10,25
237:12,24 238:8
239:3 240:10 241:4
243:24 244:17
245:13,14 246:2
247:9,25 248:15
251:25 253:9,22
254:5,12 255:2,5,8
255:11,20 256:15
257:9,25 258:22
259:4,12,14,17
261:23 262:15
263:15 264:1,21
265:7,16 268:6,15
269:4,25 270:25
271:8,15,24 272:16
276:14 277:8 278:8
278:17,22 279:8
280:12,21 282:7
283:1,16,21 284:10
289:8,19
**witnessed**
142:7 145:2,2 156:3
183:16 193:23
**witnesses**
169:18 227:17
250:11 274:13
**witnessing**
144:7 244:21
**woman**
149:7 151:4
**wondering**



198:8
**word**
147:13 161:22
202:18,19 204:18
205:11 208:23
218:6 221:17,18
239:6
**words**
183:6,8 211:17 227:7
244:6
**work**
153:19
**worked**
250:20
**world**
147:24,25 245:17
256:18
**worried**
194:4
**worry**
153:10,13
**wouldn't**
153:12 166:14 171:1
174:12 180:22
181:5 198:24 199:2
204:25 205:13
206:7 234:24 250:8
268:23
**write**
148:8,16
**written**
205:10 241:9 244:1
274:4
**wrong**
157:20
**wrote**
188:4 203:24 204:15
204:19 205:8 256:7

_____
          **X**
_____
**X**
136:1,12
_____
          **Y**
_____
**yeah**
139:20 140:6 147:10

149:23 157:11
172:8 179:22,23
183:22 198:10
212:7,18,20 213:21
214:19 220:11
225:4 235:15
247:15 257:9 259:4
261:23 263:5
271:15 274:6
**years**
275:1

_____
          **Z**
_____
**Z**
148:19
_____
          **0**
_____
**09**
270:4
_____
          **1**
_____
**1**
257:12 261:5,6
**1:53**
134:16 137:10
**1:53PM**
137:10,15,20
**1:54PM**
137:25 138:1,5
**1:55PM**
138:10,15,20
**1:56PM**
138:25 139:1,5,10,15
**1:57PM**
139:20,25 140:1
**1:58PM**
140:5,10,15
**1:59PM**
140:20,25 141:1,5,10
**10**
213:7 218:21 274:18
**1100**
135:6
**11305**
289:25
**119**

258:20,22
**12**
201:19
**121.55**
138:23
**13**
196:1 261:3
**137**
136:6
**14**
213:12
**15**
247:1 274:25
**158**
136:15
**181**
136:16

_____
          **2**
_____
**2**
136:15 157:23 158:1
158:18 163:22,25
164:2,7 201:24
202:16 203:11
205:16,21 255:25
256:5 262:5 263:16
263:19,24
**2:00PM**
141:15,20
**2:01PM**
141:25 142:1,5,10
**2:02PM**
142:15,20,25
**2:03PM**
143:1,5,10
**2:04PM**
143:15,20,25 144:1
**2:05PM**
144:5,10,15
**2:06PM**
144:20
**2:07PM**
144:25 145:1,5,10,15
**2:08PM**
145:20,25 146:1
**2:09PM**

146:5,10,15,20
**2:10PM**
146:25 147:1,5,10,15
**2:11PM**
147:20,25 148:1
**2:12PM**
148:5,10,15
**2:13PM**
148:20,25 149:1
**2:14PM**
149:5,10
**2:15PM**
149:15,20,25 150:1,5
**2:16PM**
150:10,15,20
**2:17PM**
150:25 151:1,5,10
**2:18PM**
151:15,20,25 152:1
**2:19PM**
152:5,10,15,20
**2:19-cv-01322**
134:6
**2:20PM**
152:25 153:1,5,10
**2:21PM**
153:15,20,25
**2:22PM**
154:1,5
**2:23PM**
154:10,15
**2:24PM**
154:20,25 155:1
**2:25**
159:3
**2:25PM**
155:5,10
**2:26PM**
155:15,20
**2:27PM**
155:25 156:1,5,10
**2:28PM**
156:15,20
**2:29PM**
156:25 157:1,5,10
**2:30PM**



157:15,20
**2:31PM**
157:25 158:1
**2:32PM**
158:5,10,15,20
**2:33PM**
158:25 159:1
**2:34PM**
159:5,10
**2:35PM**
159:15,20,25 160:1
**2:36PM**
160:5,10,15
**2:37PM**
160:20
**2:38PM**
160:25 161:1,5,10,15
**2:39PM**
161:20,25 162:1,5
**2:40PM**
162:10,15,20
**2:41PM**
162:25 163:1,5,10,15
**2:42PM**
163:20
**2:44PM**
163:25 164:1,5
**2:45PM**
164:10,15
**2:46PM**
164:20,25 165:1,5
**2:47PM**
165:10,15,20
**2:48PM**
165:25 166:1,5,10
**2:49PM**
166:15,20,25 167:1
**2:50**
159:4
**2:50PM**
167:5,10
**2:51PM**
167:15,20
**2:52PM**
167:25 168:1,5
**2:53PM**

168:10,15
**2:54PM**
168:20,25 169:1,5,10
**2:55PM**
169:15,20
**2:56PM**
169:25 170:1,5,10
**2:57PM**
170:15,20
**2:58PM**
170:25 171:1,5,10,15
**2:59PM**
171:20,25 172:1,5,10
**20**
135:12 181:14
**2009**
144:8 250:18
**201**
135:5
**2019**
261:8
**2023**
134:15 137:1 286:18
289:22
**2067**
261:5,8 262:6
**21st**
289:22
**25**
159:1
**2500**
135:13
**273**
136:7
**28**
261:8
**284**
136:8

———————————
**3**
———————————
**3**
136:16 137:11
179:25 181:17,20
182:10 186:16,22
190:5 248:21 263:7
263:13

**3:00PM**
172:15,20,25 173:1,5
173:10
**3:01PM**
173:15,20,25
**3:02PM**
174:1,5,10,15
**3:03PM**
174:20,25 175:1,5
**3:04PM**
175:10,15,20
**3:05PM**
175:25 176:1,5,10
**3:06PM**
176:15,20 177:1
**3:07PM**
177:5,10,15,20
**3:08PM**
177:25 178:1,5,10,15
**3:09PM**
178:20,25 179:1,5
**3:10PM**
179:10,15
**3:11**
179:25
**3:11PM**
179:20,25 180:1
**3:26**
180:4
**3:26PM**
180:5,10,15,20
**3:27PM**
180:25 181:1,5,10
**3:29PM**
181:15
**3:30PM**
181:20
**3:31PM**
181:25 182:1,5
**3:32PM**
182:10,15
**3:33PM**
182:20,25 183:1,5
**3:34PM**
183:10,15
**3:35PM**

183:20,25 184:1,5
**3:36PM**
184:10,15,20
**3:37PM**
185:1,5,10,15
**3:38PM**
185:20,25 186:1
**3:39**
186:10
**3:39PM**
186:5,10
**3:45**
186:12
**3:45PM**
186:15,20,25 187:1,5
**3:46PM**
187:10,15,20
**3:47PM**
187:25 188:1,5,10
**3:48PM**
188:15,20 189:1,5
**3:49PM**
189:10,15,20
**3:50PM**
189:25 190:1,5
**3:51PM**
190:10,15,20
**3:52PM**
190:25 191:1,5,10
**3:53PM**
191:15,20,25 192:1
**3:54PM**
192:5,10,15,20
**3:55PM**
192:25 193:1,5,10
**3:56PM**
193:15,20,25 194:1
**3:57PM**
194:5,10
**3:58PM**
194:15,20,25 195:1
**3:59PM**
195:5,10,15
**312.345.0700**
135:14



**4**

**4**
180:4 225:6 257:12
    264:3,8
**4:00PM**
195:20,25 196:1,5
**4:01PM**
196:10,15,20
**4:02PM**
196:25 197:1,5,10,15
**4:03PM**
197:20,25 198:1
**4:04PM**
198:5,10,15
**4:05PM**
198:20,25 199:1,5
**4:06PM**
199:10,15,20,25
**4:07PM**
200:1,5,10,15
**4:08PM**
200:20,25 201:1,5
**4:09**
269:24
**4:09PM**
201:10,15
**4:11PM**
201:20,25 202:1
**4:12PM**
202:5,10,15
**4:13PM**
202:20,25 203:1,5
**4:14PM**
203:10,15,20
**4:15PM**
203:25 204:1,5,10,15
**4:16PM**
204:20,25 205:1,5
**4:17PM**
205:10,15,20
**4:18PM**
205:25 206:1,5,10
**4:19PM**
206:15,20
**4:20PM**

206:25 207:1,5,10
**4:21PM**
207:15,20,25 208:1,5
**4:22PM**
208:10,15,20
**4:23PM**
208:25 209:1,5,10
**4:24PM**
209:15,20,25 210:1,5
**4:25PM**
210:10,15,20,25
    211:1,5
**4:26PM**
211:10,15,20
**4:27PM**
211:25 212:1,5,10,15
    212:20
**4:28**
213:2
**4:28PM**
212:25 213:1
**4:31**
213:4
**4:31PM**
213:5,10
**4:32PM**
213:15,20,25 214:1,5
**4:33PM**
214:10,15,20,25
    215:1,5,10
**4:34PM**
215:15,20,25 216:1,5
    216:10
**4:35PM**
216:15,20 217:1,5,10
**4:36PM**
217:15,20,25 218:1,5
**4:37PM**
218:10,15,20
**4:38PM**
218:25 219:1,5,10
**4:39PM**
219:15,20,25 220:1,5
    220:10
**4:40PM**
220:15,20,25 221:1,5

**4:41PM**
221:10,15,20
**4:42PM**
221:25 222:1,5,10
**4:43PM**
222:15,20,25 223:1,5
**4:44PM**
223:10,15,20,25
    224:1,5
**4:45PM**
224:10,15,20,25
**4:46**
225:6
**4:46PM**
225:1,5
**4:54**
225:10
**4:54PM**
225:10,15,20,25
    226:1,5
**4:55PM**
226:10,15,20
**4:56PM**
226:25 227:1,5,10,15
**4:57PM**
227:20,25 228:1,5,10
    228:15
**4:58PM**
228:20,25 229:1,5
**4:59PM**
229:10,15,20
**42**
270:5
**434.531.9569**
135:7
**45**
274:5

**5**

**5**
220:1 225:10 265:22
    266:7
**5:00PM**
229:25 230:1,5,10
**5:01PM**
230:15,20,25 231:1

**5:02PM**
231:5,10,15,20
**5:03PM**
231:25 232:1,5
**5:04PM**
232:10,15,20
**5:05PM**
232:25 233:1,5,10,15
**5:06PM**
233:20,25 234:1,5
**5:07PM**
234:10,15,20,25
    235:1
**5:08PM**
235:5,10,15,20
**5:09PM**
235:25 236:1,5,10
**5:10PM**
236:15,20,25 237:1
**5:11PM**
237:5,10
**5:12PM**
237:15,20,25 238:1,5
**5:13PM**
238:10,15,20
**5:14PM**
238:25 239:1,5,10
**5:15PM**
239:15,20,25 240:1,5
    240:10
**5:16PM**
240:15,20,25 241:1
**5:17PM**
241:5,10,15
**5:18PM**
241:20,25 242:1
**5:19PM**
242:5,10,15
**5:20PM**
242:20,25 243:1
**5:21PM**
243:5,10,15
**5:22PM**
243:20,25 244:1,5
**5:23PM**
244:10,15,20



**5:24PM**
244:25 245:1,5,10
**5:25PM**
245:15,20,25 246:1,5
246:10
**5:26PM**
246:15,20,25 247:1,5
**5:27PM**
247:10,15,20,25
248:1,5
**5:28PM**
248:10,15
**5:29PM**
248:20,25 249:1,5
**5:30**
249:5
**5:35**
249:7
**5:35PM**
249:10,15,20
**5:36PM**
249:25 250:1,5,10
**5:37PM**
250:15,20
**5:38PM**
250:25 251:1,5,10,15
**5:39PM**
251:20,25 252:1,5
**5:40PM**
252:10,15
**5:41PM**
252:20,25 253:1
**5:42PM**
253:5,10,15
**5:43PM**
253:20,25 254:1,5,10
**5:44PM**
254:15,20
**5:45PM**
254:25 255:1,5,10,15
**5:46PM**
255:20,25 256:1
**5:47PM**
256:5,10,15,20
**5:48PM**
256:25 257:1,5,10

**5:49PM**
257:15,20
**5:50PM**
257:25 258:1
**5:51PM**
258:5
**5:52PM**
258:10,15,20,25
259:1,5
**5:53PM**
259:10,15,20,25
260:1,5
**5:54PM**
260:10,15
**5:55PM**
260:20,25 261:1
**5:56PM**
261:5
**5:57PM**
261:10,15,20
**5:58PM**
262:1,5,10,15
**5:59PM**
262:20 263:1,5
**50**
159:2
**52**
181:19 182:4

_____
**6**
6
222:10 261:5 266:19
266:25
**6:00PM**
263:10,15,20
**6:01PM**
263:25 264:1,5,10
**6:02PM**
264:15,20 265:1
**6:03PM**
265:5,10,15
**6:04PM**
265:20,25 266:1,5,10
**6:05PM**
266:15,20,25 267:1
**6:06PM**

267:5,10,15
**6:07PM**
267:20,25 268:1
**6:08PM**
268:5,10,15,20
**6:09PM**
268:25 269:1,5,10,15
269:20
**6:10PM**
269:25 270:1,5,10,15
**6:16PM**
270:20,25 271:1
**6:17PM**
271:5,10,15
**6:18PM**
271:20,25 272:1,5
**6:19PM**
272:10,15
**6:20PM**
272:20,25 273:1,5,10
**6:21PM**
273:15,20,25 274:1
**6:22PM**
274:5,10,15,20
**6:23PM**
274:25 275:1,5,10
**6:24PM**
275:15,20,25 276:1
**6:25PM**
276:5,10,15
**6:26PM**
276:20,25 277:1,5
**6:27PM**
277:10,15,20
**6:28PM**
277:25 278:1,5,10
**6:29PM**
278:15,20,25 279:1,5
**6:30PM**
279:10,15,20
**6:31PM**
279:25 280:1,5
**6:32PM**
280:10,15,20
**6:33PM**
280:25 281:1,5,10,15

**6:34PM**
281:20,25 282:1,5
**6:35PM**
282:10,15,20,25
**6:36PM**
283:1,5,10,15
**6:37PM**
283:20,25 284:1,5
**6:38PM**
284:10,15,20,25
**6:39**
134:16 285:17,18
**6:39PM**
285:1,5,10,15
**60**
213:7 218:21 220:1
222:19
**60603**
135:13
**61**
212:22 216:21
222:10,19 228:20
**62**
228:20 229:7
**65**
225:13,20 226:20
**66**
226:20 228:21
**67**
226:20
**68**
226:20

_____
**7**
7
261:3

_____
**8**
8
134:15 137:1

_____
**9**
9
222:10
**911**
256:18



**94105**
 135:6
**941574**
 286:4 287:2





March 24, 2023

John D. Mckay Esq.
Park Avenue Law, L.L.C.
127 West Fairbanks Avenue, #519
Winter Park, FL 32789

Re: Peter Delvecchia v. Frontier Airlines Inc., et al

Date: 3/8/2023
Deponent: Captain Vickie Norton (2)
Job #: 941574

Dear John Mckay,

The witness did not waive the right to read and sign his/her deposition in the above referenced matter.  Enclosed is the copy of the deposition, together with an errata sheet and additional signature page.  Please instruct the deponent to read the transcript, list any corrections (including page and line number) on the errata sheet, sign and date the errata sheet, and also sign the signature page.

You will have 30 days from receipt of this letter to complete the enclosed documents. Once completed, please return the completed errata documents to:

Customer Service Department
Magna Legal Services
1635 Market Street, 8th Floor
Philadelphia, PA 19103

Should you have any questions, please do not hesitate to contact Customer Service at CustomerService@MagnaLS.com or 866-624-6221.

Sincerely,

Magna Customer Service Department

cc: Brian T. Maye, Esquire

**MAGNA** ◗
LEGAL SERVICES

1   Vol 1 thru errata sheet line 18
          E R R A T A
2   Vol 2 thru line 23

3

4 | PAGE | LINE | CHANGE FROM | CHANGE TO | REASON |
|---|---|---|---|---|
| 5   8 | 22 | "piloting command" | "pilot-in-command" | accuracy |
| 6   31 | 22 | "sic" | "says" | accuracy |
| 7   34 | 22 | "NCSV" | "NTSB" | accuracy |
| 8   35 | 1 | "Part 112" | "Part 121" | accuracy |
| 9   41 | 2 | "pause (sic)" | "posit it as" | accuracy |
| 10  47 | 21 | remove "of" and insert comma after "departure" | | accuracy |
| 11  59 | 11 | insert period vs. comma after "protocol." | | accuracy |
| 12  59 | 23 | "attendant" | "attendants" | accuracy |
| 13  71 | 16 | remove "for" | | accuracy |
| 14  71 | 18 | "attendant" | "attendants" | accuracy |
| 15  87 | 23 | remove comma after "about" | | accuracy |
| 16  87 | 25 | replace ; w/ period after "uncomfortable" and capitalize "Does" | | accuracy |
| 17  88 | 1 | replace period with question mark after "touching" | | accuracy |
| 18  123 | 10 | "road" | "row" | accuracy |
| 19  NOTE: Begin Vol 2: | | | | |
| 20  5 | 14 | "actual" | "assessing" | accuracy |
| 21  23 | 22-23 | "...Capt Shupe was reported..." | "...reported to Capt Shupe..." | accuracy |
| 22  126 | 18 | "CAS" | "CASS" | accuracy |
| 23  134 | 19 | replace . after "back" and "about" with ? | | accuracy |
| 24 | | | | |

**MAGNA** ▶
**LEGAL SERVICES**

1    ACKNOWLEDGMENT OF DEPONENT

2
     I, *Vickie R. Norton*, do
3    hereby certify that I have read the
     foregoing pages, 1 - PGS, and that the
4    same is a correct transcription of the
     answers given by me to the questions
5    therein propounded, except for the
     corrections or changes in form or
6    substance, if any, noted in the attached
     Errata Sheet.
7

8    Vickie R. Norton          3/31/2023
     WITNESS NAME              DATE
9

10

11

12

13

14

15

16

17

18

19

20

21

22

**www.MagnaLS.com**                               **866-624-6221**

Seven Penn Center
1635 Market Street – 8th Floor
Philadelphia, PA 19103