1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

PETER DELVECCHIA, individually and as
next friend of A.D., a Minor,

Plaintiffs,

v.

FRONTIER AIRLINES, INC., et al.,

Defendants.

Case No. 2:19-cv-01322-KJD-DJA

**ORDER – Granting Motion for Summary Judgment**

Presently before the Court is Defendants' Motion for Summary Judgment (#266). Plaintiffs responded in opposition (#303) to which Defendants replied (#307). For the reasons stated below, the Court grants Defendants' motion.

I.    Factual and Procedural Background[1]

On March 28, 2019, Plaintiffs Peter DelVecchia and his adopted son, A.D., flew on a Frontier flight from Raleigh-Durham International Airport to Las Vegas. (#266, at 2). When boarding the flight, Plaintiffs were initially seated in an exit row. Id. at 3. However, after Flight Attendant ("FA") Anna Bond ("Bond") determined that A.D., who was 12 years old at the time, was too young to sit in an exit row, Plaintiffs were relocated to Row 17.[2] Id. After Peter and A.D. were reseated, FA Bright-Sakurada ("Bright") reported to Captain Shupe that she was concerned about the manner in which Peter was stroking the face of A.D. Id. Subsequently, FA Warren reported to Captain Shupe that he observed Peter's hand on A.D.'s crotch. Id. at 4. Based on the reports by FAs Bright and Warren, Captain Shupe decided that Peter and A.D. should be separated for the rest of the flight. Id.

During the Flight, Captain Shupe and First Officer ("FO") Sean Mullin (together, the "Pilots") exchanged text messages with ground personnel through the Aircraft Communication

---

[1] The facts recounted in this section do not represent any findings by the Court regarding what facts are disputed or undisputed.

[2] Neither party disputes the fact that the federal minimum age requirement to sit in an exit row on a commercial flight is 15 years old.

1   Addressing and Reporting System ("ACARS"). Id. The Pilots reported what the flight attendants

2   had relayed to them, including the separation of Peter and A.D. Id. Specifically, it was reported

3   that "[t]here seems to be some inappropriate touching between an older male and a younger

4   male[.]" (#266-6, at 3). Furthermore, the Pilots sought confirmation that law enforcement

5   officers ("LEOs") would be waiting for them upon their arrival in Las Vegas. (#266, at 3-4).

6       Upon landing in Las Vegas, Sergeant Obasi and other Las Vegas police officers met with the

7   flight attendants right outside the aircraft; the flights attendants completed written reports, and

8   Sergeant Obasi spoke with Captain Shupe. Id. at 5. Based on the flight attendants' statements and

9   the officers' discussions with Peter, Sergeant Obasi determined there was sufficient information

10  to warrant involving the FBI. Id. Plaintiffs were transported to Terminal 3 to meet with the FBI,

11  along with the flight attendants' written statements, and Peter was allegedly questioned for six

12  hours. Id. After a search of Peter's electronic devices revealed nothing inappropriate, Plaintiffs

13  retrieved their luggage, and no further action was taken. Id. at 6. The FBI prepared a written

14  report of its investigation. Id.

15       Plaintiffs have since brought suit against Defendants Fronter Airlines ("Frontier"), Scott

16  Warren ("Warren"), and Rex Shupe ("Shupe"), asserting claims of racial discrimination under 42

17  U.S.C. § 1981, intentional infliction of emotional distress, false imprisonment, assault and

18  battery, and defamation. (#153, at 29-39). Defendants now argue they are immune from liability

19  under 49 U.S.C. § 44941 because there is no evidence of actual malice in their reports. (#266, at

20  2). Furthermore, Defendants argue that Plaintiffs' § 1981 claims fail because there is no evidence

21  that their legitimate, non-discriminatory reason for their actions was pretext for intentional race

22  discrimination. Id. Based on these arguments, Defendants move for summary judgment and ask

23  the Court to dismiss the case in its entirety. Id.

24  II.    Legal Standard

25       Summary judgment may be granted if the pleadings, depositions, answers to interrogatories,

26  and admissions on file, together with affidavits, if any, show that there is no genuine issue as to

27  any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed

28  R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The moving party

1    bears the initial burden of showing the absence of a genuine issue of material fact. See Celotex,

2    477 U.S. at 323. The burden then shifts to the nonmoving party to set forth specific facts

3    demonstrating a genuine factual issue for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio

4    Corp., 475 U.S. 574, 587 (1986).

5        All justifiable inferences must be viewed in the light most favorable to the nonmoving party.

6    See Matsushita, 475 U.S. at 587. However, the nonmoving party may not rest upon the mere

7    allegations or denials of his or her pleadings, but he or she must produce specific facts, by

8    affidavit or other evidentiary materials as provided by Rule 56(e), showing there is a genuine

9    issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). "Where evidence

10   is genuinely disputed on a particular issue—such as by conflicting testimony—that 'issue is

11   inappropriate for resolution on summary judgment.'" Zetwick v. Cnty. of Yolo, 850 F.3d 436,

12   441 (9th Cir. 2017) (quoting Direct Techs., LLC v. Elec. Arts, Inc., 836 F.3d 1059, 1067 (9th

13   Cir. 2016)). "Credibility determinations, the weighing of the evidence, and the drawing of

14   legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S.

15   at 255.

16   III.    Analysis

17       Defendants assert they are immune from liability under 49 U.S.C. § 44941 because the

18   statements to LEOs, relaying the flight attendants' concerns of "inappropriate touching" of a

19   minor, were essentially accurate.[3] (#266, at 8). Plaintiffs argue that because § 44941's purpose is

20   to "[prevent] terrorism, not child endangerment," the statute is inapplicable to the current matter.

21   (#303, at 28-29). As such, the Court's analysis begins with an examination of whether Defendants

22   are granted immunity under 49 U.S.C. § 44941.

23   **A.  49 U.S.C. § 44941 Immunity**

24       In the present matter, determining whether immunity can be granted under § 44941 requires

25   the Court to first answer whether the statute applies to incidents of child endangerment. As in

26

27   [3] Defendants also argue, in a footnote, that Nevada provides statutory immunity under NRS §§
     432B.160(1) and 32B.220(5) from civil or criminal liability to any person who, in good faith, reports the
28   abuse or neglect of a child to law enforcement. (#266, at 11). Since the Court ultimately finds that
     Defendants are afforded federal immunity under § 44941, it need not analyze whether state immunity also
     applies.

any case of statutory construction, the Court's analysis begins with whether the statutory text is plain and unambiguous. <u>Carcieri v. Salazar</u>, 555 U.S. 379, 387 (2009). If it is, the Court must apply the statute according to its terms. <u>Id.</u> Starting with the text, § 44941 provides, in relevant part:

> "Any air carrier or foreign air carrier or any employee of an air carrier or foreign air carrier who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism . . . to any employee or agent of the Department of Transportation, the Department of Homeland Security, the Department of Justice, any Federal, State, or local law enforcement officer, or any airport or airline security officer shall not be civilly liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, for such disclosure."

49 U.S.C. § 44941(a).

There is no question that § 44941 grants immunity based on four categories of reported incidents—air piracy, a threat to aircraft or passenger safety, or terrorism. <u>See id.</u> While the Parties both argue the text is plain and unambiguous, they disagree as to which direction it leads. Defendants argue that § 44941's plain language clearly covers incidents of child endangerment, resulting in a text that is unambiguous. (<u>See</u> #266, at 7-12); (#307, at 12). Plaintiffs argue that "§ 44941's purpose is to prevent terrorism, not child endangerment," thereby suggesting that the statute unambiguously applies only to acts of terrorism. (<u>See</u> #303, at 28). However, for the text to be considered ambiguous, it has to be susceptible to more than one reasonable interpretation. <u>Guido v. Mount Lemmon Fire Dist.</u>, 859 F.3d 1168, 1173 (9th Cir. 2017), <u>aff'd</u>, 586 U.S. 1, 139 (2018). Thus, the question posed to the Court is whether the phrase "a threat to . . . passenger safety" can reasonably be interpreted to both include and exclude incidents of child endangerment. For reasons explained in detail below, the Court finds the phrase is open to only one reasonable interpretation: "a threat to . . . passenger safety" includes incidents of child endangerment. Thus, the Court concludes that the statutory text is plain and unambiguous.

In answering this question, the Court first looked to whether an interpretation of § 44941(a) has been provided by a court whose opinion binds this Court, specifically the United States Supreme Court or Ninth Circuit Court of Appeals. Although the Parties cited cases that provide

insight into their individual interpretations, only one—Air Wisconsin Airlines Corp. v. Hoeper, 571 U.S. 237 (2014)— is binding on this Court. Moreover, the Court's independent research did not uncover any additional binding decisions addressing the current question.[4] While Air Wisconsin addresses § 44941, it does not offer a comprehensive analysis of the statute's interpretation, but rather insight into its purpose. See 571 U.S. at 241-249. Therefore, the Court undertakes its own statutory analysis of 49 U.S.C. § 44941(a).

When interpreting the phrase "a threat to . . . passenger safety," the Court proceeds from the understanding that unless otherwise defined, the terms of this statutory phrase should be interpreted according to their ordinary meaning. See Sebelius v. Cloer, 569 U.S. 369, 376 (2013). Read in this way, the text of § 44941(a) is quite clear, and consulting dictionary definitions only reinforces this conclusion. See United States v. TRW Rifle 7.62X51mm Caliber, One Model 14 Serial 593006, 447 F.3d 686, 689 (9th Cir. 2006) (holding that it is common practice to consult dictionary definitions to clarify the ordinary meaning of terms and how those terms were defined at the time the statute was adopted); see also Kemp v. United States, 596 U.S. 528, 534 (2022) (using Webster's, Funk & Wagnalls, and Black's Law Dictionary to determine what constitutes a "mistake" in both an ordinary and legal sense).

"Threat" is defined as "[a]n expression of intention to inflict pain, harm, or punishment." The American Heritage Dictionary of the English Language (5th ed. 2014), available at http://www.ahdictionary.com (accessed online). "Passenger" is defined as "[a] person who travels in a conveyance, such as a car or train, without participating in its operation." Id. And "safety" is defined as "[t]he condition of being safe; freedom from danger, risk, or injury." Id. Examining these definitions, the Court finds that the terms have plain and unambiguous ordinary meanings. Applying these meanings to the phrase "a threat to . . . passenger safety," there is no doubt that a suspected incident of child endangerment aboard an airplane falls squarely within its scope. One passenger inappropriately touching another—which indicates an intention to inflict pain, harm, or punishment—compromises their safety by placing them in a state of danger, risk,

---

[4] A Westlaw search of the specific statutory provision, § 44941(a), returned only 18 cases across all federal courts that mention it. Of these cases, none were from the Ninth Circuit Court of Appeals or the District of Nevada.

1  or injury. However, Plaintiffs argue that the statute does not cover incidents of child

2  endangerment because: (1) "§ 44941's purpose is preventing terrorism, not child endangerment"

3  and (2) "[n]o reported decision has ever stretched the concept of 'passenger safety' to include

4  allegations of 'inappropriate touch' by another passenger; rather they pertain to reports of alleged

5  security or terrorism threats consistent with its statutory history." (#303, at 28). The problem

6  with these arguments is twofold.

7      First, Plaintiffs' argument that "§ 44941's purpose is preventing terrorism, not child

8  endangerment," fails because it would render the term "terrorism" superfluous and meaningless.

9  "It is an accepted canon of statutory interpretation that [the Court] must interpret the statutory

10  phrase as a whole, giving effect to each word and not interpreting the provision so as to make

11  other provisions meaningless or superfluous." United States v. 144,774 Pounds of Blue King

12  Crab, 410 F.3d 1131, 1134 (9th Cir. 2005). If the Court were to believe Plaintiffs' statutory

13  construction, there would have been no reason for Congress to include the term "terrorism" in

14  the statute, as it would become redundant or meaningless when considered alongside the phrase

15  "a threat to aircraft or passenger safety." Under this view, § 44941(a) would grant immunity

16  based on incidents of air piracy, a terrorist threat to the aircraft or passengers, or terrorism.

17  The Court cannot accept this conclusion, as it would effectively render a portion of the statute

18  inoperative. See Trim v. Reward Zone USA LLC, 76 F.4th 1157, 1161 (9th Cir. 2023) ("[A]

19  statute should be interpreted so as not to render one part inoperative.").

20      Furthermore, in § 44941(a), the term "terrorism" appears directly after the phrase "a threat to

21  . . . passenger safety" separated by the word "or." See 49 U.S.C. § 44941(a). The fact that they

22  are separated by the word "or" further signals to the Court that Congress indeed intended them to

23  represent two distinct concepts. See Prince v. Jacoby, 303 F.3d 1074, 1080 (9th Cir. 2002)

24  (holding that the use of the disjunctive "or" in the phrase "deny equal access or a fair opportunity

25  to, or discriminate against" suggests that "equal access" and "discriminate against" have

26  meanings independent of "fair opportunity"). Therefore, by giving effect to each word, the Court

27  finds that the language of the text clearly shows Congress intended the phrase "a threat to . . .

28  passenger safety" to encompass a meaning broader than just terrorism.

Although Plaintiffs cite two cases in support of their argument regarding the purpose of §
44941—Air Wisconsin Airlines Corp. v. Hoeper, 571 U.S. at 237 and Ilczyszyn v. Sw. Airlines
Co., 295 Cal. Rptr. 3d 533 (2022)—neither compels the Court to alter its conclusion. (See #303,
at 28). In fact, the Court finds that Air Wisconsin Airlines Corp actually supports the outcome
now reached.[5] In Air Wisconsin Airlines Corp, the Supreme Court explained that "[i]n 2001,
Congress created the Transportation Security Administration (TSA) to assess and manage threats
against air travel. To ensure that the TSA would be informed of potential threats, Congress gave
airlines and their employees immunity against civil liability for reporting suspicious behavior."
571 U.S. at 241 (citations omitted). "In directing the TSA to receive, assess, and distribute
intelligence information related to transportation security, Congress wanted to ensure that air
carriers and their employees would not hesitate to provide the TSA with the information it
needed. This is the purpose of the immunity provision, evident both from its context and from
the title of the statutory section that contained it: 'encouraging airline employees to report
suspicious activities.'" Id. at 248-249 (cleaned up). The Court finds that the Supreme Court's
language clearly reinforces the idea that the statute is not intended primarily for reporting
terrorist acts but for reporting suspicious activities more broadly.

Second, Plaintiffs' argument regarding the reported decisions of other courts and their
alleged consistency with § 44941's legislative history fails on its face, as they provide no legal
analysis to substantiate this claim. (See #303, at 28-29). Plaintiffs assert this conclusion and then
merely list eleven cases in a footnote, without further analyzing the statute's legislative history,
the cases cited, or how they support their interpretation. See id. Citing numerous cases shifts the
burden to the Court to examine every decision and then determine whether Plaintiffs' assertion
has merit. Without any accompanying analysis, the Court will not undertake this task. While
such an examination might be warranted in the presence of binding precedent, that is not the
situation here. Of the eleven cases cited, only one could potentially bind this Court: Air

---

[5] The court's analysis in Ilczyszyn v. Sw. Airlines Co. focused primarily on the purpose of § 44941 and
whether immunity may be extended to the conduct that arises from security threat disclosures. See 295
Cal. Rptr. at 549-551. It did not address whether an allegation of inappropriate touching falls within the
statute's language. Therefore, the Court does not rely on this case for interpreting the statute. As such, the
Court foregoes a detailed analysis of this case and focuses on the Supreme Court's language in Air
Wisconsin Airlines Corp., 571 U.S. at 237.

1    Wisconsin Airlines Corp. v. Hoeper, 571 U.S. at 237. However, as previously explained, this

2    case supports the Court's interpretation.

3        Furthermore, even if Plaintiffs did expand on their legislative history argument, it would still

4    fail, as they have already asserted that the text of § 44941(a) has a plain meaning. See id. at 28

5    ("Indeed, § 44941(a)'s plain language reflects it applies to . . . ."). If Plaintiffs truly believe, as

6    they claim, that the language of §44941(a) has a plain meaning, then the statutory interpretation

7    inquiry ends there. See CVS Health Corp. v. Vividus, LLC, 878 F.3d 703, 706 (9th Cir. 2017)

8    ("If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends

9    there."). "Only when statutes are ambiguous may courts look to legislative history." In re Del

10   Biaggio, 834 F.3d 1003, 1010 (9th Cir. 2016). Since the Court finds that the text of § 44941(a) is

11   plain and unambiguous, examining the legislative history is unnecessary.

12       While the Court concludes that Defendants may be granted immunity under § 44941(a), the

13   extent to which this immunity applies to Plaintiffs' claims remains unresolved. The Court will

14   now address this question.

15           i.  Scope of § 44941(a) Immunity

16       Defendants argue that immunity should extend beyond defamation and reputation-based torts

17   and cover their alleged conduct associated with their disclosures to law enforcement. (#266, at

18   12). Plaintiffs argue that the statute does not provide immunity for actions and statements

19   attributable solely to the airline or its employees and agents. (#303, at 29-30). The Court agrees

20   with Defendants and finds that language from the statute supports the Court's conclusion.

21   Specifically, "[a]ny air carrier . . . or any employee of an air carrier . . . who makes a voluntary

22   disclosure of any suspicious transaction . . . shall not be civilly liable to any person under any

23   law or regulation of the United States, any constitution, law, or regulation of any State . . . for

24   such disclosure." § 44941(a) (emphasis added). On its face, the statutory language clearly

25   provides for broad immunity, extending beyond defamation or reputation-based torts. Otherwise,

26   the phrase "any law of any state" would have little effect. See Williams v. Taylor, 529 U.S. 362,

27   404 (2000) (holding that a cardinal principle of statutory construction is to give effect, if

28   possible, to every clause and word of a statute). As a result, the Court finds that actions logically

flowing from the disclosure must also be covered, or else it would be unclear how an individual could be granted immunity "under any law or regulation of the United States, any constitution, law, or regulation of any State . . . for such disclosure." See 49 U.S.C. § 44941(a).

Furthermore, the unique facts of this case further support this understanding. For instance, the fact that the allegedly inappropriate touching occurred while the airplane was actively in the air.  In situations like this, where law enforcement is not immediately available, such as when the airplane is still at the gate, the question becomes what actions airline employees are permitted to take once a suspicious activity has been reported. If the statute is interpreted to provide immunity only for the disclosure itself and not for any subsequent actions, airline employees would have to choose between addressing the suspicious activity or waiting for law enforcement to address it when the plane lands. The Court finds that this scenario places airline employees—flight attendants and pilots—in a situation that could have disastrous outcomes. See United States v. LKAV, 712 F.3d 436, 440 (9th Cir. 2013) ("Statutory interpretations which would produce absurd results are to be avoided."). It would seem unreasonable to allow these individuals to only report suspicious activities and then prohibit them from taking action, while hoping that the situation does not worsen and that law enforcement will have time to respond. While the Court will not hypothesize about the numerous situations on airplanes that might prompt employee intervention, it acknowledges that such situations do exist. It is these intervening acts that the Court finds would be covered by immunity under the language: "shall not be civilly liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State[.]"

However, this is not to say that all actions should receive blanket immunity; there are certainly limitations. As argued by Plaintiffs, one such limitation is when actions and statements are attributable only to the airline and its employees, as illustrated by Abdallah v. Mesa Air Grp., Inc., 83 F.4th 1006 (5th Cir. 2023). The controversy in Abdallah centered around a flight attendant's concerns about two passengers aboard a Mesa Airlines flight[6]—Abdallah and Alkhawaldeh. 83 F.4th at 1009. While the plane was being boarded, the flight attendant alleged

---

[6] Plaintiffs bought their tickets from American Airlines; the flight was operated by Mesa.

that she observed what she perceived to be suspicious behavior from the two passengers. Specifically, Abdallah's move to the exit row, his premature acceptance of his exit-row responsibilities, and his wave to Alkhawaldeh. Id. at 1010. The flight attendant alerted the captain of her suspicions, who then spoke with the gate agent, American's Ground Security Coordinator, Mesa's flight supervisor, dispatch, the Transportation Security Administration ("TSA"), and other law enforcement. Id. Ultimately, the Ground Security Coordinator concluded that based on plaintiffs' flight histories, calm demeanor, and reasonable actions there was no safety risk. Id.

However, despite the recommendations of ground security, the captain unilaterally delayed takeoff until the 90-minute mark, at which point passengers would have to deplane. Id. at 1011. The passengers all deplaned. Id. As the plaintiffs waited at their gate for their rescheduled flights, an FBI agent and uniformed police officer asked Alkhawaldeh to come into a private room for questioning. Id. Alkhawaldeh refused questioning without a lawyer but handed over his identification and luggage for a search. Id. The agent also asked to question Abdallah, who consented. Id. Eventually, plaintiffs flew on their rebooked flights to their ultimate destination. Id. Plaintiffs sued Mesa and American for racial and national-origin discrimination under 42 U.S.C. § 1981 and Title VI of the Civil Rights Act of 1964. Id. They then voluntarily dismissed all their claims except for the § 1981 claim against Mesa. Id.

Mesa moved for summary judgment, which the district court granted. Id. In doing so, the district court held that Mesa was entitled to immunity under § 44902(b) and § 44941(a). Id. at 1012. Subsequently, plaintiffs appealed summary judgment as to their § 1981 claim and the finding of immunity under § 44902(b). Id.

On appeal, Mesa argued that because the district court held that it had immunity under § 44941(a)—a sufficient and independent ground for the summary judgment—and plaintiffs do not challenge this immunity on appeal, the appeal must fail. Id. In analyzing this argument, the Fifth Circuit held that while plaintiffs did not challenge the district court's decision to grant immunity under § 44941(a), it did not doom the entirety of their appeal. Id. The Fifth Circuit found that the district court held only that Mesa is entitled to immunity for any reports made to the proper

authorities, not that it was entitled to immunity on the entirety of plaintiffs' claims. Id. The Fifth Circuit went on to hold that "[a]lthough § 44941(a) grants immunity for any communications made between Mesa and external security agents—and to any impact that 'flowed from the decisions made by such law enforcement officers,' it does not grant immunity for things that occurred solely because of the airline's actions." Id. at 1012-1013 (quoting Baez v. JetBlue Airways Corp., 793 F.3d 269, 276 (2d Cir. 2015)). As such, the Fifth Circuit concluded that § 44941(a) does not grant immunity for Mesa's decision to cancel the flight or for other actions and statements attributable only to the airline. Id. at 1013.

Here, the Court finds that the holding in Abdallah is readily distinguishable from the Court's own conclusion. In Abdallah, the parties agreed that the decision to delay the flight was solely Mesa's, and that the security officials informed the pilot that there was no safety concern and that the plane should take off. 83 F.4th at 1013. The Court fully agrees that once law enforcement or security officials have acted and informed those involved that there is no issue, the airline and its employees should not receive immunity for actions taken thereafter. However, the scenario faced by the Fifth Circuit is markedly different than the one before this Court, where the incident was not resolved by security officials. Thus, the Court finds no conflict between its own holding and the holding in Abdallah and concludes that actions logically flowing from the disclosure of a suspicious activity are granted immunity under § 44941(a).

### ii.   § 44941(b)

Before addressing Defendants' remaining arguments, the Court must first consider Plaintiffs' contention that immunity for the ACARS disclosure is forfeited under § 44941(b). (See #303, at 31-34). Under § 44941(b), immunity shall not apply to "(1) any disclosure made with actual knowledge that the disclosure was false, inaccurate, or misleading; or (2) any disclosure made with reckless disregard as to the truth or falsity of that disclosure." § 44941(b). As previously stated, the disclosure at issue in this case is the ACARS message reporting that "[t]here seems to be some inappropriate touching between an older male and a younger male[.]" (#266-6, at 3). As an initial matter, the Court finds that Plaintiffs' analysis in this section is highly convoluted. (See #303, at 31-34). The analysis is filled with factual assertions that the Court finds difficult to

understand in terms of their significance for applying § 44941(b).[7] Therefore, the Court construes Plaintiffs' argument as asserting that the ACARS disclosure was inaccurate and misleading because Defendant Warren did not report various facts to Defendant Shupe—specifically, the fact that Peter and A.D. appeared to be sleeping—and because Defendants failed to investigate the reported observations before making the ACARS report. See id.

Defendants argue that their statements to LEOs and the ACARS message were accurate based on: "(1) FA Bright-Sakurada's report that she observed Peter 'stroking' A.D.'s face in a manner that made her uncomfortable, and (2) FA Warren's report that he observed Peter's hand on A.D.'s crotch." (#266, at 8). The Court agrees. First, FA Bright's deposition testimony makes clear that she witnessed Peter touching A.D.'s face. The following are excerpts from her deposition:

> Q: Now, did you see him stroking the little boy's face?
> A: Yeah. So I did a – a trash run. . . . And as – as I was – I was going past 17, and I did see the older gentleman lean over and just – just like this, up and down, up and down, up and down.
>
> .   .   .
>
> Q: Tell – show me again what it is exactly that you feel that no parent would do to their child.
> A: He just was leaning over very closely and just up and down, just stroking, just looking at him, just stroking his face up and down, up and down.

(#266-5, at 12-13). Second, throughout Defendant Warren's deposition, he was repeatedly asked about his observations, and his answers make it undisputed that he observed Peter's hand on A.D.'s crotch. The following are excerpts from his deposition:

> Q: Okay. All right, and so he asked you to go take a look, and what did you do then?
> A: That's when I went – I was in the front of the plane looking at Mr. DelVecchia and his son as I walked by Row 17 and that's when I noted that his hand was on the child's crotch and they appeared to be sleeping.

---

[7] For instance, Plaintiffs state: "[t]he aircraft was in cruise, on autopilot, and the pilots were taking lavatory breaks. They had hours of cruise flight left in which to conduct a proper investigation, but the pilots chose to issue a report at the FA's urging without even waking Peter and A.D. up to hear their side of the story." Id. at 32 (citation omitted). The Court fails to see how statements like this bear on the materiality of the reported disclosure.

1

.   .   .

2      Q: Okay. And describe for me what you saw with respect to Peter's hand.
3      A: His right hand was on the boy's crotch – the child, sorry – like down on the
       front, to show you, he can't write it, but –
4      Q: Yeah, you can observe – I mean, you can demonstrate for the TV, if you could.
5      A: Yeah, I mean, his right hand was like here on the child.
       Q: Actually grabbing like that?
6      A: Yes, the fingers were down in there and everything.
       Q: Yeah
7      A: Um-hum.

8

.   .   .

9

10     Q: Okay. So you could actually see the hand in between the two legs?
       A: Yes.

11

.   .   .

12

13     Q: And Peter's right hand was still between the child's legs?
       A: Yes.

14   (#266-3, at 16-17).

15     "[A] statement otherwise eligible for [§ 44941(a)] immunity may not be denied immunity

16   unless the statement is materially false." Air Wisconsin Airlines Corp., 571 U.S. at 247. In this

17   context, a materially false statement is generally one that would have a different effect on the

18   mind of the reader from that which the truth would have produced. Id. at 251. The "reader" is a

19   reasonable security officer. Id. Here, the Court finds that, based on the observations of Defendant

20   Warren and FA Bright, the ACARS message was not materially false. The FAs made

21   observations of what they determined to be the inappropriate touching of a younger child by an

22   older man. (#266-3, at 22) (acknowledging that what he observed was inappropriate touching of

23   the child by Peter); (#266-5, at 13) (FA Bright stating, "[i]t just seemed inappropriate."). These

24   observations were reported to Defendant Shupe, who then sent the ACARS message stating

25   "[t]here seems to be some inappropriate touching between an older male and a younger male[.]"

26   (See #266-4, at 6, 14) (stating that the observations were reported to him); (#266-6, at 3)

27   (ACARS message). Since the Court finds both FA observations to be undisputed facts, Plaintiffs

28   cannot dispute the literal truth of this statement.

1    Although Plaintiffs attempt to argue that Defendants should have investigated the incident

2    before making the report, this argument lacks merit in determining immunity. As clarified by the

3    Supreme Court, "it would defeat [the statute's] purpose to deny immunity for substantially true

4    reports, on the theory that the person making the report had not yet gathered enough information

5    to be certain of its truth." Air Wisconsin Airlines Corp., 571 U.S. at 249. As such, Plaintiffs'

6    argument regarding a duty to investigate ultimately fails. Plaintiffs' remaining argument—that

7    Defendant Warren withheld from Defendant Shupe the fact that both Peter and A.D. appeared to

8    be asleep—fares no better. (See #303, at 33). Plaintiffs implicitly argue that Defendant Warren

9    should have qualified his statements to Defendant Shupe by adding that it appeared Plaintiffs

10   were sleeping. See id. However, "a statement that would otherwise qualify for [§ 44941(a)]

11   immunity cannot lose that immunity because of some minor imprecision, so long as the 'the gist'

12   of the statement is accurate." Air Wisconsin Airlines Corp., 571 U.S. at 255. As stated

13   previously, Defendant Warren testified to having observed Peter's hand in A.D.'s crotch,

14   whether he reported to Defendant Shupe that they were asleep does not affect the accuracy of

15   that observation. "[I]t is irrelevant whether trained lawyers or judges might with the luxury of

16   time have chosen more precise words." Id. Therefore, the Court concludes that "the gist" of the

17   situation conveyed to Defendant Shupe and subsequently through the ACARS message was

18   accurate. As such, the Court finds that the ACARS messages and subsequent disclosures to law

19   enforcement are granted immunity under § 44941(a). The Court now turns to Defendants'

20   remaining arguments.

21   **B.  Racial Discrimination Under 42 U.S.C. § 1981**

22   Defendants move for summary judgment on Plaintiffs' § 1981 claim, arguing that Plaintiffs

23   cannot establish a prima facie case of racial discrimination and there is no "specific and

24   substantial" evidence suggesting that Defendants' concern for the safety of A.D. was merely

25   pretext for intentional racial discrimination. (#266, at 13). Plaintiffs respond that Defendants

26   have misstated the applicable law, and that there is direct and circumstantial evidence of

27   discriminatory intent. (See #303, at 36-43).

28   Section 1981 prohibits race-based discrimination with respect to the "benefits, privileges,

terms, and conditions of [a] contractual relationship." 42 U.S.C. § 1981(b). "In order to prevail in a [§ 1981] case, the plaintiff must establish a prima facie case of discrimination." Vasquez v. Cnty. of Los Angeles, 349 F.3d 634, 640 (9th Cir. 2003). "The prima facie case may be based either on a presumption arising from the factors such as those set forth in [McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)], or by more direct evidence of discriminatory intent." Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994). If Plaintiffs satisfy the initial burden of establishing a prima facie case of racial discrimination, the burden shifts to Defendants to prove they had a legitimate non-discriminatory reason for the adverse action. Lindsey v. SLT Los Angeles, LLC, 447 F.3d 1138, 1144 (9th Cir. 2006). If Defendants meets this burden, Plaintiffs must prove that such a reason was merely a pretext for intentional discrimination. Id. Here, Plaintiffs argue that they have established their prima facie case both through direct evidence of discriminatory intent and by evaluating circumstantial evidence using the McDonnell Douglas factors. (See #303, at 37-39). As such, the Court evaluates each argument in turn.

    i.   Direct Evidence

Plaintiffs' Third Amended Complaint contends that Defendants acted with racial animus in denying Plaintiffs their federally protected right to enjoy the benefits and privileges of their contractual relationship with Defendant Frontier during the flight. (#153, at 30). Plaintiffs now argue that statements from FA Bond, FA Nickel, FA Bright, and Defendant Warren constitute direct evidence of discriminatory intent to treat Peter and A.D. differently from other passengers based on their races and A.D.'s ethnic characteristics. (See #303 at 37). The Court disagrees. Direct evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption. Coghlan v. Am. Seafoods Co. LLC., 413 F.3d 1090, 1095 (9th Cir. 2005). However, all the statements cited by Plaintiffs require inferring discriminatory animus on the part of Defendants to support their argument regarding discriminatory intent; therefore, they cannot be considered as direct evidence.

First, Plaintiffs argue that "[a]ccording to Bond, Nickel and Warren were 'shocked' to learn that A.D. had not been removed from the exit row because of an inability to speak English,"

rather than because of his age. (See #303 at 37). However, the Court is unsure how this comment demonstrates discriminatory intent. It is undisputed that A.D. was removed from the exit row because of his age. Id. at 6. So, Plaintiffs must be arguing that the actions taken by FA Nickel and Defendant Warren throughout the flight were partially motivated by racial animus towards A.D., with their reactions—expressing "shock" at A.D.'s removal from the exit row due to age, rather than language—serving as direct evidence of this animus. See id. at 37. The Court rejects this argument as relying on a highly speculative and substantial inference; therefore, it does not amount to direct evidence of discriminatory intent.[8] See Coghlan, 413 F.3d at 1095.

Second, Plaintiffs argue that FA Nickel "testified that she saw something 'off' with Peter and A.D." (#303, at 37). However, a review of FA Nickel's testimony reveals this statement to be a complete fabrication. (See #281-6, at 92). When asked about her feelings regarding the caressing reported by FA Bright, she described it as giving her "[a]n off feeling." See id. Since FA Nickel never made the testimony asserted by Plaintiffs, the Court outright rejects this argument.

Third, Plaintiffs argue FA Bond told the police that the "relationship they had looked very awkward." (#303, at 37). The problem with this argument is that Plaintiffs fail to cite to their statement of facts or any evidence from the record for the Court to review in support of the proffered testimony. Essentially, Plaintiffs invite the Court to scour the record and present the evidence supporting summary judgment, which the Court declines to do. See Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001) (explaining that a district court need not consider uncited materials). As such, this argument also fails.

Fourth, Plaintiffs argue that FA Bright entered the cockpit to tell Defendant Shupe how uncomfortable she and all the other FAs felt about Peter and A.D.'s relationship. (#303, at 37). Once again, Plaintiffs have misapplied testimony from the record in an attempt to infer racial animus. When in fact, the statement cited by Plaintiffs—"how comfortable I felt an all the other flights attendants felt about . . . their relationship"—was part of FA Bright's explanation to Defendant Shupe and FO Mullin regarding her observations of Peter rubbing A.D.'s face. (See

---

[8] In fact, the Court finds that FA Nickel's deposition testimony reveals a more plausible explanation for her belief that A.D. was reseated for a language issue. According to her testimony, she "believed it was a language issue, because he did not look under 15." (#281-6, at 42). FA Bond testified that a main reasoning for moving individuals from the exit row is either age or language. (#281-4, at 52).

#266-5, at 18-19). A review of FA Bright's testimony makes clear that this statement came after her observation and discussion with the other FAs, it was not the one-off statement that Plaintiffs have suggested. See id. at 18. Therefore, the Court fails to see how this statement qualifies as direct evidence of discriminatory intent.

Finally, Plaintiffs argue that Defendant Warren "refused to accept that Peter is A.D.'s father" and that FA Bright stated to law enforcement officers, "I'm not sure they're even related[.]" (#303, at 37). Plaintiffs further argue that both individuals specifically mentioned the races of Peter and A.D. after making these statements. See id. The Court fails to see how these statements amount to direct evidence of discriminatory intent. The argument and evidence presented by Plaintiffs ask the Court find that FA Bright and Defendant Warren harbored a belief that a White man and a Black son could never be related, and that they then proceeded to discriminate against them based on this racial animus throughout the flight. Once again, the Court outright rejects this argument as relying on a highly speculative and substantial inference. See Coghlan, 413 F.3d at 1095. The Court cannot conclude that merely believing two individuals may not be related constitutes direct evidence of discriminatory intent. Accordingly, the Court finds that Plaintiffs have failed to produce direct evidence of discriminatory intent and will now consider their arguments regarding the McDonnell Douglas factors.

## ii.   McDonnell Douglas Factors

To establish a prima facie case of racial discrimination under 42 U.S.C. § 1981, Plaintiffs must show that: (1) they are members of a protected class, (2) they attempted to contract for certain services, (3) they were denied the right to contract for those services, and (4) they were deprived of services while similarly-situated persons outside the protected class were not.[9] Lindsey, 447 F.3d at 1145; Childs v. Boyd Gaming Corp., No. 2:18-CV-00316-GMN-VCF, 2018 WL 4333945, at *4 (D. Nev. Sept. 11, 2018) (listing the four elements required to establish a prima facie case of racial discrimination under § 1981). The proof required to establish a prima

---

[9] In Lindsey, the Ninth Circuit applied this fourth element without deciding whether this element "is required in many or all cases arising in a commercial, non-employment context." See 447 F.3d at 1145 (noting that "the Seventh and Sixth Circuits conflict over adaptation of the fourth McDonnell Douglas requirement.").

facie case is minimal and does not even need to rise to the level of a preponderance of the evidence. Lindsey, 447 F.3d at 1145.

### 1. Members of a Protected Class

Defendants argue that while A.D. is a protected class member, Peter is not. (See #266, at 14). Specifically, Defendants argue that plaintiffs like Peter who are not protected class members gain standing under § 1981 if they are the direct target of racial discrimination and sustain personal injuries stemming from their association with members of a protected class. Id. The Court rejects this argument. In McDonald v. Santa Fe Trail Transp. Co., the Supreme Court held that § 1981 "explicitly applies to 'All persons,' . . . including white persons." 427 U.S. 273, 287 (1976). Therefore, for purposes of § 1981, Peter is considered a member of a protected class. Furthermore, it is undisputed that A.D., being Black, is a member of the protected racial class of African-Americans.

### 2. Attempted to Contract for Services

As to the second element, it is undisputed that Plaintiffs attempted to contract for services with Defendant Frontier. However, Defendants argue that since Peter and A.D. did not enter into any contracts with Defendants Warren or Shupe, their § 1981 claims can only apply to Defendant Frontier. (#266, at 14). Plaintiffs respond that individual defendants can be held liable for infringing on rights protected by § 1981 even without separate contracts, regardless of whether the employer is also liable. (#303, at 35). The Court agrees with Plaintiffs and finds that individuals can be held liable under § 1981. See Flores v. City of Westminster, 873 F.3d 739, 753 n.6 (9th Cir. 2017) ("Numerous cases, including our own, have allowed individual liability under Section 1981."). However, "[a] claim seeking personal liability under section 1981 must be predicated on the actor's personal involvement." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000). Given that that record is filled with facts detailing the actions of Defendants Shupe and Warren, the Court has no problem concluding that the individual defendants were personally involved in the incident. The Court now turns to the third element— whether Plaintiffs were denied the right to contract for services.

3.   <u>Denied the Right to Contract for Services</u>

Regarding the third element, the Court finds it undisputed that Plaintiffs were not denied the right to contract for services. Plaintiffs were able to purchase two airline tickets from North Carolina to Las Vegas, and despite an incident occurring on the flight, they were still able to travel from North Carolina to Las Vegas. In fact, Plaintiffs themselves admit to this. (<u>See</u> #303, at 38) ("Peter and A.D. may not have been wholly denied the right to contract for air travel from RDU to LAS[.]"). However, Plaintiffs argue this element is met because "they received the benefits of the contract in a manner significantly different from the other passengers on the aircraft[.]" <u>See id.</u> The problem with this argument is that Plaintiffs apply incorrect and non-binding law to their analysis. <u>See id.</u> Specifically, they ask the Court to apply the test adopted by Magistrate Judge Ryu in <u>Makhzoomi v. Sw. Airlines Co.</u>, 419 F. Supp. 3d 1136, 1149 (N.D. Cal. 2019), to the present case. <u>Id.</u> In doing so, Plaintiffs ask the Court to reformulate element three from <u>Lindsey</u>, into a new element that requires showing: "that they were denied the right to enjoy the benefits of a contractual relationship by all of the Defendants in that (a) they were deprived of services while similarly situated persons outside of the protected class were not and/or (b) they received the services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." <u>See id.</u> at 39. The Court will not do this.

In <u>Makhzoomi</u>, the Northern District of California applied a test from the Sixth Circuit, despite the Ninth Circuit's test in <u>Lindsey</u> being binding on them. <u>See</u> 419 F. Supp. 3d at 1149 ("The court concludes that the test from <u>Christian</u> is a better fit for the circumstances of this case[.]"). The problem with this approach is that the test from <u>Christian v. Wal-Mart Stores, Inc.</u>, 252 F.3d 862, 872 (6th Cir. 2001), differs from the test applied by the Ninth Circuit in <u>Lindsey</u>. Specifically, the Sixth Circuit held that "[i]n a § 1981 commercial establishment case, a plaintiff must prove: (1) plaintiff is a member of a protected class; (2) plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and (3) plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not

and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory." <u>Christian</u>, 252 F.3d at 872. While the first two elements are the same, the third element in <u>Christian</u> differs from the third element in <u>Lindsey</u>. <u>See</u> <u>generally</u> <u>Lindsey</u>, 447 F.3d at 1145 (stating the first three elements of a prima facie case under § 1981).

While the Ninth Circuit did analyze the test in <u>Christian</u>, it did so only in the context of the fourth <u>McDonnell Douglas</u> requirement. <u>See</u> <u>id.</u> In doing so, the Ninth Circuit noted, "[a]lthough we find the Sixth Circuit's reasoning compelling, we need not decide today whether its modification of the fourth element of a prima facie case under section 1981 is required in many or all cases arising in a commercial, non-employment context." <u>Id.</u> Although the Ninth Circuit's analysis focused on adapting the fourth <u>McDonnell Douglas</u> requirement, it did not alter the third element. While the Ninth Circuit ultimately applied a fourth element—whether a similarly-situated group of a different protected class was offered the contractual services that were denied to the plaintiff—it did not apply the second half of the Sixth Circuit's modification to this element, which involves determining whether the plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory. <u>See</u> <u>id.</u> at 1145-1147.

The Ninth Circuit did not elaborate extensively on why it applied only part of the modification, but simply stated, "[i]n the case before us . . . Panache has offered clear evidence that a similarly-situated group of a different protected class was offered the contractual services which were denied to Panache." <u>See</u> <u>id.</u> at 1145. However, the Court now theorizes that this reasoning may relate to element three of the prima facie case. <u>Lindsey</u> makes it clear that element three of a prima facie case under § 1981 is that "[plaintiff] was denied the right to contract for those services." <u>Id.</u> As such, even if the Court agreed with Plaintiffs' proposed modification, it would still fail because it would render element three entirely redundant. Under the proposed modification, a § 1981 analysis would not conclude even if plaintiff was not denied the right to contract for services. The district court would then turn to element four and analyze whether the services were provided in a markedly hostile manner. Conversely, if a plaintiff was

1    denied the right to contract for services, the court would need to determine whether a similarly-

2    situated group of a different protected class was offered the contractual services which were

3    denied to the plaintiff. [10] Under both scenarios, the analysis would automatically move to

4    element four, but this outcome conflicts with the test set forth in Lindsey. As such, the Court

5    cannot support it.

6        Here, Plaintiffs sought a trip from North Carolina to Nevada and were neither denied the

7    right to contract for these services nor denied the services themselves. Therefore, Plaintiffs have

8    failed to meet element three of the prima facie case, which, under Lindsey, requires showing that

9    they were denied the right to contract for services. Accordingly, the Court grants summary

10   judgment in favor of Defendants on Plaintiffs' § 1981 claim.

11       **C. Defamation**

12       Defendants move for summary judgment on Plaintiffs' defamation claim on three grounds:

13   (1) there is no evidence that the statements contained in Frontier's Passenger Name Record

14   ("PNR") were published to a third person; (2) the statements reflected in the ACARS messages

15   and PNR are entitled to qualified privilege under Neveda law; and (3) there is no evidence to

16   suggest that a third-party aboard the flight heard the alleged statements. (#266, at 20-21).

17   Defendants additionally argue that immunity under § 44941(a) also applies. Id. at 8. Plaintiffs

18   argue that summary judgment is not appropriate because: (1) a reasonable jury could conclude

19   that Higgins, a passenger on the plane, heard Defendant Warren accuse Peter of sexually

20   molesting A.D.; (2) employees Warren, Shupe, Bright-Sakura, Paulo, and Bond all published

21   defamatory statements; (3) the ACARS statements do not qualify for federal immunity; and (4)

22   Defendants have failed to meet their burden of proving state law immunity applies to Plaintiffs'

23   PNR. (#303, at 50-51). The Court will address each argument in turn, beginning with

24   Defendants' assertion that they are entitled to qualified privilege under Nevada law.

25       In Nevada, to succeed in a defamation action, Plaintiffs must prove four elements: (1) a false

26   and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged

27   publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or

---

[10] Element four would still include the other half of the Sixth Circuit's modification: "plaintiff was deprived of services while similarly-situated persons outside the protected class were not." See id.

presumed damages. <u>Pope v. Motel 6</u>, 114 P.3d 277, 282 (Nev. 2005). Certain classes of defamatory statements are, however, considered defamatory per se and are actionable without proof of damages.[11] <u>Id.</u> However, a defendant may raise the defense of privilege to allegations of defamation. <u>See</u> <u>Simpson v. Mars Inc.</u>, 929 P.2d 966, 968 (Nev. 1997). In Nevada, a qualified or conditional privilege exists where a defamatory statement is made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a right or a duty, if it is made to a person with a corresponding interest or duty. <u>Circus Circus Hotels, Inc. v. Witherspoon</u>, 657 P.2d 101, 105 (Nev. 1983). The defendant bears the burden of alleging and proving that a publication is privileged. <u>Pope</u>, 114 P.3d at 284. Whether a communication is privileged is a question of law for the court. <u>Circus Circus Hotels, Inc.</u>, 657 P.2d at 105. If the defendant establishes that the privilege exists, the burden then shifts to the plaintiff to prove that the defendant abused the privilege by publishing the communication with malice. <u>Id.</u>

Defendants argue that the ACARS messages and Plaintiffs' PNR are entitled to qualified privilege because the communications "were relayed by the pilots to ground personnel whose job was to respond and/or relay pertinent information to law enforcement officers, and by other Frontier employees in furtherance of their employment responsibilities to provide customer service and field and investigate passenger complaints." (#266, at 21). As an initial matter, the Court will not address Defendants' and Plaintiffs' arguments regarding the ACARS statements, as it has already determined, based on the full analysis above, that Defendants are granted immunity for these messages under § 44941(a). Furthermore, the Court finds that Plaintiffs' PNR is entitled to qualified privilege under Nevada law.

Here, the exhibit in question (#282), Defendant Frontier's PNR for Plaintiffs, which was filed under seal and contains various details regarding Plaintiffs and the overall incident that occurred, has already been addressed by Magistrate Judge Albregts in a prior Order. (<u>See</u> #313, at 3). The

---

[11] Plaintiffs argue that Defendants have mischaracterized their claim of defamation per se as a claim of classic defamation. (<u>See</u> #303, at 49). The Court finds no need to address this argument at this time, as a claim of defamation per se only eliminates the requirement to prove damages. <u>See</u> <u>K-Mart Corp. v. Washington</u>, 866 P.2d 274, 282 (Nev. 1993) (holding that certain classes of defamatory statements are actionable without proof of damages). The basis for Defendants' summary judgment motion is that there is no dispute of fact regarding publication to a third party, which remains an element under classic defamation and defamation per se.

1  focus of that Order was on addressing Defendants' renewed motion to seal various exhibits,

2  including Plaintiffs' PNR. In their motion, Defendants argued that Plaintiffs' PNR "should be

3  kept under seal because it contains trade secrets, proprietary information, and commercial or

4  financial information." (#311, at 4). Defendants further argued that it "contains sensitive

5  information reflecting the manner and outcome of Frontier's internal investigation, including

6  summaries of exchanges between Frontier personnel and Plaintiff Peter DelVecchia, as well as

7  statements made by Frontier personnel collected in the course of Frontier's internal

8  investigation." Id. at 5. In ruling on Defendants' motion, Magistrate Judge Albregts held that

9  Defendants had provided sufficient and compelling reasons to keep the exhibit under seal,

10  specifically addressing the reasoning provided by Defendants. (#313, at 3).

11      Although Magistrate Judge Albregts's analysis and holding were based on a motion to seal,

12  the underlying reasoning for sealing the exhibit and granting privilege are the same—the PNR

13  contains sensitive information relating to Plaintiffs that was communicated and disclosed over

14  the course of Defendant Frontier's internal investigation. Furthermore, during Plaintiffs' 30(b)(6)

15  deposition of Defendant Frontier, Plaintiffs' counsel introduced the PNR and authenticated it

16  under Federal Rule of Evidence 803(6), the business records exception to hearsay. (See #285, at

17  237-238) (filed under seal). As such, the Court finds that Defendants have met their burden of

18  proving the PNR is privileged and now addresses Plaintiffs' argument.

19      In arguing against privilege, Plaintiffs assert that Defendants have failed to meet their burden

20  and that the defamatory statements were published with knowledge of their falsity, or at least

21  with reckless disregard for their truth, thus satisfying the standard of actual malice. (#303, at 51).

22  The Court rejects this argument, as nothing cited by Plaintiffs or contained within the PNR

23  supports their argument. As stated previously, Plaintiffs' PNR contains a collection of statements

24  regarding Defendant Frontier's investigation into the alleged incident, including observations

25  made by the flight attendants and statements from law enforcement and Peter himself. (See

26  #282) (filed under seal). As the Court has already found that the flight attendants' observations

27  were accurate, the remaining statements reveal nothing beyond Defendant Frontier's efforts to

28  investigate the incident and ascertain what occurred. "The question [of privilege] goes to the jury

only if there is sufficient evidence for the jury to reasonably infer that the publication was made with malice in fact." Circus Circus Hotels, Inc., 657 P.2d at 105. Plaintiffs' argument does not meet this burden, and the Court finds that Plaintiffs' PNR is entitled to qualified privilege under Nevada law.

Defendants next argue that there is no evidence showing that oral statements made aboard the flight were published to a third person. (#266, at 20-21). At summary judgment, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." Celotex Corp., 477 U.S. at 325. This is precisely what Defendants have done here. Therefore, the Court now turns to Plaintiffs' arguments regarding publication.

In reviewing Plaintiffs' response, the Court finds it important to note that their first argument contains ambiguities regarding which facts support liability for which defendants. For instance, Plaintiffs argue that Defendants ignore the fact that a flight attendant told Higgins that "someone's hand was in someone's crotch," a statement Higgins knew referred to Peter and A.D. (#303, at 50).[12] However, the Court is unclear about who Plaintiffs are alleging is liable for the publication of this statement. Plaintiffs' argument does not specify whether they are attempting to hold Defendant Warren liable for publishing the statement to a third party—if that indeed occurred, with Higgins's declaration as evidence—or if they are seeking to hold Defendant Frontier responsible for the actions of the unnamed female flight attendant, or pursuing something else entirely.[13] See id. As the nonmoving party, Plaintiffs "must produce specific facts . . . to show that there is a genuine issue for trial." See Momox-Caselis v. Donohue, 987 F.3d 835, 841 (9th Cir. 2021). But if the Court is unable to determine which defendant these facts are intended to implicate, it cannot assess whether there is a genuine issue for trial. As such, this

---

[12] The language Plaintiffs cite comes from Higgins's declaration: "There were two female flight attendants at the rear of the plane, and I asked them what had happened and why they had selected me to sit in the same row with the black youth. One of them responded to me, stating that another flight attendant had seen 'that someone's hand was in someone's crotch.'" (#281-19, at 3).

[13] Even if Plaintiffs had clarified their argument, it would still fail as a matter of law because the statement—"someone's hand was in someone's crotch"—is not a false statement. See Pope, 114 P.3d at 282 (holding that the first element of defamation is a false statement of fact by the defendant). As previously discussed, the Court finds it undisputed that Defendant Warren observed Peter's hand in his son's crotch.

argument fails.

Regarding this passenger, Plaintiffs subsequently argue that although Higgins claimed that he didn't hear "Warren angrily accuse [Peter] of sexually molesting A.D.," his testimony on that point is unbelievable and that "[a] reasonable jury could conclude that Warren published to Higgins the same statements that Peter testified Warren said to him." (#303, at 50). Plaintiffs allude to the idea that despite Higgins having filed a declaration and been deposed—neither of which the Court finds mentioned the alleged statements between Peter and Defendant Warren— he is lying as to whether he heard Defendant Warren say something to Peter. See id. However, to survive summary judgment, Plaintiffs, as the nonmoving party, must produce specific facts—by affidavit or other evidentiary materials as provided by Rule 56(e)—demonstrating there is a genuine issue for trial. Anderson, 477 U.S. at 256. Plaintiffs fail to do this and merely present the self-serving conclusion that Higgins is lying, without providing any evidence to substantiate this claim. As such, this argument also fails, and their remaining arguments fare no better.

First, Plaintiffs argue that "Bright-Sakurada clearly knew that she was telling a falsehood when she announced in the jet bridge that 'all' of the FAs had witnessed Peter molesting A.D." (#303, at 51). However, the facts cited by Plaintiffs do not support this argument. What the facts do state, is that Paulo, who worked as a gate agent, "recalled specifically that Bright-Sakurada had told her and the others present on the jet bridge that all of the FAs aboard the flight had witnessed inappropriate touching of the minor child." (#303, at 24-25). As stated above, a defamation claim requires the plaintiff to show that a false and defamatory statement was published to a third party, making the content of the statement itself a critical part of the analysis. See Pope, 114 P.3d at 282. Yet, Plaintiffs' argument attempts to completely misstate the actual spoken statement. Plaintiffs have presented no evidence that FA Bright actually spoke the phrase "all of the FAs had witnessed Peter molesting A.D.," and as such, this argument fails.

Second, Plaintiffs argue that "Paulo, an authorized agent of Frontier, admitted that she had absolutely no way of knowing whether or not that statement was true when she repeated it in Peter and A.D.'s PNR, which can still be read to this day by any of the thousands of people who can log into Frontier's Navitaire program." (#303, at 51) (citation omitted). However, as the Court

has previously determined that Plaintiffs' PNR is entitled to qualified privilege under Nevada law, this argument also fails.

Third, Plaintiffs argue that "Bond knew that she was lying when she told Bright-Sakurada that certain things had happened in the exit row that suggest human trafficking," because FA Bond admitted those things never happened." Id. Although Plaintiffs cite paragraph 28 in their statement of facts to support this assertion, that paragraph does not mention any statements between FA Bond and FA Bright regarding human trafficking. See id. at 11. Paragraph 28 only mentions that FA Bond relayed the following observations to FA Bright: (1) "the dad stepped in very quickly and said, 'He's 11,' or, 'He's 12,'" (2) "it was very strange that the son couldn't speak for himself," and (3) "it was very weird that the dad made the son get in first, so, like, he wasn't allowed to be around a different passenger." See id.; (#266-5, at 10). The Court finds once again that Plaintiffs have failed to properly apply the elements of defamation to the facts presented. While Plaintiffs attempt to argue that these statements suggest an inference of human trafficking, inferences alone do not establish that Defendants published a false and defamatory statement concerning Plaintiffs. See Pope, 114 P.3d at 282 (emphasis added). As such, this argument also fails.

Plaintiffs' fourth and final argument regarding publication asserts that "Warren knew that his statement about Peter fondling A.D. was untrue when he reported it to the other FAs and the pilots, and Shupe and Mulin had no way of knowing whether it was true or not when they sent the non-safety-related message to Frontier's management through ACARS." [14] (#303, at 51). Although Plaintiffs cite paragraphs 22 and 27 in their statement of facts, these paragraphs do not provide any support for this argument. Paragraph 22 states: "A.D. who was chilly, tucked his jacket tightly around his legs. Peter and A.D. went to sleep almost as soon as the flight departed; they slept until FA Warren woke them up to separate them." Id. at 9 (citations omitted). And

[14] Plaintiffs also raise the argument that "[n]o privilege attached to Warren falsely telling A.D. that his father had molested him[.]" (#303, at 51). However, the party opposing summary judgment must direct the Court's attention to specific, triable facts, and the reviewing court is not required to comb through the record to find some reason to deny a motion for summary judgment. Gordon v. Virtumundo, Inc., 575 F.3d 1040, 1058 (9th Cir. 2009). As such, this argument fails on its face because Plaintiffs do not cite any evidence in support of this assertion.

paragraph 27 states: "Aside from Bond's interaction at the exit row that was part of her regulatory duties, the FAs and pilots chose not to speak to Plaintiffs before acting on their racially-based assumptions." Id. at 11. As the nonmoving party, Plaintiffs "must produce specific facts, by affidavit or other evidentiary materials, to show that there is a genuine issue for trial." Momox-Caselis, 987 F.3d at 841. But the Court fails to see how these paragraphs support the assertion that Defendant Warren made statements about "Peter fondling A.D."

Furthermore, while Plaintiffs may argue that they are referring to Defendant Warren's statements about "inappropriate touching," the distinction between these and the specific allegation of "fondling" is crucial for the purposes of defamation. If Plaintiffs believed that Defendant Warren published a defamatory statement, they should have included the exact language in their analysis to allow the Court to properly evaluate the merits of their argument. Instead, Plaintiffs summarize the statements made by Defendant Warren and conclude that he made statements "about Peter fondling A.D." (See #303, at 51). However, the term "fondling" never appears in the deposition testimony of Defendant Shupe, Defendant Warren, FO Mullin, FA Bright, FA Nickel, or FA Bond. Essentially, Plaintiffs are asking the Court to sift through their argument and identify the correct one; the Court will not do this. See United States v. Sineneng-Smith, 590 U.S. 371, 375-76 (2020) (holding that, as a general rule, our system is designed around the premise that parties represented by competent counsel are responsible for advancing the facts and arguments necessary to obtain relief, as they are presumed to know what is best for them). Accordingly, the Court grants summary judgment in Defendants' favor on Plaintiffs' defamation claim.

**D. False Imprisonment**

Defendants argue that Plaintiffs' claim of false imprisonment must fail because: (1) A.D. was not confined to any fixed boundaries, (2) Defendant Shupe was authorized under Federal Aviation Regulations to take necessary actions, including separating Peter and A.D., to ensure passenger safety; and (3) immunity under § 44941 extends to this cause of action. (#266, at 22). Plaintiffs argue that "ample evidence" satisfies the elements of false imprisonment because Defendant Warren took A.D. to the back of the aircraft against his will, instructed Higgins to sit

in the row with A.D., thereby preventing Peter and A.D. from reaching each other, and refused to let A.D. return to his seat next to Peter. (#303, at 48). The Court agrees with Defendants and, as explained above, finds that immunity under § 44941(a) extends to this cause of action. Furthermore, because the Court finds immunity applies to this cause of action, it foregoes analyzing the elements of false imprisonment under Nevada law.[15] Accordingly, the Court grants summary judgment in Defendants' favor on Plaintiffs' false imprisonment claim.

### E.  Intentional Infliction of Emotional Distress

Defendants argue that Plaintiffs cannot establish that they committed extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress.[16] (#266, at 25). Plaintiffs argue that the evidence shows that Defendants intentionally abused their positions of authority to cause emotional distress, or recklessly disregarded the likelihood that it would cause such distress. (#303, at 47). Under Nevada law, the elements of intentional infliction of emotional distress ("IIED") are: "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." Star v. Rabello, 625 P.2d 90, 92 (Nev. 1981).

Extreme and outrageous conduct is that which is outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community. Maduike v. Agency Rent-A-Car, 953 P.2d 24, 26 (Nev. 1998). Extreme or outrageous conduct may arise from an abuse of a position or relationship which gives the actor actual or apparent authority over another. Norman v. Gen. Motors Corp., 628 F. Supp. 702, 704 (D. Nev. 1986). The Court determines whether the defendant's conduct may be regarded as extreme and outrageous so as to permit recovery, but, where reasonable people may differ, the jury determines whether the conduct was extreme and

---

[15] In Nevada, the elements of false imprisonment are: (1) the defendant intentionally confines the plaintiff within boundaries fixed by the defendant, (2) the defendant's act directly or indirectly results in such confinement of the plaintiff, and (3) the plaintiff is conscious of the confinement or is harmed by it. Hernandez v. City of Reno, 634 P.2d 668, 671 (Nev. 1981) (citing Restatement (Second) of Torts § 35 (1965)).

[16] Defendants do not argue that § 44941 immunity applies to this claim. (See #266, at 24-25). Therefore, the Court does not address its potential applicability to the facts presented.

outrageous enough to result in liability. <u>Chehade Refai v. Lazaro</u>, 614 F. Supp. 2d 1103, 1121 (D. Nev. 2009).

Plaintiffs assert the following facts as evidence of extreme and outrageous conduct: (1) falsely accusing Peter of molesting A.D.; (2) attacking Peter with multiple blows to the head; (3) sequestering A.D. in a rear seat; (4) telling A.D. that his father molested him; (5) refusing to accept that A.D and Peter are related; (6) assaulting A.D. by reaching for his genitals; (7) preventing Peter from comforting A.D.; and (8) delivering them to the police. (#303, at 47). As an initial matter, the Court finds that facts three, seven, and eight do not constitute extreme and outrageous conduct. It is undisputed that this case arises from observations of allegedly inappropriate touching aboard an airplane. Therefore, in the context of this case, separating Peter and A.D., prohibiting them from speaking to each other, and contacting law enforcement are not actions that fall outside the bounds of decency or are regarded as utterly intolerable in a civilized community. <u>See</u> <u>Maduike</u>, 953 P.2d at 26.

Fact five fails for the same reason. Again, the standard is conduct that falls outside all possible bounds of decency and is regarded as utterly intolerable in a civilized community. Liability for emotional distress will not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. <u>Candelore v. Clark Cnty. Sanitation Dist.</u>, 975 F.2d 588, 591 (9th Cir. 1992) (considering claim for IIED under Nevada law). While refusing to acknowledge that Peter and A.D. are related may have insulted Plaintiffs, the conduct does not rise to the level of extreme and outrageous. <u>See</u> <u>id.</u> Facts two and six, which pertain to Plaintiffs' claims of battery and assault, also fail because, as detailed below, the Court has determined that summary judgment in favor of the Defendants is appropriate for these claims.

Turning to fact one, which concerns Peter being accused of molesting A.D., Plaintiffs provide seven citations from their statement of facts to support this argument. (#303, at 47) (citing paragraphs 76, 78-82, and 92). The first of these paragraphs, paragraph 76, contains the same factual assertions Plaintiffs made in support of their defamation claim—Higgins testified that after the flight landed, a female FA told him that "someone's hand was in someone's crotch." However, the problem with this argument is that the cited testimony was not directed at

1   the Plaintiffs; it was received after the fact. Plaintiffs cannot create a claim of IIED simply by

2   combing through deposition testimony. Facts from paragraphs 78, 79, 80, and 92 fare no better.

3   See id. at 21-25. The cited facts consist of testimony from various individuals aboard the plane

4   about what they believed was happening. See generally id. But none of these facts support the

5   claim that Defendants accused Peter of molesting A.D. While the inferences drawn by these

6   individuals may have been embarrassing and even insulting to Plaintiffs, they do not support a

7   finding that Defendants engaged in extreme and outrageous conduct toward them.

8       The facts from the remaining paragraphs, paragraphs 81 and 82, also fail to amount to

9   extreme and outrageous conduct. Plaintiffs assert that Defendant Warren told A.D. "that man

10  was putting his hand over your crotch," and argue that he should not have discussed the incident

11  with A.D., as doing so was against Frontier's protocol for handling sexual misconduct. See id. at

12  22. Again, the problem with Plaintiffs argument is it fails to incorporate the governing law of

13  IIED. In the context of this case, attempting to explain to a child what had happened falls far

14  short of conduct that is outside all possible bounds of decency and is regarded as utterly

15  intolerable in a civilized community. See Maduike, 953 P.2d 24, 26 (Nev. 1998).

16      Finally, Fact four, which concerns Defendant Warren telling A.D. that this father molested

17  him, fails for the same reasons. First, the facts cited in support of this assertion, paragraphs 81

18  and 82, simply do not support the conclusion that Defendant Warren told A.D. his father

19  "molested" him. (See #303, at 22). Second, while it is undisputed that Defendant Warren tried to

20  explain to A.D. what happened, nothing in Defendant Warren's testimony or in paragraphs 81 or

21  82 suggests that this explanation was made with the intention of, or reckless disregard for,

22  causing emotional distress. (See #266-3, at 29); (#303, at 22); Star, 625 P.2d at 92 (holding that

23  the first element of IIED is extreme and outrageous conduct with either the intention of, or

24  reckless disregard for, causing emotional distress).

25      Lastly, since the Court finds that Defendants did not engage in extreme and outrageous

26  conduct, Plaintiffs' arguments regarding injury do not need to be addressed. Accordingly, the

27  Court grants summary judgment in favor of Defendants on Plaintiffs' IIED claim.

28

1

### F.  Assault and Battery

2     Defendants argue that Plaintiffs' claims of assault and battery fail because: (1) there is no

3  evidence indicating that Defendant Warren intended to cause any harmful or offensive contact

4  with A.D.; (2) no passengers sitting in the vicinity of Row 17 witnessed Defendant Warren hit

5  Peter; and (3) Defendant Warren is entitled to immunity under § 44941.[17] (#266, at 26). Plaintiffs

6  argue that summary judgment is inappropriate because: (1) Peter's testimony establishes that

7  Defendant Warren punched him repeatedly in the back of the head; (2) Sergeant Obasi confirmed

8  that Peter told him right after the flight landed that Defendant Warren had punched him; (3) A.D.

9  testified that Defendant Warren intentionally reached toward his crotch and hovered his hand

10  above his genitals while discussing his alleged observation; and (4) Defendant Warren's hand

11  movement was intentional, and A.D. was put in apprehension that Defendant Warren was going

12  to grope him. (#303, at 49). The Court will first address Plaintiffs' battery claim.

13     To establish a battery claim, a plaintiff must show that the defendant (1) intended to cause

14  harmful or offensive contact and (2) such contact did occur. Burns v. Mayer, 175 F. Supp. 2d

15  1259, 1269 (D. Nev. 2001) (citing Restatement (Second) of Torts §§ 13, 18 (1965)). Defendants

16  argue that summary judgment is appropriate on Plaintiffs' battery claim because none of the

17  passengers sitting in the vicinity of Peter's row witnessed Defendant Warren's alleged battery.

18  (#266, at 26). Plaintiffs argue that testimony from several individuals establishes that Defendant

19  Warren punched Peter in the back of the head. (See #303, at 49). The Court agrees with

20  Defendants and finds that Plaintiffs have failed to raise a genuine dispute of material fact.

21     Plaintiffs argue that "Peter's testimony establishes that Warren punched him repeatedly in the

22  back of the head, an intentional act," and cite paragraph 68 in their statement of facts to support

23  this argument. Id. The problem with this argument is that paragraph 68 doesn't raise a factual

24  dispute about whether Defendant Warren allegedly hit Peter; it only describes Peter's head

25  pain.[18] See id. at 19. Furthermore, in reviewing Peter's testimony relating to the alleged attack,

---

26  [17] Although Defendants argue that § 44941 immunity should extend to this claim, the Court finds that the
27  facts presented do not necessitate its application. (See #266, at 26). Therefore, the Court will forego
determining the applicability of § 44941 immunity and will address the claim directly on its merits.

28  [18] Paragraph 68 states: "Peter testified that he had pain and memory issues a week later, on returning to
Las Vegas for their flight home: 'I remember struggling. My head was hurting really bad, and I started to

1   Peter admits he was asleep during the alleged incident. (#266-1, at 12) ("And as I was sleeping

2   there – and I want to reiterate, my head was against the seat ahead of me – there were several

3   hard hits to the back and my head and neck"). Because he was asleep, Peter never actually saw

4   what or who hit his head. As stated in his deposition, he only thinks Defendant Warren might

5   have been the individual based on his proximity to Peter after he awoke. See id. at 14-15.

6   Specifically, Peter testified that "[Warren] was the person hitting me in head, because as I got up

7   . . . he was the only black flight attendant, and it was a black man standing over me and leaning

8   into the row. So I have no doubt who hit me." See id. However, mere allegations and speculation

9   do not create a factual dispute for purposes of summary judgment. Loomis v. Cornish, 836 F.3d

10   991, 997 (9th Cir. 2016).

11       Plaintiffs' argument asks the Court to infer that because Peter felt something on the back of

12   his head and then immediately saw Defendant Warren standing over him, then Defendant

13   Warren must have been the one who punched him. The Court will not do this. "It is the record

14   made on summary judgment that controls, not that record plus speculative inferences a trier of

15   fact might add; and the only inferences permitted from the summary judgment record itself are

16   those that are reasonable given the substantive law which is the foundation for the claim or

17   defense." Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). As argued by

18   Defendants, none of the passengers deposed who sat in the vicinity of Peter witnessed Defendant

19   Warren punch him. (#266, at 26). Had Plaintiffs presented any facts to dispute this claim, the

20   Court would come to a different conclusion. However, the record only contains Plaintiffs'

21   uncorroborated and self-serving testimony, which does not amount to a genuine issue for trial.

22   See Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002) (explaining that the

23   Ninth Circuit has refused to find a "genuine issue" where the only evidence presented is

24   uncorroborated and self-serving testimony). Essentially, Plaintiffs' argument asks the Court to

25   infer that Defendant Warren punched Peter so forcefully that he "suffered a concussion," despite

26   no witnesses on the airplane observing this event. The Court cannot support such an

27   have . . . some issues remembering things, and the pain was—I assumed it was because of the pain in my
    head, but I was having some issues, logical issue. You know, I forgot to fill the car up with gas, and we
28   almost ran out of gas. Stupid things like that I don't normally do.'" Id. at 19.

- 32 -

unreasonable inference.

Finally, Plaintiffs attempt to argue that testimony from Sergeant Obasi supports the conclusion that Defendant Warren punched Peter. (#303, at 49). It does not. Sergeant Obasi was not aboard the flight and therefore lacks personal knowledge of what happened on the flight. Telling someone you were punched and presenting facts that you were actually punched are two different things. Consequently, the Court finds that Plaintiffs have failed to raise a factual dispute over whether contact occurred between Defendant Warren and Peter. See Momox-Caselis, 987 F.3d at 841.

Next, to establish an assault claim under Nevada law, a "plaintiff must demonstrate that the defendant (1) intended to cause harmful or offensive physical contact or an imminent apprehension of such contact, and (2) the victim was put in apprehension of such conduct." Sandoval v. Las Vegas Metro. Police Dep't, 854 F. Supp. 2d 860, 882 (D. Nev. 2012) (citing Restatement (Second) of Torts § 21 (1965)), aff'd in part, rev'd in part, 756 F.3d 1154 (9th Cir. 2014). Defendants next argue that there is no evidence indicating that Defendant Warren intended to cause any harmful or offensive physical contact with A.D. (#266, at 26). Plaintiffs argue that Defendant Warren intentionally reached towards A.D.'s crotch, causing A.D. to fear that Warren was going to grope him. (#303, at 49). The Court agrees with Defendants. Plaintiffs' analysis of this claim is roughly one paragraph long and mainly includes testimony about how A.D. felt. See id. While the testimony raises a dispute of fact regarding the second element of assault, it fails to raise a dispute regarding the first element—whether Defendant Warren intended to cause harmful or offensive physical contact or to create an imminent apprehension of such contact. (See #303, at 49). Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiffs' assault and battery claims.

### G. Punitive Damages

Defendants argue that because they did not commit oppression, fraud, or malice, Plaintiffs' punitive damages claim cannot survive. (See #266, at 27). As the Court finds that summary judgment precludes all of Plaintiffs' claims, it need not address the merits of Defendants' argument.

IV.   <u>Conclusion</u>

Accordingly, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (#266) is **GRANTED**. Summary Judgment is **GRANTED** in favor of Defendants Frontier Airlines, Scott Warren, and Rex Shupe against all of Plaintiffs' claims, and the Clerk of the Court is kindly instructed to enter **JUDGMENT** in favor of Defendants.

Dated this 27th day of August 2024.

Kent J. Dawson
United States District Judge